OFFICE COPY

'08 CIV 3730

JUDGE RAKOFF

COHEN & GRESSER LLP
Mark S. Cohen (mcohen@cohengresser.com)
Nathaniel P. T. Read (nread@cohengresser.com)
100 Park Avenue, 23rd Floor
New York, NY 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

GOOD HILL PARTNERS L.P. ON BEHALF OF        :
GOOD HILL MASTER FUND, L.P.,                :
                                            :
                              Plaintiff,    :    Case No.
                                            :
              - against -                   :    COMPLAINT
                                            :
                                            :    JURY TRIAL DEMANDED
WM ASSET HOLDINGS CORP. CI 2007-WM2,        :
WM ASSET HOLDINGS CO 2007-WM2 LLC,          :
WM ASSET HOLDINGS CORP., WAMU ASSET         :
ACCEPTANCE CORP., WAMU CAPITAL CORP.,       :
WASHINGTON MUTUAL BANK, and                 :
WASHINGTON MUTUAL, INC.                     :
                                            :
                              Defendants.   :

---------------------------------------------------------------- x

RECEIVED APR 18 2008 U.S.D.C. S.D.N.Y. CASHIERS

Good Hill Partners L.P., on behalf of Good Hill Master Fund, L.P., ("Good Hill") by its

attorneys Cohen & Gresser LLP, for its complaint against WM Asset Holdings Corp. CI 2007-

WM2, WM Asset Holdings CI 2007-WM2 LLC, WM Asset Holdings Corp., WaMu Asset

Acceptance Corp., WaMu Capital Corp. (collectively, the "Issuing Defendants"), Washington

Mutual Bank (the "Bank"), and Washington Mutual, Inc. ("WaMu") alleges upon personal belief

with respect to its own acts and upon information and belief with respect to all others, as follows:

## Nature Of The Claims

1.      Good Hill brings this action to recover the damages caused by the fraudulent misrepresentations and omissions made by WaMu and the Issuing Defendants under the control of the Bank and WaMu in connection with an April 2007 offering of asset-backed bonds. These misrepresentations and omissions were made in a Term Sheet, Private Placement Memorandum, and an associated Prospectus, and e-mails from WaMu representatives. In reliance on Defendants' misrepresentations and omissions, Good Hill purchased over $18 million in bonds and suffered over $7 million in losses.

2.      WaMu, through the Bank and other divisions, issues subprime mortgages. WaMu pools its subprime mortgage loans into collateral for bonds, and creates special-purpose trusts to own the pools of mortgage loans.

3.      WaMu issues and sells mortgage-backed bonds through the Issuing Defendants to the public through private placement memoranda, prospectuses, and other disclosure documents. In addition to bonds directly backed by subprime mortgage loans, WaMu also issues "net interest margin" ("NIM") bonds.

4.      NIM bonds are backed by the excess interest, or the "net interest margin" – the difference between the interest WaMu receives on mortgage loans in the underlying pool and the interest it pays on the bonds backed by those loans. NIM bondholders are generally entitled to receive this excess interest. When the trust incurs realized losses, however, that income can be used to pay amounts due to other bondholders and not the NIM bondholders. Realized losses occur after a liquidation event such as a foreclosure sale and the mortgage loan has been removed from the collateral pool held by the trust.

5.    Good Hill purchased $18.45 million of WaMu NIM bonds denominated as Class N-2 Notes in the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). Good Hill purchased the NIM bonds at 98% of their face value.

6.    The 2007-WM2 Offering was made in connection with an associated offering of asset-backed bonds. These bonds were collateralized by a $1.5 billion pool of subprime residential mortgage loans held by the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust included both senior-lien and junior-lien mortgage loans.

7.    The prospectus for this offering was included with and incorporated into the private placement memorandum WaMu issued for the 2007-WM2 Offering.

8.    The Private Placement Memorandum and Prospectus for the 2007-WM2 Offering provided that the Trust would not incur a Realized Loss on any particular mortgage loan in the pool until a liquidation event (such as a foreclosure sale) occurred. Foreclosure sales and other liquidation events typically are not completed until at least a year after the borrower stops making payments on the mortgage loan.

