UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GOOD HILL PARTNERS L.P. ON BEHALF    :
OF GOOD HILL MASTER FUND, L.P.,     :     ELECTRONICALLY FILED
                                       :
             Plaintiff,          :     Case No. 08 Civ. 3730 (JSR)
                                       :
           -against-           :
                                       :
WM ASSET HOLDINGS CORP. CI 2007-    :
WM2, WM ASSET HOLDINGS CO 2007-     :
WM2 LLC, WM ASSET HOLDINGS CORP.,  :
WAMU ASSET ACCEPTANCE CORP.,     :
WAMU CAPITAL CORP., WASHINGTON    :
MUTUAL BANK, and WASHINGTON       :
MUTUAL, INC.,                        :
                                       :
            Defendants.       :

-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>

                                Victor J. Rocco (VR-4191)
                                Heller Ehrman LLP
                                7 Times Square
                                New York, NY 10036
                                Phone: (212) 832-8300
                                Fax: (212) 763-7600

                                *Attorneys for Defendants WM Asset Holdings*
                                *Corp. CI 2007-WM2, WM Asset Holdings CI*
                                *2007-WM2 LLC, WM Asset Holdings Corp.,*
                                *WaMu Asset Acceptance Corp., WaMu Capital*
                                *Corp., Washington Mutual Bank, and*
                                *Washington Mutual, Inc.*

## Table of Contents

**Page**

**Preliminary Statement**................................................................................................1

**Background** ................................................................................................................4

     A.    The Subordinated Status of the NIM Bonds ................................................4

     B.    The Role of the Servicer and the Determination of a "Realized Loss" ..................6

     C.    The NIM Bond Offering ................................................................7

     D.    The Alleged Fraud ................................................................9

**Argument** ................................................................................................................11

I.    Legal Standards................................................................................................11

II.    Good Hill Has Failed to State a Fraud Claim Under Section 10(b)
or the Common Law of New York ................................................................12

     A.    Good Hill Has Not Pleaded a Material Misstatement or Omission ......................13

           1.    The Servicer Has Broad Discretion to Declare a "Realized Loss"
on Junior Lien Mortgage Loans ................................................13

           2.    Nor Does Good Hill Allege an Omission of Material Fact ......................16

           3.    Projections or Forecasts of Potential Future Losses Do Not Rise to the
Level of an Actionable Misstatement ................................................17

           4.    Good Hill Has Failed to Plead a Material Misstatement or Omission
With the Specificity Required Under Rule 9(b) or the PSLRA................19

     B.    Good Hill Does Not Adequately Allege that Any Defendant Acted With the
Requisite Scienter ................................................................21

III.    Good Hill Has Failed to State a Claim for Control Person Liability Under
Section 20(a) of the Securities Exchange Act ................................................23

IV.    Good Hill Cannot State a Claim of Aiding and Abetting Fraud Under the Common
Law of New York ................................................................24

**Conclusion** ................................................................................................................24

**Table of Authorities**

**Page**

**Cases**

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47, 53 (2d Cir. 1995).........................................................................................23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87, 98-99, 105 (2d Cir. 2007) ...................................................... 11, 12, 19, 20, 22

*Bell Atl. Corp. v. Twombly*,
    -- U.S. --, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)...........................................11

*Boguslavsky v. Kaplan*,
    159 F.3d 715, 720 (2d Cir. 1998)..................................................................................24

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147, 152-153 (2d Cir. 2002) ..........................................................................11

*Edison Fund v. Cogent Inv. Strategies Fund Ltd.*,
    No. 06 Civ. 4045 (JGK), 2008 WL 857631, at *13 (S.D.N.Y. Mar. 31, 2008).......... 23, 24

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004)....................................................................22

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008)....................................................................19

*In re Int'l Bus. Mach. Corp. Sec. Litig.*,
    163 F.3d 102, 107 (2d Cir. 1998)..................................................................................18

*In re Monster Worldwide, Inc. Sec. Litig.*,
    No. 07 Civ. 2237 (JSR), 2008 WL 623339, at *1 (S.D.N.Y. Mar. 4, 2008) ........ 12, 21, 22

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006)....................................................................18

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008)....................................................................11

*In re Razorfish, Inc. Sec. Litig.*,
    No. 00 Civ. 9474 (JSR), 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001)...............12

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 248, 251-252 (S.D.N.Y. 2005) .................................................................18

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ......................... 22

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*,
223 F.Supp.2d 474, 489 (S.D.N.Y. 2002) ......................................................... 12

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996) .................................... 12

*Lencyzcki v. Shearson Lehman Hutton, Inc.*,
238 A.D.2d 248 (N.Y. App. Div. 1997) ........................................................... 24

*Luce v. Edelstein*,
802 F.2d 49, 56 (2d Cir. 1986) .................................................................. 18

*Mills v. Polar Molecular Corp.*,
12 F.3d 1170, 1175 (2d Cir. 1993) ............................................................... 21

*Novak v. Kasaks*,
216 F.3d 300, 309 (2d Cir. 2000)) ............................................................... 23

*Polar Int'l Brokerage Corp. v. Reeve*,
108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) ....................................................... 21

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450, 1472 (2d Cir. 1996) ............................................................. 24

*Stevelman v. Alias Research, Inc.*,
174 F.3d 79, 84 (2d Cir. 1999) ................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
-- U.S. --, 127 S. Ct. 2499, 2507, 2509, 168 L. Ed. 2d 179 (2007) ........................... 11, 22

*VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*,
348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) ....................................................... 24

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*,
474 F. Supp. 2d 505, 516, 519 (S.D.N.Y. 2007) ............................................... 20, 23

**Statutes and Rules**

15 U.S.C. § 78t(a) ............................................................................ 23, 24

15 U.S.C. § 78u-4(b)(1) ......................................................................... 20

15 U.S.C. § 78u-4(b)(2) ......................................................................... 21

Federal Rules of Civil Procedure
Rule 9(b) ................................................................................. *passim*

Rule 12(b)(6)................................................................................................................ 1, 11

