COHEN & GRESSER LLP
Mark S. Cohen (mcohen@cohengresser.com)
Marc E. Isserles (misserles@cohengresser.com)
Nathaniel P. T. Read (nread@cohengresser.com)
100 Park Avenue, 23rd Floor
New York, New York 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

GOOD HILL PARTNERS L.P. ON BEHALF OF
GOOD HILL MASTER FUND, L.P.,

                     Plaintiff,

          - against -

WM ASSET HOLDINGS CORP. CI 2007-WM2,
WM ASSET HOLDINGS CO 2007-WM2 LLC,
WM ASSET HOLDINGS CORP., WAMU ASSET
ACCEPTANCE CORP., WAMU CAPITAL CORP.,
WASHINGTON MUTUAL BANK, and
WASHINGTON MUTUAL, INC.

                    Defendants.

-------------------------------------------------------------- x

Case No. 08 Civ. 3730(JSR)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

ECF Case

1.      Good Hill Partners L.P., on behalf of Good Hill Master Fund, L.P., ("Good Hill")

by its attorneys Cohen & Gresser LLP, for its complaint against WM Asset Holdings Corp. CI

2007-WM2 ("WM Asset Caymans"), WM Asset Holdings CI 2007-WM2 LLC ("WM Asset

LLC"), WM Asset Holdings Corp. ("WM Asset Holdings"), WaMu Asset Acceptance Corp.

("WaMu Asset Acceptance"), WaMu Capital Corp. ("WaMu Capital") (WM Asset Caymans,

WM Asset LLC, WM Asset Holdings, WaMu Asset Acceptance, and WaMu Capital are

collectively referred to herein as the "Issuing Defendants"),Washington Mutual Bank (the

"Bank"), and Washington Mutual, Inc. ("WaMu") alleges upon personal belief with respect to its own acts and upon information and belief with respect to all others, as follows:

## Nature Of The Claims

2.      Good Hill brings this action to recover the damages caused by the fraudulent misrepresentations and omissions made by the Issuing Defendants and the Bank in connection with an April 2007 offering of asset-backed bonds. WaMu and the Bank directed and controlled the actions of all the other Defendants, and consciously participated in their fraudulent conduct.

3.      WaMu Capital, the other Issuing Defendants, and the Bank marketed these asset-backed bonds through offering documents that were false and misleading because they failed to disclose that the Bank would impose a "charge-off policy" for junior liens and in effect represented that no such policy would be imposed. A charge-off policy significantly increases the likelihood that the trust supporting the bonds will incur substantial losses within the first year after the bond offering and is thus an important factor in the decision to invest in those asset-backed bonds.

4.      But the offering documents created by WaMu Capital, the other Issuing Defendants, and the Bank would have led any reasonable investor – as they led Good Hill – to conclude that the Bank would not in fact impose such a policy. These Defendants knew, or were reckless in failing to know, that these representations and omissions were false, and that it was likely that the Bank would impose a charge-off policy.

5.      Good Hill purchased over $18 million in bonds in reasonable reliance on Defendants' false and misleading representations and omissions. Just three months after Good Hill bought those bonds, the Bank told Good Hill that it would apply the charge-off policy that the offering documents misleadingly represented would not be imposed. At that time, the Bank's

representatives wrongfully claimed that the offering documents had disclosed the Bank's right to impose such a policy – even though the offering documents never mentioned such a policy. As a result of the imposition of this previously-undisclosed charge-off policy, Good Hill suffered at least $7 million in damages.

6.    Since 2000, WaMu has issued subprime mortgage loans and securitized those loans through asset-backed bond offerings. WaMu directs these activities through its control of the Bank, WaMu Capital, the other Issuing Defendants, and other WaMu affiliates.

7.    The Bank and other WaMu divisions issue subprime mortgage loans. WaMu, through WaMu Asset Acceptance and other affiliates, then pools those loans into collateral for bonds and creates special-purpose trusts to own the pools of mortgage loans.

8.    Through WaMu Capital and special-purpose entities such as the other Issuing Defendants, WaMu directs the issuance and sale of mortgage-backed bonds to the public through private placement memoranda, prospectuses, and other disclosure documents. In addition to bonds directly backed by mortgage loans, WaMu and its affiliates also issue "net interest margin" ("NIM") bonds.

9.    NIM bonds are backed by the excess interest, or the "net interest margin" – *i.e.* the difference between the interest the collateral trust receives on mortgage loans in the underlying pool and the interest paid on the bonds backed by those loans. NIM bondholders are generally entitled to receive this excess interest. When the trust incurs "realized losses," however, that income can be used to pay amounts due to other bondholders and not the NIM bondholders.

10.    Good Hill purchased $18.45 million of WaMu NIM bonds denominated as Class N-2 Notes in the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). Good Hill purchased the NIM bonds at 98% of their face value.

11.    The 2007-WM2 Offering was made in connection with an associated offering of asset-backed bonds. These bonds were collateralized by a $1.5 billion pool of subprime residential mortgage loans held by the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust included both senior-lien and junior-lien mortgage loans.

12.    In prospectuses issued under WaMu's direction and control in 2006 and 2007 for bond offerings backed by junior-lien mortgage loans, WaMu Capital and other WaMu affiliates expressly disclosed that the Bank would apply a charge-off policy to the mortgage loans in the collateral pool. The charge-off policy generally required the Bank to charge-off a junior-lien mortgage loan after the loan had been in default for 180 days. The disclosures in these documents specifically stated that the charge-off policy would result in affected junior-lien mortgage loans being "treated as a liquidated mortgage loan giving rise to a realized loss." Investors reviewing these documents thus understood that there was a significant risk that the collateral underlying the bonds would incur losses within six months of the offering, thus decreasing the value of the underlying bonds.

13.    By contrast, the offering documents for the 2007-WM2 Offering do not mention a charge-off policy at all, much less provide a specific disclosure that the Bank would impose a charge-off policy when servicing junior-lien mortgage loans. Other than this significant omission, the relevant risk disclosures in the 2007-WM2 Offering are virtually identical to the disclosures made in contemporaneous junior-lien transactions offered by WaMu Capital and other WaMu affiliates acting as issuers.

14.     Given the lack of any express disclosure that the Bank would impose a charge-off policy when servicing the junior-lien collateral supporting the 2007-WM2 Offering, any reasonable investor would have understood that the Bank would *not* impose such a policy, and that the Trust would not incur realized losses on that basis. At the very least, the failure of the Issuing Defendants and the Bank to disclose the significant possibility that the Bank would impose a charge-off policy – a risk that WaMu Capital, the Bank, and other WaMu affiliates typically disclose in similar bond offering documents – rendered the 2007-WM2 Offering documents misleading regarding a key term affecting how losses on the collateral would be realized. How losses on the collateral are determined is of critical importance to prospective investors in asset-backed bonds.

15.     The disclosures in the offering documents that the Bank would not impose a charge-off policy for junior-lien mortgages were confirmed by a Term Sheet that WaMu Capital prepared and sent to investors. In that Term Sheet, WaMu Capital included graphs identifying various loss scenarios that were inconsistent with the Bank's application of a 180-day charge-off policy to junior-lien mortgages. Thus, through this graph, WaMu Capital misleadingly represented to Good Hill that the Bank would not impose a charge-off policy.

16.     In addition, WaMu Capital employees made representations to Good Hill in contemporaneous e-mails and oral statements that were wholly inconsistent with the possibility that the Bank would impose a charge-off policy to junior liens. These representations and the omission of any disclosure regarding a charge-off policy sent Good Hill the unmistakable, but flatly false, message that the Bank would not in fact apply such a policy.

17.     Good Hill reasonably relied on these misrepresentations and omissions when it purchased over $18 million in bonds. Despite these representations that the Bank would not

apply a charge-off policy to junior lien mortgages, the Bank informed Good Hill in July 2007 –
just three months after Good Hill purchased its bonds – that it would, in fact, apply a 180-day
charge-off policy to junior-lien mortgages, and that the Trust would incur realized losses as a
result of that policy.

18.    The application of the previously-undisclosed charge-off policy caused the excess
cash flow that formed the collateral for Good Hill's NIM bonds to be paid to other bondholders
instead of Good Hill. This material impact to the value of the collateral securing the NIM bonds
greatly reduced the value of the NIM bonds themselves.