9.    The Term Sheet included models of Realized Losses on the mortgage loans showing that the Trust would likely suffer very few – if any – Realized Losses in the first fourteen months after the Offering. E-mails from WaMu representatives in March and April 2007 explicitly stated that the Trust would not suffer Realized Losses during this time period.

10.    Good Hill thus understood (as would any other reasonable investor) that the Trust would not incur any Realized Losses during the first year after the Offering.

11.    E-mails from WaMu representatives also made clear that each junior-lien mortgage loan included in the Trust was related to a senior-lien mortgage loan also held by the Trust. In other words, the Bank and other WaMu subprime issuers had made both the senior- and junior-

lien mortgage loans to the same borrower, and both loans were secured by the same property. Not surprisingly, the disclosure documents and e-mails from WaMu representatives made clear that the Bank and other WaMu defendants would treat these related loans as one loan for purposes of Realized Losses.

12.     Good Hill agreed to purchase the NIM bonds because it understood, based on the risk disclosures made in the Term Sheet, Private Placement Memorandum, and Prospectus that the NIM bonds would generate a steady cash flow for a year to fourteen months.

13.     Fewer than three months after Good Hill purchased the NIM bonds, however, it discovered that WaMu and the Bank had changed their policies and practices, so that the Trust would recognize Realized Losses on junior-lien mortgage loans differently than on senior-lien mortgage loans – in other words, differently than WaMu, the Bank, and the Issuing Defendants had represented. WaMu and the Bank informed Good Hill that Realized Losses on junior-lien mortgage loans would be recognized six months after the borrower failed to make a payment on the underlying mortgage loan, without regard to the timing of Realized Loss on the related senior-lien mortgage or the liquidation of the mortgaged property or other scenarios disclosed by the Term Sheet, Private Placement Memorandum, Prospectus, and associated documents.

14.     This change meant that the excess cash flow that formed the collateral for Good Hill's NIM bonds would no longer be used to pay those bonds, but would instead go to other bondholders. This material impact to the value of the collateral securing the NIM bonds greatly reduced the value of the NIM bonds themselves.

15.     Good Hill would not have bought the NIM bonds – and certainly would not have paid 98% of face value for them – if the Defendants had disclosed their intent to treat junior-lien mortgage loans in the pool differently from the related senior-lien loans. Defendants failed to

disclose this risk and affirmatively misrepresented the actual risks in violation of their duties under the federal securities laws and the common law. As a result, Good Hill has suffered damages of at least $7 million.

## The Parties

16.    Plaintiff Good Hill Partners L.P. is a Delaware limited partnership with a principal place of business in Westport, Connecticut. It is the investment manager for Good Hill Master Fund L.P. (the "Fund").

17.    The Fund purchased the bonds at issue and incurred the losses described below. The Fund then assigned all of its rights, including the right to bring this suit, to Good Hill Partners L.P.

18.    Defendant WM Asset Holdings Corp. CI 2007-WM2 ("WM Asset Caymans") is a Cayman Islands company, with an address of c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984, George Town, Grand Cayman, KY1-1104, Cayman Islands. WM Caymans was the issuer of the NIM bonds in the 2007-WM2 Offering.

19.    Defendant WM Asset Holdings CI 2007-WM2 LLC ("WM Asset LLC") is a Delaware limited liability company with an office at 850 Library Avenue, Suite 204, Newark, Delaware 19711. WM Asset LLC was the co-issuer of the NIM bonds in the 2007-WM2 Offering.

20.    Defendant WM Asset Holdings Corp. ("WM Asset Holdings") is a Delaware corporation that may be served care of Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. WM Asset Holdings was the seller and sponsor of the NIM bonds in the 2007-WM2 Offering.

21.    Defendant WaMu Capital Corp. ("WaMu Capital") is a Delaware corporation with a principal place of business at 1301 Second Avenue, Seattle, Washington 98101. WaMu Capital is a registered broker-dealer and was the initial purchaser of the NIM bonds in the 2007-WM2 offering. WaMu Capital also has a New York office, from which it marketed the WaMu 2007-WM2 Offering.