Private Securities Litigation Reform Act of 1995 ................................................ *passim*

Securities Exchange Act of 1934
    Section 10(b)................................................................................................. *passim*

Defendants WM Asset Holdings Corp. CI 2007-WM2 ("WM Cayman"), WM Asset Holdings CI 2007-WM2 LLC ("WM U.S."), WM Asset Holdings Corp. ("WM Asset Holdings"), WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance"), WaMu Capital Corp. ("WCC"), Washington Mutual Bank (the "Bank"), and Washington Mutual, Inc. ("WaMu", and collectively, the "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## Preliminary Statement

This is an action brought by a self-described fund manager to recover damages for alleged fraudulent misrepresentations and omissions. Reduced to its essentials, Good Hill Partners L.P. ("Good Hill" or "Plaintiff") claims that Defendants falsely represented that the trust that holds the pools of senior and junior subprime mortgage loans which generate the income used to pay down the Net Interest Margin ("NIM") bonds that Good Hill acquired, would not incur a "Realized Loss" until 12 to 14 months after a pooled loan went into default. (When the trust incurs a "Realized Loss," the mortgage servicer removes the defaulted mortgage loan from the trust and the income that would be used to pay down the NIM bonds is instead used to make up the shortfall on payments due to the holders of bonds that are senior to the NIM bonds.) Good Hill thus claims that it was assured an initial period of 12 to 14 months of uninterrupted cash flow in return for its investment. Good Hill alleges that, although Defendants knew when the NIM bonds were issued that the mortgage servicer was planning to change its policy with respect to how it would treat the defaulting junior loans in the loan pool, and intended to recognize "Realized Losses" on those loans after only 180 days, no one ever disclosed that fact to Good Hill. It also claims that the "disclosure documents," and emails from WaMu representatives, made clear that senior and junior mortgage loans would be treated as one loan

1

for purposes of "Realized Loss," and those representations likewise assured it of an uninterrupted

cash flow in respect of its NIM bonds for the first 12 to 14 months.  The Complaint alleges that

the mortgage servicer did not treat junior and senior loans as one loan for purposes of "Realized

Loss," and that the mortgage servicer's decision to declare a "Realized Loss" on defaulted junior

loans earlier, and without regard to how it treated senior loans in the pool, resulted in

significantly less cash to pay Good Hill because all available cash first had to be used to pay the

shortfalls suffered by senior bondholders.  Good Hill alleges that if it had known about this

"change" in the mortgage servicer's policy, or that junior and senior loans would not be treated

the same when it purchased its bonds, because of the dramatic effect each had on the return on its

investment, it would not have completed the transaction or, at a minimum, it would have

bargained for a lower price.  For each of the reasons discussed below, the Complaint does not

state a claim under the federal securities laws or for common law fraud or aiding and abetting

fraud under New York law and should be dismissed.

First, Good Hill's claims to the contrary notwithstanding, there is nothing inaccurate or

misleading about the representations made in the disclosure documents and e-mails regarding

when the mortgage servicer could declare a "Realized Loss" on a defaulted mortgage loan in the

trust.  In fact, it is plain from those very documents that the mortgage servicer is free to

recognize a "Realized Loss" at any time following default provided certain conditions are

present.  Good Hill's contrary claims, at best, are bottomed on an obvious misreading of the

meaning of "Realized Loss" as defined in the Pooling and Servicing Agreement (the "PSA").  In

Good Hill's view, a "Realized Loss" cannot occur until the defaulted mortgage loan in the pool

is the subject of a foreclosure sale or other liquidation event, which typically occur 12 to 14

months after the borrower had stopped making payments on the loan.  But Good Hill's conjured-

2

up definition of "Realized Loss" is contrary to the definition of that term in the PSA – a document that it admits receiving prior to its purchase of the NIM bonds.  The PSA makes clear that the Bank, as servicer of the underlying mortgage pools, has the broad discretion to declare a "Realized Loss", once it concludes that it will not recover any money on a defaulted mortgage loan.  Good Hill points to nothing in the PSA that supports its self-serving definition of "Realized Loss," nor can it identify any statement in any of the disclosure documents, Term Sheet, or e-mails (which it allegedly received from WaMu employees) that would even suggest anything to the contrary.  Good Hill simply ignores these governing definitions in the deal documents, and tries to muster further support for its specious claim by pointing to certain projections and forecasts which it claims to have received in connection with its purchase of the bonds and unidentified emails it claims to have received from unidentified WaMu employees. These claims of deception are also spurious.  None of the projections or forecasts were misleading, nor are they the kind of representations that could be used to support a fraud claim under Section 10(b) or the common law of New York.  As for the emails, alleged unidentified statements from unidentified sources simply do not satisfy the heightened pleading requirements of Rule 9(b) or the PSLRA, and are not actionable.

Second, and just as importantly, there are no factual allegations in the Complaint that would support a claim that the Defendants acted with the kind of fraudulent intent necessary to state a claim for relief under the federal securities laws or the common law.  The Complaint includes only a single allegation that could even be considered relevant to any defendant's state of mind, and that allegation involves some unidentified "SEC filings" in connection with some unidentified and obviously unrelated "bond offerings backed only by junior lien mortgage loans" that were made by WaMu, in May 2007, one month after the transaction at issue.  Of course, this

3

sort of generic claim of fraudulent intent on the part of separate defendants is improper.  Even if

intent to deceive could be collectively alleged, this sort of vague and elliptical allegation not only

fails the stringent particularity pleading standards of the PSLRA and Rule 9(b), it is well-settled

in this Circuit that this type of "fraud by hindsight" allegation cannot satisfy the scienter

requirement of the federal securities law or the New York law of common law fraud or aiding

and abetting liability.

## Background

Good Hill is the investment manager of a fund that purchased $18.45 million of NIM

bonds from defendant WCC on April 26, 2007.  (*See* Complaint, dated April 18, 2008, ¶¶ 5, 72

(attached as Ex. A to Declaration of Victor J. Rocco, dated June 27, 2008 ("Rocco Decl.")).)