19.    Good Hill would not have bought the NIM bonds – and certainly would not have
paid 98% of face value for them – if the Defendants had disclosed the possibility that the Bank
would impose a charge-off policy on the junior-lien collateral in the Trust.

20.    At the time of the 2007-WM2 Offering, WaMu Capital and the other Issuing
Defendants knew, or were reckless in not knowing, that the Bank as servicer would impose a
charge-off policy on junior-lien mortgages, and that their representations that no charge-off
policy would be imposed were therefore false and misleading at the time Good Hill purchased
the bonds.

21.    Indeed, given WaMu Capital's extensive experience as an issuer on prior and
contemporaneous similar transactions in which the Bank acted as servicer on junior-liens and
imposed a charge-off policy, the close working relationship between the Issuing Defendants and
the Bank in the marketing and sale of these bonds, and the duty of the Issuing Defendants as
issuers to identify and disclose to investors all material risks associated with a bond offering, the
failure of these Defendants to identify and disclose the risk that the Bank would in fact apply a

charge-off policy was highly unusual and marked an extreme departure from the standards of ordinary care governing the marketing and sale of asset-backed bonds.

22.    Nor did WaMu Capital or the other Issuing Defendants have an innocent, non-fraudulent reason to fail to disclose this risk to investors (a risk they typically disclose), or to represent – as they did repeatedly – that the Bank would not in fact apply such a policy.  To the contrary, their representations and omissions were so obviously false and contrary to reasonable expectations of the market that they knew, or were reckless in not knowing, that Good Hill would be misled as a result, and would decide to purchase these bonds based on the mistaken, fraudulently-induced belief that the collateral in trust would not experience realized losses on the basis of a charge-off policy.  For the same reasons, the Bank knew or was reckless in not knowing that its failure to disclose the risk of a charge-off policy in the Offering documents was likely to mislead investors into thinking that no such policy would be imposed.

23.    The Issuing Defendants' and the Bank's misleading representations and omissions of material fact were done in violation of their duties under the federal securities laws, Connecticut securities laws, and the common law of Connecticut.  Because WaMu and the Bank had the power to control the misrepresentations and omissions of the Issuing Defendants, and consciously participated in those misrepresentations and omissions through their exercise of such control, they also violated the federal securities laws and the common law of Connecticut. As a result, Good Hill has suffered damages of at least $7 million.

## The Parties

24.    Plaintiff Good Hill Partners L.P. is a Delaware limited partnership with a principal place of business in Westport, Connecticut.  It is the investment manager for Good Hill Master Fund L.P. (the "Fund").

25.    The Fund purchased the bonds at issue and incurred the losses described below. The Fund then assigned all of its rights, including the right to bring this suit, to Good Hill Partners L.P.

26.    Defendant WM Asset Holdings Corp. CI 2007-WM2 ("WM Asset Caymans") is a Cayman Islands company, with an address of c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984, George Town, Grand Cayman, KY1-1104, Cayman Islands.  WM Caymans was the issuer of the NIM bonds in the 2007-WM2 Offering.

27.    Defendant WM Asset Holdings CI 2007-WM2 LLC ("WM Asset LLC") is a Delaware limited liability company with an office at 850 Library Avenue, Suite 204, Newark, Delaware 19711.  WM Asset LLC was the co-issuer of the NIM bonds in the 2007-WM2 Offering.

28.    Defendant WM Asset Holdings Corp. ("WM Asset Holdings") is a Delaware corporation that may be served care of Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  WM Asset Holdings is a wholly-owned subsidiary of the Bank and was the seller and sponsor of the NIM bonds in the 2007-WM2 Offering.

29.    Defendant WaMu Capital Corp. ("WaMu Capital") is a Delaware corporation with a principal place of business at 1301 Second Avenue, Seattle, Washington 98101.  WaMu Capital is a wholly-owned subsidiary of the Bank and a registered broker-dealer.  WaMu Capital was the initial purchaser and underwriter of the NIM bonds in the 2007-WM2 offering, and, as such, was the only entity appearing on the cover of the Private Placement Memorandum, and was listed as an underwriter on the Prospectus Supplement.  WaMu Capital also has a New York office, from which it marketed the WaMu 2007-WM2 Offering.

30.     Defendant WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance") is a Delaware corporation with an office at 1400 South Douglass Road, Suite 100, Anaheim, California 92806. WaMu Asset is a wholly-owned subsidiary of the Bank. WaMu Asset was the depositor of the certificates issued which in the aggregate constituted the entire ownership interest in the pool of mortgage loans that served as the collateral for the NIM bonds in the 2007-WM2 Offering. WaMu Asset Acceptance issued the Prospectus at issue here, and sold the underlying securities issued pursuant to that Prospectus.

31.     WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Capital, and WaMu Asset Acceptance are collectively referred to herein as the "Issuing Defendants."

32.     Defendant Washington Mutual Bank (the "Bank") is a national bank with branches throughout New York City. The Bank has its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. The Bank is an indirect wholly-owned subsidiary of WaMu. The Bank is the servicer of the collateral underlying the NIM bonds in the 2007-WM2 Offering. The Bank was also the sponsor of the public offering of the underlying asset-backed bonds issued in connection with the 2007-WM2 Offering. The Bank also exercised control over each of the Issuing Defendants in connection with the 2007-WM2 Offering.

33.     Defendant Washington Mutual, Inc. ("WaMu") is the ultimate parent company of all the defendants. WaMu is publicly traded on the New York Stock Exchange. WaMu is a Washington corporation with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. WaMu exercised control over each defendant regarding its actions in connection with the 2007-WM2 Offering.

## Jurisdiction and Venue

34.    This Court has personal jurisdiction over the Defendants because each Defendant regularly conducts business in the Southern District of New York or purposefully availed itself of the benefits and protections of this forum.

35.    This Court has personal jurisdiction over defendants WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Asset Acceptance, and WaMu Capital because each of those defendants played an integral role in the marketing and selling of the 2007-WM2 NIM bonds in New York. In particular, WaMu Capital employees located in Manhattan provided information about the 2007-WM2 Offering to Good Hill in connection with its purchase of those bonds.

36.    This Court has personal jurisdiction over the Bank because it regularly conducts business in New York City through its approximately one hundred branches here.

37.    This Court has personal jurisdiction over WaMu because it also regularly conducts business in New York City through its banking, insurance, investment product, and other operating subsidiaries.

38.    This Court has subject matter jurisdiction over the federal securities law claims because they arise under the laws of the United States, and must be brought in federal district courts pursuant to 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over Good Hill's state law claims pursuant to 28 U.S.C. § 1367.

## Facts

I.    *WaMu Acquired the Long Beach Subprime Mortgage Business to Expand the Scope of its Asset-backed Bond Offerings.*

39.    In the early 1990's, Long Beach Savings Bank, a leading lender in the subprime residential mortgage market, began issuing bonds backed by pools of subprime mortgages.

Subprime mortgages are issued to borrowers with lower credit ratings and carry higher interest rates and higher risk than conventional mortgages.

40.     In 1997, Long Beach Savings split into two entities: Ameriquest Mortgage Company, a privately-held lender, and a publicly-traded lender known as Long Beach Securities Corp. WaMu purchased Long Beach Securities Corp. in 1999.

41.     WaMu's 1999 purchase of Long Beach Securities Corp., now known as Long Beach Mortgage Company, greatly expanded WaMu's subprime lending business, as well as its associated business of issuing bonds backed by subprime mortgage loans.

42.     In January 2007, WaMu issued a press release stating that it would "securitize all loans issued through its Long Beach Mortgage division using the WaMu Asset Acceptance Corp. shelf registration . . . ." The contact person on the press release was Henry Engelken, a Bank employee in New York with whom Good Hill spoke after it purchased the NIM bonds in the 2007-WM2 Offering. In the press release, Doug Potolsky, a Bank executive, describes WaMu's control over both securitizations under the prior Long Beach name and its plan to control securitizations made after January 2007 using the WaMu name:

> We've made many changes in [Long Beach Mortgage Company's] business model and operations beginning when we consolidated its operations into WaMu and this is a logical next step. For these reasons, we feel it is appropriate to brand our Long Beach Mortgage securitized product offerings as Washington Mutual product offerings.