22.    Defendant WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance") is a Delaware corporation with an office at 1400 South Douglass Road, Suite 100, Anaheim, California 92806. WaMu Asset was the depositor of the certificates issued which in the aggregate constituted the entire ownership interest in the pool of mortgage loans that served as the collateral for the NIM bonds in the 2007-WM2 Offering.

23.    WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Capital, and WaMu Asset Acceptance are collectively referred to herein as the "Issuing Defendants."

24.    Defendant Washington Mutual Bank (the "Bank") is a national bank with branches throughout New York City. The Bank has its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. The Bank is the servicer of the collateral underlying the NIM bonds in the 2007-WM2 Offering.

25.    Defendant Washington Mutual, Inc. ("WaMu") is the ultimate parent company of all the defendants. WaMu is publicly traded on the New York Stock Exchange. WaMu is a Washington corporation with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. WaMu exercised control over each defendant regarding its actions in connection with the 2007-WM2 Offering.

## Jurisdiction and Venue

26.     This Court has personal jurisdiction over the Defendants because each Defendant regularly conducts business in the Southern District of New York or purposefully availed itself of the benefits and protections of this forum.

27.     This Court has personal jurisdiction over defendants WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Asset Acceptance, and WaMu Capital because each of those defendants played an integral role in the marketing and selling of the 2007-WM2 NIM bonds in New York. In particular, employees of WaMu Capital located in Manhattan provided information about the 2007-WM2 Offering to Good Hill in connection with its purchase of those bonds.

28.     This Court has personal jurisdiction over the Bank because it regularly conducts business in New York City through its approximately one hundred branches here.

29.     This Court has personal jurisdiction over WaMu because it also regularly conducts business in New York City through its banking, insurance, investment product, and other operating subsidiaries. In addition, WaMu employees located in Manhattan provided information to Good Hill regarding the 2007-WM2 Offering in a successful effort to market that offering to Good Hill.

30.     This Court has subject matter jurisdiction over the federal securities law claims because they arise under the laws of the United States, and must be brought in federal district courts pursuant to 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over Good Hill's state law claims pursuant to 28 U.S.C. § 1367.

## Facts

### I.    *WaMu Acquires the Long Beach Subprime Mortgage Business*

31.    In the early 1990's, Long Beach Savings Bank, a leading lender in the subprime residential mortgage market, began issuing bonds backed by pools of subprime mortgages. Subprime mortgages are issued to borrowers with lower credit ratings and carry higher interest rates and higher risk than conventional mortgages.

32.    In 1997, Long Beach Savings split into two entities: Ameriquest Mortgage Company, a privately-held lender, and a publicly-traded lender known as Long Beach Securities Corp. WaMu purchased Long Beach Securities Corp. in 1999.

33.    WaMu's 1999 purchase of Long Beach Securities Corp., now known as Long Beach Mortgage Company, greatly expanded WaMu's subprime lending business, as well as its associated business of issuing bonds backed by subprime mortgage loans.

34.    In January 2007, WaMu issued a press release stating that it would "securitize all loans issued through its Long Beach Mortgage division using the WaMu Asset Acceptance Corp. shelf registration . . . ." A WaMu executive (who had previously signed SEC filings made in connection with bonds issued using the "Long Beach" name) was quoted as saying:

> We've made many changes in [Long Beach Mortgage Company's] business model and operations beginning when we consolidated its operations into WaMu and this is a logical next step. For these reasons, we feel it is appropriate to brand our Long Beach Mortgage securitized product offerings as Washington Mutual product offerings.

### II.    *WaMu's Long Beach Asset-Backed Bond Platform*

35.    WaMu, through the Bank and other subsidiaries, is among the ten largest subprime mortgage lenders in the United States. WaMu originated nearly $30 billion in subprime mortgage loans in 2005 and nearly $20 billion in 2006.