The bonds that Good Hill purchased were issued by defendants WM Cayman and WM U.S. as

part of a private placement offering that was sponsored by defendant WM Asset Holdings (the

"NIM bond offering").  (*See id.* ¶¶ 18-20.)

### A.    The Subordinated Status of the NIM Bonds

The NIM bonds at issue in this lawsuit were associated with a series of asset-backed

certificates (the "Senior bonds") that were sold to investors through a public offering in early

April 2007.  (*See id.* ¶ 51.)  Purchasers of the Senior bonds are entitled to receive a monthly

distribution of interest and/or principal from a trust formed by the Bank specifically for the

purpose of holding pools of subprime mortgage loans (the "Trust").  (Prospectus Supplement,

dated April 5, 2007 ("Pro. Supp."), at S-1, S-3-4 (attached as Ex. E to Rocco Decl.).)  At the time

of the NIM bond offering, the Trust held approximately 6,723 subprime mortgage loans with a

total principal balance of nearly $1.6 billion.  (*Id.* at S-1, S-51.)  Most of the loans in the Trust, or

approximately 94.3% of the total principal balance, are senior-lien (or first-lien) mortgage loans;

the remaining loans held by the Trust, or 5.7% of the total principal balance, are junior-lien (or

4

second-lien) mortgage loans. (*See id.* at S-54-55; *see also* Compl. ¶ 56 ("The Prospectus showed that the Trust contained nearly all senior-lien subprime mortgages, but included some junior-lien subprime mortgages as well.").)

The payments received by the Trust from the underlying mortgages also serve as the source of income to pay down the NIM bonds. (Compl. ¶ 48; *see also* Private Placement Memo., dated April 26, 2007 ("PPM"), at 17 (attached as Ex. C to Rocco Decl.).) According to the PPM, the NIM bonds are entitled to receive the excess cash flow,[1] *if any*, generated each month by the pooled subprime mortgage loans that is not otherwise used to, among other things, reimburse the Servicer for its advances, fees or expenses, pay interest and principal due to Senior bond holders and satisfy the excess collateral reserve for Senior bonds. (PPM at 17.)

The excess cash flow upon which the NIM bonds rely is derived, at least in part, from the "income generated by the difference between the interest paid on the underlying mortgage loans and the interest [paid by the Trust] on the [Senior bonds]." (Compl. ¶ 46.) As the Complaint describes it, if the borrowers on the subprime mortgage loans held by the Trust were to pay an annual interest rate of 8%, but the Trust was only to pay an annual interest rate of 6% to the Senior bondholders, the Trust would have a residual income stream of at least 2% of the total principal balance of the pooled loans. (*Id.* ¶ 47.)

Because they are subordinated, the NIM bonds are "extremely sensitive to losses" on the subprime mortgage loans held by the Trust – a risk that is prominently disclosed in the disclosure materials which Good Hill received before it purchased the NIM bonds. (*See* PPM at 17; *see*

---

[1] The NIM bonds represent a right to the proceeds received by two certificates (the Class C and P certificates) that were issued by the Trust in connection with the securitization of the mortgage pool. (PPM at 3.) Only one of those certificates, the Class C certificate, is at issue in this lawsuit. (*See id.* (describing cash flow that Class C Certificate is entitled to receive from the Trust).)

*also* Compl. ¶ 53.)  "[W]hen the Trust suffers [a] Realized Loss[], the residual income is no longer used to pay the principal and interest due on the NIM bonds, but is instead used to make up the shortfall on the payments due to the holders of the [Senior bonds]."  (Compl. ¶ 64; *see also* PPM at 17 (explaining how "Realized Losses" and Servicer's decision to not make nonrecoverable advances to Trust reduce the excess cash flow that would otherwise be distributed to NIM bondholders).)

### B.     The Role of the Servicer and the Determination of a "Realized Loss"

The decision to declare a "Realized Loss" on a defaulted mortgage loan held by the Trust is governed by the terms of the PSA that defendant WaMu Asset Acceptance, as depositor of the loans, entered with the defendant Bank, as the servicer of the pooled mortgage loans (the "Servicer").  (*See* Compl. ¶¶ 38-39; *see also* PSA, dated April 1, 2007, at §§ 3.01 – 3.31 (attached as Ex. F to Rocco Decl.).)  That agreement, which is attached to the PPM that Good Hill received prior to its purchase of the bonds, defines "Realized Loss" as:

> [w]ith respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan.

(PSA at 54.)  The term "Liquidated Mortgage Loan," is thus key to the definition of "Realized Loss," and is defined, in turn, in the PSA as:

> any Mortgage Loan in respect of which the Servicer has determined, in accordance with the servicing procedures specified herein . . . that all Liquidation Proceeds which it *expects to recover* with respect to the liquidation of the Mortgage Loan or disposition of the related REO Property have been recovered."[2]

---

[2] "Liquidation Proceeds" is defined in the PSA as "[t]he amount . . . received by the Servicer in connection with . . . (ii) the liquidation of a defaulted Mortgage Loan by means of a trustee's sale, foreclosure sale or otherwise . . . ."  (*Id.*)

(*Id.* at 37 (emphasis added).)  The use of the phrase "expects to recover" in the definition of "Liquidated Mortgage Loan" makes clear that the Servicer may declare a "Realized Loss" even if it has not liquidated the defaulted mortgage loan in the ordinary sense of the word.[3]  In fact, the only limitations on the Servicer's discretion to declare a "Realized Loss" is that the decision must be (1) in the interest of all bondholders, and (2) "in the same manner in which it services and administers mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers . . . "  (PSA § 3.01.)  Good Hill does not allege (nor could it allege) that the Bank, as Servicer, failed to comply with either of these criteria in respect to how it treated defaulted junior-lien mortgage loans.