43.     In addition, WaMu made a presentation to the public in January 2007 regarding its Subprime Mortgage Program that describes WaMu's successful efforts to bring all of its residential mortgage businesses "under one roof." The presentation touts the experience of WaMu's managers in all aspects of the subprime mortgage securitization process: the origination of loans, sale of those loans to collateral trusts, securitization of the payments due the trusts

through issuance of asset-backed bonds through special-purpose conduits, and collection and servicing on the loans in the collateral pool. The contacts for further information regarding this WaMu presentation included Mr. Potolsky (who had signed SEC filings regarding bonds issued under the "Long Beach" name) and Mr. Engelken, and Kevin Richmond of WaMu Capital.

44.     These statements show that WaMu and the Bank direct and control the actions of their affiliates through the entire course of issuing bonds backed by mortgages issued by the Bank and its divisions.

## II.     *WaMu and Its Affiliated Issuers Offer Asset-Backed Bonds Backed by Loans.*

45.     WaMu, through the Bank and other subsidiaries, was among the ten largest subprime mortgage lenders in the United States. WaMu originated nearly $30 billion in subprime mortgage loans in 2005 and nearly $20 billion in 2006.

46.     WaMu pools its subprime mortgage loans into collateral for bonds. These pools are held by trusts specifically formed to own the underlying mortgage loans. The pools may hold all senior-lien mortgage loans, all junior-lien mortgage loans, or a combination of senior- and junior-lien mortgage loans. WaMu Capital and other WaMu affiliates then issue and sell these mortgage-backed bonds to investors.

47.     WaMu and its affiliated issuers offer these bonds to the public through prospectuses, private placement memoranda, and other disclosure documents. The prospectus for a given transaction contains relatively general disclosures; the details regarding the collateral supporting the transaction and other specifics are provided in a prospectus supplement.

48.     WaMu's pools of mortgages are governed by pooling and servicing agreements between WaMu Asset Acceptance as the depositor of the loans and the Bank as the servicer of those loans.

49.     As the servicer of the underlying mortgage loans, the Bank collects payments from the borrowers, calculates the outstanding principal and interest, addresses non-payment by borrowers, and performs other operations related to the administration of the mortgage loans.

**III.    *WaMu and Its Affiliated Issuers Offer NIM Bonds to Securitize an Income Stream Arising from Traditional Asset-backed Bond Offerings.***

50.     In addition to bonds directly backed by subprime mortgage loans, WaMu and its affiliated issuers also offer "net interest margin" ("NIM") bonds.

51.     The borrowers on the underlying mortgage loans in the pool pay a higher rate of interest than is paid to the bonds that are backed directly by those loans. This amount is referred to as the excess interest, or the "net interest margin" – the difference between the interest WaMu receives on mortgage loans in the pool and the interest it pays on the bonds backed by those loans.

52.     NIM bondholders are generally entitled to receive the income generated by the difference between the interest paid on the underlying mortgage loans and the interest on bonds backed by the loans. These bonds are referred to as the certificates of the transaction.

53.     To offer a simplified example, suppose the borrowers on the underlying mortgage loans pay an 8% annual interest rate, but WaMu is only paying 6% annual interest on the certificates. The mortgage loans total $1 billion in principal, and WaMu has issued $1 billion in face amount of certificates. Each year, WaMu would receive a residual income stream of 2% (8% - 6%) of the $1 billion, or $20 million. Rather than keeping these funds for itself, WaMu chose to issue NIM bonds backed by this income stream.

54.     NIM bonds generate a fairly stable cash flow that includes payments of both interest due on the bonds and partial payments of principal. Depending on the cash flow generated by the underlying pool of mortgage loans, NIM bonds are typically repaid in full in a

relatively short period of time, even though their stated maturity date can be as many as thirty years after the issuance. NIM bonds are often subordinated to other bonds issued in the same offering, and thus are more sensitive to realized losses incurred by the trust.

**IV.    *Good Hill Purchased Over $18 Million in Bonds in the WaMu 2007-WM2 Offering.***

55.    Good Hill was formed in late 2006 as an investment management company. Good Hill examined a variety of investments, including asset-backed securities.

56.    Among the offerings of asset-backed securities that Good Hill evaluated for purchase were NIM bonds issued by WaMu in connection with an offering of traditional asset-backed bonds. The traditional bonds were denominated the WaMu Asset-Backed Certificates (the "Underlying Certificates") and were offered through a prospectus dated March 22, 2007 and a supplement thereto dated April 5, 2007 (collectively, the "Prospectus").

57.    The trust that held the mortgage-loan collateral for these Certificates and the associated NIM bonds was called the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust contained two groups of loans: Group I and Group II.

58.    The NIM bond offering was denominated the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). The 2007-WM2 Offering was described in an April 18, 2007 Term Sheet (the "Term Sheet") and a private placement memorandum dated April 26, 2007 (the "Private Placement Memorandum"). The Private Placement Memorandum attached the Prospectus Supplement and Prospectus and referred investors to those documents for disclosures on those Underlying Certificates. The Bank was the sponsor of the public offering of the Underlying Certificates, and WaMu Capital was an underwriter of that transaction.

59.    The Prospectus Supplement includes disclosures most relevant to the particular offering while the Prospectus contains more general disclosures. The Prospectus Supplement highlights this distinction, telling investors that information about the offering is provided

> in two separate documents that progressively provide more detail:
> (a) the accompanying prospectus, which provides general
> information, some of which may not apply to your series of
> certificates, and (b) this prospectus supplement, which describes
> the specific terms of your series of certificates.

60.     The Private Placement Memorandum also attached the Term Sheet, a sample
indenture for the NIM bonds, the pooling and servicing agreement governing the collateral held
in the trust (the "2007-WM2 PSA"), and other materials relating to the NIM bonds, the
Underlying Certificates, and the Trust.

61.     The 2007-WM2 Offering included three series of bonds: the N1, N2, and N3.

62.     Good Hill focused its interest on the N2 Notes, which were issued with a total
face value of $19,450,000 and a fixed interest rate of 7.500%. The stated maturity date was
April 2047. This bond was rated A-/A- by Standard & Poor's and Fitch because of the collateral
backing and structure of the 2007-WM2 Offering.

63.     The Prospectus Supplement showed that the Trust contained nearly all senior-lien
subprime mortgages, but included some junior-lien subprime mortgages as well. According to
the Prospectus Supplement, approximately 1.88% of the loans in Group I were junior-lien
mortgages and approximately 8.07% of the loans in Group II were junior-lien mortgages. A
March 28, 2007 collateral report issued by WaMu Capital made clear that these junior-lien
mortgages were related to senior-lien mortgages included in the Trust: the borrowers and
collateral associated with the related loans were the same.

64.     The Bank was the servicer of the underlying mortgage loans contained in the
Trust and the sponsor of the public offering of the underlying asset-backed bonds issued in
connection with the 2007-WM2 Offering.

65.     Under the structure of the 2007-WM2 Offering, when the Trust suffers Realized
Losses, the residual income is no longer used to pay the principal and interest due on the NIM

bonds, but is instead used to make up the shortfall on the payments due to the holders of the

Underlying Certificates. The value of the collateral supporting the NIM bonds – and the value of

the NIM bonds themselves – decreases significantly when the Trust incurs Realized Losses.

Accordingly, when and how the Trust would incur such losses – including whether WaMu would

apply a charge-off policy to accelerate or increase those losses – was a key factor in the

determination by Good Hill and any other prospective NIM bond investor of whether to invest in

the NIM bonds.

**V.    *In Similar Offerings Involving Junior-lien Mortgage Loans, WaMu Capital and WaMu's Affiliated-Issuers Explicitly Disclose The Risk That The Bank Will Apply A Charge-off Policy.***

66.    Besides issuing bonds backed by nearly all senior-lien mortgage loans (with some

junior-lien mortgages included, as in the 2007-WM2 Offering), for several years WaMu has

issued bonds backed only by junior-lien mortgage loans.

67.    Prior to purchasing the bonds in the 2007-WM2 Offering, Good Hill reviewed

and was aware of the disclosures regarding the charge-off policy and realized losses that WaMu

and the Bank's issuing affiliates typically make in junior-lien transactions.