36.    WaMu pools its subprime mortgage loans into collateral for bonds. These pools are held by trusts specifically formed to own the underlying mortgage loans. The pools may hold all senior-lien mortgage loans, all junior-lien mortgage loans, or a combination of senior- and junior-lien mortgage loans. The Issuing Defendants then issue and sell these mortgage-backed bonds to investors.

37.    WaMu offers these bonds to the public through prospectuses, private placement memoranda, and other disclosure documents.

### a.    The servicer

38.    WaMu's pools of mortgages are governed by pooling and servicing agreements between WaMu Asset Acceptance as the depositor of the loans and the Bank as the servicer of those loans.

39.    As the servicer of the underlying mortgage loans, the Bank collects payments from the borrowers, calculates the outstanding principal and interest, addresses non-payment by borrowers, and performs other operations related to the administration of the mortgage loans. The Bank also commences foreclosure proceedings and determines when the trust has incurred a realized loss on mortgage loans.

### b.    WaMu's disclosures and course of dealing regarding realized losses

40.    As detailed in the disclosure documents for bond offerings backed by only senior-lien mortgage loans or a mix of junior- and senior-lien mortgage loans, although the trust suffers a cash flow shortfall whenever a borrower does not make a payment on a mortgage loan in the trust, the trust does not realize a loss on that loan until there has been a liquidation event (such as a foreclosure sale).

41.    Foreclosure sales and other liquidation events typically take place at least a year after the borrower stops making payments on the mortgage loan. A portion of the delay often

stems from the Bank's efforts to reach repayment arrangements with borrowers rather than going forward with a foreclosure sale or other effort to liquidate the mortgaged property.

42.    As discussed in detail below, the disclosures in the 2007-WM2 Offering – which was backed by both senior- and junior-lien mortgage loans – made clear that the trust would only realize losses after a foreclosure sale or other liquidation event, which take place over a year after the borrower stops making payments. Good Hill relied on these disclosures when calculating yields and prices for the bonds it purchased in the 2007-WM2 Offering.

43.    By contrast, when WaMu and the other Defendants issue bonds backed only by junior-lien mortgage loans, the disclosure documents for those issuances state that the trust will realize losses on those junior-lien mortgage loans when the borrower is more than 180 days (six months) behind in payments.

III.    *WaMu Also Issues NIM Bonds*

44.    In addition to bonds directly backed by subprime mortgage loans, WaMu also issues "net interest margin" ("NIM") bonds.

45.    The borrowers on the underlying mortgage loans in the pool pay a higher rate of interest than is paid to the bonds that are backed directly by those loans. This amount is referred to as the excess interest, or the "net interest margin" – the difference between the interest WaMu receives on mortgage loans in the pool and the interest WaMu pays on the bonds backed by those loans.

46.    NIM bondholders are generally entitled to receive the income generated by the difference between the interest paid on the underlying mortgage loans and the interest on bonds backed by the loans. These bonds are referred to as the certificates of the transaction.

47.    To offer a simplified example, suppose the borrowers on the underlying mortgage loans pay an 8% annual interest rate, but WaMu is only paying 6% annual interest on the

certificates. The mortgage loans total $1 billion in principal, and WaMu has issued $1 billion in face amount of certificates. Each year, WaMu would receive a residual income stream of 2% (8% - 6%) of the $1 billion, or $20 million. Rather than keeping these funds for itself, WaMu chose to issue NIM bonds backed by this income stream.

48.    NIM bonds generate a fairly stable cash flow that includes payments of both interest due on the bonds and partial payments of principal. Depending on the cash flow generated by the underlying pool of mortgage loans, NIM bonds are typically repaid in full in a relatively short period of time, even though their stated maturity date can be as many as thirty years after the issuance.

## IV.    *Good Hill is Formed and Begins Purchasing Asset-Backed Securities*

49.    Good Hill was formed in late 2006 as an investment management company.

50.    Good Hill examined a variety of investments, including mortgage-backed bonds and other asset-backed securities.

## V.    *The WaMu 2007-WM2 Offering*

51.    The NIM bonds that Good Hill purchased were offered in connection with a series of asset-backed bonds. These bonds were known as WaMu Asset-Backed Certificates (the "Underlying Certificates") and were offered through a prospectus dated March 22, 2007 and a supplement thereto dated April 5, 2007 (collectively, the "Prospectus").