C.    **The NIM Bond Offering**

The bonds that Good Hill acquired from WCC were one of three series of NIM bonds offered to investors by WM Cayman and WM U.S.  (*See* PPM at i; Compl. ¶ 54.)  Two of the series of bonds were insured; the series bought by Good Hill was not.  (PPM at i.)  According to the Complaint, those bonds, which were denominated as Class N-2 Notes, had a face value of $18,450,000[4] and a fixed interest rate of 7.5% per annum, and would not mature until April

---

[3] The definition of "Realized Loss" is consistent with section 4.04(d) of the PSA, which prohibits the Servicer from advancing to the Trust principal or interest due on a delinquent mortgage loan that it concludes is a "Nonrecoverable Advance."  (*Id.* § 4.04(d).)  A "Nonrecoverable Advance" is defined in the PSA, in relevant part, as any advance "proposed to be made in respect of a Mortgage Loan . . . that, in the good faith business judgment of the Servicer" will not be "ultimately recoverable" from  "Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan . . ." (*See id.* at 45.)

[4] Elsewhere in the Complaint, Good Hill alleges that the face value of the Class N-2 Notes was $19,450,000 (Compl. ¶ 55).  However, given Good Hill's allegation that it purchased the NIM bonds for $18,081,000, and that Good Hill alleges that this amount represented 98% of the face value of the bonds, we assume for purposes of this motion that the face value of the bonds is $18,450,000.

2047.  (Compl. ¶ 55.)  Good Hill allegedly purchased the NIM bonds for 98% of their face value, or $18,081,000.  (*Id.* ¶ 72)

In connection with the NIM bond offering, Good Hill received the following documents: (1) a Term Sheet dated April 18, 2007 prepared by WCC (the "Term Sheet") (attached as Ex. B to Rocco Decl.); (2) the April 26, 2007 PPM prepared by WM Cayman and WM U.S.; and, (3) the additional disclosures that were attached and referenced in the PPM, including the Prospectus, dated March 22, 2007 (attached as Ex. D to Rocco Decl.), and Prospectus Supplement for the Senior bond offering, and the PSA (together with the PPM, the "disclosure documents").  (Compl. ¶ 53.)  According to the Complaint, Good Hill also received e-mails from unidentified WaMu employees on unspecified dates in March and April 2007 about the NIM bonds.  (*Id.* ¶¶ 9, 62, 68.)

The disclosure documents make clear that the NIM bonds are "complex securities" which are "not suitable investments for all investors."  (Pro. Supp. at S-10.)  Indeed, the Prospectus Supplement identifies over 20 separate risk factors that investors should consider before purchasing the Senior bonds, which, although paid before the NIM bondholders, also depend upon the same income stream as the NIM bonds for payments.  All bondholders, senior and NIM alike, assume the risk that "recent developments in the residential mortgage market may adversely affect the return on [their] certificates."  (*Id.*)  The Prospectus Supplement further states:

> continued decline or an extended flattening of [housing prices] may result in additional increases in delinquencies and losses on residential mortgage loans generally, [and] particularly . . . with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

(*Id.* at S-10-11.)  The PPM also highlights the uncertainty of the cash flows generated by the pooled subprime mortgage loans, explaining that "[u]nlike more standard corporate debt

securities, the timing and amount of payments of principal on the [n]otes is not fixed and . . . will be dependent on the rate, amount and timing of principal payments on the [pooled mortgage loans]."  (PPM at 20.)

> **D.     The Alleged Fraud**

Good Hill has brought this action to recover damages for alleged fraudulent misrepresentations and omissions it claims were made by Defendants in connection with the NIM bond offering.  The crux of Good Hill's claims is that Defendants falsely represented, through material misstatements and omissions, that the Trust would not incur a "Realized Loss" on a junior-lien mortgage loan until a liquidation event ("such as a foreclosure sale") occurred – an event that it alleges "typically" is "not completed until at least a year after the borrower stops making payments on the mortgage loan."  (*See* Compl. ¶ 8.)  As a result of these alleged misstatements and omissions, Good Hill alleges that it "understood . . . that the Trust would not incur any Realized Loss during the first year after the Offering," and that it was, therefore, assured of uninterrupted cash flow for that period.  (*Id.* ¶ 10.)

Good Hill alleges that its belief that the Trust would incur no "Realized Loss" during the first year after the NIM bond offering was reinforced because unidentified e-mails it received from unidentified WaMu employees, as well as unidentified representations in the disclosure documents, "also made clear that each junior-lien mortgage loan included in the Trust was related to a senior-lien mortgage loan also held by the Trust."  (*Id.* ¶ 11.)  Good Hill further claims that "the Bank and other WaMu defendants would treat these 'related' loans as one loan for purposes of Realized Losses."  (*Id.* (internal quotation marks added).)  Because "Realized Losses" on senior mortgage loans are not recognized by the Servicer before foreclosure, typically a year or more following default, Good Hill claims that it "agreed to purchase the NIM bonds because it understood, based on the risk disclosures made in the Term Sheet, [PPM], and

Prospectus that the NIM bonds would generate a steady cash flow for a year to fourteen months." (*Id.* ¶ 12.)  Good Hill attempts to support its claim by citing to unidentified graphs and models in the Term Sheet, and unspecified e-mail communications with unnamed WaMu employees, which purportedly showed that the Trust would incur minimal realized losses in the first 13 months following the NIM bond offering, and that those bonds would be fully repaid within 14 months.  (*Id.* ¶¶ 65-66.)

Good Hill broadly alleges that Defendants knew, however, when the NIM bonds were issued, but did not disclose, that the Servicer planned to change its policy with respect to how it would treat defaulted junior-lien mortgage loans in the Trust, and intended to recognize a "Realized Loss" on those loans after only 180 days of delinquent payments.  (*Id.* ¶¶ 61-63, 73, 76-77.)  It also alleges that the Servicer did not treat junior-lien and senior-lien mortgage loans as one loan for purposes of "Realized Loss", which "resulted in the possibility that the Trust would incur Realized Losses at least six months earlier than it otherwise would have under the Realized Loss disclosures made by WaMu representatives in e-mails, and in the Term Sheet, Private Placement Memorandum, and Prospectus."  (*Id.* ¶ 78.)