68.    In these junior-lien-backed WaMu bond offerings, WaMu Capital and other

WaMu affiliates acting under WaMu's direction and control specifically disclose that the Bank,

acting as servicer, will apply a charge-off policy by which junior-lien loans generally will be

"charged off" or removed from the underlying trust no later than 180 days after the borrower

defaults on the loan.

69.    An example of such an offering is the Long Beach Mortgage Loan Trust 2006-A,

issued pursuant to a prospectus dated April 7, 2006 and a prospectus supplement dated May 2,

2006. WaMu directed and controlled this bond issuance. The issuer was a WaMu special-

purpose entity, WaMu Capital was an underwriter, and the Bank was the servicer of the

collateral – just as in the WaMu offering in which Good Hill purchased over $18 million in NIM
bonds.

      70.    The "Summary of Terms" section that begins the prospectus supplement for that
junior-lien-only transaction specifically discloses not only that a charge-off policy would apply
to the junior-lien mortgage loans held by the trust, but that application of that policy would result
in realized losses:

> Loan Charge-off Policy:
>
> Generally, the servicer must charge off a mortgage loan no later
> than the date it becomes 180 days delinquent (unless it determines
> that a significant net recovery is possible), and it may charge off a
> mortgage loan prior to that date.  Once a mortgage loan has been
> charged off, the master servicer will discontinue making advances,
> the servicer will not be entitled to the servicing fee for such
> mortgage loan, *and the mortgage loan will be treated as a
> liquidated mortgage loan giving rise to a realized loss.*  (Emphasis
> supplied.)

      71.    The charge-off policy is also specifically referred to in the first entry in the Risk
Factor section of the prospectus supplement, which is titled "Second Lien Mortgage Loans are
More Likely to Incur Losses than First Lien Mortgage Loans."  That risk disclosure first
describes the general risk associated with junior-lien mortgages, stating that the

> proceeds from any liquidation, insurance or condemnation
> proceedings will generally be available to satisfy the outstanding
> balance of the [junior-lien] mortgage loans only to the extent that
> the claims of the related senior mortgages have been satisfied in
> full, including any related foreclosure costs.  There may not be
> enough proceeds to pay both the first lien and the second lien.

      72.    The disclosure in the prospectus supplement continues by specifically noting the
risk of loss associated with the charge-off policy applicable to the junior-lien mortgages in the
collateral pool:

> In circumstances when the servicer determines it to be
> uneconomical to foreclose on the mortgaged property, the servicer

may charge off the entire balance of the mortgage loan as a bad debt.

73.     The more detailed disclosures in the prospectus supplement regarding the Bank's actions as servicer also include a section describing the charge-off policy applicable to the junior-lien mortgage loans held as collateral:

> Loan Charge-off Policy.
>
> No later than the day on which a mortgage loan becomes 180 days delinquent, the servicers will determine whether a significant net recovery is possible through foreclosure proceedings or other liquidation of the related mortgage property.  If the servicer determines that no such recovery is possible, it must charge off the mortgage loan no later than the date it becomes 180 days delinquent, and it may charge off the loan prior to that date.  Once a mortgage loan has been charged off, the master servicer will discontinue making advances, the master servicer will not be entitled to the servicing fee for such mortgage loan, and the mortgage loan will be treated as a liquidated mortgage loan giving rise to a realized loss.

74.     The loan pooling and servicing agreement in this representative WaMu junior-lien-only transaction (the "Junior-Lien PSA") – an agreement between the Bank as servicer of the mortgages and the depositor, which is incorporated into the offering documents for the bond issue – also explicitly sets forth the charge-off policy.  Section 3.16 of that agreement has the heading "Realization Upon Defaulted Mortgage Loans," and Section 3.16(a)(ii) contains substantially the same text as in the indented quote above in paragraph 73.

75.     The definition of realized loss in the Junior-Lien PSA specifically refers to Section 3.16(a)(ii) and the charge-off policy reflected therein:

> With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan.  Any Mortgage Loan or REO Property that is charged off pursuant to Section 3.16(a)(ii) will give rise to a Realized Loss at the time it is charged off, as described in Section 3.16 hereof.

The definition of Liquidated Mortgage Loan thus expressly includes any loan "that has been charged off as contemplated in Section 3.16(a)(ii)," and the Junior-Lien PSA expressly defines a Liquidation Event as including the charge-off of a loan under Section 3.16(a)(ii).

76.    These representative documents – created as part of a contemporaneous, highly similar transaction involving the Bank, WaMu Capital, and other WaMu affiliates acting as issuers – demonstrate that, if the Bank acting as servicer intends to apply a charge-off policy to junior-lien mortgages, a reasonable investor would expect to see that intent repeatedly and openly disclosed in the prospectus supplement and other offering documents.

77.    WaMu directs WaMu Capital and its other affiliates to make these disclosures because the application of a charge-off policy significantly affects the amount of realized losses the collateral will experience. In particular, a 180-day blanket charge-off policy creates a higher likelihood of significant realized losses during the first year after a bond offering because junior-lien loans in default generally must be charged off when the borrower has not made a payment for six months. Conversely, where there is no charge-off policy and the junior-lien loans are serviced in conjunction with senior-lien loans, the likelihood of realized losses during the first year after an offering is much lower because the trust will not realize losses until after a foreclosure sale or similar liquidation event – events that typically do not take place within the first year after the offering is completed.

78.    Application of a charge-off policy to junior-liens can have a significant affect on the timing and amount of realized losses, and whether and how losses are incurred on the collateral are critical issues for investors considering purchasing asset-backed bonds. Accordingly, the disclosure of the risk that the Bank will impose such a policy (or the failure to make such a disclosure) is a significant element in the mix of facts investors look to when

evaluating WaMu's asset-backed bonds. Because NIM bonds are both highly sensitive to losses and generally repaid within twelve to fourteen months after the bond offering, investors – such as Good Hill – considering purchasing WaMu NIM bonds place particular emphasis on whether the offering documents expressly provide that the Bank will impose a charge-off policy.

**VI.** ***The Issuing Defendants and the Bank Failed to Disclose that the Bank Would Apply a Charge-off Policy in the 2007-WM2 Offering, and Misleadingly Indicated that the Bank Would Not Apply Such a Policy.***

79.     Given the WaMu issuers' consistent practice of making *numerous and express* disclosures in the offering documents of the servicer's intent and authority to apply a charge-off policy, a reasonable investor evaluating the 2007-WM2 Offering would have expected to see an explicit disclosure of such a policy in the Offering documents if the Bank intended to impose that policy on the junior-lien mortgage loans included in the Trust.

80.     In stark contrast to the numerous express disclosures of a charge-off policy made in WaMu offerings backed by junior-lien mortgages, the 2007-WM2 Offering documents make no mention of a charge-off policy. Given the detailed disclosures regarding charge-off policies for junior-lien mortgages in similar WaMu offerings in the past, the inescapable inference of these documents was that the Bank would *not* apply a charge-off policy to junior-lien mortgages, and that the Trust would not incur realized losses on the basis of such a policy. At the very least, the failure of the Issuing Defendants and the Bank to disclose the meaningful possibility that the Bank would impose a charge-off policy – a material risk factor directly affecting the value of the bonds – rendered those disclosure documents highly misleading.

81.     The Bank issued the Prospectus Supplement as sponsor of the Underlying Certificates. The Prospectus Supplement expressly discloses a risk titled "Junior Lien Mortgage Loans are More Likely to Incur Losses and May be Subject to Higher Prepayments that First Lien Mortgages." This section begins – just as the nearly-identical disclosure in a typical WaMu

prospectus for junior-lien-only transactions begins -- by disclosing the general risk associated

with junior-lien mortgages:

> The primary risk to holders of mortgage loans secured by junior
> liens is the possibility that adequate funds will not be available in
> connection with the foreclosure of the related senior lien to satisfy
> fully both the senior lien and the junior lien.  The claims of the
> holders of the senior lien will be satisfied in full out of the
> proceeds of the liquidation of a junior lien mortgage before the
> trust, as holder of the junior lien, receives any payments in respect
> of such mortgage loan.  If the servicer were to foreclose on any
> junior lien mortgage loan, it would do so subject to any related
> senior lien.