52.    The trust that held the mortgage-loan collateral for these Certificates and the associated NIM bonds was called the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust contained two groups of loans: Group I and Group II.

53.    The NIM bond offering was denominated the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). The 2007-WM2 Offering was described in an April 18, 2007 Term Sheet (the "Term Sheet") and a private placement memorandum dated April 26, 2007 (the

"Private Placement Memorandum"). The Private Placement Memorandum attached the Prospectus and referred investors to it for disclosures on those Underlying Certificates. The Private Placement Memorandum also attached the Term Sheet, a sample indenture for the NIM bonds, the pooling and servicing agreement governing the collateral held in the trust, and other materials relating to the NIM bonds, the Underlying Certificates, and the Trust.

54.    The 2007-WM2 Offering included three series of bonds: the N1, N2, and N3.

55.    Good Hill focused its interest on the N2 Notes, which were issued with a face value of $19,450,000 and a fixed interest rate of 7.500%. The stated maturity date was in April 2047. This bond was rated A-/A- by Standard & Poor's and Fitch because of the collateral backing and structure of the 2007-WM2 Offering.

### a.    The Trust

56.    The Prospectus showed that the Trust contained nearly all senior-lien subprime mortgages, but included some junior-lien subprime mortgages as well. According to the Prospectus, approximately 1.88% of the loans in Group I were junior-lien mortgages and approximately 8.07% of the loans in Group II were junior-lien mortgages. The Prospectus also disclosed that these junior-lien mortgages were related to senior-lien mortgages included in the Trust: the borrowers and collateral associated with the related loans were the same.

57.    The Bank was the servicer of the underlying mortgage loans contained in the Trust.

### b.    Disclosures regarding losses in the Trust

58.    The Pooling and Servicing Agreement incorporated into the Private Placement Memorandum defines "Realized Loss" as the amount of unpaid principal remaining on the underlying mortgage loan after applying all of the proceeds from a liquidation from the mortgaged property through a foreclosure sale, trustee's sale, taking by eminent domain, condemnation, or the repurchase, substitution, or sale of a mortgage loan or mortgaged property.

59.    The Prospectus made clear that the

>    primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be available in connection with the foreclosure of the related senior lien to satisfy fully both the senior lien and the junior lien. The claims of the holders of the senior lien will be satisfied in full out of the proceeds of the liquidation of a junior lien mortgage before the trust, as holder of the junior lien, receives any payments in respect of such mortgage loan. If the servicer were to foreclose on any junior lien mortgage loan, it would do so subject to any related senior lien.

60.    Accordingly, the Prospectus and Private Placement Memorandum disclosed, and Good Hill understood, that the risk of a Realized Loss arising from a junior-lien mortgage loans in the Trust stemmed from the risk that such loans would become Realized Losses at the same time as the related senior-lien mortgage (upon a foreclosure sale or other liquidation event – typically one year or more after a borrower default). These disclosures are the basic risk associated with holding a junior lien: insufficient funds may be available after the satisfaction of the related senior lien.

61.    The Private Placement Memorandum and Prospectus *did not say* that junior-lien mortgage loans would be treated differently by the Bank as servicer of the underlying loans (or any other Defendant), or that Realized Losses would be incurred on the junior-lien loans separately and before a foreclosure sale or other liquidation event occurred on the related senior-lien loans. On the contrary, the Private Placement Memorandum and Prospectus described a single methodology that would be used to determine when the Trust had incurred Realized Losses on *both* senior-lien and junior-lien mortgage loans.

62.    In addition to these formal representations, WaMu representatives sent e-mails to Good Hill making clear that, for each junior-lien mortgage loan held by the Trust, the related senior-lien mortgage loan was also held by the Trust. Because these loans were issued to the same

borrower and secured by the same property, Good Hill understood, based on WaMu's representations, that the Bank would treat those related senior-lien and junior-lien mortgage loans as if they were one loan for purposes of Realized Losses.