According to the Complaint, the alleged change in policy regarding the recognition of Realized Losses "severely affected the cash flow available to pay the NIM bonds," and the bonds' value "dropped dramatically as a result."  (*Id.* ¶ 80.)  Good Hill contends that, had it known of this risk, it would not have purchased the NIM bonds, or at least would not have paid the price it paid for them (*id.* ¶ 83), and that the value of the purchased bonds have dropped at least $7 million as a result of the Bank's purported change in policy (*id.* ¶ 84).

Based on the above allegations, Good Hill has asserted the following causes of action in the Complaint:

- a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against WM Cayman, WM U.S., WM Asset Holdings, WCC, WaMu Asset Acceptance (the so-called "Issuing Defendants"), and WaMu for material misstatement and omissions (*id.* ¶¶ 86-94);

- a claim under Section 20(a) of the Securities Exchange Act of 1934 for control person liability against WaMu and the Bank (*id.* ¶ 96-100);

- a claim of fraud under New York common law against WM Cayman, WM U.S., WM Asset Holdings, WCC, WaMu Asset Acceptance, and WaMu (*id.* ¶¶ 102-09);

- a claim of aiding and abetting fraud under New York common law against WaMu and the Bank  (*id.* ¶ 111-14).

For the reasons set forth below, Good Hill has failed to plead the essential elements necessary to plead a claim for relief for any of its claims, let alone to plead them with the particularly required under Rule 9(b) or the PSLRA.

<u>Argument</u>

## I.    Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), Good Hill must "provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* -- U.S. --, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)).  Although the Court accepts as true all well-pleaded allegations in the Complaint and draws all reasonable inferences in favor of Good Hill, no credit is given to conclusory statements that are unsupported by factual allegations.  *Id.*  Further, in ruling on the motion, the Court may consider the full text of "documents incorporated into the [C]omplaint by reference," like the Term Sheet and disclosure documents.  *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, -- U.S. --, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)); *see also, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d

11

147, 152-53 (2d Cir. 2002) (same); *In re Monster Worldwide, Inc. Sec. Litig.*, No. 07 Civ. 2237

(JSR), 2008 WL 623339, at *1 (S.D.N.Y. Mar. 4, 2008) (same).

## II.    Good Hill Has Failed to State a Fraud Claim Under
## Section 10(b) or the Common Law of New York

To plead a claim under Section 10(b) of the Securities Exchange Act of 1934 or a claim

of common law fraud under New York law, a plaintiff must allege that each defendant (i) made a

misstatement or omission of material fact, (ii) with scienter, (iii) in connection with the purchase

or sale of securities, (iv) upon which it relied, and (v) that plaintiff's reliance was the proximate

cause of its injury. *ATSI Commc'ns*, 493 F.3d at 105; *Lama Holding Co. v. Smith Barney Inc.*,

88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E. 2d 1370 (1996); *see also Internet Law Library,*

*Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 489 (S.D.N.Y. 2002) ("The

pleading requirements for common law fraud are essentially the same as those for claims under

Section 10(b) and Rule 10b-5.").  The heightened pleading standards of Rule 9(b) and the

PSLRA further require that Good Hill plead each of those elements with particularity.  *ATSI*

*Commc'ns,* 493 F.3d at 99; *see also In re Razorfish, Inc. Sec. Litig.*, No. 00 Civ. 9474 (JSR),

2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (dismissing plaintiffs' federal securities law

claims where plaintiff "utterly fail[ed] to meet the requirements of the PSLRA for alleging even

a single actionable false statement, not to mention one made with the requisite fraudulent

scienter").  Because Good Hill has failed adequately to allege these essential elements, let alone

to allege them with the requisite specificity, its federal securities law claim and common law

fraud claim must be dismissed.

12

**A.    Good Hill Has Not Pleaded a Material Misstatement or Omission**

       1.    The Servicer Has Broad Discretion to Declare a
"Realized Loss" on Junior Lien Mortgage Loans

There is nothing inaccurate or misleading about the representations made in the
disclosure documents regarding when the Servicer could recognize a "Realized Loss" on a
delinquent junior-lien or senior-lien mortgage loan in the Trust.  Good Hill's claims are based on
its own definition of "Realized Loss," not the definition that appears in the PSA.  Good Hill
bases its claims on the idea that the Servicer must wait until a foreclosure sale or some other
liquidation event before it may declare a "Realized Loss" on a delinquent mortgage loan.  (*See,
e.g.*, Compl. ¶¶ 4, 8, 42.)  It alleges that:

> The Pooling and Servicing Agreement incorporated into the Private Placement
> Memorandum *defines "Realized Loss" as the amount of unpaid principal
> remaining on the underlying mortgage loan after applying all of the proceeds
> from a liquidation from the mortgaged property through a foreclosure sale*,
> trustee's sale, taking by eminent domain, condemnation, or the repurchase,
> substitution, or sale of a mortgage loan or mortgaged property.

(*Id*. ¶ 58 (emphasis added).)

This is not the definition of "Realized Loss" in the disclosure documents that were
provided to Good Hill in connection with the NIM bond offering.  The term "Realized Loss" is
defined in the PSA as:

> With respect to any Liquidated Mortgage Loan, the amount of loss realized equal
> to the portion of the Principal Balance remaining unpaid after application of all
> Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage
> Loan.

(PSA at 54.)  "Liquidated Mortgage Loan," is defined, in turn, in the PSA as:

> any Mortgage Loan in respect of which the Servicer has determined, in
> accordance with the servicing procedures specified herein . . . that all Liquidation

13

> Proceeds which it *expects to recover* with respect to the liquidation of the
> Mortgage Loan or disposition of the related REO Property have been recovered.[5]

(*Id*. at 37 (emphasis added).)  The inclusion of the phrase "expects to recover" in the definition

of "Liquidated Mortgage Loan" – a phrase that Good Hill overlooks in the definition of

"Realized Loss" it uses in the Complaint – makes clear that the Servicer can declare a "Realized

Loss" even if it has not liquidated the defaulted mortgage loan in the ordinary sense of the word.