82.    But unlike the virtually-identical risk disclosure in a typical WaMu offering for

junior-lien-only transactions, which goes on to expressly disclose the *specific* (and highly

significant) risk associated with the Bank's charge-off policy for junior-lien mortgages, the risk

disclosure in the Prospectus Supplement makes no mention at all of a charge-off policy.  Thus, in

the very risk disclosure in which a reasonable investor would expect to find an express disclosure

of the Bank's charge-off policy for junior-liens, the Prospectus Supplement was completely

silent.  Given the critical importance of a charge-off policy disclosure to the value of a NIM

bond, and the consistent practice of WaMu issuers in disclosing the existence of such a policy in

the risk disclosures in the offering documents, any reasonable investor would have interpreted

the Prospectus Supplement to mean that the Bank would not apply a charge-off policy to the

junior-lien mortgages included in the Trust.

83.    The Prospectus Supplement also does not contain any mention of a charge-off

policy in the detailed disclosures describing the Bank's role as servicer, unlike the prospectus

supplement in WaMu's junior-only transactions.  Again, given the consistent practice of WaMu

issuers in disclosing the existence of a charge-off policy when describing the Bank's role as

servicer, the absence of any such disclosure in the Prospectus Supplement would have been

interpreted by any reasonable investor to mean that the Bank would not be applying such a policy to the junior-lien mortgages in the Trust.

84. Moreover, the 2007-WM2 PSA also fails to include any reference to a charge-off policy. As noted above, a typical Junior-Lien PSA would include numerous disclosures specifically describing the Bank's charge-off policy and the effect of that policy. Thus, the PSA included with the Long Beach Mortgage Loan Trust 2006-A offering contained an express disclosure of a charge-off policy for junior lien mortgages in Section 3.16 ("Realization Upon Defaulted Mortgage Loans") – specifically in Section 3.16(a)(ii). Although the 2007-WM2 PSA includes a virtually identical Section 3.16, it does not include a Section 3.16(a)(ii) nor does it mention a charge-off policy in any other section.

85. The definition of "Realized Loss" in the 2007-WM2 PSA also lacks any reference to a charge-off policy: "With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan." This definition is word-for-word the same as the definition in the Junior-Lien PSA -- except, of course, for the notable omission of the sentence explicitly stating that the application of the charge-off policy would give rise to a Realized Loss.

86. Not surprisingly, the definitions of Liquidated Mortgage Loan and Liquidation Event in the 2007-WM2 PSA are also virtually identical to the definitions of those terms in the Junior-Lien PSA -- except that the definitions of these terms in the 2007-WM2 PSA make no mention at all of the existence or application of a charge-off policy. Because the Bank was a party to the 2007-WM2 PSA, and knew that the 2007-WM2 PSA would be included in the Offering documents through which the Issuing Defendants would market and sell the bonds to

the public, the nondisclosure in the PSA regarding the Bank's intention to apply a charge-off policy is a nondisclosure and implied false representation attributable both to the Issuing Defendants and to the Bank itself, in addition to the nondisclosures and false statements made by the Bank and the Issuing Defendants in the Prospectus Supplement.

## VII.    *WaMu Capital Made Additional Representations That the Bank Would Not Apply a Charge-off Policy to the Collateral in the 2007-WM2 Offering.*

87.    WaMu Capital made additional statements that led to the reasonable understanding that the Bank would not impose a charge-off policy on junior-lien mortgages included in the Trust.

88.    For example, the Term Sheet issued and provided to prospective investors by WaMu Capital included three graphs showing that the Trust would incur minimal, if any, Realized Losses on the mortgages in the pool during the thirteen-month payment period for the NIM bonds.

89.    As discussed above, application of a specific charge-off policy generally requires defaulted junior-lien mortgage loans to be charged-off after the borrower has not paid for six months. These blanket charge-offs cause the trust holding those loans to incur significant realized losses as a result – especially since borrowers under junior-lien mortgages generally default on mortgage payments at a higher rate than borrowers default under senior-lien mortgages. Accordingly, if the Bank were going to impose a charge-off policy on the collateral in the Trust, a reasonable investor would have expected to see the Trust incurring more significant Realized Losses beginning in September 2007 – six months after the 2007-WM2 Offering. Because the Term Sheet did not include estimations of such losses in September 2007 or the rest of the first year following the Offering, it reinforced the representations of the 2007-WM2 disclosure documents that the Bank would not impose a charge-off policy. The graphs in

the Term Sheet amount to an additional, false representation by WaMu Capital that the Bank would not apply a charge-off policy.

90.    The Term Sheet also included a table showing the time frames in which the NIM bonds would be repaid based on various loss scenarios. Each of these showed that the NIM bonds would be repaid (both principal and interest) within 14 months, even at the highest levels of contemplated Realized Losses. Again, if the Bank were going to impose a charge-off policy, any reasonable investor would have expected to see higher Realized Losses and longer repayment windows in the Term Sheet. WaMu Capital's inclusion of short repayment windows thus confirmed the message that the Bank would not impose a charge-off policy, and, in effect, amounted to a representation that it would not do so.

91.    In addition, on March 28, 2007, Robert Clark, a Director at WaMu Capital, e-mailed a collateral report to Good Hill regarding the collateral underlying the 2007-WM2 Offering. This report showed that, for each junior-lien mortgage loan held by the Trust, the related senior-lien mortgage loan was also held by the Trust.

92.    This description of the collateral in the collateral report was highly significant to Good Hill because it indicated that the Bank would service the senior- and junior-lien mortgage loans *together*. In other words, because the Trust held the associated senior lien for every junior lien at issue, Good Hill had additional grounds for believing that the Bank would not charge-off a defaulted junior lien as bad debt in advance of a foreclosure proceeding on the senior lien. Since the Bank would control the servicing and foreclosure process on both the junior-lien mortgage loan and the related senior-lien mortgage loan, and the Prospectus Supplement did not disclose WaMu's intent to impose a charge-off policy, Good Hill reasonably understood that the

Trust would most likely incur Realized Losses on the junior-lien mortgage loans at the same time as it incurred Realized Losses on the related senior-lien loan.

93.     During phone calls with Good Hill in the period of April 18 through April 26, 2007, Kevin Richmond of WaMu Capital expressly confirmed this interpretation, and stated that the Bank would treat the related senior-lien and junior-lien mortgage loans as one loan for purposes of Realized Losses. Mr. Richmond was listed as a contact for further information in the January 2007 presentation describing the control that WaMu and the Bank exercise over all aspects of the issuing of asset-backed bonds such as those in the 2007-WM2 Offering, and Good Hill knew based on conversations with Mr. Richmond that he was familiar with the representations and disclosures made by WaMu and its affiliates in those offerings.

94.     Of course, to impose a charge-off policy under which the Bank would routinely write-off a defaulted junior lien as bad debt and incur Realized Losses after 180 days – well in advance of a foreclosure proceeding on the property – would be to service the junior and senior liens as *separate loans,* not as one loan. Thus, Mr. Richmond's statement on behalf of WaMu Capital amounted to an additional, false representation that the Bank would not impose a special 180-day charge-off policy for junior liens.

95.     Prior to purchasing the NIM bonds, Good Hill conducted a yield analysis for those bonds based on information provided by WaMu regarding the collateral held by the Trust. Good Hill's initial analysis included a conservative estimate that the Trust would suffer some Realized Losses in the first year. These estimates were not as high as Good Hill would have estimated if the Offering documents had disclosed that the Bank would impose a charge-off policy.

96.    Good Hill shared this analysis with Timothy O'Brien and Kevin Richmond of WaMu Capital, two of the lead employees marketing the 2007-WM2 Offering. On April 18, 2007, Messrs. O'Brien and Richmond responded to these calculations by e-mail. The responses stated that the Trust would not suffer the Realized Losses that Good Hill had calculated. Mr. O'Brien also noted in an April 18, 2007 e-mail that even poorly-performing prior bond offerings had not incurred Realized Losses of the magnitude Good Hill had suggested could be incurred. The responses also included statements of what Realized Losses could be expected in the first year.

97.    As with the graphs and tables in the Term Sheet, the representations regarding Realized Losses made in these April 18 emails are flatly inconsistent with the losses that would be incurred if the Bank were going to impose a charge-off policy on the junior-lien loans in the Trust. Accordingly, the e-mails amounted to additional false representations by WaMu Capital that the Bank would not apply a charge-off policy.