63.     Nowhere in the Defendants' Term Sheet, Private Placement Memorandum, Prospectus, exhibits thereto, or any other marketing materials is there a mention of the possibility that junior-lien mortgage loans could become Realized Losses based solely on the borrower being over 180-days delinquent in making payments.

### c.    Disclosures specific to the NIM bonds

64.     Under the structure of the 2007-WM2 Offering, when the Trust suffers Realized Losses, the residual income is no longer used to pay the principal and interest due on the NIM bonds, but is instead used to make up the shortfall on the payments due to the holders of the Underlying Certificates.

65.     The Term Sheet included three graphs showing that the Trust would incur minimal, if any, Realized Losses on the mortgages in the pool during the thirteen-month payment period for the NIM bonds.

66.     The Term Sheet also included a table of principal repayment time frames based on various loss scenarios. Each of these showed that the NIM bonds would be repaid (both principal and interest) within 14 months, even at the highest levels of contemplated Realized Losses. These disclosures also indicated that the senior-lien and junior-lien mortgage loans would be treated as one loan, and the Realized Losses as to both would not be taken by the Trust until more than one year after the borrower stopped making payments.

67.     Prior to purchasing the NIM bonds, Good Hill conducted a yield analysis for those bonds based on information provided by WaMu regarding the collateral held by the Trust. Good Hill's initial analysis showed the trust incurring some Realized Losses in the first year.

68.    On or before April 18, 2007, WaMu representatives responded to these calculations by e-mail. The responses included e-mails stating that the initial information provided to Good Hill had contained some errors. WaMu representatives stated in e-mails that the "correct" information regarding the underlying collateral showed that the Trust would not suffer the Realized Losses that Good Hill had calculated.

69.    WaMu representatives also noted in e-mails that even poorly-performing prior bond offerings had not incurred Realized Losses of the magnitude Good Hill had suggested could be incurred.

70.    These e-mails referred to and were consistent with the disclosures in the Term Sheet, Prospectus, and Private Placement Memorandum that the Trust would not incur Realized Losses in the first year after the 2007-WM2 Offering, the period in which the NIM bonds would be repaid.

71.    In reliance on these e-mails and the information they conveyed, as well as the other documents discussed above, Good Hill raised its valuation of the NIM bonds.

**VI.    *Good Hill purchases the N2 NIM bonds***

72.    Based on the representations in the Term Sheet, Private Placement Memorandum, Prospectus, and e-mails disclosed in connection with the 2007-WM2 Offering, Good Hill purchased $18.45 million of the N-2 NIM bonds at 98% of face value, paying $18.081 million. The trade date was April 19, 2007; the trade settled on April 26, 2007.

**VII.    *Washington Mutual Restructures the 2007-WM2 Offering***

73.    In July 2007, the Bank informed Good Hill that it had changed its policy regarding junior-lien mortgages in the Trust. Under the new policy, the Bank declared that the Trust would suffer Realized Losses on junior-lien mortgages as soon as the borrower failed to make payments for 180 days. Under this new policy, junior-lien mortgages that were more than 180-days

delinquent would be "charged off" and removed from the Trust significantly earlier than the related senior lien mortgages would be "charged off."

74.    This change resulted in the junior-lien mortgages being removed from the Trust, forcing the Trust to realize the loss associated with such junior liens six months after the borrower stopped making payments.

75.    Under the policies and practices as represented by WaMu personnel and disclosed in the Private Placement Memorandum and Prospectus, by contrast, Good Hill and other investors understood that junior-lien mortgages would not become Realized Losses until after the foreclosure process or other liquidation effort on the related senior-lien mortgage was complete, a process that takes at least a year.

76.    SEC filings made by WaMu in May 2007 regarding bond offerings backed only by junior-lien mortgage loans indicate that Defendants were aware of the risk of this mid-stream change at the time of the 2007-WM2 Offering.