The Servicer need not wait until a foreclosure sale or other liquidation event to declare a

"Realized Loss" on a delinquent mortgage loan in the Trust; the Servicer, instead, has the right to

declare a Realized Loss" as soon as it determines that it will not recover any proceeds from the

liquidation of the defaulted loan – whether through a foreclosure sale or some other liquidation

event.

Thus, by way of illustration, suppose the Trust has a senior-lien mortgage loan with a

principal balance of $100,000, and a junior-lien mortgage loan on the same property with a

principal balance of $25,000, and at the time of the NIM bond offering, the property that serves

as the collateral for the two loans is valued at $150,000.  Now suppose that six months have

passed, the borrower has failed to make a single payment on either of the two loans since the

offering, and the Servicer has concluded that the underlying property is worth $95,000.

According to the PSA, at that point, the Servicer would have the right to recognize a "Realized

Loss" on the junior loan and charge it off from the Trust because it has concluded that it will not

---

[5] Nor can Good Hill rest its interpretation of "Realized Loss" on the meaning of the term "Liquidation Proceeds."  The PSA defines that term as "[t]he amount . . . received by the Servicer in connection with . . . (ii) the liquidation of a defaulted Mortgage Loan by means of a trustee's sale, foreclosure sale or otherwise . . . ."  (*Id*. at 37.)  The inclusion of the phrase "or otherwise" in the definition makes plain that a defaulted mortgage loan may declare a "Realized Loss" prior to a foreclosure sale or trustee's sale.

14

recover enough proceeds from a foreclosure sale or other liquidation event to cover any portion of the defaulted junior-lien mortgage loan.

The Complaint broadly asserts that "the disclosures in the [NIM bond offering] made clear that the trust would only realize losses after a foreclosure sale or other liquidation event, which take place over a year after the borrower stops making payments" (Compl. ¶ 42; *see also id.* ¶¶ 8, 60.) Good Hill, does not – indeed cannot – point to a single statement in the disclosure documents, Term Sheet, or any other document that it allegedly received from any Defendant that ties the timing of the recognition of "Realized Losses" to a foreclosure or some other "liquidation event" or, for that matter, undermines, or is otherwise contrary to, the Servicer's broad discretion to declare a "Realized Loss" under the PSA. Indeed, Good Hill's purported definition of "Realized Loss" would require the Servicer to continue advancing principal and/or interest payments on a defaulted junior-lien mortgage loan with no recoverable value in direct contravention of the Servicer's obligation under section 4.04(d) of the PSA not to make these type of "Nonrecoverable Advances" to the Trust. (*See* PSA § 4.04(d).)

The only language from any of the disclosure documents actually quoted in the Complaint (other than Good Hill's self-serving definition of "Realized Loss") is a brief excerpt taken from one of the "Risk Factor[s]" listed in the Prospectus Supplement which is entitled, "Junior Lien Mortgage Loans are More Likely to Incur Losses and May be Subject to Higher Rates of Prepayments than First Lien Mortgage Loans." (Pro. Supp. at S-14; *see also* Compl. ¶ 59.) This "Risk Factor," however, has nothing to do with the Servicer's right to recognize a "Realized Loss" on a defaulted junior-lien mortgage loan in the Trust as described in the PSA. It is merely one of 20 separate risk factors identified in the Prospectus Supplement, and warns investors that it is difficult for the Servicer to recover the *full amount* of the junior-lien loan in

15

the event of default because a junior loan is subordinate to a senior-lien mortgage loan on the same property.[6]  (*See* Pro. Supp. at S-14.)  Nothing in this "Risk Factor" impairs the Servicer's right to recognize a loss on a mortgage loan in the Trust long before a foreclosure sale, and its concomitant obligation under the PSA to cease advances on such nonrecoverable loans.

2.    <u>Nor Does Good Hill Allege an Omission of Material Fact</u>

Good Hill attempts to overcome these obvious defects in its claimed misstatements by alleging that Defendants failed to disclose in the disclosure documents (1) that WaMu and the Bank would change (or were considering changing) the policy regarding the Servicer's recognition of a "Realized Loss" on junior-lien mortgage loans, and (2) that the Servicer, in fact, could recognize a "Realized Loss" on a junior-lien loan separately from and before a foreclosure sale or other liquidation event occurred with respect to the related senior-lien loan.  (Compl. ¶¶ 61, 63, 86, 89.)

Defendants did not conceal relevant information regarding the recognition of "Realized Losses."  To the contrary, the disclosure documents accurately disclose the Servicer's broad discretion in servicing the loans, including its right to declare a "Realized Loss" on a junior-lien mortgage loan as soon as it concludes that it will be unable to recover any proceeds from a foreclosure sale or other liquidation event.  Indeed, a more specific disclosure regarding the timing of the recognition of "Realized Losses" would potentially conflict with the Servicer's obligation to declare such losses "in the same manner in which it services and administers

---

[6] Good Hill also broadly claims that the Prospectus disclosed that the junior-lien mortgage loans in the Underlying Trust "were related to the senior-lien mortgages included in the Trust" – i.e., "the borrowers and collateral associated with the related loans were the same." (Compl. ¶ 56.)  Nothing in the Prospectus supports such a claim; indeed it's belied by the express terms of the Prospectus, which states: "The trust may hold mortgage loans secured by junior liens, and the related senior lien may not be held by the trust."  (Prospectus at 30.)

16

mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers . . ." (PSA § 3.01.)  In other words, because the "customary and usual standards of practice of mortgage lenders" could change at any time, Defendants could not have made any specific representations in the disclosure documents regarding when the Servicer would recognize a "Realized Loss" on a defaulted mortgage loan without running the risk that this statement would ultimately prove to be inaccurate.

In any event, as discussed in greater detail below, Good Hill has not adequately alleged that any of the so-called "Issuing Defendants" or WaMu was aware, at the time of the NIM bond offering, that the Servicer would change (or was considering changing) the policy regarding the timing of the Servicer's declaration of a "Realized Loss" on junior-lien mortgage loan.