## VIII.  *Good Hill Purchased the Bonds in Reliance on the False Representations and Omissions.*

98.    Good Hill reasonably understood based on the Prospectus Supplement, the Term Sheet, and the e-mails and oral representations discussed above that the Bank would not impose a charge-off policy on the junior-lien mortgages included in the collateral pool held by the Trust.

99.    Instead, based on these representations and omissions, Good Hill understood that Realized Losses on junior-lien mortgage loans could arise under the same circumstances as Realized Losses on senior-lien mortgage loans: after foreclosure sales or other liquidation events, most of which would occur more than a year after the Offering was completed.

100.    In reliance on these representations, Good Hill purchased $18.45 million of the N-2 NIM bonds at 98% of face value, paying $18.081 million. The trade date was April 19, 2007; the trade settled on April 26, 2007.

101.    Good Hill obtained and reviewed the Prospectus Supplement and Term Sheet at its offices in Connecticut. Good Hill's phone calls and e-mails with WaMu Capital employees discussed above were made and received in Connecticut. Good Hill made its investment decision in its Connecticut offices, and the trade ticket generated by WaMu Capital shows Good Hill Master Fund L.P. (for which Good Hill is the investment manager) making the purchase from Connecticut.

IX.    *The Issuing Defendants and the Bank Knew, or Recklessly Failed to Know, That The Representations and Omissions in the 2007-WM2 Offering Documents Regarding the Bank's Charge-Off Policy Were False.*

102.    The Issuing Defendants and the Bank knew, or were reckless in failing to know, that the representations and omissions in the 2007-WM2 Offering documents regarding the Bank's charge-off policy were false and misleading.

103.    WaMu Capital and the other Issuing Defendants failed to disclose to Good Hill the meaningful possibility that the Bank would impose a charge-off policy despite the fact that WaMu Capital had recently participated in numerous similar bond offerings with the Bank as servicer in which the disclosure documents repeatedly and expressly disclosed that precise risk to other investors.

104.    Moreover, given the close working relationship between the Bank and the Issuing Defendants in the marketing and sale of these bonds, the Issuing Defendants had every available opportunity to ascertain from the Bank whether, in fact, the Bank would apply a charge-off policy to the junior-liens at issue. Moreover, the Issuing Defendants had a duty as issuers to investigate and to disclose all of the material risks regarding the 2007-WM2 Offering – including

the material risk that the Bank would apply a charge-off policy and that the Trust, as a result, would likely experience significant Realized Losses in the first six months.

105.    The failure of WaMu Capital and the other Issuing Defendants to evaluate the risk that the Bank as servicer would apply a charge-off policy, and their failure to disclose that meaningful risk to investors, was highly unusual and represented a departure from the standards of ordinary care governing the issuance of asset-backed bonds.

106.    Yet, instead of disclosing this material risk to investors – as WaMu Capital and other affiliated WaMu issuers typically do – WaMu Capital and the other Issuing Defendants failed to disclose that risk to Good Hill. Indeed, these Defendants conveyed the opposite – plainly false – impression that the Bank would not impose a charge-off policy.

107.    Thus, in every section of the Offering documents in which a sophisticated investor, such as Good Hill, would expect to find a specific disclosure that the Bank would apply a charge-off policy to junior liens, the Offering documents were completely silent. In addition, as alleged above, representatives of WaMu Capital made additional representations to Good Hill that were utterly inconsistent with application of a charge-off policy by the Bank – representations that buttressed Good Hill's reasonable interpretation that the Bank would not apply such a policy.

108.    There could not have been an innocent, non-fraudulent reason for WaMu Capital and the other Issuing Defendants to refrain from disclosing the meaningful risk that the Bank would impose a charge-off policy, or to falsely represent that the Bank would not impose such a policy. These Defendants were intimately familiar with that risk, and had actual knowledge that the Bank, when acting as servicer for junior liens, would apply a 180-day charge-off policy to junior liens. In light of this experience and close working relationship, it is simply not plausible

to infer that the Issuing Defendants considered the risk that the Bank would apply such a policy, yet somehow determined that that risk was too insignificant to warrant disclosure.

109.    Instead, the totality of the surrounding circumstances creates a strong inference that WaMu Capital and the other Issuing Defendants knew, or were reckless in not knowing, that the Bank would impose a charge-off policy. Yet, despite their awareness of this significant risk, the Issuing Defendants remained silent, and compounded that silence with flatly misleading representations. Thus, there is a strong, indeed compelling, inference that the Issuing Defendants either deliberately intended to mislead Good Hill by concealing the known, material risk that the Bank would apply a charge-off policy, or were recklessly indifferent to the possibility that the Bank would do so.

110.    The Bank also knew, or was reckless in not knowing, at the time of the offering that it would impose a charge-off policy, and that its failure to disclose that risk in the 2007-WM2 PSA was highly misleading, and conveyed the false impression that it would not in fact impose such a policy.

111.    As noted above, when the Bank intends to impose a charge-off policy to junior liens, it typically makes numerous, express discloses of that intention in the PSA agreement. Yet here, the Bank failed to include *any* specific reference in the Prospectus Supplement or the 2007-WM2 PSA to the possibility that it might charge-off junior liens after 180 days – a highly unreasonable and misleading omission in light of the Bank's disclosure, just three months later, that it would impose that very policy.

112.    Moreover, when the Bank informed Good Hill that it would begin to impose a charge-off policy on junior-lien mortgages held by the Trust in July 2007, the Bank told Good Hill that the disclosures in the Prospectus Supplement, 2007-WM2 PSA, and related documents

state that the Bank had the right to impose a charge-off policy. These statements were made by Henry Engelken, the Bank employee listed as a contact point for the January 2007 press release and public presentation made by WaMu and the Bank regarding the control WaMu and the Bank exercised over the entire process of issuing asset-backed bonds such as those in the 2007-WM2 Offering.

113.   In other words, the Bank stated that, at the time of the 2007-WM2 Offering, there was a meaningful possibility that it would impose a charge-off policy – a policy that the Bank believed was authorized by the terms of the Offering documents themselves. Yet, the Offering documents are completely silent as to the existence or possibility of a charge-off policy, and, taken together and in light of all the surrounding circumstances, strongly indicate that the Bank would not impose any such policy.

114.   Because the Bank knew full well what an express disclosure of a charge-off policy in a PSA agreement typically would look like, it could not possibly have believed that the disclosures in the 2007-WM2 PSA – which are utterly silent about a charge-off policy – would fairly communicate to investors that the Bank might impose such a policy. Instead, given the Bank's ultimate disclosure that it would impose that very policy just three months into the term of the bonds, those omissions and implied misrepresentations about the existence of a charge-off policy were highly unreasonable, and represented an extreme departure from the ordinary standards of care that the Bank typically exhibited.

115.   The Bank would have had no innocent, non-fraudulent reason to fail to disclose a material risk – its own application of a charge-off policy that it typically discloses when acting as servicer – of which it was unarguably aware. Instead, the Bank's failure to disclose that risk must have been either deliberately calculated to mislead Good Hill to purchase these bonds, or

was recklessly indifferent to the possibility that Good Hill would be misled by those highly misleading omissions.

X.    *WaMu and the Bank were Intimately Involved in the 2007-WM2 Offering.*

116.    As discussed above, in January 2007 WaMu issued a press release telling the market that asset-backed bonds previously issued under the Long Beach SEC registration would now be issued under the WaMu Asset Acceptance registration. The press release states that future bond offerings will be "Washington Mutual product offerings."

117.    The press release thus shows not only WaMu's power to control how the bonds would be registered and issued (because it had exercised its power to change how that registration would be effected), but also shows its intent to monitor and control how those issuances would take place after January 2007.

118.    The press release quoted Doug Potolsky, a WaMu executive who had previously executed documents filed with the SEC in connection with bonds issued under the Long Beach name. The point of contact for additional information was Henry Engelken.

119.    As also discussed above, WaMu and the Bank released a presentation in January 2007 describing their control over the entire mortgage securitization process, including originating loans, collecting those loans into collateral pools, issuing bonds backed by those loans, and servicing the collateral supporting those bonds. The presentation trumpeted the extensive experience of WaMu executives – including Mr. Potolsky – in all phases of this process. The presentation is clearly an effort to provide assurance and security to prospective purchasers of bonds issued under the WaMu name that WaMu and the Bank will oversee each phase of the securitization process and make sure that it is set up and executed appropriately.