77.    Defendants thus knew or should have known the actual facts regarding the risks at issue, and should have made appropriate disclosures of those risks. Their affirmative misrepresentations and omissions caused significant harm to Good Hill.

## VIII.  *The Defendants' Mid-stream Change Greatly Decreased the Value of Good Hill's N2 Bonds*

78.    As shown in detail above, the Defendants' previously-undisclosed about-face in declaring Realized Losses on junior-lien mortgages resulted in the possibility that the Trust would incur Realized Losses at least six months earlier than they would have under the Realized Loss disclosures made by WaMu representatives in e-mails, and in the Term Sheet, Private Placement Memorandum, and Prospectus.

79. The premature "charging off" of these junior-lien mortgage loans would result in significant diminution of the funds available to pay Good Hill and other holders of the NIM bonds because when the Trust incurs Realized Losses the residual income generated by the difference between the interest received by WaMu from the borrowers and the interest it had to pay to the Certificateholders can no longer be used to pay the interest and principal due on the NIM bonds. Instead, those funds would have to be used to pay shortfalls incurred by the Certificateholders because of the Realized Losses.

80. Accordingly, Defendants' decision to change how the Bank determined when Realized Losses on junior-lien mortgage loans would be incurred severely affected the cash flow available to pay the NIM bonds. Their value dropped dramatically as a result.

81. When it decided to purchase the NIM bonds in the 2007-WM2 Offering, Good Hill relied on the disclosures regarding Realized Losses made in the Term Sheet, Private Placement Memorandum, and Prospectus, as well as the e-mails from WaMu representatives that provided further detail regarding the Trust and the timing and amount of Realized Losses.

82. Defendants' failure to disclose the risk of this mid-stream change, which they knew or should have known was material to the investment, caused significant harm to Good Hill.

83. Because it is Good Hill's practice to factor in a significant risk of delinquency and default on subprime mortgages, it would not have purchased the NIM bonds – and certainly would not have paid 98% of their face value – if it had known of the additional risk that the senior-lien and related junior-lien mortgages would not be treated as one loan and that Realized Losses could be recognized on junior-lien mortgages solely because the borrower was more than 180-days delinquent, without any foreclosure sale or other liquidation effort on the related senior-lien mortgage loan.

84.    Good Hill has incurred losses of at least $7 million as a result of the Defendants' improper actions.

## FIRST CAUSE OF ACTION
### Securities Fraud – Exchange Act § 10(b) and Rule 10(b)(5) – Against the Issuing Defendants and WaMu

85.    Good Hill incorporates paragraphs 1-84 by reference.

86.    As set forth in detail above, the Issuing Defendants and WaMu made misrepresentations and omissions regarding the NIM bonds in the WaMu 2007-WM2 Offering by stating that they were disclosing all material risks. The Issuing Defendants and WaMu failed, however, to disclose that WaMu and the Bank would change the policy regarding Realized Losses on junior-lien mortgage loans to the significant detriment of Good Hill.

87.    WaMu employees repeated these misrepresentations and omissions in e-mails to Good Hill prior to its purchase in the 2007-WM2 Offering.

88.    The risk of Realized Losses to the Trust is material to the value of the NIM bonds.

89.    Defendants knew or should have known that WaMu and the Bank would change – or were, at a minimum, considering changing – how Realized Losses would be recognized on junior-lien mortgage loans in a way that would materially increase Realized Losses incurred by the Trust and thus dramatically decrease the value of the NIM bonds.

90.    Defendants' omissions and misrepresentations were made in the Term Sheet, Private Placement Memorandum, and Prospectus released to Good Hill and other investors in connection with the 2007-WM2 Offering, and e-mails made in connection with the Offering. The documents were sent by mail and e-mail. The documents were created and sent in connection with a sale of securities.

91.    Good Hill justifiably relied on these omissions and representations, including that the related senior-lien and junior-lien mortgage loans would be treated as one loan.

92.    Good Hill purchased the N2 NIM bonds based on this reliance.

93.    The failure to disclose WaMu and the Bank's plans to change how Realized Losses would be incurred on junior-lien mortgage loans and thus the structure of the securitization caused Good Hill to purchase the NIM bonds for significantly more than it would have had the full risks been disclosed.