3.    Projections or Forecasts of Potential Future Losses
        Do Not Rise to the Level of an Actionable Misstatement

Good Hill's second theory is that graphs and tables in the Term Sheet are actionable misstatements because they projected that the Trust would incur minimal, if any, "Realized Losses" during the first 13 months following Good Hill's purchase of the NIM bonds, and that the NIM bonds would be fully repaid within 14 months.  Nothing in the Term Sheet, however, states that the Servicer would not recognize a "Realized Loss" until a specific date or event. Instead, Good Hill seems to argue that the projections made in the graphs and tables included in the Term Sheet were statements of fact that rose to the level of guarantees.  (*See* Compl. ¶¶ 65-66.)

Those projections, however, say nothing in derogation of the Servicer's broad discretion to recognize "Realized Losses," and certainly do not suppose the conclusion that the Servicer may not recognize a Realized Loss on a junior lien mortgage loan after 180 days of borrower default.  (*See* Term Sheet at 29-30, 32.)  To the contrary, the projections in the Term Sheet are

17

nothing more than WCC's opinion, based upon a series of modeling assumptions, on how the

NIM bonds might perform in the future.  (*See* Compl. ¶ 66 ("The Term Sheet also included a

table of principal repayment time frames based on various loss scenarios.  Each of these showed

that the NIM bonds would be repaid . . . within 14 months, even at the highest levels of

contemplated Realized Losses."); *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d

248, 251-52 (S.D.N.Y. 2005) (concluding that valuation models could not form basis of

actionable misstatement or omission because they were opinions rather than fact).  As such,

those projections cannot be actionable misstatements unless "they are worded as guarantees or

are supported by specific statements of fact," or unless there are sufficient allegations in the

Complaint to show that WCC did not "genuinely or reasonably believe them."  *In re Int'l Bus.*

*Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *In re Nokia Oyj (Nokia Corp.) Sec.*

*Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (projections of future performance only

actionable "upon a showing that defendants did not genuinely or reasonably believe the positive

opinions they touted").

    Neither is the circumstance here.  Disclaimers in the Term Sheet make clear that none of

the representations in the graphs and tables set forth in the Term Sheet are guarantees.  To the

contrary, the Term Sheet plainly states that the information contained therein is "preliminary,"

"expected to change," incomplete, unverified, "will be superseded in its entirety," and may be

"based upon numerous assumptions" that may or may not be reasonable, and which, if changed,

could "dramatically affect" information in the Term Sheet.  (Term Sheet at 2); *see also Luce v.*

*Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (affirming that plaintiff could not establish claim under

Section 10(b) where offering document "made it quite clear that its projections of potential cash

and tax benefits were necessarily speculative in nature and that no assurance [could] be given

that these projections [would] be realized" (internal citations and quotations omitted)).  Nor has

Good Hill identified any specific statements of fact in the Term Sheet that support the

projections in the graphs or tables, let alone a statement of fact that was false or misleading to

investors.  *See, e.g., In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008)

(granting motion to dismiss on Section 10(b) claims, in part, because defendants' "predictions of

continued prosperity" were not alleged to have been in the form of a guarantee or "bolstered . . .

with specific statements that were false or misleading").  While the Complaint broadly asserts

that the Term Sheet "indicated that the senior-lien and junior lien mortgage loans would be

treated as one loan, and the Realized Losses as to both would not be taken by the Trust until

more than one year after the borrower stopped making payments," (Compl. ¶ 66) nothing in the

Term Sheet even resembles such a statement, and Good Hill has failed to specify where in the

Term Sheet such a representation appears.  (This assumes, of course, that this kind of vague

allegation satisfies the heightened pleading standard of Rule 9(b) and the PSLRA, and it does

not.)

    Further, and as discussed in greater detail below, Good Hill has not adequately alleged

that WCC, as furnisher of the Term Sheet, believed the projections were false or inaccurate when

the Term Sheet was prepared.  *See infra* at II.B.

    4.    Good Hill Has Failed to Plead a Material Misstatement or Omission With
          the Specificity Required Under Rule 9(b) or the PSLRA

    Good Hill also fails to plead any of the misstatements or omissions alleged in the

Complaint with the specificity required under Rule 9(b) or the PSLRA.  To satisfy the

heightened pleading standards of Rule 9(b), a plaintiff must (i) specify the statements that it

contends were fraudulent; (ii) identify the speaker; (iii) state where and when the statements

were made; and (iv) explain why the statements were fraudulent.  *See ATSI Commc'ns,* 493 F.3d

at 99 (citation omitted)).  The PSLRA imposes an even stricter particularity requirement than

Rule 9(b).  Under that statute, a plaintiff must "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  *Xerion Partners I LLC v. Resurgence*

*Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)).

Good Hill does not even come close to meeting this recognized heightened standard.

The Complaint only generally describes, in the most cursory and self-serving fashion, the

e-mails Good Hill purportedly received in March and April 2007.  The Complaint does not

allege, as it must, the identity of the WaMu employees who sent it the e-mails, the position that

the author of each e-mail had at WaMu, the specific date of each e-mail, the precise language in

the e-mail that was false or misleading, how it was false, or the context of the e-mail.  Without

these essential particulars, Defendants are unable to respond to Good Hill's allegations regarding

those e-mails, let alone determine whether the alleged representations constitute actionable

misstatements under either Section 10(b) or the common law of New York.  *ATSI Commc'ns,*

493 F.3d at 99 (explaining that Rule 9(b) "serves to provide a defendant with fair notice of a

plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect

him against strike suits").