120.    The presentation listed Mr. Engelken as a point of contact for information regarding WaMu and the Bank's subprime securitization program. Kevin Richmond is also listed

as one of the "Lead Underwriter contacts" at WaMu Capital – individuals to contact regarding marketing and sale of the bonds.

121.    WaMu and the Bank were deeply involved with the 2007-WM2 Offering.  The offering was made in connection with an underlying offering made using the WaMu Asset Acceptance registration, as WaMu's January 2007 press release had stated such offerings would be made.  The Bank was the sponsor of the public offering made in connection with the 2007-WM2 Offering, and was the servicer of the loans in the Trust.  The Prospectus Supplement notes that the Bank "participated with the underwriters [including WaMu Capital] in structuring the securitization transaction."

122.    When considering whether to purchase the NIM bonds, Good Hill spoke with Mr. Richmond, whom WaMu and the Bank had listed as one of the individuals with knowledge of their overall program.  Mr. Richmond told Good Hill that he had knowledge of and experience with other WaMu bond offerings.

123.    When Good Hill learned of the Bank's previously-undisclosed intention to impose a charge-off policy, it spoke with Mr. Engelken, who was listed as the point of contact for both the January 2007 press release and presentation.  Mr. Engelken made it clear to Good Hill that he was familiar with the disclosures made in the 2007-WM2 Offering.

124.    Not only did WaMu and the Bank exercise control over the entities involved in the 2007-WM2 Offering, but certain of the employees they had listed as points of contact when touting their control were thus specifically involved in the disclosures made to Good Hill before, during, and after the Offering.

125.    There is no question that WaMu and the Bank not only had the power to direct and control the disclosures made in the 2007-WM2 Offering, but were specifically involved in, and

exerted practical and effective control over, the disclosures made in that Offering.

126.    Given WaMu and the Bank's close supervision and intimate involvement, they

knew, or were reckless in not knowing, that the omissions and misrepresentations made by the

Issuing Defendants regarding the Bank's charge-off policy were false.

## XI.    *The Bank's Application of the Undisclosed Charge-off Policy Greatly Diminished the Value of the Bonds Good Hill Purchased.*

127.    As shown in detail above, the Defendants' previously-undisclosed intent to apply

a charge-off policy to the collateral held by the Trust resulted in a much greater likelihood that

the Trust would incur Realized Losses at least six months earlier than they would have, if, as

Defendants' falsely represented in the Offering documents and elsewhere, no such charge-off

policy was applicable.

128.    The premature charging off of these junior-lien mortgage loans resulted in

significant diminution of the funds available to pay Good Hill and other holders of the NIM

bonds because when the Trust incurs Realized Losses the residual income generated by the

difference between the interest received by WaMu from the borrowers and the interest it had to

pay to the Certificateholders can no longer be used to pay the interest and principal due on the

NIM bonds.  Instead, those funds had to be used to pay shortfalls incurred by the

Certificateholders because of the Realized Losses.

129.    Accordingly, the application of the charge-off policy severely affected the cash

flow available to pay the NIM bonds.  Their value dropped dramatically as a result.

130.    When it decided to purchase the NIM bonds in the 2007-WM2 Offering, Good

Hill relied on the disclosures regarding Realized Losses made in the Prospectus Supplement,

Term Sheet, and additional statements by WaMu Capital.  In particular, Good Hill understood

that the Bank would not apply a charge-off policy to the collateral in the transaction, and made

its valuation, pricing, and investment decisions based on that understanding.

131.    Because it is Good Hill's practice to factor in a significant risk of delinquency and

default on subprime mortgages, it would not have purchased the NIM bonds – and certainly

would not have paid 98% of their face value – if it had known that the Bank intended to impose a

charge-off policy on the collateral supporting the bonds.  As discussed in detail above,

Defendants' disclosures falsely implied that a charge-off policy would not be applied.  The

Bank's application of that policy resulted in the senior-lien and related junior-lien mortgages not

being treated as one loan and Realized Losses being recognized on junior-lien mortgages solely

because the borrower was more than 180-days delinquent, without any foreclosure sale or other

liquidation effort on the related senior-lien mortgage loan.

132.    Defendants' misleading disclosures regarding the way in which the collateral

would be treated – a material fact in the investment decision – caused significant harm to Good

Hill.

133.    Good Hill has incurred losses of at least $7 million as a result of the Defendants'

improper actions.

### FIRST CAUSE OF ACTION
### Securities Fraud – Exchange Act § 10(b) and Rule 10(b)(5) – Against the Issuing Defendants and the Bank

134.    Good Hill incorporates paragraphs 1-133 by reference.

135.    As set forth in detail above, the Issuing Defendants and the Bank made

misleading representations and omitted material facts regarding the NIM bonds in the WaMu

2007-WM2 Offering.  The disclosures made by the Issuing Defendants and the Bank omitted any

reference to a charge-off policy, leading a reasonable investor such as Good Hill to conclude that

the Bank would not apply a charge-off policy to the collateral supporting the 2007-WM2 Offering.

136.    WaMu Capital employees made additional misrepresentations that supported this interpretation in telephone conversations and e-mails with Good Hill prior to its purchase in the 2007-WM2 Offering.

137.    The treatment of the collateral, including whether a charge-off policy would be applied, is material to the value of the NIM bonds.

138.    In making these misrepresentations and omissions, the Issuing Defendants and the Bank knew or should have known that the Bank intended to apply – or was, at a minimum, reserving the right to apply – a charge-off policy to the collateral supporting the 2007-WM2 Offering. Applying a charge-off policy would materially increase Realized Losses incurred by the Trust and thus dramatically decrease the value of the NIM bonds.

139.    The Issuing Defendants' and the Bank's omissions and misrepresentations were made in the Prospectus Supplement, the Term Sheet released to Good Hill and other investors in connection with the 2007-WM2 Offering, orally over the telephone, and in e-mails. The documents were sent by mail and e-mail. The documents were created and sent in connection with a sale of securities.

140.    Good Hill justifiably relied on these omissions and representations, including that the related senior-lien and junior-lien mortgage loans would be treated as one loan.

141.    Good Hill purchased the N2 NIM bonds based on this reliance.

142.    The misleading disclosures and omissions regarding the charge-off policy (or lack thereof) caused Good Hill to purchase the NIM bonds for significantly more than it would have had the full risks been disclosed.

143.    As a result of the Issuing Defendants' and the Bank's fraud, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Control Person Liability – Exchange Act § 20(a) – Against WaMu and the Bank

144.    Good Hill incorporates paragraphs 1-143 by reference.

145.    WaMu is the parent company of all the other Defendants, including the Bank. WaMu has the power to control all the Defendants. WaMu has the power to direct or cause the direction of the management and policies of all the other Defendants.

146.    WaMu expressly described its control over offerings such as the 2007-WM2 Offering in January 2007 by describing changes it had implemented to the branding and marketing of those offerings.

147.    The Bank also controls the actions of the Issuing Defendants through its sale of mortgage loans and its control of the servicing process. The Bank has the power to assert influence over the other Defendants regarding this key portion of the transaction consummated through the Offering.

148.    The Bank and WaMu were intimately involved in the 2007-WM2 Offering, and exerted direction and control over it.

149.    WaMu and the Bank consciously participated in the material misrepresentations and omissions made by the Issuing Defendants because the Bank intended to apply a charge-off policy to the collateral underlying the 2007-WM2 Offering from the time of the Offering (or intended to reserve its right to apply a charge-off policy), and WaMu knew of this intention or was reckless in failing to know it. Although they could have directed the Issuing Defendants to disclose this intention (as had been done in many WaMu bond offerings in the past) WaMu and

the Bank nevertheless permitted the Issuing Defendants to make misleading representations and material omissions described herein.

150.    As a result of the Issuing Defendants' conduct as described herein, including in the First and Third Causes of Action, and the control exercised by WaMu and the Bank, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Fraud – Common Law of Connecticut - Against the Issuing Defendants and the Bank

151.    Good Hill incorporates paragraphs 1-150 by reference.

152.    The Issuing Defendants and the Bank had a duty to disclose all material risks of loss to the assets in the Trust in connection with the Offering.