94.    As a result of Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Control Person Liability – Exchange Act § 20(a) – Against WaMu and the Bank

95.    Good Hill incorporates paragraphs 1-94 by reference.

96.    WaMu is the parent company of all the other Defendants, including the Bank. WaMu has the power to control all the Defendants. WaMu has the power to direct or cause the direction of the management and policies of all the other Defendants.

97.    WaMu expressly described its control over offerings such as the 2007-WM2 Offering in January 2007 by describing changes it had implemented to the branding and marketing of those offerings.

98.    The Bank also controls the actions of the Issuing Defendants through its sale of mortgage loans and its control of the servicing process. The Bank has the power to assert influence over the other Defendants regarding this key portion of the transaction consummated through the Offering.

99.    Upon information and belief, WaMu and the Bank participated in the material misrepresentations and omissions made by the Issuing Defendants by preparing to implement or actually implementing the material change in the structure of the Offering during the very time that the Offering was closing.

100.    As a result of the Issuing Defendants' conduct as described herein, including in the First and Third Causes of Action, and the control exercised by WaMu and the Bank, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Common Law Fraud – Against the Issuing Defendants and WaMu

101.    Good Hill incorporates paragraphs 1-100 by reference.

102.    The Issuing Defendants and WaMu had a duty to disclose all material risks of loss to the assets in the Trust in connection with the Offering.

103.    As discussed in detail above, the Issuing Defendants and WaMu failed to disclose WaMu and the Bank's intention to implement a change that would severely increase the risk of Realized Losses on junior-lien mortgage loans included in the Trust, particularly increasing the likelihood that such losses would be realized during the time the NIM bonds would be repaid.

104.    The Issuing Defendants and WaMu also affirmatively misrepresented that junior- and senior-lien mortgage loans would be treated the same by the Trust when calculating Realized Losses.

105.    The Issuing Defendants and WaMu knew that investors such as Good Hill would rely on their misrepresentations and omissions in the Offering Documents and intended that investors do so.

106.    Defendants knew or should have known that WaMu and the Bank would change – or were, at a minimum, considering changing – how Realized Losses would be recognized on junior-lien mortgage loans in a way that would materially increase Realized Losses incurred by the Trust and thus dramatically decrease the value of the NIM bonds.

107.    Good Hill justifiably relied on these misrepresentations and omissions to its detriment.

108.    As a result of the Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages in an amount to be proven at trial.

109.    Furthermore, because the Defendants' conduct was intentional, wanton, willful, and in disregard of Good Hill's rights, an award of punitive damages is warranted.

## FOURTH CAUSE OF ACTION
### Aiding and Abetting Common Law Fraud – Against WaMu and the Bank

110.    Good Hill incorporates paragraphs 1-109 by reference.

111.    WaMu and the Bank were aware of the fraud committed by the Issuing Defendants.

112.    WaMu and the Bank substantially assisted in that fraud by providing resources to complete the 2007-WM2 Offering. In addition, WaMu and the Bank directed the decision to change the Realized Loss policy, an undisclosed risk that caused significant financial harm to Good Hill.

113.    As a result of WaMu and the Bank's aiding and abetting of the Issuing Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages in an amount to be proven at trial.

114.    Furthermore, because the conduct of WaMu and the Bank was intentional, wanton, willful, and in disregard of Good Hill's rights, an award of punitive damages is warranted.

WHEREFORE, Good Hill prays that it have judgment against Defendants as follows:

1.    Actual damages as described above;

2.    Punitive damages;

3.    Pre- and post-judgment interest as allowed by law;

4.    Attorneys' fees; and

5.    All other and further relief, both general and special at law or in equity, to which it

may be entitled.

Dated: April 18, 2008
       New York, New York

COHEN & GRESSER LLP

By: _____

Mark S. Cohen
mcohen@cohengresser.com
Nathaniel P. T. Read
nread@cohengresser.com

100 Park Avenue, 23rd Floor
New York, NY 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*