Good Hill also does not identify, as it must, which of the seven Defendants made each of

the misstatements or omissions alleged in the Complaint. Instead, it broadly asserts that the

"Issuing Defendants and WaMu made misrepresentations and omissions regarding the NIM

bonds . . . by stating that they were disclosing all material risks." (Compl. ¶ 86.)  This attempt to

attribute misstatements or omissions to a group of defendants, without individuating which

20

defendant said something wrong or was required to say something more, has consistently been rejected by courts in this Circuit. *See, e.g., Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) ("The Complaint does not differentiate in any way between defendants, nor does it attempt to link any of the defendants with the alleged fraudulent statements."). Thus, absent any allegations in the Complaint tying each Defendant to a specific material misstatement or omission, the Court must dismiss Good Hill's fraud claims under Section 10(b) and New York common law for failure to plead those claims with the particularity required under either Rule 9(b) or the PSLRA.

**B.    Good Hill Does Not Adequately Allege that Any Defendant Acted With the Requisite Scienter**

Finally, and equally importantly, the Complaint fails to allege scienter under Section 10(b) – or any of the other claims asserted in the Complaint. Good Hill's single attempt at a scienter allegation is that "SEC filings made by WaMu in May 2007 regarding bond offerings backed only by junior-lien mortgage loans *indicate* that Defendants were aware" at the time of the NIM bond offering of the risk that the Servicer would change its policy in July 2007 and begin recognizing junior lien mortgage loans "as soon as the borrower failed to make payments for 180 days." (Compl. ¶¶ 73-76 (emphasis added).)

Such a generalized allegation of awareness does not meet the stringent pleading standards of the PSLRA regarding scienter. Pursuant to the PSLRA, a plaintiff must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Monster Worldwide, Inc. Sec. Litig.*, 2008 WL 623339, at *1 (quoting 15 U.S.C. § 78u-4(b)(2)). "So far as Section 10(b)…[is] concerned, the required state of mind is

'scienter,' defined in this context as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007)). A "plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns,* 493 F.3d at 99. For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.; cf. In re Monster Worldwide, Inc. Sec. Litig.*, 2008 WL 623339, at *2-3 (ruling that 90 new paragraphs in amended complaint detailing defendant's involvement in alleged backdating scheme were sufficient to plead scienter under PSLRA).

Good Hill does not even come close to meeting this strict standard. As an initial matter, generic attributions of fraudulent intent are improper. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made."); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (same). Good Hill does not allege – let alone allege with the requisite specificity – which of the seven Defendants, if any, drafted or were otherwise involved in the May 2007 SEC filings which it claims "indicated" knowledge of the risks associated with a change in practice.

Moreover, the mere fact that certain unnamed WaMu entities subsequently included a more restrictive definition of Realized Loss in some unidentified SEC filing on an unrelated bond issue does not give rise to an inference – let alone a strong inference – that any particular

defendant acted with the requisite state of mind when making a particular misstatement or

omission alleged in the Complaint.  Indeed, the Complaint is silent as to how a subsequent SEC

filing on an unrelated bond offering involving a different pool of underlying assets could have

bearing on any defendant's state of mind at the time of the offering at issue in this case which

occurred a month earlier.  Courts in this Circuit have regularly held that a plaintiff cannot plead

scienter through the type of "fraud by hindsight" allegations that are asserted in the Complaint.

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("Mere allegations that

statements in one report should have been made in earlier reports do not make out a claim of

securities fraud.") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)); *Edison*

*Fund v. Cogent Inv. Strategies Fund Ltd.*, No. 06 Civ 4045(JGK), 2008 WL 857631, at *13

(S.D.N.Y. Mar. 31, 2008) ("[A]llegations that defendants should have anticipated future events

and made certain disclosures earlier than they actually did do not suffice to make out a claim of

securities fraud.") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *Xerion Partners*

*I LLC*, 474 F. Supp. 2d at 519 (plaintiff's assertion that defendant's post-offering resignation

showed knowledge of wrongdoing at time of offering "falls far short of 'deliberate illegal

behavior,' or 'conduct which is highly unreasonable and which represents and extreme departure

from the standards of ordinary care.'" (quoting *Novak*, 216 F.3d  at 308)).

## III.    Good Hill Has Failed to State a Claim for Control Person Liability Under Section 20(a) of the Securities Exchange Act

Nor can Good Hill state a claim for control liability under Section 20(a) of the Securities

Exchange Act of 1934.  That statute provides that:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

23

15 U.S.C. § 78t(a).   The Second Circuit has explained that "[i]n order to establish a prima facie

case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled

person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person

was in some meaningful sense a culpable participant' in the primary violation."  *Boguslavsky v.*

*Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

1472 (2d Cir. 1996)).

    Because Good Hill does not state a claim pursuant to Section 10(b) against any of the

defendants, it cannot sufficiently plead the "primary violation" element of its control liability

claim against WaMu and the Bank.  *See Edison Fund*, 2008 WL 857631, at *16 (dismissing

Section 20(a) claim due to lack of primary violation of federal securities laws).

## IV.    Good Hill Cannot State a Claim of Aiding and Abetting Fraud Under the Common Law of New York

    Good Hill also has asserted a claim against WaMu and the Bank for aiding and abetting

fraud under the New York common law.  Because, as discussed above, Good Hill cannot plead either

(1) the existence of an underlying fraud, or (2) that WaMu or the Bank had actual knowledge of the

alleged fraud, both of which are essential elements of an aiding and abetting claim under New York

common law, *see VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255,

269 (S.D.N.Y. 2004); *Lenczycki v. Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248, 248 (N.Y.

App. Div. 1997), the Court must dismiss this cause of action for failure to state a claim.

## <u>Conclusion</u>

    For all of the reasons set forth herein, the motion should be granted in all respects.

24

Dated: New York, New York
      June 27, 2008

Respectfully submitted,

_____/s/ Victor J. Rocco_____
HELLER EHRMAN LLP
Victor J. Rocco (VR-4191)
(victor.rocco@hellerehrman.com)
7 Times Square
New York, NY 10036
Phone: (212) 832-8300
Fax: (212) 763-7600

Attorneys for Defendants WM Asset Holdings
Corp. CI 2007-WM2, WM Asset Holdings CI
2007-WM2 LLC, WM Asset Holdings Corp.,
WaMu Asset Acceptance Corp., WaMu Capital
Corp., Washington Mutual Bank, and
Washington Mutual, Inc.

25