153.    As discussed in detail above, the Issuing Defendants and the Bank made misleading representations and omitted material facts regarding the NIM bonds in the WaMu 2007-WM2 Offering. The disclosures made by the Issuing Defendants and the Bank omitted any reference to a charge-off policy, leading a reasonable investor such as Good Hill to conclude that the Bank would not apply a charge-off policy to the collateral supporting the 2007-WM2 Offering.

154.    WaMu Capital employees supported this interpretation in telephone conversations and e-mails with Good Hill prior to its purchase in the 2007-WM2 Offering.

155.    The treatment of the collateral, including whether a charge-off policy would be applied, is material to the value of the NIM bonds.

156.    In making these misrepresentations and omissions, the Issuing Defendants and the Bank knew or should have known that the Bank intended to apply – or was, at a minimum, reserving the right to apply – a charge-off policy to the collateral supporting the 2007-WM2

Offering. Applying a charge-off policy would materially increase Realized Losses incurred by the Trust and thus dramatically decrease the value of the NIM bonds.

157.    The Issuing Defendants and the Bank knew that investors such as Good Hill would rely on their misrepresentations and omissions in the Prospectus Supplement, the Term Sheet, orally over the telephone, and in e-mails. These Defendants intended that Good Hill and other investors rely on these misrepresentations and omissions.

158.    Good Hill justifiably relied on these misrepresentations and omissions to its detriment.

159.    As a result of the Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages in an amount to be proven at trial.

160.    Furthermore, because the Defendants' conduct was intentional, wanton, willful, and in disregard of Good Hill's rights, an award of punitive damages is warranted.

**FOURTH CAUSE OF ACTION**
**Aiding and Abetting Fraud – Common Law of Connecticut –**
**Against WaMu and the Bank**

161.    Good Hill incorporates paragraphs 1-160 by reference.

162.    WaMu and the Bank were aware of the fraud committed by the Issuing Defendants.

163.    WaMu and the Bank substantially assisted in that fraud by providing resources to complete the 2007-WM2 Offering. In addition, WaMu and the Bank directed and permitted the misleading representations and material omission of its intention to impose a charge-off policy, an undisclosed risk that caused significant financial harm to Good Hill.

164.    As a result of WaMu and the Bank's aiding and abetting of the Issuing Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages in an amount to be proven at trial.

165.   Furthermore, because the conduct of WaMu and the Bank was intentional, wanton, willful, and in disregard of Good Hill's rights, an award of punitive damages is warranted.

## FIFTH CAUSE OF ACTION
### Violation of Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-4 ("CUSA") – Against The Issuing Defendants and the Bank

166.   Good Hill incorporates paragraphs 1-165 by reference.

167.   As discussed in detail above, the Issuing Defendants and the Bank, either directly or indirectly, offered or sold securities to Good Hill in the State of Connecticut by means of either untrue statements of material fact, or by their omission to state material facts necessary to make any statements made, in the circumstances of their making, not misleading.

168.   Specifically, the Issuing Defendants and the Bank sold or offered to sell Good Hill securities by failing to disclose the risk that the Bank would apply a charge-off policy to junior-liens, and by misleadingly representing that the Bank in fact would not apply a charge-off policy.

169.   The Issuing Defendants and the Bank are liable under the CUSA for any false misrepresentation or omission, whether Defendants made those misrepresentations intentionally, recklessly, or negligently.

170.   Good Hill did not know of these untruths or omissions at the time it purchased the bonds.

171.   As a result of Defendants' violations of the CUSA, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation – Common Law of Connecticut – Against The Issuing Defendants and the Bank

172.   Good Hill incorporates paragraphs 1-171 by reference.

173.    The Bank and the Issuing Defendants, in the course of their business, supplied false information for the guidance of Good Hill in the purchase of the bonds, and did so by failing to exercise reasonable care or competence in obtaining the correct information.

174.    Specifically, the Issuing Defendants and the Bank failed to disclose the risk that the Bank would apply a charge-off policy to junior-liens, and misleadingly represented that the Bank in fact would not apply a charge-off policy.

175.    Because the Issuing Defendants and the Bank voluntarily disclosed certain risks associated with the purchase of these bonds, they had a duty to make a full and fair disclosure as to all material matters of the transaction – including the risk that the Bank would apply a charge-off policy.

176.    Good Hill was one of a limited group of persons for whose benefit and guidance the Issuing Defendants and the Bank supplied the false information, and the Issuing Defendants and the Bank knew that Good Hill intended to rely on the information that they supplied.

177.    The Issuing Defendants and the Bank owed Good Hill a duty of care in the marketing and sale of these securities.

178.    Even if the misrepresentations and omissions of the Issuing Defendants and the Bank were made innocently, those Defendants are liable because they had the means of knowing the truth, ought to have known the truth, and were under a duty to know the truth, regarding the Bank's intention to apply a charge-off policy.

179.    Good Hill justifiably relied on this false information in deciding to purchase the bonds.

180.    As a direct result of the negligent misrepresentations of the Issuing Defendants and the Bank, Good Hill has incurred, and hereby demands recovery of, damages as described

above in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Innocent Misrepresentation – Common Law of Connecticut – Against The Issuing Defendants and the Bank

181.    Good Hill incorporates paragraphs 1-180 by reference.

182.    The Bank and the Issuing Defendants marketed and sold these bonds to Good Hill by means of representations of material facts that were untrue or misleading – specifically, that the Bank would not impose a charge-off policy.

183.    The Bank and the Issuing Defendants made these representations for the purpose of inducing Good Hill to purchase the bonds.

184.    Good Hill justifiably relied on these representations in purchasing the bonds.

185.    As a direct result of the false representations of the Issuing Defendants and the Bank – actionable even if innocently made – Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment – Common Law of Connecticut – Against All Defendants

186.    Good Hill incorporates paragraphs 1-185 by reference.

187.    Defendants unjustly benefitted from the sale of these bonds to Good Hill by receiving over $18 million in consideration based on false misrepresentations and omissions regarding the Bank's intention to apply a charge-off policy.

188.    Good Hill would not have purchased the bonds but for these false representations and omissions.

189.    As a result of the false representations and omissions regarding the Bank's charge-off policy, Good Hill was deprived of over $7 million that it otherwise would have earned.

190.    Due to their false and misleading misstatements and omissions, it is contrary to equity and good conscience to permit Defendants to retain the benefits of the transaction at the direct expense of Good Hill.

191.    Good Hill hereby demands the return in equity of the benefits of the transaction that Defendants have unjustly retained.

WHEREFORE, Good Hill prays that it have judgment against Defendants as follows:

1.    Actual damages as described above;

2.    Punitive damages;

3.    Pre- and post-judgment interest as allowed by law;

4.    Attorneys' fees; and

5.    All other and further relief, both general and special at law or in equity, to which it may be entitled.

Dated:  July 18, 2008
        New York, New York

COHEN & GRESSER LLP

By: _____
    Mark S. Cohen
    mcohen@cohengresser.com
    Marc E. Isserles
    misserles@cohengresser.com
    Nathaniel P. T. Read
    nread@cohengresser.com

    100 Park Avenue, 23rd Floor
    New York, NY 10017
    Phone: (212) 957-7600
    Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

GOOD HILL PARTNERS L.P. ON BEHALF OF
GOOD HILL MASTER FUND, L.P.,

                      Plaintiff,

      - against -

WM ASSET HOLDINGS CORP. CI 2007-WM2,
WM ASSET HOLDINGS CO 2007-WM2 LLC,
WM ASSET HOLDINGS CORP., WAMU ASSET
ACCEPTANCE CORP., WAMU CAPITAL CORP.,
WASHINGTON MUTUAL BANK, and
WASHINGTON MUTUAL, INC.

                  Defendants.

-------------------------------------------------------------- x

Case No. 08 Civ. 3730

**DECLARATION OF
SERVICE**

      I, Nathaniel P. T. Read, an attorney duly admitted to practice before this Court, hereby declare the following to be true under penalty of perjury:

      On July 18, 2008, I caused the Amended Complaint in this action to be served upon counsel for Defendants by FedEx to the following address:

          Victor Rocco, Esq.
          Heller Ehrman LLP
          7 Times Square
          New York, New York 10036

Dated: July 18, 2008

                              Nathaniel P. T. Read (NR 8807)
                              nread@cohengresser.com