UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GOOD HILL PARTNERS L.P. ON BEHALF :
OF GOOD HILL MASTER FUND, L.P., :  ELECTRONICALLY FILED
 :
   Plaintiff, :  Case No. 08 Civ. 3730 (JSR)
 :
  -against- :
 :
WM ASSET HOLDINGS CORP. CI 2007- :
WM2, WM ASSET HOLDINGS CO 2007- :
WM2 LLC, WM ASSET HOLDINGS CORP., :
WAMU ASSET ACCEPTANCE CORP., :
WAMU CAPITAL CORP., WASHINGTON :
MUTUAL BANK, and WASHINGTON :
MUTUAL, INC., :
 :
   Defendants. :

-------------------------------------------------------------x

## DECLARATION OF VICTOR J. ROCCO IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

VICTOR J. ROCCO declares, pursuant to 28 U.S.C. § 1746:

1.  I am an attorney licensed to practice law before the courts of the State of New

York and before this Court.  I am a shareholder in the law firm Heller Ehrman LLP, attorneys for

defendants WM Asset Holdings Corp. CI 2007-WM2, WM Asset Holdings CI 2007-WM2 LLC,

WM Asset Holdings Corp., WaMu Asset Acceptance Corp., WaMu Capital Corp., Washington

Mutual Bank, and Washington Mutual, Inc. (collectively, "Defendants") in this action.

2.  I make this Declaration in support of Defendants' Motion to Dismiss the

Amended Complaint and specifically to place before the Court certain documents.  Defined

terms not otherwise defined herein shall have the meaning ascribed to them in the Memorandum

of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, dated August 11,

2008.

3.      Attached to this Declaration as Exhibit A is a true and correct copy of the Amended Complaint, filed July 18, 2008.

4.      Attached to this Declaration as Exhibit B is a true and correct copy of the Term Sheet, dated April 18, 2007.

5.      Attached to this Declaration as Exhibit C is a true and correct copy of the Private Placement Memorandum, dated April 26, 2007.

6.      Attached to this Declaration as Exhibit D is a true and correct copy of the Prospectus, dated March 22, 2007.

7.      Attached to this Declaration as Exhibit E is a true and correct copy of the Prospectus Supplement, dated April 5, 2007.

8.      Attached to this Declaration as Exhibit F is a true and correct copy of the Pooling and Servicing Agreement, dated as of April 1, 2007.

9.      Attached to this Declaration as Exhibit G is a true and correct copy of the Long Beach Offering Pooling and Servicing Agreement, dated as of May 1, 2006.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2008 in New York, New York.

__/s/ Victor J. Rocco_____
VICTOR J. ROCCO (VR-4191)

Exhibit A

COHEN & GRESSER LLP
Mark S. Cohen (mcohen@cohengresser.com)
Marc E. Isserles (misserles@cohengresser.com)
Nathaniel P. T. Read (nread@cohengresser.com)
100 Park Avenue, 23rd Floor
New York, New York 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| GOOD HILL PARTNERS L.P. ON BEHALF OF GOOD HILL MASTER FUND, L.P., | : <br> : <br> :    Case No. 08 Civ. 3730 |
|        Plaintiff, | : <br> :    **AMENDED COMPLAINT** |
|    - against - | : <br> :    **JURY TRIAL DEMANDED** <br> : |
| WM ASSET HOLDINGS CORP. CI 2007-WM2, WM ASSET HOLDINGS CO 2007-WM2 LLC, WM ASSET HOLDINGS CORP., WAMU ASSET ACCEPTANCE CORP., WAMU CAPITAL CORP., WASHINGTON MUTUAL BANK, and WASHINGTON MUTUAL, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : |
|        Defendants. | : |

---

1.      Good Hill Partners L.P., on behalf of Good Hill Master Fund, L.P., ("Good Hill")

by its attorneys Cohen & Gresser LLP, for its complaint against WM Asset Holdings Corp. CI

2007-WM2 ("WM Asset Caymans"), WM Asset Holdings CI 2007-WM2 LLC ("WM Asset

LLC"), WM Asset Holdings Corp. ("WM Asset Holdings"), WaMu Asset Acceptance Corp.

("WaMu Asset Acceptance"), WaMu Capital Corp. ("WaMu Capital") (WM Asset Caymans,

WM Asset LLC, WM Asset Holdings, WaMu Asset Acceptance, and WaMu Capital are

collectively referred to herein as the "Issuing Defendants"),Washington Mutual Bank (the

"Bank"), and Washington Mutual, Inc. ("WaMu") alleges upon personal belief with respect to its own acts and upon information and belief with respect to all others, as follows:

## Nature Of The Claims

2.      Good Hill brings this action to recover the damages caused by the fraudulent misrepresentations and omissions made by the Issuing Defendants and the Bank in connection with an April 2007 offering of asset-backed bonds.  WaMu and the Bank directed and controlled the actions of all the other Defendants, and consciously participated in their fraudulent conduct.

3.      WaMu Capital, the other Issuing Defendants, and the Bank marketed these asset-backed bonds through offering documents that were false and misleading because they failed to disclose that the Bank would impose a "charge-off policy" for junior liens and in effect represented that no such policy would be imposed.  A charge-off policy significantly increases the likelihood that the trust supporting the bonds will incur substantial losses within the first year after the bond offering and is thus an important factor in the decision to invest in those asset-backed bonds.

4.      But the offering documents created by WaMu Capital, the other Issuing Defendants, and the Bank would have led any reasonable investor – as they led Good Hill – to conclude that the Bank would not in fact impose such a policy.  These Defendants knew, or were reckless in failing to know, that these representations and omissions were false, and that it was likely that the Bank would impose a charge-off policy.

5.      Good Hill purchased over $18 million in bonds in reasonable reliance on Defendants' false and misleading representations and omissions.  Just three months after Good Hill bought those bonds, the Bank told Good Hill that it would apply the charge-off policy that the offering documents misleadingly represented would not be imposed.  At that time, the Bank's

representatives wrongfully claimed that the offering documents had disclosed the Bank's right to impose such a policy – even though the offering documents never mentioned such a policy. As a result of the imposition of this previously-undisclosed charge-off policy, Good Hill suffered at least $7 million in damages.

6.     Since 2000, WaMu has issued subprime mortgage loans and securitized those loans through asset-backed bond offerings. WaMu directs these activities through its control of the Bank, WaMu Capital, the other Issuing Defendants, and other WaMu affiliates.

7.     The Bank and other WaMu divisions issue subprime mortgage loans. WaMu, through WaMu Asset Acceptance and other affiliates, then pools those loans into collateral for bonds and creates special-purpose trusts to own the pools of mortgage loans.

8.     Through WaMu Capital and special-purpose entities such as the other Issuing Defendants, WaMu directs the issuance and sale of mortgage-backed bonds to the public through private placement memoranda, prospectuses, and other disclosure documents. In addition to bonds directly backed by mortgage loans, WaMu and its affiliates also issue "net interest margin" ("NIM") bonds.

9.     NIM bonds are backed by the excess interest, or the "net interest margin" – *i.e.* the difference between the interest the collateral trust receives on mortgage loans in the underlying pool and the interest paid on the bonds backed by those loans. NIM bondholders are generally entitled to receive this excess interest. When the trust incurs "realized losses," however, that income can be used to pay amounts due to other bondholders and not the NIM bondholders.

10.    Good Hill purchased $18.45 million of WaMu NIM bonds denominated as Class N-2 Notes in the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). Good Hill purchased the NIM bonds at 98% of their face value.

11.    The 2007-WM2 Offering was made in connection with an associated offering of asset-backed bonds. These bonds were collateralized by a $1.5 billion pool of subprime residential mortgage loans held by the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust included both senior-lien and junior-lien mortgage loans.

12.    In prospectuses issued under WaMu's direction and control in 2006 and 2007 for bond offerings backed by junior-lien mortgage loans, WaMu Capital and other WaMu affiliates expressly disclosed that the Bank would apply a charge-off policy to the mortgage loans in the collateral pool. The charge-off policy generally required the Bank to charge-off a junior-lien mortgage loan after the loan had been in default for 180 days. The disclosures in these documents specifically stated that the charge-off policy would result in affected junior-lien mortgage loans being "treated as a liquidated mortgage loan giving rise to a realized loss." Investors reviewing these documents thus understood that there was a significant risk that the collateral underlying the bonds would incur losses within six months of the offering, thus decreasing the value of the underlying bonds.

13.    By contrast, the offering documents for the 2007-WM2 Offering do not mention a charge-off policy at all, much less provide a specific disclosure that the Bank would impose a charge-off policy when servicing junior-lien mortgage loans. Other than this significant omission, the relevant risk disclosures in the 2007-WM2 Offering are virtually identical to the disclosures made in contemporaneous junior-lien transactions offered by WaMu Capital and other WaMu affiliates acting as issuers.

14.    Given the lack of any express disclosure that the Bank would impose a charge-off policy when servicing the junior-lien collateral supporting the 2007-WM2 Offering, any reasonable investor would have understood that the Bank would *not* impose such a policy, and that the Trust would not incur realized losses on that basis.  At the very least, the failure of the Issuing Defendants and the Bank to disclose the significant possibility that the Bank would impose a charge-off policy – a risk that WaMu Capital, the Bank, and other WaMu affiliates typically disclose in similar bond offering documents – rendered the 2007-WM2 Offering documents misleading regarding a key term affecting how losses on the collateral would be realized.  How losses on the collateral are determined is of critical importance to prospective investors in asset-backed bonds.

15.    The disclosures in the offering documents that the Bank would not impose a charge-off policy for junior-lien mortgages were confirmed by a Term Sheet that WaMu Capital prepared and sent to investors.  In that Term Sheet, WaMu Capital included graphs identifying various loss scenarios that were inconsistent with the Bank's application of a 180-day charge-off policy to junior-lien mortgages.  Thus, through this graph, WaMu Capital misleadingly represented to Good Hill that the Bank would not impose a charge-off policy.

16.    In addition, WaMu Capital employees made representations to Good Hill in contemporaneous e-mails and oral statements that were wholly inconsistent with the possibility that the Bank would impose a charge-off policy to junior liens.  These representations and the omission of any disclosure regarding a charge-off policy sent Good Hill the unmistakable, but flatly false, message that the Bank would not in fact apply such a policy.

17.    Good Hill reasonably relied on these misrepresentations and omissions when it purchased over $18 million in bonds.  Despite these representations that the Bank would not

apply a charge-off policy to junior lien mortgages, the Bank informed Good Hill in July 2007 – just three months after Good Hill purchased its bonds – that it would, in fact, apply a 180-day charge-off policy to junior-lien mortgages, and that the Trust would incur realized losses as a result of that policy.

18.    The application of the previously-undisclosed charge-off policy caused the excess cash flow that formed the collateral for Good Hill's NIM bonds to be paid to other bondholders instead of Good Hill.  This material impact to the value of the collateral securing the NIM bonds greatly reduced the value of the NIM bonds themselves.

19.    Good Hill would not have bought the NIM bonds – and certainly would not have paid 98% of face value for them – if the Defendants had disclosed the possibility that the Bank would impose a charge-off policy on the junior-lien collateral in the Trust.

20.    At the time of the 2007-WM2 Offering, WaMu Capital and the other Issuing Defendants knew, or were reckless in not knowing, that the Bank as servicer would impose a charge-off policy on junior-lien mortgages, and that their representations that no charge-off policy would be imposed were therefore false and misleading at the time Good Hill purchased the bonds.

21.    Indeed, given WaMu Capital's extensive experience as an issuer on prior and contemporaneous similar transactions in which the Bank acted as servicer on junior-liens and imposed a charge-off policy, the close working relationship between the Issuing Defendants and the Bank in the marketing and sale of these bonds, and the duty of the Issuing Defendants as issuers to identify and disclose to investors all material risks associated with a bond offering, the failure of these Defendants to identify and disclose the risk that the Bank would in fact apply a

charge-off policy was highly unusual and marked an extreme departure from the standards of ordinary care governing the marketing and sale of asset-backed bonds.

22.     Nor did WaMu Capital or the other Issuing Defendants have an innocent, non-fraudulent reason to fail to disclose this risk to investors (a risk they typically disclose), or to represent – as they did repeatedly – that the Bank would not in fact apply such a policy.  To the contrary, their representations and omissions were so obviously false and contrary to reasonable expectations of the market that they knew, or were reckless in not knowing, that Good Hill would be misled as a result, and would decide to purchase these bonds based on the mistaken, fraudulently-induced belief that the collateral in trust would not experience realized losses on the basis of a charge-off policy.  For the same reasons, the Bank knew or was reckless in not knowing that its failure to disclose the risk of a charge-off policy in the Offering documents was likely to mislead investors into thinking that no such policy would be imposed.

23.     The Issuing Defendants' and the Bank's misleading representations and omissions of material fact were done in violation of their duties under the federal securities laws, Connecticut securities laws, and the common law of Connecticut.  Because WaMu and the Bank had the power to control the misrepresentations and omissions of the Issuing Defendants, and consciously participated in those misrepresentations and omissions through their exercise of such control, they also violated the federal securities laws and the common law of Connecticut. As a result, Good Hill has suffered damages of at least $7 million.

## The Parties

24.     Plaintiff Good Hill Partners L.P. is a Delaware limited partnership with a principal place of business in Westport, Connecticut.  It is the investment manager for Good Hill Master Fund L.P. (the "Fund").

25.    The Fund purchased the bonds at issue and incurred the losses described below. The Fund then assigned all of its rights, including the right to bring this suit, to Good Hill Partners L.P.

26.    Defendant WM Asset Holdings Corp. CI 2007-WM2 ("WM Asset Caymans") is a Cayman Islands company, with an address of c/o Deutsche Bank (Cayman) Limited, P.O. Box 1984, George Town, Grand Cayman, KY1-1104, Cayman Islands. WM Caymans was the issuer of the NIM bonds in the 2007-WM2 Offering.

27.    Defendant WM Asset Holdings CI 2007-WM2 LLC ("WM Asset LLC") is a Delaware limited liability company with an office at 850 Library Avenue, Suite 204, Newark, Delaware 19711. WM Asset LLC was the co-issuer of the NIM bonds in the 2007-WM2 Offering.

28.    Defendant WM Asset Holdings Corp. ("WM Asset Holdings") is a Delaware corporation that may be served care of Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. WM Asset Holdings is a wholly-owned subsidiary of the Bank and was the seller and sponsor of the NIM bonds in the 2007-WM2 Offering.

29.    Defendant WaMu Capital Corp. ("WaMu Capital") is a Delaware corporation with a principal place of business at 1301 Second Avenue, Seattle, Washington 98101. WaMu Capital is a wholly-owned subsidiary of the Bank and a registered broker-dealer. WaMu Capital was the initial purchaser and underwriter of the NIM bonds in the 2007-WM2 offering, and, as such, was the only entity appearing on the cover of the Private Placement Memorandum, and was listed as an underwriter on the Prospectus Supplement. WaMu Capital also has a New York office, from which it marketed the WaMu 2007-WM2 Offering.

30.     Defendant WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance") is a Delaware corporation with an office at 1400 South Douglass Road, Suite 100, Anaheim, California 92806. WaMu Asset is a wholly-owned subsidiary of the Bank. WaMu Asset was the depositor of the certificates issued which in the aggregate constituted the entire ownership interest in the pool of mortgage loans that served as the collateral for the NIM bonds in the 2007-WM2 Offering. WaMu Asset Acceptance issued the Prospectus at issue here, and sold the underlying securities issued pursuant to that Prospectus.

31.     WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Capital, and WaMu Asset Acceptance are collectively referred to herein as the "Issuing Defendants."

32.     Defendant Washington Mutual Bank (the "Bank") is a national bank with branches throughout New York City. The Bank has its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. The Bank is an indirect wholly-owned subsidiary of WaMu. The Bank is the servicer of the collateral underlying the NIM bonds in the 2007-WM2 Offering. The Bank was also the sponsor of the public offering of the underlying asset-backed bonds issued in connection with the 2007-WM2 Offering. The Bank also exercised control over each of the Issuing Defendants in connection with the 2007-WM2 Offering.

33.     Defendant Washington Mutual, Inc. ("WaMu") is the ultimate parent company of all the defendants. WaMu is publicly traded on the New York Stock Exchange. WaMu is a Washington corporation with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101. WaMu exercised control over each defendant regarding its actions in connection with the 2007-WM2 Offering.

## Jurisdiction and Venue

34.    This Court has personal jurisdiction over the Defendants because each Defendant regularly conducts business in the Southern District of New York or purposefully availed itself of the benefits and protections of this forum.

35.    This Court has personal jurisdiction over defendants WM Asset Caymans, WM Asset LLC, WM Asset Holdings, WaMu Asset Acceptance, and WaMu Capital because each of those defendants played an integral role in the marketing and selling of the 2007-WM2 NIM bonds in New York.  In particular, WaMu Capital employees located in Manhattan provided information about the 2007-WM2 Offering to Good Hill in connection with its purchase of those bonds.

36.    This Court has personal jurisdiction over the Bank because it regularly conducts business in New York City through its approximately one hundred branches here.

37.    This Court has personal jurisdiction over WaMu because it also regularly conducts business in New York City through its banking, insurance, investment product, and other operating subsidiaries.

38.    This Court has subject matter jurisdiction over the federal securities law claims because they arise under the laws of the United States, and must be brought in federal district courts pursuant to 15 U.S.C. § 78aa.  This Court has supplemental jurisdiction over Good Hill's state law claims pursuant to 28 U.S.C. § 1367.

## Facts

I.    *WaMu Acquired the Long Beach Subprime Mortgage Business to Expand the Scope of its Asset-backed Bond Offerings.*

39.    In the early 1990's, Long Beach Savings Bank, a leading lender in the subprime residential mortgage market, began issuing bonds backed by pools of subprime mortgages.

Subprime mortgages are issued to borrowers with lower credit ratings and carry higher interest rates and higher risk than conventional mortgages.

40.    In 1997, Long Beach Savings split into two entities: Ameriquest Mortgage Company, a privately-held lender, and a publicly-traded lender known as Long Beach Securities Corp.  WaMu purchased Long Beach Securities Corp. in 1999.

41.    WaMu's 1999 purchase of Long Beach Securities Corp., now known as Long Beach Mortgage Company, greatly expanded WaMu's subprime lending business, as well as its associated business of issuing bonds backed by subprime mortgage loans.

42.    In January 2007, WaMu issued a press release stating that it would "securitize all loans issued through its Long Beach Mortgage division using the WaMu Asset Acceptance Corp. shelf registration . . . ."  The contact person on the press release was Henry Engelken, a Bank employee in New York with whom Good Hill spoke after it purchased the NIM bonds in the 2007-WM2 Offering.  In the press release, Doug Potolsky, a Bank executive, describes WaMu's control over both securitizations under the prior Long Beach name and its plan to control securitizations made after January 2007 using the WaMu name:

> We've made many changes in [Long Beach Mortgage Company's] business model and operations beginning when we consolidated its operations into WaMu and this is a logical next step.  For these reasons, we feel it is appropriate to brand our Long Beach Mortgage securitized product offerings as Washington Mutual product offerings.

43.    In addition, WaMu made a presentation to the public in January 2007 regarding its Subprime Mortgage Program that describes WaMu's successful efforts to bring all of its residential mortgage businesses "under one roof."  The presentation touts the experience of WaMu's managers in all aspects of the subprime mortgage securitization process: the origination of loans, sale of those loans to collateral trusts, securitization of the payments due the trusts

through issuance of asset-backed bonds through special-purpose conduits, and collection and servicing on the loans in the collateral pool. The contacts for further information regarding this WaMu presentation included Mr. Potolsky (who had signed SEC filings regarding bonds issued under the "Long Beach" name) and Mr. Engelken, and Kevin Richmond of WaMu Capital.

44.    These statements show that WaMu and the Bank direct and control the actions of their affiliates through the entire course of issuing bonds backed by mortgages issued by the Bank and its divisions.

## II.    *WaMu and Its Affiliated Issuers Offer Asset-Backed Bonds Backed by Loans.*

45.    WaMu, through the Bank and other subsidiaries, was among the ten largest subprime mortgage lenders in the United States. WaMu originated nearly $30 billion in subprime mortgage loans in 2005 and nearly $20 billion in 2006.

46.    WaMu pools its subprime mortgage loans into collateral for bonds. These pools are held by trusts specifically formed to own the underlying mortgage loans. The pools may hold all senior-lien mortgage loans, all junior-lien mortgage loans, or a combination of senior- and junior-lien mortgage loans. WaMu Capital and other WaMu affiliates then issue and sell these mortgage-backed bonds to investors.

47.    WaMu and its affiliated issuers offer these bonds to the public through prospectuses, private placement memoranda, and other disclosure documents. The prospectus for a given transaction contains relatively general disclosures; the details regarding the collateral supporting the transaction and other specifics are provided in a prospectus supplement.

48.    WaMu's pools of mortgages are governed by pooling and servicing agreements between WaMu Asset Acceptance as the depositor of the loans and the Bank as the servicer of those loans.

49.    As the servicer of the underlying mortgage loans, the Bank collects payments from the borrowers, calculates the outstanding principal and interest, addresses non-payment by borrowers, and performs other operations related to the administration of the mortgage loans.

**III.    *WaMu and Its Affiliated Issuers Offer NIM Bonds to Securitize an Income Stream Arising from Traditional Asset-backed Bond Offerings.***

50.    In addition to bonds directly backed by subprime mortgage loans, WaMu and its affiliated issuers also offer "net interest margin" ("NIM") bonds.

51.    The borrowers on the underlying mortgage loans in the pool pay a higher rate of interest than is paid to the bonds that are backed directly by those loans. This amount is referred to as the excess interest, or the "net interest margin" – the difference between the interest WaMu receives on mortgage loans in the pool and the interest it pays on the bonds backed by those loans.

52.    NIM bondholders are generally entitled to receive the income generated by the difference between the interest paid on the underlying mortgage loans and the interest on bonds backed by the loans. These bonds are referred to as the certificates of the transaction.

53.    To offer a simplified example, suppose the borrowers on the underlying mortgage loans pay an 8% annual interest rate, but WaMu is only paying 6% annual interest on the certificates. The mortgage loans total $1 billion in principal, and WaMu has issued $1 billion in face amount of certificates. Each year, WaMu would receive a residual income stream of 2% (8% - 6%) of the $1 billion, or $20 million. Rather than keeping these funds for itself, WaMu chose to issue NIM bonds backed by this income stream.

54.    NIM bonds generate a fairly stable cash flow that includes payments of both interest due on the bonds and partial payments of principal. Depending on the cash flow generated by the underlying pool of mortgage loans, NIM bonds are typically repaid in full in a

relatively short period of time, even though their stated maturity date can be as many as thirty years after the issuance. NIM bonds are often subordinated to other bonds issued in the same offering, and thus are more sensitive to realized losses incurred by the trust.

## IV.    *Good Hill Purchased Over $18 Million in Bonds in the WaMu 2007-WM2 Offering.*

55.    Good Hill was formed in late 2006 as an investment management company. Good Hill examined a variety of investments, including asset-backed securities.

56.    Among the offerings of asset-backed securities that Good Hill evaluated for purchase were NIM bonds issued by WaMu in connection with an offering of traditional asset-backed bonds. The traditional bonds were denominated the WaMu Asset-Backed Certificates (the "Underlying Certificates") and were offered through a prospectus dated March 22, 2007 and a supplement thereto dated April 5, 2007 (collectively, the "Prospectus").

57.    The trust that held the mortgage-loan collateral for these Certificates and the associated NIM bonds was called the WaMu Series 2007-HE2 Trust (the "Trust"). The Trust contained two groups of loans: Group I and Group II.

58.    The NIM bond offering was denominated the WaMu CI NIM Notes Series 2007-WM2 (the "2007-WM2 Offering"). The 2007-WM2 Offering was described in an April 18, 2007 Term Sheet (the "Term Sheet") and a private placement memorandum dated April 26, 2007 (the "Private Placement Memorandum"). The Private Placement Memorandum attached the Prospectus Supplement and Prospectus and referred investors to those documents for disclosures on those Underlying Certificates. The Bank was the sponsor of the public offering of the Underlying Certificates, and WaMu Capital was an underwriter of that transaction.

59.    The Prospectus Supplement includes disclosures most relevant to the particular offering while the Prospectus contains more general disclosures. The Prospectus Supplement highlights this distinction, telling investors that information about the offering is provided

> in two separate documents that progressively provide more detail:
> (a) the accompanying prospectus, which provides general
> information, some of which may not apply to your series of
> certificates, and (b) this prospectus supplement, which describes
> the specific terms of your series of certificates.

60.     The Private Placement Memorandum also attached the Term Sheet, a sample

indenture for the NIM bonds, the pooling and servicing agreement governing the collateral held

in the trust (the "2007-WM2 PSA"), and other materials relating to the NIM bonds, the

Underlying Certificates, and the Trust.

61.     The 2007-WM2 Offering included three series of bonds: the N1, N2, and N3.

62.     Good Hill focused its interest on the N2 Notes, which were issued with a total

face value of $19,450,000 and a fixed interest rate of 7.500%. The stated maturity date was

April 2047. This bond was rated A-/A- by Standard & Poor's and Fitch because of the collateral

backing and structure of the 2007-WM2 Offering.

63.     The Prospectus Supplement showed that the Trust contained nearly all senior-lien

subprime mortgages, but included some junior-lien subprime mortgages as well. According to

the Prospectus Supplement, approximately 1.88% of the loans in Group I were junior-lien

mortgages and approximately 8.07% of the loans in Group II were junior-lien mortgages. A

March 28, 2007 collateral report issued by WaMu Capital made clear that these junior-lien

mortgages were related to senior-lien mortgages included in the Trust: the borrowers and

collateral associated with the related loans were the same.

64.     The Bank was the servicer of the underlying mortgage loans contained in the

Trust and the sponsor of the public offering of the underlying asset-backed bonds issued in

connection with the 2007-WM2 Offering.

65.     Under the structure of the 2007-WM2 Offering, when the Trust suffers Realized

Losses, the residual income is no longer used to pay the principal and interest due on the NIM

bonds, but is instead used to make up the shortfall on the payments due to the holders of the

Underlying Certificates. The value of the collateral supporting the NIM bonds – and the value of

the NIM bonds themselves – decreases significantly when the Trust incurs Realized Losses.

Accordingly, when and how the Trust would incur such losses – including whether WaMu would

apply a charge-off policy to accelerate or increase those losses – was a key factor in the

determination by Good Hill and any other prospective NIM bond investor of whether to invest in

the NIM bonds.

V.      *In Similar Offerings Involving Junior-lien Mortgage Loans, WaMu Capital and*
        *WaMu's Affiliated-Issuers Explicitly Disclose The Risk That The Bank Will Apply A*
        *Charge-off Policy.*

        66.     Besides issuing bonds backed by nearly all senior-lien mortgage loans (with some

junior-lien mortgages included, as in the 2007-WM2 Offering), for several years WaMu has

issued bonds backed only by junior-lien mortgage loans.

        67.     Prior to purchasing the bonds in the 2007-WM2 Offering, Good Hill reviewed

and was aware of the disclosures regarding the charge-off policy and realized losses that WaMu

and the Bank's issuing affiliates typically make in junior-lien transactions.

        68.     In these junior-lien-backed WaMu bond offerings, WaMu Capital and other

WaMu affiliates acting under WaMu's direction and control specifically disclose that the Bank,

acting as servicer, will apply a charge-off policy by which junior-lien loans generally will be

"charged off" or removed from the underlying trust no later than 180 days after the borrower

defaults on the loan.

        69.     An example of such an offering is the Long Beach Mortgage Loan Trust 2006-A,

issued pursuant to a prospectus dated April 7, 2006 and a prospectus supplement dated May 2,

2006. WaMu directed and controlled this bond issuance. The issuer was a WaMu special-

purpose entity, WaMu Capital was an underwriter, and the Bank was the servicer of the

collateral – just as in the WaMu offering in which Good Hill purchased over $18 million in NIM bonds.

70.    The "Summary of Terms" section that begins the prospectus supplement for that junior-lien-only transaction specifically discloses not only that a charge-off policy would apply to the junior-lien mortgage loans held by the trust, but that application of that policy would result in realized losses:

> Loan Charge-off Policy:
>
> Generally, the servicer must charge off a mortgage loan no later than the date it becomes 180 days delinquent (unless it determines that a significant net recovery is possible), and it may charge off a mortgage loan prior to that date.  Once a mortgage loan has been charged off, the master servicer will discontinue making advances, the servicer will not be entitled to the servicing fee for such mortgage loan, *and the mortgage loan will be treated as a liquidated mortgage loan giving rise to a realized loss.*  (Emphasis supplied.)

71.    The charge-off policy is also specifically referred to in the first entry in the Risk Factor section of the prospectus supplement, which is titled "Second Lien Mortgage Loans are More Likely to Incur Losses than First Lien Mortgage Loans."  That risk disclosure first describes the general risk associated with junior-lien mortgages, stating that the

> proceeds from any liquidation, insurance or condemnation proceedings will generally be available to satisfy the outstanding balance of the [junior-lien] mortgage loans only to the extent that the claims of the related senior mortgages have been satisfied in full, including any related foreclosure costs.  There may not be enough proceeds to pay both the first lien and the second lien.

72.    The disclosure in the prospectus supplement continues by specifically noting the risk of loss associated with the charge-off policy applicable to the junior-lien mortgages in the collateral pool:

> In circumstances when the servicer determines it to be uneconomical to foreclose on the mortgaged property, the servicer

may charge off the entire balance of the mortgage loan as a bad debt.

73.    The more detailed disclosures in the prospectus supplement regarding the Bank's actions as servicer also include a section describing the charge-off policy applicable to the junior-lien mortgage loans held as collateral:

> Loan Charge-off Policy.
>
> No later than the day on which a mortgage loan becomes 180 days delinquent, the servicers will determine whether a significant net recovery is possible through foreclosure proceedings or other liquidation of the related mortgage property.  If the servicer determines that no such recovery is possible, it must charge off the mortgage loan no later than the date it becomes 180 days delinquent, and it may charge off the loan prior to that date.  Once a mortgage loan has been charged off, the master servicer will discontinue making advances, the master servicer will not be entitled to the servicing fee for such mortgage loan, and the mortgage loan will be treated as a liquidated mortgage loan giving rise to a realized loss.

74.    The loan pooling and servicing agreement in this representative WaMu junior-lien-only transaction (the "Junior-Lien PSA") – an agreement between the Bank as servicer of the mortgages and the depositor, which is incorporated into the offering documents for the bond issue – also explicitly sets forth the charge-off policy.  Section 3.16 of that agreement has the heading "Realization Upon Defaulted Mortgage Loans," and Section 3.16(a)(ii) contains substantially the same text as in the indented quote above in paragraph 73.

75.    The definition of realized loss in the Junior-Lien PSA specifically refers to Section 3.16(a)(ii) and the charge-off policy reflected therein:

> With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan.  Any Mortgage Loan or REO Property that is charged off pursuant to Section 3.16(a)(ii) will give rise to a Realized Loss at the time it is charged off, as described in Section 3.16 hereof.

The definition of Liquidated Mortgage Loan thus expressly includes any loan "that has been charged off as contemplated in Section 3.16(a)(ii)," and the Junior-Lien PSA expressly defines a Liquidation Event as including the charge-off of a loan under Section 3.16(a)(ii).

76.    These representative documents – created as part of a contemporaneous, highly similar transaction involving the Bank, WaMu Capital, and other WaMu affiliates acting as issuers – demonstrate that, if the Bank acting as servicer intends to apply a charge-off policy to junior-lien mortgages, a reasonable investor would expect to see that intent repeatedly and openly disclosed in the prospectus supplement and other offering documents.

77.    WaMu directs WaMu Capital and its other affiliates to make these disclosures because the application of a charge-off policy significantly affects the amount of realized losses the collateral will experience.  In particular, a 180-day blanket charge-off policy creates a higher likelihood of significant realized losses during the first year after a bond offering because junior-lien loans in default generally must be charged off when the borrower has not made a payment for six months.  Conversely, where there is no charge-off policy and the junior-lien loans are serviced in conjunction with senior-lien loans, the likelihood of realized losses during the first year after an offering is much lower because the trust will not realize losses until after a foreclosure sale or similar liquidation event – events that typically do not take place within the first year after the offering is completed.

78.    Application of a charge-off policy to junior-liens can have a significant affect on the timing and amount of realized losses, and whether and how losses are incurred on the collateral are critical issues for investors considering purchasing asset-backed bonds. Accordingly, the disclosure of the risk that the Bank will impose such a policy (or the failure to make such a disclosure) is a significant element in the mix of facts investors look to when

evaluating WaMu's asset-backed bonds. Because NIM bonds are both highly sensitive to losses and generally repaid within twelve to fourteen months after the bond offering, investors – such as Good Hill – considering purchasing WaMu NIM bonds place particular emphasis on whether the offering documents expressly provide that the Bank will impose a charge-off policy.

## VI.    *The Issuing Defendants and the Bank Failed to Disclose that the Bank Would Apply a Charge-off Policy in the 2007-WM2 Offering, and Misleadingly Indicated that the Bank Would Not Apply Such a Policy.*

79.    Given the WaMu issuers' consistent practice of making *numerous and express* disclosures in the offering documents of the servicer's intent and authority to apply a charge-off policy, a reasonable investor evaluating the 2007-WM2 Offering would have expected to see an explicit disclosure of such a policy in the Offering documents if the Bank intended to impose that policy on the junior-lien mortgage loans included in the Trust.

80.    In stark contrast to the numerous express disclosures of a charge-off policy made in WaMu offerings backed by junior-lien mortgages, the 2007-WM2 Offering documents make no mention of a charge-off policy. Given the detailed disclosures regarding charge-off policies for junior-lien mortgages in similar WaMu offerings in the past, the inescapable inference of these documents was that the Bank would *not* apply a charge-off policy to junior-lien mortgages, and that the Trust would not incur realized losses on the basis of such a policy. At the very least, the failure of the Issuing Defendants and the Bank to disclose the meaningful possibility that the Bank would impose a charge-off policy – a material risk factor directly affecting the value of the bonds – rendered those disclosure documents highly misleading.

81.    The Bank issued the Prospectus Supplement as sponsor of the Underlying Certificates. The Prospectus Supplement expressly discloses a risk titled "Junior Lien Mortgage Loans are More Likely to Incur Losses and May be Subject to Higher Prepayments that First Lien Mortgages." This section begins – just as the nearly-identical disclosure in a typical WaMu

prospectus for junior-lien-only transactions begins – by disclosing the general risk associated

with junior-lien mortgages:

> The primary risk to holders of mortgage loans secured by junior
> liens is the possibility that adequate funds will not be available in
> connection with the foreclosure of the related senior lien to satisfy
> fully both the senior lien and the junior lien.  The claims of the
> holders of the senior lien will be satisfied in full out of the
> proceeds of the liquidation of a junior lien mortgage before the
> trust, as holder of the junior lien, receives any payments in respect
> of such mortgage loan.  If the servicer were to foreclose on any
> junior lien mortgage loan, it would do so subject to any related
> senior lien.

82.    But unlike the virtually-identical risk disclosure in a typical WaMu offering for

junior-lien-only transactions, which goes on to expressly disclose the *specific* (and highly

significant) risk associated with the Bank's charge-off policy for junior-lien mortgages, the risk

disclosure in the Prospectus Supplement makes no mention at all of a charge-off policy.  Thus, in

the very risk disclosure in which a reasonable investor would expect to find an express disclosure

of the Bank's charge-off policy for junior-liens, the Prospectus Supplement was completely

silent.  Given the critical importance of a charge-off policy disclosure to the value of a NIM

bond, and the consistent practice of WaMu issuers in disclosing the existence of such a policy in

the risk disclosures in the offering documents, any reasonable investor would have interpreted

the Prospectus Supplement to mean that the Bank would not apply a charge-off policy to the

junior-lien mortgages included in the Trust.

83.    The Prospectus Supplement also does not contain any mention of a charge-off

policy in the detailed disclosures describing the Bank's role as servicer, unlike the prospectus

supplement in WaMu's junior-only transactions.  Again, given the consistent practice of WaMu

issuers in disclosing the existence of a charge-off policy when describing the Bank's role as

servicer, the absence of any such disclosure in the Prospectus Supplement would have been

interpreted by any reasonable investor to mean that the Bank would not be applying such a policy to the junior-lien mortgages in the Trust.

84.    Moreover, the 2007-WM2 PSA also fails to include any reference to a charge-off policy. As noted above, a typical Junior-Lien PSA would include numerous disclosures specifically describing the Bank's charge-off policy and the effect of that policy. Thus, the PSA included with the Long Beach Mortgage Loan Trust 2006-A offering contained an express disclosure of a charge-off policy for junior lien mortgages in Section 3.16 ("Realization Upon Defaulted Mortgage Loans") – specifically in Section 3.16(a)(ii). Although the 2007-WM2 PSA includes a virtually identical Section 3.16, it does not include a Section 3.16(a)(ii) nor does it mention a charge-off policy in any other section.

85.    The definition of "Realized Loss" in the 2007-WM2 PSA also lacks any reference to a charge-off policy: "With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan." This definition is word-for-word the same as the definition in the Junior-Lien PSA – except, of course, for the notable omission of the sentence explicitly stating that the application of the charge-off policy would give rise to a Realized Loss.

86.    Not surprisingly, the definitions of Liquidated Mortgage Loan and Liquidation Event in the 2007-WM2 PSA are also virtually identical to the definitions of those terms in the Junior-Lien PSA – except that the definitions of these terms in the 2007-WM2 PSA make no mention at all of the existence or application of a charge-off policy. Because the Bank was a party to the 2007-WM2 PSA, and knew that the 2007-WM2 PSA would be included in the Offering documents through which the Issuing Defendants would market and sell the bonds to

the public, the nondisclosure in the PSA regarding the Bank's intention to apply a charge-off

policy is a nondisclosure and implied false representation attributable both to the Issuing

Defendants and to the Bank itself, in addition to the nondisclosures and false statements made by

the Bank and the Issuing Defendants in the Prospectus Supplement.

## VII.    *WaMu Capital Made Additional Representations That the Bank Would Not Apply a Charge-off Policy to the Collateral in the 2007-WM2 Offering.*

87.    WaMu Capital made additional statements that led to the reasonable

understanding that the Bank would not impose a charge-off policy on junior-lien mortgages

included in the Trust.

88.    For example, the Term Sheet issued and provided to prospective investors by

WaMu Capital included three graphs showing that the Trust would incur minimal, if any,

Realized Losses on the mortgages in the pool during the thirteen-month payment period for the

NIM bonds.

89.    As discussed above, application of a specific charge-off policy generally requires

defaulted junior-lien mortgage loans to be charged-off after the borrower has not paid for six

months.  These blanket charge-offs cause the trust holding those loans to incur significant

realized losses as a result – especially since borrowers under junior-lien mortgages generally

default on mortgage payments at a higher rate than borrowers default under senior-lien

mortgages.  Accordingly, if the Bank were going to impose a charge-off policy on the collateral

in the Trust, a reasonable investor would have expected to see the Trust incurring more

significant Realized Losses beginning in September 2007 – six months after the 2007-WM2

Offering.  Because the Term Sheet did not include estimations of such losses in September 2007

or the rest of the first year following the Offering, it reinforced the representations of the 2007-

WM2 disclosure documents that the Bank would not impose a charge-off policy.  The graphs in

the Term Sheet amount to an additional, false representation by WaMu Capital that the Bank

would not apply a charge-off policy.

90.     The Term Sheet also included a table showing the time frames in which the NIM

bonds would be repaid based on various loss scenarios.  Each of these showed that the NIM

bonds would be repaid (both principal and interest) within 14 months, even at the highest levels

of contemplated Realized Losses.  Again, if the Bank were going to impose a charge-off policy,

any reasonable investor would have expected to see higher Realized Losses and longer

repayment windows in the Term Sheet.  WaMu Capital's inclusion of short repayment windows

thus confirmed the message that the Bank would not impose a charge-off policy, and, in effect,

amounted to a representation that it would not do so.

91.     In addition, on March 28, 2007, Robert Clark, a Director at WaMu Capital, e-

mailed a collateral report to Good Hill regarding the collateral underlying the 2007-WM2

Offering.  This report showed that, for each junior-lien mortgage loan held by the Trust, the

related senior-lien mortgage loan was also held by the Trust.

92.     This description of the collateral in the collateral report was highly significant to

Good Hill because it indicated that the Bank would service the senior- and junior-lien mortgage

loans *together*.  In other words, because the Trust held the associated senior lien for every junior

lien at issue, Good Hill had additional grounds for believing that the Bank would not charge-off

a defaulted junior lien as bad debt in advance of a foreclosure proceeding on the senior lien.

Since the Bank would control the servicing and foreclosure process on both the junior-lien

mortgage loan and the related senior-lien mortgage loan, and the Prospectus Supplement did not

disclose WaMu's intent to impose a charge-off policy, Good Hill reasonably understood that the

Trust would most likely incur Realized Losses on the junior-lien mortgage loans at the same time as it incurred Realized Losses on the related senior-lien loan.

93.    During phone calls with Good Hill in the period of April 18 through April 26, 2007, Kevin Richmond of WaMu Capital expressly confirmed this interpretation, and stated that the Bank would treat the related senior-lien and junior-lien mortgage loans as one loan for purposes of Realized Losses.  Mr. Richmond was listed as a contact for further information in the January 2007 presentation describing the control that WaMu and the Bank exercise over all aspects of the issuing of asset-backed bonds such as those in the 2007-WM2 Offering, and Good Hill knew based on conversations with Mr. Richmond that he was familiar with the representations and disclosures made by WaMu and its affiliates in those offerings.

94.    Of course, to impose a charge-off policy under which the Bank would routinely write-off a defaulted junior lien as bad debt and incur Realized Losses after 180 days – well in advance of a foreclosure proceeding on the property – would be to service the junior and senior liens as *separate loans,* not as one loan.  Thus, Mr. Richmond's statement on behalf of WaMu Capital amounted to an additional, false representation that the Bank would not impose a special 180-day charge-off policy for junior liens.

95.    Prior to purchasing the NIM bonds, Good Hill conducted a yield analysis for those bonds based on information provided by WaMu regarding the collateral held by the Trust. Good Hill's initial analysis included a conservative estimate that the Trust would suffer some Realized Losses in the first year.  These estimates were not as high as Good Hill would have estimated if the Offering documents had disclosed that the Bank would impose a charge-off policy.

96.     Good Hill shared this analysis with Timothy O'Brien and Kevin Richmond of WaMu Capital, two of the lead employees marketing the 2007-WM2 Offering. On April 18, 2007, Messrs. O'Brien and Richmond responded to these calculations by e-mail. The responses stated that the Trust would not suffer the Realized Losses that Good Hill had calculated. Mr. O'Brien also noted in an April 18, 2007 e-mail that even poorly-performing prior bond offerings had not incurred Realized Losses of the magnitude Good Hill had suggested could be incurred. The responses also included statements of what Realized Losses could be expected in the first year.

97.     As with the graphs and tables in the Term Sheet, the representations regarding Realized Losses made in these April 18 emails are flatly inconsistent with the losses that would be incurred if the Bank were going to impose a charge-off policy on the junior-lien loans in the Trust. Accordingly, the e-mails amounted to additional false representations by WaMu Capital that the Bank would not apply a charge-off policy.

## VIII.   *Good Hill Purchased the Bonds in Reliance on the False Representations and Omissions.*

98.     Good Hill reasonably understood based on the Prospectus Supplement, the Term Sheet, and the e-mails and oral representations discussed above that the Bank would not impose a charge-off policy on the junior-lien mortgages included in the collateral pool held by the Trust.

99.     Instead, based on these representations and omissions, Good Hill understood that Realized Losses on junior-lien mortgage loans could arise under the same circumstances as Realized Losses on senior-lien mortgage loans: after foreclosure sales or other liquidation events, most of which would occur more than a year after the Offering was completed.

100.    In reliance on these representations, Good Hill purchased $18.45 million of the N-2 NIM bonds at 98% of face value, paying $18.081 million.  The trade date was April 19, 2007; the trade settled on April 26, 2007.

101.    Good Hill obtained and reviewed the Prospectus Supplement and Term Sheet at its offices in Connecticut.  Good Hill's phone calls and e-mails with WaMu Capital employees discussed above were made and received in Connecticut. Good Hill made its investment decision in its Connecticut offices, and the trade ticket generated by WaMu Capital shows Good Hill Master Fund L.P. (for which Good Hill is the investment manager) making the purchase from Connecticut.

**IX.**    ***The Issuing Defendants and the Bank Knew, or Recklessly Failed to Know, That The Representations and Omissions in the 2007-WM2 Offering Documents Regarding the Bank's Charge-Off Policy Were False.***

102.    The Issuing Defendants and the Bank knew, or were reckless in failing to know, that the representations and omissions in the 2007-WM2 Offering documents regarding the Bank's charge-off policy were false and misleading.

103.    WaMu Capital and the other Issuing Defendants failed to disclose to Good Hill the meaningful possibility that the Bank would impose a charge-off policy despite the fact that WaMu Capital had recently participated in numerous similar bond offerings with the Bank as servicer in which the disclosure documents repeatedly and expressly disclosed that precise risk to other investors.

104.    Moreover, given the close working relationship between the Bank and the Issuing Defendants in the marketing and sale of these bonds, the Issuing Defendants had every available opportunity to ascertain from the Bank whether, in fact, the Bank would apply a charge-off policy to the junior-liens at issue.  Moreover, the Issuing Defendants had a duty as issuers to investigate and to disclose all of the material risks regarding the 2007-WM2 Offering – including

the material risk that the Bank would apply a charge-off policy and that the Trust, as a result, would likely experience significant Realized Losses in the first six months.

105.    The failure of WaMu Capital and the other Issuing Defendants to evaluate the risk that the Bank as servicer would apply a charge-off policy, and their failure to disclose that meaningful risk to investors, was highly unusual and represented a departure from the standards of ordinary care governing the issuance of asset-backed bonds.

106.    Yet, instead of disclosing this material risk to investors – as WaMu Capital and other affiliated WaMu issuers typically do – WaMu Capital and the other Issuing Defendants failed to disclose that risk to Good Hill.  Indeed, these Defendants conveyed the opposite – plainly false – impression that the Bank would not impose a charge-off policy.

107.    Thus, in every section of the Offering documents in which a sophisticated investor, such as Good Hill, would expect to find a specific disclosure that the Bank would apply a charge-off policy to junior liens, the Offering documents were completely silent.  In addition, as alleged above, representatives of WaMu Capital made additional representations to Good Hill that were utterly inconsistent with application of a charge-off policy by the Bank – representations that buttressed Good Hill's reasonable interpretation that the Bank would not apply such a policy.

108.    There could not have been an innocent, non-fraudulent reason for WaMu Capital and the other Issuing Defendants to refrain from disclosing the meaningful risk that the Bank would impose a charge-off policy, or to falsely represent that the Bank would not impose such a policy.  These Defendants were intimately familiar with that risk, and had actual knowledge that the Bank, when acting as servicer for junior liens, would apply a 180-day charge-off policy to junior liens.  In light of this experience and close working relationship, it is simply not plausible

to infer that the Issuing Defendants considered the risk that the Bank would apply such a policy, yet somehow determined that that risk was too insignificant to warrant disclosure.

109.    Instead, the totality of the surrounding circumstances creates a strong inference that WaMu Capital and the other Issuing Defendants knew, or were reckless in not knowing, that the Bank would impose a charge-off policy.  Yet, despite their awareness of this significant risk, the Issuing Defendants remained silent, and compounded that silence with flatly misleading representations.  Thus, there is a strong, indeed compelling, inference that the Issuing Defendants either deliberately intended to mislead Good Hill by concealing the known, material risk that the Bank would apply a charge-off policy, or were recklessly indifferent to the possibility that the Bank would do so.

110.    The Bank also knew, or was reckless in not knowing, at the time of the offering that it would impose a charge-off policy, and that its failure to disclose that risk in the 2007-WM2 PSA was highly misleading, and conveyed the false impression that it would not in fact impose such a policy.

111.    As noted above, when the Bank intends to impose a charge-off policy to junior liens, it typically makes numerous, express discloses of that intention in the PSA agreement.  Yet here, the Bank failed to include *any* specific reference in the Prospectus Supplement or the 2007-WM2 PSA to the possibility that it might charge-off junior liens after 180 days – a highly unreasonable and misleading omission in light of the Bank's disclosure, just three months later, that it would impose that very policy.

112.    Moreover, when the Bank informed Good Hill that it would begin to impose a charge-off policy on junior-lien mortgages held by the Trust in July 2007, the Bank told Good Hill that the disclosures in the Prospectus Supplement, 2007-WM2 PSA, and related documents

state that the Bank had the right to impose a charge-off policy. These statements were made by Henry Engelken, the Bank employee listed as a contact point for the January 2007 press release and public presentation made by WaMu and the Bank regarding the control WaMu and the Bank exercised over the entire process of issuing asset-backed bonds such as those in the 2007-WM2 Offering.

113.    In other words, the Bank stated that, at the time of the 2007-WM2 Offering, there was a meaningful possibility that it would impose a charge-off policy – a policy that the Bank believed was authorized by the terms of the Offering documents themselves. Yet, the Offering documents are completely silent as to the existence or possibility of a charge-off policy, and, taken together and in light of all the surrounding circumstances, strongly indicate that the Bank would not impose any such policy.

114.    Because the Bank knew full well what an express disclosure of a charge-off policy in a PSA agreement typically would look like, it could not possibly have believed that the disclosures in the 2007-WM2 PSA – which are utterly silent about a charge-off policy – would fairly communicate to investors that the Bank might impose such a policy. Instead, given the Bank's ultimate disclosure that it would impose that very policy just three months into the term of the bonds, those omissions and implied misrepresentations about the existence of a charge-off policy were highly unreasonable, and represented an extreme departure from the ordinary standards of care that the Bank typically exhibited.

115.    The Bank would have had no innocent, non-fraudulent reason to fail to disclose a material risk – its own application of a charge-off policy that it typically discloses when acting as servicer – of which it was unarguably aware. Instead, the Bank's failure to disclose that risk must have been either deliberately calculated to mislead Good Hill to purchase these bonds, or

was recklessly indifferent to the possibility that Good Hill would be misled by those highly misleading omissions.

**X.    *WaMu and the Bank were Intimately Involved in the 2007-WM2 Offering.***

116.    As discussed above, in January 2007 WaMu issued a press release telling the market that asset-backed bonds previously issued under the Long Beach SEC registration would now be issued under the WaMu Asset Acceptance registration. The press release states that future bond offerings will be "Washington Mutual product offerings."

117.    The press release thus shows not only WaMu's power to control how the bonds would be registered and issued (because it had exercised its power to change how that registration would be effected), but also shows its intent to monitor and control how those issuances would take place after January 2007.

118.    The press release quoted Doug Potolsky, a WaMu executive who had previously executed documents filed with the SEC in connection with bonds issued under the Long Beach name. The point of contact for additional information was Henry Engelken.

119.    As also discussed above, WaMu and the Bank released a presentation in January 2007 describing their control over the entire mortgage securitization process, including originating loans, collecting those loans into collateral pools, issuing bonds backed by those loans, and servicing the collateral supporting those bonds. The presentation trumpeted the extensive experience of WaMu executives – including Mr. Potolsky – in all phases of this process. The presentation is clearly an effort to provide assurance and security to prospective purchasers of bonds issued under the WaMu name that WaMu and the Bank will oversee each phase of the securitization process and make sure that it is set up and executed appropriately.

120.    The presentation listed Mr. Engelken as a point of contact for information regarding WaMu and the Bank's subprime securitization program. Kevin Richmond is also listed

as one of the "Lead Underwriter contacts" at WaMu Capital – individuals to contact regarding marketing and sale of the bonds.

121.    WaMu and the Bank were deeply involved with the 2007-WM2 Offering. The offering was made in connection with an underlying offering made using the WaMu Asset Acceptance registration, as WaMu's January 2007 press release had stated such offerings would be made. The Bank was the sponsor of the public offering made in connection with the 2007-WM2 Offering, and was the servicer of the loans in the Trust. The Prospectus Supplement notes that the Bank "participated with the underwriters [including WaMu Capital] in structuring the securitization transaction."

122.    When considering whether to purchase the NIM bonds, Good Hill spoke with Mr. Richmond, whom WaMu and the Bank had listed as one of the individuals with knowledge of their overall program. Mr. Richmond told Good Hill that he had knowledge of and experience with other WaMu bond offerings.

123.    When Good Hill learned of the Bank's previously-undisclosed intention to impose a charge-off policy, it spoke with Mr. Engelken, who was listed as the point of contact for both the January 2007 press release and presentation. Mr. Engelken made it clear to Good Hill that he was familiar with the disclosures made in the 2007-WM2 Offering.

124.    Not only did WaMu and the Bank exercise control over the entities involved in the 2007-WM2 Offering, but certain of the employees they had listed as points of contact when touting their control were thus specifically involved in the disclosures made to Good Hill before, during, and after the Offering.

125.    There is no question that WaMu and the Bank not only had the power to direct and control the disclosures made in the 2007-WM2 Offering, but were specifically involved in, and

exerted practical and effective control over, the disclosures made in that Offering.

126.    Given WaMu and the Bank's close supervision and intimate involvement, they knew, or were reckless in not knowing, that the omissions and misrepresentations made by the Issuing Defendants regarding the Bank's charge-off policy were false.

## XI.    *The Bank's Application of the Undisclosed Charge-off Policy Greatly Diminished the Value of the Bonds Good Hill Purchased.*

127.    As shown in detail above, the Defendants' previously-undisclosed intent to apply a charge-off policy to the collateral held by the Trust resulted in a much greater likelihood that the Trust would incur Realized Losses at least six months earlier than they would have, if, as Defendants' falsely represented in the Offering documents and elsewhere, no such charge-off policy was applicable.

128.    The premature charging off of these junior-lien mortgage loans resulted in significant diminution of the funds available to pay Good Hill and other holders of the NIM bonds because when the Trust incurs Realized Losses the residual income generated by the difference between the interest received by WaMu from the borrowers and the interest it had to pay to the Certificateholders can no longer be used to pay the interest and principal due on the NIM bonds.  Instead, those funds had to be used to pay shortfalls incurred by the Certificateholders because of the Realized Losses.

129.    Accordingly, the application of the charge-off policy severely affected the cash flow available to pay the NIM bonds.  Their value dropped dramatically as a result.

130.    When it decided to purchase the NIM bonds in the 2007-WM2 Offering, Good Hill relied on the disclosures regarding Realized Losses made in the Prospectus Supplement, Term Sheet, and additional statements by WaMu Capital.  In particular, Good Hill understood

that the Bank would not apply a charge-off policy to the collateral in the transaction, and made

its valuation, pricing, and investment decisions based on that understanding.

131.    Because it is Good Hill's practice to factor in a significant risk of delinquency and

default on subprime mortgages, it would not have purchased the NIM bonds – and certainly

would not have paid 98% of their face value – if it had known that the Bank intended to impose a

charge-off policy on the collateral supporting the bonds.  As discussed in detail above,

Defendants' disclosures falsely implied that a charge-off policy would not be applied.  The

Bank's application of that policy resulted in the senior-lien and related junior-lien mortgages not

being treated as one loan and Realized Losses being recognized on junior-lien mortgages solely

because the borrower was more than 180-days delinquent, without any foreclosure sale or other

liquidation effort on the related senior-lien mortgage loan.

132.    Defendants' misleading disclosures regarding the way in which the collateral

would be treated – a material fact in the investment decision – caused significant harm to Good

Hill.

133.    Good Hill has incurred losses of at least $7 million as a result of the Defendants'

improper actions.

**FIRST CAUSE OF ACTION**
**Securities Fraud – Exchange Act § 10(b) and Rule 10(b)(5) – Against the Issuing**
**Defendants and the Bank**

134.    Good Hill incorporates paragraphs 1-133 by reference.

135.    As set forth in detail above, the Issuing Defendants and the Bank made

misleading representations and omitted material facts regarding the NIM bonds in the WaMu

2007-WM2 Offering.  The disclosures made by the Issuing Defendants and the Bank omitted any

reference to a charge-off policy, leading a reasonable investor such as Good Hill to conclude that

the Bank would not apply a charge-off policy to the collateral supporting the 2007-WM2 Offering.

136.    WaMu Capital employees made additional misrepresentations that supported this interpretation in telephone conversations and e-mails with Good Hill prior to its purchase in the 2007-WM2 Offering.

137.    The treatment of the collateral, including whether a charge-off policy would be applied, is material to the value of the NIM bonds.

138.    In making these misrepresentations and omissions, the Issuing Defendants and the Bank knew or should have known that the Bank intended to apply – or was, at a minimum, reserving the right to apply – a charge-off policy to the collateral supporting the 2007-WM2 Offering.  Applying a charge-off policy would materially increase Realized Losses incurred by the Trust and thus dramatically decrease the value of the NIM bonds.

139.    The Issuing Defendants' and the Bank's omissions and misrepresentations were made in the Prospectus Supplement, the Term Sheet released to Good Hill and other investors in connection with the 2007-WM2 Offering, orally over the telephone, and in e-mails.  The documents were sent by mail and e-mail.  The documents were created and sent in connection with a sale of securities.

140.    Good Hill justifiably relied on these omissions and representations, including that the related senior-lien and junior-lien mortgage loans would be treated as one loan.

141.    Good Hill purchased the N2 NIM bonds based on this reliance.

142.    The misleading disclosures and omissions regarding the charge-off policy (or lack thereof) caused Good Hill to purchase the NIM bonds for significantly more than it would have had the full risks been disclosed.

143.    As a result of the Issuing Defendants' and the Bank's fraud, Good Hill has

incurred, and hereby demands recovery of, damages as described above in an amount to be

proven at trial.

## SECOND CAUSE OF ACTION
### Control Person Liability – Exchange Act § 20(a) – Against WaMu and the Bank

144.    Good Hill incorporates paragraphs 1-143 by reference.

145.    WaMu is the parent company of all the other Defendants, including the Bank.

WaMu has the power to control all the Defendants.  WaMu has the power to direct or cause the

direction of the management and policies of all the other Defendants.

146.    WaMu expressly described its control over offerings such as the 2007-WM2

Offering in January 2007 by describing changes it had implemented to the branding and

marketing of those offerings.

147.    The Bank also controls the actions of the Issuing Defendants through its sale of

mortgage loans and its control of the servicing process.  The Bank has the power to assert

influence over the other Defendants regarding this key portion of the transaction consummated

through the Offering.

148.    The Bank and WaMu were intimately involved in the 2007-WM2 Offering, and

exerted direction and control over it.

149.    WaMu and the Bank consciously participated in the material misrepresentations

and omissions made by the Issuing Defendants because the Bank intended to apply a charge-off

policy to the collateral underlying the 2007-WM2 Offering from the time of the Offering (or

intended to reserve its right to apply a charge-off policy), and WaMu knew of this intention or

was reckless in failing to know it.  Although they could have directed the Issuing Defendants to

disclose this intention (as had been done in many WaMu bond offerings in the past) WaMu and

the Bank nevertheless permitted the Issuing Defendants to make misleading representations and material omissions described herein.

150.    As a result of the Issuing Defendants' conduct as described herein, including in the First and Third Causes of Action, and the control exercised by WaMu and the Bank, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Fraud – Common Law of Connecticut - Against the Issuing Defendants and the Bank

151.    Good Hill incorporates paragraphs 1-150 by reference.

152.    The Issuing Defendants and the Bank had a duty to disclose all material risks of loss to the assets in the Trust in connection with the Offering.

153.    As discussed in detail above, the Issuing Defendants and the Bank made misleading representations and omitted material facts regarding the NIM bonds in the WaMu 2007-WM2 Offering.  The disclosures made by the Issuing Defendants and the Bank omitted any reference to a charge-off policy, leading a reasonable investor such as Good Hill to conclude that the Bank would not apply a charge-off policy to the collateral supporting the 2007-WM2 Offering.

154.    WaMu Capital employees supported this interpretation in telephone conversations and e-mails with Good Hill prior to its purchase in the 2007-WM2 Offering.

155.    The treatment of the collateral, including whether a charge-off policy would be applied, is material to the value of the NIM bonds.

156.    In making these misrepresentations and omissions, the Issuing Defendants and the Bank knew or should have known that the Bank intended to apply – or was, at a minimum, reserving the right to apply – a charge-off policy to the collateral supporting the 2007-WM2

Offering.  Applying a charge-off policy would materially increase Realized Losses incurred by

the Trust and thus dramatically decrease the value of the NIM bonds.

157.    The Issuing Defendants and the Bank knew that investors such as Good Hill

would rely on their misrepresentations and omissions in the Prospectus Supplement, the Term

Sheet, orally over the telephone, and in e-mails.  These Defendants intended that Good Hill and

other investors rely on these misrepresentations and omissions.

158.    Good Hill justifiably relied on these misrepresentations and omissions to its

detriment.

159.    As a result of the Defendants' fraud, Good Hill has incurred, and hereby demands

recovery of, damages in an amount to be proven at trial.

160.    Furthermore, because the Defendants' conduct was intentional, wanton, willful,

and in disregard of Good Hill's rights, an award of punitive damages is warranted.

## FOURTH CAUSE OF ACTION
### Aiding and Abetting Fraud – Common Law of Connecticut – Against WaMu and the Bank

161.    Good Hill incorporates paragraphs 1-160 by reference.

162.    WaMu and the Bank were aware of the fraud committed by the Issuing

Defendants.

163.    WaMu and the Bank substantially assisted in that fraud by providing resources to

complete the 2007-WM2 Offering.  In addition, WaMu and the Bank directed and permitted the

misleading representations and material omission of its intention to impose a charge-off policy,

an undisclosed risk that caused significant financial harm to Good Hill.

164.    As a result of WaMu and the Bank's aiding and abetting of the Issuing

Defendants' fraud, Good Hill has incurred, and hereby demands recovery of, damages in an

amount to be proven at trial.

165.    Furthermore, because the conduct of WaMu and the Bank was intentional, wanton, willful, and in disregard of Good Hill's rights, an award of punitive damages is warranted.

## FIFTH CAUSE OF ACTION
### Violation of Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-4 ("CUSA") – Against The Issuing Defendants and the Bank

166.    Good Hill incorporates paragraphs 1-165 by reference.

167.    As discussed in detail above, the Issuing Defendants and the Bank, either directly or indirectly, offered or sold securities to Good Hill in the State of Connecticut by means of either untrue statements of material fact, or by their omission to state material facts necessary to make any statements made, in the circumstances of their making, not misleading.

168.    Specifically, the Issuing Defendants and the Bank sold or offered to sell Good Hill securities by failing to disclose the risk that the Bank would apply a charge-off policy to junior-liens, and by misleadingly representing that the Bank in fact would not apply a charge-off policy.

169.    The Issuing Defendants and the Bank are liable under the CUSA for any false misrepresentation or omission, whether Defendants made those misrepresentations intentionally, recklessly, or negligently.

170.    Good Hill did not know of these untruths or omissions at the time it purchased the bonds.

171.    As a result of Defendants' violations of the CUSA, Good Hill has incurred, and hereby demands recovery of, damages as described above in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation – Common Law of Connecticut – Against The Issuing Defendants and the Bank

172.    Good Hill incorporates paragraphs 1-171 by reference.

173.    The Bank and the Issuing Defendants, in the course of their business, supplied false information for the guidance of Good Hill in the purchase of the bonds, and did so by failing to exercise reasonable care or competence in obtaining the correct information.

174.    Specifically, the Issuing Defendants and the Bank failed to disclose the risk that the Bank would apply a charge-off policy to junior-liens, and misleadingly represented that the Bank in fact would not apply a charge-off policy.

175.    Because the Issuing Defendants and the Bank voluntarily disclosed certain risks associated with the purchase of these bonds, they had a duty to make a full and fair disclosure as to all material matters of the transaction – including the risk that the Bank would apply a charge-off policy.

176.    Good Hill was one of a limited group of persons for whose benefit and guidance the Issuing Defendants and the Bank supplied the false information, and the Issuing Defendants and the Bank knew that Good Hill intended to rely on the information that they supplied.

177.    The Issuing Defendants and the Bank owed Good Hill a duty of care in the marketing and sale of these securities.

178.    Even if the misrepresentations and omissions of the Issuing Defendants and the Bank were made innocently, those Defendants are liable because they had the means of knowing the truth, ought to have known the truth, and were under a duty to know the truth, regarding the Bank's intention to apply a charge-off policy.

179.    Good Hill justifiably relied on this false information in deciding to purchase the bonds.

180.    As a direct result of the negligent misrepresentations of the Issuing Defendants and the Bank, Good Hill has incurred, and hereby demands recovery of, damages as described

above in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Innocent Misrepresentation – Common Law of Connecticut –
### Against The Issuing Defendants and the Bank

181.    Good Hill incorporates paragraphs 1-180 by reference.

182.    The Bank and the Issuing Defendants marketed and sold these bonds to Good Hill
by means of representations of material facts that were untrue or misleading – specifically, that
the Bank would not impose a charge-off policy.

183.    The Bank and the Issuing Defendants made these representations for the purpose
of inducing Good Hill to purchase the bonds.

184.    Good Hill justifiably relied on these representations in purchasing the bonds.

185.    As a direct result of the false representations of the Issuing Defendants and the
Bank – actionable even if innocently made – Good Hill has incurred, and hereby demands
recovery of, damages as described above in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment – Common Law of Connecticut – Against All Defendants

186.    Good Hill incorporates paragraphs 1-185 by reference.

187.    Defendants unjustly benefitted from the sale of these bonds to Good Hill by
receiving over $18 million in consideration based on false misrepresentations and omissions
regarding the Bank's intention to apply a charge-off policy.

188.    Good Hill would not have purchased the bonds but for these false representations
and omissions.

189.    As a result of the false representations and omissions regarding the Bank's
charge-off policy, Good Hill was deprived of over $7 million that it otherwise would have
earned.

190.    Due to their false and misleading misstatements and omissions, it is contrary to equity and good conscience to permit Defendants to retain the benefits of the transaction at the direct expense of Good Hill.

191.    Good Hill hereby demands the return in equity of the benefits of the transaction that Defendants have unjustly retained.

WHEREFORE, Good Hill prays that it have judgment against Defendants as follows:

1.    Actual damages as described above;

2.    Punitive damages;

3.    Pre- and post-judgment interest as allowed by law;

4.    Attorneys' fees; and

5.    All other and further relief, both general and special at law or in equity, to which it may be entitled.

Dated:  July 18, 2008
     New York, New York

**COHEN & GRESSER LLP**

By:  _____

     Mark S. Cohen
     mcohen@cohengresser.com
     Marc E. Isserles
     misserles@cohengresser.com
     Nathaniel P. T. Read
     nread@cohengresser.com

     100 Park Avenue, 23rd Floor
     New York, NY 10017
     Phone: (212) 957-7600
     Fax:    (212) 957-4514

     *Attorneys for Plaintiff Good Hill Partners L.P.*

Exhibit B

*The following is a preliminary Term Sheet. All terms and statements are subject to change.*

## $24,125,000 Class N-1 *(approximate)*
## $19,450,000 Class N-2 *(approximate)*
## $4,675,000 Class N-3 *(approximate)*

## WaMu CI NIM Notes Series 2007-WM2



## WM Asset Holdings Corp. *(Seller/Sponsor)*

## Washington Mutual Bank *(Servicer)*

### Private 144A Offering

### April 18, 2007

# WaMu CI NIM Notes Series 2007-WM2



COMPUTATIONAL MATERIALS DISCLAIMER

The information contained herein is furnished to you solely by WaMu Capital Corp. ("WCC") (and not by the WM Asset Holdings Corp. CI 2007-WM2, the issuer of the securities, or Washington Mutual Bank or any of their affiliates) to assist you in making a preliminary analysis of the securities referenced herein.  This information is not an offer to sell securities or a solicitation of an offer to buy such securities or any other asset.  WCC is acting in its capacity as initial purchaser and not as agent for the issuer or its affiliates in connection with the proposed transaction.  This information is submitted on a confidential basis to a limited number of institutional investors and may not be reproduced in whole or in part, nor may it be distributed or any of its contents to anyone other than the prospective investor to whom it has been submitted by WCC.

The information contained herein (a) is preliminary, is expected to change, and does not contain all of the information that a prospective investor will need to make a full analysis of the proposed transaction, (b) supersedes all information relating to the subject securities that has been made available to you previously, and (c) will be superseded in its entirety by any information made available to you after the date hereof, if any, as well as by the private placement memorandum/offering document relating to the actual securities preliminary discussed herein.  In addition, the information contained herein is based on information obtained from third parties, the accuracy and completeness of which has not been verified by WCC.  Any decision to invest in the securities preliminarily described should be made only after reviewing the related final private placement memorandum/offering document, conducting such investigations as you deem necessary and consulting you own legal, tax, financial and accounting advisors in order to make an independent determination of the suitability, risks and consequences of an investment in such securities.

Certain of the information contained herein may be based upon numerous assumptions (which assumptions may not be specifically identified in the information), and changes in such assumptions may dramatically affect information such as weighted average lives, yields, principal payment periods, etc.  WCC does not make any representation regarding the reasonableness of such assumptions or the likelihood that any of such assumptions will coincide with actual market conditions or events.  The information should not be construed as either projections or predictions or as legal, tax, financial or accounting advice.

WCC and its affiliates may, from time to time, have long or short positions in, and buy and sell, the securities mentioned herein or similar securities, and perform investment banking services for any company mentioned herein.

2

## WaMu CI NIM Notes Series 2007-WM2



---

### Structure Overview (To Maturity)

| Class | Approximate Size | Coupon | Type | WAL (yrs) | Principal Payment Window (mos) | Payment Delay (days) | Interest Accrual Basis | Stated Final Maturity | Expected Ratings (S&P) |
|---|---|---|---|---|---|---|---|---|---|
| N-1[(1)] | $24,125,000 | 1mL + [TBD]% | NIM | 0.75 | 1-17 | 0 | Act/360 | April 2012 | AA |
| N-2 | $19,450,000 | 7.50% | NIM | 0.61 | 1-13 | 0 | 30/360 | April 2047 | A- |
| N-3[(1)] | $4,675,000 | 1mL + [TBD]% | NIM | 1.26 | 13-17 | 0 | Act/360 | April 2012 | AA |

(1) The Class N-1 Notes and the Class N-3 Notes will be insured by Radian generally for timely payments of interest and ultimate payment of principal on the expected final maturity.

| | |
|---|---|
| **ISSUER:** | WM Asset Holdings Corp. CI 2007-WM2, a Cayman Islands company |
| **CO-ISSUER:** | WM Asset Holdings CI 2007-WM2 LLC, a Delaware limited liability company |
| **SELLER/SPONSOR:** | WM Asset Holdings Corp. |
| **SERVICER:** | Washington Mutual Bank |
| **INDENTURE TRUSTEE:** | Citibank, N.A. |
| **CO-TRUSTEE:** | U.S. Bank National Association |
| **EXPECTED PRICING DATE:** | Week of April 16, 2007 |
| **CLOSING DATE:** | April 26, 2007 |
| **NOTE INSURER:** | Radian Insurance Inc. ("***Radian***") |
| **CAP COUNTERPARTY:** | [TBD] |
| **INITIAL PURCHASER:** | WaMu Capital Corp. |

3

## WaMu CI NIM Notes Series 2007-WM2



---

<table>
<tr><td colspan="2" align="center"><strong>Transaction Terms</strong></td></tr>
<tr><td><strong>Notes Offered:</strong></td><td>Approximately $24,125,000 of WaMu CI NIM Notes Series 2007-WM2, Class N-1.  Approximately $19,450,000 of WaMu CI NIM Notes Series 2007-WM2, Class N-2.  Approximately $4,675,000 of WaMu CI NIM Notes Series 2007-WM2, Class N-3.  The Class N-1, the Class N-2 Notes and the Class N-3 Notes are collectively referred to herein as the "Notes."  The Notes will be offered only to "qualified institutional buyers" ("QIBs") as defined in Rule 144A under the Securities Act of 1933, as amended.</td></tr>
<tr><td><strong>Interest Accrual Period:</strong></td><td>For the first Payment Date, will be the period beginning with the Closing Date and ending on the day prior to such Payment Date, and with respect to any subsequent Payment Date, will be the period beginning with the previous Payment Date and ending on the day prior to such Payment Date.  For each Payment Date other than the first Payment Date, Interest will be calculated for the Class N-2 Notes based on a 30-day month and a 360-day year.  Interest will be calculated for the Class N-1 Notes and the Class N-3 Notes based on the actual number of days during the Interest Accrual Period and a 360-day year.</td></tr>
<tr><td><strong>Note Insurer Premium:</strong></td><td>4.00% per annum.  The Note Insurer Premium will be calculated based on the actual number of days during the Interest Accrual Period and a 360-day year and the unpaid principal balance of the Class N-1 Notes and the Class N-3 Notes for such Payment Date.</td></tr>
<tr><td><strong>Record Date:</strong></td><td>Payments on the Notes will be made on each Payment Date to the noteholders of record on the last business day immediately preceding such Payment Date.</td></tr>
<tr><td><strong>Underlying Distribution Date:</strong></td><td>The 25th day of each month (or if such 25th day is not a business day, the next succeeding business day) commencing in May 2007.</td></tr>
<tr><td><strong>Cut-off Date:</strong></td><td>April 1, 2007.</td></tr>
<tr><td><strong>Payment Date:</strong></td><td>The Underlying Distribution Date, commencing in May 2007, <em>provided, however,</em> if the Note Insurer fails to make a payment required under the Note Policy in accordance with its terms, the Payment Date for the Class N-1 Notes and the Class N-3 Notes will be the third Business Day following the Underlying Distribution Date.</td></tr>
</table>

## WaMu CI NIM Notes Series 2007-WM2



---

### Transaction Terms

**Payment Date:**  The Underlying Distribution Date, commencing in May 2007.

**Underlying Trust:**  WaMu Asset-Backed Certificates WaMu Series 2007-HE2 (the "***Underlying Trust***").  Please refer to the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Prospectus Supplement (the "***Prospectus***"), attached as an exhibit to the Private Placement Memorandum for more detailed information on the Underlying Trust.

**Underlying Mortgage Loans:**  The mortgage loans will consist of a pool of fixed-rate and adjustable-rate, one- to four-family, first and second lien residential mortgage loans (the "***Underlying Mortgage Loans***").  The description of the Underlying Mortgage Loans is on the basis of their scheduled principal balances as of the Cut-off Date.  As of the Cut-off Date, the Underlying Mortgage Loans have an aggregate scheduled principal balance of approximately $1,593,665,287.  Approximately 4.23% of the Underlying Mortgage Loans are 40-Year Mortgage Loans (as defined herein).

**Trust Collateral:**  The ***Trust Collateral*** will consist of:
  i. WaMu Asset-Backed Certificates WaMu Series 2007-HE2, Class C (the "***Underlying Class C Certificates***"), representing a 100% percentage interest in such class;
  ii. WaMu Asset-Backed Certificates WaMu Series 2007-HE2, Class P (the "***Underlying Class P Certificates***"), representing a 100% percentage interest in such class;
  iii. Any amounts received under the NIM Cap Agreements; and
  iv. Any other amounts that may be deposited into an account (the ***"Note Account"***) on the Closing Date.

**Underlying Class P Certificates:**  The Underlying Class P Certificates will be entitled to receive prepayment charges due on the Underlying Mortgage Loans to the extent such loans prepay in full (but not in part) and have a contractual prepayment charge obligation unless such prepayment charges are waived and are not otherwise required to be paid by the Servicer in accordance with the Underlying Pooling Agreement.  The Servicer may waive prepayment charges or part of a prepayment charge if such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such prepayment charge and related mortgage loan and doing so is standard and customary in servicing mortgage loans

5

**WaMu CI NIM Notes Series 2007-WM2**



---

| | **Transaction Terms** |
|---|---|
| | (including any waiver of a prepayment charge in connection with a refinancing of a mortgage loan that is related to a default or a reasonably foreseeable default).  The Servicer may also waive any prepayment charge or part of a prepayment charge in any instance when the mortgage debt is accelerated as a result of the mortgagor's default in making the Underlying Mortgage Loan payments.  The Servicer will be entitled to all prepayment charges or premiums payable in respect of partial principal prepayment on the Underlying Mortgage Loans as additional compensation for its services as the Servicer.  Prepayment charges apply to approximately 80.86% of the Underlying Mortgage Loans as of the Cut-off Date. |
| **Underlying Class C Certificates:** | The Underlying Class C Certificates will be entitled to receive excess cashflow, if any, from the Underlying Mortgage Loans each month after payment or reimbursement of certain fees and expenses, payment of required distributions to holders of each class of certificates issued by the Underlying Trust with a payment priority higher than the Underlying Class C Certificates (the "**Senior Certificates**"), payments to maintain the overcollateralization level required in the Underlying Pooling Agreement, net payments if any, to the Swap Counterparty (as defined herein) and payments if any to the Final Maturity Reserve Account (as defined herein) of the Underlying Trust.  On and after the Underlying Distribution Date in April 2027, all amounts otherwise payable to the Underlying Class C Certificates will be deposited in the Final Maturity Reserve Account until the amount on deposit in the Final Maturity Reserve Account is equal to the stated principal balance of the 40-Year Mortgage Loans less the certificate principal balance of the Underlying Class C Certificates. |
| | The pooling and servicing agreement of the Underlying Trust (the "**Underlying Pooling Agreement**") will provide that excess cashflow is required, among other things, to be used on any Underlying Distribution Date to pay principal with respect to the Senior Certificates so that the Senior Certificates are overcollateralized in an amount equal to the Overcollateralization Target Amount (as described in the Underlying Pooling Agreement).  The Overcollateralization Target Amount will be fully funded on the date the Senior Certificates are issued.   If, due to losses on the Underlying Mortgage Loans, the overcollateralization amount is less than the Overcollateralization Target Amount on any Underlying Distribution Date, no distributions will be made to the Underlying Class C Certificates from proceeds of the Underlying Mortgage Loans on such Underlying Distribution Date until the Overcollateralization Target |

**WaMu CI NIM Notes Series 2007-WM2**



| | |
|---|---|
| **Transaction Terms** | |
| | Amount has again been reached. |
| **Available Funds:** | The "*Available Funds*" on each Payment Date will consist of the N1 Available Funds and the N2/3 Available Funds. |
| | The "*N1 Available Funds*" on each Payment Date will consist of: (i) 50% of any cashflow distributed to the Underlying Class C Certificates and the Underlying Class P Certificates on the related Underlying Distribution Date, (ii) any amounts received from the Note Insurer pursuant to the Note Policy for payments in interest and principal to the Class N-1 Notes, (iii) any amounts received from the Cap Counterparty with respect to the Class N-1 Cap Agreement, *provided, however,* that if any amounts are remaining after distributions to the Class N-1 Notes with respect to the Class N-1 Cap Agreement, the remaining amount will be made part of N1 Available Funds for distribution on such Payment Date and (iv) any N2/3 Available Funds remaining on such Payment Date after application of the N2/3 Available Funds as described below. |
| | The "*N2/3 Available Funds*" on each Payment Date will consist of (i) 50% of any cashflow distributed to the Underlying Class C Certificates and the Underlying Class P Certificates on the related Underlying Distribution Date, (ii), solely for the benefit of the Class N-3 Notes, (x) any amounts received from the Note Insurer pursuant to the Note Policy for payments of interest and principal to the Class N-3 Notes and (y) any amounts received from the Cap Counterparty with respect to the Class N-3 Cap Agreement (together with the Class N-1 Cap Agreement, the "NIM Cap Agreements"), *provided, however,* that if any amounts are remaining after distributions to the Class N-3 Notes with respect to the Class N-3 Cap Agreement, the remaining amount will be made part of N2/3 Available Funds for distribution on such Payment Date and (iii) any N1 Available Funds remaining on such Payment Date after application of the N1 Available Funds as described below. |
| **Interest Distribution Amount:** | For any Payment Date, the sum of (i) current interest due on such Notes and (ii) any previously accrued and unpaid interest (and interest accrued on such unpaid interest). |

## WaMu CI NIM Notes Series 2007-WM2



| | |
|---|---|
| **Principal Distribution Amount:** | For any Payment Date and with respect to the Class N-1 Notes, any Available Funds remaining after payment of clauses (A)(i) through (A)(iii) under "Payments on the Notes" below.  For any Payment Date and with respect to the Class N-2 Notes, any Available Funds remaining after payment of clauses (B)(i) through (B)(iv) under "Payments on the Notes" below.  For any Payment Date and with respect to the Class N-3 Notes, any Available Funds remaining after payment of clauses (B)(i) through (B)(v) under "Payments on the Notes" below. |
| **Payments on the Notes:** | Periodic distributions paid to the Indenture Trustee on account of the Trust Collateral and the Note Policy will be deposited into the Note Account. On each Payment Date, the Indenture Trustee will make the following payments from the Available Funds for such Payment Date in the following order of priority, to the extent of such Available Funds (provided, any payments pursuant to the Note Policy on such Payment Date related to interest, will be applied only with respect to payments made pursuant to clauses (A)(iii) and (B)(iv); and any payments pursuant to the Note Policy on such Payment Date related to principal, will be applied only with respect to payments made pursuant to clauses (A)(iv) and (B)(vi); and provided, further, any payments received pursuant to the Class N-1 Cap Agreement on such Payment Date will be applied *first*, with respect to payments made pursuant to clause (A)(iii); *second*, with respect to payments made pursuant to clause (A)(iv) and *third*, with respect to payments made pursuant to clauses (i) through (vi) as part of the N1 Available Funds) and provided, further, any payments received pursuant to the Class N-3 Cap Agreement on such Payment Date will be applied *first*, with respect to payments made pursuant to clause (B)(iv); *second*, with respect to payments made pursuant to clause (B)(vi) and *third*, with respect to payments made pursuant to clauses (B)(i) through (B)(viii) as part of the N2/3 Available Funds): |

(A) The N1 Available Funds will be paid as follows:

    (i)      To the Indenture Trustee and Co-Trustee, any extraordinary trust expenses and to the Issuer and Co-Issuer, the administrative expenses, in each case, subject to a limit (as set forth in the Indenture) multiplied by a fraction the numerator of which is equal to the N1 Available Funds or N2/3 Available Funds, as applicable, and the denominator of which is equal to the Available Funds (the "***NIM Allocation Percentage***");

8

**WaMu CI NIM Notes Series 2007-WM2**



(ii)  To the Co-Trustee, for payment to the Note Insurer, the Note Insurer Premium related to the Class N-1 Notes for such Payment Date;

(iii)  To the Class N-1 Notes, the Interest Distribution Amount for such class;

(iv)  To the Class N-1 Notes, the Principal Distribution Amount for such class, as principal, until the note balance of such class is reduced to zero;

(v)  To the Co-Trustee, for payment to the Note Insurer, any Class N-1 Reimbursement Amounts (as defined in the Indenture), including any reimbursement for a previous Note Insurer Optional Deposit (as defined in the Indenture), any amounts due the Note Insurer under the Insurance Agreement (as defined in the Indenture) multiplied by the NIM Allocation Percentage and any unpaid Note Insurer Premiums with respect to the Class N-1 Notes for prior Payment Dates, in each case with interest thereon (as described in the Indenture); and

(vi)  Any remaining amounts to be applied pursuant to clause (B) below after application of the N2/3 Available Funds for such Payment Date.

(B) The N2/3 Available Funds will be paid as follows:

(i)  To the Indenture Trustee and Co-Trustee, any extraordinary trust expenses and to the Issuer and Co-Issuer, the administrative expenses, in each case, multiplied by the NIM Allocation Percentage;

(ii)  To the Co-Trustee, for payment to the Note Insurer, the Note Insurer Premium related to the Class N-3 Notes for such Payment Date;

(iii)  To the Class N-2 Notes, the Interest Distribution Amount for such class;

(iv)  To the Class N-3 Notes, the Interest Distribution Amount for such class;

(v)  To the Class N-2 Notes, the Principal Distribution Amount for such class, as principal, until the note balance of such class is reduced to zero;

(vi)  To the Class N-3 Notes, the Principal Distribution Amount for such class, as principal, until the note balance of such class is reduced to zero;

(vii)  To the Co-Trustee, for payment to the Note Insurer, any Class N-3 Reimbursement Amounts (as defined in the Indenture), including any reimbursement for a previous Note Insurer Optional Deposit (as defined in the Indenture), any amounts due the Note Insurer under the Insurance Agreement (as defined in the Indenture) multiplied by the NIM Allocation

**WaMu CI NIM Notes Series 2007-WM2**



---

|  | Percentage and any unpaid Note Insurer Premiums with respect to the Class N-3 Notes for prior Payment Dates, in each case with interest thereon (as described in the Indenture); and |
| :-- | :-- |
| (viii) | Any remaining amounts to be applied pursuant to clause (A) above after application of the N1 Available Funds for such Payment Date. |

(C) Any Available Funds remaining after payments pursuant to clauses (A) and (B) above will be paid as follows:

|  |  |
| :-- | :-- |
| (i) | To the Issuer, to pay any taxes, assessments or governmental charges; |
| (ii) | To the Issuer and Co-Issuer any administrative expenses and to the Indenture Trustee and Co-Trustee, any extraordinary trust expenses incurred in excess of the applicable limit; and |
| (iii) | To the Issuer or to its order. |

**Note Policy:** The Note Policy generally will guarantee timely payment of interest on the Class N-1 Notes and the Class N-3 Notes and the ultimate payment of principal of the Class N-1 Notes and the Class N-3 Notes.

**Note Insurer Optional Deposit:** The Note Insurer will have the right but not the obligation to cause the Class N-1 Notes to be redeemed by paying the principal of the Class N-1 Notes, in whole or in part, on and after the 24th Payment Date if, prior to such Payment Date, there are Class N-1 Reimbursement Amounts that remain unreimbursed with respect to the Note Insurer.

The Note Insurer will have the right but not the obligation to cause the Class N-3 Notes to be redeemed by paying the principal of the Class N-3 Notes, in whole or in part, on and after the 24th Payment Date if, prior to such Payment Date, there are Class N-3 Reimbursement Amounts that remain unreimbursed with respect to the Note Insurer.

**ERISA:** It is anticipated that the Notes will be eligible for ERISA plans, subject to certain conditions.

**SMMEA:** The Notes will **not** be SMMEA eligible.

**Tax Status:** It is anticipated that the Notes will be treated as debt for federal income tax purposes.

**WaMu CI NIM Notes Series 2007-WM2**



| **Ratings:** | It is expected that the Class N-1 Notes and the Class N-3 Notes will be rated "AA" by Standard & Poor's, a division of The McGraw Hill Companies, Inc. (**"S&P"**) and the Class N-2 Notes will be rated "A-" by S&P.  The ratings of the Notes address the likelihood of the timely payment of interest and the ultimate payment of principal on the Notes on or before their stated final maturity date.  The ratings of the Class N-1 Notes and the Class N-3 Notes will depend primarily upon the creditworthiness of the Note Insurer. |
|---|---|

# WaMu CI NIM Notes Series 2007-WM2



---

### N1 Interest Rate Cap Schedule

| Payment Date | Scheduled Notional Cap Balance ($)* | Strike Rate (%) | Payment Date | Scheduled Notional Cap Balance ($)* | Strike Rate (%) |
|---|---|---|---|---|---|
| May 2007 | 24,125,000.00 | 6.00 | February 2008 | 24,125,000.00 | 6.00 |
| June 2007 | 24,125,000.00 | 6.00 | March 2008 | 24,125,000.00 | 6.00 |
| July 2007 | 24,125,000.00 | 6.00 | April 2008 | 24,125,000.00 | 6.00 |
| August 2007 | 24,125,000.00 | 6.00 | May 2008 | 21,924,127.95 | 6.00 |
| September 2007 | 24,125,000.00 | 6.00 | June 2008 | 19,748,847.76 | 6.00 |
| October 2007 | 24,125,000.00 | 6.00 | July 2008 | 18,154,270.64 | 6.00 |
| November 2007 | 24,125,000.00 | 6.00 | August 2008 | 17,289,004.91 | 6.00 |
| December 2007 | 24,125,000.00 | 6.00 | September 2008 | 14,130,546.99 | 6.00 |
| January 2008 | 24,125,000.00 | 6.00 | October 2008 | 8,448,871.98 | 0.00 |

*Notional Balance for any Payment Date shall be equal to the lesser of (x) the Schedule Notional Cap Balance set forth in the table above or (y) the outstanding principal balance of the Class N-1 Notes for such Payment Date.

### N3 Interest Rate Cap Schedule

| Payment Date | Scheduled Notional Cap Balance ($)* | Strike Rate (%) | Payment Date | Scheduled Notional Cap Balance ($)* | Strike Rate (%) |
|---|---|---|---|---|---|
| May 2007 | 4,675,000.00 | 6.00 | February 2008 | 4,675,000.00 | 6.00 |
| June 2007 | 4,675,000.00 | 6.00 | March 2008 | 4,675,000.00 | 6.00 |
| July 2007 | 4,675,000.00 | 6.00 | April 2008 | 4,675,000.00 | 6.00 |
| August 2007 | 4,675,000.00 | 6.00 | May 2008 | 4,248,509.77 | 6.00 |
| September 2007 | 4,675,000.00 | 6.00 | June 2008 | 3,826,978.79 | 6.00 |
| October 2007 | 4,675,000.00 | 6.00 | July 2008 | 3,517,977.83 | 6.00 |
| November 2007 | 4,675,000.00 | 6.00 | August 2008 | 3,350,304.58 | 6.00 |
| December 2007 | 4,675,000.00 | 6.00 | September 2008 | 2,738,251.07 | 6.00 |
| January 2008 | 4,675,000.00 | 6.00 | October 2008 | 1,637,242.55 | 0.00 |

*Notional Balance for any Payment Date shall be equal to the lesser of (x) the Schedule Notional Cap Balance set forth in the table above or (y) the outstanding principal balance of the Class N-3 Notes for such Payment Date.

**Terms used herein and not otherwise defined shall have the meanings assigned thereto in the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Prospectus and the Underlying Pooling Agreement.**

# WaMu CI NIM Notes Series 2007-WM2



---

## Collateral Summary

### The statistics listed below are based on the scheduled principal balance of the Underlying Mortgage Loans as of the Cut-off Date.

|  |  | Minimum | Maximum |
|---|---|---|---|
| Scheduled Principal Balance | $1,593,665,287 | $9,987 | $1,198,268 |
| Average Scheduled Principle Balance | $237,047 |  |  |
| Number of Mortgage Loans | 6,723 |  |  |
|  |  |  |  |
| Weighted Average Gross Coupon | 8.142% | 5.400% | 13.350% |
| Weighted Average FICO Score | 635 | 500 | 811 |
| Weighted Average Original LTV* | 81.29% | 8.00% | 100.00% |
| Weighted Average Original LTV with MI** | 78.33% | 8.00% | 100.00% |
| Weighted Average Combined Original LTV*** | 86.11% | 8.00% | 100.00% |
| Weighted Average DTI | 41.66% | 0.72% | 83.41% |
|  |  |  |  |
| Weighted Average Original Term | 364 months | 120 months | 480 months |
| Weighted Average Stated Remaining Term | 362 months | 118 months | 479 months |
| Weighted Average Seasoning | 2 months | 1 month | 10 months |
|  |  |  |  |
| Weighted Average Gross Margin | 5.152% | 4.990% | 7.250% |
| Weighted Average Minimum Interest Rate | 8.116% | 5.400% | 13.350% |
| Weighted Average Maximum Interest Rate | 14.116% | 11.400% | 19.350% |
| Weighted Average Initial Rate Cap | 2.199% | 1.000% | 3.000% |
| Weighted Average Subsequent Rate Cap | 1.000% | 1.000% | 1.000% |
| Weighted Average Months to Roll | 28 months | 14 months | 59 months |

| Maturity Date |  | February 1,2017 | March 1,2047 |
|---|---|---|---|
| Adj Rate Mortgage | 75.10% | Full | 62.50% |
| Fixed Rate Mortgage | 24.90% | Limited | 5.01% |
|  |  | Stated | 32.49% |
| ARM—2 Yr/6 Mth | 15.45% |  |  |
| ARM—2 Yr/6 Mth 40 Yr | 2.24% | Cash-Out Refi | 55.75% |
| ARM—2 Yr/6 Mth IO | 7.01% | Purchase | 30.22% |
| ARM—3 Yr/6 Mth | 5.96% | Rate/Term Refi | 14.03% |
| ARM—3 Yr/6 Mth 40 Yr | 0.76% |  |  |

13

# WaMu CI NIM Notes Series 2007-WM2



| | | | |
|---|---|---|---|
| ARM—3 Yr/6 Mth IO | 1.42% | Condominium | 6.86% |
| ARM—5 Yr/6 Mth | 1.67% | Planned Unit Developement | 12.92% |
| ARM—5 Yr/6 Mth 40 Yr | 0.38% | Single Family | 72.48% |
| ARM—5 Yr/6 Mth IO | 2.67% | Townhouse | 0.16% |
| Balloon—2 Yr/6 Mnth | 28.46% | Two to Four Family | 7.56% |
| Balloon—3 Yr/6 Mnth | 5.98% | | |
| Balloon—30 Year | 3.77% | Investor | 7.85% |
| Balloon—5 Yr/6 Mnth | 3.09% | Owner-Occupied | 90.64% |
| Fixed—10 Year | 0.03% | Second Home | 1.51% |
| Fixed—15 Year | 0.35% | | |
| Fixed—20 Year | 0.23% | First Lien | 94.29% |
| Fixed—30 Year | 19.67% | Second Lien | 5.71% |
| Fixed—40 Year | 0.85% | | |
| | | Top 5 Locations: | |
| Not Interest Only | 88.89% | California | 39.91% |
| Interest Only | 11.11% | Florida | 7.49% |
| | | Maryland | 5.58% |
| Prepay Penalty: N/A | 19.14% | New York | 5.35% |
| Prepay Penalty: 12 months | 9.18% | Texas | 5.08% |
| Prepay Penalty: 24 months | 36.07% | | |
| Prepay Penalty: 36 months | 35.61% | | |

*Original LTV for all first lien loans and combined original LTV for all second lien loans*
**Original LTV for all first lien loans and combined original LTV for all second lien loans, in each case adjusted for MI*
***Combined LTV including simultaneous seconds for all first lien loans and combined original LTV for all second lien loans*

| Prepayment Penalty Term (months) | # of Loans | Current Principal Balance($) | Pct by Curr Prin Bal(%) | Weighted Average Gross Coupon(%) | Weighted Average Orig LTV(%) | Weighted Average FICO | Full Doc (%) | ARM (%) | MI (%) |
|---|---|---|---|---|---|---|---|---|---|
| N/A | 1,499 | $305,008,256.96 | 19.14% | 8.900% | 82.25% | 631 | 53.88% | 76.95% | 6.71% |
| 12 | 479 | $146,317,630.61 | 9.18% | 8.329% | 81.09% | 640 | 62.09% | 88.52% | 9.49% |
| 24 | 2,400 | $574,778,957.62 | 36.07% | 8.315% | 82.38% | 628 | 58.83% | 91.32% | 6.49% |
| 36 | 2,345 | $567,560,441.86 | 35.61% | 7.510% | 79.73% | 644 | 70.95% | 54.22% | 16.43% |
| **Total** | **6,723** | **$1,593,665,287.05** | **100.00%** | **8.142%** | **81.29%** | **635** | **62.50%** | **75.10%** | **10.35%** |

# WaMu CI NIM Notes Series 2007-WM2



---

### Underlying Transaction Bond Summary - WaMu Asset-Backed Certificates WaMu Series 2007-HE2

| Class[1] | Principal Balance ($) | Initial Coupon [2,3] | Ratings (S&P/Moody's/Fitch) | Expected Final Distribution | Certificate Type |
|---|---|---|---|---|---|
| I-A | 491,550,000 | 1mL + 0.260% | AAA/Aaa/AAA | April 25, 2037 | Floating Rate Senior |
| II-A1 | 357,425,000 | 1mL + 0.110% | AAA/Aaa/AAA | April 25, 2037 | Floating Rate Senior |
| II-A2 | 125,322,000 | 1mL + 0.190% | AAA/ Aaa/AAA | April 25, 2037 | Floating Rate Senior |
| II-A3 | 199,414,000 | 1mL + 0.250% | AAA/ Aaa/AAA | April 25, 2037 | Floating Rate Senior |
| II-A4 | 117,955,000 | 1mL + 0.360% | AAA/ Aaa/AAA | April 25, 2037 | Floating Rate Senior |
| M-1 | 50,997,000 | 1mL + 0.470% | AA+/ Aa1/AA+ | April 25, 2037 | Floating Rate Subordinate |
| M-2 | 44,623,000 | 1mL + 0.550% | AA/Aa2/AA | April 25, 2037 | Floating Rate Subordinate |
| M-3 | 27,092,000 | 1mL + 0.750% | AA-/Aa3/AA- | April 25, 2037 | Floating Rate Subordinate |
| M-4 | 23,905,000 | 1mL + 1.350% | A+/A1/A+ | April 25, 2037 | Floating Rate Subordinate |
| M-5 | 23,108,000 | 1mL + 1.700% | A/A2/A | April 25, 2037 | Floating Rate Subordinate |
| M-6 | 21,514,000 | 1mL + 2.250% | A-/A3/A- | April 25, 2037 | Floating Rate Subordinate |
| M-7 | 20,718,000 | 1mL + 2.250% | BBB+/Baa1/BBB+ | April 25, 2037 | Floating Rate Subordinate |
| M-8 | 12,749,000 | 1mL + 2.250% | BBB/Baa2/BBB | April 25, 2037 | Floating Rate Subordinate |
| M-9 | 17,531,000 | 1mL + 2.250% | BBB-/Baa3/BBB- | April 25, 2037 | Floating Rate Subordinate |
| | | | | | |
| **Total** | **$1,533,903,000** | | | | |

(1) *The Class I-A Certificates are backed primarily by the Group I Mortgage Loans. The Class II-A1, Class II-A2, Class II-A3 and Class II-A4 Certificates are backed primarily by the Group II Mortgage Loans. The Class M (as defined herein) are backed by the cash flows from all the Underlying Mortgage Loans.*

(2) *The margin on the Class I-A, Class II-A1, Class II-A2, Class II-A3 and Class II-A4 Certificates will be equal to 2.0x the original margin on the first Underlying Distribution Date after the 10% Clean-up Call may first be exercised. The margin on the Class M Certificates will be equal to 1.5x the original margin on the first Underlying Distribution Date after which the 10% Clean-up Call may first be exercised.*

(3) *Subject to limitations described in the related prospectus supplement.*

## WaMu CI NIM Notes Series 2007-WM2



---

### Underlying Transaction Summary of Terms - WaMu Asset-Backed Certificates WaMu Series 2007-HE2

| | |
|---|---|
| *Cut-off Date:* | April 1, 2007. |
| *Sponsor and Servicer* | Washington Mutual Bank. |
| *Swap Counterparty:* | ABN AMRO Bank N.V. |
| *PMI Insurer:* | Radian Guaranty Inc. |
| *Group I Certificates:* | The Class I-A Certificates. |
| *Group II Certificates:* | The Class II-A1, Class II-A2, Class II-A3 and Class II-A4 Certificates. |
| *Class A Certificates:* | The Group I Certificates and the Group II Certificates. |
| *Class M Certificates:* | The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates. |
| *Certificates:* | The Class A Certificates and the Class M Certificates. |
| *Closing Date:* | On or about April 10, 2007. |
| *Due Period:* | With respect to any Underlying Distribution Date, the period commencing on the 2nd business day of the month preceding the month in which the Underlying Distribution Date occurs and ending on the 1st day of the month in which such Underlying Distribution Date occurs. |
| *Prepayment Period:* | With respect to any Underlying Distribution Date, (i) the period commencing on the 15th day of the month preceding the month in which the Underlying Distribution Date occurs (or in the case of the first Underlying Distribution Date, the Cut-off Date) and ending on the 14th day of the month in which such Underlying Distribution Date occurs, for purposes of prepayments in full; and (ii) the calendar month immediately preceding the month in which the Underlying Distribution Date occurs, for any other purpose. |

16

## WaMu CI NIM Notes Series 2007-WM2



---

| | |
|---|---|
| *Clean-up Call:* | The terms of the underlying transaction will allow for a clean-up call of the Underlying Mortgage Loans and the retirement of the Certificates, which may be exercised by the Servicer on the Underlying Distribution Date following the determination date in which the aggregate stated principal balance of the Underlying Mortgage Loans is less than or equal to 10% of the aggregate stated principal balance of the Underlying Mortgage Loans as of the Cut-off Date. |
| *Pricing Prepayment Speed*: | The Certificates will be priced based on the following collateral prepayment assumptions:<br>FRM Loans:  100% PPC (100% PPC: 4.6% - 23% CPR over 12 months, 23% CPR thereafter)<br>ARM Loans:  100% PPC (100% PPC: 4% - 28% CPR over 12 months, 28% CPR from months 12 to 24, 55% CPR from months 25 to 28 and 35% CPR from month 29 and thereafter.) |
| *Designations of the Underlying Mortgage Loans:* | As of the Cut-off Date, the Underlying Mortgage Loans have an aggregate scheduled principal balance of approximately $1,593,665,287, of which: (i) approximately $606,476,772 comprise a pool of conforming balance, first and second lien, fixed-rate and adjustable-rate mortgage loans (the "***Group I Mortgage Loans***") and (ii) approximately $987,188,515  comprise a pool of conforming and non-conforming balance, first and second lien, fixed-rate and adjustable-rate mortgage loans (the "***Group II Mortgage Loans***").<br><br>Approximately 4.23% of the Underlying Mortgage Loans are 40-Year Mortgage Loans. |
| *40-Year Mortgage Loans:* | Underlying Mortgage Loans with an original term to maturity equal to 480 months. |
| *Pass-Through Rate:* | With respect to each Class of Certificates on any Underlying Distribution Date, a per annum rate equal to the lesser of (i) the related Formula Rate and (ii) the related Net WAC Rate. |
| *Formula Rate:* | With respect to each Class of Certificates on any Underlying Distribution Date, a per annum rate equal to the lesser of (i) One Month LIBOR plus the related margin for such Class and (ii) the related Maximum Cap Rate. |
| *Group I Interest Distribution Amount* | With respect to any Underlying Distribution Date, an amount equal to the sum of (a) the portion of available funds (net of the product of (i) the Servicing Fee and the mortgage insurance fee, if applicable, and (ii) the aggregate stated principal balance of the Group I Mortgage Loans) attributable to interest received or advanced with respect to the Group I Mortgage Loans and (b) compensating interest paid by the Servicer with respect to the Group I Mortgage Loans. |

**WaMu CI NIM Notes Series 2007-WM2**



---

*Group II Interest Distribution Amount*

With respect to any Underlying Distribution Date, an amount equal to the sum of (a) the portion of available funds (net of the product of (i) the Servicing Fee and the mortgage insurance fee, if applicable, and (ii) the aggregate stated principal balance of the Group II Mortgage Loans) attributable to interest received or advanced with respect to the Group II Mortgage Loans and (b) compensating interest paid by the Servicer with respect to the Group II Mortgage Loans.

*Overcollateralization Target Amount*:

With respect to any Underlying Distribution Date, (i) prior to the Stepdown Date, approximately 3.75% of the aggregate stated principal balance of the Underlying Mortgage Loans as of the cut-off date, (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) the lesser of (I) approximately 3.75% of the aggregate stated principal balance of the Underlying Mortgage Loans as of the cut-off date and (II) approximately 7.50% of the aggregate stated principal balance of the Underlying Mortgage Loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (y) 0.50% of the aggregate stated principal balance of the Underlying Mortgage Loans as of the cut-off date, and (iii) on or after the Stepdown Date if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Underlying Distribution Date.

*Stepdown Date:*

The earlier to occur of:
(i) the Underlying Distribution Date on which the aggregate principal balance of the Class A Certificates has been reduced to zero; and,
(ii) the later to occur of:
   (x) the Underlying Distribution Date occurring in May 2010 and
   (y) the first Underlying Distribution Date on which the Credit Enhancement Percentage is greater than or equal to 37.90%.

*Delinquency Trigger Event:*

With respect to any Underlying Distribution Date on or after the Stepdown Date, if the 60+ delinquency percentage exceeds 42.00% of the Credit Enhancement Percentage.

# WaMu CI NIM Notes Series 2007-WM2



---

*Loss Trigger Event:*    With respect to any Underlying Distribution Date in or after May 2009, if the cumulative Realized Losses on the Underlying Mortgage Loans as a percentage of the aggregate stated principal balance of the Underlying Mortgage Loans as of the Cut-off Date, for the related Underlying Distribution Date are greater than:

| Distribution Date | Cumulative Realized Loss Percentage |
|---|---|
| May 2009 through April 2010 | 1.50% for the first month, plus an additional $1/12^{th}$ of 1.85% for each month thereafter. |
| May 2010 through April 2011 | 3.35% for the first month, plus an additional $1/12^{th}$ of 1.90% for each month thereafter. |
| May 2011 through April 2012 | 5.25% for the first month, plus an additional $1/12^{th}$ of 1.50% for each month thereafter. |
| May 2012 through April 2013 | 6.75% for the first month, plus an additional $1/12^{th}$ of 0.85% for each month thereafter. |
| May 2013 through April 2014 | 7.60% for the first month, plus an additional $1/12^{th}$ of 0.05% for each month thereafter. |
| May 2014 and thereafter | 7.65% for each month. |

*Trigger Event:*    With respect to any Underlying Distribution Date if either a Loss Trigger Event or a Delinquency Trigger Event is in effect on such Underlying Distribution Date.

# WaMu CI NIM Notes Series 2007-WM2



*Credit Support:*

| | Initial Credit Enhancement Percentage | | Target Credit Enhancement Percentage On and After Stepdown Date | |
|---|---|---|---|---|
| Class | Percent | | Class | Percent |
| A | 18.95% | | A | 37.90% |
| M-1 | 15.75% | | M-1 | 31.50% |
| M-2 | 12.95% | | M-2 | 25.90% |
| M-3 | 11.25% | | M-3 | 22.50% |
| M-4 | 9.75% | | M-4 | 19.50% |
| M-5 | 8.30% | | M-5 | 16.60% |
| M-6 | 6.95% | | M-6 | 13.90% |
| M-7 | 5.65% | | M-7 | 11.30% |
| M-8 | 4.85% | | M-8 | 9.70% |
| M-9 | 3.75% | | M-9 | 7.50% |

*Final Maturity Reserve Rate:*    An annual rate of 0.80%.

*Final Maturity Reserve Account:*    On each distribution date on and after the distribution date in May 2017 through the distribution date in April 2027, if the aggregate principal balance of the mortgage loans having 40-year original terms to maturity is greater than the aggregate principal balance specified in Annex II attached to this prospectus supplement for that distribution date, a portion of interest collections calculated at Final Maturity Reserve Rate of the total principal balance of the mortgage loans with 40-year original terms to maturity, to the extent available after payment of certain fees and expenses of the trust and any net payments owed to the swap counterparty but before payment of interest on the offered certificates, will be deposited in the final maturity reserve account maintained by the trustee until the amounts on deposit in the final maturity reserve account are equal to the stated principal balance of the mortgage loans with 40-year original terms to maturity on such distribution date. On and after the distribution date in May 2027, all amounts otherwise payable to the Class C Certificates will be deposited in the final maturity reserve account until the amounts on deposit in the final maturity reserve account are equal to the stated principal balance of the mortgage loans with

**WaMu CI NIM Notes Series 2007-WM2**



---

40-year original terms to maturity less the certificate principal balance of the Class C Certificates on such distribution date. On the earlier of the last scheduled distribution date and the termination of the trust, any amounts on deposit in the final maturity reserve account will be applied as a payment of principal or interest with respect to the offered certificates as described in the prospectus supplement.

*Swap Agreement:*      n the closing date, Citibank, N.A., as trustee on behalf of the supplemental interest trust, will enter into a swap agreement with the swap counterparty to the swap agreement described in this prospectus supplement. The trustee will act as supplemental interest trust trustee pursuant to the pooling agreement to receive and distribute funds related to the swap agreement on behalf of the supplemental interest trust, whether payable by or to the swap counterparty pursuant to the swap agreement. On or before each distribution date from the June 2007 distribution date through the distribution date in April 2012, the supplemental interest trust trustee will be obligated to make a payment to the swap counterparty at a rate equal to 4.760% per annum, and the swap counterparty will be obligated to make a payment to the supplemental interest trust trustee at a rate equal to one-month LIBOR (as determined pursuant to the swap agreement), in each case, on a scheduled notional amount specified on Annex I attached to this prospectus supplement based upon a 30/360 convention. Payments under the swap agreement will be made on a net basis. To the extent that the fixed payment exceeds the floating payment on any distribution date, amounts otherwise available to certificateholders will be applied to make a net swap payment to the swap counterparty, and to the extent that the floating payment exceeds the fixed payment on any distribution date, the swap counterparty will owe a net swap payment to the supplemental interest trust trustee. Any net amounts received by the supplemental interest trust trustee under the swap agreement will generally be applied to maintain overcollateralization at required levels, pay interest shortfalls and repay losses, as described in the prospectus supplement.

Upon early termination of the Swap Agreement, the Underlying Supplemental Interest Trust or the Swap Counterparty may be liable to make a termination payment (the "Swap Termination Payment") to the other party (regardless of which party caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the Swap Agreement. In the event that the Underlying Supplemental Interest Trust is required to make a Swap Termination Payment, in certain instances, that payment will be paid on the related Underlying Distribution Date, and on any subsequent Underlying Distribution Dates until paid in full, prior to distributions to certificateholders.

# WaMu CI NIM Notes Series 2007-WM2



---

## Swap Schedule

| Distribution Date | Swap Notional Amount ($) | Distribution Date | Swap Notional Amount ($) |
|---|---|---|---|
| 1 | 0 | 31 | 385,089,087 |
| 2 | 1,253,344,121 | 32 | 372,236,954 |
| 3 | 1,243,068,537 | 33 | 360,062,889 |
| 4 | 1,230,041,615 | 34 | 348,409,140 |
| 5 | 1,214,606,839 | 35 | 334,777,980 |
| 6 | 1,196,822,361 | 36 | 318,283,400 |
| 7 | 1,191,110,912 | 37 | 316,054,868 |
| 8 | 1,183,050,254 | 38 | 293,072,557 |
| 9 | 1,172,887,876 | 39 | 281,924,113 |
| 10 | 1,160,456,279 | 40 | 271,614,947 |
| 11 | 1,144,148,225 | 41 | 262,060,457 |
| 12 | 1,121,386,840 | 42 | 253,140,756 |
| 13 | 1,092,385,394 | 43 | 244,764,716 |
| 14 | 1,061,837,984 | 44 | 236,933,740 |
| 15 | 1,032,516,446 | 45 | 229,594,729 |
| 16 | 1,004,876,102 | 46 | 222,805,535 |
| 17 | 978,878,653 | 47 | 216,194,575 |
| 18 | 954,294,699 | 48 | 209,757,987 |
| 19 | 930,756,873 | 49 | 203,539,820 |
| 20 | 908,297,406 | 50 | 197,470,889 |
| 21 | 887,012,627 | 51 | 191,575,911 |
| 22 | 866,856,552 | 52 | 185,794,923 |
| 23 | 841,467,404 | 53 | 180,157,951 |
| 24 | 530,405,115 | 54 | 174,663,659 |
| 25 | 498,854,082 | 55 | 169,312,436 |
| 26 | 471,895,501 | 56 | 164,103,557 |
| 27 | 449,719,440 | 57 | 159,032,956 |
| 28 | 430,700,970 | 58 | 154,150,784 |
| 29 | 413,909,249 | 59 | 149,466,158 |
| 30 | 398,788,047 | 60 | 144,987,350 |

# WaMu CI NIM Notes Series 2007-WM2



WaMu Capital Corp.

A Washington Mutual, Inc. Company

---

## NIM Pricing Assumptions

| | | | |
|---|---|---|---|
| **Accrual Period:** | Act/360 for N-1 and N-3 | | |
| | 30/360 for N-2 | | |
| **Settlement Date:** | 4/26/2007 | **Prepayment Penalty Collection Rate:** | 95% |
| **ARM Collateral Cumulative Losses (Approx):** | 3.75% | **Fixed Collateral Cumulative Losses (Approx):** | 3.25% |
| **First Pay:** | 5/25/2007 | **Recovery Delay:** | 0 Months |
| **Interest Rate Vectors:** | Forward LIBOR Curves | **Trigger:** | Delinquency Trigger Event assumes 25.00% |
| **ARM Base Loss Severity:** | 40.00% | **Fixed Base Loss Severity:** | 45.00% |
| **Coupons:** | One-month LIBOR + 0.54% for the Class N-1 Notes, 7.500% for the Class N-2 Notes and One-month LIBOR + 0.80% for the Class N-3 Notes. | | |
| **Prices:** | 100.0000% for the Class N-1 Notes, 98.9265% for the Class N-2 Notes and 100.0000% for the Class N-3 Notes. | | |
| **Base Prepayment Assumption:** | 100% of prepayment curves in Schedule A. The maximum CPR % is assumed to be 95%. | | |
| **Clean-up call not exercised** | | | |

## WaMu CI NIM Notes Series 2007-WM2



---

### Modeling Assumptions Schedule A:  Base Prepayment Assumption
#### Fixed Rate Base Prepayment Assumption



## WaMu CI NIM Notes Series 2007-WM2



---

### Modeling Assumptions Schedule A:  Base Prepayment Assumption
#### 2 Year Hybrid ARM Base Prepayment Assumption



25

# WaMu CI NIM Notes Series 2007-WM2



---

## Modeling Assumptions Schedule A: Base Prepayment Assumption
### 3Year Hybrid LIBOR ARM Base Prepayment Assumption



# WaMu CI NIM Notes Series 2007-WM2



---

## Modeling Assumptions Schedule A:  Base Prepayment Assumption
### 5/25 LIBOR ARM Base Prepayment Assumption



# WaMu CI NIM Notes Series 2007-WM2



## Modeling Assumptions Schedule B: Forward LIBOR Rates

**Modeling Assumptions Schedule B: Forward LIBOR Rates**



28

**WaMu CI NIM Notes Series 2007-WM2**





**WaMu CI NIM Notes Series 2007-WM2**





# WaMu CI NIM Notes Series 2007-WM2


**WaMu Capital Corp.**
A Washington Mutual, Inc. Company

---

### Class N-1

| | | | |
|---|---|---|---|
| Balance | $24,125,000 | Delay | 0 |
| | One-month LIBOR | | |
| Coupon | + 0.540% | Dated | 04/26/2007 |
| Settle | 04/26/2007 | First Payment | 05/25/2007 |

| | *75% Base Loss* | *100% Base Loss* | *125% Base Loss* | *150% Base Loss* | *175% Base Loss* | *200% Base Loss* | |
|---|---|---|---|---|---|---|---|
| *Price = 100.0000%* | | | | | | | |
| 70% PricingSpeed | 5.807 | 5.805 | 5.804 | 5.803 | 5.801 | 5.800 | Yield% |
| | 0.77 | 0.78 | 0.78 | 0.78 | 0.78 | 0.79 | WAL for Princ Pmts |
| | 0.745 | 0.747 | 0.750 | 0.752 | 0.755 | 0.758 | Mod Durn 30360 |
| | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 | 1 - 18 | 1 - 19 | Principal Window |
| | 17 | 18 | 18 | 18 | 18 | 19 | Principal # Months |
| | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.14% | 0.17% | 0.21% | 0.24% | 0.36% | Total Collat Loss (Tranche Life) |
| 85% PricingSpeed | 5.810 | 5.809 | 5.808 | 5.807 | 5.805 | 5.804 | Yield% |
| | 0.76 | 0.76 | 0.77 | 0.77 | 0.77 | 0.77 | WAL for Princ Pmts |
| | 0.733 | 0.735 | 0.737 | 0.740 | 0.743 | 0.745 | Mod Durn 30360 |
| | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 | 1 - 18 | Principal Window |
| | 17 | 17 | 18 | 18 | 18 | 18 | Principal # Months |
| | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.17% | 0.21% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 100% PricingSpeed | 5.814 | 5.813 | 5.812 | 5.811 | 5.809 | 5.808 | Yield% |
| | 0.75 | 0.75 | 0.75 | 0.75 | 0.76 | 0.76 | WAL for Princ Pmts |
| | 0.722 | 0.723 | 0.725 | 0.727 | 0.730 | 0.733 | Mod Durn 30360 |
| | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 | Principal Window |
| | 17 | 17 | 17 | 18 | 18 | 18 | Principal # Months |
| | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.21% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 115% PricingSpeed | 5.818 | 5.817 | 5.816 | 5.815 | 5.814 | 5.812 | Yield% |
| | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 | 0.75 | WAL for Princ Pmts |
| | 0.710 | 0.712 | 0.713 | 0.715 | 0.717 | 0.720 | Mod Durn 30360 |
| | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | Principal Window |
| | 17 | 17 | 17 | 17 | 18 | 18 | Principal # Months |
| | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.15% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 130% PricingSpeed | 5.822 | 5.821 | 5.820 | 5.819 | 5.818 | 5.816 | Yield% |
| | 0.72 | 0.73 | 0.73 | 0.73 | 0.73 | 0.73 | WAL for Princ Pmts |
| | 0.697 | 0.700 | 0.701 | 0.703 | 0.705 | 0.707 | Mod Durn 30360 |
| | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | Principal Window |
| | 17 | 17 | 17 | 17 | 17 | 18 | Principal # Months |
| | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.15% | 0.18% | 0.28% | Total Collat Loss (Tranche Life) |
| 150% PricingSpeed | 5.827 | 5.827 | 5.826 | 5.824 | 5.823 | 5.822 | Yield% |
| | 0.71 | 0.71 | 0.71 | 0.71 | 0.71 | 0.72 | WAL for Princ Pmts |
| | 0.682 | 0.683 | 0.685 | 0.687 | 0.689 | 0.690 | Mod Durn 30360 |
| | 1 - 16 | 1 - 16 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | Principal Window |
| | 16 | 16 | 17 | 17 | 17 | 17 | Principal # Months |
| | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% | Total Collat Loss (Collat Maturity) |
| | 0.06% | 0.08% | 0.13% | 0.15% | 0.18% | 0.20% | Total Collat Loss (Tranche Life) |

# WaMu CI NIM Notes Series 2007-WM2



**WaMu Capital Corp.**
A Washington Mutual, Inc. Company

**Class N-2**

| Balance | $19,450,000.00 | Delay | 0 |
|---|---|---|---|
| Coupon | 7.50000% | Dated | 04/26/2007 |
| Settle | 04/26/2007 | First Payment | 05/25/2007 |
| Price = 98.9265% | 75% Base Loss | 100% Base Loss | 125% Base Loss |

| | 75% Base Loss | 100% Base Loss | 125% Base Loss | 150% Base Loss | 175% Base Loss | 200% Base Loss | |
|---|---|---|---|---|---|---|---|
| 70% PricingSpeed | 9.438 | 9.436 | 9.434 | 9.432 | 9.429 | 9.427 | Yield% |
| | 0.64 | 0.64 | 0.64 | 0.64 | 0.64 | 0.64 | WAL for Princ Pmts |
| | 0.590 | 0.590 | 0.591 | 0.592 | 0.593 | 0.593 | Mod Durn Act/360 |
| | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | Principal Window |
| | 14 | 14 | 14 | 14 | 14 | 14 | Principal # Months |
| | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% | Total Collat Loss (Collat Maturity) |
| | 0.03% | 0.04% | 0.05% | 0.07% | 0.08% | 0.09% | Total Collat Loss (Tranche Life) |
| 85% PricingSpeed | 9.471 | 9.469 | 9.466 | 9.464 | 9.461 | 9.459 | Yield% |
| | 0.62 | 0.62 | 0.63 | 0.63 | 0.63 | 0.63 | WAL for Princ Pmts |
| | 0.579 | 0.580 | 0.581 | 0.582 | 0.582 | 0.583 | Mod Durn Act/360 |
| | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | Principal Window |
| | 14 | 14 | 14 | 14 | 14 | 14 | Principal # Months |
| | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% | Total Collat Loss (Collat Maturity) |
| | 0.03% | 0.04% | 0.05% | 0.07% | 0.08% | 0.09% | Total Collat Loss (Tranche Life) |
| 100% PricingSpeed | 9.502 | 9.500 | 9.498 | 9.497 | 9.495 | 9.493 | Yield% |
| | 0.61 | 0.61 | 0.61 | 0.61 | 0.62 | 0.62 | WAL for Princ Pmts |
| | 0.570 | 0.570 | 0.571 | 0.571 | 0.572 | 0.572 | Mod Durn Act/360 |
| | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 14 | Principal Window |
| | 13 | 13 | 13 | 13 | 13 | 14 | Principal # Months |
| | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% | Total Collat Loss (Collat Maturity) |
| | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.09% | Total Collat Loss (Tranche Life) |
| 115% PricingSpeed | 9.533 | 9.531 | 9.530 | 9.528 | 9.526 | 9.525 | Yield% |
| | 0.60 | 0.60 | 0.60 | 0.60 | 0.61 | 0.61 | WAL for Princ Pmts |
| | 0.560 | 0.561 | 0.561 | 0.562 | 0.562 | 0.563 | Mod Durn Act/360 |
| | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | Principal Window |
| | 13 | 13 | 13 | 13 | 13 | 13 | Principal # Months |
| | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% | Total Collat Loss (Collat Maturity) |
| | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% | Total Collat Loss (Tranche Life) |
| 130% PricingSpeed | 9.566 | 9.564 | 9.563 | 9.561 | 9.559 | 9.557 | Yield% |
| | 0.59 | 0.59 | 0.59 | 0.59 | 0.59 | 0.60 | WAL for Princ Pmts |
| | 0.551 | 0.551 | 0.552 | 0.552 | 0.553 | 0.553 | Mod Durn Act/360 |
| | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | Principal Window |
| | 13 | 13 | 13 | 13 | 13 | 13 | Principal # Months |
| | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% | Total Collat Loss (Collat Maturity) |
| | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% | Total Collat Loss (Tranche Life) |
| 150% PricingSpeed | 9.613 | 9.611 | 9.610 | 9.608 | 9.606 | 9.604 | Yield% |
| | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | WAL for Princ Pmts |
| | 0.538 | 0.538 | 0.539 | 0.539 | 0.540 | 0.540 | Mod Durn Act/360 |
| | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | Principal Window |
| | 13 | 13 | 13 | 13 | 13 | 13 | Principal # Months |
| | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% | Total Collat Loss (Collat Maturity) |
| | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% | Total Collat Loss (Tranche Life) |

32

# WaMu CI NIM Notes Series 2007-WM2



**Class N-3**

| | | | | | | |
|---|---|---|---|---|---|---|
| Balance | $4,675,000 | Delay | 0 | | | |
| | One-month LIBOR | | | | | |
| Coupon | + 0.800% | Dated | 04/26/2007 | | | |
| Settle | 04/26/2007 | First Payment | 05/25/2007 | | | |

| Price = 100.0000% | 75% Base Loss | 100% Base Loss | 125% Base Loss | 150% Base Loss | 175% Base Loss | 200% Base Loss | |
|---|---|---|---|---|---|---|---|
| 70% PricingSpeed | 5.985 | 5.984 | 5.981 | 5.979 | 5.976 | 5.973 | Yield% |
| | 1.28 | 1.29 | 1.30 | 1.31 | 1.32 | 1.33 | WAL for Princ Pmts |
| | 1.223 | 1.229 | 1.236 | 1.246 | 1.255 | 1.264 | Mod Durn 30360 |
| | 14 - 17 | 14 - 17 | 14 - 18 | 14 - 18 | 14 - 18 | 14 - 18 | Principal Window |
| | 4 | 4 | 5 | 5 | 5 | 5 | Principal # Months |
| | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.17% | 0.21% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 85% PricingSpeed | 5.990 | 5.988 | 5.986 | 5.984 | 5.981 | 5.978 | Yield% |
| | 1.27 | 1.28 | 1.28 | 1.29 | 1.30 | 1.31 | WAL for Princ Pmts |
| | 1.208 | 1.214 | 1.220 | 1.228 | 1.237 | 1.247 | Mod Durn 30360 |
| | 14 - 17 | 14 - 17 | 14 - 17 | 14 - 18 | 14 - 18 | 14 - 18 | Principal Window |
| | 4 | 4 | 4 | 5 | 5 | 5 | Principal # Months |
| | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.21% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 100% PricingSpeed | 5.995 | 5.993 | 5.991 | 5.989 | 5.986 | 5.983 | Yield% |
| | 1.25 | 1.26 | 1.26 | 1.27 | 1.28 | 1.29 | WAL for Princ Pmts |
| | 1.189 | 1.196 | 1.203 | 1.210 | 1.219 | 1.229 | Mod Durn 30360 |
| | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 18 | 14 - 18 | Principal Window |
| | 5 | 5 | 5 | 5 | 6 | 5 | Principal # Months |
| | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.15% | 0.24% | 0.28% | Total Collat Loss (Tranche Life) |
| 115% PricingSpeed | 6.001 | 5.999 | 5.997 | 5.994 | 5.992 | 5.990 | Yield% |
| | 1.23 | 1.23 | 1.24 | 1.25 | 1.26 | 1.27 | WAL for Princ Pmts |
| | 1.169 | 1.176 | 1.183 | 1.190 | 1.197 | 1.207 | Mod Durn 30360 |
| | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 18 | 13 - 18 | Principal Window |
| | 5 | 5 | 5 | 5 | 5 | 6 | Principal # Months |
| | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% | Total Collat Loss (Collat Maturity) |
| | 0.08% | 0.10% | 0.13% | 0.15% | 0.18% | 0.28% | Total Collat Loss (Tranche Life) |
| 130% PricingSpeed | 6.006 | 6.005 | 6.002 | 6.000 | 5.998 | 5.996 | Yield% |
| | 1.21 | 1.21 | 1.22 | 1.23 | 1.24 | 1.24 | WAL for Princ Pmts |
| | 1.150 | 1.156 | 1.163 | 1.170 | 1.177 | 1.184 | Mod Durn 30360 |
| | 13 - 16 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | Principal Window |
| | 4 | 5 | 5 | 5 | 5 | 5 | Principal # Months |
| | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% | Total Collat Loss (Collat Maturity) |
| | 0.06% | 0.10% | 0.13% | 0.15% | 0.18% | 0.20% | Total Collat Loss (Tranche Life) |
| 150% PricingSpeed | 6.013 | 6.012 | 6.010 | 6.009 | 6.006 | 6.004 | Yield% |
| | 1.18 | 1.19 | 1.19 | 1.20 | 1.21 | 1.21 | WAL for Princ Pmts |
| | 1.128 | 1.133 | 1.137 | 1.143 | 1.150 | 1.157 | Mod Durn 30360 |
| | 13 - 16 | 13 - 16 | 13 - 16 | 13 - 17 | 13 - 17 | 13 - 17 | Principal Window |
| | 4 | 4 | 4 | 5 | 5 | 5 | Principal # Months |
| | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% | Total Collat Loss (Collat Maturity) |
| | 0.06% | 0.08% | 0.10% | 0.15% | 0.18% | 0.20% | Total Collat Loss (Tranche Life) |

33

# WaMu CI NIM Notes Series 2007-WM2



---

**FOR ADDITIONAL INFORMATION PLEASE CALL:**

| WaMu Capital Corp. | |
| --- | --- |
| **Trading** | |
| David Nagle | (206) 554-2425 |
| Kevin Richmond | (212) 702-6921 |
| **Finance** | |
| Vinny Varca | (212) 702-6931 |
| Jason Laukaitis | (206) 302-4189 |
| Tom Lazar | (206) 554-2416 |

| Rating Agency | |
| --- | --- |
| **S&P** | |
| Todd Niemy | (212) 438-2494 |

34

Exhibit C

PRIVATE PLACEMENT MEMORANDUM                                    CONFIDENTIAL

**WM ASSET HOLDINGS CORP. CI 2007-WM2**
**(Issuer)**


**WM ASSET HOLDINGS CI 2007-WM2 LLC**
**(Co-Issuer )**


**WAMU CI NIM NOTES SERIES 2007-WM2**


**$24,125,000 Class N-1 Notes**
**$19,450,000 Class N-2 Notes**
**$4,675,000 Class N-3 Notes**

THIS MEMORANDUM IS NOT TO BE COPIED OR OTHERWISE REPRODUCED IN ANY MANNER WHATSOEVER. FAILURE TO COMPLY WITH THIS DIRECTIVE CAN RESULT IN A VIOLATION OF THE SECURITIES ACT OF 1933.

No person has been authorized to give any information or to make any representations other than those contained in this memorandum and, if given or made, such information or representations must not be relied upon. The delivery of this memorandum at any time does not imply that the information herein is correct as of any time subsequent to the date of this memorandum.

This memorandum has been prepared by WM Asset Holdings Corp. CI 2007-WM2 (the "Issuer") and WM Asset Holdings CI 2007-WM2 LLC (the "Co-Issuer" and together with the Issuer, the "Issuers") for use solely in connection with the offering of the WaMu CI NIM Notes Series 2007-WM2, Class N-1 (the "Class N-1 Notes"), WaMu CI NIM Notes Series 2007-WM2, Class N-2 (the "Class N-2 Notes")and WaMu CI NIM Notes Series 2007-WM2, Class N-3 (the "Class N-3 Notes") (collectively, the "Notes") described herein. The Issuers have not authorized or assumed any liability for any use of this memorandum in connection with any other offer or sale of the Notes by WaMu Capital Corp. ("WCC" or the "Initial Purchaser") or any other person.

INVESTORS INTERESTED IN PURCHASING THE NOTES SHOULD REVIEW THE INDENTURE AND THE CAP AGREEMENTS (AS DESCRIBED HEREIN) IN CONJUNCTION WITH THIS MEMORANDUM. IN ADDITION, SUCH INVESTORS SHOULD REVIEW IN CONJUNCTION WITH THIS MEMORANDUM, WITH RESPECT TO THE UNDERLYING CERTIFICATES, THE DISCLOSURE EXHIBITS, INCLUDING THE EXHIBITS THERETO, WHICH INCLUDE THE RELATED PROSPECTUS AND A FORM OF THE POOLING AND SERVICING AGREEMENT (IN EACH CASE, AS DESCRIBED HEREIN).

PROSPECTIVE INVESTORS IN THE NOTES SHOULD CAREFULLY REVIEW "RISK FACTORS" HEREIN FOR A DESCRIPTION OF CERTAIN RISKS ASSOCIATED WITH OWNING THE NOTES.

Two irrevocable and unconditional note insurance policy (the "Class N-1 Note Policy" and the "Class N-3 Note Policy," as applicable, each a "Note Policy" and together, the "Note Policies") with respect to the Class N-1 Notes and the Class N-3 Notes (the "Insured Notes")will be issued by Radian Insurance Inc. (the "Note Insurer"). The Class N-2 Notes will not be insured by the Note Insurer.

The Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any state securities laws and the Notes may not be offered or sold in the United States or to, or for the account or benefit of, any U.S. person unless the offer or sale would qualify for an exemption from the registration requirements of the Securities Act and state securities laws. Accordingly, the Notes are being offered only to "qualified institutional buyers" ("QIBs") as defined in Rule 144A adopted under the Securities Act ("Rule 144A"). It is expected that delivery of the Notes will be made in book-entry form through the Same-Day Funds Settlement System of The Depository Trust Company ("DTC") on or about April 26, 2007 against payment therefor in immediately available funds.


**WaMu Capital Corp.**

**PRIVATE PLACEMENT MEMORANDUM – CONFIDENTIAL**

**WM ASSET HOLDINGS CORP. CI 2007-WM2**

**(Issuer)**

**WM ASSET HOLDINGS CI 2007-WM2 LLC**

**(Co-Issuer)**

**WAMU CI NIM Notes Series 2007-WM2**

| Note Class | Original Note Balance (Approximate) | Note Rate | Expected Rating by S&P |
|---|---|---|---|
| N-1 | $24,125,000 | Variable[(1)] | AA |
| N-2 | $19,450,000 | 7.500% | A- |
| N-3 | $4,675,000 | Variable[(1)] | AA |

_____
[(1)] Determined as described herein.

The Notes represent non-recourse obligations of the Issuer and the Co-Issuer.

The Notes are secured by a trust estate consisting of, among other things:

1.  WaMu Asset-Backed Certificates, WaMu Series 2007-HE2 Trust, Class C (the "Underlying Class C Certificate");

2.  WaMu Asset-Backed Certificates, WaMu Series 2007-HE2 Trust, Class P (the "Underlying Class P Certificate" and, together with the Underlying Class C Certificate, the "Underlying Certificates");

3.  Each of the cap agreements related to the Class N-1 Notes (the "Class N-1 Cap Agreement" ) and the Class N-3 Notes (the "Class N-3 Cap Agreement" ) (forms of which are attached as an exhibit to this private placement memorandum) (each a "Cap Agreement" and together the "Cap Agreements" ); and

4.  the amounts on deposit in the NIM Reserve Account.

The Underlying Certificates represent an ownership interest in a trust fund (the "Underlying Trust Fund") which consists of a pool (the "Mortgage Pool") of first and second lien, adjustable-rate and fixed-rate residential mortgage loans (the "Mortgage Loans").

Each Underlying Certificate represents a 100% interest in a single class from the series of asset-backed pass-through certificates entitled WaMu Asset-Backed Certificates, WaMu Series 2007-HE2 Trust (all of the certificates of such series, including the Underlying Certificates, the "Series Certificates"). With respect to the Underlying Trust Fund, the Series Certificates (other than the Underlying Class C Certificate and the Underlying Class P Certificate and the classes of Series Certificates designated the Class R Certificates, the Class R-CX Certificates, and the Class R-PX Certificates) are referred to herein as the "Senior Certificates." Certain of the characteristics of the Underlying Certificates, as of their date of issuance (the "Issue Date"), are set forth or described in Exhibits 1 and 2 hereto (such exhibits, the "Disclosure Exhibits"). The Disclosure Exhibits contain (i) a form of the pooling and servicing agreement pursuant to which the Series Certificates were issued (the "Underlying Pooling and Servicing Agreement") and (ii) the base prospectus (the "Base Prospectus") and prospectus supplement (the "Prospectus Supplement") prepared in connection with a public offering of certain classes of the Senior Certificates (such

Prospectus Supplement and Base Prospectus, together, the "Prospectus"). The issuance of the Series Certificates pursuant to the Underlying Pooling and Servicing Agreement is referred to herein as the "Underlying Transaction."

The Notes will be issued pursuant to an indenture dated as of April 26, 2007 (the "Indenture"), among the Issuer, the Co-Issuer and Citibank, N.A. as indenture trustee (the "Indenture Trustee") and U.S. Bank National Association as co-trustee (the "Co-Trustee"). A form of the Indenture is attached as Exhibit 3 hereto.

***Please refer to page I-1 for an index to the definitions of the capitalized terms used in this memorandum. Capitalized terms used but not defined in this memorandum have the meanings assigned to such terms in the Indenture, except for certain capitalized terms used in reference to the Series Certificates, which terms have the meanings assigned to them in the Underlying Pooling and Servicing Agreement.***

The Notes will be represented, except in certain limited circumstances, by permanent book-entry Notes in registered form without interest coupons, which will be deposited with or on behalf of DTC and registered in the name of Cede & Co. as nominee for DTC. Beneficial interests in the book-entry Notes will be shown on, and transfers thereof will be effected only through, records maintained by DTC and its direct and indirect participants.

As described herein, under the Indenture, the Noteholders will agree to treat the Notes as indebtedness for federal, state and local income, single business and franchise tax purposes. See "Certain Federal Income Tax Consequences" herein.

Investors are encouraged to consult their own counsel, tax advisors, accountants, financial and other advisors for considerations of investing in the Notes that may be particular to the investor's individual situation.

THE NOTES WILL REPRESENT NON-RECOURSE OBLIGATIONS OF THE ISSUER AND THE CO-ISSUER. PROCEEDS OF THE ASSETS IN THE TRUST ESTATE WILL BE THE SOLE SOURCE OF PAYMENTS ON THE CLASS N-2 NOTES, AND PROCEEDS OF THE ASSETS IN THE TRUST ESTATE, TOGETHER WITH PAYMENTS, IF ANY, ON EITHER NOTE POLICY ARE THE SOLE SOURCE OF PAYMENTS ON THE INSURED NOTES. NO RESERVE FUND (OTHER THAN THE NIM RESERVE ACCOUNT), OTHER INSURANCE, GUARANTEE OR OTHER SOURCE OF CREDIT ENHANCEMENT WILL BE AVAILABLE WITH RESPECT TO THE NOTES. THE NOTES WILL NOT REPRESENT AN INTEREST IN OR OBLIGATION OF WM ASSET HOLDINGS CORP. OR THE INITIAL PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES. THE NOTES WILL NOT BE INSURED OR GUARANTEED BY ANY GOVERNMENTAL AGENCY OR INSTRUMENTALITY.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE NOTES OFFERED HEREBY. THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY SALE OF THE NOTES, IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF SUCH STATE OR OTHER JURISDICTION. THE DELIVERY OF THIS MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM.

THE NOTES WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED ONLY TO QIBs PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE SECURITIES ACT. THE TRANSFER OR RESALE OF THE NOTES IS SUBJECT TO CERTAIN RESTRICTIONS AS DESCRIBED HEREIN.

No invitation, whether directly or indirectly, may be made to the public in the Cayman Islands to subscribe for the Notes unless the Issuer is listed on the Cayman Islands Stock Exchange.

The Initial Purchaser has agreed to purchase the Notes from the Issuers, and the Initial Purchaser has advised the Issuers that it proposes to place such Notes privately with a limited number of investors that are QIBs in compliance with Rule 144A. Prospective investors in the Notes should be aware that they may be required to bear the financial risk of this investment for an indefinite period of time. See "Notice to Investors," "Risk Factors—Restrictions on Transfer; Limited Liquidity; Absence of Secondary Market" and "Description of the Notes—Transfer and Exchange" herein. As further described herein, the Notes are subject to additional restrictions on transfer to certain employee benefit plans (each, a "Plan") subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). See "ERISA Considerations" herein.

**FOR NEW HAMPSHIRE RESIDENTS ONLY: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED ("RSA 421-B") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE ATTORNEY GENERAL OR THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE ATTORNEY GENERAL OR THE SECRETARY OF STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

**THIS MEMORANDUM IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE.**

**AN INVESTOR OR POTENTIAL INVESTOR IN THE NOTES (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH PERSON OR ENTITY) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL RELATED MATERIALS OF ANY KIND, INCLUDING OPINIONS OR OTHER TAX ANALYSES, THAT ARE PROVIDED TO SUCH PERSON OR ENTITY. HOWEVER, SUCH PERSON OR ENTITY MAY NOT DISCLOSE ANY OTHER INFORMATION RELATING TO THIS TRANSACTION UNLESS SUCH INFORMATION IS RELATED TO SUCH TAX TREATMENT AND TAX STRUCTURE.**

**THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO THE PUBLIC GENERALLY TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE NOTES. DISTRIBUTION OF THIS MEMORANDUM WITHOUT THE PRIOR WRITTEN CONSENT OF THE ISSUER AND THE INITIAL PURCHASER IS PROHIBITED. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH OFFEREE AGREES TO THE FOREGOING AND NOT TO MAKE ANY COPIES OF THIS MEMORANDUM OR ANY DOCUMENTS REFERRED TO HEREIN AND, IF SUCH OFFEREE DOES NOT PURCHASE ANY NOTES OR THE OFFERING THEREOF CONTEMPLATED HEREUNDER IS TERMINATED, TO RETURN TO THE ISSUER THIS MEMORANDUM AND ALL DOCUMENTS DELIVERED HEREWITH.**

**THIS MEMORANDUM HAS BEEN PREPARED BY THE ISSUERS FOR USE SOLELY IN CONNECTION WITH THE INITIAL PLACEMENT OF THE NOTES DESCRIBED HEREIN BY THE INITIAL PURCHASER TO ONE OR MORE PURCHASERS. THE ISSUERS HAVE NOT AUTHORIZED OR ASSUMED ANY LIABILITY FOR ANY USE OF THIS MEMORANDUM IN CONNECTION WITH ANY OTHER OFFER OR SALE OF THE NOTES BY THE INITIAL PURCHASER OR ANY OTHER PERSON.**

THIS MEMORANDUM HAS BEEN PREPARED BY THE ISSUERS.  THE INITIAL PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM, AND NOTHING HEREIN SHALL BE DEEMED TO CONSTITUTE SUCH A REPRESENTATION OR WARRANTY BY THE INITIAL PURCHASER OR ANY PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE TRUST ESTATE, THE MORTGAGE LOANS, THE UNDERLYING CERTIFICATES OR THE NOTES.

OTHER THAN WITH RESPECT TO INFORMATION CONCERNING THE NOTE INSURER CONTAINED UNDER THE CAPTION "THE NOTE POLICIES AND THE NOTE INSURER—THE NOTE INSURER" HEREIN, NONE OF THE INFORMATION IN THIS MEMORANDUM HAS BEEN SUPPLIED OR VERIFIED BY THE NOTE INSURER, AND THE NOTE INSURER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO SUCH INFORMATION. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE NOTE INSURER MAKES NO REPRESENTATION OR WARRANTY AS TO: (i) THE ACCURACY OR COMPLETENESS OF THE INFORMATION IN THIS MEMORANDUM (OTHER THAN DESCRIBED ABOVE) OR (ii) THE TAX STATUS OF ANY PAYMENTS UNDER THE NOTES.

THIS MEMORANDUM IS ACCOMPANIED BY, AMONG OTHER THINGS, THE DISCLOSURE EXHIBITS AND THE SCHEDULE OF PREPAYMENT CHARGES, WHICH SET FORTH IMPORTANT INFORMATION REGARDING THE UNDERLYING CERTIFICATES, THE MORTGAGE LOANS AND THE PREPAYMENT CHARGES.  INVESTORS IN THE NOTES ARE STRONGLY URGED TO READ THE DISCLOSURE EXHIBITS, INCLUDING THE EXHIBITS THERETO AND THE SCHEDULE OF PREPAYMENT CHARGES, IN THEIR ENTIRETY.

IT IS EXPECTED THAT INVESTORS INTERESTED IN PARTICIPATING IN THIS PRIVATE PLACEMENT WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE NOTES.  REPRESENTATIVES OF THE ISSUER WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE TRUST ESTATE AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST.

THE APPROPRIATE CHARACTERIZATION OF THE NOTES UNDER VARIOUS LEGAL INVESTMENT RESTRICTIONS AND THE ABILITY OF INVESTORS SUBJECT TO THESE RESTRICTIONS TO PURCHASE THE NOTES ARE SUBJECT TO SIGNIFICANT INTERPRETIVE UNCERTAINTIES. ACCORDINGLY, INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE NOTES CONSTITUTE LEGAL INVESTMENTS FOR THEM.  THE NOTES WILL NOT BE "MORTGAGE RELATED SECURITIES" FOR PURPOSES OF THE SECONDARY MORTGAGE MARKET ENHANCEMENT ACT OF 1984.

THERE WILL BE NO LIQUID MARKET FOR THE NOTES.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act in connection with the sale of the Notes, the Issuers will be required to furnish, upon the request of any holder of Notes, to such holder and a prospective purchaser designated by such holder, the information required to be delivered under Rule 144A(d)(4) under the Securities Act.

## NOTICE TO INVESTORS

Because of the following restrictions, purchasers of Notes are advised to consult legal counsel prior to purchasing or making any offer, resale, pledge or other transfer of the Notes offered hereby.

The Notes have not been and will not be registered under the Securities Act or registered or qualified under any applicable state securities laws. Neither the Issuers nor any other person is or will be required to so register or qualify the Notes or to provide registration rights to any holder of Notes.

The Notes are being offered only to QIBs pursuant to and in accordance with Rule 144A in transactions exempt from the registration requirements of the Securities Act. The Notes are subject to restrictions on transferability and resale. No transfer of any Note or interest therein may be made by an investor unless that transfer is made pursuant to an effective registration statement under the Securities Act, and effective registration or qualification under applicable state securities laws, or is made in a transaction that does not require such registration or qualification. Furthermore, the Indenture will provide that no transfer of any Note or interest therein may be made by an investor except in compliance with Rule 144A to a QIB that is acquiring such Note or interest therein for its own account or for the account of another QIB. The Notes will bear a legend referring to such restrictions. The Indenture will provide that no transfer of any Note will be registered by the Note Registrar under the Indenture unless certain required certifications are provided to the Note Registrar, at the expense of the transferor and transferee, with respect to their compliance with these transfer restrictions. With respect to transfers of interests in book-entry Notes deposited with DTC, the transferors and transferees will be deemed to have made such certifications.

The purchase and holding of a Note or any interest therein by any Plan subject to ERISA or the Code could result in a prohibited transaction under ERISA and the Code and the imposition of excise taxes pursuant to Section 4975 of the Code, unless an administrative or statutory exemption is available with respect to such transaction. Accordingly, the Indenture will provide for certain restrictions on transfer of the Notes and interests therein to Plans. See "ERISA Considerations" herein.

If a purchaser is acquiring any Note or interest therein as a fiduciary or agent for one or more accounts, such purchaser will be required to deliver to the Note Registrar under the Indenture a certification (or in the case of any Note transferred in book-entry form, will be deemed to have certified) to the effect that it has (i) sole investment discretion with respect to each such account and (ii) full power to make the foregoing acknowledgments, representations, warranties, certifications and agreements with respect to each such account as set forth in this "Notice to Investors" and as set forth under "ERISA Considerations" herein.

It is anticipated that the Initial Purchaser will purchase the Notes on April 26, 2007.

_____

The date of this memorandum is April 26, 2007.

# TABLE OF CONTENTS

Page

AVAILABLE INFORMATION ...................................................................................................................... vi

NOTICE TO INVESTORS ........................................................................................................................... vi

SUMMARY OF PRIVATE PLACEMENT MEMORANDUM ........................................................................ 1

RISK FACTORS ......................................................................................................................................... 15
    Prepayments and Defaults .................................................................................................................... 15
    Subordination of the Class N-3 Notes .................................................................................................. 15
    Additional Risks Associated with the Mortgage Loans ........................................................................ 16
    Basis Risk on the Underlying Certificates ............................................................................................ 16
    Subordination of the Underlying Class C Certificate ............................................................................ 17
    Risks Associated with the Underlying Swap Agreement ...................................................................... 17
    Risks Associated with the Final Maturity Reserve Account .................................................................. 17
    Limited Credit Enhancement for the Class N-2 Notes .......................................................................... 18
    Overcollateralization Requirements Affecting the Underlying Class C Certificate ................................ 18
    Credit Risks; Limited Assets ................................................................................................................ 18
    Limited Remedies; Actions by Indenture Trustee, the Note Insurer Upon Event of Default Under the
    Indenture ............................................................................................................................................. 19
    Uncertainty of Cashflows .................................................................................................................... 20
    Terrorist Attacks and Military Action Could Adversely Affect the Yield on the Notes ........................ 20
    Non-recourse Obligations .................................................................................................................... 21
    Restrictions on Transfer; Limited Liquidity; Absence of Secondary Market ........................................ 21
    Book-Entry Registration ...................................................................................................................... 21
    Rating of Notes; Possibility of Withdrawal or Downgrading ................................................................ 21
    Suitability of the Notes as Investments ................................................................................................ 22
    Certain Rights of the Note Insurer May Adversely Affect the Rights of the holders of the Class N-2
    Notes .................................................................................................................................................. 22

SUMMARY OF THE TRANSACTION ........................................................................................................ 22

DESCRIPTION OF THE NOTES ................................................................................................................ 23
    General ................................................................................................................................................ 23
    Calculation of One-Month LIBOR ........................................................................................................ 24
    Transfer and Exchange ........................................................................................................................ 25
    Book-Entry Registration; Delivery and Form ........................................................................................ 25
    Available Funds .................................................................................................................................... 26
    Payments ............................................................................................................................................. 27
    Cap Agreement .................................................................................................................................... 31
    Underlying Swap Agreement ................................................................................................................ 31
    Reports to Noteholders and Others ...................................................................................................... 32
    Optional Redemption ............................................................................................................................ 33
    Final Maturity of the Notes .................................................................................................................. 34
    Definitions ............................................................................................................................................ 34

THE ISSUER AND THE CO-ISSUER ........................................................................................................ 35
    General ................................................................................................................................................ 35
    Business ............................................................................................................................................... 35
    Directors .............................................................................................................................................. 36
    Trust Estate ......................................................................................................................................... 36

SPONSOR ................................................................................................................................................. 36

THE SELLER AND THE SERVICER .......................................................................................................... 37

THE INDENTURE TRUSTEE AND THE CO-TRUSTEE ............................................................................ 37
    General ................................................................................................................................................ 37
    Resignation and Removal of the Indenture Trustee .............................................................................. 37

Co-Trustees and Separate Indenture Trustees........................................................................................37
Indemnification.....................................................................................................................................38
DESCRIPTION OF THE INDENTURE......................................................................................................38
Certain Covenants..................................................................................................................................38
The Note Account..................................................................................................................................39
Events of Default...................................................................................................................................39
Modification of the Indenture................................................................................................................42
Governing Law......................................................................................................................................43
Satisfaction and Discharge of the Indenture ........................................................................................43
USE OF PROCEEDS ...................................................................................................................................43
THE UNDERLYING CERTIFICATES.......................................................................................................43
General ..................................................................................................................................................44
Underlying Class C Certificate .............................................................................................................44
Underlying Class P Certificate .............................................................................................................44
THE MORTGAGE POOL ............................................................................................................................45
YIELD CONSIDERATIONS........................................................................................................................45
Yield Considerations Relating to the Underlying Certificates..............................................................46
THE NOTE POLICIES AND THE NOTE INSURER .................................................................................55
The Note Policies...................................................................................................................................55
The Note Insurer....................................................................................................................................59
CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................................................................60
General ..................................................................................................................................................60
U.S. Federal Tax Treatment of the Issuer .............................................................................................62
U.S. Federal Tax Treatment of the Notes ..............................................................................................62
U.S. Federal Tax Treatment of the Noteholders ...................................................................................62
Sales of Notes ........................................................................................................................................65
Information Reporting and Backup Withholding ...................................................................................66
CAYMAN ISLANDS TAX CONSIDERATIONS .......................................................................................67
STATE AND OTHER TAX CONSEQUENCES ..........................................................................................68
ERISA CONSIDERATIONS ........................................................................................................................68
LEGAL INVESTMENT................................................................................................................................71
RATINGS......................................................................................................................................................72
PRIVATE PLACEMENT .............................................................................................................................72
LEGAL MATTERS ......................................................................................................................................73

Exhibits

EXHIBIT 1      Form of Underlying Pooling and Servicing Agreement (without exhibits)
EXHIBIT 2      Prospectus for Series Certificates
EXHIBIT 3      Form of Indenture (without exhibits)
EXHIBIT 4      Schedule of Prepayment Charges
EXHIBIT 5      Default Curves
EXHIBIT 6      Prepayment Curves
EXHIBIT 7      Underlying Swap Agreement
EXHIBIT 8      Term Sheet
EXHIBIT 9      Assumed Mortgage Loan Characteristics
EXHIBIT 10     Forward Curves
EXHIBIT 11     Form of Cap Agreements

## SUMMARY OF PRIVATE PLACEMENT MEMORANDUM

The following summary does not purport to be complete and is qualified in its entirety by reference to the detailed information appearing elsewhere herein.

Issuer ........................................................................ WM Asset Holdings Corp. CI 2007-WM2, an exempted company with limited liability organized in the Cayman Islands under the Companies Law (2004 Revision). The registered office of the Issuer is at the offices of Deutsche Bank (Cayman) Limited, P.O. Box 1984, George Town, Grand Cayman KY1-1104, Cayman Islands. See "The Issuer and the Co-Issuer—General" herein.

Co-Issuer .................................................................. WM Asset Holdings CI 2007-WM2 LLC, a Delaware limited liability company. The registered office of the Co-Issuer is located at 2711 Centerville Road, Wilmington, Delaware. The Co-Issuer will not own or hold any assets other than initial capital of $250.00. See "The Issuer and the Co-Issuer—General" herein.

Securities Offered .................................................... $24,125,000 Original Note Balance of WaMu CI NIM Notes Series 2007-WM2, Class N-1 Notes;

$19,450,000 Original Note Balance of WaMu CI NIM Notes Series 2007-WM2, Class N-2 Notes; and

$4,675,000 Original Note Balance of WaMu CI NIM Notes Series 2007-WM2, Class N-3 Notes.

The Notes will represent non-recourse obligations of the Issuer and the Co-Issuer. The source of payments of principal of and interest on the Class N-2 Notes is limited to the proceeds of the assets in the Trust Estate. The source of payments of principal of and interest on the Insured Notes is limited to the proceeds of the assets in the Trust Estate and proceeds of each Note Policy.

The Class N-3 Notes will be subordinate to the Class N-2 Notes to the extent described under "Description of the Notes" herein.

Trust Estate ............................................................. The Trust Estate will consist of, among other things, the Underlying Certificates, the Cap Agreements and the NIM Reserve Account.

The Underlying Certificates represent an ownership interest in the Underlying Trust Fund which consists primarily of the Mortgage Loans that constitute the Mortgage Pool.

The Mortgage Pool consists of first and second lien, adjustable-rate and fixed-rate residential mortgage loans.

Each Underlying Certificate represents a 100% interest in a single class of the Series Certificates. The Underlying Certificates, collectively, represent an entitlement to receive

certain distributions in respect of the assets of the Underlying Trust Fund from time to time to the extent funds are available to make such distributions. See "The Underlying Certificates" herein and the Disclosure Exhibits.

Closing Date ............................................................. On or about April 26, 2007.

Sponsor ..................................................................... WM Asset Holdings Corp., a Delaware corporation. The Sponsor is a wholly owned special purpose subsidiary of Washington Mutual Bank, a federal savings association. See "Sponsor" herein.

Administrator............................................................. Deutsche Bank (Cayman) Limited, a licensed trust company incorporated in the Cayman Islands, as administrator under the Administration Agreement, dated as of April 26, 2007, among, *inter alia*, the Administrator, the Issuer and the Note Insurer (the "Administration Agreement"). The Administrator will perform certain specified administrative functions on behalf of the Issuer. See "Issuer and the Co-Issuer—Business" herein.

Co-Administrators ................................................... Washington Mutual Bank ("WMB") and Citibank, N.A., as co-administrators (each a "Co-Administrator" and together the "Co-Administrators") under the Co-Administration Agreement, dated as of April 26, 2007 among the Co-Administrators, the Issuer and the Co-Issuer (the "Co-Administration Agreement"). The Co-Administrators will perform certain specified administrative functions on behalf of the Issuer and the Co-Issuer. See "The Issuer and the Co-Issuer—Business" herein.

Indenture Trustee...................................................... Citibank, N.A. as indenture trustee under the Indenture. See "The Indenture Trustee and Co-Trustee" herein.

Co-Trustee ................................................................ U.S. Bank National Association, as co-trustee under the Indenture. See "The Indenture Trustee and the Co-Trustee" herein.

Final Maturity Date .................................................. The Payment Date occurring in April 2047 with respect to the Class N-2 Notes, and the Payment Date occurring in April 2012 with respect to the Insured Notes.

Description of the Notes ........................................... The Notes will represent non-recourse obligations of the Issuer and the Co-Issuer and will be issued pursuant to the Indenture. Payments on the Notes will be secured by the Trust Estate. The Issuer will pledge the Trust Estate to the Indenture Trustee pursuant to the Indenture. The proceeds of the assets of the Trust Estate will be the sole source of payments on the Class N-2 Notes. The proceeds of the assets of the Trust Estate, together with payments, if any, on each Note Policy, will be the sole source of payments on the Insured Notes. No other reserve fund, other insurance, guarantee or other source of credit enhancement will be available. The Aggregate Note Balance of any class of Notes outstanding at any time will represent the then maximum amount that the Noteholders of such class of Notes are entitled to receive as distributions

2

allocable to principal.  See "—Payments on the Notes" below and "Description of the Notes" herein.

Book-Entry Registration............................................  The Notes will be represented by one or more Book-Entry Notes which will be deposited with, or on behalf of, a nominee of DTC.  Beneficial interests in the Book-Entry Notes will be shown on, and transfers thereof will be affected through, records maintained by DTC and its affiliates.  Except under the limited circumstances described herein, investors in the Notes will not be entitled to receive physical certificates in exchange for their beneficial interest in the Book-Entry Notes.  See "Description of the Notes—Book-Entry Registration; Delivery and Form."

The Underlying Certificates
    *General* ..................................................................  The Underlying Certificates, consisting of the Underlying Class C Certificate and the Underlying Class P Certificate, were issued on the Issue Date in connection with the securitization of the Mortgage Pool.

With respect to the Series Certificates, the amount available for distribution to the holders of the Series Certificates (including the Underlying Certificates) on any Underlying Distribution Date is primarily a function of (i) the amount remitted by mortgagors under the Mortgage Loans in payment of their scheduled installments of principal and interest, (ii) the amount of prepayments made by such mortgagors and any related prepayment charges payable in connection with such principal prepayments in full (the "Prepayment Charges"), (iii) the amount of liquidation and insurance proceeds received with respect to the Mortgage Loans that have defaulted, (iv) the amount of any principal and interest advances made by the Servicer, (v) the amount of any payments received by the Underlying Trust Fund from and made to the swap counterparty (the "Underlying Counterparty") pursuant to the swap agreement (the "Underlying Swap Agreement") in the Underlying Transaction, (vi) the amount of any payments made into the final maturity reserve account (the "Underlying Final Maturity Reserve Account") in the Underlying Transaction and (vii) the amount of proceeds of the Clean-Up Call (if exercised).

The Indenture Trustee will establish and maintain a segregated trust account for the Notes for, among other things, the collection of distributions on, and any other proceeds of, the Underlying Certificates and other assets of the Trust Estate (the "Note Account").

For specific information regarding certain characteristics of the Mortgage Loans, investors should review the section entitled "The Mortgage Pool" in the Prospectus.

    *Underlying Class C Certificate* .............................  The Underlying Class C Certificate represents an entitlement to receive (i) the excess cashflow, if any, generated by the Mortgage Loans each month after (a) payment of servicing fees,  (b)  payment  of  other  specified  expenses  and

3

reimbursements of the Underlying Trust Fund, (c) payments, if any, to the Underlying Counterparty pursuant to the Underlying Swap Agreement, including payments that are required as a result of an early termination of the Underlying Swap Agreement, (d) deposits, if any, into the Underlying Final Maturity Reserve Account and (e) payment of required distributions to holders of the Senior Certificates, (ii) certain payments, if any, made by the Underlying Counterparty pursuant to the Underlying Swap Agreement for the related Underlying Distribution Date after required distributions to the holders of the Senior Certificates and the Underlying Counterparty and (iii) amounts remaining in the Underlying Final Maturity Reserve Account on the earlier of the date of termination of the Underlying Trust Fund and the Underlying Distribution Date in April 2037 after required distributions to the holders of the Senior Certificates and the Underlying Counterparty.

The Underlying Class C Certificate is subordinate in right of payment to the Senior Certificates. The Underlying Class C Certificate is in a "first loss position," and the Underlying Trust Fund does not contain a source of funds to protect the holder of the Underlying Class C Certificate against losses on the Mortgage Loans. Investors should review the Disclosure Exhibits for a detailed description of (i) the subordination of the Underlying Class C Certificate to the Senior Certificates and (ii) the payment priorities with respect to the Series Certificates.

The Underlying Pooling and Servicing Agreement provides that excess cashflow is required, among other things, to be used on any Underlying Distribution Date to pay principal with respect to the Senior Certificates until the Senior Certificates are overcollateralized in the amount specified therefor in the Underlying Pooling and Servicing Agreement (such amount, the "Overcollateralization Target Amount"). Although on the Issue Date the Overcollateralization Target Amount was satisfied, if, on any Underlying Distribution Date, the amount of overcollateralization is not equal to the Overcollateralization Target Amount, no distributions will be made from proceeds of the Mortgage Loans to the Underlying Class C Certificate until the Overcollateralization Target Amount has been restored to the level specified therefor. The Overcollateralization Target Amount is subject to reduction based upon the satisfaction of certain tests or triggers as set forth in the Underlying Pooling and Servicing Agreement.

*Underlying Class P Certificate* ............................. The Underlying Class P Certificate represents an entitlement to receive on each Underlying Distribution Date any Prepayment Charges payable in connection with certain principal prepayments in full on the Mortgage Loans.

The amount available for distribution to the holders of the Underlying Class P Certificate on any Underlying Distribution Date in respect of Prepayment Charges is determined by the amount of Prepayment Charges paid by the mortgagors or the

Servicer in connection with principal prepayments in full on the related Mortgage Loans during the prepayment period applicable for such Underlying Distribution Date.

Generally, each Prepayment Charge is only applicable to certain prepayments on the related Mortgage Loan and only remains applicable with respect to the related Mortgage Loan for the limited time periods specified in the terms of such Prepayment Charge.  For information about the Prepayment Charges as of April 1, 2007, investors should review the Schedule of Prepayment Charges attached hereto as Exhibit 4.

In the Underlying Pooling and Servicing Agreement, the Servicer has warranted that it will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and related Mortgage Loan and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default).  The Servicer may also waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the mortgagor's default in making the Mortgage Loan payments.  If the Servicer breaches this warranty, it will be obligated under the Underlying Pooling and Servicing Agreement to cure such a breach by remitting to the Underlying Trust Fund an amount equal to such waived Prepayment Charges.  In those cases when the Servicer waives a Prepayment Charge and such waiver does not result in a breach of the Servicer's warranty (including cases in which waiver is required by the applicable servicing standards), then the Servicer will not be required to make any payment in respect of such waived Prepayment Charge.  To the extent that prepayment charges are not collected by the Servicer from a mortgagor, the effect that any such charge might have had on reducing prepayment speeds will be greatly reduced.  The Servicer will be entitled to retain as servicing compensation all prepayment charges or premiums payable in respect of partial principal prepayment on the Mortgage Loans.  Prospective investors in the Notes should refer to the Underlying Pooling and Servicing Agreement for information about the representations and warranties the Servicer has made about the Prepayment Charges and the covenants the Servicer has made about the waiver of Prepayment Charges.

Cap Agreement ........................................................ The Class N-1 Notes and the Class N-3 Notes will each be entitled to the benefit of the related Cap Agreement and payments thereon, if any, deposited with the Indenture Trustee.  In general, the counterparty to each Cap Agreement will be obligated to pay the Indenture Trustee an amount equal to the greater of (i) the product of (A) one-month LIBOR minus 6.000%, (B) the related notional amount for such Payment Date and (C) a fraction, the numerator of which is the

actual number of days elapsed from the prior Payment Date to but excluding the current Payment Date, and the denominator of which is 360 and (ii) zero.

Each Cap Agreement will terminate following the Payment Date in October 2008. For the terms and conditions of the Cap Agreements and information about when and in what amounts the counterparty thereunder may be required to make payments to the Indenture Trustee, investors should review the Cap Agreements in their entirety, the form of which is attached hereto as Exhibit 11. There can be no assurance as to the extent of benefits, if any, that may be realized by the Noteholders as a result of the Cap Agreements. See "Description of the Notes—Cap Agreement."

Underlying Swap Agreement .................................. The Underlying Trust Fund has previously entered into the Underlying Swap Agreement with ABN AMRO Bank N.V.. On each Underlying Distribution Date from the June 2007 Underlying Distribution Date through the Underlying Distribution Date in April 2012, the Underlying Trust Fund will be obligated to make a payment to the Underlying Counterparty at a rate equal to 4.760% (per annum), and the Underlying Counterparty will be obligated to make a payment at a rate equal to one-month LIBOR (as determined pursuant to the Underlying Swap Agreement), in each case, on a notional amount specified on Annex I attached to the Prospectus Supplement based upon a 30/360 convention. Payments under the Underlying Swap Agreement will be made on a net basis. To the extent that the fixed payment exceeds the floating payment on any Underlying Distribution Date, the Underlying Trust Fund will make a net swap payment to the Underlying Counterparty, and to the extent that the floating payment exceeds the fixed payment on any Underlying Distribution Date, the Underlying Counterparty will be required to make a net swap payment to the Underlying Trust Fund. Any net amounts paid by the Underlying Trust Fund to the Underlying Counterparty will reduce the excess cashflow on, and consequently, the amounts available for distribution to the Underlying Class C Certificate. Any net amounts received by the Underlying Trust Fund under the Underlying Swap Agreement will generally be applied to maintain overcollateralization, pay interest shortfalls and repay losses, and thereafter any remaining portion of such payments will be distributed to the Underlying Class C Certificate.

The Underlying Swap Agreement will terminate following the Underlying Distribution Date in April 2012. For the terms and conditions of the Underlying Swap Agreement and information about when and in what amounts the Underlying Counterparty may be required to make payments to the Underlying Trust Fund, investors should review the Underlying Swap Agreement in its entirety, the form of which is attached hereto as Exhibit 7. There can be no assurance as to the extent of benefits, if any, that may be realized by the holders of the Notes as a result of the Underlying Swap

Agreement.  See "Description of the Notes—Underlying Swap Agreement."

NIM Reserve Account

On the Closing Date, the Sponsor will cause to be deposited an amount equal to $350,000 into an account (the "NIM Reserve Account" ).  The Indenture Trustee will withdraw the amount on deposit in the NIM Reserve Account on the first Payment Date to be made part of Available Funds.   See "Description of the Notes—Payments."

Record Date .............................................................

Payments on the Notes will be made on each Payment Date to the Noteholders of record on the related Record Date.  The "Record Date" for each Payment Date will be the Business Day immediately preceding each Payment Date, so long as the Notes are registered in the name of DTC or its nominee.  With respect to any Notes not registered in the name of DTC or its nominee, the "Record Date" for each Payment Date will be the last Business Day of the month immediately preceding the Payment Date.  See "Description of the Notes—Book-Entry Registration; Delivery and Form."

Payments on the Notes
    *General* ..............................................................

Payments on the Notes will be made each month on the Underlying Distribution Date, which is the 25th day of each month or, if such 25th day is not an Underlying Business Day on the next succeeding Underlying Business Day following such 25th day, commencing in May 2007; provided, however, if the Note Insurer fails to make a payment required under either Note Policy in accordance with its terms, the Payment Date for the Notes will be the third Business Day following the Underlying Distribution Date.  The Noteholders of record on the related Record Date will be entitled to receive (i) the related Interest Distribution Amount, if any, and (ii) any related Principal Distribution Amount on each Payment Date.  All payments on each Payment Date generally will be made to the extent of the Available Funds for such Payment Date.

The "Available Funds" for any Payment Date will generally be equal to (i) the N1 Available Funds and (ii) the N2/3 Available Funds.

The "N1 Available Funds" for any Payment Date will generally be equal to (i) 50% of all payments and other collections received by the Indenture Trustee on or in respect of the Underlying Certificates on the related Underlying Distribution Date, (ii) any payments received pursuant to the Cap Agreement related to the Class N1 Notes for such Payment Date, (iii) with respect to the first Payment Date, 50% of the amount on deposit in the NIM Reserve Account (iv) with respect to the Class N-1 Notes, any Class N-1 Insured Payment (other than any Class N-1 Preference Amount) or Note Insurer Optional Deposit and (v) any N2/3 Available Funds remaining on such Payment Date after application of the N2/3 Available Funds as described herein, in each case, deposited in the Note Account, after deduction of any amounts deposited to the Note Account in error.

7

The "N2/3 Available Funds" for any Payment Date will generally be equal to (i) 50% of all payments and other collections received by the Indenture Trustee on or in respect of the Underlying Certificates on the related Underlying Distribution Date, (ii) with respect to the Class N-3 Notes, (x) any payments received pursuant to the Cap Agreement related to the Class N3 Notes for such Payment Date, and (y) any Class N-3 Insured Payment (other than any Class N-3 Preference Amount) or Note Insurer Optional Deposit, (iii) with respect to the first Payment Date, 50% of the amount on deposit in the NIM Reserve Account and (iv) any N-1 Available Funds remaining on such Payment Date after application of the N-1 Available Funds as described herein, in each case, deposited in the Note Account, after deduction of any amounts deposited to the Note Account in error.

Except in limited circumstances with respect to the Class N-2 Notes, failure of the Issuers to make payments of interest or principal on any class of Notes on any Payment Date prior to the Final Maturity Date of such class of Notes will not be an Event of Default, and investors will have no remedy with respect to any such non-payment until the Final Maturity Date of such class of Notes, and with respect to the Insured Notes, if a Note Insurer default shall have occurred and be continuing.  The failure of the Issuers to pay all interest and principal by the Final Maturity Date will be an Event of Default under the Notes.  Additionally, the failure of the Issuers to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date will be an Event of Default with respect to the Class N-2 Notes.  Thus, investors will have no right to accelerate their Notes unless the Issuers fail to pay all interest and principal due on the Notes by the Final Maturity Date or, with respect to the Class N-2 Notes, the Issuers fail to pay the Interest Distribution Amount for any continuous six month period after the Accelerated Default Date.  *See* "Description of the Indenture—Events of Default".

*Interest Payments* ................................................. The "Note Rate" for the Class N-1 Notes will be calculated at the per annum rate of one-month LIBOR plus 0.540%.  The "Note Rate" for the Class N-2 Notes will be the per annum rate of 7.500%.  The "Note Rate" for the Class N-3 Notes will be calculated at the per annum rate of one-month LIBOR plus 0.800%.  The "Interest Accrual Period" will be, for the first Payment Date, the period beginning on the Closing Date and ending on the day prior to such Payment Date and will be, for any subsequent Payment Date, the period beginning with the previous Payment Date and ending on the day prior to such Payment Date.  For each Payment Date (other than the first Payment Date) and the Class N-2 Notes, interest will be calculated on the basis of 30 days in the Interest Accrual Period, regardless of the actual number of days in such Interest Accrual Period, based on a 360-day year.  For each Payment Date and the Class N-1 and Class N-3 Notes, interest will be calculated on the basis of the actual number of days in the Interest Accrual Period, based on a 360-day year.  The first

Interest Accrual Period will be 29 days. Interest accrued during the related Interest Accrual Period on the then outstanding related Aggregate Note Balance at the related Note Rate will be paid on the Notes on each Payment Date, subject to the Available Funds for such Payment Date.

On each Payment Date, interest on the Notes will be paid as described herein under "Description of the Notes—Payments."

There can be no assurance that on any Payment Date payments in respect of accrued interest due on the Class N-2 Notes will be timely made or paid in full.  If, with respect to the Insured Notes, an Insurer Default were to occur and be continuing on any Payment Date, then there could be no assurance that on such Payment Date payments in respect of accrued interest due on the Insured Notes would be timely made or paid in full. However, amounts not paid on any Payment Date in respect of interest accrued at the related Note Rate on a class of Notes for the related Interest Accrual Period will be carried forward and paid (with additional interest at the related Note Rate on the amount so carried forward through the Interest Accrual Period prior to payment) on subsequent Payment Dates, but only to the extent of the Available Funds remaining after the payment of current interest due on such subsequent Payment Date.

Other than with respect to the Final Maturity Date, the failure to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date, to the extent that Available Funds are distributed, the Noteholders will have no remedy for their failure to receive interest or principal on any Payment Date that occurs before the related Final Maturity Date, other than with respect to the Insured Notes (in the case of interest on each Payment Date and in the case of principal on their Final Maturity Date) as provided in each Note Policy.

*Principal Payments*................................................. On each Payment Date, the Indenture Trustee will pay the Principal Distribution Amount as described herein under "Description of the Notes—Payments."

The "Principal Distribution Amount" means, for any Payment Date and each class of Notes, the lesser of (i) the outstanding Aggregate Note Balance of such class of Notes immediately prior to such Payment Date and (ii) (A) in the case of the Class N-1 Notes, the sum of (x) any Available Funds remaining after distributions made pursuant to clauses (a)(i) through (iv) in "Description of the Notes—Payments—*Payments on the Notes*" and (y) without duplication, in the case of any Payment Date (A) with respect to which there is a Note Insurer Optional Deposit or the Final Maturity Date with respect to the Class N-1 Notes, the portion of any Class N-1 Insured Payment or Note Insurer Optional Deposit allocable to the Aggregate Note Balance of the Class N-1 Notes and (B) with respect to which there is a payment pursuant to the Class N-1 Cap Agreement, any such payment remaining unpaid after distributions pursuant to clause (a)(iv) in "Description of the Notes—

Payments—*Payments on the Notes*", (B) in the case of the Class N-2 Notes, the sum of (x) any Available Funds remaining after distributions made pursuant to clauses (b)(i) through (iv) in "Description of the Notes—Payments—*Payments on the Notes*" above and (C) in the case of the Class N-3 Notes, the sum of (x) any Available Funds remaining after distributions made pursuant to clauses (b)(i) through (vi) in "Description of the Notes—Payments—*Payments on the Notes*" above and (y) without duplication, in the case of any Payment Date (A) with respect to which there is a Note Insurer Optional Deposit or the Final Maturity Date with respect to the Class N-3 Notes, the portion of any Class N-3 Insured Payment or Note Insurer Optional Deposit allocable to the Aggregate Note Balance of the Class N-3 Notes and (B) with respect to which there is a payment pursuant to the N-3 Cap Agreement, any such payment remaining unpaid after distributions pursuant to clause (b)(vi) in "Description of the Notes—Payments—*Payments on the Notes*". See "Description of the Notes—Payments."

Note Policies........................................................... The Note Insurer, Radian Insurance Inc., a Pennsylvania insurance company, will provide the Note Policies. Subject to the requirements of each Note Policy, the Note Insurer will unconditionally and irrevocably guarantee that the full amount of each Class N-1 Insured Payment and Class N-3 Insured Payment will be remitted to the Co-Trustee for remittance to the Indenture Trustee for distribution to the holders of the Class N-1 Notes and the Class N-3 Notes, respectively. Each Note Policy generally will guarantee timely payment of interest on the Insured Notes and the ultimate payment of principal of the Insured Notes. The Note Insurer's obligations under each Note Policy will be discharged to the extent funds equal to the amount required to be paid thereunder are received by the Co-Trustee, whether or not such funds are properly applied by the Co-Trustee. The Note Policies may not be cancelled. The Class N-2 Notes will not be insured by either Note Policy.

A "Insurer Default" means the occurrence and continuance of the Note Insurer's failure to make either a Class N-1 Insured Payment or a Class N-3 Insured Payment required under the related Note Policy in accordance with its terms.

See "The Note Policies and the Note Insurer."

Optional Redemption................................................. The Issuers will not be permitted to redeem the Notes. However, subject to certain conditions set forth in the Indenture, the Note Insurer will have the right but not the obligation to cause the Insured Notes to be redeemed, in whole or in part, on or after the Payment Date in April 2009 if (a) prior to such Payment Date, the Note Insurer has made payments of claims under either Note Policy and such amounts or certain other amounts due the Note Insurer have not been reimbursed or paid to the Note Insurer as of such Payment Date or (b) on or after such Payment Date, any claim is made on either Note Policy or certain other amounts have become

due the Note Insurer and have not been reimbursed or paid to the Note Insurer as of such Payment Date.

Further, WMB as the servicer (in such capacity, the "Servicer") is entitled, subject to certain conditions as described in "Description of the Certificates—Optional Termination of the Trust" in the Prospectus Supplement, to purchase all outstanding Mortgage Loans in the Mortgage Pool and thereby effect early retirement of the Series Certificates. Any such purchase of the Mortgage Loans and early termination of the Series Certificates is referred to herein as a "Clean-Up Call" with respect to the Series Certificates. If the Servicer does not exercise the Clean-Up Call, the Note Insurer may exercise the Clean-Up Call. The amount received by the Underlying Trust Fund upon the purchase of the Mortgage Loans pursuant to the Clean-Up Call is required to result in distributions on the Underlying Class C Certificate sufficient to satisfy the payment terms of the Notes and to pay any and all amounts due the Note Insurer under the Indenture and Insurance Agreement. The Servicer is entitled to exercise the Clean-Up Call only if the Note Insurer consents to such exercise. See "Description of the Notes—Optional Redemption."

In addition, the holder of the Subordinate Note (other than WMB or any of its affiliates) (or, if the holder of the Subordinate Note does not exercise such right, the Note Insurer) has the option to purchase from the Underlying Trust Fund any Mortgage Loan which is 90 days or more in default. However, the holder of the Subordinate Note and the Note Insurer must first purchase the Mortgage Loan that, as of the time of such purchase, has been in default for the longest period before purchasing any Mortgage Loans that have been in default for shorter periods. Neither the holder of the Subordinate Note nor the Note Insurer will be subject to the servicing requirements of the Underlying Pooling and Servicing Agreement in exercising its right to purchase Mortgage Loans which are 90 or more days in default.

Special Prepayment Considerations with Respect to the Notes ..................................... The rate and timing of distributions on the Notes will depend, in general, on the rate and timing of the allocation of cashflow to the Underlying Certificates, which will in turn be affected by, among other things, the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases of the Mortgage Loans), any payments received by the Underlying Trust Fund from and made to the Underlying Counterparty pursuant to the Underlying Swap Agreement and the allocation thereof to make distributions on the Underlying Certificates. Furthermore, the rate and timing of payments on the Class N-3 Notes will depend on the rate and timing of payments on the Class N-2 Notes. As a result, the Notes are subject to substantial inherent cashflow uncertainties affecting the Underlying Certificates. See "—Special Yield Considerations with Respect to the Notes" below and "Yield Considerations."

See also the Disclosure Exhibits and "Yield, Prepayment and Maturity Considerations" in the Prospectus.

Special Yield Considerations
  with Respect to the Notes ....................................... The yield to maturity on the Notes will depend, in general, on (i) the applicable Note Rate, (ii) the applicable purchase price, (iii) the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) on the Mortgage Loans, payment of any related Prepayment Charges and Realized Losses on the Mortgage Loans, (iv) adjustments of the pass-through rates of the Senior Certificates and adjustments of the Mortgage Rates of those Mortgage Loans that are adjustable-rate Mortgage Loans, (v) whether or not the Clean-Up Call occurs and, if any such call occurs, the timing of such occurrence, (vi) the rate of one-month LIBOR and the rate of six-month LIBOR, (vii) whether payments are received from the counterparty pursuant to the Cap Agreements, (viii) whether payments are received from or made to the Underlying Counterparty pursuant to the Underlying Swap Agreement, (ix)  whether payments are made to or paid from the Underlying Final Maturity Reserve Account, (x) in the case of the Insured Notes, whether the Note Insurer exercises its right to redeem the Insured Notes, in whole or in part, (xi) whether the Trust Estate is liquidated by the Controlling Party prior to the related Final Maturity Date and (xii) in the case of the Class N-3 Notes, the rate, amount and timing of payments on the Class N-2 Notes, as well as other factors.  See "Yield Considerations" herein.  See also the Disclosure Exhibits and "Yield, Prepayment and Maturity Considerations" in the Prospectus.

Investors in the Notes bear the risk that factors such as, but not limited to, prepayment, default, delinquency and/or loss severity experience with respect to the Mortgage Loans may be higher than anticipated, which could result in unanticipated reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions.  Also, investors bear the risk that fluctuations in LIBOR-based interest rates could also result in unanticipated reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions.  Investors in the Notes should fully consider the risks associated with reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions and the effect of any such reductions or delays on the weighted average lives and yield on the Notes as well as on the ability of investors in the Class N-2 Notes to recover their initial investment.  Risks associated with reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions include: (i) the risk that distributions on the Underlying Certificates on any Underlying Distribution Date may be insufficient to pay any Interest Distribution Amount or any Principal Distribution Amount on the Class N-2 Notes on the related Payment Date, (ii) the risk that distributions on the Underlying Certificates over the lives of the Class N-2 Notes may be insufficient to repay in full the

Aggregate Note Balances of the Class N-2 Notes and interest on the Aggregate Note Balances of the Class N-2 Notes outstanding from time to time at the related Note Rate and (iii) the risk that certain Prepayment Charges will be waived or otherwise not collected and not reimbursed by the Servicer as more fully described herein.  Investors in the Class N-2 Notes also bear the risk that they may fail to recover their initial investment.  Because principal payments on the Insured Notes will be affected by various factors and because the Note Policies will only guarantee the ultimate payment of principal of the Insured Notes on the related Final Maturity Date, there can be no assurance as to the rate and timing of principal payments on the Insured Notes.  In addition, if the Note Insurer were to default in its obligations under the Note Policies, there could be no assurance as to the receipt by the holders of the Insured Notes of interest payments or the final principal payment on the Insured Notes.

Investors in the Notes will bear the risk of any volatility in the payments of principal of the Notes and the effect of such volatility on the yield and weighted average lives of the Notes.  Any reinvestment risk resulting from any greater than expected payments on the Underlying Certificates will be borne by investors in the Notes.

Certain Federal Income
Tax Consequences ..................................................

Thacher Proffitt & Wood LLP, counsel to the Sponsor and the Issuers with respect to certain matters, will deliver its opinion generally to the effect that, assuming compliance with the Indenture and certain related documents, and based in part on the facts and assumptions set forth in this memorandum and certain additional information, for federal income tax purposes, (i) the Notes will be characterized as indebtedness and not as ownership interests in the Issuer, (ii) the Issuer will not be subject to U.S. federal income tax on its net income, (iii) payments received by the Issuer on the Underlying Certificates will not be subject to U.S. federal withholding tax, (iv) the existence of the Co-Issuer will be disregarded for U.S. federal income tax purposes and (v) the Co-Issuer's activities will not cause the Issuer to be engaged in a trade or business in the U.S.  Under the Indenture, the Noteholders will agree to treat the Notes as indebtedness for federal, state and local income, single business and franchise tax purposes. Additionally, for federal income tax purposes, the Issuer may treat the Notes as issued without original issue discount. For further information regarding the federal income tax consequences of investing in the Notes, see "Certain Federal Income Tax Consequences" herein.  Each investor should consult its own tax advisor regarding state and local tax consequences.

Ratings......................................................................

It is a condition to the issuance of the Notes that the Notes be rated not lower than the ratings set forth on the inside cover of this memorandum by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P").  S&P is referred to in this memorandum as the "Rating Agency".  With respect to

the Insured Notes, such ratings will depend primarily upon the creditworthiness of the Note Insurer. The ratings reflect the assessment of the Rating Agency, based on particular prepayment and loss assumptions, of the likelihood of the ultimate receipt by the Noteholders of each class of Notes of the Original Note Balances of such class of Notes and the timely receipt by the Noteholders of each class of Notes of interest on the Aggregate Note Balance of such class of Notes outstanding from time to time at the Note Rate of such class of Notes; however, such ratings do not represent any assessment of the timing of receipt by Noteholders of each class of Notes of the Original Note Balances of such class of Notes or the corresponding effect on yield to investors. The Issuer has not requested that any rating agency rate the Notes other than S&P. If another rating agency were to rate the Notes, such rating agency may assign a rating different from the ratings described above. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. See "Yield Considerations" and "Ratings" herein.

Legal Investment ...................................................... The Notes will not be "mortgage related securities" within the meaning of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA"). The appropriate characterization of the Notes under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase the Notes, may be subject to significant interpretative uncertainties. In addition, institutions whose investment activities are subject to review by certain regulatory authorities may be or may become subject to restrictions, which may be retroactively imposed by such regulatory authorities, on the investment by such institutions in certain forms of securities. Accordingly, investors should consult their own legal advisors to determine whether and to what extent the Notes constitute legal investments for them. See "Legal Investment" herein.

ERISA Considerations............................................. A fiduciary of any Plan should review carefully with its legal counsel whether the purchase or holding of the Notes or an interest therein could give rise to a transaction that is prohibited or is not otherwise permitted either under ERISA or Section 4975 of the Code or whether there exists any statutory or administrative exemption applicable to an investment therein.

Any Plan fiduciary considering whether to purchase the Notes or an interest therein on behalf of a Plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. See "ERISA Considerations" herein.

## RISK FACTORS

*Prospective Noteholders should review the section entitled "Risk Factors" in the Prospectus Supplement as well as the following factors in connection with any purchase of Notes:*

### Prepayments and Defaults

The average lives of the Notes and the yields realized by Noteholders will be sensitive to levels of payments, including prepayments, on the Mortgage Loans. The yield to maturity on the Notes may be adversely affected by a higher than expected rate of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) and Realized Losses on the Mortgage Loans. The amount of distributions on the Underlying Class C Certificate will be extremely sensitive to the rate and timing of principal payments and Realized Losses on the Mortgage Loans. The amount of distributions on the Underlying Class C Certificate will be negatively affected by a rapid rate of principal payments and Realized Losses on the Mortgage Loans, and the amount of distributions on such certificate will decrease more significantly as a result of principal payments and Realized Losses on the Mortgage Loans with relatively high Mortgage Rates.

The terms of certain of the Mortgage Loans provide for payment by the related mortgagor of a Prepayment Charge in limited circumstances on certain prepayments. Any Prepayment Charges paid in respect of the Mortgage Loans will be distributed to the Underlying Class P Certificate and therefore on the Notes. Generally, each Prepayment Charge remains applicable with respect to the related Mortgage Loan only for the limited time periods specified in the terms of the related Mortgage Loan. In the Underlying Pooling and Servicing Agreement, the Servicer has warranted that it will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default). The Servicer may also waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the mortgagor's default in making the Mortgage Loan payments. If the Servicer breaches this warranty, it will be obligated under the Underlying Pooling and Servicing Agreement to cure such a breach by remitting to the Underlying Trust Fund an amount equal to such waived Prepayment Charges. In those cases when the Servicer waives a Prepayment Charge and such waiver does not result in a breach of the Servicer's warranty (including cases in which waiver is required by the applicable servicing standards), then the Servicer will not be required to make any payment in respect of each waived Prepayment Charge. To the extent that prepayment charges are not collected by the Servicer from a mortgagor, the effect that any such charge might have had on reducing prepayment speeds will be greatly reduced. The Servicer will be entitled to retain as servicing compensation all prepayment charges or premiums payable in respect of partial principal prepayment on the Mortgage Loans. Prospective investors should conduct their own analysis of the effect, if any, that the payment of Prepayment Charges on the Underlying Class P Certificate or actions taken by the Servicer with respect to waiver thereof, may have on the yield to maturity of the Notes. The Issuer makes no representation as to the effect that the payment of the Prepayment Charges distributed on the Underlying Class P Certificate may have on the yield to maturity of the Notes. See "Yield Considerations" herein. For information about the Prepayment Charges as of April 1, 2007, investors should review the Schedule of Prepayment Charges attached hereto as Exhibit 4. Prospective investors in the Notes should refer to the Underlying Pooling and Servicing Agreement for information about the representations and warranties the Servicer has made about the Prepayment Charges and the covenants the Servicer has made about the waiver of Prepayment Charges.

### Subordination of the Class N-3 Notes

The entitlement of the Class N-3 Notes to receive payments in respect of interest will be subordinated to the entitlement of the Class N-2 Notes to receive payments in respect of interest. Additionally, the entitlement of the Class N-3 Notes to receive payments in respect of principal will be subordinated to the entitlement of the Class N-2 Notes to receive payments in respect of principal.

**Additional Risks Associated with the Mortgage Loans**

Some of the risks associated with the Mortgage Loans, including the underwriting guidelines used to originate the Mortgage Loans, the delinquency status of the Mortgage Loans, the loan-to-value ratios of the Mortgage Loans, the second lien mortgage loans, the geographic concentration of the Mortgage Loans and compliance issues with respect to laws that govern the origination and servicing of the Mortgage Loans are described in the section entitled "Risk Factors" in the Prospectus Supplement.

**Basis Risk on the Underlying Certificates**

The Senior Certificates have pass-through rates based upon the value of one-month LIBOR while the Mortgage Rates on the Mortgage Loans are generally either fixed or fixed for a certain period of time and subsequently based upon the value of a six-month LIBOR index, subject to periodic adjustments and limitations on such adjustments. In a rising interest rate environment, the pass-through rates on the Senior Certificates may rise while the Mortgage Rates of the adjustable-rate Mortgage Loans may rise more slowly and while the Mortgage Rates of the fixed-rate Mortgage Loans do not adjust at all. As a consequence, cashflow resulting from excess interest on the Mortgage Loans, and accordingly, amounts distributable to the Underlying Class C Certificate, may be substantially reduced or eliminated. Each class of Senior Certificates is subject to a pass-through rate ceiling for such class. If a rising interest rate environment, or a disproportionately high rate of prepayments (including prepayments and collections upon defaults, liquidations and repurchases) and Realized Losses on the Mortgage Loans with relatively high Mortgage Rates, causes the pass-through rates on any such class of Senior Certificates to equal the pass-through rate ceiling applicable thereto, then no excess interest will be generated by the portion of the Underlying Trust Fund represented by the Certificate Principal Balance of such class of Senior Certificates.

The Senior Certificates are subject to basis risk shortfalls as described above and are entitled to recover the amount of any such shortfalls, with interest thereon, on any Underlying Distribution Date on which excess cashflow from the Mortgage Loans or other amounts are available to fund such recovery prior to any payments made to the Underlying Class C Certificate. Therefore, any amounts paid on any Underlying Distribution Date directly or indirectly from excess cashflow on the Mortgage Loans to the Senior Certificates in respect of any such shortfalls will reduce the excess cashflow amounts that would otherwise be distributable on the Underlying Class C Certificate. In such circumstances, amounts (if any) payable pursuant to the Underlying Swap Agreement to the Underlying Class C Certificate may be insufficient (after payment of certain administrative expenses to the Issuers and certain permitted reimbursements to the Indenture Trustee) to pay interest due on the Notes.

Payments pursuant to the Underlying Swap Agreement and the Cap Agreements will be limited as described in this memorandum. As a result, to the extent that interest due on the Notes exceeds amounts paid to the Underlying Certificates on account of the Mortgage Loans during the applicable period, payments pursuant to the Underlying Swap Agreement and the Cap Agreements may be insufficient to compensate for such shortfall. In addition, the Underlying Swap Agreement will terminate after the Underlying Distribution Date in April 2012, and the Cap Agreements will terminate after the Payment Date in October 2008. If the Underlying Counterparty defaults on its obligations pursuant to the Underlying Swap Agreement and the counterparty to the Cap Agreements defaults on its obligations pursuant to the Cap Agreements, and with respect to the Insured Notes, a Note Insurer Default has occurred and is continuing, Noteholders may incur losses. The terms of each Cap Agreement are described under "Description of the Notes—The Cap Agreements" and the terms of the Underlying Swap Agreement are described under "Description of the Notes—Underlying Swap Agreement."

The pass-through rate ceiling applicable to any class of Senior Certificates is generally calculated with reference to the weighted average of the Mortgage Rates of the Mortgage Loans in the related Loan Group or Loan Groups, net of servicing fees, net of certain amounts payable into the Underlying Final Maturity Reserve Account and net of certain amounts payable to the Underlying Counterparty pursuant to the Underlying Swap Agreement.

For additional information about the pass-through rates of the Senior Certificates and their relation to the Mortgage Rates of the Mortgage Loans, see the section entitled "Risk Factors" in the Prospectus Supplement.

**Subordination of the Underlying Class C Certificate**

As described in the Disclosure Exhibits, payments of principal of and interest on the Mortgage Loans in the Underlying Trust Fund will be available to make payments on the Underlying Class C Certificate only after payment of related servicing fees, payment of other related specified expenses and reimbursements of the Underlying Trust Fund, payment of amounts, if any, due to the Underlying Counterparty pursuant to the Underlying Swap Agreement, payment of amounts, if any, required to be deposited in the Underlying Final Maturity Reserve Account and payment of required distributions to holders of the Senior Certificates. Consequently, the amount of excess cashflow distributable on the Underlying Class C Certificate is extremely sensitive to losses on the Mortgage Loans (and the timing thereof), because Realized Losses will be allocated directly or indirectly to such Underlying Class C Certificate first, by a reduction of the amount of excess cashflow otherwise payable in respect of such Underlying Class C Certificate and second, by a reduction in the amount of overcollateralization of the Senior Certificates by the Mortgage Loans. Any such reduction in the amount of overcollateralization provided to the Senior Certificates by the Mortgage Loans to a level below the Overcollateralization Target Amount will be borne by the Underlying Class C Certificate because excess cashflow generated by the Mortgage Loans otherwise available for distribution on the Underlying Class C Certificate will be distributed first to the holders of the Senior Certificates to restore the reduced amount of overcollateralization to the Overcollateralization Target Amount.

The order of priority for monthly distribution of all collected funds (monthly payments and unscheduled payments or recoveries on the Mortgage Loans less servicing fees) in respect of the Mortgage Loans, as described in the Disclosure Exhibits, generally results in the following amounts being paid prior to any distributions on the Underlying Class C Certificate: (i) certain permitted fees and reimbursements from the Underlying Trust Fund to the trustee, the Delaware trustee and the Servicer; (ii) payment of amounts, if any, due to the Underlying Counterparty pursuant to the Underlying Swap Agreement; (iii) payment of amounts, if any, required to be deposited in the Underlying Final Maturity Reserve Account; (iv) interest on the Senior Certificates; and (v) principal on the Senior Certificates (including amounts necessary to meet and maintain the Overcollateralization Target Amount). Moreover, Realized Losses with respect to the Mortgage Loans will likely result in a reduction of the amount of overcollateralization available to the Senior Certificates and accordingly, with respect to the Underlying Class C Certificate, losses on the Mortgage Loans will reduce the excess cashflow to which the Underlying Class C Certificate might otherwise be entitled.

Certain decisions by the Servicer, including decisions regarding whether or not certain principal and interest advances or servicing advances are nonrecoverable, may also impact the availability of cashflow with respect to the Underlying Class C Certificate. Decisions by the holder of the Subordinate Note and the Note Insurer regarding the optional purchase of defaulted Mortgage Loans may also impact the availability of cash flow with respect to the Underlying Class C Certificate. In addition, as described above under "—Basis Risk on the Underlying Certificates" and as described in the Disclosure Exhibits, the Senior Certificates may be entitled to recover the amount of interest not paid on an Underlying Distribution Date because of the application of the pass-through rate ceiling, which may result in a reduction of the amount of excess interest that could be included among the amounts that may remain available on any Underlying Distribution Date for distribution to the holders of the Underlying Class C Certificate.

**Risks Associated with the Underlying Swap Agreement**

Any amounts paid to the Underlying Counterparty under the terms of the Underlying Swap Agreement will reduce the amount of excess cashflow otherwise available for distribution to the Underlying Class C Certificate. See "Risk Factors—Payments to the Swap Counterparty Will Reduce Amounts Available for Distribution to the Offered Certificates" in the Prospectus Supplement. To the extent that a Swap Termination Payment is due to the Underlying Counterparty there may be no funds available to make payments on the Notes on one or more Payment Dates.

**Risks Associated with the Final Maturity Reserve Account**

Commencing on the Underlying Distribution Date in February 2017, and on each Underlying Distribution Date thereafter, the Underlying Trust Fund will, to the extent required, deposit the Aggregate Final Maturity Reserve Amount into the Underlying Final Maturity Reserve Account for such Underlying Distribution Date, as described

under "Description of the Certificates—Allocation of Available Funds" in the Prospectus Supplement. The Aggregate Underlying Final Maturity Reserve Amount, if any, will reduce the excess cashflow and, consequently, the amounts available for distribution to the Underlying Class C Certificate on the Underlying Distribution Date on which such amount is deposited in the Final Maturity Reserve Account. On and after the Underlying Distribution Date in January 2027, all amounts otherwise payable to the Class C Certificates will be deposited in the Final Maturity Reserve Account until the amounts on deposit in the Final Maturity Reserve Account are equal to the Stated Principal Balance of the Mortgage Loans with 40-year original terms to maturity less the certificate principal balance of the Underlying Class C Certificates on such Underlying Distribution Date. On the earlier of the Underlying Distribution Date in January 2037 and the termination of the Underlying Trust Fund, all amounts on deposit in the Underlying Final Maturity Reserve Account, if any, will be distributed to holders of the Senior Certificates and the Underlying Counterparty, as described under "Description of the Certificates—The Final Maturity Reserve Account" in the Prospectus Supplement. Any amounts remaining in the Underlying Final Maturity Reserve Account after distributions have been made to the Senior Certificates and the Underlying Counterparty will be distributable to the Underlying Class C Certificate.

**Limited Credit Enhancement for the Class N-2 Notes**

The only credit enhancement available to the holders of the Class N-2 Notes is represented by the overcollateralization of the Class N-2 Notes by the excess, if any, of the expected future cashflows on the Underlying Certificates over the amount expected to be paid to holders of the Class N-2 Notes in respect of their Original Note Balances and interest on the applicable Note Balance outstanding from time to time at the applicable Note Rate (in each case as such expectations are determined in part based upon investors' assumptions as to rates of prepayment and default of the Mortgage Loans). The Class N-2 Notes are non-recourse obligations of the Issuer and the Co-Issuer and proceeds of the assets of the Trust Estate represent the sole source of payments on the Class N-2 Notes. Moreover, the failure by the Issuers to make payments of interest on or of principal of the Class N-2 Notes on any Payment Date prior to their Final Maturity Date or the failure to pay the Interest Distribution Amount of the Class N-2 Notes for any continuous six-month period after the Accelerated Default Date, will not constitute an Event of Default and holders of the Class N-2 Notes will not have any remedy for any such non-payment until their Final Maturity Date. Consequently, in the event that the prepayment, default, delinquency and/or loss severity experience with respect to the Mortgage Loans is higher than that assumed by investors, there may be insufficient cashflow to pay the full amount of principal of and interest on the Notes and holders of the Notes could lose a portion of their principal. In addition, holders of the Notes may experience a lower than anticipated yield on their initial investment.

**Overcollateralization Requirements Affecting the Underlying Class C Certificate**

The Senior Certificates are subject to overcollateralization requirements. The Overcollateralization Target Amount on each Underlying Distribution Date is the amount set forth in the Underlying Pooling and Servicing Agreement. On the Issue Date, the Overcollateralization Target Amount was satisfied. On each Underlying Distribution Date, no payments may be made in respect of the Underlying Class C Certificate unless, among other things, the Overcollateralization Target Amount remains satisfied.

Subject to certain tests and triggers, the Overcollateralization Target Amount may be permitted to decrease after the Stepdown Date. If at any time certain delinquency and/or loss levels with respect to the Mortgage Loans are exceeded, there will be a delay in the reduction of the Overcollateralization Target Amount. Investors in the Notes bear the risk that there may be significant periods during which no or limited distributions will be made on the Underlying Class C Certificate. In such event, the yield of the Notes may be adversely affected and the weighted average lives of the Notes may be lengthened.

**Credit Risks; Limited Assets**

The Mortgage Pool contains Mortgage Loans (i) originated by WMB (the "Seller") or acquired by the Seller in the secondary market in the ordinary course of its business and which were underwritten or re-underwritten by the Seller in accordance with the Seller's underwriting standards and (ii) serviced by the Servicer under the Underlying Pooling and Servicing Agreement. Accordingly, investors will not have the benefit of diversification that might have existed if the Mortgage Loans had been originated by various originators.

Because of the nature of the Underlying Certificates and the complexity of analyzing the credit risks associated therewith, the Notes are an appropriate investment only for persons familiar with the performance of pools of mortgage loans similar to the Mortgage Loans and asset-backed securities structures and the risks associated with unrated subordinated securities such as the Underlying Class C Certificate. The yield to maturity and the aggregate amount and timing of distributions on the Notes is subject to material variability from period to period and over the lives of the Notes. The interaction of these factors and the effects on an investment in the Notes are impossible to predict and are likely to change from time to time. As a result, an investment in the Notes involves substantial risks and uncertainties (including loss of the initial investments with respect to the Class N-2 Notes, and if an Insurer Default has occurred and is continuing, with respect to the Insured Notes) and should only be considered by sophisticated institutional investors with substantial investment experience with similar types of securities.

The Trust Estate will not have any significant assets or sources of funds other than the Underlying Certificates, amounts on deposit in the NIM Reserve Account and payments, if any, received by the Indenture Trustee pursuant to the Cap Agreements. Holders of the Class N-2 Notes must rely solely upon payments on the Underlying Certificates and holders of the Insured Notes must rely solely upon payments on the Underlying Certificates, payments, if any, received by the Indenture Trustee pursuant to the related Cap Agreement and payments, if any, on the Note Policies to recover their investment. In addition, because the value of the Underlying Certificates (as initially determined based on the assumptions described herein) may be subject to fluctuations depending on the performance of the Mortgage Loans, general economic conditions and the level of market interest rates at the time, if an Event of Default under the Indenture were to occur, and the Indenture Trustee were to liquidate the Underlying Certificates, there can be no assurance that the net proceeds of the liquidated Underlying Certificates will be sufficient for holders of the Class N-2 Notes and holders of Insured Notes (if an Insurer Default has occurred and is continuing) to recover their entire investment. In the event of an Insurer Default, investors in the Insured Notes may suffer a loss.

**Limited Remedies; Actions by Indenture Trustee, the Note Insurer Upon Event of Default Under the Indenture**

Other than with respect to the related Final Maturity Date, or, with respect to the Class N-2 Notes only, the failure to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date, if the Available Funds are insufficient to pay the Interest Distribution Amount and/or any Principal Distribution Amount on any Payment Date prior to the Final Maturity Date of such class of Notes, it will not constitute an Event of Default. Thus, if there is no other breach or default in performance by the parties to the transaction agreements, Noteholders will have no remedy for non-payment of any class of Notes until the Final Maturity Date of such class of Notes (or with respect to the Class N-2 Notes only, until any date on or after which the Issuers have failed to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date), other than the right by the holders of the Insured Notes to receive the Class N-1 Insured Payments or the Class N-3 Insured Payments, as applicable. In addition, the voting rights held by the Underlying Certificates are insufficient to cause or prevent the exercise of any remedies under the Underlying Pooling and Servicing Agreement, including removal of the Servicer if it defaults in its obligations under the Underlying Pooling and Servicing Agreement. However, the Note Insurer has certain rights to cause or prevent the exercise of certain remedies under each Underlying Pooling and Servicing Agreement.

Following an Event of Default, the Indenture Trustee (with respect to the Class N-2 Notes and, with respect to the Insured Notes, if an Insurer Default has occurred and is continuing) or the Note Insurer (with respect to the Insured Notes) may and, at the written direction of the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes or all of the Notes), the Indenture Trustee is required to declare the related Notes to be immediately due and payable. In connection with such acceleration, the Indenture Trustee is required to liquidate the Underlying Certificates in the manner directed by the Controlling Party. Such a declaration may be rescinded only by the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes or all of the Notes). The Underlying Certificates may be liquidated by the Controlling Party and payments on the Class N-2 Notes may be accelerated even though no Event of Default with respect to the Class N-2 Notes has occurred.

19

Certain proceeds of any acceleration and liquidation of the Underlying Certificates represent the sole available source to satisfy the obligations to the holders of the Class N-2 Notes upon an Event of Default. The rights to Class N-1 Insured Payments, the Class N-3 Insured Payments, certain proceeds of any acceleration and liquidation of the Underlying Certificates and any payments made pursuant to the Cap Agreements represent the sole available sources to satisfy the obligations of the Insured Notes upon an Event of Default. In the event that the principal of any class of Notes is declared due and payable, as described above, and the Underlying Certificates are sold, the net proceeds from such sale may be insufficient to pay the Noteholders the unpaid and accrued interest on their class of Notes, and the full unpaid principal amount of their class of Notes. However, following the occurrence of an Event of Default, the Co-Trustee will continue to submit claims under the Note Policies to enable the Note Insurer to continue to make payments of the applicable Interest Distribution Amount on the Insured Notes on each Payment Date and the outstanding principal amount of the Insured Notes on their Final Maturity Date; provided, that under such circumstances, the Note Insurer may elect to pay at an earlier time all or any portion of the outstanding principal amount of the Insured Notes, plus accrued and unpaid interest thereon. If an Event of Default under the Indenture were to occur, and if an Insurer Default were then to have occurred and be continuing, investors in the Insured Notes may suffer a loss.

**Uncertainty of Cashflows**

Unlike more standard corporate debt securities, the timing and amount of payments of principal on the Notes is not fixed and will be determined by the timing and amount of cashflows on the Underlying Certificates, which in turn will be dependent on the rate, amount and timing of principal payments on the Mortgage Loans (including prepayments and collections upon defaults, liquidations and repurchases), by the rate, amount and timing of payment of any Prepayment Charges in connection with principal prepayments on the Mortgage Loans, by the rate, amount and timing of Realized Losses on the Mortgage Loans, by adjustments of the pass-through rates of the Senior Certificates and adjustments of the Mortgage Rates of those Mortgage Loans that are adjustable-rate Mortgage Loans, and by payments, if any, received from or made to the Underlying Counterparty pursuant to the Underlying Swap Agreement. Furthermore, the rate and timing of payments on the Class N-3 Notes will be affected by the rate, amount and timing of payments on the Class N-2 Notes. In addition, the rate and timing of payments on the Notes will be affected if the Clean-Up Call is exercised. The rate and timing of payments on the Class N-3 Notes will be affected if the Note Insurer exercises its right to redeem the Class N-3 Notes, in whole or in part. See "Description of the Notes—Optional Redemption" herein.

**Terrorist Attacks and Military Action Could Adversely Affect the Yield on the Notes**

Since the terrorist attacks in the United States on September 11, 2001, there exists an increased likelihood of further terrorist activity in the United States. In addition, current political and military tensions in the Middle East have resulted in a significant deployment of United States military personnel in the region. Investors should consider the possible effects of past and possible future terrorist attacks and any resulting military response by the United States on the delinquency, default and prepayment experience of the Mortgage Loans. In accordance with the servicing standard set forth in the Underlying Pooling and Servicing Agreement, the Servicer may defer, reduce or forgive payments and delay foreclosure proceedings in respect of Mortgage Loans to mortgagors affected in some way by past and possible future events. In addition, the current deployment of United States military personnel in the Middle East and the activation of a substantial number of United States military reservists or members of the National Guard may significantly increase the proportion of Mortgage Loans whose mortgage payments are reduced by the application of the Servicemembers Civil Relief Act (the "Relief Act"). See "Legal Aspects of Mortgage Assets-Servicemembers' Civil Relief Act" in the Prospectus for additional information.

The Relief Act provides relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active duty after the origination of their mortgage loan. The Relief Act provides generally that these mortgagors may not be charged interest on a mortgage loan in excess of 6% per annum during the period of the mortgagor's active duty. These reductions are not required to be paid by the mortgagor at any future time, will not be advanced by the Servicer and will reduce accrued interest on the Underlying Class C Certificate. In addition, the Relief Act imposes limitations that would impair the ability of the Servicer to foreclose on an affected mortgage loan during the mortgagor's period of active duty status, and, under some circumstances during an additional period thereafter. Certain reductions in interest collections arising from the application of the Relief Act or any state law providing for similar relief will not be covered by the Servicer.

**Non-recourse Obligations**

The Notes represent non-recourse obligations of the Issuer and the Co-Issuer. The proceeds of the assets of the Trust Estate represent the sole source of payments on the Class N-2 Notes. The proceeds of the assets of the Trust Estate, together with the proceeds of each Note Policy, represent the sole source of payments on the Insured Notes. The Notes do not represent a general corporate obligation of or an interest in the Issuers, nor do they represent an interest in or any obligation of the Sponsor, the Indenture Trustee, the Initial Purchaser or any affiliates of the Issuers, the Sponsor, the Indenture Trustee or the Initial Purchaser. The obligations to be performed directly by the Issuers with respect to the Trust Estate are generally limited to the obligation to accept reassignment of all or a portion of the Underlying Certificates under certain circumstances upon breach of certain representations and warranties made by the Issuers with respect to the Underlying Certificates, and other limited obligations, all as set forth in the Indenture. The ability of the Issuers to perform such direct obligations will be dependent in part on the financial condition of the Issuers at the time such obligations arise.

**Restrictions on Transfer; Limited Liquidity; Absence of Secondary Market**

The Notes have not been and will not be registered under the Securities Act or registered or qualified under the securities laws of any jurisdiction. The Notes are subject to restrictions on transferability and resale and may be transferred or resold only to QIBs in transactions that are pursuant to and in accordance with Rule 144A and that comply with any applicable state securities laws and the other restrictions on transfer set forth in the Indenture. None of the Issuer, the Co-Issuer, the Indenture Trustee, the Sponsor, the Co-Trustee, the Note Insurer or the Initial Purchaser is or will be obligated to register or qualify the Notes under the Securities Act or the securities laws of any jurisdiction. Certain investors may not purchase the Notes. See "Notice to Investors," "ERISA Considerations" and "Legal Investment" herein. There is currently no secondary market for the Notes. As a result of the foregoing restrictions on transfer and other factors, it is doubtful that a secondary market for the Notes will develop or, if a secondary market does develop with respect to the Notes, that it will provide the Noteholders with liquidity of investment or that it will continue for the respective lives of the Notes. If a trading market does not develop, Noteholders may be unable to resell the Notes for an extended period of time, if at all. Future trading prices for the Notes will depend upon many factors including, among others, prevailing interest rates, payment and loss experience with respect to the Underlying Certificates, collection and availability of Prepayment Charges, the likelihood of the exercise of the Clean-Up Call and the market for similar securities, each of which is subject to various pressures. There have been times in the past where the absence of a liquid secondary market for similar asset backed securities has caused the holders thereof to be unable to sell their securities other than at a significant loss. As a result, investors must be prepared to bear the risk of holding the Notes for as long as the Notes are outstanding.

**Book-Entry Registration**

Except as otherwise noted herein, the Notes will be represented by one or more book-entry certificates registered in the name of and deposited with, or on behalf of, Cede & Co., as nominee of DTC, and will not be registered in the names of the beneficial Noteholders or their nominees. As a result, Noteholders will only be able to exercise their rights as a Noteholder indirectly through DTC and its participating organizations (collectively, the "Participants"). In addition, the access of Noteholders to information regarding the Notes may be limited. The furnishing of notices and other communications by DTC to the Participants, and directly and indirectly through the Participants to Noteholders, will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Furthermore, as described herein, Noteholders may suffer delays in the receipt of distributions on the Notes, and the ability of any Noteholder to pledge or otherwise take actions with respect to its interest in the Notes may be limited due to the lack of a physical certificate evidencing such interest. None of the Sponsor, the Issuer, the Indenture Trustee, the Co-Trustee, the Note Insurer or the Initial Purchaser will have any responsibility or liability for payments made to DTC on account of beneficial ownership interests in the Notes. See "Description of the Notes—Book-Entry Registration; Delivery and Form."

**Rating of Notes; Possibility of Withdrawal or Downgrading**

The ratings assigned to the Notes by the Rating Agency depends primarily on its assessment of the likelihood of receipt by the Noteholders of the Original Note Balances and interest on the respective Aggregate Note

Balances outstanding from time to time at the applicable Note Rate. The rating assigned to the Insured Notes by the Rating Agency is based, in large part, on the creditworthiness of the Note Insurer. Any downgrading in the rating assigned to the claims paying ability of the Note Insurer is likely to result in a downgrading in the rating assigned by the Rating Agency to the Insured Notes. The ratings assigned to the Notes by the Rating Agency are also based on particular interest rate, prepayment and loss assumptions with respect to the Mortgage Pool. The actual performance of the Mortgage Pool may vary from such assumptions. The ratings assigned to the Notes by the Rating Agency are not a recommendation to purchase, hold or sell the Notes, inasmuch as such ratings do not address the Notes' market price or suitability for a particular investor. In addition, while the ratings address the likelihood of receipt by the Noteholders of the Original Note Balances and interest on the Aggregate Note Balances outstanding from time to time at the applicable Note Rate, such ratings do not represent any assessment of the timing of receipt by the Noteholders of the Original Note Balances or the corresponding effect on yield to investors. See "Yield Considerations" and "Ratings" herein. There is no assurance that the Rating Agency's ratings will remain in effect for any given period of time or that the Rating Agency will not lower or withdraw its ratings.

**Suitability of the Notes as Investments**

The Notes are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The Notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

**Certain Rights of the Note Insurer May Adversely Affect the Rights of the holders of the Class N-2 Notes**

The Note Insurer will be entitled to exercise certain rights that preempt the rights of the holders of the Class N-2 Notes including, among others, the right to control the administration of the Trust Estate. The consent of the Note Insurer will be required prior to any amendment of the Indenture. Investors in the Class N-2 Notes should be aware that:

- the Note Policies will not cover, or benefit in any manner whatsoever, the Class N-2 Notes;

- the rights granted to the Note Insurer are extensive;

- the interests of the Note Insurer may be inconsistent with, and adverse to, the interests of the holders of the Class N-2 Notes, and the Note Insurer has no obligation or duty to consider the interests of the holders of the Class N-2 Notes in connection with the exercise or non-exercise of its rights; and

- the Note Insurer's exercise of the rights and consents set forth in the Indenture may negatively affect the Class N-2 Notes.

## SUMMARY OF THE TRANSACTION

On the Closing Date, (i) the Sponsor will sell the Underlying Certificates to the Issuer pursuant to the Certificate Purchase and Sale Agreement between the Sponsor and the Issuer, dated April 26, 2007 and the Sponsor will deposit $350,000 into the NIM Reserve Account (ii) the Issuer will pledge the Underlying Certificates to the Indenture Trustee and cause the Notes to be issued pursuant to the Indenture, (iii) Washington Mutual Bank will enter into the Cap Agreements with the counterparty thereto and assign the Cap Agreements to the Issuer, (iv) the Note Insurer will issue the Note Policies, (v) the Indenture Trustee will deliver the Notes upon the order of the Issuers to the Initial Purchaser in connection with the sale by the Issuers of the Notes to the Initial Purchaser, (vi) the authorized share capital of the Issuer will consist of US $50,000 divided into 50,000 ordinary shares, par value U.S. $1.00 per share, 250 of which will be issued (all of the issued ordinary shares will be held in trust for charitable purposes by Deutsche Bank (Cayman) Limited, a licensed trust company incorporated in the Cayman Islands, under the terms of a declaration of trust), and (vii) the Issuer will issue a subordinate, unsecured, limited recourse note (the "Subordinate Note") to WMB or its designee evidencing the right to receive proceeds of the assets of the Trust Estate after all of the Issuers' obligations under the Indenture have been discharged. The proceeds of the sale of the

Notes will be delivered by the Initial Purchaser to the Issuers, and by the Issuers to the Sponsor as the cash portion of the consideration for the Underlying Certificates.

On each Underlying Distribution Date, the Indenture Trustee will receive all distributions, if any, on the Underlying Certificates. On each Payment Date, from distributions received on the Underlying Certificates, amounts on deposit in the NIM Reserve Account and from any payments received pursuant to the Cap Agreements, the Indenture Trustee will make payments on the Notes, in the order of priority described in "Description of the Notes—Payments" and to the extent of funds remaining undistributed. With respect to the Insured Notes, to the extent that a Class N-1 Insured Payment or a Class N-3 Insured Payment is payable for any Payment Date, then the Note Insurer will be required under the related Note Policy to make such Class N-1 Insured Payment or Class N-3 Insured Payment, as applicable, to the Co-Trustee who will be required to remit such amount to the Indenture Trustee for distribution to the holders of the Insured Notes.

The holders of the Subordinate Note issued by the Issuer to WMB or its designee will not be entitled to any distributions from the Trust Estate until all amounts owed to the Noteholders and the Note Insurer pursuant to the Indenture have been paid in full.

## DESCRIPTION OF THE NOTES

**General**

The Notes will be issued on April 26, 2007, pursuant to the Indenture. The Notes will accrue interest at the related note rate (each, a "Note Rate"). The Note Rate for the Class N-1 Notes will be calculated at the per annum rate of one-month LIBOR plus 0.540%, the Note Rate for the Class N-2 Notes will be a per annum rate of 7.500% and the Note Rate for the Class N-3 Notes will be calculated at the per annum rate of one-month LIBOR plus 0.800%. All of the Notes are offered hereby.

The Class N-3 Notes are subordinate to the Class N-2 Notes to the extent that on each Payment Date, (i) no interest will be paid on the Class N-3 Notes until the Class N-2 Notes have received the related Interest Distribution Amount and (ii) no principal will be paid on the Class N-3 Notes until the Class N-2 Notes have received the related Principal Distribution Amount. Consequently, the Aggregate Note Balance of the Class N-2 Notes will be reduced faster than the Aggregate Note Balance of the Class N-3 Notes.

The Notes will represent non-recourse obligations of the Issuer and the Co-Issuer. The Insured Notes will be entitled to the benefits of the related Note Policy. Noteholders of a class of Notes will be entitled to receive an aggregate amount equal to the applicable Original Note Balance of the class of Notes owned by such Noteholders, plus interest accrued on the outstanding Aggregate Note Balance of such class of Notes from time to time at the applicable Note Rate, as described herein. From and after the Payment Date on which the Aggregate Note Balance of such Notes is reduced to zero, Noteholders will not be entitled to receive any further payments. The proceeds of the assets of the Trust Estate represent the sole source of payments on the Class N-2 Notes. The proceeds of the assets of the Trust Estate, together with the proceeds of the Note Policies, represent the sole source of payments on the Insured Notes. The term "Aggregate Note Balance" as of any date of determination means the Note Balance of all Notes of the related class of Notes then Outstanding. The term "Note Balance" as of any date of determination means the principal amount stated on the face of such Note, less any payments in respect of principal previously paid on such Note. The Aggregate Note Balance of a class of Notes on the Closing Date is the "Original Note Balance" of such class of Notes. On the Closing Date, the Aggregate Note Balance of the Class N-1 Notes will be $24,125,000, the Aggregate Note Balance of the Class N-2 Notes will be $19,450,000, and the Aggregate Note Balance of the Class N-3 Notes will be $4,675,000.

The assets of the Trust Estate will consist of all right, title and interest in and to (i) the Underlying Certificates and all payments received thereon after the Closing Date, (ii) the Cap Agreements and all payments received pursuant to the Cap Agreements, (iii) the Note Account and the NIM Reserve Account, (iv) the right of the Issuer to enforce remedies under certain agreements, (v) all present and future claims, demands, causes and choses in action in respect of the foregoing and (vi) all proceeds of the foregoing as more fully described under "The Issuer and the Co-Issuer—Trust Estate" herein.

The Notes will be issued in minimum denominations of $25,000 and integral multiples of $1.00 in excess thereof. The Notes will be issued in book-entry form through the facilities of DTC. See "Description of the Notes—Book Entry Registration; Delivery and Form" herein.

Payments with respect to the Notes will be made on each Payment Date (to the extent of funds available therefor) by check mailed to the related Noteholders of record on the Record Date at the addresses appearing in the register maintained for Noteholders (the "Note Register") or, in the case of a Noteholder who has so notified the Indenture Trustee in writing in accordance with the Indenture, by wire transfer in immediately available funds to the account of such Noteholder at a bank or other depository institution having appropriate wire transfer facilities.

Notwithstanding the foregoing, the final payment in retirement of the Notes will be made only upon presentation and surrender of such Notes at the office or agency designated by the Indenture Trustee for that purpose, unless the Issuer and the Indenture Trustee agree otherwise.

**Calculation of One-Month LIBOR**

With respect to each Interest Accrual Period, on the second LIBOR Business Day preceding the commencement of such Interest Accrual Period (each such date, a "LIBOR Determination Date"), the Indenture Trustee will determine one-month LIBOR for the next Interest Accrual Period for the Insured Notes on the basis of the "Interest Settlement Rate" for United States dollar deposits of one-month maturity set forth in the British Bankers' Association (the "BBA"), as such rate appears on Reuters Monitor Money Rates Service page "LIBOR01" (as defined below), as of 11:00 a.m. (London time) on such LIBOR Determination Date. With respect to any LIBOR Determination Date, if such Interest Settlement Rate does not appear on Reuters Monitor Money Rates Service page "LIBOR01" as of 11:00 a.m. (London time) on such date or if pages is not available on such date the Indenture Trustee will obtain such rate from Bloomberg L.P. page "BBAM." Alternatively, the Indenture Trustee will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such LIBOR Determination Date two or more Reference Banks provide such offered quotations, one-month LIBOR for the related Interest Accrual Period will be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 0.03125%). If on such LIBOR Determination Date fewer than two Reference Banks provide such offered quotations, one-month LIBOR for the related Interest Accrual Period will be the higher of (x) one-month LIBOR as determined on the previous LIBOR Determination Date and (y) the Reserve Interest Rate (as defined herein).

As used in this section, "LIBOR Business Day" means a day on which banks are open for dealing in foreign currency and exchange in London and New York City; "Reuters Monitor Money Rates Service page "LIBOR01"" means the display page currently so designated on the Reuters Monitor Money Rates Service (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices); "Reference Banks" means leading banks selected by the Indenture Trustee and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) which have been designated as such by the Indenture Trustee and (iii) not controlling, controlled by or under common control with, the Sponsor, the Issuer or the Co-Issuer or any affiliate of the Sponsor, the Issuer or the Co-Issuer; and "Reserve Interest Rate" shall be the rate per annum that the Indenture Trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.03125%) of the one-month United States dollar lending rates which one or more New York City banks selected by the Indenture Trustee are quoting on the relevant LIBOR Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Indenture Trustee can determine no such arithmetic mean, the lowest one-month United States dollar lending rate which one or more New York City banks selected by the Indenture Trustee are quoting on such LIBOR Determination Date to leading European banks.

The establishment of one-month LIBOR on each LIBOR Determination Date by the Indenture Trustee and the Indenture Trustee's calculation of the rate of interest applicable to the Insured Notes for the related Interest Accrual Period will (in the absence of manifest error) be final and binding.

**Transfer and Exchange**

No transfer of a Note shall be made unless such transfer is exempt from, or in accordance with, the registration requirements of the Securities Act and applicable state securities laws. None of the Issuer, the Co-Issuer, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Sponsor or the Initial Purchaser will register the Notes under the Securities Act, qualify the Notes under the securities laws of any state or provide registration rights to any Noteholder. No service charge will be made in connection with any transfer or exchange of Notes, but the Indenture Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

**Book-Entry Registration; Delivery and Form**

The Notes initially will be represented by one or more permanent book-entry certificates in definitive, fully registered form without interest coupons (such certificate or certificates referred to herein as the "Book-Entry Notes"). The Book-Entry Notes will be deposited upon issuance with the Indenture Trustee as custodian for DTC, and registered in the name of DTC or its nominee, for credit to an account of a direct or indirect participant in DTC as described below. Persons acquiring beneficial ownership interests in the Book-Entry Notes will hold such beneficial interests through DTC if they are participants of such system, or indirectly through organizations which are participants in such system. Investors may hold such beneficial interests in the Book-Entry Notes in minimum denominations of $25,000 and in increments of $1.00 in excess thereof. Except as described below, no beneficial owner will be entitled to receive physical notes registered in its, or its nominee's, name ("Definitive Notes") representing the Notes beneficially owned by such beneficial owner. Unless and until Definitive Notes are issued, it is anticipated that the only "Noteholder" of the Notes will be Cede & Co., as nominee of DTC. Beneficial owners will not be "Noteholders" as that term is used in the Indenture. Beneficial owners are only permitted to exercise their rights indirectly through participants through DTC.

The beneficial owner's ownership of an interest in a Book-Entry Note will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary") that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of an interest in such Book-Entry Note will be recorded on the records of DTC (or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC participant).

Beneficial owners will receive all distributions of principal of and interest on the Book-Entry Notes from the Indenture Trustee through DTC and DTC participants. While the Book-Entry Notes are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers among participants on whose behalf it acts with respect to the Book-Entry Notes and is required to receive and transmit distributions of principal of, and interest on, the Book-Entry Notes. Participants and indirect participants with whom beneficial owners have accounts with respect to Book-Entry Notes are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective beneficial owners. Accordingly, although beneficial owners will not possess physical notes representing their respective interests in the Book-Entry Notes, the Rules provide a mechanism by which beneficial owners will receive distributions and will be able to transfer their interests in the Notes. Transfers between participants will occur in accordance with the Rules.

DTC, a New York-chartered limited purpose trust company, performs services for its participants, some of which (and/or their representatives) own DTC. In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the Book-Entry Notes, whether held for its own account or as a nominee for another person. In general, beneficial ownership of Book-Entry Notes will be subject to the Rules, as in effect from time to time.

Distributions on the Book-Entry Notes will be made on each Payment Date by the Indenture Trustee to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners of the Book-Entry Notes that it represents and to each Financial

Intermediary for which it acts as agent. Each such Financial Intermediary will be responsible for disbursing funds to the beneficial owners of the Book-Entry Notes that it represents.

Under a book-entry format, beneficial owners may experience some delay in their receipt of payments, since such payments will be forwarded by the Indenture Trustee to Cede & Co. Because DTC can only act on behalf of Financial Intermediaries, the ability of a beneficial owner to pledge interests in Book-Entry Notes to persons or entities that do not participate in DTC's depository system, or otherwise take actions in respect of such interests in Book-Entry Notes, may be limited. In addition, issuance of the Book-Entry Notes in book-entry form may reduce the liquidity of such Notes in the secondary market since certain potential investors may be unwilling to purchase Notes that are not in the form of, or for which they cannot obtain, Definitive Notes.

Monthly and annual reports on the Issuers will be provided to Cede & Co., as nominee of DTC, and may be made available by Cede & Co. to beneficial owners upon request, in accordance with the Rules, and to the Financial Intermediaries to whose DTC accounts the interests in the Book-Entry Notes of such beneficial owners are credited.

DTC has advised the Issuers and the Indenture Trustee that, unless and until Definitive Notes are issued, DTC will take any action permitted to be taken by the holders of the Book-Entry Notes under the Indenture only at the direction of one or more Financial Intermediaries to whose DTC accounts the interests in the Book-Entry Notes are credited, to the extent that such actions are taken on behalf of Financial Intermediaries whose holdings include interests in such Book-Entry Notes. DTC may take actions, at the direction of the related participants, with respect to some Book-Entry Notes which conflict with actions taken with respect to other Book-Entry Notes.

Definitive Notes will be issued to beneficial owners of the Book-Entry Notes, or their nominees, rather than to DTC, only if (a) DTC or the Issuer advises the Indenture Trustee and the Note Registrar in writing that DTC is no longer willing or able to discharge properly its responsibilities as nominee and depository with respect to the Book-Entry Notes and the Issuers are unable to locate a qualified successor or (b) the Issuer (at the direction of or with the consent of the Note Insurer, but only if an Event of Default has occurred) notifies the Indenture Trustee and DTC of its intent to terminate the book-entry system through DTC and, upon receipt of notice of such intent from DTC, the participants with a position in the Book-Entry Notes agree to initiate such termination.

Upon the occurrence of either of the events described in the immediately preceding paragraph, the Indenture Trustee will be required to notify all beneficial owners of the occurrence of such event and the availability through DTC of Definitive Notes. Upon surrender by DTC of the global note or notes representing the Book-Entry Notes and instructions for re-registration, the Indenture Trustee will issue Definitive Notes, and thereafter the Indenture Trustee will recognize the holders of such Definitive Notes as "Noteholders" under the Indenture.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of interests in the Book-Entry Notes among participants of DTC, DTC is under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

None of the Issuer, the Co-Issuer, the Indenture Trustee, the Co-Issuer, the Note Insurer, the Sponsor or the Initial Purchaser will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the Book-Entry Notes held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

**Available Funds**

The "Available Funds" for any Payment Date are generally equal to (i) the N-1 Available Funds and (ii) the N2/3 Available Funds.

The "N1 Available Funds" for any Payment Date will generally be equal to (i) 50% of all payments and other collections received by the Indenture Trustee on or in respect of the Underlying Certificates on the related Underlying Distribution Date, (ii) any payments received pursuant to the Cap Agreement related to the Class N1 Notes for such Payment Date, (iii) any Class N-1 Insured Payment (other than any Class N-1 Preference Amount) or Note Insurer Optional Deposit (iv) with respect to the first Payment Date, 50% of the amount on deposit in the NIM

Reserve Account and (v) any N2/3 Available Funds remaining on such Payment Date after application of the N2/3 Available Funds as described herein, in each case, deposited in the Note Account, after deduction of any amounts deposited to the Note Account in error.

The "N2/3 Available Funds" for any Payment Date will generally be equal to (i) 50% of all payments and other collections received by the Indenture Trustee on or in respect of the Underlying Certificates on the related Underlying Distribution Date, (ii) with respect to the Class N-3 Notes, (x) any payments received pursuant to the Cap Agreement related to the Class N3 Notes for such Payment Date, and (y) any Class N-3 Insured Payment (other than any Class N-3 Preference Amount) or Note Insurer Optional Deposit, (iii) with respect to the first Payment Date, 50% of the amount on deposit in the NIM Reserve Account and (iv) any N-1 Available Funds remaining on such Payment Date after application of the N-1 Available Funds as described herein, in each case, deposited in the Note Account, after deduction of any amounts deposited to the Note Account in error.

## NIM Reserve Account

On the Closing Date, the Sponsor will cause to be deposited an amount equal to $350,000 into an account (the "NIM Reserve Account" ). The Indenture Trustee will withdraw the amount on deposit in the NIM Reserve Account on the first Payment Date to be made part of Available Funds.

## Payments

Payments on the Underlying Certificates will be made on the 25th day of each month or, if such 25th day is not an Underlying Business Day, on the next succeeding Underlying Business Day following such 25th day (each, an "Underlying Distribution Date").

Payments on the Notes will be made each month on the same day as the related Underlying Distribution Date (each, a "Payment Date"), commencing in May 2007; provided, however, upon the occurrence and continuance of a Note Insurer Default, the Payment Date will be the third Business Day following the Underlying Distribution Date. Payments on the Notes will be made to related Noteholders of record as of the Business Day immediately preceding the relevant Payment Date, so long as such Notes are Book-Entry Notes. With respect to any Definitive Notes, the Record Date will be the last Business Day of the month immediately preceding the month of the relevant Payment Date.

Other than with respect to the related Final Maturity Date or, with respect to the Class N-2 Notes only, the failure to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date, if the Available Funds are insufficient to pay the Interest Distribution Amount and/or any Principal Distribution Amount on any Payment Date prior to the Final Maturity Date for such class of Notes, will not constitute an Event of Default. Thus, if there is no other breach or default in performance by the parties to the transaction agreements, Noteholders will have no remedy against the Issuers or the Trust Estate with respect to any such non-payment until the Final Maturity Date for such class of Notes (or with respect to the Class N-2 Notes only, until any date on or after which the Issuers have failed to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date) and, with respect to the Insured Notes, if a Note Insurer Default shall then have occurred and be continuing.

*Payments on the Notes*

On or before each Payment Date, the Indenture Trustee will be required to determine the Available Funds for such Payment Date. On each Payment Date, the Indenture Trustee will distribute the following amounts from the Available Funds other than the amounts received from the counterparty pursuant to the Cap Agreements. Any Class N-1 Insured Payment and any Note Insurer Optional Deposit made with respect to the Class N-1 Notes on such Payment Date related to interest, will be applied only with respect to payments made pursuant to clause (a)(ii) below; and any Class N-1 Insured Payment and any Note Insurer Optional Deposit made with respect to the Class N-1 Notes on such Payment Date related to principal, will be applied only with respect to payments made pursuant to clause (a)(v) below; and provided, further, any payments received pursuant to the Class N-1 Cap Agreement on such Payment Date will be applied *first*, pursuant to clause (a)(ii) below; *second*, pursuant to clause (a)(v) below,

*third*, pursuant to clauses (a)(i) through (vi) below, *fourth*, pursuant to clauses (c)(i) through (iii), in that order) for such Payment Date.  Any Class N-3 Insured Payment and any Note Insurer Optional Deposit made with respect to the Class N-3 Notes on such Payment Date related to interest, will be applied only with respect to payments made pursuant to clause (b)(iv) below; and any Class N-3 Insured Payment and any Note Insurer Optional Deposit made with respect to the Class N-3 Notes on such Payment Date related to principal, will be applied only with respect to payments made pursuant to clause (b)(vii) below; and provided, further, any payments received pursuant to the Class N-3 Cap Agreement on such Payment Date will be applied *first*, pursuant to clause (b)(iv) below; *second*, pursuant to clause (b)(vii) below, *third*, pursuant to clauses (b)(i) through (viii) below and *fourth*, pursuant to clauses (c)(i) through (iii) below, in that order) for such Payment Date.

(a)    The N-1 Available Funds will be paid as follows:

(i)    first, for any Payment Date on or after the Payment Date in May 2007, to the Administrator, the Issuer or the Co-Issuer (or any Person designated by them), as applicable, the Administrative Expenses not previously paid, and second, for any Payment Date to the Indenture Trustee and the Co-Trustee any Extraordinary Expenses not previously paid, *pro rata*, based on their entitlements, in each case, multiplied by the NIM Allocation Percentage, provided, that, payments pursuant to this clause (a)(i) shall not to exceed $300,000 in the aggregate for all Payment Dates (taking into account all payments made pursuant to clause (b)(i) below for all Payment Dates);

(ii)    to the holders of the Class N-1 Notes, the related Interest Distribution Amount for such Payment Date;

(iii)    to the Co-Trustee, for payment to the Note Insurer, the Class N-1 Insurer Premium for such Payment Date;

(iv)    to the Co-Trustee, for payment to the Note Insurer, any Class N-1 Reimbursement Amounts, with such amounts allocated first, to interest on any Note Insurer Optional Deposit, second, to reimbursement of any Note Insurer Optional Deposit, third, to interest on any other Class N-1 Reimbursement Amounts and fourth, to reimbursement of any other Class N-1 Reimbursement Amounts;

(v)    to the holders of the Class N-1 Notes, the Principal Distribution Amount for such Payment Date, if any, until the related Aggregate Note Balance thereof has been reduced to zero; and

(vi)    any remaining N-1 Available Funds will be paid pursuant to clause (b) below after application of the N2/3 Available Funds for such Payment Date.

(b)    The N2/3 Available Funds will be paid as follows:

(i)    first, for any Payment Date on or after the Payment Date in May 2007, to the Administrator, the Issuer or the Co-Issuer (or any Person designated by them), as applicable, the Administrative Expenses not previously paid, and second, for any Payment Date to the Indenture Trustee and the Co-Trustee any Extraordinary Expenses not previously paid, *pro rata*, based on their entitlements, in each case, multiplied by the NIM Allocation Percentage, provided, that, payments pursuant to this clause (a)(i) shall not to exceed $300,000 in the aggregate for all Payment Dates (taking into account all payments made pursuant to clause (b)(i) below for all Payment Dates);

(ii)    to the Co-Trustee, for payment to the Note Insurer, the Class N-3 Insurer Premium for such Payment Date;

(iii)    to the holders of the Class N-2 Notes, the related Interest Distribution Amount for such Payment Date;

(iv)    to the holders of the Class N-3 Notes, the related Interest Distribution Amount for such Payment Date;

(v)    to the holders of the Class N-2 Notes, the Principal Distribution Amount for such Payment Date, if any, until the related Aggregate Note Balance thereof has been reduced to zero;

(vi)    to the Co-Trustee, for payment to the Note Insurer, any Class N-3 Reimbursement Amounts, with such amounts allocated first, to interest on any Note Insurer Optional Deposit, second, to reimbursement of any Note Insurer Optional Deposit, third, to interest on any other Class N-3 Reimbursement Amounts and fourth, to reimbursement of any other Class N-3 Reimbursement Amounts;

(vii)    to the holders of the Class N-3 Notes, the Principal Distribution Amount for such Payment Date, if any, until the related Aggregate Note Balance thereof has been reduced to zero;

(viii)    any remaining N2/3 Available Funds will be paid pursuant to clause (a) above after application of the N-1 Available Funds for such Payment Date.

(c)    Any Available Funds remaining after payments are made pursuant to clauses (a) and (b) above will be paid as follows:

(i)    on behalf of the Issuers, to pay any taxes, assessments and governmental charges levied upon the Issuers or upon the income, profits or property of the Issuers, or shown due on any tax returns filed by the Issuers;

(ii)    first, to the Administrator, the Issuer and the Co-Issuer (or any Person designated by them) any amounts in respect of Administrative Expenses incurred in excess of the limit set forth in the definition of Administrative Expenses and second, to the Indenture Trustee any amounts in respect of Extraordinary Expenses incurred in excess of $300,000; and

(iii)    to the Issuer or to its order.

Available Funds consisting of payments under the Cap Agreements will be distributed on any Payment Date after distribution of all other Available Funds other than any Class N-1 Insured Payments, Class N-3 Insured Payments and Note Insurer Optional Deposits on such Payment Date.

The receipt of any Class N-1 Insured Payment or Class N-3 Insured Payment under the related Note Policy or Note Insurer Optional Deposit under the Indenture will not constitute a reduction of any unpaid amount of principal of or interest on the Insured Notes outstanding under the Indenture or otherwise discharge any obligation whatsoever of the Issuer or the Co-Issuer under such Insured Notes or the Indenture, except that, for purposes of calculating payments to the holders of the Insured Notes as described above (but not for purposes of determining subrogation rights of the Note Insurer) such Class N-1 Insured Payment, Class N-3 Insured Payment or Note Insurer Optional Deposit will be taken into account.  In addition, receipt of any amount sufficient to pay and discharge indebtedness on any Outstanding class of Notes will not be sufficient to satisfy and discharge the Indenture, and the Insured Notes will remain Outstanding, so long as the Note Insurer has not been paid any premium required to be paid to it, or the Note Insurer has paid any Class N-1 Insured Payment, Class N-3 Insured Payment or Note Insurer Optional Deposit and such payment has not been reimbursed in full.  The Insured Notes will not be deemed to have been paid in full and retired and all rights of the Note Insurer will be preserved and maintained as long as the Note Insurer is owed any amount under any of the Operative Agreements.

The "Administrative Expenses" means (a) amounts due and accrued pursuant to the Administration Agreement, (b) amounts due and accrued pursuant to the Management Agreement and (c) without duplication, amounts owed by the Issuer or the Co-Issuer in respect of any governmental fee, charge or tax (including annual return fees, license or franchise fees and registered office fees) up to a limit of $40,000 in any calendar year, but subject to a limit of $10,000 in any calendar year with respect to (i) annual payments payable under the Administration Agreement and (ii) annual return fees, filing and registration fees owed by the Issuer or the Co-Issuer under (c) above.

The "Extraordinary Expenses" means any (i) amounts constituting indemnification for the Indenture Trustee or the Co-Trustee, (ii) amounts payable from the Note Account in respect of taxes, and any other costs, expenses and liabilities (exclusive of fees to the Indenture Trustee and the Co-Trustee) that are required to be borne by the Trust Estate in accordance with applicable law or the terms of the Indenture (including, without limitation, the cost of various opinions of and advice from counsel required to be obtained in connection with the Indenture Trustee's or the Co-Trustee's performance of its duties under the Indenture) and (iii) out-of-pocket expenses incurred by the Indenture Trustee if it performs (or hires agents, attorneys, accountants, independent contractors or auditors to perform) the administrative duties of WMB under the Co-Administration Agreement; provided, however, that Extraordinary Expenses shall not include expenses payable or paid by the Underlying Trust Fund to the Indenture Trustee in its capacity as trustee with respect to the Underlying Trust Fund.

Each of the Indenture Trustee and the Co-Trustee is entitled to receive payments or reimbursements, as provided herein under "—Payments," for any Extraordinary Expenses, up to a limit of $300,000 in the aggregate incurred during the period from the Closing Date until the Indenture has been discharged, which limit is applicable to the combined Extraordinary Expenses of the Indenture Trustee and the Co-Trustee; provided, however, that the Indenture Trustee and the Co-Trustee will not have any obligation to incur additional Extraordinary Expenses in excess of such aggregate limit unless it has received reasonable security or indemnity for such additional Extraordinary Expenses. Neither the Indenture Trustee nor the Co-Trustee will be responsible to Noteholders for any consequences resulting from any failure of the Indenture Trustee or the Co-Trustee to incur any Extraordinary Expenses in excess of the aforementioned aggregate limit.

The "Interest Accrual Period" means, for the first Payment Date, the period beginning on the Closing Date and ending on the day prior to such Payment Date and, for any subsequent Payment Date, the period beginning with the previous Payment Date and ending on the day prior to such Payment Date. For each Payment Date (other than the first Payment Date) and the Class N-2 Notes, interest will be calculated on the basis of 30 days in the Interest Accrual Period (regardless of the actual number of days in such Interest Accrual Period), based on a 360-day year. For each Payment Date and the Insured Notes, interest will be calculated on the basis of the actual number of days in the Interest Accrual Period, based on a 360-day year. The first Interest Accrual Period will be 29 days.

The "Interest Distribution Amount" means, for any Payment Date and each class of Notes, an amount equal to interest accrued during the related Interest Accrual Period on the outstanding Aggregate Note Balance of such class of Notes at the related Note Rate for such Payment Date, plus any Interest Shortfall for such class of Notes with respect to such Payment Date.

The "Interest Shortfall" means, with respect to each class of Notes and (i) the first Payment Date, zero and (ii) any Payment Date after the first Payment Date, an amount equal to the excess, if any, of the Interest Distribution Amount for such class of Notes for the immediately preceding Payment Date over the amount of interest actually received on such class of Notes for such immediately preceding Payment Date (together with interest at the related Note Rate on such unpaid Interest Shortfall for the most recently ended Interest Accrual Period).

The "NIM Allocation Percentage" means a fraction, expressed as a percentage, the numerator of which is equal to the N-1 Available Funds or the N2/3 Available Funds, as applicable, for such Payment Date and the denominator of which is equal to the Available Funds for such Payment Date, in each case, prior to any payments of such amounts for such Payment Date.

The "Principal Distribution Amount" means, for any Payment Date and each class of Notes, the lesser of (i) the outstanding Aggregate Note Balance of such class of Notes immediately prior to such Payment Date and (ii) (A) in the case of the Class N-1 Notes, the sum of (x) any Available Funds remaining after distributions made pursuant to clauses (a)(i) through (iv) in "—*Payments on the Notes*" above and (y) without duplication, in the case of any Payment Date (A) with respect to which there is a Note Insurer Optional Deposit or the Final Maturity Date with respect to the Class N-1 Notes, the portion of any Class N-1 Insured Payment or Note Insurer Optional Deposit allocable to the Aggregate Note Balance of the Class N-1 Notes and (B) with respect to which there is a payment pursuant to the Class N-1 Cap Agreement, any such payment remaining unpaid after distributions pursuant to clause (a)(iv) in "—*Payments on the Notes*" above, (B) in the case of the Class N-2 Notes, the sum of (x) any Available Funds remaining after distributions made pursuant to clauses (b)(i) through (iv) in "—*Payments on the Notes*" above and (C) in the case of the Class N-3 Notes, the sum of (x) any Available Funds remaining after distributions made

pursuant to clauses (b)(i) through (vi) in "—*Payments on the Notes*" above and (y) without duplication, in the case of any Payment Date (A) with respect to which there is a Note Insurer Optional Deposit or the Final Maturity Date with respect to the Class N-3 Notes, the portion of any Class N-3 Insured Payment or Note Insurer Optional Deposit allocable to the Aggregate Note Balance of the Class N-3 Notes and (B) with respect to which there is a payment pursuant to the N-3 Cap Agreement, any such payment remaining unpaid after distributions pursuant to clause (b)(vi) in "—*Payments on the Notes*" above.

Prior to 10:00 a.m., Philadelphia time, on the second Business Day preceding each Payment Date the Indenture Trustee, based solely upon the information provided by the Servicer and the Trustee for the Underlying Transaction, is required to determine whether there will be a Class N-1 Insured Payment or a Class N-3 Insured Payment (other than any Class N-1 Preference Amount or Class N-3 Preference Amount) payable on such Payment Date. If the Indenture Trustee determines that there will be a Class N-1 Insured Payment or a Class N-3 Insured Payment (other than any Class N-1 Preference Amount or Class N-3 Preference Amount) payable on such Payment Date, the Indenture Trustee is required to complete the notice in the form set forth as Exhibit A to each Note Policy (the "Note Insurer Notice") and submit such Note Insurer Notice in accordance with the related Note Policy to the Co-Trustee who will in turn submit the Note Insurer Notice to the Note Insurer no later than 12:00 noon, Philadelphia time, on such second Business Day preceding such Payment Date, as a claim for a Class N-1 Insured Payment or a Class N-3 Insured Payment (other than any Class N-1 Preference Amount or Class N-3 Preference Amount). The Note Insurer will be required to remit or cause to be remitted to the Co-Trustee such Class N-1 Insured Payment or Class N-3 Insured Payment (other than any Class N-1 Preference Amount or Class N-3 Preference Amount) in accordance with the terms of the related Note Policy and the Co-Trustee will remit such amounts to the Indenture Trustee.

**Cap Agreement**

The Class N-1 Notes will be entitled to the benefits of the Class N-1 Cap Agreement and payments thereon, if any, deposited with the Indenture Trustee and the Class N-3 Notes will be entitled to the benefits of the Class N-3 Cap Agreement and payments thereon, if any, deposited with the Indenture Trustee (each a "Cap Agreement" and together the "Cap Agreements" ).

In general, the counterparty to the Cap Agreements will be obligated to pay the Indenture Trustee an amount equal to the greater of (i) the product of (A) one-month LIBOR minus 6.000%, (B) the related notional amount for such Payment Date and (C) a fraction, the numerator of which is the actual number of days elapsed from the prior Payment Date to but excluding the current Payment Date, and the denominator of which is 360 and (ii) zero. For the terms and conditions of each Cap Agreement and information about when and in what amounts the counterparty thereunder may be required to make payments to the Indenture Trustee, investors should review the Cap Agreement in its entirety, the form of which is attached hereto as Exhibit 11. There can be no assurance as to the extent of benefits, if any, that may be realized by the holders of the Insured Notes as a result of the Cap Agreements.

*The Counterparty*

Bear Stearns Financial Products Inc. ("BSFP") will be the Counterparty. BSFP, a Delaware corporation, is a bankruptcy remote derivatives product company based in New York, New York that has been established as a wholly owned subsidiary of The Bear Stearns Companies, Inc. BSFP engages in a wide array of over-the-counter interest rate, currency, and equity derivatives, typically with counterparties who require a highly rated derivative provider. As of the dates of this Prospectus, BSFP has a ratings classification of "AAA" from Standard & Poor's and "Aaa" from Moody's Investors Service. BSFP will provide upon request, without charge, to each person to whom this prospectus supplement is delivered, a copy of (i) the ratings analysis from each of Standard & Poor's and Moody's Investors Service evidencing those respective ratings or (ii) the most recent audited annual financial statements of BSFP. Request for information should be directed to the DPC Manager of Bear Stearns Financial Products Inc. at (212) 272-4009 or in writing at 383 Madison Avenue, 36th Floor, New York, New York 10179. BSFP is an affiliate of Bear, Stearns & Co. Inc.

The information contained in the preceding paragraph has been provided by BSFP for use in this prospectus supplement. BSFP has not been involved in the preparation of, and does not accept responsibility for, this prospectus supplement as a whole or the accompanying prospectus.

**Underlying Swap Agreement**

The Underlying Trust Fund has entered into the Underlying Swap Agreement with the Underlying Counterparty. Under the Underlying Swap Agreement, beginning on the Underlying Distribution Date in June 2007, on each Underlying Distribution Date until the Underlying Distribution Date in April 2012, the Underlying Trust Fund will be obligated to pay to the Underlying Counterparty an amount equal to the product of (a) 4.760%, (b) a Swap Notional Amount for that Underlying Distribution Date and (c) a fraction, the numerator of which is 30 and the denominator of which is 360, and the Underlying Counterparty will be obligated to pay to the Underlying Trust Fund an amount equal to the product of (x) one-month LIBOR, (y) the Swap Notional Amount for that Underlying Distribution Date, and (z) a fraction, the numerator of which is 30 and the denominator of which is 360. A Net Swap Payment will be required to be made on each Underlying Distribution Date by the Underlying Trust Fund to the Underlying Counterparty, to the extent that the fixed amount exceeds the corresponding floating amount. A Net Counterparty Payment will be required to be made by the Underlying Counterparty to the Underlying Trust Fund, to the extent that the floating amount exceeds the corresponding fixed amount.

The "Swap Notional Amount" is set forth with respect to each Underlying Distribution Date on Annex I to the Prospectus Supplement. The Swap Notional Amount for the Underlying Distribution Date in June 2007 is $1,253,344,121. The Underlying Swap Agreement will terminate immediately following the Underlying Distribution Date in April 2012 unless terminated earlier as described in the Prospectus Supplement under "Description of the Certificates—The Swap Agreement."

It is intended that payments pursuant to the Underlying Swap Agreement provide limited protection against upward movements in one-month LIBOR and reduce the basis risk to the Senior Certificates associated with the Underlying Trust Fund's investment in certain hybrid delayed adjustment date adjustable rate mortgage loans and fixed rate mortgage loans. See "The Mortgage Pool" in the Prospectus Supplement. Any Net Counterparty Payment and Swap Termination Payment made to the Underlying Trust Fund under the Underlying Swap Agreement by the Underlying Counterparty allocable to the Senior Certificates are first applied to maintain overcollateralization, pay interest shortfalls and repay losses before any such amounts are paid to the Underlying Class C Certificate.

For the terms and conditions of the Underlying Swap Agreement and information about when and in what amounts the Underlying Counterparty may be required to make payments to the Underlying Trust Fund and to the Underlying Class C Certificate, investors should review the Underlying Swap Agreement in its entirety, the form of which is attached hereto as Exhibit 7. There can be no assurance as to the extent of benefits, if any, that may be realized by the holders of the Notes as a result of the Underlying Swap Agreement.

**Reports to Noteholders and Others**

On each Payment Date, the Indenture Trustee will provide or make available a statement to each Noteholder in the form required by the Indenture, setting forth the following information:

(a)    the amount of any payment on such Payment Date allocable to accrued interest on each class of Notes;

(b)    the amount of any payment on such Payment Date allocable to principal on each class of Notes;

(c)    amounts paid pursuant to the Cap Agreement for such Payment Date and any amount so required to be paid but which was not paid;

(d)    the Note Balance of each Note after giving effect to payments allocable to principal, if any, on such Payment Date;

(e)       the Interest Shortfall for such Payment Date with respect to each class of Notes;

(f)       the amount of any portion of the amounts described in clauses (a) and (b) above consisting of a Class N-1 Insured Payment (other than any Class N-1 Preference Amount) or Class N-3 Insured Payment (other than any Class N-3 Preference Amount);

(g)       the amount of Class N-1 Insurer Premiums and Class N-1 Reimbursement Amounts payable on such Payment Date to the Note Insurer before and after distributions of N-1 Available Funds and the amount of Class N-3 Insurer Premiums and Class N-3 Reimbursement Amounts payable on such Payment Date to the Note Insurer before and after distributions of N2/3 Available Funds;

(h)       the amount of any Class N-1 Deficiency Amount and Class N-3 Deficiency Amount for such Payment Date, in each case, separately setting forth the amounts identified in clauses (i) and (ii) of the definition thereof;

(i)       the amount of any Note Insurer Optional Deposits included in the Available Funds for such Payment Date;

(j)       a copy of the report to holders of the Underlying Certificates made on the related Underlying Distribution Date; and

(k)       the aggregate amount of Administrative Expenses and Extraordinary Expenses.

The Indenture Trustee will make the monthly statement to Noteholders (and, at its option, any additional files containing the same information in an alternative format) available each month to any interested parties via the Indenture Trustee's website. The Indenture Trustee's website will be located at http://www.sf.citidirect.com. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling 1 800 422-2066. The Indenture Trustee has the right to change the way the monthly statements to Noteholders are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Indenture Trustee is required to provide timely and adequate notification to all above parties regarding any such changes.

In addition, within 60 days after the end of each calendar year, the Indenture Trustee will make available to each person (upon the written request of such person) who was a Noteholder of record at any time during such calendar year sufficient information regarding payments made on the Notes for such calendar year or, in the event such person was a Noteholder of record during a portion of such calendar year, for the applicable portion of such year, and (ii) such other customary information as may be deemed necessary to enable such Noteholders to prepare their tax returns. The Indenture Trustee's obligation to deliver the reports specified in (i) and (ii) will be deemed satisfied to the extent it provides substantially similar information pursuant to relevant provisions of the Code.

**Optional Redemption**

The Issuers will not be permitted to redeem the Notes. However, subject to certain conditions set forth in the Indenture, the Note Insurer will have the right but not the obligation to cause the Insured Notes to be redeemed, in whole or in part, on or after the Payment Date in April 2009 if (a) prior to such Payment Date, the Note Insurer has made payments of claims under the related Note Policy and such amounts or certain other amounts due the Note Insurer have not been reimbursed or paid to the Note Insurer as of such Payment Date or (b) on or after such Payment Date, any claim is made on a Note Policy or certain other amounts have become due the Note Insurer and have not been reimbursed or paid to the Note Insurer as of such Payment Date. Such redemption of the Insured Notes will be effected by the Note Insurer through payment of an amount (the "Note Insurer Optional Deposit") to the Co-Trustee for deposit into the Note Account in the amount equal to the portion of the Aggregate Note Balance of the Insured Notes to be redeemed plus all accrued and unpaid interest on such portion of the Aggregate Note Balance of the Insured Notes to be redeemed, which will be applied by the Indenture Trustee to pay the Insured Notes.

Further, WMB as Servicer is entitled, subject to certain conditions as described in "Description of the Certificates—Optional Termination of the Trust" in the Prospectus Supplement to exercise the Clean-Up Call. If the Servicer does not exercise the Clean-Up Call, the Note Insurer may exercise the Clean-Up Call. The amount received by the Underlying Trust Fund upon the purchase of the Mortgage Loans pursuant to the Clean-Up Call is required to result in distributions on the Underlying Class C Certificate sufficient to satisfy the payment terms of the Notes and to pay any and all amounts due the Note Insurer under the Indenture and the Insurance Agreement. The Servicer is entitled to exercise the Clean-Up Call only if the Note Insurer consents to such exercise.

In addition, the holder of the Subordinate Note (other than WMB or any of its affiliates) (or, if the holder of the Subordinate Note does not exercise such right, the Note Insurer) has the option to purchase from the Underlying Trust Fund any Mortgage Loan which is 90 days or more in default. However, each of the holder of the Subordinate Note and the Note Insurer must first purchase the Mortgage Loan that, as of the time of such purchase, has been in default for the longest period before purchasing any Mortgage Loans that have been in default for shorter periods. Neither the holder of the Subordinate Note nor the Note Insurer will be subject to the servicing requirements of the Underlying Pooling and Servicing Agreement in exercising its right to purchase Mortgage Loans which are 90 or more days in default.

### Final Maturity of the Notes

The final maturity date (the "Final Maturity Date") of (i) the Class N-2 Notes is the Payment Date occurring in April 2047 and (ii) the Insured Notes is the Payment Date occurring in April 2012. Failure to pay all accrued interest on and all principal of a class of Notes in full by its Final Maturity Date will constitute an Event of Default under the Indenture, permitting the Indenture Trustee, at the direction of the Note Insurer, if applicable, with respect to the Insured Notes, or as otherwise provided in the Indenture, to accelerate the applicable Notes and liquidate the Trust Estate. The Notes may be paid in full prior to their Final Maturity Dates as described herein.

### Definitions

The "Accelerated Default Date" means the Payment Date in April 2012.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions (i) in the State of New York, (ii) in the city in which the corporate trust office of the Indenture Trustee is located or (iii) in the Cayman Islands (to the extent an action is required by the Issuer that has not been delegated to the Indenture Trustee or any agent of the Issuer located outside the Cayman Islands) are authorized or obligated by law, executive order or government decree to be closed.

The "Controlling Party": As of any date of determination: (i) the Note Insurer, so long as an Insurer Default is not continuing; or (ii) the Noteholders representing more than 50% of the Aggregate Note Balance (unless a lower or higher percentage of Noteholders is expressly permitted or required to authorize the related action hereunder, in which case such lower or higher percentage), so long as an Insurer Default has occurred and is continuing.

"Operative Agreements": The Indenture, the Administration Agreement, the Co-Administration Agreement, the Certificate Purchase Agreement, the Cap Agreement, the Insurance Agreement, each Note Policy, the Optional Termination Side Letter, the Note Purchase Agreement, the Mortgage Loan Purchase Agreement and the Underlying Pooling and Servicing Agreement.

"Optional Termination Side Letter": The letter agreement dated the Closing Date from WMB to the Note Insurer and Citibank, N.A., as trustee under the Underlying Pooling and Servicing Agreement.

"Outstanding": When used with respect to the Notes, means, as of the date of determination, any Note theretofore authenticated and delivered under the Indenture, except:

(i)      Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation (other than any Note as to which any amount that has become due and payable in respect

thereof has not been paid in full and any other Class N-3 Note as to which (i) the Note Insurer has paid a Class N-3 Insured Payment, Note Insurer Optional Deposit or any other amount under the Indenture, the related Note Policy, the Insurance Agreement or any other Operative Agreement and has not been reimbursed in full therefor or (ii) the Note Insurer has not been paid all Class N-3 Insurer Premiums and Class N-3 Reimbursement Amounts under any such agreement); and

        (ii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture, other than any such Notes in respect of which there shall have been presented to the Note Registrar proof satisfactory to it that such Notes are held by a bona fide purchaser in whose hands such Notes are valid obligations of the Issuer.

"Underlying Business Day":  "Business Day," as defined in the Underlying Pooling and Servicing Agreement.

## THE ISSUER AND THE CO-ISSUER

**General**

The Issuer, a Cayman Islands exempted company with limited liability, was incorporated on April 17, 2007 under the Companies Law (2004 Revision) of the Cayman Islands.  The registered office of the Issuer is at the offices of Deutsche Bank (Cayman) Limited, P.O. Box 1984, George Town, Grand Cayman KY1-1104, Cayman Islands.  The Issuer has no prior operating history or prior business and will not have any substantial assets other than the Trust Estate and will not have any substantial liabilities other than in connection with the Notes.  The Issuer will not publish any financial statements nor will it appoint any auditors.

The authorized share capital of the Issuer is US $50,000 divided into 50,000 ordinary shares of US $1.00 each, 250 of which will be issued.  As of the Closing Date, all of the issued ordinary shares (the "Ordinary Shares") will be fully-paid and will be held by Deutsche Bank (Cayman) Limited as share trustee (the "Share Trustee") under the terms of a declaration of trust (the "Declaration of Trust") under which the Share Trustee holds the Ordinary Shares in trust until the Termination Date (as defined in the Declaration of Trust) and may only dispose or otherwise deal with the Ordinary Shares with the approval of the Indenture Trustee for so long as there are Notes or subordinated notes outstanding.  Prior to the Termination Date, the trust is an accumulation trust, but the Share Trustee has power with the consent of the Indenture Trustee, to make distributions for the benefit of the Noteholders or Qualified Charities (as defined in the Declaration of Trust).  It is not anticipated that any distribution will be made while any Note is outstanding.  Following the Termination Date, the Share Trustee will wind up the trust and make a final distribution to charity.  The Share Trustee has no beneficial interest in, and derives no benefit (other than its fees for acting as Share Trustee) from, its holding of the Ordinary Shares.

The Co-Issuer was organized as a limited liability company on April 24, 2007 in the State of Delaware.  The registered office of the Co-Issuer is located at 2711 Centerville Road, Wilmington, Delaware 19808.  The Co-Issuer has no prior operating history and will not own or hold any assets other than its initial capitalization of $250.

Pursuant to the Co-Administration Agreement, the Co-Administrators have agreed to perform certain administrative duties for the Issuer and the Co-Issuer under the Indenture.  In consideration of the foregoing, the Co-Administrators will receive various fees and other charges payable in accordance with the terms of the Indenture.

The Notes are obligations only of the Issuer and the Co-Issuer and the Notes are not obligations of the Indenture Trustee, the Co-Trustee, the Sponsor, the Administrator, the Co-Administrators, the Note Insurer or the Initial Purchaser or any of their officers or directors, partners, members or security holders or their respective affiliates or any of their officers and directors, or any officers or directors of the Issuers.

**Business**

The Indenture will provide that the Issuers will not undertake any business other than (i) the issuance of the Notes and their equity interests, (ii) in the case of the Issuer only, the acquisition and management of the Trust

Estate, and (iii) other related transactions.  Neither of the Issuers will have any subsidiaries (except that the Co-Issuer will be a subsidiary of the Issuer).

Deutsche Bank (Cayman) Limited (the "Administrator"), a licensed trust company incorporated in the Cayman Islands, will act as the local administrator of the Issuer.  The office of the Administrator will serve as the general business office of the Issuer.  Through this office and pursuant to the terms of  the Administration Agreement by and between the Administrator and the Issuer, the Administrator will provide administrative services to, and perform various management functions on behalf of, the Issuer, including the provision of persons to act as directors of the Issuer, communications with shareholders and the general public, and the provision of certain clerical, administrative and other services until termination of the Administration Agreement.  In consideration of the foregoing, the Administrator will receive various fees and other charges payable by the Issuer at rates agreed upon from time to time plus expenses.  Such fees and expenses will constitute Administrative Expenses.

The Administrator will be subject to the overview of the Issuer's Board of Directors.  The Administration Agreement may be terminated by either the Issuer or the Administrator upon 14 days' written notice following the occurrence of certain events.  In addition, either the Issuer or the Administrator may terminate the Administration Agreement at any time by giving at least three (3) months' notice in writing to the other party.

The Administrator's principal office is located at P.O. Box 1984, George Town, Grand Cayman KY1-1104, Cayman Islands.

## Directors

The directors of the Issuer are Gwen Pineau, David Dyer, Alan Corkish and Simon Wetherell, each of whom is a director, officer and/or employee of Deutsche Bank (Cayman) Limited.

The director of the Co-Issuer is Mr. Donald Puglisi.

## Trust Estate

The Issuer will pledge pursuant to the Indenture the Trust Estate (other than the Cap Agreement which the Indenture Trustee will enter into, not in its individual capacity but solely on behalf of the Trust Estate, at the direction of the Issuer pursuant to the Indenture and for the benefit of the Trust Estate) to secure the payments on the Notes.  The Trust Estate will consist of all right, title and interest in and to (i) the Underlying Certificates and all distributions due and made thereon after the Closing Date, (ii) the Cap Agreements and all payments received pursuant to the Cap Agreement, (iii) the Note Account and the NIM Reserve Account and all amounts deposited therein from time to time, (iv) the right of the Issuer to enforce remedies against the Administrator under the Administration Agreement (provided that the Issuer retains the right to give instructions and directions to the Administrator thereunder) and against the Co-Administrators under the Co-Administration Agreement (provided that the Issuer retains the right to give instructions and directions to the Co-Administrators thereunder) and against the Sponsor under the Certificate Purchase Agreement, (v) all present and future claims, demands, causes and choses in action in respect of the foregoing and (vi) all investments of any of those amounts and all proceeds of the foregoing of every kind and nature whatsoever, including, without limitation, all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property that at any time constitute all or part of or are included in the proceeds of the foregoing ((i)-(vi), collectively, the "Trust Estate").

## SPONSOR

*The following information has been supplied by the Sponsor for inclusion in this memorandum and has not been independently verified by the Issuers, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Initial Purchaser or any of their respective affiliates.  None of the Issuers, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Initial Purchaser or any of their respective affiliates assume any responsibility for the accuracy, completeness or applicability of such information.*

The Sponsor, WM Asset Holdings Corp., is incorporated in the State of Delaware and is a wholly owned special purpose subsidiary of WMB. The Sponsor was organized for the purpose of acquiring, holding and securitizing mortgage loans and mortgage securities. The Sponsor maintains its registered office in the State of Delaware at Corporation Trust Center, 1209 Orange Street in the City of Wilmington, County of New Castle.

## THE SELLER AND THE SERVICER

*The following information has been supplied by the Seller for inclusion in this memorandum and has not been independently verified by the Issuers, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Initial Purchaser or any of their respective affiliates. None of the Issuers, the Co-Trustee, the Note Insurer, the Indenture Trustee, the Initial Purchaser or any of their respective affiliates assume any responsibility for the accuracy, completeness or applicability of such information.*

WMB is the originator or the purchaser of the Mortgage Loans and the seller of the Mortgage Loans, indirectly, to the Underlying Trust Fund. WMB is also the servicer with respect to the Mortgage Loans for the Underlying Trust Fund (in such capacity, the "Servicer"). For descriptions of WMB, see "The Sponsor" and "The Servicers—The Servicer" in the Prospectus Supplement. WMB is an indirect, wholly owned subsidiary of Washington Mutual, Inc.

## THE INDENTURE TRUSTEE AND THE CO-TRUSTEE

**General**

Citibank, N.A. will act as Indenture Trustee under the Indenture. The Indenture Trustee may have normal banking relationships with the Sponsor and/or its affiliates. As compensation for its duties under the Indenture, the Indenture Trustee will be paid a fee, at no expense to the Trust Estate, according to a letter agreement between the Indenture Trustee and WMB.

**Resignation and Removal of the Indenture Trustee**

The Indenture Trustee may resign at any time, in which event the Issuers will be obligated to appoint a successor indenture trustee as set forth in the Indenture. Notice of resignation under the Indenture shall also constitute notice of resignation as a Co-Administrator under the Co-Administration Agreement. The Indenture Trustee may be removed at any time, with or without cause by the Note Insurer or, if an Insurer Default has occurred and is continuing, by the Noteholders representing more than 50% of the Aggregate Note Balances of all Outstanding Notes. The Indenture Trustee may be removed at any time by the Issuers with the consent of the Note Insurer for any material breach of the Indenture Trustee's obligations under the Indenture or any material breach of the obligations of the Indenture Trustee in its capacity as a Co-Administrator under the Co-Administration Agreement. The Issuers may, with the consent of the Note Insurer, remove the Indenture Trustee if the Indenture Trustee ceases to be eligible to continue as such under the Indenture or if the Indenture Trustee becomes insolvent. If the Issuers remove the Indenture Trustee, the Issuers will be obligated to appoint a successor Indenture Trustee as directed by the Note Insurer. Any resignation or removal of the Indenture Trustee and appointment of a successor Indenture Trustee will not become effective until acceptance of the appointment by the successor Indenture Trustee.

**Co-Trustees and Separate Indenture Trustees**

For the purpose of meeting the legal requirements of certain local jurisdictions, the Indenture Trustee will have the power to appoint co-trustees or separate trustees acceptable to the Note Insurer of all or any part of the Trust Estate. In the event of such appointment, all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee by the Issuers shall be conferred or imposed upon the Indenture Trustee and each such separate trustee or co-trustee jointly or, in any jurisdiction in which the Indenture Trustee shall be incompetent or unqualified to perform certain acts, singly upon such separate trustee or co-trustee who shall exercise and perform such rights, powers, duties and obligations solely at the directions of the Indenture Trustee. The Indenture Trustee may also appoint agents to perform any of the responsibilities of the Indenture Trustee which agents shall have all of

the rights, powers, duties and obligations of the Indenture Trustee conferred on them by such appointment; provided that the Indenture Trustee shall continue to be responsible for its duties and obligations under the Indenture.

On the Closing Date, the Indenture Trustee will appoint, as directed by the Issuer, U.S. Bank National Association as the Co-Trustee. The Co-Trustee may have normal banking relationships with the Sponsor and/or its affiliates. As compensation for its duties under the Indenture, the Co-Trustee will have been paid a one-time fee on or prior to the Closing Date and will be paid an annual fee by WMB pursuant to a letter agreement between the Co-Trustee and WMB.

The Co-Trustee shall make claims under each Note Policy at the direction of the Indenture Trustee and will be responsible for accepting and forwarding any Class N-3 Insured Payments and any Note Insurer Optional Deposits from the Note Insurer.

**Indemnification**

The Indenture Trustee and the Co-Trustee and any director, officer, employee, agent or affiliate of the Indenture Trustee and the Co-Trustee, respectively, will be entitled to indemnification as provided in clause (i) in "Description of the Notes—Payments—Payments on the Notes" (subject to an aggregate limit of $300,000 on the amount of all Extraordinary Expenses for which the Indenture Trustee and the Co-Trustee may be reimbursed) and as provided in clause (ix) in "Description of the Notes—Payments—Payments on the Notes" for any loss, liability, expense or disbursement (including, without limitation, costs and expenses of litigation, and of investigation, counsel fees, damages, judgments and amounts paid in settlement but not including expenses, disbursements and advancements incurred or made by the Indenture Trustee or the Co-Trustee, as applicable, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Indenture Trustee's or the Co-Trustee's performance in accordance with the provisions of the Indenture, the Co-Administration Agreement, the Underlying Certificates, the Cap Agreement or the Notes) incurred in connection with any act or omission on the part of the Indenture Trustee or the Co-Trustee, as applicable, with respect to the Indenture, the Co-Administration Agreement, the Underlying Certificates, the Cap Agreement or the Notes (other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence of the Indenture Trustee or the Co-Trustee, as applicable, in the performance of its duties under the Indenture, or as may arise from a breach of any representation or warranty of the Indenture Trustee or the Co-Trustee, as applicable, set forth in the Indenture).

With respect to any third party claim: (i) the Indenture Trustee will be required to give the Issuers, the Note Insurer and the Noteholders written notice thereof promptly after the Indenture Trustee shall have knowledge thereof; (ii) while maintaining control over its own defense, the Indenture Trustee will be required to cooperate and consult fully with the Issuers and the Note Insurer in preparing such defense; and (iii) notwithstanding the foregoing, the Indenture Trustee will not be entitled to reimbursement from the assets of the Trust Estate for settlement of any such claim by the Indenture Trustee entered into without the prior consent of the Issuers and the Note Insurer, which consent will not be unreasonably withheld.

## DESCRIPTION OF THE INDENTURE

*The following summaries describe certain provisions of the Indenture. The summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Indenture. A form of the Indenture is attached hereto as Exhibit 3.*

**Certain Covenants**

For so long as the Notes are outstanding, except in connection with the consummation of one of the transactions contemplated by the following sentence, neither the Issuer nor the Co-Issuer may liquidate or dissolve and must maintain its continued existence. Also, neither the Issuer nor the Co-Issuer may consolidate or merge with or into any other Person or, except as described herein, convey or transfer its properties and assets substantially as an entirety without the consent of the Note Insurer and the Noteholders representing not less than 66 2/3% of the Aggregate Note Balances of all Outstanding Notes, and unless (a) the person (if other than the Issuer or the Co-

Issuer) formed by or surviving such merger or consolidation or acquiring such assets shall have expressly assumed, by supplemental indenture delivered to the Indenture Trustee and the Note Insurer the obligation to make, due and punctual payments of interest on and principal of all Notes and all amounts payable to the Note Insurer and the obligation to perform every applicable covenant of the Indenture and each other Operative Agreement to be performed by the Issuer or the Co-Issuer, as applicable, (b) immediately after giving effect to such transaction, no default or Event of Default shall have occurred and be continuing, (c) the Indenture Trustee and the Note Insurer shall have received written confirmation from the Rating Agency to the effect that the consummation of such transaction will not cause the Rating Agency to qualify, downgrade or withdraw its then current ratings of the Notes without regard to the related Note Policy and (d) the Indenture Trustee and the Note Insurer shall have received from the Issuer or the Co-Issuer, as applicable, an officers' certificate and an opinion of counsel, each to the effect that, among other things, such transaction complies with the foregoing requirements.

Neither the Issuer nor the Co-Issuer may incur, assume, have outstanding or guarantee any indebtedness other than the Notes issued pursuant to the Indenture or except as otherwise permitted by the Indenture.

**The Note Account**

*General*.  The Indenture Trustee will be required to establish and maintain the Note Account, which will be established in such manner and/or with such a depository as are specified in the Indenture and which would not cause a qualification, downgrade or withdrawal of any of the then current ratings on the Notes without regard to the related Note Policy as confirmed in writing by the Rating Agency.

*Deposits*.  The Indenture Trustee, upon receipt, will be required to deposit or cause to be deposited in the Note Account all payments and other collections received on or in respect of the Underlying Certificates subsequent to the Closing Date, any Class N-3 Insured Payments (other than any Class N-3 Preference Amount) and Note Insurer Optional Deposits received by it and all amounts received by it pursuant to the Cap Agreement from the counterparty thereto.

*Withdrawals*.  The Indenture Trustee may make withdrawals from the Note Account for any of the following purposes (the order set forth below not constituting an order of priority for such withdrawals):

(i)      to make payments in accordance with the priorities set forth in "Description of the Notes—Payments—Payments on the Notes"; and

(ii)      to withdraw any amounts deposited in the Note Account in error (after providing to the Note Insurer written documentation of such error reasonably acceptable to each of the Note Insurer).

**Events of Default**

The Indenture will provide that any of the following shall constitute an "Event of Default" with respect to the Notes:

(i)      any failure to pay all interest on and all principal of any Note in full by the Final Maturity Date; or

(ii)      with respect to the Class N-2 Notes only, any failure of the Issuers to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous period of six months after the Accelerated Default Date; or

(iii)      any default in the observance or performance of any covenant or agreement of the Issuer or Co-Issuer made in the Indenture (other than certain defaults as provided in the Indenture), which default continues unremedied for a period of 60 days after there shall have been given, by registered or certified mail, to the Issuers and the Note Insurer by the Indenture Trustee or to the Issuers, the Note Insurer and the Indenture Trustee by the Noteholders holding at least 25% of the Aggregate Note Balance of the

Outstanding Notes or by the Note Insurer, a written notice specifying such default and requiring it to be remedied and stating that such notice is a "Notice of Default" under the Indenture; or

(iv)      the entry by a court having jurisdiction over the Issuer or the Co-Issuer of (a) a decree or order for relief in respect of the Issuer or the Co-Issuer in an involuntary case or proceeding under any applicable federal or state delinquency, bankruptcy, insolvency, reorganization or other similar law or (b) a decree or order adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of or for the Issuer or the Co-Issuer under any applicable federal, state or other similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of or for the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order not stayed or dismissed and in effect for a period of more than ninety (90) consecutive days; or

(v)       the commencement by the Issuer or the Co-Issuer of a voluntary case or proceeding under any applicable federal or state delinquency, bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the entry of a decree or order for relief in respect of the Issuer or the Co-Issuer, as the case may be, in an involuntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against the Issuer or the Co-Issuer, as the case may be, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under any applicable federal, state or other similar law, or the consent by the Issuer or the Co-Issuer to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of or for the Issuer or the Co-Issuer or of any substantial part of the Issuer's or the Co-Issuer's property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of the Issuer's or the Co-Issuer's inability to pay its debts generally as they become due, or the taking of corporate action by the Issuer or the Co-Issuer in furtherance of any such action; or

(vi)      the impairment of the validity or effectiveness of the Indenture or any grant thereunder, or the subordination or, except as permitted under the Indenture, termination or discharge of the lien created under the Indenture, or the creation of any lien, charge, security interest, mortgage or other encumbrance with respect to any part of the Trust Estate or any interest in or proceeds of the Trust Estate, or the failure of the lien of the Indenture to constitute a valid first-priority security interest in the Trust Estate; provided that if such impairment, subordination, the creation of such lien, or the failure of the lien on the Trust Estate to constitute such a security interest shall be susceptible of cure, no Event of Default shall arise until the continuation of any such default unremedied for a period of 30 days after receipt of notice thereof as provided in clause (ii) above; or

(vii)     a breach of the representations and warranties of the Issuer or the Co-Issuer contained in the Indenture, that: (a) the Issuer and the Co-Issuer are each duly authorized under applicable law to create and issue the Notes, to execute and deliver the Indenture and the other Operative Agreements to which it is a party and all instruments included in the Trust Estate which it has executed and delivered, and that all corporate action and governmental consents, authorizations and approvals necessary or required therefor have been duly and effectively taken or obtained, that the Notes, when issued, and the Indenture and such other Operative Agreements will be valid and legally binding obligations of each of the Issuer and the Co-Issuer enforceable in accordance with their terms; (b) immediately prior to its grant of the Trust Estate provided for in the Indenture, the Issuer had good title to, and was the sole owner of, the Underlying Certificates, free and clear of any pledge, lien, encumbrance or security interest; (c) the Indenture Trustee has a valid and enforceable first-priority security interest in the Trust Estate, subject only to exceptions permitted by the Indenture; and (d) the Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended, and that the Issuer is not required to be registered as an "investment company" under the Investment Company Act of 1940, as amended; or

(viii)    an event of default under the Insurance Agreement.

If an Event of Default with respect to any class of Notes has occurred and is continuing, the Indenture Trustee (with respect to the Class N-2 Notes and, with respect to the Insured Notes, if an Insurer Default has occurred and is continuing) or the Note Insurer (with respect to the Insured Notes) may, but is not obligated to, and at the written direction of the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes), the Indenture Trustee is required to declare such Notes to be immediately due and payable by notice in writing to the Issuers, the Indenture Trustee and the Note Insurer, and upon such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration and all Reimbursement Amounts, if any, will become immediately due and payable.  In the event of any acceleration of such Insured Notes by operation of the Indenture, the Indenture Trustee will continue to be entitled to make claims under the Note Policy related to such Insured Notes.  Payments under the related Note Policy following acceleration thereof will be applied by the Indenture Trustee:

*first*:  to the related holders of the Insured Notes for amounts due and unpaid on such Insured Notes for interest, ratably to such Noteholders, without preference or priority of any kind among such Insured Notes, according to the amounts due and payable on such Insured Notes for interest; and

*second*:  to the related holders of the Insured Notes for amounts due and unpaid on such Insured Notes for principal, ratably to such Noteholders, without preference or priority of any kind among such Insured Notes, according to the amounts due and payable on such Insured Notes for principal.

In the event that the Insured Notes are accelerated due to an Event of Default, the Note Insurer will have the right (in addition to the obligation to pay the Insured Payments on such Notes in accordance with the related Note Policy), but not the obligation, to make payments under related Note Policy or otherwise of interest and principal due on such Notes, in whole or in part, on any date or dates following such acceleration as the Note Insurer in its sole discretion, elects.

If an Event of Default has occurred and is continuing, the Indenture Trustee (with respect to the Class N-2 Notes and, with respect to the Insured Notes, if an Insurer Default has occurred and is continuing) or with the consent of the Note Insurer (with respect to the Insured Notes) may or, if the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes) shall request, the Indenture Trustee is required to exercise any of the remedies specified in the Indenture, including liquidation of the Trust Estate.  At any time after a declaration of acceleration with respect to such Notes has been made, as provided in the Indenture, and before a judgment or decree for payment of the money due in respect of such Notes has been obtained by the Indenture Trustee, as provided in the Indenture, the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes) by written notice to the Issuers and the Indenture Trustee may rescind and annul such declaration and its consequences.  No such rescission and annulment will affect any subsequent default or impair any right consequent thereto.

The rights to the proceeds of any acceleration and liquidation of the Underlying Certificates and the Cap Agreement represent the sole sources of funds to satisfy the obligations of the Class N-2 Notes upon an Event of Default.  The rights to Insured Payments and to the proceeds of any acceleration and liquidation of the Underlying Certificates and the Cap Agreements represent the sole sources of funds to satisfy the obligations of the Insured Notes upon an Event of Default.

In the event that the principal of the Notes is declared due and payable, as described above, and the Underlying Certificates and the Cap Agreement are sold or otherwise liquidated, the net proceeds from such sale may be insufficient to pay the Noteholders the full unpaid principal amount of their Notes.  Then, Noteholders may suffer a loss (in the case of the Insured Notes, if an Insurer Default occurs).

The Indenture Trustee will not be deemed to have knowledge of certain Events of Default (or of such events which, with notice or lapse of time or both, would constitute Events of Default) unless an officer in the Indenture Trustee's corporate trust department has actual knowledge thereof or the Indenture Trustee has received written notice thereof in the manner set forth in the Indenture.  Subject to the provisions of the Indenture relating to

the duties of the Indenture Trustee, if an Event of Default has occurred and is continuing, the Indenture Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of the Note Insurer or Noteholders unless approved by the Note Insurer (with respect to the Insured Notes) and such Note Insurer or Noteholders, as applicable, shall have offered to the Indenture Trustee security or indemnity satisfactory to the Indenture Trustee against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction. Subject to such provisions for indemnification and certain limitations contained in the Indenture, the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes and/or all the Notes) will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee. In addition, the Noteholders representing more than 50% of the Aggregate Note Balance of Outstanding Class N-2 Notes (with respect to the Class N-2 Notes) or the Controlling Party (with respect to the Insured Notes) may in certain cases waive any default, except a default in payment of the entire principal amount of any Note on or before its Final Maturity Date or in respect of a covenant or provision which cannot be modified without the consent of all Noteholders affected and the Note Insurer.

No Noteholder has any right to institute any proceedings with respect to the Indenture or the Trust Estate, unless (i) such Noteholder has previously given written notice to the Indenture Trustee of a continuing Event of Default, (ii) the Noteholders of more than 50% of the Aggregate Note Balance of Outstanding Notes or, the Noteholders representing more than 50% of the Aggregate Note Balance of all Outstanding Class N-2 Notes, with respect to the failure to pay the Interest Distribution Amount to the Class N-2 Notes for any continuous six month period after the Accelerated Default Date, have made written request to the Indenture Trustee to institute proceedings in respect of such Event of Default in its own name as Indenture Trustee thereunder and no direction inconsistent therewith has been given by such Noteholders within 30 days of such written request, (iii) such Noteholder or Noteholders have offered to the Indenture Trustee adequate indemnity or security satisfactory to the Indenture Trustee against the costs, expenses and liabilities to be incurred in compliance with such request, (iv) the Indenture Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceedings and (v) an Insurer Default has occurred and is continuing.

In determining whether the holders of the requisite Aggregate Note Balances have given or made any request, demand, authorization, direction, notice, consent or waiver described under this "—Events of Default" subsection, Notes known by the Indenture Trustee to be owned by the Issuers or any affiliate thereof will be disregarded and deemed not to be outstanding.

Each Noteholder will be deemed, by the acceptance of its Note, to have agreed not to file, or join in filing, any petition in bankruptcy or commence any similar proceeding in respect of the Issuers.

**Modification of the Indenture**

Modifications of and amendments to the Indenture may be made by the Issuers, the Indenture Trustee and the Co-Trustee with the consent of the Noteholders of not less than 66 2/3% of the Aggregate Note Balance of the Outstanding Notes (not including any Notes known by the Indenture Trustee to be held by the Issuers or any affiliates thereof) and with the prior written consent of the Note Insurer; provided that no such modification or amendment may, without the prior written consent of the Note Insurer and the consent of each Noteholder affected thereby, among other things, (i) change the Final Maturity Date or the Payment Date of any principal of or interest on any Note, (ii) authorize the Indenture Trustee to agree to delay the timing of, or reduce the payments to be made on, the Underlying Certificates except as provided in the Indenture, (iii) reduce the Note Balance of or interest on any Note, (iv) change the coin or currency in which the principal of any Note or any interest thereon is payable, (v) impair the right to institute suit for the enforcement of any payment on or with respect to any Note on or after its Final Maturity Date, (vi) reduce the percentage of the then Aggregate Note Balance of any class of the Outstanding Notes, the consent of the Noteholders of which is required for modification or amendment of the Indenture or for waiver of certain defaults, (vii) reduce the requirements set forth in the Indenture for voting with respect to the Notes, (viii) change any obligation of the Issuers to maintain an office or agency in the places and for the purposes required by the Indenture, (ix) modify provisions for payments on the Notes, (x) deprive any Noteholder of the benefit of the security interest in the Trust Estate except as otherwise provided in the Indenture, or (xi) except where permitted by the Indenture, release from the lien of the Indenture all or any part of the Trust Estate.

The Issuers and the Indenture Trustee and the Co-Trustee may also amend the Indenture without obtaining the consent of Noteholders (but with the prior written consent of the Note Insurer), among other things, to correct any typographical error, to cure any ambiguity or to correct or supplement any provision of the Indenture or the Notes that may be defective or inconsistent with any other provisions; provided that such action does not materially adversely affect the interests of the Noteholders or affect in any material respect the permitted activities of the Issuers or the Indenture Trustee under the Indenture as evidenced by an opinion of counsel or a confirmation from the Rating Agency of the then current ratings of the Notes. Such amendments may also be so made without the consent of Noteholders (but with the prior written consent of the Note Insurer) to evidence the succession of another person to the Indenture Trustee, add to the covenants of the Issuers for the benefit of the Noteholders and/or the Note Insurer, to convey, transfer, assign, mortgage or pledge any property to the Indenture Trustee, to correct any manifestly incorrect description or amplify the description of any property subject to the lien of the Indenture, to modify the Indenture as required by applicable law and to add any additional Events of Default.

## Governing Law

The Indenture and the Notes provide that they will be governed by, and shall be construed in accordance with, the laws of the State of New York.

## Satisfaction and Discharge of the Indenture

The Indenture will be discharged (except with respect to certain continuing rights specified in the Indenture) (a) (1) upon the delivery to the Indenture Trustee for cancellation of all of the Notes other than Notes which have been destroyed, lost or stolen and have been replaced or paid and Notes for which money has been deposited in the Note Account for the full payment thereof (and thereafter repaid to the Issuer or discharged from such trust) as provided in the Indenture, (2) upon the expiration of the Note Policies and delivery of the related Note Policy to the Note Insurer for cancellation or (3) at such time as all Notes not previously canceled by the Indenture Trustee have become, or, on the next Payment Date, will become, due and payable and the Issuers have deposited with the Indenture Trustee an amount sufficient to repay all of the Notes and all amounts payable to the Note Insurer under the Operative Agreements, and (b) the Issuer has paid all other amounts payable under the Indenture and all amounts payable to the Indenture Trustee, the Co-Trustee, the Note Registrar, the Administrator, the Co-Administrators, the Rating Agency, the Note Insurer and each of the Noteholders under the Operative Agreements.

## USE OF PROCEEDS

The Issuer will direct that the proceeds of the sale of the Notes by it and the Co-Issuer to the Initial Purchaser be paid to the Sponsor as consideration for the Underlying Certificates as described in "Summary of Transaction" herein.

## THE UNDERLYING CERTIFICATES

*The following information and the information in the next section entitled "The Mortgage Pool" has been supplied by the Seller for inclusion in this memorandum and has not been independently verified by the Issuers, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Initial Purchaser or any of their respective affiliates. None of the Issuers, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Initial Purchaser or any of their respective affiliates assume any responsibility for the accuracy, completeness or applicability of such information.*

Information about the Underlying Certificates is available in the Disclosure Exhibits attached hereto. The Disclosure Exhibits include (i) the form of Underlying Pooling and Servicing Agreement pursuant to which the Series Certificates were issued and (ii) the Prospectus prepared in connection with the initial offering of certain classes of the Series Certificates. Each and every description of an Underlying Certificate or any documents related thereto contained in this memorandum is subject to, and is qualified in its entirety by reference to, the Prospectus and to the actual terms and provisions of the Underlying Pooling and Servicing Agreement (including the form of certificate of the class to which the Underlying Certificates belong). Investors should review carefully the Disclosure Exhibits for information about the Underlying Certificates prior to purchasing any Notes.

**General**

Each Underlying Certificate represents a 100% interest in a class of asset backed pass-through certificates previously issued by WaMu Series 2007-HE2 Trust.  The identity of the Underlying Certificates (including the series and class designation of each) are set forth on the inside cover hereof.

**Underlying Class C Certificate**

The Underlying Class C Certificate represents an entitlement to receive (i) the excess cashflow, if any, generated by the Mortgage Loans each month after (a) payment of servicing fees, (b) payment of other specified expenses and reimbursements of the Underlying Trust Fund, (c) payments, if any, to the Underlying Counterparty pursuant to the Underlying Swap Agreement, including payments that are required as a result of an early termination of the Underlying Swap Agreement and (d) payment of required distributions to holders of the Senior Certificates and (ii) certain payments, if any, made by the Underlying Counterparty pursuant to the Underlying Swap Agreement for the related Underlying Distribution Dates after required distributions to the holders of the Senior Certificates and the Underlying Counterparty.  The amounts described in clauses (i)(a) through (d) of the preceding sentence will not be available for distribution on the Underlying Certificates.  Prospective investors in the Notes should refer to the Disclosure Exhibits for more information about these amounts.

The Underlying Class C Certificate is subordinate in right of payment to the Senior Certificates.  The Underlying Class C Certificate is in a "first loss position," and the Underlying Trust Fund does not contain a source of funds to protect the holders of the Underlying Class C Certificate against losses on the Mortgage Loans. Investors should review the Disclosure Exhibits for a detailed description of the subordination of the Underlying Class C Certificate to the Senior Certificates and the payment priorities with respect to the Series Certificates.

The Underlying Pooling and Servicing Agreement provides that excess cashflow is required, among other things, to be used on any Underlying Distribution Date to pay principal with respect to the Senior Certificates until the Overcollateralization Target Amount has been satisfied.  Although on the Issue Date the Overcollateralization Target Amount was satisfied, if, on any Underlying Distribution Date, the amount of overcollateralization is not equal to the Overcollateralization Target Amount, no distributions will be made from amounts collected on the Mortgage Loans to the Underlying Class C Certificate until the Overcollateralization Target Amount has been restored to the level specified therefor.  The Overcollateralization Target Amount is subject to reduction based upon the satisfaction of certain tests or triggers as set forth in the Underlying Pooling and Servicing Agreement.

**Underlying Class P Certificate**

The Underlying Class P Certificate represents an entitlement to receive on each Underlying Distribution Date any Prepayment Charges payable in connection with certain principal prepayments on the related Mortgage Loans.  In the Underlying Pooling and Servicing Agreement, the Servicer has warranted that it will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and related Mortgage Loan and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default).  The Servicer may also waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the mortgagor's default in making the Mortgage Loan payments.  If the Servicer breaches this warranty, it will be obligated under the Underlying Pooling and Servicing Agreement to cure such a breach by remitting to the Underlying Trust Fund an amount equal to such waived Prepayment Charges.  In those cases when the Servicer waives a Prepayment Charge and such waiver does not result in a breach of the Servicer's warranty (including cases in which waiver is required by the applicable servicing standards), then the Servicer will not be required to make any payment in respect of such waived Prepayment Charge.  The Servicer will be entitled to retain as servicing compensation all prepayment charges or premiums payable in respect of partial principal prepayment on the Mortgage Loans.

The amount available for distribution to the holders of the Underlying Class P Certificate on any Underlying Distribution Date in respect of Prepayment Charges is determined by the amount of Prepayment Charges

paid by the mortgagors or the Servicer in connection with principal prepayments on the related Mortgage Loans during the prepayment period applicable for such Underlying Distribution Date.

Generally, each Prepayment Charge is only applicable to certain prepayments on the related Mortgage Loan and only remains applicable with respect to the related Mortgage Loan for the limited time periods specified in the terms of such Prepayment Charge. For information about the Prepayment Charges as of April 1, 2007, investors should review the Schedule of Prepayment Charges attached hereto as Exhibit 4. Prospective investors in the Notes should refer to the Underlying Pooling and Servicing Agreement for information about the representations and warranties the Servicer has made about the Prepayment Charges and the covenants the Servicer has made about the waiver of Prepayment Charges.

## THE MORTGAGE POOL

As described in the Prospectus Supplement, the Mortgage Loans were transferred and assigned to the Underlying Trust Fund on the Issue Date. The Mortgage Pool consists of first and second lien, adjustable-rate and fixed-rate residential mortgage loans.

For information about the Mortgage Pool as of April 1, 2007 (the "Cut-off Date"), prospective investors in the Notes should review the Prospectus Supplement, attached hereto as a Disclosure Exhibit. For information regarding certain characteristics of the Mortgage Loans as of the Cut-off Date, investors should review the section entitled "The Mortgage Pool" in the Prospectus Supplement.

## YIELD CONSIDERATIONS

The yield to maturity on the Notes will depend, in general, on (i) the applicable Note Rate, (ii) the applicable purchase price, (iii) the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) on the Mortgage Loans, payment of any related Prepayment Charges and Realized Losses on the Mortgage Loans, (iv) adjustments of the pass-through rates of the Senior Certificates and adjustments of the Mortgage Rates of those Mortgage Loans that are adjustable-rate Mortgage Loans, (v) whether or not the Clean-Up Call occurs and, if any such call occurs, the timing of such occurrence, (vi) the rate of one-month LIBOR and the rate of six-month LIBOR, (vii) whether payments are received from the counterparty pursuant to the Cap Agreement (viii) whether payments are received from or made to the Underlying Counterparty pursuant to the Underlying Swap Agreement, (ix) whether payments are made to or paid from the Underlying Final Maturity Reserve Account, (x) in the case of the Insured Notes, whether the Note Insurer exercises its right to redeem the Insured Notes, in whole or in part, (xi) whether the Trust Estate is liquidated by the Controlling Party prior to the related Final Maturity Date and (xii) in the case of the Insured Notes, the rate, amount and timing of interest and principal payments on the Class N-2 Notes, as well as other factors.

**Investors in the Notes bear the risk that factors such as, but not limited to, prepayment, default, delinquency and/or loss severity experience with respect to the Mortgage Loans may be higher than anticipated, which could result in unanticipated reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions. Also, investors bear the risk that fluctuations in LIBOR-based interest rates could also result in unanticipated reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions. Investors in the Notes should fully consider the risks associated with reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions and the effect of any such reductions or delays on the weighted average lives and yield on the Notes as well as on the ability of investors in the Class N-2 Notes to recover their initial investment. Risks associated with reductions in the amount of distributions on the Underlying Certificates or delays in the timing of such distributions include: (i) the risk that distributions on the Underlying Certificates on any Underlying Distribution Date may be insufficient to pay any Interest Distribution Amount or any Principal Distribution Amount on the Class N-2 Notes on the related Payment Date, (ii) the risk that distributions on the Underlying Certificates over the lives of the Class N-2 Notes may be insufficient to repay in full the Aggregate Note Balances of the Class N-2 Notes and interest on the Aggregate Note Balances of the Class N-2 Notes outstanding from time to time at the related Note Rate and (iii) the risk that certain Prepayment Charges will be waived or otherwise not collected and not reimbursed by the Servicer as more fully described herein. Because principal payments on the Insured Notes will be**

45

**affected by various factors and because each Note Policy will only guarantee the ultimate payment of principal of the Insured Notes on the related Final Maturity Date, there can be no assurance as to the rate and timing of principal payments on the Insured Notes. In addition, if the Note Insurer were to default in its obligations under the Note Policies, there could be no assurance as to the receipt by the holders of the Insured Notes of interest payments or the final principal payment on the Insured Notes.**

Investors in the Notes will bear the risk of any volatility in the payments of principal of the Notes and the effect of such volatility on the yield and weighted average lives of the Notes. Any reinvestment risk resulting from any greater than expected payments on the Underlying Certificates will be borne by investors in the Notes and any reinvestment risk as a result of the Note Insurer exercising its option to redeem the Insured Notes, in whole or in part, will be borne by investors in the Insured Notes.

Prospective investors in the Insured Notes should note that if one-month LIBOR were to increase, then failure of the Underlying Counterparty under the Underlying Swap Agreement to make payments thereunder or failure of the counterparty to the Cap Agreement to make payments thereunder, without a corresponding decrease in the level of one-month LIBOR, could result in an early full or partial termination of the Insured Notes by the Note Insurer on or after the Payment Date in May 2012, through the payment of a Note Insurer Optional Deposit. Upon the payment of a Note Insurer Optional Deposit, the Aggregate Note Balance of the Insured Notes will be reduced or retired, and the weighted average life of such Notes may be affected.

**Yield Considerations Relating to the Underlying Certificates**

### *Underlying Class C Certificate*

The Underlying Pooling and Servicing Agreement provides that excess cashflow is required, among other things, to be used on any Underlying Distribution Date to pay principal with respect to the Senior Certificates until the Overcollateralization Target Amount is satisfied. Although on the Issue Date the Overcollateralization Target Amount was satisfied, if, on any Underlying Distribution Date, the amount of overcollateralization is not equal to the Overcollateralization Target Amount, no distributions will be made from amounts collected on the Mortgage Loans to the Underlying Class C Certificate until the Overcollateralization Target Amount has been restored to the level specified therefor. The Overcollateralization Target Amount is subject to reduction based upon the satisfaction of certain tests or triggers as set forth in the Underlying Pooling and Servicing Agreement. In the event that the Overcollateralization Target Amount is permitted to decrease on any Underlying Distribution Date, the Underlying Pooling and Servicing Agreement provides that a portion of the principal payments on the Mortgage Loans be distributed to the holders of the Underlying Class C Certificate on such Underlying Distribution Date (to the extent of amounts remaining undistributed after all other required distributions on the Senior Certificates have been made).

With respect to the Underlying Class C Certificate, principal payments (including prepayments and collections upon defaults, liquidations and repurchases) and Realized Losses on the Mortgage Loans will reduce the aggregate outstanding principal balance of the Mortgage Loans and therefore will reduce the aggregate amount of excess interest that could be generated by the Mortgage Loans, and the aggregate amount of excess interest generated by the Mortgage Loans will decrease more significantly as a result of principal payments and Realized Losses on the Mortgage Loans with relatively high Mortgage Rates. If prepayments or liquidations occur with more frequency on Mortgage Loans having relatively higher Mortgage Rates than on Mortgage Loans having relatively lower Mortgage Rates, and the foregoing results in certain of the Senior Certificates having their pass-through rates limited by the applicable pass-through rate ceiling (as described in the Disclosure Exhibits), then no excess interest will be generated by the portion of the aggregate principal balance of the Mortgage Loans equal to the Certificate Principal Balances of such Senior Certificates. Reductions of the amount of excess interest generated by the Mortgage Loans will in turn reduce the aggregate amount of distributions on the Underlying Class C Certificate available for payments on the Notes.

In addition to reducing the amount of distributions on the Underlying Class C Certificate by reducing the aggregate amount of excess interest generated by the Mortgage Loans, Realized Losses on the Mortgage Loans will further reduce the amount of distributions on the Underlying Class C Certificate because the amount of such Realized Losses will be absorbed by overcollateralization (with the resulting diminution of any excess cashflow from the Mortgage Loans that would otherwise be payable on the Underlying Class C Certificate). In addition, if

any Realized Losses are allocated to any of the Senior Certificates, the holders of such certificates will be entitled to reimbursement for such allocations on future Underlying Distribution Dates prior to any distributions on the Underlying Class C Certificate.

The amount of excess interest generated by the Mortgage Loans will also be affected by, and will vary inversely with, the amount of interest required to be distributed to the Senior Certificates. The classes of Senior Certificates have different pass-through rates, and to the extent the principal balances of the more senior classes of Senior Certificates entitled to principal that have relatively lower pass-through rates are reduced more rapidly than the principal balances of the more subordinate classes of Senior Certificates entitled to principal that have relatively higher pass-through rates, the weighted average pass-through rate of the Senior Certificates may increase. In addition, the pass-through rates on the Senior Certificates increase as one-month LIBOR increases, and therefore increases in one-month LIBOR may increase the weighted average pass-through rate of the Senior Certificates. An increase in the weighted average pass-through rate on the Senior Certificates may reduce the amount of excess interest that could be included among the amounts that may remain available on any Underlying Distribution Date for distribution to the holders of the Underlying Class C Certificate and amounts, if any, payable pursuant to the Underlying Swap Agreement may be insufficient to compensate for any such shortfalls. See "Yield, Prepayment and Maturity Considerations" and "Description of the Certificates" in the Prospectus Supplement.

As described in the Prospectus Supplement, on and after the Underlying Distribution Date in February 2017, a portion of collections on the Mortgage Loans will, to the extent required, be deposited in the Underlying Final Maturity Reserve Account. In addition, on and after the Underlying Distribution Date in January 2027, all amounts otherwise payable to the Underlying Class C Certificates will be deposited in the Underlying Final Maturity Reserve Account until the amounts on deposit in the Underlying Final Maturity Reserve Account are equal to the stated principal balance of the Mortgage Loans with 40-year original terms to maturity less the certificate principal balance of the Underlying Class C Certificates on such Underlying Distribution Date. The amounts on deposit in the Underlying Final Maturity Reserve Account, if any, will not be distributable until the earlier of the Underlying Distribution Date in January 2037 and the termination of the Underlying Trust Fund. The resulting delay in receipt of such collections by the Class C Certificate may adversely affect the yields on the Notes. See "Risk Factors—The Final Maturity Reserve Account." See "Description of the Certificates—The Final Maturity Reserve Account" in the Prospectus Supplement.

In addition, as described under "Risk Factors—Basis Risk on the Underlying Certificates" herein and as described in the Disclosure Exhibits, the Senior Certificates may be entitled to recover the amount of interest not paid on an Underlying Distribution Date on such certificates because of the application of the applicable pass-through rate ceiling, which may result in a reduction of the amount of excess interest that could be included among the amounts that may remain available on any Underlying Distribution Date for distribution to the holders of the Underlying Class C Certificate. The reduction in excess interest payable to the Underlying Class C Certificate may, among other things, result in (i) shortfalls in the Interest Distribution Amounts (to the extent not covered by the Note Insurer with respect to the Insured Notes) and decreases in amounts payable in respect of principal on any Payment Date and (ii) an extension of the weighted average lives of the Notes.

The amount distributable to the Underlying Class C Certificate will be influenced by the value of one-month LIBOR because (a) pursuant to the Underlying Swap Agreement (i) Net Swap Payments will be made by the Underlying Trust Fund on any Underlying Distribution Date on which the fixed rate payment owed by the Underlying Trust Fund to the Underlying Counterparty is greater than the LIBOR-based floating rate payment owed by the Underlying Counterparty to the Underlying Trust Fund and (ii) Net Counterparty Payments will be made to the Underlying Trust Fund on any Underlying Distribution Date only if the LIBOR-based floating rate payment owed by the Underlying Counterparty to the Underlying Trust Fund is greater than the fixed rate payment owed by the Underlying Trust Fund to the Underlying Counterparty and (b) any Net Counterparty Payments and Swap Termination Payment made to the Underlying Trust Fund under the Underlying Swap Agreement from the Underlying Counterparty allocable to the Senior Certificates are first applied to maintain overcollateralization, pay interest shortfalls and repay losses before any such amounts are paid to the Underlying Class C Certificate.

The notional amount of the Underlying Swap Agreement declines over time and becomes zero after the Underlying Distribution Date in April 2012, unless terminated earlier as described in "Description of the Certificates—The Swap Agreement" in the Prospectus Supplement. Amounts payable to the Underlying Trust Fund

under the Underlying Swap Agreement may be insufficient to compensate for any reductions in the amounts received on the Underlying Class C Certificate as a result of interest shortfalls resulting from increases in LIBOR.

For a discussion of other factors that could reduce (or increase) the amount of distributions on the Underlying Class C Certificate or that could slow (or hasten) the timing of such distributions, see "Yield, Prepayment and Maturity Considerations" in the Prospectus Supplement.

### *Underlying Class P Certificate*

The amount available for distribution to the holders of the Underlying Class P Certificate on any Underlying Distribution Date in respect of Prepayment Charges is determined by the amount of Prepayment Charges paid by the mortgagors or the Servicer in connection with principal prepayments on the Mortgage Loans during the prepayment period applicable for such Underlying Distribution Date.

Generally, each Prepayment Charge is only applicable to certain prepayments on the related Mortgage Loan and only remains applicable with respect to the related Mortgage Loan for the limited time periods specified in the terms of such Prepayment Charge. In the Underlying Pooling and Servicing Agreement, the Servicer has warranted that it will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds, taking into account the value of such Prepayment Charge and related Mortgage Loan, and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default). The Servicer may also waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the mortgagor's default in making the Mortgage Loan payments. If the Servicer breaches this warranty, it will be obligated under the Underlying Pooling and Servicing Agreement to cure such a breach by remitting to the Underlying Trust Fund an amount equal to such waived Prepayment Charges. In those instances when the Servicer waives a Prepayment Charge and such waiver does not result in a breach of the Servicer's warranty (including cases in which waiver is required by the applicable servicing standards), then the Servicer will not be required to make any payment in respect of such waived Prepayment Charge. The Servicer will be entitled to retain as servicing compensation all prepayment charges or premiums payable in respect of partial principal prepayment on the Mortgage Loans.

The Issuer makes no representation as to the effect that the payment of the Prepayment Charges on the Underlying Class P Certificate may have on the yield to maturity of the Notes. Prospective investors in the Notes should conduct their own analysis of whether and to what extent payment of Prepayment Charges or decisions by the Servicer with respect to waiver thereof may affect the yield to maturity of the Notes. Prospective investors in the Notes should refer to the Underlying Pooling and Servicing Agreement for information about the representations and warranties the Servicer has made about the Prepayment Charges and the covenants the Servicer has made about the waiver of Prepayment Charges.

### *General Assumptions*

Losses (as a function of the default rate and severity of losses resulting from such defaults), increases in one-month LIBOR (with corresponding increases in the pass-through rates on the Senior Certificates) without corresponding increases in the Mortgage Rates on the adjustable-rate Mortgage Loans, and/or prepayments on the Mortgage Loans above certain assumed levels described below would adversely affect the yield to maturity on the Notes and could affect the ability of investors in the Notes to recoup fully the principal amount of their initial investment.

With respect to the Underlying Class C Certificate, an acceleration in the prepayments and/or losses on the Mortgage Loans as compared to the assumptions used in preparing the following tables will generally result in reduced cashflow on such Underlying Certificates, resulting in slower reductions in the outstanding principal of the Notes (and possible failure of investors in the Notes to recoup fully the principal amount of their initial investments).

With respect to the Underlying Class P Certificate, a deceleration in the prepayments on the Mortgage Loans as compared to the assumptions used in preparing the following tables will generally result in a reduced cashflow on such Underlying Certificates. Investors should conduct their own analysis of whether and to what extent the payment of Prepayment Charges on the Underlying Class P Certificate and actions taken by the Servicer regarding the waiver thereof may affect the yield to maturity of the Notes.

To provide a starting point for prospective investors to evaluate the Notes, yield scenarios for the Notes have been based on the following assumptions:

1.      Distributions on the Underlying Certificates and on the Notes occur on the 25th day of the month, in each case regardless of the days on which such distributions actually occur, commencing in May 2007.

2.      Each Note Rate is as set forth herein, and the Original Note Balance of the Class N-1 Notes is $24,125,000, the Original Note Balance of the Class N-2 Notes is $19,450,000 and the Original Note Balance of the Class N-3 Notes is $4,675,000;

3.      The Notes are purchased on April 26, 2007 at a price of 100.0000% for the Class N-1 Notes, 98.9306%, for the Class N-2 Notes and 100.0000%, for the Class N-3 Notes, in each case, without any accrued interest (settle flat);

4.      The characteristics of the Mortgage Loans are set forth on Exhibit 9 attached hereto and all adjustable-rate Mortgage Loans will adjust based on six-month LIBOR index and adjust every six months following their initial rate adjustment date;

5.      Cashflows on the Underlying Certificates are applied generally in the manner set forth in the Underlying Pooling and Servicing Agreement;

6.      No Clean-Up Call on the Mortgage Loans is exercised;

7.      The mortgage rates on the adjustable rate Mortgage Loans and the pass-through rates on the Senior Certificates are established and maintained as indicated in the Prospectus Supplement;

8.      95% of all Prepayment Charges payable on the Mortgage Loans are collected and paid to the holders of the Underlying Class P Certificate. The certificate principal balance of the Underlying Class P Certificate is equal to zero;

9.      Defaults on the Mortgage Loans are assumed to occur monthly at the indicated "Percentage of Monthly Defaults" set forth on the applicable "Monthly Default Curve" attached hereto as Exhibit 5. The defaults occurring in each month will equal the product of (1) the product of (a) the percentage set forth opposite the related month on the applicable "Monthly Default Curve", and (b) the percentage set forth in the following tables under the heading "Approximate Monthly Defaults" and (2) the aggregate principal balance of the related Mortgage Loans as of the closing date of the Underlying Transaction. The final liquidations and recoveries occur in the same month as the default;

10.     Liquidations result in a Realized Loss allocable to principal equal to 40% with respect to adjustable rate Mortgage Loans and 45% with respect to the fixed rate Mortgage Loans, in each case of the principal balance of the Mortgage Loans assumed to be liquidated. There is no recovery lag between default and liquidation;

11.     Delinquency Trigger Event assumes 25.00%;

12.     Prepayments on the Mortgage Loans (with a maximum of 95% CPR) occur on the last day of each month beginning in April 2007 at the indicated percentages of the "Prepayment Curve" set forth in the following tables. The "Prepayment Curve" is attached hereto as Exhibit 6 for each indicated type of Mortgage Loan based on the loan type, loan age and original prepayment penalty terms;

13.     For each Payment Date, one-month LIBOR and six-month LIBOR have the values set forth on the forward curves, attached hereto as Exhibit 10;

14.     There are payments made pursuant to the Underlying Swap Agreement and such payments are determined using one-month LIBOR set forth on Exhibit 10;

15.     The amount of Administrative Expenses and Extraordinary Expenses for any Payment Date is equal to zero;

16.     Prepayment penalties are as described in the assumed mortgage loan characteristics on Exhibit 9.

17.     On the Payment Date on which the certificate principal balance of all Senior Certificates will be reduced to zero, an amount equal to the then outstanding principal balance of the Mortgage Loans will be paid to the Underlying Class C Certificate;

18.     The Class N-1 Insurer Premiums and the Class N-3 Insurer Premiums are paid in accordance with the terms of the Insurance Agreement;

19.     Any unpaid Class N-1 Reimbursement Amount, Class N-3 Reimbursement Amount, Class N-1 Insurer Premium and Class N-3 Insurer Premium from prior payment dates accrues interest at 4.00% per annum;

20.     No Insurer Default occurs;

21.     The amount on deposit in the NIM Reserve Account is $350,000; and

22.     The first Interest Accrual Period for the Notes is 29 days.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model.  The model used in this memorandum assumes a prepayment rate for the Mortgage Loans of 100% of the Prepayment Curve.  No representation is made that the Mortgage Loans will prepay at 100% of the Prepayment Curve or any other rate.

The default assumptions do not purport to be an historical description of default experience or a prediction of the anticipated rate of default of any pool of mortgage loans.  Discrepancies between the assumed and actual performance underscore the hypothetical nature of the tables, which is provided only to give a general sense of the sensitivity of the respective average lives of the Notes in varying Realized Loss and prepayment scenarios.  Changes in average lives will affect the yield on the Notes.  No representation is made regarding the appropriateness of the Prepayment Curve, the default assumptions or the other assumptions used in preparing the tables below, the rate, timing or severity of Realized Losses, the rate and timing of prepayments, the relationship among defaults, Realized Losses and prepayments or the resulting yield to maturity or average lives of the Notes.

Notwithstanding the default assumptions, the loss severity percentages and the percentages of the Prepayment Curve reflected in the tables, it is highly unlikely that the Mortgage Loans will be prepaid or that Realized Losses will be incurred according to one particular pattern.  In addition, there will be other discrepancies between the actual characteristics of the Mortgage Loans and the assumed characteristics used in preparing the following tables, and one-month LIBOR and six-month LIBOR will not remain constant and may not conform to the values thereof assumed in preparing the following tables.  In addition, Administrative Expenses will be paid by the Trust Estate, as described herein, prior to any of the related Available Funds being paid on the Notes.  Any discrepancy may have an effect, and such effect may be substantial, upon the average lives set forth in the tables and the resulting yield on the Notes.  Under various scenarios, pre-tax yields to maturity could be zero or negative.  Even if the Mortgage Loans perform as expected or better than expected with respect to the default assumptions, the loss severity percentages and the percentages of the Prepayment Curve reflected in the following tables, increases in one-month LIBOR, among other things, may have a substantial negative effect upon the average lives set forth in the tables and the resulting yield on the Notes, and under various scenarios, even when all other characteristics are as expected or better than expected, pre-tax yields to maturity could be negative or zero.

Investors are urged to make their investment decisions based on their determinations as to anticipated rates of prepayment, Realized Losses, one-month LIBOR and six-month LIBOR under a variety of scenarios.

**Class N-1**

| % of Prepayment Curve | Percentage of Base Default Curve | | | | | |
|---|---|---|---|---|---|---|
| | 75% | 100% | 125% | 150% | 175% | 200% |
| **70% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.807 | 5.806 | 5.804 | 5.803 | 5.802 | 5.800 |
| Average Life (yrs) ............................ | 0.77 | 0.77 | 0.78 | 0.78 | 0.78 | 0.78 |
| Modified Duration (yrs) ................... | 0.743 | 0.744 | 0.747 | 0.750 | 0.752 | 0.755 |
| Principal Window (months) ............. | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 | 1 - 19 |
| Principal No. Months ....................... | 17 | 18 | 18 | 18 | 18 | 19 |
| Total Loss (Notes Maturity) ............. | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% |
| Total Loss (Life of Transaction) ...... | 0.08% | 0.14% | 0.17% | 0.21% | 0.24% | 0.36% |
| **85% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.811 | 5.810 | 5.809 | 5.807 | 5.806 | 5.804 |
| Average Life (yrs) ............................ | 0.76 | 0.76 | 0.76 | 0.77 | 0.77 | 0.77 |
| Modified Duration (yrs) ................... | 0.731 | 0.733 | 0.735 | 0.737 | 0.740 | 0.742 |
| Principal Window (months) ............. | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 |
| Principal No. Months ....................... | 17 | 17 | 17 | 18 | 18 | 18 |
| Total Loss (Notes Maturity) ............. | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% |
| Total Loss (Life of Transaction) ...... | 0.08% | 0.10% | 0.13% | 0.21% | 0.24% | 0.28% |
| **100% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.815 | 5.814 | 5.813 | 5.812 | 5.810 | 5.808 |
| Average Life (yrs) ............................ | 0.75 | 0.75 | 0.75 | 0.75 | 0.76 | 0.76 |
| Modified Duration (yrs) ................... | 0.719 | 0.721 | 0.723 | 0.725 | 0.728 | 0.730 |
| Principal Window (months) ............. | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 | 1 - 18 |
| Principal No. Months ....................... | 17 | 17 | 17 | 18 | 18 | 18 |
| Total Loss (Notes Maturity) ............. | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% |
| Total Loss (Life of Transaction) ...... | 0.08% | 0.10% | 0.13% | 0.21% | 0.24% | 0.28% |
| **115% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.818 | 5.817 | 5.816 | 5.815 | 5.814 | 5.813 |
| Average Life (yrs) ............................ | 0.73 | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 |
| Modified Duration (yrs) ................... | 0.707 | 0.709 | 0.711 | 0.713 | 0.715 | 0.718 |
| Principal Window (months) ............. | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 | 1 - 18 |
| Principal No. Months ....................... | 17 | 17 | 17 | 17 | 18 | 18 |
| Total Loss (Notes Maturity) ............. | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% |
| Total Loss (Life of Transaction) ...... | 0.08% | 0.10% | 0.13% | 0.15% | 0.24% | 0.28% |
| **130% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.823 | 5.821 | 5.820 | 5.819 | 5.818 | 5.817 |
| Average Life (yrs) ............................ | 0.72 | 0.72 | 0.72 | 0.73 | 0.73 | 0.73 |
| Modified Duration (yrs) ................... | 0.695 | 0.697 | 0.699 | 0.701 | 0.702 | 0.704 |
| Principal Window (months) ............. | 1 - 16 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 17 | 1 - 18 |
| Principal No. Months ....................... | 16 | 17 | 17 | 17 | 17 | 18 |
| Total Loss (Notes Maturity) ............. | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% |
| Total Loss (Life of Transaction) ...... | 0.06% | 0.10% | 0.13% | 0.15% | 0.18% | 0.28% |
| **150% Prepayment Curve** | | | | | | |
| Yield (%) ............................................ | 5.828 | 5.827 | 5.826 | 5.825 | 5.824 | 5.823 |
| Average Life (yrs) ............................ | 0.70 | 0.71 | 0.71 | 0.71 | 0.71 | 0.71 |
| Modified Duration (yrs) ................... | 0.679 | 0.681 | 0.682 | 0.684 | 0.686 | 0.688 |
| Principal Window (months) ............. | 1 - 16 | 1 - 16 | 1 - 16 | 1 - 17 | 1 - 17 | 1 - 17 |
| Principal No. Months ....................... | 16 | 16 | 16 | 17 | 17 | 17 |
| Total Loss (Notes Maturity) ............. | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% |
| Total Loss (Life of Transaction) ...... | 0.06% | 0.08% | 0.10% | 0.15% | 0.18% | 0.20% |

| Class N-2 | | | | | | |
|---|---|---|---|---|---|---|
| | **Percentage of Base Default Curve** | | | | | |
| **% of Prepayment Curve** | **75%** | **100%** | **125%** | **150%** | **175%** | **200%** |
| **70% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.439 | 9.436 | 9.434 | 9.432 | 9.430 | 9.427 |
| Average Life (yrs) ...................... | 0.63 | 0.63 | 0.63 | 0.63 | 0.64 | 0.64 |
| Modified Duration (yrs) ............... | 0.587 | 0.588 | 0.589 | 0.590 | 0.590 | 0.591 |
| Principal Window (months) .......... | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 |
| Principal No. Months ................... | 14 | 14 | 14 | 14 | 14 | 14 |
| Total Loss (Notes Maturity).......... | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% |
| Total Loss (Life of Transaction) ... | 0.03% | 0.04% | 0.05% | 0.07% | 0.08% | 0.09% |
| **85% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.471 | 9.469 | 9.467 | 9.464 | 9.462 | 9.459 |
| Average Life (yrs) ...................... | 0.62 | 0.62 | 0.62 | 0.62 | 0.62 | 0.63 |
| Modified Duration (yrs) ............... | 0.577 | 0.578 | 0.578 | 0.579 | 0.580 | 0.581 |
| Principal Window (months) .......... | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 | 1 - 14 |
| Principal No. Months ................... | 14 | 14 | 14 | 14 | 14 | 14 |
| Total Loss (Notes Maturity).......... | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% |
| Total Loss (Life of Transaction) ... | 0.03% | 0.04% | 0.05% | 0.07% | 0.08% | 0.09% |
| **100% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.502 | 9.500 | 9.498 | 9.497 | 9.495 | 9.493 |
| Average Life (yrs) ...................... | 0.61 | 0.61 | 0.61 | 0.61 | 0.61 | 0.61 |
| Modified Duration (yrs) ............... | 0.568 | 0.568 | 0.569 | 0.569 | 0.570 | 0.570 |
| Principal Window (months) .......... | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 14 |
| Principal No. Months ................... | 13 | 13 | 13 | 13 | 13 | 14 |
| Total Loss (Notes Maturity).......... | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% |
| Total Loss (Life of Transaction) ... | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.09% |
| **115% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.533 | 9.531 | 9.530 | 9.528 | 9.526 | 9.525 |
| Average Life (yrs) ...................... | 0.60 | 0.60 | 0.60 | 0.60 | 0.60 | 0.60 |
| Modified Duration (yrs) | 0.558 | 0.559 | 0.559 | 0.560 | 0.560 | 0.561 |
| Principal Window (months) .......... | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 |
| Principal No. Months ................... | 13 | 13 | 13 | 13 | 13 | 13 |
| Total Loss (Notes Maturity).......... | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% |
| Total Loss (Life of Transaction) ... | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% |
| **130% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.566 | 9.565 | 9.563 | 9.561 | 9.559 | 9.558 |
| Average Life (yrs) ...................... | 0.59 | 0.59 | 0.59 | 0.59 | 0.59 | 0.59 |
| Modified Duration (yrs) ............... | 0.549 | 0.549 | 0.550 | 0.550 | 0.551 | 0.551 |
| Principal Window (months) .......... | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 |
| Principal No. Months ................... | 13 | 13 | 13 | 13 | 13 | 13 |
| Total Loss (Notes Maturity).......... | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% |
| Total Loss (Life of Transaction) ... | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% |
| **150% Prepayment Curve** | | | | | | |
| Yield (%) ................................ | 9.614 | 9.612 | 9.610 | 9.608 | 9.606 | 9.605 |
| Average Life (yrs) ...................... | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 | 0.58 |
| Modified Duration (yrs) ............... | 0.536 | 0.536 | 0.537 | 0.537 | 0.538 | 0.538 |
| Principal Window (months) .......... | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 | 1 - 13 |
| Principal No. Months ................... | 13 | 13 | 13 | 13 | 13 | 13 |
| Total Loss (Notes Maturity).......... | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% |
| Total Loss (Life of Transaction) ... | 0.02% | 0.03% | 0.04% | 0.05% | 0.06% | 0.07% |

53

| **Class N-3** | | | | | |
|---|---|---|---|---|---|
| | **Percentage of Base Default Curve** | | | | |
| **% of Prepayment Curve** | **75%** | **100%** | **125%** | **150%** | **175%** | **200%** |
| **70% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 5.986 | 5.984 | 5.982 | 5.980 | 5.977 | 5.974 |
| Average Life (yrs) ........................ | 1.28 | 1.29 | 1.30 | 1.31 | 1.32 | 1.33 |
| Modified Duration (yrs) ................ | 1.220 | 1.226 | 1.233 | 1.242 | 1.252 | 1.261 |
| Principal Window (months) .......... | 14 - 17 | 14 - 17 | 14 - 18 | 14 - 18 | 14 - 18 | 14 - 18 |
| Principal No. Months .................... | 4 | 4 | 5 | 5 | 5 | 5 |
| Total Loss (Notes Maturity)........... | 2.72% | 3.63% | 4.53% | 5.44% | 6.33% | 7.18% |
| Total Loss (Life of Transaction) ... | 0.08% | 0.10% | 0.17% | 0.21% | 0.24% | 0.28% |
| **85% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 5.990 | 5.989 | 5.987 | 5.985 | 5.982 | 5.979 |
| Average Life (yrs) ........................ | 1.27 | 1.27 | 1.28 | 1.29 | 1.30 | 1.31 |
| Modified Duration (yrs) ................ | 1.206 | 1.212 | 1.218 | 1.225 | 1.234 | 1.243 |
| Principal Window (months) .......... | 14 - 17 | 14 - 17 | 14 - 17 | 14 - 18 | 14 - 18 | 14 - 18 |
| Principal No. Months .................... | 4 | 4 | 4 | 5 | 5 | 5 |
| Total Loss (Notes Maturity)........... | 2.72% | 3.60% | 4.46% | 5.30% | 6.08% | 6.80% |
| Total Loss (Life of Transaction) ... | 0.08% | 0.10% | 0.13% | 0.21% | 0.24% | 0.28% |
| **100% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 5.996 | 5.994 | 5.992 | 5.990 | 5.987 | 5.984 |
| Average Life (yrs) ........................ | 1.24 | 1.25 | 1.26 | 1.27 | 1.28 | 1.29 |
| Modified Duration (yrs) ................ | 1.186 | 1.193 | 1.200 | 1.207 | 1.215 | 1.226 |
| Principal Window (months) .......... | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 18 | 14 - 18 |
| Principal No. Months | 5 | 5 | 5 | 5 | 6 | 5 |
| Total Loss (Notes Maturity)........... | 2.65% | 3.46% | 4.20% | 4.89% | 5.52% | 6.09% |
| Total Loss (Life of Transaction) ... | 0.08% | 0.10% | 0.13% | 0.15% | 0.24% | 0.28% |
| **115% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 6.002 | 6.000 | 5.997 | 5.995 | 5.993 | 5.991 |
| Average Life (yrs) ........................ | 1.22 | 1.23 | 1.24 | 1.25 | 1.25 | 1.26 |
| Modified Duration (yrs) ................ | 1.165 | 1.173 | 1.180 | 1.187 | 1.194 | 1.203 |
| Principal Window (months) .......... | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 18 |
| Principal No. Months .................... | 5 | 5 | 5 | 5 | 5 | 6 |
| Total Loss (Notes Maturity)........... | 2.46% | 3.13% | 3.74% | 4.29% | 4.80% | 5.28% |
| Total Loss (Life of Transaction) ... | 0.08% | 0.10% | 0.13% | 0.15% | 0.18% | 0.28% |
| **130% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 6.007 | 6.006 | 6.003 | 6.001 | 5.999 | 5.997 |
| Average Life (yrs) ........................ | 1.20 | 1.21 | 1.22 | 1.22 | 1.23 | 1.24 |
| Modified Duration (yrs) ................ | 1.148 | 1.152 | 1.159 | 1.167 | 1.174 | 1.181 |
| Principal Window (months) .......... | 13 - 16 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 | 13 - 17 |
| Principal No. Months .................... | 4 | 5 | 5 | 5 | 5 | 5 |
| Total Loss (Notes Maturity)........... | 2.21% | 2.77% | 3.28% | 3.75% | 4.19% | 4.59% |
| Total Loss (Life of Transaction) ... | 0.06% | 0.10% | 0.13% | 0.15% | 0.18% | 0.20% |
| **150% Prepayment Curve** | | | | | | |
| Yield (%) ........................... | 6.014 | 6.012 | 6.011 | 6.010 | 6.007 | 6.005 |
| Average Life (yrs) ........................ | 1.18 | 1.19 | 1.19 | 1.19 | 1.20 | 1.21 |
| Modified Duration (yrs) ................ | 1.126 | 1.130 | 1.135 | 1.139 | 1.146 | 1.154 |
| Principal Window (months) .......... | 13 - 16 | 13 - 16 | 13 - 16 | 13 - 16 | 13 - 17 | 13 - 17 |
| Principal No. Months .................... | 4 | 4 | 4 | 4 | 5 | 5 |
| Total Loss (Notes Maturity)........... | 1.87% | 2.33% | 2.75% | 3.13% | 3.49% | 3.83% |
| Total Loss (Life of Transaction) ... | 0.06% | 0.08% | 0.10% | 0.11% | 0.18% | 0.20% |

It is very unlikely that the Mortgage Loans will prepay or suffer losses or delinquencies in a manner consistent with the assumptions used in preparing the preceding tables until maturity or that all of the Mortgage Loans in the Mortgage Pool will prepay or suffer losses at the same rate.  In addition, it is very unlikely that the levels of one-month LIBOR and six-month LIBOR will remain at the levels assumed.  For example, while the assumptions used in preparing the preceding tables assume prepayment rates for all of the Mortgage Loans, some Mortgage Loans have Prepayment Charges and others do not, and the Mortgage Loans that are adjustable-rate Mortgage Loans have varying rate adjustment characteristics.  In addition, there will be discrepancies between the actual characteristics of the Mortgage Loans included in the Mortgage Pool and the assumed characteristics used in preparing the preceding tables and there will be discrepancies between one-month LIBOR and six-month LIBOR used in preparing the preceding tables and the actual values thereof from time to time.  Any discrepancy may have an effect on yield, and such effect may be substantial.  Even if the Mortgage Loans perform as expected or better than expected with respect to prepayments and losses than under the scenarios shown in the preceding tables, increases in one-month LIBOR, which are not shown in the preceding tables, among other things, may have a substantial negative effect upon the weighted average lives set forth in the tables and the resulting yield on the Notes, and under various scenarios, even when all other characteristics are as expected or better than expected, pre-tax yields to maturity could be zero or negative.

## THE NOTE POLICIES AND THE NOTE INSURER

### The Note Policies

*The following summary of the terms of the Note Policies does not purport to be complete and is qualified in its entirety by reference to the Note Policies, copies of which are available upon reasonable request from the Indenture Trustee.*

The Note Insurer, in consideration of the payment of the Insurer Premium will issue the Class N-1 Note Policy and the Class N-3 Note Policy.  Subject to the terms of each Note Policy, the Note Insurer unconditionally and irrevocably insures that an amount equal to each Insured Payment with respect to the Class N-1 Notes and the Class N-3 Notes will be received from the Note Insurer by the Co-Trustee, or its successor, acting on behalf of the Indenture Trustee and for the benefit of the holders of the Insured Notes, for payment to each such Noteholder of such Noteholder's proportionate share of such amount.  The Note Insurer's obligations under each Note Policy with respect to a particular Insured Payment shall be discharged to the extent funds equal to the applicable Insured Payment are received by the Co-Trustee, whether or not such funds are properly applied by the Co-Trustee, the Indenture Trustee or any other person.  Insured Payments shall be made by or on behalf of the Note Insurer only at the time set forth in each Note Policy and no accelerated Insured Payments shall be made regardless of any acceleration of the Insured Notes, unless such acceleration is at the sole option of the Note Insurer.  The Note Insurer is not insuring any payments with respect to the Class N-2 Notes.

Notwithstanding the foregoing paragraph, the Note Policies do not cover shortfalls, if any, attributable to the liability of the Issuer or the Indenture Trustee for withholding taxes, if any (including interest and penalties in respect thereof).

Subject to the terms and conditions of each Note Policy, the Note Insurer will pay any Insured Payment that is a NIM Preference Amount on the second Business Day following receipt by it on a Business Day of (i) a certified copy of a final, nonappealable order of a court of competent jurisdiction exercising such jurisdiction in the related insolvency proceeding to the effect that such NIM Preference Amount is required to be returned to a trustee in bankruptcy pursuant to the United States Bankruptcy Code because it has been avoided as a preferential transfer or otherwise is being rescinded by or is required to be restored to the related debtor in such proceeding, (ii) an officer's certificate by or on behalf of the Indenture Trustee or the Co-Trustee to the effect that such order has been entered and is not subject to any stay, (iii) an opinion of counsel satisfactory to the Note Insurer that such order is final and not subject to appeal, (iv) an assignment in form and substance satisfactory to the Note Insurer, irrevocably assigning to the Note Insurer all rights and claims against the debtor that made such payment or otherwise with respect to such payment and (v) appropriate instruments to effect the appointment of the Note Insurer as agent in any legal proceeding related to such payment, such instruments to be in form and substance satisfactory to the Note Insurer, provided that if such documents are received after 12:00 noon, Philadelphia time, on such Business Day,

they will be deemed to be received on the following Business Day.  Such Insured Payment shall be disbursed to the receiver or trustee in bankruptcy named in the final order of the court exercising jurisdiction on behalf of the Indenture Trustee or the Co-Trustee and not to the Indenture Trustee or the Co-Trustee directly unless the Indenture Trustee, the Co-Trustee or any holders of the Insured Notes has returned one or more Insured Payments made in respect of the Insured Notes to such receiver or trustee in bankruptcy, in which case such Insured Payment shall be disbursed to the Co-Trustee for the benefit of the related Noteholders.

The Note Insurer will pay any other amount payable under the Note Policies in respect of a Insured Payment not later than 12:00 noon, Philadelphia time, on the later of (i) the Payment Date on which such Insured Payment is due and (ii) the second Business Day following receipt in Philadelphia, Pennsylvania, on a Business Day by the Note Insurer of a Note Insurer Notice; provided that if such Note Insurer Notice is received after 12:00 noon, Philadelphia time, on such Business Day, it will be deemed to be received on the following Business Day.  If any such Note Insurer Notice received by the Note Insurer is not in proper form or is otherwise insufficient for the purpose of making a claim under a Note Policy or contains any misstatement, it shall be deemed not to have been received by the Note Insurer for purposes of this paragraph, and the Note Insurer shall promptly so advise the Co-Trustee or the Indenture Trustee both of which may submit an amended Note Insurer Notice.  The amount of each Insured Payment that is due under each Note Policy, unless otherwise stated in the related Note Policy, will be disbursed to the Co-Trustee, for the benefit of the holders of the Insured Notes, by wire transfer of immediately available funds as described herein.

As used herein, the following terms shall have the following meanings:

"Class N-1 Deficiency Amount" means, with respect to any Payment Date prior to the Final Maturity Date for the Class N-1 Notes, the excess, if any, of the Interest Distribution Amount for the Class N-1 Notes on such Payment Date over the N-1 Available Funds (without regard to any portion thereof consisting of a Class N-1 Insured Payment or Note Insurer Optional Deposit allocable to principal) allocable to the Class N-1 Notes on such Payment Date and, with respect to the Final Maturity Date for the Class N-1 Notes, the excess, if any, of (i) the sum of (A) the Interest Distribution Amount for the Class N-1 Notes on such Payment Date and (B) the Aggregate Note Balance of the Class N-1 Notes on such Payment Date over (ii) the N-1 Available Funds (without regard to any portion thereof consisting of a Class N-1 Insured Payment) allocable to the Class N-1 Notes on such Final Maturity Date, in each case, without regard to any amendment, modification or supplement to any Operative Document (as defined in the Insurance Agreement) unless the Note Insurer shall have given its consent thereto in writing.  For the avoidance of doubt, the Class N-1 Deficiency Amount does not include any shortfall attributable to the liability of the Issuer, the Co-Issuer or the Indenture Trustee for withholding taxes (including interest and penalties with respect thereto) under the Code.

"Class N-3 Deficiency Amount" means, with respect to any Payment Date prior to the Final Maturity Date for the Class N-3 Notes, the excess, if any, of the Interest Distribution Amount for the Class N-3 Notes on such Payment Date over the N2/3 Available Funds (without regard to any portion thereof consisting of a Class N-3 Insured Payment or Note Insurer Optional Deposit allocable to principal) allocable to the Class N-3 Notes on such Payment Date and, with respect to the Final Maturity Date for the Class N-3 Notes, the excess, if any, of (i) the sum of (A) the Interest Distribution Amount for the Class N-3 Notes on such Payment Date and (B) the Aggregate Note Balance of the Class N-3 Notes on such Payment Date over (ii) the N2/3 Available Funds (without regard to any portion thereof consisting of a Class N-3 Insured Payment) allocable to the Class N-3 Notes on such Final Maturity Date, in each case, without regard to any amendment, modification or supplement to any Operative Document (as defined in the Insurance Agreement) unless the Note Insurer shall have given its consent thereto in writing.  For the avoidance of doubt, the Class N-3 Deficiency Amount does not include any shortfall attributable to the liability of the Issuer, the Co-Issuer or the Indenture Trustee for withholding taxes (including interest and penalties with respect thereto) under the Code.

"Insurance Agreement" means the Insurance and Indemnity Agreement dated the Closing Date among the Note Insurer, WMB, the Sponsor, the Issuer, the Co-Issuer, Citibank, N.A. both as Indenture Trustee and as trustee under the Underlying Pooling and Servicing Agreement and the Co-Trustee.

"Insured Payment" means, with respect to any Payment Date, (i) any Class N-1 Insured Payment and (ii) any Class N-3 Insured Payment.

"Class N-1 Insured Payment" means, with respect to any Payment Date, the sum of (i) a payment by the Note Insurer under the Class N-1 Note Policy in respect of any Class N-1 Deficiency Amount on such date and (ii) any Class N-1 Preference Amount.

"Class N-3 Insured Payment" means, with respect to any Payment Date, the sum of (i) a payment by the Note Insurer under the Class N-3 Note Policy in respect of any Class N-3 Deficiency Amount on such date and (ii) any Class N-3 Preference Amount.

"Insurer Default" means the occurrence and continuance of the Note Insurer's failure to make a Class N-1 Insured Payment or a Class N-3 Insured Payment required under the related Note Policy in accordance with its terms.

"Insurer Premium" means, with respect to any Payment Date, (i) the Class N-1 Insurer Premium and (ii) the Class N-3 Insurer Premium.

"Class N-1 Insurer Premium" means, for any Payment Date, the monthly premium payable to the Note Insurer with respect to the Class N-1 Notes on such Payment Date as set forth in the Insurance Agreement.

"Class N-3 Insurer Premium" means, for any Payment Date, the monthly premium payable to the Note Insurer with respect to the Class N-3 Notes on such Payment Date as set forth in the Insurance Agreement.

"Late Payment Rate":  As defined in the Insurance Agreement.

"Note Insurer Notice" means the telephonic notice from the Indenture Trustee, promptly confirmed in writing by telecopy from the Co-Trustee, substantially in the form of Exhibit A attached to each Note Policy, the original of which is subsequently delivered by registered or certified mail, from the Co-Trustee specifying the applicable Insured Payment which shall be due and owing on the applicable Payment Date or on the Final Maturity Date for the Insured Notes.

"NIM Preference Amount":  Any (i) Class N-1 Preference Amount or (ii) Class N-3 Preference Amount.

"Class N-1 Preference Amount":  Any Class N-3 Insured Payment paid under the Class N-1 Note Policy that is a Preference Amount.

"Class N-3 Preference Amount":  Any Class N-3 Insured Payment paid under the Class N-3 Note Policy that is a Preference Amount.

"Class N-1 Reimbursement Amount" means the sum of (i) any unreimbursed Class N-1 Insured Payments and any unreimbursed Note Insurer Optional Deposits and (ii) all other amounts owed to the Note Insurer under the Operative Agreements, in each case, together with interest on such amounts at the Late Payment Rate; provided, however, that Class N-1 Reimbursement Amounts for Note Insurer Optional Deposits allocable to principal shall accrue interest at the Note Rate applicable to the Class N-1 Notes.

"Class N-3 Reimbursement Amount" means the sum of (i) any unreimbursed Class N-3 Insured Payments and any unreimbursed Note Insurer Optional Deposits and (ii) all other amounts owed to the Note Insurer under the Operative Agreements, in each case, together with interest on such amounts at the Late Payment Rate; provided, however, that Class N-3 Reimbursement Amounts for Note Insurer Optional Deposits allocable to principal shall accrue interest at the Note Rate applicable to the Class N-3 Notes.

"Preference Amount" means any amount previously paid on the Insured Notes that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final, nonappealable order of a court of competent jurisdiction.

The Note Policies may not be cancelled for any reason prior to payment in full of the Insured Notes, and the premium payable in respect of each Note Policy is not refundable for any reason (including payment, or provision being made for payment, prior to the maturity of the Insured Notes).

Subject to the terms of the Indenture and the Insurance Agreement, the Note Insurer will be subrogated to the rights of each holder of the Insured Notes to receive payments in respect of the Insured Notes to the extent the Note Insurer makes Class N-1 Insured Payments or Class N-3 Insured Payments or makes Note Insurer Optional Deposits under the related Note Policy.

To the fullest extent permitted by applicable law, the Note Insurer will agree not to assert, and will waive, for the benefit of each holder of the Insured Notes, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to the Note Insurer to avoid payment of its obligations under the related Note Policy in accordance with the express provisions of related Note Policy. In particular, and without limiting the foregoing, in the event a breach of any representation or warranty made by WMB occurs, the Note Insurer will nevertheless make all payments in accordance with each Note Policy without setoff or reduction and will assert any claims against WMB separately. The foregoing will not limit or otherwise impair the Note Insurer's right to pursue recovery or claims (based on contractual rights, securities law violations, fraud or other causes of action) against any person or entity, or require payment by the Note Insurer of any amounts that have been previously paid or that are not otherwise due in accordance with the express provisions of the related Note Policy. Each Note Policy will not require payment to the extent any force majeure event or governmental act prevents the Note Insurer from performing its obligations under the Note Policies or such performance is rendered impossible, in which event the Note Insurer will agree to (i) use commercially reasonable efforts to perform its obligations under the Note Policies notwithstanding such force majeure event, governmental act or impossibility of performance and (ii) perform its obligations under the Note Policies promptly following cessation of such force majeure event, governmental act or impossibility of performance.

WMB, the Sponsor, the Issuer, the Co-Issuer, the Indenture Trustee, the Co-Trustee and the Note Insurer will enter into the Insurance Agreement pursuant to which WMB will agree to pay the Note Insurer for (i) any payment made under the Note Policies arising as a result of any failure by WMB to repurchase, substitute for or otherwise deposit any amount required to be deposited in respect of any Mortgage Loan or Underlying Certificate as mandated by any Operative Document (as defined in the Insurance Agreement), together with interest on any and all such amounts remaining unreimbursed and (ii) any payment made under the Note Policies arising as a result of any failure to pay or deposit any amount required to be paid or deposited by any person (other than the Note Insurer) pursuant to the Operative Documents, together with interest on any and all such amounts remaining unreimbursed. In addition, WMB will agree to pay the Note Insurer any and all reasonable charges, fees, costs and expenses that the Note Insurer may reasonably pay or incur in connection with (i) any accounts established to facilitate payments under the Note Policies to the extent that the Note Insurer has not been immediately reimbursed on the date that any amount is paid by the Note Insurer under the Note Policies, (ii) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents or (iii) any amendment, waiver, consent or other action with respect to, or related to, any Operative Document. WMB will also agree to indemnify the Note Insurer against certain liabilities, including liabilities arising from (i) any breach by any of WMB, the Sponsor, the Issuer or the depositor under the Underlying Pooling and Servicing Agreement (the "Underlying Depositor") of any of their respective representations, warranties or covenants contained in the Insurance Agreement and (ii) the misfeasance or malfeasance of, or gross negligence or theft committed by WMB, the Sponsor, the Underlying Depositor or the Issuer in connection with the transactions contemplated by the Operative Documents.

An "event of default" under the Insurance Agreement will constitute an Event of Default under the Indenture and allow the Note Insurer, among other things, to direct the Indenture Trustee to declare the principal and interest on the Insured Notes immediately due and payable and to declare amounts owed to the Note Insurer immediately due and payable. See "Description of the Indenture—Events of Default." An "event of default" under the Insurance Agreement includes: (i) any representation or warranty made by any party to the Insurance Agreement (other than the Note Insurer) under the Insurance Agreement, or any such party, the Underlying Depositor or any other Person (other than the Note Insurer) under any other Operative Document, or in any certificate furnished under any of the Operative Documents by any such person, shall prove to be untrue or incorrect in any material respect; (ii) any party to the Insurance Agreement, the Underlying Depositor or any other Person

(other than the Note Insurer) shall fail to pay when due any amount payable by it under any Operative Documents, (iii) the Insurance Agreement or any other Operative Document is determined pursuant to a finding or ruling by a governmental agency not to be valid and binding on any party thereto (other than the Note Insurer) or WMB, the Sponsor, the Underlying Depositor or the Issuers assert that any of the Operative Documents is not valid on the parties thereto (other than the Note Insurer); (iv) the occurrence and continuance of events of default, certain termination events or other similar occurrences under any Operative Document other than with respect to the Note Insurer; (v) any failure on the part of any party to the Insurance Agreement (other than the Note Insurer), the Underlying Depositor or any other Person (other than the Note Insurer) to observe or perform in any material respect any other of the covenants or agreements on its part contained in the Insurance Agreement or in any other Operative Document beyond applicable cure periods; (vi) certain events of bankruptcy or insolvency affecting WMB, the Sponsor, the Underlying Depositor or the Issuers or (vii) certain events subjecting the Trust Estate, the Issuers, the Sponsor or the Underlying Trust Fund to income tax.

**The Note Insurer**

*The following information has been supplied by Radian Insurance Inc. for inclusion in this memorandum and has not been independently verified by the Issuers, the Indenture Trustee, the Co-Trustee, the Sponsor, the Initial Purchaser or any of their respective affiliates. None of the Issuers, the Indenture Trustee, the Co-Trustee, the Sponsor, the Initial Purchaser or any of their respective affiliates assume any responsibility for the accuracy, completeness or applicability of such information.*

The Note Insurer does not accept any responsibility for the accuracy or completeness of, has not participated in the preparation of, this memorandum or any information contained or incorporated by reference herein, or omitted therefrom, other than with respect to the accuracy of the information set forth under the heading "The Note Policies and the Note Insurer—The Note Insurer." Additionally, the Note Insurer nor any of its affiliates makes any representations regarding the Notes or the advisability of investing in the Notes.

*General*. The Note Insurer, Radian Insurance Inc., is a Pennsylvania domiciled and licensed insurer and a wholly-owned subsidiary of Radian Guaranty Inc. ("Radian Guaranty"), which is a wholly-owned subsidiary of Radian Group Inc. ("Radian"), an insurance holding company listed on the New York Stock Exchange.

Radian Guaranty Inc. is a wholly owned subsidiary of Radian Group Inc. ("Radian"). On February 6, 2007, MGIC Investment Corporation ("MGIC") and Radian announced that they have entered into a merger agreement. The agreement provides for the surviving company to be headquartered in Milwaukee, Wisconsin. The merger is subject to final due diligence and regulatory review. Radian and MGIC anticipate that the merger will close in the fourth quarter of 2007. Copies of all information regarding Radian and MGIC that is referenced in this Memorandum can be read and copied at the SEC's website at http:/www.sec.gov, the public reference room of the Securities and Exchange Commission at 450 Fifth Street, N.W., Washington, D.C. 20549, and the offices of the New York Stock Exchange, 20 Broad Street, New York 10005.

The Note Insurer is regulated by the Insurance Department of the Commonwealth of Pennsylvania. **None of Radian, Radian Guaranty or any of their officers, directors, shareholders or affiliates is obligated to pay the debts of or claims against the Note Insurer.**

*Ratings*. The Note Insurer's financial strength is rated "AA" by S&P and Fitch, Inc. ("Fitch") and "Aa3" by Moody's Investors Service, Inc. The Note Insurer's financial strength currently is not rated by any other rating agency. Each rating of the Note Insurer should be evaluated independently. The ratings reflect the respective rating agencies' current assessments of the creditworthiness of the Note Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Insured Notes and such ratings may be subject to revision, qualification or withdrawal at any time by the rating agencies. Any downward revision, qualification or withdrawal of any of the above ratings may have an adverse effect on the market price of the Insured Notes. The Note Insurer does not guaranty the market price of the Insured Notes nor does it guaranty that the financial strength ratings will not be revised, qualified or withdrawn.

*Net Worth and Liquidity Maintenance Agreement.* Radian Guaranty has entered into an agreement to cause the Note Insurer to maintain a certain net worth and to have sufficient liquidity to meet its obligations.

The following table presents selected financial information of Radian Guaranty as of December 31, 2004, December 31, 2005 and September 30, 2006 (unaudited) determined on the basis of statutory accounting principles, which differ in significant respects from generally accepted accounting principles.

**Radian Guaranty Inc.[1]**
**Selected Financial Information**
**(Dollars in Thousands)**

|  | December 31, 2004 | December 31, 2005 | December 31, 2006 (unaudited) |
|---|---|---|---|
| Admitted Assets | $3,249,254 | $3,568,614 | $3,963,743 |
| Liabilities (excluding Contingency Reserve) | 628,898 | 670,045 | 751,415 |
| Capital and Surplus | 421,826 | 413,434 | 496,051 |
| Contingency Reserve | 2,198,530 | 2,485,135 | 2,716,277 |
| Total Policyholder's Surplus[2] | 2,620,356 | 2,898,569 | 3,212,328 |

[1]  Although Radian Guaranty has undertaken to maintain the net worth and liquidity of the Note Insurer, such undertaking shall not constitute an obligation of Radian Guaranty to provide a direct or indirect guarantee of any debt or other obligation of the Note Insurer whatsoever, including the Note Insurer's obligations under each Note Policy.

[2]  Total Policyholder's Surplus is equal to the sum of the Capital and Surplus and Contingency Reserve items referred to above.

Copies of the Note Insurer's and Radian Guaranty's quarterly and annual statutory financial statements are available upon request to Radian Insurance Inc., 1601 Market Street, Philadelphia, Pennsylvania 19103. The telephone number of the Note Insurer is (215) 231-1000.

**The Note Insurer's role is limited to providing the coverage set forth in each Note Policy.**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) including that under "*Certain Federal Income Tax Consequences*" and "*ERISA Considerations*" (i) was not intended or written to be used, and cannot be used, for the purpose of avoiding any tax penalty and (ii) was written to promote, market or recommend the transaction or matter addressed in the communication.  Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

**General**

The following is a general discussion of the anticipated material U.S. federal income tax consequences of the purchase, ownership and disposition of the Notes.  Where noted, it constitutes the opinion of Thacher Proffitt & Wood LLP, counsel to the Issuers.

Except as otherwise stated below, this summary deals only with Notes that are (i) beneficially owned by a holder (a "Noteholder") who is a United States person and (ii) held as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code").  A "United States person" is any person who is one of the following:

- a citizen or resident of the United States;

- a corporation or partnership (or other entity treated as a corporation or partnership for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any State thereof or the District of Columbia (except, in the case of a partnership or entity treated as a partnership, to the extent provided in U.S. Treasury regulations);

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- any trust if (x) a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all of its substantial decisions or (y) the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

A "Non-U.S. Holder" is a beneficial owner of a Note who is not a United States person. A "U.S. Holder" is any beneficial owner of a Note that is a United States person.

If a partnership (including any entity that is treated as a partnership for U.S. federal income tax purposes) is a Noteholder, the treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership. A Noteholder that is a partnership, and the partners in such partnership, should consult their tax advisors about the U.S. federal income tax consequences of holding and disposing of the Notes.

A Noteholder's tax treatment may vary depending on his, her or its particular situation. Except where noted, this summary does not deal with special situations. For example, this summary does not address:

- tax consequences to Noteholders who may be subject to special tax treatment such as banks, insurance companies, tax-exempt organizations, mutual funds, dealers or traders in securities, real estate investment trusts, regulated investment companies, S corporations, estates and trusts;

- tax consequences to persons who hold the Notes as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- tax consequences to Noteholders whose functional currency is not the U.S. dollar; or

- any state, local or foreign tax consequences.

This summary is based on the Code, the Treasury regulations promulgated under the Code and administrative and judicial interpretations. These income tax laws, regulations and interpretations, however, may change at any time. Any change could be retroactive to the issuance date of the Notes.

The authorities on which this summary is based are subject to various interpretations. The opinions of Thacher Proffitt & Wood LLP expressed herein are not binding on the Internal Revenue Service (the "IRS") or the courts. The opinions and this summary are based on certain facts set forth in this memorandum, additional information and assumptions. If any of these facts, additional information and assumptions is not true, the conclusions expressed herein may not be accurate. Prospective investors should be aware that no rulings have been or will be sought from the IRS and either the IRS or the courts could disagree with the explanations or conclusions contained in this summary. There can be no assurance that the IRS would not challenge the conclusions expressed herein or that a court would not sustain such a challenge. This summary merely represents the best judgment of Thacher Proffitt & Wood LLP as to the likely outcome if the matters discussed herein were properly presented to a court in a contested case and the facts represented were established. Accordingly, prospective purchasers should consult their tax advisors and tax return preparers regarding the preparation of any item on a tax return, even where the anticipated tax treatment has been discussed herein.

In addition to the federal income tax consequences described below, potential investors should consider the state, local and foreign tax consequences, if any, of the purchase, ownership and disposition of the Notes. See "State

and Other Tax Consequences" below. Noteholders are advised to consult their tax advisors concerning the federal, state, local, foreign or other tax consequences to them of the purchase, ownership and disposition of the Notes.

## U.S. Federal Tax Treatment of the Issuer

The Code provides a specific exemption from U.S. federal income tax on net income for foreign corporations that restrict their activities in the United States to trading in stocks and securities (and any other activity closely related thereto) for their own account, whether such trading (or such other activity) is conducted by the corporation or its employees or through a resident broker, commission agent, custodian or other agent. This exemption does not apply to foreign corporations that are engaged in activities in the United States other than trading in stocks and securities (and any other activity closely related thereto) for their own account or that are dealers in stocks and securities. Provided that the Issuer restricts its activities to holding, collecting payments on, and disposing of the Underlying Certificates, and the Co-Issuer carries on no activities and holds no assets, the Issuer will be entitled to rely on this exemption and will not be subject to U.S. federal income tax on a net income basis with respect to its interest income and any gain from the sale or disposition of the Underlying Certificates. Further, the existence of the Co-Issuer will be disregarded for U.S. federal income tax purposes and the activities of the Co-Issuer will not cause the Issuer to be engaged in a trade or business in the U.S.

If it were determined that the Issuer were engaged in a trade or business in the United States for federal income tax purposes, and the Issuer had taxable income that was effectively connected with such U.S. trade or business, the Issuer would be subject under the Code to the regular U.S. corporate income tax on such effectively connected taxable income (and possibly to a 30% branch profits tax as well). The imposition of such a tax liability would materially affect the Issuer's financial ability to repay the Notes. The balance of this summary assumes that the Issuer is not subject to U.S. federal income tax on a net income basis.

In addition, Thacher Proffitt & Wood LLP will issue an opinion that payments of interest on or gain from the sale or disposition of the Underlying Certificates will not be subject to U.S. tax withholding so long as (i) neither the Issuer nor any person related to the Issuer holds a residual interest in the real estate mortgage investment conduit that issued the Underlying Certificates and (ii) the Issuer provides to the Underlying Trust Fund (or other appropriate withholding agent) documentation in the appropriate form. If either of the above requirements is not met, payments of interest on some or all of the Underlying Certificates may be subject to a 30% U.S. withholding tax. Any such withholding will affect the amount of funds that the Issuer has available to make payments on the Notes.

## U.S. Federal Tax Treatment of the Notes

Upon the issuance of the Notes, Thacher Proffitt & Wood LLP will deliver its opinion generally to the effect that, for U.S. federal income tax purposes, assuming compliance with all provisions of the Indenture and certain related documents, and based on the facts set forth in this memorandum and additional information provided by the Issuer and the Depositor, the Notes will be treated as indebtedness and not as ownership interests in the Issuer.

The Issuer's characterization of the Notes as indebtedness for federal income tax purposes will be binding on any Noteholder who does not disclose on its tax return that it is treating the Notes as equity for U.S. federal income tax purposes. Moreover, under the Indenture, the Issuer and the Indenture Trustee on behalf of the Noteholders and each Noteholder will agree to treat the Notes as indebtedness for U.S. federal, state and local income, single business and franchise tax purposes. Except where indicated to the contrary, the following discussion sets forth the consequences that will follow if the Notes are treated as indebtedness for U.S. federal income tax purposes.

## U.S. Federal Tax Treatment of the Noteholders

The following discussion is based in part upon the rules governing original issues discount ("OID") that are set forth in Sections 1271-1275 of the Code and in the Treasury regulations issued thereunder (the "OID

Regulations"). The OID Regulations do not adequately address certain issues relevant to, and in some instances provide that they are not applicable to, securities such as the Notes.

*Status as Real Property Loans*. The Notes will not constitute "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code, which is relevant for purposes of determining whether a Noteholder is a domestic building and loan association within the meaning of Section 7701(a)(19) of the Code. The Notes will not constitute "real estate assets" for purposes of Section 856(c)(4)(A) of the Code, and interest on the Notes will not constitute "interest on obligations secured by mortgages on real property or on interests in real property" for purposes of Section 856(c)(3)(B) of the Code, both of which are relevant for purposes of determining whether a Noteholder is a real estate investment trust within the meaning of Section 856 of the Code. In addition, the Notes will not constitute "qualified mortgages" within the meaning of Section 860G(a)(3) of the Code, which is relevant for purposes of determining whether a Noteholder is a REMIC within the meaning of Section 860D of the Code.

*Interest and OID*. The Issuer intends to take the position that the Notes may be issued with OID. If the Notes were issued with OID, holders of the Notes generally would be required to include such discount in income as it accrues in accordance with the method described below. Because the failure to pay interest timely does not cause a default under the Notes, it is possible that the IRS could assert that all of the interest on the Notes should be considered OID, which would have to be accrued currently by the Noteholders. However, under applicable Treasury regulations, if the terms and conditions of a debt instrument are such that there is only a remote likelihood that interest payments will not be timely made, the interest will not be considered OID. The Issuer believes that the likelihood of late payments of interest on the Notes is remote.

The OID on a Note is the excess of its stated redemption price at maturity over its issue price. The issue price of a Note is the first cash price at which a substantial amount of such Notes are sold (excluding sales to bond houses, brokers and underwriters). If less than a substantial amount of the Notes are sold for cash on or prior to the Closing Date, the issue price for the Notes will be the fair market value of such Notes on the Closing Date. Under the OID Regulations, the "stated redemption price" of a Note is equal to the total of all payments to be made on such Note other than "qualified stated interest." "Qualified stated interest" is interest that is unconditionally payable at least annually during the entire term of the instrument at a rate or rates meeting the requirements of the OID Regulations.

Section 1272(a)(6) of the Code provides special rules applicable to debt instruments issued with OID; Treasury regulations have not been issued under that section. Section 1272(a)(6) of the Code requires that a reasonable prepayment assumption be used in computing the accrual of OID if payments under such debt instruments may be accelerated by reason of prepayments of other obligations securing such debt instruments. The prepayment assumption is to be determined in a manner prescribed in Treasury regulations; however, those regulations have not been issued. The Conference Committee Report of the Tax Reform Act of 1986 (the "Committee Report") indicates that the regulations will provide that the prepayment assumption used with respect to a debt instrument must be the same as that used in pricing the initial offering of such debt instrument. The prepayment assumption used for the Notes (the "Prepayment Assumption") is available from the Issuer. No representation is made that a Note will prepay at any particular speed.

As to each "accrual period," that is, each period that ends on a date that corresponds to the day prior to each Payment Date and begins on the first day following the immediately preceding accrual period (or in the case of the first such period, begins on the Closing Date), a calculation will be made of the portion of the OID that accrued during such accrual period. The portion of OID that accrues in any accrual period will equal the excess, if any, of (i) the sum of (A) the present value, as of the end of the accrual period, of all of the payments remaining to be made on the Note, if any, in future periods and (B) the payments made on such Note during the accrual period of amounts included in the stated redemption price, over (ii) the adjusted issue price of such Class of Notes at the beginning of the accrual period. The present value of the remaining payments referred to in the preceding sentence will be calculated (i) assuming that payments on the Note will be received in future periods based on the Mortgage Loans being prepaid at a rate equal to the Prepayment Assumption, (ii) using a discount rate equal to the original yield to maturity of the Note and (iii) taking into account events (including actual prepayments) that have occurred before the close of the accrual period. For these purposes, the original yield to maturity of the Note will be calculated based on its issue price and assuming that payments on the Note will be made in all accrual periods based on the

Mortgage Loans being prepaid at a rate equal to the Prepayment Assumption.  As noted above, the stated redemption price of the Notes will include all stated interest thereon.  The adjusted issue price of a Note at the beginning of any accrual period will equal the issue price of such Note, increased by the aggregate amount of OID that accrued with respect to such Note in prior accrual periods, and reduced by the amount of any payments made on such Note in prior accrual periods of amounts included in the stated redemption price.  The OID accruing during any accrual period, computed as described above, will be allocated ratably to each day during the accrual period to determine the daily portion of OID for such day.

A subsequent purchaser of a Note that purchases the Note at a cost less than its remaining stated redemption price will also be required to include in gross income the daily portions of any OID with respect to such Note.  However, each such daily portion will be reduced, if the subsequent purchaser's cost exceeds the Note's "adjusted issue price," in proportion to the ratio such excess bears to the aggregate OID remaining to be accrued on such Note.  The adjusted issue price of a Note on any given day equals the sum of (i) the adjusted issue price (or, in the case of the first accrual period, the issue price) of such Note at the beginning of the accrual period which includes such day and (ii) the daily portions of OID for all days during such accrual period prior to such day.

*Market Discount*.  Under Section 1276 of the Code, a Noteholder that purchases a Note at a market discount, that is, at a purchase price less than its adjusted issue price, must, unless the market discount is *de minimis*, (i) include in income as ordinary income a portion of each payment of principal equal to the accrued market discount on the Note not previously included in income and (ii) treat the gain, if any, recognized on disposition of the Note as ordinary income to the extent of any accrued market discount not previously included in income.  Alternatively, a holder of a market discount Note may elect to include market discount in income currently as it accrues.  If made, this election will apply to all market discount bonds acquired by such Noteholder on or after the first day of the first taxable year to which the election applies.  In addition, the OID Regulations permit the holder of a Note to elect to accrue all interest and discount (including *de minimis* market discount or OID) in income as interest, and to amortize premium, based on a constant yield method.  If such an election were made with respect to a Note with market discount, the Noteholder would be deemed to have made an election to include currently market discount in income with respect to all other debt instruments having market discount that such Noteholder acquires during the taxable year of the election or thereafter, and possibly previously acquired instruments.  Similarly, a Noteholder that made this election for a Note that is acquired at a premium would be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Noteholder owns or acquires.  See "—*Premium*" below.  Each of these elections to accrue interest, discount and premium with respect to a Note on a constant yield method or as interest is irrevocable without the consent of the IRS.

Market discount with respect to a Note will be considered to be *de minimis* if such market discount is less than 0.25% of the remaining stated redemption price of the Note multiplied by the number of complete years to maturity remaining after the date of its purchase.  The OID Regulations addressing the calculation of *de minimis* OID provide that the weighted average maturity is to be used rather than complete years to maturity for obligations payable in installments; it is likely that the same rule applies with respect to market discount, presumably taking into account the prepayment assumption used in pricing the transaction.  If market discount is treated as *de minimis* under this rule, it would likely be treated in a manner similar to OID of a *de minimis* amount.  That is, it is included in income as principal payments are made based on the proportion of the amount of principal payment to the stated principal of the debt instrument.  Such treatment would result in discount being included in income at a slower rate than it would be using the method described above.

Section 1276(b)(3) of the Code specifically authorizes the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, such as the Notes, the principal of which is payable in more than one installment.  Such regulations have not yet been issued.  Until they are, the rules described in the legislative history apply.  The legislative history indicates that in each accrual period market discount on instruments such as the Notes should accrue, at the Noteholder's option: (i) on the basis of a constant yield method, (ii) in the case of a debt instrument issued without OID, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total amount of stated interest remaining to be paid on the Notes as of the beginning of the accrual period, or (iii) in the case of a debt instrument issued with OID, in an amount that bears the same ratio to the total remaining market discount as the OID accrued in the accrual period bears to the total OID remaining on the debt instrument at the beginning of the accrual period.  The legislative history also provides that the prepayment assumption used to calculate the accrual of

OID, if any, is to be used in calculating the accrual of market discount. The prepayment assumption that would be used is available from the Issuer. No representation is made that a Note will prepay at any particular speed. Because the regulations referred to in this paragraph have not been issued, it is not possible to predict what effect such regulations might have on the tax treatment of a Note purchased at a discount in the secondary market.

Because the Notes provide for monthly payments throughout their term, the effect of these rules may be to require market discount on the Notes to be includible in income at a rate that is not significantly different from the rate at which such discount would accrue if it were OID.

Further, under Section 1277 of the Code, a holder of a market discount Note may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry the Note. For this purpose, the *de minimis* rule referred to above applies. Any deferred interest expense would not exceed the market discount that accrues during the taxable year and is, in general, allowed as a deduction not later than the year in which such market discount is includible in income. If the Noteholder elects to include market discount in income currently (as described above), the interest deferral rule described above will not apply.

*Premium*. A Note purchased at a cost (excluding any portion of the cost attributable to accrued interest) greater than its remaining stated redemption price will be considered to be purchased at a premium. The holder of such a Note may elect under Section 171 of the Code to amortize such premium under the constant yield method over the remaining term of the Note. If made, this election will apply to all debt instruments having amortizable bond premium that the holder owns or subsequently acquires. Amortizable bond premium will be treated as an offset to interest income on the related debt instrument, rather than as a separate interest deduction. As described above, the OID Regulations permit holders of Notes to elect to include all interest, discount and premium in income based on a constant yield method, further treating the Noteholder as having made the election to amortize premium generally. See "—*Market Discount*" above. The legislative history states that the same rules that apply to accrual of market discount (which rules may require use of a prepayment assumption in accruing market discount with respect to Notes without regard to whether such Notes have OID) would also apply in amortizing bond premium under Section 171 of the Code. However, it is possible that a prepayment assumption of zero is required.

*Realized Losses*. Under Section 165 of the Code, a Noteholder will not be entitled to deduct a loss until such Noteholder's Note becomes wholly worthless (i.e., when it becomes clear that no further principal payments will be made on the Note).

Each holder of a Note will be required to accrue interest with respect to such Note, without giving effect to any reductions in distributions on the Underlying Certificates attributable to defaults or delinquencies on the Mortgage Loans until it can be established that any such reduction ultimately will not be recoverable. As a result, the amount of taxable income reported in any period by any such Noteholder could exceed the amount of economic income actually realized by the Noteholder in such period. Although such a Noteholder eventually would recognize a loss or reduction in income attributable to previously accrued and included income that ultimately will not be realized, the law is unclear with respect to the timing and character of such loss or reduction in income.

## Sales of Notes

If a Note is sold, the selling Noteholder will recognize gain or loss equal to the difference between the amount realized on the sale and the Noteholder's adjusted basis in the Note. The adjusted basis of a Note generally will equal the cost of the Note to the Noteholder, increased by income reported by the Noteholder with respect to the Note (including market discount income) and reduced (but not below zero) by any amortized premium (not already taken into account in determining income) and any payments on the Note received by the Noteholder. Any such gain or loss will generally be capital gain or loss. However, in certain circumstances, including those described in the following two paragraphs, gain or loss may be treated as ordinary income or loss.

As discussed above, gain recognized on the sale of a Note by a seller who purchased the Note at a market discount will be taxable as ordinary income to the extent of the market discount that accrued during the period the seller held the Note, reduced by any market discount included in the seller's income under the rules described above

under "—U.S. Federal Tax Treatment of the Noteholders—*Market Discount*" and "—U.S. Federal Tax Treatment of the Noteholders—*Premium*."

Also, a Noteholder may elect to have net capital gain taxed at ordinary income rates rather than capital gains rates in order to include such net capital gain in total net investment income for the taxable year, for purposes of the rule that limits the deduction of interest on indebtedness incurred to purchase or carry property held for investment to the Noteholder's net investment income.

A Noteholder who is an individual may be entitled to preferential treatment for net long-term capital gains; however, the ability of Noteholders to offset capital losses against ordinary income is limited. Gain or loss realized on the sale, exchange or retirement of a Note by a Noteholder who is a United States person generally will be treated as from sources within the United States.

**Information Reporting and Backup Withholding**

Under certain circumstances, the Code requires "information reporting" annually to the IRS and to each Noteholder, and "backup withholding" with respect to certain payments made on or with respect to the Notes. Backup withholding generally does not apply with respect to certain Noteholders, including corporations, tax-exempt organizations, qualified pension and profit sharing trusts, and individual retirement accounts. Backup withholding will apply to a Noteholder who is a United States person only if such Noteholder (i) fails to furnish the Noteholder's taxpayer identification number ("TIN") which, for an individual, would be his or her Social Security Number, (ii) furnishes an incorrect TIN, (iii) is notified by the IRS that the Noteholder has failed to properly report payments of interest and dividends, or (iv) under certain circumstances, fails to certify, under penalty of perjury, that the Noteholder has furnished a correct TIN and has not been notified by the IRS that the Noteholder is subject to backup withholding for failure to report interest and dividend payments.

A Non-U.S. Holder that provides the applicable IRS Form W-8BEN or W-8IMY, together with all appropriate attachments, signed under penalties of perjury, identifying the Non-U.S. Holder and stating that the Non-U.S. Holder is not a United States person, will not be subject to IRS reporting requirements or U.S. backup withholding for payments of interest or principal on the Notes. In addition, IRS Form W-8BEN will be required from the beneficial owners of interests in a Non-U.S. Holder that is treated as a partnership for U.S. federal income tax purposes.

The payment of the proceeds on the disposition of a Note by a Noteholder to or through the U.S. office of a broker generally will be subject to information reporting and backup withholding unless the Noteholder either certifies its status as a Non-U.S. Holder under penalties of perjury on the applicable IRS Form W-8BEN or W-8IMY or otherwise establishes an exemption. The payment of the proceeds on the disposition of a Note by a Non-U.S. Holder to or through a non-U.S. office of a non-U.S. broker will not be subject to backup withholding or information reporting unless the non-U.S. broker is a "U.S. Related Person" (as defined below). The payment of proceeds on the disposition of a Note by a Non-U.S. Holder to or through a non-U.S. office of a U.S. broker or a U.S. Related Person generally will not be subject to backup withholding but will be subject to information reporting unless the Noteholder certifies its status as a Non-U.S. Holder under penalties of perjury or the broker has certain documentary evidence in its files as to the Non-U.S. Holder's foreign status and the broker has no actual knowledge to the contrary.

For this purpose, a "U.S. Related Person" is (i) a "controlled foreign corporation" for U.S. federal income tax purposes, (ii) a foreign person 50% or more of whose gross income from all sources for the three-year period ending with the close of its taxable year preceding the payment (or for such part of the period that the broker has been in existence) is derived from activities that are effectively connected with the conduct of a U.S. trade or business, or (iii) a foreign partnership if at any time during its tax year one or more of its partners are United States persons who, in the aggregate, hold more than 50% of the income or capital interest of the partnership or if, at any time during its taxable year, the partnership is engaged in the conduct of a U.S. trade or business.

Backup withholding is not an additional tax and may be refunded (or credited against the Noteholder's U.S. federal income tax liability, if any), <u>provided</u> that certain required information is furnished. The information reporting requirements may apply regardless of whether withholding is required. Copies of the information returns

reporting such interest and withholding also may be made available to the tax authorities in the country in which a Non-U.S. Holder is a resident under the provisions of an applicable income tax treaty or agreement.

**THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE NOTES. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF EACH SUCH INVESTOR'S PARTICULAR CIRCUMSTANCES.**

## CAYMAN ISLANDS TAX CONSIDERATIONS

The following discussion of certain Cayman Islands income tax consequences of an investment in the Notes is based on the advice of Maples and Calder as to Cayman Islands law received by the Issuer. The discussion is a general summary of the present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(a)    payments of interest and principal on the Notes will not be subject to taxation in the Cayman Islands and no withholding will be required on the payment of interest and principal to any holder of the Notes, nor will gains derived from the disposal of the Notes be subject to Cayman Islands income, capital gains or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

(b)    no stamp duty is payable in respect of the issue of the Notes. The Notes themselves will be stampable if they are executed in or brought into the Cayman Islands; and

(c)    Certificates evidencing the Notes, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty. However, an instrument of transfer in respect of a Note or a Certificate would be subject to Cayman Islands stamp duty if executed in or brought into the Cayman Islands.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and expects to obtain an undertaking from the Governor in Cabinet of the Cayman Islands in substantially the following form:

**The Tax Concessions Law**
**1999 Revision**
**Undertaking as to Tax Concessions**

In accordance with the provision of Section 6 of The Tax Concessions Law (1999 Revision), the Governor in Cabinet undertakes with the Issuer:

(a)    that no law which is hereafter enacted in the Islands any tax to be levied on profits, income, gains or appreciations shall apply to the Issuer or its operations; and

(b)    In addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable;

(i)    on or in respect of the shares, debentures or other obligations of the Issuer; or

(ii)    by way of the withholding in whole or part, or any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

67

These concessions shall be for a period of twenty years from the date on which the undertaking is granted.

**THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE NOTES.  PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF EACH SUCH INVESTOR'S PARTICULAR CIRCUMSTANCES.**

## STATE AND OTHER TAX CONSEQUENCES

In addition to the federal income tax consequences described under "Certain Federal Income Tax Consequences" above, potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the Notes offered hereunder.  State tax law may differ substantially from federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction.  Therefore, prospective investors should consult their own tax advisors with respect to the various tax consequences of investments in the Notes offered hereunder.

**THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE NOTES.  PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF EACH SUCH INVESTOR'S PARTICULAR CIRCUMSTANCES.**

## ERISA CONSIDERATIONS

Sections 404 and 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), impose certain fiduciary and prohibited transaction restrictions on employee pension and welfare benefit plans subject to Title I of ERISA ("ERISA Plans") and on certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general and separate accounts, in which such ERISA Plans are invested.  Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on tax-qualified retirement plans described in Section 401(a) of the Code, individual retirement accounts described in Section 408 of the Code, Archer MSAs described in Section 220(d) of the Code, health savings accounts as described in Section 223(d) of the Code and Coverdell Education Savings Accounts described in Section 530 of the Code (collectively, "Tax Favored Plans"). ERISA and the Code prohibit a broad range of transactions involving assets of ERISA Plans and Tax Favored Plans (collectively, "Plans") and persons who have certain specified relationships to such Plans (so-called "Parties in Interest" within the meaning of ERISA or "Disqualified Persons" within the meaning of the Code), unless a statutory or administrative exemption is available with respect to any such transaction.

Certain employee benefit plans, such as governmental plans (as defined in ERISA Section 3(32)), plans maintained outside the United States primarily for the benefit of persons substantially all of whom are non-resident aliens as described in Section 4(b)(4) of ERISA and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA) are not subject to ERISA requirements.  Accordingly, assets of such plans may be invested in the Notes without regard to the ERISA considerations described below, subject to the provisions of other applicable federal and state law. Any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in Section 503 of the Code.

Certain transactions involving the Issuers might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchases a Note, if the assets of the Issuers are deemed to be assets of the Plan. The United States Department of Labor (the "DOL") has promulgated regulations at 29 C.F.R. Section 2510.3-101 (the "DOL Regulations") defining the term "Plan Assets".  Under the DOL Regulations, generally, when a Plan makes an investment in an equity interest in another entity (such as the Issuer or the Co-Issuer), the underlying assets of that entity may be considered Plan Assets unless certain exceptions apply.  Exceptions contained in the DOL Regulations provide that a Plan's assets will include both an equity interest and an undivided interest in each asset of an entity in which it makes an equity investment, unless:  (1) the entity is an "operating

company" as defined in the DOL Regulations; or (2) the equity investment made by the Plan is either in a "publicly-offered security" that is "widely held," both as defined in the DOL Regulations, or a security issued by an investment company registered under the Investment Company Act of 1940, as amended; or (3) Benefit Plan Investors (as defined below) do not own 25% or more in value of any class of equity securities issued by the entity, excluding equity interests held by persons (other than Benefit Plan Investors) with discretionary authority or control over the entity's assets, or who provide investment advice for a fee with respect to such assets, and any affiliates thereof. For this purpose, "Benefit Plan Investors" include Plans, as well as any entity whose underlying assets include Plan Assets by reason of a Plan's investment in such entity. Under the DOL Regulations, the term "equity interest" means any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. Although it is not free from doubt, the Issuers believe that the Notes should be treated as debt obligations without significant equity features for the purposes of the DOL Regulations as of the date hereof.

ERISA generally imposes on Plan fiduciaries certain general fiduciary requirements, including those of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. Any person who exercises any authority or control with respect to the management or disposition of the assets of a Plan and any person who provides investment advice with respect to such assets for a fee is a fiduciary of such Plan. As a result of the DOL Regulations, a Plan's investment in the Notes may cause the Underlying Certificates and other assets of the Trust Estate (or the assets of the Underlying Trust Fund) to be deemed Plan Assets. If this is the case, any party exercising management or discretionary control with respect to such assets may be deemed a Plan fiduciary and will therefore be subject to the fiduciary requirements and prohibited transaction provisions of ERISA and the Code with respect thereto. The Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any other provider of credit support or any of their affiliates may be considered to be or may become Parties in Interest (or Disqualified Persons) with respect to certain Plans. Therefore, the acquisition or holding of the Notes by or on behalf of a Plan could be considered to give rise to a prohibited transaction within the meaning of ERISA and the Code unless one or more statutory or administrative exemptions is available.

Because the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any provider of credit support or any of their affiliates may receive certain benefits in connection with the sale of the Notes, the purchase of Notes using Plan Assets over which any of such parties has investment authority might be deemed to be a violation of the prohibited transaction rules of ERISA or Section 4975 of the Code for which no exemption may be available. Accordingly, the Notes may not be purchased using Plan Assets if any of the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any provider of credit support or any of their affiliates has investment authority with respect to such assets.

Whether or not the Underlying Certificates and other assets of the Trust Estate were deemed to include Plan Assets, prior to making an investment in the Notes, prospective Plan investors should determine whether the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any provider of credit support or any of their affiliates is a Party in Interest (or Disqualified Person) with respect to such Plan and, if so, whether such transaction is subject to one or more statutory or administrative exemptions. The DOL has granted certain class exemptions ("Class Exemptions") which provide relief from certain of the prohibited transaction provisions of ERISA and the related excise tax provisions of the Code, including, but not limited to: Prohibited Transaction Class Exemption ("PTCE") 84-14, which exempts certain transactions effected on behalf of a Plan by a "qualified professional asset manager"; PTCE 90-1, which exempts certain transactions between insurance company separate accounts and Parties in Interest (or Disqualified Persons); PTCE 91-38, which exempts certain transactions between bank collective investment funds and Parties in Interest (or Disqualified Persons); PTCE 95-60, which exempts certain transactions between insurance company general accounts and Parties in Interest (or Disqualified Persons); and PTCE 96-23, which exempts certain transactions effected on behalf of a Plan by an "in-house asset manager." In addition, the Pension Protection Act of 2006 provides a statutory exemption under Section 408(b)(17) of ERISA for certain prohibited transactions between a Plan and a party in interest other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the

transaction or renders investment advice with respect to those assets, solely by reason of providing services to the Plan or by reason of certain relationship to such a service provider, provided that certain conditions are met. There can be no assurance that any exemption will apply with respect to any particular Plan investment in the Notes or, even if all of the conditions specified therein were satisfied, that any exemption would apply to all prohibited transactions that may occur in connection with such investment. Accordingly, prior to making an investment in the Notes, prospective Plan investors should determine whether the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any provider of credit support or any of their affiliates is a Party in Interest (or Disqualified Person) with respect to such Plan and, if so, whether such transaction is subject to one or more statutory or administrative exemptions.

In addition to any exemption that may be available under PTCE 95-60 for the purchase and holding of the Notes by an insurance company general account, Section 401(c) to ERISA provides certain exemptive relief from the provisions of Part 4 of Title I of ERISA and Section 4975 of the Code, including the prohibited transaction restrictions imposed by ERISA and the related excise taxes imposed by the Code, for transactions involving an insurance company general account. Pursuant to Section 401(c) of ERISA, the DOL issued final regulations on January 5, 2000 ("401(c) Regulations"), which provide guidance for the purpose of determining, in cases where insurance policies supported by an insurer's general account are issued to or for the benefit of a Plan on or before December 31, 1998, which general account assets constitute Plan Assets. Section 401(c) of ERISA generally provides that, effective July 5, 2001, any assets of an insurance company general account which support insurance policies issued to Plans on or before December 31, 1998 for which the insurance company does not comply with the 401(c) Regulations may be treated as Plan Assets. In addition, because Section 401(c) does not relate to insurance company separate accounts, separate account assets are still treated as Plan Assets of any Plan invested in such separate account. Insurance companies contemplating the investment of general account assets in the Notes should consult with their legal counsel with respect to the applicability of Section 401(c) of ERISA and the U.S. Supreme Court's decision in <u>John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank</u>, 510 U.S. 86 (1993), including the general account's ability to purchase and continue to hold the Notes after July 4, 2001.

As mentioned above, although it is not free from doubt, the Issuers believe that the Notes should be treated as indebtedness without substantial equity features for the purposes of the DOL Regulations as of the date hereof. Although it is not free from doubt, the Issuers also believe that, so long as the Notes retain a rating of at least investment grade, the Notes should continue to be treated as indebtedness without substantial equity features for the purposes of the DOL Regulations. There is, however, increased uncertainty regarding the characterization of debt instruments that do not carry an investment grade rating. Consequently, in the event of a withdrawal or downgrade to below investment grade of the rating of the Notes, the subsequent transfer of the Notes or any interest therein to a Plan trustee or other person acting on behalf of a Plan, or using Plan Assets to effect such transfer, is restricted. A prospective transferee of the Notes or any interest therein who is a Plan trustee or is acting on behalf of a Plan, or using Plan Assets to effect such transfer, is required to provide written confirmation (or in the case of any Note transferred in book-entry form, will be deemed to have confirmed) that at the time of such transfer the Notes are rated at least investment grade, and that such Transferee believes that the Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat such Notes.

In addition, each purchaser of a Note that is a Plan will be required to represent (or in the case of any such Note transferred in book-entry form, will be deemed to have represented) that (1) none of the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators, the Note Registrar, any provider of credit support or any of their affiliates is a Party in Interest or Disqualified Person with respect to such purchaser that is a Plan; or (2) the acquisition and holding of such Note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code. Alternatively, regardless of the rating of the Notes, a prospective transferee of such Notes or any interest therein who is a Plan trustee or is acting on behalf of a Plan, or using Plan Assets to effect such transfer, may provide the Indenture Trustee an opinion of counsel satisfactory to the Indenture Trustee, which opinion will not be at the expense of the Trust Estate, the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note Insurer, the Administrator, the Co-Administrators or the Note Registrar that the purchase, holding and transfer of the Notes or interests therein is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Trust Estate, the Issuer, the Co-Issuer, the Sponsor, the Initial Purchaser, the Indenture Trustee, the Co-Trustee, the Note

Insurer, the Administrator or the Co-Administrators to any obligation in addition to those undertaken in the Indenture.

Any prospective Plan investor considering whether to invest in the Notes should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code to such investment. In addition, any Plan fiduciary should consider its general fiduciary obligations under ERISA in determining whether to purchase Notes on behalf of a Plan.

The sale of any of the Notes to a Plan is in no respect a representation by the Issuers or the Initial Purchaser that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

## LEGAL INVESTMENT

The appropriate characterization of the Notes under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase Notes, is subject to significant interpretive uncertainties.

Institutions whose investment activities are subject to review by certain regulatory authorities hereafter may be or may become subject to restrictions on investment in the Notes, and such restrictions may be retroactively imposed.  The Federal Financial Institutions Examination Council, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision ("OTS") and the National Credit Union Administration ("NCUA") have adopted guidelines, and have proposed policies, regarding the suitability of investments in various types of derivative mortgage-backed securities, including securities such as the Notes.

For example, on April 23, 1998, the Federal Financial Institutions Examination Council issued a revised supervisory policy statement (the "1998 Policy Statement") applicable to all depository institutions, setting forth guidelines for investments in "high-risk mortgage securities."  The 1998 Policy Statement has been adopted by the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the NCUA and the OTS with an effective date of May 26, 1998.  The 1998 Policy Statement rescinds a 1992 policy statement that had required, prior to purchase, a depository institution to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and, if so, that the proposed acquisition would reduce the institution's overall interest rate risk.  The 1998 Policy Statement eliminates former constraints on investing in certain "high-risk" mortgage derivative products and substitutes broader guidelines for evaluating and monitoring investment risk.  In addition, the NCUA has issued regulations governing federal credit union investments which prohibit investment in certain specified types of securities, which may include the Notes.  The NCUA has indicated that its regulations will take precedence over the Policy Statement.  Similar policy statements and regulations have been issued by other regulators having jurisdiction over other types of depository institutions.

On December 1, 1998, the OTS issued Thrift Bulletin 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities" ("TB 13a"), which is applicable to thrift institutions regulated by the OTS.  TB 13a has an effective date of January 1, 1999.  One of the primary purposes of TB 13a is to require thrift institutions, prior to taking any investment position, to (i) conduct a pre-purchase portfolio sensitivity analysis for any "significant transaction" involving securities or financial derivatives, and (ii) conduct a pre-purchase price sensitivity analysis of any "complex security" or financial derivative.  For the purposes of TB 13a, "complex security" includes among other things any collateralized mortgage obligation or REMIC security, other than any "plain vanilla" mortgage pass-through security (that is, securities that are part of a single class of securities in the related pool that are non-callable and do not have any special features).  Accordingly, the Notes would likely be viewed as "complex securities."  The OTS recommends that while a thrift institution should conduct its own in-house pre-acquisition analysis, it may rely on an analysis conducted by an independent third-party as long as management understands the analysis and its key assumptions.  Further, TB 13a recommends that the use of "complex securities with high price sensitivity" be limited to transactions and strategies that lower a thrift institution's portfolio interest rate risk.  TB 13a warns that investment in complex securities by thrift institutions that do not have adequate risk measurement, monitoring and control systems may be viewed by OTS examiners as an unsafe and unsound practice.

The Issuer makes no representations as to the proper characterization of the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes under the applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of the Notes. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own legal advisors in determining whether and to what extent the Notes constitute legal investments or are subject to investment, capital or other restrictions. The Notes will not be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984.

## RATINGS

It is a condition to the purchase of the Notes by the Initial Purchaser that the Notes be rated not lower than the following ratings by S&P:

| Note Class | S&P |
| --- | --- |
| N-1 | AA |
| N-2 | A- |
| N-3 | AA |

The rating of the Insured Notes will depend primarily upon the creditworthiness of the Note Insurer. The ratings reflect the assessments of the Rating Agency, based on particular prepayment and loss assumptions, of the likelihood of the receipt by the Noteholders of the related Original Note Balances and interest on the Aggregate Note Balances outstanding from time to time at the applicable Note Rate; however, such ratings do not represent any assessment of the timing of receipt by Noteholders of the related Original Note Balance or the corresponding effect on yield to investors. In connection with the foregoing, the ratings address (i) the ultimate receipt by holders of the Class N-2 Notes of the related Original Note Balance on or prior to the Payment Date in April 2047 and the ultimate receipt by holders of the Insured Notes of the related Original Note Balance on or prior to the Payment Date in April 2012 and (ii) the timely receipt by Noteholders on each Payment Date of interest at the applicable Note Rate on the related Aggregate Note Balance outstanding immediately prior to such Payment Date. The ratings also address structural, legal and issuer related aspects associated with the Notes, including the nature of the underlying assets.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to any Notes is subsequently lowered for any reason, no person or entity is obligated to provide any additional credit support or credit enhancement with respect to such Notes. The Issuer has not requested that any rating agency rate any Notes other than as stated above. If another rating agency were to rate the Notes, such rating agency may assign a rating different from the ratings described above.

## PRIVATE PLACEMENT

Subject to the terms and conditions set forth in the Note Purchase Agreement, dated as of April 26, 2007, the Issuers have agreed to sell the Notes to the Initial Purchaser and the Initial Purchaser has agreed to purchase the Notes from the Issuers.

The Notes have not been registered under the Securities Act or registered or qualified under any applicable state securities laws, and neither the Issuer nor any other person is required to so register or qualify the Notes or to provide registration rights to any investor therein. The Initial Purchaser has advised the Issuer that it proposes to place the Notes purchased by it privately in compliance with Rule 144A to QIBs that are acquiring such Notes or interests therein for their own account or for the account of another QIB. Such investors will be required to make or shall be deemed to have made certain representations with respect to their ability to invest in the Notes. The Notes are offered subject to receipt and acceptance by the Initial Purchaser and to certain other conditions.

The Issuers, the Sponsor and WMB have agreed to indemnify the Initial Purchaser against certain civil liabilities, including liabilities under the Securities Act, or to contribute to payments the Initial Purchaser may be required to make in respect thereof.

## LEGAL MATTERS

Certain legal matters relating to the Notes will be passed upon for the Sponsor, the Issuer, the Co-Issuer and the Initial Purchaser by Thacher Proffitt & Wood LLP, and for the Issuer by Maples and Calder, Cayman Islands as to matters of Cayman Law.

## INDEX OF DEFINED TERMS

1998 Policy Statement ............................................70
401(c) Regulations..................................................69
Accelerated Default Date.......................................34
Administration Agreement .....................................2
Administrative Expenses ......................................29
Administrator..........................................................35
Aggregate Note Balance .......................................23
Available Funds.....................................................26
Base Prospectus ....................................................iii
BBA........................................................................24
Benefit Plan Investors..........................................68
Book-Entry Notes .................................................25
Business Day..........................................................34
Cap Agreement......................................................31
Cap Agreement......................................................ii
Cap Agreements ....................................................31
Cap Agreements ....................................................ii
Class Exemptions..................................................68
Class N-1 Cap Agreement ....................................ii
Class N-1 Deficiency Amount ..............................55
Class N-1 Insured Payment ..................................56
Class N-1 Insurer Premium ..................................56
Class N-1 Notes.....................................................i
Class N-1 Preference Amount ...............................56
Class N-1 Reimbursement Amount .......................56
Class N-2 Notes.....................................................i
Class N-3 Cap Agreement ....................................ii
Class N-3 Deficiency Amount ..............................55
Class N-3 Insured Payment ..................................56
Class N-3 Insurer Premium ..................................56
Class N-3 Notes.....................................................i
Class N-3 Preference Amount ...............................56
Class N-3 Reimbursement Amount .......................56
Clean-Up Call........................................................10
Co-Administration Agreement ..............................2
Co-Administrator...................................................2
Co-Administrators .................................................2
Code.......................................................................59
Co-Issuer...............................................................i
Committee Report..................................................62
Controlling Party...................................................34
Co-Trustee .............................................................iii
Cut-off Date...........................................................44
Declaration of Trust...............................................35
Definitive Notes ....................................................25
Disclosure Exhibits ...............................................ii
Disqualified Persons..............................................67
DOL........................................................................67
DOL Regulations...................................................67
DTC........................................................................i
ERISA....................................................................iv
ERISA Plans ..........................................................67
Event of Default ....................................................39

Extraordinary Expenses.........................................29
Final Maturity Date ...............................................33
Financial Intermediary..........................................25
Fitch.......................................................................58
Indenture ...............................................................iii
Indenture Trustee ..................................................iii
Initial Purchaser....................................................i
Insurance Agreement.............................................55
Insured Notes.........................................................i
Insured Payment....................................................55
Insurer Default.......................................................56
Insurer Premium....................................................56
Interest Accrual Period .........................................30
Interest Distribution Amount................................30
Interest Shortfall....................................................30
IRS.........................................................................60
Issue Date ..............................................................ii
Issuer......................................................................i
Issuers....................................................................i
Late Payment Rate.................................................56
LIBOR Business Day.............................................24
LIBOR Determination Date...................................24
Mortgage Loans.....................................................ii
Mortgage Pool.......................................................ii
N-1 Available Funds..............................................27
NCUA....................................................................70
NIM Allocation Percentage...................................30
NIM Preference Amount .......................................56
Non-U.S. Holder....................................................60
Note Account.........................................................3
Note Balance..........................................................23
Note Insurer...........................................................i
Note Insurer Notice ...............................................31
Note Insurer Notice ...............................................56
Note Insurer Optional Deposit..............................33
Note Policy ............................................................i
Note Rate................................................................23
Note Register .........................................................24
Noteholder .............................................................59
Notes......................................................................i
OID.........................................................................61
OID Regulations....................................................61
Operative Agreements...........................................34
Optional Termination Side Letter .........................34
Ordinary Shares.....................................................35
Original Note Balance ...........................................23
OTS........................................................................70
Outstanding...........................................................34
Overcollateralization Target Amount ...................4
Participants ............................................................21
Parties in Interest ..................................................67
Payment Date.........................................................27
Plan........................................................................iv

Plan Assets ............................................................. 67
Plans ..................................................................... 67
Preference Amount ............................................... 57
Prepayment Assumption ........................................ 62
Principal Distribution Amount ............................. 30
Prospectus ............................................................ iii
Prospectus Supplement ......................................... iii
PTCE .................................................................... 68
QIBs ........................................................................ i
Radian ................................................................... 58
Radian Guaranty ................................................... 58
Rating Agency ...................................................... 13
Record Date ............................................................ 7
Reference Banks ................................................... 24
Relief Act .............................................................. 20
Reserve Interest Rate ............................................ 24
Reuters Monitor Money Rates Service page ......... 24
RSA 421-B ............................................................ iv
Rule 144A ............................................................... i
Rules ..................................................................... 25
S&P ...................................................................... 13
Securities Act .......................................................... i
Seller .................................................................... 18
Senior Certificates ................................................. ii

Series Certificates .................................................. ii
Servicer ................................................................. 10
Share Trustee ........................................................ 35
SMMEA ................................................................ 14
Subordinate Note .................................................. 23
Swap Notional Amount ........................................ 31
Tax Favored Plans ................................................ 67
TB 13a .................................................................. 70
TIN ....................................................................... 65
Trust Estate ........................................................... 36
U.S. Related Person .............................................. 65
Underlying Business Day ...................................... 34
Underlying Certificates .......................................... ii
Underlying Class C Certificate ............................... ii
Underlying Class P Certificate ............................... ii
Underlying Depositor ............................................ 57
Underlying Distribution Date ............................... 27
Underlying Pooling and Servicing Agreement ........ ii
Underlying Transaction .......................................... iii
Underlying Trust Fund ........................................... ii
United States person ............................................. 59
WCC ....................................................................... i
WMB ...................................................................... 2

Exhibit D

**PROSPECTUS**

**Mortgage Pass-Through Certificates**
**Mortgage Trust Certificates**
**Mortgage-Backed Notes**
**(Issuable in Series)**

**WaMu ASSET ACCEPTANCE CORP.**
**Depositor**

---

**You should consider carefully the risk factors beginning on page 5 of this prospectus and in the prospectus supplement.**

The prospectus together with the accompanying prospectus supplement will constitute the full prospectus.

---

**The Securities:**

WaMu Asset Acceptance Corp., as depositor, will sell the securities, which may be in the form of mortgage pass-through certificates, mortgage-backed notes or mortgage trust certificates. Each issue of securities will have its own series designation and will evidence either:

- the ownership of assets held by a trust, or

- debt obligations secured by assets held by a trust.

**The Trust and Its Assets:**

The assets of a trust will primarily include any combination of various types of:

- one-to-four-family residential first and junior lien mortgage loans,

- multifamily first and junior mortgage loans,

- commercial first and junior mortgage loans,

- mixed-use residential and commercial first and junior mortgage loans,

- home equity lines of credit,

- cooperative apartment loans, or

- home equity revolving lines of credit, including partial balances of those lines of credit or beneficial interests in those lines of credit.

The assets of the trust may also include mortgage securities and rights to excess servicing fees.

The assets of the trust for a series of securities may also include financial guaranty insurance policies, pool insurance policies, letters of credit, reserve funds or currency or interest rate exchange agreements or any combination of credit support. Credit enhancement may also be provided by means of subordination of one or more classes of securities, by cross-collateralization or by overcollateralization.

**Neither the Securities and Exchange Commission nor any state securities commission has approved these securities or determined that this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is March 22, 2007.

**IMPORTANT NOTICE ABOUT INFORMATION PRESENTED IN THIS PROSPECTUS AND THE ACCOMPANYING PROSPECTUS SUPPLEMENT**

We provide information to you about the offered securities in two separate documents that progressively provide more detail:

- this prospectus, which provides general information, some of which may not apply to your series of securities; and

- the accompanying prospectus supplement, which describes the specific terms of your series of securities.

You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including the information incorporated by reference. We have not authorized anyone to provide you with different information. We are not offering the securities in any state where the offer is not permitted. We do not claim the accuracy of the information in this prospectus or the accompanying prospectus supplement as of any date other than the dates stated on their respective covers.

We include cross-references in this prospectus and the accompanying prospectus supplement to captions in these materials where you can find further related discussions. The following Table of Contents and the Table of Contents included in the accompanying prospectus supplement provide the pages on which these captions are located.

Several capitalized terms are used in this prospectus to assist you in understanding the terms of the securities. Some of the capitalized terms used in this prospectus are defined in the glossary beginning on page 138 in this prospectus.

# TABLE OF CONTENTS

| | Page |
|---|---|
| RISK FACTORS | 5 |
| ADDITIONAL RISK FACTORS APPLICABLE TO NEGATIVE AMORTIZATION LOANS | 24 |
| DESCRIPTION OF THE TRUSTS | 27 |
| Description of the Mortgage Assets to be Held By a Trust | 27 |
| Mortgage Loan Information in Prospectus Supplement | 34 |
| Static Pool Information | 35 |
| DESCRIPTION OF THE PRE-FUNDING ACCOUNT FOR THE PURCHASE OF ADDITIONAL MORTGAGE LOANS | 35 |
| THE DEPOSITOR, THE SPONSOR, THE SERVICER AND CERTAIN OTHER TRANSACTION PARTIES | 36 |
| USE OF PROCEEDS | 36 |
| YIELD AND MATURITY CONSIDERATIONS | 37 |
| Maturity and Weighted Average Life | 39 |
| THE DEPOSITOR'S MORTGAGE LOAN PURCHASE PROGRAM | 42 |
| Underwriting Standards | 42 |
| Qualifications of Originators and Mortgage Loan Sellers | 43 |
| DESCRIPTION OF THE SECURITIES | 44 |
| Form of Securities | 45 |
| Exchangeable Securities | 47 |
| Assignment of Trust Assets; Review of Files by Trustee | 49 |
| Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach | 51 |
| Establishment of Custodial Account; Deposits to Custodial Account In Respect of Trust Assets | 53 |
| Deposits to Distribution Account | 56 |
| Distributions on the Securities | 56 |
| Advances by Servicer in Respect of Delinquencies on the Trust Assets | 58 |
| Form of Reports to Securityholders | 59 |
| Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator | 60 |
| Description of Sub-Servicing | 61 |
| Procedures for Realization Upon Defaulted Mortgage Assets | 62 |
| Retained Interest; Servicing or Administration Compensation and Payment of Expenses | 64 |
| Annual Servicing Compliance Reports | 64 |
| Matters Regarding the Servicer and the Depositor | 65 |
| Events of Default Under the Governing Agreement and Rights Upon Events of Default | 66 |

| | Page |
|---|---|
| Amendment of the Governing Agreements | 68 |
| Termination of the Trust and Disposition of Trust Assets | 69 |
| Description of the Trustee | 70 |
| Duties of the Trustee | 70 |
| DESCRIPTION OF CREDIT SUPPORT | 71 |
| Subordination | 71 |
| Letter of Credit | 72 |
| Mortgage Pool Insurance Policy | 74 |
| Special Hazard Insurance Policy | 75 |
| Bankruptcy Bond | 77 |
| Fraud Bond | 77 |
| Financial Guarantee Insurance | 77 |
| Reserve Fund | 77 |
| Overcollateralization | 77 |
| Cross-Support Features | 78 |
| OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES | 78 |
| Swaps and Yield Supplement Agreements | 78 |
| Purchase Obligations | 78 |
| Mandatory Auctions | 79 |
| DESCRIPTION OF PRIMARY INSURANCE POLICIES | 80 |
| Primary Mortgage Insurance Policies | 80 |
| Primary Hazard Insurance Policies | 80 |
| FHA Insurance | 81 |
| VA Guarantees | 84 |
| LEGAL ASPECTS OF MORTGAGE ASSETS | 84 |
| Mortgage Loans | 84 |
| Cooperative Loans | 85 |
| Foreclosure on Mortgages | 86 |
| Foreclosure on Mortgaged Properties Located in the Commonwealth of Puerto Rico | 87 |
| Foreclosure on Cooperative Shares | 88 |
| Rights of Redemption with Respect to Mortgage Loans | 89 |
| Anti-Deficiency Legislation and Other Limitations on Lenders | 89 |
| Junior Mortgages | 91 |
| Home Equity Line of Credit Loans | 91 |
| Enforceability of Due-on-Sale Clauses | 91 |
| Prepayment Charges and Prepayments | 92 |
| Leases and Rents | 92 |
| Subordinate Financing | 92 |
| Applicability of Usury Laws | 93 |
| Alternative Mortgage Instruments | 93 |
| Servicemembers Civil Relief Act | 94 |
| Environmental Legislation | 94 |
| Forfeitures in Drug and RICO Proceedings | 95 |

|  | Page |
|---|---|
| Negative Amortization Loans............ | 95 |
| MATERIAL FEDERAL INCOME TAX CONSEQUENCES........................ | 95 |
| General ................................ | 95 |
| Opinions ............................... | 96 |
| REMICs ............................... | 97 |
| Taxation of Owners of REMIC Regular Certificates........................... | 99 |
| Taxation of Owners of REMIC Residual Certificates........................... | 105 |
| Matters Relevant to Holders of All REMIC Certificates................... | 110 |
| Withholding Regulations ................ | 115 |
| Notes .................................. | 115 |
| Grantor Trusts.......................... | 115 |
| Partnership Trusts ...................... | 123 |
| Tax Return Disclosure and Investor List Requirements ........................ | 128 |
| STATE AND OTHER TAX CONSEQUENCES........................ | 128 |
| ERISA CONSIDERATIONS................. | 128 |

|  | Page |
|---|---|
| Plan Asset Regulation.................... | 129 |
| Underwriter's and WCC Exemption ..... | 129 |
| Other Exemptions ....................... | 132 |
| Insurance Company General Accounts ... | 133 |
| Representations from Investing Plans .... | 133 |
| Tax-Exempt Plan Investors.............. | 133 |
| Consultation with Counsel .............. | 133 |
| CERTAIN LEGAL INVESTMENT ASPECTS ................................. | 134 |
| METHODS OF DISTRIBUTION ............ | 135 |
| LEGAL MATTERS ......................... | 136 |
| FINANCIAL INFORMATION ............... | 136 |
| RATINGS ................................. | 137 |
| AVAILABLE INFORMATION .............. | 137 |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE........ | 137 |
| GLOSSARY ................................ | 138 |
| APPENDIX A: Global Clearance, Settlement and Tax Documentation Procedures With Respect to Book-Entry Securities .......... | 143 |

## RISK FACTORS

**The offered securities are not suitable investments for all investors. In particular, you should not purchase the offered securities unless you understand and are able to bear the prepayment, credit, liquidity and market risks associated with the securities.**

**You should carefully consider the following risk factors in connection with the purchase of the offered securities as well as the additional risk factors in the prospectus supplement related to your security and, if applicable, the additional risk factors described under "Additional Risk Factors Applicable to Negative Amortization Loans" below.**

**The Securities Will Have Limited Liquidity So Investors May Be Unable to Sell Their Securities or May Be Forced to Sell Them at a Discount From Their Initial Offering Price**

There can be no assurance that a resale market for the securities of any series will develop following the issuance and sale of any series of securities. Even if a resale market does develop, it may not provide securityholders with liquidity of investment or continue for the life of the securities of any series. The prospectus supplement for any series of securities may indicate that an underwriter specified in the prospectus supplement intends to establish a secondary market in the securities; however no underwriter will be obligated to do so. As a result, any resale prices that may be available for any offered security in any market that may develop may be at a discount from the initial offering price. The offered securities will not be listed on any securities exchange.

**Credit Support May Be Limited; The Failure of Credit Support to Cover Losses on the Trust Assets Will Result in Losses Allocated to the Related Securities**

Credit support is intended to reduce the effect of delinquent payments or losses on the assets of the trust on those classes of securities that have the benefit of the credit support. With respect to each series of securities, credit support may be provided in one or more of the forms referred to in this prospectus. Regardless of the form of credit support provided, the amount of coverage will usually be limited in amount and in many cases will be subject to periodic reduction in accordance with a schedule or formula. Furthermore, credit support may provide only very limited coverage as to particular types of losses or risks, and may provide no coverage as to other types of losses or risks. If losses on the trust assets exceed the amount of coverage provided by any credit support or the losses are of a type not covered by any credit support, these losses will be borne by the holders of the related securities or specific classes of the related securities. See "Description of Credit Support."

**The Mortgaged Properties May Fail to Provide Adequate Security for the Mortgage Loans**

The securities will be directly or indirectly backed by mortgage loans. If the mortgaged properties fail to provide adequate security for the mortgage loans held by a trust, any resulting losses, to the extent not covered by credit support, will be allocated to the related securities in the manner described in the related prospectus supplement and consequently would adversely affect the yield to maturity on those securities. Some types of mortgage loans held by a trust may have a greater likelihood of delinquency and foreclosure than other mortgage loans, and a greater likelihood of loss in the event of delinquency and foreclosure. The prospectus supplement for each series of securities will describe the mortgage loans that are to be

5

held by the trust issuing your security and risks associated with those mortgage loans, which you should carefully consider in connection with the purchase of your security.

In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

**Foreclosure of Mortgage Loans May Result In Limitations or Delays In Recovery and Losses Allocated to the Securities**

Even assuming that the mortgaged properties provide adequate security for the mortgage loans, substantial delays can be encountered in connection with the liquidation of defaulted mortgage loans, and corresponding delays in the receipt of related proceeds by the securityholders could occur. An action to foreclose on a mortgaged property securing a mortgage loan is regulated by state statutes, rules and judicial decisions and is subject to many of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring several years to complete. In several states an action to obtain a deficiency judgment is not permitted following a nonjudicial sale of a mortgaged property. In the event of a default by a mortgagor, these restrictions may impede the ability of the servicer to foreclose on or sell the mortgaged property or to obtain liquidation proceeds sufficient to repay all amounts due on the related mortgage loan. The servicer will be entitled to deduct from liquidation proceeds all advances of scheduled principal and interest and all expenses incurred in attempting to recover amounts due on the related liquidated mortgage loan and not yet repaid, including payments to prior lienholders, legal fees and costs of legal action, real estate taxes, maintenance and preservation expenses and other reimbursable servicing advances. If any mortgaged properties fail to provide adequate security for the mortgage loans held by the trust issuing your security and insufficient funds are available from any applicable credit support, you could experience a loss on your investment.

Liquidation expenses with respect to defaulted mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, assuming that a servicer takes the same steps in realizing upon a defaulted mortgage loan having a small remaining principal balance as it would in the case of a defaulted mortgage loan having a larger principal balance, the amount realized after expenses of liquidation would be less as a percentage of the outstanding principal balance of the smaller principal balance mortgage loan than would be the case with a larger principal balance loan.

**There May Be a Greater Likelihood of Losses on Mortgage Loans Originated Under Some Underwriting Standards**

Each mortgage loan to be transferred to a trust will have been originated in accordance with the underwriting standards applied by the originator of that mortgage loan.

6

Underwriting standards may vary significantly among originators. While the underwriting standards of each originator will have been approved by an affiliate of the depositor, the underwriting standards, including documentation requirements, of some originators may be less restrictive than those of other originators. Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

**Mortgaged Properties Are Subject to Environmental Risks and the Cost of Environmental Clean-Up May Increase Losses on the Mortgage Loans**

Under various federal, state and local environmental laws, ordinances and regulations, a current or previous owner of real property may be liable for the costs of removal or remediation of hazardous or toxic substances on, under or in the property. These laws often impose liability whether or not the owner or operator knew of, or was responsible for, the presence of the hazardous or toxic substances. A lender also risks liability on foreclosure of the mortgage on the property. In addition, the presence of hazardous or toxic substances, or the failure to properly remediate the property, may adversely affect the owner's or operator's ability to sell the property. Although the incidence of environmental contamination of residential properties is less common than that for commercial properties, some mortgage loans held by a trust could be secured by mortgaged properties that are subject to environmental law violations. The servicer is generally prohibited from foreclosing on a mortgaged property unless it has taken adequate steps to ensure environmental compliance with respect to the mortgaged property. However, if the servicer errs and forecloses on mortgaged property that is subject to environmental law violations, or to the extent a mortgage loan seller does not provide adequate representations and warranties against environmental law violations, or is unable to honor its obligations, including the obligation to repurchase a mortgage loan upon the breach of a representation or warranty, a trust could experience losses which, to the extent not covered by credit support, could adversely affect the yield to maturity on the securities issued by that trust.

**The Ratings of Your Securities May Be Lowered Or Withdrawn Which May Adversely Affect the Liquidity or Market Value of Your Securities**

It is a condition to the issuance of the securities that each series of securities be rated in one of the four highest rating categories by a nationally recognized statistical rating agency. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any security, and accordingly, there can be no

7

assurance that the ratings assigned to any security on the date on which the security is originally issued will not be lowered or withdrawn by a rating agency at any time thereafter. The ratings of any series of securities by any applicable rating agency may be lowered following the initial issuance of the securities as a result of factors that the rating agency considers significant, such as the downgrading of the obligations of any applicable credit support provider, or as a result of losses on the related mortgage assets in excess of the levels contemplated by the rating agency at the time of its initial rating analysis. None of the sponsor, the depositor, the servicer or any of their respective affiliates will have any obligation to replace or supplement any credit support, or to take any other action to maintain any ratings of any series of securities. If any rating is revised or withdrawn, the liquidity or the market value of your security may be adversely affected.

**Failure of the Mortgage Loan Seller or Originator to Repurchase or Replace a Mortgage Loan May Result in Losses Allocated to the Related Securities**

Generally, each mortgage loan seller will have made representations and warranties in respect of the mortgage loans sold by the mortgage loan seller and related to a series of securities. If the mortgage loan seller did not originate the mortgage loans that it sold, the representations and warranties may in some cases instead have been made by the originator. In the event of a breach of a mortgage loan seller's or originator's representation or warranty that materially adversely affects the interests of the securityholders or the trust in a mortgage loan, the mortgage loan seller or originator will be obligated to cure the breach or repurchase or, if permitted, replace the mortgage loan as described under "Description of the Securities—Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach." However, there can be no assurance that a mortgage loan seller or originator will honor its obligation to cure, repurchase or, if permitted, replace any mortgage loan as to which a breach of a representation or warranty arises. A mortgage loan seller's or originator's failure or refusal to honor its repurchase obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the securities issued by the trust.

When a mortgage loan seller or originator is unable, or disputes its obligation, to repurchase affected mortgage loans from the trust, the servicer or, if multiple servicers, a designated servicer, or the depositor may negotiate and enter into one or more settlement agreements with the mortgage loan seller or originator that could provide for the purchase of only a portion of the affected mortgage loans. Any settlement could lead to losses on the mortgage loans which would be borne by the related securities. The depositor will not be obligated to purchase a mortgage loan if a mortgage loan seller or originator defaults on its obligation to do so, and no assurance can be given that the mortgage loan sellers or originators will carry out their repurchase obligations. In no event will any other person

8

be obligated to purchase any mortgage loan. A default by a mortgage loan seller or originator is not a default by the depositor or by the servicer. Any mortgage loan not so repurchased or substituted for will continue to be held by the trust and any related losses will be allocated to the related credit support, to the extent available, and otherwise to one or more classes of securities issued by the trust.

The representations and warranties of a mortgage loan seller or originator in respect of a mortgage loan may have been made as of a date prior to the date of initial issuance of the related series of securities, and a substantial period of time may have elapsed between the date as of which the representations and warranties were made and the date of initial issuance of the related series of securities. Accordingly, the occurrence of events during this period that are not covered by a mortgage loan seller's or originator's repurchase or substitution obligation could lead to losses that, to the extent not covered by credit support, may adversely affect the yield to maturity of the related securities.

**The Yield to Maturity on Your Securities Will Depend on a Variety of Factors Including Prepayments**

The timing of principal payments on the securities of a series will be affected by a number of factors, including the following:

- the extent of prepayments on the underlying assets held by the trust;

- how payments of principal are allocated among the classes of securities of that series as specified in the related prospectus supplement;

- if any party has an option to terminate the related trust early, the effect of the exercise of the option;

- the rate and timing of defaults and losses on the assets held by the trust;

- repurchases of assets of the trust as a result of material breaches of representations and warranties made by the depositor or a mortgage loan seller or originator; and

- with respect to a trust holding home equity revolving credit loans, additional draws on under the related credit line agreements.

Prepayments on mortgage loans may be influenced by prevailing mortgage interest rates. In general, in the case of fixed-rate mortgage loans, and in the case of ARM Loans during an initial fixed-rate period, if prevailing mortgage interest rates decline significantly below the mortgage interest rates on the mortgage loans, the prepayment rate may increase. In addition, if prevailing mortgage interest rates decline significantly, ARM Loans could be subject to higher prepayment rates both during and after any initial fixed-rate period because the availability of fixed-rate mortgage loans at competitive interest rates may encourage mortgagors to refinance their mortgage loans to "lock in" lower fixed interest rates.

9

Penalties for early prepayment may also affect the prepayment rate, as they may discourage mortgagors from prepaying their mortgage loans during the period such prepayment penalties are in effect, even in a declining interest rate environment.

To the extent that a mortgage loan contains a "due-on-sale" clause and such clause is exercised, the sale of a mortgaged property may also cause a prepayment in full on the related mortgage loan.

Local and regional economic conditions and homeowner mobility may also affect the prepayment rate.

To the extent amounts in any pre-funding account have not been used to purchase additional mortgage loans, holders of the related securities may receive an additional prepayment.

The rate of prepayment of the mortgage loans included in or underlying the assets held by each trust may affect the yield to maturity of the securities. In general, if you purchase a class of offered securities at a price higher than its outstanding principal balance and principal distributions on your class occur faster than you anticipate at the time of purchase, the yield will be lower than you anticipate. Conversely, if you purchase a class of offered securities at a price lower than its outstanding principal balance and principal distributions on that class occur more slowly than you anticipate at the time of purchase, the yield will be lower than you anticipate.

The yield to maturity on some types of classes of securities, including securities that are entitled to principal distributions only or interest distributions only, securities as to which all or a portion of accrued interest will not be distributed but rather added to the principal balance of the security, and securities with an interest rate which fluctuates inversely with an index, may be relatively more sensitive to the rate of prepayment on the related mortgage loans than other classes of securities and, if applicable, to the occurrence of an early retirement of the securities. The prospectus supplement for a series will set forth the related classes of securities that may be more sensitive to prepayment rates.

See "Yield and Maturity Considerations" in this prospectus.

**The Exercise of an Optional Termination Right Will Affect the Yield to Maturity on the Related Securities**

The prospectus supplement for each series of securities will identify the party or parties that may, at its option, purchase the assets held by the trust if the aggregate principal balance of the mortgage loans and other assets held by the trust is less than the percentage specified in the related prospectus supplement of the aggregate principal balance of the outstanding mortgage loans and other trust assets at the cut-off date for that trust. The exercise of this option to terminate will result in the early retirement of the securities issued by that trust. The prospectus supplement for each series of securities will state the price to be paid by the terminating party and the amounts that the holders

10

of the securities will be entitled to receive upon early retirement.

A trust may also be terminated and the securities retired upon the determination of the depositor, bond administrator or trustee, as applicable, based upon an opinion of counsel, that the REMIC status of the trust has been lost or that a substantial risk exists that the REMIC status will be lost for the then current tax year.

The termination of a trust and the early retirement of securities by any party would decrease the average life of the securities and would adversely affect the holders of securities that are entitled to interest distributions only. In addition, any other class of securities purchased at a premium could be adversely affected by an optional termination.

**Violations of Consumer Protection Laws May Result in Losses on the Mortgage Loans and the Securities Backed By Those Mortgage Loans**

Federal and state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices:

- regulate interest rates and other charges on mortgage loans;
- require specific disclosures to borrowers;
- require licensing of originators; and
- regulate generally the origination, servicing and collection process for the mortgage loans.

Depending on the specific facts and circumstances involved, violations may limit the ability of a trust to collect all or a part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of amounts previously paid and could result in liability for damages and administrative enforcement against the originator or an assignee of the originator, like a trust, or the initial servicer or a subsequent servicer, as the case may be. In particular, it is possible that mortgage loans held by a trust will be subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA"). HOEPA adds additional provisions to Regulation Z, the implementing regulation of the Federal Truth-In-Lending Act. These provisions impose additional disclosure and other requirements on creditors with respect to nonpurchase money mortgage loans with interest rates or origination costs in excess of prescribed levels. The provisions of HOEPA apply to mortgage loans that were originated on or after October 1, 1995. These provisions can impose specific statutory liabilities upon creditors who fail to comply with their provisions and may affect the enforceability of the related loans. In addition, any assignee of the creditor, like a trust, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including the right to rescind the mortgage loan. Class action lawsuits under HOEPA have been brought naming

11

as defendants securitization trusts like the trusts described in this prospectus.

The mortgage loan seller or originator will represent that all applicable federal and state laws were complied with in connection with the origination of the mortgage loans. If there is a breach of a representation that materially and adversely affects the interest of the trust, the mortgage loan seller or originator will be obligated to purchase the affected mortgage loan or to substitute a qualifying replacement mortgage loan. If the mortgage loan seller or originator fails to repurchase or substitute, a trust could experience losses which, to the extent not covered by credit support, could adversely affect the yield to maturity on the related securities. See "Legal Aspects of Mortgage Assets."

**Modification of a Mortgage Loan by the Servicer May Reduce the Yield on the Related Securities**

If a mortgage asset is in default or default is reasonably foreseeable, the servicer for the trust or the underlying Mortgage Security, if it determines that modification of the mortgage asset could reasonably be expected to result in collections and other recoveries for that mortgage asset in excess of the liquidation proceeds that would be recovered upon foreclosure of, or other realization upon, that mortgage asset, may permit modifications of the mortgage asset rather than proceeding with foreclosure. Modification may have the effect of reducing the interest rate on the mortgage asset, forgiving the payment of principal or interest or extending the final maturity date of the mortgage asset. Any modified mortgage asset held by the trust may result in reduced collections from that mortgage asset and, to the extent not covered by the related credit support, reduced distributions on one or more classes of the related securities. Any mortgage asset modified to extend the final maturity of the mortgage asset may result in extending the final maturity of one or more classes of the related securities. See "Collection and Other Servicing Procedures Employed by the Servicer."

The servicing agreement may permit the servicer to deliver to a lender an assignment of mortgage and the related endorsed mortgage note in connection with a refinance of the related mortgaged property. As a result, it may be possible to refinance a mortgage loan through modification of an existing mortgage note, reducing the costs and documentation burden of the refinancing. The depositor and its affiliates do not have substantial experience with this method of financing except in states, such as New York, in which it is the usual standard of practice of mortgage lending. It is unknown to what extent, if any, the availability of refinancing through this mechanism may affect the rate at which prepayments on the mortgage loans would otherwise occur.

**The Return on Your Securities Could be Reduced due to the Servicemembers Civil Relief Act or any Comparable State Legislation**

Following the terrorist attacks in the United States on September 11, 2001, the United States has increased its active military operations (including, most recently, significant military actions in Iraq) and has placed a

12

substantial number of military reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. Calling reservists, members of the National Guard and civilians to active military duty may adversely affect the performance of your securities. Under the Servicemembers Civil Relief Act, as amended (the "Relief Act"), persons in active military service are provided relief from the performance of some payment obligations. The relief includes a 6.000% per annum interest rate cap on each mortgage loan, provided that the mortgage loan was obtained before the commencement of active military service. In addition, all civil court actions, such as bankruptcy and foreclosure proceedings, are delayed. See "Legal Aspects of Mortgage Assets—Servicemembers Civil Relief Act."

State legislation may provide similar relief for military personnel placed on active duty status.

The application of the interest rate cap to any mortgage loan would result in securityholders receiving less interest than they would otherwise be entitled to (to the extent that the interest rate otherwise payable by the borrower under the terms of the applicable mortgage note exceeded 6.000%), unless covered by credit support described in the related prospectus supplement.

The effect of a delay in foreclosure proceedings with respect to any mortgage loan by application of the Relief Act may be to cause a loss, or increase the severity of any loss that would have otherwise occurred, upon the final liquidation of the mortgage loan. These losses would be allocated to securityholders in the manner described in the related prospectus supplement, unless covered by credit support described in the prospectus supplement.

**Interest Only Loans Have a Greater Degree of Risk if a Default Occurs Because They do not Provide for any Payments of Scheduled Principal During an Initial Interest-Only Period**

If the mortgage pool includes mortgage loans that do not provide for any payments of scheduled principal during an initial interest-only period, the related prospectus supplement will specify the percentage of such interest only loans in the mortgage pool. During the initial interest-only period, monthly payments on the interest only loans will be comprised solely of interest accrued on the outstanding principal balance of the mortgage loan during the preceding calendar month. Since the mortgagors are not required to make scheduled principal payments on these mortgage loans during the interest-only period, the principal balance of the mortgage loan may be higher than the principal balance of a similar mortgage loan which requires the payment of both principal and interest throughout the entire term of the mortgage loan. A higher principal balance may result in a greater loss upon the liquidation of the mortgage loan due to a default.

13

**For transactions in which the offered securities are mortgage pass-through certificates, investors should consider the following ten risk factors:**

**The Trust May Not Have a Perfected Interest In Collections Commingled by the Servicer With Its Own Funds, Which Could Cause Delayed or Reduced Distributions on the Certificates**

The servicer will be permitted to commingle collections on the mortgage loans with its own funds, and may use the commingled funds for its own benefit. The trust may not have a perfected interest in these amounts, and thus distributions on the certificates could be delayed or reduced if the servicer were to enter conservatorship, receivership, or bankruptcy, were to become insolvent, or were to fail to perform its obligations under the related pooling agreement.

**The Conservatorship, Receivership, Bankruptcy, or Insolvency of WMB as Servicer, the Depositor, or the Trust Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB acts as the initial servicer, investors should consider the following**:

WMB is the initial servicer of the mortgage loans and provides administrative services to the depositor. WMB is a federal savings association, and its deposits are insured by the FDIC. If certain events occur relating to WMB's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, or any holder of certificates to enforce any obligations of WMB under any transaction document or to collect any amount owing by WMB under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could:

- authorize WMB to stop servicing the mortgage loans or to stop providing administrative services to the depositor;

- prevent the appointment of a successor servicer or the appointment of a successor administrator for the depositor; or

- alter the terms on which WMB continues to service the mortgage loans or provide administrative services to the depositor, including the amount or the priority of the fees paid to WMB.

If any of these events were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

14

The depositor is a wholly-owned subsidiary of WMB. Certain banking laws and regulations may apply not only to WMB but to its subsidiaries as well. If the depositor were found to have violated any of these laws or regulations, holders of the certificates could suffer a loss on their investment.

Arguments also may be made that the FDIC's rights and powers extend to the depositor and the trust and that, as a consequence, the FDIC could repudiate or otherwise directly affect the rights of holders of the certificates under the transaction documents. If the FDIC were to take this position, losses to holders of the certificates could result.

In addition, no assurance can be given that the FDIC would not attempt to exercise control over the mortgage loans or the other assets of the depositor or the trust on an interim or a permanent basis. If this were to occur, distributions on the certificates could be delayed or reduced.

Furthermore, if a conservator or receiver for WMB were to argue that any of the conservator's or receiver's administrative expenses relate to the mortgage loans or the transaction documents, those expenses could be paid from collections on the mortgage loans before the trustee receives any payments, which could result in losses to holders of the certificates.

The depositor has been established and each trust will have been established so as to minimize the risk that either of them would become insolvent or enter bankruptcy. Nevertheless, each of them may be eligible to file for bankruptcy, and no assurance can be given that the risk of insolvency or bankruptcy has been eliminated. If the depositor or the trust were to become insolvent or were to enter bankruptcy, distributions on the certificates could be delayed or reduced. Risks also exist that, if the depositor or the trust were to enter bankruptcy, the other entity and its assets (including the mortgage loans) would be treated as part of the bankruptcy estate.

Regardless of any decision made by the FDIC or ruling made by a court, moreover, the mere fact that WMB, the depositor, the trust, or any of their affiliates has become insolvent or entered conservatorship, receivership, or bankruptcy could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a receivership, conservatorship, bankruptcy, or insolvency of WMB, the depositor, or the trust that could result in delays or reductions in distributions on the certificates.

**The Conservatorship, Receivership, or Insolvency of WMB as Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB is a mortgage loan seller, investors should consider the following:**

WMB sells mortgage loans to the depositor. WMB is a federal savings association, and its deposits are insured by the FDIC. If certain events occur relating to WMB's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB.

WMB will treat its transfer of mortgage loans to the depositor as a sale. Arguments may be made, however, that the transfer of the mortgage loans constitutes only the grant of a security interest under applicable law.

Nevertheless, the FDIC has issued a regulation surrendering certain rights to reclaim, recover, or recharacterize a financial institution's transfer of financial assets such as the mortgage loans if:

- the transfer involved a securitization of the financial assets and meets specified conditions for treatment as a sale under relevant accounting principles;

- the financial institution received adequate consideration for the transfer;

- the parties intended that the transfer constitute a sale for accounting purposes; and

- the financial assets were not transferred fraudulently, in contemplation of the financial institution's insolvency, or with the intent to hinder, delay, or defraud the financial institution or its creditors.

WMB's transfer of the mortgage loans will be intended to satisfy all of these conditions.

If a condition required under the FDIC's regulation were found not to have been met, however, the FDIC could seek to reclaim, recover, or recharacterize WMB's transfer of the related mortgage loans. The FDIC may not be subject to an express time limit in deciding whether to take these actions, and a delay by the FDIC in making a decision could result in delays or reductions in distributions on the certificates. If the FDIC were successful in any of these actions, moreover, holders of the certificates may not be entitled under applicable law to the full amount of their damages.

Even if the conditions set forth in the regulation were satisfied and the FDIC did not reclaim, recover, or recharacterize WMB's transfer of the related mortgage loans, distributions to holders of the certificates could be delayed or reduced if WMB entered conservatorship or receivership.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB under any transaction document or to collect any amount owing by WMB under any transaction document. The FDIC also may require that its claims process be followed before payments

16

on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could authorize WMB to refuse to perform its obligations under the mortgage loan sale agreement pursuant to which it sold mortgage loans to the depositor, including its obligations to make payments or to repurchase or substitute for mortgage loans.

If this were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

There may be other possible effects of a receivership, conservatorship, bankruptcy, or insolvency of WMB, the depositor, or the trust that could result in delays or reductions in distributions on the certificates.

**The Conservatorship, Receivership, or Insolvency of WMB fsb as Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB fsb is a mortgage loan seller, investors should consider the following:**

WMB fsb sells mortgage loans to the depositor. WMB fsb is a federal savings bank, and its deposits are insured by the FDIC. If certain events occur relating to WMB fsb's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB fsb.

WMB fsb will treat its transfer of mortgage loans to the depositor as a sale. Arguments may be made, however, that the transfer of the mortgage loans constitutes only the grant of a security interest under applicable law.

Nevertheless, the FDIC has issued a regulation surrendering certain rights to reclaim, recover, or recharacterize a financial institution's transfer of financial assets such as the mortgage loans if:

- the transfer involved a securitization of the financial assets and meets specified conditions for treatment as a sale under relevant accounting principles;

- the financial institution received adequate consideration for the transfer;

- the parties intended that the transfer constitute a sale for accounting purposes; and

- the financial assets were not transferred fraudulently, in contemplation of the financial institution's insolvency, or with the intent to hinder, delay, or defraud the financial institution or its creditors.

17

WMB fsb's transfer of the mortgage loans will be intended to satisfy all of these conditions.

If a condition required under the FDIC's regulation were found not to have been met, however, the FDIC could seek to reclaim, recover, or recharacterize WMB fsb's transfer of the related mortgage loans. The FDIC may not be subject to an express time limit in deciding whether to take these actions, and a delay by the FDIC in making a decision could result in delays or reductions in distributions on the certificates. If the FDIC were successful in any of these actions, moreover, holders of the certificates may not be entitled under applicable law to the full amount of their damages.

Even if the conditions set forth in the regulation were satisfied and the FDIC did not reclaim, recover, or recharacterize WMB fsb's transfer of the related mortgage loans, distributions to holders of the certificates could be delayed or reduced if WMB fsb entered conservatorship or receivership.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB fsb under any transaction document or to collect any amount owing by WMB fsb under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could authorize WMB fsb to refuse to perform its obligations under the mortgage loan sale agreement pursuant to which it sold mortgage loans to the depositor, including its obligations to make payments or to repurchase or substitute for mortgage loans.

If this were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to argue that any term of the transaction documents violates applicable regulatory requirements.

There may be other possible effects of a receivership, conservatorship, or insolvency of WMB fsb that could result in delays or reductions in distributions on the certificates.

18

**The Bankruptcy or Insolvency of WMMSC Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMMSC is a mortgage loan seller, investors should consider the following:**

WMMSC sells mortgage loans to the depositor. WMMSC will represent and warrant in the mortgage loan sale agreement that the transfer of the mortgage loans to the depositor is an absolute sale, so that the depositor is the sole owner of each mortgage loan. WMMSC is eligible to be the debtor in a bankruptcy case. If WMMSC were to become a debtor in a bankruptcy case, and a party in interest (including WMMSC itself) were to take the position that the transfer of the mortgage loans to the depositor is not a sale, but rather should be recharacterized as the grant of a security interest in the mortgage loans to secure a borrowing of WMMSC, delays in distributions on the certificates could result. If a court were to adopt such a position, then delays or reductions in distributions on the certificates could result.

WMMSC and the depositor have taken steps to minimize the risk that in the event WMMSC were to become the debtor in a bankruptcy case, a court would order that the assets and liabilities of the depositor be substantively consolidated with those of WMMSC. The depositor is a separate special purpose corporation. If a party in interest (including WMMSC itself) asserted that the depositor's assets and liabilities should be consolidated with those of WMMSC, delays in distributions on the certificates could result. If the court ordered that the depositor's assets and liabilities be consolidated with those of WMMSC, there could be delays or reductions in distributions on certificates.

Should WMMSC go into bankruptcy, there could be other adverse effects on the holders of the certificates that could result in delays or reductions in distributions on certificates. These adverse effects could include, but may not be limited to, one or more of the following. The automatic stay provisions of the bankruptcy laws could prevent (unless approval of the bankruptcy court was obtained) any action by the depositor, the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMMSC under any transaction document or to collect any amount owing by WMMSC under any transaction document. In addition, with the authorization of the bankruptcy court, WMMSC may be able to repudiate any of the transaction documents to which it is a party. Such a repudiation would excuse WMMSC from performing any of its obligations (including payment obligations). The rights of the trust under the transaction documents may be limited or eliminated. Such a repudiation could also excuse the other parties to the transaction documents from performing any of their obligations. In particular, WMMSC may be able to repudiate its obligations to make payments or to repurchase or substitute for mortgage loans as required by the mortgage loan sale agreement.

19

Regardless of any ruling made by a court, moreover, the mere fact that WMMSC or any of its affiliates has become insolvent or gone into bankruptcy, conservatorship, or receivership could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a bankruptcy or insolvency of WMMSC that could result in delays or reductions in distributions on the certificates.

**The Bankruptcy, Conservatorship, Receivership, or Insolvency of a Mortgage Loan Seller Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which an entity other than WMB, WMB fsb or WMMSC is a mortgage loan seller, investors should consider the following:**

The transfer of mortgage loans by a mortgage loan seller (other than WMB, WMB fsb or WMMSC) to WMB, WMB fsb, WMMSC, or the depositor will be structured as an absolute sale, so that the transferee is the sole owner of each mortgage loan. If the mortgage loan seller were to become the subject of a receivership, conservatorship, bankruptcy, or other insolvency proceeding, and a party in interest (including the mortgage loan seller itself) were to take the position that the transfer of the mortgage loans is not a sale, but rather should be recharacterized as the grant of a security interest in the mortgage loans to secure a borrowing of the mortgage loan seller, delays in distributions on the certificates could result. If a court (or other relevant entity) were to adopt such a position, then delays or reductions in distributions on the certificates could result.

**Regulatory Action With Respect to WMB or WMB fsb Could Result In Losses**

Each of WMB and WMB fsb is regulated and supervised by the Office of Thrift Supervision and the FDIC. These regulatory authorities, and possibly others, have broad powers of enforcement with respect to WMB, WMB fsb, and their affiliates.

If any of these regulatory authorities were to conclude that an obligation under a transaction document to which WMB or WMB fsb is a party were an unsafe or unsound practice or violated any law, regulation, written condition, or agreement applicable to WMB, WMB fsb, or their affiliates, that authority may have the power to order WMB, WMB fsb, or the related affiliate to rescind the transaction document, to refuse to perform the obligation, to amend the terms of the obligation, or to take any other action determined by that authority to be appropriate. In addition, WMB, WMB fsb, or the related affiliate probably would not be liable to holders of certificates for contractual damages for complying with such an order, and holders of certificates would be unlikely to have any recourse against the regulatory authority. Therefore, if such an order were issued, distributions on the certificates could be delayed or reduced.

In one case of which the depositor is aware, the regulatory authority ordered the financial institution to immediately

20

resign as servicer and to cease performing its duties as servicer within approximately 120 days, to immediately withhold and segregate funds from collections for payment of its servicing fee (notwithstanding the priority of payments in the securitization documents and the perfected security interest of the relevant trust in those funds), and to increase its servicing fee percentage above that which was specified in the securitization documents.

| | |
|---|---|
| **Some Interests Could Have Priority Over the Trust's Interest In the Mortgage Loans, Which Could Cause Delayed or Reduced Distributions on the Certificates** | **For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:** |

The trustee will not physically possess some or all of the mortgage notes and mortgages related to the mortgage loans owned by the Trust. Instead, WMB fsb will hold some or all of the mortgage notes and mortgages as custodian on behalf of the trust. The mortgage notes and mortgages held by WMB fsb will not be endorsed or otherwise marked to reflect the transfer to the trust, and assignments of the mortgages to the trust will not be prepared or recorded. As a result, if a third party were to obtain physical possession of those mortgage notes or mortgages without actual knowledge of the prior transfer to the trust, the trust's interest in those mortgage notes and mortgages could be defeated, thereby likely resulting in delays or reductions in distributions on the certificates.

| | |
|---|---|
| **Assignments of Mortgages to the Trustee or the Trust Will Not Be Prepared or Recorded** | **For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:** |

With respect to each mortgage held by WMB fsb as custodian on behalf of the trust, an assignment of the mortgage transferring the beneficial interest under the mortgage to the trustee or the trust will not be prepared or recorded. In addition, an assignment of the mortgage will not be prepared or recorded in connection with the sale of the mortgage loan from the mortgage loan seller to the depositor. In many states, the recording of a separate assignment of the mortgage is not required to validly transfer ownership of the mortgage loan. However, at any time until an assignment of the mortgage with respect to a mortgage loan is recorded in the name of the trustee or the trust in the appropriate jurisdiction, (a) the mortgage loan seller, as the existing mortgagee of record, could execute another assignment of mortgage to any party with respect to such mortgage, which assignment of mortgage could be recorded prior to any recording of an assignment of the mortgage to the trustee or the trust and which would support an adverse claim of such other party with respect to the mortgage loan and/or result in delay in enforcing the mortgage, (b) the mortgage loan seller, as the existing mortgagee of record, could execute and deliver to the mortgagor an instrument of discharge and satisfaction with

respect to the mortgage, which would generally be effective upon recording to release the lien of such mortgage loan, (c) the trustee or the trust may not have a claim against the mortgagor for payments made to the mortgage loan seller, as the existing mortgagee of record, but instead may be required to proceed against the mortgage loan seller to recover the amount of any such payment made, (d) the trustee or the trust may not be able, acting directly in its own name, to enforce the mortgage against the related mortgaged property or mortgagor and may be required to act indirectly through the mortgage loan seller, as the existing mortgagee of record, and (e) the mortgage loan seller, and not the trustee or the trust, would be entitled to receive any notice with respect to any mortgage required to be given to the mortgagee of record. The occurrence of any of these could result in delays or reductions in distributions on the certificates.

**The Conservatorship, Receivership, or Insolvency of WMB fsb as Custodian Could Result In Delayed or Reduced Distributions on the Certificates**

**For transactions in which WMB fsb holds some or all of the mortgage notes and mortgages as custodian on behalf of the trust, investors should consider the following:**

WMB fsb is the custodian of some or all of the mortgage loan files. WMB fsb is a federal savings bank, and its deposits are insured by the FDIC. If certain events occur relating to WMB fsb's financial condition or the propriety of its actions, the FDIC may be appointed as conservator or receiver for WMB fsb.

The FDIC may be able to obtain a stay of any action by the trust, the trustee, the servicer, or any holder of certificates to enforce any obligations of WMB fsb under any transaction document or to collect any amount owing by WMB fsb under any transaction document. The FDIC also may require that its claims process be followed before payments on the mortgage loans are released to the trustee. The delay caused by any of these actions could result in losses to holders of the certificates.

The FDIC, moreover, may have the power to choose whether or not the terms of the transaction documents will continue to apply. Thus, regardless of what the transaction documents provide, the FDIC could:

- authorize WMB fsb to stop providing custodial services;

- prevent the appointment of a successor custodian; or

- alter the terms on which WMB fsb continues to provide custodial services, including the amount or the priority of the fees paid to WMB fsb.

If any of these events were to occur, the trust's rights under the transaction documents may be limited or eliminated. Such a repudiation by the FDIC could also excuse the other parties to the transaction documents from performing any of their obligations. Payments to holders of the certificates could be delayed or reduced. Holders of the certificates also may suffer a loss if the FDIC were to

argue that any term of the transaction documents violates applicable regulatory requirements.

The depositor is an affiliate of WMB fsb. Certain banking laws and regulations may apply not only to WMB fsb but to its affiliates as well. If the depositor were found to have violated any of these laws or regulations, holders of the certificates could suffer a loss on their investment. Arguments also may be made that the FDIC's rights and powers extend to the depositor and the trust and that, as a consequence, the FDIC could repudiate or otherwise directly affect the rights of holders of the certificates under the transaction documents. If the FDIC were to take this position, losses to holders of the certificates could result. In addition, no assurance can be given that the FDIC would not attempt to exercise control over the mortgage loans or the other assets of the depositor or the trust on an interim or a permanent basis. If this were to occur, distributions on the certificates could be delayed or reduced.

Regardless of any decision made by the FDIC or ruling made by a court, moreover, the mere fact that WMB fsb or any of its affiliates has become insolvent or entered conservatorship, receivership, or bankruptcy could have an adverse effect on the value of the mortgage loans and on the liquidity and value of the certificates.

There may be other possible effects of a receivership, conservatorship, or insolvency of WMB fsb that could result in delays or reductions in distributions on the certificates.

### ADDITIONAL RISK FACTORS APPLICABLE TO NEGATIVE AMORTIZATION LOANS

**The following risk factors apply to any offered securities backed by Negative Amortization Loans. If your security is backed by Negative Amortization Loans, as described in the prospectus supplement, you should carefully consider the following factors in connection with the purchase of your security as well as the other risk factors in this prospectus and in the prospectus supplement related to your security.**

**The Yield on Your Securities May be Limited by Maximum Mortgage Interest Rates**

Each Negative Amortization Loan has a maximum mortgage interest rate, which may prevent the mortgage interest rate on a mortgage loan from increasing, despite prevailing market interest rates. As a result, the yield on your securities may be adversely affected.

**Increases in the Related Index May Increase the Likelihood of Negative Amortization**

After the initial fixed-rate period, the mortgage interest rate on each Negative Amortization Loan will be adjusted monthly to equal the sum of the related index and a margin. Since the mortgage interest rate on each Negative Amortization Loan adjusts monthly and the minimum monthly payment adjusts annually (unless the principal balance of the mortgage loan would otherwise exceed a certain percentage, specified in the related mortgage note and in the related prospectus supplement, of its original principal balance), increases in the index will cause a larger portion of the minimum monthly payment to be allocated to interest and a smaller portion to principal. If the interest due on the Negative Amortization Loan exceeds the minimum monthly payment, the excess interest will be added to its outstanding principal balance in the form of "negative amortization." In addition, on any adjustment date until the fifth anniversary of the first due date, the minimum monthly payment may not increase by more than 7.5% (unless the principal balance of the Negative Amortization Loan would otherwise exceed a specified percentage of its original principal balance), which may not be enough to raise the minimum monthly payment to the amount necessary to avoid negative amortization.

Increases in the related index are a significant possibility for any Negative Amortization Loan, particularly if it was originated at a time when the value of the index was low relative to historical values. Many factors, including changes in economic conditions and monetary policy of the U.S. Federal Reserve Bank, may lead to increases in the index.

**Even if the Related Index Remains Constant, the Minimum Monthly Payment on the Negative Amortization Loans May be Less Than the Actual Interest Due For the First Five Years, Increasing the Likelihood of Negative Amortization During the Early Years of the Negative Amortization Loans**

The minimum monthly payment for the entire first year following origination of each Negative Amortization Loan reflects the fixed rate in effect during the initial fixed-rate period, which will generally be lower than the fully indexed rate in effect at any time during the first year. Therefore, after the initial fixed-rate period, even if the related index does not increase, the minimum monthly payment during the first year of the mortgage loan may not be enough to pay the amount of interest due on the mortgage loan, which is calculated based on the sum of the index and the margin. If the mortgagor chooses to pay the minimum monthly payment rather than a higher payment

24

that includes all interest due, this will lead to an increase in the outstanding principal balance of the mortgage loan in the form of negative amortization.

Even after the first year, when the minimum monthly payment may increase by 7.5%, this adjustment may not be enough to raise the minimum monthly payment to the amount necessary to pay the interest due on the mortgage loan based on the sum of the index and the margin in effect during the following year. If during the following year the new minimum monthly payment is still less than the amount of interest due, there will continue to be negative amortization if the mortgagor chooses to pay the minimum monthly payment.

Therefore the effect of the initial fixed rate at the beginning of the life of the mortgage loan may be to continue to cause the minimum monthly payment to be less than the monthly interest due on the mortgage loan until the fifth anniversary of the first due date (or until such due date as the principal balance of the mortgage loan would otherwise exceed a specified percentage of its original principal balance) when the minimum monthly payment will be reset to a fully-amortizing payment regardless of the 7.5% limit.

**Negative Amortization May Increase Losses Applied to Your Securities**

When interest due on a Negative Amortization Loan is added to the principal balance of the mortgage loan through negative amortization, the mortgaged property provides proportionally less security for the repayment of the mortgage loan. Therefore, if the mortgagor defaults on the mortgage loan there is a greater likelihood that a loss will be incurred upon the liquidation of the mortgaged property. Furthermore, the loss will be larger than would otherwise have been recognized in the absence of negative amortization. Securityholders will bear these losses, to the extent not covered by credit support, as described in the related prospectus supplement.

**Allocations of Net Negative Amortization May Affect Your Yield**

For any given month in which interest due on Negative Amortization Loans is added to the principal balances of those mortgage loans through negative amortization, the reduction in interest distributions resulting from such negative amortization may, if so provided in the related prospectus supplement, be offset, in part, by applying principal prepayments received on the mortgage loans to interest distributions on the related securities. For any distribution date, the amount of negative amortization on the mortgage loans, to the extent not offset by principal prepayments received on the mortgage loans, referred to as "Net Negative Amortization," will be deducted from the interest payable to the related securities, as described in the related prospectus supplement. The amount of the reduction of accrued interest distributable to each class of securities attributable to Net Negative Amortization will be added to the class principal balance of that class. The increase in the class principal balance of any class of securities will have

the effect of increasing the applicable investors' exposure to realized losses on the related mortgage loans. In addition, because the allocation of principal prepayments between senior and subordinate securities may be determined based on the relationship between the aggregate class principal balance of the senior securities and the aggregate class principal balance of the subordinate securities, this method of allocating Net Negative Amortization may affect the rate and timing of distributions of principal prepayments among the classes of securities, as described in the related prospectus supplement.

**As a Result of Negative Amortization, Additional Negative Amortization Loans Not Covered by Primary Insurance May in the Future Have a Loan-to-Value Ratio in Excess of 80%**

The related prospectus supplement will describe the percentage, if any, of Negative Amortization Loans not covered by a primary insurance policy as of the related cut-off date, whose loan-to-value ratio was less than or equal to 80% at the time of origination but increased to more than 80% as a result of negative amortization.

Additional Negative Amortization Loans not covered by a primary insurance policy, whose loan-to-value ratio was less than or equal to 80% at the time of origination, may after the related cut-off date experience an increase in their loan-to-value ratio to exceed 80%, as a result of negative amortization.

**A Declining Interest Rate Environment May Accelerate the Payment on Your Securities**

If a decline in the related index causes the interest due on a Negative Amortization Loan to be less than the current minimum monthly payment, the amount of that difference will be subtracted from the outstanding principal balance of the mortgage loan and remitted to the related securityholders as principal distributions on their securities. To the extent that these amounts are greater than the principal payments on the Negative Amortization Loans you anticipated, the principal balance of your securities may be reduced to zero sooner than you expected.

26

## DESCRIPTION OF THE TRUSTS

Each trust will hold assets consisting of:

- a segregated pool of various types of first and junior lien mortgage loans, construction loans, cooperative apartment loans, home equity revolving lines of credit (including partial balances of those lines of credit or beneficial interests in those lines of credit as are subject to the related agreement governing the trust), or Mortgage Securities;

- amounts on deposit in the distribution account, pre-funding account, if applicable, or any other account maintained for the benefit of the securityholders;

- property acquired on behalf of securityholders by foreclosure, deed in lieu of foreclosure or repossession and any revenues received on the property;

- any hazard insurance policies, FHA insurance policies, VA guarantees and primary mortgage insurance policies held by the trust, each as described under "Description of Primary Insurance Policies";

- the rights of the depositor under the agreement or agreements under which it acquired the mortgage assets held by the trust;

- any cash advance reserve fund or surety bond held by the trust, each as described under "Description of the Securities—Advances by Servicer in Respect of Delinquencies on the Trust Assets"; and

- any letter of credit, mortgage pool insurance policy, special hazard insurance policy, bankruptcy bond, fraud bond, financial guarantee insurance policy, reserve fund, currency or interest rate exchange agreement or guarantee, each as described under "Description of Credit Support."

The mortgage loans may be mortgage loans that have been consolidated and/or have had various terms changed, mortgage loans that have been converted from adjustable rate loans to fixed rate loans, or construction loans which have been converted to permanent loans.

Any Mortgage Securities that are held by a trust may have been issued previously by the depositor or an affiliate of the depositor, a financial institution, another entity engaged in the business of mortgage lending or a limited purpose entity organized for the purpose of, among other things, acquiring and depositing mortgage loans into trusts, and selling beneficial interests in such trusts. If any of the Mortgage Securities held by a trust are Agency Securities, such Agency Securities may have been guaranteed and/or issued by Ginnie Mae, Freddie Mac, or Fannie Mae. As to any series of securities, the accompanying prospectus supplement will include a description of the Mortgage Securities and any related credit enhancement, and the mortgage loans underlying those Mortgage Securities will be described together with any other mortgage loans included in the mortgage pool relating to that series. References in this prospectus to Advances to be made and other actions to be taken by the servicer in connection with the mortgage loans may include Advances made and other actions taken under the terms of the Mortgage Securities. Each security will evidence an interest in only the related trust, and not in any other trust.

A portion of the interest received on a mortgage loan may not be included in the assets of the related trust. Instead, that interest may be retained by or payable to the originator, servicer or seller (or a designee of one of the foregoing) of the loan, free and clear of the interest of securityholders under the related agreement.

### Description of the Mortgage Assets to be Held By a Trust

Each mortgage asset will be originated by a person other than the depositor. Each mortgage asset will be selected by the depositor for sale to a trust from among those purchased by the depositor, either directly or through its affiliates, from Washington Mutual Bank, the parent of the depositor, and its affiliates or from banks, savings and loan associations, mortgage bankers, mortgage brokers, investment banking firms, the Federal Deposit Insurance Corporation and other mortgage loan originators or sellers not affiliated with the depositor. Each seller of mortgage assets to the depositor will be referred to in this prospectus and the related prospectus supplement as a mortgage loan seller. Each mortgage asset may have been originated by the mortgage loan seller or by a mortgage loan originator from which the mortgage loan seller or an intervening seller of the mortgage asset purchased the mortgage asset. The mortgage assets acquired by the

depositor will have been originated in accordance with the underlying criteria described in this prospectus under "The Depositor's Mortgage Loan Purchase Program—Underwriting Standards" or in the prospectus supplement. All mortgage assets held by a trust as of the Closing Date will have been purchased by the depositor on or before the Closing Date. However, in the case of pre-funding, the agreement governing the trust may provide for the transfer by the mortgage loan seller of additional mortgage assets to the related trust after the Closing Date. See "Description of the Pre-Funding Account for the Purchase of Additional Mortgage Loans."

The mortgage assets held by a trust will be evidenced by a promissory note or contract, referred to in this prospectus as a mortgage note, and may be secured by any of the following:

- first or junior liens on one-to-four-family residential properties including detached and attached dwellings, townhouses, rowhouses, individual condominium units, individual units in planned-unit developments and individual units in de minimis planned-unit developments. Loans secured by this type of property are referred to in this prospectus as single-family loans and may be conventional loans, FHA-insured loans or VA-guaranteed loans as specified in the related prospectus supplement;

- first or junior liens secured by shares in a private cooperative housing corporation that give the owner of the shares the right to occupy a particular dwelling unit in the cooperative;

- rental apartments or projects, including apartment buildings owned by cooperative housing corporations, containing five or more dwelling units. The multifamily properties may include high-rise, mid-rise or garden apartments. Loans secured by this type of property may be conventional loans or FHA-insured loans as specified in the related prospectus supplement;

- properties consisting of mixed residential and commercial structures;

- commercial properties including office buildings, retail buildings and a variety of other commercial properties as may be described in the related prospectus supplement; provided, however, that no more than 10% of the assets held by a trust, by original principal balance, will be secured by these types of commercial properties;

- leasehold interests in residential properties, which are interests held by a mortgagor who is leasing the property, as lessee under a long term ground lease, from the fee owner of the property;

- manufactured homes that are permanently affixed to their site; or

- real property acquired upon foreclosure or comparable conversion of the mortgage loans held by a trust.

Mortgage loans made with respect to multifamily or commercial property may entail risks of delinquency and foreclosure, and risks of loss in the event of a delinquency and foreclosure, that are greater than similar risks associated with single-family property. The ability of a mortgagor to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of such property rather than any independent income or assets of the mortgagor. Thus, the value of an income-producing property is directly related to the net operating income derived from such property. In contrast, the ability of a mortgagor to repay a single-family loan typically is dependent primarily upon the mortgagor's household income, rather than the capacity of the related property to produce income. Thus, other than in geographical areas where employment is dependent upon a particular employer or an industry, the mortgagor's income tends not to reflect directly the value of a single-family property. A decline in the net operating income of an income-producing property will likely affect both the performance of the related loan as well as the liquidation value of such property, whereas a decline in the income of a mortgagor on a single-family property will likely affect the performance of the related loan but may not affect the liquidation value of such property.

The performance of a mortgage loan secured by an income-producing property leased by the mortgagor to tenants, as well as the liquidation value of such property, may be dependent upon the business operated by such tenants in connection with such property, the creditworthiness of such tenants or both. The risks associated with such loans may be offset by the number of tenants or, if applicable, a diversity of types of business operated by such tenants. Commercial mortgage loans held by a trust may be secured by liens on

28

owner-occupied mortgaged properties or on mortgaged properties leased to a single tenant. Accordingly, a decline in the financial condition of the borrower or single tenant, as applicable, may have a disproportionately greater effect on the net operating income from such mortgaged properties than would be the case with respect to mortgaged properties with multiple tenants. Furthermore, the value of any commercial or multifamily mortgaged property may be adversely affected by risks generally incident to interests in real property, including:

- changes in general or local economic conditions and/or specific industry segments;

- declines in real estate values;

- declines in rental or occupancy rates;

- increases in interest rates, real estate tax rates and other operating expenses;

- changes in governmental rules, regulations and fiscal policies, including environmental legislation;

- acts of God; and

- other factors beyond the control of the depositor, the servicer or the trust.

Commercial and multifamily mortgage loans that are held by a trust may be nonrecourse loans or loans for which borrower recourse may be restricted or unenforceable, as to which, in the event of mortgagor default, recourse may be had only against the specific multifamily or commercial property and such other assets, if any, as have been pledged to secure the mortgage loan. With respect to those mortgage loans that provide for recourse against the mortgagor and its assets generally, there can be no assurance that such recourse will ensure a recovery in respect of a defaulted mortgage loan greater than the liquidation value of the related mortgaged property.

The term of any leasehold interest that secures a mortgage loan will generally exceed the term of the related mortgage note by at least five years.

The manufactured homes securing the mortgage loans will consist of manufactured homes within the meaning of 42 United States Code, Section 5402(6), which defines a manufactured home as "a structure, transportable in one or more sections, which in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning, and electrical systems contained therein; except that such term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under this chapter."

The mortgaged properties may be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States. The mortgaged properties may include vacation, second and nonowner occupied homes.

The mortgage assets to be held by a trust may be any one of the following types of mortgage assets:

- Fully amortizing mortgage loans with a fixed rate of interest and level monthly payments to maturity;

- Fully amortizing mortgage loans with an interest rate that adjusts periodically, with corresponding adjustments in the amount of monthly payments, to equal the sum, which may be rounded, of a fixed percentage amount and an index;

- ARM Loans that provide for an election, at the borrower's option, to convert the adjustable interest rate to a fixed interest rate, which will be described in the related prospectus supplement;

- Negative Amortization Loans that provide for negative amortization or accelerated amortization resulting from delays in or limitations on the payment adjustments necessary to amortize fully the outstanding principal balance of the loan at its then applicable interest rate over its remaining term;

29

- Fully amortizing mortgage loans with a fixed interest rate and level monthly payments, or payments of interest only, during the early years of the term, followed by periodically increasing or decreasing monthly payments of principal and interest for the duration of the term or for a specified number of years, which will be described in the related prospectus supplement;

- Fixed interest rate mortgage loans providing for level payment of principal and interest on the basis of an assumed amortization schedule and a balloon payment at the end of a specified term;

- Mortgage loans that provide for a line of credit under which amounts may be advanced to the borrower from time to time including home equity revolving credit loans;

- Fixed interest rate mortgage loans that provide that the interest may increase upon default, which increased rate may be subject to adjustment and may or may not convert back to the original fixed interest rate upon cure of the default;

- Fixed interest rate mortgage loans that provide for increases or reductions in the interest rate, and corresponding monthly payment, during the first 36, 60, 84 or 120 months (or other specified period) of the term of the mortgage loan;

- Limited documentation or no documentation mortgage loans;

- Additional Collateral Loans;

- Previously issued Mortgage Securities; and

- "Re-performing loans," which term includes mortgage loans that are subject to a repayment plan or bankruptcy plan, and that had arrearages of at least three monthly payments when the repayment plan or bankruptcy plan was entered into, and mortgage loans that have been modified. These mortgage loans may be acquired by the depositor from a wide variety of sources through bulk or periodic sales. The rate of default on re-performing mortgage loans may be higher than the rate of default on mortgage loans that have not previously been in arrears.

Each single-family loan having a loan-to-value ratio at origination in excess of 80% may be required to be covered by a primary mortgage guaranty insurance policy insuring against default on the mortgage loan as to at least the amount of the mortgage loan exceeding 75% of the value of the mortgaged property at origination. This type of insurance will remain in force at least until the mortgage loan amortizes to a level that would produce a loan-to-value ratio lower than 80%. See "Description of Primary Insurance Policies—Primary Mortgage Insurance Policies."

The trust may hold mortgage loans secured by junior liens, and the related senior lien may not be held by the trust. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior liens to satisfy fully both the senior liens and the junior mortgage loan. In addition, some or all of the single-family loans secured by junior liens may be High LTV Loans. See "Legal Aspects of Mortgage Assets—Foreclosure on Mortgages."

The loan-to-value ratio of a mortgage loan at any given time is the ratio, expressed as a percentage, of the then outstanding principal balance of the mortgage loan, or, in the case of a home equity line of credit loan, the maximum principal amount which may be advanced over the term of the loan, plus, in the case of a mortgage loan secured by a junior lien, the outstanding principal balance of the related senior liens, to the value of the related mortgaged property. The value of a single-family property or cooperative unit generally is the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of the loan and (b) if the mortgaged property is being purchased in conjunction with the origination of the mortgage loan, the sales price for the property.

The underwriting standards of the mortgage loan originator or mortgage loan seller may require an internal review of the appraisal (a "review appraisal") used to determine the loan-to-value of a mortgage loan which may be performed by underwriters rather than a licensed appraiser. Where the review appraisal results in a valuation of the mortgaged property that is less than a specified percentage of the original appraisal, the loan-to-value ratio of the related mortgage loan will be based on the review appraisal.

See "Description of the Securities—Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach" in this prospectus for a description of representations made by or on behalf of mortgage loan sellers at the time mortgage loans are sold.

The trust may hold mortgage loans subject to temporary buydown plans which provide that the monthly payments made by the borrower in the early years of themortgage loan will be less than the scheduled monthly payments on the mortgage loan, the resulting difference to be made up from (a) an amount contributed by the borrower, the seller of the mortgaged property, or another source and placed in a custodial account and (b) in some cases, investment earnings on the buydown funds. The borrower under a buydown mortgage loan is usually qualified at the lower monthly payment taking into account the funds on deposit in the custodial account. Accordingly, the repayment of a buydown mortgage loan is dependent on the ability of the borrower to make larger level monthly payments after the funds in the custodial account have been depleted. See "The Depositor's Mortgage Loan Purchase Program—Underwriting Standards" for a discussion of loss and delinquency considerations relating to buydown mortgage loans.

The trust may hold mortgage loans with respect to which a portion of the loan proceeds are held back from the mortgagor until required repairs or improvements on the mortgaged property are completed, in accordance with the mortgage loan seller's underwriting standards.

The trust may hold mortgage loans that are delinquent as of the related cut-off date. In that case, the related prospectus supplement will set forth, as to each mortgage loan, available information as to the period of delinquency and any other information relevant for a prospective purchaser to make an investment decision. No mortgage loan held by a trust will be more than 90 days delinquent and no trust will hold 20% or more (by principal balance) of mortgage loans which are more than 30 days delinquent.

A mortgage loan may contain a prohibition on prepayment or a Lockout Period or require payment of a prepayment charge. A multifamily, commercial or mixed-use loan may also contain a provision that entitles the lender to a share of profits realized from the operation or disposition of the related mortgaged property. If the holders of any class or classes of offered securities of a series will be entitled to all or a portion of this type of equity participation, the related prospectus supplement will describe the equity participation and the method or methods by which distributions in respect of the equity participations will be made.

### Limited Documentation and No Documentation Mortgage Loans

Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

### Additional Collateral Loans

A trust may hold Additional Collateral Loans, which are mortgage loans that are secured by both the related mortgaged property and certain additional collateral which will consist of (i) a security interest in financial assets owned by the mortgagor (which will consist of securities, insurance policies, annuities, certificates of deposit, cash, accounts or similar assets) and/or (ii) a third party guarantee (usually by a relative of the mortgagor), which in turn is secured by a security interest in financial assets of the type described in clause (i) above or in residential property owned by the guarantor. The amount of such additional collateral will be determined by the mortgage loan seller in accordance with its underwriting standards, and the requirement to maintain the additional collateral will terminate when the loan-to-value ratio of the Additional Collateral Loan is reduced to a predetermined level (which will be specified in the accompanying prospectus supplement) as a result of a reduction in the principal balance of the mortgage loan caused by principal payments by the mortgagor or an increase in the appraised value of the related mortgaged property. The servicer will be required to attempt to realize on any such additional collateral, in addition to the related mortgaged property, if the Additional Collateral Loan is liquidated upon default. No assurance can be given as to the amount of proceeds, if any, that might be realized on any Additional Collateral Loan from the additional collateral.

31

*Home Equity Revolving Credit Loans*

*General.* The home equity revolving credit loans will be originated under credit line agreements subject to a maximum amount or credit limit. In most instances, interest on each home equity revolving credit loan will be calculated based on the average daily balance outstanding during the billing cycle. The billing cycle in most cases will be the calendar month preceding a due date. Each home equity revolving credit loan will have a loan rate that is subject to adjustment on the day specified in the related mortgage note, which may be daily or monthly, equal to the sum of the index on the day specified in the accompanying prospectus supplement, and the gross margin specified in the related mortgage note, subject to the maximum rate specified in the mortgage note and the maximum rate permitted by applicable law. Some home equity revolving credit loans may be teaser loans with an introductory rate that is lower than the rate that would be in effect if the applicable index and gross margin were used to determine the loan rate. As a result of the introductory rate, interest collections on the loans may initially be lower than expected. Commencing on their first adjustment date, the loan rates on the teaser loans will be based on the applicable index and gross margin.

The borrower for each home equity revolving credit loan may draw money, in most cases with either checks or credit cards, on such home equity revolving credit loan at any time during the period specified in the related credit line agreement, which period we refer to in this prospectus as the draw period. If the draw period is less than the full term of the home equity revolving credit loan, the borrower will not be permitted to make any draw during the repayment period. Prior to the repayment period, or prior to the date of maturity for loans without repayment periods, the borrower for each home equity revolving credit loan will be obligated to make monthly payments on the home equity revolving credit loan in a minimum amount as specified in the related mortgage note, which usually will be the finance charge for each billing cycle as described in the second following paragraph. In addition, if a home equity revolving credit loan has a repayment period, during this period, the borrower is required to make monthly payments consisting of principal installments that would substantially amortize the principal balance by the maturity date, and to pay any current finance charges and additional charges.

The borrower for each home equity revolving credit loan will be obligated to pay off the remaining account balance on the related maturity date, which may be a substantial principal amount. The maximum amount of any draw for any home equity revolving credit loan is equal to the excess, if any, of the credit limit over the principal balance outstanding under the mortgage note at the time of the draw. Draws will be funded by the servicer or other entity specified in the accompanying prospectus supplement.

For each home equity revolving credit loan:

- the finance charge for any billing cycle, in most cases, will be an amount equal to the aggregate of, as calculated for each day in the billing cycle, the then-applicable loan rate divided by 365 multiplied by that day's principal balance,

- the account balance on any day in most cases will be the aggregate of the unpaid principal of the home equity revolving credit loan outstanding at the beginning of the day, plus all related draws funded on that day and outstanding at the beginning of that day, plus the sum of any unpaid finance charges and any unpaid fees, insurance premiums and other charges, collectively known as additional charges, that are due on the home equity revolving credit loan minus the aggregate of all payments and credits that are applied to the repayment of any draws on that day, and

- the principal balance on any day usually will be the related account balance minus the sum of any unpaid finance charges and additional charges that are due on the home equity revolving credit loan.

Payments made by or on behalf of the borrower for each home equity revolving credit loan, in most cases, will be applied, first, to any unpaid finance charges that are due on the home equity revolving credit loan, second, to any unpaid additional charges that are due thereon, and third, to any related draws outstanding.

The mortgaged property securing each home equity revolving credit loan will be subject to the lien created by the related loan in the amount of the outstanding principal balance of each related draw or portion of draw, if any, that is not included in the related pool, whether made on or before the related cut-

32

off date or after that cut-off date. The lien will be the same rank as the lien created by the mortgage relating to the home equity revolving credit loan, and monthly payments, collections and other recoveries under the credit line agreement related to the home equity revolving credit loan will be allocated as described in the related prospectus supplement among the home equity revolving credit loan and the outstanding principal balance of each draw or portion of draw excluded from the pool. The depositor, an affiliate of the depositor or an unaffiliated seller may have an interest in any draw or portion of draw excluded from the pool. If any entity with an interest in a draw or portion of draw excluded from the pool or any other excluded balance were to become a debtor under the Bankruptcy Code or the subject of a receivership or conservatorship and regardless of whether the transfer of the related home equity revolving credit loan constitutes an absolute assignment, a party in interest (including such entity itself) could assert that such entity retains rights in the related home equity revolving credit loan and therefore compel the sale of such home equity revolving credit loan over the objection of the trust and the securityholders. If that occurs, delays and reductions in payments to the trust and the securityholders could result.

In most cases, each home equity revolving credit loan may be prepaid in full or in part at any time and without penalty, and the related borrower will have the right during the related draw period to make a draw in the amount of any prepayment made for the home equity revolving credit loan.

The mortgage note or mortgage related to each home equity revolving credit loan will usually contain a customary "due-on-sale" clause.

As to each home equity revolving credit loan, the borrower's rights to receive draws during the draw period may be suspended, or the credit limit may be reduced, for cause under a limited number of circumstances, including, but not limited to:

- a materially adverse change in the borrower's financial circumstances;

- a decline in the value of the mortgaged property below its appraised value at origination; or

- a payment default by the borrower.

However, as to each home equity revolving credit loan, a suspension or reduction usually will not affect the payment terms for previously drawn balances. The servicer will have no obligation to investigate as to whether any of those circumstances have occurred or may have no knowledge of their occurrence. Therefore, there can be no assurance that any borrower's ability to receive draws will be suspended or reduced if the foregoing circumstances occur. In the event of default under a home equity revolving credit loan, at the discretion of the servicer, the home equity revolving credit loan may be terminated and declared immediately due and payable in full. For this purpose, a default includes but is not limited to:

- the borrower's failure to make any payment as required;

- any action or inaction by the borrower that materially and adversely affects the mortgaged property or the rights in the mortgaged property; or

- any fraud or material misrepresentation by a borrower in connection with the loan.

The servicer will have the option to allow an increase in the credit limit applicable to any home equity revolving credit loan in certain limited circumstances. In most cases, the servicer will have an unlimited ability to allow increases provided that the specified conditions are met including:

- a new appraisal or other indication of value is obtained; and

- the new combined LTV ratio is less than or equal to the original combined LTV ratio.

If a new appraisal is not obtained and the other conditions in the preceding sentence are met, the servicer will have the option to allow a credit limit increase for any home equity revolving credit loan subject to the limitations described in the related agreement.

The proceeds of the home equity revolving credit loans may be used by the borrower to improve the related mortgaged properties, may be retained by the related borrowers or may be used for purposes unrelated to the mortgaged properties.

*Allocation of Home Equity Revolving Credit Loan Balances.* For any series of securities backed by home equity revolving credit loans, the related trust may hold either (i) the entire principal balance of each home equity revolving credit loan outstanding at any time, including balances attributable to draws made after the related cut-off date, or (ii) a specified portion of the total principal balance of each home equity

33

revolving credit loan outstanding at any time, which will consist of all or a portion of the principal balance as of the cut-off date minus the portion of all payments and losses after the cut-off date that are allocated to such balance, and may not include some portion of the principal balance attributable to draws made after the cut-off date. In this prospectus, we refer to the principal balance or portion of the principal balance of each home equity revolving credit loan outstanding at any time and held by the trust as the trust balance.

The accompanying prospectus supplement will describe the specific provisions by which payments and losses on any home equity revolving credit loan will be allocated as between the trust balance and any portion of the principal balance of a home equity revolving credit loan, if any, not included in the trust balance at any time, which may include balances attributable to draws after the cut-off date and may include a portion of the principal balance outstanding as of the cut-off date. In this prospectus, we refer to the portion of the principal balance of each home equity revolving credit loan outstanding at any time and not held by the trust as the excluded balance. Typically, the provisions (i) may provide that principal payments made by the borrower will be allocated as between the trust balance and any excluded balance either on a pro rata basis, or first to the trust balance until reduced to zero, then to the excluded balance, or according to other priorities specified in the accompanying prospectus supplement, and (ii) may provide that interest payments, as well as liquidation proceeds or similar proceeds following a default and any realized losses, will be allocated between the trust balance and any excluded balance on a pro rata basis or according to other priorities specified in the accompanying prospectus supplement.

Even if a trust initially holds the entire principal balance of the home equity revolving credit loans, the related agreement may provide that after a specified date or on the occurrence of specified events, the trust will not acquire balances attributable to additional draws made thereafter. The accompanying prospectus supplement will describe these provisions as well as the related allocation provisions that would be applicable.

### Mortgage Loan Information in Prospectus Supplement

Each prospectus supplement will contain specific information with respect to the mortgage assets held by the related trust, as of the cut-off date specified in the prospectus supplement, which will usually be close of business on the first day of the month of formation of the related trust, to the extent specifically known to the depositor as of the date of the prospectus supplement, including, in summary form, the following:

- the aggregate outstanding principal balance, and the largest, smallest and average outstanding principal balance, of the mortgage assets,

- the type of property securing the mortgage assets and the percentage of mortgage assets in the related mortgage pool which are secured by that type of property,

- the range of original terms to maturity of the mortgage assets,

- the latest maturity date,

- the aggregate principal balance of mortgage loans having loan-to-value ratios at origination exceeding 80%, or, with respect to mortgage loans secured by a junior lien, the aggregate principal balance of mortgage loans having combined loan-to-value ratios exceeding 80%,

- the interest rates or range of interest rates borne by the mortgage loans,

- the geographical distribution of the mortgaged properties on a state-by-state basis,

- the number and aggregate principal balance of buydown mortgage loans, if any,

- a description of the retained interest, if any,

- with respect to ARM Loans, the index, the adjustment dates, the gross margins, and the maximum interest rate variation at the time of any adjustment and over the life of the ARM Loan,

- the range of debt service coverage ratios for mortgage loans secured by multifamily properties or commercial properties, and

- whether the mortgage loans provide for payments of interest only for any period and the frequency and amount by which, and the term during which, monthly payments adjust.

The composition and characteristics of a mortgage pool containing revolving credit loans may change from time to time as a result of any draws made after the related cut-off date under the related credit line agreements. If mortgage assets are transferred to or repurchased from the trust after the date of the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans, the addition or deletion will be noted in a Distribution Report on Form 10-D or a Current Report on Form 8-K, as appropriate. In no event, however, will more than 5%, by principal balance at the cut-off date, of the mortgage assets deviate from the characteristics of the mortgage assets set forth in the related prospectus supplement other than as a result of any draws under credit line agreements relating to revolving credit loans.

## Static Pool Information

In addition to the information about the mortgage assets held by the related trust, the prospectus supplement will also provide, or incorporate by reference, static pool information about prior securitized pools of mortgage assets of the sponsor for the same asset type, or about originations or purchases by the sponsor for the same asset type. Static pool information may be posted on an Internet Web site and, if so, the prospectus supplement will provide the Internet address for such Internet Web site.

## DESCRIPTION OF THE PRE-FUNDING ACCOUNT
## FOR THE PURCHASE OF ADDITIONAL MORTGAGE LOANS

The agreement governing the trust may provide for the purchase of additional mortgage assets by the trust after the date of initial issuance of the securities. In that case, the trust will include a pre-funding account, into which all or a portion of the proceeds of the sale of one or more classes of securities of the related series will be deposited to be released as additional mortgage assets are purchased. Additional mortgage assets will be required to conform to the requirements set forth in the related agreement or other agreement providing for the transfer, and will be underwritten to the same standards as the mortgage assets initially held by the trust. The pre-funding account will be required to be maintained with an eligible institution under the related agreement. The pre-funding account may be interest-bearing or the amount held in the account may be invested in U.S. government securities and other high-quality investments specified in the related agreement. The amount held in the pre-funding account shall at no time exceed 25% of the aggregate outstanding principal balance of the securities. The agreement governing the trust will generally provide that the period for purchasing additional mortgage assets will terminate on the earliest of (i) a specified date, which may not be later than six months or, if a REMIC election has been made with respect to the trust, three months, after the date on which the related securities were issued, (ii) the date on which the amount on deposit in the pre-funding account falls below a specified amount and (iii) the occurrence of a servicing default under the related agreement. Any amounts remaining in the pre-funding account at the end of the pre-funding period will be deemed to be principal prepayments and applied in the manner set forth in the related prospectus supplement.

The depositor or the mortgage loan seller will be required to provide data regarding the additional mortgage assets to the rating agencies and the security insurer, if any, sufficiently in advance of the scheduled transfer to permit review by the rating agencies and the security insurer. Transfer of the additional mortgage assets will be further conditioned upon confirmation by the rating agencies that the transfer of mortgage assets to the trust will not result in the downgrading of the securities or, in the case of a series guaranteed or supported by a security insurer, will not adversely affect the capital requirements of the security insurer. Finally, a legal opinion to the effect that the conditions to the transfer of the additional mortgage assets have been satisfied may be required.

The agreement governing the trust will require the trustee, at the end of the pre-funding period, to send to securityholders or make available on an Internet Web site updated pool composition information reflecting the additional mortgage assets purchased by the trust during the pre-funding period. In addition, such information will be reported in a Distribution Report on Form 10-D or a Current Report on Form 8-K, as appropriate.

## THE DEPOSITOR, THE SPONSOR, THE SERVICER
## AND CERTAIN OTHER TRANSACTION PARTIES

The depositor, a Delaware corporation, is a wholly-owned indirect subsidiary of Washington Mutual, Inc., a savings and loan holding company. The depositor was organized for the purpose of providing mortgage lending institutions, including affiliated institutions, with greater financing and lending flexibility by purchasing mortgage loans from such institutions and issuing mortgage-backed securities. The depositor engages in no activities other than securitizing assets. The depositor's principal executive offices are located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101. The depositor's telephone number is (206) 554-8838.

The depositor does not have, and it may not in the future have, any significant assets. The prospectus supplement for each series of securities will disclose if the depositor is a party to any legal proceedings that could have a material negative impact on the related trust and the interests of the potential investors.

The sponsor of the securitization transaction will be specified in the related prospectus supplement, and may be Washington Mutual Bank, the parent of the depositor, another affiliate of the depositor or an unaffiliated entity. Washington Mutual Bank is a federal savings association and a wholly-owned subsidiary of Washington Mutual, Inc. The principal executive offices of Washington Mutual Bank are located at 1301 Second Avenue, WMC 3501, Seattle, Washington 98101.

The servicer will be specified in the related prospectus supplement, and may be Washington Mutual Bank. There may be multiple servicers, each of which will act as a servicer for a certain group of the mortgage assets. In that case, each servicer will have all of the rights and responsibilities described in this prospectus for only the mortgage loans it is servicing, and the related servicing agreement or pooling and servicing agreement will be signed by each servicer and will make clear which mortgage loans are being serviced by which servicer. In addition, a servicer may perform some or all of its obligations through the use of one or more sub-servicers. A servicer may appoint a special servicer to perform certain functions, such as loan work-outs.

A master servicer may be appointed to supervise the servicer or servicers and to perform other roles typically performed by the servicer or servicers. In addition, a bond or certificate administrator may be appointed whose role is primarily to calculate and determine the monthly payments to be made to the securityholders.

## USE OF PROCEEDS

The net proceeds to be received from the sale of the securities will be applied by the depositor to the purchase of assets to be transferred to the related trust or will be used by the depositor to pay costs of structuring and issuing the securities. The depositor expects that it will make additional sales of securities similar to the securities from time to time, but the timing and amount of offerings of securities will depend on a number of factors, including the volume of mortgage assets acquired by the depositor, prevailing interest rates, availability of funds and general market conditions.

## YIELD AND MATURITY CONSIDERATIONS

The yield on any offered security will depend on many factors, including:

- the price paid by the securityholder,

- the rate at which interest accrues on the security,

- the receipt and timing of receipt of distributions on the security,

- the weighted average life of the mortgage assets held by the related trust,

- liquidations of mortgage assets following mortgagor defaults,

- purchases of mortgage assets in the event of optional termination of the trust or breaches of representations made in respect of those mortgage assets by the depositor, the servicer, the mortgage loan seller or others, and

- in the case of securities evidencing interests in ARM Loans, by changes in the interest rates or the conversions of ARM Loans to a fixed interest rate.

*Security Interest Rate.* Securities of any class within a series may have fixed, variable or adjustable security interest rates, which may or may not be based upon the interest rates borne by the mortgage assets held by the related trust. The prospectus supplement with respect to any series of securities will specify the security interest rate for each class of securities or, in the case of a variable or adjustable security interest rate, the method of determining the security interest rate. Holders of Stripped Interest Securities or a class of securities having a security interest rate that varies based on the weighted average interest rate of the underlying mortgage assets will be affected by disproportionate prepayments and repurchases of mortgage assets having higher interest rates than the average interest rate.

*Timing of Payment of Interest and Principal.* The effective yield to securityholders entitled to payments of interest will be slightly lower than the yield otherwise produced by the applicable security interest rate because, while interest on the mortgage assets may accrue from the first day of each month, the distributions of such interest will not be made until the distribution date, which may be as late as the 28th day of the month following the month in which interest accrues on the mortgage assets. On each distribution date, a payment of interest on the securities, or addition to the principal balance of a class of Accrual Securities, will include interest accrued during the interest accrual period described in the related prospectus supplement for that remittance date. If the interest accrual period ends on a date other than a remittance date for the related series, the yield realized by the holders of the securities may be lower than the yield that would result if the interest accrual period ended on the remittance date. In addition, interest accrued for an interest accrual period for one or more classes of securities may be calculated on the assumption that distributions of principal, and additions to the principal balance of Accrual Securities, and allocations of losses on the mortgage assets may be made on the first day of the interest accrual period for a remittance date and not on the remittance date. This method would produce a lower effective yield than if interest were calculated on the basis of the actual principal amount outstanding during an interest accrual period.

When a principal prepayment in full is made on a mortgage loan, the borrower is charged interest only for the period from the due date of the preceding monthly payment up to the date of the prepayment, instead of for a full month. When a partial prepayment is made on a mortgage loan other than a home equity revolving credit loan, the mortgagor is not charged interest on the amount of the prepayment for the month in which the prepayment is made. Accordingly, the effect of principal prepayments in full during any month will be to reduce the aggregate amount of interest collected that is available for distribution to securityholders. The mortgage loans held by a trust may contain provisions limiting prepayments or requiring the payment of a prepayment charge upon prepayment in full or in part. Any such prepayment charges may be applied to offset the above-described shortfalls in interest collections, may be available for distribution only to a specific class of securities or may not be available for distribution to any class of securities. Full and partial principal prepayments collected during the applicable Prepayment Period will be available for distribution to securityholders on the related distribution date. Neither the trustee nor the depositor will be obligated to fund shortfalls in interest collections resulting from prepayments. The prospectus supplement for a series of securities may specify that the servicer will be obligated to pay from its own funds, without reimbursement, those interest shortfalls attributable to full and/or partial prepayments

37

by mortgagors but only up to the specific amounts described in the prospectus supplement. See "Description of the Securities."

The outstanding principal balances of home equity revolving credit loans are, in most cases, much smaller than traditional first lien mortgage loan balances, and the original terms to maturity of those loans are often shorter than those of traditional first lien mortgage loans. As a result, changes in interest rates will not affect the monthly payments on those loans to the same degree that changes in mortgage interest rates will affect the monthly payments on traditional first lien mortgage loans. Consequently, the effect of changes in prevailing interest rates on the prepayment rates on shorter-term, smaller balance loans may not be similar to the effects of those changes on traditional first lien mortgage loan prepayment rates, or those effects may be similar to the effects of those changes on mortgage loan prepayment rates, but to a smaller degree.

For some loans, including home equity revolving credit loans and ARM loans, the loan rate at origination may be below the rate that would result if the index and margin relating thereto were applied at origination. Under the applicable underwriting standards, the borrower under each of the loans, other than a home equity revolving credit loan, may be qualified on the basis of the loan rate in effect at origination, and borrowers under home equity revolving credit loans may be qualified based on an assumed payment which reflects a rate significantly lower than the maximum rate. The repayment of any such loan may thus be dependent on the ability of the borrower to make larger monthly payments following the adjustment of the loan rate. In addition, depending upon the use of the revolving credit line and the payment patterns, during the repayment period, a borrower may be obligated to make payments that are higher than the borrower originally qualified for. Some of the home equity revolving credit loans are not expected to significantly amortize prior to maturity. As a result, a borrower will, in these cases, be required to pay a substantial principal amount at the maturity of a home equity revolving credit loan.

The prospectus supplement for each series of securities may set forth additional information regarding yield considerations.

*Principal Prepayments.* The yield to maturity on the securities will be affected by the rate of principal payments on the mortgage assets, including principal prepayments, curtailments, defaults and liquidations. The rate at which principal prepayments occur on the mortgage assets will be affected by a variety of factors, including, without limitation, the following:

- the terms of the mortgage assets,
- the level of prevailing interest rates,
- the availability of mortgage credit,
- in the case of multifamily loans and commercial loans, the quality of management of the mortgaged properties, and
- economic, demographic, geographic, tax, legal and other factors.

In general, however, if prevailing interest rates fall significantly below the interest rates on the mortgage assets held by a particular trust, those mortgage assets are likely to be the subject of higher principal prepayments than if prevailing rates remain at the rates borne by those mortgage assets. Conversely, if prevailing interest rates rise significantly above the interest rates on the mortgage assets held by a particular trust, those mortgage assets are likely to be the subject of lower principal prepayments than if prevailing rates remain at the rates borne by those mortgage assets. The rate of principal payments on some or all of the classes of securities of a series will correspond to the rate of principal payments on the mortgage assets held by the related trust and is likely to be affected by the existence of prepayment penalty provisions of the mortgage assets in a mortgage pool, and by the extent to which the servicer of any such mortgage asset is able and willing to enforce such provisions. There can be no certainty as to the rate of prepayments on the mortgage assets during any period or over the life of the related securities.

If the purchaser of a security offered at a discount calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is faster than that actually experienced on the mortgage assets, the actual yield to maturity will be lower than that so calculated. Conversely, if the purchaser of a security offered at a premium calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is slower than that actually experienced on the mortgage assets, the actual

yield to maturity will be lower than that so calculated. In either case, the effect on yield of prepayments on one or more classes of securities of a series may be mitigated or exacerbated by the priority of distributions of principal to those classes as provided in the related prospectus supplement.

The timing of changes in the rate of principal payments on the mortgage assets may significantly affect an investor's actual yield to maturity, even if the average rate of distributions of principal is consistent with an investor's expectation. In general, the earlier a principal payment is received on the mortgage assets and distributed in respect of a security, the greater the effect on such investor's yield to maturity. The effect on an investor's yield of principal payments occurring at a rate higher or lower than the rate anticipated by the investor during a given period may not be offset by a subsequent like decrease or increase in the rate of principal payments.

*Defaults.* The rate of defaults on the mortgage assets will also affect the rate and timing of principal payments on the mortgage assets and thus the yield on the securities. In general, defaults on single-family loans are expected to occur with greater frequency in their early years. However, mortgage assets that require balloon payments, including multifamily loans, risk default at maturity, or that the maturity of the balloon loan may be extended in connection with a workout. The rate of default on mortgage loans that are refinance, limited documentation or no documentation mortgage loans, mortgage assets with high loan-to-value ratios and ARM Loans may be higher than for other types of mortgage assets. Likewise, the rate of default on loans that have been originated under lower than traditional underwriting standards may be higher than those originated under traditional standards. Furthermore, the rate and timing of defaults and liquidations on the mortgage assets will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values.

A trust may hold mortgage loans that are one month or more delinquent at the time of offering of the related series of securities or which have recently been several months delinquent. The rate of default on delinquent mortgage loans or mortgage loans with a recent history of delinquency, including re-performing loans, is likely to be higher than the rate of default on loans that have a current payment status.

The rate of defaults and the severity of losses on mortgage loans with documentation deficiencies may be higher than for mortgage loans with no documentation deficiencies. To the extent that any document relating to a mortgage loan is not in the possession of the trustee or its custodian, the deficiency may make it difficult or impossible to realize on the mortgaged property in the event of foreclosure, which will affect the timing and the amount of liquidation proceeds received by the trustee.

**Maturity and Weighted Average Life**

*Prepayments.* The rates at which principal payments are received on the mortgage assets held by a trust and the rate at which payments are made from any credit support for the related series of securities may affect the ultimate maturity and the weighted average life of each class of the series. Weighted average life refers to the average amount of time that will elapse from the date of issue of a security until each dollar of principal of that security will be repaid to the investor. The weighted average life of a class of securities of a series will be influenced by, among other factors, the rate at which principal on the related mortgage assets is paid to that class, which may be in the form of scheduled amortization or prepayments. For this purpose, the term prepayment includes prepayments, in whole or in part, and liquidations due to default. Prepayments on the mortgage assets will generally accelerate the rate at which principal is paid on some or all of the classes of the securities of the related series.

One or more classes of securities may have a final scheduled remittance date, which is the date on or before which the principal balance of that class is scheduled to be reduced to zero, calculated on the basis of the assumptions applicable to that series as described in the prospectus supplement.

In addition, the weighted average life of the securities may be affected by the varying maturities of the related mortgage assets. If any mortgage assets have actual terms to maturity less than those assumed in calculating the final scheduled remittance dates for the classes of securities of the related series, one or more classes of the securities may be fully paid prior to their respective final scheduled remittance dates, even in the absence of prepayments. Accordingly, the prepayment experience of the mortgage pool will, to

39

some extent, be a function of the mix of interest rates and maturities of the mortgage assets in that mortgage pool. See "Description of the Trusts."

Prepayments on loans are also commonly measured relative to a prepayment standard or model, such as the Constant Prepayment Rate prepayment model or the Standard Prepayment Assumption prepayment model, each as described below. CPR represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans for the life of those loans. SPA represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans. A prepayment assumption of 100% of SPA assumes prepayment rates of 0.2% per annum of the then outstanding principal balance of the loans in the first month of the life of the loans and an additional 0.2% per annum in each month thereafter until the thirtieth month. Beginning in the thirtieth month and in each month thereafter during the life of the loans, 100% of SPA assumes a constant prepayment rate of 6% per annum each month.

Neither CPR nor SPA nor any other prepayment model or assumption purports to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of loans. Moreover, CPR and SPA were developed based upon historical prepayment experience for single-family loans. Thus, it is likely that prepayment of any mortgage assets will not conform to any particular level of CPR or SPA.

The prospectus supplement with respect to each series of securities may contain tables, if applicable, setting forth the projected weighted average life of one or more classes of offered securities of the series and the percentage of the initial principal balance of each class that would be outstanding on specified remittance dates based on the assumptions stated in that prospectus supplement, including assumptions that prepayments on the related mortgage assets are made at rates corresponding to various percentages of CPR, SPA or at other rates specified in the prospectus supplement. Tables and assumptions are intended to illustrate the sensitivity of the weighted average life of the securities to various prepayment rates and are not intended to predict or to provide information that will enable investors to predict the actual weighted average life of the securities. It is unlikely that prepayment of any mortgage assets for any series will conform to any particular level of CPR, SPA or any other rate specified in the related prospectus supplement.

There can be no assurance as to the rate of prepayment of the mortgage loans underlying or comprising the assets of any trust.

*Type of Mortgage Asset.* The type of mortgage assets held by a trust may affect the weighted average life of the related securities. A number of mortgage assets may have balloon payments due at maturity, and because the ability of a mortgagor to make a balloon payment typically will depend upon its ability either to refinance the loan or to sell the related mortgaged property, there is a risk that mortgage assets having balloon payments may default at maturity, or that the servicer may extend the maturity of the mortgage asset in connection with a workout. In addition, a number of mortgage assets may be junior mortgage loans. The rate of default on junior mortgage loans may be greater than that of mortgage loans secured by first liens on comparable properties. In the case of defaults, recovery of proceeds may be delayed by, among other things, bankruptcy of the mortgagor or adverse conditions in the market where the property is located. In order to minimize losses on defaulted mortgage assets, the servicer may, to the extent and under the circumstances set forth in this prospectus and in the related servicing agreement, be permitted to modify mortgage assets that are in default or as to which a payment default appears imminent. Any defaulted balloon payment or modification that extends the maturity of a mortgage asset will tend to extend the weighted average life of the securities, thereby lengthening the period of time elapsed from the date of issuance of a security until it is retired.

Although the interest rates on ARM Loans will be subject to periodic adjustments, adjustments will (1) except in the case of Negative Amortization Loans, not increase or decrease the interest rate by more than a fixed percentage amount on each adjustment date, (2) not increase the interest rate over a fixed percentage amount during the life of any ARM Loan and (3) be based on an index, which may not rise and fall identically with the mortgage interest rate due to limitations on the amount or timing of adjustments, plus the related fixed percentage set forth in the related mortgage note, which may be different from margins being used at the time for newly originated adjustable rate mortgage loans. In addition, for some ARM Loans interest may during an initial period accrue at a fixed rate. For all of the foregoing reasons,

the interest rates on the ARM Loans in a mortgage pool at any time may not equal the prevailing rates for similar, newly originated adjustable rate mortgage loans. In certain interest rate environments, the prevailing interest rates on fixed rate mortgage loans may be sufficiently low in relation to the then-current interest rates on ARM Loans with the result that the rate of prepayments may increase as a result of refinancings. There can be no certainty as to the rate of prepayments on the mortgage assets during any period or over the life of any series of securities.

The interest rates on Negative Amortization Loans adjust monthly, after an initial fixed rate period, and their minimum monthly payments adjust less frequently. During a period of rising interest rates, the amount of accrued interest may exceed the amount of the minimum monthly payment. In addition, during the first year after the initial fixed rate period, and in some cases during the first several years, the amount of accrued interest may also exceed the minimum monthly payment even if the index does not rise, because the minimum monthly payment during the entire first year is calculated based on the initial fixed rate, which is generally lower than the fully indexed rate. As a result, if the mortgagor chooses to pay the minimum monthly payment rather than one of the higher payment options, a portion of the accrued interest will be deferred and added to the principal balance of the Negative Amortization Loan, which is referred to as "negative amortization," and will bear interest at the applicable interest rate. All or a portion of the accrued interest that is added to the principal balances of Negative Amortization Loans through negative amortization may be deducted from the interest payable to the related class or classes of securities and added to the principal balances of those securities, as described in the related prospectus supplement. The addition of any deferred interest to the principal balance of any class or classes of related securities will lengthen the weighted average life of that class and may adversely affect the securityholder's yield to maturity depending on the price at which the securities were purchased. In addition, during a period of declining interest rates, a larger portion of the minimum monthly payment will be allocated to principal and a smaller portion to interest, and since principal payments on the Negative Amortization Loans will be applied to reduce the principal balance of the related class or classes of securities, the weighted average life of the securities will be shortened which may adversely affect securityholder's yield to maturity depending upon the price at which such securities were purchased.

There can be no assurance as to the rate of principal payments or draws on the home equity revolving credit loans. In most cases, the home equity revolving credit loans may be prepaid in full or in part without penalty. The prospectus supplement will specify whether loans may not be prepaid in full or in part without penalty. The rate of principal payments and the rate of draws, if applicable, may fluctuate substantially from time to time. Such loans may experience a higher rate of prepayment than typical first lien mortgage loans. Due to the unpredictable nature of both principal payments and draws, the rates of principal payments net of draws for those loans may be much more volatile than for typical first lien mortgage loans.

For any series of securities backed by home equity revolving credit loans, provisions governing whether future draws on the home equity revolving credit loans will be transferred to the trust will have a significant effect on the rate and timing of principal payments on the securities. The rate at which additional balances are generated may be affected by a variety of factors. The yield to maturity of the securities of any series, or the rate and timing of principal payments on the loans may also be affected by the risks associated with other loans.

As a result of the payment terms of the home equity revolving credit loans or of the mortgage provisions relating to future draws, there may be no principal payments on those securities in any given month. In addition, it is possible that the aggregate draws on home equity revolving credit loans held by a trust may exceed the aggregate payments of principal on those home equity revolving credit loans for the related period. A series of securities may provide for a period during which all or a portion of the principal collections on the home equity revolving credit loans are reinvested in additional balances or are accumulated in a trust account pending commencement of an amortization period relating to the securities.

*Mortgage Securities.* Some Mortgage Securities held by a trust may be backed by underlying mortgage loans having differing interest rates. Accordingly, the rate at which principal payments are received on the securities will, to some extent, depend on the interest rates on the underlying mortgage loans.

*Foreclosures and Payment Plans.* The number of foreclosures and the principal amount of the mortgage assets that are foreclosed in relation to the number of mortgage assets that are repaid in accordance with their terms will affect the weighted average life of those mortgage assets and that of the

related series of securities. Servicing decisions made with respect to the mortgage assets, including the use of payment plans prior to a demand for acceleration and the restructuring of mortgage assets in bankruptcy proceedings, may also have an effect upon the payment patterns of particular mortgage assets and thus the weighted average life of the securities.

*Due-On-Sale Clauses.* Acceleration of mortgage payments as a result of certain transfers of or the creation of encumbrances upon underlying mortgaged properties is another factor affecting prepayment rates that may not be reflected in the prepayment standards or models used in the relevant prospectus supplement. In most cases the mortgage assets will include "due-on-sale" clauses that permit the lender in certain instances to accelerate the maturity of the loan if the borrower sells, transfers or conveys the property. The servicer will employ its usual practices in determining whether to exercise any right that the trust may have as mortgagee to accelerate payment of the mortgage asset. An ARM Loan may be assumable under some conditions if the proposed transferee of the related mortgaged property establishes its ability to repay the mortgage asset and, in the reasonable judgment of the servicer or the related sub-servicer, the security for the ARM Loan would not be impaired by the assumption. The extent to which ARM Loans are assumed by purchasers of the mortgaged properties rather than prepaid by the related mortgagors in connection with the sales of the mortgaged properties will affect the weighted average life of the related series of securities. See "Legal Aspects of Mortgage Assets—Enforceability of Provisions."

**THE DEPOSITOR'S MORTGAGE LOAN PURCHASE PROGRAM**

The mortgage loans to be transferred to a trust will be purchased by the depositor, either directly or indirectly, from the mortgage loan sellers, which may include Washington Mutual Bank or other affiliates of the depositor.

**Underwriting Standards**

The mortgage loans to be transferred to each trust will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects the credit, appraisal and underwriting standards described herein to be continuously revised based on opportunities and prevailing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates, mortgage-backed notes and mortgage trust certificates.

The underwriting criteria applied by the originators of the mortgage loans transferred to a trust may vary significantly among originators. The mortgage loan sellers will generally review only a limited portion of the mortgage loans in any delivery of such mortgage loans for conformity with the applicable credit, appraisal and underwriting standards. For each originator of 20% or more of the mortgage loans transferred to a trust, the accompanying prospectus supplement will describe, to the extent material, the originator's origination program and how long the originator has been engaged in originating assets. The description will include, to the extent material, a description of the originator's experience in originating mortgage loans of the type transferred to the trust and the originator's underwriting criteria for those mortgage loans.

The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated generally in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.

The depositor anticipates that some of the mortgage loans held by a trust for certain series of securities will have been originated based on underwriting standards and documentation requirements that are less restrictive than for other mortgage loan lending programs. In such cases, borrowers may have credit

histories that contain delinquencies on mortgage and/or consumer debts. Some borrowers may have initiated bankruptcy proceedings within a few years of the time of origination of the related loan. In addition, loans held by a trust may have been originated in connection with a governmental program under which underwriting standards were significantly less stringent and designed to promote home ownership or the availability of affordable residential rental property regardless of higher risks of default and losses.

The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts. If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.

In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

Certain states where mortgage properties may be located are "anti-deficiency" states, where, in general, lenders providing credit on on-to-four-family properties must look solely to the property for repayment in the event of foreclosure. See "Legal Aspects of the Mortgage Loans—Anti-Deficiency Legislation and Other Limitation on Lenders". Underwriting standards in all states (including anti-deficiency states) will require that the underwriting officers be satisfied that the value of the property being financed, as indicated by the independent appraisal, currently supports and is anticipated to support in the future the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

In the case of a mortgage loan secured by a leasehold interest in a residential property, commercial property or mixed-use property the title to which is held by a third party lessor, the mortgage loan seller, or another party on its behalf, will be required to warrant, among other things, that the remaining term of the lease and any sublease be at least five years longer than the remaining term of the mortgage loan.

For any loan insured by the FHA, the mortgage loan seller is required to represent that the FHA loan complies with the applicable underwriting policies of the FHA. See "Description of Primary Insurance Policies—FHA Insurance."

For any loan guaranteed by the VA, the mortgage loan seller will be required to represent that the VA loan complies with the applicable underwriting policies of the VA. See "Description of Primary Insurance Policies—VA Guarantees."

The recent foreclosure or repossession and delinquency experience with respect to mortgage loans serviced by the servicer or, if applicable, the master servicer or a significant sub-servicer will be provided in the related prospectus supplement.

**Qualifications of Originators and Mortgage Loan Sellers**

Each originator will be required to satisfy the qualifications set forth in this paragraph. Each originator must be an institution experienced in originating conventional mortgage loans in accordance with customary and reasonable practices and the mortgage loan seller's or the depositor's guidelines, and must maintain satisfactory facilities to originate those loans. Each originator must be a HUD-approved mortgagee or an institution the deposit accounts in which are insured by the FDIC. In addition, with respect to FHA loans or

43

VA loans, each originator must be approved to originate the mortgage loans by the FHA or VA, as applicable. Each originator and mortgage loan seller must also satisfy criteria as to financial stability evaluated on a case by case basis by the depositor.

## DESCRIPTION OF THE SECURITIES

The securities will be issued in series. Each series of certificates evidencing interests in a trust holding mortgage loans will be issued in accordance with a pooling and servicing agreement among the depositor, the servicer and the trustee named in the prospectus supplement. Each series of notes evidencing indebtedness of a trust holding mortgage loans will be issued in accordance with an indenture between the related issuer and the trustee named in the prospectus supplement. The issuer of notes will be the depositor or a trust established under a trust agreement between the depositor and the trustee for the purpose of issuing a series of notes. Where the issuer is a trust, the ownership of the trust will be evidenced by equity certificates issued under the trust agreement. Each series of securities evidencing interests in a trust whose assets consist of Mortgage Securities will be issued in accordance with an agreement among the depositor, the trustee, and a manager, bond administrator or certificate administrator. The provisions of each agreement will vary depending upon the nature of the securities to be issued and the nature of the related trust. Forms of pooling and servicing agreement, servicing agreement, trust agreement and indenture have been filed as exhibits to the registration statement of which this prospectus is a part. The following summaries describe specific provisions which will appear in each agreement. The prospectus supplement for a series of securities will describe additional provisions of the agreement relating to a series. This prospectus together with the prospectus supplement will describe the material terms of the agreement governing the trust related to a series of securities. As used in the prospectus supplement with respect to any series, the term "certificate" or the term "note" refers to all of the certificates or notes of that series, whether or not offered by this prospectus and by the related prospectus supplement, unless the context otherwise requires.

Each series of securities may consist of either:

- a single class of securities evidencing the entire beneficial interest in or indebtedness of the related trust;

- two or more classes of securities evidencing the entire beneficial interest in or indebtedness of the related trust, one or more classes of which will be senior in right of payment to one or more of the other classes;

- two or more classes of securities, one or more classes of which are entitled to (a) principal distributions, with disproportionate, nominal or no interest distributions or (b) interest distributions, with disproportionate, nominal or no principal distributions; or

- two or more classes of securities which differ as to timing, sequential order, priority of payment, security interest rate or amount of distributions of principal or interest or both, or as to which distributions of principal or interest or both on any class may be made upon the occurrence of specified events, in accordance with a schedule or formula, or on the basis of collections from designated portions of the mortgage pool, and one or more classes of securities as to which all or a portion of accrued interest will not be distributed but rather will be added to the principal balance of the security on each distribution date in the manner described in the related prospectus supplement.

With respect to any series of notes, the equity certificates, insofar as they represent the beneficial ownership interest in the issuer, will be subordinate to the related notes.

A class of securities may have a principal balance or notional amount, and may be entitled to payments of interest on the principal balance or notional amount based on a fixed, variable or adjustable interest rate. See "—Distributions on the Securities" below.

The specific percentage ownership interest of each class of securities and the minimum denomination for each security will be specified in the related prospectus supplement.

As to each series of certificates with respect to which a REMIC election is to be made, the servicer, REMIC administrator, or the trustee will be obligated to take all actions required in order to comply with

applicable laws and regulations, and will be obligated to pay any Prohibited Transaction Taxes or Contribution Taxes arising out of a breach of its obligations with respect to its compliance without any right of reimbursement from the trust or from any securityholder. A Prohibited Transaction Tax or Contribution Tax resulting from any other cause will be paid by the related trust, resulting in a reduction in amounts otherwise distributable to securityholders. See "Material Federal Income Tax Consequences."

## Form of Securities

The certificates of each series, including any class of nonoffered certificates, will be issued either as physical certificates or in book-entry form and will represent the entire beneficial interest in the trust created by the related pooling and servicing agreement. The notes of each series, including any class of nonoffered notes, will be issued either as physical notes or in book-entry form and will represent indebtedness of the issuer. The securities will be transferable and exchangeable for like securities of the same class and series in authorized denominations at the corporate trust office of the trustee. The prospectus supplement for each series of securities will describe any limitations on transferability. No service charge will be made for any registration of exchange or transfer of securities, but the depositor or the trustee or any agent of the trustee may require payment of a sum sufficient to cover any tax or other governmental charge.

If a class of securities of any series is issued in book-entry form, The Depository Trust Company ("DTC") will act as securities depository for such class. Such class will be initially represented by a single security registered in the name of a nominee of Cede & Co., DTC's partnership nominee, or such other name as may be requested by DTC. If the initial principal balance of such class exceeds $500 million, a single security will be issued with respect to each $500 million of initial principal balance and an additional security will be issued with respect to any remaining principal balance of such class. The interests of beneficial owners of book-entry securities will be represented by entries on the records of DTC participants or indirect DTC participants. Physical certificates or notes will be available to beneficial owners of book-entry securities only under the limited circumstances described in the first paragraph under "—Definitive Securities" below.

DTC has advised the depositor that it is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation, which, in turn, is owned by a number of DTC participants, the New York Stock Exchange, Inc., the American Stock Exchange LLC, the National Association of Securities Dealers, Inc. and other entities.

DTC holds securities that its participants deposit with DTC. DTC also facilitates the settlement among DTC participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in DTC participants' accounts, which eliminates the need for physical movement of securities. DTC participants include underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and similar organizations. Indirect access to the DTC system is also available to other entities, referred to as indirect DTC participants, such as securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly. DTC has no knowledge of the actual beneficial owners of the book-entry securities; DTC's records reflect only the identity of the DTC participants to whose accounts the book-entry securities are credited, which may or may not be the beneficial owners of the book-entry securities. DTC participants and indirect DTC participants are responsible for keeping account of their holdings on behalf of their customers. Beneficial owners of book-entry securities will not receive written confirmation from DTC of their purchases, but are expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the related DTC participants and indirect DTC participants.

Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to make book-entry transfers among DTC participants on whose behalf it acts and is required to receive and transmit payments of principal and interest, if any, on the book-entry securities. DTC

participants and indirect DTC participants with whom beneficial owners of book-entry securities have accounts similarly are required to make book-entry transfers and receive and transmit payments on behalf of their respective beneficial owners. Accordingly, although beneficial owners of book-entry securities will not possess definitive securities, the DTC rules and the rules of DTC participants provide a mechanism by which beneficial owners of book-entry securities will receive payments and will be able to transfer their interests.

Beneficial owners of book-entry securities may hold their book-entry securities through DTC, if they are DTC participants, or indirectly through organizations that are DTC participants, including Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream"). Euroclear and Clearstream will hold interests on behalf of their participants through customers' securities accounts in Euroclear's and Clearstream's names on the books of the depositaries that serve Euroclear and Clearstream. Those depositaries, in turn, will hold those interests in customers' securities accounts in the depositaries' names on the books of DTC.

Beneficial owners of book-entry securities will not be recognized by the trustee, the depositor, the issuer or the servicer as holders of the related securities for purposes of the related agreement, and beneficial owners will be able to exercise their rights as owners of their securities only indirectly through DTC or DTC participants. Any beneficial owner that desires to purchase, sell or otherwise transfer any interest in book-entry securities may do so only through DTC or through DTC participants. In addition, beneficial owners of book-entry securities will receive all distributions of principal and interest on the book-entry securities through DTC or DTC participants. Beneficial owners may experience delays in the receipt of payments relating to their securities because, although payments are required to be forwarded to DTC on each Distribution Date, DTC will forward payments to DTC participants, which will then be required to forward them to indirect DTC participants. Payments on book-entry securities held through Euroclear or Clearstream will be credited to the cash accounts of Euroclear participants or Clearstream participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. The payments will be subject to tax reporting in accordance with relevant United States tax laws and regulations. *See Appendix A to this prospectus.*

Transfers between DTC participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures. *See Appendix A to this prospectus.*

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositaries; however, the cross market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in that system in accordance with its rules and procedures and within its established deadlines defined with respect to European time. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositaries. *See Appendix A to this prospectus.*

Neither DTC nor Cede & Co., nor any other DTC nominee, will consent or vote with respect to book-entry securities unless authorized by a DTC participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an omnibus proxy to the issuer as soon as possible after the applicable record date. The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those DTC participants to whose accounts book-entry securities are credited on the record date. Euroclear or Clearstream, as the case may be, will take any action permitted to be taken by securityholders under the related agreement on behalf of a Euroclear participant or Clearstream participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depositary to effect the actions on its behalf through DTC.

Clearstream, as a professional depository, holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in accounts of Clearstream participants, thereby eliminating the need for

physical movement of securities. As a professional depository, Clearstream is subject to regulation by the Luxembourg Monetary Institute.

The Euroclear system was created to hold securities for its participating organizations and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of securities and any risk from lack of simultaneous transfers of securities and cash. The operator of the Euroclear system is Euroclear, under contract with the clearance cooperative, Euroclear System Clearance Systems S.C., a Belgian co-operative corporation. All operations are conducted by Euroclear, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with Euroclear, not the clearance cooperative.

The Euroclear clearance cooperative establishes policy for Euroclear on behalf of Euroclear participants. Securities clearance accounts and cash accounts with Euroclear are governed by the Terms and Conditions Governing Use of Euroclear and the related operating procedures of Euroclear and applicable Belgian law. The terms and conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments for securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific securities to specific securities clearance accounts.

None of the sponsor, the servicer, the trustee or any of their respective affiliates will have any liability for any actions taken by DTC or its nominee or Clearstream or Euroclear, for any aspect of the records relating to or payments made on account of beneficial owner of book-entry securities, or for maintaining, supervising or reviewing any records relating to those beneficial ownership interests.

For a discussion of certain federal income tax consequences applicable to holders of book-entry securities who hold such securities through Clearstream or Euroclear, or through DTC if the holder has an address outside the United States, see Appendix A to this prospectus.

*Definitive Securities*

If a class of securities of any series is initially issued in book-entry form, such class will be issued in fully registered, certificated form to securityholders or their nominees, rather than to DTC or its nominee, only if:

- the servicer advises the trustee in writing that DTC is no longer willing or able to discharge properly its responsibilities as depository with respect to the book-entry securities and the trustee or the servicer is unable to locate a qualified successor;

- the servicer, to the extent permitted by law, advises the trustee in writing that it elects to terminate the book-entry system with respect to the book-entry securities; or

- after the occurrence of an event of default under the related pooling and servicing agreement, in the case of certificates, or the related indenture, in the case of notes, as applicable, holders of book-entry securities evidencing not less than 66⅔% of the voting rights advise the trustee and DTC through DTC participants in writing that the continuation of a book-entry system through DTC (or its successor) is no longer in the best interest of the securityholders.

If any of the above events occurs, DTC is required to notify all DTC participants of the availability of definitive securities. When DTC surrenders its physical securities and provides instructions for re-registration, the trustee will be required to issue definitive securities to replace the book-entry securities. After that happens, the trustee will recognize the holders of those definitive securities as securityholders under the related pooling and servicing agreement or indenture, as applicable.

Definitive securities will be transferable and exchangeable at the office or agency of the trustee. A reasonable service charge may be imposed for any registration of transfer or exchange, and the trustee or its agent may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection with registration of transfer or exchange.

## Exchangeable Securities

*General.* If so stated in the related prospectus supplement, a series of securities may include one or more classes of exchangeable securities. In any of these series, the holders of one or more of the classes of

47

exchangeable securities will be entitled, after notice and payment to the trustee of an administrative fee, to exchange all or a portion of those classes for proportionate interests in one or more of the other classes of exchangeable securities. The classes of securities that are exchangeable for one another will be referred to in the related prospectus supplement as "related" to each other, and each related grouping of exchangeable securities will be referred to as a "combination." Each combination of exchangeable securities will be issued by the related trust and, in the aggregate, will represent a distinct combination of interests in the trust. At any time after their initial issuance, any class of exchangeable securities may be exchanged for the related class or classes of exchangeable securities. In some cases, multiple classes of exchangeable securities may be exchanged for one or more classes of related exchangeable securities. Exchanges of securities will be permitted only if payments on the exchangeable securities received in the exchange, in the aggregate, will be made in the same amounts and at the same times as the aggregate payments that would have been made on the exchanged securities.

Descriptions in the related prospectus supplement about the securities of that series, including descriptions of principal and interest distributions, registration and denomination of securities, credit enhancement, yield and prepayment considerations and tax, ERISA and legal investment considerations, will also apply to each class of exchangeable securities. The related prospectus supplement will separately describe the yield and prepayment considerations applicable to, and the risks of investment in, each class of exchangeable securities in a combination. For example, separate decrement tables and yield tables, if applicable, will be included for each class of a combination of exchangeable securities.

*Exchanges.* In order for a holder of exchangeable securities to exchange them for the related exchangeable securities, the following three conditions must be satisfied:

- the aggregate principal balance of the exchangeable securities received in the exchange, immediately after the exchange, must equal the aggregate principal balance, immediately prior to the exchange, of the exchanged securities;

- the aggregate annual amount of interest of the exchangeable securities received in the exchange must equal the aggregate annual amount of interest of the exchanged securities; and

- the class or classes of exchangeable securities must be exchanged in the applicable proportions, if any, described in the related prospectus supplement.

There are many different types of combinations of exchangeable securities. Any individual series of securities may have multiple types of combinations. Some examples of combinations of exchangeable securities include:

- Two classes of exchangeable securities—one with an interest rate that varies directly with changes in an index and the other with an interest rate that varies indirectly with changes in that same index—may be exchanged, together, for a single class of securities with a fixed interest rate. In this case, the two classes with interest rates that varied with an index would be exchanged for a single class with a fixed interest rate. In addition, the aggregate principal balance of the two classes would equal the principal balance of the class with the fixed interest rate.

- Two classes of exchangeable securities—one that is an interest only class and one that is a principal only class—may be exchanged, together, for a single class of securities that is entitled to both principal and interest payments. The principal balance of the new principal and interest class would be equal to the principal balance of the exchanged principal only class, and the interest rate on the new principal and interest class would be a fixed rate that when applied to the principal balance of this class would generate an annual interest amount equal to the annual interest amount of the exchanged interest only class.

- Two classes of exchangeable securities—each a principal and interest class with different fixed interest rates—may be exchanged, together, for a single class that is entitled to both principal and interest payments, with a principal balance equal to the aggregate principal balance of the two exchanged classes, and a fixed interest rate that when applied to the principal balance of the new class, would generate an annual interest amount equal to the aggregate annual interest amount of the two exchanged classes.

48

These examples of combinations of exchangeable securities describe combinations of exchangeable securities which differ in their interest characteristics. In some series, a securityholder may be able to exchange its exchangeable securities for other exchangeable securities that have different principal payment characteristics. Examples of these types of combinations include:

- Two classes of exchangeable securities—one that is an accrual class that accretes interest for a specified period, with the accreted amount added to the principal balance of that accrual class, and one that is an accretion-directed class that receives principal payments from these accretions—may be exchanged, together, for a single class that receives payments of principal continuously from the first distribution date on which it receives interest until it is retired.

- Two classes of exchangeable securities—one that receives principal payments in accordance with a predetermined schedule, such as a planned amortization class, and one that only receives principal payments on a distribution date if scheduled payments have been made according to schedule—may be exchanged, together, for a single class of exchangeable securities that receives principal payments without regard to the schedule from the first distribution date on which it receives principal until it is retired.

These examples of combinations of exchangeable securities describe exchanging multiple classes of securities for a single class of securities. If so stated in the related prospectus supplement, it is also possible that a single class of exchangeable securities may be exchanged for two or more classes of securities in the same type of combinations as described in these examples.

A number of factors may limit the ability of an exchangeable securityholder to effect an exchange. For example, the securityholder must own, at the time of the proposed exchange, the class or classes necessary to make the exchange in the necessary proportions. If a securityholder does not own the necessary classes or does not own the necessary classes in the proper proportions, the securityholder may not be able to obtain the desired class of exchangeable securities. The securityholder desiring to make the exchange may not be able to purchase the necessary class from the then-current owner at a reasonable price or the necessary proportion of the needed class may no longer be available due to principal payments or prepayments that have been applied to that class.

*Procedures.* The related prospectus supplement will describe the procedures that must be followed to make an exchange. A securityholder will be required to provide notice to the trustee a specified number of days prior to the proposed exchange date. The notice must include the outstanding principal or notional amount of the securities to be exchanged and to be received, and the proposed exchange date. When the trustee receives this notice, it will provide instructions to the securityholder regarding delivery of the securities and payment of the administrative fee. A securityholder's notice to the trustee will become irrevocable on the second business day prior to the proposed exchange date. Any exchangeable securities in book-entry form will be subject to the rules, regulations and procedures applicable to DTC's book-entry securities.

If the related prospectus supplement describes exchange proportions for a combination of classes of exchangeable securities, these proportions will be based on the original, rather than the outstanding, principal or notional amounts of these classes.

**Assignment of Trust Assets; Review of Files by Trustee**

At the time of issuance of any series of securities, the depositor will cause the pool of mortgage assets or Mortgage Securities to be transferred to the related trust, together with all principal and interest received on or with respect to the mortgage assets or Mortgage Securities after the related cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest. The trustee will, concurrently with the assignment of mortgage assets or Mortgage Securities, deliver the securities to the depositor in exchange for the trust assets. Each mortgage asset will be identified in a schedule appearing as an exhibit to the related agreement. The schedule of mortgage assets will include detailed information as to the mortgage assets held by the trust, including the outstanding principal balance of each mortgage asset after application of payments due on the cut-off date, information regarding the interest rate on the mortgage asset, the interest rate net of the sum of the rates at which the servicing fee and the retained interest, if any, are calculated, the retained interest, if any, the current scheduled monthly payment

of principal and interest, the maturity of the mortgage note, the value of the mortgaged property and other information with respect to the mortgage assets. Each Mortgage Security will be identified in the related agreement, which will specify as to each Mortgage Security information regarding the original principal amount and outstanding principal balance of each Mortgage Security as of the cut-off date, as well as the annual pass-through rate or interest rate for each Mortgage Security sold to the trust.

If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc., or MERS®, assignments of the mortgages for the mortgage loans held by the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. With respect to mortgage loans registered through the MERS® System, MERS® shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trust and will not have any interest in any of those mortgage loans.

The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian, a mortgage note endorsed to the trustee, the trust, or in blank, the original recorded mortgage with evidence of recording or filing indicated on it, and an assignment (except as to any mortgage loan registered on the MERS® System) to the trustee, the trust, or in blank of the mortgage in a form for recording or filing as may be appropriate in the state where the mortgaged property is located; or, in the case of each cooperative loan, the related cooperative note endorsed to the trustee, the trust, or in blank, the original security agreement, the proprietary lease or occupancy agreement, the assignment of the proprietary lease to the originator of the cooperative loan, the recognition agreement, the related stock certificate and related blank stock powers, a copy of the original filed financing statement, and an assignment to the trustee or the trust of the security agreement, the assignment of proprietary lease and the financing statement; *provided, however,* that if so indicated in the applicable prospectus supplement, the depositor will not deliver to the trustee or to the custodian mortgage notes endorsed to the trustee, the trust or in blank, assignments of mortgage to the trustee, the trust, or in blank, or assignments to the trustee or the trust of the other documents relating to cooperative loans described above.

With respect to any mortgage loan secured by a mortgaged property located in Puerto Rico, the mortgages with respect to these mortgage loans either (a) secure a specific obligation for the benefit of a specified person or (b) secure an instrument transferable by endorsement. Endorsable Puerto Rico Mortgages do not require an assignment to transfer the related lien. Rather, transfer of endorsable mortgages follows an effective endorsement of the related mortgage note and, therefore, delivery of the assignment referred to in the paragraph above would be inapplicable. Direct Puerto Rico Mortgages that secure a specific obligation for the benefit of a specified person, however, require an assignment to be recorded with respect to any transfer of the related lien and the assignment for that purpose would be delivered to the trustee.

With respect to any security backed by a Mortgage Security, the depositor will transfer, convey and assign to the trust all right, title and interest of the depositor in the Mortgage Securities and related property. The assignment will include all principal and interest due on or with respect to the Mortgage Securities after the cut-off date specified in the accompanying prospectus supplement. The depositor will cause the Mortgage Securities to be registered in the name of the trust, the trustee or its nominee, and the trust will concurrently authenticate and deliver the securities. The trustee will not be in possession of or be assignee of record of any underlying assets for a Mortgage Security.

Mortgage loans may be transferred to a trust with documentation defects or omissions, such as missing notes or mortgages or missing title insurance policies. The related prospectus supplement will state whether the mortgage loan seller, the depositor or any other person will be required to cure those defects or repurchase or substitute for those mortgage loans if the defect or omission is not cured.

If stated in the related prospectus supplement, for up to 50% of the total number of mortgage loans as of the cut-off date, the depositor may deliver all or a portion of each related mortgage file (including the related mortgage note) to the trustee within 30 days after the Closing Date. Should the depositor fail to deliver all or a portion of any mortgage files to the trustee within that period, the depositor will be required to use its best efforts to deliver a replacement mortgage loan for the related delay delivery mortgage loan or repurchase the related delay delivery mortgage loan.

50

The trustee will be authorized, with the consent of the depositor and the servicer, to appoint a custodian pursuant to a custodial agreement to maintain possession of documents relating to the mortgage loans as the agent of the trustee.

### Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach

*Representations by the Mortgage Loan Seller or Originator.* Each mortgage loan seller, or a party on its behalf, generally will have made representations and warranties in respect of the mortgage loans sold by that mortgage loan seller to the depositor. If the mortgage loan seller did not originate the mortgage loans, the mortgage loan seller may in some cases instead have assigned to the depositor the representations and warranties made to the mortgage loan seller by the mortgage loan originator, an intervening seller of the mortgage loans, or a party on its behalf. The depositor will assign to the trust those representations and warranties made or assigned to the depositor. The representations and warranties will be made as of a specified date, which may be the Closing Date for the initial issuance of the related series of securities, the cut-off date or a different date on which the mortgage loans were sold by the mortgage loan seller or the originator, as applicable. The representations and warranties will include, by way of example, the following:

- Each mortgage is a valid and enforceable lien on the related mortgaged property, except as such enforcement may be limited by laws affecting the enforcement of creditors' rights generally and principles of equity, and except as provided in the applicable sale agreement;

- The purchaser of the mortgage loans will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than any lien under the applicable sale agreement);

- No mortgage loan is more than a specified number of days delinquent;

- There are no delinquent assessments or taxes outstanding against any mortgaged property;

- Each mortgaged property is free of damage and in good repair, ordinary wear and tear excepted;

- Each mortgage loan at the time it was made complied with all applicable local, state and federal laws;

- Each mortgage loan (except mortgage loans secured by cooperative properties) is covered by a title insurance policy insuring the lien status of the mortgage, subject to the exceptions set forth in the policy; and

- All required hazard insurance or other insurance has been validly issued and remains in full force and effect.

If a person makes any of the foregoing representations and warranties on behalf of a mortgage loan seller or originator, the identity of the person will be specified in the related prospectus supplement. Any such person will be an affiliate of the mortgage loan seller or originator or a person acceptable to the depositor having knowledge regarding the subject matter of those representations and warranties.

If the foregoing representations and warranties are made prior to the Closing Date and assigned by the depositor to the trust, a substantial period of time may have elapsed between the date the representations and warranties were made and the Closing Date. If so, and unless the representations and warranties are later restated, the person who made the representations and warranties will have a cure, repurchase or substitution obligation (as described below) in connection with any breach of a representation and warranty only if the relevant event that caused the breach occurred prior to the date of sale of the applicable mortgage loan by the person who made the representation and warranty. However, the depositor will not transfer any mortgage loan to a trust if anything has come to the depositor's attention that would cause it to believe that the representations and warranties made in respect of a mortgage loan will not be accurate and complete in all material respects as of the Closing Date.

*Representations by the Depositor.* The depositor will only represent and warrant, in respect of the mortgage loans, that as of the Closing Date, the trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the mortgage loan seller and (ii) any lien under the agreement governing the trust).

51

*Remedies for Breach.* Upon a breach of any representation and warranty of the depositor, a mortgage loan seller, an originator or another party on behalf of a mortgage loan seller or originator that materially and adversely affects the value of a mortgage asset or the interests of the securityholders or the trust in the mortgage asset, the person who made the representation and warranty will be obligated either to cure the breach in all material respects, repurchase the mortgage asset at the Purchase Price or substitute for that mortgage asset as described in the next paragraph.

If the depositor, a mortgage loan seller, an originator or another party who made a representation and warranty on behalf of a mortgage loan seller or originator discovers or receives notice of any breach of its representations and warranties with respect to a mortgage asset, such person may be permitted, rather than to repurchase the mortgage asset, to reacquire the mortgage asset from the trust and substitute in its place one or more mortgage assets, but only if (a) with respect to a trust for which a REMIC election is to be made, the substitution is effected within two years of the date of initial issuance of the certificates, plus permissible extensions, or (b) with respect to a trust for which no REMIC election is to be made, the substitution is effected within 180 days of the date of initial issuance of the securities. Each substitute mortgage asset will, on the date of substitution, comply with the following requirements:

(1) have an outstanding principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of the outstanding principal balance, after deduction of all unpaid scheduled payments due as of the date of substitution, of the reacquired mortgage asset,

(2) have an interest rate not less than, and not more than 1% greater than, the interest rate of the reacquired mortgage asset,

(3) have a remaining term to maturity not more than one year greater than, and not more than two years less than, that of the reacquired mortgage asset,

(4) have a Lockout Date, if applicable, not earlier than the Lockout Date on the reacquired mortgage loan, and

(5) comply with all of the representations and warranties set forth in the applicable agreement as of the date of substitution.

In connection with any substitution, an amount generally equal to the difference between the outstanding principal balance of the reacquired mortgage asset and the outstanding principal balance of the substitute mortgage asset, together with (i) one month's interest at the applicable rate at which interest accrued on the reacquired mortgage asset (net of the rate at which the servicing fee is calculated) on the difference and (ii) the amounts described in clauses (3), (4) and (5) of the definition of "Purchase Price," will be deposited in the distribution account and distributed to securityholders on the first distribution date following the Prepayment Period in which the substitution occurred. In the event that one mortgage asset is substituted for more than one reacquired mortgage asset, or more than one mortgage asset is substituted for one or more reacquired mortgage assets, then the principal balances described in clause (1) above will be the applicable aggregate principal balances, the interest rate described in clause (2) above with respect to reacquired mortgage assets will be the weighted average interest rate, the remaining term described in clause (3) above with respect to reacquired mortgage assets will be the weighted average remaining term, and the Lockout Date described in clause (4) above with respect to reacquired mortgage assets will be the weighted average Lockout Date.

An independent verification of the substituting party's compliance with the foregoing requirements with respect to substitutions of mortgage assets may be made by the rating agencies that rated the related securities. Securityholders will be notified of changes to the pool assets in the monthly report to securityholders.

With respect to any series as to which credit support is provided by means of a mortgage pool insurance policy, in addition to making the representations and warranties described above, the depositor, a mortgage loan seller, an originator or another party on behalf of a mortgage loan seller or originator, as specified in the related prospectus supplement, will represent and warrant that no action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed which has resulted or will result in the exclusion from, denial of or defense to coverage under any applicable primary mortgage insurance policy, FHA insurance policy, mortgage pool insurance policy, special hazard insurance policy or bankruptcy bond, irrespective of the cause of the failure of coverage but excluding any failure of an insurer

to pay by reason of the insurer's own breach of its insurance policy or its financial inability to pay. This representation is referred to in this prospectus and the related prospectus supplement as the insurability representation. Upon a breach of the insurability representation which materially and adversely affects the interests of the securityholders in a mortgage loan, the person making such representation will be obligated either to cure the breach in all material respects or to purchase the affected mortgage asset at the Purchase Price. The related prospectus supplement may provide that the performance of an obligation to repurchase mortgage assets following a breach of an insurability representation will be ensured in the manner specified in the prospectus supplement. See "Description of Primary Insurance Policies" and "Description of Credit Support" in this prospectus and in the related prospectus supplement for information regarding the extent of coverage under the aforementioned insurance policies.

The obligation to repurchase or, other than with respect to the insurability representation if applicable, to substitute mortgage loans constitutes the sole remedy available to the securityholders or the trustee for any breach of the representations. The depositor will not be obligated to repurchase or substitute for a mortgage loan if a mortgage loan seller, originator or other person defaults on its obligation to do so, and no assurance can be given that mortgage loan sellers, originators or other persons will carry out their repurchase or substitution obligations with respect to mortgage loans.

The servicer will make representations and warranties regarding its authority to enter into, and its ability to perform its obligations under, the servicing agreement. Upon a breach of any representation of the servicer which materially and adversely affects the interests of the securityholders, the servicer will be obligated to cure the breach in all material respects.

**Establishment of Custodial Account; Deposits to Custodial Account In Respect of Trust Assets**

The servicer or the trustee will, as to each trust, establish and maintain or cause to be established and maintained one or more separate accounts for the collection of payments on the related trust assets. These accounts are collectively referred to in this prospectus as the custodial account. The custodial account must be either

- maintained with an eligible institution with minimum debt ratings as specified in the related servicing agreement or otherwise satisfactory to the rating agency or agencies rating any class of securities of the series;

- an account or accounts the deposits in which are insured by the FDIC, to the limits established by the FDIC; or

- a trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity.

A custodial account may be maintained as an interest bearing or a noninterest bearing account, or the funds held in the custodial account may be invested pending each succeeding distribution date in U.S. government securities and other high-quality investments specified in the related servicing agreement. Any interest or other income earned on funds in the custodial account will either (i) be paid to the servicer or the trustee or their designee as additional compensation, or (ii) be paid as is set forth in the applicable prospectus supplement. The custodial account may be maintained with an institution that is an affiliate of the servicer or the trustee, provided that the institution meets the standards set forth in the bullet points above. If permitted by the rating agency or agencies and so specified in the related prospectus supplement, a custodial account may contain funds relating to more than one series of securities and may, if applicable, contain other funds respecting payments on mortgage loans belonging to the servicer or serviced by it on behalf of others.

Each sub-servicer servicing a trust asset under a sub-servicing agreement will establish and maintain one or more separate accounts which may be interest bearing and which will comply with the standards with respect to custodial accounts or other standards as may be acceptable to the servicer. The sub-servicer will be required to credit to the related sub-servicing account on a daily basis the amount of all proceeds of mortgage assets received by the sub-servicer, less its servicing compensation. The sub-servicer will remit to the servicer by wire transfer of immediately available funds all funds held in the sub-servicing account with respect to each mortgage asset on the monthly remittance date or dates specified in the related servicing agreement.

The servicer will deposit or cause to be deposited in the custodial account for each trust that holds mortgage loans, the following payments and collections received, or advances made, by the servicer or on its behalf subsequent to the cut-off date, other than payments due on or before the cut-off date and exclusive of any retained interest and net of any portion retained by the servicer or a sub-servicer as its servicing compensation:

(1) all payments on account of principal, including principal prepayments, on the mortgage assets or Mortgage Securities;

(2) all payments on account of interest on the mortgage assets or Mortgage Securities;

(3) all proceeds of the hazard insurance policies and any special hazard insurance policy, other than amounts applied to the restoration or repair of the property or released to the mortgagor in accordance with the normal servicing procedures of the servicer or the related sub-servicer, subject to the terms and conditions of the related Mortgage and mortgage note, any primary mortgage insurance policy, any FHA insurance policy, any VA guarantee, any bankruptcy bond and any mortgage pool insurance policy and all other amounts received and retained in connection with the liquidation of defaulted mortgage loans, by foreclosure or otherwise, together with the net proceeds on a monthly basis with respect to any mortgaged properties acquired for the benefit of securityholders by foreclosure or by deed in lieu of foreclosure or otherwise;

(4) any amounts required to be paid under any letter of credit, as described below under "Description of Credit Support—Letter of Credit";

(5) any advances made as described below under "Advances by the Servicer in respect of Delinquencies on the Trust Assets";

(6) if applicable and if so specified in the related prospectus supplement, all amounts required to be transferred to the custodial account from a reserve fund, as described below under "Description of Credit Support—Reserve Fund";

(7) any buydown funds, and, if applicable, investment earnings on those funds, required to be deposited in the custodial account as described in the first paragraph below;

(8) all proceeds of any mortgage loan or property in respect of any mortgage asset purchased by, and all amounts paid in connection with any substitution of mortgage assets by, the depositor or any mortgage loan seller or originator as described under "—Representations and Warranties Regarding the Mortgage Loans; Remedies for Breach" above, exclusive of the retained interest, if any, in respect of the mortgage asset;

(9) all payments required to be deposited in the custodial account with respect to any deductible clause in any blanket insurance policy described under "Description of Primary Insurance Policies—Primary Hazard Insurance Policies"; and

(10) any amount required to be deposited by the servicer in connection with net losses realized on investments for the benefit of the servicer of funds held in the custodial account.

For each buydown mortgage loan, the servicer, or a sub-servicer, will deposit related buydown funds in a custodial account, which may be interest bearing, and that otherwise meets the standards for custodial accounts. This account is referred to in this prospectus and the related prospectus supplement as a buydown account. The terms of all buydown mortgage loans provide for the contribution of buydown funds in an amount not less than either (a) the total payments to be made from the buydown funds under the related buydown plan or (b) if the buydown funds are present valued, that amount that, together with investment earnings on those funds at a specified rate, compounded monthly, will support the scheduled level of payments due under the buydown mortgage loan. Neither the servicer, any sub-servicer nor the depositor will be obligated to add to the buydown funds any of its own funds should investment earnings prove insufficient to maintain the scheduled level of payments. To the extent that any insufficiency in buydown funds is not recoverable from the borrower, distributions to securityholders will be affected. For each buydown mortgage loan, the servicer will deposit in the custodial account the amount, if any, of the buydown funds, and, if applicable, investment earnings on those funds, so that when added to the amount due from the borrower on the buydown mortgage loan, it equals the full monthly payment which would be due if it were not subject to the buydown plan.

54

If a buydown mortgage loan is prepaid in full or liquidated, the related buydown funds will be applied as follows. If the mortgagor on a buydown mortgage loan prepays the loan in its entirety during the buydown period, the servicer will withdraw from the buydown account and remit to the mortgagor in accordance with the related buydown plan any buydown funds remaining in the buydown account. If a prepayment by a mortgagor during the buydown period together with buydown funds will result in a prepayment in full, the servicer will withdraw from the buydown account for deposit in the custodial account the buydown funds and investment earnings on those funds, if any, which together with the prepayment will result in a prepayment in full. If the mortgagor defaults during the buydown period with respect to a buydown mortgage loan and the mortgaged property is sold in liquidation, either by the servicer or the insurer under any related insurance policy, the servicer will withdraw from the buydown account the buydown funds and all investment earnings on those funds, if any, for deposit in the custodial account or remit the same to the insurer if the mortgaged property is transferred to the insurer and the insurer pays all of the loss incurred in respect of the default. In the case of any prepaid or defaulted buydown mortgage loan the buydown funds in respect of which were supplemented by investment earnings, the servicer will withdraw from the buydown account and either deposit in the custodial account or remit to the borrower, depending upon the terms of the buydown plan, any investment earnings remaining in the related buydown account.

Any buydown funds and any investment earnings on those funds deposited in the custodial account in connection with a full prepayment of the related buydown mortgage loan will be deemed to reduce the amount that would be required to be paid by the borrower to repay fully the related mortgage loan if the mortgage loan were not subject to the buydown plan.

With respect to Mortgage Securities, the trustee, manager, bond administrator or certificate administrator, as specified in the accompanying prospectus supplement, will deposit in the custodial account all payments on the Mortgage Securities as they are received after the cut-off date. If the trustee has not received a distribution for any Mortgage Security by the second business day after the date on which such distribution was due and payable, the trustee will request the issuer or guarantor, if any, of such Mortgage Security to make such payment as promptly as possible and legally permitted. The trustee may take any legal action against the related issuer or guarantor as is appropriate under the circumstances, including the prosecution of any claims in connection therewith. The reasonable legal fees and expenses incurred by the trustee in connection with the prosecution of any legal action will be reimbursable to the trustee out of the proceeds of the action and will be retained by the trustee prior to the deposit of any remaining proceeds in the custodial account pending distribution of those proceeds to the securityholders of the affected series. If the trustee has reason to believe that the proceeds of the legal action may be insufficient to cover its projected legal fees and expenses, the trustee will notify the related securityholders that it is not obligated to pursue any available remedies unless adequate indemnity for its legal fees and expenses is provided by the securityholders.

*Withdrawals.* With respect to each series of securities, the servicer, trustee or special servicer may make withdrawals from the custodial account for the related trust for any of the following purposes, unless otherwise provided in the related agreement:

(1) to make distributions to the related securityholders on each distribution date;

(2) to reimburse the servicer or any other specified person for unreimbursed advances made by it in respect of mortgage assets held by the trust as described under "—Advances by Servicer in Respect of Delinquencies on the Trust Assets" below or unreimbursed servicing expenses incurred by it with respect to mortgage assets held by the trust and properties acquired in respect of those assets, these reimbursements to be made out of late collections of interest and principal, Insurance Proceeds, Liquidation Proceeds or other amounts received on the particular mortgage assets or related properties with respect to which the advances were made;

(3) to reimburse the servicer or any other specified person for any advances or servicing expenses described in clause (2) above made or incurred by it which, in the good faith judgment of the servicer or the other person, will not be recoverable from the amounts described in clause (2) above, the reimbursement to be made from amounts collected on other mortgage assets held by the trust;

(4) if so specified in the related prospectus supplement, to pay the servicer, a special servicer or another specified entity (including a provider of credit enhancement) interest accrued on the advances

or expenses described in clause (2) above made or incurred by it while these remain outstanding and unreimbursed;

(5) to reimburse the servicer, the depositor, or any of their respective directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "—Matters Regarding the Servicer and the Depositor";

(6) if so specified in the related prospectus supplement, to pay the fees of the trustee or, if applicable, the custodian;

(7) if so specified in the related prospectus supplement, to pay any ongoing fees of a credit support provider, if applicable;

(8) if so specified in the related prospectus supplement, to reimburse the trustee or any of its directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "—Description of the Trustee";

(9) to pay the servicer, the trustee, or such other person designated in the applicable prospectus supplement as additional compensation, interest and investment income earned in respect of amounts held in the custodial account;

(10) if one or more elections have been made to treat the trust or designated assets held by the trust as a REMIC, to pay any federal, state or local taxes imposed on the trust or its assets or transactions, as and to the extent described under "Material Federal Income Tax Consequences—REMICS—Prohibited Transactions and Other Possible REMIC Taxes";

(11) if so specified in the related prospectus supplement, to pay for the cost of an independent appraiser or other expert in real estate matters retained to determine a fair sale price for a defaulted mortgage loan or a property acquired in respect of that loan in connection with the liquidation of the mortgage loan or property;

(12) if so specified in the related prospectus supplement, to pay for the cost of various opinions of counsel obtained pursuant to the related agreement for the benefit of the related securityholders;

(13) if so specified in the related prospectus supplement, to pay for costs and expenses incurred by the trust for environmental site assessments performed with respect to multifamily properties that constitute security for defaulted mortgage loans, and for any containment, clean-up or remediation of hazardous wastes and materials present on those mortgaged properties, as described under "Procedures for Realization Upon Defaulted Mortgage Assets";

(14) to make any other withdrawals permitted by the related agreement and described in the related prospectus supplement;

(15) to clear and terminate the custodial account upon the termination of the trust; and

(16) to correct for any amounts deposited in error.

**Deposits to Distribution Account**

The trustee will, as to the related trust, establish and maintain a distribution account which must be an eligible account. The trustee will deposit or cause to be deposited in the distribution account for the related trust amounts received from the servicer or otherwise in respect of the related securities.

**Distributions on the Securities**

Distributions allocable to principal and interest on the securities of each series will be made by or on behalf of the trustee each month on each date as specified in the related prospectus supplement and referred to as a distribution date, generally commencing with the month following the month in which the applicable cut-off date occurs. Distributions will be made to the persons in whose names the securities are registered at the close of business on the Record Date, and the amount of each distribution will be determined as of the close of business on the date specified in the related prospectus supplement and referred to as the determination date. All distributions with respect to each class of securities on each distribution date will be allocated pro rata among the outstanding securities of that class. Payments to the holders of securities of any class on each distribution date will be made to the securityholders of the

56

respective class of record on the next preceding Record Date, other than in respect of the final distribution, based on the aggregate fractional undivided interests in that class represented by their respective securities. Payments will be made by wire transfer in immediately available funds to the account of, or by check mailed to, each securityholder, as specified by each securityholder and at the address of such holder as it appears on the security register maintained by the trustee or its agent. The final distribution in retirement of the securities will be made only upon presentation and surrender of the securities at the office or agency specified in the notice to securityholders of the final distribution. With respect to each series of certificates or notes, the security register will be referred to as the certificate register or note register, respectively.

For each class of securities of any series that is issued in book-entry form, such class will be represented by a single security registered in the name of a nominee of DTC, and beneficial owners of such book-entry securities will receive all distributions of principal and interest through DTC or DTC participants. See "—Form of Securities" above.

All distributions on the securities of each series on each distribution date will be made from the available distribution amount described in the next sentence, in accordance with the terms of the applicable pooling and service agreement or indenture. The available distribution amount for each series of securities will be described in the related prospectus supplement and will include the following amounts for each distribution date:

(1) the total amount of all cash received by or on behalf of the servicer with respect to the mortgage assets by the related determination date and not previously distributed, except:

(a) all scheduled payments of principal and interest collected but due on a date subsequent to the related Due Date;

(b) all prepayments received subsequent to the related Prepayment Period (together with any interest payment received with prepayments in full to the extent that it represents the payment of interest accrued on the mortgage asset for the period after the previous Due Period);

(c) Liquidation Proceeds, Insurance Proceeds and other unscheduled recoveries received subsequent to the related Prepayment Period;

(d) all amounts that are due or reimbursable to the depositor, the trustee, a mortgage loan seller, a sub-servicer or the servicer or that are payable in respect of specified expenses of the related trust; and

(e) any other amounts described in the related prospectus supplement;

(2) if the related prospectus supplement so provides, interest or investment income on amounts on deposit in the distribution account;

(3) all advances with respect to the distribution date;

(4) if the related prospectus supplement so provides, Compensating Interest;

(5) to the extent not included under clause (1) above, any amounts collected under, from or in respect of any credit support with respect to the distribution date; and

(6) any other amounts described in the related prospectus supplement.

The entire available distribution amount will be distributed among the related securities, including any nonoffered securities, on each distribution date, and accordingly will not be available for any future distributions.

*Distributions of Interest on the Securities.* Each class of securities may earn interest at a different rate, which may be a fixed, variable or adjustable security interest rate. The related prospectus supplement will specify the security interest rate for each class, or, in the case of a variable or adjustable security interest rate, the method for determining the security interest rate.

With respect to each class of securities entitled to interest and each distribution date, the distribution in respect of interest will be equal to one month's interest on the outstanding principal balance of the security immediately prior to the distribution date, at the applicable security interest rate, subject to the following. As to each Strip Security with no or a nominal principal balance, the distributions in respect of interest on any distribution date will be on the basis of a notional amount and equal one month's Stripped Interest. Prior to the time interest is distributable on any class of Accrual Securities, interest accrued on that class

will be added to the principal balance of that class on each distribution date. Interest distributions on each security of a series will be reduced in the event of shortfalls in collections of interest resulting from prepayments on mortgage loans, as described below, to the extent not covered by Compensating Interest, with that shortfall allocated among the securities of that series as specified in the related prospectus supplement. See "Yield and Maturity Considerations" in this prospectus.

*Distributions of Principal of the Securities.* The principal balance of a security, at any time, will equal the maximum amount that the holder will be entitled to receive in respect of principal out of the future cash flow on the mortgage assets and other assets held by the related trust. The principal balance of each offered security will be stated in the related prospectus supplement as the certificate principal balance with respect to a certificate and the note balance with respect to a note. The outstanding principal balance of a security will be reduced to the extent of distributions of principal on that security, and, if and to the extent so provided on the related prospectus supplement, by the amount of any realized losses allocated to that security. The outstanding principal balance of a security may be increased by any deferred interest if so specified in the related prospectus supplement. The initial aggregate principal balance of a series and each class of securities related to a series will be specified in the related prospectus supplement. Distributions of principal will be made on each distribution date to the class or classes of securities entitled to principal until the principal balance of that class has been reduced to zero. Distributions of principal of any class of securities will be made on a pro rata basis among all of the securities of the class. Securities with no principal balance will not receive distributions of principal.

*Prepayment Interest Shortfalls and Compensating Interest.* When a borrower prepays a mortgage loan in full between scheduled due dates for the mortgage loan, the borrower pays interest on the amount prepaid only to but not including the date on which the principal prepayment is made. Similarly, Liquidation Proceeds from a mortgaged property will not include interest for any period after the date on which the liquidation took place. Partial prepayments will in most cases be applied as of the most recent due date, so that no interest is due on the following due date on the amount prepaid.

If so stated in the accompanying prospectus supplement, to the extent funds are available from amounts that may include the servicing fee, the servicer may make an additional payment to securityholders to cover certain prepayment interest shortfalls with respect to loans that prepaid during the related prepayment period, referred to as Compensating Interest. Compensating Interest will be limited to the amount specified in the accompanying prospectus supplement and may not be sufficient to cover the prepayment interest shortfalls. If so stated in the accompanying prospectus supplement, no Compensating Interest may be paid at all. Compensating Interest will generally not be paid with respect to closed-end home equity loans and revolving credit loans. If so stated in the accompanying prospectus supplement, prepayment interest shortfalls may be applied to reduce interest otherwise payable to all or some classes of securities of a series.

*Allocation to Securityholders of Losses on the Trust Assets.* With respect to any defaulted mortgage loan that is finally liquidated, through foreclosure sale or otherwise, the amount of the realized loss incurred in connection with liquidation will equal the excess, if any, of the unpaid principal balance of the liquidated loan immediately prior to liquidation, over the aggregate amount of Liquidation Proceeds derived from liquidation remaining after application of the proceeds to unpaid accrued interest on the liquidated loan and to reimburse the servicer or any sub-servicer for related unreimbursed advances and expenses. With respect to mortgage loans the principal balances of which have been reduced in connection with bankruptcy proceedings, the amount of that reduction also will be treated as a realized loss. As to any series of securities, other than a Senior/Subordinate Series, any realized loss not covered as described under "Description of Credit Support" will be allocated among all of the securities on a pro rata basis. As to any Senior/Subordinate Series, realized losses will be allocated first to the most subordinate class of securities as described below under "Description of Credit Support—Subordination."

## Advances by Servicer in Respect of Delinquencies on the Trust Assets

With respect to any series of securities, the servicer will advance, on or before each distribution date, from funds held by the servicer for future distribution, or from its own funds, the amount of interest that was due on each mortgage asset on the related Due Date and was delinquent on the related determination date. The prospectus supplement for a series may also provide that the servicer will advance the amount of

principal that was due on the related Due Date and was delinquent on the related determination date, except that, with respect to balloon loans, the servicer will not have to advance a delinquent balloon payment. Notwithstanding the foregoing, the servicer will not make an advance if it determines, in good faith, that the advance would not be recoverable from late payments, Insurance Proceeds, Liquidation Proceeds or other amounts received for the mortgage asset with respect to the which the advance was made.

Advances are intended to maintain a regular flow of scheduled interest and principal payments to holders of the class or classes of securities entitled to payments, rather than to guarantee or insure against losses. An advance of the servicer's funds will be reimbursable only out of recoveries on the mortgage asset with respect to the which the advance was made, including amounts received under any form of credit support; provided, however, that an advance will be reimbursable from recoveries on other mortgage assets in the event that the servicer determines that the advance is not ultimately reimbursable from recoveries on the related mortgage asset. If advances have been made by the servicer from funds held by the servicer for future distribution, the servicer will replace those funds on any future distribution date to the extent that funds available for distribution on that distribution date are less than distributions required to be made to securityholders on that date. If so specified in the related prospectus supplement, the obligations of the servicer to make advances may be secured by a cash advance reserve fund or a surety bond. If applicable, information regarding the characteristics of, and the identity of any obligor on, any surety bond, will be set forth in the related prospectus supplement.

Advances in respect of delinquencies will not be made in connection with home equity revolving credit loans. In the case of home equity revolving credit loans, the servicer may be required to advance funds to cover any draws made on a home equity revolving credit loan, subject to reimbursement by the entity specified in the accompanying prospectus supplement, provided that draws may be covered first from principal collections on the other loans in the mortgage pool.

As specified in the accompanying prospectus supplement for any series of securities as to which the trust holds Mortgage Securities, any advancing obligations will be under the terms of the Mortgage Securities and may differ from the provisions relating to advances described in this prospectus.

**Form of Reports to Securityholders**

On each distribution date, the servicer or the trustee will make available to each securityholder and to such other parties as may be specified in the related servicing agreement, a statement setting forth the following as of the distribution date:

(1) the total amount of (i) interest, (ii) scheduled principal, (iii) principal prepayments, (iv) liquidation proceeds, (v) repurchase proceeds and (vi) subsequent recoveries on mortgage loans after such mortgage loans were liquidated, available for distribution to the securities on that distribution date;

(2) the amount of (i) interest and (ii) principal to be distributed to each class of securities on that distribution date;

(3) the amount of (i) any realized losses and (ii) any shortfall in interest collections resulting from prepayments (to the extent not covered by Compensating Interest) or from application of the Relief Act to be allocated to each class of securities on that distribution date;

(4) the principal balance for each class of securities before and after giving effect to such distributions and allocations;

(5) the amount of any advances of scheduled principal and interest made by the servicer during the related distribution period;

(6) the number and aggregate principal balance of the mortgage loans at the beginning and end of the distribution period;

(7) updated aggregate pool information, including weighted average pass-through rate, weighted average remaining term and geographic concentrations;

(8) delinquency information for the distribution period, including (i) the number and aggregate principal balance of the mortgage loans delinquent one, two and three months or more, (ii) the number and aggregate principal balance of the mortgage loans with respect to which foreclosure proceedings

have been initiated and (iii) the number and aggregate principal balance of the mortgage loans with respect to which the related mortgaged properties have been acquired by the trust through foreclosure;

(9) the amount deposited in a reserve fund, if any, on that distribution date;

(10) the amount remaining in the reserve fund, if any, as of the close of business on that distribution date;

(11) in the case of securities that accrue interest at the variable rate, the security interest rate applicable to that distribution date, as calculated in accordance with the method specified in the related prospectus supplement; and

(12) as to any series which includes credit support, the amount of coverage of each instrument of credit support as of the close of business on that distribution date.

In addition, by the date required by applicable tax law of each calendar year, the servicer will furnish, to each person who at any time during the calendar year was a holder of a security, a statement setting forth the aggregate amount of interest and principal distributed to each class of securities and the aggregate amount of administration or servicing compensation received by the trustee or the servicers for that calendar year or the applicable portion of that year during which that person was a securityholder, and such other customary information as the servicer determines to be necessary to enable securityholders to prepare their tax returns for such calendar year or portion of such calendar year.

## Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator

The servicer, directly or through sub-servicers, will make reasonable efforts to collect all scheduled payments under the mortgage loans and will follow or cause to be followed the collection procedures as it would follow with respect to mortgage assets that are comparable to the mortgage assets and held for its own account, provided these procedures are consistent with the related servicing agreement and any related insurance policy, bankruptcy bond, letter of credit or other insurance instrument described under "Description of Primary Insurance Policies" or "Description of Credit Support." The servicer, however, will not be required to make Nonrecoverable Advances. Consistent with this servicing standard, the servicer may, in its discretion, waive any late payment charge in respect of a late mortgage loan payment and, only upon determining that the coverage under any related insurance instrument will not be affected, extend or cause to be extended the due dates for payments due on a mortgage note for a period not greater than 180 days.

In instances in which a mortgage asset is in default, or if default is reasonably foreseeable, and if determined by the servicer or special servicer, if applicable, to be in the best interests of the related securityholders, the servicer may permit modifications of the mortgage asset rather than proceeding with foreclosure. In making that determination, the estimated realized loss that might result if the mortgage asset were liquidated would be taken into account. Modifications may have the effect of reducing the interest rate on the mortgage asset, forgiving the payment of principal or interest or extending the final maturity date of the mortgage asset. Any modified mortgage asset will continue to be held by the related trust, and the reduction in collections resulting from the modification may result in reduced distributions of interest, or other amounts, on, or may extend the final maturity of, one or more classes of the related securities.

In connection with any significant partial prepayment of a mortgage asset, the servicer, to the extent not inconsistent with the terms of the mortgage note and local law and practice, may permit the mortgage asset to be reamortized so that the monthly payment is recalculated as an amount that will fully amortize the remaining principal amount of the mortgage asset by the original maturity date based on the original interest rate. This will not be permitted if it would constitute a modification of the mortgage asset for federal income tax purposes.

In any case in which property securing a mortgage asset has been, or is about to be, conveyed by the borrower, or in any case in which property securing a multifamily loan or commercial loan has been, or is about to be, encumbered by the borrower, the servicer will exercise or cause to be exercised on behalf of the related trust the lender's rights to accelerate the maturity of the mortgage asset under any due-on-sale or due-on-encumbrance clause applicable to that mortgage asset. The servicer will exercise these rights only if the exercise of any of these rights is permitted by applicable law and will not impair or threaten to impair

any recovery under any related insurance instrument. If these conditions are not met or if the servicer reasonably believes it is unable under applicable law to enforce a due-on-sale or due-on-encumbrance clause, the servicer will enter into or cause to be entered into an assumption and modification agreement with the person to whom the property has been or is about to be conveyed or encumbered, under which that person becomes liable under the mortgage note or cooperative note and, to the extent permitted by applicable law, the borrower remains liable on it. The original mortgagor may be released from liability on a mortgage asset if the servicer shall have determined in good faith that a release will not adversely affect the collectability of the mortgage asset. An ARM Loan may be assumed if the ARM Loan is by its terms assumable and if, in the reasonable judgment of the servicer, the proposed transferee of the related mortgaged property establishes its ability to repay the loan and the security for the ARM Loan would not be impaired by the assumption. If a mortgagor transfers the mortgaged property subject to an ARM Loan without consent, that ARM Loan may be declared due and payable. Any fee collected by or on behalf of the servicer for entering into an assumption agreement will be retained by or on behalf of the servicer as additional servicing compensation. In connection with any assumption, the terms of the related mortgage asset may not be changed except in the instance where an assumption is related to a defaulted cure. See "Legal Aspects of Mortgage Assets—Enforceability of Provisions."

In the case of multifamily loans, commercial loans or mixed-use loans, a mortgagor's failure to make scheduled payments may mean that operating income is insufficient to service the mortgage debt, or may reflect the diversion of that income from the servicing of the mortgage debt. In addition, a mortgagor under a multifamily loan, commercial loan or mixed-use loan that is unable to make scheduled payments may also be unable to make timely payment of all required taxes and otherwise to maintain and insure the related mortgaged property. In general, the servicer will be required to monitor any multifamily loan, commercial loan or mixed-use loan that is in default, evaluate whether the causes of the default can be corrected over a reasonable period without significant impairment of the value of the related mortgaged property, initiate corrective action in cooperation with the mortgagor if cure is likely, inspect the related mortgaged property and take such other actions as are consistent with the related servicing agreement. A significant period of time may elapse before the servicer is able to assess the success of any such corrective action or the need for additional initiatives. The time within which the servicer can make the initial determination of appropriate action, evaluate the success of corrective action, develop additional initiatives, institute foreclosure proceedings and actually foreclose (or accept a deed to a mortgaged property in lieu of foreclosure) on behalf of the securityholders of the related series may vary considerably depending on the particular multifamily loan, commercial loan or mixed-use loan, the mortgaged property, the mortgagor, the presence of an acceptable party to assume the multifamily loan, commercial loan or mixed-use loan and the laws of the jurisdiction in which the mortgaged property is located.

If a mortgagor files a bankruptcy petition, the servicer may not be permitted to accelerate the maturity of the related mortgage asset or to foreclose on the mortgaged property for a considerable period of time. See "Legal Aspects of Mortgage Assets."

For any series of securities for which the trust holds Mortgage Securities, the servicing and administration obligations of the manager, bond administrator or certificate administrator, as applicable, will be described in the accompanying prospectus supplement.

**Description of Sub-Servicing**

Any servicer may delegate its servicing obligations in respect of the mortgage assets to sub-servicers, but the servicer will remain obligated under the related servicing agreement. Each sub-servicer will be required to perform the customary functions of a servicer of comparable assets, including:

- collecting payments from borrowers and remitting the collections to the servicer,

- maintaining primary hazard insurance as described in this prospectus and in any related prospectus supplement,

- filing and settling claims under primary hazard insurance policies, which may be subject to the right of the servicer to approve in advance any settlement,

- maintaining escrow or impound accounts of borrowers for payment of taxes, insurance and other items required to be paid by any borrower in accordance with the mortgage asset,

61

- processing assumptions or substitutions where a due-on-sale clause is not exercised,

- attempting to cure delinquencies,

- supervising foreclosures or repossessions,

- inspecting and managing mortgaged properties, if applicable, and

- maintaining accounting records relating to the mortgage assets.

The servicer will be responsible for filing and settling claims in respect of mortgage assets in a particular mortgage pool under any applicable mortgage pool insurance policy, bankruptcy bond, special hazard insurance policy or letter of credit. See "Description of Credit Support."

The sub-servicing agreement between any servicer and a sub-servicer will be consistent with the terms of the related servicing agreement and will not result in a withdrawal or downgrading of any class of securities issued in accordance with the related agreement. With respect to those mortgage assets serviced by the servicer through a sub-servicer, the servicer will remain liable for its servicing obligations under the related pooling and servicing agreement or servicing agreement as if the servicer alone were servicing those mortgage assets. Although each sub-servicing agreement will be a contract solely between the servicer and the sub-servicer, the agreement under which a series of securities is issued will provide that, if for any reason the servicer for the series of securities is no longer acting in a servicing capacity, the trustee or any successor servicer must recognize the sub-servicer's rights and obligations under the sub-servicing agreement.

The servicer will be solely liable for all fees owed by it to any sub-servicer, irrespective of whether the servicer's compensation under the related agreement is sufficient to pay the fees. However, a sub-servicer may be entitled to a retained interest in mortgage assets. Each sub-servicer will be reimbursed by the servicer for expenditures which it makes, generally to the same extent the servicer would be reimbursed under the related servicing agreement. See "Description of the Securities—Retained Interest; Servicing or Administration Compensation and Payment of Expenses."

The servicer may require any sub-servicer to agree to indemnify the servicer for any liability or obligation sustained by the servicer in connection with any act or failure to act by the sub-servicer in its servicing capacity. Each sub-servicer is required to maintain a fidelity bond and an errors and omissions policy with respect to its officers, employees and other persons acting on its behalf or on behalf of the servicer.

**Procedures for Realization Upon Defaulted Mortgage Assets**

The servicer will be required to foreclose upon or otherwise take title in the name of the trustee or the trust of mortgaged properties relating to defaulted mortgage assets to which no satisfactory arrangements can be made for collection of delinquent payments, but the servicer will not be required to foreclose if it determines that foreclosure would not be in the best interests of the securityholders or the provider of credit support, if any. If the mortgage loan is an Additional Collateral Loan, the servicer may proceed against the related mortgaged property or the related additional collateral first, or may proceed against both concurrently, as permitted by applicable law and the terms under which the additional collateral is held, including any third-party guarantee. See "Legal Aspects of the Mortgage Assets—Anti-Deficiency Legislation and Other Limitations on Lenders."

In addition, the servicer may not acquire title to any one-to-four-family residential property securing a mortgage loan if the servicer is aware of evidence of toxic waste or other environmental contamination on the property and it determines that it would be imprudent to foreclose. The servicer may not acquire title to any multifamily residential property or commercial property securing a mortgage loan or take any other action that would cause the related trustee, the trust or any other specified person to be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or an "operator" of such mortgaged property within the meaning of federal environmental laws, unless the servicer has previously determined, based on a report prepared by a person who regularly conducts environmental audits (which report will be an expense of the trust), that either:

(1) the mortgaged property is in compliance with applicable environmental laws and regulations or, if not, that taking actions as are necessary to bring the mortgaged property into compliance with

62

these laws is reasonably likely to produce a greater recovery on a present value basis than not taking those actions; and

(2) there are no circumstances or conditions present at the mortgaged property that have resulted in any contamination for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any applicable environmental laws and regulations or, if those circumstances or conditions are present for which any such action could be required, taking those actions with respect to the mortgaged property is reasonably likely to produce a greater recovery on a present value basis than not taking those actions. See "Legal Aspects of Mortgage Assets—Environmental Legislation."

As servicer of the mortgage loans, the servicer will present claims to the insurer under each insurance instrument, and will take reasonable steps as are necessary to receive payment or to permit recovery with respect to defaulted mortgage assets. The servicer, however, will not be required to make Nonrecoverable Advances. As set forth above under "—Collection and Other Servicing Procedures Employed by the Servicer," all collections by or on behalf of the servicer under any insurance instrument, other than amounts to be applied to the restoration of a mortgaged property or released to the mortgagor, are to be deposited in the custodial account for the related trust, subject to withdrawal as previously described. The servicer or its designee will not receive payment under any letter of credit included as an insurance instrument with respect to a defaulted mortgage asset unless all Liquidation Proceeds and Insurance Proceeds which it deems to be finally recoverable have been realized; however, the servicer will be entitled to reimbursement for any unreimbursed advances and reimbursable expenses.

If any property securing a defaulted mortgage asset is damaged and proceeds, if any, from the related hazard insurance policy or special hazard insurance policy are insufficient to restore the damaged property to a condition sufficient to permit recovery under the related credit insurance instrument, if any, the servicer is not required to expend its own funds to restore the damaged property unless it determines (a) that the restoration will increase the proceeds to securityholders on liquidation of the mortgage loan after reimbursement of the servicer for its expenses and (b) that its expenses will be recoverable by it from related Liquidation Proceeds.

If recovery on a defaulted mortgage asset under any related credit insurance instrument is not available for the reasons set forth in the preceding paragraph, the servicer nevertheless will be obligated to follow or cause to be followed the normal practices and procedures as it deems necessary or advisable to realize upon the defaulted mortgage asset. If the proceeds of any liquidation of the property securing the defaulted mortgage asset are less than the outstanding principal balance of the defaulted mortgage asset plus interest accrued at the interest rate plus the aggregate amount of unreimbursed servicing expenses incurred with respect to the mortgage asset and unreimbursed advances of delinquent monthly payments made with respect to the mortgage asset, the trust will realize a loss in the amount of the difference.

If the servicer or its designee recovers Insurance Proceeds with respect to any defaulted mortgage asset, the servicer will be entitled to retain, from the portion of those proceeds distributed to securityholders, the aggregate amount of unreimbursed servicing expenses incurred with respect to the mortgage asset and unreimbursed advances of delinquent monthly payments made with respect to the mortgage asset. Because Insurance Proceeds cannot exceed deficiency claims and expenses incurred by the servicer, no payment or recovery will result in a recovery to the trust which exceeds the principal balance of the defaulted mortgage asset together with accrued interest thereon at the interest rate net of servicing fees and the retained interest, if any. In addition, when property securing a defaulted mortgage asset can be resold for an amount exceeding the outstanding principal balance of the mortgage asset together with accrued interest and expenses, it may be expected that, if legally permissible, the insurer will exercise its right under any related mortgage pool insurance policy to purchase the property and realize for itself any excess proceeds. See "Description of Primary Insurance Policies" and "Description of Credit Support."

With respect to collateral securing a cooperative loan, any prospective purchaser will generally have to obtain the approval of the board of directors of the relevant cooperative before purchasing the shares and acquiring rights under the proprietary lease or occupancy agreement securing the cooperative loan. This approval is usually based on the purchaser's income and net worth and numerous other factors. The necessity of obtaining board approval could limit the number of potential purchasers for those shares and otherwise limit the servicer's ability to sell, and realize the value of, those shares. See "Legal Aspects of Mortgage Assets—Foreclosure on Cooperative Shares."

The manager, bond administrator or certificate administrator, as applicable, will deal with any defaulted Mortgage Securities in the manner described in the accompanying prospectus supplement.

### Retained Interest; Servicing or Administration Compensation and Payment of Expenses

The prospectus supplement for a series of securities will specify whether there will be any retained interest in the trust assets. A retained interest in a trust asset represents a specified portion of the interest payable on that asset. The retained interest will be deducted from borrower payments as received and will not be transferred to the related trust. Any partial recovery of interest on a mortgage asset, after deduction of all applicable servicing fees, may be allocated pro rata between the retained interest, if any, and interest at the net interest rate on the mortgage asset. If the holder of the retained interest were to become the subject of a receivership, conservatorship, bankruptcy, or other insolvency proceeding, a party in interest (including the holder itself) could assert that such holder retains rights in the related trust assets and therefore compel the sale of such trust assets over the objection of the trust and the securityholders. If that occurs, delays and reductions in payments to the trust and the securityholders could result.

The servicer's primary compensation with respect to a series of securities will come from the monthly payment to it of an amount equal to one-twelfth of the servicing fee rate specified in the related prospectus supplement times the scheduled principal balance of the trust asset. Since any retained interest and the servicer's primary compensation are percentages of the scheduled principal balance of each trust asset, these amounts will decrease in accordance with the amortization schedule of the trust assets. As additional compensation in connection with a series of securities relating to mortgage loans, the servicer or the sub-servicers will retain all assumption fees, late payment charges and, if so stated in the prospectus supplement, prepayment charges, to the extent collected from mortgagors. Any interest or other income which may be earned on funds held in the custodial account, distribution account, sub-servicing account or any other account created under the related servicing agreement (to the extent not applied as Compensating Interest) may be paid as additional compensation to the servicer or the sub-servicers, as the case may be. Any sub-servicer will receive a portion of the servicer's primary compensation as its sub-servicing compensation.

In addition to amounts payable to any sub-servicer, the servicer may pay from its servicing compensation expenses incurred in connection with its servicing of the mortgage loans, including, without limitation, payment of the fees and disbursements of the trustee and independent accountants, payment of expenses incurred in connection with distributions and reports to securityholders, and other expenses, as described in the related prospectus supplement.

The servicer is entitled to reimbursement for reimbursable expenses, which may include taxes or insurance with respect to mortgaged properties to the extent not paid by the mortgagor, expenses incurred by the servicer in connection with foreclosure and bankruptcy proceedings and expenses for the maintenance and restoration of properties acquired through foreclosure, the right of reimbursement being prior to the rights of securityholders to receive any related Liquidation Proceeds. The servicer is also entitled to reimbursement for advances of delinquent principal and interest.

Notwithstanding the foregoing, with respect to a series of securities as to which the trust holds Mortgage Securities, the compensation payable to the manager, bond administrator or certificate administrator, as applicable, for servicing and administering such Mortgage Securities on behalf of the holders of those certificates may be based on a percentage per annum described in the accompanying prospectus supplement of the outstanding balance of the Mortgage Securities and may be retained from distributions of interest on the Mortgage Securities if stated in the accompanying prospectus supplement

### Annual Servicing Compliance Reports

Each servicing agreement will require the servicer to deliver to the trustee, on or before the date in each year specified in the servicing agreement, and, if required, file with the Commission as part of a Report on Form 10-K filed on behalf of each trust, the following documents:

- a report on its assessment of compliance during the preceding calendar year with all applicable servicing criteria set forth in relevant Commission regulations with respect to asset-backed securities transactions taken as a whole involving the servicer that are backed by the same

types of assets as those backing the offered securities, as well as similar reports on assessment of compliance received from certain other parties participating in the servicing function as required by relevant Commission regulations;

- with respect to each assessment report described in the immediately preceding bullet point, a report by a registered public accounting firm that attests to, and reports on, the assessment made by the asserting party, as set forth in relevant Commission regulations; and

- a statement of compliance from the servicer, and similar statements from certain other parties involved in servicing the mortgage assets as required by relevant Commission regulations, signed by an authorized officer, to the effect that:

  - a review of the servicer's activities during the reporting period and of its performance under the applicable servicing agreement has been made under such officer's supervision; and

  - to the best of such officer's knowledge, based on such review, the servicer has fulfilled all of its obligations under the servicing agreement in all materials respects throughout the reporting period or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

### Matters Regarding the Servicer and the Depositor

The servicer under each servicing agreement will be named in the related prospectus supplement. The servicer may be an affiliate of the depositor and may have other business relationships with the depositor or the depositor's affiliates.

Each servicing agreement will provide that the servicer may not resign from its obligations and duties under the related agreement, except upon a determination that its duties under the related agreement are no longer permissible under applicable law. No resignation will become effective until the trustee or a successor servicer has assumed the servicer's obligations and duties under the related agreement.

Each servicing agreement will further provide that neither the servicer, the depositor nor any director, officer, employee, or agent of the servicer or the depositor will be under any liability to the related trust or securityholders for any action taken, or for refraining from the taking of any action, in good faith under the related agreement, or for errors in judgment; provided, however, that neither the servicer, the depositor nor any such person will be protected against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties under the related agreement or by reason of reckless disregard of obligations and duties under the related agreement. Each servicing agreement will further provide that the servicer, the depositor and any director, officer, employee or agent of the servicer or the depositor will be entitled to indemnification by the related trust and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the related agreement or the securities, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under the related agreement. In addition, each servicing agreement will provide that neither the servicer nor the depositor will be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its respective responsibilities under the related agreement and which in its opinion may involve it in any expense or liability. The servicer or the depositor may, however, in its discretion undertake any action which it may deem necessary or desirable with respect to the related agreement and the rights and duties of the parties and the interests of the securityholders. In that event, the legal expenses and costs of the action and any resulting liability will be expenses, costs and liabilities of the trust, and the servicer or the depositor, as the case may be, will be entitled to be reimbursed by the trust.

Any person into which the servicer or the depositor may be merged or consolidated, or any person resulting from any merger or consolidation to which the servicer or the depositor is a party, or any person succeeding to the business of the servicer or the depositor, will be the successor of the servicer or the depositor, as applicable, under the related agreement.

**Events of Default Under the Governing Agreement and Rights Upon Events of Default**

*Pooling and Servicing Agreement*

Events of default under each pooling and servicing agreement will include each of the following:

- any failure by the servicer to make any required advance of delinquent principal and interest that continues unremedied at the opening of business on the distribution date in respect of which such advance was to have been made;

- any failure by the servicer to remit to the trustee for distribution to securityholders any other required payment that continues unremedied for a specified number of days after the giving of written notice of the failure to the servicer by the trustee, or to the servicer and the trustee by the holders of certificates evidencing not less than 25% of the voting rights;

- any failure by the servicer duly to observe or perform in any material respect any of its other covenants or obligations under the agreement which continues unremedied for a specified number of days after the giving of written notice of the failure to the servicer by the trustee, or to the servicer and the trustee by the holders of certificates evidencing not less than 25% of the voting rights; and

- events of insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings regarding the servicer and actions by or on behalf of the servicer indicating its insolvency or inability to pay its obligations.

So long as an event of default under a pooling and servicing agreement remains unremedied, the trustee or the holders of certificates evidencing not less than 25% of the voting rights may terminate all of the rights and obligations of the servicer under the pooling and servicing agreement, other than any retained interest of the servicer and its right to reimbursement for advances, whereupon the trustee will succeed to all of the responsibilities, duties and liabilities of the servicer under the agreement and will be entitled to similar compensation arrangements. If the trustee is prohibited by law from obligating itself to make advances on delinquent mortgage assets, then the trustee will not be so obligated.

If the trustee is unwilling to so act, it may, or if the trustee is unable to so act, it shall, appoint, or petition a court of competent jurisdiction for the appointment of, a loan servicing institution with a minimum net worth at the time of the appointment as is set forth in the pooling and servicing agreement, to act as successor to the servicer under the pooling and servicing agreement. Pending the appointment of a successor, the trustee is obligated to act in the capacity of servicer. The trustee and any successor servicer may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation payable to the servicer under the related agreement.

If the servicer shall have been terminated following an event of default described in the first bullet point above, the servicer will have the right, in limited circumstances described in the pooling and servicing agreement, to remedy such event of default and thereafter resume its rights and obligations as servicer.

No securityholder will have the right under any pooling and servicing agreement to institute any proceeding under the agreement unless:

- the securityholder previously has given to the trustee written notice of default,

- the holders of securities evidencing not less than 25% of the voting rights have made written request upon the trustee to institute the proceeding in its own name as trustee,

- there shall have been offered to the trustee reasonable indemnity, and

- the trustee for a specified number of days after its receipt of notice has neglected or refused to institute a proceeding.

The trustee, however, will be under no obligation to exercise any of the trusts or powers vested in it by any pooling and servicing agreement or to make any investigation of matters arising under that pooling and servicing agreement or to institute, conduct or defend any litigation at the request, order or direction of any of the holders of securities covered by the agreement, unless the securityholders have offered to the trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred.

66

*Servicing Agreement*

A servicing default under the related servicing agreement will include each of the following:

- any failure by the servicer to make a required deposit to a specified account which continues unremedied for a specified number of business days after the giving of written notice of the failure to the servicer by the trustee or by any other specified party;

- any failure by the servicer duly to observe or perform in any material respect any other of its covenants or agreements in the servicing agreement with respect to the series of notes which continues unremedied for a specified number of days after the giving of written notice of the failure to the servicer by the trustee or any other specified party;

- events of insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings regarding the servicer and actions by the servicer indicating its insolvency or inability to pay its obligations and

- any other servicing default as set forth in the servicing agreement.

So long as a servicing default remains unremedied, either the depositor or the trustee may, by written notification to the servicer and to the issuer or the trustee, as applicable, terminate all of the rights and obligations of the servicer under the servicing agreement, other than the servicer's right to reimbursement for advances. Upon termination of the servicer the trustee will succeed to all responsibilities, duties and liabilities of the servicer under the servicing agreement, other than any obligation to repurchase mortgage loans, and will be entitled to similar compensation arrangements. If the trustee is unwilling to so act, it may appoint, or if it is unable to so act, it shall appoint, or petition a court of competent jurisdiction for the appointment of, an approved mortgage servicing institution with a minimum net worth at the time of the appointment as is set forth in the servicing agreement, to act as successor to the servicer under the servicing agreement. Pending the appointment of a successor, the trustee is obligated to act in the capacity of servicer. The trustee and the successor may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation to the initial servicer under the servicing agreement.

*Indenture*

An event of default under the indenture will include each of the following:

- a default by the issuer for a specified number of days or more in the payment of any principal of or interest on any note of the series;

- failure by the issuer to perform any other covenant in the indenture which continues for a specified number of days after notice of failure is given in accordance with the procedures described in the related prospectus supplement;

- any representation or warranty made by the issuer in the indenture or in any related certificate or other writing having been incorrect in a material respect as of the time made, and the breach is not cured within a specified number of days after notice of breach is given in accordance with the procedures described in the related prospectus supplement;

- events of bankruptcy, insolvency, receivership or liquidation of the issuer; or

- any other event of default provided with respect to notes of that series.

If an event of default with respect to the notes of any series occurs and is continuing, the trustee or the holders of a majority of the then aggregate outstanding amount of the notes of the series may declare the principal amount, or, if the notes of that series are Accrual Securities, the portion of the principal amount as may be specified in the terms of that series, as provided in the related prospectus supplement, of all the notes of the series to be due and payable immediately. That declaration may, under the circumstances set forth in the indenture, be rescinded and annulled by the holders of a majority in aggregate outstanding amount of the related notes.

If following an event of default with respect to any series of notes, the notes of the series have been declared to be due and payable, the trustee may, in its discretion, notwithstanding the acceleration, elect to maintain possession of the collateral securing the notes of the series and to continue to apply payments on the collateral as if there had been no declaration of acceleration if the collateral continues to provide

sufficient funds for the payment of principal of and interest on the notes of the series as they would have become due if there had not been a declaration. In addition, the trustee may not sell or otherwise liquidate the collateral securing the notes of a series following an event of default, unless

- the holders of 100% of the then aggregate outstanding amount of the notes of the series consent to the sale,

- the proceeds of the sale or liquidation are sufficient to pay in full the principal of and accrued interest, due and unpaid, on the outstanding notes of the series at the date of the sale, or

- the trustee determines that the collateral would not be sufficient on an ongoing basis to make all payments on the notes as the payments would have become due if the notes had not been declared due and payable, and the trustee obtains the consent of the holders of a majority of the then aggregate outstanding amount of the notes of the series.

If the trustee liquidates the collateral in connection with an event of default, the indenture may provide that the trustee will have a prior lien on the proceeds of any liquidation for unpaid fees and expenses. As a result, upon the occurrence of an event of default, the amount available for payments to the noteholders would be less than would otherwise be the case. However, the trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the indenture for the benefit of the noteholders after the occurrence of an event of default.

If the principal of the notes of a series is declared due and payable, the holders of those notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount of the note less the amount of the discount that is unamortized.

No noteholder or holder of an equity certificate generally will have any right under a trust agreement or indenture to institute any proceeding with respect to the agreement unless:

- the holder previously has given to the trustee written notice of default and the default is continuing,

- the holders of notes or equity certificates of any class evidencing not less than 25% of the aggregate percentage interests constituting the class (1) have made written request upon the trustee to institute a proceeding in its own name as trustee and (2) have offered to the trustee reasonable indemnity,

- the trustee has neglected or refused to institute a proceeding for 60 days after receipt of the request and indemnity, and

- no direction inconsistent with the written request has been given to the trustee during the 60 day period by the holders of a majority of the note balances of the class. However, the trustee will be under no obligation to exercise any of the trusts or powers vested in it by the applicable agreement or to institute, conduct or defend any litigation at the request, order or direction of any of the holders of notes or equity certificates covered by the agreement, unless the holders have offered to the trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby.

**Amendment of the Governing Agreements**

With respect to each series of certificates, each related pooling and servicing agreement or trust agreement may be amended by the depositor, the servicer and the trustee, with the consent of any credit support provider, but without the consent of any of the holders of certificates covered by the agreement, (i) to cure any ambiguity, (ii) to correct or supplement any provision in the agreement which may be defective or inconsistent with any other provisions in the agreement, (iii) to comply with any requirements imposed by the Code or any regulations thereunder, (iv) to add any provision to, or amend any provision in, the agreement, provided that such amendment or addition does not adversely affect in any material respect the interests of the holder of any certificate, and (v) to make other amendments described in the agreement. However, with respect to any series of certificates as to which a REMIC election is to be made, the trustee will not consent to any amendment of the agreement described in clause (iii) above unless it shall first have received an opinion of counsel to the effect that such amendment is necessary or helpful to comply with the requirements imposed by the Code or any regulations thereunder and will not cause any REMIC formed

under the agreement to fail to qualify as a REMIC. Each agreement may also be amended by the depositor, the servicer and the trustee, with the consent of the holders of certificates evidencing not less than 66% of the voting rights, and with the consent of any credit support provider, for any purpose, but no amendment may, without the consent of the holder of each certificate affected thereby:

- reduce in any manner the amount of, or delay the timing of, payments of principal or interest which are required to be made under the agreement,

- reduce the percentage of voting rights required to amend the agreement; or

- make other amendments that by the terms of the agreement require such holder's consent.

With respect to each series of notes, each related servicing agreement or indenture may be amended by the parties to the agreement, with the consent of any credit support provider, but without the consent of any of the holders of the notes covered by the agreement, (i) to cure any ambiguity, (ii) to correct or supplement any provision in the agreement which may be defective or inconsistent with any other provisions in the agreement, (iii) to comply with any requirements imposed by the Code or any regulations thereunder, (iv) to add any provision to, or amend any provision in, the agreement, provided that such amendment or addition does not adversely affect in any material respect the interests of the holder of any note, and (v) to make other amendments described in the agreement. Each agreement may also be amended by the parties to the agreement, with the consent of the holders of notes evidencing not less than 66% of the voting rights, and with the consent of any credit support provider, for any purpose, but that no amendment may, without the consent of the holder of each note affected thereby:

- reduce in any manner the amount of, or delay the timing of, payments of principal or interest which are required to be made under the agreement;

- reduce the percentage of voting rights required to amend the agreement; or

- make other amendments that by the terms of the agreement require such holder's consent.

The voting rights evidenced by any certificate or note will be the portion of the voting rights of all of the certificates or notes, as applicable, in the related series allocated in the manner described in the related prospectus supplement.

**Termination of the Trust and Disposition of Trust Assets**

The obligations created by the related agreements for each series of securities will terminate upon the payment to securityholders of that series of all amounts held in the distribution account or by the servicer and required to be paid to them under the agreements following the earlier of:

- the final payment or other liquidation of the last asset held by the related trust or the disposition of all property acquired upon foreclosure of any mortgage asset, and

- the purchase of all of the assets of the trust by the servicer or such other party as is specified in the related prospectus supplement, under the circumstances and in the manner set forth in the related prospectus supplement.

In no event, however, will the trust created by the related agreements continue beyond the date specified in the related agreement. Written notice of termination of the related agreements will be given to each securityholder, and the final distribution will be made only upon surrender and cancellation of the securities at an office or agency appointed by the trustee which will be specified in the notice of termination.

Any purchase of assets of the trust in connection with a termination of the trust by reason of such purchase will be made at the price set forth in the related prospectus supplement, which in most cases will equal the sum of (i) the excess of (a) 100% of the aggregate scheduled principal balance of the mortgage loans (other than any mortgage loans in respect of which the related mortgaged property has been acquired by the trust), plus accrued interest at the applicable interest rate through the last day of the month of purchase, over (b) the amount of any Bankruptcy Losses incurred with respect to the mortgage loans to the extent not already allocated to the securities as a realized loss and (2) without duplication, the appraised fair market value of all mortgaged properties acquired by the trust and of any other property owned by the

trust, such sum reduced by any unreimbursed advances (other than advances made with respect to mortgage loans as to which the servicer expects that foreclosure is not imminent).

The exercise of an optional termination right will effect early retirement of the securities of that series, but that right is subject to the aggregate principal balance of the outstanding mortgage assets at the time of purchase being less than the percentage of the aggregate principal balance of the mortgage assets at the cut-off date specified in the related prospectus supplement, which percentage will be between 25% and 0%.

## Description of the Trustee

The trustee or indenture trustee, each referred to as the trustee, under each pooling and servicing agreement, trust agreement or indenture will be named in the related prospectus supplement. The bank or trust company serving as trustee may have other banking relationships with the depositor and its affiliates and with the servicer and its affiliates.

## Duties of the Trustee

The trustee will make no representations as to the validity or sufficiency of any agreement, the securities or any mortgage loan or related document and will not be accountable for the use or application by or on behalf of the servicer of any funds paid to the servicer or its designee in respect of the securities or the mortgage loans, or deposited into or withdrawn from the custodial account or any other account by or on behalf of the servicer. If no event of default has occurred and is continuing, the trustee will be required to perform only those duties specifically required under the related agreement. However, upon receipt of the various certificates, reports or other instruments required to be furnished to it, the trustee will be required to examine the documents and to determine whether they conform to the requirements of the related agreement.

## DESCRIPTION OF CREDIT SUPPORT

For any series of securities, credit support may be provided for one or more classes of that series, or for the underlying mortgage assets. Credit support may be in the form of one or more of the following:

- subordination of one or more classes to other classes in a series of securities,
- letters of credit,
- insurance policies on the underlying mortgage assets,
- surety bonds,
- guarantees on payments on the securities,
- reserve funds,
- overcollateralization, or
- cross-collateralization.

If so provided in the related prospectus supplement, any form of credit support may be structured so as to be drawn upon by more than one series of securities.

The credit support provided for a series of securities will in most cases not provide protection against all risks of loss and will not guarantee repayment of the entire principal balance of the securities and interest due on the securities. If losses or shortfalls occur that exceed the amount covered by credit support or that are not covered by credit support, securityholders will bear their allocable share of deficiencies. Also, if a form of credit support covers more than one pool of mortgage assets held by a trust or more than one series of securities, holders of securities evidencing interests in any of the covered pools or covered trusts will be subject to the risk that the credit support will be exhausted by the claims of other covered pools or covered trusts prior to that covered pool or covered trust receiving any of its intended share of the coverage.

If credit support is provided with respect to one or more classes of securities of a series, or the related mortgage assets, the related prospectus supplement will include a description of

- the nature and amount of coverage under that credit support,
- any conditions to payment of that credit support not otherwise described in this prospectus,
- the conditions under which the amount of coverage under the credit support may be reduced, terminated or replaced, and
- the material provisions relating to the credit support.

Additionally, the related prospectus supplement may set forth certain information with respect to the credit support provider, which may include:

- a brief description of its principal business activities,
- its principal place of business, place of incorporation and the jurisdiction under which it is chartered or licensed to do business,
- if applicable, the identity of regulatory agencies that exercise primary jurisdiction over the conduct of its business, and
- its total assets and its stockholders' or policyholders' surplus, if applicable, as of the date specified in the prospectus supplement.

The material terms of the policy or agreement, as applicable, governing the applicable credit support will be described in the related prospectus supplement, and the policy or agreement will be filed with the Commission as an exhibit to a Current Report on Form 8-K to be filed within 15 days of issuance of the related series.

### Subordination

One or more classes of securities may be subordinate securities. The rights of the subordinate securityholders to receive distributions with respect to the mortgage loans will be subordinate to the rights of the senior securityholders to the extent described in the related prospectus supplement.

All realized losses will be allocated to the subordinate securities of the related series, or, if the series includes more than one class of subordinate securities, to the outstanding class of subordinate securities having the first priority for allocation of realized losses and then to additional outstanding classes of subordinate securities, if any, until the principal balance of the applicable subordinate securities has been reduced to zero. Any additional realized losses will be allocated to the senior securities or, if the series includes more than one class of senior securities, either on a pro rata basis among all of the senior securities in proportion to their respective outstanding principal balances or in such other manner as is provided in the related prospectus supplement. However, with respect to realized losses that are attributable to physical damage to mortgaged properties of a type that is not covered by standard hazard insurance policies, the amount of realized losses that may be allocated to the subordinate securities of the related series may be limited to an amount specified in the related prospectus supplement. If so, any realized losses of this type in excess of the amount allocable to the subordinate securities will be allocated among all outstanding classes of securities of the related series, on a pro rata basis in proportion to their respective outstanding principal balances, regardless of whether any subordinate securities remain outstanding, or in such other manner as is provided in the related prospectus supplement. Any allocation of a realized loss to a security will be made by reducing the principal balance of that security as of the distribution date following the calendar month in which the realized loss was incurred.

The principal balance of any security will be reduced by all amounts previously distributed on that security in respect of principal, and by any realized losses allocated to that security. If there were no realized losses or prepayments of principal on any of the mortgage loans, the respective rights of the holders of securities of any series to future distributions would not change. However, to the extent so provided in the related prospectus supplement, holders of senior securities may be entitled to receive a disproportionately larger amount of prepayments received, which will have the effect of accelerating the amortization of the senior securities and increasing the percentage interest in future distributions evidenced by the subordinate securities, with a corresponding decrease in the senior percentage, as well as preserving the availability of the subordination provided by the subordinate securities. On the other hand, as set forth in the paragraph above, realized losses will be first allocated to subordinate securities by reduction of the principal balance of those securities, which will have the effect of increasing the interest in future distributions evidenced by the senior securities.

If so provided in the related prospectus supplement, amounts otherwise payable on any distribution date to holders of subordinate securities may be deposited into a reserve fund. Amounts held in any reserve fund may be applied as described below under "—Reserve Fund" and in the related prospectus supplement.

With respect to any Senior/Subordinate Series, the terms and provisions of the subordination may vary from those described in the preceding paragraphs and any variation will be described in the related prospectus supplement.

If so provided in the related prospectus supplement, the credit support for the senior securities of a Senior/Subordinate Series may include, in addition to the subordination of the subordinate securities of the series and the establishment of a reserve fund, any of the other forms of credit support described in this prospectus. If any of the other forms of credit support described below is maintained solely for the benefit of the senior securities of a Senior/Subordinate Series, then that coverage described may be limited to the extent necessary to make required distributions on the senior securities or as otherwise specified in the related prospectus supplement. If so provided in the related prospectus supplement, the obligor on any other forms of credit support maintained for the benefit of the senior securities of a Senior/Subordinate Series may be reimbursed for amounts paid to the senior securities out of amounts otherwise payable on the subordinate securities.

## Letter of Credit

As to any series of securities to be covered by a letter of credit, the issuer of the letter of credit will deliver to the trustee an irrevocable letter of credit. The servicer or the trustee will be required to exercise its best reasonable efforts to keep or cause to be kept the letter of credit in full force and effect, unless coverage under the letter of credit has been exhausted through payment of claims. The fees for the letter of credit will be paid as described in the related prospectus supplement.

The servicer or the trustee will make or cause to be made draws on the letter of credit issuer under each letter of credit. Letters of credit may cover all or any of the following amounts, in each case up to a maximum amount set forth in the letter of credit:

(1) For any mortgage asset that became a liquidated asset during the related Prepayment Period, other than mortgage assets as to which amounts paid or payable under any related hazard insurance instrument, including the letter of credit as described in (2) below, are not sufficient either to restore the mortgaged property or to pay the outstanding principal balance of the mortgage asset plus accrued interest, an amount which, together with all Liquidation Proceeds, Insurance Proceeds, and other collections on the liquidated loan, net of amounts payable or reimbursable therefrom to the servicer for related unpaid servicing fees and unreimbursed advances and servicing expenses, will equal the sum of (A) the unpaid principal balance of the liquidated asset, plus accrued interest at the applicable interest rate net of the rates at which the servicing fee and retained interest are calculated, plus (B) the amount of related advances and servicing expenses, if any, not reimbursed to the servicer from Liquidation Proceeds, Insurance Proceeds and other collections on the liquidation asset, which shall be paid to the servicer;

(2) For each mortgage asset that is delinquent and as to which the mortgaged property has suffered damage, other than physical damage caused by hostile or warlike action in time of war or peace, by any weapons of war, by any insurrection or rebellion, or by any nuclear reaction or nuclear radiation or nuclear contamination whether controlled or uncontrolled, or by any action taken by any governmental authority in response to any of the foregoing, and for which any amounts paid or payable under the related primary hazard insurance policy or any special hazard insurance policy are not sufficient to pay either of the following amounts, an amount which, together with all Insurance Proceeds paid or payable under the related primary hazard insurance policy or any special hazard insurance policy, net, if the proceeds are not to be applied to restore the mortgaged property, of all amounts payable or reimbursable therefrom to the servicer for related unpaid servicing fees and unreimbursed advances and servicing expenses, will be equal to the lesser of (A) the amount required to restore the mortgaged property and (B) the sum of (1) the unpaid principal balance of the mortgage asset plus accrued interest at the applicable interest rate net of the rates at which the servicing fees and retained interest, if any, are calculated, plus (2) the amount of related advances and servicing expenses, if any, not reimbursed to the servicer from Insurance Proceeds paid under the related primary hazard insurance policy or any special hazard insurance policy; and

(3) For any mortgage asset that has been subject to bankruptcy proceedings, the amount of any debt service reduction or the amount by which the principal balance of the mortgage asset has been reduced by the related bankruptcy court.

If the related prospectus supplement so provides, upon payment by the letter of credit issuer with respect to a liquidated asset, or a payment of the full amount owing on a mortgage asset as to which the mortgaged property has been damaged, as described in (2)(B) above, the liquidated asset will be transferred by the related trust in accordance with the terms set forth in the related prospectus supplement and will no longer be subject to the agreement. Mortgage assets that have been subject to bankruptcy proceedings, or as to which payment under the letter of credit has been made for the purpose of restoring the related mortgaged property, as described in (2)(A) above, will continue to be held by the related trust. The maximum dollar coverages provided under any letter of credit will each be reduced to the extent of related unreimbursed draws.

In the event that the entity that has issued a letter of credit ceases to be duly organized, or its debt obligations are rated lower than the highest rating on any class of the securities on the date of issuance by the rating agency or agencies, the servicer or the trustee may be required to use its best reasonable efforts to obtain or cause to be obtained, as to each letter of credit, a substitute letter of credit issued by an entity that meets these requirements and providing the same coverage; provided, however, that, if the fees charged or collateral required by the successor entity shall be more than the fees charged or collateral required by the predecessor entity, each component of coverage thereunder may be reduced proportionately to a level as results in the fees and collateral being not more than the fees then charged and collateral then required by the predecessor entity.

**Mortgage Pool Insurance Policy**

As to any series of securities to be covered by a mortgage pool insurance policy with respect to any realized losses on liquidated loans, the servicer will be required to exercise its best reasonable efforts to maintain or cause to be maintained the mortgage pool insurance policy in full force and effect, unless coverage under that policy has been exhausted through payment of claims. The premiums for each mortgage pool insurance policy will be paid as described in the related prospectus supplement.

The servicer will present or cause to be presented claims to the insurer under each mortgage pool insurance policy. Mortgage pool insurance policies, however, are not blanket policies against loss, since claims may be made only upon satisfaction of certain conditions, as described below and, if applicable, in the related prospectus supplement.

Mortgage pool insurance policies do not cover losses arising out of the matters excluded from coverage under the primary mortgage insurance policy, or losses due to a failure to pay or denial of a claim under a primary mortgage insurance policy, irrespective of the reason therefor.

Mortgage pool insurance policies in general provide that no claim may validly be presented under the policy for a mortgage loan unless:

- an acceptable primary mortgage insurance policy, if the initial loan-to-value ratio of the mortgage loan exceeded 80%, has been kept in force until the loan-to-value ratio is reduced to 80%;

- premiums on the primary hazard insurance policy have been paid by the insured and real estate taxes and foreclosure, protection and preservation expenses have been advanced by or on behalf of the insured, as approved by the insurer;

- if there has been physical loss or damage to the mortgaged property, it has been restored to its physical condition at the time the mortgage loan became insured under the mortgage pool insurance policy, subject to reasonable wear and tear; and

- the insured has acquired good and merchantable title to the mortgaged property, free and clear of all liens and encumbrances, except permitted encumbrances, including any right of redemption by or on behalf of the mortgagor, and if required by the insurer, has sold the property with the approval of the insurer.

Assuming the satisfaction of these conditions, the insurer has the option to either (a) acquire the property securing the defaulted mortgage loan for a payment equal to the principal balance of the defaulted mortgage loan plus accrued and unpaid interest at the interest rate on the mortgage loan to the date of acquisition and expenses described above advanced by or on behalf of the insured, on condition that the insurer must be provided with good and merchantable title to the mortgaged property, unless the property has been conveyed under the terms of the applicable primary mortgage insurance policy, or (b) pay the amount by which the sum of the principal balance of the defaulted mortgage loan and accrued and unpaid interest at the interest rate to the date of payment of the claim and the expenses exceed the proceeds received from a sale of the mortgaged property which the insurer has approved. In both (a) and (b), the amount of payment under a mortgage pool insurance policy will be reduced by the amount of the loss paid under the primary mortgage insurance policy.

Unless earlier directed by the insurer, a claim under a mortgage pool insurance policy must be filed (a) in the case when a primary mortgage insurance policy is in force, within a specified number of days (typically, 60 days) after the claim for loss has been settled or paid, or after acquisition by the insured or a sale of the property approved by the insurer, whichever is later, or (b) in the case when a primary mortgage insurance policy is not in force, within a specified number of days (typically, 60 days) after acquisition by the insured or a sale of the property approved by the insurer. A claim must be paid within a specified period (typically, 30 days) after the claim is made by the insured.

The amount of coverage under each mortgage pool insurance policy will be reduced over the life of the securities of any series by the aggregate dollar amount of claims paid less the aggregate of the net amounts realized by the insurer upon disposition of all acquired properties. The amount of claims paid includes certain expenses incurred by the servicer as well as accrued interest on delinquent mortgage loans to the date of payment of the claim. Accordingly, if aggregate net claims paid under a mortgage pool

insurance policy reach the applicable policy limit, coverage under the policy will be exhausted and any further losses will be borne by securityholders of the related series. See "Legal Aspects of Mortgage Assets—Foreclosure on Mortgages."

If an insurer under a mortgage pool insurance policy ceases to be a private mortgage guaranty insurance company duly qualified as such under applicable laws or no longer has a claims-paying ability acceptable to the rating agency or agencies, the servicer may be required to use its best reasonable efforts to obtain or cause to be obtained from another qualified insurer a replacement insurance policy comparable to the mortgage pool insurance policy with a total coverage equal to the then outstanding coverage of the mortgage pool insurance policy; provided, however, that if the cost of the replacement policy is greater than the cost of the original mortgage pool insurance policy, the coverage of the replacement policy may be reduced to the level that its premium rate does not exceed the premium rate on the original mortgage pool insurance policy. However, if the insurer ceases to be a qualified insurer solely because it ceases to be approved as an insurer by Freddie Mac or Fannie Mae, the servicer will review, or cause to be reviewed, the financial condition of the insurer with a view towards determining whether recoveries under the mortgage pool insurance policy are jeopardized for reasons related to the financial condition of the insurer. If the servicer determines that recoveries are so jeopardized, it may be required to use its best reasonable efforts to obtain from another qualified insurer a replacement policy, subject to the same cost limitation.

Because each mortgage pool insurance policy will require that the property subject to a defaulted mortgage loan be restored to its original condition prior to claiming against the insurer, the policy will not provide coverage against hazard losses. As set forth in the immediately following paragraph, the primary hazard insurance policies covering the mortgage loans typically exclude from coverage physical damage resulting from a number of causes and, even when the damage is covered, may afford recoveries that are significantly less than the full replacement cost of the losses. Further, a special hazard insurance policy, or a letter of credit that covers special hazard realized losses, will not cover all risks, and the coverage will be limited in amount. These hazard risks will, as a result, be uninsured and will therefore be borne by securityholders.

**Special Hazard Insurance Policy**

As to any series of securities, the related prospectus supplement may provide that the servicer will exercise its best reasonable efforts to maintain or cause to be maintained a special hazard insurance policy in full force and effect covering losses that are attributable to physical damage to the mortgaged properties of a type that is not covered by standard hazard insurance policies, unless coverage under the policy has been exhausted through payment of claims; provided, however, that the servicer will be under no obligation to maintain the policy if any insurance instrument covering the series as to any realized losses on liquidated loans is no longer in effect. The premiums on each special hazard insurance policy will be paid as described in the related prospectus supplement.

Each special hazard insurance policy will, subject to the limitations described in the next paragraph, protect holders of securities of the related series from:

- loss by reason of damage to mortgaged properties caused by certain hazards, including earthquakes and mudflows, not insured against under the primary hazard insurance policies or a flood insurance policy if the property is in a designated flood area, and

- loss from partial damage caused by reason of the application of the co-insurance clause contained in the primary hazard insurance policies.

Special hazard insurance policies usually will not cover losses occasioned by normal wear and tear, war, civil insurrection, governmental actions, errors in design, nuclear or chemical reaction or contamination, faulty workmanship or materials, flood, if the property is located in a designated flood area, and other risks.

Subject to the foregoing limitations, each special hazard insurance policy will provide that, when there has been damage to property securing a defaulted mortgage asset acquired by the insured and to the extent the damage is not covered by the related primary hazard insurance policy or flood insurance policy, the insurer will pay the lesser of:

(1) the cost of repair to the property; and

(2) upon transfer of the property to the insurer, the unpaid principal balance of the mortgage asset at the time of acquisition of the property by foreclosure, deed in lieu of foreclosure or repossession, plus accrued interest to the date of claim settlement and expenses incurred by or on behalf of the servicer with respect to the property.

The amount of coverage under the special hazard insurance policy will be reduced by the sum of (a) the unpaid principal balance plus accrued interest and certain expenses paid by the insurer, less any net proceeds realized by the insurer from the sale of the property, plus (b) any amount paid as the cost of repair of the property.

Restoration of the property with the proceeds described under clause (1) of the second preceding paragraph will satisfy the condition under an insurance instrument providing coverage as to credit, or other nonhazard, risks, that the property be restored before a claim may be validly presented with respect to the defaulted mortgage asset secured by the property. The payment described under clause (2) of the immediately preceding paragraph will render unnecessary presentation of a claim in respect of the mortgage loan under an insurance instrument providing coverage as to credit, or other nonhazard, risks, as to any realized losses on a liquidated loan. Therefore, so long as the insurance instrument providing coverage as to credit, or other nonhazard, risks, remains in effect, the payment by the insurer of either of the above alternative amounts will not affect the total insurance proceeds paid to securityholders, but will affect the relative amounts of coverage remaining under any special hazard insurance policy and any credit insurance instrument.

The sale of a mortgaged property must be approved by the insurer under any special hazard insurance policy and funds received by the insured in excess of the unpaid principal balance of the mortgage asset plus interest thereon to the date of sale plus expenses incurred by or on behalf of the servicer with respect to the property, not to exceed the amount actually paid by the insurer, must be refunded to the insurer and, to that extent, coverage under the special hazard insurance policy will be restored. If aggregate claim payments under a special hazard insurance policy reach the policy limit, coverage under the policy will be exhausted, and any further losses will be borne by securityholders.

A claim under a special hazard insurance policy must be filed within a specified number of days after the insured has acquired good and merchantable title to the property, and a claim payment is payable within a specified number of days after a claim is accepted by the insurer. Special hazard insurance policies provide that no claim may be paid unless primary hazard insurance policy premiums, flood insurance premiums, if the property is located in a federally designated flood area, and, as approved by the insurer, real estate property taxes, property protection and preservation expenses and foreclosure or repossession costs have been paid by or on behalf of the insured, and unless the insured has maintained the primary hazard insurance policy and, if the property is located in a federally designated flood area, flood insurance, as required by the special hazard insurance policy.

If a special hazard insurance policy is canceled or terminated for any reason, other than the exhaustion of total policy coverage, the servicer may be required to use its best reasonable efforts to obtain or cause to be obtained from another insurer a replacement policy comparable to that special hazard insurance policy with a total coverage that is equal to the then existing coverage of the replaced special hazard insurance policy; provided, however, that if the cost of the replacement policy is greater than the cost of that special hazard insurance policy, the coverage of the replacement policy may be reduced to a level so that its premium rate does not exceed the premium rate on that special hazard insurance policy.

Since each special hazard insurance policy is designed to permit full recoveries as to any realized losses on liquidated loans under a credit insurance instrument in circumstances in which recoveries would otherwise be unavailable because property has been damaged by a cause not insured against by a primary hazard insurance policy and thus would not be restored, each agreement governing the trust will provide that, if the related credit insurance instrument shall have lapsed or terminated or been exhausted through payment of claims, the servicer will be under no further obligation to maintain the special hazard insurance policy.

**Bankruptcy Bond**

As to any series of securities to be covered by a bankruptcy bond with respect to actions that may be taken by a bankruptcy court in connection with a mortgage asset, the servicer will be required to exercise its best reasonable efforts to maintain or cause to be maintained the bankruptcy bond in full force and effect, unless coverage under the bond has been exhausted through payment of claims. The premiums for each bankruptcy bond on will be paid as described in the related prospectus supplement. Subject to the limit of the dollar amount of coverage provided, each bankruptcy bond will cover certain losses resulting from an extension of the maturity of a mortgage asset, or a reduction by the bankruptcy court of the principal balance of or the interest rate on a mortgage asset, and the unpaid interest on the amount of a principal reduction during the pendency of a proceeding under the Bankruptcy Code. See "Legal Aspects Of Mortgage Assets—Foreclosure On Mortgages."

**Fraud Bond**

If so provided in the related prospectus supplement, there may be a fraud bond to cover to some extent fraud losses, which are realized losses attributable to fraudulent conduct or negligence by either the mortgage loan seller, servicer or mortgagor in connect with the origination of a mortgage asset. The servicer will be required to exercise its best reasonable efforts to maintain or cause to be maintained the fraud bond in full force and effect, unless coverage under the fraud bond has been exhausted through payment of claims. The type, coverage amount, term and premiums for each fraud bond will be described in the related prospectus supplement.

**Financial Guarantee Insurance**

Financial guarantee insurance, if any, with respect to a series of securities will be provided by one or more insurance companies. The financial guarantee insurance will guarantee, with respect to one or more classes of securities of a series, timely distributions of interest only, timely distributions of interest and ultimate distribution of principal or timely distributions of interest and distributions of principal on the basis of a schedule of principal distributions set forth in or determined in the manner specified in the related prospectus supplement. The financial guarantee insurance may also guarantee against the allocation of losses to a securityholder or against any payment made to a securityholder that is subsequently recovered as a voidable preference payment under federal bankruptcy law. The material terms of the financial guarantee insurance policy for a series, if any, will be described in the related prospectus supplement, and the financial guarantee insurance policy will be filed with the Commission as an exhibit to a Current Report on Form 8-K within 15 days of issuance of the securities of the related series.

**Reserve Fund**

If so provided in the related prospectus supplement, there will be deposited in an account, a reserve fund, any combination of cash, one or more irrevocable letters of credit or one or more permitted investments in specified amounts, or any other instrument satisfactory to the rating agency or agencies, which will be applied and maintained in the manner and under the conditions specified in the prospectus supplement. In the alternative or in addition to a deposit, the prospectus supplement for a Senior/Subordinate Series may provide that a reserve fund be funded through application of all or a portion of amounts otherwise payable on the subordinate securities. Amounts in a reserve fund may be distributed to securityholders, or applied to reimburse the servicer for outstanding advances, or may be used for other purposes, in the manner specified in the related prospectus supplement.

Amounts deposited in any reserve fund for a series may be invested in permitted investments by, or at the direction of, the servicer or any other person named in the related prospectus supplement.

**Overcollateralization**

If so specified in the related prospectus supplement, interest collections on the mortgage assets may exceed interest payments on the securities for the related distribution date. The excess interest may be deposited into a reserve fund or applied as an additional payment of principal on one or more classes of the securities of the related series. If excess interest is applied as principal payments on the securities, the

effect will be to reduce the principal balance of the securities relative to the outstanding balance of the mortgage loans, thereby creating overcollateralization and additional protection to the securityholders, as specified in the related prospectus supplement. If so provided in the related prospectus supplement, overcollateralization may also be provided on the date of issuance of the securities by the issuance of securities in an initial aggregate principal amount which is less than the aggregate principal amount of the mortgage assets held by the related trust.

**Cross-Support Features**

If the assets held by a trust are divided into separate asset groups, the beneficial ownership of which is evidenced by a separate class or classes of a series, credit support may be provided by a cross-support feature which requires that distributions be made on senior securities evidencing the beneficial ownership of one asset group prior to distributions on subordinate securities evidencing the beneficial ownership interest in another asset group. The related prospectus supplement for a series that includes a cross-support feature will describe the manner and conditions for applying that cross-support feature. As to any series that includes a cross-support feature, only assets of the trust will be used to provide cross-support, and cross-support will be provided only to securities issued by that trust. A trust will not provide a cross-support feature that benefits securities issued by any other trust, and a trust will not receive cross-support from any other trust.

## OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES

**Swaps and Yield Supplement Agreements**

The trustee or a trust may enter into interest rate swaps and related caps, floors and collars to minimize the risk of securityholders from adverse changes in interest rates, which are collectively referred to as swaps, and other yield supplement agreements or similar yield maintenance arrangements that do not involve swap agreements or other notional principal contracts, which are collectively referred to as yield supplement agreements.

An interest rate swap is an agreement between two parties to exchange a stream of interest payments on an agreed hypothetical or "notional" principal amount. No principal amount is exchanged between the counterparties to an interest rate swap. In the typical swap, one party agrees to pay a fixed rate on a notional principal amount, while the counterparty pays a floating rate based on one or more reference interest rates including the London Interbank Offered Rate, or LIBOR, a specified bank's prime rate or U.S. Treasury Bill rates. Interest rate swaps also permit counterparties to exchange a floating rate obligation based upon one reference interest rate, such as LIBOR, for a floating rate obligation based upon another referenced interest rate, such as U.S. Treasury Bill rates.

Unlike an interest rate swap, pursuant to which two parties agree to exchange a stream of interest payments, a yield supplement agreement is an agreement pursuant to which one party agrees to make interest payments to the other party on an agreed hypothetical or "notional" principal amount in exchange for a predetermined fee paid by the other party up-front or on specified dates. Yield supplement agreements may be entered into to supplement the interest rate or other rates on one or more classes of the securities of any series.

Although the terms of the swaps and yield supplement agreements may provide for termination under various circumstances, there can be no assurance that the trustee or the trust will be able to terminate an agreement when it would be economically advantageous to do so.

**Purchase Obligations**

Some classes of securities of any series and (to the extent the trust assets include Mortgage Securities) some types of trust assets, as specified in the accompanying prospectus supplement, may be subject to a purchase obligation that would become applicable on one or more specified dates, or upon the occurrence of one or more specified events, or on demand made by or on behalf of the applicable securityholders. A purchase obligation may be in the form of a conditional or unconditional purchase commitment, liquidity facility, remarketing agreement, maturity guaranty, put option or demand feature. The terms and conditions

of each purchase obligation, including the purchase price, timing and payment procedure, will be described in the accompanying prospectus supplement. Each purchase obligation may be a secured or unsecured obligation of the provider of that purchase obligation, which may include a bank or other financial institution or an insurance company. Each purchase obligation will be evidenced by an instrument delivered to the trustee for the benefit of the applicable securityholders of the related series. As specified in the accompanying prospectus supplement, each purchase obligation relating to Mortgage Securities held by the trust will be payable solely to the trust. Each purchase obligation related to securities issued by the trust will be payable directly to the holders of those securities. The purchase obligations will not be a part of the trust assets. The purchase obligations also will not be a part of the securities. Rather, securities subject to a purchase obligation will be offered to the initial investors subject to an overriding purchase arrangement, under which the securities will at the same time be offered to the provider of the purchase obligation on a forward basis.

**Mandatory Auctions**

Some classes of securities of any series, as specified in the accompanying prospectus supplement, may be subject to a mandatory auction that would take place on a specified date, or upon the occurrence of one or more specified events, or on demand made by or on behalf of the applicable securityholders. Such classes would be auctioned by an auction administrator, which may be the trustee, to third-party investors. The terms and conditions of any such mandatory auction, including any minimum purchase price, the timing of the auction and the auction procedures, will be described in the accompanying prospectus supplement. If so specified in the accompanying prospectus supplement, with respect to classes of securities subject to a mandatory auction, the auction administrator may enter into a swap contract with a swap counterparty pursuant to which (i) the swap counterparty will be required to pay to the auction administrator, for the benefit of the holders of the auctioned securities, the excess, if any, of the sum of the outstanding principal balance of those securities on the auction date plus accrued interest over the price at which the securities are sold in the auction and (ii) the auction administrator will be required to pay to the swap counterparty the excess, if any, of the price at which the securities are sold in the auction over the sum of the outstanding principal balance of those securities on the auction date plus accrued interest. The obligation of the swap counterparty to make the payment described above may be a secured or unsecured obligation of the swap counterparty.

## DESCRIPTION OF PRIMARY INSURANCE POLICIES

Each mortgage loan will be required to be covered by a primary hazard insurance policy and, if so specified in the prospectus supplement, a primary mortgage insurance policy.

### Primary Mortgage Insurance Policies

Although the terms and conditions of primary mortgage insurance policies differ, each primary mortgage insurance policy will generally cover losses up to an amount equal to the excess of the unpaid principal amount of a defaulted mortgage loan, plus accrued and unpaid interest thereon and approved expenses, over a specified percentage of the value of the related mortgaged property.

As conditions to the filing or payment of a claim under a primary mortgage insurance policy, the insured will typically be required, in the event of default by the borrower, to:

- advance or discharge (1) hazard insurance premiums and (2) as necessary and approved in advance by the insurer, real estate taxes, property protection and preservation expenses and foreclosure and related costs,

- in the event of any physical loss or damage to the mortgaged property, have the mortgaged property restored to at least its condition at the effective date of the primary mortgage insurance policy, ordinary wear and tear excepted, and

- tender to the insurer good and merchantable title to, and possession of, the mortgaged property.

The servicer, however, will not be required to advance any of the amounts described above in connection with a claim under a primary mortgage insurance policy if the advance would constitute a Nonrecoverable Advance. If the servicer does not make any of these advances, because they would constitute Nonrecoverable Advances, payments under primary mortgage insurance policies may be lower than they otherwise would be.

Multifamily loans, commercial loans and mixed-use loans will not be covered by primary mortgage insurance policies, regardless of the related loan-to-value ratio.

### Primary Hazard Insurance Policies

Each servicing agreement will require the servicer to cause the borrower on each mortgage loan to maintain a primary hazard insurance policy providing for coverage of the standard form of fire insurance policy with extended coverage customary in the state in which the mortgaged property is located. The primary hazard coverage will be in general in an amount equal to the lesser of the principal balance owing on the mortgage loan and the amount necessary to fully compensate for any damage or loss to the improvements on the mortgaged property on a replacement cost basis, but in either case not less than the amount necessary to avoid the application of any co-insurance clause contained in the hazard insurance policy. The ability of the servicer to assure that hazard insurance proceeds are appropriately applied may be dependent upon its being named as an additional insured under any primary hazard insurance policy and under any flood insurance policy referred to in the paragraph below, and upon the borrower furnishing information to the servicer in respect of a claim. All amounts collected by the servicer under any primary hazard insurance policy, except for amounts to be applied to the restoration or repair of the mortgaged property or released to the borrower in accordance with the servicer's normal servicing procedures, and subject to the terms and conditions of the related mortgage and mortgage note, will be deposited in the custodial account. The servicing agreement will provide that the servicer may satisfy its obligation to cause each borrower to maintain a hazard insurance policy by the servicer's maintaining a blanket policy insuring against hazard losses on the mortgage loans. If the blanket policy contains a deductible clause, the servicer will deposit in the custodial account all sums that would have been deposited in the custodial account but for that clause.

In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of the improvements of the property by fire, lightning, explosion, smoke, windstorm and hail, and riot, strike and civil commotion, subject to the conditions and exclusions specified in each policy. Although the policies relating to the mortgage loans will be underwritten by different insurers under different state laws in accordance with different applicable state forms, and therefore will not contain

identical terms and conditions, the basic terms of these policies are dictated by respective state laws, and most hazard insurance policies typically do not cover any physical damage resulting from the following: war, revolution, governmental actions, floods and other water-related causes, earth movement, including earthquakes, landslides and mudflows, nuclear reactions, toxic mold, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, in some cases, vandalism. This list is merely indicative of the kinds of uninsured risks and is not intended to be all-inclusive. When a mortgaged property is located at origination in a federally designated flood area and flood insurance is available, each agreement will require the servicer to cause the borrower to acquire and maintain flood insurance in an amount equal in general to the lesser of (1) the amount necessary to fully compensate for any damage or loss to the improvements which are part of the mortgaged property on a replacement cost basis and (2) the maximum amount of insurance available under the federal flood insurance program, whether or not the area is participating in the program.

The hazard insurance policies covering the mortgaged properties typically will contain a co-insurance clause that in effect requires the insured at all times to carry insurance of a specified percentage, generally 80% to 90%, of the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, the co-insurance clause generally provides that the insurer's liability in the event of partial loss does not exceed the lesser of (1) the replacement cost of the improvements less physical depreciation and (2) the proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of the improvements.

The servicer will not require that a hazard or flood insurance policy be maintained for any cooperative loan. Generally, the cooperative is responsible for maintenance of hazard insurance for the property owned by the cooperative, and the tenant-stockholders of that cooperative do not maintain individual hazard insurance policies. However, if a cooperative and the related borrower on a cooperative note do not maintain hazard insurance or do not maintain adequate coverage or any insurance proceeds are not applied to the restoration of the damaged property, damage to the related borrower's cooperative apartment or the cooperative's building could significantly reduce the value of the collateral securing the cooperative note.

Since the amount of hazard insurance the servicer will cause to be maintained on the improvements securing the mortgage loans declines as the principal balances owing thereon decrease, and since residential, commercial and mixed-use properties have historically appreciated in value over time, hazard insurance proceeds collected in connection with a partial loss may be insufficient to restore fully the damaged property. The terms of the mortgage loans provide that borrowers are required to present claims to insurers under hazard insurance policies maintained on the mortgaged properties. The servicer, on behalf of the trustee and securityholders, is obligated to present or cause to be presented claims under any blanket insurance policy insuring against hazard losses on mortgaged properties. However, the ability of the servicer to present or cause to be presented these claims is dependent upon the extent to which information in this regard is furnished to the servicer by borrowers.

**FHA Insurance**

The Federal Housing Administration (the "FHA") is responsible for administering various federal programs, including mortgage insurance, authorized under the National Housing Act of 1934, as amended (the "Housing Act"). If so provided in the related prospectus supplement, a number of the mortgage loans will be insured by the FHA.

Under Section 203(b) of the Housing Act, the FHA insures mortgage loans of up to 30 years' duration for the purchase of one- to four-family dwelling units. There are two primary FHA insurance programs that are available for multifamily mortgage loans. Sections 221(d)(3) and (d)(4) of the Housing Act allow the U.S. Department of Housing and Urban Development ("HUD") to insure mortgage loans that are secured by newly constructed and substantially rehabilitated multifamily rental projects. Section 244 of the Housing Act provides for co-insurance of such mortgage loans made under Sections 221(d)(3) and (d)(4) by HUD/FHA and a HUD-approved co-insurer. Generally the term of such a mortgage loan may be up to 40 years and the ratio of the loan amount to property replacement cost can be up to 90%.

Section 223(f) of the Housing Act allows HUD to insure mortgage loans made for the purchase or refinancing of existing multifamily projects. Section 244 also provides for co-insurance of mortgage loans made under Section 223(f).

HUD has the option, in most cases, to pay insurance claims in cash or in debentures issued by HUD. Presently, claims are being paid in cash, and claims have not been paid in debentures since 1965. HUD debentures issued in satisfaction of FHA insurance claims bear interest at the applicable HUD debenture interest rate.

Some of the mortgage loans held by a trust may be Title I loans as described below and in the related prospectus supplement. The regulations, rules and procedures promulgated by the FHA under Title I contain the requirements under which lenders approved for participation in the Title I program may obtain insurance against a portion of losses incurred with respect to eligible loans that have been originated and serviced in accordance with FHA regulations, subject to the amount of insurance coverage available in such Title I lender's FHA reserve, as described below and in the related prospectus supplement. In general, an insurance claim against the FHA may be denied or surcharged if the Title I loan to which it relates does not strictly satisfy the requirements of the National Housing Act and FHA regulations but FHA regulations permit the Secretary of the Department of Housing and Urban Development, subject to statutory limitations, to waive a Title I lender's noncompliance with FHA regulations if enforcement would impose an injustice on the lender.

The servicer will either serve as or contract with the person specified in the prospectus supplement to serve as the administrator for FHA claims pursuant to an FHA claims administration agreement. The FHA claims administrator will be responsible for administering, processing and submitting FHA claims with respect to the Title I loans. The securityholders will be dependent on the FHA claims administrator to (1) make claims on the Title I loans in accordance with FHA regulations and (2) remit all FHA insurance proceeds received from the FHA in accordance with the related agreement. The securityholders' rights relating to the receipt of payment from and the administration, processing and submission of FHA claims by any FHA claims administrator is limited and governed by the related agreement and the FHA claims administration agreement and these functions are obligations of the FHA claims administrator, but not the FHA.

Under Title I, the FHA maintains an FHA insurance coverage reserve account for each Title I lender. The amount in each Title I lender's FHA reserve is a maximum of 10% of the amounts disbursed, advanced or expended by a Title I lender in originating or purchasing eligible loans registered with the FHA for Title I insurance, with certain adjustments permitted or required by FHA regulations. The balance of such FHA reserve is the maximum amount of insurance claims the FHA is required to pay to the related Title I lender. Mortgage loans to be insured under Title I will be registered for insurance by the FHA. Following either the origination or transfer of loans eligible under Title I, the Title I lender will submit such loans for FHA insurance coverage within its FHA reserve by delivering a transfer of note report or by an electronic submission to the FHA in the form prescribed under the FHA regulations. The increase in the FHA insurance coverage for such loans in the Title I lender's FHA reserve will occur on the date following the receipt and acknowledgment by the FHA of the transfer of note report for such loans. The insurance available to any trust will be subject to the availability, from time to time, of amounts in each Title I lender's FHA reserve, which will initially be limited to the amount specified in the related prospectus supplement.

If so provided in the related prospectus supplement, the trustee or FHA claims administrator may accept an assignment of the FHA reserve for the related Title I loans, notify FHA of that assignment and request that the portion of the mortgage loan seller's FHA reserves allocable to the Title I loans be transferred to the trustee or the FHA claims administrator on the Closing Date. Alternatively, in the absence of such provision, the FHA reserves may be retained by the mortgage loan seller and, upon an insolvency or receivership of the mortgage loan seller, the trustee will notify FHA and request that the portion of the mortgage loan seller's FHA reserves allocable to the Title I loans be transferred to the trustee or the FHA claims administrator. Although each trustee will request such a transfer of reserves, FHA is not obligated to comply with such a request, and may determine that it is not in FHA's interest to permit a transfer of reserves. If the mortgage loan seller is the subject of a bankruptcy, receivership, conservatorship or other insolvency proceeding, the FHA may be prohibited by law from complying with such request and the trustee may be prohibited from making such a request. In addition, the FHA has not specified how insurance reserves would be allocated in a transfer, and there can be no assurance that any reserve amount, if transferred to the trustee or the FHA claims administrator, as the case may be, would not be substantially less than 10% of the outstanding principal amount of the related Title I loans. It is likely that the mortgage

loan seller, the trustee or the FHA claims administrator would be the lender of record on other Title I loans, so that any FHA reserves that are retained, or permitted to be transferred, would become commingled with FHA reserves available for other Title I loans. FHA also reserves the right to transfer reserves with "earmarking" (segregating reserves so that they will not be commingled with the reserves of the transferee) if it is in FHA's interest to do so.

Under Title I, the FHA will reduce the insurance coverage available in a Title I lender's FHA reserve with respect to loans insured under that Title I lender's contract of insurance by (1) the amount of FHA insurance claims approved for payment related to those loans and (2) the amount of reduction of the Title I lender's FHA reserve by reason of the sale, assignment or transfer of loans registered under the Title I lender's contract of insurance. The FHA insurance coverage also may be reduced for any FHA insurance claims previously disbursed to the Title I lender that are subsequently rejected by the FHA.

Unlike certain other government loan insurance programs, loans under Title I (other than loans in excess of $25,000) are not subject to prior review by the FHA. The FHA disburses insurance proceeds with respect to defaulted loans for which insurance claims have been filed by a Title I lender prior to any review of those loans. A Title I lender is required to repurchase a Title I loan from the FHA that is determined to be ineligible for insurance after insurance claim payments for such loan have been paid to the lender. Under the FHA regulations, if the Title I lender's obligation to repurchase the Title I loan is unsatisfied, the FHA is permitted to offset the unsatisfied obligation against future insurance claim payments owed by the FHA to such lender. FHA regulations permit the FHA to disallow an insurance claim with respect to any loan that does not qualify for insurance for a period of up to two years after the claim is made and to require the Title I lender that has submitted the insurance claim to repurchase the loan.

The proceeds of loans under the Title I program may be used only for permitted purposes, including the alteration, repair or improvement of residential property, the purchase of a manufactured home or lot (or cooperative interest therein) on which to place the home or the purchase of both a manufactured home and the lot (or cooperative interest therein) on which the home is placed.

Subject to certain limitations described below, eligible Title I loans are generally insured by the FHA for 90% of an amount equal to the sum of

- the net unpaid principal amount and the uncollected interest earned to the date of default,
- interest on the unpaid loan obligation from the date of default to the date of the initial submission of the insurance claim, plus 15 calendar days (the total period not to exceed nine months) at a rate of 7% per annum,
- uncollected court costs,
- title examination costs,
- fees for required inspections by the lenders or its agents, up to $75, and
- origination fees up to a maximum of 5% of the loan amount.

Accordingly if sufficient insurance coverage is available in such FHA reserve, then the Title I lender bears the risk of losses on a Title I loan for which a claim for reimbursement is paid by the FHA of at least 10% of the unpaid principal, uncollected interest earned to the date of default, interest from the date of default to the date of the initial claim submission and certain expenses.

In general, the FHA will insure loans of up to $17,500 for manufactured homes which qualify as real estate under applicable state law and loans of up to $12,000 per unit for a $48,000 limit for four units for owner-occupied multifamily homes. If the loan amount is $15,000 or more, the FHA requires a drive-by appraisal, the current tax assessment value, or a full Uniform Residential Appraisal Report dated within 12 months of the closing to verify the property's value. The maximum loan amount on transactions requiring an appraisal is the amount of equity in the property shown by the market value determination of the property.

With respect to Title I loans, the FHA regulations do not require that a borrower obtain title or fire and casualty insurance. However, if the related mortgaged property is located in a flood hazard area, flood insurance in an amount at least equal to the loan amount is required. In addition, the FHA regulations do not require that the borrower obtain insurance against physical damage arising from earth movement

(including earthquakes, landslides and mudflows). Accordingly, if a mortgaged property that secures a Title I loan suffers any uninsured hazard or casualty losses, holders of the related series of securities that are secured in whole or in part by such Title I loan may bear the risk of loss to the extent that such losses are not recovered by foreclosure on the defaulted loans or from any FHA insurance proceeds. Such loss may be otherwise covered by amounts available from the credit enhancement provided for the related series of securities, if specified in the related prospectus supplement.

Following a default on a Title I loan insured by the FHA, the servicer may, subject to certain conditions and mandatory loss mitigation procedures, either commence foreclosure proceedings against the improved property securing the loan, if applicable, or submit a claim to FHA, but may submit a claim to FHA after proceeding against the improved property only with the prior approval of the Secretary of HUD. The availability of FHA Insurance following a default on a Title I loan is subject to a number of conditions, including strict compliance with FHA regulations in originating and servicing the Title I loan. Failure to comply with FHA regulations may result in a denial of or surcharge on the FHA insurance claim. Prior to declaring a Title I loan in default and submitting a claim to FHA, the servicer must take certain steps to attempt to cure the default, including personal contact with the borrower either by telephone or in a meeting and providing the borrower with 30 days' written notice prior to declaration of default. FHA may deny insurance coverage if the borrower's nonpayment is related to a valid objection to faulty contractor performance. In such event, the servicer or other entity as specified in the related prospectus supplement will seek to obtain payment by or a judgment against the borrower, and may resubmit the claim to FHA following such a judgment.

## VA Guarantees

The U.S. Department of Veterans Affairs (the "VA") is an Executive Branch Department of the United States, headed by the Secretary of Veterans Affairs. The VA currently administers a variety of federal assistance programs on behalf of eligible veterans and their dependents and beneficiaries. The VA administers a loan guaranty program under which the VA guarantees a portion of loans made to eligible veterans. If so provided in the prospectus supplement, a number of the mortgage loans will be guaranteed by the VA.

Under the VA loan guaranty program, a VA loan may be made to any eligible veteran by an approved private sector mortgage lender. The VA guarantees payment to the holder of that loan of a fixed percentage of the loan indebtedness, up to a maximum dollar amount, in the event of default by the veteran borrower. When a delinquency is reported to the VA and no realistic alternative to foreclosure is developed by the loan holder or through the VA's supplemental servicing of the loan, the VA determines, through an economic analysis, whether the VA will (a) authorize the holder to convey the property securing the VA loan to the Secretary of Veterans Affairs following termination or (b) pay the loan guaranty amount to the holder. The decision as to disposition of properties securing defaulted VA loans is made on a case-by-case basis using the procedures set forth in 38 U.S.C. Section 3732(c), as amended.

## LEGAL ASPECTS OF MORTGAGE ASSETS

The following discussion contains general summaries of legal aspects of loans secured by residential, commercial and mixed-use properties. Because these legal aspects are governed in part by applicable state law, which laws may differ substantially from state to state, the summaries do not purport to be complete nor to reflect the laws of any particular state, nor to encompass the laws of all states in which the security for the mortgage assets is situated.

## Mortgage Loans

The single-family loans, multifamily loans, commercial loans and mixed-use loans will be secured by either mortgages, deeds of trust, security deeds or deeds to secure debt depending upon the type of security instrument customary to grant a security interest according to the prevailing practice in the state in which the property subject to that mortgage loan is located. The filing of a mortgage or a deed of trust creates a lien upon or conveys title to the real property encumbered by that instrument and represents the security for the repayment of an obligation that is customarily evidenced by a promissory note. It is not prior to the

lien for real estate taxes and assessments. Priority with respect to mortgages and deeds of trust depends on their terms and generally on the order of recording with the applicable state, county or municipal office. There are two parties to a mortgage: the mortgagor, who is the borrower/homeowner or the land trustee; and the mortgagee, who is the lender. Under the mortgage instrument, the mortgagor delivers to the mortgagee a note or bond and the mortgage. In the case of a land trust, title to the property is held by a land trustee under a land trust agreement, while the borrower/homeowner is the beneficiary of the land trust; at origination of a mortgage loan, the borrower executes a separate undertaking to make payments on the mortgage note. Although a deed of trust is similar to a mortgage, a deed of trust normally has three parties: the trustor, similar to a mortgagor; the beneficiary, similar to a mortgagee, who is the lender; and the trustee, a third-party grantee. Under a deed of trust, the trustor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the obligation. A security deed and a deed to secure debt are special types of deeds which indicate on their face that they are granted to secure an underlying debt. By executing a security deed or deed to secure debt, the grantor conveys title to, as opposed to merely creating a lien upon, the subject property to the grantee until the time as the underlying debt is repaid. The mortgagee's authority under a mortgage and the trustee's authority under a deed of trust, security deed or deed to secure debt are governed by the law of the state in which the real property is located, the express provisions of the mortgage, deed of trust, security deed or deed to secure debt and, sometimes, the directions of the beneficiary.

**Cooperative Loans**

The cooperative owns or has a leasehold interest in all the real property and owns in fee or leases the building and all separate dwelling units therein. The cooperative is directly responsible for project management and, in most cases, payment of real estate taxes, other governmental impositions and hazard and liability insurance. If there is a blanket mortgage on the cooperative apartment building and underlying land, or one or the other, the cooperative, as project mortgagor, is also responsible for meeting these blanket mortgage obligations. A blanket mortgage is ordinarily incurred by the cooperative in connection with either the construction or purchase of the cooperative's apartment building or the obtaining of capital by the cooperative. There may be a lease on the underlying land and the cooperative, as lessee, is also responsible for meeting the rental obligation. The interests of the occupants under proprietary leases or occupancy agreements as to which the cooperative is the landlord are generally subordinate to the interests of the holder of the blanket mortgage and to the interest of the holder of a land lease. If the cooperative is unable to meet the payment obligations (a) arising under its blanket mortgage, the mortgagee holding the blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements or (b) arising under its land lease, the holder of the landlord's interest under the land lease could terminate it and all subordinate proprietary leases and occupancy agreements. Also, the blanket mortgage on a cooperative may provide financing in the form of a mortgage that does not fully amortize, with a significant portion of principal being due in one final payment at final maturity. The inability of the cooperative to refinance this mortgage and its consequent inability to make the final payment could lead to foreclosure by the mortgagee. Similarly, a land lease has an expiration date and the inability of the cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the cooperative's interest in the property and termination of all proprietary leases and occupancy agreements. In either event, foreclosure by the holder of the blanket mortgage or the termination of the underlying lease could eliminate or significantly diminish the value of any collateral held by the lender that financed the purchase by an individual tenant-stockholder of cooperative shares or, in the case of the trust, the collateral securing the cooperative loans.

The cooperative is owned by tenant-stockholders who, through ownership of stock, shares or membership certificates in the corporation, receive proprietary leases or occupancy agreements which confer exclusive rights to occupy specific units. Generally, a tenant-stockholder of a cooperative must make a monthly payment to the cooperative representing the tenant-stockholder's pro rata share of the cooperative's payments for its blanket mortgage, real property taxes, maintenance expenses and other capital or ordinary expenses. An ownership interest in a cooperative and accompanying occupancy rights is financed through a cooperative share loan evidenced by a promissory note and secured by an assignment of and a security interest in the occupancy agreement or proprietary lease and a security interest in the related cooperative shares. The lender generally takes possession of the share certificate and a counterpart of the proprietary

lease or occupancy agreement and a financing statement covering the proprietary lease or occupancy agreement and the cooperative shares is filed in the appropriate filing offices to perfect the lender's interest in its collateral. Upon default of the tenant-stockholder, the lender may sue for judgment on the promissory note, dispose of the collateral at a public or private sale or otherwise proceed against the collateral or tenant-stockholder as an individual as provided in the security agreement covering the assignment of the proprietary lease or occupancy agreement and the pledge of cooperative shares as described under "—Foreclosure on Cooperative Shares" below.

## Foreclosure on Mortgages

Foreclosure of a deed of trust is generally accomplished by a nonjudicial trustee's sale under a specific provision in the deed of trust, which authorizes the trustee to sell the property upon any default by the borrower under the terms of the note or deed of trust and in accordance with applicable state law. In several states, the trustee must record a notice of default and send a copy to the borrower-trustor and to any person who has recorded a request for a copy of a notice of default and notice of sale. In addition, the trustee in several states must provide notice to any other individual having an interest in the real property, including any junior lienholder. The trustor, borrower, or any person having a junior encumbrance on the real estate, may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and expenses incurred in enforcing the obligation. Generally, state law controls the amount of foreclosure expenses and costs, including attorneys' fees, that may be recovered by a lender. If the deed of trust is not reinstated, a notice of sale must be posted in a public place and, in most states, published for a specific period of time in one or more newspapers. In addition, several state laws require that a copy of the notice of sale be posted on the property, recorded and sent to all parties having an interest in the real property.

An action to foreclose a mortgage is an action to recover the mortgage debt by enforcing the mortgagee's rights under the mortgage and in the mortgaged property. It is regulated by statutes and rules and subject throughout to the court's equitable powers. Since a foreclosure action is equitable in nature and is addressed to a court of equity, the court may relieve a mortgagor of a default and deny the mortgagee foreclosure on proof that the mortgagor's default was neither willful nor in bad faith and that the mortgagee's action established a waiver of the default, or constituted fraud, bad faith, or oppressive or unconscionable conduct that warranted a court of equity to refuse affirmative relief to the mortgagee. A court may relieve the mortgagor from an entirely technical default where the default was not willful.

A foreclosure action or sale in accordance with a power of sale is subject to most of the delays and expenses of other lawsuits if defenses or counterclaims are interposed, sometimes requiring up to several years to complete. Moreover, it is possible that a noncollusive, regularly conducted foreclosure sale or sale in accordance with a power of sale may be challenged as a fraudulent conveyance, regardless of the parties' intent, if a court determines that the sale was for less than fair consideration and the sale occurred while the mortgagor was insolvent. Similarly, a suit against the debtor on the mortgage note may take several years. In addition, delays in completion of the foreclosure and additional losses may result where loan documents relating to a mortgage loan are missing.

In case of foreclosure under either a mortgage or a deed of trust, the sale by the referee or other designated officer or by the trustee is a public sale. However, because of the difficulty potential third party purchasers at the sale have in determining the exact status of title and because the physical condition of the property may have deteriorated during the foreclosure proceedings, it is uncommon for a third party to purchase the property at the foreclosure sale. Rather, it is common for the lender to purchase the property from the trustee or referee for an amount equal to the principal amount of the mortgage or deed of trust plus accrued and unpaid interest and the expenses of foreclosure.

Thereafter, the lender will assume the burdens of ownership, including obtaining casualty insurance, paying taxes and making repairs at its own expense as are necessary to render the property suitable for sale. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Any loss may be reduced by the receipt of any mortgage insurance proceeds.

A junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgages, in which case it may either pay the entire amount due on the senior

mortgages to the senior mortgagees prior to or at the time of the foreclosure sale or undertake the obligation to make payments on the senior mortgages if the mortgagor is in default thereunder. In either event the amounts expended will be added to the balance due on the junior loan, and may be subrogated to the rights of the senior mortgagees. In addition, if the foreclosure of a junior mortgage triggers the enforcement of a due-on-sale clause in a senior mortgage, the junior mortgagee may be required to pay the full amount of the senior mortgages to the senior mortgagees. Accordingly, with respect to those mortgage loans which are junior mortgage loans, if the lender purchases the property, the lender's title will be subject to all senior liens and claims and some governmental liens. The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale, real estate taxes and then in satisfaction of the indebtedness secured by the mortgage or deed of trust under which the sale was conducted. Any remaining proceeds are generally payable to the holders of junior mortgages or deeds of trust and other liens and claims in order of their priority, whether or not the borrower is in default. Any additional proceeds are generally payable to the mortgagor or trustor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgagee or may require the institution of separate legal proceedings.

If the servicer were to foreclose on any junior lien it would do so subject to any related senior lien. In order for the debt related to the junior mortgage loan to be paid in full at the sale, a bidder at the foreclosure sale of the junior mortgage loan would have to bid an amount sufficient to pay off all sums due under the junior mortgage loan and the senior lien or purchase the mortgaged property subject to the senior lien. If proceeds from a foreclosure or similar sale of the mortgaged property are insufficient to satisfy all senior liens and the junior mortgage loan in the aggregate, the trust as the holder of the junior lien and, accordingly, holders of one or more classes of related securities bear (1) the risk of delay in distributions while a deficiency judgment against the borrower is obtained and (2) the risk of loss if the deficiency judgment is not realized upon. Moreover, deficiency judgments may not be available in a jurisdiction. In addition, liquidation expenses with respect to defaulted junior mortgage loans do not vary directly with the outstanding principal balance of the loans at the time of default. Therefore, assuming that the servicer took the same steps in realizing upon a defaulted junior mortgage loan having a small remaining principal balance as it would in the case of a defaulted junior mortgage loan having a large remaining principal balance, the amount realized after expenses of liquidation would be smaller as a percentage of the outstanding principal balance of the small junior mortgage loan than would be the case with the defaulted junior mortgage loan having a large remaining principal balance.

In foreclosure, courts have imposed general equitable principles. The equitable principles are generally designed to relieve the borrower from the legal effect of its defaults under the loan documents. Examples of judicial remedies that have been fashioned include judicial requirements that the lender undertake affirmative and sometimes expensive actions to determine the causes for the borrower's default and the likelihood that the borrower will be able to reinstate the loan. In a few cases, courts have substituted their judgment for the lender's judgment and have required that lenders reinstate loans or recast payment schedules in order to accommodate borrowers who are suffering from temporary financial disability. In other cases, courts have limited the right of a lender to foreclose if the default under the mortgage instrument is not monetary, for example, the borrower's failure to adequately maintain the property or the borrower's execution of a second mortgage or deed of trust affecting the property. Finally, a few courts have been faced with the issue of whether or not federal or state constitutional provisions reflecting due process concerns for adequate notice require that borrowers under deeds of trust or mortgages receive notices in addition to the statutorily-prescribed minimums. For the most part, these cases have upheld the notice provisions as being reasonable or have found that the sale by a trustee under a deed of trust, or under a mortgage having a power of sale, does not involve sufficient state action to afford constitutional protection to the borrower.

### Foreclosure on Mortgaged Properties Located in the Commonwealth of Puerto Rico

Under the laws of the Commonwealth of Puerto Rico, the foreclosure of a real estate mortgage usually follows an ordinary civil action filed in the Superior Court for the district where the mortgaged property is located. If the defendant does not contest the action filed, a default judgment is rendered for the plaintiff and the mortgaged property is sold at public auction, after publication of the sale for two weeks, by posting written notice in three public places in the municipality where the auction will be held, in the tax collection

office and in the public school of the municipality where the mortgagor resides, if known. If the residence of the mortgagor is not known, publication in one of the newspapers of general circulation in the Commonwealth of Puerto Rico must be made at least once a week for two weeks. There may be as many as three public sales of the mortgaged property. If the defendant contests the foreclosure, the case may be tried and judgment rendered based on the merits of the case.

There are no redemption rights after the public sale of a foreclosed property under the laws of the Commonwealth of Puerto Rico. Commonwealth of Puerto Rico law provides for a summary proceeding for the foreclosure of a mortgage, but it is very seldom used because of concerns regarding the validity of these actions. The process may be expedited if the mortgagee can obtain the consent of the defendant to the execution of a deed in lieu of foreclosure.

Under Commonwealth of Puerto Rico law, in the case of the public sale upon foreclosure of a mortgaged property that (1) is subject to a mortgage loan that was obtained for a purpose other than the financing or refinancing of the acquisition, construction or improvement of the property and (2) is occupied by the mortgagor as his principal residence, the mortgagor of the property has a right to be paid a stated amount from the proceeds obtained on the public sale of the property before any recovery by the mortgagee. The mortgagor can claim this sum of money from the mortgagee at any time prior to the public sale or up to one year after the sale. This payment would reduce the amount of sales proceeds available to satisfy the mortgage loan and may increase the amount of the loss.

**Foreclosure on Cooperative Shares**

The cooperative shares and proprietary lease or occupancy agreement owned by the tenant-stockholder and pledged to the lender are, in almost all cases, subject to restrictions on transfer as set forth in the cooperative's certificate of incorporation and by-laws, as well as in the proprietary lease or occupancy agreement, and may be canceled by the cooperative for failure by the tenant-stockholder to pay rent or other obligations or charges owed by the tenant-stockholder, including mechanics' liens against the cooperative apartment building incurred by the tenant-stockholder. Typically, rent and other obligations and charges arising under a proprietary lease or occupancy agreement that are owed to the cooperative are made liens upon the shares to which the proprietary lease or occupancy agreement relates. In addition, the proprietary lease or occupancy agreement generally permits the cooperative to terminate the lease or agreement in the event the tenant-stockholder fails to make payments or defaults in the performance of covenants required thereunder. Typically, the lender and the cooperative enter into a recognition agreement that, together with any lender protection provisions contained in the proprietary lease, establishes the rights and obligations of both parties in the event of a default by the tenant-stockholder on its obligations under the proprietary lease or occupancy agreement. A default by the tenant-stockholder under the proprietary lease or occupancy agreement will usually constitute a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, in the event that the tenant-stockholder has defaulted under the proprietary lease or occupancy agreement, the cooperative will take no action to terminate the lease or agreement until the lender has been provided with notice of and an opportunity to cure the default. The recognition agreement typically provides that if the proprietary lease or occupancy agreement is terminated, the cooperative will recognize the lender's lien against proceeds from a sale of the cooperative apartment, subject, however, to the cooperative's right to sums due under the proprietary lease or occupancy agreement or that have become liens on the shares relating to the proprietary lease or occupancy agreement. The total amount owed to the cooperative by the tenant-stockholder, which the lender generally cannot restrict and does not monitor, could reduce the value of the collateral below the outstanding principal balance of the cooperative loan and accrued and unpaid interest thereon.

Recognition agreements also provide that in the event of a foreclosure on a cooperative loan, the lender must obtain the approval or consent of the cooperative as required by the proprietary lease before transferring the cooperative shares or assigning the proprietary lease. Generally, the lender is not limited in any rights it may have to dispossess the tenant-stockholders.

Under the laws applicable in most states, foreclosure on the cooperative shares is accomplished by a sale in accordance with the provisions of Article 9 of the Uniform Commercial Code (the "UCC") and the security agreement relating to those shares. Article 9 of the UCC requires that a sale be conducted in a

"commercially reasonable" manner. Whether a foreclosure sale has been conducted in a commercially reasonable manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the foreclosure.

Article 9 of the UCC provides that the proceeds of the sale will be applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to the right of the cooperative corporation to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency. See "—Anti-Deficiency Legislation and Other Limitations on Lenders" below.

## Rights of Redemption with Respect to Mortgage Loans

In several states, after sale in accordance with a deed of trust or foreclosure of a mortgage, the trustor or mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. The right of redemption should be distinguished from the equity of redemption, which is a right that must be exercised prior to the foreclosure sale. In several states, redemption may occur only upon payment of the entire principal balance of the loan, accrued interest and expenses of foreclosure. In other states, redemption may be authorized if the former borrower pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The right of redemption would defeat the title of any purchaser acquired at a public sale. Consequently, the practical effect of a right of redemption is to force the lender to retain the property and pay the expenses of ownership and maintenance of the property until the redemption period has expired. In several states, there is no right to redeem property after a trustee's sale under a deed of trust.

## Anti-Deficiency Legislation and Other Limitations on Lenders

Several states have imposed statutory prohibitions that limit the remedies of a beneficiary under a deed of trust or a mortgagee under a mortgage. In several states, statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following foreclosure or sale under a deed of trust. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Other statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. Finally, other statutory provisions limit any deficiency judgment against the former borrower following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or a mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the judicial sale.

Generally, Article 9 of the UCC governs foreclosure on cooperative shares and the related proprietary lease or occupancy agreement. Some courts have interpreted Article 9 to prohibit or limit a deficiency award in some circumstances, including circumstances where the disposition of the collateral (which, in the case of a cooperative loan, would be the shares of the cooperative and the related proprietary lease or occupancy agreement) was not conducted in a commercially reasonable manner.

With respect to Additional Collateral Loans, realization upon the additional collateral may be governed by the UCC in effect under the law of the state applicable thereto. Some courts have interpreted the UCC to prohibit or limit a deficiency award in some circumstances, including those in which the disposition of the additional collateral was not conducted in a commercially reasonable manner. In some states, the UCC does not apply to liens upon additional collateral consisting of some types of personal property (including, for example, bank accounts and, to a certain extent, insurance policies and annuities). Realization upon such additional collateral will be governed by state laws other than the UCC, and the availability of deficiency awards under such state laws may be limited. Whether realization upon any additional collateral is governed by the UCC or by other state laws, the ability of secured parties to realize upon the additional collateral may be limited by statutory prohibitions that limit remedies in respect of the related mortgage loans. Such

limitations may affect secured parties either independently or in conjunction with statutory requirements that secured parties proceed against the related mortgaged properties first or against both such mortgaged properties and the additional collateral concurrently.

In addition to laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including the federal bankruptcy laws and state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon collateral or enforce a deficiency judgment. For example, under federal bankruptcy law, the filing of a petition acts as a stay against any effort to collect any debt or to enforce any remedy. Moreover, a bankruptcy court may permit a debtor to cure a monetary default with respect to a mortgage loan on a debtor's residence by paying arrearages within a reasonable time period and reinstating the original mortgage loan payment schedule even though the lender accelerated the mortgage loan and foreclosure proceedings had occurred prior to the filing of the debtor's bankruptcy petition. Bankruptcy courts have approved plans, based on the particular facts of the bankruptcy case, that effected the curing of a mortgage loan default by paying arrearages over a number of years.

The terms of a mortgage loan secured by property of the debtor may be modified in bankruptcy. These modifications may include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule and reducing the lender's security interest to the value of the mortgaged property, thus leaving the lender a general unsecured creditor for the difference between the value of the mortgaged property and the outstanding balance of the loan. Furthermore, payments made on the mortgage loan by the debtor prior to the commencement of the bankruptcy case may be avoidable as preferential payments, so that the trust or the holders of the securities would be required to return such payments to the debtor.

Tax liens arising under the Code may have priority over the lien of a mortgage or deed of trust. In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of single-family mortgage loans by numerous federal and state consumer protection laws. These laws include the Federal Truth-in-Lending Act, Regulation Z, Real Estate Settlement Procedures Act, Regulation X, Equal Credit Opportunity Act, Regulation B, Fair Credit Billing Act, Fair Housing Act, Fair Credit Reporting Act and related statutes and regulations. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. This liability may affect assignees of the mortgage loans. In particular, the originators' failure to comply with requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject both originators and assignees of the obligations to monetary penalties and could result in obligors' rescinding loans against either originators or assignees.

In addition, the mortgage loans held by a trust may also be subject to the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), if the mortgage loans were originated on or after October 1, 1995, are not mortgage loans made to finance the purchase of the mortgaged property and have interest rates or origination costs in excess of prescribed levels. HOEPA adds additional provisions to Regulation Z and requires additional disclosures, specifies the timing of the disclosures and limits or prohibits inclusion of specific provisions in mortgages subject to HOEPA. Remedies available to the mortgagor include monetary penalties, as well as rescission rights if certain disclosures were not given as required or if the particular mortgage includes provisions prohibited by law. HOEPA also provides that any purchaser or assignee of a mortgage covered by HOEPA is subject to all of the claims and defenses to loan payment, whether under the Federal Truth-in-Lending Act, as amended by HOEPA, or other law, that the borrower could assert against the original lender unless the purchaser or assignee did not know and could not with reasonable diligence have determined that the mortgage loan was subject to the provisions of HOEPA. The maximum damages that may be recovered under the HOEPA from an assignee is the remaining amount of indebtedness plus the total amount paid by the borrower in connection with the mortgage loan.

In addition to HOEPA, a number of legislative proposals have been introduced at the federal, state and local government levels that are designed to discourage predatory lending practices. Some state and local governments have enacted, and other states or local governments or the federal government may enact, laws that impose requirements and restrictions greater than those of HOEPA. These laws prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans. Purchasers or assignees of a mortgage loan, including the related trust, could be exposed to all

claims and defenses that the mortgagor could assert against the originator of the mortgage loan for a violation of law. Claims and defenses available to the borrower could include monetary penalties, rescission and defenses to a foreclosure action or an action to collect.

### Junior Mortgages

The mortgage loans may be secured by junior mortgages or deeds of trust, which are junior to senior mortgages or deeds of trust which are not held by the trust. The rights of the trust as the holder of a junior deed of trust or a junior mortgage are subordinate in lien priority and in payment priority to those of the holder of the senior mortgage or deed of trust, including the prior rights of the senior mortgagee or beneficiary to receive and apply hazard insurance and condemnation proceeds and, upon default of the mortgagor, to cause a foreclosure on the property. Upon completion of the foreclosure proceedings by the holder of the senior mortgage or the sale in accordance with the deed of trust, the junior mortgagee's or junior beneficiary's lien will be extinguished unless the junior lienholder satisfies the defaulted senior loan. See "—Foreclosure on Mortgages."

Furthermore, the terms of the junior mortgage or deed of trust are subordinate to the terms of the senior mortgage or deed of trust. Upon a failure of the mortgagor or trustor to perform any of its obligations, the senior mortgagee or beneficiary, subject to the terms of the senior mortgage or deed of trust, may have the right to perform the obligation itself. Generally, all sums so expended by the mortgagee or beneficiary become part of the indebtedness secured by the mortgage or deed of trust. To the extent a senior mortgagee expends sums, these sums will generally have priority over all sums due under the junior mortgage.

### Home Equity Line of Credit Loans

The form of credit line trust deed or mortgage generally used by most institutional lenders which make home equity line of credit loans typically contains a "future advance" clause, which provides, in essence, that additional amounts advanced to or on behalf of the borrower by the beneficiary or lender are to be secured by the deed of trust or mortgage. The priority of the lien securing any advance made under the clause may depend in most states on whether the deed of trust or mortgage is called and recorded as a credit line deed of trust or mortgage. If the beneficiary or lender advances additional amounts, the advance is entitled to receive the same priority as amounts initially advanced under the trust deed or mortgage, notwithstanding the fact that there may be junior trust deeds or mortgages and other liens that intervene between the date of recording of the trust deed or mortgage and the date of the future advance, and notwithstanding that the beneficiary or lender had actual knowledge of the intervening junior trust deeds or mortgages and other liens at the time of the advance. In most states, the trust deed or mortgage liens securing mortgage loans of the type that includes home equity credit lines applies retroactively to the date of the original recording of the trust deed or mortgage, provided that the total amount of advances under the home equity credit line does not exceed the maximum specified principal amount of the recorded trust deed or mortgage, except as to advances made after a tax lien or judgment lien imposed on the property.

### Enforceability of Due-on-Sale Clauses

If so described in the accompanying prospectus supplement, the mortgage loans held by a trust may contain due-on-sale clauses. These clauses permit the lender to accelerate the maturity of the mortgage loan if the borrower sells, transfers, or conveys the property without the prior consent of the lender. The enforceability of these clauses has been impaired in various ways in several states by statute or decisional law. The ability of lenders and their assignees and transferees to enforce due-on-sale clauses was addressed by the Garn-St. Germain Depository Institutions Act of 1982 (the "Garn-St. Germain Act"). This legislation, subject to exceptions, preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses. The Garn-St. Germain Act does encourage lenders to permit assumptions of loans at the original rate of interest provided for in the mortgage note or at another rate less than the average of the original rate and the market rate.

The Garn-St. Germain Act also sets forth nine specific instances in which a mortgage lender covered by the Garn-St. Germain Act, including federal savings associations and federal savings banks, may not

exercise a due-on-sale clause, even though a transfer of the property may have occurred. These include intra-family transfers, some transfers by operation of law, leases of fewer than three years and the creation of a junior encumbrance. Regulations promulgated under the Garn-St. Germain Act also prohibit the imposition of a prepayment charge upon the acceleration of a mortgage loan in accordance with a due-on-sale clause.

The inability to enforce a due-on-sale clause may result in a mortgage loan bearing an interest rate below the current market rate being assumed by a new home buyer rather than being paid off, which may have an impact upon the average life of the mortgage loans related to a series and the number of mortgage loans that may be outstanding until maturity.

## Prepayment Charges and Prepayments

Applicable regulations prohibit the imposition of a prepayment charge or equivalent fee for or in connection with the acceleration of a mortgage loan by exercise of a due-on-sale clause. A mortgagee to whom a prepayment in full has been tendered will be compelled to give either a release of the mortgage or an instrument assigning the existing mortgage to a refinancing lender.

Some state laws restrict the imposition of prepayment charges even when the mortgage loans expressly provide for the collection of those charges. The Alternative Mortgage Transaction Parity Act of 1982 (the "Parity Act") permits the collection of prepayment charges in connection with some types of mortgage loans subject to the Parity Act, or Parity Act loans, preempting any contrary state law prohibitions. However, some states may not recognize the preemptive authority of the Parity Act or have opted out of the Parity Act. Moreover, the OTS, the agency that administers the application of the Parity Act to some types of mortgage lenders that are not chartered under federal law, withdrew its favorable regulations and opinions that previously authorized those lenders, notwithstanding contrary state law, to charge prepayment charges and late fees on Parity Act loans in accordance with OTS rules. The withdrawal is effective with respect to Parity Act loans originated on or after July 1, 2003. The OTS's action does not affect Parity Act loans originated before July 1, 2003. Accordingly, it is possible that prepayment charges may not be collected on some mortgage loans that provide for the payment of these charges. Any prepayment charges collected on mortgage loans may be available for distribution only to a specific class of securities or may not be available for distribution to any class of securities. If so specified in the accompanying prospectus supplement, prepayment charges may be retained by the servicer or by sub-servicers as additional servicing compensation.

## Leases and Rents

Mortgages that encumber income-producing property often contain an assignment of rents and leases and/or may be accompanied by a separate assignment of rents and leases, pursuant to which the borrower assigns to the lender the borrower's right, title and interest as landlord under each lease and the income derived therefrom, and, unless rents are to be paid directly to the lender, retains a revocable license to collect the rents for so long as there is no default. If the borrower defaults, the license terminates and the lender is entitled to collect the rents. Local law may require that the lender take possession of the property and/or obtain a court-appointed receiver before becoming entitled to collect the rents. In addition, if bankruptcy or similar proceedings are commenced by or against the borrower, the lender's ability to collect the rents may be adversely affected. In the event of borrower default, the amount of rent the lender is able to collect from the tenants can significantly affect the value of the lender's security interest.

## Subordinate Financing

When the mortgagor encumbers mortgaged property with one or more junior liens, the senior lender is subjected to additional risk. First, the mortgagor may have difficulty repaying multiple loans. In addition, if the junior loan permits recourse to the mortgagor, as junior loans often do, and the senior loan does not, a mortgagor may be more likely to repay sums due on the junior loan than those on the senior loan. Second, acts of the senior lender that prejudice the junior lender or impair the junior lender's security may create a superior equity in favor of the junior lender. For example, if the mortgagor and the senior lender agree to an increase in the principal amount of or the interest rate payable on the senior loan, the senior lender may

lose its priority to the extent an existing junior lender is harmed or the mortgagor is additionally burdened. Third, if the mortgagor defaults on the senior loan or any junior loan, or both, the existence of junior loans and actions taken by junior lenders may impair the security available to the senior lender and may interfere with or delay the taking of action by the senior lender. Moreover, the bankruptcy of a junior lender may operate to stay foreclosure or similar proceedings by the senior lender.

## Applicability of Usury Laws

Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980 provides that state usury limitations shall not apply to certain types of residential first mortgage loans originated by certain lenders after March 31, 1980. A similar federal statute was in effect with respect to mortgage loans made during the first three months of 1980. The statute authorized any state to reimpose interest rate limits by adopting before April 1, 1983 a law or constitutional provision that expressly rejects application of the federal law. In addition, even where Title V is not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on mortgage loans covered by Title V. Several states have taken action to reimpose interest rate limits or to limit discount points or other charges.

Title V also provides that state usury limitations do not apply to any loan that is secured by a first lien on specific kinds of manufactured housing if certain conditions are met, including the terms of any prepayments, late charges and deferral fees and requiring a 30-day notice period prior to instituting any action leading to repossession of or foreclosure with respect to the related unit. Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting before April 1, 1983 a law or constitutional provision which expressly rejects application of the federal law. Fifteen states adopted such a law prior to the April 1, 1983 deadline. In addition, even where Title V was not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on loans covered by Title V.

The depositor or the mortgage loan seller or originator will be required to represent and warrant to the trust that all mortgage loans have been originated in compliance with applicable state laws, including usury laws.

## Alternative Mortgage Instruments

ARM Loans and home equity revolving credit loans originated by nonfederally chartered lenders have historically been subject to a variety of restrictions. These restrictions differed from state to state, resulting in difficulties in determining whether a particular alternative mortgage instrument originated by a state-chartered lender complied with applicable law. These difficulties were simplified substantially as a result of the enactment of Title VIII of the Garn-St. Germain Act. Title VIII provides that, notwithstanding any state law to the contrary:

- state-chartered banks may originate alternative mortgage instruments, including ARM Loans, in accordance with regulations promulgated by the Comptroller of the Currency with respect to origination of alternative mortgage instruments by national banks,

- state-chartered credit unions may originate alternative mortgage instruments in accordance with regulations promulgated by the National Credit Union Administration with respect to origination of alternative mortgage instruments by federal credit unions, and

- all other nonfederally chartered housing creditors, including, without limitation, state-chartered savings and loan associations, savings banks and mutual savings banks and mortgage banking companies, may originate alternative mortgage instruments in accordance with the regulations promulgated by the Federal Home Loan Bank Board, predecessor to the Office of Thrift Supervision, with respect to origination of alternative mortgage instruments by federal savings and loan associations.

Title VIII further provides that any state may reject applicability of the provisions of Title VIII by adopting prior to October 15, 1985 a law or constitutional provision expressly rejecting the applicability of these provisions. Several states have taken this type of action.

All of the ARM Loans and home equity revolving credit loans held by a trust that were originated by a state-chartered lender after the enactment of a state law or constitutional provision rejecting the applicability of Title VIII will have complied with applicable state law. All of the ARM Loans and home equity revolving credit loans held by a trust that were originated by federally chartered lenders or that were originated by state-chartered lenders prior to enactment of a state law or constitutional provision rejecting the applicability of Title VIII will have been originated in compliance with all applicable federal regulations.

**Servicemembers Civil Relief Act**

Under the terms of the Servicemembers Civil Relief Act, as amended (the "Relief Act"), a borrower who enters military service after the origination of that borrower's mortgage loan, including a borrower who was in reserve status and is called to active duty after origination of the mortgage loan, may not be charged interest, including fees and charges, in excess of a rate of interest, currently 6% per annum, during the period of that borrower's active duty status. In addition to adjusting the interest, the lender must forgive any such interest in excess of that rate, unless a court or administrative agency of the United States or of any State orders otherwise upon application of the lender. The Relief Act applies to borrowers who are members of the Army, Navy, Air Force, Marines, National Guard, Reserves and Coast Guard, and officers of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration assigned to duty with the military. Because the Relief Act applies to borrowers who enter military service, including reservists who are called to active duty, after origination of the related mortgage loan, no information can be provided as to the number of mortgage loans that may be affected by the Relief Act. Application of the Relief Act may adversely affect, for an indeterminate period of time, the ability of the servicer to collect full amounts of interest on the applicable mortgage loans. Any shortfalls in interest collections resulting from the application of the Relief Act would result in a reduction of the amounts distributable to the holders of the related series of securities, unless covered by a form of credit support as described in the related prospectus supplement. In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on or an enforce rights with respect to an affected mortgage loan, during the borrower's period of active duty status and, sometimes, during an additional three month period thereafter. Thus, if the Relief Act applies to any mortgage loan that goes into default, there may be delays in payment and losses incurred by the related securityholders.

**Environmental Legislation**

Under the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), and under several state laws, a secured party that takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property may become liable for the costs of cleaning up hazardous substances regardless of whether they have contaminated the property. CERCLA imposes strict as well as joint and several liability on several classes of potentially responsible parties, including current owners and operators of the property who did not cause or contribute to the contamination. Furthermore, liability under CERCLA is not limited to the original or unamortized principal balance of a loan or to the value of the property securing a loan. Lenders may be held liable under CERCLA as owners or operators unless they qualify for the secured creditor exemption to CERCLA. This exemption exempts from the definition of owners and operators those who, without participating in the management of a facility, hold indicia of ownership primarily to protect a security interest in the facility. What constitutes sufficient participation in the management of a property securing a loan or the business of a borrower to render the exemption unavailable to a lender has been a matter of interpretation by the courts. CERCLA has been interpreted to impose liability on a secured party even absent foreclosure where the party participated in the financial management of the borrower's business to a degree indicating a capacity to influence waste disposal decisions. However, court interpretations of the secured creditor exemption have been inconsistent. In addition, when lenders foreclose and become owners of collateral property, courts are inconsistent as to whether that ownership renders the secured creditor exemption unavailable. Other federal and state laws may impose liability on a secured party that takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property on which contaminants other than CERCLA hazardous substances are present, including petroleum, agricultural chemicals, hazardous wastes, asbestos, radon and lead-based paint. Environmental cleanup costs

may be substantial. It is possible that the cleanup costs could become a liability of a trust and reduce the amounts otherwise distributable to the holders of the related series of securities. Moreover, there are federal statutes and state statutes that impose an environmental lien for any cleanup costs incurred by the state on the property that is the subject of the cleanup costs. All subsequent liens on a property generally are subordinated to an environmental lien and in some states even prior recorded liens are subordinated to environmental liens. In the latter states, the security interest of the trust in a related parcel of real property that is subject to an environmental lien could be adversely affected.

Traditionally, many residential mortgage lenders have not taken steps to evaluate whether contaminants are present with respect to any mortgaged property prior to the origination of the mortgage loan. These kinds of evaluations will not have been made prior to the origination of the residential mortgage loans held by any trust. No party will make any representations or warranties with respect to the absence or effect of contaminants on any mortgaged property or any casualty resulting from the presence of contaminants. See "Description of the Securities—Procedures for Realization Upon Defaulted Mortgage Assets" for a description of limitations on the servicer's power to foreclose on or otherwise acquire title to mortgaged properties that may be contaminated by hazardous substances. A failure to foreclose may reduce amounts otherwise available for distribution to securityholders.

### Forfeitures in Drug and RICO Proceedings

Federal law provides that property owned by persons convicted of drug-related crimes or of criminal violations of the Racketeer Influenced and Corrupt Organizations statute ("RICO") may be seized by the government if the property was used in or purchased with the proceeds of these crimes. Under procedures contained in the Comprehensive Crime Control Act of 1984, the government may seize the property even before conviction. The government must publish notice of the forfeiture proceeding and may give notice to all parties "known to have an alleged interest in the property," including the holders of mortgage loans.

A lender may avoid forfeiture of its interest in the property if it establishes that: (1) its mortgage was executed and recorded before commission of the crime upon which the forfeiture is based or (2) the lender was at the time of execution of the mortgage "reasonably without cause to believe" that the property was used in or purchased with the proceeds of illegal drug or RICO activities.

### Negative Amortization Loans

A case decided by the United States Court of Appeals for the First Circuit held that state restrictions on the compounding of interest are not preempted by the provisions of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMC") and, as a result, a mortgage loan that provided for negative amortization violated New Hampshire's requirement that first mortgage loans provide for computation of interest on a simple interest basis. The holding was limited to the effect of DIDMC on state laws regarding the compounding of interest and the court did not address the applicability of the Alternative Mortgage Transaction Parity Act of 1982, which authorizes a lender to make residential mortgage loans that provide for negative amortization. The First Circuit's decision is binding authority only on Federal District Courts in Maine, New Hampshire, Massachusetts, Rhode Island and Puerto Rico.

## MATERIAL FEDERAL INCOME TAX CONSEQUENCES

### General

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the securities offered under this prospectus and the prospectus supplement. This discussion is for securityholders that hold the securities as capital assets within the meaning of Section 1221 of the Code and does not purport to discuss all federal income tax consequences that may be applicable to particular individual circumstances, including those of banks, insurance companies, foreign investors, tax-exempt organizations, dealers in securities or currencies, mutual funds, real estate investment trusts, natural person, cash method taxpayers, S corporations, estates and trusts, securityholders that hold the securities as part of a hedge, straddle, integrated or conversion transaction, or securityholders whose functional currency is not the United States dollar. Also, it does not address

alternative minimum tax consequences or the indirect effects on the holders of equity interests in a securityholder.

The following discussion addresses securities of four general types:

- REMIC Certificates representing interests in a trust, or assets held by a trust, as to which a REMIC election under the REMIC Provisions of the Code is in effect,

- Notes representing indebtedness of an owner trust for federal income tax purposes,

- Grantor Trust Certificates representing interests in a Grantor Trust as to which no REMIC election will be made, and

- Partnership Certificates representing interests in a Partnership Trust which is treated as a partnership for federal income tax purposes.

The prospectus supplement for each series of certificates will indicate whether one or more REMIC elections will be made for the related trust and will identify all regular interests and residual interests in the REMIC or REMICs. For purposes of this tax discussion, references to a securityholder or a holder are to the beneficial owner of a security.

The following discussion is based in part upon the OID Regulations and in part upon the REMIC Regulations. The OID Regulations do not adequately address issues relevant to the offered securities. As described at "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount," in some instances the OID Regulations provide that they are not applicable to securities like the offered securities.

The authorities on which this discussion and the opinions referred to below are based are subject to change or differing interpretations which could apply retroactively. An opinion of counsel is not binding on the IRS or the courts, and no rulings have been or will be sought from the IRS with respect to any of the federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Taxpayers and preparers of tax returns, including those filed by any REMIC or other issuer, should be aware that under applicable Treasury regulations a provider of advice on specific issues of law is not considered an income tax return preparer unless the advice (1) is given with respect to events that have occurred at the time the advice is rendered and is not given with respect to the consequences of contemplated actions, and (2) is directly relevant to the determination of an entry on a tax return. Treasury regulations require, among other things, that, in order for a taxpayer's reliance on an opinion of counsel to meet the requirements for exculpation from certain accuracy related penalties, the opinion must "take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction"; consequently, this summary and the opinions contained herein may not be sufficient to avoid income tax penalties that may be imposed with respect to the offered securities. Accordingly, it is suggested that taxpayers consult their own tax advisors and tax return preparers regarding the preparation of any item on a tax return and the application of United States federal income tax laws, as well as the laws of any state, local or foreign taxing jurisdictions, to their particular situations, even where the anticipated tax treatment has been discussed in this prospectus. See "State and Other Tax Consequences."

**Opinions**

On or prior to the date of the related prospectus supplement with respect to the issuance of each series of REMIC Certificates, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as counsel to the depositor, will provide an opinion generally to the effect that, assuming (i) compliance with all provisions of the related pooling and servicing agreement, (ii) certain representations set forth in the related pooling and servicing agreement are true, (iii) there is continued compliance with applicable provisions of the Code, as it may be amended from time to time, and applicable Treasury regulations issued thereunder and (iv) a REMIC election is made timely in the required form, for federal income tax purposes, the related trust, or each applicable asset held by the related trust, will qualify as a REMIC and the offered REMIC Certificates will be considered to evidence ownership of REMIC regular interests or REMIC residual interests in that REMIC within the meaning of the REMIC Provisions.

On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of notes, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as counsel to the depositor, will provide an opinion generally to the effect that, assuming compliance with all provisions of the indenture, owner trust agreement and other related documents, for federal income tax purposes (1) the notes will be treated as indebtedness and (2) the issuer, as created under the owner

trust agreement, will not be characterized as an association or publicly traded partnership within the meaning of Section 7704 of the Code taxable as a corporation or as a taxable mortgage pool within the meaning of Section 7701(i) of the Code.

On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of Grantor Trust Certificates, counsel to the depositor will provide its opinion that, assuming compliance with all provisions of the related pooling and servicing agreement, the related Grantor Trust will be classified as a grantor trust under subpart E, part I of subchapter J of Chapter 1 of the Code and not as a partnership or an association taxable as a corporation.

With respect to each series of Partnership Certificates, counsel to the depositor will provide its opinion that the trust will not be a taxable mortgage pool or an association, or publicly traded partnership, taxable as a corporation for federal income tax purposes. This opinion will be based on the assumption that the terms of the related pooling and servicing agreement and related documents will be complied with, and on counsel's conclusions that the nature of the income of the trust will exempt it from the rule that certain publicly traded partnerships are taxable as corporations.

In addition, as to any securities offered pursuant hereto, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as applicable, are of the opinion that the statements made in the following discussion, as supplemented by the discussion under the heading "Material Federal Income Tax Consequences", if any, in the prospectus supplement accompanying this prospectus with respect to those securities, to the extent that they constitute matters of law or legal conclusions, are correct in all material respects as of the date of such prospectus supplement.

Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP and Heller Ehrman LLP have not been asked to opine on any other federal income tax matter, and the balance of this summary does not purport to set forth any opinion of counsel concerning any other particular federal income tax matter. For example, the discussion under "—Taxation of Owners of REMIC Residual Certificates—Excess Inclusions" below is a general summary of federal income tax consequences relating to an investment in a REMIC residual interests that has "excess inclusion income," which summary counsel opines is correct in all material respects as described above; however, that summary does not set forth any opinion as to whether any particular class of REMIC residual interests will be treated as having excess inclusion income.

Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP and Heller Ehrman LLP have not been asked to, and do not, render any opinion regarding the state or local income tax consequences of the purchase, ownership and disposition of a beneficial interest in the notes. See "—State and Other Tax Consequences."

## REMICs

*Classification of REMICs*. On or prior to the date of the related prospectus supplement with respect to the issuance of each series of REMIC Certificates, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as counsel to the depositor, will provide an opinion generally to the effect that, assuming (i) compliance with all provisions of the related pooling and servicing agreement, (ii) certain representations set forth in the related pooling and servicing agreement are true, (iii) there is continued compliance with applicable provisions of the Code, as it may be amended from time to time, and applicable Treasury regulations issued thereunder and (iv) a REMIC election is made timely in the required form, for federal income tax purposes, the related trust, or each applicable assets held by the related trust, will qualify as a REMIC and the offered REMIC Certificates will be considered to evidence ownership of REMIC regular interests or REMIC residual interests in that REMIC within the meaning of the REMIC Provisions.

If an entity electing to be treated as a REMIC fails to comply with one or more of the ongoing requirements of the Code for status as a REMIC during any taxable year, the Code provides that the entity will not be treated as a REMIC for that year or for later years. In that event, the entity may be taxable as a corporation under Treasury regulations, and the related REMIC Certificates may not be accorded the status or given the tax treatment described under "—Taxation of Owners of REMIC Regular Certificates" and "—Taxation of Owners of REMIC Residual Certificates." The Treasury Department is authorized to issue regulations providing relief in the event of an inadvertent termination of REMIC status, although these regulations have not been issued. If these regulations are issued, relief in the event of an inadvertent

termination may be accompanied by sanctions, which may include the imposition of a corporate tax on all or a portion of the REMIC's income for the period in which the requirements for status as a REMIC are not satisfied. The pooling and servicing agreement with respect to each REMIC will include provisions designed to maintain the trust's status as a REMIC under the REMIC Provisions. It is not anticipated that the status of any trust as a REMIC will be inadvertently terminated.

*Characterization of Investments in REMIC Certificates.* In general, the REMIC Certificates will not treated for federal income tax purposes as ownership interests in the assets held by the related trust. However, except as provided in the following sentence, the REMIC Certificates will be real estate assets within the meaning of Section 856(c)(5)(B) of the Code and assets described in Section 7701(a)(19)(C) of the Code in the same proportion that the assets of the REMIC underlying the REMIC Certificates would be so treated. If 95% or more of the assets of the REMIC qualify for either of the treatments described in the previous sentence at all times during a calendar year, the REMIC Certificates will qualify for the corresponding status in their entirety for that calendar year. Interest, including original issue discount, on the REMIC Regular Certificates and income allocated to the class of REMIC Residual Certificates will be interest described in Section 856(c)(3)(B) of the Code to the extent the certificates are treated as real estate assets within the meaning of Section 856(c)(5)(B) of the Code. In addition, the REMIC Regular Certificates will be qualified mortgages within the meaning of Section 860G(a)(3) of the Code if transferred to another REMIC on its startup day in exchange for regular or residual interests in that REMIC. The determination as to the percentage of the REMIC's assets that constitute assets described in these sections of the Code will be made for each calendar quarter based on the average adjusted basis of each category of the assets held by the REMIC during the calendar quarter. The trustee will report those determinations to certificateholders in the manner and at the times required by Treasury regulations.

Amendments made to the REMIC Provisions by the American Jobs Creation Act of 2004, or the Jobs Act, allow, effective January 1, 2005, REMICs to hold reverse mortgage loans, home equity lines of credit loans and sufficient assets to fund draws on the foregoing mortgage loans. Under the legislative history to the Jobs Act, a "reverse mortgage loan" is a loan that is secured by an interest in real property, and that (1) provides for advances that are secured by the same property, (2) requires the payment of an amount due at maturity that is no greater than the value of the securing property, (3) provides that all payments are due only on maturity of the loan, and (4) matures after a fixed term or at the time the obligor ceases to use the securing property as a personal residence. If reverse mortgage loans or home equity line of credit loans are contributed to a REMIC, the accompanying tax consequences will be described separately in the related prospectus supplement offering interests in that REMIC.

The assets of the REMIC will include mortgage loans, payments on mortgage loans held prior to the distribution of these payments to the REMIC Certificateholders and property acquired by foreclosure held prior to the sale of such property, and may include amounts in reserve accounts. It is unclear whether property acquired by foreclosure and amounts in reserve accounts would be considered to be part of the mortgage loans, or whether these assets otherwise would receive the same treatment as the mortgage loans for purposes of all of the Code sections discussed in the immediately preceding paragraph. The REMIC Regulations do provide, however, that cash received from payments on mortgage loans held pending distribution is considered part of the mortgage loans for purposes of Section 856(c)(5)(B) of the Code. Furthermore, foreclosure property will qualify as real estate assets under Section 856(c)(5)(B) of the Code. In addition, in some instances mortgage loans may not be treated entirely as assets described in such Code sections. The related prospectus supplement will describe the mortgage loans that may not be treated entirely as assets described in the sections of the Code discussed in the immediately preceding paragraph.

*Tiered REMIC Structures.* For some series of REMIC Certificates, two or more separate elections may be made to treat designated assets held by the related trust as REMICs for federal income tax purposes, creating a tiered REMIC structure. As to each series of REMIC Certificates that involves a tiered REMIC structure, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as counsel to the depositor, will provide an opinion generally to the effect that (i) assuming compliance with all provisions of the related pooling and servicing agreement, (ii) certain representations set forth in the related pooling and servicing agreement are true, (iii) there is continued compliance with applicable provisions of the Code, as it may be amended from time to time, and applicable Treasury regulations issued thereunder and (iv) REMIC elections are made timely in the required forms, each of the REMICs in that series will qualify as a REMIC and the REMIC Certificates issued by these REMICs will be considered to evidence ownership of REMIC regular interests or REMIC residual interests in the related REMIC within the meaning of the REMIC Provisions.

Solely for purposes of determining whether the REMIC Certificates will be real estate assets within the meaning of Section 856(c)(5)(B) of the Code, and loans secured by an interest in real property under Section 7701(a)(19)(C) of the Code, and whether the income on the certificates is interest described in Section 856(c)(3)(B) of the Code, all of the REMICs in that series will be treated as one REMIC.

### Taxation of Owners of REMIC Regular Certificates

*General*. Except as described in "—Taxation of Owners of REMIC Residual Certificates—Possible Pass-Through of Miscellaneous Itemized Deductions," REMIC Regular Certificates will be treated for federal income tax purposes as debt instruments issued by the REMIC and not as ownership interests in the REMIC or its assets. In general, interest, original issue discount and market discount paid or accrued on a REMIC Regular Certificate will be treated as ordinary income to the holder of such REMIC Regular Certificate. Distributions in reduction of the stated redemption price at maturity of the REMIC Regular Certificate will be treated as a return of capital to the extent of such holder's basis in such REMIC Regular Certificate. Holders of REMIC Regular Certificates that ordinarily report income under a cash method of accounting will be required to report income with respect to REMIC Regular Certificates under an accrual method.

*Original Issue Discount*. A REMIC Regular Certificate may be issued with original issue discount within the meaning of Section 1273(a) of the Code. Any holder of a REMIC Regular Certificate issued with original issue discount in excess of a de minimis amount will be required to include original issue discount in income as it accrues in advance of the receipt of the cash attributable to that income, in accordance with a constant yield method described below. Section 1272(a)(6) of the Code provides special original issue discount rules applicable to REMIC Regular Certificates. Regulations have not yet been proposed or adopted under Section 1272(a)(6) of the Code. Further, application of the OID Regulations to the REMIC Regular Certificates remains unclear in some respects because the OID Regulations generally purport not to apply to instruments to which Section 1272(a)(6) applies such as REMIC Regular Certificates, and separately because they either do not address, or are subject to varying interpretations with regard to, several relevant issues.

The Code requires that a reasonable Prepayment Assumption be used for mortgage loans held by a REMIC in computing the accrual of original issue discount on REMIC Regular Certificates issued by that REMIC and for certain other federal income tax purposes, and that adjustments be made in the amount and rate of accrual of that discount to reflect differences between the actual prepayment rate and the Prepayment Assumption. The Prepayment Assumption is to be determined in a manner prescribed in Treasury regulations. To date, those regulations have not been issued. The Congressional committee reports accompanying the enactment of Section 1272(a)(6) of the Code indicate that the regulations will provide that the Prepayment Assumption used for a REMIC Regular Certificate must be the same as that used in pricing the initial offering of the REMIC Regular Certificate. The Prepayment Assumption used in reporting original issue discount for each series of REMIC Regular Certificates will be consistent with this standard and will be disclosed in the related prospectus supplement. However, none of the depositor, the servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or at any other rate. Each prospective investor must make its own decision as to the appropriate prepayment assumption to be used in deciding whether or not to purchase any REMIC Regular Certificate.

The original issue discount, if any, on a REMIC Regular Certificate will be the excess of its stated redemption price at maturity over its issue price. The issue price of a particular class of REMIC Regular Certificates will be the first cash price at which a substantial amount of REMIC Regular Certificates of that class is sold, excluding sales to bond houses, brokers and underwriters. If less than a substantial amount of a class of REMIC Regular Certificates is sold for cash on or prior to the Closing Date, the issue price for that class that will be used in making reports to investors and the IRS will be the fair market value of that class on the Closing Date. Under the OID Regulations, the stated redemption price of a REMIC Regular Certificate is equal to the total of all payments to be made on the certificate other than qualified stated interest. Under the OID Regulations, "qualified stated interest" is interest that is unconditionally payable at least annually during the entire term of the certificate at either (i) a single fixed rate that appropriately takes into account the length of the interval between payments or (ii) the current values of a single

99

"qualified floating rate" or "objective rate" (each, a "Single Variable Rate"). A "current value" is the value of a variable rate on any day that is no earlier than three months prior to the first day on which that value is in effect and no later than one year following that day. A "qualified floating rate" is a rate whose variations can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds in the currency in which the certificate is denominated. Such a rate remains qualified even though it is multiplied by a fixed, positive multiple not exceeding 1.35, increased or decreased by a fixed rate, or both. Certain combinations of rates constitute a single qualified floating rate, including (i) interest stated at a fixed rate for an initial period of less than one year followed by a qualified floating rate if the value of the floating rate at the Closing Date is intended to approximate the fixed rate, and (ii) two or more qualified floating rates that can be expected to have approximately the same values throughout the term of the certificate. A combination of such rates is conclusively presumed to be a single floating rate if the values of all rates on the Closing Date are within 0.25% of each other. A variable rate that is subject to an interest rate cap, floor, "governor" or similar restriction on rate adjustment may be a qualified floating rate only if such restriction is fixed throughout the term of the instrument, or is not reasonably expected as of the Closing Date to cause the yield on the debt instrument to differ significantly from the expected yield absent the restriction. An "objective rate" is a rate (other than a qualified floating rate) determined using a single formula fixed for the life of the certificate, which is based on (i) one or more qualified floating rates (including a multiple or inverse of a qualified floating rate), (ii) one or more rates each of which would be a qualified floating rate for a debt instrument denominated in a foreign currency, (iii) the yield or changes in price of one or more items of "actively traded" personal property, (iv) a combination of rates described in (i), (ii) and (iii), or (v) a rate designated by the IRS. However, a variable rate is not an objective rate if it is reasonably expected that the average value of the rate during the first half of the certificate's term will differ significantly from the average value of such rate during the final half of its term. A combination of interest stated at a fixed rate for an initial period of less than one year followed by an objective rate is treated as a single objective rate if the value of the objective rate at the Closing Date is intended to approximate the fixed rate; such a combination of rates is conclusively presumed to be a single objective rate if the objective rate on the Closing Date does not differ from the fixed rate by more than 0.25%. The qualified stated interest payable with respect to certain variable rate debt instruments not bearing stated interest at a Single Variable Rate generally is determined under the OID Regulations by converting such instruments into fixed rate debt instruments. Instruments qualifying for such treatment generally include those providing for stated interest at (i) more than one qualified floating rates, or at (ii) a single fixed rate and (a) one or more qualified floating rates or (b) a single "qualified inverse floating rate" (each, a "Multiple Variable Rate"). A qualified inverse floating rate is an objective rate equal to a fixed rate reduced by a qualified floating rate, the variations in which can reasonably be expected to inversely reflect contemporaneous variations in the cost of newly borrowed funds (disregarding permissible rate caps, floors, governors and similar restrictions such as are described above). Under these rules, some of the payments of interest on a certificate bearing a fixed rate of interest for an initial period followed by a qualified floating rate of interest in subsequent periods could be treated as included in the stated redemption price at maturity if the initial fixed rate were to differ sufficiently from the rate that would have been set using the formula applicable to subsequent periods. See "—Variable Rate Certificates". REMIC Regular Certificates offered hereby other than certificates providing for variable rates of interest or for the accretion of interest are not anticipated to have stated interest other than "qualified stated interest," but if any such REMIC Regular Certificates are so offered, appropriate disclosures will be made in the related prospectus supplement. Some or all of the payments on REMIC Regular Certificates providing for the accretion of interest will be included in the stated redemption price at maturity of such certificates.

In the case of REMIC Regular Certificates bearing adjustable interest rates, the determination of the total amount of original issue discount and the timing of the inclusion thereof will vary according to the characteristics of the REMIC Regular Certificates. In general terms, original issue discount is accrued by treating the interest rate of the securities as fixed and making adjustments to reflect actual interest rate adjustments.

Certain classes of REMIC Regular Certificates may provide for the first interest payment on a REMIC Regular Certificate to be made more than one month after the date of issuance, which is a period longer than the subsequent monthly intervals between interest payments. Assuming the accrual period for original issue discount is each monthly period that ends on the day prior to each distribution date, as a consequence

of this long first accrual period some or all interest payments may be required to be included in the stated redemption price of the REMIC Regular Certificate and accounted for as original issue discount. Because interest on REMIC Regular Certificates must in any event be accounted for under an accrual method, applying this analysis would result in only a slight difference in the timing of the inclusion in income of the yield on the REMIC Regular Certificates.

If the accrued interest to be paid on the first distribution date is computed for a period that begins prior to the Closing Date, a portion of the purchase price paid for a REMIC Regular Certificate will reflect the accrued interest. In these cases, information returns to the certificateholders and the IRS will be based on the position that the portion of the purchase price paid for the interest accrued for periods prior to the Closing Date is part of the overall cost of the REMIC Regular Certificate, and not a separate asset the cost of which is recovered entirely out of interest received on the next distribution date, and that portion of the interest paid on the first distribution date in excess of interest accrued for a number of days corresponding to the number of days from the Closing Date to the first distribution date should be included in the stated redemption price of the REMIC Regular Certificate. However, the OID Regulations state that all or a portion of the accrued interest may be treated as a separate asset the cost of which is recovered entirely out of interest paid on the first distribution date. It is unclear how an election to do so would be made under the OID Regulations and whether this election could be made unilaterally by a certificateholder.

Notwithstanding the general definition of original issue discount, original issue discount on a REMIC Regular Certificate will be considered to be de minimis if it is less than 0.25% of the stated redemption price of the REMIC Regular Certificate multiplied by its weighted average life. For this purpose, the weighted average life of a REMIC Regular Certificate is computed as the sum of the amounts determined, as to each payment included in the stated redemption price of the REMIC Regular Certificate, by multiplying (1) the number of complete years, rounding down for partial years, from the issue date until that payment is expected to be made, presumably taking into account the Prepayment Assumption, by (2) a fraction, the numerator of which is the amount of the payment, and the denominator of which is the stated redemption price at maturity of the REMIC Regular Certificate. Under the OID Regulations, original issue discount of only a de minimis amount, other than de minimis original issue discount attributable to a teaser interest rate or an initial interest holiday, will be included in income as each payment of stated principal is made, based on the product of the total amount of the de minimis original issue discount attributable to that certificate and a fraction, the numerator of which is the amount of the principal payment and the denominator of which is the outstanding stated principal amount of the REMIC Regular Certificate. The OID Regulations also would permit a certificateholder to elect to accrue de minimis original issue discount into income currently based on a constant yield method. See "—Market Discount" for a description of this election under the OID regulations.

If original issue discount on a REMIC Regular Certificate is in excess of a de minimis amount, the holder of the certificate must include in ordinary gross income the sum of the daily portions of original issue discount for each day during its taxable year on which it held the REMIC Regular Certificate, including the purchase date but excluding the disposition date. In the case of an original holder of a REMIC Regular Certificate, the daily portions of original issue discount will be determined as described in the following paragraph.

Generally, an accrual period is a period that ends on the day prior to a distribution date and begins on the first day following the immediately preceding accrual period, except that the first accrual period begins on the Closing Date. The prospectus supplement will disclose any situations where a different accrual period is used. As to each accrual period, a calculation will be made of the portion of the original issue discount that accrued during the accrual period. The portion of original issue discount that accrues in any accrual period will equal the excess of (1) the sum of (a) the present value, as of the end of the accrual period, of all of the distributions remaining to be made on the REMIC Regular Certificate in future periods and (b) the distributions made on the REMIC Regular Certificate during the accrual period of amounts included in the stated redemption price, over (2) the adjusted issue price of the REMIC Regular Certificate at the beginning of the accrual period. The present value of the remaining distributions referred to in the preceding sentence will be calculated assuming that distributions on the REMIC Regular Certificate will be received in future periods based on the mortgage loans being prepaid at a rate equal to the Prepayment Assumption, using a discount rate equal to the original yield to maturity of the certificate and taking into account events, including actual prepayments, that have occurred before the close of the accrual period. For

101

these purposes, the original yield to maturity of the certificate will be calculated based on its issue price and assuming that distributions on the certificate will be made in all accrual periods based on the mortgage loans being prepaid at a rate equal to the Prepayment Assumption. The adjusted issue price of a REMIC Regular Certificate at the beginning of any accrual period will equal the issue price of the certificate, increased by the aggregate amount of original issue discount that accrued with respect to the certificate in prior accrual periods, and reduced by the amount of any distributions made on the certificate in prior accrual periods of amounts included in the stated redemption price. The original issue discount accruing during any accrual period will be allocated ratably to each day during the accrual period to determine the daily portion of original issue discount for that day.

If a REMIC Regular Certificate issued with original issue discount is purchased at a cost, excluding any portion of the cost attributable to accrued qualified stated interest, less than its remaining stated redemption price, the purchaser will also be required to include in gross income the daily portions of any original issue discount for the certificate. However, if the cost of the certificate is in excess of its adjusted issue price, each daily portion will be reduced in proportion to the ratio the excess bears to the aggregate original issue discount remaining to be accrued on the REMIC Regular Certificate. The adjusted issue price of a REMIC Regular Certificate on any given day equals the sum of (1) the adjusted issue price or, in the case of the first accrual period, the issue price, of the certificate at the beginning of the accrual period which includes that day and (2) the daily portions of original issue discount for all days during the accrual period prior to that day.

*Variable Rate Certificates.* Purchasers of REMIC Regular Certificates bearing a variable rate of interest should be aware that there is uncertainty concerning the application of Section 1272(a)(6) of the Code and the OID Regulations to such certificates. In the absence of other authority, the servicer and the trustee intend to be guided by the provisions of the OID Regulations governing variable rate debt instruments in adapting the provisions of Section 1272(a)(6) of the Code to such certificates for the purpose of preparing reports furnished to REMIC Regular Certificateholders. The effect of the application of such provisions generally will be to cause Certificateholders holding REMIC Regular Certificates bearing interest at a Single Variable Rate to take into account for each period an amount corresponding approximately to the sum of (i) the qualified stated interest, accruing on the outstanding face amount of the REMIC Regular Certificate as the stated interest rate for that Certificate varies from time to time and (ii) the amount of original issue discount that would have been attributable to that period on the basis of a constant yield to maturity for a bond issued at the same time and issue price as the REMIC Regular Certificate, having the same face amount and schedule of payments of principal as such Certificate, subject to the same Prepayment Assumption, and bearing interest at a fixed rate equal to the value of the applicable qualified floating rate or qualified inverse floating rate in the case of a certificate providing for either such rate, or equal to the fixed rate that reflects the reasonably expected yield on the certificate in the case of a certificate providing for an objective rate other than an inverse floating rate, in each case as of the issue date. Certificateholders holding REMIC Regular Certificates bearing interest at a Multiple Variable Rate generally will take into account interest and original issue discount under a similar methodology, except that the amounts of qualified stated interest and original issue discount attributable to such a Certificate first will be determined for an equivalent fixed rate debt instrument, the assumed fixed rates for which are (a) for each qualified floating rate, the value of each such rate as of the Closing Date (with appropriate adjustment for any differences in intervals between interest adjustment dates), (b) for a qualified inverse floating rate, the value of the rate as of the Closing Date, (c) for any other objective rate, the fixed rate that reflects the yield that is reasonably expected for the Certificate, and (d) for an actual fixed rate, such hypothetical fixed rate as would result under (a) or (b) if the actual fixed rate were replaced by a hypothetical qualified floating rate or qualified inverse floating rate such that the fair market value of the Certificate as of the issue date would be approximately the same as that of an otherwise identical debt instrument providing for the hypothetical variable rate rather than the actual fixed rate. If the interest paid or accrued with respect to a Multiple Variable Rate Certificate during an accrual period differs from the assumed fixed interest rate, such difference will be an adjustment (to interest or original issue discount, as applicable) to the REMIC Regular Certificateholder's taxable income for the taxable period or periods to which such difference relates. Additionally, purchasers of such Certificates should be aware that the provisions of the OID Regulations applicable to variable rate debt instruments have been limited and may not apply to some REMIC Regular Certificates having variable rates. If such a Certificate is not governed

by the provisions of the OID Regulations applicable to variable rate debt instruments, it may be subject to provisions of proposed Treasury regulations applicable to instruments having contingent payments. The application of those provisions to instruments such as variable rate REMIC Regular Certificates is subject to differing interpretations. Prospective purchasers of variable rate REMIC Regular Certificates are advised to consult their tax advisors concerning the tax treatment of such Certificates.

The IRS issued proposed regulations on August 24, 2004, concerning the accrual of interest income by the holders of REMIC regular interests. The proposed regulations would create a special rule for accruing original issue discount on REMIC regular interests providing for a delay between record and payment dates, such that the period over which original issue discount accrues coincides with the period over which the holder's right to interest payments accrues under the governing contract provisions rather than over the period between distribution dates. If the proposed regulations are adopted in the same form as proposed, taxpayers would be required to accrue interest from the issue date to the first record date, but would not be required to accrue interest after the last record date. The proposed regulations are limited to REMIC regular interests with delayed payment for periods of fewer than 32 days. The proposed regulations are proposed to apply to any REMIC regular interest issued after the date the final regulations are published in the Federal Register. The proposed regulations provide automatic consent for the holder of a REMIC regular interest to change its method of accounting for original issue discount under the final regulations. The change is proposed to be made on a cut-off basis and, thus, does not affect REMIC regular interests issued before the date the final regulations are published in the Federal Register.

The IRS issued a notice of proposed rulemaking on the timing of income and deductions attributable to interest-only regular interests in a REMIC on August 24, 2004. In this notice, the IRS and Treasury requested comments on whether to adopt special rules for taxing regular interests in a REMIC that are entitled only to a specified portion of the interest in respect of one or more mortgage loans held by the REMIC, or REMIC IOs, high-yield REMIC regular interests, and apparent negative-yield instruments. The IRS and Treasury also requested comments on different methods for taxing the foregoing instruments, including the possible recognition of negative amounts of original issue discount, the formulation of special guidelines for the application of Code Section 166 to REMIC IOs and similar instruments, and the adoption of a new alternative method applicable to REMIC IOs and similar instruments. It is uncertain whether the IRS actually will propose any regulations as a consequence of the solicitation of comments and when any resulting new rules would be effective.

*Market Discount.* A certificateholder that purchases a REMIC Regular Certificate at a market discount will recognize gain upon receipt of each distribution representing stated redemption price. A REMIC Regular Certificate issued without original issue discount will have market discount if purchased for less than its remaining stated principal amount and a REMIC Regular Certificate issued with original issue discount will have market discount if purchased for less than its adjusted issue price. Under Section 1276 of the Code, a certificateholder that purchases a REMIC Regular Certificate at a market discount in excess of a de minimis amount will be required to allocate the portion of each distribution representing stated redemption price first to accrued market discount not previously included in income, and to recognize ordinary income to that extent. A certificateholder may elect to include market discount in income currently as it accrues rather than including it on a deferred basis. If made, the election will apply to all market discount bonds acquired by the certificateholder on or after the first day of the first taxable year to which the election applies. In addition, the OID Regulations permit a certificateholder to elect to accrue all interest and discount in income as interest, and to amortize premium, based on a constant yield method. If such an election were made with respect to a REMIC Regular Certificate with market discount, the certificateholder would be deemed to have made an election to include currently market discount in income with respect to all other debt instruments having market discount that the certificateholder acquires during the taxable year of the election or later taxable years, and possibly previously acquired instruments. Similarly, a certificateholder that made this election for a certificate that is acquired at a premium would be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that the certificateholder owns or acquires. Each of these elections to accrue interest, discount and premium with respect to a certificate on a constant yield method or as interest would be irrevocable, except with the approval of the IRS. See "—Premium" below.

However, market discount with respect to a REMIC Regular Certificate will be considered to be de minimis for purposes of Section 1276 of the Code if the market discount is less than 0.25% of the

remaining stated redemption price of the REMIC Regular Certificate multiplied by the number of complete years to maturity remaining after the date of its purchase. In interpreting a similar rule with respect to original issue discount on obligations payable in installments, the OID Regulations refer to the weighted average maturity of obligations, and it is likely that the same rule will be applied with respect to market discount, presumably taking into account the Prepayment Assumption. If market discount is treated as de minimis under this rule, it appears that the actual discount would be treated in a manner similar to original issue discount of a de minimis amount. This treatment would result in discount being included in income at a slower rate than discount would be required to be included in income using the method described above. See "—Original Issue Discount" above.

Section 1276(b)(3) of the Code specifically authorizes the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, the principal of which is payable in more than one installment. Until regulations are issued by the Treasury Department, the rules described in the Congressional committee reports accompanying the enactment of Section 1276(b)(3) of the Code apply. Those committee reports indicate that in each accrual period market disc ount on REMIC Regular Certificates should accrue, at the certificateholder's option:

(1) on the basis of a constant yield method,

(2) in the case of a REMIC Regular Certificate issued without original issue discount, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total amount of stated interest remaining to be paid on the REMIC Regular Certificate as of the beginning of the accrual period, or

(3) in the case of a REMIC Regular Certificate issued with original issue discount, in an amount that bears the same ratio to the total remaining market discount as the original issue discount accrued in the accrual period bears to the total original issue discount remaining on the REMIC Regular Certificate at the beginning of the accrual period.

Moreover, the Prepayment Assumption used in calculating the accrual of original issue discount is also used in calculating the accrual of market discount. Because the regulations referred to in this paragraph have not been issued, it is not possible to predict what effect these regulations might have on the tax treatment of a REMIC Regular Certificate purchased at a discount in the secondary market.

To the extent that REMIC Regular Certificates provide for monthly or other periodic distributions throughout their term, the effect of these rules may be to require market discount to be includible in income at a rate that is not significantly slower than the rate at which the discount would accrue if it were original issue discount. Moreover, in any event a holder of a REMIC Regular Certificate generally will be required to treat a portion of any gain on the sale or exchange of the certificate as ordinary income to the extent of the market discount accrued to the date of disposition under one of these methods, less any accrued market discount previously reported as ordinary income.

Further, under Section 1277 of the Code a holder of a REMIC Regular Certificate may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry a REMIC Regular Certificate purchased with market discount. For these purposes, the de minimis rule applies. Any such deferred interest expense would not exceed the market discount that accrues during the taxable year and is, in general, allowed as a deduction not later than the year in which the market discount is includible in income. If a holder elects to include market discount in income currently as it accrues on all market discount instruments acquired by the holder in that taxable year or later taxable years, the interest deferral rule will not apply.

*Premium.* A REMIC Regular Certificate purchased at a cost, excluding any portion of the cost attributable to accrued qualified stated interest, greater than its remaining stated redemption price will be considered to be purchased at a premium. The holder of a REMIC Regular Certificate may elect under Section 171 of the Code to amortize the premium under a constant yield method over the life of the certificate. If made, the election will apply to all debt instruments having amortizable bond premium that the holder owns or subsequently acquires. Amortizable premium will be treated as an offset to interest income on the related debt instrument, rather than as a separate interest deduction. The OID Regulations also permit certificateholders to elect to include all interest, discount and premium in income based on a constant yield method, further treating the certificateholder as having made the election to amortize

premium generally. The Congressional committee reports accompanying the enactment of Section 1276(b)(3) of the Code state that the same rules that apply to accrual of market discount, which rules will require use of a Prepayment Assumption in accruing market discount with respect to REMIC Regular Certificates without regard to whether the certificates have original issue discount, will also apply in amortizing bond premium under Section 171 of the Code. The IRS indicated that it may require that a prepayment assumption of zero be used in accruing premium on REMIC regular interests. Prospective purchasers are encouraged to consult their own tax advisors on this issue. See "—Market Discount" above.

*Realized Losses.* Under Section 166 of the Code, both corporate holders of the REMIC Regular Certificates and noncorporate holders of the REMIC Regular Certificates that acquire the certificates in connection with a trade or business should be allowed to deduct, as ordinary losses, any losses sustained during a taxable year in which their certificates become wholly or partially worthless as the result of one or more realized losses on the mortgage loans. However, it appears that a noncorporate holder that does not acquire a REMIC Regular Certificate in connection with a trade or business will not be entitled to deduct a loss under Section 166 of the Code until the holder's certificate becomes wholly worthless, i.e., until its outstanding principal balance has been reduced to zero, and that the loss will be characterized as a short-term capital loss.

Each holder of a REMIC Regular Certificate will be required to accrue interest and original issue discount with respect to the certificate, without giving effect to any reduction in distributions attributable to defaults or delinquencies on the mortgage loans or other assets underlying the REMIC Certificates, until it can be established that the reduction ultimately will not be recoverable. As a result, the amount of taxable income reported in any period by the holder of a REMIC Regular Certificate could exceed the amount of economic income actually realized by that holder in the period. Although the holder of a REMIC Regular Certificate eventually will recognize a loss or reduction in income attributable to previously accrued and included income that as the result of a realized loss ultimately will not be realized, the law is unclear with respect to the timing and character of this loss or reduction in income.

## Taxation of Owners of REMIC Residual Certificates

*General.* Although a REMIC is a separate entity for federal income tax purposes, a REMIC is not subject to entity-level taxation, except with regard to prohibited transactions and some other transactions. Rather, the taxable income or net loss of a REMIC is generally taken into account by the holder of the REMIC Residual Certificates. Accordingly, the REMIC Residual Certificates will be subject to tax rules that differ significantly from those that would apply if the REMIC Residual Certificates were treated for federal income tax purposes as direct ownership interests in the mortgage loans or as debt instruments issued by the REMIC. See "—Matters Relevant to Holders of All REMIC Certificates—Prohibited Transactions and Other Possible REMIC Taxes" below.

A holder of a REMIC Residual Certificate generally will be required to report its daily portion of the taxable income or, subject to the limitations noted in this discussion, the net loss of the REMIC for each day during a calendar quarter that the holder owned the REMIC Residual Certificate. For this purpose, the taxable income or net loss of the REMIC usually will be allocated to each day in the calendar quarter ratably using a 30 days per month/90 days per quarter/360 days per year convention. Any expected use of a different convention will be disclosed in the related prospectus supplement. The daily amounts so allocated will then be allocated among the REMIC Residual Certificateholders in proportion to their respective ownership interests on that day. Any amount included in the gross income or allowed as a loss of any REMIC Residual Certificateholder by virtue of this allocation will be treated as ordinary income or loss. The taxable income of the REMIC will be determined under the rules described below in "—Taxable Income of the REMIC" and will be taxable to the REMIC Residual Certificateholders without regard to the timing or amount of cash distributions by the REMIC. Ordinary income derived from REMIC Residual Certificates will be portfolio income for purposes of the taxation of taxpayers subject to limitations under Section 469 of the Code on the deductibility of passive losses.

A holder of a REMIC Residual Certificate that purchased the certificate from a prior holder of that certificate also will be required to report on its federal income tax return amounts representing its daily share of the taxable income, or net loss, of the REMIC for each day that it holds the REMIC Residual Certificate. Those daily amounts generally will equal the amounts of taxable income or net loss determined

105

as described above. The Congressional committee reports accompanying enactment of the REMIC Provisions indicate that some modifications of the general rules may be necessary to reduce, or increase, the income of a REMIC Residual Certificateholder that purchased the REMIC Residual Certificate from a prior holder of the certificate at a price greater than, or less than, the adjusted basis, the REMIC Residual Certificate would have had in the hands of an original holder of the certificate. The REMIC Regulations, however, do not provide for any such modifications.

Any payments received by a holder of a REMIC Residual Certificate in connection with the acquisition of such REMIC Residual Certificate will be taken into account in determining the income of such holder for federal income tax purposes. On May 11, 2004, the IRS issued regulations, effective for taxable years ending on or after May 11, 2004, that require "inducement fees" received by a transferee of a noneconomic REMIC residual interest to be included in income over time according to an amortization schedule that reasonably reflects the costs and benefits of holding the REMIC residual interest over its expected life. The regulations also provide two more specific methods that are accepted as meeting the general test set forth above for determining the timing and amount of income inclusion. One generally follows the method of inclusion used by the taxpayer for GAAP purposes, but not over a period shorter than the period over which the REMIC is expected to generate income. The other calls for ratable inclusion over the remaining anticipated weighted average life of the REMIC as of the time the REMIC residual interest is transferred to the taxpayer. Holders of REMIC Residual Certificates are encouraged to consult their tax advisors concerning the treatment of such payments for income tax purposes and the effect of these regulations.

The amount of income REMIC Residual Certificateholders will be required to report, or the tax liability associated with the income, may exceed the amount of cash distributions received from the REMIC for the corresponding period. Consequently, REMIC Residual Certificateholders should have other sources of funds sufficient to pay any federal income taxes due as a result of their ownership of REMIC Residual Certificates or unrelated deductions against which income may be offset, subject to the rules relating to excess inclusions, and noneconomic residual interests discussed at "—Noneconomic REMIC Residual Certificates." The fact that the tax liability associated with the income allocated to REMIC Residual Certificateholders may exceed the cash distributions received by the REMIC Residual Certificateholders for the corresponding period may significantly adversely affect the REMIC Residual Certificateholders' after-tax rate of return. This disparity between income and distributions may not be offset by corresponding losses or reductions of income attributable to the REMIC Residual Certificateholder until subsequent tax years and, then, may not be completely offset due to changes in the Code, tax rates or character of the income or loss.

*Taxable Income of the REMIC.* The taxable income or net loss of the REMIC will equal the income from the mortgage loans and other assets of the REMIC plus any cancellation of indebtedness income due to the allocation of realized losses to REMIC Regular Certificates, less the deductions allowed to the REMIC for interest, including original issue discount and reduced by any premium on issuance, on the REMIC Regular Certificates, whether or not offered by the prospectus, amortization of any premium on the mortgage loans, bad debt losses with respect to the mortgage loans and, except as described below, for servicing, administrative and other expenses.

For purposes of determining its taxable income, the REMIC will have an initial aggregate basis in its assets equal to their fair market value immediately after their transfer to the REMIC. For this purposes, the servicer intends to treat the fair market value of the mortgage loans and other assets as being equal to the aggregate issue prices of all REMIC Certificates. The aggregate basis will be allocated among the mortgage loans and the other assets of the REMIC in proportion to their respective fair market values. The issue price of any offered REMIC Certificates will be determined in the manner described above under "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount." Accordingly, if one or more classes of REMIC Certificates are retained initially rather than sold, the trustee may be required to estimate the fair market value of the interests in order to determine the basis of the REMIC in the mortgage loans and other property held by the REMIC.

Subject to possible application of the de minimis rules, the method of accrual by the REMIC of original issue discount income and market discount income with respect to mortgage loans that it holds will be equivalent to the method for accruing original issue discount income for holders of REMIC Regular Certificates. However, a REMIC that acquires loans at a market discount must include the market discount

106

in income currently, as it accrues, on a constant yield basis. See "—Taxation of Owners of REMIC Regular Certificates" above, which describes a method for accruing discount income that is analogous to that required to be used by a REMIC as to mortgage loans with market discount that it holds.

A mortgage loan will be deemed to have been acquired with either discount or premium to the extent that the REMIC's basis in the mortgage loan is either less than or greater than its stated redemption price. Any discount will be includible in the income of the REMIC as it accrues, in advance of receipt of the cash attributable to the income, under a method similar to the method described above for accruing original issue discount on the REMIC Regular Certificates. It is anticipated that each REMIC will elect under Section 171 of the Code to amortize any premium on the mortgage loans. Premium on any mortgage loan to which the election applies may be amortized under a constant yield method, presumably taking into account a Prepayment Assumption. This election would not apply to any mortgage loan originated on or before September 27, 1985, premium on which should be allocated among the principal payments on that mortgage loan and be deductible by the REMIC as those payments become due or upon the prepayment of the mortgage loan.

A REMIC will be allowed deductions for interest, including original issue discount, on the REMIC Regular Certificates, whether or not offered by this prospectus, equal to the deductions that would be allowed if these REMIC Regular Certificates were indebtedness of the REMIC. Original issue discount will be considered to accrue for this purpose as described above under "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount," except that the de minimis rule and the adjustments for subsequent holders of these REMIC Regular Certificates will not apply.

Issue premium is the excess of the issue price of a REMIC Regular Certificate over its stated redemption price. If a class of REMIC Regular Certificates is issued with issue premium, the net amount of interest deductions that are allowed the REMIC in each taxable year for the REMIC Regular Certificates of that class will be reduced by an amount equal to the portion of the issue premium that is considered to be amortized or repaid in that year. Although the matter is not entirely clear, it is likely that issue premium would be amortized under a constant yield method in a manner analogous to the method of accruing original issue discount described above under "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount."

Subject to the exceptions described in the following sentences, the taxable income of a REMIC will be determined in the same manner as if the REMIC were an individual having the calendar year as its taxable year and using the accrual method of accounting. However, no item of income, gain, loss or deduction allocable to a prohibited transaction will be taken into account. See "—Matters Relevant to Holders of All REMIC Certificates—Prohibited Transactions and Other Possible REMIC Taxes" below.

Further, the limitation on miscellaneous itemized deductions imposed on individuals by Section 67 of the Code, allowing these deductions only to the extent they exceed in the aggregate two percent of the taxpayer's adjusted gross income, will not be applied at the REMIC level so that the REMIC will be allowed deductions for servicing, administrative and other non-interest expenses in determining its taxable income. These expenses will be allocated as a separate item to the holders of REMIC Certificates, subject to the limitation of Section 67 of the Code and the rules relating to the alternative minimum tax. See "—Possible Pass-Through of Miscellaneous Itemized Deductions" below. If the deductions allowed to the REMIC exceed its gross income for a calendar quarter, the excess will be the net loss for the REMIC for that calendar quarter.

*Basis Rules, Net Losses and Distributions.* The adjusted basis of a REMIC Residual Certificate will be equal to the amount paid for the REMIC Residual Certificate, increased by amounts included in the income of the REMIC Residual Certificateholder and decreased, but not below zero, by distributions made, and by net losses allocated, to the REMIC Residual Certificateholder.

A REMIC Residual Certificateholder is not allowed to take into account any net loss for any calendar quarter to the extent the net loss exceeds the REMIC Residual Certificateholder's adjusted basis in its REMIC Residual Certificate as of the close of the calendar quarter, determined without regard to the net loss. Any loss that is not currently deductible by reason of this limitation may be carried forward indefinitely to future calendar quarters and, subject to the same limitation, may be used only to offset income from the REMIC Residual Certificate. The ability of REMIC Residual Certificateholders to deduct

net losses may be subject to additional limitations under the Code, as to which REMIC Residual Certificateholders are encouraged to consult their tax advisors.

Any distribution on a REMIC Residual Certificate will be treated as a non-taxable return of capital to the extent it does not exceed the holder's adjusted basis in the REMIC Residual Certificate. To the extent a distribution on a REMIC Residual Certificate exceeds this adjusted basis, it will be treated as gain from the sale of the REMIC Residual Certificate. Holders of REMIC Residual Certificates may be entitled to distributions early in the term of the related REMIC under circumstances in which their bases in the REMIC Residual Certificates will not be sufficiently large that the distributions will be treated as nontaxable returns of capital. Their bases in the REMIC Residual Certificates will initially equal the amount paid for the REMIC Residual Certificates and will be increased by the REMIC Residual Certificateholders' allocable shares of taxable income of the REMIC. However, these bases increases may not occur until the end of the calendar quarter, or perhaps the end of the calendar year, with respect to which the REMIC taxable income is allocated to the REMIC Residual Certificateholders. To the extent the REMIC Residual Certificateholders' initial bases are less than the distributions to the REMIC Residual Certificateholders, and increases in initial bases either occur after the distributions or, together with their initial bases, are less than the amount of the distributions, gain will be recognized by the REMIC Residual Certificateholders on these distributions and will be treated as gain from the sale of their REMIC Residual Certificates.

The effect of these rules is that a REMIC Residual Certificateholder may not amortize its basis in a REMIC Residual Certificate, but may only recover its basis through distributions, through the deduction of any net losses of the REMIC or upon the sale of its REMIC Residual Certificate. See "—Matters Relevant to Holders of All REMIC Certificates—Sales of REMIC Certificates" below.

For a discussion of possible modifications of these rules that may require adjustments to the income of a holder of a REMIC Residual Certificate other than an original holder in order to reflect any difference between the cost of the REMIC Residual Certificate to the REMIC Residual Certificateholder and the adjusted basis the REMIC Residual Certificate would have in the hands of an original holder, see "—General" above.

*Excess Inclusions.* Any excess inclusions with respect to a REMIC Residual Certificate will be subject to federal income tax in all events.

In general, the excess inclusions with respect to a REMIC Residual Certificate for any calendar quarter will be the excess, if any, of

(1) the daily portions of REMIC taxable income allocable to the REMIC Residual Certificate over

(2) the sum of the daily accruals for each day during the quarter that the REMIC Residual Certificate was held by the REMIC Residual Certificateholder.

The daily accruals of a REMIC Residual Certificateholder will be determined by allocating to each day during a calendar quarter its ratable portion of the product of the adjusted issue price of the REMIC Residual Certificate at the beginning of the calendar quarter and 120% of the long-term Federal rate in effect on the Closing Date. For this purpose, the adjusted issue price of a REMIC Residual Certificate as of the beginning of any calendar quarter will be equal to the issue price of the REMIC Residual Certificate, increased by the sum of the daily accruals for all prior quarters and decreased, but not below zero, by any distributions made with respect to the REMIC Residual Certificate before the beginning of that quarter. The issue price of a REMIC Residual Certificate is the initial offering price to the public, excluding bond houses and brokers, at which a substantial amount of the REMIC Residual Certificates were sold. The long-term Federal rate is an average of current yields on Treasury securities with a remaining term of greater than nine years, computed and published monthly by the IRS. Although it has not done so, the Treasury has authority to issue regulations that would treat the entire amount of income accruing on a REMIC Residual Certificate as an excess inclusion if the REMIC Residual Certificates are considered not to have significant value.

For REMIC Residual Certificateholders, an excess inclusion:

(1) will not be permitted to be offset by deductions, losses or loss carryovers from other activities,

(2) will be treated as unrelated business taxable income to an otherwise tax-exempt organization and

108

(3) will not be eligible for any rate reduction or exemption under any applicable tax treaty with respect to the 30% United States withholding tax imposed on distributions to REMIC Residual Certificateholders that are foreign investors. See, however, "—Matters Relevant to Holders of All REMIC Certificates—Foreign Investors in REMIC Certificates," below.

Furthermore, for purposes of the alternative minimum tax: (1) excess inclusions will not be permitted to be offset by the alternative tax net operating loss deduction; and (2) alternative minimum taxable income may not be less than the taxpayer's excess inclusions; provided, however, that for purposes of clause (2), alternative minimum taxable income is determined without regard to the special rule that taxable income cannot be less than excess inclusions. The latter rule has the effect of preventing nonrefundable tax credits from reducing the taxpayer's income tax to an amount lower than the alternative minimum tax on excess inclusions.

In the case of any REMIC Residual Certificates held by a real estate investment trust, the aggregate excess inclusions with respect to the REMIC Residual Certificates, as reduced, but not below zero, by the real estate investment trust taxable income, will be allocated among the shareholders of the trust in proportion to the dividends received by the shareholders from the trust, and any amount so allocated will be treated as an excess inclusion with respect to a REMIC Residual Certificate as if held directly by the shareholder. "Real estate investment trust taxable income" is defined by Section 857(b)(2) of the Code, and as used in the prior sentence does not include any net capital gain. Treasury regulations yet to be issued could apply a similar rule to regulated investment companies, common trust funds and cooperatives; the REMIC Regulations currently do not address this subject.

*Noneconomic REMIC Residual Certificates*. Under the REMIC Regulations, transfers of noneconomic REMIC Residual Certificates will be disregarded for all federal income tax purposes if "a significant purpose of the transfer was to enable the transferor to impede the assessment or collection of tax." If the transfer is disregarded, the purported transferor will continue to remain liable for any taxes due with respect to the income on the noneconomic REMIC Residual Certificate. The REMIC Regulations provide that a REMIC Residual Certificate is "noneconomic" unless, at the time of transfer, based on the Prepayment Assumption and on any required or permitted clean up calls, or required liquidation provided for in the REMIC's organizational documents, the present value of the expected future distributions on the REMIC Residual Certificate, discounted using the applicable Federal rate for obligations whose term ends on the close of the last quarter in which excess inclusions are expected to accrue with respect to the REMIC Residual Certificate, equals at least the product of the present value of the anticipated excess inclusions and the highest marginal corporate tax rate, and the transferor reasonably expects that the transferee will receive distributions with respect to the REMIC Residual Certificate at or after the time the taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes. Accordingly, all transfers of REMIC Residual Certificates that may constitute noneconomic residual interests will be subject to restrictions under the terms of the related pooling and servicing agreement that are intended to reduce the possibility of a transfer of REMIC Residual Certificates being disregarded. These restrictions will require each party to a transfer to provide an affidavit that no purpose of the transfer is to impede the assessment or collection of tax, including representations as to the financial condition of the prospective transferee, for which the transferor is also required to make a reasonable investigation to determine the transferee's historic payment of its debts and ability to continue to pay its debts as they come due in the future. Final Treasury regulations impose additional conditions for achieving assurance that a transfer of a noneconomic interest will be respected. The additional condition requires that either (i) the present value of the net tax detriment attributable to holding the residual interest not exceed the sum of the present value of any amount received by the transferee, plus the present value of any expected tax savings from losses on the residual interest, or (ii) the transferee be a domestic taxable corporation with large amounts of gross and net assets that agrees that all future transfers will be to taxable domestic corporations and, among other things, the facts and circumstances known to the transferor at the time of transfer would not indicate to a reasonable person that the taxes with respect to the residual interest will not be paid. If the amount paid to the transferee is unreasonably low, the transferor is deemed to know that the transferee cannot or will not pay the tax. Prior to purchasing a REMIC Residual Certificate, a prospective purchaser should consider the possibility that a purported transfer of the REMIC Residual Certificate by that prospective purchaser to another purchaser at a future date may be disregarded, which would result in the retention of tax liability by the prospective purchaser.

The related prospectus supplement will disclose whether offered REMIC Residual Certificates may be considered noneconomic residual interests under the REMIC Regulations; provided, however, that any disclosure that a REMIC Residual Certificate will not be considered noneconomic will be based upon assumptions, and the depositor will make no representation that a REMIC Residual Certificate will not be considered noneconomic for purposes of the rules described in the preceding paragraph. See "—Matters Relevant to Holders of All REMIC Certificates—Foreign Investors in REMIC Certificates" below for additional restrictions applicable to transfers of REMIC Residual Certificates to foreign persons.

*Mark-To-Market Rules*. In general, all securities owned by a dealer, except to the extent that the dealer has specifically identified a security as held for investment, must be marked to market in accordance with the applicable Code provision and the related regulations. However, IRS regulations provide that for purposes of this mark-to-market requirement a REMIC Residual Certificate is not treated as a security and thus may not be marked to market. Prospective purchasers of a REMIC Residual Certificate are encouraged to consult their tax advisors regarding the possible application of the mark-to-market requirement to REMIC Residual Certificates.

*Possible Pass-Through of Miscellaneous Itemized Deductions*. Fees and expenses of a REMIC generally will be allocated to the holders of the related REMIC Residual Certificates. The applicable Treasury regulations indicate, however, that in the case of a REMIC that is similar to a single class grantor trust, all or a portion of these fees and expenses should be allocated to the holders of the related REMIC Regular Certificates. If some or all of these fees and expenses will be allocated to the holders of REMIC Regular Certificates, a statement to that effect will be included in the related prospectus supplement.

With respect to REMIC Residual Certificates or REMIC Regular Certificates the holders of which receive an allocation of fees and expenses in accordance with the preceding paragraph, if any holder thereof is an individual, estate or trust, or a pass-through entity beneficially owned by one or more individuals, estates or trusts,

- an amount equal to the individual's, estate's or trust's share of the fees and expenses will be added to the gross income of the holder, and

- the individual's, estate's or trust's share of the fees and expenses will be treated as a miscellaneous itemized deduction allowable subject to the limitation of Section 67 of the Code.

Section 67 of the Code permits these deductions only to the extent they exceed in the aggregate two percent of a taxpayer's adjusted gross income. In addition, Section 68 of the Code provides that the amount of itemized deductions otherwise allowable for an individual whose adjusted gross income exceeds a specified amount will be reduced. The amount of additional taxable income reportable by REMIC Certificateholders that are subject to the limitations of either Section 67 or Section 68 of the Code may be substantial. Furthermore, in determining the alternative minimum taxable income of a holder of a REMIC Certificate that is an individual, estate or trust, or a pass-through entity beneficially owned by one or more individuals, estates or trusts, no deduction will be allowed for the holder's allocable portion of servicing fees and other miscellaneous itemized deductions of the REMIC, even though an amount equal to the amount of the fees and other deductions will be included in the holder's gross income. Accordingly, these REMIC Certificates may not be appropriate investments for individuals, estates, or trusts, or pass-through entities beneficially owned by one or more individuals, estates or trusts. Prospective investors are encouraged to consult with their own tax advisors prior to making an investment in these certificates.

### Matters Relevant to Holders of All REMIC Certificates

*Sales of REMIC Certificates*. If a REMIC Certificate is sold, the selling certificateholder will recognize gain or loss equal to the difference between the amount realized on the sale and its adjusted basis in the REMIC Certificate. The adjusted basis of a REMIC Regular Certificate generally will be equal to:

- the cost of the REMIC Regular Certificate to the certificateholder,

- increased by income reported by such certificateholder with respect to the REMIC Regular Certificate, including original issue discount and market discount income, and

- reduced, but not below zero, by distributions on the REMIC Regular Certificate received by the certificateholder and by any amortized premium.

The adjusted basis of a REMIC Residual Certificate will be determined as described under "—Taxation of Owners of REMIC Residual Certificates—Basis Rules, Net Losses and Distributions." Except as provided in the following four paragraphs, gain or loss from the sale of a REMIC Certificate will be capital gain or loss, provided the REMIC Certificate is held as a capital asset within the meaning of Section 1221 of the Code.

Gain from the sale of a REMIC Regular Certificate that might otherwise be capital gain will be treated as ordinary income to the extent the gain does not exceed the excess, if any, of (1) the amount that would have been includible in the seller's income with respect to the REMIC Regular Certificate assuming that income had accrued thereon at a rate equal to 110% of the applicable Federal rate, determined as of the date of purchase of the REMIC Regular Certificate, over (2) the amount of ordinary income actually includible in the seller's income prior to the sale. In addition, gain recognized on the sale of a REMIC Regular Certificate by a seller who purchased the REMIC Regular Certificate at a market discount will be taxable as ordinary income in an amount not exceeding the portion of the discount that accrued during the period the REMIC Regular Certificate was held by the holder, reduced by any market discount included in income under the rules described above under "—Taxation of Owners of REMIC Regular Certificates—Market Discount" and "—Premium."

REMIC Certificates will be evidences of indebtedness within the meaning of Section 582(c)(1) of the Code, so that gain or loss recognized from the sale of a REMIC Certificate by a bank or thrift institution to which this section applies will be ordinary income or loss.

A portion of any gain from the sale of a REMIC Regular Certificate that might otherwise be capital gain may be treated as ordinary income to the extent that the certificate is held as part of a conversion transaction within the meaning of Section 1258 of the Code. A conversion transaction includes a transaction in which the taxpayer has taken two or more positions in the same or similar property that reduce or eliminate market risk, if substantially all of the taxpayer's return is attributable to the time value of the taxpayer's net investment in the transaction. The amount of gain so realized in a conversion transaction that is recharacterized as ordinary income generally will not exceed the amount of interest that would have accrued on the taxpayer's net investment at 120% of the appropriate applicable Federal rate at the time the taxpayer enters into the conversion transaction, subject to appropriate reduction for prior inclusion of interest and other ordinary income items from the transaction.

Finally, a taxpayer may elect to have net capital gain taxed at ordinary income rates rather than capital gains rates in order to include the net capital gain in total net investment income for the taxable year, for purposes of the rule that limits the deduction of interest on indebtedness incurred to purchase or carry property held for investment to a taxpayer's net investment income.

Except as may be provided in Treasury regulations yet to be issued, if the seller of a REMIC Residual Certificate reacquires the REMIC Residual Certificate, or acquires any other residual interest in a REMIC or any similar interest in a taxable mortgage pool, as defined in Section 7701(i) of the Code, during the period beginning six months before, and ending six months after, the date of the sale, such sale will be subject to the wash sale rules of Section 1091 of the Code. In that event, any loss realized by the REMIC Residual Certificateholder on the sale will not be deductible, but instead will be added to the REMIC Residual Certificateholder's adjusted basis in the newly-acquired asset.

Losses on the sale of a REMIC Residual Certificate in excess of a threshold amount (which amount may need to be aggregated with similar or previous losses) may require disclosure of such loss on an IRS Form 8886. Investors are encouraged to consult with their tax advisors as to the need to file such forms.

*Prohibited Transactions and Other Possible REMIC Taxes.* In the event a REMIC engages in a prohibited transaction, the Code imposes a 100% tax on the net income derived by the REMIC from the prohibited transaction. A prohibited transaction may occur upon the disposition of a mortgage loan, the receipt of income from a source other than a mortgage loan or other permitted investments, the receipt of compensation for services, or gain from the disposition of an asset purchased with the payments on the mortgage loans for temporary investment pending distribution on the REMIC Certificates. It is not anticipated that any REMIC will engage in any prohibited transactions in which it would recognize a material amount of net income.

111

In addition, a contribution to a REMIC made after the day on which the REMIC issues all of its interests could result in the imposition on the REMIC of a tax equal to 100% of the value of the contributed property. Each pooling and servicing agreement will include provisions designed to prevent the acceptance of any contributions that would be subject to this tax.

REMICs also are subject to federal income tax at the highest corporate rate on net income from foreclosure property, determined by reference to the rules applicable to real estate investment trusts. Net income from foreclosure property generally means the excess over related deductions of the sum of gain from the sale of foreclosure property that is inventory and the gross income from foreclosure property other than qualifying rents and other qualifying income for a real estate investment trust. It is not anticipated that any REMIC will recognize net income from foreclosure property subject to federal income tax.

To the extent permitted by then applicable laws, any tax resulting from a prohibited transaction, tax resulting from a contribution made after the Closing Date, tax on net income from foreclosure property or state or local income or franchise tax that may be imposed on the REMIC usually will be borne by the related servicer or trustee in either case out of its own funds, provided that the servicer or the trustee has sufficient assets to do so, and provided that the tax arises out of a breach of the servicer's or the trustee's obligations under the related pooling and servicing agreement and in respect of compliance with applicable laws and regulations. Any of these taxes not borne by the servicer or the trustee will be charged against the related trust resulting in a reduction in amounts payable to holders of the related REMIC Certificates.

*Tax and Restrictions on Transfers of REMIC Residual Certificates to Certain Organizations.* If a REMIC Residual Certificate is transferred to a disqualified organization, a tax would be imposed in an amount equal to the product of:

- the present value, discounted using the applicable Federal rate for obligations whose term ends on the close of the last quarter in which excess inclusions are expected to accrue with respect to the REMIC Residual Certificate, of the total anticipated excess inclusions with respect to the REMIC Residual Certificate for periods after the transfer and

- the highest marginal federal income tax rate applicable to corporations.

The anticipated excess inclusions must be determined as of the date that the REMIC Residual Certificate is transferred and must be based on events that have occurred up to the time of the transfer, the Prepayment Assumption and any required or permitted clean up calls or required liquidation provided for in the REMIC's organizational documents. The tax would be imposed on the transferor of the REMIC Residual Certificate, except that where the transfer is through an agent for a disqualified organization, the tax would instead be imposed on the agent. However, a transferor of a REMIC Residual Certificate would in no event be liable for the tax with respect to a transfer if the transferee furnishes to the transferor an affidavit that the transferee is not a disqualified organization and, as of the time of the transfer, the transferor does not have actual knowledge that the affidavit is false. Moreover, an entity will not qualify as a REMIC unless there are reasonable arrangements designed to ensure that

- residual interests in the entity are not held by disqualified organizations and

- information necessary for the application of the tax described in this prospectus will be made available.

Restrictions on the transfer of REMIC Residual Certificates and other provisions that are intended to meet this requirement will be included in the pooling and servicing agreement, and will be discussed more fully in any prospectus supplement relating to the offering of any REMIC Residual Certificate.

In addition, if a pass-through entity includes in income excess inclusions with respect to a REMIC Residual Certificate, and a disqualified organization is the record holder of an interest in the entity, then a tax will be imposed on the entity equal to the product of (1) the amount of excess inclusions on the REMIC Residual Certificate that are allocable to the interest in the pass-through entity held by the disqualified organization and (2) the highest marginal federal income tax rate imposed on corporations. A pass-through entity will not be subject to this tax for any period, however, if each record holder of an interest in the pass-through entity furnishes to the pass-through entity

- the holder's social security number and a statement under penalties of perjury that the social security number is that of the record holder or

112

- a statement under penalties of perjury that the record holder is not a disqualified organization.

Notwithstanding the preceding two sentences, in the case of a REMIC Residual Certificate held by an electing large partnership, as defined in Section 775 of the Code, all interests in the partnership shall be treated as held by disqualified organizations, without regard to whether the record holders of the partnership furnish statements described in the preceding sentence, and the amount that is subject to tax under the second preceding sentence is excluded from the gross income of the partnership allocated to the partners, in lieu of allocating to the partners a deduction for the tax paid by the partnership.

For these purposes, a disqualified organization means:

- the United States, any State or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of the foregoing, not including, however, instrumentalities described in Section 168(h)(2)(D) of the Code or the Federal Home Loan Mortgage Corporation,

- any organization, other than a cooperative described in Section 521 of the Code, that is exempt from federal income tax, unless it is subject to the tax imposed by Section 511 of the Code or

- any organization described in Section 1381(a)(2)(C) of the Code.

For these purposes, a pass-through entity means any regulated investment company, real estate investment trust, trust, partnership or other entity described in Section 860E(e)(6)(B) of the Code. In addition, a person holding an interest in a pass-through entity as a nominee for another person will, with respect to the interest, be treated as a pass-through entity.

*Termination*. A REMIC will terminate immediately after the distribution date following receipt by the REMIC of the final payment in respect of the mortgage loans or upon a sale of the REMIC's assets following the adoption by the REMIC of a plan of complete liquidation. The last distribution on a REMIC Regular Certificate will be treated as a payment in retirement of a debt instrument. In the case of a REMIC Residual Certificate, if the last distribution on the REMIC Residual Certificate is less than the REMIC Residual Certificateholder's adjusted basis in the Certificate, the REMIC Residual Certificateholder should, but may not, be treated as realizing a loss equal to the amount of the difference. The loss may be subject to the "wash sale" rules of Section 1091 of the Code. See "—Sales of REMIC Certificates" above. The character of this loss as ordinary or capital is uncertain.

The inadvertent termination of a REMIC may have other consequences. See "REMICs—Classification of REMICs" above.

*Reporting and Other Administrative Matters*. Solely for purposes of the administrative provisions of the Code, the REMIC will be treated as a partnership and REMIC Residual Certificateholders will be treated as partners. The trustee or other party specified in the related prospectus supplement will file REMIC federal income tax returns on behalf of the related REMIC, and under the terms of the related Agreement, will either (1) be irrevocably appointed by the holders of the largest percentage interest in the related REMIC Residual Certificates as their agent to perform all of the duties of the tax matters person with respect to the REMIC in all respects or (2) be designated as and will act as the tax matters person with respect to the related REMIC in all respects and will hold at least a nominal amount of REMIC Residual Certificates.

The trustee, as the tax matters person or as agent for the tax matters person, subject to notice requirements and various restrictions and limitations, generally will have the authority to act on behalf of the REMIC and the REMIC Residual Certificateholders in connection with the administrative and judicial review of items of income, deduction, gain or loss of the REMIC, as well as the REMIC's classification. REMIC Residual Certificateholders generally will be required to report such REMIC items consistently with their treatment on the REMIC's tax return and may be bound by a settlement agreement between the trustee, as either tax matters person or as agent for the tax matters person, and the IRS concerning any REMIC item subject to that settlement agreement. Adjustments made to the REMIC tax return may require a REMIC Residual Certificateholder to make corresponding adjustments on its return, and an audit of the REMIC's tax return, or the adjustments resulting from an audit, could result in an audit of a REMIC Residual Certificateholder's return. Any person that holds a REMIC Residual Certificate as a nominee for another person may be required to furnish the REMIC, in a manner to be provided in Treasury regulations, with the name and address of the person and other information. The IRS has issued proposed regulations that, if adopted as final regulations, would cause the question of whether a transfer of residual interests will

113

be respected for federal income tax purposes to be determined in the audits of the transferee and transferor rather than an item to be determined as a partnership item in the audit of the REMIC's tax return.

Reporting of interest income, including any original issue discount, with respect to REMIC Regular Certificates is required annually, and may be required more frequently under Treasury regulations. These information reports generally are required to be sent to individual holders of REMIC regular interests and the IRS; holders of REMIC Regular Certificates that are corporations, trusts, securities dealers and some other non-individuals will be provided interest and original issue discount income information and the information set forth in the following paragraph upon request in accordance with the requirements of the applicable regulations. The information must be provided by the later of 30 days (41 days under proposed regulations) after the end of the quarter for which the information was requested, or two weeks after the receipt of the request. The REMIC must also comply with rules requiring information about a REMIC Regular Certificate issued with original issue discount to be reported to the IRS. Reporting with respect to the REMIC Residual Certificates, including income, excess inclusions, investment expenses and relevant information regarding qualification of the REMIC's assets will be made as required under the Treasury regulations, generally on a quarterly basis.

The REMIC Regular Certificate information reports will include a statement of the adjusted issue price of the REMIC Regular Certificate at the beginning of each accrual period. In addition, the reports will include information required by regulations with respect to computing the accrual of any market discount. Because exact computation of the accrual of market discount on a constant yield method would require information relating to the holder's purchase price that the REMIC may not have, Treasury regulations only require that information pertaining to the appropriate proportionate method of accruing market discount be provided. See "—Taxation of Owners of REMIC Regular Certificates—Market Discount."

The responsibility for complying with the foregoing reporting rules will be borne by the trustee or other party designated in the related prospectus supplement. Certificateholders may request any information with respect to the returns described in section 1.6049-7(e)(2) of the Treasury regulations.

*Backup Withholding With Respect to REMIC Certificates.* Payments of interest and principal, as well as payments of proceeds from the sale of REMIC Certificates, may be subject to the backup withholding tax under Section 3406 of the Code if recipients of the payments fail to furnish to the payor information including their taxpayer identification numbers, or otherwise fail to establish an exemption from the backup withholding tax. Any amounts deducted and withheld from a distribution to a recipient would be allowed as a credit against the recipient's federal income tax. Furthermore, penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner.

*Foreign Investors in REMIC Certificates.* A REMIC Regular Certificateholder that is not a United States Person and is not subject to federal income tax as a result of any direct or indirect connection to the United States in addition to its ownership of a REMIC Regular Certificate will not be subject to United States federal income or withholding tax in respect of a distribution on a REMIC Regular Certificate, provided that the holder complies to the extent necessary with identification requirements, including delivery of a statement signed by the certificateholder under penalties of perjury certifying that the certificateholder is not a United States Person and providing the name and address of the certificateholder. The IRS may assert that the foregoing tax exemption should not apply with respect to a REMIC Regular Certificate held by a REMIC Residual Certificateholder that owns directly or indirectly a 10% or greater interest in the REMIC Residual Certificates or with respect to payments that are subject to certain contingencies. If the holder does not qualify for exemption, distributions of interest, including distributions in respect of accrued original issue discount, to the holder may be subject to a tax rate of 30%, subject to reduction under any applicable tax treaty.

Special rules apply to partnerships, estates and trusts, and in certain circumstances certifications as to foreign status and other matters may be required to be provided by partners and beneficiaries thereof. A certificateholder who is not an individual or corporation holding the certificates on its own behalf may have substantially increased reporting requirements. In particular, in the case of a certificate held by a foreign partnership (or foreign trust), the partners (or beneficiaries) rather than the partnership (or trust) will be required to provide the certification discussed above, and the partnership (or trust) will be required to provide certain additional information.

114

In addition, the foregoing rules will not apply to exempt a United States shareholder of a controlled foreign corporation from taxation on the United States shareholder's allocable portion of the interest income received by the controlled foreign corporation.

Further, it appears that a REMIC Regular Certificate would not generally be included in the estate of a non-resident alien individual and would not be subject to United States estate taxes. However, it is suggested that certificateholders who are non-resident alien individuals consult their tax advisors concerning this question.

Transfers of REMIC Residual Certificates to investors that are not United States Persons generally will be prohibited under the related pooling and servicing agreement. Any REMIC Residual Certificates that may be transferred to investors that are not United States Persons will be identified in the related prospectus supplement.

**Withholding Regulations**

The IRS has issued regulations which provide procedures for complying with, or obtaining exemptions under, the withholding, backup withholding and information reporting rules described above. The regulations attempt to unify certification requirements and reliance standards. Prospective investors are urged to consult their tax advisors regarding the procedures for obtaining an exemption from withholding under the regulations.

**Notes**

*General*. On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of notes, Orrick, Herrington & Sutcliffe LLP, Thacher Proffitt & Wood LLP or Heller Ehrman LLP, as counsel to the depositor, will provide an opinion generally to the effect that, assuming compliance with all provisions of the indenture, owner trust agreement and other related documents, for federal income tax purposes (1) the notes will be treated as indebtedness and (2) the issuer, as created under the owner trust agreement, will not be characterized as an association or publicly traded partnership within the meaning of Section 7704 of the Code taxable as a corporation or as a taxable mortgage pool within the meaning of Section 7701(i) of the Code. For purposes of this tax discussion, references to a noteholder or a holder are to the beneficial owner of a note.

*Status as Real Property Loans*. Notes held by a domestic building and loan association will not constitute "loans . . . secured by an interest in real property" within the meaning of Code Section 7701(a)(19)(C)(v). Notes held by a real estate investment trust will not constitute real estate assets within the meaning of Code Section 856(c)(5)(B). Interest on notes will not be considered "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B).

*Taxation of Noteholders*. Notes generally will be subject to the same rules of taxation as REMIC Regular Certificates issued by a REMIC, except that (1) income reportable on the notes is not required to be reported under the accrual method unless the holder otherwise uses the accrual method and (2) the special rule treating a portion of the gain on sale or exchange of a REMIC Regular Certificate as ordinary income is inapplicable to the notes. See "—Taxation of Owners of REMIC Regular Certificates" and "—Matters Relevant to Holders of All REMIC Certificates—Sales of REMIC Certificates." Also, interest paid on a note to a noteholder that is not a United States Person will normally qualify for the exception from United States withholding tax described in "—Matters Relevant to Holders of All REMIC Certificates—Foreign Investors in REMIC Certificates," except, in addition to the exceptions noted in that section, where the recipient is a holder, directly or by attribution, of 10% or more of the capital or profits interest in the issuer.

**Grantor Trusts**

*Classification of Grantor Trusts*

On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of Grantor Trust Certificates, counsel to the depositor will provide its opinion that, assuming compliance with all provisions of the related pooling and servicing agreement, the related Grantor Trust

will be classified as a grantor trust under subpart E, part I of subchapter J of Chapter 1 of the Code and not as a partnership or an association taxable as a corporation.

### Characterization of Investments in Grantor Trust Certificates

*Grantor Trust Fractional Interest Certificates.* Grantor Trust Fractional Interest Certificates generally will represent interests in "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code; "obligation[s] (including any participation or certificate of beneficial ownership therein) which . . . [are] principally secured by an interest in real property" within the meaning of Section 860G(a)(3) of the Code; and real estate assets within the meaning of Section 856(c)(5)(B) of the Code to the same extent that the assets comprising the trust qualify for such treatment. In addition, interest on Grantor Trust Fractional Interest Certificates generally will be considered "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Section 856(c)(3)(B) of the Code to the same extent that the interest on the assets comprising the trust qualifies for such treatment.

The assets held by certain Grantor Trusts may include buydown mortgage loans. The characterization of an investment in buydown mortgage loans will depend upon the precise terms of the related buydown agreement, but to the extent that the buydown mortgage loans are secured by a bank account or other personal property, they may not be treated in their entirety as assets described in the preceding paragraph. No directly applicable precedents exist with respect to the federal income tax treatment or the characterization of investments in buydown mortgage loans. Accordingly, holders of Grantor Trust Certificates are encouraged to consult their own tax advisors with respect to the characterization of investments in Grantor Trust Certificates representing an interest in a Grantor Trust that holds buydown mortgage loans.

*Grantor Trust Strip Certificates.* Even if Grantor Trust Strip Certificates evidence an interest in a Grantor Trust holding mortgage loans that are "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code, and real estate assets within the meaning of Section 856(c)(5)(B) of the Code, and the interest on the mortgage loans is "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code, it is unclear whether the Grantor Trust Strip Certificates, and income from the Grantor Trust Strip Certificates will be characterized the same way. However, the policies underlying these Sections, to encourage or require investments in mortgage loans by thrift institutions and real estate investment trusts, suggest that this characterization is appropriate. Counsel to the depositor will not deliver any opinion on these questions. It is suggested that prospective purchasers to which the characterization of an investment in Grantor Trust Strip Certificates is material consult their tax advisors regarding whether the Grantor Trust Strip Certificates, and the income therefrom, will be so characterized.

The Grantor Trust Strip Certificates will be "obligation[s] (including any participation or certificate of beneficial ownership therein) which . . . [are] principally secured by an interest in real property" within the meaning of Section 860G(a)(3)(A) of the Code.

*Taxation of Owners of Grantor Trust Fractional Interest Certificates.* Holders of a particular series of Grantor Trust Fractional Interest Certificates generally will be required to report on their federal income tax returns their shares of the entire income from the mortgage loans, including amounts used to pay reasonable servicing fees and other expenses, and will be entitled to deduct their shares of any reasonable servicing fees and other expenses. Because of stripped interests, market or original issue discount, or premium, the amount includible in income on account of a Grantor Trust Fractional Interest Certificate may differ significantly from the amount distributable on the same certificate representing interest on the mortgage loans. Under Section 67 of the Code, an individual, estate or trust holding a Grantor Trust Fractional Interest Certificate directly or through some pass-through entities will be allowed a deduction for the reasonable servicing fees and expenses only to the extent that the aggregate of the holder's miscellaneous itemized deductions exceeds two percent of the holder's adjusted gross income. In addition, Section 68 of the Code provides that the amount of itemized deductions otherwise allowable for an individual whose adjusted gross income exceeds a specified amount will be reduced. The reduction provided by Section 68 is scheduled to be phased out beginning in 2006. The amount of additional taxable income reportable by holders of Grantor Trust Fractional Interest Certificates who are subject to the limitations of either Section

116

67 or Section 68 of the Code may be substantial. Further, certificateholders, other than corporations, subject to the alternative minimum tax may not deduct miscellaneous itemized deductions in determining the holder's alternative minimum taxable income. Although it is not entirely clear, it appears that in transactions in which multiple classes of Grantor Trust Certificates, including Grantor Trust Strip Certificates, are issued, the fees and expenses should be allocated among the classes of Grantor Trust Certificates using a method that recognizes that each class benefits from the related services. In the absence of statutory or administrative clarification as to the method to be used, it is intended to base information returns or reports to the IRS and certificateholders on a method that allocates the expenses among classes of Grantor Trust Certificates with respect to each period on the distributions made to each class during that period.

The federal income tax treatment of Grantor Trust Fractional Interest Certificates of any series will depend on whether they are subject to the stripped bond rules of Section 1286 of the Code. Grantor Trust Fractional Interest Certificates may be subject to those rules if (1) a class of Grantor Trust Strip Certificates is issued as part of the same series of certificates or (2) the depositor or any of its affiliates retains, for its own account or for purposes of resale, a right to receive a specified portion of the interest payable on the mortgage loans. Further, the IRS has ruled that an unreasonably high servicing fee retained by a seller or servicer will be treated as a retained ownership interest in mortgages that constitutes a stripped coupon. For purposes of determining what constitutes reasonable servicing fees for various types of mortgages the IRS has established safe harbors. The servicing fees paid with respect to the mortgage loans for a series of Grantor Trust Certificates may be higher than those safe harbors and, accordingly, may not constitute reasonable servicing compensation. The related prospectus supplement will include information regarding servicing fees paid to the servicer, any sub-servicer or their respective affiliates necessary to determine whether the safe harbor rules apply.

*If Stripped Bond Rules Apply*. If the stripped bond rules apply, each Grantor Trust Fractional Interest Certificate will be treated as having been issued with original issue discount within the meaning of Section 1273(a) of the Code, subject, however, to the discussion in the eighth following paragraph regarding the possible treatment of stripped bonds as market discount bonds and the discussion regarding de minimis market discount. See "—Market Discount" below.

Under the stripped bond rules, the holder of a Grantor Trust Fractional Interest Certificate, whether a cash or accrual method taxpayer, will be required to report interest income from its Grantor Trust Fractional Interest Certificate for each month in an amount equal to the income that accrues on the certificate in that month calculated under a constant yield method, in accordance with the rules of the Code relating to original issue discount.

The original issue discount on a Grantor Trust Fractional Interest Certificate will be the excess of the certificate's stated redemption price over its issue price. The issue price of a Grantor Trust Fractional Interest Certificate as to any purchaser will be equal to the price paid by the purchaser for the Grantor Trust Fractional Interest Certificate. The stated redemption price of a Grantor Trust Fractional Interest Certificate will be the sum of all payments to be made on the certificate, other than qualified stated interest, if any, as well as the certificate's share of reasonable servicing fees and other expenses. See "—If Stripped Bond Rules Do Not Apply" below for a definition of qualified stated interest.

In general, the amount of the income that accrues in any month equals the product of the holder's adjusted basis in the Grantor Trust Fractional Interest Certificate at the beginning of the month, see "—Sales of Grantor Trust Certificates," and the yield of the Grantor Trust Fractional Interest Certificate to the holder. This yield is equal to a rate, compounded based on the regular interval between distribution dates and used to discount the holder's share of future payments on the mortgage loans, causes the present value of those future payments to equal the price at which the holder purchased the certificate. In computing yield under the stripped bond rules, a certificateholder's share of future payments on the mortgage loans will not include any payments made in respect of any ownership interest in the mortgage loans retained by the depositor, the servicer, any sub-servicer or their respective affiliates, but will include the certificateholder's share of any reasonable servicing fees and other expenses.

To the extent the Grantor Trust Fractional Interest Certificates represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, Section 1272(a)(6) of the Code requires (1) the use of a reasonable Prepayment Assumption in accruing original issue discount and

117

(2) adjustments in the accrual of original issue discount when prepayments do not conform to the Prepayment Assumption. It is unclear whether those provisions would be applicable to the Grantor Trust Fractional Interest Certificates that do not represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, or whether use of a reasonable Prepayment Assumption may be required or permitted without reliance on these rules. It is also uncertain, if a Prepayment Assumption is used, whether the assumed prepayment rate would be determined based on conditions at the time of the first sale of the Grantor Trust Fractional Interest Certificate or, for a particular holder, at the time of purchase of the Grantor Trust Fractional Interest Certificate by that holder. It is suggested that Certificateholders consult their own tax advisors concerning reporting original issue discount with respect to Grantor Trust Fractional Interest Certificates and, in particular, whether a Prepayment Assumption should be used in reporting original issue discount.

In the case of a Grantor Trust Fractional Interest Certificate acquired at a price equal to the principal amount of the mortgage loans allocable to the certificate, the use of a Prepayment Assumption generally would not have any significant effect on the yield used in calculating accruals of interest income. In the case, however, of a Grantor Trust Fractional Interest Certificate acquired at a price less than or greater than the principal amount of the certificate, that is, at a discount or a premium, the use of a reasonable Prepayment Assumption would increase or decrease the yield, and thus accelerate or decelerate, respectively, the reporting of income.

If a Prepayment Assumption is not used, then when a mortgage loan prepaid in full, the holder of a Grantor Trust Fractional Interest Certificate acquired at a discount or a premium generally will recognize ordinary income or loss equal to the difference between the portion of the prepaid principal amount of the mortgage loan that is allocable to the certificate and the portion of the adjusted basis of the certificate that is allocable to the certificateholder's interest in the mortgage loan. If a Prepayment Assumption is used, it appears that no separate item of income or loss should be recognized upon a prepayment. Instead, a prepayment should be treated as a partial payment of the stated redemption price of the Grantor Trust Fractional Interest Certificate and accounted for under a method similar to that described for taking account of original issue discount on REMIC Regular Certificates. It is unclear whether any other adjustments would be required to reflect differences between an assumed prepayment rate and the actual rate of prepayments. See "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount."

It is intended to base information reports or returns to the IRS and certificateholders in transactions subject to the stripped bond rules on a Prepayment Assumption that will be disclosed in the related prospectus supplement and on a constant yield computed using a representative initial offering price for each class of certificates. However, none of the depositor, the servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or any other rate and certificateholders should bear in mind that the use of a representative initial offering price will mean that the information returns or reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders of each series who bought at that price.

Under Treasury Regulation Section 1.1286-1, stripped bonds may be treated as market discount bonds and any purchaser of a stripped bond treated as a market discount bond is to account for any discount on the bond as market discount rather than original issue discount. This treatment only applies, however, if immediately after the most recent disposition of the bond by a person stripping one or more coupons from the bond and disposing of the bond or coupon (1) there is no, or only a de minimis amount of, original issue discount or (2) the annual stated rate of interest payable on the original bond is no more than one percentage point lower than the gross interest rate payable on the original mortgage loan, before subtracting any servicing fee or any stripped coupon. If interest payable on a Grantor Trust Fractional Interest Certificate is more than one percentage point lower than the gross interest rate payable on the mortgage loans, the related prospectus supplement will disclose that fact. If the original issue discount or market discount on a Grantor Trust Fractional Interest Certificate determined under the stripped bond rules is less than 0.25% of the stated redemption price multiplied by the weighted average maturity of the mortgage loans, then that original issue discount or market discount will be considered to be de minimis. Original issue discount or market discount of only a de minimis amount will be included in income in the same manner as de minimis original issue and market discount described in "—If Stripped Bond Rules Do Not Apply" and "—Market Discount" below.

*If Stripped Bond Rules Do Not Apply.* Subject to the discussion below on original issue discount, if the stripped bond rules do not apply to a Grantor Trust Fractional Interest Certificate, the certificateholder will be required to report its share of the interest income on the mortgage loans in accordance with the certificateholder's normal method of accounting. The original issue discount rules will apply to a Grantor Trust Fractional Interest Certificate to the extent it evidences an interest in mortgage loans issued with original issue discount.

The original issue discount, if any, on the mortgage loans will equal the difference between the stated redemption price of the mortgage loans and their issue price. Under the OID Regulations, the stated redemption price is equal to the total of all payments to be made on the mortgage loan other than qualified stated interest. Qualified stated interest is interest that is unconditionally payable at least annually at a single fixed rate, a qualified floating rate, an objective rate, or a combination of a single fixed rate and one or more qualified floating rates or one qualified inverse floating rate. In general, the issue price of a mortgage loan will be the amount received by the borrower from the lender under the terms of the mortgage loan, less any points paid by the borrower, and the stated redemption price of a mortgage loan will equal its principal amount, unless the mortgage loan provides for an initial below-market rate of interest or the acceleration or the deferral of interest payments. The determination as to whether original issue discount will be considered to be de minimis will be calculated using the test described in the REMIC discussion. See "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" above.

In the case of mortgage loans bearing adjustable or variable interest rates, the related prospectus supplement will describe the manner in which the rules will be applied with respect to those mortgage loans by the servicer or the trustee in preparing information returns to the certificateholders and the IRS.

If original issue discount is in excess of a de minimis amount, a portion of the original issue discount with respect to a mortgage loan will be required to be accrued and reported in income each month, based on a constant yield. Section 1272(a)(6) of the Code requires that a Prepayment Assumption be made in computing yield with respect to any pool of debt instruments the yield on which may be affected by reason of prepayments. Accordingly, for certificates backed by these pools, it is intended to base information reports and returns to the IRS and certificateholders on the use of a Prepayment Assumption. However, in the case of certificates not backed by these pools, it currently is not intended to base the reports and returns on the use of a Prepayment Assumption. It is suggested that certificateholders consult their own tax advisors concerning whether a Prepayment Assumption should be used in reporting original issue discount with respect to Grantor Trust Fractional Interest Certificates. Certificateholders should refer to the related prospectus supplement with respect to each series to determine whether and in what manner the original issue discount rules will apply to mortgage loans in the series.

A purchaser of a Grantor Trust Fractional Interest Certificate that purchases the Grantor Trust Fractional Interest Certificate at a cost less than the certificate's allocable portion of the aggregate remaining stated redemption price of the mortgage loans held by the related trust will also be required to include in gross income the certificate's daily portions of any original issue discount with respect to the mortgage loans. However, the daily portion will be reduced, if the cost of the Grantor Trust Fractional Interest Certificate to the purchaser is in excess of the certificate's allocable portion of the aggregate adjusted issue prices of the mortgage loans held by the related trust, approximately in proportion to the ratio the excess bears to the certificate's allocable portion of the aggregate original issue discount remaining to be accrued on the mortgage loans. The adjusted issue price of a mortgage loan on any given day equals the sum of (1) the adjusted issue price, or, in the case of the first accrual period, the issue price, of the mortgage loan at the beginning of the accrual period that includes that day and (2) the daily portions of original issue discount for all days during the accrual period prior to that day. The adjusted issue price of a mortgage loan at the beginning of any accrual period will equal the issue price of the mortgage loan, increased by the aggregate amount of original issue discount with respect to the mortgage loan that accrued in prior accrual periods, and reduced by the amount of any payments made on the mortgage loan in prior accrual periods of amounts included in its stated redemption price.

In addition to its regular reports, the servicer or the trustee will provide to any holder of a Grantor Trust Fractional Interest Certificate such information as the holder may reasonably request from time to

time with respect to original issue discount accruing on Grantor Trust Fractional Interest Certificates. See "—Grantor Trust Reporting" below.

*Market Discount*. If the stripped bond rules do not apply to the Grantor Trust Fractional Interest Certificate, a certificateholder may be subject to the market discount rules of Sections 1276 through 1278 of the Code to the extent an interest in a mortgage loan is considered to have been purchased at a market discount, that is, in the case of a mortgage loan issued without original issue discount, at a purchase price less than its remaining stated redemption price, or in the case of a mortgage loan issued with original issue discount, at a purchase price less than its adjusted issue price. If market discount is in excess of a de minimis amount, the holder generally will be required to include in income in each month the amount of the discount that has accrued through the month that has not previously been included in income, but 122limited, in the case of the portion of the discount that is allocable to any mortgage loan, to the payment of stated redemption price on the mortgage loan that is received by, or, in the case of accrual basis certificateholders, due to, the trust in that month.

A certificateholder may elect to include market discount in income currently as it accrues under a constant yield method based on the yield of the certificate to the holder rather than including it on a deferred basis under rules similar to those described in "—Taxation of Owners of REMIC Regular Certificates—Market Discount" above.

Section 1276(b)(3) of the Code authorizes the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, the principal of which is payable in more than one installment. Until regulations are issued by the Treasury Department, rules described in the committee report will apply. Under those rules, in each accrual period market discount on the mortgage loans should accrue, at the certificateholder's option: (1) on the basis of a constant yield method, (2) in the case of a mortgage loan issued without original issue discount, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total stated interest remaining to be paid on the mortgage loan as of the beginning of the accrual period, or (3) in the case of a mortgage loan issued with original issue discount, in an amount that bears the same ratio to the total original issue discount remaining at the beginning of the accrual period. The Prepayment Assumption, if any, used in calculating the accrual of original issue discount is to be used in calculating the accrual of market discount. The effect of using a Prepayment Assumption could be to accelerate the reporting of the discount income. Because the regulations referred to in this paragraph have not been issued, it is not possible to predict what effect the regulations might have on the tax treatment of a mortgage loan purchased at a discount in the secondary market.

Because the mortgage loans will provide for periodic payments of stated redemption price, the market discount may be required to be included in income at a rate that is not significantly slower than the rate at which the discount would be included in income if it were original issue discount.

Market discount with respect to mortgage loans may be considered to be de minimis and, if so, will be includible in income under de minimis rules similar to those described above in "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" with the exception that it is less likely that a Prepayment Assumption will be used for purposes of these rules with respect to the mortgage loans.

Further, under the rules described in "—Taxation of Owners of REMIC Regular Certificates—Market Discount," above, any discount that is not original issue discount and exceeds a de minimis amount may require the deferral of interest expense deductions attributable to accrued market discount not yet includible in income, unless an election has been made to report market discount currently as it accrues. This rule applies without regard to the origination dates of the mortgage loans.

*Premium*. If a certificateholder is treated as acquiring the underlying mortgage loans at a premium, that is, at a price in excess of their remaining stated redemption price, the certificateholder may elect under Section 171 of the Code to amortize using a constant yield method the portion of the premium allocable to mortgage loans originated after September 27, 1985. Amortizable premium is treated as an offset to interest income on the related debt instrument, rather than as a separate interest deduction. However, premium allocable to mortgage loans originated before September 28, 1985 or to mortgage loans for which an amortization election is not made, should be allocated among the payments of stated redemption price on

the mortgage loan and be allowed as a deduction as these payments are made, or, for a certificateholder using the accrual method of accounting, when the payments of stated redemption price are due.

It is unclear whether a Prepayment Assumption should be used in computing amortization of premium allowable under Section 171 of the Code. If premium is not subject to amortization using a Prepayment Assumption and a mortgage loan prepaid in full, the holder of a Grantor Trust Fractional Interest Certificate acquired at a premium should recognize a loss, equal to the difference between the portion of the prepaid principal amount of the mortgage loan that is allocable to the certificate and the portion of the adjusted basis of the certificate that is allocable to the mortgage loan. If a Prepayment Assumption is used to amortize this premium, it appears that this loss would be unavailable. Instead, if a Prepayment Assumption is used, a prepayment should be treated as a partial payment of the stated redemption price of the Grantor Trust Fractional Interest Certificate and accounted for under a method similar to that described for taking account of original issue discount on REMIC Regular Certificates. It is unclear whether any other adjustments would be required to reflect differences between the Prepayment Assumption used, and the actual rate of prepayments. See "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount."

*Taxation of Owners of Grantor Trust Strip Certificates.* The stripped coupon rules of Section 1286 of the Code will apply to the Grantor Trust Strip Certificates. Except as described above in "—If Stripped Bond Rules Apply," no regulations or published rulings under Section 1286 of the Code have been issued and uncertainty exists as to how it will be applied to securities like the Grantor Trust Strip Certificates. Accordingly, it is suggested that holders of Grantor Trust Strip Certificates consult their own tax advisors concerning the method to be used in reporting income or loss with respect to the certificates.

The OID Regulations do not apply to stripped coupons, although they provide general guidance as to how the original issue discount sections of the Code will be applied. In addition, the discussion below is subject to the discussion under "—Possible Application of Contingent Payment Rules" and assumes that the holder of a Grantor Trust Strip Certificate will not own any Grantor Trust Fractional Interest Certificates.

Under the stripped coupon rules, it appears that original issue discount will be required to be accrued in each month on the Grantor Trust Strip Certificates based on a constant yield method. In effect, each holder of Grantor Trust Strip Certificates would include as interest income in each month an amount equal to the product of the holder's adjusted basis in the Grantor Trust Strip Certificate at the beginning of that month and the yield of the Grantor Trust Strip Certificate to the holder. The yield would be calculated based on the price paid for that Grantor Trust Strip Certificate by its holder and the payments remaining to be made thereon at the time of the purchase, plus an allocable portion of the servicing fees and expenses to be paid with respect to the mortgage loans. See "—If Stripped Bond Rules Apply" above.

As noted, Section 1272(a)(6) of the Code requires that a Prepayment Assumption be used in computing the accrual of original issue discount with respect to some categories of debt instruments, and that adjustments be made in the amount and rate of accrual of the discount when prepayments do not conform to the Prepayment Assumption. To the extent the Grantor Trust Strip Certificates represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, those provisions apply to Grantor Trust Strip Certificates. It is unclear whether those provisions would be applicable to the Grantor Trust Strip Certificates that do not represent an interest in any such pool, or whether use of a Prepayment Assumption may be required or permitted in the absence of these provisions. It is also uncertain, if a Prepayment Assumption is used, whether the assumed prepayment rate would be determined based on conditions at the time of the first sale of the Grantor Trust Strip Certificate or, with respect to any subsequent holder, at the time of purchase of the Grantor Trust Strip Certificate by that holder.

The accrual of income on the Grantor Trust Strip Certificates will be significantly slower if a Prepayment Assumption is permitted to be made than if yield is computed assuming no prepayments. It currently is intended to base information returns or reports to the IRS and certificateholders on the Prepayment Assumption disclosed in the related prospectus supplement and on a constant yield computed using a representative initial offering price for each class of certificates. However, none of the depositor, the servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or at any other rate and certificateholders should bear in mind that the use of a representative initial offering price will mean that the information returns or reports, even

if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders of each series who bought at that price. Prospective purchasers of the Grantor Trust Strip Certificates are encouraged to consult their own tax advisors regarding the use of the Prepayment Assumption.

It is unclear under what circumstances, if any, the prepayment of a mortgage loan will give rise to a loss to the holder of a Grantor Trust Strip Certificate. If a Grantor Trust Strip Certificate is treated as a single instrument rather than an interest in discrete mortgage loans and the effect of prepayments is taken into account in computing yield with respect to the Grantor Trust Strip Certificate, it appears that no loss may be available as a result of any particular prepayment unless prepayments occur at a rate faster than the Prepayment Assumption. However, if a Grantor Trust Strip Certificate is treated as an interest in discrete mortgage loans, or if the Prepayment Assumption is not used, then, when a mortgage loan is prepaid, the holder of a Grantor Trust Strip Certificate should be able to recognize a loss equal to the portion of the adjusted issue price of the Grantor Trust Strip Certificate that is allocable to the mortgage loan.

*Possible Application of Contingent Payment Rules*. The coupon stripping rules' general treatment of stripped coupons is to regard them as newly issued debt instruments in the hands of each purchaser. To the extent that payments on the Grantor Trust Strip Certificates would cease if the mortgage loans were prepaid in full, the Grantor Trust Strip Certificates could be considered to be debt instruments providing for contingent payments. Under the OID Regulations, debt instruments providing for contingent payments are not subject to the same rules as debt instruments providing for noncontingent payments. Regulations were promulgated in 1996, regarding contingent payment debt instruments, the "Contingent Payment Regulations," but it appears that Grantor Trust Strip Certificates, to the extent subject to Section 1272(a)(6) of the Code as described above, or due to their similarity to other mortgage-backed securities, such as REMIC regular interests and debt instruments subject to Section 1272(a)(6) of the Code, that are expressly excepted from the application of the Contingent Payment Regulations, are or may be excepted from these regulations. Like the OID Regulations, the Contingent Payment Regulations do not specifically address securities, like the Grantor Trust Strip Certificates, that are subject to the stripped bond rules of Section 1286 of the Code.

If the contingent payment rules under the Contingent Payment Regulations were to apply, the holder of a Grantor Trust Strip Certificate would be required to apply the noncontingent bond method. Under the noncontingent bond method, the issuer of a Grantor Trust Strip Certificate determines a projected payment schedule on which interest will accrue. Holders of Grantor Trust Strip Certificates are bound by the issuer's projected payment schedule. The projected payment schedule consists of all noncontingent payments and a projected amount for each contingent payment based on the projected yield of the Grantor Trust Strip Certificate.

The projected amount of each payment is determined so that the projected payment schedule reflects the projected yield. The projected amount of each payment must reasonably reflect the relative expected values of the payments to be received by the holder of a Grantor Trust Strip Certificate. The projected yield referred to above is a reasonable rate, not less than the applicable Federal rate, that as of the issue date reflects general market conditions, the credit quality of the issuer, and the terms and conditions of the mortgage loans. The holder of a Grantor Trust Strip Certificate would be required to include as interest income in each month the adjusted issue price of the Grantor Trust Strip Certificate at the beginning of the period multiplied by the projected yield, and would add to, or subtract from, the income any variation between the payment actually received in that month and the payment originally projected to be made in that month.

Assuming that a Prepayment Assumption were used, if the Contingent Payment Regulations or their principles were applied to Grantor Trust Strip Certificates, the amount of income reported with respect thereto would be substantially similar to that described under "—Taxation of Owners of Grantor Trust Strip Certificates." Certificateholders are encouraged to consult their tax advisors concerning the possible application of the contingent payment rules to the Grantor Trust Strip Certificates.

*Sales of Grantor Trust Certificates*. Any gain or loss (equal to the difference between the amount realized and adjusted basis) recognized on the sale or exchange of a Grantor Trust Certificate by an investor who holds the Grantor Trust Certificate as a capital asset will be capital gain or loss, except to the extent of accrued and unrecognized market discount, which will be treated as ordinary income, and, in the

case of banks and other financial institutions, except as provided under Section 582(c) of the Code. The adjusted basis of a Grantor Trust Certificate generally will equal its cost, increased by any income reported by the seller, including original issue discount and market discount income, and reduced, but not below zero, by any previously reported losses, any amortized premium and any distributions with respect to the Grantor Trust Certificate.

Gain or loss from the sale of a Grantor Trust Certificate may be partially or wholly ordinary and not capital in some circumstances. Gain attributable to accrued and unrecognized market discount will be treated as ordinary income, as will gain or loss recognized by banks and other financial institutions subject to Section 582(c) of the Code. Furthermore, a portion of any gain that might otherwise be capital gain may be treated as ordinary income to the extent that the Grantor Trust Certificate is held as part of a conversion transaction within the meaning of Section 1258 of the Code. A conversion transaction generally is one in which the taxpayer has taken two or more positions in the same or similar property that reduce or eliminate market risk, if substantially all of the taxpayer's return is attributable to the time value of the taxpayer's net investment in the transaction. The amount of gain realized in a conversion transaction that is recharacterized as ordinary income generally will not exceed the amount of interest that would have accrued on the taxpayer's net investment at 120% of the appropriate applicable Federal rate at the time the taxpayer enters into the conversion transaction, subject to appropriate reduction for prior inclusion of interest and other ordinary income items from the transaction. Finally, a taxpayer may elect to have net capital gain taxed at ordinary income rates rather than capital gains rates in order to include the net capital gain in total net investment income for that taxable year, for purposes of the rule that limits the deduction of interest on indebtedness incurred to purchase or carry property held for investment to a taxpayer's net investment income.

*Grantor Trust Reporting.* The servicer or the trustee will furnish to each holder of a Grantor Trust Fractional Interest Certificate with each distribution a statement setting forth the amount of the distribution allocable to principal on the underlying mortgage loans and to interest thereon at the related pass-through rate. In addition, the servicer or the trustee will furnish, within a reasonable time after the end of each calendar year, to each holder of a Grantor Trust Certificate who was a holder at any time during that year, information regarding the amount of any servicing compensation received by the servicer and sub-servicer and any other customary factual information the servicer or the trustee deems necessary or desirable to enable holders of Grantor Trust Certificates to prepare their tax returns and will furnish comparable information to the IRS as and when required by law to do so. Because the rules for accruing discount and amortizing premium with respect to the Grantor Trust Certificates are uncertain in various respects, there is no assurance the IRS will agree with the trust's information reports of these items of income and expense. Moreover, these information reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders that bought their certificates at the representative initial offering price used in preparing the reports.

*Backup Withholding.* In general, the rules described in "—REMICs—Backup Withholding with Respect to REMIC Certificates" will also apply to Grantor Trust Certificates.

*Foreign Investors.* In general, the discussion with respect to REMIC Regular Certificates in "—Taxation of Owners of REMIC Residual Certificates—Foreign Investors in REMIC Certificates" applies to Grantor Trust Certificates except that Grantor Trust Certificates will be eligible for exemption from U.S. withholding tax, subject to the conditions described in the discussion, only to the extent the related mortgage loans were originated after July 18, 1984 and only to the extent such mortgage loans have not been converted to real property.

To the extent that interest on a Grantor Trust Certificate would be exempt under Sections 871(h)(1) and 881(c) of the Code from United States withholding tax, and the Grantor Trust Certificate is not held in connection with a certificateholder's trade or business in the United States, the Grantor Trust Certificate will not be subject to United States estate taxes in the estate of a non-resident alien individual.

## Partnership Trusts

*Classification of Partnership Trusts.* With respect to each series of Partnership Certificates, counsel to the depositor will provide its opinion that the trust will not be a taxable mortgage pool or an association, or publicly traded partnership, taxable as a corporation for federal income tax purposes. This opinion will be

based on the assumption that the terms of the related pooling and servicing agreement and related documents will be complied with, and on counsel's conclusions that the nature of the income of the trust will exempt it from the rule that certain publicly traded partnerships are taxable as corporations.

If the trust were taxable as a corporation for federal income tax purposes, the trust would be subject to corporate income tax on its taxable income. The trust's taxable income would include all its income on the related mortgage loans, possibly reduced by its interest expense on any outstanding debt securities. Any corporate income tax could materially reduce cash available to make distributions on the Partnership Certificates and certificateholders could be liable for any tax that is unpaid by the trust.

*Characterization of Investments in Partnership Certificates.* For federal income tax purposes,

(1) Partnership Certificates held by a thrift institution taxed as a domestic building and loan association will not constitute "loans . . . secured by an interest in real property" within the meaning of Code Section 7701(a)(19)(C)(v);

(2) Partnership Certificates held by a real estate investment trust will constitute real estate assets within the meaning of Code Section 856(c)(5)(B) and interest on Partnership Certificates will be treated as "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Code Section 856(c)(3)(B), based on the real estate investments trust's proportionate interest in the assets of the Partnership Trust based on capital accounts; and

(3) Partnership Certificates held by a regulated investment company will not constitute Government securities within the meaning of Code Section 851(b)(3)(A)(i).

*Taxation of Owners of Partnership Certificates*

*Treatment of the Partnership Trust as a Partnership.* If specified in the prospectus supplement, the depositor will agree, and the certificateholders will agree by their purchase of Certificates, to treat the Partnership Trust as a partnership for purposes of federal and state income tax, franchise tax and any other tax measured in whole or in part by income, with the assets of the partnership being the assets held by the Partnership Trust and the partners of the partnership being the certificateholders, including the depositor. However, the proper characterization of the arrangement involving the Partnership Trust, the Partnership Certificates and the depositor is not clear, because there is no authority on transactions closely comparable to that contemplated in the prospectus.

A variety of alternative characterizations are possible. For example, because one or more of the classes of Partnership Certificates have certain features characteristic of debt, the Partnership Certificates might be considered debt of the depositor or the Partnership Trust. Any alternative characterization would not result in materially adverse tax consequences to Certificateholders as compared to the consequences from treatment of the Partnership Certificates as equity in a partnership. The following discussion assumes that the Partnership Certificates represent equity interests in a partnership.

*Partnership Taxation.* As a partnership, the Partnership Trust will not be subject to federal income tax. Rather, each Certificateholder will be required to separately take into account the holder's allocated share of income, gains, losses, deductions and credits of the Partnership Trust. It is anticipated that the Partnership Trust's income will consist primarily of interest earned on the mortgage loans, including appropriate adjustments for market discount, original issue discount and bond premium, as described above under "—Grantor Trusts—Characterization of Investments in Grantor Trust Certificates—If Stripped Bond Rules Do Not Apply," "—Market Discount" and "—Premium," and any gain upon collection or disposition of mortgage loans. The Partnership Trust's deductions will consist primarily of interest accruing with respect to any outstanding debt securities, servicing and other fees, and losses or deductions upon collection or disposition of any outstanding debt securities.

The tax items of a partnership are allocable to the partners in accordance with the Code, Treasury regulations and the partnership agreement, which will include a pooling and servicing agreement and related documents. The pooling and servicing agreement will provide, in general, that the Certificateholders will be allocated taxable income of the Partnership Trust for each Due Period equal to the sum of (1) the interest that accrues on the Partnership Certificates in accordance with their terms for the Due Period, including interest accruing at the applicable pass-through rate for the Due Period and interest on amounts previously due on the Partnership Certificates but not yet distributed; (2) any Partnership Trust income attributable to

discount on the mortgage loans that corresponds to any excess of the principal amount of the Partnership Certificates over their initial issue price; and (3) any other amounts of income payable to the certificateholders for the Due Period. The allocation will be reduced by any amortization by the Partnership Trust of premium on mortgage loans that corresponds to any excess of the issue price of Partnership Certificates over their principal amount. All remaining taxable income of the Partnership Trust will be allocated to the depositor. Based on the economic arrangement of the parties, this approach for allocating Partnership Trust income should be permissible under applicable Treasury regulations, although no assurance can be given that the IRS would not require a greater amount of income to be allocated to certificateholders. Moreover, even under that method of allocation, certificateholders may be allocated income equal to the entire pass-through rate plus the other items described under that method even though the Partnership Trust might not have sufficient cash to make current cash distributions of these amounts. Thus, cash basis holders will in effect be required to report income from the Partnership Certificates on the accrual basis and certificateholders may become liable for taxes on Partnership Trust income even if they have not received cash from the Partnership Trust to pay these taxes.

Some or all of the taxable income allocated to a certificateholder that is a pension, profit sharing or employee benefit plan or other tax-exempt entity, including an individual retirement account, may constitute unrelated business taxable income generally taxable to that holder under the Code.

A share of expenses of the Partnership Trust, including fees of the servicer but not interest expense, allocable to an individual, estate or trust certificateholder would be miscellaneous itemized deductions subject to the limitations described above under "—Grantor Trusts—Taxation of Owners of Grantor Trust Fractional Interest Certificates." Accordingly, deductions for these expenses might be disallowed to the individual in whole or in part and might result in that holder being taxed on an amount of income that exceeds the amount of cash actually distributed to the holder over the life of the Partnership Trust.

Discount income or premium amortization with respect to each mortgage loan would be calculated in a manner similar to the description under "—Grantor Trusts—Taxation of Owners of Grantor Trust Fractional Interest Certificates—If Stripped Bond Rules Do Not Apply." Notwithstanding this description, it is intended that the Partnership Trust will make all tax calculations relating to income and allocations to certificateholders on an aggregate basis for all mortgage loans held by the Partnership Trust rather than on a mortgage loan-by-mortgage loan basis. If the IRS were to require that these calculations be made separately for each mortgage loan, the Partnership Trust might be required to incur additional expense, but it is believed that there would not be a material adverse effect on certificateholders.

*Discount and Premium.* It is not anticipated that the mortgage loans will have been issued with a significant amount of original issue discount and, therefore, the Partnership Trust should not have a significant amount of original issue discount income. However, the purchase price paid by the Partnership Trust for the mortgage loans may be greater or less than the remaining principal balance of the mortgage loans at the time of purchase. If so, the mortgage loans will have been acquired at a premium or discount, as the case may be. As stated in the previous paragraph, the Partnership Trust intends to make any calculation of original issue discount on an aggregate basis, but might be required to recompute it on a mortgage loan-by-mortgage loan basis. See "—Grantor Trusts—Characterization of Investments in Grantor Trust Certificates—Market Discount" and "—Premium."

If the Partnership Trust acquires the mortgage loans at a market discount or premium, the Partnership Trust will elect to include any discount in income currently as it accrues over the life of the mortgage loans or to offset any premium against interest income on the mortgage loans. As stated in the second preceding paragraph, a portion of the market discount income or premium deduction may be allocated to certificateholders.

*Section 708 Termination.* Under Section 708 of the Code, the Partnership Trust will be deemed to terminate for federal income tax purposes if 50% or more of the capital and profits interests in the Partnership Trust are sold or exchanged within a 12-month period. A 50% or greater transfer would cause a deemed contribution of the assets of a Partnership Trust, the old partnership, to a new Partnership Trust, the new partnership, in exchange for interests in the new partnership. These interests would be deemed distributed to the partners of the old partnership in liquidation thereof, which would not constitute a sale or exchange.

*Disposition of Certificates*. Generally, capital gain or loss will be recognized on a sale of Partnership Certificates in amount equal to the difference between the amount realized and the seller's tax basis in the Partnership Certificates sold. A certificateholder's tax basis in a Partnership Certificate will generally equal the holder's cost increased by the holder's share of Partnership Trust income includible in income and decreased by any distributions received with respect to the Partnership Certificate. In addition, both the tax basis in the Partnership Certificates and the amount realized on a sale of a Partnership Certificate would include the holder's share of any liabilities of the Partnership Trust. A holder acquiring Partnership Certificates at different prices may be required to maintain a single aggregate adjusted tax basis in such Partnership Certificates, and, upon sale or other disposition of some of the Partnership Certificates, allocate a portion of the aggregate tax basis to the Partnership Certificates sold, rather than maintaining a separate tax basis in each Partnership Certificate for purposes of computing gain or loss on a sale of that Partnership Certificate.

Any gain on the sale of a Partnership Certificate attributable to the holder's share of unrecognized accrued market discount on the mortgage loans would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements. The Partnership Trust does not expect to have any other assets that would give rise to such special reporting considerations. Thus, to avoid these special reporting requirements, the Partnership Trust will elect to include market discount in income as it accrues.

If a certificateholder is required to recognize an aggregate amount of income, not including income attributable to disallowed itemized deductions, over the life of the Partnership Certificates that exceeds the aggregate cash distributions with respect thereto, the excess will generally give rise to a capital loss upon the retirement of the Partnership Certificates.

*Allocations Between Transferors and Transferees*. In general, the Partnership Trust's taxable income and losses will be determined each Due Period and the tax items for a particular Due Period will be apportioned among the certificateholders in proportion to the principal amount of Partnership Certificates owned by them as of the close of the last day of such Due Period. As a result, a holder purchasing Partnership Certificates may be allocated tax items which will affect its tax liability and tax basis attributable to periods before the actual transaction.

The use of a Due Period convention may not be permitted by existing regulations. If a Due Period convention is not allowed or may be used only for transfers of less than all of the partner's interest, taxable income or losses of the Partnership Trust might be reallocated among the certificateholders. The depositor will be authorized to revise the Partnership Trust's method of allocation between transferors and transferees to conform to a method permitted by future regulations.

*Section 731 Distributions*. In the case of any distribution to a certificateholder, no gain will be recognized to that certificateholder to the extent that the amount of any money distributed with respect to the Partnership Certificate does not exceed the adjusted basis of the certificateholder's interest in the Partnership Certificate. To the extent that the amount of money distributed exceeds the certificateholder's adjusted basis, gain will be currently recognized. In the case of any distribution to a certificateholder, no loss will be recognized except upon a distribution in liquidation of a certificateholder's interest. Any gain or loss recognized by a certificateholder will be capital gain or loss.

*Section 754 Election*. In the event that a certificateholder sells its Partnership Certificates at a profit, the purchasing certificateholder will have a higher basis in the Partnership Certificates than the selling certificateholder had. An opposite result will follow if the Partnership Certificate is sold at a loss. The tax basis of the Partnership Trust's assets would not be adjusted to reflect that higher or lower basis unless the Partnership Trust were to file an election under Section 754 of the Code. In order to avoid the administrative complexities that would be involved in keeping accurate accounting records, as well as potentially onerous information reporting requirements, the Partnership Trust will not make such election. As a result, a certificateholder might be allocated a greater or lesser amount of Partnership Trust income than would be appropriate based on their own purchase price for Partnership Certificates.

*Administrative Matters*. The trustee is required to keep or have kept complete and accurate books of the Partnership Trust. Such books will be maintained for financial reporting and tax purposes on an accrual basis and the fiscal year of the Partnership Trust will be the calendar year. The trustee will file a partnership information return, IRS Form 1065, with the IRS for each taxable year of the Partnership Trust and will report each certificateholder's allocable share of items of Partnership Trust income and expense to

holders and the IRS on Schedule K-1. The trustee will provide the Schedule K-1 information to nominees that fail to provide the Partnership Trust with the information statement described below and the nominees will be required to forward this information to the beneficial owners of the Partnership Certificates. Generally, holders must file tax returns that are consistent with the information return filed by the Partnership Trust or be subject to penalties unless the holder notifies the IRS of all such inconsistencies.

Under Section 6031 of the Code, any person that holds Partnership Certificates as a nominee at any time during a calendar year is required to furnish the Partnership Trust with a statement containing information on the nominee, the beneficial owners and the Partnership Certificates so held. Such information includes (1) the name, address and taxpayer identification number of the nominee and (2) as to each beneficial owner (x) the name, address and identification number of that person, (y) whether that person is a United States Person, a tax-exempt entity or a foreign government, an international organization, or any wholly-owned agency or instrumentality of either of the foregoing, and (z) information relating to Partnership Certificates that were held, bought or sold on behalf of that person throughout the year. In addition, brokers and financial institutions that hold Partnership Certificates through a nominee are required to furnish directly to the trustee information as to themselves and their ownership of Partnership Certificates. A clearing agency registered under Section 17A of the Securities Exchange Act of 1934 is not required to furnish any information statement to the Partnership Trust. The information referred to above for any calendar year must be furnished to the Partnership Trust on or before the following January 31. Nominees, brokers and financial institutions that fail to provide the Partnership Trust with the information described above may be subject to penalties.

The tax matters person designated in the pooling and servicing agreement will be responsible for representing the certificateholders in any dispute with the IRS. The Code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer. Generally, the statute of limitations for partnership items does not expire until three years after the date on which the partnership information return is filed. Any adverse determination following an audit of the return of the Partnership Trust by the appropriate taxing authorities could result in an adjustment of the returns of the certificateholders, and a certificateholder may be precluded from separately litigating a proposed adjustment to the items of the Partnership Trust. An adjustment could also result in an audit of a certificateholder's returns and adjustments of items not related to the income and losses of the Partnership Trust.

*Tax Consequences to Foreign Certificateholders.* It is not clear whether the Partnership Trust would be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-United States Persons, because there is no clear authority dealing with that issue under facts substantially similar to those in this case. Although it is not expected that the Partnership Trust would be engaged in a trade or business in the United States for these purposes, the Partnership Trust will withhold as if it were so engaged in order to protect the Partnership Trust from possible adverse consequences of a failure to withhold. The Partnership Trust expects to withhold on the portion of its taxable income that is allocable to foreign certificateholders pursuant to Section 1446 of the Code as if this income were effectively connected to a U.S. trade or business. Amounts withheld will be deemed distributed to the foreign certificateholders. Subsequent adoption of Treasury regulations or the issuance of other administrative pronouncements may require the Partnership Trust to change its withholding procedures. In determining a holder's withholding status, the Partnership Trust may rely on IRS Form W-8BEN, IRS Form W-8ECI, IRS Form W-9 or the holder's certification of nonforeign status signed under penalties of perjury.

Each foreign holder might be required to file a U.S. individual or corporate income tax return, including, in the case of a corporation, the branch profits tax, on its share of the Partnership Trust's income. Each foreign holder must obtain a taxpayer identification number from the IRS and submit that number to the Partnership Trust on Form W-8 BEN or Form W-8ECI in order to assure appropriate crediting of the taxes withheld. A foreign holder generally would be entitled to file with the IRS a claim for refund with respect to taxes withheld by the Partnership Trust, taking the position that no taxes were due because the Partnership Trust was not engaged in a U.S. trade or business. However, interest payments made or accrued to a certificateholder who is a foreign person generally will be considered guaranteed payments to the extent such payments are determined without regard to the income of the Partnership Trust. If these interest payments are properly characterized as guaranteed payments, then the interest will not be considered portfolio interest. As a result, certificateholders who are foreign persons will be subject to

127

United States federal income tax and withholding tax at a rate of 30 percent, unless reduced or eliminated pursuant to an applicable treaty. In that event, a foreign holder would only be entitled to claim a refund for that portion of the taxes in excess of the taxes that should be withheld with respect to the guaranteed payments.

*Backup Withholding.* Distributions made on the Partnership Certificates and proceeds from the sale of the Partnership Certificates will be subject to a backup withholding tax if the certificateholder fails to comply with certain identification procedures, unless the holder is an exempt recipient under applicable provisions of the Code.

It is suggested that prospective purchasers consult their tax advisors with respect to the tax consequences to them of the purchase, ownership and disposition of REMIC Certificates, Notes, Grantor Trust Certificates and Partnership Certificates, including the tax consequences under state, local, foreign and other tax laws and the possible effects of changes in federal or other tax laws.

**Tax Return Disclosure and Investor List Requirements**

Treasury regulations directed at potentially abusive tax shelter activity appear to apply to transactions not conventionally regarded as tax shelters. The regulations require taxpayers to report certain disclosures on IRS Form 8886 if they participate in a 'reportable transaction.' Material advisors with respect to the transaction are required to maintain records including investor lists containing identifying information and to furnish those records to the IRS upon demand. A transaction may be a "reportable transaction" based upon any of several indicia, including the existence of book-tax differences common to financial transactions, one or more of which may be present with respect to an investment in securities offered under this prospectus and the related prospectus supplement. The Jobs Act imposes significant penalties for failure to comply with these disclosure requirements. Investors in securities are encouraged to consult their own tax advisers concerning any possible disclosure obligation with respect to their investment, and should be aware that the depositor and other participants in the transaction intend to comply with such disclosure and investor list maintenance requirements as they determine apply to them with respect to the transaction.

## STATE AND OTHER TAX CONSEQUENCES

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the offered securities. State tax law may differ substantially from the corresponding federal tax law, and the discussion described under "Material Federal Income Tax Consequences" does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors are encouraged to consult their own tax advisors with respect to the various tax consequences of investments in the offered securities.

## ERISA CONSIDERATIONS

Sections 404 and 406 of ERISA impose fiduciary and prohibited transaction restrictions on ERISA Plans and on certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans, bank collective investment funds and insurance company general and separate accounts in which such ERISA Plans are invested. Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on Tax-Favored Plans.

Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA) and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA or Section 4975 of the Code. Accordingly, assets of such plans may be invested in securities without regard to the ERISA considerations described below, subject to the provisions of applicable federal and state law. However, any such plan that is a tax-qualified plan and exempt from taxation under Sections 401(a) and 501(a) of the Code is subject to the prohibited transaction restrictions imposed under Section 503 of the Code.

In addition to imposing general fiduciary standards, including those of investment prudence and diversification and the requirement that a Plan's investment be made in accordance with the documents governing the Plan, Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of

transactions involving "plan assets" of Plans and Parties in Interest, unless a statutory, regulatory or administrative exemption is available. Certain Parties in Interest that participate in a prohibited transaction may be subject to penalties and/or excise taxes imposed under ERISA and/or Section 4975 of the Code, unless a statutory, regulatory or administrative exemption is available with respect to any such transaction.

**Plan Asset Regulation**

An investment of Plan Assets in securities may cause the underlying mortgage loans, cooperative loans, agency securities, private securities, and/or other assets held by a trust to be deemed "plan assets" of the investing Plan or Plans. The United States Department of Labor ("DOL") has issued the DOL Regulation for purposes of applying the general fiduciary standards of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code when a Plan acquires an interest (such as a security) in such entity. Because of the factual nature of certain rules in the DOL Regulation, it cannot be predicted whether the assets of a Plan will be deemed to include either (i) an interest in the assets of a entity in which the Plan holds an equity interest (such as a trust), or (ii) merely the Plan's interest in the instrument evidencing such interest. Therefore, neither Plans nor certain entities in which Plan Assets are invested should acquire or hold securities in reliance upon the availability of any exception under the DOL Regulation.

Under the DOL Regulation, the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may apply to a trust and cause the depositor, any servicer, any trustee, the obligor under any credit enhancement mechanism and certain of their affiliates to be considered or become Parties in Interest with respect to a Plan investing in the securities, whether directly or through an entity holding Plan Assets. In such circumstances, the acquisition or holding of securities by or with Plan Assets of the investing Plan could also give rise to a prohibited transaction under ERISA and/or Section 4975 of the Code, unless a statutory, regulatory or administrative exemption is available. Under the DOL Regulation, the assets of a Plan which holds a security would include such security and may also be deemed to include the mortgage loans and/or other assets held by the related trust. Special caution should be exercised before Plan Assets are used to acquire a security in such circumstances, especially if, with respect to such Plan Assets, the depositor, any servicer, any trustee, the obligor under any credit enhancement mechanism or any of their affiliates has either (i) investment discretion with respect to such Plan Assets, or (ii) authority or responsibility to give (or regularly gives) investment advice with respect to such Plan Assets for a fee pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets.

Any person who has discretionary authority or control as to the management or disposition of Plan Assets, or who provides investment advice with respect to Plan Assets for a fee (in the manner described above), is a fiduciary with respect to such Plan Assets. If the mortgage loans and/or other assets held by a trust were to constitute Plan Assets, any party exercising management or discretionary control with respect to such assets may be deemed to be a "fiduciary" with respect to any investing Plan and subject to the fiduciary requirements of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code. In addition, if the mortgage loans and/or other assets held by a trust constitute Plan Assets, the acquisition or holding of securities by, on behalf of or with Plan Assets of a Plan, and the operation of such trust, may be deemed to constitute or result in a prohibited transaction under ERISA and Section 4975 of the Code.

**Underwriter's and WCC Exemption**

The Underwriter's Exemption generally exempts from the application of the prohibited transaction provisions of ERISA and Section 4975 of the Code certain transactions, among others, relating to (i) the servicing and operation of pools of certain secured obligations (such as mortgage loans) that are held by an entity, including a trust, and (ii) the purchase, sale and holding of securities, including pass-through securities, issued by such entity as to which an underwriter (or its affiliate) which has received an Underwriter's Exemption is the sole underwriter or manager or co-manager of the underwriting syndicate or a placement agent, provided that certain conditions set forth in the Underwriter's Exemption are satisfied. For this purpose, the term "Underwriter" as used in reference to the Underwriter's Exemption includes both such an underwriter, placement agent or affiliate and any member of the underwriting syndicate or selling

group with respect to the Class of Certificates as to which such underwriter, placement agent or affiliate is the manager, a co-manager or a placement agent.

If so specified in the accompanying prospectus supplement, broad exemptive relief may be available under the Underwriter's Exemption or under the DOL authorization described immediately below. Effective August 24, 2003, the DOL authorized (DOL Auth. No. 2003-14E) WaMu Capital Corp. ("WCC") and its affiliates to rely upon the exemptive relief from certain of the prohibited transaction provisions of ERISA and Section 4975 of the Code available under DOL Prohibited Transaction Class Exemption 96-62 (the "WCC Exemption") relating to (i) the servicing and operation of pools of certain secured obligations (such as mortgage loans) that are held by an entity, including a trust, and (ii) the purchase, sale and holding of securities, including pass-through certificates or notes, issued by such entity as to which WCC (or its affiliate) is the sole underwriter or manager or co-manager of the underwriting syndicate or a placement agent, provided that certain conditions set forth in the WCC Exemption are satisfied. For this purpose, the term "Underwriter" as used in reference to the WCC Exemption includes both WCC or an affiliate and any member of the underwriting syndicate or selling group with respect to the Class of Certificates as to which WCC or the affiliate is the manager, a co-manager or a placement agent.

Each Underwriter's Exemption and the WCC Exemption set forth the following eight general conditions, which must be satisfied in order for a transaction involving the purchase, sale and holding of securities to be eligible for exemptive relief under either the Underwriter's Exemption or the WCC Exemption:

*First*, the acquisition of securities by a Plan or with Plan Assets must be on terms that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party.

*Second*, the Underwriter's Exemption and the WCC Exemption only apply to securities evidencing rights and interests that are not subordinated to the rights and interests evidenced by other securities issued by the same trust or other entity, unless none of the mortgage loans or other assets has a loan-to-value ratio or combined loan-to-value ratio that exceeds 100% at the date of issuance of the securities.

*Third*, the securities, at the time of acquisition by a Plan or with Plan Assets, must be rated in one of the four highest generic rating categories by at least one of the Exemption Rating Agencies. The securities must be rated in one of the two highest generic categories by at least one of the Exemption Rating Agencies if the loan-to-value ratio or combined loan-to-value ratio of any one- to four-family residential or home equity mortgage loan held in the trust exceeds 100% but does not exceed 125% at the date of issuance of the securities. However, in that case neither the Underwriter's Exemption nor the WCC Exemption will apply (i) to any of the securities if (x) any mortgage loan or other asset held by the trust (other than a one- to four-family residential or home equity mortgage loan) has a loan-to-value ratio or combined loan-to-value ratio that exceeds 100% at the date of issuance of the securities or (y) any one- to four-family residential or home equity mortgage loan has a loan-to-value ratio or combined loan-to-value ratio that exceeds 125% at the date of issuance of the securities or (ii) to any subordinated securities.

*Fourth*, the trustee must not be an affiliate of any other member (other than an underwriter) of the "Restricted Group," which consists of the depositor, each underwriter, each insurer, the servicer, any other servicer, the trustee, the swap counterparty under any swap arrangement, any mortgagor with respect to assets held by a trust constituting more than 5% of the aggregate unamortized principal balance of the assets held by the trust as of the date of initial issuance of the securities and their respective affiliates.

*Fifth*, the sum of all payments made to and retained by the underwriters must represent not more than reasonable compensation for underwriting the securities; the sum of all payments made to and retained by the depositor pursuant to the assignment of the assets to the trust must represent not more than the fair market value of such obligations; and the sum of all payments made to and retained by the servicer or any sub-servicer must represent not more than reasonable compensation for such person's services under the related pooling and servicing agreement, indenture or servicing agreement, as applicable, and reimbursement of such person's reasonable expenses in connection therewith.

*Sixth*, the Plan or other person investing Plan Assets in the securities must be an accredited investor (as defined in Rule 501(a)(1) of Regulation D under the Securities Act of 1933, as amended).

*Seventh*, (i) the trust must hold solely assets of the type that have been included in other investment pools; (ii) securities evidencing interests in such other investment pools must have been rated in one of the

four highest categories by at least one of the Exemption Rating Agencies for at least one year prior to the acquisition of securities by or with Plan Assets of a Plan in reliance on the Underwriter's Exemption or the WCC Exemption; and (iii) securities in such other investment pools must have been purchased by investors (other than Plans) for at least one year prior to any acquisition of securities by or with Plan Assets of a Plan in reliance on the Underwriter's Exemption or the WCC Exemption.

*Eighth*, unless the trust constitutes a grantor trust for federal income tax purposes or a REMIC election has been made for federal income tax purposes with respect to all the assets held by the trust, (i) the legal documents establishing the trust must contain restrictions on the trust's ability to borrow money or issue debt other than in connection with the securitization, on the trust's merging, reorganizing, liquidating or selling assets other than in connection with the securitization, and limiting the trust's activities to activities relating to the securitization, (ii) the related pooling and servicing agreement, indenture or servicing agreement, as applicable, must prohibit all parties thereto from filing an involuntary bankruptcy or insolvency proceeding against the trust and (iii) a legal opinion must be issued that states that either (x) the transfer of assets to the trust constitutes a true sale and is not being made pursuant to a financing of the assets by the transferor, or (y) in the event of insolvency or receivership of the transferor, the assets transferred to the trust will not be part of the estate of the transferor.

The exemptive relief afforded by the Underwriter's Exemption and the WCC Exemption does not apply to any securities where the related trust or other entity holds revolving credit loans or unsecured loans. In addition, the exemptive relief afforded by the Underwriter's Exemption and the WCC Exemption is subject to additional conditions if the securities are related to a trust or other entity which holds certain purchase obligations, swaps, interest rate cap contracts or a pre-funding arrangement, which conditions will be described in the accompanying prospectus supplement.

The Underwriter's Exemption provides that a trust may hold as an asset an "eligible yield supplement agreement," which includes yield supplement agreements or similar arrangements, or if purchased by or on behalf of the trust, interest rate cap contracts to supplement the interest rates otherwise payable on obligations held by the trust. Any agreement or arrangement that is in the form of a notional principal contract must meet the following conditions:

(a) it is denominated in U.S. dollars;

(b) the trust receives on, or immediately prior to, the respective payment date for the class of securities to which the agreement or arrangement relates, a fixed rate of interest or a floating rate of interest based on a publicly available index (e.g., LIBOR or the U.S. Federal Reserve's Cost of Funds Index), with the trust receiving such payments on at least a quarterly basis;

(c) it is not leveraged (i.e., payments are based on the applicable notional amount, the day count fractions, the fixed or floating rates permitted above, the difference between the products thereof, calculated on a one-to-one ratio and not on a multiplier of such difference);

(d) it does not allow any of the three preceding requirements to be unilaterally altered without the consent of the trustee;

(e) it is entered into between the trust and an "eligible counterparty" (i.e., a bank or other financial institution which has a rating, at the date of issuance of securities, which is one of the three highest long-term credit rating categories, or one of the two highest short-term credit rating categories, utilized by at least one of the Exemption Rating Agencies rating the securities; provided, that if a counterparty is relying on its short-term rating to establish the eligibility under the Underwriter's Exemption, such counterparty must either have a long-term rating in one of the three highest long-term rating categories or not have a long-term rating from the applicable Exemption Rating Agency); and

(f) it has a notional amount that does not exceed either the principal balance of the class of securities to which it relates or the portion of the principal balance of such class represented by certain eligible obligations held by the trust.

Any fiduciary or other person who proposes to use Plan Assets to acquire securities in reliance upon the Underwriter's Exemption or the WCC Exemption must make its own determination as to whether the general conditions set forth above will be satisfied with respect to its acquisition and holding of such securities.

If the general conditions of the Underwriter's Exemption or the WCC Exemption are satisfied, the Underwriter's Exemption or the WCC Exemption, as applicable, may provide exemptive relief from:

(a) The restrictions imposed by Sections 406(a) and 407(a) of ERISA and Sections 4975(c)(1)(A) through (D) of the Code in connection with the direct or indirect sale, exchange, transfer or holding, or the direct or indirect acquisition or disposition in the secondary market, of securities by or with Plan Assets of a Plan, provided that no exemptive relief is provided from the restrictions of Sections 406(a)(1)(E), 406(a)(2) and 407 of ERISA for the acquisition or holding of a security by or with Plan Assets of a Plan sponsored by any member of the Restricted Group (an "Excluded Plan"), or by any person who has discretionary authority or renders investment advice for a fee (as described above) with respect to Plan Assets of such Excluded Plan;

(b) When certain additional conditions are met, the restrictions imposed by Sections 406(b)(1) and (b)(2) of ERISA and Section 4975(c)(1)(E) of the Code in connection with (i) the direct or indirect sale, exchange or transfer of securities in the initial issuance of securities between the depositor or an underwriter and a Plan when the person who has discretionary authority or renders investment advice for a fee (as described above) with respect to the investment of the relevant Plan Assets in the securities is a mortgagor with respect to 5% or less of the fair market value of the assets held by a trust (or its affiliate), (ii) the direct or indirect acquisition or disposition in the secondary market of securities by or with Plan Assets of a Plan, and (iii) the holding of securities by or with Plan Assets of a Plan; and

(c) The restrictions imposed by Sections 406 and 407(a) of ERISA and Section 4975(c) of the Code for certain transactions in connection with the servicing, management and operation of the Mortgage Pools, subject to certain specific conditions which the depositor expects will be satisfied if the general conditions of the Underwriter's Exemption or the WCC Exemption are satisfied.

The Underwriter's Exemption and the WCC Exemption also may provide exemptive relief from the restrictions imposed by Sections 406(a) and 407(a) of ERISA and Sections 4975(c)(1)(A) through (D) of the Code if such restrictions would otherwise be deemed to apply merely because a person is deemed to be a Party in Interest with respect to a Plan investing in the securities (whether directly or through an entity holding Plan Assets) by virtue of providing services to the Plan (or such Plan Assets), or by virtue of having certain specified relationships to such a person, solely as a result of the Plan's ownership of securities.

Before purchasing a security in reliance upon the Underwriter's Exemption or the WCC Exemption, a fiduciary or other investor of Plan Assets should itself confirm that (i) the securities constitute "securities" for purposes of the Underwriter's Exemption or the WCC Exemption, as applicable, and (ii) the specific and general conditions and other requirements set forth in the Underwriter's Exemption or the WCC Exemption would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in the Underwriter's Exemption or the WCC Exemption, as applicable, the fiduciary or other Plan Asset investor should consider its general fiduciary obligations under ERISA in determining whether to purchase any securities with Plan Assets.

**Other Exemptions**

Any fiduciary or other person who proposes to use Plan Assets to acquire securities should consult with its legal counsel with respect to the potential applicability of ERISA and the Code to such investment and the availability of exemptive relief under the Underwriter's Exemption, the WCC Exemption or any other prohibited transaction exemption in connection therewith. In particular, in connection with an acquisition of securities representing a beneficial ownership interest in a pool of single-family residential first or second mortgage loans or agency securities, such fiduciary or other Plan Asset investor should also consider the availability of exemptive relief under PTCE 83-1 for certain transactions involving mortgage pool investment trusts. However, PTCE 83-1 does not provide exemptive relief with respect to securities evidencing an interest in a trust with assets that include cooperative loans, private securities, mortgage loans secured by third or more junior liens, contracts, multifamily or mixed-use mortgage loans, or certain other assets, or which contain a swap or a pre-funding arrangement. In addition, such fiduciary or other Plan Asset investor should consider the availability of other class exemptions granted by the DOL, which provide relief from certain of the prohibited transaction provisions of ERISA and Section 4975 of the Code,

including Sections I and III of PTCE 95-60, regarding transactions by insurance company general accounts. The applicable prospectus supplement may contain additional information regarding the application of the Underwriter's Exemption, the WCC Exemption, PTCE 83-1, PTCE 95-60 or other DOL class exemptions with respect to the offered securities. There can be no assurance that any of these exemptions will apply with respect to any particular Plan's or other Plan Asset investor's investment in the securities or, even if an exemption were applicable, that such exemption would apply to all prohibited transactions that may occur in connection with such an investment.

**Insurance Company General Accounts**

Insurance companies contemplating the investment of general account assets in the securities should consult with their legal advisors with respect to the applicability of Section 401(c) of ERISA. The DOL issued final regulations under Section 401(c) which were published in the Federal Register on January 5, 2000 and became generally applicable on July 5, 2001.

**Representations from Investing Plans**

The accompanying prospectus supplement will describe any conditions that must be satisfied in order for a transfer of securities to a Plan to be registered by the trustee, in the event that the criteria specified in the Underwriter's Exemption or the WCC Exemption, as applicable, as described above are not satisfied by one or more classes of securities, or by a trust or the mortgage loans and other assets held by the trust.

The accompanying prospectus supplement will also describe any representations that will be deemed to have been made by each beneficial owner of a subordinated security offered by this prospectus and the accompanying prospectus supplement (or any interest therein), by virtue of its acquisition or holding of such security (or interest therein), about the satisfaction of certain conditions to the acquisition and holding of such security. If any subordinated security (or any interest therein) is acquired or held in violation of those conditions, the next preceding permitted beneficial owner will be treated as the beneficial owner of the subordinated security, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of any subordinated security (or interest therein) was effected in violation of those conditions will be required to indemnify and hold harmless the depositor, the trustee, the servicer, any sub-servicer, the underwriter and the trust from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

**Tax-Exempt Plan Investors**

A Plan which is exempt from federal income taxation pursuant to Section 501 of the Code generally will be subject to federal income taxation to the extent that its income constitutes unrelated business taxable income (or "UBTI") within the meaning of Section 512 of the Code. Excess inclusions of a REMIC allocated to a REMIC Residual Certificate held by such a Plan will be considered UBTI and thus will be subject to federal income tax. See "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Residual Certificates—Excess Inclusions." In addition, the exemptive relief afforded by the Underwriter's Exemption does not apply to the purchase, sale or holding of any class of REMIC Residual securities.

**Consultation with Counsel**

There can be no assurance that the Underwriter's Exemption, the WCC Exemption or any other exemption granted by the DOL will apply with respect to any particular Plan that acquires securities (whether directly or through an entity holding Plan Assets) or, even if all of the conditions specified in the Underwriter's Exemption or the WCC Exemption, as applicable, were satisfied, that exemptive relief would be available for all transactions involving a trust. Prospective Plan Asset investors should consult with their legal counsel concerning the impact of ERISA and the Code and the potential consequences in their specific circumstances prior to making an investment in securities.

Any fiduciary or other person who proposes to acquire or hold securities on behalf of a Plan or with Plan Assets should consult with its legal counsel with respect to the potential applicability of the fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of

the Code to the proposed investment and the availability of exemptive relief under the Underwriter's Exemption, the WCC Exemption, PTCE 83-1, Sections I and III of PTCE 95-60, and/or any other class exemption granted by the DOL. In addition to making its own determination as to the availability of the exemptive relief provided in the Underwriter's Exemption, the WCC Exemption or any other DOL exemption, any fiduciary of an ERISA-subject Plan should consider its general fiduciary obligations under ERISA in determining whether to purchase securities on behalf of such Plan.

*Any fiduciary or other person who proposes to use Plan Assets to acquire securities should consult with its own legal counsel with respect to the potential consequences under ERISA and the Code of the acquisition and ownership of securities.*

## CERTAIN LEGAL INVESTMENT ASPECTS

The prospectus supplement for each series of securities will specify which classes of securities of the series, if any, will constitute "mortgage related securities" for purposes of SMMEA. Any class of securities that is not rated in one of the two highest rating categories by one or more nationally recognized statistical rating agencies or that represents an interest in a trust that holds junior mortgage loans will not constitute mortgage related securities for purposes of SMMEA. Mortgage related securities constitute legal investments to the same extent that, under applicable law, obligations issued by or guaranteed as to principal and interest by the United States or any agency or instrumentality of the United States constitute legal investments for persons, trusts, corporations, partnerships, associations, business trusts and business entities, including depository institutions, insurance companies and pension funds created pursuant to or existing under the laws of the United States or of any state, the authorized investments of which are subject to state regulation. Under SMMEA, if a state enacted legislation prior to October 3, 1991 specifically limiting the legal investment authority of any entities with respect to mortgage related securities, the securities would constitute legal investments for entities subject to that legislation only to the extent provided in that legislation. SMMEA provides, however, that in no event will the enactment of any legislation of this kind affect the validity of any contractual commitment to purchase, hold or invest in mortgage related securities, or require the sale or other disposition of such securities, so long as that contractual commitment was made or the securities were acquired prior to the enactment of that legislation.

SMMEA also amended the legal investment authority of federally-chartered depository institutions as follows: federal savings and loan associations and federal savings banks may invest in, sell or otherwise deal with "mortgage related securities" without limitation as to the percentage of their assets represented thereby, federal credit unions may invest in these securities, and national banks may purchase these securities for their own account without regard to the limitations generally applicable to investment securities described in 12 U.S.C. §24 (Seventh), subject in each case to any regulations that the applicable federal regulatory authority may prescribe.

On April 23, 1998, the Federal Financial Institutions Examination Council issued a revised supervisory policy statement applicable to all depository institutions, setting forth guidelines for investments in high-risk mortgage securities. The 1998 Policy Statement was adopted by the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the FDIC, the National Credit Union Administration, or NCUA, and the OTS with an effective date of May 26, 1998. The 1998 Policy Statement rescinded a 1992 policy statement that had required, prior to purchase, a depository institution to determine whether a mortgage derivative product that it was considering acquiring was high-risk, and, if so, required that the proposed acquisition would reduce the institution's overall interest rate risk. The 1998 Policy Statement eliminates constraints on investing in certain "high-risk" mortgage derivative products and substitutes broader guidelines for evaluating and monitoring investment risk.

The OTS has issued Thrift Bulletin 73a, entitled "Investing in Complex Securities," or TB 73a, which is effective as of December 18, 2001 and applies to savings associations regulated by the OTS, and Thrift Bulletin 13a, entitled "Management of Interest Rate Risk, Investment Securities, and Derivatives Activities," or TB 13a, which is effective as of December 1, 1998, and applies to thrift institutions regulated by the OTS.

One of the primary purposes of TB 73a is to require savings associations, prior to taking any investment position, to determine that the investment position meets applicable regulatory and policy requirements (including those set forth in TB 13a (see below)) and internal guidelines, is suitable for the

institution, and is safe and sound. The OTS recommends, with respect to purchases of specific securities, additional analysis, including, among others, analysis of repayment terms, legal structure, expected performance of the issuer and any underlying assets as well as analysis of the effects of payment priority, with respect to a security which is divided into separate tranches with unequal payments, and collateral investment parameters, with respect to a security that is prefunded or involves a revolving period. TB 73a reiterates the OTS's due diligence requirements for investing in all securities and warns that if a savings association makes an investment that does not meet the applicable regulatory requirements, the savings association's investment practices will be subject to criticism, and the OTS may require divestiture of such securities. The OTS also recommends, with respect to an investment in any "complex securities," that savings associations should take into account quality and suitability, marketability, interest rate risk, and classification factors. For the purposes of each of TB 73a and TB 13a, "complex security" includes among other things any collateralized mortgage obligation or real estate mortgage investment conduit security, other than any "plain vanilla" mortgage pass through security (that is, securities that are part of a single class of securities in the related pool that are non callable and do not have any special features). Accordingly, all classes of the offered certificates would likely be viewed as "complex securities." With respect to quality and suitability factors, TB 73a warns:

- that a savings association's sole reliance on outside ratings for material purchases of complex securities is an unsafe and unsound practice,

- that a savings association should only use ratings and analyses from nationally recognized rating agencies in conjunction with, and in validation of, its own underwriting processes, and

- that it should not use ratings as a substitute for its own thorough underwriting analyses.

With respect to the interest rate risk factor, TB 73a recommends that savings associations should follow the guidance set forth in TB 13a.

One of the primary purposes of TB 13a is to require thrift institutions, prior to taking any investment position, to:

- conduct a pre-purchase portfolio sensitivity analysis for any "significant transaction" involving securities or financial derivatives, and

- conduct a pre-purchase price sensitivity analysis of any "complex security" or financial derivative.

The OTS recommends that while a thrift institution should conduct its own in-house pre-acquisition analysis, it may rely on an analysis conducted by an independent third party as long as management understands the analysis and its key assumptions. Further, TB 13a recommends that the use of "complex securities with high price sensitivity" be limited to transactions and strategies that lower a thrift institution's portfolio interest rate risk. TB 13a warns that investment in complex securities by thrift institutions that do not have adequate risk measurement, monitoring and control systems may be viewed by the OTS examiners as an unsafe and unsound practice.

There may be other restrictions on the ability of certain investors, including depository institutions, either to purchase securities or to purchase securities representing more than a specified percentage of the investor's assets. Investors should consult their own legal advisors in determining whether and to what extent the securities constitute legal investments for those investors or are subject to investment, capital or other restrictions, and, if applicable, whether SMMEA has been overridden in any jurisdiction relevant to that investor.

## METHODS OF DISTRIBUTION

The securities offered by this prospectus and by the related prospectus supplements will be offered in series through one or more of the methods described in the paragraph below. The prospectus supplement prepared for each series will describe the method of offering being utilized for that series and will state the net proceeds to the depositor from the sale.

The depositor intends that securities will be offered through the following methods from time to time and that offerings may be made concurrently through more than one of these methods or that an offering of

the securities of a particular series may be made through a combination of two or more of these methods. These methods are as follows:

    1. By negotiated firm commitment or best efforts underwriting and public re-offering by underwriters;

    2. By placements by the depositor with institutional investors through dealers; and

    3. By direct placements by the depositor with institutional investors.

If underwriters are used in a sale of any securities, other than in connection with an underwriting on a best efforts basis, the securities will be acquired by the underwriters for their own account and may be resold from time to time in one or more transactions, including negotiated transactions, at fixed public offering prices or at varying prices to be determined at the time of sale or at the time of commitment therefor. The underwriters may be broker-dealers affiliated with the depositor whose identities and relationships to the depositor will be as set forth in the related prospectus supplement. The managing underwriter or underwriters with respect to the offer and sale of the securities of a particular series will be set forth on the cover of the prospectus supplement relating to the series and the members of the underwriting syndicate, if any, will be named in the prospectus supplement.

In connection with the sale of the securities offered, underwriters may receive compensation from the depositor or from purchasers of such securities in the form of discounts, concessions or commissions. Underwriters and dealers participating in the distribution of the securities will be deemed to be underwriters in connection with the securities, and any discounts or commissions received by them from the depositor and any profit on the resale of offered securities by them will be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

It is anticipated that the underwriting agreement pertaining to the sale of offered securities of any series will provide that the obligations of the underwriters will be subject to conditions precedent, that the underwriters will be obligated to purchase all the securities if any are purchased, other than in connection with an underwriting on a best efforts basis, and that, in limited circumstances, the depositor will indemnify the several underwriters and the underwriters will indemnify the depositor against certain civil liabilities, including liabilities under the Securities Act of 1933, or will contribute to payments required to be made in respect of those liabilities.

The prospectus supplement with respect to any series offered by placements through dealers will contain information regarding the nature of the offering and any agreements to be entered into between the depositor and purchasers of offered securities of the series.

The depositor anticipates that the offered securities will be sold primarily to institutional investors or sophisticated noninstitutional investors. Purchasers of offered securities, including dealers, may, depending on the facts and circumstances of such purchases, be deemed to be underwriters within the meaning of the Securities Act of 1933 in connection with reoffers and sales by them of the offered securities. Holders of offered securities should consult with their legal advisors in this regard prior to any reoffer or sale.

## LEGAL MATTERS

The legality of the issuance of the securities has been passed upon for the depositor by Orrick, Herrington & Sutcliffe LLP, San Francisco. Certain other legal matters in connection with the securities will be passed upon for the depositor by Orrick, Herrington & Sutcliffe LLP, San Francisco, Thacher Proffitt & Wood LLP, New York, or Heller Ehrman LLP, Seattle, as specified in the related prospectus supplement.

## FINANCIAL INFORMATION

The depositor has determined that its financial statements are not material to the offering made by this prospectus. The securities do not represent an interest in, or an obligation of, the depositor or any of its affiliates.

## RATINGS

It is a condition to the issuance of any class of securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by at least one nationally recognized statistical rating organization.

Any ratings on the securities address the likelihood of receipt by the holders of those securities of all collections on the underlying mortgage assets to which such holders are entitled. These ratings address the structural, legal and issuer-related aspects associated with the securities, the nature of the underlying mortgage assets and the credit quality of the guarantor, if any. The ratings do not represent any assessment of the likelihood of principal prepayments by borrowers or of the degree by which prepayments might differ from those originally anticipated. As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of Strip Securities in extreme cases might fail to recoup their initial investments.

## AVAILABLE INFORMATION

The depositor is subject to the informational requirements of the Securities Exchange Act of 1934 and in accordance therewith files reports and other information with the Commission. Reports and other information filed by the depositor can be read and copied at the Commission's Public Reference Room, 100 F Street, N.E., Washington, D.C. 20549. Information on the operation of the Public Reference Room may be obtained by calling the Commission at 1-800-SEC-0330. The Commission maintains an Internet site (http://www.sec.gov) that contains copies of reports, proxy and information statements, and other information regarding issuers that file electronically with the Commission. Copies of certain information filed by the depositor with the Commission can be obtained electronically through the Commission's Internet site. The depositor does not intend to send any financial reports to securityholders.

This prospectus does not contain all of the information set forth in the registration statement, of which this prospectus forms a part, and exhibits thereto which the depositor has filed with the Commission under the securities Act of 1933 and to which reference is hereby made.

## INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

We "incorporate by reference" into the prospectus supplement for each series of securities the information we file with the Commission with respect to that series, which means that we can disclose important information to you by referring you to those documents. The information we incorporate by reference into a prospectus supplement is considered to be part of that prospectus supplement from the date it was filed, unless we update or supersede that information by information we file subsequently that is incorporated by reference into that prospectus supplement. We incorporate by reference into the prospectus supplement for each series of securities (i) certain static pool information, as described under "Static Pool Information" in that prospectus supplement, and (ii) any documents filed by us with the Commission with respect to that series under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of that prospectus supplement and prior to the termination of the offering of that series.

Any statement contained in a prospectus supplement or in a document incorporated or deemed to be incorporated by reference into a prospectus supplement will be deemed to be modified or superseded for the purposes of that prospectus supplement to the extent that a statement contained in any other subsequently filed document which also is or is deemed to be incorporated by reference into that prospectus supplement modifies or supersedes the statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of the prospectus supplement.

We will provide without charge to each person to whom this prospectus is delivered in connection with the offering of a series of securities, upon written or oral request, copies of any or all of the documents that have been incorporated by reference into the related prospectus supplement. Requests should be directed to WaMu Asset Acceptance Corp., Attention: Secretary, 1301 Second Avenue, WMC 3501A, Seattle, WA 98101, or by telephone at (206) 554-8838.

## GLOSSARY

*Agency Securities:* Any securities issued by Freddie Mac, Fannie Mae or Ginnie Mae. Agency Securities may represent whole or partial interests in pools of (1) mortgage loans or (2) Agency Securities. Ginnie Mae securities will be backed by the full faith and credit of the United States. None of the Freddie Mac securities or Fannie Mae securities will be backed, directly or indirectly, by the full faith and credit of the United States. Agency Securities may be backed by fixed or adjustable-rate mortgage loans or other types of mortgage loans specified in the accompanying prospectus supplement.

*Accrual Securities:* A class of securities as to which accrued interest or a portion of accrued interest will not be distributed but rather will be added to the principal balance of the security on each distribution date in the manner described in the related prospectus supplement.

*Additional Collateral Loans:* Mortgage loans that are secured by both the related mortgaged property and certain additional collateral which will consist of (i) a security interest in financial assets owned by the mortgagor (which will consist of securities, insurance policies, annuities, certificates of deposit, cash, accounts or similar assets) and/or (ii) a third party guarantee (usually by a relative of the mortgagor), which in turn is secured by a security interest in financial assets of the type described in clause (i) above or in residential property owned by the guarantor.

*Applicable Federal Rate:* A rate based on the average of current yields on Treasury securities, which rate is computed and published monthly by the IRS.

*ARM Loan:* A mortgage loan with an interest rate that adjusts periodically (after an initial fixed-rate period, if applicable) to equal the sum of a fixed percentage amount and an index.

*Bankruptcy Loss:* For any mortgage loan, (i) the amount of any permanent forgiveness of principal with respect to such mortgage loan by a court of competent jurisdiction in a case under the United States Bankruptcy Code or (ii) the amount, if any, by which the outstanding principal balance of such mortgage loan exceeds any valuation, by a court of competent jurisdiction in a case under the United States Bankruptcy Code, of the related mortgaged property.

*CERCLA:* The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

*Clean-Up Call:* The right of a specified party to effect a termination of a trust upon the aggregate principal balance of the outstanding assets of the trust at that time being less than the percentage, as specified in the related prospectus supplement, of the aggregate principal balance of the trust assets at the cut-off date, which percentage will be between 25% and 0%.

*Clearstream:* Clearstream Banking, société anonyme, a company organized under Luxembourg law, which holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in accounts of Clearstream participants.

*Closing Date:* With respect to any series of securities, the date on which the securities are issued.

*Code:* The Internal Revenue Code of 1986, as amended.

*Commission:* The Securities and Exchange Commission.

*Compensating Interest:* For mortgage loans that prepaid in full and/or in part, at any time or only during a specified period each month, an additional payment made by the servicer or any sub-servicer, to the extent funds are available from the servicing fee and/or other amounts, generally equal to the amount of any shortfall in interest collections resulting from such prepayment. The accompanying prospectus supplement will describe in detail whether Compensating Interest is paid and if so, how Compensating Interest is calculated, including any limitations on the amount of Compensating Interest to be paid to the related securityholders.

*CPR:* A constant rate of prepayment on the outstanding principal balance of a pool of mortgage loans, as described in "Yield And Maturity Considerations—Maturity and Weighted Average Life" in this prospectus.

*Crime Control Act:* The Comprehensive Crime Control Act of 1984, as amended.

*DIDMC:* The Depository Institutions Deregulation and Monetary Control Act of 1980.

*DOL:* The United States Department of Labor.

*DOL Regulation:* The regulation promulgated by the DOL at 29 C.F.R. §2510.3-101.

*DTC:* The Depository Trust Company, a limited-purpose trust company organized under the New York Banking Law, which holds securities for its DTC participants, which include securities brokers and dealers, banks, trust companies, clearing corporations and other organizations.

*Due Date:* The date on which scheduled monthly payments on the mortgage assets are due, which may be the first day of each calendar month or another date, as specified in the prospectus supplement.

*Due Period:* The period during which interest accrues on a mortgage asset, which may be the calendar month immediately preceding the month in which the distribution date occurs or another period, as specified in the prospectus supplement.

*ERISA:* The Employee Retirement Income Security Act of 1974, as amended.

*ERISA Plans:* Employee pension and welfare benefit plans subject to Title I of ERISA.

*Euroclear:* Euroclear Bank S.A./N.V., a company organized under Belgian law, which holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment.

*Exemption Rating Agencies:* Collectively, Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., Fitch Ratings, DBRS Limited and DBRS, Inc.

*Fannie Mae:* The Federal National Mortgage Association.

*FDIC:* The Federal Deposit Insurance Corporation.

*FHA:* The Federal Housing Administration.

*Freddie Mac:* The Federal Home Loan Mortgage Corporation.

*Garn-St. Germain Act:* The Garn-St. Germain Depository Institutions Act of1982, as amended.

*Ginnie Mae:* The Governmental National Mortgage Association.

*Grantor Trust Certificate:* A certificate representing an interest in a Grantor Trust.

*Grantor Trust Fractional Interest Certificate:* A Grantor Trust Certificate representing an undivided equitable ownership interest in the principal of the mortgage loans held by the related Grantor Trust, together with interest on the Grantor Trust Certificates at a pass-through rate.

*Grantor Trust Strip Certificate:* A certificate representing ownership of all or a portion of the difference between interest paid on the mortgage loans held by the related Grantor Trust (net of normal administration fees and any retained interest) and interest paid to the holders of Grantor Trust Fractional Interest Certificates issued by the Grantor Trust. A Grantor Trust Strip Certificate may also evidence a nominal ownership interest in the principal of the mortgage loans held by the related Grantor Trust.

*Grantor Trust:* A trust as to which no REMIC election will be made and which qualifies as a grantor trust within the meaning of Subpart E, part I, subchapter J of Chapter 1 of the Code.

*High LTV Loan:* A mortgage loan with a loan-to-value ratio in excess of 80% and as high as 125% and which is not insured by a primary insurance policy.

*HOEPA:* The Home Ownership and Equity Protection Act of 1994, as amended.

*HUD:* The United States Department of Housing and Urban Development.

*Insurance Proceeds:* Proceeds received with respect to a mortgage loan under any hazard insurance policy, special insurance policy, primary insurance policy, FHA insurance policy, VA guarantee, bankruptcy bond or mortgage pool insurance policy, to the extent such proceeds are not applied to the restoration of the property or released to the mortgagor in accordance with normal servicing procedures.

*IRS:* United States Internal Revenue Service.

*Liquidation Proceeds:* All amounts, other than Insurance Proceeds, received in connection with the liquidation of a defaulted mortgage loan, by foreclosure or otherwise.

*Lockout Date:* The date of expiration of the Lockout Period with respect to a mortgage loan.

*Lockout Period:* The period specified in a mortgage note during which prepayment of the mortgage loan is prohibited.

*Mortgage:* The mortgage, deed of trust or similar instrument securing a mortgage loan.

*Mortgage Security:* Mortgage pass-through certificates (including Agency Securities) evidencing interests in mortgage loans, or whole or partial participations in mortgage loans.

*NCUA:* The National Credit Union Administration.

*Negative Amortization Loan:* An ARM Loan (i) whose interest rate adjusts monthly (after an initial fixed-rate period) and whose minimum monthly payment adjusts less frequently, (ii) which, in the event that the amount of accrued interest exceeds the minimum monthly payment, provides for the addition of such excess accrued interest to its principal balance in the form of negative amortization and (iii) which may provide for additional payment options in the event that such additional payment options exceed the minimum monthly payment, including the option to pay the full amount of accrued interest or to pay a fully amortizing payment.

*Nonrecoverable Advance:* An advance made or to be made with respect to a mortgage asset that the servicer determines is not ultimately recoverable from late payments, Insurance Proceeds, Liquidation Proceeds or otherwise with respect to such mortgage asset.

*OID Regulations:* The rules governing original issue discount that are set forth in Sections 1271-1273 and 1275 of the Code and in the related Treasury regulations.

*Parity Act:* The Alternative Mortgage Transaction Parity Act of 1982.

*Parties In Interest:* Collectively, persons who are "parties in interest" under Section 3(14) of ERISA or "disqualified persons" under Section 4975(e)(2) of the Code and who have certain specified relationships to a Plan.

*Partnership Certificate:* A certificate representing an interest in a Partnership Trust.

*Partnership Trust:* A trust as to which no REMIC election will be made and which qualifies as a partnership within the meaning of subchapter K of Chapter 1 of the Code.

*Plan Assets:* Collectively, "plan assets" and "assets of a Plan" as those terms are described in the DOL Regulation and include an undivided interest in the underlying assets of certain entities in which a Plan holds an equity interest.

*Plan:* Collectively, ERISA Plans and Tax-Favored Plans.

*Prepayment Assumption:* With respect to a REMIC Regular Certificate or a Grantor Trust Certificate, the assumption as to the rate of prepayments of the principal balances of mortgage loans held by the trust used in pricing the initial offering of that security.

*Prepayment Period:* The calendar month immediately preceding the month in which the distribution date occurs, or if stated in the prospectus supplement, the period beginning on the 15th day of the month preceding the month in which the distribution date occurs and ending on the 14th day of the month in which the distribution date occurs, or any other period as described in the prospectus supplement.

*PTCE:* Prohibited Transaction Class Exemption issued by the DOL under ERISA.

*PTE:* Prohibited Transaction Exemption issued by the DOL under ERISA.

*Purchase Price:* As to any mortgage loan, an amount equal to the sum, without duplication, of (1) the scheduled principal balance of the mortgage loan, (2) one month's interest on the mortgage loan at the rate at which interest accrues on the mortgage loan, net of the rate at which the servicing fee is calculated, (3) the aggregate amount of all principal and interest due but unpaid under the terms of the related mortgage note, (4) the aggregate amount of all unreimbursed advances of reimbursable expenses made by the servicer with respect to that mortgage loan and (5) any expenses, specified in the agreement governing the trust, incurred by the trust or the trustee in respect of the breach or defect giving rise to a purchase obligation.

*Record Date:* The last business day of the month preceding the month in which a distribution date occurs.

*Relief Act:* The Servicemembers Civil Relief Act.

140

*REMIC:* A real estate mortgage investment conduit as defined in Sections 860A through 860G of the Code.

*REMIC Certificates:* Certificates evidencing interests in a trust as to which a REMIC election is in effect.

*REMIC Certificateholders:* Holders of REMIC Certificates.

*REMIC Provisions:* Sections 860A through 860G of the Code.

*REMIC Regular Certificate:* A REMIC Certificate designated as a regular interest in the related REMIC.

*REMIC Residual Certificate:* A REMIC Certificate designated as a residual interest in the related REMIC

*REMIC Regulations:* The REMIC Provisions and the related Treasury regulations.

*Retained Interest:* A portion of the interest payments on a trust asset that may be retained by the depositor or any other previous owner of the asset.

*RICO:* The Racketeer Influenced and Corrupt Organizations statute.

*Senior/Subordinate Series:* A series of securities of which one or more classes is senior in right of payment to one or more other classes to the extent described in the related prospectus supplement.

*Single-Family Properties:* One-to-four-family residential properties including detached and attached dwellings, townhouses, rowhouses, individual condominium units, individual units in planned-unit developments, individual units in de minimis planned-unit developments and individual units in cooperative apartments.

*SMMEA:* The Secondary Mortgage Market Enhancement Act of 1984, as amended.

*SPA:* A variable rate of prepayment on the outstanding principal balance of a pool of mortgage loans, as described in "Yield And Maturity Considerations—Maturity and Weighted Average Life" in this prospectus.

*Strip Securities:* A class of securities which are entitled to (a) principal distributions, with disproportionate, nominal or no interest distributions, or (b) interest distributions, with disproportionate, nominal or no principal distributions.

*Stripped Interest:* The distributions of interest on a Strip Security with no or a nominal principal balance.

*Tax-Favored Plans:* Tax-qualified retirement plans described in Section 401(a) of the Code and individual retirement accounts described in Section 408 of the Code.

*UCC:* The Uniform Commercial Code.

*Underwriter's Exemption:* The essentially identical individual exemptions that the DOL has issued to various underwriters (collectively, as amended by PTE 97-34, 62 Fed. Reg. 39021 (July 21, 1997), PTE 2000-58, 65 Fed. Reg. 67765 (November 13, 2000)) and PTE 2002-41, 67 Fed. Reg. 54487 (August 22, 2002).

*United States Person:* A citizen or resident of the United States; a corporation or partnership, including an entity treated as a corporation or partnership for federal income tax purposes, created or organized in, or under the laws of, the United States or any state thereof or the District of Columbia, except, in the case of a partnership, to the extent provided in Treasury regulations; an estate whose income is subject to United States federal income tax regardless of its source; or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. To the extent prescribed in regulations by the Secretary of the Treasury, which have not yet been issued, a trust which was in existence on August 20, 1996, other than a trust treated as owned by the grantor under subpart E of part I of subchapter J of Chapter 1 of the Code, and which was treated as a United States person on August 20, 1996 may elect to continue to be treated as a United States person notwithstanding the previous sentence.

*VA:* The United States Department of Veteran Affairs.

*WCC:* WaMu Capital Corp.

*WMB:* Washington Mutual Bank.

*WMB fsb:* Washington Mutual Bank fsb.

*WMMSC:* Washington Mutual Mortgage Securities Corp.

*WCC Exemption:* An exemption granted by the DOL to WCC and its affiliates from certain of the prohibited transaction provisions of ERISA and Section 4975 of the Code, as described under "ERISA Considerations—Underwriter's and WCC Exemption."

## GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES WITH RESPECT TO BOOK-ENTRY SECURITIES

Investors in book-entry securities may hold interests in those securities through any of DTC, Euroclear or Clearstream. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding interests in book-entry securities through Euroclear and Clearstream will be conducted in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice. Secondary market trading between investors holding interests in book-entry securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between investors holding interests in book-entry securities through Euroclear or Clearstream and investors holding interests in book-entry securities through DTC participants will be effected on a delivery-against-payment basis through the respective depositories of Euroclear and Clearstream, in such capacity, and other DTC participants.

Although DTC, Euroclear and Clearstream are expected to follow the procedures described below in order to facilitate transfers of interests in the book-entry securities among participants of DTC, Euroclear and Clearstream, they are under no obligation to perform or continue to perform those procedures, and those procedures may be discontinued at any time. None of the sponsor, the depositor, the servicer, the trust or the trustee will have any responsibility for the performance by DTC, Euroclear and Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their obligations.

Non-U.S. holders of book-entry securities will be subject to U.S. withholding taxes unless those holders meet specific requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

### Initial Settlement

The book-entry securities will be registered in the name of Cede & Co. as nominee of DTC. Investors' interests in the book-entry securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. Clearstream and Euroclear will hold positions on behalf of their participants through their respective depositories, which in turn will hold those positions in accounts as DTC participants.

Investors electing to hold interests in book-entry securities through DTC participants, rather than through Clearstream or Euroclear accounts, will be subject to the settlement practices applicable to similar issues of pass-through securities. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold interests in book-entry securities through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary book-entry security and no "lock-up" or restricted period. Interests in book-entry securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

### Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Transfers between DTC Participants.* Secondary market trading between DTC participants will be settled using the DTC procedures applicable to similar issues of pass-through securities in same-day funds.

*Transfers between Clearstream and/or Euroclear Participants.* Secondary market trading between Clearstream participants or Euroclear participants and/or investors holding interests in book-entry securities through them will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Transfers between DTC seller and Clearstream or Euroclear purchaser.* When interests in book-entry securities are to be transferred on behalf of a seller from the account of a DTC participant to the account of a Clearstream participant or a Euroclear participant for a purchaser, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day before settlement. Clearstream or Euroclear will instruct its respective depository to receive an interest in the book-entry securities against payment. Payment will include interest accrued on the book-entry securities from and including the last distribution date to but excluding the settlement date. Payment will then be made by the respective depository to the DTC participant's account against delivery of an interest in the book-entry securities. After this settlement has been completed, the interest will be credited to the respective clearing system, and by the clearing system, in accordance with its usual procedures, to the Clearstream participant's or Euroclear participant's account. The credit of this interest will appear on the next business day and the cash debit will be back-valued to, and the interest on the book-entry securities will accrue from, the value date, which would be the preceding day when settlement occurred in New York. If settlement is not completed through DTC on the intended value date, i.e., the trade fails, the Clearstream or Euroclear cash debit will be valued instead as of the actual settlement date.

Clearstream participants and Euroclear participants will need to make available to the respective clearing system the funds necessary to process same-day funds settlement. The most direct means of doing so is to pre-position funds for settlement from cash on hand, in which case the Clearstream participants or Euroclear participants will take on credit exposure to Clearstream or Euroclear until interests in the book-entry securities are credited to their accounts one day later.

As an alternative, if Clearstream or Euroclear has extended a line of credit to them, Clearstream participants or Euroclear participants can elect not to pre-position funds and allow that credit line to be drawn upon. Under this procedure, Clearstream participants or Euroclear participants receiving interests in book-entry securities for purchasers would incur overdraft charges for one day, to the extent they cleared the overdraft when interests in the book-entry securities were credited to their accounts. However, interest on the book-entry securities would accrue from the value date. Therefore, the investment income on the interest in the book-entry securities earned during that one-day period would tend to offset the amount of these overdraft charges, although this result will depend on each Clearstream participant's or Euroclear participant's particular cost of funds.

Since the settlement through DTC will take place during New York business hours, DTC participants are subject to DTC procedures for transferring interests in book-entry securities to the respective depository of Clearstream or Euroclear for the benefit of Clearstream participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the seller settling the sale through a DTC participant, a cross-market transaction will settle no differently than a sale to a purchaser settling through a DTC participant.

Finally, intra-day traders that use Clearstream participants or Euroclear participants to purchase interests in book-entry securities from DTC participants or sellers settling through them for delivery to Clearstream participants or Euroclear participants should note that these trades will automatically fail on the sale side unless affirmative action is taken. At least three techniques should be available to eliminate this potential condition:

- borrowing interests in book-entry securities through Clearstream or Euroclear for one day, until the purchase side of the intra-day trade is reflected in the relevant Clearstream or Euroclear accounts, in accordance with the clearing system's customary procedures;

- borrowing interests in book-entry securities in the United States from a DTC participant no later than one day before settlement, which would give sufficient time for such interests to be reflected in the relevant Clearstream or Euroclear accounts in order to settle the sale side of the trade;

- staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day before the value date for the sale to the Clearstream participant or Euroclear participant.

*Transfers between Clearstream or Euroclear seller and DTC purchaser.* Due to time zone differences in their favor, Clearstream participants and Euroclear participants may employ their customary procedures

144

for transactions in which interests in book-entry securities are to be transferred by the respective clearing system, through the respective depository, to a DTC participant. The seller will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day before settlement. Clearstream or Euroclear will instruct its respective depository, to credit an interest in the book-entry securities to the DTC participant's account against payment. Payment will include interest accrued on the book-entry securities from and including the last distribution date to but excluding the settlement date. The payment will then be reflected in the account of the Clearstream participant or Euroclear participant the following business day, and receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would be back-valued to the value date, which would be the preceding day, when settlement occurred through DTC in New York. If settlement is not completed on the intended value date, i.e., the trade fails, receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would instead be valued as of the actual settlement date.

**Certain U.S. Federal Income Tax Documentation Requirements**

A beneficial owner who is an individual or corporation holding the book-entry security on its own behalf through Clearstream or Euroclear, or through DTC if the holder has an address outside the U.S., will be subject to the 30% U.S. withholding tax that typically applies to payments of interest, including original issue discount, on registered debt issued by U.S. persons, unless:

- each clearing system, bank or other institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between the beneficial owner or a foreign corporation or foreign trust and the U.S. entity required to withhold tax complies with applicable certification requirements; and

- the beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

  - Exemption for Non-U.S. Persons—Form W-8BEN. Beneficial holders of book-entry securities that are Non-U.S. persons (which would not include entities treated as partnerships or grantor trusts for U.S. federal income tax purposes) generally can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN, or Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding. If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change.

  - Exemption for Non-U.S. persons with effectively connected income—Form W-8ECI. A Non-U.S. person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI, or Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States.

  - Exemption or reduced rate for Non-U.S. persons resident in treaty countries—Form W-8BEN. Non-U.S. persons residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate, depending on the treaty terms, by filing Form W-8BEN. Form W-8BEN may be filed by the beneficial holder or its agent.:

  - Exemption for U.S. Persons—Form W-9. U.S. persons can obtain a complete exemption from the withholding tax by filing Form W-9, or Payer's Request for Taxpayer Identification Number and Certification.

*U.S. Federal Income Tax Reporting Procedure*. The holder of a book-entry security or, in the case of a Form W-8BEN or Form W-8ECI filer, its agent, files by submitting the appropriate form to the person through whom it holds the security—the clearing agency, in the case of persons holding directly on the books of the clearing agency. Form W-8BEN and Form W-8ECI generally are effective until the third succeeding calendar year from the date the form is signed. However, the W-8BEN with a taxpayer identification number will remain effective until a change in circumstances makes any information on the

form incorrect, provided that the withholding agent reports at least annually to the beneficial owner on Form 1042-S. The term "U.S. person" means:

- a citizen or resident of the United States;

- a corporation, partnership or other entity treated as a corporation or a partnership for United States federal income tax purposes, organized in or under the laws of the United States or any state, including for this purpose the District of Columbia, unless, in the case of a partnership, future Treasury regulations provide otherwise;

- an estate that is subject to U.S. federal income tax regardless of the source of its income; or

- a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.

Some trusts not described in the final bullet of the preceding sentence that were in existence on August 20, 1996 and elect to be treated as a United States Person will also be a U.S. person. The term "Non-U.S. person" means any person who is not a U.S. person. This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the book-entry securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the book-entry securities.

Exhibit E

Prospectus Supplement to Prospectus Dated March 22, 2007

# WaMu Asset-Backed Certificates
# WaMu Series 2007-HE2 Trust
### Issuing Entity

# WaMu Asset Acceptance Corp.
### Depositor

# Washington Mutual Bank
### Sponsor and Servicer

## $1,533,903,000
(Approximate)

**Consider carefully the risk factors beginning on page S-9 in this prospectus supplement and on page 5 in the accompanying prospectus.**

The certificates will represent interests only in the issuing entity, which is the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust and will not represent interests in or obligations of Washington Mutual Bank, Washington Mutual Mortgage Securities Corp., WaMu Asset Acceptance Corp., Washington Mutual, Inc. or any of their affiliates.

**Neither these certificates nor the underlying mortgage loans are guaranteed by any agency or instrumentality of the United States.**

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

**The WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust will issue fourteen classes of offered certificates and five classes of non-offered certificates. Each class of offered certificates will be entitled to receive monthly distributions of interest or principal or both, beginning on May 25, 2007. The pass-through rate for each class of offered certificates will be variable and will be based in part on the one-month LIBOR index. The table on page S-2 contains a list of the classes of offered certificates, including the original certificate principal balance of each class and the pass-through rate.**

**The primary asset of the trust will be a pool of sub-prime first and second lien, adjustable-rate and fixed-rate residential mortgage loans. The trust will also contain other assets, which are described on page S-33 of this prospectus supplement.**

### The Offered Certificates

| | |
|---|---|
| Total principal amount | $1,533,903,000 (approximate) |
| First payment date | May 25, 2007 |
| Interest and/or principal paid | Monthly |
| Last scheduled distribution date | April 25, 2037 |

Credit enhancement for the senior certificates will be provided by nine classes of mezzanine certificates, which will be subordinated to the senior certificates. Credit enhancement for the offered certificates will also be provided in the form of excess interest, overcollateralization, allocation of losses, cross-collateralization and a primary mortgage insurance policy for certain of the first lien mortgage loans with original loan-to-value ratios in excess of 80%. The offered certificates will also have the benefit of a swap agreement.

The underwriters listed below will offer the offered certificates at varying prices to be determined at the time of sale. The proceeds to WaMu Asset Acceptance Corp. from the sale of the offered certificates will be approximately 99.04% of the principal balance of the offered certificates, before deducting expenses. The underwriters' commission will be the difference between the price paid to WaMu Asset Acceptance Corp. for the offered certificates and the amount received from the sale of the offered certificates to the public.

**Neither the SEC nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

# WaMu Capital Corp.                    Lehman Brothers
# Banc of America Securities LLC

April 05, 2007

## Important Notice About Information Presented in this
## Prospectus Supplement and the Accompanying Prospectus

We provide information to you about the offered certificates in two separate documents that progressively provide more detail: (a) the accompanying prospectus, which provides general information, some of which may not apply to your series of certificates, and (b) this prospectus supplement, which describes the specific terms of your series of certificates.

You should be certain to review the information in this prospectus supplement for a description of the specific terms of your certificates.

Investors are encouraged to consult their own counsel, tax advisors, accountants, financial and other advisors for considerations of investing in the Certificates that may be particular to the investor's individual situation.

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

You can find a listing of the pages where some of the capitalized terms used in this prospectus supplement and the accompanying prospectus are defined under the caption "Index of Defined Terms" in this prospectus supplement and under the caption "Glossary" beginning on page 142 in the accompanying prospectus. Capitalized terms used in this prospectus supplement and not otherwise defined in this prospectus supplement have the meanings assigned in the accompanying prospectus.

## European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a)      to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)      to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c)      in any other circumstances which do not require the publication by the issuing entity of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe to the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## United Kingdom

Each underwriter has represented and agreed that:

(a)      it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the issuing entity; and

(b)      it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

## TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT

Page

SUMMARY INFORMATION............................................................................................................1

RISK FACTORS ...........................................................................................................................10

THE SPONSOR ............................................................................................................................28
    General .................................................................................................................................28
    The Sponsor's Origination Channels..................................................................................29

STATIC POOL INFORMATION ..................................................................................................29

UNDERWRITING OF THE MORTGAGE LOANS....................................................................29
    General .................................................................................................................................29
    Evaluation of the Borrower's Credit Standing ..................................................................30
    Evaluation of the Borrower's Repayment Ability..............................................................30
    Evaluation of the Adequacy of Collateral .........................................................................31
    Underwriting Exceptions.....................................................................................................31
    Documentation Programs ....................................................................................................31
    Quality Control Review.......................................................................................................32
    Risk Categories...................................................................................................................32

THE DEPOSITOR .......................................................................................................................34

THE TRUST .................................................................................................................................34
    Assignment of the Mortgage Loans and Other Assets to the Trust ..................................34
    Restrictions on Activities of the Trust...............................................................................36
    Discretionary Activities With Respect to the Trust ..........................................................36

THE SERVICERS .........................................................................................................................39
    General .................................................................................................................................39
    The Servicer ........................................................................................................................39
    The Calculation Agent........................................................................................................45
    The Trustee..........................................................................................................................46
    Special Servicing Agreements............................................................................................49

THE CUSTODIAN .......................................................................................................................50

THE DELAWARE TRUSTEE......................................................................................................50
    General .................................................................................................................................50
    Limitations on the Delaware Trustee's Liability ...............................................................50
    Resignation and Removal of the Delaware Trustee...........................................................51

AFFILIATIONS AND RELATED TRANSACTIONS .................................................................51

THE MORTGAGE POOL ............................................................................................................51
    General .................................................................................................................................52
    The Group I Mortgage Loans..............................................................................................54
    The Group II Mortgage Loans.............................................................................................55
    Representations and Warranties Regarding the Mortgage Loans.......................................56
    Criteria for Selection of Mortgage Loans ..........................................................................58

DESCRIPTION OF THE CERTIFICATES.................................................................................58
    General .................................................................................................................................58
    Book Entry Certificates ......................................................................................................59
    Definitive Certificates ........................................................................................................59
    Allocation of Available Funds............................................................................................60
    Credit Enhancement ...........................................................................................................67
    The PMI Insurer .................................................................................................................71
    The PMI Policy ...................................................................................................................71
    The Swap Agreement ..........................................................................................................72

**TABLE OF CONTENTS**

PROSPECTUS SUPPLEMENT

Page

The Swap Counterparty ..........................................................................................................................75
Interest Coverage Account .....................................................................................................................75
The Final Maturity Reserve Account ....................................................................................................75
Definitions ..............................................................................................................................................77
Pass-Through Rates ................................................................................................................................87
Calculation of One-Month LIBOR .......................................................................................................90
Optional Termination of the Trust .......................................................................................................90
Amendment of the Pooling Agreement .................................................................................................91
Servicing Compensation, Payment of Expenses and Compensating Interest .....................................92
Reports and Other Information ..............................................................................................................96

YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS ......................................................98
Additional Information ........................................................................................................................100
Weighted Average Lives .....................................................................................................................100
Yield Sensitivity of the Mezzanine Certificates ................................................................................108

USE OF PROCEEDS .................................................................................................................................109

MATERIAL FEDERAL INCOME TAX CONSEQUENCES ...............................................................109
Allocation of Purchase Price and Sales Price ....................................................................................110
Original Issue Discount and Premium ................................................................................................110
The NPC Component ............................................................................................................................111
Payments on the Last Scheduled Distribution Date ..........................................................................112
Potential Alternative Treatment of Right to Receive Payments Outside of the REMIC ..................112
Treatment as Real Estate Assets .........................................................................................................112
Prohibited Transactions .......................................................................................................................113

ERISA CONSIDERATIONS ....................................................................................................................113
ERISA Considerations While the Supplemental Interest Trust and the Final Maturity Reserve Trust are in Existence ............................................................................................................................................114
ERISA Considerations After Termination of the Supplemental Interest Trust and the Final Maturity Reserve Trust ........................................................................................................................................114

LEGAL INVESTMENT CONSIDERATIONS .......................................................................................115

METHOD OF DISTRIBUTION ..............................................................................................................115

LEGAL MATTERS ..................................................................................................................................116

RATINGS ..................................................................................................................................................116

APPENDIX A  MORTGAGE LOAN TABLES .....................................................................................118
Group I Mortgage Loans ......................................................................................................................118
Group II Mortgage Loans .....................................................................................................................128

APPENDIX B  DECREMENT TABLES ................................................................................................138

ANNEX I .....................................................................................................................................................152

ANNEX II ...................................................................................................................................................154

INDEX OF DEFINED TERMS ................................................................................................................157

## SUMMARY INFORMATION

- *The following summary highlights selected information from this prospectus supplement.  It does not contain all of the information that you need to consider in making your investment decision.  To understand the terms of the offered certificates, read carefully this entire prospectus supplement and the accompanying prospectus.*

- *This summary provides an overview of certain calculations, cash flows and other information to aid your understanding.  This summary is qualified by the full description of these calculations, cash flows and other information in this prospectus supplement and the accompanying prospectus.*

### TRANSACTION

On or about April 10, 2007, which is the closing date, the mortgage loans that support the certificates will be sold by Washington Mutual Bank, the sponsor of the securitization transaction, to WaMu Asset Acceptance Corp., the depositor.  On the closing date, the depositor will sell the mortgage loans and related assets to the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust, a Delaware statutory trust.  In exchange for the mortgage loans and related assets, the trust will issue the certificates pursuant to the order of the depositor.

The mortgage loans will be serviced by Washington Mutual Bank.  Washington Mutual Mortgage Securities Corp. will act as calculation agent and will be responsible for calculating loan payoff amounts for each monthly distribution on the certificates.  Some servicing functions will be performed by Citibank, N.A., as trustee.  Some servicing functions will be outsourced to third party vendors.

The trustee of the trust will be Citibank, N.A., and the Delaware trustee will be Christiana Bank & Trust Company.  Deutsche Bank National Trust Company will review the mortgage notes, mortgages and certain other legal documents related to the mortgage loans as custodian for the trust in accordance with the review requirements of the pooling agreement.

### NIMS Insurer

In the future, the depositor may decide to proceed with the issuance of net interest margin securities ("**NIMS**") to be backed, in whole or in part, by the Class C Certificates and the Class P Certificates.  The NIMS, if issued, would be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date.  One or more insurance companies ("**NIMS insurer**") may issue a financial guaranty insurance policy covering certain payments to be made on the NIMS, if issued.  In such event, the NIMS insurer will have various rights under the pooling agreement and will

be able to exercise certain rights that could adversely impact the certificateholders.  See *"Risk Factors— Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates" in this prospectus supplement.*

### WHAT YOU OWN

Your certificates will represent interests *only* in the assets of the issuing entity.  All payments to you will come only from the amounts received in connection with those assets.

The issuing entity will own a pool of mortgage loans and other assets, as described under "The Trust" in this prospectus supplement.

On the closing date, there will be no outstanding series or classes of securities that are backed by the assets of the issuing entity or otherwise have claims on the assets of the issuing entity, other than the certificates. The depositor does not expect that any securities representing additional interests in or claims on the assets of the issuing entity will be issued in the future.

### Information About the Mortgage Pool

The mortgage pool consists of 6,723 mortgage loans with an aggregate principal balance as of April 1, 2007 of approximately $1,593,665,287.  All of the mortgage loans are secured by residential properties and each is set to mature within 40 years of the date it was originated.

In the event of a material breach of the representations and warranties made by the sponsor with respect to the mortgage loans, or in the event that a required loan document is not included in the mortgage files for the mortgage loans, the sponsor or the depositor, as applicable, will, unless it has cured the breach in all material respects, be required to repurchase the affected mortgage loan or substitute a new mortgage loan for the affected mortgage loan.

*See "Description of the Mortgage Pool—
Representations and Warranties Regarding the
Mortgage Loans" in this prospectus supplement.*

The mortgage pool consists of the following two loan
groups:

| Loan Group | Number of Mortgage Loans | Approximate Principal Balance as of April 1, 2007 | Maximum Years to Maturity From Origination Date |
|---|---|---|---|
| Loan Group 1 | 3,165 | $606,476,772 | 40 |
| Loan Group 2 | 3,558 | $987,188,515 | 40 |

*For a further description of the mortgage loans in
each loan group, see "Description of the Mortgage
Pool" and Appendix B in this prospectus supplement.*

## THE CERTIFICATES

### The Offered Certificates

| Class | Approximate Original Certificate Principal Balance | Pass-Through Rate | Type |
|---|---|---|---|
| I-A | $491,550,000 | Variable | Senior |
| II-A1 | $357,425,000 | Variable | Senior |
| II-A2 | $125,322,000 | Variable | Senior |
| II-A3 | $199,414,000 | Variable | Senior |
| II-A4 | $117,955,000 | Variable | Senior |
| M-1 | $50,997,000 | Variable | Mezzanine |
| M-2 | $44,623,000 | Variable | Mezzanine |
| M-3 | $27,092,000 | Variable | Mezzanine |
| M-4 | $23,905,000 | Variable | Mezzanine |
| M-5 | $23,108,000 | Variable | Mezzanine |
| M-6 | $21,514,000 | Variable | Mezzanine |
| M-7 | $20,718,000 | Variable | Mezzanine |
| M-8 | $12,749,000 | Variable | Mezzanine |
| M-9 | $17,531,000 | Variable | Mezzanine |

The pass-through rates for the offered certificates will
be calculated at the per annum rate of one-month
LIBOR plus the related margin as specified below,
subject to the limitations described in this prospectus
supplement.

| | Margin | |
|---|---|---|
| Class | (1) | (2) |
| I-A | 0.260% | 0.520% |
| II-A1 | 0.110% | 0.220% |
| II-A2 | 0.190% | 0.380% |
| II-A3 | 0.250% | 0.500% |
| II-A4 | 0.360% | 0.720% |
| M-1 | 0.470% | 0.705% |
| M-2 | 0.550% | 0.825% |
| M-3 | 0.750% | 1.125% |
| M-4 | 1.350% | 2.025% |
| M-5 | 1.700% | 2.550% |
| M-6 | 2.250% | 3.375% |
| M-7 | 2.250% | 3.375% |
| M-8 | 2.250% | 3.375% |
| M-9 | 2.250% | 3.375% |

_____
[1] For each distribution date up to and including the Optional
Termination Date.
[2] For each distribution date after the Optional Termination Date.

*See "Description of the Certificates—Pass-Through
Rates" in this prospectus supplement for additional
information.*

### The Non-Offered Certificates

In addition to the offered certificates, the trust will
issue five additional classes of certificates. These
certificates will be designated as the Class C
Certificates, the Class P Certificates, the Class R
Certificates, the Class R-CX Certificates and the
Class R-PX Certificates. **These certificates are not
being offered by this prospectus supplement.**

The approximate initial class principal balance,
annual certificate interest rate and type of each of the
Class C Certificates, the Class P Certificates, the
Class R Certificates, the Class R-CX and the Class R-
PX Certificates will be as follows:

| Class | Approximate Original Certificate Principal Balance | Pass-Through Rate | Type |
|---|---|---|---|
| C | $59,762,187 | Variable (1) | Subordinate |
| P | 100 | (2) | Prepayment Charge |
| R | 0 | (2) | Residual |
| R-CX | 0 | (2) | Residual |
| R-PX | 0 | (2) | Residual |

[1] The Class C Certificates will accrue interest as provided in the
pooling agreement.
[2] The Class P, Class R, Class R-CX and Class R-PX Certificates
will not accrue interest on their class principal balance.

The original certificate principal balance of the Class
C Certificates will be approximately equal to the
initial overcollateralization that will be required by
the pooling agreement. The certificate principal
balance of the Class C Certificates on any date will
represent the overcollateralization for the offered
certificates and may change from time to time as
provided in the pooling agreement. The Class C
Certificates will initially evidence an interest of
approximately 3.75% of the aggregate principal
balance of the mortgage loans in the trust on the
closing date.

The Class P Certificates will have an original
certificate principal balance of $100 and will not be
entitled to distributions in respect of interest. The
Class P Certificates will be entitled to receive certain
prepayment premiums or charges received in respect
of the mortgage loans.

The Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates will not have an original principal balance and will be the classes of certificates representing the residual interests in the trust.

The Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates will be delivered to the sponsor or an affiliate of the sponsor or its designee as partial consideration for the mortgage loans.

See "Description of the Certificates—General" in this prospectus supplement.

**Designations**

| Designation | Class of Certificates |
| --- | --- |
| *Offered Certificates* | Class A Certificates and Mezzanine Certificates |
| *Class A Certificates* | Group I Senior Certificates and Group II Senior Certificates |
| *Group I Senior Certificates* | Class I-A Certificates |
| *Group II Senior Certificates* | Class II-A-1 Certificates, Class II-A-2 Certificates, Class II-A-3 Certificates and Class II-A-4 Certificates |
| *Mezzanine Certificates* | Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class M-4 Certificates, Class M-5 Certificates, Class M-6 Certificates, Class M-7 Certificates, Class M-8 Certificates and Class M-9 Certificates |
| *Residual Certificates* | Class R Certificates, Class R-CX Certificates and Class R-PX Certificates |
| *Subordinate Certificates* | Mezzanine Certificates and Class C Certificates |

**Relationship Between Loan Groups and the Offered Certificates**

The Class I-A Certificates will generally represent interests in the Group I mortgage loans, and the Class II-A-1 Certificates, the Class II-A-2 Certificates, the Class II-A-3 Certificates and the Class II-A-4

Certificates will generally represent interests in the Group II mortgage loans.

The Mezzanine Certificates will represent interests in all of the mortgage loans.

**Last Scheduled Distribution Date**

The last scheduled distribution date for the offered certificates will be the distribution date in April 2037. It is intended that the amounts deposited in the final maturity reserve account will be sufficient to retire the offered certificates on the last scheduled distribution date, even though the outstanding principal balance of the mortgage loans having 40-year original terms to maturity have not been reduced to zero on the last scheduled distribution date. The actual last distribution date for each class of the offered certificates may be earlier or later, and could be substantially earlier, than the distribution date in April 2037. *See "Description of the Certificates—General" in this prospectus supplement.*

**DISTRIBUTIONS ON THE CERTIFICATES**

**Monthly Distributions**

Each month, the trustee will make distributions of interest and/or principal to the holders of the certificates. Distributions will be made on the 25th day of each calendar month, or if the 25th day is not a business day, on the next business day. The first distribution date will be May 25, 2007.

*Source of Payments.* The mortgagors will pay their interest and principal during the month to the servicer. Each month, the servicer will subtract the servicing fee and other servicing compensation and will send the remainder (other than amounts held for future distribution) to the trustee. On the distribution date for that month, the trustee will distribute that amount (net of any net swap payments due to the swap counterparty) by loan group to the holders of the certificates related to that loan group in the order described in "*Description of the Certificates—Allocation of Available Funds*" in this prospectus supplement. The servicing fee for the mortgage loans will be 0.50% per annum on the stated principal balance of each mortgage loan. Any prepayment charges collected on the mortgage loans will be paid to the holders of the Class P Certificates and will not be available to any other class of certificates.

*Advances.* For any month, if the servicer receives a payment on a mortgage loan that is less than the full scheduled payment or if no payment is received at

all, the servicer will advance funds held by the servicer for future distribution, or its own funds, to cover that shortfall. However, the servicer will not be required to make advances if it determines that those advances will not be recoverable from future payments or collections on that mortgage loan.

See "*The Servicers—The Servicer—Servicing Procedures—Advances*" in this prospectus supplement.

**Distributions of Interest**

The offered certificates will accrue interest for any distribution date from the previous distribution date (or, in the case of the first accrual period, from the closing date) to the day prior to the current distribution date. Interest will be calculated for the offered certificates on the basis of the actual number of days in the accrual period, based on a 360-day year. On each distribution date interest will be distributed to these classes of certificates in the order described in "*Description of the Certificates—Allocation of Available Funds—Interest Distributions on the Offered Certificates*" in this prospectus supplement.

The offered certificates will accrue interest on their certificate principal balances outstanding immediately prior to each distribution date.

The Class C Certificates will accrue interest as provided in the pooling agreement. The Class P Certificates and the Residual Certificates will not accrue interest.

See "Description of the Certificates" in this prospectus supplement for additional information.

**Compensating Interest and Interest Shortfalls**

When mortgagors make prepayments in full, they need not pay a full month's interest. Instead, they are required to pay interest only to the date of their prepayment. When mortgagors make partial prepayments, they do not pay interest on the amount of that prepayment. To compensate certificateholders for the shortfall in interest this causes, the servicer will be required to pay compensating interest to the certificateholders out of the servicing fee it collects. For a description of how compensating interest is allocated among the certificates, as well as important limitations on the amount of compensating interest that will be allocated among the certificates, *see "Description of the Certificates—Servicing Compensation, Payment of Expenses and*

*Compensating Interest*" in this prospectus supplement.

**Distributions of Principal**

Principal will be distributed to holders of the offered certificates on each distribution date in the priority, in the amounts and to the extent described in this prospectus supplement under "Description of the Certificates—Allocation of Available Funds."

**Performance Triggers**

The priority of the distribution of principal to the holders of the offered certificates will be altered after the stepdown date if cumulative losses on the mortgage loans exceed a specified percentage on any distribution date in or after May 2009, or if mortgage loan delinquencies exceed a specified percentage on any distribution date. *See "Description of the Certificates—Allocation of Available Funds" in this prospectus supplement.*

**CREDIT ENHANCEMENT**

**Subordination**

- the rights of the Mezzanine Certificates and the Class C Certificates to receive distributions will be subordinated to the rights of the Class A Certificates;

- the rights of the Mezzanine Certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the Mezzanine Certificates with lower numerical class designations; and

- the rights of the Class C Certificates to receive distributions will be subordinated to the rights of the Mezzanine Certificates;

in each case, to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior classes of certificates in respect of interest and principal and to afford such certificates protection against realized losses on the mortgage loans.

*See "Description of the Certificates—Credit Enhancement—Subordination" in this prospectus supplement.*

**Excess Interest**

The mortgage loans bear interest each month that in the aggregate is expected to exceed the amount needed to pay monthly interest on the certificates, the fees and expenses of the trust, certain net amounts owed to the swap counterparty and certain amounts required to be deposited in the final maturity reserve account, if applicable. The excess interest from the mortgage loans each month will be available to absorb realized losses on the mortgage loans and to maintain overcollateralization at required levels as described in the pooling agreement.

*See "Description of the Certificates—Allocation of Available Funds" and "—Credit Enhancement— Excess Interest" in this prospectus supplement.*

**Overcollateralization**

As of the closing date, the aggregate principal balance of the mortgage loans as of the cut-off date will exceed the aggregate certificate principal balance of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates on the closing date by approximately $59,762,187, which will be equal to the original certificate principal balance of the Class C Certificates. Such amount represents approximately 3.75% of the aggregate principal balance of the mortgage loans as of the cut-off date, and is approximately equal to the initial amount of overcollateralization that will be required to be provided under the pooling agreement. Excess interest generated by the mortgage loans will be distributed as an additional payment of principal to the offered certificates then entitled to distributions of principal to the extent necessary to maintain the required level of overcollateralization. The required level of overcollateralization may be permitted to step down as provided in the pooling agreement. We cannot assure you that sufficient interest will be generated by the mortgage loans to maintain the required level of overcollateralization.

*See "Description of the Certificates—Credit Enhancement—Overcollateralization Provisions" in this prospectus supplement.*

**Allocation of Losses**

If, on any distribution date, excess interest, overcollateralization and any net payments by the swap counterparty pursuant to the swap agreement are not sufficient to absorb realized losses on the mortgage loans as described under "Description of the Certificates—Credit Enhancement— Overcollateralization Provisions" in this prospectus supplement, then realized losses on such mortgage

loans will be allocated to the Mezzanine Certificates. If realized losses on the mortgage loans are allocated to the Mezzanine Certificates, such losses will be allocated *first*, to the to the Class M-9 Certificates, *second*, to the Class M-8 Certificates, *third*, to the Class M-7 Certificates, *fourth*, to the Class M-6 Certificates, *fifth*, to the Class M-5 Certificates, *sixth*, to the Class M-4 Certificates, *seventh*, to the Class M-3 Certificates, *eighth,* to the Class M-2 Certificates and *ninth*, to the Class M-1 Certificates. The pooling agreement will not permit the allocation of realized losses on the mortgage loans to the Class A Certificates, the Class P Certificates or the Residual Certificates; however, investors in the Class A Certificates should be aware that under certain loss scenarios there will not be enough interest and principal on the mortgage loans to pay the Class A Certificates all interest and principal amounts to which the Class A Certificates are then entitled.

Once realized losses are allocated to the Mezzanine Certificates, such amounts will not be reinstated after that (other than the amounts reinstated due to a subsequent recovery on a liquidated mortgage loan). However, the amount of any realized losses allocated to the Mezzanine Certificates may be paid to the holders of those certificates at a later date from net monthly excess cash flow, to the extent available, and from amounts, if any, received from the swap counterparty pursuant to the swap agreement according to the priorities described under "Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

*See "Description of the Certificates—Credit Enhancement—Allocation of Losses" in this prospectus supplement.*

**Cross-Collateralization**

The trust provides for limited cross-collateralization of the Group I Senior Certificates and the Group II Senior Certificates through the application of interest generated by one loan group to fund interest shortfalls on the Class A Certificates primarily supported by the other loan group and through the application of principal generated by one loan group to fund certain distributions of principal on the Class A Certificates primarily supported by the other loan group.

*See "Description of the Certificates—Allocation of Available Funds" and "Credit Enhancement—Cross Collateralization" in this prospectus supplement.*

**Primary Mortgage Insurance Policy**

Radian Guaranty Inc., (the "PMI Insurer") a Pennsylvania corporation will provide a primary mortgage insurance policy "the ("PMI Policy"). Approximately 13.94% of the Group I mortgage loans and approximately 8.14% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) will be covered by the PMI Policy, which may provide limited protection to the trust in the event such mortgage loans default.

The PMI Insurer will be paid a monthly fee equal to approximately 1.200% per annum of the aggregate scheduled principal balance of the mortgage loans covered by the policy (which will equal approximately 0.124% per annum of the aggregate scheduled principal balance of all mortgage loans as of the cut-off date).

*See "Description of the Certificates—The PMI Insurer" and "—The PMI Policy" in this prospectus supplement.*

**SWAP AGREEMENT**

On the closing date, Citibank, N.A., as trustee on behalf of the supplemental interest trust, will enter into a swap agreement with the swap counterparty to the swap agreement described in this prospectus supplement. The trustee will act as supplemental interest trust trustee pursuant to the pooling agreement to receive and distribute funds related to the swap agreement on behalf of the supplemental interest trust, whether payable by or to the swap counterparty pursuant to the swap agreement. On or before each distribution date from the June 2007 distribution date through the distribution date in April 2012, the supplemental interest trust trustee will be obligated to make a payment to the swap counterparty at a rate equal to 4.760% per annum, and the swap counterparty will be obligated to make a payment to the supplemental interest trust trustee at a rate equal to one-month LIBOR (as determined pursuant to the swap agreement), in each case, on a scheduled notional amount specified on Annex I attached to this prospectus supplement based upon a 30/360 convention. Payments under the swap agreement will be made on a net basis. To the extent that the fixed payment exceeds the floating payment

on any distribution date, amounts otherwise available to certificateholders will be applied to make a net swap payment to the swap counterparty, and to the extent that the floating payment exceeds the fixed payment on any distribution date, the swap counterparty will owe a net swap payment to the supplemental interest trust trustee. Any net amounts received by the supplemental interest trust trustee under the swap agreement will generally be applied to maintain overcollateralization at required levels, pay interest shortfalls and repay losses, as described in this prospectus supplement.

*See "Description of the Certificates—The Swap Agreement" in this prospectus supplement.*

**FINAL MATURITY RESERVE ACCOUNT**

On each distribution date on and after the distribution date in May 2017 through the distribution date in April 2027, if the aggregate principal balance of the mortgage loans having 40-year original terms to maturity is greater than the aggregate principal balance specified in Annex II attached to this prospectus supplement for that distribution date, a portion of interest collections calculated at a per annum rate of 0.80% of the total principal balance of the mortgage loans with 40-year original terms to maturity, to the extent available after payment of certain fees and expenses of the trust and any net payments owed to the swap counterparty but before payment of interest on the offered certificates, will be deposited in the final maturity reserve account maintained by the trustee until the amounts on deposit in the final maturity reserve account are equal to the stated principal balance of the mortgage loans with 40-year original terms to maturity on such distribution date. On and after the distribution date in May 2027, all amounts otherwise payable to the Class C Certificates will be deposited in the final maturity reserve account until the amounts on deposit in the final maturity reserve account are equal to the stated principal balance of the mortgage loans with 40-year original terms to maturity less the certificate principal balance of the Class C Certificates on such distribution date. On the earlier of the last scheduled distribution date and the termination of the trust, any amounts on deposit in the final maturity reserve account will be applied as a payment of principal or interest with respect to the offered certificates as described in this prospectus supplement.

*See "Description of the Certificates—The Final Maturity Reserve Account" in this prospectus supplement.*

**INTEREST COVERAGE ACCOUNT**

On the closing date, the depositor will pay to the trust for deposit in an interest coverage account, an amount which will be applied by the trustee to cover shortfalls in the amount of interest generated by the mortgage loans arising from the long first accrual period for the payment of interest on the certificates.

*We refer you to "Description of the Certificates—Interest Coverage Account" in this prospectus supplement.*

**OPTIONAL TERMINATION**

The servicer (or if the servicer fails to exercise such right, the NIMS insurer, if any) may purchase all of the mortgage loans and retire the certificates when the aggregate stated principal balance of the mortgage loans and the REO properties is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, subject to certain limitations.

*See "Description of the Certificates—Optional Termination of the Trust" in this prospectus supplement and "Description of the Securities—Termination of the Trust and Disposition of Trust Assets" in the accompanying prospectus.*

**YIELD CONSIDERATIONS**

The yield to maturity of each class of offered certificates will depend upon, among other things:

- the price at which the certificates are purchased;
- the applicable pass-through interest rate; and
- the rate of prepayments (including liquidations) on the related mortgage loans.

*See "Risk Factors" and "Yield and Prepayment Considerations" in this prospectus supplement.*

**BOOK-ENTRY REGISTRATION**

In general, the offered certificates will be available only in book-entry form through the facilities of The Depository Trust Company, Euroclear and Clearstream.

*See "Description of the Securities—Form of Securities" in the accompanying prospectus.*

**DENOMINATIONS**

The offered certificates are offered in minimum denominations of $25,000 initial class principal balance each and multiples of $1 in excess of $25,000.

**LEGAL INVESTMENT**

None of the offered certificates will constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA").

*See "Legal Investment Considerations" in this prospectus supplement and "Certain Legal Investment Aspects" in the accompanying prospectus.*

**ERISA CONSIDERATIONS**

Subject to important considerations described in "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus, the offered certificates will be eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. Prior to the termination of the supplemental interest trust and the final maturity reserve trust, employee benefit plans or individual retirement accounts or persons purchasing with employee benefit plan or individual retirement account assets may purchase the offered certificates only if the purchase and holding meets the requirements of an investor-based class exemption issued by the Department of Labor.

*See "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus.*

**FEDERAL INCOME TAX CONSEQUENCES**

For federal income tax purposes, the servicer will cause one or more REMIC elections to be made with respect to the trust (exclusive of the reserve fund, the supplemental interest trust, the supplemental interest account, the swap agreement, the final maturity reserve account and the interest coverage account, each as described in this prospectus supplement). The certificates, other than the Residual Certificates, will represent ownership of REMIC regular interests, coupled with (other than the Class C Certificates and the Class P Certificates) an interest in the swap agreement, an obligation to make payments to the supplemental interest trust and the right to receive Net WAC Rate carryover amounts, and will generally be treated as representing ownership of debt for federal income tax purposes. You will be required to include in income all interest and original issue

discount on these certificates in accordance with the
accrual method of accounting regardless of your
usual methods of accounting.  For federal income tax
purposes, the Residual Certificates will represent
ownership of the REMIC residual interests.

*See "Material Federal Income Tax Consequences"
in this prospectus supplement and "Material Federal
Income Tax Consequences" in the accompanying
prospectus.*

**RATINGS**

It is a condition to the issuance of the offered
certificates that they receive ratings not lower than
the following by Standard & Poor's, a division of
The McGraw-Hill Companies, Inc., Moody's
Investors Service, Inc. and Fitch, Inc.

|       | S&P   | Moody's | Fitch |
|-------|-------|---------|-------|
| I-A   | AAA   | Aaa     | AAA   |
| II-A1 | AAA   | Aaa     | AAA   |
| II-A2 | AAA   | Aaa     | AAA   |
| II-A3 | AAA   | Aaa     | AAA   |
| II-A4 | AAA   | Aaa     | AAA   |
| M-1   | AA+   | Aa1     | AA+   |
| M-2   | AA    | Aa2     | AA    |
| M-3   | AA-   | Aa3     | AA-   |
| M-4   | A+    | A1      | A+    |
| M-5   | A     | A2      | A     |
| M-6   | A-    | A3      | A-    |
| M-7   | BBB+  | Baa1    | BBB+  |
| M-8   | BBB   | Baa2    | BBB   |
| M-9   | BBB-  | Baa3    | BBB-  |

The ratings on the offered certificates will address the
likelihood of the receipt by holders of the offered
certificates of all distributions on the underlying
mortgage loans to which they are entitled.  They do
not address the likely actual rate of prepayments.
The rate of prepayments, if different than originally
anticipated, could adversely affect the yield realized
by holders of the offered certificates or cause the
holders of the certificates entitled to interest only to
fail to recover their initial investment.

*See "Ratings" in this prospectus supplement and
"Rating" in the accompanying prospectus.*

## RISK FACTORS

**The offered certificates are not suitable investments for all investors. In particular, you should not purchase any class of offered certificates unless you understand and are able to bear the prepayment, credit, liquidity and market risks associated with that class.**

**The offered certificates are complex securities and it is important that you possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this prospectus supplement and the accompanying prospectus in the context of your financial situation.**

**Sub-prime Mortgage Loans are Subject to a Greater Risk of High Delinquencies**

The mortgage loans were underwritten under the sub-prime mortgage loan underwriting standards of Washington Mutual Bank (the "WMB sub-prime underwriting standards"). WMB sub-prime underwriting standards are primarily intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The WMB sub-prime underwriting standards are less stringent than the standards Washington Mutual Bank applies to its borrowers who qualify for its prime or Alt-A mortgage loans and less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit history, credit score(s), loan-to-value ratio and debt-to-income ratio.

Borrowers who qualify under the WMB sub-prime underwriting standards generally have payment histories, documentation or debt-to-income ratios that would not satisfy Fannie Mae and Freddie Mac underwriting standards and such borrowers may have a record of major derogatory credit items, such as outstanding judgments or prior bankruptcies. The WMB sub-prime underwriting standards do not prohibit a mortgagor from obtaining secondary financing, from the sponsor or from another source, at the time of origination of the sponsor's first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the sponsor's loan-to-value ratio determination.

As a result, the rates of delinquency, bankruptcy and foreclosure for the mortgage loans could be higher, and may be substantially higher, than those of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of sub-prime mortgage loans than on mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. See "Underwriting of the Mortgage Loans" in this prospectus supplement.

**Recent Developments in the Residential Mortgage Market May Adversely Affect the Return on Your Certificates**

Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the yield on your certificates. Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector. In addition, in recent months housing prices in many states have declined or stopped appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in

additional increases in delinquencies and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

Another factor that may have contributed to, and may in the future result in, higher delinquency rates is the increase in monthly payments on adjustable rate mortgage loans. Borrowers with adjustable payment mortgage loans are being exposed to increased monthly payments when the related mortgage interest rate adjusts upward from the initial fixed rate or a low introductory rate, as applicable, to the rate computed in accordance with the applicable index and margin. This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans.

Borrowers seeking to avoid these increased monthly payments by refinancing their mortgage loans may no longer be able to find available replacement loans at comparably low interest rates. A decline in housing prices may also leave borrowers with insufficient equity in their homes to permit them to refinance, and in addition, many mortgage loans have prepayment premiums that add to the cost of refinancing. Furthermore, borrowers who intend to sell their homes on or before the expiration of the fixed rate periods on their mortgage loans may find that they cannot sell their properties for an amount equal to or greater than the unpaid principal balance of their loans. These events, alone or in combination, may contribute to higher delinquency rates.

You should consider that the general market conditions discussed above may affect the performance of the mortgage loans and may adversely affect the return on your certificates.

**The Yield on Your Certificates is Directly Related to the Prepayment Rate on the Related Mortgage Loans**

Mortgagors may prepay their mortgage loans in whole or in part at any time. The yield to maturity on your certificates is directly related to the rate at which the mortgagors pay principal on the related mortgage loans. We cannot predict the rate at which mortgagors will repay their mortgage loans. A prepayment of a mortgage loan generally will result in a prepayment on the certificates.

- If you purchase your certificates at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your certificates at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The rate of prepayments on the mortgage loans may be sensitive to prevailing interest rates. Generally, if prevailing interest rates decline significantly below the interest rates on the fixed-rate mortgage loans, those mortgage loans are more likely to prepay than if prevailing rates remain above the interest rates on those mortgage loans. In addition, if interest rates decline, adjustable-rate mortgage loan prepayments may increase due to the availability of fixed-rate mortgage loans or other

adjustable-rate mortgage loans at lower interest rates. Conversely, if prevailing interest rates rise significantly, the prepayments on fixed-rate and adjustable-rate mortgage loans may decrease. Furthermore, adjustable-rate mortgage loans may prepay at different rates and in response to different factors than fixed-rate mortgage loans; the inclusion of both types of mortgage loans in the mortgage pool may increase the difficulty in analyzing possible prepayment rates.

- The prepayment behavior of the adjustable-rate mortgage loans and of the fixed-rate mortgage loans may respond to different factors, or may respond differently to the same factors. If, at the time of their first adjustment, the mortgage rates on any of the adjustable-rate mortgage loans would be subject to adjustment to a rate higher than the then prevailing mortgage rates available to the related mortgagors, such mortgagors may prepay their adjustable-rate mortgage loans. The adjustable-rate mortgage loans may also suffer an increase in defaults and liquidations following upward adjustments of their mortgage rates, especially following their initial adjustments.

- Approximately 81.03% of the Group I mortgage loans and approximately 80.76% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) require the mortgagor to pay a prepayment charge in certain instances if the mortgagor prepays the mortgage loan during a stated period, which may be from one year to three years after the mortgage loan was originated. The servicer will not collect prepayment charges after three years from the date the mortgage loan was originated. A prepayment charge may or may not discourage a mortgagor from prepaying the related mortgage loan during the applicable period.


- The sponsor may be required to purchase mortgage loans from the trust in the event certain breaches of representations and warranties occur and have not been cured. In addition, the holder of the Class C Certificates, except if such holder is the sponsor or any of its affiliates (or if the holder of the Class C Certificates fails to exercise such option, the NIMS insurer, if any), has the option to purchase mortgage loans that become 90 days or more delinquent, which option is subject to certain limitations and conditions described in the pooling agreement. If the Class C Certificates are serving as collateral for the NIMS, the holder of the NIMS residual will have the rights of the holder of the Class C Certificates described in the immediately preceding sentence. These purchases will have the same effect on the holders of the offered certificates as a prepayment of those mortgage loans.

- The servicer (or if the servicer fails to exercise such right, the NIMS insurer, if any) may purchase all of the mortgage loans and retire the certificates when the aggregate stated principal balance of the mortgage loans and the REO properties is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, subject to certain limitations. Such purchases will result in an earlier return of the principal on the certificates and will affect the yield on the offered certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will affect the yield on the

offered certificates.

- If the rate of default and the amount of losses on the mortgage loans is higher than you expect, then your yield may be lower than you expect.

- As a result of the absorption of realized losses on the mortgage loans by excess interest, overcollateralization and certain payments from the swap counterparty as described in this prospectus supplement, liquidations of defaulted mortgage loans, whether or not realized losses are incurred upon such liquidations, will result in an earlier return of the principal of the offered certificates and will influence the yield on the offered certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the offered certificates.

- The overcollateralization provisions are intended to result in an accelerated rate of principal distributions to the offered certificates then entitled to principal distributions at any time that the overcollateralization provided by the mortgage pool falls below the required level.  An earlier return of principal to the holders of the offered certificates as a result of the overcollateralization provisions will influence the yield on the offered certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the offered certificates.  In addition, if the Class A Certificates are entitled to distributions of principal at any time that overcollateralization is required to be restored to the required level, then the amounts available for such purpose will be allocated pro rata between the Group I Senior Certificates and the Group II Senior Certificates based on the amount of principal actually received on the Group I mortgage loans and Group II mortgage loans, respectively, for the related distribution date.  This, as well as the relative sizes of the two loan groups, may magnify the prepayment effect on the Class A Certificates caused by the relative rates of prepayments and defaults experienced by the two loan groups.

- The multiple class structure of the offered certificates will cause the yield of certain classes of the offered certificates to be particularly sensitive to changes in the rates of prepayments of mortgage loans. Because distributions of principal will be made to the classes of certificates according to the priorities described in this prospectus supplement, the yield to maturity on the offered certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes of offered certificates. In particular, the Mezzanine Certificates will not receive any portion of the amount of principal payable to the certificates prior to the distribution date in May 2010 or a later date as provided in the pooling agreement, unless the certificate principal balance of the Class A Certificates has been reduced to zero. After that, subject to the loss and delinquency performance of the mortgage pool, the Mezzanine Certificates may continue (unless the certificate principal balance of the Class A Certificates has been reduced to zero) to receive no portion of the amount of principal then payable to the certificates. The weighted average lives of the Mezzanine Certificates will therefore be longer than would otherwise be the case. The effect on the market value of the Mezzanine Certificates of changes in market interest rates or market yields for similar securities may be greater than for the Class A Certificates.

*See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement for a description of factors that may influence the rate and timing of prepayments on the mortgage loans.*

**Balloon Mortgage Loans are More Likely to Incur Losses**

Balloon mortgage loans pose a risk because a mortgagor must make a large lump sum payment of principal at the end of the loan term. If the mortgagor is unable to pay the lump sum or refinance such amount, you may suffer a loss. Approximately 41.19% of the Group I mortgage loans and approximately 41.36% of the Group II mortgage loans (in each case, by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) are balloon mortgage loans.

**Junior Lien Mortgage Loans are More Likely to Incur Losses and May be Subject to Higher Rates of Prepayments than First Lien Mortgage Loans**

Approximately 1.88% of the Group I mortgage loans and approximately 8.07% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) are junior lien mortgage loans. All of the junior lien mortgage loans are fixed-rate mortgage loans. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior lien to satisfy fully both the senior lien and the junior lien. The claims of the holders of the senior lien will be satisfied in full out of proceeds of the liquidation of a junior lien mortgage loan before the trust, as holder of the junior lien, receives any payments in respect of such mortgage loan. If the servicer were to foreclose on any junior lien mortgage loan, it would do so subject to any related senior lien. In order for the debt related to the mortgage loan to be paid in full at this type of sale, a bidder at the foreclosure sale of a junior lien mortgage loan would have to bid an amount sufficient to pay off all sums due under the junior lien mortgage loan and the senior lien or purchase the mortgaged property subject to the senior lien. Liquidation expenses with respect to defaulted junior lien mortgage loans do not vary directly with the outstanding principal balance of the loan at the time of default. A decline in the value of the mortgaged properties securing the mortgage loans with junior liens may increase the likelihood that, in the event of a default by the

related mortgagors, liquidation or other proceeds will be insufficient to satisfy the junior lien mortgage loans after satisfaction of any senior liens and the payment of any liquidation expenses.  In the event that the proceeds from a foreclosure or similar sale of the related mortgaged property are insufficient to satisfy the senior lien and the junior lien mortgage loan in the aggregate, the trust, as the holder of the junior lien mortgage loan, will bear:

- the risk of delay in distributions while a deficiency judgment against the borrower is obtained,

- the risk of loss if the deficiency judgment is not realized upon, and

- the risk that deficiency judgments may not be available in all jurisdictions.

Other factors may affect the prepayment rate of junior lien mortgage loans, such as the amounts of, and interest on, the related senior lien mortgage loans and the use of senior lien mortgage loans as long term financing for home purchases and junior lien mortgage loans as shorter term financing for a variety of purposes, such as home improvement, educational expenses and purchases of consumer durables such as automobiles.  Accordingly, junior lien mortgage loans may experience a higher rate of prepayments than traditional senior lien mortgage loans.  In addition, any future limitations on the rights of borrowers to deduct interest payments on junior lien mortgage loans for federal income tax purposes may further increase the rate of prepayments on junior lien mortgage loans.

**A Conflict of Interest Exists Between the Interests of the Servicer as Holder of the Class C Certificates and the Interests of Holders of the Offered Certificates**

The servicer will initially, directly or indirectly, own all or a portion of the Class C Certificates and the Residual Certificates.  The timing of mortgage loan foreclosures and sales of the related mortgaged properties may affect the weighted average lives and yields of the offered certificates.  Investors should consider that the timing of such foreclosures or sales may not be in the best interests of all certificateholders and that no formal policies or guidelines have been established to resolve or minimize such a conflict of interest.

**The First Payment Date on Some Mortgage Loans Has Not Occurred Yet, Meaning that those Borrowers Could Not be Delinquent on the Referenced Monthly Payment**

Investors in the offered certificates should realize that approximately 6.83% of the Group I mortgage loans and approximately 4.50% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) have a first payment date occurring on or after April 1, 2007 and, therefore, such mortgage loans could not have been delinquent with respect to their April 1, 2007 monthly payment on April 1, 2007.

**Delinquent Mortgage Loans May Negatively Affect the Offered Certificates**

As of March 17, 2007, there were approximately 10.06% of the Group I mortgage loans and approximately 16.94% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) on which the monthly payment due on or prior to March 1, 2007 had not been received.  The sponsor will repurchase or substitute another mortgage loan for each mortgage loan on which the monthly payment due on or prior to March 1, 2007 has not been received as of the closing date.  Except with respect to approximately 0.99% of the Group I mortgage loans and approximately 1.18% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the

cut-off date), none of the mortgage loans have ever been delinquent, except for the mortgage loans on which the monthly payment due in March 2007 had not been received.  None of the mortgage loans have been contractually delinquent for more than 30 days more than once during the twelve months preceding the closing date and no mortgage loan as of the closing date has ever experienced a delinquency of 60 or more days since the origination thereof. See the definition of "Delinquent" under "Description of the Certificates—Definitions" in this prospectus supplement for the method of determining when a mortgage loan is 30 days or more delinquent.

**A Simultaneous-Second Lien Mortgage Loan on a Mortgaged Property May Increase the Risk that the Related Mortgage Loan Becomes Subject to Foreclosure**

With respect to approximately 11.86% of the Group I mortgage loans and approximately 33.19% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date), at the time of origination of such first lien mortgage loan, the sponsor or another lender also originated a second lien mortgage loan which may or may not be included in the trust.  The weighted average original loan-to-value ratio of such mortgage loans is approximately 79.51%, with respect to such Group I mortgage loans, and approximately 79.74%, with respect to such Group II mortgage loans, and the weighted average original combined loan-to-value ratio of such mortgage loans (including the related simultaneous second lien) is approximately 98.34%, with respect to such Group I mortgage loans, and approximately 99.02%, with respect to such Group II mortgage loans.  The weighted average original combined loan-to-value ratio (including the related simultaneous second lien) of all Group I mortgage loans is approximately 81.82% and of all Group II mortgage loans is approximately 88.74%.  With respect to such mortgage loans, foreclosure frequency may be increased relative to mortgage loans that were originated without a simultaneous second lien because mortgagors with a simultaneous second lien have less equity in the mortgaged property.  Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the sponsor or from any other lender.

**Performance of Forty Year Mortgage Loans is Subject to Greater Uncertainties**

Approximately 4.93% of the Group I mortgage loans and approximately 3.79% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) have an original term to maturity of 480 months.  These mortgage loans are a relatively new product and there is little statistical information or history with respect to defaults and prepayment experience for mortgage loans of this type.  It may be difficult to judge prospective defaults on these mortgage loans based on examination of the credit score(s) used in determining the creditworthiness of a prospective mortgagor because the mortgagor's credit is subject to a greater possible fluctuation due to the extended payment period.  Furthermore, a term to maturity of 480 months permits the mortgagor to have a lower monthly payment than would be the case with the same down payment under a similar mortgage loan with a 360 month original term to maturity, which results in less of an increase in equity in the mortgaged property over time.

**Credit Enhancement for the Offered Certificates May be Inadequate**

The credit enhancement features described in the summary of this prospectus supplement are intended to enhance the likelihood that holders of the Class A Certificates, and to a limited extent, the holders of the Mezzanine Certificates, will receive regular payments of interest and principal.  However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or defaults on the mortgage loans.  If delinquencies or

defaults occur on the mortgage loans, neither the servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if such advances are not likely to be recovered.  If substantial losses occur as a result of defaults and delinquent payments on the mortgage loans you may suffer losses.

Furthermore, although loan-level primary mortgage insurance coverage has been acquired on behalf of the trust from the PMI Insurer with respect to approximately 13.94% of the Group I mortgage loans and approximately 8.14% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date), such coverage will provide only limited protection against losses on defaulted covered mortgage loans.  Unlike a financial guaranty policy, coverage under a mortgage insurance policy is subject to certain limitations and exclusions including, for example, losses resulting from fraud and physical damage to the mortgaged property and to certain conditions precedent to payment, such as notices and reports.  As a result, coverage may be denied or limited on covered mortgage loans.  In addition, since the amount of coverage depends on the loan-to-value ratio at the time of origination of the covered mortgage loan, a decline in the value of a mortgaged property will not result in increased coverage, and the trust may still suffer a loss on a covered mortgage loan.  The PMI Insurer also may affect the timing and conduct of foreclosure proceedings and other servicing decisions regarding defaulted mortgage loans covered by the policy.

Under the PMI Policy, the amount of the claim generally will include interest to the date the claim is presented.  However, the claim must be paid generally within 60 days thereafter.  To the extent the servicer is required to continue making monthly advances after the claim is presented but before the claim is paid, reimbursement of these advances will reduce the amount of liquidation proceeds available for distribution to certificateholders.

| | |
|---|---|
| **Enhancement Provided by the Swap Agreement May Not be Adequate** | Any amounts received by the supplemental interest trust trustee under the swap agreement will be applied as described in this prospectus supplement to maintain overcollateralization at required levels, pay interest shortfalls and repay realized losses.  However, no amounts will be payable to the supplemental interest trust trustee by the swap counterparty unless the floating amount owed by the swap counterparty on a distribution date exceeds the fixed amount owed to the swap counterparty.  This will not occur except in periods when one-month LIBOR (as determined pursuant to the swap agreement) exceeds the applicable rate of payment owed by the supplemental interest trust trustee, which will be 4.760% per annum.  We cannot assure you that any amounts will be received by the supplemental interest trust trustee under the swap agreement, or that any such amounts that are received will be sufficient to maintain overcollateralization at required levels, pay interest shortfalls or repay realized losses on the mortgage loans.  See "Description of the Certificates—The Swap Agreement." |
| **Excess Interest from the Mortgage Loans May Not be Sufficient to Maintain Overcollateralization And Absorb Losses** | The weighted average of the mortgage rates on the mortgage loans each month is expected to be higher than the weighted average pass-through rate on the offered certificates for the related distribution date.  The mortgage loans are expected to generate more interest each month than is needed to pay interest owed on the offered certificates, to pay certain net amounts owed to the swap counterparty, to pay certain amounts required to be deposited in the final maturity reserve account, if applicable, and to pay the fees and expenses of the trust on the related distribution date.  Any |

remaining interest generated by the mortgage loans each month will then be used to absorb losses that occur on the mortgage loans. After these financial obligations of the trust are covered, the available excess interest generated by the mortgage loans each month will be used to maintain overcollateralization at the required level determined as provided in the pooling agreement. We cannot assure you, however, that enough excess interest will be generated to absorb losses or to maintain the required level of overcollateralization. The factors described below, as well as the factors described in the next risk factor, will affect the amount of excess interest that the mortgage loans will generate:

- Every time a mortgage loan is prepaid in full or in part, excess interest may be reduced because the mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, may be generating less interest.

- Every time a mortgage loan is liquidated or written off, excess interest will be reduced because such mortgage loan will no longer be outstanding and generating interest.

- If the rates of delinquencies, defaults or losses on the mortgage loans are higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available to make required distributions on the offered certificates.

- The adjustable-rate mortgage loans have mortgage rates that adjust based on an index that is different from the index used to determine the pass-through rates on the offered certificates and the fixed-rate mortgage loans have mortgage rates that do not adjust. In addition, the first adjustment of the mortgage rates for approximately 53.17% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of the cut-off date) will not occur until two years after the date of origination, the first adjustment of the mortgage rates for approximately 14.12% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of the cut-off date) will not occur until three years after the date of origination and the first adjustment of the mortgage rates for approximately 7.81% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of the cut-off date) will not occur until five years after the date of origination. As a result, the pass-through rates on the offered certificates may increase relative to the weighted average of the mortgage rates on the Group I mortgage loans (in the case of the Group I Senior Certificates), the Group II mortgage loans (in the case of the Group II Senior Certificates) and all of the mortgage loans (in the case of the Mezzanine Certificates), or the pass-through rate on such certificates may remain constant as the weighted average of the mortgage rates on the Group I mortgage loans (in the case of the Group I Senior Certificates), the Group II mortgage loans (in the case of the Group II Senior Certificates) and all of the mortgage loans (in the case of the Mezzanine Certificates) decline. In either case, this would require that more of the interest generated by the mortgage loans be applied to cover interest on the offered certificates.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher mortgage rates than on the

mortgage loans with relatively lower mortgage rates, the amount of excess interest generated by the mortgage loans will be less than would otherwise be the case.

- If neither the servicer nor the NIMS insurer, if any, terminates the trust on the Optional Termination Date, then the pass-through rates on the offered certificates will, subject to the limitation described in the next risk factor below, increase. Any such increase will reduce the amount of excess interest that could become available for other purposes.

**Mortgage Loan Interest Rates May Limit Pass-Through Rates on the Offered Certificates**

The offered certificates accrue interest at pass-through rates based on the one-month LIBOR index plus specified margins, but all of such pass-through rates are subject to a limit. The limit on the pass-through rate for the Group I Senior Certificates is based on the weighted average of the mortgage rates on the Group I mortgage loans. The limit on the pass-through rates for the Group II Senior Certificates is based on the weighted average of the mortgage rates on the Group II mortgage loans. The limit on the pass-through rates for the Mezzanine Certificates is based on the weighted average of the mortgage rates on all the mortgage loans. The mortgage rates on which the limits on the pass-through rates are based are net of certain net amounts owed to the swap counterparty, certain amounts required to be deposited in the final maturity reserve account, if any, and certain fees and expenses of the trust.

A variety of factors, in addition to those described in the previous risk factor, could limit the pass-through rates and adversely affect the yield to maturity on the offered certificates. Some of these factors are described below:

- The mortgage rates on the fixed-rate mortgage loans will not adjust, and the mortgage rates on the adjustable rate mortgage loans generally are based on a six-month LIBOR index. Generally, the adjustable-rate mortgage loans have periodic and maximum limitations on adjustments to their mortgage rates, and approximately 75.10% of the mortgage loans (by aggregate scheduled principal balance of the mortgage loans as of the cut-off date), will not have the first adjustment to their mortgage rates until two years, three years or five years after the origination. As a result of the limits on the pass-through rates for the offered certificates, such certificates may accrue less interest than they would accrue if their pass-through rates were based solely on the one-month LIBOR index plus the specified margins.

- Six-month LIBOR may change at different times and in different amounts than one-month LIBOR. As a result, it is possible that mortgage rates on certain of the adjustable-rate mortgage loans may decline while the pass-through rates on the offered certificates are stable or rising. It is also possible that the mortgage rates on the adjustable-rate mortgage loans and the pass-through rates for the offered certificates may decline or increase during the same period, but that the pass-through rates on these certificates may decline more slowly or increase more rapidly.

- The pass-through rates for the offered certificates adjust monthly while the mortgage rates on the adjustable-rate mortgage loans adjust less frequently and the mortgage rates on the fixed rate mortgage loans do not adjust. Consequently, the limits on the pass-through rates for the

offered certificates may limit increases in the pass-through rates for such certificates for extended periods in a rising interest rate environment.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher mortgage rates than on the mortgage loans with relatively lower mortgage rates, the pass-through rates on the offered certificates are more likely to be limited.

- The required payment by the trust into the final maturity reserve account will result in the limit on the pass-through rates on the offered certificates being lower than would be the case if such payment was not made. The required payment by the trust of certain net amounts payable to the swap counterparty will result in the limit on the pass-through rates on the offered certificates being lower than would be the case if the trust did not have such obligation. The required payment by the trust of fees payable to the PMI Insurer will result in the limit on the pass-through rates on the offered certificates being lower than would be the case if the trust did not have such obligation.

If the pass-through rates on the offered certificates are limited for any distribution date, the resulting basis risk shortfalls may be recovered on the same distribution date or on future distribution dates on a subordinated basis to the extent that on such distribution date or future distribution dates there are available funds remaining after certain other distributions on the offered certificates, the payments of certain net amounts made to the swap counterparty, certain payments made to the final maturity reserve account and the payment of the fees and expenses of the trust. The ratings on the offered certificates will not address the likelihood of any such recovery of basis risk shortfalls by holders of the offered certificates.

Amounts used to pay basis risk shortfalls on the offered certificates may be supplemented by amounts, if any, received by the supplemental interest trust trustee under the swap agreement. However, the amount received under the swap agreement may be insufficient to pay the holders of the applicable certificates the full amount of interest which they would have received absent the limits on the pass-through rates. The swap agreement will terminate after the distribution date in April 2012.

**Payments to the Swap Counterparty Will Reduce Amounts Available for Distribution to the Offered Certificates**

Any net swap payment, including certain termination payments payable by the supplemental interest trust trustee to the swap counterparty under the terms of the swap agreement will reduce amounts available for distribution to the offered certificates, and may reduce payments of interest on the offered certificates. If the rate of prepayments on the mortgage loans is faster than anticipated, the scheduled notional amount on which payments due under the swap agreement are calculated may exceed the total principal balance of the mortgage loans, thereby increasing the relative proportion of interest collections on the mortgage loans that must be applied to make swap payments to the swap counterparty and, under certain circumstances, requiring application of principal received on the mortgage loans to make net swap payments to the swap counterparty. Therefore, the combination of a rapid rate of prepayments and low prevailing interest rates could adversely affect the yields on the offered certificates.

In the event that the supplemental interest trust trustee, after application of all interest and principal received on the mortgage loans, cannot make the

required net swap payments to the swap counterparty, a swap termination payment as described in this prospectus supplement may be owed to the swap counterparty. Any termination payment payable to the swap counterparty in the event of early termination of the swap agreement will reduce amounts available for distribution to the offered certificates, unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement.

| | |
|---|---|
| **A Reduction of the Swap Counterparty's Ratings May Reduce the Ratings of the Offered Certificates** | As of the date of this prospectus supplement, the swap counterparty currently has the ratings described under "Description of the Certificates—The Swap Counterparty." The ratings of the offered certificates are dependent in part upon the credit ratings of the swap counterparty. If a credit rating of the swap counterparty is qualified, reduced or withdrawn and the swap counterparty fails to perform one or more actions specified in the swap agreement or a substitute counterparty is not obtained in accordance with the terms of the swap agreement, the ratings of the offered certificates may be qualified, reduced or withdrawn. In that event, the value and marketability of those offered certificates will be adversely affected. See "Description of the Certificates—Swap Agreement." |
| **A Reduction of the PMI Insurer's Ratings May Reduce the Ratings of the Offered Certificates** | As of the date of this prospectus supplement, the PMI Insurer currently has the ratings described under "Description of the Certificates—The PMI Insurer." The ratings of the offered certificates are dependent in part upon the credit ratings of the PMI Insurer. Any qualification, reduction or withdrawal of the ratings assigned to the PMI Insurer could result in the ratings of the offered certificates being qualified, reduced or withdrawn. In that event, the value and marketability of those offered certificates will be adversely affected. See "Description of the Certificates—The PMI Insurer." |
| **The Mezzanine Certificates Have a Greater Risk of Loss Than the Class A Certificates** | The weighted average lives of, and yields to maturity on, the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates will be more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such investor based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of such mortgage loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the amount of overcollateralization and excess interest following distributions of principal on the related distribution date, will reduce the certificate principal balance of the Class M-9 Certificates, the Class M-8 Certificates, the Class M-7 Certificates, the Class M-6 Certificates, the Class M-5 Certificates, the Class M-4 Certificates, the Class M-3 Certificates, the Class M-2 Certificates and the Class M-1 Certificates, in that order. As a result of such reductions, less interest will accrue on such class of Mezzanine Certificates than would otherwise be the case. Once a realized loss is allocated to a Mezzanine Certificate, no principal or interest will be distributable with respect to such written down amount unless such written down amount is reinstated due to a subsequent recovery on a liquidated mortgage loan. However, the amount of |

any realized losses allocated to the Mezzanine Certificates may be paid to the Mezzanine Certificates on a later distribution date from collections on the mortgage loans and from amounts, if any, received from the swap counterparty pursuant to the swap agreement, according to the priorities specified under "Description of the Certificates—Credit Enhancement—Excess Interest" in this prospectus supplement.

Unless the certificate principal balance of each Class A Certificate has been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until May 2010 or a later date as provided in this prospectus supplement, or during any period in which delinquencies or cumulative realized losses on the related mortgage loans exceed certain levels. As a result, the weighted average lives of the Mezzanine Certificates will be longer than would otherwise be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of the Mezzanine Certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels occur, it is possible for such certificates to receive no principal distributions even if no losses have occurred on the mortgage pool.

In addition, the multiple class structure of the Mezzanine Certificates causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment of the mortgage loans. Because distributions of principal will be made to such certificates according to the priorities described in this prospectus supplement, the yield to maturity on the Mezzanine Certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on such classes of certificates. The yield to maturity on the Mezzanine Certificates will also be extremely sensitive to losses due to defaults on the mortgage loans (and their timing), to the extent such losses are not covered by excess interest, overcollateralization or the Mezzanine Certificates with a lower payment priority. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the Mezzanine Certificates may be adversely affected by losses even if such classes of certificates do not ultimately bear such loss.

**The Return on Your Certificates Could be Reduced Due to Prepayment Interest Shortfalls and Relief Act Shortfalls**

When a mortgage loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for payment on the next distribution date. The servicer is required to cover a portion of the shortfall in interest collections that is attributable to prepayments (except in respect of principal prepayments in full received during the period from the first through the 14th day of the month of the related distribution date), but only up to the amount of the servicer's servicing fee for the related calendar month. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act, as amended (the "**Relief Act**") or similar state or local law, will not be covered by the servicer.

On any distribution date, any shortfalls resulting from the application of the Relief Act or similar state or local law, and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer, in each case regardless of which loan group experienced the shortfall, will be allocated, first, to the current interest with respect to the

Class C Certificates, and after that, to the current interest with respect to the offered certificates, on a pro rata basis based on the respective amounts of interest accrued on such certificates for such distribution date. The holders of the offered certificates will not be entitled to reimbursement for prepayment interest shortfalls not covered by compensating interest or for shortfalls resulting from application of the Relief Act or similar state or local law. If these shortfalls are allocated to the offered certificates the amount of interest paid on those certificates will be reduced, adversely affecting the yield on your investment.

**Delays in Liquidating Delinquent Mortgage Loans May Result in Losses**

Substantial delays could be encountered in connection with the liquidation of delinquent mortgage loans. Further, reimbursement of advances made on a mortgage loan, liquidation expenses such as legal fees, real estate taxes, hazard insurance and maintenance and preservation expenses may reduce the portion of liquidation proceeds payable on the certificates. If a mortgaged property fails to provide adequate security for the related mortgage loan, you could incur a loss on your investment if the credit enhancements are insufficient to cover the loss.

**Mortgages with High Loan-to-Value Ratios May have a Greater Risk of Loss**

Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below. Approximately 41.22% of the Group I mortgage loans and approximately 38.11% of the Group II mortgage loans (in each case by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) had loan-to-value ratios at origination (or combined loan-to-value ratio in the case of 80%, or second lien mortgage loans) in excess of 80%, but no more than 100%. Additionally, the sponsor's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties.

**The Yield on Your Certificates May be Affected by Commencement of Amortization of the Interest Only Mortgage Loans**

Approximately 3.84% of the Group I mortgage loans and approximately 15.57% of the Group II mortgage loans (in each case, by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date) require the mortgagors to make monthly payments only of accrued interest for the first two, three or five years following origination.

After such interest only period, the mortgagor's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will amortize fully on or prior to its final payment date. If the monthly payment increases, the related mortgagor may not be able to pay the increased amount and may default on or may refinance the related mortgage loan to avoid the higher payment. Because no principal payments are required on such mortgage loans during such interest only period, the offered certificates then entitled to distributions of principal will receive smaller principal distributions during such period than they would have received if the related mortgagors were required to make monthly payments of interest and principal for the entire lives of such mortgage loans. This slower rate of principal distributions may reduce the return on an investment in the related offered certificates that are purchased at a discount.

**The Geographic Concentration of the Mortgaged Properties in Certain States Increases the Risk of the Related Mortgage Loans Incurring Losses Due to Developments in those States**

The charts presented under Annex A list the geographic distribution of mortgage loans.  Mortgaged properties in California may be particularly susceptible to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters not covered by standard hazard insurance policies for each mortgage loan or otherwise insured against for the benefit of the trust.

In addition, the conditions below will have a disproportionate impact on the mortgage loans in general:

- Economic conditions in states with high concentrations of mortgage loans may affect the ability of mortgagors to repay their loans on time even if such conditions do not affect real property values.

- Declines in the residential real estate markets in the states with high concentrations of mortgage loans may reduce the values of properties located in those states, which would result in an increase in loan-to-value ratios.

- Any increase in the market value of properties located in the states with high concentrations of mortgage loans would reduce loan-to-value ratios and could, therefore, make alternative sources of financing available to mortgagors at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

**Violation of Federal or State Laws May Result in Losses on the Mortgage Loans**

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and generally require licensing of the originator.  In addition, other state laws, municipal ordinances, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices (including predatory lending practices), and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

- the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience.

Violations of certain provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the mortgage loans and in addition could subject the trust to damages and administrative enforcement.  In particular, the sponsor's failure to comply with certain requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject the trust (and other assignees of the mortgage loans) to monetary penalties, and could result in the obligors'

rescinding the mortgage loans against either the trust or subsequent holders of the mortgage loans.  See "Legal Aspects of Mortgage Assets—Anti-Deficiency Legislation and Other Limitations on Lenders" in the accompanying prospectus.

The sponsor will represent that at origination each mortgage loan complied with all applicable federal and state laws and regulations.  In addition, the sponsor will represent that none of the mortgage loans is subject to the requirements of the Home Ownership and Equity Protection Act of 1994 ("**HOEPA**") or is a "high cost" or "predatory" loan under any state or local law or regulation applicable to the originator of such mortgage loan, or which would result in liability to the purchaser or assignee of such mortgage loan under any predatory or abusive lending law.  In the event of a breach of any of such representations, the sponsor will be obligated to cure such breach or repurchase or replace the affected mortgage loan, in the manner and to the extent described under "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement.

Under the anti-predatory lending laws of some states, the mortgagor is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan.  This test may be highly subjective and open to interpretation.  As a result, a court may determine that a mortgage loan does not meet the test even if an originator reasonably believed that the test was satisfied.  Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the sponsor will be required to repurchase such mortgage loan from the trust.

In addition to HOEPA, a number of legislative proposals have been introduced at the federal, state and local level that are designed to discourage predatory lending practices.  Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that mortgagors be given certain disclosures prior to the consummation of such mortgage loans.  In some cases, state law may impose requirements and restrictions more stringent than those in HOEPA.  The originator's failure to comply with these laws could subject the trust, and other assignees of the mortgage loans, to monetary penalties and could result in mortgagors exercising their rights to rescind their mortgage loans against either the trust or subsequent holders of the mortgage loans.  Lawsuits have been brought in various states making claims against assignees of high cost mortgage loans for violations of state law.  Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

**Proceeds of the Assets in the Trust are the Sole Source of Payment on the Certificates**

The certificates will not represent an interest in or obligation of the depositor, the sponsor, the servicer, the originator, the trustee, the Delaware trustee or any of their respective affiliates.  None of the offered certificates or the underlying mortgage loans will be guaranteed or insured by any governmental agency or instrumentality, or by the depositor, the sponsor, the servicer, the originator, the trustee, the Delaware trustee or any of their respective affiliates.  Proceeds of the assets included in the trust will be the sole source of payments on the offered certificates, and there will be no recourse to the depositor, the sponsor, the servicer, the originator, the trustee, the Delaware trustee or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all payments provided for

under the offered certificates.

**The Lack of a Secondary Market May Make it Difficult for You to Resell Your Certificates**

The underwriters intend to make a secondary market in the classes of offered certificates actually purchased by them, but they have no obligation to do so. There is no assurance that such a secondary market will develop or, if it develops, that it will continue.  Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield.  The market values of the offered certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

Investments can lose value because of actual performance as well as perceptions of future performance based on changes in the external interest rate environment and other market factors not directly related to the performance of the mortgage loans themselves.

The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future.  Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit, or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

**Reduction or Withdrawal of Ratings of the Offered Certificates May Affect Their Market Value and Liquidity**

Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change.  No person is obligated to maintain the ratings at their initial levels.  If a rating agency reduces or withdraws its rating on one or more classes of the offered certificates, the liquidity and market value of the affected certificates is likely to be reduced.

**Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates**

A financial guaranty insurance policy or policies ("**NIMS policy**") may be issued by the NIMS insurer, if any, covering certain payments to be made on NIMS which may be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date.  The NIMS are not offered hereby and, if issued, the NIMS would be backed, in whole or in part, by cashflow received on the Class C Certificates and the Class P Certificates, which are not offered hereby.  The NIMS, if issued, would not be backed by the trust (other than by the interests represented by the Class C Certificates and the Class P Certificates) or by any of the offered certificates.

Notwithstanding the foregoing, pursuant to the terms of the pooling agreement, unless there exists a continuance of any failure by the NIMS insurer, if any, to make a required payment under the NIMS policy ("**NIMS insurer default**"), the NIMS insurer will be entitled to exercise, among others, certain rights that preempt the rights of the holders of the offered certificates, without the consent of such holders, and the holders of the offered certificates may exercise such rights only with the prior written consent of the NIMS insurer.  Such rights are expected to include (i) the right to provide notices of servicer defaults and the right to direct the trustee to terminate the rights and obligations of the servicer under the pooling agreement in the event of a default by the servicer; (ii) the right to remove the trustee, any co-trustee, the Delaware trustee or custodian pursuant to the pooling agreement; and (iii) the right to direct the trustee to make investigations and take actions pursuant to the pooling agreement.  In addition, unless a NIMS insurer default exists, the NIMS insurer's consent

will be required prior to, among other things: (i) the appointment of any successor servicer or the removal of the trustee or the Delaware trustee; (ii) the appointment of any subservicer or any co-trustee and the removal of any subservicer or any co-trustee; or (iii) any amendment to the pooling agreement regardless of whether such amendment would affect the Class C Certificates, the Class P Certificates or the Class R Certificates.

Investors in the offered certificates should note that:

- any NIMS policy will not cover, or benefit in any manner whatsoever, the offered certificates;

- the rights granted to any NIMS insurer are extensive;

- the interests of any NIMS insurer may be inconsistent with, and adverse to, the interests of the holders of the offered certificates, and the NIMS insurer has no obligation or duty to consider the interests of the offered certificates in connection with the exercise or non-exercise of the NIMS insurer's rights;

- any NIMS insurer's exercise of the rights and consents described above may negatively affect the offered certificates, and the existence of such rights, whether or not exercised, may adversely affect the liquidity of the offered certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

- there may be more than one series of notes insured by the NIMS insurer and the NIMS insurer will have the rights described in this prospectus supplement and in the pooling agreement so long as any such series of notes remain outstanding.

**The Return on Your Certificates Could be Reduced due to the Application of the Servicemembers Civil Relief Act or any Comparable State Legislation**

Following the terrorist attacks in the United States on September 11, 2001, the United States has increased its active military operations (including, most recently, significant military actions in Iraq) and has placed a substantial number of military reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. Calling reservists, members of the National Guard and civilians to active military duty may adversely affect the performance of your certificates. Under the Relief Act, persons in active military service are provided relief from the performance of some payment obligations. The relief includes a 6.000% per annum interest rate cap on each mortgage loan, provided that the mortgage loan was obtained before the commencement of active military service. In addition, all civil court actions, such as bankruptcy and foreclosure proceedings, are delayed. Furthermore, the servicer will be required to waive any prepayment charge that would otherwise be due during the time that any mortgage loans is subject to the Relief Act.

State legislation may provide similar relief for military personnel placed on active duty status. For the purpose of this prospectus supplement, references to the Relief Act include any such comparable state legislation. See "Legal Aspects of Mortgage Assets—Servicemembers Civil Relief Act" in the accompanying prospectus.

| **The Offered Certificates May Not be Suitable Investments For Certain Investors** | The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date.  The offered certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors. |

## THE SPONSOR

### General

Washington Mutual Bank, the sponsor of the securitization transaction, is a federal savings association that provides financial services to consumers and commercial clients. It is an indirect wholly-owned subsidiary of Washington Mutual, Inc.  At December 31, 2006, Washington Mutual, Inc. and its subsidiaries had assets of $346.3 billion. The sponsor and its affiliates currently operate more than 2,600 retail banking, mortgage lending, commercial banking and financial services offices throughout the United States.

Securitization of mortgage loans is an integral part of the sponsor's management of its capital.  It has engaged in securitizations of prime and Alt-A first lien single-family residential mortgage loans through WaMu Asset Acceptance Corp., as depositor, since 2005, and through Washington Mutual Mortgage Securities Corp., as depositor, since 2001.  From 1997 until 2001, the sponsor engaged in securitizations of single-family residential mortgage loans through unaffiliated depositors, and some of its predecessor organizations also securitized mortgage loans.  It has engaged in securitizations of multi-family and commercial mortgage loans through unaffiliated depositors since 2001.

Beginning in December 2000, Long Beach Mortgage Company, initially as a subsidiary of Washington Mutual, Inc. and, after March 1, 2006, as a subsidiary of the sponsor, engaged in securitizations of sub-prime first and second lien residential mortgage loans through Long Beach Securities Corp., as depositor.  From 1997 until 2000, Long Beach Mortgage Company engaged in securitizations of sub-prime first and second lien residential mortgage loans through unaffiliated depositors.  As of July 1, 2006, Long Beach Mortgage Company became a division of Washington Mutual Bank.

The sponsor generally acts as servicer of all mortgage loans securitized by the sponsor, and it will act as servicer of the mortgage loans owned by the trust.  The sponsor participated with the underwriters in structuring the securitization transaction.

The following table shows, for each indicated period, the aggregate principal balance of all sub-prime first and second lien residential mortgage loans originated by the sponsor through Long Beach Mortgage, a division of Washington Mutual Bank ("**Long Beach Mortgage**") (including those purchased by the sponsor through Long Beach Mortgage from correspondent lenders) during that period and the portion of those mortgage loans securitized during that period through Long Beach Securities Corp., the depositor for those securitizations.  The term "Long Beach Mortgage" in this prospectus supplement includes Long Beach Mortgage Company prior to July 1, 2006.

**The Sponsor's Origination and Securitization of Sub-prime
Residential Mortgage Loans**

| | Year ended December 31 | | |
| --- | --- | --- | --- |
| | **2004** | **2005** | **2006** |
| | (Dollar Amounts in Millions) | | |
| Aggregate Principal Balance of Mortgage Loans Originated by Sponsor ............................... | $16,175 | $29,781 | $19,710 |
| Aggregate Principal Balance of Mortgage Loans Securitized | $13,338 | $15,444 | $26,220 |

**The Sponsor's Origination Channels**

All of the mortgage loans owned by the trust have been either originated by the sponsor through wholesale brokers or purchased by the sponsor from approved correspondents and were underwritten or re-underwritten by the sponsor generally in accordance with the WMB sub-prime underwriting standards as described in this prospectus supplement. The sponsor originates sub-prime mortgage loans through its network of mortgage lending offices and loan origination centers. See "Underwriting of the Mortgage Loans" in this Prospectus Supplement.

**STATIC POOL INFORMATION**

On February 12, 2007, the depositor filed with the Securities and Exchange Commission, as Exhibit 99.1 to a Current Report on Form 8-K, static pool information about prior securitized pools of sub-prime mortgage loans of the sponsor which information is incorporated by reference into this prospectus supplement. As of July 1, 2006, Long Beach Mortgage Company, which became a subsidiary of Washington Mutual, Inc. in October 1999 and a subsidiary of Washington Mutual Bank in March 2006, became a division of Washington Mutual Bank.

The static pool information includes (i) information about the original characteristics of each prior securitized pool as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each prior securitized pool in quarterly increments from the related cut-off date through December 31, 2006. The static pool information about prior securitized pools of mortgage loans of the sponsor that were established before January 1, 2006 is not deemed to be a part of this prospectus supplement, the prospectus or the related registration statement.

**There can be no assurance that the rates of delinquencies, losses and prepayments experienced by the prior securitized pools will be comparable to delinquencies, losses and prepayments expected to be experienced by the mortgage loans owned by the trust.**

**UNDERWRITING OF THE MORTGAGE LOANS**

**General**

All of the mortgage loans owned by the trust have been, or will be, originated by the sponsor through wholesale brokers or re-underwritten upon acquisition from correspondents by the sponsor generally in accordance with the WMB sub-prime underwriting standards described in this section. The WMB sub-prime underwriting standards are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral. The term "sponsor" as used in this "Underwriting of the Mortgage Loans" section of this prospectus supplement refers to Long Beach Mortgage Company for mortgage loans owned by the trust that were originated or acquired prior to July 1, 2006.

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding the amount of income and related sources, liabilities and related monthly payments, credit history and employment history, as well as certain other personal information. During the underwriting or re-

underwriting process, the sponsor reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the WMB sub-prime underwriting standards.

All of the mortgage loans are either originated under the WMB sub-prime underwriting programs based on loan application packages submitted through wholesale mortgage brokerage companies or purchased from approved correspondents. Loan application packages submitted through mortgage brokerage companies, containing relevant credit, property and underwriting information on the loan request, are compiled by the mortgage brokerage company and submitted to the sponsor for approval and funding. The mortgage brokerage companies receive the loan origination fee charged to the borrower at the time the loan is made. No single mortgage brokerage company accounts for more than 5% of the mortgage loans originated or acquired by the sponsor under the WMB sub-prime underwriting standards, as measured by outstanding principal balance.

The WMB sub-prime underwriting standards are less stringent than the standards Washington Mutual Bank applies to borrowers who qualify for its prime or Alt-A mortgage loans and less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit history, credit score(s), loan-to-value ratio and debt-to-income ratio. Borrowers who qualify under the WMB sub-prime underwriting standards generally have payment histories, documentation or debt-to-income ratios that would not satisfy Fannie Mae and Freddie Mac underwriting standards and such borrowers may have a record of major derogatory credit items, such as outstanding judgments or prior bankruptcies. All debts in bankruptcy must be paid off or discharged or the proceeding dismissed prior to the funding of the mortgage loan. The WMB sub-prime underwriting standards permit Chapter 13 bankruptcy buyouts.

**Evaluation of the Borrower's Credit Standing**

The sponsor obtains a credit report on each prospective borrower from a credit reporting company in addition to the one obtained from the wholesale broker or correspondent. The sponsor then compares the two credit reports. The report typically contains information relating to such matters as credit payment history with local and national merchants and lenders, installment debt payments, credit score(s) and any record of defaults, bankruptcy, repossession, suits or judgments.

The sponsor uses a credit scoring methodology as part of its underwriting and re-underwriting process. The credit scoring methodology assesses a prospective borrower's ability to repay a mortgage loan based upon predetermined mortgage loan characteristics and credit risk factors. The credit scoring methodology generates a credit score usually ranging from around 300 to 800, with a higher score indicating a borrower with a relatively more favorable credit history. The credit score is based upon such factors as the prospective borrower's payment history, delinquencies on accounts, levels of outstanding debt, length of credit history and types of credit and bankruptcy experience.

**Evaluation of the Borrower's Repayment Ability**

The WMB sub-prime underwriting standards permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if at the time of origination of the first lien mortgage loan, the sponsor also originated a second lien mortgage loan. The WMB sub-prime second lien mortgage loan underwriting standards permit second lien mortgage loans with a combined loan-to-value ratio at origination of up to 100%. The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision. The maximum combined loan-to-value ratio, including any second lien mortgage subordinate to the sponsor's first lien mortgage, is generally 100% under the "Premium A," "A," "A-," "B+" and "B" risk categories, and 95% under the "C" risk category. Non-institutional (private party) second lien loans are not permitted.

**Evaluation of the Adequacy of Collateral**

The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process. In most cases, properties in below average condition, including properties requiring major deferred maintenance, are not acceptable under the WMB sub-prime underwriting programs. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.

Every independent appraisal is reviewed by an underwriter of the sponsor or its affiliate and is reviewed by one or more third party vendors which may refer the appraisal to the sponsor or one of its affiliates for additional further review before the loan is funded or re-underwritten. Depending upon the original principal balance and loan-to-value ratio of the mortgaged property, the appraisal review may include an administrative review, technical review, desk review or field review of the original appraisal.

The sponsor requires that all mortgage loans in the WMB sub-prime underwriting programs have title insurance and be secured by liens on real property. The sponsor also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the mortgage loan or the replacement cost of the property, whichever is less. The sponsor does not require that the mortgage loans originated or re-underwritten under the WMB sub-prime underwriting programs be covered by a primary mortgage insurance policy.

**Underwriting Exceptions**

On a case-by-case basis and only with the approval of an employee with appropriate risk level authority, the sponsor may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the WMB sub-prime underwriting risk category guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the prospective borrower's current address. It is expected that some of the mortgage loans owned by the trust will be underwriting exceptions.

**Documentation Programs**

The mortgage loans have been, or will be, originated or re-underwritten upon acquisition, generally in accordance with the WMB sub-prime underwriting standards under the WMB sub-prime full documentation, limited documentation or stated income documentation residential loan programs.

Under the full documentation residential loan program, salaried prospective borrowers are generally required to submit their most recent W-2s and pay stubs and self-employed prospective borrowers are generally required to submit their most recent federal income tax return. Under the stated income documentation residential loan program, prospective borrowers are required to state their income on the application but are not required to submit any documents in support. Under the limited documentation residential loan program, salaried prospective borrowers or self-employed prospective borrowers are generally required to submit their most recent six months of personal bank statements or business bank statements. Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application. The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion. However, the prospective borrower's income as stated on the application is not independently verified. Verification of employment is required for salaried prospective borrowers. Maximum loan-to-value ratios under the stated income documentation residential loan programs are generally lower than those permitted under the full documentation and limited documentation residential loan programs. Generally, the same underwriting standards that apply to the full documentation and limited documentation residential loan programs, except as noted in this section, apply to the stated income documentation residential loan programs.

**Quality Control Review**

As part of its quality control system, the sponsor re-verifies information that has been provided by the mortgage brokerage company prior to funding a loan and the sponsor conducts a post-funding audit of every origination file.  In addition, Washington Mutual Bank periodically audits files based on a statistical sample of closed loans.  In the course of its pre-funding review, the sponsor re-verifies the income of each prospective borrower or, for a self-employed prospective borrower, reviews the income documentation obtained under the full documentation and limited documentation residential loan programs.  The sponsor generally requires evidence of funds to close on the mortgage loan.

**Risk Categories**

Under the WMB sub-prime underwriting programs, various risk categories are used to grade the likelihood that the prospective borrower will satisfy the repayment conditions of the mortgage loan.  These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the prospective borrower's credit history and debt ratio.

Mortgage loans are originated under the WMB sub-prime underwriting standards using the following categories and criteria for grading the potential likelihood that a prospective borrower will satisfy the repayment obligations of a mortgage loan:

Credit Grade:  "Premium A".  Under the "Premium A" risk category, the prospective borrower must have a credit report reflecting a one year credit history and a prior mortgage or rental history evidencing no 30-day late payments during the last 12 months.  No notice of default filings or foreclosures may have occurred during the preceding 36 months.  No open lawsuits are permitted; however, the prospective borrower may be a plaintiff in a lawsuit if a reasonable explanation is provided.  Maximum qualifying debt service-to-income ratio is 55.  A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied properties consisting of three-to-four units.  In addition, the prospective borrower must have a credit score of 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units.

Credit Grade:  "A".  Under the "A" risk category, a maximum of one 30-day late payment within the last 12 months is permitted on an existing mortgage loan.  A maximum of one rolling 30-day late payment is allowed.  No notice of default filings or foreclosures may have occurred during the preceding 36 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 100% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 95% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans, 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units).

Credit Grade:  "A-".  Under the "A-" risk category, a maximum of two 30-day late payments within the last 12 months is permitted on an existing mortgage loan.  A maximum of two rolling 30-day late payments is allowed.  No notice of default filings or foreclosures may have occurred during the preceding 36 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties

consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-four units.  Generally, the debt service-to-income ratio maximum may be 55% based on the prospective borrower's net disposable income and if the loan-to-value ratio is less than or equal to 90%.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans, 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units).

Credit Grade:  "B+".  Under the "B+" risk category, a maximum of three 30-day late payments within the last 12 months is permitted on an existing mortgage loan.  No notice of default filings or foreclosures may have occurred during the preceding 24 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 95% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 90% is permitted for second homes, and a maximum loan-to-value ratio of 85% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 90% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 80% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans, 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units).

Credit Grade:  "B".  Under the "B" risk category, a maximum of one 60-day late payment within the last 12 months is permitted on an existing mortgage loan.  No notice of default filings or foreclosures may have occurred during the preceding 18 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 90% is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 85% is permitted for second homes, and a maximum loan-to-value ratio of 80% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 85% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 75% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio must be 55% or less based on the prospective borrower's net disposable income and/or loan-to-value ratio.  In addition, the prospective borrower must have a credit score of 500 or higher (550 or higher for interest only mortgage loans, 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units).

Credit Grade:  "C".  Under the "C" risk category, the prospective borrower may have experienced significant credit problems in the past.  A maximum of four 60-day late payments and no 90-day late payments, or three 60-day late payments and one 90-day late payment, or if the loan-to-value ratio does not exceed 70%, two 90-day late payments and one 120-day late payment, within the last 12 months is permitted on an existing mortgage loan.  No notice of default filings or foreclosures may have occurred during the preceding 12 months.  The mortgaged property must be in at least average condition.  A maximum loan-to-value ratio of 80% for the full documentation loan program and limited documentation loan program and 75% for the stated documentation loan program is permitted for owner occupied single-family, two-unit and condominium properties, a maximum loan-to-value ratio of 80% is permitted for second homes, and a maximum loan-to-value ratio of 75% is permitted for owner occupied mortgaged properties consisting of three-to-four units.  A maximum loan-to-value ratio of 80% is permitted for non-owner occupied single-family, two-unit and condominium properties, and a maximum loan-to-value ratio of 70% is permitted for non-owner occupied mortgaged properties consisting of three-to-four units.  Generally, the debt service-to-income ratio must not exceed 55%.  In addition, the prospective borrower must have a credit score of 600 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of one-to-two units and 640 or higher for mortgage loans secured by non-owner occupied mortgaged properties consisting of three-to-four units.

In general, higher credit risk mortgage loans are graded in categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however,

the WMB sub-prime underwriting programs establish lower maximum loan-to-value ratios and maximum loan amounts for loans graded in such categories.

There can be no assurance that every mortgage loan owned by the trust was originated in conformity with the applicable underwriting standards in all material respects. The WMB sub-prime underwriting standards include a set of specific criteria pursuant to which the underwriting evaluation is made. The application of the WMB sub-prime underwriting standards does not imply that each specific criterion was satisfied with respect to every mortgage loan. Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the mortgage loan is in substantial compliance with those underwriting standards. For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in those underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards. The sponsor applies the WMB sub-prime underwriting standards in accordance with a procedure that complies with applicable federal and state laws and regulations.

## THE DEPOSITOR

WaMu Asset Acceptance Corp., the depositor, is a Delaware corporation and a wholly owned subsidiary of Washington Mutual Bank. The depositor engages in no activities other than securitizing assets. It will have no material continuing obligations with respect to the mortgage loans or the certificates following the issuance of the certificates, other than the obligations to (i) file financing statements perfecting the trust's interest in the mortgage loans, (ii) repurchase or substitute for affected mortgage loans in the event of a material breach of a representation and warranty made by the depositor in the pooling agreement that has not been remedied, and (iii) indemnify the underwriters against some civil liabilities, including liabilities under the Securities Act of 1933.

## THE TRUST

The issuer of the certificates, the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust, will be a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between WaMu Asset Acceptance Corp., as depositor, and Christiana Bank & Trust Company, as Delaware trustee. The pooling agreement among the depositor, Washington Mutual Bank, as servicer, Citibank, N.A., as trustee, and Christiana Bank & Trust Company, as Delaware trustee, will restate the trust agreement and will be the governing instrument of the trust.

The trust will not own any assets other than the mortgage loans and the other assets described below. The trust will not have any liabilities other than those incurred in connection with the pooling agreement and any related agreement. The trust will not have any directors, officers, or other employees. No equity contribution will be made to the trust by the sponsor, the depositor or any other party, except for a de minimis contribution made by the depositor pursuant to the trust agreement, and the trust will not have any other capital. The fiscal year end of the trust will be December 31. The trust will act through the trustee and the Delaware trustee, whose fees and reasonable expenses will be paid or reimbursed by the servicer. The trustee, whose initial acceptance fees will be paid by the sponsor, will act on behalf of the trust and the certificateholders in accordance with the terms of the pooling agreement. The trustee will be entitled to income earnings on deposits in the distribution account.

### Assignment of the Mortgage Loans and Other Assets to the Trust

A pool of mortgage loans, as described in this prospectus supplement, will be sold to the trust on or about April 10, 2007 (the "**closing date**"). The trust will own the right to receive all payments of principal and interest on the mortgage loans due after April 1, 2007 (the "**cut-off date**"). A schedule to the pooling agreement will include information about each mortgage loan, including:

- the applicable loan group;

- the scheduled principal balance as of the close of business on the cut-off date;

- the term of the mortgage loan; and

- the mortgage interest rate as of the close of business on the cut-off date and information about how that mortgage interest rate adjusts, if applicable.

The mortgage notes will be endorsed in blank or to the trustee and assignments of the mortgages to the trust will be prepared in blank or to the trustee but will not be recorded.  The sponsor will not be required to provide assignments of mortgage or intervening assignments of mortgage if the related mortgage is held through the MERS® system.  In addition, the mortgages for some or all of the mortgage loans that are not already held through the MERS® system may, at the discretion of the servicer, in the future be held through the MERS® system.  Deutsche Bank National Trust Company, the custodian will have possession of and will review the mortgage notes, mortgages and mortgage files containing the documents specified in the pooling agreement in accordance with its terms.  See "The Custodian" in this prospectus supplement.

The custodian, will review each mortgage file either on or before the closing date or within one year of the closing date or subsequent transfer date, as applicable (or promptly after the custodian's receipt of any document permitted to be delivered after the closing).  If any document in a mortgage file is found to be missing or materially defective with the criteria specified in the pooling agreement, such defect is material and the sponsor does not cure that defect within 90 days of notice from the custodian (or within a longer period after the closing date as provided in the mortgage loan purchase agreement in the case of missing documents not returned from the public recording office), the sponsor will be obligated to repurchase the related mortgage loan from the trust.  See "The Mortgage Pool—Representations and Warranties Regarding the Mortgage Loans" in this prospectus supplement for a description of the requirements with respect to repurchases of mortgage loans.

Rather than repurchase the mortgage loan as provided above, the sponsor may remove the mortgage loan (a "**reacquired mortgage loan**") from the trust and substitute in its place another mortgage loan (a "**substitute mortgage loan**"); however, substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that substitution will not disqualify the trust as a REMIC or result in a prohibited transaction tax under the Code.  Any substitute mortgage loan generally will, on the date of substitution, among other characteristics specified in the pooling agreement:

- have a principal balance, after deduction of all scheduled payments due in or prior to the month of substitution, not in excess of, and not more than 5% less than, the outstanding principal balance of the reacquired mortgage loan (the amount of the difference between the purchase price of the reacquired mortgage loan and the principal balance of the substitute mortgage loan will be deposited by the sponsor and held for distribution to the certificateholders on the related distribution date (a "**substitution price**")),

- have a current mortgage rate not lower than, and not more than 1% per annum higher than, that of the reacquired mortgage loan,

- with respect to an adjustable-rate mortgage loan, (a) have a mortgage rate subject to a minimum mortgage rate not less than the minimum mortgage rate applicable to the reacquired mortgage loan, (b) have a margin at least equal to that of the reacquired mortgage loan, (c) have a mortgage rate subject to a maximum rate that is not greater than the maximum rate applicable to the reacquired mortgage loan and (d) have a next adjustment date that is not more than two months later than the next adjustment date on the reacquired mortgage loan,

- have a loan-to-value ratio not higher than that of the reacquired mortgage loan,

- have a remaining term to maturity not later than (and not more than one year less than) that of the reacquired mortgage loan,

- have the same due date as the reacquired mortgage loan, and

- comply with all of the representations and warranties applicable to the mortgage loans as specified in the mortgage loan purchase agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

The mortgage pool will be the primary asset of the trust.  The trust will also contain other assets, including:

- insurance policies related to individual mortgage loans (including the PMI Policy), if applicable;

- any property that secured a mortgage loan that the trust acquires after the cut-off date by foreclosure or deed in lieu of foreclosure;

- the right to receive certain payments paid to the supplemental interest trust trustee under the swap agreement; and

- amounts held in the distribution account, the reserve fund, the interest coverage account and the final maturity reserve account.

In exchange for the mortgage loans and the other assets described above, the trustee will authenticate and deliver the certificates pursuant to the order of the depositor.  It is the intent of the parties to the pooling agreement that the conveyance of the mortgage loans and the related assets to the trust constitute an absolute sale of those assets.  However, in the event that the pooling agreement for any reason is held or deemed to create a security interest in those assets, then the pooling agreement will constitute a security agreement and the depositor will grant to the trust a security interest in those assets.

## Restrictions on Activities of the Trust

Pursuant to the pooling agreement, the trust will have the power and authority (i) to acquire, hold, lease, manage, administer, control, invest, reinvest, operate and transfer assets of the trust, (ii) to issue and make distributions on the certificates and (iii) to engage in such other activities as are described in the pooling agreement. The trust will be required to act in accordance with requirements specified in the pooling agreement that are designed to maintain the trust's existence as a legal entity separate and distinct from any other entity.  The trust will not be permitted to do any of the following:

- to engage in any business or activity other than those described in the pooling agreement;

- to incur or assume any indebtedness other than indebtedness incurred under the pooling agreement or any related agreement;

- to guarantee or otherwise assume liability for the debts of any other entity;

- to confess a judgment against the trust;

- to possess or assign the assets of the trust for other than a trust purpose;

- to lend any funds to any entity, except as contemplated by the pooling agreement; or

- to do other actions prohibited by the pooling agreement.

The permissible activities of the trust may not be modified except by an amendment to the pooling agreement. *See* "Description of the Certificates—Amendment of the Pooling Agreement" in this prospectus supplement.

## Discretionary Activities With Respect to the Trust

The following is a description of material discretionary activities that may be taken with regard to the administration of the mortgage loans or the certificates:

- The servicer will be authorized under the pooling agreement to exercise discretion with regard to its servicing of the mortgage loans in accordance with the servicing standard specified in the pooling agreement. See "The Servicers—The Servicer—*Servicing Procedures—Servicing Standard; Waivers and Modifications*" in this prospectus supplement.

- The servicer will be authorized to engage subservicers to service the mortgage loans in accordance with the servicing standard specified in the pooling agreement and may terminate any subservicer with the consent of the NIMS insurer, if any. *See* "Description of the Securities—Description of Sub-Servicing" in the prospectus.

- The sponsor will have discretion to determine whether to repurchase a mortgage loan or to substitute for a mortgage loan, if required under the pooling agreement to repurchase or substitute for a defective mortgage loan. See "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement.

- On the Optional Termination Date, the servicer, or if the servicer does not exercise such right, the NIMS insurer, if any, will be permitted to purchase all of the mortgage loans owned by the trust, subject to certain limitations. *See* "Description of the Certificates—Optional Termination of the Trust" in this prospectus supplement.

- In the event of certain transfers of a Residual Certificate to a person who is not a permitted transferee under the pooling agreement, the trustee and the depositor will have the right to arrange a sale of the Residual Certificate.

- In the event that certain events of default by the servicer under the pooling agreement have not been remedied, either the depositor, the trustee, holders of certificates evidencing at least 51% of the voting rights or the NIMS insurer, if any, will have the right to terminate the servicer. In the event that the servicer fails to perform its advancing obligations and such event of default has been unremedied, the trustee will be required to terminate the servicer. If the servicer is terminated or resigns, the trustee will become the successor servicer; however, the trustee will have the right to appoint, or to petition a court to appoint, a successor servicer. See "The Servicers—The Trustee—*Events of Default or Breaches Under the Pooling Agreement*" in this prospectus supplement.

- In the event that the trustee or the Delaware trustee resigns or is no longer qualified to perform its duties, the servicer, with the consent of the NIMS insurer, if any, and the NIMS insurer, if any, will have the right to appoint a successor trustee or Delaware trustee. The servicer, with the consent of the NIMS insurer, if any, and the NIMS insurer, if any, may remove a trustee or Delaware trustee at any time and appoint a successor trustee or Delaware trustee. See "The Servicers—The Trustee—*Resignation or Removal of the Trustee*" and "The Delaware Trustee—Resignation and Removal of the Delaware Trustee" in this prospectus supplement.

- In the event the swap agreement is cancelled or terminated, the depositor (with the consent of the NIMS insurer, if any) and the NIMS insurer, if any, will have the discretion to choose a replacement counterparty.

- As a third party beneficiary of the pooling agreement, the NIMS insurer, if any, will be entitled to enforce certain designated rights granted to the NIMS insurer by the pooling agreement. See "Risk Factors—Certain Rights of the NIMS Insurer May Adversely Affect the Rights of Holders of Offered Certificates" in this prospectus supplement.

- As a third party beneficiary of the pooling agreement, the swap counterparty will be entitled to consent to any amendments to the pooling agreement that materially affects the swap counterparty's rights or interests under the pooling agreement. *See* "Description of the Certificates—Amendment of the Pooling Agreement" in this prospectus supplement.

- The trustee, at the direction of the servicer and with the consent of the parties specified in the pooling agreement, may enter into a facility with any person which provides that such person may fund advances

and/or servicing advances.  Such facility will not reduce the servicer's obligation to fund such advances and/or servicing advances.  See "The Servicers-The Servicer-Servicing Procedures-Advances" in this prospectus supplement.

- Holders of certificates evidencing more than 50% of the voting rights will have the right, with the consent of the NIMS insurer, if any, at any time to remove the trustee or the Delaware trustee and to appoint an eligible successor trustee.

## THE SERVICERS

### General

All of the mortgage loans owned by the trust will be serviced by Washington Mutual Bank, as servicer, pursuant to the pooling agreement.  Washington Mutual Mortgage Securities Corp. will act as calculation agent and be responsible for calculating loan payoff amounts for each monthly distribution on the certificates.  The trustee will be responsible for calculating monthly distributions on the certificates, preparing monthly distribution reports and other functions, as described under "—The Trustee—*Material Duties of the Trustee*" below.

The servicer will outsource to third party vendors some servicing functions, as described under "—The Servicer—*Servicing Procedures—The Servicer's Third Party Vendors*" below.

### The Servicer

*The Servicer's Servicing Experience*

The servicer has been servicing residential mortgage loans for over 100 years.  The residential mortgage loans serviced by the servicer have included, since 2001, sub-prime residential mortgage loans serviced for Long Beach Mortgage Company and for its securitization trusts.

The following table shows the number and aggregate principal balance of sub-prime first and second lien mortgage loans serviced by the servicer as of each specified date.

#### Sub-prime Mortgage Loans Serviced by the Servicer

| | As of December 31 | | |
|---|---|---|---|
| | **2004** | **2005** | **2006** |
| | **(Dollar Amounts in Millions)** | | |
| Number of Sub-prime Mortgage Loans Serviced for Sponsor or its Affiliates (or their Securitization Trusts) .............................................. | 167,572 | 198,556 | 275,597 |
| Aggregate Principal Balance ........... | $24,835 | $33,132 | $47,820 |
| Number of Sub-prime Mortgage Loans Serviced for Third Parties..... | 11,423 | 40,817 | 1,540 |
| Aggregate Principal Balance ........... | $678 | $6,349 | $194 |

*Servicing Procedures*

*Servicing Functions.*  The functions to be performed by the servicer will include payment collection and payment application, investor reporting and other investor services, default management and escrow administration.  The servicer will perform its servicing functions at loan servicing centers located in Florence, South Carolina; Milwaukee, Wisconsin; Chatsworth, California; and Jacksonville, Florida.

*Servicing Standard; Waivers and Modifications.*  Pursuant to the pooling agreement, the servicer will be required to service the mortgage loans in the best interests and for the benefit of the certificateholders (as determined by the servicer in its reasonable judgment) in accordance with the terms of the pooling agreement and related mortgage loans and (unless inconsistent with those servicing practices) in the same manner in which it services and administers similar mortgage loans for its own portfolio, considering customary and usual standards of practice of lenders and servicers administering similar mortgage loans in the local area where the mortgaged property is located.  The servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the

mortgage loans and, to the extent consistent with the pooling agreement and applicable insurance policies, follow such collection procedures as it would follow with respect to comparable mortgage loans that are held for its own account.  The servicer will be responsible for filing claims under the PMI Policy on behalf of the trust.

Consistent with the servicing standard described above, the servicer will be permitted to waive, modify or vary any term of any mortgage loan, subject to certain conditions, as described in "Description of the Securities— Collection and Other Servicing Procedures Employed by the Servicer, Manager, Bond Administrator or Certificate Administrator" in the prospectus.

*Mortgage Loan Servicing System.*  In performing its servicing functions, the servicer will use computerized mortgage loan servicing systems that it leases from Fidelity Information Services, a division of Fidelity National Financial ("**Fidelity**"), a third party vendor (collectively, the "**Fidelity System**").  The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied.  The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received.  The servicer began using the Fidelity System in 1996.  Prior to July 2004, the servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

*Collection Account, Servicing Account, Reserve Account and Distribution Account.*  Mortgagor payments on the mortgage loans, including scheduled monthly payments, any full or partial prepayments and any escrow payments (which are payments made by some mortgagors and held by the servicer in escrow for future payment of taxes and insurance), will initially be deposited into either a lockbox account maintained by a third party financial institution or a payment clearing account maintained by the servicer.  Payments deposited into the lockbox account will be transferred by the servicer into the payment clearing account.  Other collections on the mortgage loans, including liquidation proceeds and insurance proceeds, net of allowable reimbursement (other than insurance proceeds required for the restoration or repair of the related mortgaged property, which the servicer will retain for such purpose), will also initially be deposited into a payment clearing account maintained by the servicer.  Within 48 hours of receipt, the servicer will (i) transfer all such collections on the mortgage loans (other than escrow payments) into a collection account maintained by the servicer and (ii) transfer all escrow payments into a servicing account maintained by the servicer.

The servicer will deposit into the collection account any required advances of principal and interest.  See "—*Advances*" below.  The sponsor or the depositor, as applicable, will also deposit into the collection account any proceeds from the repurchase of any of the mortgage loans.  See "The Mortgage Pool—Representations and Warranties Regarding the Mortgage Loans" below. The servicer will deposit in the collection account all payments received from the PMI insurer.

Under the pooling agreement, the servicer will be permitted to make a net deposit into the collection account of the amounts required to be deposited into that account less the amounts that the servicer is permitted to withdraw from that account, as described under "—Permitted Withdrawals" below.  Under the pooling agreement, the collection account will be an investment account that is an eligible account under the pooling agreement maintained with an eligible institution under the pooling agreement, and the funds held in the collection account may be invested in eligible investments, for the servicer's benefit, before those funds are to be transferred to a distribution account maintained by the trustee.

On the business day immediately preceding each distribution date, the servicer will transfer from the collection account into the distribution account the funds held in the collection account that are required to be distributed to certificateholders and the swap counterparty on that distribution date.  The trustee may invest funds held in the distribution account in eligible investments, for the trustee's benefit, before those funds are to be distributed to certificateholders. Payments made under the swap agreement by the swap counterparty and payments

made by the supplemental interest trust trustee to the swap counterparty will be deposited in a separate reserve account maintained by the supplemental interest trust trustee.

On each distribution date, the trustee will withdraw from the distribution account and each of the reserve accounts the funds required to be distributed to certificateholders and/or into the supplemental interest account on that distribution date; and the supplemental interest trust trustee will withdraw from the supplemental interest account the funds required to be distributed to the swap counterparty on that date.

Certain amounts on deposit in the distribution account will be deposited in the final maturity reserve account maintained by the trustee on specified distribution dates as described in "Description of the Certificates— The Final Maturity Reserve Account" in this prospectus supplement.  On the earlier of the last scheduled distribution date and the termination of the trust, any amounts on deposit in the final maturity reserve account will be applied by the trustee as payment of principal or interest as described in "Description of the Certificates—The Final Maturity Reserve Account" in this prospectus supplement.

Scheduled monthly payments on the mortgage loans generally will be held pending distribution to certificateholders from the date of receipt by the servicer until the immediately following distribution date. However, if a monthly payment is received prior to its scheduled due date, that payment will be held until the distribution date in the calendar month in which it was due.  Payoffs received by the servicer in any prepayment period (that is, from the 15th day of a calendar month until the 14th day of the next calendar month) will be held until the distribution date immediately following the end of that prepayment period.  Partial prepayments, liquidation proceeds, insurance proceeds, subsequent recoveries and repurchase proceeds will be held from the date of receipt by the servicer until the distribution date in the immediately succeeding calendar month.

Funds held in the lockbox accounts and the payment clearing accounts may be commingled with collections on other mortgage loans serviced by the servicer.  Funds held in the collection account, the servicing account, the reserve account, the supplemental interest account and the distribution account will not be commingled with collections on mortgage loans that are not owned by the trust.

Only the servicer or the third party financial institutions that maintain the lockbox accounts will have access to funds held in those accounts.  Only the servicer will have access to funds held in the payment clearing accounts, the collection account and the servicing account.  Only the trustee will have direct access to funds held in the reserve accounts and the distribution account; however, the trustee may invest funds in the distribution account for the trustee's benefit and may make certain withdrawals from that account.

All of the transaction accounts described above will be reconciled on a monthly basis.  There will not be any external verification of activity in the transaction accounts, except as may occur in connection with the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries, or in connection with periodic examination by the servicer's regulatory authorities.

The diagram on the next page illustrates the flow of collections and other payments on the mortgage loans and payments by the swap counterparty through the transaction accounts described above.

**Flow of Payments**



*Permitted Withdrawals.* The pooling agreement will permit the servicer to make withdrawals, from time to time, from the collection account, for the following purposes:

- to reimburse itself for advances and servicing advances, as described under "—*Advances*" below;

- to pay to itself the servicing fee (to the extent not applied to pay compensating interest);

- to pay to itself investment earnings earned on funds held in the collection account (to the extent not applied to pay compensating interest);

- to pay to itself interest that was accrued and received on payoffs received during the period from the first day through the 14th day of any month;

- to reimburse itself or the depositor or any of their directors, officers, employees or agents for certain expenses, costs and liabilities incurred in connection with any legal action relating to the pooling agreement or the certificates, as and to the extent described under "Description of the Securities—Matters Regarding the Servicer and the Depositor" in the prospectus; and

- other permitted purposes described in the pooling agreement.

*Advances.* The servicer will be required under the pooling agreement to advance its own funds (or, in the case of advances described in clause (i), either its own funds or funds held by it for future distribution) (i) to cover any shortfalls between payments of principal and interest scheduled to be received in respect of the mortgage loans, other than balloon payments, each month and the amounts actually received and, with respect to balloon mortgage loans, with respect to which the balloon payment is not made when due, an assumed monthly payment that would have been due on the related due date based on the original principal amortization schedule for such balloon mortgage loan, and (ii) to pay all reasonable and customary "out-of-pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance of its servicing obligations, including, but not limited to, the cost of (A) the preservation, restoration, inspection and protection of the mortgaged properties, (B) environmental audit reports, (C) any enforcement or judicial proceedings, including foreclosures, (D) the management and liquidation of mortgaged properties acquired in satisfaction of the related mortgage and (E) certain insurance premiums and certain ongoing expenses associated with the mortgage pool and incurred by the servicer in connection with its responsibilities under the pooling agreement. The amounts described in clause (i) of this paragraph are referred to as "**advances**" and the amounts described in clause (ii) of this paragraph are referred to as "**servicing advances**" in this prospectus supplement. The servicer, however, will not make any of the advances or servicing advances if it determines in its good faith business judgment that they would not be recoverable from late payments, insurance proceeds or liquidation proceeds on a mortgage loan ("**nonrecoverable advance**"); *provided further,* that the servicer will not make advances for the restoration of foreclosure properties unless it determines that the restoration will increase the liquidation proceeds after reimbursement to itself for those advances. The servicer will not charge interest or other fees with respect to any advances or servicing advances.

If the servicer determines that any advance or servicing advance is a nonrecoverable advance, the servicer will be entitled to be reimbursed for such advance from collections on other mortgage loans owned by the trust.

The pooling agreement will provide that the trustee at the direction of the servicer, on behalf of the trust and with the consent of the parties set forth in the pooling agreement, may enter into a facility with any person which provides that such person may fund advances and/or servicing advances, although no such facility may reduce or otherwise affect the servicer's obligation to fund such advances and/or servicing advances. Any advances and/or servicing advances made by an advancing person will be reimbursed to the advancing person in the same manner as reimbursement would be made to the servicer.

*Servicing of Delinquent Mortgage Loans; Foreclosure.* The servicer will make reasonable efforts to collect or cause to be collected all delinquent payments (that is, payments that are more than 30 days past due). Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns and drive-by property inspections. The servicer will be required under the pooling agreement to make reasonable efforts to foreclose upon

the mortgaged property related to each defaulted mortgage loan as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the pooling agreement, the servicer will be permitted in lieu of foreclosure to accept a payment of less than the outstanding principal balance of the defaulted mortgage loan if in the judgment of the servicer doing so could reasonably be expected to result in collections and other recoveries with respect to the mortgage loan in excess of net liquidation proceeds that would be recoverable upon foreclosure. The servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property except as provided in the pooling agreement. *See* "Description of the Securities—Procedures for Realization Upon Defaulted Mortgage Assets" and "Legal Aspects of the Mortgage Assets—Foreclosure on Mortgages" in the prospectus.

*Sub-prime Mortgage Loans; Default Management.* Sub-prime borrowers generally are a higher credit risk than prime borrowers. Following foreclosure, sub-prime mortgaged properties are sometimes stripped of furnishings or vandalized.

The servicer's sub-prime default management efforts focus on early intervention and dialogue with potentially troubled borrowers in order to avoid and minimize the effects of delinquencies. The front-end strategy of the sub-prime collections and loss mitigation group includes using behavioral scoring tools to focus on high risk accounts and address small issues before they become significant problems. If a sub-prime borrower fails to make a payment when due on a mortgage loan, the servicer calls this borrower as early as the third day after the payment due date. First payment defaults are segmented from the general loan population and monitored daily when the loan becomes five days delinquent. The servicer also focuses its efforts on late stage (i.e., two or more months delinquent) delinquency management. The primary focus of the late stage delinquency strategy is detailed management of troubled loans.

Although the servicer focuses on rehabilitating delinquent loans and preventing foreclosure, asset recovery is an important component of sub-prime default management. The servicer has procedures for dealing with all aspects of asset recovery, including bankruptcy and foreclosure. The servicer has a detailed regimen for addressing bankruptcy and foreclosure activity. Bankruptcy and foreclosure cases are referred to attorneys upon the occurrence of certain events, and various procedures ensure that bankruptcies and foreclosures are tracked throughout the case. Overall bankruptcy and foreclosure performance is monitored through daily, weekly and monthly reports. The servicer uses outside vendors experienced in the sale of sub-prime REO properties to manage the sale of REO properties. The servicer oversees the outside vendors and has adopted strategies for the sale of manufactured homes, low value properties, aged inventories and distressed properties. New REO properties are allocated to high performing vendors.

In addition to its asset recovery processes, the servicer engages in extensive loss mitigation efforts for loans that are transferred into foreclosure. Mortgagors' financial statements are updated to determine whether a stipulated repayment agreement, modification, short sale or deed in lieu of foreclosure is an appropriate workout alternative. Loans subject to stipulated repayment agreements remain classified as foreclosures. A mortgagor typically pays a specified percentage of the arrearage in a stipulated repayment plan, and the plans generally average less than a year in length. The servicer has implemented processes to reduce the number of mortgagors who fail to meet their repayment obligations, and management reviews broken repayment plans. An economic analysis is completed to determine the loss severity of all potential short sales, process all potential loan modifications and validate mortgagors' ability and intent to repay a modified payment.

*Maintenance of Hazard and Flood Insurance.* The servicer will be required to maintain or cause to be maintained hazard insurance and, if applicable, flood insurance for each mortgage loan.

*Limitations on the Servicer's Liability.* See "Description of the Securities—Matters Regarding the Servicer and the Depositor" in the prospectus for a description of certain limitations on the servicer's liability under the pooling agreement.

*Back-up Servicing. See* "Description of the Securities—Events of Default Under the Governing Agreement and Rights Upon Events Of Default" in the prospectus for a description of the material terms under the pooling agreement regarding the servicer's replacement, resignation or transfer.

*The Servicer's Third Party Vendors.*  The servicer expects to outsource to third party vendors a portion of, or in its entirety, the following servicing functions:  (i) early payment collections, up to 59 days delinquent, (ii) processing and monitoring of foreclosure actions, (iii) processing and monitoring of mortgagor bankruptcy proceedings, (iv) preservation of properties related to delinquent loans, (v) maintenance, marketing and sale of REO properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, ARM notices and default notices and (x) depositing mortgagor payments into a lockbox account.  From time to time, the servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions.  Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The servicer has entered into service level agreements with some of its vendors, which specify detailed performance criteria, including, in some cases, minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria.  The servicer will monitor vendor compliance as necessary with the applicable servicing procedures through quality control measures that include reviews of a statistical sampling of mortgage loans.

*The Servicer's Quality Control Procedures*

The servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records.  Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others.  Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors.  Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function.  The data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire protected environment, and commercial electrical power is backed up by generators.

In addition, the servicer conducts periodic internal audits of critical servicing and technology functions.  External audits by entities such as Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries may provide independent verification of the adequacy of such functions.  Periodic examination by the servicer's regulatory authorities may provide additional independent review of the servicer's management controls.

Both the servicer and Fidelity maintain detailed business continuity plans to enable each entity to resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically.  Fidelity is contractually obligated to return the servicer to full functionality within 48 hours of a reported system outage.  The servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of the back-up site.

It is the servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

**The Calculation Agent**

*The Calculation Agent's Experience*

Washington Mutual Mortgage Securities Corp., the calculation agent, is a Delaware corporation and a wholly owned subsidiary of the servicer.  The calculation agent has been master servicing residential mortgage loans since before 1979.  The calculation agent has been acting as calculation agent of the servicer with respect to residential mortgage loans serviced by the servicer since February 2005.  The calculation agent will calculate the amount of loan payoffs to be included in each monthly distribution.

*Services Performed by the Calculation Agent*

The servicer and the calculation agent are parties to an agreement under which the calculation agent has agreed to perform some of the services required to be performed by the servicer under the pooling agreement. The calculation agent will perform the following services: (1) calculate the amount of loan payoffs to be included in each monthly distribution, (2) calculate compensating interest to be paid by the servicer for each monthly distribution, and (3) other services specified in the agreement.

The calculation agent's principal offices are located in Vernon Hills, Illinois. The calculation agent will perform its services using SBO2000, a computerized mortgage loan servicing system, that it has licensed from Alan King and Co., a third party vendor. SBO2000 produces detailed information about the financial status of each mortgage loan, including outstanding principal balance and current interest rate, and about transactions that affect the mortgage loan, including the amount and due date of each scheduled payment, the amount and date of receipt of each prepayment in full on a mortgage loan, the amount and month of receipt of all other unscheduled payments, and how each payment was applied. Each month, the calculation agent will receive from the servicer a servicing report generated by the Fidelity System with respect to the mortgage loans owned by the trust, and will input data from that servicing report into SBO2000. The calculation agent began using SBO2000 in October 2006. Prior to October 2006, the calculation agent performed its services using a proprietary computerized mortgage loan servicing system.

The servicer will pay the calculation agent a fee for its services under the agreement. Payment of this fee will not affect distributions to certificateholders.

*The Calculation Agent's Quality Control Procedures*

The calculation agent uses substantially the same management and technology controls as those of the servicer to ensure the accuracy and integrity of servicing records. See "—The Servicer—*The Servicer's Quality Control Procedures*" above.

The calculation agent conducts periodic internal audits of critical servicing and technology functions. Investor reviews and the annual examination by Washington Mutual, Inc.'s independent accountants in connection with their audit of Washington Mutual, Inc. and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the servicer's regulatory authorities may provide additional independent review of the calculation agent's management controls.

The calculation agent maintains a detailed business continuity plan to enable it to resume critical business functions in the event of a disaster or other serious servicing system outage, which plan is reviewed and updated periodically. The calculation agent performs annual disaster recovery tests in which it reroutes data and servicing system operations to a back-up site, and then processes sample transactions to ensure the functionality of the back-up site.

It is the calculation agent's policy to require its third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

## The Trustee

*General*

The trustee will be Citibank, N.A., a national banking association and wholly owned subsidiary of Citigroup Inc., a Delaware corporation. Citibank, N.A. performs as trustee through the Agency and Trust line of business, which is part of the Global Transaction Services division. Citibank, N.A. has primary corporate trust offices located in both New York and London. Citibank, N.A. is a leading provider of corporate trust services offering a full range of agency, fiduciary, tender and exchange, depositary and escrow services. As of the fourth quarter of 2006, Citibank's Agency & Trust group manages in excess of $3.8 trillion in fixed income and equity investments on behalf of approximately 2,500 corporations worldwide. Since 1987, Citibank Agency & Trust has provided trust services for asset-backed securities containing pool assets consisting of airplane leases, auto loans and

leases, boat loans, commercial loans, commodities, credit cards, durable goods, equipment leases, foreign securities, funding agreement backed note programs, truck loans, utilities, student loans and commercial and residential mortgages.   As of the end of the fourth quarter of 2006, Citibank, N.A. acts as trustee and/or paying agent for approximately 329 various residential mortgage-backed transactions.

Citibank's offices for notices under the pooling and servicing agreement are located 388 Greenwich Street, 14th Floor, New York, New York 10013, Attention: Citibank Agency & Trust, and its telephone number is (949) 250-6464.

*Material Duties of the Trustee*

The trustee will have the following material duties under the pooling agreement:

- to authenticate and deliver the certificates, pursuant to the order of the depositor;

- to maintain a certificate register and, upon surrender of certificates for registration of transfer or exchange, to authenticate and deliver new certificates;

- to calculate and make the required distributions to certificateholders on each distribution date;

- to prepare and make available to certificateholders the monthly distribution reports and any other reports required to be delivered by the trustee under the pooling agreement;

- if the remaining certificate principal balance of a class of certificates is to be paid on a specified distribution date, to send a notice to that effect to the holders of that class of certificates;

- to act as successor servicer, or to appoint a successor servicer, to the extent described under "—*Events of Default or Breaches Under the Pooling Agreement*" below;

- to perform tax administration services for the trust as specified in the pooling agreement; and

- to communicate with investors and rating agencies with respect to the certificates as specified in the pooling agreement.

*Events of Default or Breaches Under the Pooling Agreement*

If certain events of default by the servicer under the pooling agreement occur and remain unremedied, either the trustee, depositor, NIMS insurer, if any, or holders of certificates evidencing at least 51% of the voting rights will have the right to terminate the servicer.  In the event that the servicer fails to perform its advancing obligations and such event of default has not been remedied, the trustee will be required to terminate the servicer.  If the servicer is terminated, or the servicer resigns because its duties under the pooling agreement are no longer permitted under applicable law, the trustee will be required to become the successor servicer as provided in the pooling agreement.  However, if the trustee is unwilling or unable to act as successor servicer, it may appoint, or petition a court to appoint, a successor servicer.

The trustee will be required to notify certificateholders and the rating agencies of any event of a default by the servicer actually known to a responsible officer of the trustee, and of the appointment of any successor servicer.

The trustee will be required to notify the depositor and the servicer if it discovers a breach of any of the representations or warranties made by the sponsor in the mortgage loan purchase agreement with respect to any mortgage loan which materially and adversely affects the value of such mortgage loan or the interests of the certificateholders in such mortgage loan.

*See* "Description of the Securities—Events of Default Under the Governing Agreement and Rights Upon Events of Default" in the prospectus.

*Limitations on the Trustee's Liability*

The trustee will not be liable under the pooling agreement:

- except for the performance of such duties and obligations as are specifically specified in the pooling agreement prior to the occurrence of a servicer event of default and after the curing of such servicer event of default;

- for an error of judgment made in good faith by a responsible officer of the trustee unless it is proved that the trustee was negligent in ascertaining the pertinent facts;

- for any action taken or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the pooling agreement;

- for any action taken or omitted by it in good faith in accordance with the direction of the NIMS insurer, if any, or the holders of certificates evidencing at least 25% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to the trustee, or exercising of any trust or power conferred upon the trustee under the pooling agreement;

- for any loss resulting from the investment of funds held in the collection account at the direction of the servicer;

- for any willful misconduct or negligence of any agents, custodians, nominees or attorneys appointed by the trustee to perform any of its duties (as long as such agents, custodians, nominees or attorneys are appointed with due and proper care); or

- to expend or risk its own funds or incur any liability  in the performance of its duties if it has reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

In the absence of bad faith, the trustee may conclusively rely upon any certificates or opinions of counsel furnished to the trustee under the pooling agreement.  Any such opinion of counsel will be full and complete authorization and protection in respect of any action taken or omitted to be taken by the trustee in good faith and in accordance with such opinion of counsel. The trustee may also request and rely conclusively upon and will be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other document reasonably believed by it to be genuine and to have been signed or presented by the proper party and the manner of obtaining consents and evidencing the authorization of the execution of those documents will be subject to such reasonable regulations as the trustee may prescribe.  The trustee will not be deemed to have knowledge or notice of any matter, including an event of default, unless actually known to a responsible officer of the trustee or unless a responsible officer of the trustee has received written notice thereof.  The trustee will not be responsible for verifying, recomputing or recalculating information given to it by the servicer except as expressly required by the pooling agreement.

*Indemnification of the Trustee*

The trustee and any director, officer, employee or agent of the trustee will be indemnified by the trust against any loss, liability or expense incurred by the trustee arising out of or in connection with the acceptance or administration of its obligations and duties under the pooling agreement, other than any loss, liability or expense:

   (i)       in any way relating to the failure of the servicer to perform its duties and service the mortgage loans in compliance with the terms of the pooling agreement,

   (ii)      that constitutes a specific liability of the trustee under certain sections of the pooling agreement, or

(iii)     incurred by reason of willful misfeasance, bad faith or negligence in the performance of the trustee's duties under the pooling agreement or reckless disregard of the trustee's obligations and duties under the pooling agreement.

Any amounts payable to the trustee or any director, officer, employee or agent of the trustee in respect of indemnification or pursuant to any other right of reimbursement from the trust that the trustee or any director, officer, employee or agent of the trustee may have under the pooling agreement may be withdrawn by the trustee from the distribution account at any time.

The indemnification provided to the trustee in the pooling agreement will not include expenses, disbursements and advances incurred or made by the trustee, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the trustee's performance in accordance with the provisions of the pooling agreement.  The servicer is required to indemnify the trustee against any loss, liability or expense resulting from a breach of the servicer's obligations and duties under the pooling agreement, including its failure to perform its duties and service the mortgage loans in accordance with the terms of the pooling agreement.

The indemnification provided to the trustee in the pooling agreement will be subject to monthly and aggregate limits in the case of certain legal fees and expenses associated with certain third party claims.  The failure of the trustee to incur this type of expense in excess of the limits specified in the pooling agreement could result in greater harm, loss or liability being incurred by the trust than might otherwise be the case.  By accepting their certificates, the certificateholders agree to hold the trustee harmless for any consequences to the certificateholders resulting from any failure of the trustee to incur, in excess of the specified limits, any expenses that are limited by the pooling agreement.

*Resignation and Removal of the Trustee*

The trustee may at any time resign by giving written notice to the servicer, the NIMS insurer, if any, the depositor, and the certificateholders.  Upon receiving such notice of resignation, the servicer will be required to appoint a successor trustee.  If the trustee ceases to be eligible under the pooling agreement and fails to resign or if the trustee becomes incapable of acting, the servicer, with the consent of the NIMS insurer, if any, or the NIMS insurer, if any, may remove such trustee and appoint a successor trustee acceptable to the NIMS insurer, if any.  The holders of certificates evidencing at least 50% of the voting rights, with the consent of the NIMS insurer, if any, may at any time remove the trustee and appoint a successor trustee.

**Special Servicing Agreements**

The pooling agreement will permit the servicer to enter into one or more special servicing agreements with unaffiliated owners of one or more classes of Subordinate Certificates or of a class of securities representing interests in one or more classes of Subordinate Certificates.  Under those agreements, the owner may, for delinquent mortgage loans:

(a)     instruct the servicer to start or delay foreclosure proceedings, provided that the owner deposits a specified amount of cash with the servicer, which will be available for distribution to certificateholders if liquidation proceeds are less than they otherwise may have been had the servicer acted pursuant to its normal servicing procedures;

(b)     purchase those delinquent mortgage loans from the trust immediately before the beginning of foreclosure proceedings at a price equal to the aggregate outstanding principal balance of the mortgage loans, plus accrued interest at the applicable mortgage interest rates through the last day of the month in which the mortgage loans are purchased; and/or

(c)     assume all of the servicing rights and obligations for the delinquent mortgage loans so long as (i) the servicer has the right to transfer the servicing rights and obligations of the mortgage loans to another servicer and (ii) the owner will service the mortgage loans according to the servicer's servicing guidelines.

## THE CUSTODIAN

Deutsche Bank National Trust Company ("DBNTC") will act as custodian for the trust.  DBNTC is a national banking association which has an office in Santa Ana, California.  DBNTC has performed this custodial role in numerous mortgage-backed transactions since 1991.

DBNTC will maintain the mortgage files in secure, fire-resistant facilities.  DBNTC will not physically segregate the mortgage files from other mortgage files in DBNTC's custody but will be kept in shared facilities.  However, DBNTC's proprietary document tracking system will show the location within DBNTC's facilities of each mortgage file and will show that the mortgage loan documents are held by the custodian on behalf of the trust.  DBNTC has no pending legal proceedings that would materially affect its ability to perform its duties as custodian.  DBNTC may perform certain of its obligations through one or more third party vendors.  However, DBNTC shall remain liable for the duties and obligations required of it under the related custodial agreement.

DBNTC is providing the foregoing information at the depositor's request in order to assist the depositor with the preparation of its disclosure documents to be filed with the Securities and Exchange Commission pursuant to Regulation AB.  Otherwise, the custodian has not participated in the preparation of such disclosure documents and assumes no responsibility or liability for their contents.

The custodian will hold the mortgage notes, mortgages and other legal documents in the mortgage files for the benefit of the certificateholders.

The custodian will review each mortgage file in accordance with the review criteria specified in a custodial agreement and deliver a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

## THE DELAWARE TRUSTEE

### General

Christiana Bank & Trust Company, the Delaware trustee under the pooling agreement, is a Delaware banking corporation. The Delaware trustee has served as Delaware trustee for asset-backed securities transactions involving residential mortgage loans since approximately January 2002.

The Delaware trustee will serve as trustee for the trust for the sole purpose of satisfying the requirement under the Delaware statutory trust statute that the trust have at least one trustee with a principal place of business in Delaware. The Delaware trustee's duties under the pooling agreement will be limited to (i) accepting legal process served on the trust in the State of Delaware and (ii) executing any certificates with respect to the trust which the Delaware Trustee is required to execute under the Delaware statutory trust statute.

### Limitations on the Delaware Trustee's Liability

The Delaware trustee will not be liable under the pooling agreement:

- except for the performance of such duties and obligations as are specifically set forth in the pooling agreement;

- for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by the pooling agreement; or

- for any action taken or omitted by it in good faith in accordance with the direction of the NIMS insurer, if any, or the holders of certificates evidencing at least 25% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to the Delaware trustee, or relating to the exercise of any trust or power conferred upon the Delaware trustee under the pooling agreement.

In the absence of bad faith, the Delaware trustee may conclusively rely upon any certificates or opinions of counsel furnished to the Delaware trustee under the pooling agreement. Any such opinion of counsel will be full and complete authorization and protection in respect of any action taken or omitted to be taken by the Delaware trustee in good faith and in accordance with such opinion of counsel. The Delaware trustee will not be deemed to have knowledge or notice of any matter, including an event of default, unless actually known to it or unless it has received written notice thereof.

**Resignation and Removal of the Delaware Trustee**

The Delaware trustee may at any time resign by giving written notice thereof to the servicer under the pooling agreement. Upon receiving such notice of resignation, the servicer will be required to appoint a successor Delaware trustee. If the Delaware trustee ceases to be eligible under the pooling agreement and fails to resign, or the Delaware trustee becomes incapable of acting, the servicer, with the consent of the NIMS insurer, if any, may remove the Delaware trustee and appoint a successor Delaware trustee. The holders of certificates evidencing at least 50% of the voting rights may at any time remove the Delaware trustee and appoint a successor Delaware trustee.

Any expenses associated with the resignation of the Delaware trustee will be required to be paid by the Delaware trustee, and any expenses associated with the removal of the Delaware trustee will be required to be paid by the servicer.

## AFFILIATIONS AND RELATED TRANSACTIONS

The depositor is a direct wholly owned subsidiary of the sponsor.  The sponsor is the servicer and the originator of the mortgage loans and is an indirect wholly owned subsidiary of Washington Mutual, Inc.  The calculation agent is a direct wholly owned subsidiary of the servicer.  WaMu Capital Corp., one of the underwriters, is a direct wholly owned subsidiary of the sponsor.  The Delaware trustee is an affiliate of the trustee.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the sponsor, the depositor and the trust and (b) any of the servicer, the trustee, any originator of the mortgage loans, the PMI Insurer or the swap counterparty.

## THE MORTGAGE POOL

The statistical information presented in this prospectus supplement relates to the mortgage loans and related mortgaged properties in each loan group as of April 1, 2007, the cut-off date.  As of the cut-off date, the mortgage pool will consist of approximately 6,723 mortgage loans with an aggregate scheduled principal balance as of the cut-off date of approximately $1,593,665,287 consisting of approximately 3,165 Group I mortgage loans with an aggregate scheduled principal balance as of the cut-off date of approximately $606,476,772 and approximately 3,558 Group II mortgage loans with an aggregate scheduled principal balance as of the cut-off date of approximately $987,188,515.  Prior to the closing date, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation, delinquency, payment in full, insufficient collateral value or otherwise if the depositor deems such removal necessary or desirable, and may be prepaid at any time, and some mortgage loans may be added to the mortgage pool.  As a result, the characteristics of the mortgage loans on the closing date may differ from the characteristics presented in this prospectus supplement; however, such differences are not expected to be material.

Unless otherwise noted, all statistical percentages or weighted averages presented in this prospectus supplement are measured as a percentage of the aggregate scheduled principal balance as of the cut-off date of the mortgage loans that are, as of the cut-off date, in the applicable loan group, or of the indicated subset of the mortgage loans that are, as of the cut-off date, in the applicable loan group.  The "**scheduled principal balance**" of a mortgage loan as of any date is equal to the principal balance of that mortgage loan at its origination, less the sum of all scheduled payments in respect of principal due on that mortgage loan on or before that date, whether or not received.

References in this prospectus supplement to the loan-to-value ratios of the mortgage loans, in the case of junior lien mortgage loans, unless indicated otherwise, refer to the quotient of (x) the sum of the principal balance of the applicable junior lien mortgage loan and the principal balance of all mortgage indebtedness secured by any senior lien(s) on the related mortgaged property divided by (y) the value (as determined as described in this prospectus supplement, and which may not be the actual value) of such related mortgaged property.

**General**

WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust (the "**trust**" or the "**issuing entity**") will consist of a pool of residential mortgage loans, which will, in turn, consist of the Group I mortgage loans, which consist of fixed-rate and adjustable-rate, first and second lien residential mortgage loans with principal balances that conform to Fannie Mae and Freddie Mac loan limits, and the Group II mortgage loans, which consist of fixed-rate and adjustable-rate, first and second lien residential mortgage loans with principal balances that may or may not conform to Fannie Mae and Freddie Mac loan limits. The mortgage loans have original terms to maturity ranging from 10 years to 40 years and an aggregate scheduled principal balance as of the cut-off date of approximately $1,593,665,287. All of the mortgage loans will be secured by first or second mortgages or deeds of trust or other similar security instruments (each, a "**mortgage**"). The mortgages create first liens or second liens on one- to four-family residential properties consisting of attached or detached one- to four-family dwelling units and individual condominium units (each, a "**mortgaged property**").

The depositor will purchase the mortgage loans from the sponsor pursuant to the mortgage loan purchase agreement (the "**mortgage loan purchase agreement**") between the sponsor and the depositor. Pursuant to the pooling and servicing agreement, dated as of April 1, 2007 (the "**pooling agreement**"), among the depositor, the servicer, the trustee, and the Delaware trustee, the depositor will cause the mortgage loans to be assigned to the trustee for the benefit of the certificateholders. *See* "The Trust—Assignment of the Mortgage Loans and Other Asset to the Trust" in this prospectus supplement.

Each of the mortgage loans was, or will be, selected from the sponsor's portfolio of mortgage loans. The mortgage loans were, or will be, originated by the sponsor or acquired by the sponsor in the secondary market or from one of its affiliates in the ordinary course of its business and were, or will be, underwritten or re-underwritten by the sponsor generally in accordance with the WMB sub-prime underwriting standards as described under "Underwriting of the Mortgage Loans" in this prospectus supplement.

No proceeds from any mortgage loan were, or will be, used to finance single-premium credit insurance policies.

Each mortgage loan will accrue interest at the fixed rate or adjustable rate calculated as specified under the terms of the related mortgage note.

Approximately 24.90% of the mortgage loans are fixed-rate mortgage loans that have mortgage rates that are fixed for the life of the related mortgage loan.

Approximately 75.10% of the mortgage loans are adjustable-rate mortgage loans. Each adjustable-rate mortgage loan accrues interest at a mortgage rate that adjusts from time to time as described below. Generally, the adjustable-rate mortgage loans provide for semi-annual adjustment of their mortgage rates and for corresponding adjustments to the monthly payment amount due on the mortgage loans, in each case on each adjustment date applicable to the mortgage loan; provided, that the first adjustment for the adjustable-rate mortgage loans will occur within an initial period of two years, in the case of approximately 53.17% of the mortgage loans, three years, in the case of approximately 14.12% of the mortgage loans and five years, in the case of approximately 7.81% of the mortgage loans. On each adjustment date for each adjustable-rate mortgage loan, the mortgage rate will be adjusted to equal the sum, rounded to the nearest or next highest multiple of 0.125%, of six-month LIBOR and a related fixed percentage amount specified in the mortgage note ("**gross margin**").

The mortgage rate on each adjustable-rate mortgage loan will not decrease or increase on the first related adjustment date by more than a stated percentage specified in the related mortgage note on the first related

adjustment date ("**initial periodic rate cap**") and will not increase or decrease by more than a stated percentage specified in the related mortgage note on any adjustment date after that ("**subsequent periodic rate cap**"). The adjustable-rate mortgage loans have a weighted average initial periodic rate cap of approximately 2.199% per annum and a weighted average subsequent periodic rate cap of approximately 1.000% per annum. Each mortgage rate on each adjustable-rate mortgage loan will not exceed a specified maximum mortgage rate over the life of such mortgage loan or be less than a specified minimum mortgage rate over the life of such mortgage loan. Effective with the first monthly payment due on each adjustable-rate mortgage loan after each related adjustment date, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding scheduled principal balance of the related mortgage loan over its remaining term, and pay interest at the mortgage rate as so adjusted. Due to the application of the periodic rate caps and the maximum mortgage rates, the mortgage rate on each such adjustable-rate mortgage loan, as adjusted on any related adjustment date, may be less than the sum of the index and the related gross margin, rounded as described in this prospectus supplement. None of the adjustable-rate mortgage loans permits the related mortgagor to convert the adjustable mortgage rate to a fixed mortgage rate. With respect to the adjustable-rate mortgage loans, the "**index**" is generally the average of interbank offered rates for six month U.S. dollar deposits in the London market based on quotations of major banks, and most recently available as of a day specified in the related note as published in the Western Edition of *The Wall Street Journal* ("**six-month LIBOR**"). If the index is no longer published or is otherwise unavailable, the servicer will select an alternative index which is based upon comparable information.

Approximately 7.01%, 1.42%, and 2.67% of the mortgage loans require the mortgagors to make monthly payments only of accrued interest for the first two, three and five years, respectively, following origination. At the end of such periods, the monthly payments on each such interest only mortgage loan will be recalculated to provide for amortization of the principal balance by the maturity date and payment of interest at the then-current mortgage rate. With respect to such mortgage loans, the related mortgage rate is fixed for the related interest only period following origination and adjusts based on six-month LIBOR with semi-annual adjustments after the initial fixed period.

Approximately 80.86% of the mortgage loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments. *See Appendix A for tables showing prepayment charge terms of the mortgage loans by loan group.* Generally, the mortgage loans with prepayment charges provide for the payment of a penalty in connection with certain voluntary, full or partial prepayments made within a period of time specified in the related mortgage note and generally ranging from one year to three years from the date of origination of such mortgage loan. The amount of the applicable prepayment charge, to the extent permitted under applicable law, is as provided in the related mortgage note. Under certain circumstances described in the pooling agreement, the servicer may waive a prepayment charge. Regardless of the terms of the mortgage note, the servicer will not collect any prepayment charges required to be paid more than three years after the origination of the mortgage loan. All prepayment charge payments remitted to the trust with respect to voluntary full prepayments will be distributed to the holders of the Class P Certificates. The holders of the Class P Certificates will not receive any prepayment charge payments with respect to voluntary partial prepayments; each such payment will be retained by the servicer as additional servicing compensation. No prepayment charge payments will be available for distribution to holders of the other classes of certificates. Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on the prepayment performance of the mortgage loans. The depositor makes no representations as to the effect that the prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on the prepayment performance of the mortgage loans.

Approximately 39.29% of the mortgage loans had loan-to-value ratios at origination in excess of 80%. No mortgage loan had a loan-to-value ratio at origination in excess of 100%, and the weighted average loan-to-value ratio of the mortgage loans at origination was approximately 81.29%. There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination is less than or equal to its original loan-to-value ratio. Additionally, the servicer's determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.

Approximately 41.30% of the mortgage loans are balloon mortgage loans.

All of the mortgage loans have a scheduled payment due each month on the first day of the month (the "**due date**").

The weighted average remaining term to maturity of the mortgage loans was approximately 362 months as of the cut-off date.  None of the mortgage loans had a first due date prior to July 1, 2006 or after April 1, 2007 or will have a remaining term to maturity of less than 118 months or greater than 479 months as of the cut-off date.  The latest maturity date of any mortgage loan is March 1, 2047.  Approximately 4.23% of the mortgage loans had an original term to maturity of 480 months.

The Class I-A Certificates will generally represent interests in the Group I mortgage loans, and the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates will generally represent interests in the Group II mortgage loans.  The Mezzanine Certificates will represent interests in all mortgage loans.  Information about the characteristics of the mortgage loans in each such group is described under "The Group I Mortgage Loans" and "The Group II Mortgage Loans" below.

**The Group I Mortgage Loans**

The Group I mortgage loans consist of approximately 3,165 mortgage loans and have an aggregate scheduled principal balance as of the cut-off date of approximately $606,476,772.  Approximately 98.12% of the Group I mortgage loans are secured by first liens on the related mortgaged property and approximately 1.88% of the Group I mortgage loans are secured by second liens on the related mortgaged property.

Approximately 24.14% of the Group I mortgage loans are fixed-rate mortgage loans, and approximately 75.86% of the Group I mortgage loans are adjustable-rate mortgage loans.  The first adjustment for the adjustable-rate Group I mortgage loans will occur within an initial period of two years, in the case of approximately 50.58% of the Group I mortgage loans, three years, in the case of approximately 16.77% of the Group I mortgage loans and five years, in the case of approximately 8.51% of the Group I mortgage loans.  The adjustable-rate Group I mortgage loans have a weighted average initial periodic rate cap of approximately 2.310% per annum and a weighted average subsequent periodic rate cap of approximately 1.000% per annum.

Approximately 1.79%, 0.43% and 1.61% of the Group I mortgage loans have interest only-periods of two, three and five years, respectively, following the date of origination.

Approximately 81.03% of the Group I mortgage loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments.

Approximately 41.22% of the Group I mortgage loans had loan-to-value ratios at origination in excess of 80%.  No Group I mortgage loan had a loan-to-value ratio at origination in excess of 100%, and the weighted average loan-to-value ratio of the Group I mortgage loans at origination was approximately 79.59%.

Approximately 41.19% of the Group I mortgage loans are balloon mortgage loans.

The weighted average remaining term to maturity of the Group I mortgage loans was approximately 362 months as of the cut-off date.  None of the Group I mortgage loans had a first due date prior to July 1, 2006 or after April 1, 2007 or will have a remaining term to maturity of less than 176 months or greater than 479 months as of the cut-off date.  The latest maturity date of any Group I mortgage loan is March 1, 2047.  Approximately 4.93% of the Group I mortgage loans had an original term to maturity of 480 months.

The average principal balance of the Group I mortgage loans at origination was approximately $191,873.  The average scheduled principal balance of the Group I mortgage loans as of the cut-off date was approximately $191,620.  No Group I mortgage loan had a scheduled principal balance as of the cut-off date greater than $698,567 or less than $9,987.

The Group I mortgage loans had a weighted average credit score of approximately 618.  The credit scores for the Group I mortgage loans ranged from a minimum credit score of 500 to a maximum credit score of 811.  *See* "Underwriting of the Mortgage Loans."

The Group I mortgage loans had mortgage rates as of the cut-off date of not less than 5.500% per annum and not more than 12.800% per annum and the weighted average mortgage rate of the Group I mortgage loans was approximately 8.022% per annum as of the cut-off date.

As of the cut-off date, the adjustable-rate Group I mortgage loans had gross margins ranging from 4.990% per annum to 7.250% per annum, minimum mortgage rates ranging from 5.500% per annum to 12.600% per annum and maximum mortgage rates ranging from 11.500% per annum to 18.600% per annum.  As of the cut-off date, the adjustable-rate Group I mortgage loans had a weighted average gross margin of approximately 5.239% per annum, a weighted average minimum mortgage rate of approximately 8.108% per annum and a weighted average maximum mortgage rate of approximately 14.108% per annum.  The first adjustment date following the cut-off date on any adjustable-rate Group I mortgage loan will occur on June 1, 2008, and the weighted average time until the first adjustment date for the adjustable-rate Group I mortgage loans following the cut-off date is approximately 28 months.

The Group I mortgage loans are expected to have the characteristics as of the cut-off date (the sum in any column may not equal the total indicated due to rounding) described under "Group I Mortgage Loan Tables" in Appendix A (which is incorporated by reference into this prospectus supplement).

## The Group II Mortgage Loans

The Group II mortgage loans consist of approximately 3,558 mortgage loans and have an aggregate scheduled principal balance as of the cut-off date of approximately $987,188,515.  Approximately 91.93% of the Group II mortgage loans are secured by first liens on the related mortgaged property and approximately 8.07% of the Group II mortgage loans are secured by second liens on the related mortgaged property.

Approximately 25.37% of the Group II mortgage loans are fixed-rate mortgage loans, and approximately 74.63% of the Group II mortgage loans are adjustable-rate mortgage loans.  The first adjustment for the adjustable rate Group II mortgage loans will occur within an initial period of two years, in the case of approximately 54.76% of the Group II mortgage loans, three years, in the case of approximately 12.49% of the Group II mortgage loans and five years, in the case of approximately 7.39% of the Group II mortgage loans.  The adjustable-rate Group II mortgage loans have a weighted average initial periodic rate cap of approximately 2.129% per annum and a weighted average subsequent periodic rate cap of approximately 1.000% per annum.

Approximately 10.22%, 2.03% and 3.32% of the Group II mortgage loans have interest only-periods of two, three and five years, respectively, following the date of origination.

Approximately 80.76% of the Group II mortgage loans provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments.

Approximately 38.11% of the Group II mortgage loans had loan-to-value ratios at origination in excess of 80%.  No Group II mortgage loan had a loan-to-value ratio at origination in excess of 100%, and the weighted average loan-to-value ratio of the Group II mortgage loans at origination was approximately 82.34%.

Approximately 41.36% of the Group II mortgage loans are balloon mortgage loans.

The weighted average remaining term to maturity of the Group II mortgage loans was approximately 361 months as of the cut-off date.  None of the Group II mortgage loans had a first due date prior to September 1, 2006 or after April 1, 2007 or will have a remaining term to maturity of less than 118 months or greater than 479 months as of the cut-off date.  The latest maturity date of any Group II mortgage loan is March 1, 2047.  Approximately 3.79% of the Group II mortgage loans had an original term to maturity of 480 months.

The average principal balance of the Group II mortgage loans at origination was approximately $277,745. The average scheduled principal balance of the Group II mortgage loans as of the cut-off date was approximately $277,456.  No Group II mortgage loans had a principal balance as of the cut-off date greater than $1,198,268 or less than $13,932.

The Group II mortgage loans had a weighted average credit score of approximately 646.  The credit scores for the Group II mortgage loans ranged from a minimum credit score of 501 to a maximum credit score of 806.  *See* "Underwriting of the Mortgage Loans."

The Group II mortgage loans had mortgage rates as of the cut-off date of not less than 5.400% per annum and not more than 13.350% per annum and the weighted average mortgage rate of the Group II mortgage loans was approximately 8.215% per annum as of the cut-off date.

As of the cut-off date, the adjustable-rate Group II mortgage loans had gross margins ranging from 4.990% per annum to 7.250% per annum, minimum mortgage rates ranging from 5.400% per annum to 13.350% per annum and maximum mortgage rates ranging from 11.400% per annum to 19.350% per annum.  As of the cut-off date, the adjustable-rate Group II mortgage loans had a weighted average gross margin of approximately 5.079% per annum, a weighted average minimum mortgage rate of approximately 8.121% per annum and a weighted average maximum mortgage rate of approximately 14.121% per annum.  The first adjustment date following the cut-off date on any adjustable-rate Group II mortgage loan occurs on September 1, 2008, and the weighted average time until the first adjustment date for the adjustable-rate Group II mortgage loans following the cut-off date is approximately 27 months.

The Group II mortgage loans are expected to have the characteristics as of the cut-off date (the sum in any column may not equal the total indicated due to rounding) described under "Group II Mortgage Loan Tables" in Appendix A (which is incorporated by reference into this prospectus supplement).

**Representations and Warranties Regarding the Mortgage Loans**

Under the mortgage loan purchase agreement pursuant to which the sponsor will sell the mortgage loans to the depositor, the sponsor will make representations and warranties in respect of the mortgage loans, which representations and warranties the depositor will assign to the trust pursuant to the pooling agreement.  Among those representations and warranties are the following:

- Each mortgage is a valid and enforceable first or second lien on the mortgaged property, except as provided in the mortgage loan purchase agreement;

- Immediately prior to the assignment of the mortgage loans to the depositor, the sponsor had good title to, and was the sole legal and beneficial owner of, each mortgage loan, free and clear of any pledge, lien, encumbrance or security interest and has full right and authority, subject to no interest or participation of, or agreement with, any other party to sell and assign the mortgage loan;

- With respect to each mortgage loan, the related mortgagor will not fail or has not failed to make the first monthly payment due under the terms of the mortgage loan by the second succeeding due date after the due date on which such monthly payment was due;

- There are no mortgage loans with respect to which the monthly payment due thereon in March 2007 had not been made, none of the mortgage loans has been contractually delinquent for more than 30 days more than once during the preceding twelve months and, no mortgage loan has ever experienced a delinquency of 60 or more days since the origination thereof;

- There are no delinquent tax or assessments liens against any mortgaged property;

- There is no valid offset, defense or counterclaim to any mortgage note or mortgage;

- Each mortgaged property is free of material damage and at least in average repair;

- Each mortgage loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws;

- A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, and, with respect to each adjustable rate mortgage loan, an adjustable rate mortgage endorsement in an amount at least equal to the balance of the mortgage loan as of the cut-off date or a commitment (binder) to issue the same was effective on the date of the origination of each mortgage loan, and each such policy is valid and remains in full force and effect;

- The loan-to-value ratio for each mortgage loan was no greater than 100% at the time of origination;

- The improvements upon each mortgage property are covered by a valid and existing hazard insurance policy required under the mortgage loan purchase agreement;

- The mortgage note and the related mortgage are genuine, and each is the legal, valid and binding obligation of the mortgagor enforceable against the mortgagor by the mortgagee or its representative in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by law; and

- Each mortgage loan constitutes a qualified mortgage within the meaning of Section 860G(a)(3) of the Code.

Under the pooling agreement, the depositor will make the following representation and warranty to the trust in respect of the mortgage loans:

- Immediately prior to the sale and assignment by the depositor to the trustee on behalf of the trust of each mortgage loan, the depositor had good and marketable title to each mortgage loan, subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature; and

- As of the closing date, the depositor has transferred all of its right, title and interest in the mortgage loans to the trustee on behalf of the trust.

Pursuant to the pooling agreement, the depositor will represent and warrant to the trust that, as of the closing date, the trust will be the legal owner of each mortgage loan, free and clear of any encumbrance or lien (other than (i) any lien arising before the depositor's purchase of the mortgage loan from the sponsor and (ii) any lien under the pooling agreement).

In the event of a material breach of the representations and warranties made by the sponsor or the depositor, the sponsor or the depositor will be required to either cure the breach in all material respects, repurchase the affected mortgage loan or substitute for the affected mortgage loan. In the event that a required loan document is not included in the mortgage files for the mortgage loans, the sponsor generally will also be required to either cure the defect or repurchase or substitute for the affected mortgage loan. The repurchase price for each mortgage loan repurchased by the sponsor or the depositor, as applicable, will be equal to the stated principal balance of that mortgage loan as of the date of purchase, plus all accrued and unpaid interest on that mortgage loan, computed at the applicable mortgage rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed advances and servicing advances made by the servicer, plus in the case of a mortgage loan required to be purchased because that mortgage loan is in breach of the representation that it is in compliance with certain predatory and abusive-lending laws, any additional costs or damages incurred by the trust as assignee or purchaser of that mortgage loan. The proceeds of the purchase will be treated as a prepayment of the mortgage loan for purposes of distributions to certificateholders. See "The Trust—Assignment of the Mortgage Loans and Other Assets to the Trust" in this prospectus supplement for a description of the requirements with respect to substitutions of mortgage loans.

**Criteria for Selection of Mortgage Loans**

The sponsor selected the mortgage loans from among its portfolio of mortgage loans held for sale based on a variety of considerations, including type of mortgage loan, geographic concentration, range of mortgage interest rates, principal balance, credit scores and other characteristics described in Appendix A (which is incorporated by reference into this prospectus supplement) to this prospectus supplement, and taking into account investor preferences and the depositor's objective of obtaining the most favorable combination of ratings on the certificates.

## DESCRIPTION OF THE CERTIFICATES

**General**

The offered certificates will be issued pursuant to the pooling agreement. Summaries of the specific terms and provisions pursuant to which such certificates will be issued are presented below. The following summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the pooling agreement. When particular provisions or terms used in the pooling agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

The WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust will consist of the following classes:

- Class I-A
- Class II-A1
- Class II-A2
- Class II-A3
- Class II-A4
- Class M-1
- Class M-2

- Class M-3
- Class M-4
- Class M-5
- Class M-6
- Class M-7
- Class M-8
- Class M-9

- Class C
- Class P
- Class R
- Class R-CX
- Class R-PX

Collectively, the certificates will represent all of the beneficial interests in the trust. The certificates will have the following designations:

| | |
|---|---|
| Group I Senior Certificates.......................... | Class I-A Certificates. |
| Group II Senior Certificates ....................... | Class II-A1 Certificates, Class II-A2 Certificates, Class II-A3 Certificates and Class II-A4 Certificates. |
| Class A Certificates ..................................... | Group I Senior Certificates and Group II Senior Certificates. |
| Mezzanine Certificates ............................... | Class M-1 Certificates, Class M-2 Certificates, Class M-3 Certificates, Class M-4 Certificates, Class M-5 Certificates, Class M-6 Certificates, Class M-7 Certificates, Class M-8 Certificates and Class M-9 Certificates. |
| Residual Certificates.................................... | Class R Certificates, Class R-CX Certificates and Class R-PX Certificates. |
| Certificates.................................................. | Class A Certificates, Mezzanine Certificates, Class C Certificates, Class P Certificates and Residual Certificates. |
| Subordinate Certificates .............................. | Mezzanine Certificates and Class C Certificates. |

Only the Class A Certificates and the Mezzanine Certificates are offered by this prospectus supplement. The Class C Certificates, the Class P Certificates and the Residual Certificates are not offered by this prospectus supplement.

The Class I-A Certificates will generally represent interests in the Group I mortgage loans, and the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates will generally represent interests in the Group II mortgage loans.  The Mezzanine Certificates will represent interests in all of the mortgage loans.

The Class A Certificates and the Mezzanine Certificates will have the original certificate principal balances specified on page S-2 of this prospectus supplement.  The original certificate principal balance of the Class C Certificates will be approximately $59,762,187, which will be equal to the excess of the aggregate principal balance of the mortgage loans as of the cut-off date over the original certificate principal balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates.  The Class P Certificates will have an original certificate principal balance of $100 and will not bear interest.  The Class P Certificates will be entitled to all prepayment charges received in respect of voluntary prepayments in full and the servicer will be entitled to all prepayment charges received in respect of voluntary prepayments in part on the related mortgage loans, and such amounts will not be available for distribution to the holders of the offered certificates.  The Residual Certificates will not have original certificate principal balances and will not bear interest.

The offered certificates will be issued in book-entry form as described below.  The offered certificates will be issued in minimum denominations of $25,000 original certificate principal balance and integral multiples of $1.00 in excess thereof.  The "**last scheduled distribution date**" for the offered certificates is in April 2037.  It is intended that the amounts deposited in the final maturity reserve account will be sufficient to retire the offered certificates on the last scheduled distribution date, even though mortgage loans having 40-year original terms to maturity may remain outstanding.  The actual final distribution date for the offered certificates may occur earlier or later, and could be significantly earlier, than the last scheduled distribution date.

Distributions on the offered certificates will be made by the trustee on the 25th day of each month, or if such day is not a business day, on the first business day after that, commencing in May 2007 (each, a "**distribution date**"), to the persons in whose names such certificates are registered at the close of business on the related record date.  The "**record date**" for the offered certificates and any distribution date (for so long as they are book-entry certificates) is the business day immediately preceding such distribution date and the "record date" for any book-entry certificate that becomes a definitive certificate is the last business day of the month immediately preceding the month in which the related distribution date occurs.

A NIMS policy may be issued by the NIMS insurer covering certain payments to be made on NIMS which may be issued by an affiliate of the depositor or by one or more entities sponsored by an affiliate of the depositor after the closing date.  The NIMS are not offered hereby and, if issued, the NIMS would be backed, in whole or in part, by cashflow received on the Class C Certificates and the Class P Certificates, which are not offered hereby.  The NIMS, if issued, *would not* be backed by the trust (other than by the interests represented by the Class C Certificates and the Class P Certificates) or by any of the offered certificates.

## Book Entry Certificates

The offered certificates will be "**book-entry certificates**" (for so long as they are registered in the name of the applicable depository or its nominee).  Persons acquiring beneficial ownership interests in the book-entry certificates ("**certificate owners**") will hold such certificates through The Depository Trust Company ("**DTC**") in the United States, or, upon request, through Clearstream Banking Luxembourg, formerly known as Cedelbank SA ("**Clearstream**"), or the Euroclear System ("**Euroclear**") in Europe, if they are participants of such systems, or indirectly through organizations which are participants in such systems.  The book-entry certificates will be issued in one or more certificates which equal the aggregate certificate principal balance of such certificates and will initially be registered in the name of Cede & Co., the nominee of DTC.  See "Description of the Securities—Form of Securities" in the accompanying prospectus for a description of the book-entry system.

## Definitive Certificates

Definitive certificates will be issued to certificate owners of the book-entry certificates, or their nominees, rather than to DTC or its nominee, only if (a) DTC or the depositor advises the trustee in writing that DTC is no longer willing, qualified or able to discharge properly its responsibilities as nominee and depository with respect to

the book-entry certificates and the depositor or the trustee is unable to locate a qualified successor, (b) the depositor notifies the trustee and DTC of its intent to terminate the book-entry system through DTC and, upon receipt of notice of such intent from DTC, the participants with a position in the book-entry certificates agree to initiate such termination or (c) after the occurrence of a Servicer Event of Default (as defined in the pooling agreement), certificate owners having percentage interests aggregating not less than 51% of the book-entry certificates advise the trustee and DTC through the financial intermediaries and the DTC participants in writing that the continuation of a book-entry system through DTC (or a successor thereto) is no longer in the best interests of certificate owners.

The trustee or its paying agent, if any, will make distributions of principal and interest on the definitive certificates directly to holders of those definitive certificates in accordance with the pooling agreement procedures described in this prospectus supplement.  Distributions of principal and interest on each distribution date will be made to holders in whose names certificates were registered at the close of business on the related record date. Distributions will be made by wire transfer in immediately available funds for the account of each holder of a certificate or, if a holder has not provided wire instructions at least five business days prior to the related record date, by check mailed to the address of the holder as it appears on the register maintained by the trustee.  The final payment on any certificate will be made only on presentation and surrender of the certificate at the offices of the trustee or its agent or such office or agency as is specified in the notice of final distribution to holders of certificates being retired.

Definitive certificates will be transferable and exchangeable at the office or agency of the trustee maintained for that purpose, which initially shall be Citibank, N.A., Corporate Agency and Trust, 111 Wall Street, 15th Floor, New York, New York 10005, Attn: Transfer Desk (WaMu 2007-HE2).  No service charge may be imposed for any registration of transfer or exchange, but the trustee may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection with registration of transfer or exchange.

**Allocation of Available Funds**

Distributions with respect to the offered certificates will be made on each distribution date primarily from available funds.  With respect to any distribution date, funds available for distribution to the certificateholders ("**available funds**") will be equal to the sum of the following amounts with respect to the mortgage loans, net of amounts payable or reimbursable to the servicer, the Delaware trustee, the custodian or the trustee from the trust:  (i) the aggregate amount of monthly payments on the mortgage loans due on the related due date and received by the determination date, after deduction of the fee paid to the PMI Insurer, the servicing fee for such distribution date and any accrued and unpaid PMI Insurer fees or servicing fees in respect of any prior distribution dates, (ii) certain unscheduled payments in respect of the mortgage loans, including any prepayments, insurance proceeds, net liquidation proceeds, subsequent recoveries, termination price deposits and proceeds from repurchases of and substitutions for such mortgage loans occurring during the related prepayment period, excluding prepayment charges and any prepayment interest excess, (iii) amounts transferred from the interest coverage account and (iv) payments from the servicer in connection with advances and prepayment interest shortfalls for such distribution date.  The holders of the Class P Certificates will be entitled to all prepayment charges received in respect of voluntary prepayments in full and the servicer will be entitled to all prepayment charges received in respect of voluntary prepayments in part on the mortgage loans, and such amounts will not be part of available funds or available for distribution with respect to the offered certificates.

The Class I-A Certificates will generally represent interests in the Group I mortgage loans, and the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates will generally represent interests in the Group II mortgage loans.  The Mezzanine Certificates will represent interests in all of the mortgage loans.

*Interest Distributions on the Offered Certificates*

On each distribution date, the trustee will withdraw from the distribution account that portion of available funds equal to the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date, and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group I Interest Remittance Amount or the Group II Interest Remittance Amount, as applicable, remaining for such distribution date:

(i)        the Group I Interest Remittance Amount will be distributed as follows:

(A)        *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount remaining unpaid from prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable for the related distribution date;

(B)        *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount remaining unpaid from prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable for the related distribution date to the extent not paid pursuant to clause (ii)(A) below;

(C)        *third*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, for such distribution date;

(D)        *fourth*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, for such distribution date, to the extent not paid pursuant to clause (ii)(C) below;

(E)        *fifth*, to the Class I-A Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such class; and

(F)        *sixth*, concurrently, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such classes, in each case, to the extent not paid pursuant to clause (ii)(E) below, allocated among the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, *pro rata*, based on their respective entitlements.

(ii)        the Group II Interest Remittance Amount will be distributed as follows:

(A)        *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount remaining unpaid from prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable for the related distribution date;

(B)        *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount remaining unpaid from prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable for the related distribution date to the extent not paid pursuant to clause (i)(A) above;

(C)      *third*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, for such distribution date;

(D)      *fourth*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, for such distribution date, to the extent not paid pursuant to clause (i)(C) above;

(E)      *fifth*, concurrently, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such classes, in each case allocated among the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, *pro rata*, based on their respective entitlements; and

(F)      *sixth*, to the Class I-A Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such class, to the extent not paid pursuant to clause (i)(E) above.

(iii)      the sum of any Group I Interest Remittance Amount and Group II Interest Remittance Amount remaining undistributed following the distributions pursuant to clauses (i) and (ii) above will be distributed as follows:

*first*, to the Class M-1 Certificates, the related Monthly Interest Distributable Amount;

*second*, to the Class M-2 Certificates, the related Monthly Interest Distributable Amount;

*third*, to the Class M-3 Certificates, the related Monthly Interest Distributable Amount;

*fourth*, to the Class M-4 Certificates, the related Monthly Interest Distributable Amount;

*fifth*, to the Class M-5 Certificates, the related Monthly Interest Distributable Amount;

*sixth*, to the Class M-6 Certificates, the related Monthly Interest Distributable Amount;

*seventh*, to the Class M-7 Certificates, the related Monthly Interest Distributable Amount;

*eighth*, to the Class M-8 Certificates, the related Monthly Interest Distributable Amount; and

*ninth*, to the Class M-9 Certificates, the related Monthly Interest Distributable Amount.

Any Group I Interest Remittance Amount and Group II Interest Remittance Amount remaining undistributed following these distributions will be used in determining the amount of Net Monthly Excess Cashflow, if any, for such distribution date.

On any distribution date, any shortfalls resulting from the application of the Relief Act or similar state or local law and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated, first, to the Monthly Interest Distributable Amount with respect to the Class C Certificates and after that, to the Monthly Interest Distributable Amounts with respect to the offered certificates, on a *pro rata* basis based on the respective amounts of interest accrued on such certificates for such distribution date.  The holders of the offered certificates will not be entitled to reimbursement for any prepayment interest shortfalls not covered by the compensating interest paid by the servicer or any shortfalls resulting from the application of the Relief Act or similar state or local law.

If on any distribution date, the offered certificates do not receive the related Monthly Interest Distributable Amount and the related Unpaid Interest Shortfall Amount, if any, then such unpaid amounts will be recoverable by the holders of such classes, with interest on such unpaid amounts, on future distribution dates, as Unpaid Interest Shortfall Amounts, subject to the priorities described in this prospectus supplement.

*Principal Distributions on the Offered Certificates*

On each distribution date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the offered certificates will be entitled to receive distributions in respect of principal to the extent of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in the following amounts and order of priority:

(i)    the Group I Principal Distribution Amount will be distributed as follows:

(A)    *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(B)    *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such distribution date;

(C)    *third*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(D)    *fourth*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such distribution date;

(E)    *fifth*, to the Class I-A Certificates, until their certificate principal balance has been reduced to zero; and

(F)    *sixth*, to the Group II Senior Certificates (allocated among the Group II Senior Certificates in the priority described below), until their certificate principal balances have been reduced to zero, to the extent unpaid in (ii)(E) below.

(ii)    the Group II Principal Distribution Amount will be distributed as follows:

(A)    *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(B)    *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount

not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such distribution date;

(C)      *third*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(D)      *fourth*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such distribution date;

(E)      *fifth*, to the Group II Senior Certificates (allocated among the Group II Senior Certificates in the priority described below), until their certificate principal balances have been reduced to zero; and

(F)      *sixth*, to the Class I-A Certificates, until their certificate principal balance has been reduced to zero, to the extent not paid pursuant to clause (i)(E) above.

(iii)      the sum of any Group I Principal Distribution Amount and Group II Principal Distribution Amount remaining undistributed following the distributions pursuant to clauses (i) and (ii) above will be distributed in the following order of priority:

*first*, to the Class M-1 Certificates, until their certificate principal balance has been reduced to zero;

*second*, to the Class M-2 Certificates, until their certificate principal balance has been reduced to zero;

*third*, to the Class M-3 Certificates, until their certificate principal balance has been reduced to zero;

*fourth*, to the Class M-4 Certificates, until their certificate principal balance has been reduced to zero;

*fifth*, to the Class M-5 Certificates, until their certificate principal balance has been reduced to zero;

*sixth*, to the Class M-6 Certificates, until their certificate principal balance has been reduced to zero;

*seventh*, to the Class M-7 Certificates, until their certificate principal balance has been reduced to zero;

*eighth*, to the Class M-8 Certificates, until their certificate principal balance has been reduced to zero; and

*ninth*¸ to the Class M-9 Certificates, until their certificate principal balance has been reduced to zero.

Any principal remaining undistributed following these distributions will be used in determining the amount of Net Monthly Excess Cashflow, if any, for such distribution date.

On each distribution date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the offered certificates will be entitled to receive distributions in respect of principal to the extent of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in the following amounts and order of priority (the "**Post-Stepdown Monthly Principal Distribution**"):

(i)        the Group I Principal Distribution Amount will be distributed as follows:

(A)        *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(B)        *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such distribution date;

(C)        *third*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(D)        *fourth*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such distribution date;

(E)        *fifth*, to the Class I-A Certificates, the Group I Senior Principal Distribution Amount, until their certificate principal balance has been reduced to zero; and

(F)        *sixth*, to the Group II Senior Certificates, the Group II Senior Principal Distribution Amount, to the extent not paid pursuant to clause (ii)(E) below (allocated among the Group II Senior Certificates in the priority described below), until their certificate principal balances have been reduced to zero.

(ii)        the Group II Principal Distribution Amount will be distributed as follows:

(A)        *first*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group II Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

(B)        *second*, to the supplemental interest trust trustee for payment to the swap counterparty, the Group I Net Swap Payment, provided a swap default with respect to the swap counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount

not paid on prior distribution dates) (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such distribution date;

        (C)     *third*, to the final maturity reserve account, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such distribution date;

        (D)     *fourth*, to the final maturity reserve account, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such distribution date;

        (E)     *fifth*, to the Group II Senior Certificates, the Group II Senior Principal Distribution Amount (allocated among the Group II Senior Certificates in the priority described below), until their certificate principal balances have been reduced to zero; and

        (F)     *sixth*, to the Class I-A Certificates, the Group I Senior Principal Distribution Amount, to the extent not paid pursuant to clause (i)(E) above, until their certificate principal balance has been reduced to zero.

    (iii)     the sum of any Group I Principal Distribution Amount and Group II Principal Distribution Amount remaining undistributed following the distribution pursuant to clauses (i) and (ii) above will be distributed in the following order of priority:

        *first*, to the Class M-1 Certificates, the Class M-1 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *second,* to the Class M-2 Certificates, the Class M-2 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *third,* to the Class M-3 Certificates, the Class M-3 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *fourth*, to the Class M-4 Certificates, the Class M-4 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *fifth*, to the Class M-5 Certificates, the Class M-5 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *sixth*, to the Class M-6 Certificates, the Class M-6 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *seventh*, to the Class M-7 Certificates, the Class M-7 Principal Distribution Amount, until their certificate principal balance has been reduced to zero;

        *eighth*, to the Class M-8 Certificates, the Class M-8 Principal Distribution Amount, until their certificate principal balance has been reduced to zero; and

        *ninth*, to the Class M-9 Certificates, the Class M-9 Principal Distribution Amount, until their certificate principal balance has been reduced to zero.

Any principal remaining undistributed following these distributions will be used in determining the amount of Net Monthly Excess Cashflow, if any, for such distribution date.

With respect to the Group II Senior Certificates, all principal distributions will be allocated sequentially, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, in each case, until their certificate principal balances have been reduced to zero, with the exception that beginning on the first distribution date on or after which the certificate principal balances of the Mezzanine Certificates have been reduced to zero and the Net Monthly Excess Cashflow and Overcollateralized Amount for such distribution date are insufficient to cover realized losses on the Group II mortgage loans, principal distributions among the Group II Senior Certificates will be allocated, pro rata, based on their certificate principal balances, in each case, until their certificate principal balances have been reduced to zero.

The allocation of distributions in respect of principal to the Class A Certificates on each distribution date (a) prior to the Stepdown Date or (b) on which a Trigger Event has occurred, will have the effect of accelerating the amortization of the Class A Certificates while, in the absence of realized losses, increasing the respective percentage interest in the principal balance of the mortgage loans evidenced by the Subordinate Certificates. Increasing the respective percentage interest in the trust of the Subordinate Certificates relative to that of the Class A Certificates is intended to preserve the availability of the subordination provided by the Subordinate Certificates.

**Credit Enhancement**

The credit enhancement provided for the benefit of the holders of the offered certificates consists of subordination, excess interest, overcollateralization, allocation of losses and cross-collateralization, each as described in this prospectus supplement. The offered certificates will also have the benefit of the swap agreement.

*Subordination*

The rights of the Subordinate Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the Class A Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of the Class A Certificates of the full amount of their scheduled monthly payments of interest and principal, and to afford such holders protection against realized losses.

The protection afforded to the Class A Certificates by means of the subordination of the Subordinate Certificates will be accomplished by (i) the preferential right of the Class A Certificates to receive on any distribution date, prior to distributions on the Subordinate Certificates, distributions in respect of interest and principal, subject to funds available for such distributions, and (ii) if necessary, the right of the Class A Certificates to receive future distributions of amounts that would otherwise be payable to the Subordinate Certificates.

The Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates and then, the Class M-9 Certificates will have the right to receive distributions in respect of the mortgage loans in that order. The rights of the Mezzanine Certificates to receive distributions in respect of the mortgage loans will be senior to the rights of the Class C Certificates to the extent described in this prospectus supplement. This subordination is intended to enhance the likelihood of regular receipt by the more senior classes of certificates of distributions in respect of interest and principal and to afford such classes of certificates protection against realized losses.

*Excess Interest*

The weighted average net mortgage rate for the mortgage loans each month is generally expected to be higher than the weighted average of the Pass-Through Rates on the offered certificates for the related distribution date.  As a result of the foregoing and as a result of overcollateralization, interest collections on the mortgage loans each month are expected to be generated in excess of the amount of interest payable to the offered certificates, the Net Swap Payment, the Aggregate Final Maturity Reserve Amount and the related fees and expenses payable by the trust on the related distribution date.  The pooling agreement will require that, on each distribution date, any Net Monthly Excess Cashflow be applied on such distribution date as an accelerated payment of principal on the class or classes of certificates then entitled to receive distributions in respect of principal, but only to the limited extent described in this prospectus supplement.

With respect to any distribution date, any Net Monthly Excess Cashflow will be paid in the following order of priority, in each case to the extent of the Net Monthly Excess Cashflow remaining undistributed:

(i)        to the certificates then entitled to receive distributions in respect of principal, in an amount equal to the sum of any Extra Principal Distribution Amount and (without duplication) the Remaining Principal Distribution Amount for such distribution date, payable to such certificates as part of the Group I Principal Distribution Amount or the Group II Principal Distribution Amount, as applicable, as described under "Allocation of Available Funds—Principal Distributions on the Offered Certificates" above;

(ii)        concurrently, to the Class A Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such classes for such distribution date to the extent remaining unpaid after distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount on such distribution date, allocated among such classes *pro rata*, based on their respective entitlements;

(iii)        to the Class M-1 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(iv)        to the Class M-1 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(v)        to the Class M-2 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(vi)        to the Class M-2 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(vii)        to the Class M-3 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(viii)        to the Class M-3 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(ix)        to the Class M-4 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(x)        to the Class M-4 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xi)        to the Class M-5 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(xii)        to the Class M-5 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xiii)    to the Class M-6 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(xiv)    to the Class M-6 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xv)    to the Class M-7 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(xvi)    to the Class M-7 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xvii)    to the Class M-8 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(xviii)    to the Class M-8 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xix)    to the Class M-9 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such class for such distribution date;

(xx)    to the Class M-9 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such class for such distribution date;

(xxi)    to the reserve fund, the amount equal to the difference between any Net WAC Rate Carryover Amounts with respect to the offered certificates for such distribution date and any amounts deposited in the reserve fund pursuant to this clause (xxi) that were not distributed on the prior distribution date;

(xxii)    to the supplemental interest trust trustee, for payment to the swap counterparty, any unpaid Swap Termination Payment payable by the supplemental interest trust trustee (including any amount remaining unpaid from prior distribution dates) (only if the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement);

(xxiii)    to the final maturity reserve account, the Supplemental Final Maturity Reserve Amount for such distribution date;

(xxiv)    if such distribution date follows the prepayment period during which occurs the latest date on which a prepayment charge may be required to be paid in respect of any mortgage loan, to the Class P Certificates, in reduction of their certificate principal balance, until their certificate principal balance is reduced to zero;

(xxv)    to the Class C Certificates as provided in the pooling agreement; and

(xxvi)    any remaining amounts to the Residual Certificates as provided in the pooling agreement.

On each distribution date, after making the distributions of the available funds (including the Net Monthly Excess Cashflow) as described above, the trustee will withdraw the amounts on deposit in the reserve fund and will distribute such amounts to the offered certificates as described under "Pass-Through Rates" below in this prospectus supplement.

On each distribution date, the trustee will withdraw from the distribution account all amounts representing prepayment charges in respect of voluntary principal prepayments in full on the mortgage loans received during the related prepayment period and will distribute those amounts to the Class P Certificates.

*Overcollateralization Provisions*

As of the closing date, the aggregate stated principal balance of the mortgage loans as of the cut-off date will exceed the aggregate certificate principal balance of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates on the closing date by approximately $59,762,187, which will be equal to the original certificate principal balance of the Class C Certificates. Such amount represents approximately 3.75% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, and is approximately equal to the initial amount of overcollateralization that will be required to be provided under the pooling agreement. Excess interest generated by the mortgage loans will be distributed as a payment of principal to the offered certificates then entitled to distributions of principal to the extent necessary to maintain the required level of overcollateralization. The required level of overcollateralization may be permitted to step down as provided in the pooling agreement. We cannot assure you that sufficient interest will be generated by the mortgage loans to maintain the required level of overcollateralization.

*Allocation of Losses*

Any realized losses on any distribution date, first, will reduce amounts distributable in respect of the Class C Certificates (through the reduction of the Net Monthly Excess Cashflow and Net Counterparty Payments payable to the Class C Certificates), second, will be absorbed by the reduction of overcollateralization and, third, will be allocated to the Mezzanine Certificates in the following order, in each case until the related certificate principal balance has been reduced to zero: to the Class M-9 Certificates, to the Class M-8 Certificates, to the Class M-7 Certificates, to the Class M-6 Certificates, to the Class M-5 Certificates, to the Class M-4 Certificates, to the Class M-3 Certificates, to the Class M-2 Certificates and to the Class M-1 Certificates.

Any allocation of realized losses to the Mezzanine Certificates will be made by reducing their certificate principal balance by the amount so allocated as of the distribution date in the month following the prepayment period in which such realized loss was incurred. Notwithstanding anything to the contrary in this prospectus supplement, in no event will the certificate principal balance of any Mezzanine Certificate be reduced more than once in respect of any particular amount both (i) allocable to such certificate in respect of realized losses and (ii) payable as principal to such certificate from Net Monthly Excess Cashflow.

Once realized losses have been allocated to the Mezzanine Certificates, such amounts with respect to such certificates will no longer accrue interest and will not be reinstated after that (other than amounts reinstated due to subsequent recoveries on a liquidated mortgage loan). However, Allocated Realized Loss Amounts may be paid to the Mezzanine Certificates from the Net Monthly Excess Cashflow, to the extent available, and from amounts, if any, received from the swap counterparty pursuant to the swap agreement, according to the priorities described under "—*Excess Interest*" above.

Any Allocated Realized Loss Amounts to be reinstated on any distribution date due to subsequent recoveries will be reinstated to the Mezzanine Certificates in the following order, in each case until the related Allocated Realized Loss Amount has been reduced to zero: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates. Any Allocated Realized Loss Amounts to be reinstated to the Mezzanine Certificates due to subsequent recoveries will be made by increasing the certificate principal balance of the related certificate by the amount so reinstated as of the distribution date in the month following the prepayment period in which such subsequent recoveries occurred.

The pooling agreement will not permit the allocation of realized losses to the Class A Certificates, the Class P Certificates or the Residual Certificates. Investors in the Class A Certificates should note that although realized losses cannot be allocated to the Class A Certificates, under certain loss scenarios there will not be enough principal and interest on the mortgage loans to pay the Class A Certificates all interest and principal amounts to which such classes are then entitled.

*Cross-Collateralization*

The trust provides for limited cross-collateralization of the Group I Senior Certificates and the Group II Senior Certificates through the application of interest generated by one loan group to fund interest shortfalls on the

Class A Certificates primarily supported by the other loan group and through the application of principal generated by one loan group to fund certain distributions of principal on the Class A Certificates primarily supported by the other loan group.

**The PMI Insurer**

Radian Guaranty Inc., ("Radian Guaranty" or the "PMI Insurer") a Pennsylvania corporation with its principal offices in Philadelphia, Pennsylvania, is a private mortgage insurance company and wholly-owned subsidiary of Radian Group Inc., ("Radian") an insurance holding company listed on the New York Stock Exchange. Radian Guaranty is licensed in all 50 states, the District of Columbia and Guam to offer mortgage insurance and is approved as a private mortgage insurer by Fannie Mae and Freddie Mac.  Radian Guaranty's financial strength is rated "AA" by S&P and Fitch and "Aa3" by Moody's.  Radian Guaranty's financial strength currently is not rated by any other rating agency.  The ratings reflect each respective rating agencies' current assessments of the creditworthiness of Radian Guaranty and its ability to pay claims on its policies of insurance.  Each financial strength rating of Radian Guaranty should be evaluated independently.  Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.  The above ratings are not recommendations to buy, sell or hold any class of offered certificates, and such ratings are subject to revision, qualification or withdrawal at any time by the applicable rating agencies.  Radian Guaranty does not guaranty the market prices of the offered certificates nor does it guaranty that its financial strength ratings will not be revised, qualified or withdrawn.

Radian Guaranty is a wholly owned subsidiary of Radian.  On February 6, 2007, MGIC Investment Corporation ("MGIC") and Radian announced that they have entered into a merger agreement. The agreement provides for a merger of equals, with the surviving company to be headquartered in Milwaukee, Wisconsin. The merger is subject to final due diligence and regulatory review. Radian and MGIC anticipate that the merger will close in the fourth quarter of 2007.  Copies of all information regarding Radian and MGIC that is referenced in this prospectus supplement can be read and copied at the SEC's website at http:/www.sec.gov, the SEC's public reference room at 450 Fifth Street, N/W, Washington, D.C. 20549, and the offices at the NYSE 20 Broad Street, New York 10005.

Copies of Radian Guaranty's quarterly and annual statutory financial statements, which are based on accounting principals that differ from generally accepted accounting principles and which may result in significant financial differences, are available upon request to Radian Guaranty at Radian Guaranty Inc., 1601 Market Street, Philadelphia, Pennsylvania 19103.   Radian Guaranty's telephone number is (215) 231 – 1000.

**The PMI Policy**

Approximately 13.94% of the Group I mortgage loans and approximately 8.14% of the Group II mortgage loans, in each case, by aggregate stated principal balance of the related loan group as of the cut-off date, will be insured by an insurance policy (the "**PMI Policy**," and the Mortgage Loans covered by such policy, the "**PMI Mortgage Loans**").  The PMI Policy will insure against losses under each PMI Mortgage Loan in an amount (after taking into account other existing primary mortgage insurance coverage) equal to the percentage of the outstanding principal balance of such PMI Mortgage Loan equal to (i) 100% minus a fraction equal to (x) 60.00% over (y) the loan-to-value ratio of the related PMI Mortgage Loan at origination. The PMI Policy will only cover those mortgage loans which meet certain underwriting criteria.

The PMI Policy will be issued initially to the trustee on behalf of the trust.  The PMI Policy will be required to remain in force with respect to each PMI Mortgage Loan until (i) the principal balance of the PMI Mortgage Loan is paid in full or liquidated or (ii) any event specified in the PMI Policy occurs that allows for the termination of the PMI Policy by the PMI Insurer.

The PMI Policy generally will require that delinquencies on any PMI Mortgage Loan must be reported to the PMI Insurer within fifteen (15) days after such loan is three months in default, and appropriate proceedings to obtain title to the property securing the PMI Mortgage Loan must be commenced within six months of default.  The PMI Policy under which the PMI Mortgage Loans are insured will contain provisions substantially as follows: (i) for the insured to present a claim, the insured must have acquired, and tendered to the PMI Insurer, title to the property

securing the PMI Mortgage Loan, free and clear of all liens and encumbrances, including, but not limited to, any right of redemption by the mortgagor unless such acquisition of good and merchantable title is excused under the terms of the PMI Policy; (ii) a claim generally includes unpaid principal, accrued interest to the date such claim is presented by the insured, and certain expenses; (iii) when a claim is presented the PMI Insurer will have the option of either (A) paying the claim in full, taking title to the property securing the PMI Mortgage Loan, and arranging for its sale or (B) paying the insured percentage of the claim and with the insured retaining title to the property securing the PMI Mortgage Loan; (iv) claims generally must be filed within 60 days after the insured has acquired good and merchantable title to the property securing the PMI Mortgage Loan; and (v) a claim generally must be paid within 60 days after the claim is filed by the insured.

Unless approved in writing by the PMI Insurer, the insured under the PMI Policy will not be permitted to make any change in the terms of a PMI Mortgage Loan, including the borrowed amount, mortgage rate, term or amortization schedule of the PMI Mortgage Loan, except as specifically permitted by the terms of the PMI Mortgage Loan; nor make any change in the property or other collateral securing the PMI Mortgage Loan; nor release any mortgagor under the PMI Mortgage Loan from liability. If a PMI Mortgage Loan is assumed with the insured's approval, the PMI Insurer's liability for coverage of the PMI Mortgage Loan under the PMI Policy generally will terminate as of the date of such assumption, unless the PMI Insurer approves the assumption in writing.

The PMI Policy specifically excludes coverage of: (i) any claim resulting from a default existing at the inception of coverage or occurring after lapse or cancellation of coverage; (ii) any claim, if the mortgage, deed of trust or other similar instrument did not provide the insured at origination with a first lien on the property securing the PMI Mortgage Loan; and (iii) certain claims involving or arising out of any breach by the insured of its obligations under, or its failure to comply with the terms of, the PMI Policy or of its obligations as imposed by operation of law.

In issuing the PMI Policy, the PMI Insurer will rely upon certain information and data regarding the PMI Mortgage Loans furnished to the PMI Insurer by the sponsor. The PMI Policy will not insure against a loss sustained by reason of a default arising from or involving certain matters, including (i) misrepresentation or fraud in obtaining the PMI Policy or negligence in origination or servicing of the PMI Mortgage Loans, including, but not limited to, misrepresentation by the lender or certain other persons involved in the origination of the PMI Mortgage Loan or the application for insurance or (ii) failure to construct a property securing a PMI Mortgage Loan in accordance with specified plans. In addition, the PMI Policy will not cover the costs or expenses related to the repair of physical damage to a property securing a PMI Mortgage Loan.

The preceding description of the PMI Policy is only a brief outline and does not purport to summarize or describe all of the provisions, terms and conditions of the PMI Policy. For a more complete description of these provisions, terms and conditions, reference is made to the PMI Policy, a copy of which is available upon request from the Trustee.

**The Swap Agreement**

The offered certificates will have the benefit of a swap agreement (the "**swap agreement**") documented by a 1992 ISDA Master Agreement (Multicurrency-Cross Border), together with a Schedule and Confirmation between Citibank, N.A., not individually, but solely as trustee on behalf of a separate trust created under the pooling agreement (the "**supplemental interest trust**") and ABN AMRO Bank N.V. (in such capacity, the "**swap counterparty**").

Under the swap agreement, beginning on the distribution date in June 2007, on or before each distribution date through the distribution date in April 2012 (the "**swap termination date**"), the supplemental interest trust trustee will be obligated to pay to the swap counterparty an amount equal to the product of (a) 4.760%, (b) a notional amount specified on Annex I, which is incorporated by reference into this prospectus supplement (the "**swap notional amount**") and (c) a fraction, the numerator of which is 30 and the denominator of which is 360 (the "**Swap Payment**"), and the swap counterparty will be obligated to pay to the supplemental interest trust trustee, acting on behalf of the supplemental interest trust, an amount equal to the product of (x) one-month LIBOR (as determined pursuant to the swap agreement), (y) the swap notional amount for that distribution date, and (z) a fraction, the

numerator of which is 30 and the denominator of which is 360 (the "**Counterparty Payment**").  A Net Swap Payment will be required to be made on or before each distribution date by the supplemental interest trust trustee from amounts on deposit in the supplemental interest account (as defined below) to the swap counterparty, to the extent that the Swap Payment exceeds the corresponding Counterparty Payment.  A Net Counterparty Payment will be required to be made by the swap counterparty to the supplemental interest trust trustee, acting on behalf of the supplemental interest trust, to the extent that the Counterparty Payment exceeds the corresponding Swap Payment. As of the closing date, the "significance percentage" as calculated in accordance with Item 1115 of Regulation AB under the Securities Act of 1933, as amended, will be less than 10%.

The swap agreement and any payments made by the swap counterparty pursuant to the swap agreement will be assets of the supplemental interest trust but will not be assets of any REMIC.  All payments to the swap counterparty from the supplemental interest trust and all payments to the supplemental interest trust from the swap counterparty required to be made under the swap agreement will be made through a reserve account (the "**supplemental interest account**").

The respective obligations of the swap counterparty and the supplemental interest trust trustee, acting on behalf of the supplemental interest trust, to pay scheduled amounts due under the swap agreement (other than the Swap Termination Payment) will be subject to the following conditions precedent: (1) no swap event of default or event that with the giving of notice or lapse of time or both would become a swap event of default shall have occurred and be continuing with respect to the other party under the swap agreement and (2) no "Early Termination Date" (as defined in the ISDA Master Agreement) has occurred or been effectively designated with respect to the swap agreement.

A "**swap default**" means the occurrence of a swap event of default, a termination event with respect to the swap agreement or an additional termination event with respect to the swap agreement.  The standard events of default described in Section 5(a) of the ISDA Master Agreement, to the extent and in the manner made applicable to the swap counterparty and the supplemental interest trust under the swap agreement, are each a "**swap event of default**."  The standard termination events described in Section 5(b) of the ISDA Master Agreement, to the extent and in the manner made applicable to the swap counterparty and the supplemental interest trust under the swap agreement, are each a "**termination event**."

In addition, there are "**additional termination events**" including:

(a)       relating to the supplemental interest trust trustee, if the trust is terminated, if the mortgage loans are purchased from the trust in connection with an optional termination as provided under the pooling agreement or if the pooling agreement is amended without the prior written consent of the swap counterparty where such written consent is required;

(b)       relating to the swap counterparty, if the swap counterparty fails to provide certain information about itself required by Item 1115(b) of the Regulation AB; and

(c)       relating to the failure of the swap counterparty to comply with the first rating trigger collateral posting requirements of the swap agreement, and if a second rating trigger downgrade has occurred and been continuing for 30 or more business days and a firm offer from a replacement swap counterparty remains capable of acceptance by the offeree.

If the applicable long-term or short-term credit ratings of the swap counterparty fall below certain levels specified in the swap agreement, then if the swap counterparty has not furnished a guarantee of its obligations under the swap agreement from an eligible guarantor or transferred its obligations under the swap agreement to a substitute counterparty that either satisfies the ratings requirements set forth in the swap agreement or has its obligations under the swap agreement covered by a guarantee from an eligible guarantor, in either case within the time periods and subject to detailed requirements specified in the swap agreement, then the swap counterparty is required, at its cost and subject to detailed requirements specified in the swap agreement, to post collateral securing its obligations under the swap agreement.  If the applicable long-term or short-term credit ratings of the swap counterparty fall below certain lower levels specified in the swap agreement, then the swap counterparty is required, at its cost and subject to detailed requirements specified in the swap agreement, to use commercially reasonable efforts to, as soon as

possible, furnish a guarantee of its obligations under the swap agreement from an eligible guarantor or transfer its obligations under the swap agreement to a substitute counterparty that either satisfies the ratings requirements set forth in the swap agreement or has its obligations under the swap agreement covered by a guarantee from an eligible guarantor.

Upon an "Early Termination Date" (as defined in the swap agreement) due to any swap default, the supplemental interest trust trustee or the swap counterparty may be liable to make a termination payment (the "**Swap Termination Payment**") to the other (regardless, if applicable, of which of the parties has caused the termination). The Swap Termination Payment will be computed in accordance with the procedures set forth in the swap agreement. In the event that the supplemental interest trust trustee is required to make a Swap Termination Payment, that payment will be paid from the supplemental interest trust on the related distribution date, and on any subsequent distribution dates until paid in full, in accordance with the priorities set forth under "Description of the Certificates—Allocation of Available Funds."

To the extent that any payments are received from a substitute swap counterparty as payment by such replacement swap counterparty to enter into the replacement transaction(s), such specific amounts shall be used to pay any termination payments owed to the swap counterparty that is being replaced.

The Net Swap Payments and the Swap Termination Payment, if any, payable by the supplemental interest trust trustee and deposited in the supplemental interest account by the supplemental interest trust trustee as described under "Description of the Certificates—Allocation of Available Funds," "—Credit Enhancement—*Excess Interest*" and "—Final Maturity Reserve Account—*Application of Amounts on Deposit in the Final Maturity Reserve Account*" will be distributed to the swap counterparty on the related distribution date. The Net Counterparty Payments and the Swap Termination Payment, if any, payable by the swap counterparty to the supplemental interest trust trustee and deposited in the supplemental interest account will be distributed to the swap counterparty and the holders of the offered certificates on each distribution date (or used to find a replacement swap agreement to the extent required in the pooling agreement), after giving effect to all other distributions, other than distributions from the reserve fund and the final maturity reserve account, as follows:

(i)    *first*, for payment to the swap counterparty, any unpaid Swap Termination Payment payable by the supplemental interest trust, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement); and

(ii)   *second*,

(A)    if the NIMS are issued and are outstanding, for payment in the amounts and in accordance with priorities (i) through (xxv) of the payment of Net Monthly Excess Cashflow described in "Description of the Certificates—Credit Enhancement—*Excess Interest*" to the extent not paid with Net Monthly Excess Cashflow on such distribution date; or

(B)    if the NIMS are not issued or are not outstanding, for payment in the amounts and in accordance with priorities (i) through (xxiii) of the payment of Net Monthly Excess Cashflow described in "Description of the Certificates—Credit Enhancement—*Excess Interest*" to the extent not paid with Net Monthly Excess Cashflow on such distribution date.

Any amounts in the supplemental interest account received from the swap counterparty and not distributed on a distribution date after payments pursuant to clause (ii)(B) above will remain in the supplemental interest account and be distributed pursuant to clause (ii)(B) above on the next distribution date.

**The Swap Counterparty**

ABN AMRO Bank N.V., a public limited liability company incorporated under the laws of The Netherlands ("ABN AMRO"), is an international banking group offering a wide range of banking products and financial services on a global basis through a network of 4,532 offices and branches in 56 countries and territories as of the year-end 2006. ABN AMRO is one of the largest banking groups in the world, with total consolidated assets of €987.1 billion at December 31, 2006. As of the date of this prospectus supplement, ABN AMRO's senior unsecured debt obligations are rated "AA-" by Standard & Poor's and "Aa1" by Moody's.

Additional information, including the most recent form 20-F of ABN AMRO Holding N.V., the parent company of ABN AMRO, and additional quarterly and current reports filed with the United States Securities and Exchange Commission by ABN AMRO Holding N.V., may be obtained upon request to:

ABN AMRO Bank N.V.
Investor Relations (HQ 9141)
P.O. Box 283
1000 EA Amsterdam
The Netherlands
Tel. +31 20 628 78 35
Fax +31 20 628 78 37
www.abnamro.com
investorrelations@nl.abnamro.com

Except for the information provided in this paragraph and in the immediately preceding paragraph, neither the Swap Counterparty nor ABN AMRO Holding N.V. have been involved in the preparation of, and do not accept responsibility for, this prospectus supplement or the accompanying prospectus.

**Interest Coverage Account**

The trustee will establish for the benefit of the certificateholders a trust account (the "**interest coverage account**"). On the closing date, the depositor will deliver to the trust for deposit in the interest coverage account a cash amount as specified in the pooling agreement. On the first distribution date, funds on deposit in the interest coverage accounts will be applied by the trustee to cover shortfalls in the amount of interest resulting from the extended initial accrual period.

**The Final Maturity Reserve Account**

On the closing date, the trustee will establish a "**final maturity reserve account**," into which the depositor will make an initial deposit of $1,000. Beginning on the distribution date in May 2017 and on each distribution date up to and including the earlier of (i) the distribution date in April 2027 and (ii) the Final Maturity Reserve Funding Date, if on such distribution date the stated principal balance of the mortgage loans with 40-year original terms to maturity is greater than the stated principal balance for such distribution date set forth in Annex II, which is incorporated by reference into this prospectus supplement, the trustee will deposit the Group I Final Maturity Reserve Amount and the Group II Final Maturity Reserve Amount into the final maturity reserve account for each distribution date as set forth under "Description of the Certificates—Allocation of Available Funds." Beginning on the distribution date in May 2027, the trustee will deposit in the final maturity reserve account the Supplemental Final Maturity Reserve Amount for each distribution date from the Net Monthly Excess Cashflow as set forth under "Description of the Certificates—Credit Enhancement—*Excess Interest*."

On the earlier of the distribution date in April 2037 and the termination of the trust, all amounts on deposit in the final maturity reserve account will be distributed to certificateholders in the amounts and priorities described below. It is intended that these amounts will be sufficient to retire the offered certificates on the last scheduled distribution date, even though the outstanding stated principal balance of the mortgage loans having 40-year original terms to maturity have not been reduced to zero on the last scheduled distribution date. Any investment earnings on

amounts on deposit in the final maturity reserve account will remain in such account and will be distributed as described below.

Amounts on deposit in the final maturity reserve account will constitute an asset of the trust but will not be an asset of any REMIC.

*Application of Amounts on Deposit in the Final Maturity Reserve Account*

On the earlier of the distribution date in April 2037 and the termination of the trust after giving effect to all other distributions, funds on deposit in the final maturity reserve account will be distributed in the following order of priority:

(i)    concurrently, to the Class A Certificates, in reduction of their respective certificate principal balances, *pro rata*, based on their certificate principal balances, until their certificate principal balances have been reduced to zero;

(ii)    to the Mezzanine Certificates, in reduction of their respective certificate principal balances, in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates, in each case until their certificate principal balances have been reduced to zero;

(iii)    concurrently, to the Class A Certificates, up to the amount of the related Monthly Interest Distributable Amount and any Unpaid Interest Shortfall for such classes remaining unpaid after giving effect to all other distributions, in each case allocated among the Class A Certificates, *pro rata*, based on their Monthly Interest Distributable Amounts and any Unpaid Interest Shortfall Amounts;

(iv)    to the Mezzanine Certificates, up to the amount of the related Monthly Interest Distributable Amount for such classes remaining unpaid after giving effect to all other distributions, allocated among the Mezzanine Certificates in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates;

(v)    to the Mezzanine Certificates, up to the amount of any related Unpaid Interest Shortfall Amount for such classes remaining unpaid after giving effect to all other distributions, allocated among the Mezzanine Certificates in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates;

(vi)    concurrently, to the Class A Certificates, up to the amount of the related Net WAC Rate Carryover Amount remaining unpaid after giving effect to all other distributions, allocated among the Class A Certificates, *pro rata*, based on their unpaid Net WAC Rate Carryover Amounts;

(vii)    to the Mezzanine Certificates, up to the amount of the related Net WAC Rate Carryover Amount remaining unpaid after giving effect to all other distributions, in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates;

(viii)    to the Mezzanine Certificates, up to the amount of the related Allocated Realized Loss Amount remaining unpaid after giving effect to all other distributions, in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates;

(ix)　　to the supplemental interest trust trustee, for payment to the swap counterparty, any unpaid Swap Termination Payment payable by the supplemental interest trust trustee (including any amount remaining unpaid from prior distribution dates) (only if the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement) to the extent not paid with Net Monthly Excess Cashflow on such distribution date; and

(x)　　to the Class C Certificates, any remaining amount.

## Definitions

The "**accrual period**" for the offered certificates for any distribution date will be the actual number of days (based on a 360-day year) included in the period commencing on the immediately preceding distribution date (or, in the case of the first such accrual period, commencing on the closing date) and ending on the day immediately preceding such distribution date.

The "**Aggregate Final Maturity Reserve Amount**" means, with respect to any distribution date, the sum of the Group I Final Maturity Reserve Amount and the Group II Final Maturity Reserve Amount.

An "**Allocated Realized Loss Amount**" with respect to any class of the Mezzanine Certificates and any distribution date is an amount equal to (a) the sum of (i) any realized losses allocated to that class of the certificates on such distribution date and (ii) any Allocated Realized Loss Amount for that class of the certificates remaining unpaid from the previous distribution date less (b) any Allocated Realized Loss Amounts that have been reinstated with respect to such class of certificates on prior distribution dates due to subsequent recoveries.

The "**certificate principal balance**" of any Class A Certificate, Mezzanine Certificate or Class P Certificate immediately prior to any distribution date will be equal to its certificate principal balance on the closing date reduced by the sum of all amounts actually distributed in respect of principal of such class and, in the case of a Mezzanine Certificate, realized losses allocated to such class on all prior distribution dates and, in the case of a Mezzanine Certificate, increased by the Allocated Realized Loss Amounts reinstated to such class on all prior distribution dates due to subsequent recoveries.  The "certificate principal balance" of the Class C Certificates as of any date of determination is equal to the excess, if any, of (a) the then aggregate stated principal balance of the mortgage loans over (b) the sum of the then aggregate certificate principal balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates.

The "**Class A Principal Distribution Amount**" with respect to any distribution date is the sum of the Group I Senior Principal Distribution Amount and the Group II Senior Principal Distribution Amount.

The "**Class M-1 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-1 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date) and (ii) the aggregate certificate principal balance of the Class M-1 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 68.50% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-2 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-2 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date) and (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of

the Class M-1 Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-2 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 74.10% and (iii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-3 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-3 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date) and (iv) the aggregate certificate principal balance of the Class M-3 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 77.50% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-4 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-4 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates immediately prior to such distribution date (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), and (v) the aggregate certificate principal balance of the Class M-4 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 80.50% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-5 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-5 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), (v) the aggregate certificate principal balance of the Class M-4 Certificates (after taking into account the payment of the

Class M-4 Principal Distribution Amount on such distribution date) and (vi) the aggregate certificate principal balance of the Class M-5 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 83.40% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-6 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-6 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), (v) the aggregate certificate principal balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such distribution date), (vi) the aggregate certificate principal balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such distribution date) and (vii) the aggregate certificate principal balance of the Class M-6 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 86.10% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-7 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-7 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), (v) the aggregate certificate principal balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such distribution date), (vi) the aggregate certificate principal balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such distribution date), (vii) the aggregate certificate principal balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such distribution date) and (vi) the aggregate certificate principal balance of the Class M-7 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 88.70% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-8 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-8 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), (v) the aggregate certificate principal balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such distribution date), (vi) the aggregate certificate principal balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such distribution date), (vii) the aggregate certificate principal balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such distribution date), (viii) the aggregate certificate principal balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such distribution date), and (ix) the aggregate certificate principal balance of the Class M-8 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 90.30% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Class M-9 Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Class M-9 Certificates immediately prior to such distribution date and (II) the excess of (x) the sum of (i) the aggregate certificate principal balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such distribution date), (ii) the aggregate certificate principal balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such distribution date), (iii) the aggregate certificate principal balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such distribution date), (iv) the aggregate certificate principal balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such distribution date), (v) the aggregate certificate principal balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such distribution date), (vi) the aggregate certificate principal balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such distribution date), (vii) the aggregate certificate principal balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such distribution date), (viii) the aggregate certificate principal balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such distribution date), (ix) the aggregate certificate principal balance of the Class M-8 Certificates (after taking into account the payment of the Class M-8 Principal Distribution Amount on such distribution date), and (x) the aggregate certificate principal balance of the Class M-9 Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 92.50% and (ii) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus the Overcollateralization Floor.

The "**Credit Enhancement Percentage**" for any distribution date is the percentage obtained by dividing (x) the aggregate certificate principal balance of the Subordinate Certificates calculated prior to distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in respect of the certificates then entitled to distributions of principal on such distribution date by (y) the aggregate stated principal balance of the

mortgage loans, calculated prior to taking into account payments of principal on the mortgage loans due on the related due date or received during the related prepayment period.

A "**Cumulative Loss Trigger Event**" is in effect with respect to any distribution date in or after May 2009, if the percentage obtained by dividing (x) the aggregate amount of realized losses incurred (less any subsequent recoveries received) with respect to the mortgage loans from the cut-off date through the last day of the related due period by (y) the aggregate stated principal balance of the mortgage loans as of the cut-off date, exceeds the applicable percentage set forth below for such distribution date:

| Distribution Date Occurring in | Cumulative Loss Percentage |
|---|---|
| May 2009 through April 2010 | 1.50% for the first month, plus an additional $1/12^{th}$ of 1.85% for each month thereafter. |
| May 2010 through April 2011 | 3.35% for the first month, plus an additional $1/12^{th}$ of 1.90% for each month thereafter. |
| May 2011 through April 2012 | 5.25% for the first month, plus an additional $1/12^{th}$ of 1.50% for each month thereafter. |
| May 2012 through April 2013 | 6.75% for the first month, plus an additional $1/12^{th}$ of 0.85% for each month thereafter. |
| May 2013 through April 2014 | 7.60% for the first month, plus an additional $1/12^{th}$ of 0.05% for each month thereafter. |
| May 2014 and thereafter | 7.65% for each month. |

A "**Delinquency Trigger Event**" is in effect with respect to a distribution date if the percentage obtained by dividing (x) the aggregate stated principal balance of (i) mortgage loans delinquent 60 days or more, (ii) REO properties and (iii) mortgage loans in foreclosure and in bankruptcy (excluding any such mortgage loans which are less than 60 days delinquent under the bankruptcy plan) by (y) the aggregate stated principal balance of the mortgage loans, in each case, calculated prior to taking into account payments of principal on the mortgage loans due on the related due date or received during the related prepayment period, exceeds 42.00% of the Credit Enhancement Percentage.

A mortgage loan is "**delinquent**" if any monthly payment due on a due date is not made by the close of business on the next scheduled due date for such mortgage loan in accordance with the OTS method. For example, if a borrower failed to make a monthly payment due on February 1 by February 28, that mortgage loan would be considered less than 30 days delinquent. If a borrower failed to make a monthly payment due on February 1 by March 31, that mortgage loan would be considered 30 days delinquent. A mortgage loan is "30 days delinquent" if such monthly payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such monthly payment was due or, if there was no such corresponding day (*e.g.*, as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month), then on the last day of such immediately succeeding month; and similarly for "60 days delinquent" and "90 days delinquent," etc.

A "**due period**" with respect to any distribution date is the period commencing on the second day of the month preceding the month in which such distribution date occurs and ending on the first day of the month in which such distribution date occurs.

The "**Extra Principal Distribution Amount**" with respect to any distribution date is the lesser of (x) the Net Monthly Excess Cashflow for such distribution date and (y) the Overcollateralization Deficiency Amount for such distribution date.

The "**Final Maturity Reserve Funding Date**" is the earlier of (a) the distribution date in April 2037 and (b) the distribution date on which the amount on deposit in the final maturity reserve account (after giving effect to all distributions on such distribution date other than distributions from the final maturity reserve account) is equal to the stated principal balance of the mortgage loans having 40-year original terms to maturity (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and, if such distribution date is on or after the distribution date in May 2017, less the Overcollateralized Amount with respect to such distribution date.

The "**Final Maturity Reserve Rate**" is an annual rate of 0.80%.

The "**Final Maturity Reserve Shortfall**" means, with respect to any distribution date, the excess of (a) the stated principal balance of the mortgage loans having 40-year original terms to maturity (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) over (b) amounts on deposit in the final maturity reserve account (after giving effect to all distributions on such distribution date other than distributions from the final maturity reserve account).

The "**Group I Final Maturity Reserve Amount**" means for any distribution date (a) on and after the distribution date in May 2017 up to and including the earlier of (i) the distribution date in April 2027 and (ii) the Final Maturity Reserve Funding Date, if the stated principal balance of the mortgage loans having 40-year original terms to maturity is greater than the stated principal balance for such distribution date set forth in Annex II attached to this prospectus supplement, the lesser of (A) the product of (i) the Final Maturity Reserve Rate, (ii) the aggregate stated principal balance of the Group I mortgage loans having 40-year original terms to maturity on the first day of the related due period (not including for this purpose the Group I mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date) and (iii) a fraction, the numerator of which is the actual number of days in the related accrual period and the denominator of which is 360 and (B) the Final Maturity Reserve Shortfall for such distribution date multiplied by a fraction, (1) the numerator of which is the aggregate stated principal balance of the Group I mortgage loans on the first day of the related due period (not including for this purpose the Group I mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date), and (2) the denominator of which is the aggregate stated principal balance of the mortgage loans on the first day of the related due period (not including for this purpose the mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date), and (b) on any other distribution date, zero.

The "**Group I Interest Remittance Amount**" with respect to any distribution date is that portion of the available funds for such distribution date attributable to interest received or advanced with respect to the Group I mortgage loans or to compensating interest paid by the servicer with respect to the Group I mortgage loans.

The "**Group I Net Swap Payment**" means, with respect to any distribution date, the Net Swap Payment for such distribution date multiplied by the Group I Swap Percentage for such distribution date.

The "**Group I Principal Allocation Percentage**" for any distribution date is the percentage equivalent of a fraction, the numerator of which is (x) the Group I Principal Remittance Amount for such distribution date, and the denominator of which is (y) the Principal Remittance Amount for such distribution date.

The "**Group I Principal Distribution Amount**" for any distribution date is the sum of (i) (x) the Group I Principal Remittance Amount minus (y) the amount of any Overcollateralization Release Amount for such distribution date multiplied by the Group I Principal Allocation Percentage, and (ii) the Extra Principal Distribution Amount for such distribution date multiplied by the Group I Principal Allocation Percentage.

The "**Group I Principal Remittance Amount**" means with respect to any distribution date, the sum of (i) all scheduled payments of principal collected or advanced on the Group I mortgage loans by the servicer that were due during the related due period, (ii) all partial and full principal prepayments of the Group I mortgage loans applied by the servicer during the related prepayment period, (iii) the principal portion of all net liquidation proceeds, insurance proceeds and subsequent recoveries received during the related prepayment period with respect

to the Group I mortgage loans, (iv) that portion of the purchase price, representing principal of any repurchased Group I mortgage loan, deposited to the collection account during the related prepayment period, (v) the principal portion of any substitution prices deposited in the collection account during the related prepayment period with respect to the Group I mortgage loans, and (vi) on the distribution date on which the trust is to be terminated in accordance with the pooling agreement, that portion of the termination price representing principal with respect to the Group I mortgage loans.

The "**Group I Senior Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Group I Senior Certificates immediately prior to such distribution date and (II) the excess of (x) the aggregate certificate principal balance of the Group I Senior Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 62.10% and (ii) the aggregate stated principal balance of the Group I mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the Group I mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus 0.50% of the aggregate stated principal balance of the Group I mortgage loans as of the cut-off date.

The "**Group I Swap Payment**" means, with respect to any distribution date, the Swap Payment for such distribution date multiplied by the Group I Swap Percentage for such distribution date.

The "**Group I Swap Percentage**" means with respect to any distribution date, the percentage equivalent of a fraction, the numerator of which is the aggregate stated principal balance of the Group I mortgage loans and the denominator of which is the aggregate stated principal balance of the mortgage loans, in each case, as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period).

The "**Group I Swap Termination Payment**" means the Swap Termination Payment payable by the supplemental interest trust trustee multiplied by the Group I Swap Percentage for such distribution date.

The "**Group II Final Maturity Reserve Amount**" means for any distribution date (a) on and after the distribution date in May 2017 up to and including the earlier of (i) the distribution date in April 2027 and (ii) the Final Maturity Reserve Funding Date, if the stated principal balance of the mortgage loans having 40-year original terms to maturity is greater than the stated principal balance for such distribution date set forth in Annex II attached to this prospectus supplement, the lesser of (A) the product of (i) the Final Maturity Reserve Rate, (ii) the aggregate stated principal balance of the Group II mortgage loans having 40-year original terms to maturity on the first day of the related due period (not including for this purpose the Group II mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date) and (iii) a fraction, the numerator of which is the actual number of days in the related accrual period and the denominator of which is 360 and (B) the Final Maturity Reserve Shortfall for such distribution date multiplied by a fraction, (1) the numerator of which is the aggregate stated principal balance of the Group II mortgage loans on the first day of the related due period (not including for this purpose the Group II mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date), and (2) the denominator of which is the aggregate stated principal balance of the mortgage loans on the first day of the related due period (not including for this purpose the mortgage loans for which prepayments in full have been received and distributed in the month prior to that distribution date), and (b) on any other distribution date, zero.

The "**Group II Interest Remittance Amount**" with respect to any distribution date is that portion of the available funds for such distribution date attributable to interest received or advanced with respect to the Group II mortgage loans or to compensating interest paid by the servicer with respect to the Group II mortgage loans.

The "**Group II Net Swap Payment**" means, with respect to any distribution date, the Net Swap Payment for such distribution date multiplied by the Group II Swap Percentage for such distribution date.

The "**Group II Principal Allocation Percentage**" for any distribution date is the percentage equivalent of a fraction, the numerator of which is (x) the Group II Principal Remittance Amount for such distribution date, and the denominator of which is (y) the Principal Remittance Amount for such distribution date.

The "**Group II Principal Distribution Amount**" for any distribution date is the sum of (i) (x) the Group II Principal Remittance Amount minus (y) the amount of any Overcollateralization Release Amount for such distribution date multiplied by the Group II Principal Allocation Percentage, and (ii) the Extra Principal Distribution Amount for such distribution date multiplied by the Group II Principal Allocation Percentage.

The "**Group II Principal Remittance Amount**" means with respect to any distribution date, the sum of (i) all scheduled payments of principal collected or advanced on the Group II mortgage loans by the servicer that were due during the related due period, (ii) all partial and full principal prepayments of the Group II mortgage loans applied by the servicer during the related prepayment period, (iii) the principal portion of all net liquidation proceeds, insurance proceeds and subsequent recoveries received during the related prepayment period with respect to the Group II mortgage loans, (iv) that portion of the purchase price, representing principal of any repurchased Group II mortgage loan, deposited in the collection account during the related prepayment period, (v) the principal portion of any substitution prices deposited in the collection account during the related prepayment period with respect to the Group II mortgage loans and (vi) on the distribution date on which the trust is to be terminated in accordance with the pooling agreement, that portion of the termination price representing principal with respect to the Group II mortgage loans.

The "**Group II Senior Principal Distribution Amount**" for any distribution date is an amount equal to the lesser of (I) the aggregate certificate principal balance of the Group II Senior Certificates immediately prior to such distribution date and (II) the excess of (x) the aggregate certificate principal balance of the Group II Senior Certificates immediately prior to such distribution date over (y) the lesser of (A) the product of (i) approximately 62.10% and (ii) the aggregate stated principal balance of the Group II mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (B) the aggregate stated principal balance of the Group II mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) minus 0.50% of the aggregate stated principal balance of the Group II mortgage loans as of the cut-off date.

The "**Group II Swap Payment**" means, with respect to any distribution date, the Swap Payment for such distribution date multiplied by the Group II Swap Percentage for such distribution date.

The "**Group II Swap Percentage**" means with respect to any distribution date, the percentage equivalent of a fraction, the numerator of which is the aggregate stated principal balance of the Group II mortgage loans and the denominator of which is the aggregate stated principal balance of the mortgage loans, in each case, as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period).

The "**Group II Swap Termination Payment**" means the Swap Termination Payment payable by the supplemental interest trust trustee multiplied by the Group II Swap Percentage for such distribution date.

"**Insurance proceeds**" means the proceeds of any title policy, hazard policy or other insurance policy covering a mortgage loan to the extent such proceeds are not to be applied to the restoration of the related mortgaged property or released to the mortgagor in accordance with the procedures that the servicer would follow in servicing mortgage loans held for its own account, subject to the terms and conditions of the related mortgage note and mortgage, or constitute subsequent recoveries with respect to such mortgage loan.

The "**Monthly Interest Distributable Amount**" for any distribution date and each class of certificates equals the amount of interest accrued during the related accrual period at the related Pass-Through Rate on the certificate principal balance of such class of certificates immediately prior to such distribution date, in each case reduced by any net prepayment interest shortfalls allocated to such class of certificates and shortfalls resulting from

the application of the Relief Act or similar state or local law allocated to such class of certificates, in each such case as such shortfall allocations are described under "—Allocation of Available Funds—*Interest Distributions on the Offered Certificates*" above.

The "**Net Counterparty Payment**" means, with respect to any distribution date, the amount, if any, by which the Counterparty Payment for such distribution date exceeds the Swap Payment for such distribution date.

The "**Net Monthly Excess Cashflow**" for any distribution date is an amount equal to the sum of (a) any Overcollateralization Release Amount for such distribution date, (b) any Remaining Principal Distribution Amount and (c) the positive excess of (x) the available funds for such distribution date over (y) the sum for such distribution date of (A) the Monthly Interest Distributable Amounts for the offered certificates, (B) the Unpaid Interest Shortfall Amounts for the Class A Certificates, (C) the Net Swap Payment, (D) the Aggregate Final Maturity Reserve Amount, (E) any unpaid Swap Termination Payment payable by the supplemental interest trust trustee, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), and (F) the Principal Remittance Amount.

The "**Net Swap Payment**" means, with respect to any distribution date, the amount, if any, by which the Swap Payment exceeds the Counterparty Payment on such distribution date.

The "**Optional Termination Date**" is the first distribution date on which the aggregate stated principal balance of the mortgage loans and REO properties is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date.

An "**Overcollateralization Deficiency Amount**" with respect to any distribution date equals the amount, if any, by which the Overcollateralization Target Amount exceeds the Overcollateralized Amount on such distribution date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on such distribution date).

The "**Overcollateralization Floor**" means 0.50% of the aggregate stated principal balance of the mortgage loans as of the cut-off date.

The "**Overcollateralization Release Amount**" means, with respect to any distribution date, the lesser of (x) the Principal Remittance Amount for such distribution date and (y) the excess, if any, of (i) the Overcollateralized Amount for such distribution date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on such distribution date) over (ii) the Overcollateralization Target Amount for such distribution date.

The "**Overcollateralization Target Amount**" means with respect to any distribution date (i) prior to the Stepdown Date, approximately 3.75% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) the lesser of (I) approximately 3.75% of the aggregate stated principal balance of the mortgage loans as of the cut-off date and (II) approximately 7.50% of the aggregate stated principal balance of the mortgage loans as of the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) and (y) 0.50% of the aggregate stated principal balance of the mortgage loans as of the cut-off date, and (iii) on or after the Stepdown Date if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding distribution date.

The "**Overcollateralized Amount**" for any distribution date is the amount, if any, by which (i) the aggregate stated principal balance of the mortgage loans on the last day of the related due period (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) exceeds (ii) the aggregate certificate principal balance of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates as of such distribution date (after giving effect to distributions of the Principal Remittance Amount to be made on such

distribution date), but without giving effect to distributions of any Extra Principal Distribution Amount to be made on such distribution date.

The "**prepayment period**" means, with respect to any distribution date (i) the period from the 15th day of the month immediately preceding the month in which such distribution date occurs (or in the case of the first distribution date, the cut-off date) through the 14th day of the month in which such distribution date occurs, inclusive, for purposes of principal prepayments in full; and (ii) the calendar month immediately preceding the month in which such distribution date occurs, for any other purpose.

The "**Principal Remittance Amount**" means with respect to any distribution date, the sum of the Group I Principal Remittance Amount and the Group II Principal Remittance Amount.

"**Realized loss**" means, with respect to any defaulted mortgage loan that is finally liquidated (a "**liquidated mortgage loan**"), the amount of loss realized equal to the portion of the principal balance remaining unpaid after application of all liquidation proceeds, net of amounts reimbursable to the servicer for related advances, servicing advances and servicing fees (such amount, the "**net liquidation proceeds**") and all insurance proceeds in respect of such mortgage loan.

The "**Remaining Principal Distribution Amount**" means with respect to any distribution date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, an amount equal to the sum of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount remaining after the distributions described in the Post-Stepdown Monthly Principal Distribution.

The "**stated principal balance**" with respect to any mortgage loan:  (a) as of any date of determination up to but not including the distribution date on which the proceeds, if any, of a liquidation event with respect to such mortgage loan would be distributed, the scheduled principal balance as of the cut-off date, as shown in the mortgage loan schedule, minus the sum of (i) the principal portion of each monthly payment due on a due date subsequent to the cut-off date, to the extent received from the mortgagor or advanced by the servicer and distributed on or before such date of determination, (ii) all principal prepayments received after the cut-off date, to the extent distributed on or before such date of determination, (iii) all liquidation proceeds and insurance proceeds to the extent distributed on or before such date of determination and (iv) any realized loss incurred with respect to such mortgage loan as a result of a deficient valuation made during or prior to the due period for the most recent distribution date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the distribution date on which the proceeds, if any, of a liquidation event with respect to such mortgage loan would be distributed, zero.

The "**Stepdown Date**" means the earlier of (a) the later of (i) the distribution date in May 2010 and (ii) the first distribution date on which the Credit Enhancement Percentage (calculated for this purpose only after taking into account payments of principal on the mortgage loans due on the related due date or received during the related prepayment period but prior to distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in respect of the certificates then entitled to distributions of principal on such distribution date) is greater than or equal to approximately 37.90% and (b) the distribution date following the distribution date on which the aggregate certificate principal balance of the Class A Certificates is reduced to zero.

"**Subsequent recoveries**" means unexpected recoveries related to a liquidated mortgage loan received by the servicer (net of amounts reimbursable to the servicer for related advances, servicing advances and servicing fees), which were allocated as a realized loss, in reducing a certificate principal balance of a class of the Mezzanine Certificates, on a distribution date prior to the prepayment period in which such funds were received.  Subsequent recoveries may include but are not limited to unanticipated insurance settlements, tax refunds or mortgage bankruptcy distributions.

The "**Supplemental Final Maturity Reserve Amount**" means, with respect to any distribution date (a) prior to the distribution date in April 2027, zero, (b) on and after the distribution date in April 2027 up to and including the Final Maturity Reserve Funding Date, the lesser of (i) the amount of the Net Monthly Excess Cashflow for such distribution date remaining after the distribution pursuant to clause (xxii) under "—Credit Enhancement— *Excess Interest*" and (ii) the excess of (A) the stated principal balance of the mortgage loans having 40-year original

terms to maturity (after giving effect to scheduled payments of principal due during the related due period, to the extent received or advanced, and unscheduled collections of principal received during the related prepayment period) over (B) the sum of (1) amounts on deposit in the final maturity reserve account (after giving effect to all distributions on such distribution date other than distributions from the final maturity reserve account) and (2) the Overcollateralized Amount with respect to such distribution date and (c) after the Final Maturity Reserve Funding Date, zero.

A "**Trigger Event**" is in effect with respect to any distribution date if either a Cumulative Loss Trigger Event or a Delinquency Trigger Event is in effect on such distribution date.

The "**Unpaid Interest Shortfall Amount**" means (i) for each class of the offered certificates and the first distribution date, zero, and (ii) for such class of certificates and any distribution date after the first distribution date, the amount, if any, by which (a) the sum of (1) the Monthly Interest Distributable Amount for such class of certificates for the immediately preceding distribution date and (2) the outstanding Unpaid Interest Shortfall Amount, if any, for such class of certificates for such preceding distribution date exceeds (b) the aggregate amount distributed on such class of certificates in respect of interest pursuant to clause (a) of this definition on such preceding distribution date, plus interest on the amount of interest due but not paid on the class of certificates on such preceding distribution date, to the extent permitted by law, at the Pass-Through Rate on such distribution date for such class of certificates for the related accrual period.

**Pass-Through Rates**

The "**Pass-Through Rate**" for each class of the offered certificates for any distribution date (other than the first distribution date) will equal the lesser of (x) the related Formula Rate for such distribution date and (y) the related Net WAC Rate for such distribution date.

The "**Net WAC Rate**" for any distribution date (other than the first distribution date) with respect to the Group I Senior Certificates is a per annum rate equal to (a) the excess, if any, of (i) the weighted average of the adjusted net mortgage rates of the Group I mortgage loans, weighted on the basis of their stated principal balances as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) over (ii) the percentage equivalent of a fraction, (1) the numerator of which is the sum of (A) the Group I Final Maturity Reserve Amount for such distribution date, (B) any unpaid Group I Swap Termination Payment, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), and (C) the Group I Net Swap Payment, if any, for such distribution date, in each case multiplied by 12, and (2) the denominator of which is the aggregate stated principal balance of the Group I mortgage loans as of the due date in the month preceding the month of such distribution date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related accrual period.

The "**Net WAC Rate**" for any distribution date (other than the first distribution date) with respect to the Group II Senior Certificates is a per annum rate equal to (a) the excess, if any, of (i) the weighted average of the adjusted net mortgage rates of the Group II mortgage loans, weighted on the basis of their stated principal balances as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) over (ii) the percentage equivalent of a fraction, (1) the numerator of which is the sum of (A) the Group II Final Maturity Reserve Amount for such distribution date, (B) any unpaid Group II Swap Termination Payment, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), and (C) the Group II Net Swap Payment, if any, for such distribution date, in each case multiplied by 12, and (2) the denominator of which is the aggregate stated principal balance of the Group II mortgage loans as of the due date in the month preceding the month of such distribution date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related accrual period.

The "**Net WAC Rate**" for any distribution date (other than the first distribution date) with respect to the Mezzanine Certificates is a per annum rate equal to the weighted average (weighted on the basis of the results of

subtracting from the aggregate principal balance of each loan group as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) the sum of the current certificate principal balances of the related classes of the Class A Certificates) of (1) the Net WAC Rate with respect to the Group I Senior Certificates and (2) the Net WAC Rate with respect to the Group II Senior Certificates.

The "**adjusted net mortgage rate**" for any mortgage loan for any distribution date is a per annum rate equal to the applicable mortgage rate for such mortgage loan as of the first day of the month preceding the month in which such distribution date occurs minus the PMI Policy fee rate and the servicing fee rate, if applicable.

The "**Formula Rate**" for any class of the offered certificates is the lesser of (a) the "**Interest Settlement Rate**" for U.S. dollar deposits of one-month maturity set by the British Bankers' Association ("**one-month LIBOR**") as of the related LIBOR Determination Date plus the related Certificate Margin and (b) the related Maximum Cap Rate.

The "**Certificate Margin**" with respect to each class of the offered certificates will be as specified below.

| Class | Margin | | Class | Margin | |
|---|---|---|---|---|---|
|  | (1) | (2) |  | (1) | (2) |
| I-A | 0.260% | 0.520% | M-3 | 0.750% | 1.125% |
| II-A1 | 0.110% | 0.220% | M-4 | 1.350% | 2.025% |
| II-A2 | 0.190% | 0.380% | M-5 | 1.700% | 2.550% |
| II-A3 | 0.250% | 0.500% | M-6 | 2.250% | 3.375% |
| II-A4 | 0.360% | 0.720% | M-7 | 2.250% | 3.375% |
| M-1 | 0.470% | 0.705% | M-8 | 2.250% | 3.375% |
| M-2 | 0.550% | 0.825% | M-9 | 2.250% | 3.375% |

(1)    On each distribution date through and including the Optional Termination Date.
(2)    On each distribution date after the Optional Termination Date.

The "**Maximum Cap Rate**" for any distribution date with respect to the Group I Senior Certificates is a per annum rate equal to (a) the product of (i) the weighted average of the adjusted net maximum mortgage rates of the Group I mortgage loans, weighted on the basis of their stated principal balances as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) and (ii) the sum of (I) a fraction (1) the numerator of which is the aggregate stated principal balance of the mortgage loans as of the due date in the month preceding the month of such distribution date, and (2) the denominator of which is aggregate certificate principal balance of the offered certificates immediately prior to such distribution date, and (II) a fraction (1) the numerator of which is (A) any Net Counterparty Payment for such distribution date less (B) the Aggregate Final Maturity Reserve Amount for such distribution date less (C) any unpaid Swap Termination Payment payable by the supplemental interest trust trustee, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), less (D) the Net Swap Payment, if any, for such distribution date, in each case multiplied by 12, and (2) the denominator of which is the aggregate certificate principal balance of the offered certificates immediately prior to such distribution date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related accrual period.

The "**Maximum Cap Rate**" for any distribution date with respect to the Group II Senior Certificates is a per annum rate equal to (a) the product of (i) the weighted average of the adjusted net maximum mortgage rates of the Group II mortgage loans, weighted on the basis of the stated principal balances thereof as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) and (ii) the sum of (I) a fraction (1) the numerator of which is the aggregate stated principal balance of the mortgage loans as of the due date in the month preceding the month of such distribution date, and (2) the denominator of which is aggregate certificate principal balance of the offered certificates immediately prior to such distribution date, and (II) a fraction (1) the numerator of which is (A) any Net Counterparty Payment for such

distribution date less (B) the Aggregate Final Maturity Reserve Amount for such distribution date less (C) any unpaid Swap Termination Payment payable by the supplemental interest trust trustee, including any amount remaining unpaid from prior distribution dates (unless the swap counterparty is the Defaulting Party or the sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement), less (D) the Net Swap Payment, if any, for such distribution date, in each case multiplied by 12, and (2) the denominator of which is the aggregate certificate principal balance of the offered certificates immediately prior to such distribution date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related accrual period.

The "**Maximum Cap Rate**" for any distribution date with respect to the Mezzanine Certificates is a per annum rate equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate principal balance of each loan group as of the due date in the month preceding the month of such distribution date (adjusted for principal payments distributed on a prior distribution date) the sum of the current certificate principal balances of the related classes of the Class A Certificates) of (1) the Maximum Cap Rate with respect to the Group I Senior Certificates and (2) the Maximum Cap Rate with respect to the Group II Senior Certificates.

The "**adjusted net maximum mortgage rate**" for any mortgage loan for any distribution date is a per annum rate equal to the maximum mortgage rate for such mortgage loan (if such mortgage loan is an adjustable-rate mortgage loan) or the mortgage rate for such mortgage loan (if such mortgage loan is a fixed-rate mortgage loan), in either case as of the first day of the month preceding the month in which the distribution date occurs, minus the servicing fee rate and the PMI Insurer fee rate, if applicable .

On the closing date, the trustee will establish a reserve fund account (the "**reserve fund**") from which payments in respect of Net WAC Rate Carryover Amounts on the offered certificates will be made.  The reserve fund will be an asset of the trust but not of any REMIC.  On each distribution date, the trustee will deposit in the reserve fund that portion of the Net Monthly Excess Cashflow described in clause (xxi) under "Description of the Certificates—Credit Enhancement—*Excess Interest*" above.  On each distribution date, to the extent required following the distribution of the available funds as described under "Allocation of Available Funds" above but prior to any distributions from the final maturity reserve account, the trustee will withdraw from amounts in the reserve fund to pay the offered certificates, any Net WAC Rate Carryover Amounts for such distribution date.

Amounts in the reserve fund will be distributed in the following order of priority:  first, concurrently, to the Class A Certificates, up to the amount of the related Net WAC Rate Carryover Amount, allocated among the Class A Certificates, *pro rata*, based on their Net WAC Rate Carryover Amounts; and then, to the Mezzanine Certificates, up to the amount of the related Net WAC Rate Carryover Amount, in the following order of priority:  *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class M-8 Certificates and *ninth* to the Class M-9 Certificates, in each case to the extent of such amounts remaining in the reserve fund.

If on any distribution date (other than the first distribution date), the Pass-Through Rate for any class of the offered certificates is the related Net WAC Rate, then the "**Net WAC Rate Carryover Amount**" for such class of certificates for such distribution date will be an amount equal to the sum of (i) the positive excess of (x) the amount of interest that would have been distributable to such class of certificates on such distribution date if the Pass-Through Rate for such class of certificates for such distribution date were calculated at the related Formula Rate over (y) the amount of interest distributable on such class of certificates at the related Net WAC Rate for such distribution date and (ii) the related Net WAC Rate Carryover Amount for the previous distribution date not previously distributed together with interest thereon at a rate equal to the related Formula Rate for such class of certificates for the most recently ended accrual period.  If on any distribution date, the Pass-Through Rate for any class of the offered certificates is the related Formula Rate, then the Net WAC Rate Carryover Amount for such class of certificates for such distribution date will be equal to the related Net WAC Rate Carryover Amount, if any, for the previous distribution date not previously distributed together with interest thereon at a rate equal to the related Formula Rate for such class of certificates for the most recently ended accrual period.

To the extent interest on any class of the offered certificates is paid at the related Net WAC Rate instead of the related Formula Rate, a shortfall in interest equal to the Net WAC Rate Carryover Amount will occur.  Such

shortfall will be payable only from the Net Monthly Excess Cashflow and payments received under the swap agreement by the supplemental interest trust trustee, as described under "Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

**Calculation of One-Month LIBOR**

On the second LIBOR Business Day preceding the commencement of each accrual period (each such date, a "**LIBOR Determination Date**"), the trustee will determine the one-month LIBOR for such accrual period for the offered certificates on the basis of the Interest Settlement Rate for U.S. dollar deposits of one-month maturity set by the British Bankers' Association (the "**BBA**") as of 11:00 a.m. (London time) on such LIBOR Determination Date.

The BBA's Interest Settlement Rates are currently displayed on the Reuters Screen LIBOR01 Page. Reuters Screen LIBOR01 Page means the display page currently so designated on the Reuters Monitor Money Rates Service (such page, or such other page as may replace such page or such other service as may be nominated by the BBA as the information vendor for the purpose of displaying the BBA's Interest Settlement Rates for deposits in U.S. dollars, the "**Designated Page**").

A "**LIBOR Business Day**" means any day on which banks in London and New York are open for conducting transactions in foreign currency and exchange.

With respect to any LIBOR Determination Date, if the BBA's Interest Settlement Rate does not appear on the Designated Telerate Page as of 11:00 a.m. (London time) on such date, or if the Designated Telerate Page is not available on such date, the trustee will obtain such from the Reuters or Bloomberg page. Alternatively, the trustee may request the principal London office of each of the reference banks to provide a quotation of its rate. If on such LIBOR Determination Date two or more reference banks provide such offered quotations, the one-month LIBOR for the related accrual period will be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 0.03125%). If on such LIBOR Determination Date fewer than two reference banks provide such offered quotations, the one-month LIBOR for the related accrual period will be the higher of (x) the one-month LIBOR as determined on the previous LIBOR Determination Date and (y) the reserve interest rate.

As used in this section, "**reference banks**" means leading banks selected by the trustee with the consent of the NIMS insurer, if any, and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) which have been designated as such by the trustee with the consent of the NIMS insurer and (iii) not controlling, controlled by or under common control with, the depositor, the servicer or any successor servicer or the sponsor; and "**reserve interest rate**" means the rate per annum that the trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.03125%) of the one-month United States dollar lending rates which one or more New York City banks selected by the trustee with the consent of the NIMS insurer, if any, are quoting on the relevant LIBOR Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the trustee can determine no such arithmetic mean, the lowest one-month United States dollar lending rate which New York City banks selected by the trustee with the consent of the NIMS insurer are quoting on such LIBOR Determination Date to leading European banks.

The establishment of the one-month LIBOR on each LIBOR Determination Date by the trustee and the trustee's calculation of the rate of interest applicable to the offered certificates for the related accrual period will (in the absence of manifest error) be final and binding.

**Optional Termination of the Trust**

On or after the Optional Termination Date, the servicer (or if the servicer does not to exercise such right, the NIMS insurer, if any), may purchase the mortgage loans and all property acquired in respect of a mortgage loan owned by the trust, which will cause the termination of the trust and the retirement of the certificates. In the event that the option is exercised by the servicer on its own behalf, the purchase price will equal the par value of the mortgage loans and the appraised value of any REO properties plus accrued interest for each mortgage loan at the related mortgage rate to but not including the first day of the month in which such purchase price is paid. The

servicer will have the right to exercise such option on its own behalf only if the purchase price is equal to or less than the fair market value of all the mortgage loans and REO properties in the trust (as determined by the servicer) plus accrued interest for each mortgage loan at the related mortgage rate to but not including the first day of the month in which such purchase price is paid less unreimbursed advances (other than advances made with respect to mortgage loans as to which the servicer expects that foreclosure is not imminent). Additionally, if NIMS are outstanding or amounts are owed to the NIMS insurer, the servicer will have the right to exercise such option on its own behalf only if the purchase price will result in distributions on the Class C Certificates sufficient to cause the NIMS to be retired and to pay the NIMS insurer the amounts owed to it. In the event that the option is exercised by the servicer at the request of and on behalf of an unaffiliated third party or by the NIMS insurer, the purchase will be made at a purchase price generally equal to the greater of (i) the par value of the mortgage loans and the appraised value of any REO properties and (ii) the fair market value of all the mortgage loans and REO properties in the trust (as determined by the servicer or the NIMS insurer, as applicable), in each case plus accrued interest for each mortgage loan at the related mortgage rate to but not including the first day of the month in which such purchase price is paid. If NIMS are outstanding or amounts are owed to the NIMS insurer, such purchase price will also include any amount necessary to result in distributions on the Class C Certificates sufficient to cause the NIMS to be retired and to pay the NIMS insurer the amounts owed to it. The purchase price (whether paid by the servicer or the NIMS insurer) will be required to be sufficient to pay any Swap Termination Payment and any other amounts owed by the supplemental interest trust trustee to the swap counterparty. In the event the servicer or the NIMS insurer exercises this option, the portion of the related purchase price allocable to the offered certificates will be distributed in accordance with the priorities described under "Description of the Certificates—Allocation of Available Funds" and "—Credit Enhancement—*Excess Interest*" in this prospectus supplement. The distribution of the related purchase price allocable to the offered certificates will result in the following amounts, to the extent of available funds, being distributed on the offered certificates:

(i)     100% of the then outstanding certificate principal balance of the offered certificates, plus

(ii)    interest for the final accrual period on the then outstanding certificate principal balance of the offered certificates at the then applicable Pass-Through Rate for each class of the offered certificates, plus

(iii)   any previously accrued but unpaid interest to which the holders of the offered certificates are entitled, together with the amount of any Net WAC Rate Carryover Amounts, plus

(iv)    in the case of the Mezzanine Certificates, any previously unpaid Allocated Realized Loss Amount.

The trustee will be required to notify certificateholders in writing of an election to purchase the mortgage loans not less than 30 days prior to the date of purchase. Any subsequent recoveries received after the termination of the trust will be retained by the purchaser of the mortgage loans in connection with the optional termination of the trust.

**Amendment of the Pooling Agreement**

*See* "Description of the Securities—Amendment of the Governing Agreements" in the prospectus for a description of the provisions for amendment of the pooling agreement. In addition, the prior consent of the NIMS insurer will be required for any amendment of the pooling agreement and the prior written consent of the swap counterparty will be necessary for any amendments to the pooling agreement that materially affect the swap counterparty's rights or interests under the pooling agreement.

At all times for purposes of a vote on an amendment to the pooling agreement or any other matter on which certificateholders are entitled to vote under the pooling agreement, 98% of all voting rights will be allocated among the holders of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates in proportion to the then outstanding certificate principal balances of their respective certificates. At all times, 1% of all voting rights will be allocated to the holders of the Class P Certificates and 1% of all voting rights will be allocated to the holders of the Class R Certificates. The voting rights allocated to any class of certificates will be allocated among all certificateholders of that class in proportion to the outstanding percentage interests of the holders in that class.

**Servicing Compensation, Payment of Expenses and Compensating Interest**

The following table describes each type of fee or expense that may be paid from collections on the mortgage loans.

| Fee or Expense | General Purpose of Fee or Expense | Party Receiving Fee or Expense | Source of Funds for Payment of Fee or Expense | Distribution Priority of Fee or Expense |
|---|---|---|---|---|
| servicing fee (1) | compensation of the servicer for services provided under the pooling agreement | servicer | all collections on the mortgage loans | prior to distributions to certificateholders |
| PMI Insurer fee (2) | payment of premium to the PMI Insurer for the PMI Policy | PMI Insurer | all collections on the PMI Mortgage Loans | prior to distributions to certificateholders |
| all late payment charges, certain prepayment charges paid by borrowers upon voluntary partial prepayment of certain mortgage loans, assumption fees, modification fees, reconveyance fees, nonsufficient funds fees and other similar fees and charges on the mortgage loans | compensation of the servicer for services provided under the pooling agreement | servicer | all late payment charges, certain prepayment charges paid by borrowers upon voluntary partial prepayment of certain mortgage loans, assumption fees, modification fees, reconveyance fees, nonsufficient funds fees and other similar fees and charges on the mortgage loans | prior to distributions to certificateholders |
| all interest payments (net of servicing fee) on payoffs received from the first day through the 14th day of any calendar month | compensation of the servicer for services provided under the pooling agreement | servicer | all interest payments (net of servicing fee) on payoffs received from the first day through the 14th day of any calendar month | prior to distributions to certificateholders |
| all investment earnings earned on funds held in the collection account and the servicing account | compensation of the servicer for services provided under the pooling agreement | servicer | all investment earnings earned on funds held in the collection account and the servicing account | prior to distributions to certificateholders |

| Fee or Expense | General Purpose of Fee or Expense | Party Receiving Fee or Expense | Source of Funds for Payment of Fee or Expense | Distribution Priority of Fee or Expense |
|---|---|---|---|---|
| reimbursement for advances and servicing advances made under the pooling agreement, other than nonrecoverable advances (3) | reimbursement of the servicer for advances and servicing advances made under the pooling agreement | servicer | collections on the mortgage loans with respect to which advances and servicing advances were made | prior to distributions to certificateholders |
| reimbursement for nonrecoverable advances (3) | reimbursement of the servicer for advances and servicing advances made under the pooling agreement | servicer | all collections on the mortgage loans | prior to distributions to certificateholders |
| reimbursement for certain expenses, costs and liabilities incurred by the servicer or the depositor in connection with any legal action relating to the pooling agreement or the certificates (4) | reimbursement of the servicer and the depositor for certain expenses, costs and liabilities incurred under the pooling agreement | servicer or depositor | all collections on the mortgage loans | prior to distributions to certificateholders |
| all earnings on funds held in the distribution account | compensation of the trustee for services provided under the pooling agreement | trustee | all earnings on funds held in the distribution account | prior to distributions to certificateholders |
| indemnification for certain losses, liabilities and expenses incurred by the trustee or the Delaware trustee in connection with the trustee's or the Delaware trustee's acceptance or administration of its obligations and duties under the pooling agreement (5) | indemnification of the trustee and the Delaware trustee for certain losses, liabilities and expenses incurred under the pooling agreement | trustee or the Delaware trustee, as applicable | all collections on the mortgage loans | prior to distributions to certificateholders |
| reimbursement for any amounts payable by the trustee for recording of assignments of mortgages to the extent not paid by the servicer | reimbursement for amounts payable by the trustee for recording of assignments of mortgages | trustee | all collections on the mortgage loans | prior to distribution to certificateholders |

| Fee or Expense | General Purpose of Fee or Expense | Party Receiving Fee or Expense | Source of Funds for Payment of Fee or Expense | Distribution Priority of Fee or Expense |
|---|---|---|---|---|
| reimbursement for trustee's costs associated with the transfer of servicing to the trustee in the event of termination of the servicer to the extent not paid by the servicer | reimbursement for trustee's costs associated with the transfer of servicing to the trustee | trustee | all collections on the mortgage loans | prior to distribution to certificateholders |
| reimbursement for any expenses incurred by the trustee in connection with a tax audit of the trust | reimbursement for any expenses incurred by the trustee in connection with a tax audit of the trust | trustee | all collections on the mortgage loans | prior to distribution to certificateholders |
| reimbursement for enforcement expenses incurred by the servicer, the trustee or the NIMS insurer in respect of a breach by the sponsor of its representations and warranties in the mortgage loan purchase agreement or the pooling agreement | reimbursement for enforcement expenses incurred by the servicer, the trustee or the NIMS insurer | the servicer, the trustee or the NIMS insurer | all collections on the mortgage loans | prior to distribution to certificateholders |
| Net Swap Payments, provided a swap default has not occurred and is not continuing, and Swap Termination Payment (unless the swap counterparty is the defaulting party or the sole affected party under the swap agreement and as further set forth in the pooling and servicing agreement) (6) | payment of Net Swap Payments and Swap Termination Payments to the swap counterparty | swap counterparty | all collections on the mortgage loans | prior to distribution to certificateholders |
| any tax imposed under the Internal Revenue Code on a REMIC formed under the pooling agreement in the event the REMIC engages in a prohibited transaction (7) | compliance with Internal Revenue Code | United States Treasury | all collections on the mortgage loans | prior to distributions to certificateholders |

(1)    The servicing fee will be calculated at the servicing fee rate.  The servicing fee rate with respect to each mortgage loan will equal 0.50% per annum.

(2) The PMI Insurer will be paid a monthly fee equal to approximately 1.200% per annum (the "**PMI Insurer fee rate**") of the aggregate stated principal balance of the mortgage loans covered by the policy (which equals approximately 0.124% per annum of the aggregate stated principal balance of all mortgage loans as of the cut-off date).

(3) See "The Servicers—The Servicer—*Servicing Procedures—Advances*" in this prospectus supplement for a description of the servicer's obligation to make advances and servicing advances.

(4) *See* "Description of the Securities—Matters Regarding the Servicer and the Depositor" in the prospectus for a description of these reimbursable expenses, costs and liabilities.

(5) See "The Servicers—The Trustee—*Indemnification of the Trustee*" and "The Delaware Trustee—*Indemnification of the Delaware Trustee*" in this prospectus supplement for description of this indemnification.

(6) *See* "Description of the Securities"—"Allocation of Available Funds,"—"Swap Agreement" and —"Definitions" in this prospectus supplement for payments to the swap counterparty.

(7) *See* "Material Federal Income Tax Consequences—Matters Relevant to Holders of All REMIC Certificates—Prohibited Transactions and Other Possible REMIC Taxes" in the prospectus. It is not anticipated that any REMIC will engage in a prohibited transaction.

The servicer will receive a fee for its services as servicer under the pooling agreement. The "**servicing fee**" will be calculated using a "**servicing fee rate**" of 0.50% per annum on the principal balance of each mortgage loan. Any late payment charges, prepayment charges paid by borrowers upon voluntary partial prepayment of certain mortgage loans, assumption fees, modification fees, reconveyance fees, nonsufficient funds fees and other similar fees and charges on the mortgage loans, together with interest and other income earned on the funds in the collection account and any servicing account, will be retained by the servicer as additional servicing compensation and will not be included in the available funds. For any distribution date with respect to a mortgage loan for which a principal prepayment in full is applied on or after the first calendar day of the month of such distribution date and before the 15th calendar day of such month, the servicer is also entitled to retain as additional servicing compensation the amount of interest collected on such prepayment at the applicable mortgage rate (net of the servicing fee rate) from the first day of the month in which such distribution date occurs through the day on which such prepayment is applied (the "**prepayment interest excess**").

The servicing fee will be paid out of collections on the mortgage loans. The servicer will be permitted to withdraw the servicing fee each month from funds on deposit in the collection account, before those funds are transferred to the distribution account for distribution to certificateholders. The servicer will be solely responsible for subservicing fees payable to any subservicer which will be paid from the servicing fee.

In the event of any resignation or termination of the servicer pursuant to the pooling agreement, the trustee, if acting as successor servicer, will be entitled to the same compensation and reimbursement of expenses as that to which the servicer would have been entitled. If another successor servicer is appointed, the trustee will be permitted to make arrangements for the compensation of such successor servicer out of collections on the mortgage loans, subject to the limitation that such compensation may not exceed the compensation to which the servicer would have been entitled.

The servicer will pay all expenses incurred in connection with its responsibilities under the pooling agreement (subject to reimbursement for advances and servicing advances, as described under "The Servicers—The Servicer—*Servicing Procedures—Advances*" in this prospectus supplement).

The trustee will be entitled to retain all interest and other income earned on the funds in the distribution account as additional compensation and those amounts will not be included in the available funds.

The servicer is obligated to deposit into the collection account the amount of any prepayment interest shortfall (payments made by the servicer in satisfaction of such obligation, "**compensating interest**") but only up to the amount of its servicing fee for the related distribution date. The "**determination date**" with respect to any distribution date will be the 15th day of the calendar month in which such distribution date occurs or, if such 15th day is not a business day, the business day immediately preceding such 15th day. With respect to any determination date and each mortgage loan as to which a principal prepayment is applied during the portion of the related

prepayment period (except for principal prepayments in full received during the period from the first through the 14th day of the month of the related distribution date), the "**prepayment interest shortfall**" is an amount equal to interest at the applicable mortgage rate (net of the servicing fee rate) on the amount of such principal prepayment for the lesser of (i) the number of days from the date on which the principal prepayment is applied until the last day of the month in which such principal prepayment is applied and (ii) 30 days. Principal prepayments in full on the mortgage loans applied from the first day through the 14th day of any month will be passed through to the certificateholders on the distribution date in the same month (except for principal prepayments in full applied through April 14, 2007, which will be passed through to the certificateholders on the distribution date in May 2007), rather than on the distribution date of the following month, together with a full month's interest for the prior month. Accordingly, no compensating interest will be payable for principal prepayments in full applied during that period. Principal prepayments in full applied during the period from the 15th day through the last day of any month will be passed through on the distribution date in the following month, and, in order to provide for a full month's interest payment for the prior month, compensating interest will be passed through to the certificateholders for that period.

**Reports and Other Information**

On each distribution date, the trustee will prepare and make available to each holder of a certificate, a statement based upon information received from the servicer generally setting forth, among other things:

(i)     the record dates, the accrual period, the determination date and the distribution date;

(ii)    the amount of distributions with respect to each class of certificates;

(iii)   the amount of such distributions in clause (i) allocable to principal, separately identifying the aggregate amount of any principal prepayments or other unscheduled recoveries of principal;

(iv)    the amount of such distributions in clause (i) allocable to interest and the Pass-Through Rates;

(v)     the amount of any Net WAC Rate Carryover Amounts or Unpaid Interest Shortfall Amounts;

(vi)    the Group I Interest Remittance Amount and the Group II Interest Remittance Amount and the Group I Principal Remittance Amount and Group II Principal Remittance Amount for such distribution date;

(vii)   the certificate principal balance of each class of the certificates before and after giving effect to the distribution of principal on such distribution date;

(viii)  the number and the stated principal balance for the Group I mortgage loans and the Group II mortgage loans at the beginning and the end of the related due period for the Group I mortgage loans and the Group II mortgage loans and updated mortgage loan pool composition information;

(ix)    by loan group and in the aggregate, the amounts of servicing fees paid to or retained by the servicer or any subservicer;

(x)     in the aggregate, the amount of advances and servicing advances made by the servicer for the related collection period, the amount of unrecovered advances and servicing advances (after giving effect to advances and servicing advances made on the distribution date) outstanding, and the aggregate amount of non-recoverable advances and servicing advances for such distribution date;

(xi)    by loan group and in the aggregate, the number and aggregate stated principal balance of mortgage loans that were (A) delinquent (exclusive of mortgage loans in bankruptcy or foreclosure or REO properties) (1) 30 to 59 days, (2) 60 to 89 days, (3) 90 to 119 days and (4) 120 or more days, as of the last day of the calendar month, (B) in foreclosure, (C) in bankruptcy and (D) REO properties;

(xii)    the aggregate stated principal balance of all mortgage loans with respect to which the related mortgaged property was acquired by the trust in foreclosure or by deed in lieu of foreclosure (any such mortgaged property, an "**REO property**") as of the close of business on the last day of the related prepayment period;

(xiii)    by loan group and in the aggregate, the amount of principal and interest realized losses incurred during the related prepayment period and the cumulative amount of principal and interest realized losses;

(xiv)    by loan group and in the aggregate, the amount of any net prepayment interest shortfalls for such distribution date to the extent not covered by the servicer and the amount of any shortfalls resulting from the application of the Relief Act or similar state or local law for such distribution date;

(xv)    any Overcollateralization Deficiency Amount (after giving effect to distribution of principal on such distribution date);

(xvi)    by loan group and in the aggregate, the principal balance of mortgage loans repurchased by the sponsor or the depositor;

(xvii)    the date when a Stepdown Date or a Trigger Event has occurred;

(xviii)    the Overcollateralization Target Amount as of such distribution date;

(xix)    the aggregate amount of extraordinary trust expenses (as described in the pooling agreement) paid to the trustee and the Delaware Trustee for such distribution date;

(xx)    by loan group and in the aggregate, the amount of subsequent recoveries for the related prepayment period and the cumulative amount of subsequent recoveries;

(xxi)    the Group I Swap Payment, the Group II Swap Payment, the Swap Payment, the Counterparty Payment, the Group I Net Swap Payment, the Group II Net Swap Payment, the Net Swap Payment and the Net Counterparty Payment for such distribution date, the Group I Swap Termination Payment paid on such distribution date, the Group II Swap Termination Payment paid on such distribution date, the Swap Termination Payment and the Swap Termination Payment remaining unpaid from prior distribution dates, and in each case whether payable by the supplemental interest trust trustee or by the swap counterparty; and any Counterparty Payments unpaid from prior distribution dates;

(xxii)    the Group I Final Maturity Reserve Amount, the Group II Final Maturity Reserve Amount, the Supplemental Final Maturity Reserve Amount, the Aggregate Final Maturity Reserve Amount and the aggregate amount on deposit in the final maturity reserve account for such distribution date and the amount distributed to each class of the offered certificates from the final maturity reserve account; and

(xxiii)    the fees paid to the PMI Insurer and the aggregate amount of payments received by the servicer with respect to the PMI Policy.

The trustee will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month via the trustee's internet website. Parties that are unable to use the trustee's website are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The trustee will have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the trustee will provide timely and adequate notification to all above parties regarding any such changes.

Reports about the certificates required to be filed with the Securities and Exchange Commission (the "**Commission**"), including the trust's Annual Reports on Form 10-K, Distribution Reports on Form 10-D and Current Reports on Form 8-K, will be filed under the Commission file number for the trust. The public may read and copy any materials filed with the Commission at the Commission's Public Reference Room at 100 F Street, NE, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by

calling the Commission at 1-800-SEC-0330.  The Commission maintains an internet website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the Commission.  The address of that internet website is http://www.sec.gov.

In addition, within a reasonable period of time after the end of each calendar year, the trustee will make available  to each holder on the trustee's website a certificate of record during the previous calendar year sufficient information necessary to enable certificateholders to prepare their tax returns.  Such statements will not have been examined and reported upon by an independent public accountant.

## YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS

The yield to maturity of the offered certificates will be sensitive to defaults on the mortgage loans.  If a purchaser of an offered certificate calculates its anticipated yield based on an assumed rate of default and amount of losses that is lower than the default rate and amount of losses actually incurred, its actual yield to maturity may be lower than that so calculated.  In general, the earlier a loss occurs, the greater is the effect on an investor's yield to maturity.  There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the mortgage loans.  The mortgage loans were underwritten in accordance with the WMB sub-prime underwriting standards that are less stringent than the standards Washington Mutual Bank applies to its borrowers who qualify for prime or Alt-A mortgage loans and less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit history, credit score(s), loan-to-value ratio and debt-to-income ratio.  Borrowers who qualify under the WMB sub-prime underwriting standards generally have payment histories, documentation or debt-to-income ratios that would not satisfy Fannie Mae and Freddie Mac underwriting standards and such borrowers may have a record of major derogatory credit items, such as outstanding judgments or prior bankruptcies.  As a result, the rates of delinquency, bankruptcy and foreclosure for those mortgage loans could be higher, and may be substantially higher, than that of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

The rate of principal payments, the aggregate amount of distributions and the yields to maturity of the offered certificates will be affected by the rate and timing of payments of principal on the mortgage loans.  The rate of principal payments on the mortgage loans will in turn be affected by the amortization schedules of the mortgage loans and by the rate of principal prepayments (including for this purpose prepayments resulting from refinancing, liquidations of the mortgage loans due to defaults, casualties or condemnations and repurchases by the sponsor or the depositor).  Certain of the mortgage loans contain prepayment charges, and the rate of principal payments on such mortgage loans may or may not be less than the rate of principal payments for mortgage loans that did not have prepayment charges.  The mortgage loans are subject to the "due-on-sale" provisions included in the mortgage loans which provide that the mortgage loan is due upon the transfer of the related mortgaged property or is assumable by a creditworthy purchaser of the related mortgaged property, subject to limitations described under "Legal Aspects of the Mortgage Assets—Enforceability of Due-on-Sale Clauses" in the accompanying prospectus.  We refer you to "The Mortgage Pool" in this prospectus supplement.

Prepayments, liquidations and purchases of the mortgage loans (including any optional purchase) will result in distributions on the offered certificates of principal amounts which would otherwise be distributed over the remaining terms of the mortgage loans.  Since the rate of payment of principal on the mortgage loans will depend on future events and a variety of other factors, no assurance can be given as to such rate or the rate of principal prepayments.  The extent to which the yield to maturity of a class of the offered certificates may vary from the anticipated yield will depend upon the degree to which such class of certificates is purchased at a discount or premium.  Further, an investor should consider the risk that, in the case of any offered certificate purchased at a discount, a slower than anticipated rate of principal payments (including prepayments) on the mortgage loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of any offered certificate purchased at a premium, a faster than anticipated rate of principal payments on the mortgage loans could result in an actual yield to such investor that is lower than the anticipated yield.

The rate of principal payments (including prepayments) on pools of mortgage loans may vary significantly over time and may be influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs or general creditworthiness of the mortgagors, job transfers, unemployment, mortgagors' net equity in the mortgaged properties and servicing decisions.  In general, if prevailing interest rates

were to fall significantly below the mortgage rates on the mortgage loans, such mortgage loans could be subject to higher prepayment rates than if prevailing interest rates were to remain at or above the mortgage rates on such mortgage loans. Conversely, if prevailing interest rates were to rise significantly, the rate of prepayments on such mortgage loans would generally be expected to decrease. The mortgage loans may be subject to a greater rate of principal prepayments in a low interest rate environment. For example, if prevailing interest rates were to fall, mortgagors with adjustable-rate mortgage loans may be inclined to refinance their adjustable-rate mortgage loans with a fixed-rate loan to "lock in" a lower interest rate or to refinance their adjustable- rate mortgage loans with other more competitive adjustable-rate mortgage loans. The existence of the applicable periodic rate cap and maximum mortgage rate with respect to the adjustable-rate mortgage loans also may affect the likelihood of prepayments resulting from refinancings. No assurances can be given as to the rate of prepayments on the mortgage loans in stable or changing interest rate environments. In addition, the delinquency and loss experience of the fixed-rate mortgage loans may differ from that of the adjustable-rate mortgage loans because the amount of the monthly payments on the adjustable-rate mortgage loans are subject to adjustment on each adjustment date. In addition, a majority of the adjustable-rate mortgage loans will not have their initial adjustment date for two, three or five years after their origination. The adjustable-rate mortgage loans may be subject to greater rates of prepayments as they approach their initial adjustment dates even if market interest rates are only slightly higher or lower than the mortgage rates on the adjustable-rate mortgage loans as mortgagors seek to avoid changes in their monthly payments.

The interest only feature of the interest only mortgage loans may reduce the perceived benefits of refinancing to take advantage of lower market interest rates or to avoid adjustments in the mortgage rates. However, as a mortgage loan with such a feature nears the end of its interest only period, the mortgagor may be more likely to refinance the mortgage loan, even if market interest rates are only slightly less than the mortgage rate of such mortgage loan in order to avoid the increase in the monthly payments necessary to amortize the mortgage loan over its remaining life.

Approximately 81.03% and 80.75% of the Group I mortgage loans and Group II mortgage loans (in each case, by aggregate scheduled principal balance of the mortgage loans in the related loan group as of the cut-off date), respectively, provide for payment by the mortgagor of a prepayment charge in limited circumstances on certain prepayments. The holders of the Class P Certificates will be entitled to all prepayment charges received in respect of voluntary prepayments in full and the servicer will be entitled to all prepayment charges received in respect of voluntary prepayments in part on the mortgage loans, and such amounts will not be available for distribution on the other classes of certificates. Under certain circumstances, as described in the pooling agreement, the servicer may waive the payment of any otherwise applicable prepayment charge. Investors should conduct their own analysis of the effect, if any, that prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on the prepayment performance of the mortgage loans. The depositor makes no representations as to the effect that the prepayment charges, and decisions by the servicer with respect to the waiver of prepayment charges, may have on prepayment performance of the mortgage loans.

The yields on the offered certificates may be adversely affected by Net Swap Payments and the Swap Termination Payment (unless the swap counterparty is the Defaulting Party or the Sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement) payable by the supplemental interest trust trustee. Any Net Swap Payment or the Swap Termination Payment (unless the swap counterparty is the Defaulting Party or the Sole Affected Party (each as defined in the swap agreement) under certain swap termination events set forth in the pooling agreement) payable by the supplemental interest trust trustee will reduce amounts available for distribution to certificateholders. If the rate of prepayments on the mortgage loans is faster than anticipated, the swap notional amount on which payments due under the swap agreement are calculated may exceed the aggregate stated principal balance of the mortgage loans, thereby increasing the relative proportion of interest (and possibly principal) collections on the mortgage loans that must be applied to make any Net Swap Payment to the swap counterparty and consequently, the combination of rapid rates of prepayment and low prevailing interest rates could adversely affect the yields on the offered certificates.

To the extent interest on any class of the offered certificates is paid at the related Net WAC Rate instead of the related Formula Rate, a shortfall in interest equal to the Net WAC Rate Carryover Amount will occur. Such shortfall will only be payable from the Net Monthly Excess Cashflow and, payments received under the swap

agreement by the supplemental interest trust trustee, as described under "Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

**Additional Information**

The depositor has filed certain yield tables and other computational materials with respect to the offered certificates with the Commission and may file certain additional yield tables and other computational materials with respect to the offered certificates with the Commission. Such tables and materials were prepared by the underwriters at the request of certain prospective investors, based on assumptions provided by, and satisfying the special requirements of, such prospective investors. These tables and assumptions may be based on assumptions that differ from the structuring assumptions. Accordingly, such tables and other materials may not be relevant to or appropriate for investors other than those specifically requesting them. Those tables and materials are preliminary in nature and are subject to change, and may not reflect the final terms and structure of the securitization transaction. The final terms and structure of the securitization transaction are as described in this prospectus supplement.

**Weighted Average Lives**

The timing of changes in the rate of principal prepayments on the mortgage loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal prepayments is consistent with such investor's expectation. In general, the earlier a principal prepayment on the mortgage loans occurs, the greater the effect of such principal prepayment on an investor's yield to maturity. The effect on an investor's yield of principal prepayments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the offered certificates may not be offset by a subsequent like decrease (or increase) in the rate of principal prepayments.

The weighted average life of an offered certificate is the average amount of time that will elapse from the date such certificate is sold to investors (on or about April 10, 2007), until each dollar of principal is repaid to the investors in such certificate. Because it is expected that there will be prepayments and defaults on the mortgage loans, the actual weighted average lives of these certificates are expected to vary substantially from the weighted average remaining terms to maturity of the mortgage loans as described in this prospectus supplement under "The Mortgage Pool."

Prepayments of mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement (the "**Prepayment Assumption**") assumes:

(i)        In the case of the fixed-rate mortgage loans, 100% of the related vector. In the case of the fixed-rate mortgage loans, the related "**vector**" means a constant prepayment rate ("**CPR**") of 4.60% per annum of the then unpaid principal balance of such mortgage loans in the first month of the life of such mortgage loans and an additional approximately 1.6727% (precisely 18.40%/11) per annum in each month thereafter until the 12th month, and then beginning in the 12th month and in each month thereafter during the life of such mortgage loans, a CPR of 23% per annum.

(ii)       In the case of the adjustable-rate mortgage loans, 100% of the related vector. In the case of the adjustable-rate mortgage loans, the related "**vector**" means a CPR of 4% per annum of the then unpaid principal balance of such mortgage loans in the first month of the life of such mortgage loans and an additional approximately 2.1818% (precisely 24%/11) per annum in each month thereafter until the 12th month, beginning with the 13th month and remaining at 28% per annum in each month thereafter until the 24th month, beginning with the 25th month and remaining at 55% per annum in each month thereafter until the 28th month, and then beginning in the 29th month and in each month thereafter during the life of such mortgage loans, a CPR of 35% per annum.

CPR is a Prepayment Assumption that represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. The prepayment assumption does not purport to be either an historical description of the prepayment experience of any pool of mortgage loans or a prediction of the anticipated rate of prepayment of any mortgage loans, including the mortgage loans to be included in the trust. Each of the prepayment scenarios in the tables in Appendix B (which

is incorporated by reference into this prospectus supplement) assumes the respective percentages of the Prepayment Assumption indicated for such scenario.

The tables entitled "Percent of Original Certificate Principal Balance Outstanding" in Appendix B (which is incorporated by reference into this prospectus supplement) were prepared on the basis of the assumptions in the following paragraph and the tables set forth below.  There are certain differences between the loan characteristics included in such assumptions and the characteristics of the actual mortgage loans.  Any such discrepancy may have an effect upon the percentages of original certificate principal balances outstanding and weighted average lives of the offered certificates indicated in the tables in Appendix B.  In addition, since the actual mortgage loans in the trust will have characteristics that differ from those assumed in preparing the tables in Appendix B, the distributions of principal on such classes of offered certificates may be made earlier or later than indicated in the tables in Appendix B.

The percentages and weighted average lives in the tables entitled "Percent of Original Certificate Principal Balance Outstanding" in Appendix B were determined assuming, among other things, that (the "**Structuring Assumptions**"):

- the mortgage loans have the characteristics specified in the tables below (based on the mortgage pool on the closing date consisting of the mortgage loans with an aggregate stated principal balance of the mortgage loans as of the cut-off date of approximately $1,593,665,287),

- the closing date for the offered certificates occurs on April 10, 2007 and the offered certificates are sold to investors on April 10, 2007,

- distributions on the certificates are made on the 25th day of each month regardless of the day on which the distribution date actually occurs, commencing in May 2007, in accordance with the allocation of available funds specified above under "Description of the Certificates—Allocation of Available Funds,"

- the prepayment rates are those indicated in the "Prepayment Scenarios" table below,

- prepayments include thirty days' interest,

- neither the sponsor nor the depositor is required to substitute or repurchase any or all of the mortgage loans pursuant to the pooling agreement and no optional termination is exercised, except with respect to the entries identified by the row captioned "Weighted Average Life (years) to Optional Termination" in the tables in Appendix B,

- the Overcollateralization Target Amount is as specified in this prospectus supplement,

- scheduled payments for all mortgage loans are received on the first day of each month commencing in May 2007, the principal portion of such payments being computed prior to giving effect to prepayments received in the previous month, and there are no losses or delinquencies with respect to such mortgage loans,

- all mortgage loans prepay at the indicated rate and all such payments are treated as prepayments in full of individual mortgage loans, with no shortfalls in collection of interest,

- such prepayments are received on the last day of each month commencing in the month of the closing date,

- the level of one-month LIBOR is at all times equal to 5.32% per annum,

- the Pass-Through Rates for the offered certificates are as specified in this prospectus supplement,

- the mortgage rate for each adjustable-rate mortgage loan is adjusted on its next adjustment date (and on subsequent adjustment dates, if necessary) to equal the sum of (a) the assumed level of six-month LIBOR and (b) the respective gross margin (such sum being subject to the applicable periodic rate caps, minimum mortgage rates and maximum mortgage rates),

- the mortgage rate for each adjustable rate mortgage loan adjusts every six months following its first adjustment date,

- with respect to the adjustable-rate mortgage loans, six-month LIBOR at all times is equal to 5.44% per annum,

- the aggregate fees are equal to 0.50% per annum,

- the trustee fee rate is at all times equal to zero,

- the certificate principal balance of the Class P Certificates is equal to zero,

- the strike rate for the swap agreement is 4.760% and no Swap Termination Payment occurs,

- the certificate principal balance of the offered certificates is reduced to zero no later than the last scheduled distribution date,

- there is no final maturity reserve account, and

- the amount on deposit in the interest coverage account on the closing date is $955,000.

Nothing contained in the assumptions described above should be construed as a representation that the mortgage loans will not experience delinquencies or losses.

**Prepayment Scenarios**

|  | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Fixed-Rate Mortgage Loans[1] ................. | 50% | 75% | 100% | 125% | 150% |
| Adjustable-Rate Mortgage Loans[1] ......... | 50% | 75% | 100% | 125% | 150% |

[1] Percentage of the Prepayment Assumption

## Assumed Mortgage Loan Characteristics

| Group | Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Months to Next Adjustment Date | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Amortization Term to Maturity (months) | Remaining Amortization Term (months) | Remaining Term to Stated Maturity (months) | Original Interest Only Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 677,563.31 | 8.213 | 7.423 | 21 | 6.369 | 14.213 | 8.213 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 4,948,744.49 | 8.053 | 7.323 | 22 | 5.608 | 14.053 | 8.053 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 720,223.24 | 8.170 | 7.360 | 22 | 5.364 | 14.170 | 8.170 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 1,754,055.47 | 9.170 | 8.610 | 21 | 5.741 | 15.170 | 9.170 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 260,631.71 | 9.750 | 9.250 | 21 | 5.750 | 15.750 | 9.750 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 470,834.52 | 9.922 | 9.422 | 21 | 5.524 | 15.922 | 9.922 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 8,404,738.34 | 8.659 | 8.079 | 22 | 5.212 | 14.659 | 8.659 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 67,299,153.32 | 8.661 | 8.091 | 22 | 5.484 | 14.661 | 8.661 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 6,874,900.20 | 8.565 | 8.065 | 21 | 5.725 | 14.565 | 8.565 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 22,957,155.09 | 9.154 | 8.604 | 22 | 5.461 | 15.153 | 9.153 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 2,409,155.75 | 9.109 | 8.299 | 22 | 5.360 | 15.109 | 9.109 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 1,816,200.68 | 9.320 | 8.630 | 22 | 5.377 | 15.320 | 9.320 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 505,664.95 | 8.395 | 7.895 | 21 | 4.990 | 14.395 | 8.395 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 2,157,212.38 | 9.247 | 8.567 | 22 | 5.261 | 15.247 | 9.247 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 67,462.74 | 8.950 | 8.450 | 23 | 5.490 | 14.950 | 8.950 | 2.000 | 1.000 | 360 | 359 | 359 | N/A |
| 1 | 1,205,939.13 | 7.697 | 6.547 | 22 | 5.124 | 13.697 | 7.697 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 1,709,204.02 | 8.331 | 7.521 | 22 | 4.990 | 14.331 | 8.331 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 6,583,104.77 | 8.122 | 7.492 | 21 | 5.129 | 14.122 | 8.122 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 1,130,600.25 | 8.261 | 7.761 | 20 | 5.067 | 14.261 | 8.261 | 2.000 | 1.000 | 480 | 476 | 476 | N/A |
| 1 | 2,870,814.05 | 9.328 | 8.718 | 21 | 5.270 | 15.328 | 9.328 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 80,741.29 | 8.600 | 8.100 | 21 | 4.990 | 14.600 | 8.600 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 67,163.17 | 9.550 | 9.050 | 21 | 4.990 | 15.550 | 9.550 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 311,000.00 | 7.300 | 6.800 | 21 | 4.990 | 13.300 | 7.300 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 1 | 238,400.00 | 6.750 | 6.250 | 21 | 4.990 | 12.750 | 6.750 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 1 | 399,980.83 | 6.800 | 6.300 | 21 | 4.990 | 12.800 | 6.800 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 1 | 6,387,415.81 | 7.257 | 6.757 | 21 | 5.073 | 13.257 | 7.257 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 1 | 2,662,280.12 | 6.825 | 6.325 | 21 | 4.990 | 12.825 | 6.825 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 1 | 787,771.30 | 7.796 | 7.296 | 22 | 4.990 | 13.796 | 7.796 | 1.000 | 1.000 | 360 | 358 | 358 | 24 |
| 1 | 97,750.00 | 7.975 | 7.475 | 22 | 4.990 | 13.975 | 7.975 | 1.000 | 1.000 | 360 | 358 | 358 | 24 |
| 1 | 1,331,675.40 | 8.020 | 7.390 | 34 | 5.440 | 14.020 | 8.020 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 972,982.77 | 8.488 | 7.828 | 33 | 5.419 | 14.488 | 8.488 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 6,195,372.88 | 8.093 | 7.383 | 34 | 5.454 | 14.093 | 8.093 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 448,254.19 | 8.622 | 8.122 | 34 | 4.990 | 14.622 | 8.622 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 7,369,347.89 | 8.081 | 7.351 | 34 | 5.343 | 14.081 | 8.081 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 1,110,677.87 | 7.958 | 7.258 | 34 | 5.262 | 13.958 | 7.958 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 12,305,794.43 | 7.751 | 7.101 | 34 | 5.258 | 13.751 | 7.751 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 21,648,081.02 | 8.688 | 8.078 | 34 | 5.333 | 14.688 | 8.688 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 1,132,940.42 | 8.881 | 8.381 | 33 | 5.124 | 14.881 | 8.881 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 114,238.79 | 7.775 | 7.275 | 34 | 4.990 | 13.775 | 7.775 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 1,159,184.43 | 7.801 | 7.301 | 34 | 4.990 | 13.801 | 7.801 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 161,440.78 | 9.525 | 9.025 | 34 | 4.990 | 15.525 | 9.525 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 677,552.61 | 8.508 | 6.988 | 33 | 4.990 | 14.508 | 8.508 | 3.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 185,882.59 | 7.675 | 7.175 | 34 | 4.990 | 13.675 | 7.675 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 1,681,190.41 | 8.092 | 7.592 | 34 | 4.990 | 14.092 | 8.092 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 2,639,058.87 | 7.990 | 6.740 | 33 | 5.011 | 13.990 | 7.990 | 3.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 375,993.84 | 9.550 | 9.050 | 33 | 4.990 | 15.550 | 9.550 | 3.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 628,339.65 | 6.624 | 6.124 | 33 | 5.377 | 12.624 | 6.624 | 3.000 | 1.000 | 360 | 357 | 357 | 36 |
| 1 | 228,108.00 | 6.550 | 6.050 | 34 | 4.990 | 12.550 | 6.550 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 1 | 227,996.99 | 8.150 | 7.650 | 33 | 4.990 | 14.150 | 8.150 | 3.000 | 1.000 | 360 | 357 | 357 | 36 |
| 1 | 853,000.00 | 6.973 | 6.473 | 34 | 5.182 | 12.973 | 6.973 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 1 | 698,500.00 | 7.682 | 7.182 | 35 | 5.268 | 13.682 | 7.682 | 3.000 | 1.000 | 360 | 359 | 359 | 36 |
| 1 | 2,397,896.04 | 6.702 | 5.992 | 58 | 5.206 | 12.702 | 6.702 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 505,459.23 | 7.336 | 6.836 | 57 | 4.990 | 13.336 | 7.336 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 1,206,532.81 | 7.755 | 7.255 | 57 | 4.990 | 13.755 | 7.755 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 510,386.42 | 6.641 | 6.141 | 57 | 5.285 | 12.641 | 6.641 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 6,636,088.29 | 7.404 | 6.744 | 58 | 5.109 | 13.404 | 7.404 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 3,498,672.57 | 8.544 | 8.024 | 57 | 5.106 | 14.544 | 8.544 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 1 | 154,338.15 | 9.336 | 8.836 | 58 | 4.990 | 15.336 | 9.336 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 364,649.73 | 8.499 | 7.999 | 58 | 4.990 | 14.499 | 8.499 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 1 | 266,536.90 | 6.037 | 5.217 | 58 | 5.280 | 12.037 | 6.037 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 243,843.78 | 7.625 | 7.125 | 58 | 4.990 | 13.625 | 7.625 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 1,883,879.74 | 7.851 | 7.351 | 57 | 5.026 | 13.851 | 7.851 | 3.000 | 1.000 | 480 | 477 | 477 | N/A |
| 1 | 439,726.29 | 7.183 | 6.683 | 58 | 4.990 | 13.183 | 7.183 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 1 | 385,000.00 | 5.750 | 5.250 | 58 | 4.990 | 11.750 | 5.750 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 1 | 619,499.42 | 6.281 | 5.381 | 58 | 4.990 | 12.281 | 6.281 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 1 | 238,800.00 | 6.925 | 6.425 | 58 | 4.990 | 12.925 | 6.925 | 3.000 | 1.000 | 360 | 353 | 353 | 60 |
| 1 | 219,817.60 | 6.675 | 5.685 | 58 | 4.990 | 12.675 | 6.675 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 1 | 7,884,763.60 | 6.518 | 5.868 | 58 | 4.990 | 12.518 | 6.518 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 1 | 442,000.00 | 7.119 | 6.619 | 58 | 4.990 | 13.119 | 7.119 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |

| Group | Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Months to Next Adjustment Date | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Amortization Term to Maturity (months) | Remaining Amortization Term (months) | Remaining Term to Stated Maturity (months) | Original Interest Only Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 926,260.08 | 8.216 | 7.176 | 21 | 5.172 | 14.216 | 8.216 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 6,060,957.96 | 7.635 | 6.805 | 22 | 5.302 | 13.635 | 7.635 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 971,836.27 | 8.065 | 7.565 | 22 | 5.115 | 14.065 | 8.065 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 893,344.56 | 8.873 | 8.373 | 22 | 4.990 | 14.873 | 8.873 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 770,606.06 | 9.180 | 8.680 | 21 | 5.624 | 15.180 | 9.180 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 140,584.81 | 9.025 | 8.525 | 21 | 4.990 | 15.025 | 9.025 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 10,218,871.65 | 8.237 | 7.487 | 22 | 5.135 | 14.237 | 8.237 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 97,440,770.63 | 7.907 | 7.257 | 22 | 5.131 | 13.907 | 7.907 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 22,696,720.40 | 7.594 | 6.924 | 22 | 5.122 | 13.594 | 7.594 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 19,806,191.63 | 8.506 | 7.896 | 22 | 5.088 | 14.506 | 8.506 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 436,983.74 | 9.011 | 8.511 | 22 | 5.531 | 15.011 | 9.011 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 386,305.48 | 8.478 | 7.458 | 22 | 4.990 | 14.478 | 8.478 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 67,487.77 | 9.550 | 9.050 | 23 | 5.990 | 15.550 | 9.550 | 2.000 | 1.000 | 480 | 479 | 359 | N/A |
| 1 | 70,184.44 | 8.875 | 5.495 | 23 | 4.990 | 14.875 | 8.875 | 2.000 | 1.000 | 480 | 479 | 359 | N/A |
| 1 | 2,224,248.15 | 7.627 | 7.017 | 33 | 5.086 | 13.627 | 7.627 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 168,609.83 | 7.175 | 6.675 | 33 | 4.990 | 13.175 | 7.175 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 5,746,706.74 | 7.421 | 6.411 | 33 | 5.418 | 13.421 | 7.421 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 1,724,374.16 | 7.789 | 6.779 | 34 | 4.990 | 13.789 | 7.789 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 319,756.94 | 8.146 | 6.716 | 33 | 5.652 | 14.146 | 8.146 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 16,123,094.40 | 7.486 | 6.726 | 33 | 5.154 | 13.486 | 7.486 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 12,793,102.26 | 8.387 | 7.647 | 34 | 5.084 | 14.387 | 8.387 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 382,961.92 | 8.047 | 7.107 | 33 | 4.990 | 14.047 | 8.047 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 107,936.09 | 7.900 | 7.400 | 34 | 4.990 | 13.900 | 7.900 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 224,815.62 | 6.750 | 6.250 | 58 | 4.990 | 12.750 | 6.750 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 179,805.72 | 7.225 | 6.725 | 57 | 4.990 | 13.225 | 7.225 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 1 | 1,272,008.64 | 7.561 | 7.061 | 58 | 4.990 | 13.561 | 7.561 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 905,222.12 | 7.051 | 6.251 | 58 | 4.990 | 13.051 | 7.051 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 437,269.17 | 8.320 | 7.820 | 58 | 4.990 | 14.320 | 8.320 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 19,169,821.82 | 7.237 | 6.617 | 58 | 5.135 | 13.237 | 7.237 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 1 | 1,517,406.82 | 7.254 | 6.624 | 56 | 4.990 | 13.254 | 7.254 | 3.000 | 1.000 | 480 | 476 | 356 | N/A |
| 1 | 4,256,727.49 | 7.253 | 6.363 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 358 | N/A |
| 1 | 155,892.33 | 8.775 | 7.155 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 1 | 1,307,245.80 | 7.361 | 6.711 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 1 | 18,043,342.95 | 7.393 | 6.643 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 1 | 1,418,644.30 | 8.123 | 7.153 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 358 | N/A |
| 1 | 177,165.21 | 8.516 | 5.556 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 1 | 269,954.98 | 9.825 | 9.325 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 479 | 359 | N/A |
| 1 | 2,290,040.20 | 6.985 | 6.485 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 1 | 631,683.29 | 8.508 | 8.008 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 1 | 34,122.74 | 8.900 | 8.400 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 177 | 177 | N/A |
| 1 | 240,723.59 | 7.050 | 6.220 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 1 | 1,749,907.86 | 7.120 | 6.620 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 237 | 237 | N/A |
| 1 | 231,507.17 | 6.836 | 6.336 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 1 | 149,976.48 | 7.700 | 5.860 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 7,897,826.91 | 6.984 | 6.134 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 109,339.36 | 7.200 | 6.700 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 733,943.38 | 7.394 | 6.444 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 213,500.85 | 8.477 | 7.977 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 2,841,355.12 | 7.949 | 7.149 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 2,604,311.93 | 7.717 | 7.107 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 61,962,499.44 | 7.367 | 6.697 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 16,910,028.16 | 8.210 | 7.540 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 166,668.14 | 8.738 | 8.238 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 3,082,233.67 | 8.531 | 7.531 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 40,760.54 | 9.600 | 9.100 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 977,162.67 | 7.069 | 5.749 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 1,161,008.27 | 6.417 | 5.617 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 1 | 716,820.69 | 7.422 | 6.922 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 477 | N/A |
| 1 | 4,305,539.23 | 7.068 | 6.378 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 477 | N/A |
| 1 | 208,251.60 | 7.964 | 7.464 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 1 | 126,344.06 | 6.750 | 6.250 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 477 | N/A |
| 1 | 47,093.05 | 11.300 | 10.800 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 177 | 177 | N/A |
| 1 | 25,910.23 | 11.100 | 10.600 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 237 | 237 | N/A |
| 1 | 16,935.67 | 10.400 | 9.900 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 237 | 237 | N/A |
| 1 | 42,320.51 | 9.990 | 9.490 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 237 | 237 | N/A |
| 1 | 139,256.31 | 11.026 | 10.526 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 448,370.26 | 10.759 | 10.259 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 27,226.79 | 9.650 | 9.150 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 71,961.16 | 11.075 | 10.575 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 359 | 359 | N/A |
| 1 | 34,965.35 | 11.400 | 10.900 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |

| Group | Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Months to Next Adjustment Date | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Amortization Term to Maturity (months) | Remaining Amortization Term (months) | Remaining Term to Stated Maturity (months) | Original Interest Only Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 83,159.58 | 10.851 | 10.351 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 359 | 359 | N/A |
| 1 | 3,049,668.31 | 10.965 | 10.465 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 1,488,704.27 | 10.711 | 10.211 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 5,439,388.94 | 10.808 | 10.308 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 97,858.96 | 10.431 | 9.931 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 193,989.30 | 11.001 | 10.501 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 1 | 41,976.36 | 12.100 | 11.600 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 1 | 57,653.38 | 11.514 | 11.014 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 359 | 359 | N/A |
| 1 | 72,193.81 | 11.262 | 10.762 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 179,669.58 | 10.950 | 10.450 | 19 | 4.990 | 16.950 | 10.950 | 2.000 | 1.000 | 360 | 355 | 355 | N/A |
| 2 | 2,302,887.13 | 8.329 | 7.829 | 22 | 5.374 | 14.329 | 8.329 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 343,217.70 | 7.425 | 6.925 | 21 | 4.990 | 13.425 | 7.425 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 1,124,005.33 | 8.666 | 8.166 | 23 | 5.106 | 14.666 | 8.666 | 2.000 | 1.000 | 360 | 359 | 359 | N/A |
| 2 | 94,889.14 | 8.700 | 8.200 | 22 | 4.990 | 14.700 | 8.700 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 11,364,832.07 | 8.862 | 8.312 | 21 | 5.159 | 14.862 | 8.862 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 60,142,364.65 | 8.739 | 8.049 | 22 | 5.250 | 14.739 | 8.739 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 9,263,942.23 | 8.362 | 7.702 | 22 | 5.376 | 14.362 | 8.362 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 31,909,073.56 | 9.315 | 8.705 | 22 | 5.163 | 15.315 | 9.315 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 185,193.19 | 10.850 | 10.350 | 21 | 4.990 | 16.850 | 10.850 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 2,836,306.82 | 8.761 | 8.041 | 22 | 5.039 | 14.761 | 8.761 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 2,016,342.29 | 10.343 | 9.613 | 22 | 5.024 | 16.343 | 10.343 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 3,149,176.69 | 9.341 | 8.321 | 21 | 5.173 | 15.341 | 9.341 | 2.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 59,934.19 | 9.000 | 8.500 | 22 | 5.990 | 15.000 | 9.000 | 2.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 671,501.21 | 7.023 | 6.523 | 21 | 4.990 | 13.023 | 7.023 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 2 | 2,093,132.63 | 9.010 | 8.400 | 21 | 4.990 | 15.010 | 9.010 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 2 | 10,943,862.02 | 8.343 | 7.723 | 21 | 5.038 | 14.343 | 8.343 | 2.000 | 1.000 | 480 | 477 | 477 | N/A |
| 2 | 1,679,233.68 | 6.792 | 6.292 | 22 | 4.990 | 12.792 | 6.792 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 6,422,917.75 | 8.843 | 8.343 | 22 | 5.083 | 14.843 | 8.843 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 110,665.82 | 10.801 | 10.301 | 22 | 4.990 | 16.801 | 10.801 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 111,563.74 | 9.925 | 9.425 | 22 | 4.990 | 15.925 | 9.925 | 2.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 514,400.00 | 7.025 | 6.525 | 23 | 5.490 | 13.025 | 7.025 | 2.000 | 1.000 | 360 | 359 | 359 | 24 |
| 2 | 215,000.00 | 7.250 | 6.750 | 21 | 5.990 | 13.250 | 7.250 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 2 | 959,199.99 | 8.628 | 8.128 | 21 | 4.990 | 14.628 | 8.628 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 2 | 10,169,381.40 | 8.015 | 7.515 | 22 | 5.067 | 14.015 | 8.015 | 1.000 | 1.000 | 360 | 358 | 358 | 24 |
| 2 | 61,442,514.66 | 7.425 | 6.925 | 22 | 5.021 | 13.425 | 7.425 | 1.000 | 1.000 | 360 | 358 | 358 | 24 |
| 2 | 15,486,021.35 | 7.230 | 6.730 | 21 | 5.051 | 13.230 | 7.230 | 1.000 | 1.000 | 360 | 357 | 357 | 24 |
| 2 | 11,313,801.08 | 8.450 | 7.950 | 22 | 5.055 | 14.450 | 8.450 | 1.000 | 1.000 | 360 | 358 | 358 | 24 |
| 2 | 796,000.00 | 7.800 | 7.300 | 22 | 4.990 | 13.800 | 7.800 | 2.000 | 1.000 | 360 | 358 | 358 | 24 |
| 2 | 161,803.05 | 10.450 | 9.950 | 33 | 4.990 | 16.450 | 10.450 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 591,084.23 | 7.154 | 6.164 | 33 | 4.990 | 13.154 | 7.154 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 1,343,138.52 | 7.654 | 6.484 | 34 | 5.064 | 13.654 | 7.654 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 5,657,811.74 | 8.859 | 8.249 | 34 | 5.178 | 14.859 | 8.859 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 617,540.88 | 8.826 | 8.326 | 34 | 5.145 | 14.826 | 8.826 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 10,345,210.14 | 8.118 | 7.398 | 34 | 5.223 | 14.118 | 8.118 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 20,993,332.52 | 8.914 | 8.294 | 34 | 5.190 | 14.914 | 8.914 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 80,963.00 | 9.850 | 9.350 | 35 | 4.990 | 15.850 | 9.850 | 3.000 | 1.000 | 360 | 359 | 359 | N/A |
| 2 | 2,483,811.76 | 9.372 | 8.682 | 33 | 5.032 | 15.372 | 9.372 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 107,076.15 | 8.750 | 8.250 | 34 | 4.990 | 14.750 | 8.750 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 206,605.82 | 8.952 | 8.452 | 34 | 4.990 | 14.952 | 8.952 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 576,024.32 | 10.000 | 9.500 | 33 | 5.990 | 16.000 | 10.000 | 3.000 | 1.000 | 480 | 477 | 477 | N/A |
| 2 | 976,101.30 | 7.479 | 6.979 | 34 | 4.990 | 13.479 | 7.479 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 3,383,993.18 | 8.547 | 8.047 | 34 | 5.123 | 14.547 | 8.547 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 80,592.31 | 11.000 | 10.500 | 31 | 4.990 | 17.000 | 11.000 | 3.000 | 1.000 | 480 | 475 | 475 | N/A |
| 2 | 683,500.00 | 6.471 | 5.971 | 34 | 4.990 | 12.471 | 6.471 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 2 | 2,282,151.00 | 7.254 | 6.754 | 33 | 4.990 | 13.254 | 7.254 | 3.000 | 1.000 | 360 | 357 | 357 | 36 |
| 2 | 133,600.00 | 8.000 | 7.500 | 34 | 4.990 | 14.000 | 8.000 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 2 | 1,752,192.00 | 7.245 | 6.745 | 33 | 4.990 | 13.245 | 7.245 | 3.000 | 1.000 | 360 | 357 | 357 | 36 |
| 2 | 13,030,423.21 | 7.038 | 6.538 | 34 | 5.051 | 13.038 | 7.038 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 2 | 1,883,792.69 | 7.384 | 6.884 | 34 | 4.990 | 13.384 | 7.384 | 3.000 | 1.000 | 360 | 358 | 358 | 36 |
| 2 | 255,000.00 | 5.950 | 5.450 | 33 | 4.990 | 11.950 | 5.950 | 3.000 | 1.000 | 360 | 357 | 357 | 36 |
| 2 | 266,788.47 | 6.675 | 6.175 | 57 | 4.990 | 12.675 | 6.675 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 3,292,663.46 | 6.877 | 6.377 | 58 | 5.062 | 12.877 | 6.877 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 449,217.36 | 7.000 | 6.500 | 58 | 4.990 | 13.000 | 7.000 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 5,864,649.70 | 7.664 | 7.044 | 58 | 5.402 | 13.664 | 7.664 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 933,311.87 | 10.061 | 9.011 | 58 | 5.795 | 16.061 | 10.061 | 3.000 | 1.000 | 360 | 358 | 358 | N/A |
| 2 | 605,299.82 | 10.582 | 9.892 | 57 | 4.990 | 16.582 | 10.582 | 3.000 | 1.000 | 360 | 357 | 357 | N/A |
| 2 | 412,212.36 | 7.325 | 6.825 | 58 | 4.990 | 13.325 | 7.325 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 1,424,186.81 | 7.601 | 6.801 | 58 | 5.285 | 13.601 | 7.601 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 1,334,174.53 | 6.768 | 6.268 | 58 | 4.990 | 12.768 | 6.768 | 3.000 | 1.000 | 480 | 478 | 478 | N/A |
| 2 | 1,299,999.00 | 6.783 | 6.143 | 56 | 4.990 | 12.783 | 6.783 | 3.000 | 1.000 | 360 | 356 | 356 | 60 |

| Group | Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Months to Next Adjustment Date | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Amortization Term to Maturity (months) | Remaining Amortization Term (months) | Remaining Term to Stated Maturity (months) | Original Interest Only Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 2,141,950.00 | 5.974 | 5.474 | 58 | 4.990 | 11.974 | 5.974 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 2 | 2,843,861.07 | 7.183 | 6.683 | 58 | 4.990 | 13.183 | 7.183 | 3.000 | 1.000 | 360 | 358 | 358 | 60 |
| 2 | 3,114,926.99 | 7.451 | 6.891 | 56 | 4.990 | 13.451 | 7.451 | 3.000 | 1.000 | 360 | 356 | 356 | 60 |
| 2 | 16,936,034.38 | 6.729 | 6.119 | 57 | 5.026 | 12.729 | 6.729 | 3.000 | 1.000 | 360 | 357 | 357 | 60 |
| 2 | 5,411,249.99 | 8.475 | 7.915 | 57 | 4.990 | 14.475 | 8.475 | 3.000 | 1.000 | 360 | 357 | 357 | 60 |
| 2 | 854,467.98 | 7.813 | 7.113 | 57 | 4.990 | 13.813 | 7.813 | 3.000 | 1.000 | 360 | 357 | 357 | 60 |
| 2 | 163,966.53 | 9.415 | 8.915 | 57 | 4.990 | 15.415 | 9.415 | 3.000 | 1.000 | 360 | 357 | 357 | 60 |
| 2 | 1,150,877.18 | 7.109 | 6.609 | 21 | 4.990 | 13.109 | 7.109 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 1,496,577.03 | 7.807 | 7.307 | 22 | 4.990 | 13.807 | 7.807 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 984,826.53 | 8.091 | 6.431 | 21 | 5.466 | 14.091 | 8.091 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 35,334,535.07 | 8.268 | 7.718 | 21 | 5.090 | 14.268 | 8.268 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 165,281,349.57 | 8.082 | 7.522 | 22 | 5.093 | 14.082 | 8.082 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 41,702,966.95 | 7.769 | 7.219 | 21 | 5.040 | 13.769 | 7.769 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 44,490,264.35 | 8.854 | 8.214 | 21 | 5.039 | 14.854 | 8.854 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 1,354,506.38 | 9.634 | 8.224 | 21 | 5.057 | 15.634 | 9.634 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 176,544.74 | 10.115 | 9.615 | 22 | 4.990 | 16.115 | 10.115 | 2.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 739,434.14 | 8.425 | 7.925 | 21 | 4.990 | 14.425 | 8.425 | 2.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 1,712,906.69 | 7.958 | 6.528 | 33 | 4.990 | 13.958 | 7.958 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 2,237,016.85 | 7.171 | 6.271 | 34 | 4.990 | 13.171 | 7.171 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 9,430,166.44 | 7.867 | 6.907 | 33 | 5.025 | 13.867 | 7.867 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 3,024,393.31 | 8.013 | 7.513 | 33 | 5.141 | 14.013 | 8.013 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 25,445,608.02 | 7.700 | 7.000 | 33 | 5.022 | 13.700 | 7.700 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 12,730,969.48 | 8.701 | 8.071 | 34 | 5.019 | 14.701 | 8.701 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 1,054,802.45 | 7.679 | 6.609 | 34 | 4.990 | 13.679 | 7.679 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 2,188,277.90 | 7.425 | 6.615 | 58 | 5.165 | 13.425 | 7.425 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 1,253,798.54 | 7.842 | 7.142 | 57 | 5.111 | 13.842 | 7.842 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 575,784.03 | 9.450 | 8.950 | 58 | 4.990 | 15.450 | 9.450 | 3.000 | 1.000 | 480 | 478 | 358 | N/A |
| 2 | 17,709,505.53 | 6.836 | 6.176 | 57 | 5.107 | 12.836 | 6.836 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 3,793,874.92 | 7.991 | 7.491 | 57 | 5.156 | 13.991 | 7.991 | 3.000 | 1.000 | 480 | 477 | 357 | N/A |
| 2 | 1,174,810.61 | 6.604 | 5.664 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 358 | N/A |
| 2 | 345,939.05 | 7.695 | 6.855 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 479 | 359 | N/A |
| 2 | 2,752,941.74 | 8.288 | 7.568 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 2 | 2,591,362.57 | 7.498 | 6.928 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 476 | 356 | N/A |
| 2 | 24,807,039.60 | 7.013 | 6.293 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 358 | N/A |
| 2 | 2,230,931.31 | 8.784 | 8.184 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 358 | N/A |
| 2 | 535,287.14 | 6.475 | 5.975 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 477 | 357 | N/A |
| 2 | 460,387.21 | 6.950 | 6.190 | N/A | N/A | N/A | N/A | N/A | N/A | 120 | 118 | 118 | N/A |
| 2 | 1,421,092.69 | 7.783 | 7.283 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 2 | 542,988.08 | 8.007 | 7.507 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 2 | 293,453.72 | 6.900 | 5.910 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 235 | 235 | N/A |
| 2 | 174,388.88 | 7.800 | 7.300 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 2 | 124,956.19 | 7.807 | 6.797 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 2 | 73,883.54 | 6.350 | 5.850 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 2 | 647,826.41 | 8.150 | 7.650 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 6,545,386.24 | 6.801 | 6.091 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 256,171.75 | 8.250 | 6.430 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 571,464.13 | 6.600 | 6.100 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 358 | N/A |
| 2 | 3,360,132.63 | 7.733 | 7.123 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 4,000,559.59 | 7.685 | 7.005 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 87,816,627.67 | 7.179 | 6.509 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 18,465,710.59 | 7.725 | 7.125 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 84,511.93 | 9.250 | 6.490 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 108,652.34 | 9.950 | 9.450 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 2,021,733.38 | 7.911 | 7.111 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 398,974.16 | 7.398 | 6.468 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 1,910,182.67 | 8.057 | 7.417 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 507,525.44 | 6.275 | 5.775 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 2 | 220,338.44 | 7.150 | 5.450 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 2 | 80,994.03 | 12.450 | 11.950 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 479 | 479 | N/A |
| 2 | 179,891.95 | 7.850 | 7.350 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 2 | 5,661,706.40 | 6.804 | 6.294 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 478 | 478 | N/A |
| 2 | 383,722.49 | 9.600 | 9.100 | N/A | N/A | N/A | N/A | N/A | N/A | 480 | 476 | 476 | N/A |
| 2 | 85,843.23 | 11.700 | 11.200 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 2 | 82,970.92 | 9.850 | 9.350 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 178 | 178 | N/A |
| 2 | 252,132.06 | 9.716 | 9.216 | N/A | N/A | N/A | N/A | N/A | N/A | 180 | 177 | 177 | N/A |
| 2 | 69,443.69 | 11.250 | 10.750 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 2 | 81,715.07 | 11.050 | 10.550 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 237 | 237 | N/A |
| 2 | 54,846.10 | 10.834 | 10.334 | N/A | N/A | N/A | N/A | N/A | N/A | 240 | 238 | 238 | N/A |
| 2 | 121,834.96 | 9.950 | 9.450 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 156,887.99 | 11.022 | 10.522 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |

S-107

| Group | Principal Balance ($) | Gross Mortgage Rate (%) | Net Mortgage Rate (%) | Months to Next Adjustment Date | Gross Margin (%) | Maximum Mortgage Rate (%) | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Original Amortization Term to Maturity (months) | Remaining Amortization Term (months) | Remaining Term to Stated Maturity (months) | Original Interest Only Term (months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 31,765.29 | 10.950 | 10.450 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 67,954.86 | 11.350 | 10.850 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 80,072.20 | 11.050 | 10.550 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 105,574.58 | 9.800 | 9.300 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 6,948,273.07 | 11.459 | 10.959 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 33,116,510.85 | 11.089 | 10.589 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 14,313,005.95 | 10.707 | 10.207 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 23,375,889.95 | 11.236 | 10.736 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 224,806.95 | 10.189 | 9.689 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 238,090.76 | 10.361 | 9.861 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 357 | 357 | N/A |
| 2 | 18,387.90 | 11.400 | 10.900 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 358 | 358 | N/A |
| 2 | 265,710.10 | 10.087 | 9.587 | N/A | N/A | N/A | N/A | N/A | N/A | 360 | 356 | 356 | N/A |

Based on the assumptions described above, the tables in Appendix B indicate the percentages of the original certificate principal balance of the Class I-A Certificates, the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates, the Class II-A4 Certificates, the Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates and the Class M-9 Certificates that would be outstanding after each of the dates shown, at various prepayment scenarios and the corresponding weighted average lives.

**Yield Sensitivity of the Mezzanine Certificates**

If the certificate principal balances of all classes of certificates that are subordinate to a class of the Mezzanine Certificates have been reduced to zero, the yield to maturity on that class of the Mezzanine Certificates will become extremely sensitive to losses on the mortgage loans (and their timing) because the entire amount of any related realized losses (to the extent not covered by Net Monthly Excess Cashflow, any payments by the swap counterparty pursuant to the swap agreement) will be allocated to that class of the Mezzanine Certificates. The initial undivided interests in the mortgage loans evidenced by the Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates, the Class M-9 Certificates and the Class C Certificates are approximately 3.20%, approximately 2.80%, approximately 1.70%, approximately 1.50%, approximately 1.45%, approximately 1.35%, approximately 1.30%, approximately 0.80%, approximately 1.10% and approximately 3.75%, respectively. Investors in the Mezzanine Certificates should fully consider the risk that realized losses on the mortgage loans could result in the failure of such investors to fully recover their initial investments. In addition, once realized losses have been allocated to the Mezzanine Certificates, such amounts with respect to such certificates will no longer accrue interest and will not be reinstated after that, and no amounts in respect of the realized losses so allocated will be distributable to such certificates (other than amounts reinstated due to subsequent recoveries on a liquidated mortgage loan as described under "Description of the Certificates—Credit Enhancement—*Allocation of Losses*"). However, Allocated Realized Loss Amounts may be paid to the Mezzanine Certificates from the Net Monthly Excess Cashflow, to the extent available, and from amounts, if any, received from the swap counterparty pursuant to the swap agreement in the priorities described under "Description of the Certificates—Credit Enhancement—*Excess Interest*" in this prospectus supplement.

Unless the certificate principal balances of the Class A Certificates have been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until the Stepdown Date or during any period in which a Trigger Event is in effect. As a result, the weighted average lives of the Mezzanine Certificates will be longer than would otherwise be the case if distributions of principal were allocated on a *pro rata* basis among the Class A Certificates and the Mezzanine Certificates. As a result of the longer weighted average lives of the Mezzanine Certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because a Trigger Event may be based on delinquencies and not necessarily losses, it is possible for the Mezzanine Certificates to receive no principal distributions (unless the certificate principal balance of the Class A Certificates has been reduced to zero) on and after the Stepdown Date even if no losses have occurred

on the mortgage pool. For additional considerations relating to the yield on the Mezzanine Certificates, we refer you to "Yield and Maturity Considerations" in the accompanying prospectus.

### USE OF PROCEEDS

The depositor will apply the net proceeds of the sale of the offered certificates to the purchase of the mortgage loans transferred to the trust and to make a deposit into the interest coverage account.

### MATERIAL FEDERAL INCOME TAX CONSEQUENCES

One or more elections will be made to treat designated portions of the trust (exclusive of the reserve fund, the supplemental interest trust, the supplemental interest account, the swap agreement, the interest coverage account and the final maturity reserve account) as real estate mortgage investment conduits (each a "**REMIC**") for federal income tax purposes. Upon the issuance of the certificates, Thacher Proffitt & Wood LLP, counsel to the depositor, will deliver its opinion generally to the effect that, assuming (i) each REMIC election is made timely in the required form, (ii) the servicer, any subservicer and the trustee comply with all provisions of the pooling agreement, (iii) certain representations in the pooling agreement and the mortgage loan purchase agreement are true, and (iv) there is continued compliance with applicable provisions of the Internal Revenue Code of 1986, as it may be amended from time to time (the "**Code**"), and applicable Treasury regulations issued under the Code, for federal income tax purposes, each REMIC elected by the trust will qualify as a REMIC under Sections 860A through 860G of the Code.

For federal income tax reporting purposes, the trustee will treat each holder of an offered certificate as (i) holding an undivided interest in a REMIC regular interest (the "**REMIC regular interest component**") and (ii) as having entered into a limited recourse notional principal contract (the "**NPC component**") which includes the right to receive Net WAC Rate Carryover Amounts and the obligation to make payments to the supplemental interest trust. The REMIC regular interest components will represent "regular interests" in, and generally will be treated as debt instruments of, a REMIC. *See* "Material Federal Income Tax Consequences—REMICs—*Classification of REMICs*" in the accompanying prospectus.

The REMIC regular interest component will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the offered certificate to which it corresponds, except that the maximum interest rate of the REMIC regular interest component will in all cases equal the Net WAC Rate for the corresponding offered certificate, computed for this purpose (i) without reduction for any Swap Termination Payment payable by the supplemental interest trust trustee, (ii) by limiting the swap notional amount to the aggregate scheduled principal balance of the mortgage loans, and (iii) by assuming that, on each distribution date from May 2017 through April 2027, the Final Maturity Reserve Amount payable for each loan group will be the product of the Final Maturity Reserve Rate and the aggregate stated principal balance of the mortgage loans in such group having 40-year original terms to maturity, regardless of whether any amount is actually deposited in the final maturity reserve account on such distribution date. For tax purposes, any Swap Termination Payment will be treated as paid first out of Net Monthly Excess Cashflow and then out of amounts distributed on the offered certificates. As a result of the foregoing, the amount of distributions on the REMIC regular interest corresponding to an offered certificate may exceed or fall short of the actual amount of distributions on such certificate.

Any amount payable on an offered certificate in excess of the amount payable on the corresponding REMIC regular interest component will be deemed to have been paid to the holder of that certificate pursuant to the NPC component. Alternatively, any amount payable on the REMIC regular interest component of an offered certificate in excess of the amount payable on that certificate will be treated as having been received by the holder of that certificate with respect to the REMIC regular interest component and then as having been paid by such holder pursuant to the NPC Component. Each holder of an offered certificate will be required to report income accruing with respect to the REMIC regular interest component and the NPC component as discussed below and under "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Regular Certificates" in the accompanying prospectus.

**Allocation of Purchase Price and Sales Price**

The treatment of amounts received by a holder of an offered certificate under such holder's NPC component will depend on the portion, if any, of such holder's purchase price allocable thereto.  Under Treasury regulations, each holder of an offered certificate must allocate its purchase price for the certificate among the REMIC regular interest component and the NPC component in accordance with the relative fair market values of each property right.  Treasury regulations regarding original issue discount (the  "**OID Regulations**") provide that the trust's allocation of the issue price of an offered certificate is binding on all holders unless the holder explicitly discloses on its tax return that its allocation is different from the trust's allocation.  For tax reporting purposes, the trust will assume that the NPC component has a nominal value or such other value as specified in the pooling agreement (which will be available upon request from the trustee).  However, the NPC component is difficult to value and the IRS could assert that the value of the NPC component is greater than the value used for information reporting purposes.  Prospective investors should consult their tax advisors regarding the tax consequences to them if the IRS were successful in asserting a different value for the NPC component.

Upon the sale, exchange, or other disposition of an offered certificate, the beneficial owner of the certificate must allocate the amount realized between the components of the certificate based on their relative fair market values at the time of the disposition and must treat the sale, exchange or other disposition as a disposition of both components.  Assuming that the offered certificate is a capital asset within the meaning of Section 1221 of the Code, gain or loss on the disposition of the NPC component should be capital gain or loss.  For a discussion of the material federal income tax consequences to a holder on the disposition of the REMIC regular interest component, see "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Regular Certificates" in the accompanying prospectus.

**Original Issue Discount and Premium**

Some of the REMIC regular interest components of the Class A Certificates, the Mezzanine Certificates may be treated as having been issued with original issue discount.  In addition, if the IRS were to successfully assert that the NPC component of any offered certificate had a greater value than that used by the trust for tax reporting, one consequence would be a corresponding increase in the amount of original issue discount (or reduction in the premium paid) on the REMIC regular interest component.  The prepayment assumption that will be used in determining the rate of accrual of original issue discount, premium and market discount, if any, for federal income tax purposes will be based on the assumption that subsequent to the date of any determination the mortgage loans will prepay at 100% of the Prepayment Assumption.  No representation is made that the mortgage loans will prepay at such rate or at any other rate.  *See* "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Regular Certificates—*Original Issue Discount*" in the accompanying prospectus.

The OID Regulations generally address the treatment of debt instruments issued with original issue discount.  Purchasers of the offered certificates should be aware that the OID Regulations do not adequately address certain issues relevant to, or are not applicable to, prepayable securities such as the REMIC regular interest component of the offered certificates.  In addition, there is considerable uncertainty concerning the application of the OID Regulations to REMIC regular interests that provide for payments based on an adjustable rate such as the REMIC regular interest components of the offered certificates.  Because of the uncertainty concerning the application of Section 1272(a)(6) of the Code to such regular interests and because the rules of the OID Regulations relating to debt instruments having an adjustable rate of interest are limited in their application in ways that could preclude their application to such regular interests even in the absence of Section 1272(a)(6) of the Code, the IRS could assert that the REMIC regular interest component of the offered certificates should be treated as issued with original issue discount or should be governed by the rules applicable to debt instruments having contingent payments or by some other method not yet set forth in regulations.  Prospective purchasers of the offered certificates are advised to consult their tax advisors concerning the tax treatment of such certificates.

It appears that a reasonable method of reporting original issue discount with respect to the REMIC regular interest components of the offered certificates, if such components are required to be treated as issued with original issue discount, generally would be to report all income with respect to such components as original issue discount for each period, computing such original issue discount (i) by assuming that the value of the applicable index will remain constant for purposes of determining the original yield to maturity of, and projecting future distributions on,

such components, thereby treating such components as fixed-rate instruments to which the original issue discount computation rules described in the accompanying prospectus can be applied, and (ii) by accounting for any positive or negative variation in the actual value of the applicable index in any period from its assumed value as a current adjustment to original issue discount with respect to such period.  *See* "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Regular Certificates—*Original Issue Discount*" in the accompanying prospectus.

If the method for computing original issue discount described in the prospectus results in a negative amount for any period with respect to a certificateholder, the amount of original issue discount allocable to that period would be zero and the certificateholder would be permitted to offset that negative amount only against future original issue discount, if any, attributable to those certificates.

Whether or not the IRS successfully asserts that the REMIC regular interest component of the offered certificates are issued with original issue discount, the holders of the offered certificates will be required to include in income interest on such components in accordance with the accrual method of accounting.

The REMIC regular interest components of certain certificates may be treated for federal income tax purposes as having been purchased at a premium.  Whether any holder of a certificate will be treated as holding such component with amortizable bond premium will depend on such certificateholder's purchase price and the distributions remaining to be made on such certificate at the time of its acquisition by the certificateholder.  Holders of such certificates should consult their own tax advisors regarding the possibility of making an election to amortize such premium.  *See* "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Regular Certificates—*Premium*" in the accompanying prospectus.

**The NPC Component**

Payments with respect to the NPC component of an offered certificate will be treated as includible in income based on the regulations relating to notional principal contracts (the "**Notional Principal Contract Regulations**").  Treasury regulations have been promulgated under Section 1275 of the Code generally providing for the integration of a "qualifying debt instrument" with a hedge if the combined cash flows of the components are substantially equivalent to the cash flows on a fixed or variable rate debt instrument.  However, such regulations specifically disallow integration of debt instruments subject to Section 1272(a)(6) of the Code.  Therefore, holders of the offered certificates will be unable to use the integration method provided for under such regulations with respect to those certificates.

The portion of the overall purchase price of an offered certificate attributable to the NPC component must be amortized over the life of such certificate, taking into account the declining balance of the related REMIC regular interest component.  The Notional Principal Contract Regulations provide alternative methods for amortizing the purchase price of an interest rate cap contract.  Prospective investors are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the NPC component of an offered certificate.

Any payments made to a beneficial owner of an offered certificate in excess  of the amounts payable on the corresponding REMIC regular interest component will be treated as having been received on such certificate pursuant to the NPC component, and such excess will be treated as a periodic payment on a notional principal contract.  To the extent the sum of such periodic payments for any year exceeds that year's amortized cost of the NPC component, such excess represents net income for that year.  Conversely, to the extent that the amount of that year's amortized cost exceeds the sum of the periodic payments, such excess shall represent a net deduction for that year.  In addition, any amounts payable on the REMIC regular interest component in excess of the amount of payments on the offered certificate to which it relates will be treated as having been received by the beneficial owner of such certificate and then paid by such owners to the supplemental interest trust trustee pursuant to the NPC component, and such excess should be treated as a payment on a notional principal contract that is made by the beneficial owner during the applicable taxable year and that is taken into account in determining the beneficial owner's net income or net deduction with respect to the NPC component for such taxable year.  Although not clear, net income or a net deduction with respect to the NPC component should be treated as ordinary income or as an ordinary deduction.

The ability of a beneficial owner of an offered certificate to recognize a net deduction with respect to the NPC component is limited under Sections 67 and 68 of the Code in the case of (i) estates and trusts and (ii) individuals owning an interest in such component directly or through a "pass-through entity" (other than in connection with such individual's trade or business). Pass through entities include partnerships, S corporations, grantor trusts and nonpublicly offered regulated investment companies, but do not include estates, nongrantor trusts, cooperatives, real estate investment trusts and publicly offered regulated investment companies. Further, such a beneficial owner will not be able to recognize a net deduction with respect to the NPC component in computing the beneficial owner's alternative minimum tax liability. Because a beneficial owner of an offered certificate will be required to include in income the amount deemed to have been paid by such owner pursuant to the NPC component but may not be able to deduct that amount from income, a beneficial owner of an offered certificate may have income that exceeds cash distributions on the certificate, in any period and over the term of the certificate. As a result, the offered certificates may not be a suitable investment for any taxpayer whose net deduction with respect to the NPC would be subject to the limitations described above.

Upon the sale of an offered certificate, the amount of the sale proceeds allocated to the NPC component would be considered a "**termination payment**" under the Notional Principal Contract Regulations. The holder of the offered certificates will have gain or loss with respect to the termination of the NPC component (separate from and in addition to any gain or loss realized on the disposition of the holder's REMIC regular interest component) equal to (i) any termination payment it received or is deemed to have received minus (ii) the unamortized portion of any amount paid (or deemed paid) by the holder upon acquiring its interest in the NPC component. Such gain or loss will generally be treated as capital gain or loss. Moreover, in the case of a bank and certain other financial institutions, Code Section 582(c) would likely not apply to treat such gain or loss as ordinary.

**Payments on the Last Scheduled Distribution Date**

Any holder of an offered certificate receiving a principal payment from the final maturity reserve trust on the last scheduled distribution date, will be treated as selling a portion of its certificate to the holder or holders of the Class C Certificates and will be treated as receiving the amount of the principal payment as proceeds of the sale. The portion treated as having been sold will equal the percentage of the certificate principal balance of such certificate that is paid out of the final maturity reserve account. Accordingly, any principal payment from the final maturity reserve account on the last scheduled distribution date, will not be treated as a distribution from any REMIC. Prospective investors should consult their own tax advisors regarding the consequences to them of such a sale.

**Potential Alternative Treatment of Right to Receive Payments Outside of the REMIC**

The right to receive payments from the reserve fund, the supplemental interest account and the final maturity reserve account may be treated as a partnership between the holders of the offered certificates and the Class C Certificates, in which case a holder of an offered certificate will be subject to different rules on the timing of income and a foreign holder may be subject to withholding in respect of any such payments. Prospective purchasers are urged to consult their own tax advisors regarding the allocation of issue price and the timing, character and source of income and deductions resulting from ownership of a certificate.

**Treatment as Real Estate Assets**

The REMIC regular interest components of the offered certificates will be treated as assets described in Section 7701(a)(19)(C) of the Code and "real estate assets" under Section 856(c)(5) of the Code, generally in the same proportion that the assets in the trust would be so treated. No mortgage loans have been identified that would fail to qualify as assets described in such sections of the Code. In addition, interest accruing on the REMIC regular interest components of the offered certificates will be treated as "interest on obligations secured by mortgages on real property" under Section 856(c)(3)(B) of the Code, generally to the extent that the offered certificates are treated as "real estate assets" under Section 856(c)(5) of the Code. The REMIC regular interest components of the offered certificates will also be treated as "qualified mortgages" under Section 860G(a)(3) of the Code. However, the obligations of the certificateholder under the NPC component of the certificates may prevent any entity holding the certificates from qualifying as a REMIC. *See* "Material Federal Income Tax Consequences—REMICs—*Characterization of Investments in REMIC Certificates*" in the accompanying prospectus.

Any portion of the value of an offered certificate that is allocated to the NPC component will not be treated as a qualifying asset for any holder that is a mutual savings bank, domestic building and loan association, real estate investment trust, or real estate mortgage investment conduit, and any amounts received from the reserve fund or the supplemental interest trust will not be qualifying real estate income for real estate investment trusts.

**Prohibited Transactions**

It is not anticipated that any REMIC elected by the trust will engage in any transactions that would subject it to the prohibited transactions tax imposed under Section 860F(a) of the Code, the contributions tax imposed under Section 860G(d) of the Code or the tax on net income from foreclosure property imposed under Section 860G(c) of the Code. However, in the event that any such tax is imposed on any REMIC elected by the trust, such tax will be borne (i) by the trustee, if the trustee has breached its obligations with respect to REMIC compliance under the pooling agreement, (ii) by the servicer, if the servicer has breached its obligations with respect to REMIC compliance under the pooling agreement and (iii) otherwise by the trust, with a potential reduction in amounts otherwise distributable to the holders of one or more classes of the offered certificates. *See* "Description of the Securities" and "Material Federal Income Tax Consequences—Matters Relevant to Holders of All REMIC Certificates—*Prohibited Transactions and Other Possible REMIC Taxes*" in the accompanying prospectus.

The responsibility for filing annual federal information returns and other reports will be borne by the trustee or the servicer. *See* "Material Federal Income Tax Consequences—Matters Relevant to Holders of All REMIC Certificates—*Reporting and Other Administrative Matters*" in the accompanying prospectus.

For further information regarding the federal income tax consequences of investing in the offered certificates, *see* "Material Federal Income Tax Consequences—REMICs" in the accompanying prospectus.

## ERISA CONSIDERATIONS

ERISA and Section 4975 of the Internal Revenue Code contain provisions that may affect a fiduciary of an employee benefit plan or other plan or arrangement, such as an individual retirement account. Plans, insurance companies or other persons investing Plan Assets (see "ERISA Considerations—Plan Asset Regulation" in the accompanying prospectus) should carefully review with their legal counsel whether owning offered certificates is permitted under ERISA or Section 4975 of the Internal Revenue Code. The Underwriter's Exemption or the WCC Exemption, as described under "ERISA Considerations—Underwriter's and WCC Exemption" in the accompanying prospectus and as amended on March 20, 2007 by Prohibited Transaction Exemption 2007-05 at 72 Fed. Reg. 13130, may provide an exemption from restrictions imposed by ERISA or Section 4975 of the Internal Revenue Code and may permit a Plan to own, or Plan Assets to be used to purchase, the offered certificates. However, both the Underwriter's Exemption and the WCC Exemption contain several conditions, including the requirement that an affected Plan must be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933, as amended. In addition, in order to assure the inapplicability of certain restrictions imposed by Section 406(b)(1) and (2) of ERISA and Section 4975(c)(1)(E) of the Code in connection with the initial issuance of the certificates, each Plan or person using assets of any Plan that acquires offered certificates from the underwriters named in this prospectus supplement or from the sponsor or any of its affiliates shall be deemed to represent and warrant that (i) no person who has discretionary authority or renders investment advice with respect to such acquisition of such offered certificates (and no affiliate of such person) is a mortgagor with respect to more than 5% of the mortgage loans, (ii) such Plan's investment in any class of offered certificates does not and will not exceed 25% of all of the offered certificates of that class at the time such investment is made, and (iii) immediately after such investment is made, no more than 25% of the assets of such Plan is invested in securities representing an interest in a trust or other issuer containing assets sold or serviced by the same entity (provided that an entity will not be considered to service assets contained in a trust or other issuer if it is merely a subservicer with respect to such trust or issuer).

Pursuant to the Underwriter's Exemption or the WCC Exemption, Plans may purchase and hold subordinate certificates such as the Mezzanine Certificates if they are rated "BBB-" or better at the time of purchase. See "ERISA Considerations—Underwriter's and WCC Exemption" in the accompanying prospectus. A fiduciary of a Plan contemplating purchasing an offered certificate must make its own determination that the conditions set forth in the Underwriter's Exemption or the WCC Exemption will be satisfied with respect to those certificates.

**ERISA Considerations While the Supplemental Interest Trust and the Final Maturity Reserve Trust are in Existence**

For so long as the holder of an offered certificate also holds an interest in the supplemental interest trust and the final maturity reserve trust, the holder will be deemed to have acquired and be holding the offered certificate without the right to receive payments from the supplemental interest trust or the final maturity reserve trust and, separately, the right to receive payments from the supplemental interest trust and the final maturity reserve trust. The Underwriter's Exemption or the WCC Exemption is not applicable to the acquisition, holding and transfer of an interest in the supplemental interest trust or the final maturity reserve trust. In addition, while the supplemental interest trust or the final maturity reserve trust is in existence, it is possible that not all of the requirements for the Underwriter's Exemption or the WCC Exemption to apply to the acquisition, holding and transfer of offered certificates will be satisfied. However, if the Underwriter's Exemption or WCC Exemption is not available, there may be other exemptions that may apply. Accordingly, no Plan or other person using assets of a Plan may acquire or hold an offered certificate while the supplemental interest trust or the final maturity reserve trust in existence, unless (1) such Plan is an accredited investor within the meaning of the Exemption and (2) such acquisition or holding is eligible for the exemptive relief available under Prohibited Transaction Class Exemption ("PTE") 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers"). Each beneficial owner of an offered certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the offered certificate, or interest therein, that either (i) it is not a Plan or (ii) the acquisition and holding of such certificate are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions as required immediately above.

**ERISA Considerations After Termination of the Supplemental Interest Trust and the Final Maturity Reserve Trust**

Subsequent to the termination of the supplemental interest trust which holds the swap agreement and the final maturity reserve trust which holds the final maturity reserve account, it is expected that the Underwriter's Exemption or the WCC Exemption will apply to the acquisition and holding of the offered certificates by Plans if the conditions of the Underwriter's Exemption or WCC Exemption are met. A fiduciary of or other investor of Plan Assets contemplating purchasing an offered certificate must make its own determination that the conditions described above will be satisfied for such certificate.

A Plan, or other purchaser acting on its behalf or with Plan Assets, that purchases the subordinated certificates subsequent to the termination of the supplemental interest trust and the final maturity reserve trust will be deemed to have represented that:

- the certificates were rated "BBB-" or better at the time of purchase; or

- the following conditions are satisfied:

  - it is an insurance company;

  - the source of funds used to acquire or hold the certificates is an "insurance company general account" as that term is defined in PTCE 95-60; and

  - the conditions in Sections I and III of PTCE 95-60 have been satisfied.

The pooling agreement will require that if neither condition is satisfied the Plan, or other purchaser acting on its behalf or with Plan Assets, will:

- indemnify and hold harmless the depositor, the trustee, the Delaware trustee, the supplemental interest trust trustee, the servicer, the underwriters and the trust from and against all liabilities, claims, costs or expenses incurred by them as a result of the purchase; and

- be disregarded as purchaser and the immediately preceding permitted beneficial owner will be treated as the beneficial owner of that certificate.

Any fiduciary or other investor of Plan Assets that proposes to own the offered certificates on behalf of or with assets of any Plan should consult with legal counsel about: (i) whether the specific and general conditions and the other requirements in the Underwriter's Exemption, the WCC Exemption or the enumerated class exemptions would be satisfied, or whether any other prohibited transaction exemption would apply, and (ii) the application of the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Internal Revenue Code to the proposed investment.  See "ERISA Considerations" in the accompanying prospectus.

No representation is made that the sale of any of the offered certificates to a Plan or other purchaser acting on its behalf meets any relevant legal requirement for investments by Plans generally or any particular Plan, or that the investment is appropriate for Plans generally or any particular Plan.

## LEGAL INVESTMENT CONSIDERATIONS

None of the offered certificates will be "mortgage related securities" for purposes of SMMEA.

The depositor makes no representations as to the proper characterization of any class of offered certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of offered certificates under applicable legal investment restrictions.  These uncertainties may adversely affect the liquidity of any class of offered certificates.  Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of offered certificates constitutes a legal investment or is subject to investment, capital or other restrictions.

*See* "Certain Legal Investment Aspects" in the accompanying prospectus.

## METHOD OF DISTRIBUTION

The depositor has agreed to sell to the underwriters, and the underwriters have agreed to purchase, the principal amount of the offered certificates specified opposite their respective names in the table below.  An underwriting agreement between the depositor and the underwriters governs the sale of the offered certificates.

| Underwriters | Original Certificate Principal Balance of the Class I-A Certificates | Original Certificate Principal Balance of the Class II-A1 Certificates | Original Certificate Principal Balance of the Class II-A2 Certificates | Original Certificate Principal Balance of the Class II-A3 Certificates | Original Certificate Principal Balance of the Class II-A4 Certificates | Original Certificate Principal Balance of the Class M-1 Certificates | Original Certificate Principal Balance of the Class M-2 Certificates |
|---|---|---|---|---|---|---|---|
| WaMu Capital Corp. | $ 491,550,000 | $ 250,197,500 | $ 87,725,400 | $ 139,589,800 | $ 82,568,500 | $ 35,697,900 | $ 31,236,100 |
| Lehman Brothers Inc. | $           0 | $ 71,485,000 | $ 25,064,400 | $ 39,882,800 | $ 23,591,000 | $ 10,199,400 | $ 8,924,600 |
| Banc of America Securities LLC | $           0 | $ 35,742,500 | $ 12,532,200 | $ 19,941,400 | $ 11,795,500 | $ 5,099,700 | $ 4,462,300 |

| Underwriters | Original Certificate Principal Balance of the Class M-3 Certificates | Original Certificate Principal Balance of the Class M-4 Certificates | Original Certificate Principal Balance of the Class M-5 Certificates | Original Certificate Principal Balance of the Class M-6 Certificates | Original Certificate Principal Balance of the Class M-7 Certificates | Original Certificate Principal Balance of the Class M-8 Certificates | Original Certificate Principal Balance of the Class M-9 Certificates |
|---|---|---|---|---|---|---|---|
| WaMu Capital Corp. | $ 18,964,400 | $ 16,733,500 | $ 16,175,600 | $ 15,059,800 | $ 14,502,600 | $ 8,924,300 | $ 12,271,700 |
| Lehman Brothers Inc. | $ 5,418,400 | $ 4,781,000 | $ 4,621,600 | $ 4,302,800 | $ 4,143,600 | $ 2,549,800 | $ 3,506,200 |
| Banc of America Securities LLC | $ 2,709,200 | $ 2,390,500 | $ 2,310,800 | $ 2,151,400 | $ 2,071,800 | $ 1,274,900 | $ 1,753,100 |

The aggregate proceeds (excluding accrued interest) to the depositor from the sale of the offered certificates, before deducting expenses estimated to be $850,000, will be approximately 99.04% of the initial aggregate principal balance of the offered certificates.  Under the underwriting agreement, the underwriters have agreed to take and pay for all of the offered certificates, if any are taken.  The underwriters will distribute the offered certificates from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of

sale.  The difference between the purchase price for the offered certificates paid to the depositor and the proceeds from the sale of the offered certificates realized by the underwriters will constitute underwriting discounts and commissions.

WaMu Capital Corp., an underwriter, is a wholly owned subsidiary of Washington Mutual Bank and an affiliate of the depositor.

The depositor and the sponsor have agreed to indemnify the underwriters or make contributions to the underwriters with respect to certain civil liabilities, including liabilities under the Securities Act of 1933, that are based on a claim that the prospectus, this prospectus supplement, the related registration statement or any free writing prospectus prepared by the depositor, as from time to time amended or supplemented, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading (unless such statement or omission was made in reliance upon, and in conformity with, written information furnished to the depositor by the underwriters).

## LEGAL MATTERS

The depositor's counsel, Thacher Proffitt & Wood LLP, New York, New York, and its Delaware counsel, Richards, Layton & Finger, P.A., Wilmington, Delaware, will deliver legal opinions required by the underwriting agreement.  Certain legal matters will be passed upon for the underwriters by Heller Ehrman LLP, Seattle, Washington.

## RATINGS

It is a condition to the issuance of the offered certificates that they receive the ratings indicated from Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**") and Fitch, Inc. ("**Fitch**"):

| | Rating Agency | | | | Rating Agency | | |
|---|---|---|---|---|---|---|---|
| **Class** | **S&P** | **Moody's** | **Fitch** | **Class** | **S&P** | **Moody's** | **Fitch** |
| I-A | AAA | Aaa | AAA | M-3 | AA- | Aa3 | AA- |
| II-A1 | AAA | Aaa | AAA | M-4 | A+ | A1 | A+ |
| II-A2 | AAA | Aaa | AAA | M-5 | A | A2 | A |
| II-A3 | AAA | Aaa | AAA | M-6 | A- | A3 | A- |
| II-A4 | AAA | Aaa | AAA | M-7 | BBB+ | Baa1 | BBB+ |
| M-1 | AA+ | Aa1 | AA+ | M-8 | BBB | Baa2 | BBB |
| M-2 | AA | Aa2 | AA | M-9 | BBB- | Baa3 | BBB- |

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency.  The rating assigned to each class of offered certificates by each rating agency is based on that rating agency's independent evaluation of that class of certificates.  The rating assigned to a class of offered certificates by one rating agency may not correspond to any rating assigned to that class by any other rating agency.

The ratings assigned to this issue do not constitute a recommendation to purchase or sell these securities.  Rather, they are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation.  The ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans or the payment of the Net WAC Rate Carryover Amounts.

The ratings on the offered certificates address the likelihood of the receipt by certificateholders of all distributions with respect to the underlying mortgage loans to which they are entitled.  The ratings do not represent any assessment of the likelihood that the rate of principal prepayments by mortgagors might differ from those originally anticipated.  As a result of differences in the rate of principal prepayments, certificateholders might suffer

a lower than anticipated yield to maturity.  See "Risk Factors" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

     The depositor has not requested a rating on the offered certificates by any rating agency other than S&P, Moody's and Fitch.  However, there can be no assurance as to whether any other rating agency will rate the offered certificates, or, if it does, what rating would be assigned by any other rating agency.  A rating on the offered certificates by another rating agency, if assigned at all, may be lower than the rating assigned to the offered certificates by S&P, Moody's or Fitch.  In the event that the ratings initially assigned to any of the offered certificates by the rating agencies are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to such offered certificates.

## APPENDIX A

## MORTGAGE LOAN TABLES

**Group I Mortgage Loans**

### Scheduled Principal Balances as of the Cut-off Date of the Group I Mortgage Loans[1]

| Scheduled Principal Balance ($) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 0.01 - 50,000.00........... | 280 | $ 9,442,677.18 | 1.56% |
| 50,000.01 - 100,000.00........... | 487 | 38,360,837.49 | 6.33 |
| 100,000.01 - 150,000.00........... | 537 | 67,426,419.48 | 11.12 |
| 150,000.01 - 200,000.00........... | 507 | 89,099,068.16 | 14.69 |
| 200,000.01 - 250,000.00........... | 420 | 94,605,047.93 | 15.60 |
| 250,000.01 - 300,000.00........... | 368 | 100,888,300.57 | 16.64 |
| 300,000.01 - 350,000.00........... | 256 | 82,942,075.30 | 13.68 |
| 350,000.01 - 400,000.00........... | 209 | 78,397,951.15 | 12.93 |
| 400,000.01 - 450,000.00........... | 68 | 27,962,634.98 | 4.61 |
| 450,000.01 - 500,000.00........... | 15 | 7,103,035.07 | 1.17 |
| 500,000.01 - 550,000.00........... | 8 | 4,190,820.87 | 0.69 |
| 550,000.01 - 600,000.00........... | 7 | 4,099,155.36 | 0.68 |
| 600,000.01 - 650,000.00........... | 2 | 1,260,181.21 | 0.21 |
| 650,000.01 - 700,000.00........... | 1 | 698,567.11 | 0.12 |
| Total...................................... | 3,165 | $ 606,476,771.86 | 100.00% |

[1] The average scheduled principal balance as of the cut-off date of the Group I mortgage loans was approximately $191,620. The principal balances of all of the Group I mortgage loans conform to Fannie Mae and Freddie Mac loan limits.

### Original Terms to Maturity of the Group I Mortgage Loans[1]

| Original Term (months) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 180............................................... | 24 | $ 3,243,662.87 | 0.53% |
| 240............................................... | 14 | 2,066,581.44 | 0.34 |
| 360............................................... | 2,992 | 571,286,706.78 | 94.20 |
| 480............................................... | 135 | 29,879,820.77 | 4.93 |
| Total...................................... | 3,165 | $ 606,476,771.86 | 100.00% |

[1] The weighted average original term to maturity of the Group I mortgage loans was approximately 365 months.

**Remaining Terms to Maturity of the Group I Mortgage Loans[1]**

| Remaining Term (months) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 121 - 180 ................................... | 24 | $ 3,243,662.87 | 0.53% |
| 181 - 240 ................................... | 14 | 2,066,581.44 | 0.34 |
| 301 - 360 ................................... | 2,992 | 571,286,706.78 | 94.20 |
| 361 and above ........................... | 135 | 29,879,820.77 | 4.93 |
| Total ...................................... | 3,165 | $ 606,476,771.86 | 100.00% |

[1] The weighted average remaining term to maturity of the Group I mortgage loans was approximately 362 months.

**Debt to Income Ratio of the Group I Mortgage Loans**

| Debt to Income (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 20.01 - 25.00 ............................... | 129 | $ 20,080,078.90 | 3.31% |
| 25.01 - 30.00 ............................... | 218 | 35,109,555.62 | 5.79 |
| 30.01 - 35.00 ............................... | 312 | 53,749,277.06 | 8.86 |
| 35.01 - 40.00 ............................... | 472 | 86,959,027.43 | 14.34 |
| 40.01 - 45.00 ............................... | 662 | 123,702,569.47 | 20.40 |
| 45.01 - 50.00 ............................... | 844 | 163,007,150.04 | 26.88 |
| 50.01 - 55.00 ............................... | 491 | 115,071,606.90 | 18.97 |
| 55.01 - 60.00 ............................... | 37 | 8,797,506.44 | 1.45 |
| Total ...................................... | 3,165 | $ 606,476,771.86 | 100.00% |

**Property Types of the Group I Mortgage Loans**

| Property Type | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Condominium ............................. | 217 | $   38,043,629.78 | 6.27% |
| Planned Unit Development (1) .... | 338 | 66,712,742.44 | 11.00 |
| Single Family............................... | 2,411 | 450,376,153.93 | 74.26 |
| Townhouse ................................. | 11 | 1,738,898.75 | 0.29 |
| Two to Four Family..................... | 188 | 49,605,346.96 | 8.18 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

(1)   PUD refers to a home or "unit" in a Planned Unit Development.

**Occupancy Status of the Group I Mortgage Loans[1]**

| Occupancy Status | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Investor........................................ | 221 | $   40,046,574.42 | 6.60% |
| Owner-Occupied........................... | 2,905 | 558,276,388.93 | 92.05 |
| Second Home................................ | 39 | 8,153,808.51 | 1.34 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

(1)   Occupancy as represented by the mortgagor at the time of origination.

**Purpose of the Group I Mortgage Loans**

| Purpose | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Cash-Out Refinance..................... | 2,136 | $ 454,606,893.58 | 74.96% |
| Purchase....................................... | 454 | 46,943,549.25 | 7.74 |
| Rate/Term Refinance.................. | 575 | 104,926,329.03 | 17.30 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

**Original Loan-to-Value Ratios of the Group I Mortgage Loans[1]**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| **First Lien Loans:** | | | |
| Less than 60.01% ............................ | 260 | $  46,262,768.77 | 7.63% |
| 60.01 to 70.00% ............................ | 309 | 67,672,093.81 | 11.16 |
| 70.01 to 80.00% ............................ | 1206 | 242,551,089.53 | 39.99 |
| 80.01 to 85.00%: | | | |
| With MI................................... | 93 | 21,862,479.52 | 3.60 |
| Without MI............................... | 176 | 38,270,702.31 | 6.31 |
| 85.01 to 90.00%: | | | |
| With MI................................... | 261 | 58,367,539.81 | 9.62 |
| Without MI............................... | 374 | 80,575,899.94 | 13.29 |
| 90.01 to 95.00%: | | | |
| With MI ................................. | 20 | 4,288,038.79 | 0.71 |
| Without MI............................... | 125 | 27,515,065.06 | 4.54 |
| 95.01 to 100.00%: | | | |
| With MI................................... | 0 | 0.00 | 0.00 |
| Without MI............................... | 51 | 7,732,462.08 | 1.27 |
| Subtotal (First Lien) ............. | 2875 | 595,098,139.62 | 98.12 |
| **Second Lien Loans:** | | | |
| 80.01 to 85.00% ............................ | 0 | 0.00 | 0.00 |
| 85.01 to 90.00% ............................ | 2 | 48,154.71 | 0.01 |
| 90.01 to 95.00% ............................ | 22 | 778,996.78 | 0.13 |
| 95.01 to 100.00% ............................ | 266 | 10,551,480.75 | 1.74 |
| Subtotal (Second Lien)......... | 290 | 11,378,632.24 | 1.88 |
| Total ..................................... | 3,165 | $ 606,476,771.86 | 100.00% |

[1]   The weighted average original loan-to-value ratio of the Group I mortgage loans as of the cut-off date was approximately 79.59%.  References in this prospectus supplement to the loan-to-value ratios of the mortgage loans, in the case of junior lien mortgage loans, unless indicated otherwise, refer to the quotient of (x) the sum of the principal balance of the applicable junior lien mortgage loan and the principal balance of all mortgage indebtedness secured by any senior lien(s) on the related mortgaged property divided by (y) the value (as determined as described in this prospectus supplement, and which may not be the actual value) of such related mortgaged property.

### Geographic Distribution of the Mortgaged Properties relating to the Group I Mortgage Loans[1]

| Location | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Alabama | 25 | $ 3,363,405.09 | 0.55% |
| Alaska | 23 | 5,288,587.05 | 0.87 |
| Arizona | 63 | 11,865,333.10 | 1.96 |
| Arkansas | 7 | 859,885.53 | 0.14 |
| California | 572 | 154,944,391.90 | 25.55 |
| Colorado | 56 | 10,877,180.51 | 1.79 |
| Connecticut | 40 | 7,835,722.75 | 1.29 |
| Delaware | 5 | 1,166,293.88 | 0.19 |
| District of Columbia | 30 | 6,740,642.80 | 1.11 |
| Florida | 255 | 49,254,197.06 | 8.12 |
| Georgia | 76 | 11,705,700.62 | 1.93 |
| Hawaii | 14 | 4,440,087.78 | 0.73 |
| Idaho | 27 | 4,683,223.45 | 0.77 |
| Illinois | 149 | 26,247,971.19 | 4.33 |
| Indiana | 27 | 2,300,173.49 | 0.38 |
| Iowa | 20 | 2,229,273.25 | 0.37 |
| Kansas | 7 | 511,439.66 | 0.08 |
| Kentucky | 11 | 1,552,310.48 | 0.26 |
| Louisiana | 16 | 2,248,020.22 | 0.37 |
| Maine | 25 | 4,408,288.24 | 0.73 |
| Maryland | 236 | 52,063,191.84 | 8.58 |
| Massachusetts | 51 | 12,803,326.42 | 2.11 |
| Michigan | 75 | 7,813,181.24 | 1.29 |
| Minnesota | 35 | 6,293,113.80 | 1.04 |
| Missouri | 52 | 5,054,532.94 | 0.83 |
| Montana | 7 | 1,117,582.97 | 0.18 |
| Nebraska | 27 | 2,890,760.63 | 0.48 |
| Nevada | 17 | 3,677,984.90 | 0.61 |
| New Hampshire | 8 | 1,671,671.54 | 0.28 |
| New Jersey | 116 | 25,407,055.40 | 4.19 |
| New Mexico | 15 | 1,442,730.15 | 0.24 |
| New York | 125 | 32,026,673.93 | 5.28 |
| North Carolina | 33 | 4,598,079.49 | 0.76 |
| Ohio | 30 | 3,738,256.22 | 0.62 |
| Oklahoma | 6 | 687,788.94 | 0.11 |
| Oregon | 87 | 16,121,084.02 | 2.66 |
| Pennsylvania | 102 | 13,819,684.20 | 2.28 |
| Rhode Island | 8 | 1,860,864.84 | 0.31 |
| South Carolina | 8 | 934,011.54 | 0.15 |
| South Dakota | 1 | 137,439.97 | 0.02 |
| Tennessee | 39 | 4,463,667.66 | 0.74 |
| Texas | 291 | 30,012,145.30 | 4.95 |
| Utah | 13 | 2,391,521.16 | 0.39 |

| Location | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Vermont ............................................... | 6 | 1,072,057.97 | 0.18 |
| Virginia ............................................... | 52 | 10,751,184.30 | 1.77 |
| Washington ........................................... | 206 | 41,916,329.21 | 6.91 |
| West Virginia ........................................ | 3 | 464,519.94 | 0.08 |
| Wisconsin ............................................. | 67 | 8,474,545.35 | 1.40 |
| Wyoming .............................................. | 1 | 249,657.94 | 0.04 |
| Total ............................................... | 3,165 | $ 606,476,771.86 | 100.00% |

[1] The greatest ZIP Code geographic concentration of the Group I mortgage loans was approximately 0.49% in the 20774 ZIP Code.

### Documentation Level of the Group I Mortgage Loans[1]

| Documentation Level | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Full Documentation .................... | 2,314 | $ 427,275,209.67 | 70.45% |
| Limited Documentation .............. | 120 | 23,164,448.67 | 3.82 |
| Stated Income Documentation..... | 731 | 156,037,113.52 | 25.73 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

[1] For a description of each Documentation Level, *see* "Underwriting of the Mortgage Loans" in this prospectus supplement.

### Credit Grade for the Group I Mortgage Loans[1]

| Credit Grade | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Premium A.................................... | 2,178 | $ 400,268,582.64 | 66.00% |
| A .................................................. | 411 | 85,011,761.51 | 14.02 |
| A- ................................................. | 163 | 38,092,121.56 | 6.28 |
| B+ ................................................ | 91 | 18,093,173.59 | 2.98 |
| B .................................................. | 151 | 31,660,952.31 | 5.22 |
| C .................................................. | 171 | 33,350,180.25 | 5.50 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

[1] For a description of Credit Grade, *see* "Underwriting of the Mortgage Loans" in this prospectus supplement.

**Credit Scores for the Group I Mortgage Loans[1]**

| Credit Score | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 500  -  524 ...................................... | 157 | $    28,456,953.45 | 4.69% |
| 525  -  549 ...................................... | 212 | 41,884,992.44 | 6.91 |
| 550  -  574 ...................................... | 351 | 70,339,710.65 | 11.60 |
| 575  -  599 ...................................... | 370 | 78,838,993.11 | 13.00 |
| 600  -  624 ...................................... | 653 | 113,256,700.02 | 18.67 |
| 625  -  649 ...................................... | 574 | 107,651,173.84 | 17.75 |
| 650  -  674 ...................................... | 419 | 77,848,213.62 | 12.84 |
| 675  -  699 ...................................... | 214 | 44,737,198.42 | 7.38 |
| 700 or greater............................. | 215 | 43,462,836.31 | 7.17 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

[1]   The weighted average credit score of the Group I mortgage loans was approximately 618.

**Current Mortgage Rates of the Group I Mortgage Loans[1]**

| Current Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 5.500  -   5.999............................ | 48 | $    12,376,230.30 | 2.04% |
| 6.000  -   6.499............................ | 185 | 47,793,186.12 | 7.88 |
| 6.500  -   6.999............................ | 345 | 81,456,801.59 | 13.43 |
| 7.000  -   7.499............................ | 410 | 91,555,415.03 | 15.10 |
| 7.500  -   7.999............................ | 465 | 98,049,585.23 | 16.17 |
| 8.000  -   8.499............................ | 351 | 72,128,036.15 | 11.89 |
| 8.500  -   8.999............................ | 364 | 72,301,631.92 | 11.92 |
| 9.000  -   9.499............................ | 236 | 41,767,226.06 | 6.89 |
| 9.500  -   9.999............................ | 293 | 44,253,021.75 | 7.30 |
| 10.000 - 10.499............................ | 131 | 17,184,653.37 | 2.83 |
| 10.500 - 10.999............................ | 138 | 16,780,280.76 | 2.77 |
| 11.000 - 11.499............................ | 128 | 6,752,536.85 | 1.11 |
| 11.500 - 11.999............................ | 57 | 3,321,216.87 | 0.55 |
| 12.000 - 12.499............................ | 12 | 659,567.63 | 0.11 |
| 12.500 - 12.999............................ | 2 | 97,382.23 | 0.02 |
| Total........................................ | 3,165 | $ 606,476,771.86 | 100.00% |

[1]   The weighted average current Mortgage Rate of the Group I mortgage loans as of the cut-off date was approximately 8.022% per annum.

**Maximum Mortgage Rates of the Adjustable-Rate Group I Mortgage Loans**[1]

| Maximum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 11.500 - 11.999........................... | 47 | $    12,301,461.93 | 2.67% |
| 12.000 - 12.499........................... | 83 | 22,413,899.63 | 4.87 |
| 12.500 - 12.999........................... | 200 | 49,052,192.22 | 10.66 |
| 13.000 - 13.499........................... | 288 | 68,385,203.92 | 14.86 |
| 13.500 - 13.999........................... | 362 | 80,190,238.83 | 17.43 |
| 14.000 - 14.499........................... | 280 | 61,739,853.72 | 13.42 |
| 14.500 - 14.999........................... | 289 | 61,900,077.92 | 13.45 |
| 15.000 - 15.499........................... | 201 | 37,403,552.78 | 8.13 |
| 15.500 - 15.999........................... | 187 | 37,287,595.11 | 8.10 |
| 16.000 - 16.499........................... | 71 | 12,179,972.60 | 2.65 |
| 16.500 - 16.999........................... | 81 | 12,867,500.87 | 2.80 |
| 17.000 - 17.499........................... | 23 | 2,406,822.35 | 0.52 |
| 17.500 - 17.999........................... | 13 | 1,446,169.53 | 0.31 |
| 18.000 - 18.499........................... | 7 | 463,662.55 | 0.10 |
| 18.500 - 18.999........................... | 1 | 45,407.25 | 0.01 |
| Total...................................... | 2,133 | $ 460,083,611.21 | 100.00% |

[1]  The weighted average maximum mortgage rate of the adjustable-rate Group I mortgage loans as of the cut-off date was approximately 14.108% per annum.

**Minimum Mortgage Rates of the Adjustable-Rate Group I Mortgage Loans**[1]

| Minimum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 5.500 -  5.999........................... | 47 | $    12,301,461.93 | 2.67% |
| 6.000 -  6.499........................... | 83 | 22,413,899.63 | 4.87 |
| 6.500 -  6.999........................... | 200 | 49,052,192.22 | 10.66 |
| 7.000 -  7.499........................... | 288 | 68,385,203.92 | 14.86 |
| 7.500 -  7.999........................... | 362 | 80,190,238.83 | 17.43 |
| 8.000 -  8.499........................... | 280 | 61,739,853.72 | 13.42 |
| 8.500 -  8.999........................... | 289 | 61,900,077.92 | 13.45 |
| 9.000 -  9.499........................... | 201 | 37,403,552.78 | 8.13 |
| 9.500 -  9.999........................... | 187 | 37,287,595.11 | 8.10 |
| 10.000 - 10.499........................... | 71 | 12,179,972.60 | 2.65 |
| 10.500 - 10.999........................... | 81 | 12,867,500.87 | 2.80 |
| 11.000 - 11.499........................... | 23 | 2,406,822.35 | 0.52 |
| 11.500 - 11.999........................... | 13 | 1,446,169.53 | 0.31 |
| 12.000 - 12.499........................... | 7 | 463,662.55 | 0.10 |
| 12.500 - 12.999........................... | 1 | 45,407.25 | 0.01 |
| Total...................................... | 2,133 | $ 460,083,611.21 | 100.00% |

[1]  The weighted average minimum mortgage rate of the adjustable-rate Group I mortgage loans as of the cut-off date was approximately 8.108% per annum.

**Gross Margins of the Adjustable-Rate Group I Mortgage Loans[1]**

| Gross Margin (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 4.999 and below............................ | 1,639 | $ 356,349,046.18 | 77.45% |
| 5.000  -  5.999.............................. | 340 | 73,072,183.86 | 15.88 |
| 6.000  -  6.999.............................. | 147 | 29,385,203.56 | 6.39 |
| 7.000 or greater........................... | 7 | 1,277,177.61 | 0.28 |
| Total........................................ | 2,133 | $ 460,083,611.21 | 100.00% |

[1]   The weighted average Gross Margin of the adjustable-rate Group I mortgage loans as of the cut-off date was approximately 5.239% per annum.

**Next Adjustment Dates for the Adjustable-Rate Group I Mortgage Loans**

| Next Adjustment Date | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| June 1, 2008................................... | 1 | $ 36,909.32 | 0.01% |
| July 1, 2008.................................... | 1 | 339,392.51 | 0.07 |
| August 1, 2008............................... | 1 | 119,419.51 | 0.03 |
| October 1, 2008 ............................. | 15 | 3,084,095.98 | 0.67 |
| November 1, 2008 .......................... | 12 | 2,088,426.05 | 0.45 |
| December 1, 2008........................... | 19 | 3,768,697.24 | 0.82 |
| January 1, 2009.............................. | 508 | 113,794,071.88 | 24.73 |
| February 1, 2009............................ | 769 | 164,080,794.56 | 35.66 |
| March 1, 2009................................ | 95 | 19,431,159.36 | 4.22 |
| September 1, 2009 .......................... | 1 | 93,298.63 | 0.02 |
| October 1, 2009 ............................. | 1 | 299,376.97 | 0.07 |
| November 1, 2009 .......................... | 4 | 1,380,523.07 | 0.30 |
| December 1, 2009........................... | 4 | 930,373.38 | 0.20 |
| January 1, 2010.............................. | 187 | 39,720,234.75 | 8.63 |
| February 1, 2010............................ | 260 | 52,393,579.28 | 11.39 |
| March 1, 2010................................ | 34 | 6,919,018.24 | 1.50 |
| August 1, 2011............................... | 1 | 254,122.30 | 0.06 |
| September 1, 2011 .......................... | 2 | 463,261.72 | 0.10 |
| October 1, 2011 ............................. | 2 | 475,234.65 | 0.10 |
| November 1, 2011 .......................... | 3 | 337,536.12 | 0.07 |
| December 1, 2011........................... | 3 | 605,705.15 | 0.13 |
| January 1, 2012.............................. | 84 | 18,975,369.58 | 4.12 |
| February 1, 2012............................ | 117 | 28,105,467.43 | 6.11 |
| March 1, 2012................................ | 9 | 2,387,543.53 | 0.52 |
| Total........................................ | 2,133 | $ 460,083,611.21 | 100.00% |

**Initial Periodic Rate Caps of the Adjustable-Rate Group I Mortgage Loans[1]**

| Initial Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000 .......................................... | 41 | $ 10,884,598.06 | 2.37% |
| 2.000 .......................................... | 1,380 | 295,858,368.35 | 64.31 |
| 3.000 .......................................... | 712 | 153,340,644.80 | 33.33 |
| Total...................................... | 2,133 | $ 460,083,611.21 | 100.00% |

[1] Relates solely to initial rate adjustments. The weighted average initial periodic rate cap of the adjustable-rate Group I mortgage loans as of the cut-off date was approximately 2.310%.

**Subsequent Periodic Rate Caps of the Adjustable-Rate Group I Mortgage Loans[1]**

| Subsequent Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000 .......................................... | 2,133 | $ 460,083,611.21 | 100.00% |
| Total...................................... | 2,133 | $ 460,083,611.21 | 100.00% |

[1] Relates to all rate adjustments subsequent to initial rate adjustments.

**Group II Mortgage Loans**

**Scheduled Principal Balances as of the Cut-off Date of the Group II Mortgage Loans[1]**

| Scheduled Principal Balance ($) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 0.01 - 50,000.00............ | 233 | $ 8,815,882.71 | 0.89% |
| 50,000.01 - 100,000.00............ | 764 | 56,667,402.50 | 5.74 |
| 100,000.01 - 150,000.00............ | 506 | 61,961,464.47 | 6.28 |
| 150,000.01 - 200,000.00............ | 288 | 50,212,381.47 | 5.09 |
| 200,000.01 - 250,000.00............ | 198 | 44,706,735.27 | 4.53 |
| 250,000.01 - 300,000.00............ | 214 | 58,610,164.28 | 5.94 |
| 300,000.01 - 350,000.00............ | 158 | 51,181,927.09 | 5.18 |
| 350,000.01 - 400,000.00............ | 123 | 46,243,851.45 | 4.68 |
| 400,000.01 - 450,000.00............ | 208 | 89,234,650.70 | 9.04 |
| 450,000.01 - 500,000.00............ | 204 | 97,183,392.68 | 9.84 |
| 500,000.01 - 550,000.00............ | 184 | 96,618,870.60 | 9.79 |
| 550,000.01 - 600,000.00............ | 149 | 85,702,050.40 | 8.68 |
| 600,000.01 - 650,000.00............ | 109 | 68,432,113.83 | 6.93 |
| 650,000.01 - 700,000.00............ | 74 | 50,353,054.80 | 5.10 |
| 700,000.01 - 750,000.00............ | 42 | 30,568,645.76 | 3.10 |
| 750,000.01 - 800,000.00............ | 35 | 27,297,978.75 | 2.77 |
| 800,000.01 - 850,000.00............ | 17 | 14,021,390.46 | 1.42 |
| 850,000.01 - 900,000.00............ | 16 | 14,001,861.60 | 1.42 |
| 900,000.01 - 950,000.00............ | 9 | 8,400,955.38 | 0.85 |
| 950,000.01 - 1,000,000.00.......... | 23 | 22,629,002.68 | 2.29 |
| 1,000,000.01 and above............... | 4 | 4,344,738.31 | 0.44 |
| Total........................ | 3,558 | $ 987,188,515.19 | 100.00% |

[1] The average scheduled principal balance as of the cut-off date of the Group II mortgage loans was approximately $277,456.

**Original Terms to Maturity of the Group II Mortgage Loans[1]**

| Original Term (months) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 120................................. | 1 | $ 460,387.21 | 0.05% |
| 180................................. | 19 | 2,385,026.98 | 0.24 |
| 240................................. | 10 | 1,520,513.60 | 0.15 |
| 360................................. | 3,426 | 945,361,641.17 | 95.76 |
| 480................................. | 102 | 37,460,946.23 | 3.79 |
| Total........................ | 3,558 | $ 987,188,515.19 | 100.00% |

[1] The weighted average original term to maturity of the Group II mortgage loans was approximately 361 months.

**Remaining Terms to Maturity of the Group II Mortgage Loans[1]**

| Remaining Term (months) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 61  -  120 ................................... | 1 | $        460,387.21 | 0.05% |
| 121  -  180 ................................ | 19 | 2,385,026.98 | 0.24 |
| 181  -  240 ................................ | 10 | 1,520,513.60 | 0.15 |
| 301  -  360 ................................ | 3,426 | 945,361,641.17 | 95.76 |
| 361 and above ........................... | 102 | 37,460,946.23 | 3.79 |
| Total ................................ | 3,558 | $ 987,188,515.19 | 100.00% |

[1]  The weighted average remaining term to maturity of the Group II mortgage loans was approximately 361months.

**Debt to Income Ratio of the Group II Mortgage Loans**

| Debt to Income (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 0.01  -  20.00 .......................... | 339 | $   73,159,331.42 | 7.41% |
| 20.01  -  25.00 ......................... | 144 | 36,101,471.34 | 3.66 |
| 25.01  -  30.00 ......................... | 188 | 44,688,250.22 | 4.53 |
| 30.01  -  35.00 ......................... | 303 | 73,065,319.40 | 7.40 |
| 35.01  -  40.00 ......................... | 416 | 114,587,838.45 | 11.61 |
| 40.01  -  45.00 ......................... | 751 | 203,447,848.81 | 20.61 |
| 45.01  -  50.00 ......................... | 1,049 | 292,968,051.13 | 29.68 |
| 50.01  -  55.00 ......................... | 337 | 134,732,426.24 | 13.65 |
| 55.01  -  60.00 ......................... | 29 | 12,890,767.79 | 1.31 |
| 60.01 and above ........................ | 2 | 1,547,210.39 | 0.16 |
| Total ........................................ | 3,558 | $ 987,188,515.19 | 100.00% |

**Property Types of the Group II Mortgage Loans**

| Property Type | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Condominium .............................. | 291 | $   71,348,147.43 | 7.23% |
| Planned Unit Development (1) .... | 468 | 139,266,559.12 | 14.11 |
| Single Family .............................. | 2,540 | 704,758,208.67 | 71.39 |
| Townhouse .................................. | 10 | 877,288.46 | 0.09 |
| Two to Four Family .................... | 249 | 70,938,311.51 | 7.19 |
| Total ....................................... | 3,558 | $ 987,188,515.19 | 100.00% |

[1]  PUD refers to a home or "unit" in a Planned Unit Development.

**Occupancy Status of the Group II Mortgage Loans[1]**

| Occupancy Status | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Investor........................................ | 529 | $  85,092,599.74 | 8.62% |
| Owner-Occupied.......................... | 2,984 | 886,251,532.67 | 89.78 |
| Second Home............................... | 45 | 15,844,382.78 | 1.61 |
| Total....................................... | 3,558 | $ 987,188,515.19 | 100.00% |

[1]  Occupancy as represented by the mortgagor at the time of origination.

**Purpose of the Group II Mortgage Loans**

| Purpose | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Purchase ...................................... | 2,089 | $  434,685,439.67 | 44.03% |
| Cash Out Refinance.................... | 1,092 | 433,904,475.45 | 43.95 |
| Rate/Term Refinance................... | 377 | 118,598,600.07 | 12.01 |
| Total....................................... | 3,558 | $ 987,188,515.19 | 100.00% |

**Original Loan-to-Value Ratios of the Group II Mortgage Loans**[1]

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| **First Lien Loans:** | | | |
| Less than 60.01% ............................ | 108 | $   31,454,135.89 | 3.19% |
| 60.01 to 70.00% ............................. | 142 | 53,816,234.86 | 5.45 |
| 70.01 to 80.00% ............................. | 1386 | 525,651,096.94 | 53.25 |
| 80.01 to 85.00%: | | | |
| With MI ...................................... | 61 | 19,173,418.37 | 1.94 |
| Without MI ................................. | 112 | 44,628,616.54 | 4.52 |
| 85.01 to 90.00%: | | | |
| With MI...................................... | 215 | 55,443,652.58 | 5.62 |
| Without MI................................. | 503 | 133,685,560.91 | 13.54 |
| 90.01 to 95.00%: | | | |
| With MI ...................................... | 19 | 5,768,331.36 | 0.58 |
| Without MI ................................. | 73 | 28,122,005.92 | 2.85 |
| 95.01 to 100.00%: | | | |
| With MI ............................... | 0 | 0.00 | 0.00 |
| Without MI ............................ | 27 | 9,753,745.34 | 0.99 |
| Subtotal (First Lien): | 2646 | 907,496,798.71 | 91.93 |
| **Second Lien Loans:** | | | |
| Less than 60.01% ............................ | 1 | 45,332.57 | 0.00 |
| 85.01 to 90.00% ............................. | 9 | 940,066.23 | 0.10 |
| 90.01 to 95.00% ............................. | 29 | 2,762,602.69 | 0.28 |
| 95.01 to 100.00% ............................. | 873 | 75,943,714.99 | 7.69 |
| Subtotal (Second Lien) ......... | 912 | 79,691,716.48 | 8.07 |
| Total...................................... | 3,558 | $ 987,188,515.19 | 100.00% |

[1]   The weighted average original loan-to-value ratio of the Group II mortgage loans as of the cut-off date was approximately 82.34%.  References in this prospectus supplement to the loan-to-value ratios of the mortgage loans, in the case of junior lien mortgage loans, unless indicated otherwise, refer to the quotient of (x) the sum of the principal balance of the applicable junior lien mortgage loan and the principal balance of all mortgage indebtedness secured by any senior lien(s) on the related mortgaged property divided by (y) the value (as determined as described in this prospectus supplement, and which may not be the actual value) of such related mortgaged property.

**Geographic Distribution of the Mortgaged Properties relating to the Group II Mortgage Loans[1]**

| Location | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Alabama | 26 | $ 5,329,296.40 | 0.54% |
| Alaska | 8 | 2,074,311.79 | 0.21 |
| Arizona | 50 | 13,366,604.74 | 1.35 |
| Arkansas | 3 | 771,927.85 | 0.08 |
| California | 1,454 | 481,019,118.19 | 48.73 |
| Colorado | 41 | 12,267,813.58 | 1.24 |
| Connecticut | 26 | 8,157,667.08 | 0.83 |
| Delaware | 4 | 985,153.97 | 0.10 |
| District of Columbia | 22 | 9,428,241.17 | 0.96 |
| Florida | 317 | 70,157,710.71 | 7.11 |
| Georgia | 44 | 13,479,679.91 | 1.37 |
| Hawaii | 18 | 7,454,564.01 | 0.76 |
| Idaho | 11 | 2,438,460.81 | 0.25 |
| Illinois | 91 | 22,027,741.52 | 2.23 |
| Indiana | 59 | 5,265,128.92 | 0.53 |
| Iowa | 2 | 68,130.70 | 0.01 |
| Kansas | 3 | 239,616.07 | 0.02 |
| Kentucky | 11 | 2,890,781.83 | 0.29 |
| Louisiana | 7 | 1,407,037.90 | 0.14 |
| Maine | 11 | 2,259,157.07 | 0.23 |
| Maryland | 120 | 36,846,091.34 | 3.73 |
| Massachusetts | 44 | 14,608,261.12 | 1.48 |
| Michigan | 96 | 13,228,890.61 | 1.34 |
| Minnesota | 19 | 3,551,409.64 | 0.36 |
| Missouri | 48 | 4,709,094.95 | 0.48 |
| Montana | 4 | 560,119.53 | 0.06 |
| Nebraska | 8 | 1,365,139.20 | 0.14 |
| Nevada | 13 | 5,580,218.75 | 0.57 |
| New Hampshire | 2 | 579,839.60 | 0.06 |
| New Jersey | 113 | 36,656,923.32 | 3.71 |
| New Mexico | 11 | 1,877,055.77 | 0.19 |
| New York | 132 | 53,279,505.32 | 5.40 |
| North Carolina | 28 | 6,474,580.85 | 0.66 |
| Ohio | 25 | 3,833,927.58 | 0.39 |
| Oklahoma | 11 | 822,290.56 | 0.08 |
| Oregon | 64 | 16,985,219.39 | 1.72 |
| Pennsylvania | 58 | 9,275,390.58 | 0.94 |
| Rhode Island | 5 | 2,470,311.32 | 0.25 |
| South Carolina | 2 | 467,331.95 | 0.05 |
| Tennessee | 30 | 3,637,562.59 | 0.37 |
| Texas | 309 | 50,959,885.14 | 5.16 |
| Utah | 8 | 1,843,272.32 | 0.19 |
| Vermont | 4 | 2,192,772.74 | 0.22 |

| Location | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Virginia............................................. | 52 | 16,824,996.58 | 1.70 |
| Washington......................................... | 125 | 35,094,299.65 | 3.55 |
| West Virginia...................................... | 4 | 321,737.20 | 0.03 |
| Wisconsin .......................................... | 14 | 1,962,372.84 | 0.20 |
| Wyoming ............................................ | 1 | 91,870.53 | 0.01 |
| Total......................................... | 3,558 | $ 987,188,515.19 | 100.00% |

(1) The greatest ZIP code geographic concentration of the Group II mortgage loans was approximately 0.45% in the 91331 ZIP Code.

### Documentation Level of the Group II Mortgage Loans[1]

| Documentation Level | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Full Documentation ..................... | 1,989 | $ 568,735,674.26 | 57.61% |
| Limited Documentation ............... | 233 | 56,681,738.35 | 5.74 |
| Stated Income Documentation..... | 1,336 | 361,771,102.58 | 36.65 |
| Total........................................ | 3,558 | $ 987,188,515.19 | 100.00% |

(1) For a description of each Documentation Level, *see* "Underwriting of the Mortgage Loans" in this prospectus supplement.

### Credit Grade for the Group II Mortgage Loans[1]

| Credit Grade | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| Premium A.................................... | 3,022 | $ 795,699,483.40 | 80.60% |
| A .................................................. | 276 | 93,697,302.67 | 9.49 |
| A-.................................................. | 100 | 40,579,620.93 | 4.11 |
| B+ ................................................ | 37 | 11,112,320.43 | 1.13 |
| B .................................................. | 81 | 30,428,973.43 | 3.08 |
| C .................................................. | 42 | 15,670,814.33 | 1.59 |
| Total........................................ | 3,558 | $ 987,188,515.19 | 100.00% |

(1) For a description of Credit Grade, *see* "Underwriting of the Mortgage Loans" in this prospectus supplement.

**Credit Scores for the Group II Mortgage Loans[1]**

| Credit Score | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 500 - 524 ..................................... | 38 | $    16,670,372.13 | 1.69% |
| 525 - 549 ..................................... | 68 | 28,210,745.68 | 2.86 |
| 550 - 574 ..................................... | 133 | 48,310,211.83 | 4.89 |
| 575 - 599 ..................................... | 170 | 65,793,801.68 | 6.66 |
| 600 - 624 ..................................... | 672 | 171,071,942.30 | 17.33 |
| 625 - 649 ..................................... | 767 | 202,108,565.21 | 20.47 |
| 650 - 674 ..................................... | 736 | 192,540,762.77 | 19.50 |
| 675 - 699 ..................................... | 446 | 120,252,313.44 | 12.18 |
| 700 and above ............................ | 528 | 142,229,800.15 | 14.41 |
| Total....................................... | 3,558 | $  987,188,515.19 | 100.00% |

[1]  The weighted average credit score of the Group II mortgage loans was approximately 646.

**Current Mortgage Rates of the Group II Mortgage Loans[1]**

| Current Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 5.000 -   5.499............................ | 2 | $      855,200.00 | 0.09% |
| 5.500 -   5.999............................ | 39 | 17,681,454.76 | 1.79 |
| 6.000 -   6.499............................ | 188 | 84,213,512.32 | 8.53 |
| 6.500 -   6.999............................ | 263 | 108,976,601.83 | 11.04 |
| 7.000 -   7.499............................ | 338 | 129,605,462.34 | 13.13 |
| 7.500 -   7.999............................ | 455 | 163,274,663.86 | 16.54 |
| 8.000 -   8.499............................ | 323 | 120,191,791.29 | 12.18 |
| 8.500 -   8.999............................ | 330 | 120,728,200.43 | 12.23 |
| 9.000 -   9.499............................ | 174 | 51,111,532.23 | 5.18 |
| 9.500 -   9.999............................ | 347 | 61,892,728.94 | 6.27 |
| 10.000 - 10.499............................ | 221 | 37,822,767.19 | 3.83 |
| 10.500 - 10.999............................ | 196 | 25,941,338.97 | 2.63 |
| 11.000 - 11.499............................ | 403 | 38,685,101.94 | 3.92 |
| 11.500 - 11.999............................ | 201 | 18,627,662.95 | 1.89 |
| 12.000 - 12.499............................ | 63 | 6,276,619.25 | 0.64 |
| 12.500 - 12.999............................ | 14 | 1,230,092.48 | 0.12 |
| 13.000 - 13.499............................ | 1 | 73,784.41 | 0.01 |
| Total....................................... | 3,558 | $  987,188,515.19 | 100.00% |

[1]  The weighted average current mortgage rate of the Group II mortgage loans as of the cut-off date was approximately 8.215% per annum.

**Maximum Mortgage Rates of the Adjustable-Rate Group II Mortgage Loans**[1]

| Maximum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 11.000 - 11.499.......................... | 2 | $      855,200.00 | 0.12% |
| 11.500 - 11.999.......................... | 38 | 16,998,662.01 | 2.31 |
| 12.000 - 12.499.......................... | 72 | 33,427,397.90 | 4.54 |
| 12.500 - 12.999.......................... | 162 | 73,281,943.83 | 9.95 |
| 13.000 - 13.499.......................... | 264 | 108,894,515.46 | 14.78 |
| 13.500 - 13.999.......................... | 342 | 134,667,226.80 | 18.28 |
| 14.000 - 14.499.......................... | 270 | 109,014,387.33 | 14.80 |
| 14.500 - 14.999.......................... | 279 | 111,239,773.42 | 15.10 |
| 15.000 - 15.499.......................... | 141 | 46,029,962.84 | 6.25 |
| 15.500 - 15.999.......................... | 174 | 47,754,448.08 | 6.48 |
| 16.000 - 16.499.......................... | 109 | 27,441,365.61 | 3.72 |
| 16.500 - 16.999.......................... | 98 | 16,941,075.11 | 2.30 |
| 17.000 - 17.499.......................... | 44 | 7,928,100.62 | 1.08 |
| 17.500 - 17.999.......................... | 17 | 1,873,572.78 | 0.25 |
| 18.000 - 18.499.......................... | 4 | 220,394.73 | 0.03 |
| 18.500 - 18.999.......................... | 2 | 103,413.21 | 0.01 |
| 19.000 - 19.499.......................... | 1 | 73,784.41 | 0.01 |
| Total.......................... | 2,019 | $ 736,745,224.14 | 100.00% |

[1]  The weighted average maximum mortgage rate of the adjustable-rate Group II mortgage loans as of the cut-off date was approximately 14.121% per annum.

**Minimum Mortgage Rates of the Adjustable-Rate Group II Mortgage Loans**[1]

| Minimum Mortgage Rate (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 5.000 - 5.499.......................... | 2 | $      855,200.00 | 0.12% |
| 5.500 - 5.999.......................... | 38 | 16,998,662.01 | 2.31 |
| 6.000 - 6.499.......................... | 72 | 33,427,397.90 | 4.54 |
| 6.500 - 6.999.......................... | 162 | 73,281,943.83 | 9.95 |
| 7.000 - 7.499.......................... | 264 | 108,894,515.46 | 14.78 |
| 7.500 - 7.999.......................... | 342 | 134,667,226.80 | 18.28 |
| 8.000 - 8.499.......................... | 270 | 109,014,387.33 | 14.80 |
| 8.500 - 8.999.......................... | 279 | 111,239,773.42 | 15.10 |
| 9.000 - 9.499.......................... | 141 | 46,029,962.84 | 6.25 |
| 9.500 - 9.999.......................... | 174 | 47,754,448.08 | 6.48 |
| 10.000 - 10.499.......................... | 109 | 27,441,365.61 | 3.72 |
| 10.500 - 10.999.......................... | 98 | 16,941,075.11 | 2.30 |
| 11.000 - 11.499.......................... | 44 | 7,928,100.62 | 1.08 |
| 11.500 - 11.999.......................... | 17 | 1,873,572.78 | 0.25 |
| 12.000 - 12.499.......................... | 4 | 220,394.73 | 0.03 |
| 12.500 - 12.999.......................... | 2 | 103,413.21 | 0.01 |
| 13.000 - 13.499.......................... | 1 | 73,784.41 | 0.01 |
| Total.......................... | 2,019 | $ 736,745,224.14 | 100.00% |

[1]  The weighted average minimum mortgage rate of the adjustable-rate Group II mortgage loans as of the cut-off date was approximately 8.121% per annum.

**Gross Margins of the Adjustable-Rate Group II Mortgage Loans[1]**

| Gross Margin (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 4.999 and below........................ | 1,814 | $ 650,252,833.60 | 88.26% |
| 5.000 - 5.999.......................... | 176 | 72,925,340.16 | 9.90 |
| 6.000 - 6.999.......................... | 25 | 11,798,380.63 | 1.60 |
| 7.000 and above....................... | 4 | 1,768,669.75 | 0.24 |
| Total...................................... | 2,019 | $ 736,745,224.14 | 100.00% |

[1]   The weighted average gross margin of the adjustable-rate Group II mortgage loans as of the cut-off date was approximately 5.097% per annum.

**Next Adjustment Dates for the Adjustable-Rate Group II Mortgage Loans**

| Next Adjustment Date | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| September 1, 2008 ...................... | 3 | $ 1,447,629.24 | 0.20% |
| October 1, 2008 ........................ | 5 | 1,886,216.34 | 0.26 |
| November 1, 2008 ...................... | 21 | 8,347,584.13 | 1.13 |
| December 1, 2008...................... | 48 | 11,488,664.62 | 1.56 |
| January 1, 2009........................ | 615 | 241,508,153.74 | 32.78 |
| February 1, 2009........................ | 728 | 247,481,541.78 | 33.59 |
| March 1, 2009............................ | 81 | 28,453,121.99 | 3.86 |
| October 1, 2009 ........................ | 3 | 735,500.66 | 0.10 |
| November 1, 2009 ...................... | 8 | 1,753,647.13 | 0.24 |
| December 1, 2009...................... | 8 | 2,183,965.52 | 0.30 |
| January 1, 2010........................ | 145 | 55,554,068.40 | 7.54 |
| February 1, 2010........................ | 171 | 57,695,807.77 | 7.83 |
| March 1, 2010............................ | 15 | 5,339,121.58 | 0.72 |
| August 1, 2011.......................... | 2 | 1,165,000.00 | 0.16 |
| November 1, 2011 ...................... | 5 | 1,824,923.87 | 0.25 |
| December 1, 2011...................... | 6 | 3,215,925.54 | 0.44 |
| January 1, 2012........................ | 65 | 29,367,849.08 | 3.99 |
| February 1, 2012........................ | 85 | 35,341,822.32 | 4.80 |
| March 1, 2012............................ | 5 | 1,954,680.43 | 0.27 |
| Total...................................... | 2,019 | $ 736,745,224.14 | 100.00% |

**Initial Periodic Rate Caps of the Adjustable-Rate Group II Mortgage Loans[1]**

| Initial Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000........................................ | 252 | $ 100,896,318.48 | 13.69% |
| 2.000........................................ | 1,249 | 439,716,593.36 | 59.68 |
| 3.000........................................ | 518 | 196,132,312.30 | 26.62 |
| Total...................................... | 2,019 | $ 736,745,224.14 | 100.00% |

[1]  Relates solely to initial rate adjustments.  The weighted average initial periodic rate cap of the adjustable-rate Group II mortgage loans as of the cut-off date was approximately 2.129%.

**Subsequent Periodic Rate Caps of the Adjustable-Rate Group II Mortgage Loans[1]**

| Subsequent Periodic Rate Cap (%) | Number of Mortgage Loans | Scheduled Principal Balance as of the Cut-off Date | % of Aggregate Scheduled Principal Balance as of the Cut-off Date |
|---|---|---|---|
| 1.000........................................ | 2,019 | $ 736,745,224.14 | 100.00% |
| Total...................................... | 2,019 | $ 736,745,224.14 | 100.00% |

[1]  Relates to all rate adjustments subsequent to initial rate adjustments.

APPENDIX B

DECREMENT TABLES

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class I-A**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 87 | 81 | 75 | 69 | 63 |
| April 25, 2009................... | 70 | 56 | 44 | 32 | 21 |
| April 25, 2010................... | 53 | 36 | 21 | 8 | 0 |
| April 25, 2011................... | 41 | 28 | 19 | 8 | 0 |
| April 25, 2012................... | 33 | 21 | 13 | 7 | 0 |
| April 25, 2013................... | 28 | 16 | 9 | 5 | 0 |
| April 25, 2014................... | 23 | 12 | 6 | 3 | 0 |
| April 25, 2015................... | 19 | 9 | 4 | 2 | 0 |
| April 25, 2016................... | 16 | 7 | 3 | 1 | 0 |
| April 25, 2017................... | 14 | 5 | 2 | 1 | 0 |
| April 25, 2018................... | 11 | 4 | 2 | * | 0 |
| April 25, 2019................... | 9 | 3 | 1 | 0 | 0 |
| April 25, 2020................... | 8 | 2 | 1 | 0 | 0 |
| April 25, 2021................... | 7 | 2 | * | 0 | 0 |
| April 25, 2022................... | 5 | 1 | * | 0 | 0 |
| April 25, 2023................... | 5 | 1 | 0 | 0 | 0 |
| April 25, 2024................... | 4 | 1 | 0 | 0 | 0 |
| April 25, 2025................... | 3 | * | 0 | 0 | 0 |
| April 25, 2026................... | 3 | * | 0 | 0 | 0 |
| April 25, 2027................... | 2 | * | 0 | 0 | 0 |
| April 25, 2028................... | 2 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 1 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 1 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 1 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | * | 0 | 0 | 0 | 0 |
| April 25, 2033................... | * | 0 | 0 | 0 | 0 |
| April 25, 2034................... | * | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 5.04 | 3.47 | 2.59 | 1.96 | 1.42 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 4.69 | 3.22 | 2.40 | 1.81 | 1.42 |

[†] Rounded to the nearest whole percentage.

[(1)] The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)] Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

* Indicates an outstanding certificate principal balance greater than 0% and less than 0.5% of the original certificate principal balance.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class II-A1**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 72 | 58 | 44 | 30 | 16 |
| April 25, 2009.................. | 32 | 2 | 0 | 0 | 0 |
| April 25, 2010.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2011.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2012.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2013.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2014.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2015.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2016.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2017.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2018.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2019.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2020.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2021.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2022.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 1.63 | 1.23 | 1.00 | 0.85 | 0.74 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 1.63 | 1.23 | 1.00 | 0.85 | 0.74 |

[†] Rounded to the nearest whole percentage.

[(1)]  The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]  Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class II-A2**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................. | 100 | 100 | 26 | 0 | 0 |
| April 25, 2010.................. | 88 | 0 | 0 | 0 | 0 |
| April 25, 2011.................. | 8 | 0 | 0 | 0 | 0 |
| April 25, 2012.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2013.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2014.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2015.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2016.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2017.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2018.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2019.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2020.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2021.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2022.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 3.55 | 2.44 | 2.00 | 1.72 | 1.46 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ............... | 3.55 | 2.44 | 2.00 | 1.72 | 1.46 |

[†] Rounded to the nearest whole percentage.

[(1)] The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)] Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class II-A3**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................... | 100 | 100 | 100 | 69 | 22 |
| April 25, 2010.................... | 100 | 84 | 25 | 0 | 0 |
| April 25, 2011.................... | 100 | 53 | 16 | 0 | 0 |
| April 25, 2012.................... | 75 | 26 | 0 | 0 | 0 |
| April 25, 2013.................... | 53 | 6 | 0 | 0 | 0 |
| April 25, 2014.................... | 35 | 0 | 0 | 0 | 0 |
| April 25, 2015.................... | 20 | 0 | 0 | 0 | 0 |
| April 25, 2016.................... | 7 | 0 | 0 | 0 | 0 |
| April 25, 2017.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2018.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2019.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2020.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2021.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2022.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2023.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2024.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2025.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2026.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 6.46 | 4.32 | 3.00 | 2.24 | 1.97 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 6.46 | 4.32 | 3.00 | 2.24 | 1.97 |

[†] Rounded to the nearest whole percentage.

[(1)]   The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]   Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class II-A4**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 57 | 0 |
| April 25, 2011................... | 100 | 100 | 100 | 57 | 0 |
| April 25, 2012................... | 100 | 100 | 88 | 51 | 0 |
| April 25, 2013................... | 100 | 100 | 61 | 32 | 0 |
| April 25, 2014................... | 100 | 84 | 43 | 21 | 0 |
| April 25, 2015................... | 100 | 65 | 30 | 13 | 0 |
| April 25, 2016................... | 100 | 50 | 21 | 9 | 0 |
| April 25, 2017................... | 93 | 38 | 15 | 5 | 0 |
| April 25, 2018................... | 78 | 29 | 11 | 2 | 0 |
| April 25, 2019................... | 65 | 23 | 8 | 0 | 0 |
| April 25, 2020................... | 54 | 17 | 5 | 0 | 0 |
| April 25, 2021................... | 45 | 13 | 2 | 0 | 0 |
| April 25, 2022................... | 38 | 10 | * | 0 | 0 |
| April 25, 2023................... | 31 | 8 | 0 | 0 | 0 |
| April 25, 2024................... | 26 | 6 | 0 | 0 | 0 |
| April 25, 2025................... | 22 | 3 | 0 | 0 | 0 |
| April 25, 2026................... | 18 | 2 | 0 | 0 | 0 |
| April 25, 2027................... | 15 | * | 0 | 0 | 0 |
| April 25, 2028................... | 12 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 6 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 4 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 2 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | * | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 14.85 | 10.08 | 7.43 | 5.20 | 2.52 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 12.39 | 8.28 | 6.10 | 4.16 | 2.52 |

[†] Rounded to the nearest whole percentage.

[(1)]   The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]   Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

*    Indicates an outstanding certificate principal balance greater than 0% and less than 0.5% of the original certificate principal balance.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-1**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 100 | 79 |
| April 25, 2011................... | 100 | 73 | 49 | 100 | 79 |
| April 25, 2012................... | 87 | 55 | 34 | 20 | 79 |
| April 25, 2013................... | 73 | 42 | 23 | 12 | 67 |
| April 25, 2014................... | 61 | 32 | 16 | 8 | 39 |
| April 25, 2015................... | 51 | 25 | 11 | 5 | 19 |
| April 25, 2016................... | 43 | 19 | 8 | 3 | 5 |
| April 25, 2017................... | 36 | 15 | 6 | 0 | 0 |
| April 25, 2018................... | 30 | 11 | 4 | 0 | 0 |
| April 25, 2019................... | 25 | 9 | 1 | 0 | 0 |
| April 25, 2020................... | 21 | 7 | 0 | 0 | 0 |
| April 25, 2021................... | 17 | 5 | 0 | 0 | 0 |
| April 25, 2022................... | 14 | 4 | 0 | 0 | 0 |
| April 25, 2023................... | 12 | 2 | 0 | 0 | 0 |
| April 25, 2024................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026................... | 7 | 0 | 0 | 0 | 0 |
| April 25, 2027................... | 6 | 0 | 0 | 0 | 0 |
| April 25, 2028................... | 5 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 4 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 2 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.68 | 6.53 | 5.18 | 5.03 | 6.34 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.71 | 4.67 | 3.88 |

[†] Rounded to the nearest whole percentage.

[(1)]  The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]  Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-2**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011................... | 100 | 73 | 49 | 62 | 100 |
| April 25, 2012................... | 87 | 55 | 34 | 20 | 52 |
| April 25, 2013................... | 73 | 42 | 23 | 12 | 6 |
| April 25, 2014................... | 61 | 32 | 16 | 8 | 3 |
| April 25, 2015................... | 51 | 25 | 11 | 5 | 0 |
| April 25, 2016................... | 43 | 19 | 8 | 1 | 0 |
| April 25, 2017................... | 36 | 15 | 6 | 0 | 0 |
| April 25, 2018................... | 30 | 11 | 4 | 0 | 0 |
| April 25, 2019................... | 25 | 9 | 0 | 0 | 0 |
| April 25, 2020................... | 21 | 7 | 0 | 0 | 0 |
| April 25, 2021................... | 17 | 5 | 0 | 0 | 0 |
| April 25, 2022................... | 14 | 4 | 0 | 0 | 0 |
| April 25, 2023................... | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026................... | 7 | 0 | 0 | 0 | 0 |
| April 25, 2027................... | 6 | 0 | 0 | 0 | 0 |
| April 25, 2028................... | 5 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 3 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.65 | 6.50 | 5.09 | 4.68 | 5.22 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.64 | 4.33 | 4.13 |

[†] Rounded to the nearest whole percentage.

[(1)]   The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]   Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-3**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011................... | 100 | 73 | 49 | 32 | 100 |
| April 25, 2012................... | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013................... | 73 | 42 | 23 | 12 | 6 |
| April 25, 2014................... | 61 | 32 | 16 | 8 | 0 |
| April 25, 2015................... | 51 | 25 | 11 | 5 | 0 |
| April 25, 2016................... | 43 | 19 | 8 | 0 | 0 |
| April 25, 2017................... | 36 | 15 | 6 | 0 | 0 |
| April 25, 2018................... | 30 | 11 | 1 | 0 | 0 |
| April 25, 2019................... | 25 | 9 | 0 | 0 | 0 |
| April 25, 2020................... | 21 | 7 | 0 | 0 | 0 |
| April 25, 2021................... | 17 | 5 | 0 | 0 | 0 |
| April 25, 2022................... | 14 | 1 | 0 | 0 | 0 |
| April 25, 2023................... | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026................... | 7 | 0 | 0 | 0 | 0 |
| April 25, 2027................... | 6 | 0 | 0 | 0 | 0 |
| April 25, 2028................... | 5 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.62 | 6.48 | 5.03 | 4.50 | 4.58 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.61 | 4.17 | 4.13 |

[†] Rounded to the nearest whole percentage.

[(1)] The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)] Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-4**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011.................. | 100 | 73 | 49 | 32 | 44 |
| April 25, 2012.................. | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013.................. | 73 | 42 | 23 | 12 | 6 |
| April 25, 2014.................. | 61 | 32 | 16 | 8 | 0 |
| April 25, 2015.................. | 51 | 25 | 11 | 5 | 0 |
| April 25, 2016.................. | 43 | 19 | 8 | 0 | 0 |
| April 25, 2017.................. | 36 | 15 | 6 | 0 | 0 |
| April 25, 2018.................. | 30 | 11 | 0 | 0 | 0 |
| April 25, 2019.................. | 25 | 9 | 0 | 0 | 0 |
| April 25, 2020.................. | 21 | 7 | 0 | 0 | 0 |
| April 25, 2021.................. | 17 | 5 | 0 | 0 | 0 |
| April 25, 2022.................. | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 7 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 6 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 1 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.59 | 6.45 | 4.99 | 4.39 | 4.30 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.58 | 4.07 | 4.05 |

[†] Rounded to the nearest whole percentage.

[(1)]  The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]  Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-5**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011................... | 100 | 73 | 49 | 32 | 19 |
| April 25, 2012................... | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013................... | 73 | 42 | 23 | 12 | 6 |
| April 25, 2014................... | 61 | 32 | 16 | 8 | 0 |
| April 25, 2015................... | 51 | 25 | 11 | 0 | 0 |
| April 25, 2016................... | 43 | 19 | 8 | 0 | 0 |
| April 25, 2017................... | 36 | 15 | 4 | 0 | 0 |
| April 25, 2018................... | 30 | 11 | 0 | 0 | 0 |
| April 25, 2019................... | 25 | 9 | 0 | 0 | 0 |
| April 25, 2020................... | 21 | 7 | 0 | 0 | 0 |
| April 25, 2021................... | 17 | 0 | 0 | 0 | 0 |
| April 25, 2022................... | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023................... | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026................... | 7 | 0 | 0 | 0 | 0 |
| April 25, 2027................... | 3 | 0 | 0 | 0 | 0 |
| April 25, 2028................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.55 | 6.42 | 4.95 | 4.31 | 4.10 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.56 | 4.01 | 3.87 |

[†] Rounded to the nearest whole percentage.

[(1)]  The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]  Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding†**
**Class M-6**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage .............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010................... | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011................... | 100 | 73 | 49 | 32 | 19 |
| April 25, 2012................... | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013................... | 73 | 42 | 23 | 12 | 1 |
| April 25, 2014................... | 61 | 32 | 16 | 8 | 0 |
| April 25, 2015................... | 51 | 25 | 11 | 0 | 0 |
| April 25, 2016................... | 43 | 19 | 8 | 0 | 0 |
| April 25, 2017................... | 36 | 15 | 0 | 0 | 0 |
| April 25, 2018................... | 30 | 11 | 0 | 0 | 0 |
| April 25, 2019................... | 25 | 9 | 0 | 0 | 0 |
| April 25, 2020................... | 21 | 4 | 0 | 0 | 0 |
| April 25, 2021................... | 17 | 0 | 0 | 0 | 0 |
| April 25, 2022................... | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023................... | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024................... | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025................... | 8 | 0 | 0 | 0 | 0 |
| April 25, 2026................... | 4 | 0 | 0 | 0 | 0 |
| April 25, 2027................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036................... | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[1] ......... | 9.50 | 6.38 | 4.91 | 4.23 | 3.94 |
| Weighted Average Life (years) to Optional Termination[1][2] ................ | 8.80 | 5.89 | 4.55 | 3.95 | 3.73 |

† Rounded to the nearest whole percentage.

[1]   The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[2]   Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-7**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011.................. | 100 | 73 | 49 | 32 | 19 |
| April 25, 2012.................. | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013.................. | 73 | 42 | 23 | 12 | 0 |
| April 25, 2014.................. | 61 | 32 | 16 | 4 | 0 |
| April 25, 2015.................. | 51 | 25 | 11 | 0 | 0 |
| April 25, 2016.................. | 43 | 19 | 5 | 0 | 0 |
| April 25, 2017.................. | 36 | 15 | 0 | 0 | 0 |
| April 25, 2018.................. | 30 | 11 | 0 | 0 | 0 |
| April 25, 2019.................. | 25 | 8 | 0 | 0 | 0 |
| April 25, 2020.................. | 21 | 0 | 0 | 0 | 0 |
| April 25, 2021.................. | 17 | 0 | 0 | 0 | 0 |
| April 25, 2022.................. | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 10 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 5 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.43 | 6.33 | 4.85 | 4.15 | 3.82 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ............... | 8.80 | 5.89 | 4.53 | 3.90 | 3.63 |

[†] Rounded to the nearest whole percentage.

[(1)] The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)] Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-8**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011.................. | 100 | 73 | 49 | 32 | 19 |
| April 25, 2012.................. | 87 | 55 | 34 | 20 | 11 |
| April 25, 2013.................. | 73 | 42 | 23 | 12 | 0 |
| April 25, 2014.................. | 61 | 32 | 16 | 0 | 0 |
| April 25, 2015.................. | 51 | 25 | 11 | 0 | 0 |
| April 25, 2016.................. | 43 | 19 | 0 | 0 | 0 |
| April 25, 2017.................. | 36 | 15 | 0 | 0 | 0 |
| April 25, 2018.................. | 30 | 11 | 0 | 0 | 0 |
| April 25, 2019.................. | 25 | 0 | 0 | 0 | 0 |
| April 25, 2020.................. | 21 | 0 | 0 | 0 | 0 |
| April 25, 2021.................. | 17 | 0 | 0 | 0 | 0 |
| April 25, 2022.................. | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 12 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 8 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.35 | 6.27 | 4.79 | 4.08 | 3.71 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.52 | 3.87 | 3.55 |

[†] Rounded to the nearest whole percentage.

[(1)]    The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)]    Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**Percent of Original Certificate Principal Balance Outstanding[†]**
**Class M-9**
**Prepayment Scenario**

| Distribution Date | Scenario I | Scenario II | Scenario III | Scenario IV | Scenario V |
|---|---|---|---|---|---|
| Initial Percentage ............. | 100% | 100% | 100% | 100% | 100% |
| April 25, 2008.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2009.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2010.................. | 100 | 100 | 100 | 100 | 100 |
| April 25, 2011.................. | 100 | 73 | 49 | 32 | 19 |
| April 25, 2012.................. | 87 | 55 | 34 | 20 | 2 |
| April 25, 2013.................. | 73 | 42 | 23 | 9 | 0 |
| April 25, 2014.................. | 61 | 32 | 16 | 0 | 0 |
| April 25, 2015.................. | 51 | 25 | 5 | 0 | 0 |
| April 25, 2016.................. | 43 | 19 | 0 | 0 | 0 |
| April 25, 2017.................. | 36 | 15 | 0 | 0 | 0 |
| April 25, 2018.................. | 30 | 4 | 0 | 0 | 0 |
| April 25, 2019.................. | 25 | 0 | 0 | 0 | 0 |
| April 25, 2020.................. | 21 | 0 | 0 | 0 | 0 |
| April 25, 2021.................. | 17 | 0 | 0 | 0 | 0 |
| April 25, 2022.................. | 14 | 0 | 0 | 0 | 0 |
| April 25, 2023.................. | 7 | 0 | 0 | 0 | 0 |
| April 25, 2024.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2025.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2026.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2027.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2028.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2029.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2030.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2031.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2032.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2033.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2034.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2035.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2036.................. | 0 | 0 | 0 | 0 | 0 |
| April 25, 2037.................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity[(1)] ......... | 9.23 | 6.19 | 4.73 | 4.02 | 3.62 |
| Weighted Average Life (years) to Optional Termination[(1)(2)] ................ | 8.80 | 5.89 | 4.52 | 3.85 | 3.50 |

[†] Rounded to the nearest whole percentage.

[(1)] The weighted average life of any class of the offered certificates is determined by (i) multiplying the assumed net reduction, if any, in the principal amount on each distribution date on such class of certificates by the number of years from the date of issuance of such class of certificates to the related distribution date; (ii) summing the results; and (iii) dividing the sum by the aggregate amount of the assumed net reductions in principal amount on such class of certificates.

[(2)] Calculated pursuant to footnote (1) but assumes the servicer exercises its option to purchase the mortgage loans on the Optional Termination Date.

**ANNEX I**

| Period | Distribution Date | Swap Notional Amount ($) | Strike Rate (%) |
|---|---|---|---|
| 1 | May 25, 2007 | 0 | 4.760 |
| 2 | June 25, 2007 | 1,253,344,121 | 4.760 |
| 3 | July 25, 2007 | 1,243,068,537 | 4.760 |
| 4 | August 25, 2007 | 1,230,041,615 | 4.760 |
| 5 | September 25, 2007 | 1,214,606,839 | 4.760 |
| 6 | October 25, 2007 | 1,196,822,361 | 4.760 |
| 7 | November 25, 2007 | 1,191,110,912 | 4.760 |
| 8 | December 25, 2007 | 1,183,050,254 | 4.760 |
| 9 | January 25, 2008 | 1,172,887,876 | 4.760 |
| 10 | February 25, 2008 | 1,160,456,279 | 4.760 |
| 11 | March 25, 2008 | 1,144,148,225 | 4.760 |
| 12 | April 25, 2008 | 1,121,386,840 | 4.760 |
| 13 | May 25, 2008 | 1,092,385,394 | 4.760 |
| 14 | June 25, 2008 | 1,061,837,984 | 4.760 |
| 15 | July 25, 2008 | 1,032,516,446 | 4.760 |
| 16 | August 25, 2008 | 1,004,876,102 | 4.760 |
| 17 | September 25, 2008 | 978,878,653 | 4.760 |
| 18 | October 25, 2008 | 954,294,699 | 4.760 |
| 19 | November 25, 2008 | 930,756,873 | 4.760 |
| 20 | December 25, 2008 | 908,297,406 | 4.760 |
| 21 | January 25, 2009 | 887,012,627 | 4.760 |
| 22 | February 25, 2009 | 866,856,552 | 4.760 |
| 23 | March 25, 2009 | 841,467,404 | 4.760 |
| 24 | April 25, 2009 | 530,405,115 | 4.760 |
| 25 | May 25, 2009 | 498,854,082 | 4.760 |
| 26 | June 25, 2009 | 471,895,501 | 4.760 |
| 27 | July 25, 2009 | 449,719,440 | 4.760 |
| 28 | August 25, 2009 | 430,700,970 | 4.760 |
| 29 | September 25, 2009 | 413,909,249 | 4.760 |
| 30 | October 25, 2009 | 398,788,047 | 4.760 |
| 31 | November 25, 2009 | 385,089,087 | 4.760 |
| 32 | December 25, 2009 | 372,236,954 | 4.760 |
| 33 | January 25, 2010 | 360,062,889 | 4.760 |
| 34 | February 25, 2010 | 348,409,140 | 4.760 |
| 35 | March 25, 2010 | 334,777,980 | 4.760 |
| 36 | April 25, 2010 | 318,283,400 | 4.760 |
| 37 | May 25, 2010 | 316,054,868 | 4.760 |
| 38 | June 25, 2010 | 293,072,557 | 4.760 |
| 39 | July 25, 2010 | 281,924,113 | 4.760 |
| 40 | August 25, 2010 | 271,614,947 | 4.760 |
| 41 | September 25, 2010 | 262,060,457 | 4.760 |
| 42 | October 25, 2010 | 253,140,756 | 4.760 |
| 43 | November 25, 2010 | 244,764,716 | 4.760 |
| 44 | December 25, 2010 | 236,933,740 | 4.760 |
| 45 | January 25, 2011 | 229,594,729 | 4.760 |
| 46 | February 25, 2011 | 222,805,535 | 4.760 |
| 47 | March 25, 2011 | 216,194,575 | 4.760 |
| 48 | April 25, 2011 | 209,757,987 | 4.760 |
| 49 | May 25, 2011 | 203,539,820 | 4.760 |
| 50 | June 25, 2011 | 197,470,889 | 4.760 |
| 51 | July 25, 2011 | 191,575,911 | 4.760 |
| 52 | August 25, 2011 | 185,794,923 | 4.760 |
| 53 | September 25, 2011 | 180,157,951 | 4.760 |
| 54 | October 25, 2011 | 174,663,659 | 4.760 |

| Period | Distribution Date | Swap Notional Amount ($) | Strike Rate (%) |
|--------|-------------------|--------------------------|-----------------|
| 55 | November 25, 2011 | 169,312,436 | 4.760 |
| 56 | December 25, 2011 | 164,103,557 | 4.760 |
| 57 | January 25, 2012 | 159,032,956 | 4.760 |
| 58 | February 25, 2012 | 154,150,784 | 4.760 |
| 59 | March 25, 2012 | 149,466,158 | 4.760 |
| 60 | April 25, 2012 | 144,987,350 | 4.760 |

**ANNEX II**

| Period | Distribution Date | Principal Balance of the Mortgage Loans Having 40-Year Original Terms To Maturity ($) |
|---|---|---|
| 121 | May 25, 2017 | 12,714,430.44 |
| 122 | June 25, 2017 | 12,537,142.97 |
| 123 | July 25, 2017 | 12,362,276.87 |
| 124 | August 25, 2017 | 12,189,799.35 |
| 125 | September 25, 2017 | 12,019,678.04 |
| 126 | October 25, 2017 | 11,851,881.06 |
| 127 | November 25, 2017 | 11,686,376.88 |
| 128 | December 25, 2017 | 11,523,134.46 |
| 129 | January 25, 2018 | 11,362,123.17 |
| 130 | February 25, 2018 | 11,203,312.76 |
| 131 | March 25, 2018 | 11,046,673.42 |
| 132 | April 25, 2018 | 10,892,175.73 |
| 133 | May 25, 2018 | 10,739,790.66 |
| 134 | June 25, 2018 | 10,589,489.60 |
| 135 | July 25, 2018 | 10,441,244.27 |
| 136 | August 25, 2018 | 10,295,026.85 |
| 137 | September 25, 2018 | 10,150,809.84 |
| 138 | October 25, 2018 | 10,008,566.12 |
| 139 | November 25, 2018 | 9,868,268.93 |
| 140 | December 25, 2018 | 9,729,891.92 |
| 141 | January 25, 2019 | 9,593,409.03 |
| 142 | February 25, 2019 | 9,458,794.58 |
| 143 | March 25, 2019 | 9,326,023.25 |
| 144 | April 25, 2019 | 9,195,070.04 |
| 145 | May 25, 2019 | 9,065,910.30 |
| 146 | June 25, 2019 | 8,938,519.70 |
| 147 | July 25, 2019 | 8,812,874.27 |
| 148 | August 25, 2019 | 8,688,950.33 |
| 149 | September 25, 2019 | 8,566,724.52 |
| 150 | October 25, 2019 | 8,446,173.82 |
| 151 | November 25, 2019 | 8,327,275.51 |
| 152 | December 25, 2019 | 8,210,007.18 |
| 153 | January 25, 2020 | 8,094,346.70 |
| 154 | February 25, 2020 | 7,980,272.26 |
| 155 | March 25, 2020 | 7,867,762.36 |
| 156 | April 25, 2020 | 7,756,795.73 |
| 157 | May 25, 2020 | 7,647,351.48 |
| 158 | June 25, 2020 | 7,539,408.92 |
| 159 | July 25, 2020 | 7,432,947.67 |
| 160 | August 25, 2020 | 7,327,947.63 |
| 161 | September 25, 2020 | 7,224,388.98 |
| 162 | October 25, 2020 | 7,122,252.14 |
| 163 | November 25, 2020 | 7,021,517.80 |
| 164 | December 25, 2020 | 6,922,166.95 |
| 165 | January 25, 2021 | 6,824,180.78 |
| 166 | February 25, 2021 | 6,727,540.77 |
| 167 | March 25, 2021 | 6,632,228.65 |
| 168 | April 25, 2021 | 6,538,226.38 |
| 169 | May 25, 2021 | 6,445,516.17 |
| 170 | June 25, 2021 | 6,354,080.47 |

| Period | Distribution Date | Principal Balance of the Mortgage Loans Having 40-Year Original Terms To Maturity ($) |
|---|---|---|
| 171 | July 25, 2021 | 6,263,901.99 |
| 172 | August 25, 2021 | 6,174,963.63 |
| 173 | September 25, 2021 | 6,087,248.55 |
| 174 | October 25, 2021 | 6,000,740.13 |
| 175 | November 25, 2021 | 5,915,421.99 |
| 176 | December 25, 2021 | 5,831,277.94 |
| 177 | January 25, 2022 | 5,748,292.04 |
| 178 | February 25, 2022 | 5,666,448.56 |
| 179 | March 25, 2022 | 5,585,731.94 |
| 180 | April 25, 2022 | 5,506,126.91 |
| 181 | May 25, 2022 | 5,427,618.31 |
| 182 | June 25, 2022 | 5,350,191.28 |
| 183 | July 25, 2022 | 5,273,831.10 |
| 184 | August 25, 2022 | 5,198,523.28 |
| 185 | September 25, 2022 | 5,124,253.49 |
| 186 | October 25, 2022 | 5,051,007.62 |
| 187 | November 25, 2022 | 4,978,771.76 |
| 188 | December 25, 2022 | 4,907,532.17 |
| 189 | January 25, 2023 | 4,837,275.28 |
| 190 | February 25, 2023 | 4,767,987.76 |
| 191 | March 25, 2023 | 4,699,656.40 |
| 192 | April 25, 2023 | 4,632,268.19 |
| 193 | May 25, 2023 | 4,565,810.32 |
| 194 | June 25, 2023 | 4,500,270.12 |
| 195 | July 25, 2023 | 4,435,635.10 |
| 196 | August 25, 2023 | 4,371,892.93 |
| 197 | September 25, 2023 | 4,309,031.49 |
| 198 | October 25, 2023 | 4,247,038.77 |
| 199 | November 25, 2023 | 4,185,902.95 |
| 200 | December 25, 2023 | 4,125,612.37 |
| 201 | January 25, 2024 | 4,066,155.52 |
| 202 | February 25, 2024 | 4,007,521.05 |
| 203 | March 25, 2024 | 3,949,697.76 |
| 204 | April 25, 2024 | 3,892,674.59 |
| 205 | May 25, 2024 | 3,836,440.68 |
| 206 | June 25, 2024 | 3,780,985.25 |
| 207 | July 25, 2024 | 3,726,297.70 |
| 208 | August 25, 2024 | 3,672,367.58 |
| 209 | September 25, 2024 | 3,619,184.56 |
| 210 | October 25, 2024 | 3,566,738.46 |
| 211 | November 25, 2024 | 3,515,019.27 |
| 212 | December 25, 2024 | 3,464,017.02 |
| 213 | January 25, 2025 | 3,413,721.99 |
| 214 | February 25, 2025 | 3,364,124.53 |
| 215 | March 25, 2025 | 3,315,215.13 |
| 216 | April 25, 2025 | 3,266,984.41 |
| 217 | May 25, 2025 | 3,219,423.11 |
| 218 | June 25, 2025 | 3,172,522.10 |
| 219 | July 25, 2025 | 3,126,272.38 |
| 220 | August 25, 2025 | 3,080,665.09 |
| 221 | September 25, 2025 | 3,035,691.43 |
| 222 | October 25, 2025 | 2,991,342.77 |

| Period | Distribution Date | Principal Balance of the Mortgage Loans Having 40-Year Original Terms To Maturity ($) |
|--------|-------------------|----------------|
| 223 | November 25, 2025 | 2,947,610.60 |
| 224 | December 25, 2025 | 2,904,486.48 |
| 225 | January 25, 2026 | 2,861,962.14 |
| 226 | February 25, 2026 | 2,820,029.36 |
| 227 | March 25, 2026 | 2,778,680.11 |
| 228 | April 25, 2026 | 2,737,906.41 |
| 229 | May 25, 2026 | 2,697,700.39 |
| 230 | June 25, 2026 | 2,658,054.30 |
| 231 | July 25, 2026 | 2,618,960.50 |
| 232 | August 25, 2026 | 2,580,411.45 |
| 233 | September 25, 2026 | 2,542,399.71 |
| 234 | October 25, 2026 | 2,504,917.94 |
| 235 | November 25, 2026 | 2,467,958.90 |
| 236 | December 25, 2026 | 2,431,515.45 |
| 237 | January 25, 2027 | 2,395,580.55 |
| 238 | February 25, 2027 | 2,360,147.24 |
| 239 | March 25, 2027 | 2,325,208.66 |
| 240 | April 25, 2027 | 2,290,758.07 |

## INDEX OF DEFINED TERMS

accrual period ....................................................S-77
additional termination events...............................S-73
adjusted net maximum mortgage rate .................S-89
adjusted net mortgage rate ...................................S-88
advances ..............................................................S-43
Aggregate Final Maturity Reserve Amount.........S-77
Allocated Realized Loss Amount .........................S-77
available funds.....................................................S-60
BBA......................................................................S-90
book-entry certificates .........................................S-59
Certificate Margin................................................S-88
certificate owners.................................................S-59
certificate principal balance .................................S-77
Class A Certificates ...............................................S-3
Class A Principal Distribution Amount ...............S-77
Class M-1 Principal Distribution Amount ..S-77, S-78
Class M-2 Principal Distribution Amount ...........S-78
Class M-4 Principal Distribution Amount ...........S-78
Class M-5 Principal Distribution Amount ...........S-78
Class M-6 Principal Distribution Amount ...........S-79
Class M-7 Principal Distribution Amount ...........S-79
Class M-8 Principal Distribution Amount ...........S-80
Class M-9 Principal Distribution Amount ...........S-80
Clearstream..........................................................S-59
closing date..........................................................S-34
Code....................................................................S-110
Commission..........................................................S-98
compensating interest ..........................................S-96
Counterparty Payment .........................................S-73
CPR.....................................................................S-101
Credit Enhancement Percentage ..........................S-81
Cumulative Loss Trigger Event............................S-81
cut-off date...........................................................S-34
Delinquency Trigger Event...................................S-81
delinquent.............................................................S-81
Designated Page ...................................................S-90
determination date ...............................................S-96
distribution date ..................................................S-59
DTC......................................................................S-59
due date.................................................................S-54
due period .............................................................S-81
Euroclear...............................................................S-59
Extra Principal Distribution Amount...................S-82
Federal Truth-in-Lending Act..............................S-24
Fidelity.................................................................S-40
Fidelity System.....................................................S-40
final maturity reserve account .............................S-75
Final Maturity Reserve Funding Date .................S-82
Final Maturity Reserve Rate.................................S-82
Final Maturity Reserve Shortfall .........................S-82
Fitch...................................................................S-117
Formula Rate ........................................................S-88
gross margin .........................................................S-52

Group I Final Maturity Reserve Amount.............S-82
Group I Interest Remittance Amount....................S-82
Group I Net Swap Payment ..................................S-82
Group I Principal Allocation Percentage .............S-82
Group I Principal Distribution Amount ...............S-82
Group I Principal Remittance Amount .................S-83
Group I Senior Certificates ....................................S-3
Group I Senior Principal Distribution Amount....S-83
Group I Swap Payment .........................................S-83
Group I Swap Percentage .....................................S-83
Group I Swap Termination Payment ....................S-83
Group II Final Maturity Reserve Amount ...........S-83
Group II Interest Remittance Amount ..................S-84
Group II Net Swap Payment.................................S-84
Group II Principal Allocation Percentage ............S-84
Group II Principal Distribution Amount...............S-84
Group II Principal Remittance Amount................S-84
Group II Senior Certificates...................................S-3
Group II Senior Principal Distribution Amount ..S-84
Group II Swap Payment .......................................S-84
Group II Swap Percentage ....................................S-84
Group II Swap Termination Payment...................S-85
HOEPA.................................................................S-25
index ....................................................................S-53
initial periodic rate cap ........................................S-53
insurance proceeds...............................................S-85
interest coverage account .....................................S-75
Interest Settlement Rate .......................................S-88
last scheduled distribution date............................S-59
LIBOR Business Day ...........................................S-90
LIBOR Determination Date..................................S-90
liquidated mortgage loan .....................................S-86
Long Beach Mortgage ..........................................S-28
Maximum Cap Rate..............................................S-89
Mezzanine Certificates ..........................................S-3
Monthly Interest Distributable Amount...............S-85
Moody's...............................................................S-117
mortgage..............................................................S-52
mortgage loan purchase agreement......................S-52
mortgaged property..............................................S-52
Net Counterparty Payment ..................................S-85
net liquidation proceeds.......................................S-86
Net Monthly Excess Cashflow ............................S-85
Net Swap Payment...............................................S-85
Net WAC Rate......................................................S-87
Net WAC Rate Carryover Amount......................S-90
NIMS .....................................................................S-1
NIMS insurer .........................................................S-1
NIMS insurer default............................................S-26
NIMS policy .........................................................S-26
nonrecoverable advance .......................................S-43
Notional Principal Contract Regulations ...........S-112
NPC component...................................................S-110

offered certificate.................................................S-98
OID Regulations.................................................S-111
one-month LIBOR...............................................S-88
Optional Termination Date ..................................S-85
Overcollateralization Deficiency Amount ...........S-85
Overcollateralization Floor ...................................S-85
Overcollateralization Release Amount ...............S-85
Overcollateralization Target Amount .................S-86
Overcollateralized Amount..................................S-86
Pass-Through Rate.................................................S-87
PMI Insurer.............................................................S-71
PMI Insurer fee rate..............................................S-95
PMI Mortgage Loans.............................................S-71
PMI Policy...............................................................S-71
pooling agreement ................................................S-52
Post-Stepdown Monthly Principal Distribution...S-65
Prepayment Assumption.....................................S-101
prepayment interest excess ................................S-96
prepayment interest shortfall .............................S-96
prepayment period ...............................................S-86
Principal Remittance Amount.............................S-86
reacquired mortgage loan ...................................S-35
realized loss ...........................................................S-86
record date .............................................................S-59
reference banks .....................................................S-91
Relief Act................................................................S-22
Remaining Principal Distribution Amount .........S-86
REMIC ...................................................................S-110
REMIC regular interest component...................S-110
REO property .........................................................S-97
reserve fund ...........................................................S-89
reserve interest rate .............................................S-91
Residual Certificates.............................................S-3

S&P ........................................................................S-117
scheduled principal balance ................................S-51
servicing advances................................................S-43
servicing fee............................................................S-96
servicing fee rate...................................................S-96
six-month LIBOR ...................................................S-53
SMMEA ....................................................................S-7
sponsor....................................................................S-28
stated principal balance .......................................S-86
Stepdown Date.......................................................S-87
Structuring Assumptions .....................................S-102
Subordinate Certificates .......................................S-3
subsequent periodic rate cap ..............................S-53
subsequent recoveries ..........................................S-87
substitute mortgage loan .....................................S-35
substitution price ..................................................S-35
Supplemental Final Maturity Reserve Amount ...S-87
supplemental interest account............................S-73
supplemental interest trust ..................................S-72
swap agreement ....................................................S-72
swap counterparty.................................................S-72
swap default............................................................S-73
swap event of default ...........................................S-73
swap notional amount...........................................S-72
Swap Payment ......................................................S-72
swap termination date ..........................................S-72
Swap Termination Payment...................................S-74
termination event ..................................................S-73
termination payment ...........................................S-113
Trigger Event .........................................................S-87
trust........................................................................S-52
Unpaid Interest Shortfall Amount ......................S-87
vector ....................................................................S-101

Exhibit F

WAMU ASSET ACCEPTANCE CORP.,
Depositor


WASHINGTON MUTUAL BANK,
Seller and Servicer


CITIBANK, N.A.,
Trustee


and


CHRISTIANA BANK & TRUST COMPANY,
Delaware Trustee


POOLING AND SERVICING AGREEMENT
Dated as of April 1, 2007


_____


WaMu Asset-Backed Certificates

WaMu Series 2007-HE2 Trust

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................12
Section 1.01    Defined Terms.................................................................12
Section 1.02    Accounting. ....................................................................80
Section 1.03    Allocation of Certain Interest Shortfalls. .......................80
Section 1.04    Rights of the NIMS Insurer. ...........................................81

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
            CERTIFICATES.................................................................82
Section 2.01    Conveyance of Mortgage Loans. ....................................82
Section 2.02    Acceptance of REMIC 1 by the Trustee. .........................86
Section 2.03    Cure, Repurchase or Substitution of Mortgage Loans by the Seller;
                Remedies for Breaches by Depositor or Servicer; Remedies for
                Breaches Relating to Prepayment Charges. ....................87
Section 2.04    Representations, Warranties and Covenants of the Servicer. ....................91
Section 2.05    Representations and Warranties of the Depositor. ..................93
Section 2.06    Issuance of Certificates. ................................................95
Section 2.07    Reserved. .......................................................................95
Section 2.08    Conveyance of REMIC Regular Interests and Acceptance of
                REMICs by the Trustee; Issuance of Certificates. .....................95
Section 2.09    Creation of the Trust. ....................................................98
Section 2.10    Restrictions on Activities of the Trust. .........................98
Section 2.11    Separateness Requirements. ..........................................99

ARTICLE III ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS .......101
Section 3.01    Servicer to Act as Servicer.........................................101
Section 3.02    Sub-Servicing Agreements Between the Servicer and Sub-Servicers. .....103
Section 3.03    Successor Sub-Servicers. .............................................104
Section 3.04    Liability of the Servicer. ..............................................104
Section 3.05    No Contractual Relationship Between Sub-Servicers and the NIMS
                Insurer, the Trustee or Certificateholders................................105
Section 3.06    Assumption or Termination of Sub-Servicing Agreements by
                Trustee. .......................................................................105
Section 3.07    Collection of Certain Mortgage Loan Payments...........................105
Section 3.08    Sub-Servicing Accounts. ...............................................106
Section 3.09    Collection of Taxes, Assessments and Similar Items; Servicing
                Accounts.......................................................................107
Section 3.10    Collection Account and Distribution Account...........................107
Section 3.11    Withdrawals from the Collection Account and Distribution Account......110
Section 3.12    Investment of Funds in the Interest Coverage Account, the Collection
                Account and the Distribution Account.....................................112
Section 3.13    Reserved. .....................................................................113
Section 3.14    Maintenance of Hazard Insurance and Errors and Omissions and
                Fidelity Coverage. .........................................................113

# TABLE OF CONTENTS
## (cont'd)

|  |  | Page |
|---|---|---|
| Section 3.15 | Enforcement of Due-On-Sale Clauses; Assumption Agreements. | 114 |
| Section 3.16 | Realization Upon Defaulted Mortgage Loans. | 115 |
| Section 3.17 | Trustee to Cooperate; Release of Mortgage Files. | 118 |
| Section 3.18 | Servicing Compensation. | 119 |
| Section 3.19 | Reports to the Trustee; Collection Account Statements. | 120 |
| Section 3.20 | Annual Statement as to Compliance. | 120 |
| Section 3.21 | Assessments of Compliance and Attestation Reports. | 121 |
| Section 3.22 | Access to Certain Documentation. | 122 |
| Section 3.23 | Title, Management and Disposition of REO Property. | 122 |
| Section 3.24 | Obligations of the Servicer in Respect of Prepayment Interest Shortfalls. | 125 |
| Section 3.25 | Obligations of the Servicer in Respect of Mortgage Rates and Monthly Payments. | 126 |
| Section 3.26 | Reserve Fund. | 126 |
| Section 3.27 | Advance Facility. | 127 |
| Section 3.28 | PMI Policy; Claims Under the PMI Policy. | 128 |
| Section 3.29 | Swap Agreement. | 129 |
| Section 3.30 | Replacement Swap Agreement. | 129 |
| Section 3.31 | Swap Counterparty Default | 130 |

ARTICLE IV FLOW OF FUNDS .......................................................................131

| Section 4.01 | Distributions. | 131 |
|---|---|---|
| Section 4.02 | Preference Claims. | 148 |
| Section 4.03 | Statements. | 148 |
| Section 4.04 | Remittance Reports; Advances. | 152 |
| Section 4.05 | Distributions on the REMIC Regular Interests. | 154 |
| Section 4.06 | Allocation of Realized Losses. | 157 |
| Section 4.07 | Compliance with Withholding Requirements. | 161 |
| Section 4.08 | Commission Reporting. | 161 |
| Section 4.09 | Supplemental Interest Trust. | 164 |
| Section 4.10 | Final Maturity Reserve Trust. | 166 |
| Section 4.11 | Intention of the Parties and Interpretation. | 166 |
| Section 4.12 | Interest Coverage Account. | 167 |

ARTICLE V THE CERTIFICATES ...................................................................168

| Section 5.01 | The Certificates. | 168 |
|---|---|---|
| Section 5.02 | Registration of Transfer and Exchange of Certificates. | 170 |
| Section 5.03 | Mutilated, Destroyed, Lost or Stolen Certificates. | 175 |
| Section 5.04 | Persons Deemed Owners | 175 |

ARTICLE VI THE SERVICER AND THE DEPOSITOR ...............................176

| Section 6.01 | Liability of the Servicer and the Depositor. | 176 |
|---|---|---|
| Section 6.02 | Merger or Consolidation of the Depositor or the Servicer | 176 |
| Section 6.03 | Limitation on Liability of the Depositor, the Servicer and Others. | 176 |

# TABLE OF CONTENTS
### (cont'd)

|  |  | Page |
|---|---|---|
| Section 6.04 | Limitation on Resignation of Servicer. | 177 |
| Section 6.05 | Rights of the Depositor, the NIMS Insurer and the Trustee in Respect of the Servicer. | 178 |

**ARTICLE VII DEFAULT** ....................................................................................179

| Section 7.01 | Servicer Events of Default. | 179 |
|---|---|---|
| Section 7.02 | Trustee to Act; Appointment of Successor. | 181 |
| Section 7.03 | Notification to Certificateholders. | 183 |
| Section 7.04 | Waiver of Servicer Events of Default. | 183 |

**ARTICLE VIII THE TRUSTEE** ...........................................................................184

| Section 8.01 | Duties of Trustees. | 184 |
|---|---|---|
| Section 8.02 | Certain Matters Affecting the Trustees. | 185 |
| Section 8.03 | Trustees Not Liable for Certificates or Mortgage Loans. | 187 |
| Section 8.04 | Trustees May Own Certificates. | 187 |
| Section 8.05 | Trustees' Fees and Expenses. | 187 |
| Section 8.06 | Eligibility Requirements for Trustees. | 188 |
| Section 8.07 | Resignation or Removal of Trustees. | 189 |
| Section 8.08 | Successor Trustees. | 190 |
| Section 8.09 | Merger or Consolidation of Trustees. | 190 |
| Section 8.10 | Appointment of Co-Trustee or Separate Trustee. | 191 |
| Section 8.11 | Appointment of Custodians. | 192 |
| Section 8.12 | Appointment of Office or Agency. | 192 |
| Section 8.13 | Representations and Warranties of the Trustee. | 193 |
| Section 8.14 | Duties of Delaware Trustee. | 193 |
| Section 8.15 | Amendment to Certificate of Trust. | 193 |
| Section 8.16 | Trustees Act on Behalf of Trust. | 194 |

**ARTICLE IX TERMINATION** ...............................................................................194

| Section 9.01 | Termination Upon Purchase or Liquidation of All Mortgage Loans. | 194 |
|---|---|---|
| Section 9.02 | Additional Termination Requirements. | 197 |
| Section 9.03 | Termination of the Supplemental Interest Trust and the Final Maturity Reserve Trust. | 197 |

**ARTICLE X REMIC PROVISIONS** .....................................................................198

| Section 10.01 | REMIC Administration. | 198 |
|---|---|---|
| Section 10.02 | Prohibited Transactions and Activities. | 202 |
| Section 10.03 | Trustee, Servicer and Depositor Indemnification. | 202 |

**ARTICLE XI MISCELLANEOUS PROVISIONS** ..............................................203

| Section 11.01 | Amendment. | 203 |
|---|---|---|
| Section 11.02 | Recordation of Agreement; Counterparts. | 204 |
| Section 11.03 | Limitation on Rights of Certificateholders. | 205 |
| Section 11.04 | Governing Law; Jurisdiction. | 206 |

# TABLE OF CONTENTS

(cont'd)

|  |  | Page |
|---|---|---|
| Section 11.05 | Notices. | 206 |
| Section 11.06 | Severability of Provisions. | 206 |
| Section 11.07 | Notice to the Rating Agencies, the Swap Counterparty and the NIMS Insurer. | 206 |
| Section 11.08 | Article and Section References. | 207 |
| Section 11.09 | Third-Party Beneficiaries. | 208 |
| Section 11.10 | Grant of Security Interest. | 208 |

# TABLE OF CONTENTS
(cont'd)

## **Exhibits**

Exhibit A-1      Form of Senior Certificates
Exhibit A-2      Form of Subordinate Certificates
Exhibit A-3      Form of Class C Certificates
Exhibit A-4      Form of Class P Certificates
Exhibit A-5      Form of Residual Certificates
Exhibit A-6      Form of Reverse of Certificates
Exhibit B        Form of Swap Agreement
Exhibit C        Form of Mortgage Loan Purchase Agreement
Exhibit D        Mortgage Loan Schedule
Exhibit E-1      Request for Release (for Trustee/Custodian)
Exhibit E-2      Request for Release (Certificate – Mortgage Loan Paid in Full)
Exhibit E-3      Form of Mortgage Loan Assignment Agreement
Exhibit F-1      Form of Trustee's Initial Certification
Exhibit F-2      Form of Trustee's Final Certification
Exhibit G        Form of Residual NIM Holder Certificate
Exhibit H        Form of Lost Note Affidavit
Exhibit I        Form of ERISA Representation
Exhibit J-1A     [Reserved]
Exhibit J-1B     [Reserved]
Exhibit J-2      Form of Investment Letter
Exhibit K        Form of Class R Certificate, Class R-CX Certificate and
                 Class R-PX Certificate Transfer Affidavit
Exhibit L        Form of Transferor Certificate
Exhibit M        [Reserved]
Exhibit N        Criteria to be Addressed in Assessment of Compliance
Exhibit O        Form 10-D, Form 8-K and Form 10-K Reporting Responsibility
Exhibit P        Form of Trustee Certificate

## **Schedules**

Schedule I       Prepayment Charge Schedule
Schedule II      Swap Notional Amount Schedule
Schedule III     40 Year Loans Final Maturity Schedule
Schedule IV      PMI Mortgage Loan Schedule

This POOLING AND SERVICING AGREEMENT is dated as of April 1, 2007 (the "Agreement"), among WAMU ASSET ACCEPTANCE CORP., as depositor (the "Depositor"), WASHINGTON MUTUAL BANK, as seller (the "Seller") and servicer (the "Servicer"), CITIBANK, N.A., as trustee (the "Trustee"), supplemental interest trust trustee and final maturity reserve trust trustee and CHRISTIANA BANK NATIONAL TRUST COMPANY, as Delaware trustee (the "Delaware Trustee").

PRELIMINARY STATEMENT:

The Depositor intends to sell pass-through certificates (collectively, the "Certificates"), to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest in the Trust. The Certificates will consist of twenty-one classes of certificates, designated as (i) the Class I-A Certificates, (ii) the Class II-A1 Certificates, (iii) the Class II-A2 Certificates, (iv) the Class II-A3 Certificates, (v) the Class II-A4 Certificates, (vi) the Class M-1 Certificates, (vii) the Class M-2 Certificates, (viii) the Class M-3 Certificates, (ix) the Class M-4 Certificates, (x) the Class M-5 Certificates, (xi) the Class M-6 Certificates, (xii) the Class M-7 Certificates, (xiii) the Class M-8 Certificates, (xiv) the Class M-9 Certificates, (xv) the Class C Certificates, (xvi) the Class P Certificates, (xvii) the Class R Certificates, (xviii) the Class R-CX Certificates and (xix) the Class R-PX Certificates.

<u>REMIC 1</u>

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (exclusive of the Reserve Fund, the Supplemental Interest Trust, the Final Maturity Reserve Trust, the Interest Coverage Account and the Servicer Prepayment Charge Payment Amounts) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC 1." The Class R-1 Interest shall represent the sole class of "residual interests" in REMIC 1 for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, the Uncertificated REMIC 1 Pass-Through Rate, the initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC 1 Regular Interests. None of the REMIC 1 Regular Interests will be certificated.

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| IX | $ 129,509,320.86 | Variable[2] | May 25, 2047 |
| I-1-A | $ 1,955,190.52 | Variable[2] | May 25, 2047 |
| I-1-B | $ 1,955,190.52 | Variable[2] | May 25, 2047 |
| I-2-A | $ 2,478,702.37 | Variable[2] | May 25, 2047 |
| I-2-B | $ 2,478,702.37 | Variable[2] | May 25, 2047 |
| I-3-A | $ 2,936,857.68 | Variable[2] | May 25, 2047 |
| I-3-B | $ 2,936,857.68 | Variable[2] | May 25, 2047 |
| I-4-A | $ 3,383,948.09 | Variable[2] | May 25, 2047 |
| I-4-B | $ 3,383,948.09 | Variable[2] | May 25, 2047 |
| I-5-A | $ 1,086,748.06 | Variable[2] | May 25, 2047 |
| I-5-B | $ 1,086,748.06 | Variable[2] | May 25, 2047 |
| I-6-A | $ 1,533,744.66 | Variable[2] | May 25, 2047 |
| I-6-B | $ 1,533,744.66 | Variable[2] | May 25, 2047 |
| I-7-A | $ 1,933,650.21 | Variable[2] | May 25, 2047 |
| I-7-B | $ 1,933,650.21 | Variable[2] | May 25, 2047 |
| I-8-A | $ 2,365,426.69 | Variable[2] | May 25, 2047 |
| I-8-B | $ 2,365,426.69 | Variable[2] | May 25, 2047 |
| I-9-A | $ 3,103,020.97 | Variable[2] | May 25, 2047 |
| I-9-B | $ 3,103,020.97 | Variable[2] | May 25, 2047 |
| I-10-A | $ 4,330,930.90 | Variable[2] | May 25, 2047 |
| I-10-B | $ 4,330,930.90 | Variable[2] | May 25, 2047 |
| I-11-A | $ 5,518,260.80 | Variable[2] | May 25, 2047 |
| I-11-B | $ 5,518,260.80 | Variable[2] | May 25, 2047 |
| I-12-A | $ 5,812,419.67 | Variable[2] | May 25, 2047 |
| I-12-B | $ 5,812,419.67 | Variable[2] | May 25, 2047 |
| I-13-A | $ 5,579,166.42 | Variable[2] | May 25, 2047 |
| I-13-B | $ 5,579,166.42 | Variable[2] | May 25, 2047 |
| I-14-A | $ 5,259,276.62 | Variable[2] | May 25, 2047 |
| I-14-B | $ 5,259,276.62 | Variable[2] | May 25, 2047 |
| I-15-A | $ 4,946,674.17 | Variable[2] | May 25, 2047 |
| I-15-B | $ 4,946,674.17 | Variable[2] | May 25, 2047 |
| I-16-A | $ 4,677,720.88 | Variable[2] | May 25, 2047 |
| I-16-B | $ 4,677,720.88 | Variable[2] | May 25, 2047 |
| I-17-A | $ 4,478,668.50 | Variable[2] | May 25, 2047 |
| I-17-B | $ 4,478,668.50 | Variable[2] | May 25, 2047 |
| I-18-A | $ 4,273,483.34 | Variable[2] | May 25, 2047 |
| I-18-B | $ 4,273,483.34 | Variable[2] | May 25, 2047 |
| I-19-A | $ 4,049,969.15 | Variable[2] | May 25, 2047 |

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| I-19-B | $ 4,049,969.15 | Variable[2] | May 25, 2047 |
| I-20-A | $ 3,835,204.58 | Variable[2] | May 25, 2047 |
| I-20-B | $ 3,835,204.58 | Variable[2] | May 25, 2047 |
| I-21-A | $ 4,830,929.47 | Variable[2] | May 25, 2047 |
| I-21-B | $ 4,830,929.47 | Variable[2] | May 25, 2047 |
| I-22-A | $ 59,187,491.39 | Variable[2] | May 25, 2047 |
| I-22-B | $ 59,187,491.39 | Variable[2] | May 25, 2047 |
| I-23-A | $ 6,003,384.40 | Variable[2] | May 25, 2047 |
| I-23-B | $ 6,003,384.40 | Variable[2] | May 25, 2047 |
| I-24-A | $ 5,129,553.91 | Variable[2] | May 25, 2047 |
| I-24-B | $ 5,129,553.91 | Variable[2] | May 25, 2047 |
| I-25-A | $ 4,219,558.16 | Variable[2] | May 25, 2047 |
| I-25-B | $ 4,219,558.16 | Variable[2] | May 25, 2047 |
| I-26-A | $ 3,618,746.37 | Variable[2] | May 25, 2047 |
| I-26-B | $ 3,618,746.37 | Variable[2] | May 25, 2047 |
| I-27-A | $ 3,195,050.89 | Variable[2] | May 25, 2047 |
| I-27-B | $ 3,195,050.89 | Variable[2] | May 25, 2047 |
| I-28-A | $ 2,877,192.27 | Variable[2] | May 25, 2047 |
| I-28-B | $ 2,877,192.27 | Variable[2] | May 25, 2047 |
| I-29-A | $ 2,606,574.65 | Variable[2] | May 25, 2047 |
| I-29-B | $ 2,606,574.65 | Variable[2] | May 25, 2047 |
| I-30-A | $ 2,445,444.33 | Variable[2] | May 25, 2047 |
| I-30-B | $ 2,445,444.33 | Variable[2] | May 25, 2047 |
| I-31-A | $ 2,316,424.69 | Variable[2] | May 25, 2047 |
| I-31-B | $ 2,316,424.69 | Variable[2] | May 25, 2047 |
| I-32-A | $ 2,217,421.38 | Variable[2] | May 25, 2047 |
| I-32-B | $ 2,217,421.38 | Variable[2] | May 25, 2047 |
| I-33-A | $ 2,593,673.98 | Variable[2] | May 25, 2047 |
| I-33-B | $ 2,593,673.98 | Variable[2] | May 25, 2047 |
| I-34-A | $ 3,138,512.27 | Variable[2] | May 25, 2047 |
| I-34-B | $ 3,138,512.27 | Variable[2] | May 25, 2047 |
| I-35-A | $ 424,034.75 | Variable[2] | May 25, 2047 |
| I-35-B | $ 424,034.75 | Variable[2] | May 25, 2047 |
| I-36-A | $ 4,372,967.67 | Variable[2] | May 25, 2047 |
| I-36-B | $ 4,372,967.67 | Variable[2] | May 25, 2047 |
| I-37-A | $ 2,121,274.28 | Variable[2] | May 25, 2047 |
| I-37-B | $ 2,121,274.28 | Variable[2] | May 25, 2047 |
| I-38-A | $ 1,961,580.35 | Variable[2] | May 25, 2047 |
| I-38-B | $ 1,961,580.35 | Variable[2] | May 25, 2047 |
| I-39-A | $ 1,817,984.10 | Variable[2] | May 25, 2047 |
| I-39-B | $ 1,817,984.10 | Variable[2] | May 25, 2047 |
| I-40-A | $ 1,697,199.39 | Variable[2] | May 25, 2047 |
| I-40-B | $ 1,697,199.39 | Variable[2] | May 25, 2047 |
| I-41-A | $ 1,593,754.09 | Variable[2] | May 25, 2047 |
| I-41-B | $ 1,593,754.09 | Variable[2] | May 25, 2047 |
| I-42-A | $ 1,490,041.84 | Variable[2] | May 25, 2047 |
| I-42-B | $ 1,490,041.84 | Variable[2] | May 25, 2047 |
| I-43-A | $ 1,396,433.02 | Variable[2] | May 25, 2047 |
| I-43-B | $ 1,396,433.02 | Variable[2] | May 25, 2047 |
| I-44-A | $ 1,291,816.38 | Variable[2] | May 25, 2047 |
| I-44-B | $ 1,291,816.38 | Variable[2] | May 25, 2047 |
| I-45-A | $ 1,257,902.84 | Variable[2] | May 25, 2047 |
| I-45-B | $ 1,257,902.84 | Variable[2] | May 25, 2047 |
| I-46-A | $ 1,224,724.15 | Variable[2] | May 25, 2047 |
| I-46-B | $ 1,224,724.15 | Variable[2] | May 25, 2047 |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| I-47-A | $ 1,183,164.01 | Variable[2] | May 25, 2047 |
| I-47-B | $ 1,183,164.01 | Variable[2] | May 25, 2047 |
| I-48-A | $ 1,154,768.08 | Variable[2] | May 25, 2047 |
| I-48-B | $ 1,154,768.08 | Variable[2] | May 25, 2047 |
| I-49-A | $ 1,121,669.11 | Variable[2] | May 25, 2047 |
| I-49-B | $ 1,121,669.11 | Variable[2] | May 25, 2047 |
| I-50-A | $ 1,099,979.62 | Variable[2] | May 25, 2047 |
| I-50-B | $ 1,099,979.62 | Variable[2] | May 25, 2047 |
| I-51-A | $ 1,072,576.92 | Variable[2] | May 25, 2047 |
| I-51-B | $ 1,072,576.92 | Variable[2] | May 25, 2047 |
| I-52-A | $ 1,045,428.43 | Variable[2] | May 25, 2047 |
| I-52-B | $ 1,045,428.43 | Variable[2] | May 25, 2047 |
| I-53-A | $ 1,018,205.92 | Variable[2] | May 25, 2047 |
| I-53-B | $ 1,018,205.92 | Variable[2] | May 25, 2047 |
| I-54-A | $ 991,121.37 | Variable[2] | May 25, 2047 |
| I-54-B | $ 991,121.37 | Variable[2] | May 25, 2047 |
| I-55-A | $ 964,810.47 | Variable[2] | May 25, 2047 |
| I-55-B | $ 964,810.47 | Variable[2] | May 25, 2047 |
| I-56-A | $ 928,957.07 | Variable[2] | May 25, 2047 |
| I-56-B | $ 928,957.07 | Variable[2] | May 25, 2047 |
| I-57-A | $ 891,368.93 | Variable[2] | May 25, 2047 |
| I-57-B | $ 891,368.93 | Variable[2] | May 25, 2047 |
| I-58-A | $ 852,206.84 | Variable[2] | May 25, 2047 |
| I-58-B | $ 852,206.84 | Variable[2] | May 25, 2047 |
| I-59-A | $ 27,587,521.32 | Variable[2] | May 25, 2047 |
| I-59-B | $ 27,587,521.32 | Variable[2] | May 25, 2047 |
| IIX | $ 210,811,616.18 | Variable[2] | May 25, 2047 |
| II-1-A | $ 3,182,601.48 | Variable[2] | May 25, 2047 |
| II-1-B | $ 3,182,601.48 | Variable[2] | May 25, 2047 |
| II-2-A | $ 4,034,758.63 | Variable[2] | May 25, 2047 |
| II-2-B | $ 4,034,758.63 | Variable[2] | May 25, 2047 |
| II-3-A | $ 4,780,530.32 | Variable[2] | May 25, 2047 |
| II-3-B | $ 4,780,530.32 | Variable[2] | May 25, 2047 |
| II-4-A | $ 5,508,290.91 | Variable[2] | May 25, 2047 |
| II-4-B | $ 5,508,290.91 | Variable[2] | May 25, 2047 |
| II-5-A | $ 1,768,976.44 | Variable[2] | May 25, 2047 |
| II-5-B | $ 1,768,976.44 | Variable[2] | May 25, 2047 |
| II-6-A | $ 2,496,584.34 | Variable[2] | May 25, 2047 |
| II-6-B | $ 2,496,584.34 | Variable[2] | May 25, 2047 |
| II-7-A | $ 3,147,538.79 | Variable[2] | May 25, 2047 |
| II-7-B | $ 3,147,538.79 | Variable[2] | May 25, 2047 |
| II-8-A | $ 3,850,371.81 | Variable[2] | May 25, 2047 |
| II-8-B | $ 3,850,371.81 | Variable[2] | May 25, 2047 |
| II-9-A | $ 5,051,006.03 | Variable[2] | May 25, 2047 |
| II-9-B | $ 5,051,006.03 | Variable[2] | May 25, 2047 |
| II-10-A | $ 7,049,761.60 | Variable[2] | May 25, 2047 |
| II-10-B | $ 7,049,761.60 | Variable[2] | May 25, 2047 |
| II-11-A | $ 8,982,462.20 | Variable[2] | May 25, 2047 |
| II-11-B | $ 8,982,462.20 | Variable[2] | May 25, 2047 |
| II-12-A | $ 9,461,285.33 | Variable[2] | May 25, 2047 |
| II-12-B | $ 9,461,285.33 | Variable[2] | May 25, 2047 |
| II-13-A | $ 9,081,602.58 | Variable[2] | May 25, 2047 |
| II-13-B | $ 9,081,602.58 | Variable[2] | May 25, 2047 |
| II-14-A | $ 8,560,895.38 | Variable[2] | May 25, 2047 |
| II-14-B | $ 8,560,895.38 | Variable[2] | May 25, 2047 |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| II-15-A | $ 8,052,050.33 | Variable[2] | May 25, 2047 |
| II-15-B | $ 8,052,050.33 | Variable[2] | May 25, 2047 |
| II-16-A | $ 7,614,256.12 | Variable[2] | May 25, 2047 |
| II-16-B | $ 7,614,256.12 | Variable[2] | May 25, 2047 |
| II-17-A | $ 7,290,244.50 | Variable[2] | May 25, 2047 |
| II-17-B | $ 7,290,244.50 | Variable[2] | May 25, 2047 |
| II-18-A | $ 6,956,250.16 | Variable[2] | May 25, 2047 |
| II-18-B | $ 6,956,250.16 | Variable[2] | May 25, 2047 |
| II-19-A | $ 6,592,420.35 | Variable[2] | May 25, 2047 |
| II-19-B | $ 6,592,420.35 | Variable[2] | May 25, 2047 |
| II-20-A | $ 6,242,832.92 | Variable[2] | May 25, 2047 |
| II-20-B | $ 6,242,832.92 | Variable[2] | May 25, 2047 |
| II-21-A | $ 7,863,644.53 | Variable[2] | May 25, 2047 |
| II-21-B | $ 7,863,644.53 | Variable[2] | May 25, 2047 |
| II-22-A | $ 96,343,653.11 | Variable[2] | May 25, 2047 |
| II-22-B | $ 96,343,653.11 | Variable[2] | May 25, 2047 |
| II-23-A | $ 9,772,132.10 | Variable[2] | May 25, 2047 |
| II-23-B | $ 9,772,132.10 | Variable[2] | May 25, 2047 |
| II-24-A | $ 8,349,736.59 | Variable[2] | May 25, 2047 |
| II-24-B | $ 8,349,736.59 | Variable[2] | May 25, 2047 |
| II-25-A | $ 6,868,472.34 | Variable[2] | May 25, 2047 |
| II-25-B | $ 6,868,472.34 | Variable[2] | May 25, 2047 |
| II-26-A | $ 5,890,488.63 | Variable[2] | May 25, 2047 |
| II-26-B | $ 5,890,488.63 | Variable[2] | May 25, 2047 |
| II-27-A | $ 5,200,809.61 | Variable[2] | May 25, 2047 |
| II-27-B | $ 5,200,809.61 | Variable[2] | May 25, 2047 |
| II-28-A | $ 4,683,408.73 | Variable[2] | May 25, 2047 |
| II-28-B | $ 4,683,408.73 | Variable[2] | May 25, 2047 |
| II-29-A | $ 4,242,905.35 | Variable[2] | May 25, 2047 |
| II-29-B | $ 4,242,905.35 | Variable[2] | May 25, 2047 |
| II-30-A | $ 3,980,622.17 | Variable[2] | May 25, 2047 |
| II-30-B | $ 3,980,622.17 | Variable[2] | May 25, 2047 |
| II-31-A | $ 3,770,607.81 | Variable[2] | May 25, 2047 |
| II-31-B | $ 3,770,607.81 | Variable[2] | May 25, 2047 |
| II-32-A | $ 3,609,453.12 | Variable[2] | May 25, 2047 |
| II-32-B | $ 3,609,453.12 | Variable[2] | May 25, 2047 |
| II-33-A | $ 4,221,906.02 | Variable[2] | May 25, 2047 |
| II-33-B | $ 4,221,906.02 | Variable[2] | May 25, 2047 |
| II-34-A | $ 5,108,777.73 | Variable[2] | May 25, 2047 |
| II-34-B | $ 5,108,777.73 | Variable[2] | May 25, 2047 |
| II-35-A | $ 690,231.25 | Variable[2] | May 25, 2047 |
| II-35-B | $ 690,231.25 | Variable[2] | May 25, 2047 |
| II-36-A | $ 7,118,187.83 | Variable[2] | May 25, 2047 |
| II-36-B | $ 7,118,187.83 | Variable[2] | May 25, 2047 |
| II-37-A | $ 3,452,947.72 | Variable[2] | May 25, 2047 |
| II-37-B | $ 3,452,947.72 | Variable[2] | May 25, 2047 |
| II-38-A | $ 3,193,002.65 | Variable[2] | May 25, 2047 |
| II-38-B | $ 3,193,002.65 | Variable[2] | May 25, 2047 |
| II-39-A | $ 2,959,260.90 | Variable[2] | May 25, 2047 |
| II-39-B | $ 2,959,260.90 | Variable[2] | May 25, 2047 |
| II-40-A | $ 2,762,651.11 | Variable[2] | May 25, 2047 |
| II-40-B | $ 2,762,651.11 | Variable[2] | May 25, 2047 |
| II-41-A | $ 2,594,265.91 | Variable[2] | May 25, 2047 |
| II-41-B | $ 2,594,265.91 | Variable[2] | May 25, 2047 |
| II-42-A | $ 2,425,446.16 | Variable[2] | May 25, 2047 |

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| II-42-B | $ 2,425,446.16 | Variable[2] | May 25, 2047 |
| II-43-A | $ 2,273,072.48 | Variable[2] | May 25, 2047 |
| II-43-B | $ 2,273,072.48 | Variable[2] | May 25, 2047 |
| II-44-A | $ 2,102,780.62 | Variable[2] | May 25, 2047 |
| II-44-B | $ 2,102,780.62 | Variable[2] | May 25, 2047 |
| II-45-A | $ 2,047,577.16 | Variable[2] | May 25, 2047 |
| II-45-B | $ 2,047,577.16 | Variable[2] | May 25, 2047 |
| II-46-A | $ 1,993,569.85 | Variable[2] | May 25, 2047 |
| II-46-B | $ 1,993,569.85 | Variable[2] | May 25, 2047 |
| II-47-A | $ 1,925,919.49 | Variable[2] | May 25, 2047 |
| II-47-B | $ 1,925,919.49 | Variable[2] | May 25, 2047 |
| II-48-A | $ 1,879,697.42 | Variable[2] | May 25, 2047 |
| II-48-B | $ 1,879,697.42 | Variable[2] | May 25, 2047 |
| II-49-A | $ 1,825,819.89 | Variable[2] | May 25, 2047 |
| II-49-B | $ 1,825,819.89 | Variable[2] | May 25, 2047 |
| II-50-A | $ 1,790,514.38 | Variable[2] | May 25, 2047 |
| II-50-B | $ 1,790,514.38 | Variable[2] | May 25, 2047 |
| II-51-A | $ 1,745,909.08 | Variable[2] | May 25, 2047 |
| II-51-B | $ 1,745,909.08 | Variable[2] | May 25, 2047 |
| II-52-A | $ 1,701,717.57 | Variable[2] | May 25, 2047 |
| II-52-B | $ 1,701,717.57 | Variable[2] | May 25, 2047 |
| II-53-A | $ 1,657,405.58 | Variable[2] | May 25, 2047 |
| II-53-B | $ 1,657,405.58 | Variable[2] | May 25, 2047 |
| II-54-A | $ 1,613,318.13 | Variable[2] | May 25, 2047 |
| II-54-B | $ 1,613,318.13 | Variable[2] | May 25, 2047 |
| II-55-A | $ 1,570,490.03 | Variable[2] | May 25, 2047 |
| II-55-B | $ 1,570,490.03 | Variable[2] | May 25, 2047 |
| II-56-A | $ 1,512,128.93 | Variable[2] | May 25, 2047 |
| II-56-B | $ 1,512,128.93 | Variable[2] | May 25, 2047 |
| II-57-A | $ 1,450,944.07 | Variable[2] | May 25, 2047 |
| II-57-B | $ 1,450,944.07 | Variable[2] | May 25, 2047 |
| II-58-A | $ 1,387,197.16 | Variable[2] | May 25, 2047 |
| II-58-B | $ 1,387,197.16 | Variable[2] | May 25, 2047 |
| II-59-A | $ 44,906,153.68 | Variable[2] | May 25, 2047 |
| II-59-B | $ 44,906,153.68 | Variable[2] | May 25, 2047 |
| P | $ 100.00 | Variable[2] | May 25, 2047 |

---

[1]    Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC 1 Regular Interest.

[2]    Calculated in accordance with the definition of "Uncertificated REMIC 1 Pass-Through Rate" herein.

## REMIC 2

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the REMIC 1 Regular Interests and certain other related assets subject to this Agreement (exclusive of the Reserve Fund, the Supplemental Interest Trust, the Final Maturity Reserve Trust, the Interest Coverage Account and the Servicer Prepayment Charge Payment Amounts) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC 2." The Class R-2 Interest shall represent the sole class of "residual interests" in REMIC 2 for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, the Uncertificated REMIC 2 Pass-Through Rate, the initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC 2 Regular Interests. None of the REMIC 2 Regular Interests will be certificated.

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 2 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| AA | $ 780,895,878.44 | Variable[2] | May 25, 2047 |
| A-IA | $ 2,457,750.00 | Variable[2] | May 25, 2047 |
| A-IIA1 | $ 1,787,125.00 | Variable[2] | May 25, 2047 |
| A-IIA2 | $ 626,610.00 | Variable[2] | May 25, 2047 |
| A-IIA3 | $ 997,070.00 | Variable[2] | May 25, 2047 |
| A-IIA4 | $ 589,775.00 | Variable[2] | May 25, 2047 |
| M1 | $ 254,985.00 | Variable[2] | May 25, 2047 |
| M2 | $ 223,115.00 | Variable[2] | May 25, 2047 |
| M3 | $ 135,460.00 | Variable[2] | May 25, 2047 |
| M4 | $ 119,525.00 | Variable[2] | May 25, 2047 |
| M5 | $ 115,540.00 | Variable[2] | May 25, 2047 |
| M6 | $ 107,570.00 | Variable[2] | May 25, 2047 |
| M7 | $ 103,590.00 | Variable[2] | May 25, 2047 |
| M8 | $ 63,745.00 | Variable[2] | May 25, 2047 |
| M9 | $ 87,655.00 | Variable[2] | May 25, 2047 |
| ZZ | $ 8,267,135.58 | Variable[2] | May 25, 2047 |
| 1GRP | $ 11,492.04 | Variable[2] | May 25, 2047 |
| 1SUB | $ 60,647.04 | Variable[2] | May 25, 2047 |
| 2GRP | $ 18,707.87 | Variable[2] | May 25, 2047 |
| 2SUB | $ 98,719.47 | Variable[2] | May 25, 2047 |
| Swap IO | N/A[3] | Variable[2] | May 25, 2047 |
| FMR IO | N/A[4] | Variable[2] | May 25, 2047 |
| XX | $ 796,642,962.59 | Variable[2] | May 25, 2047 |

---

[1]  Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC 2 Regular Interest.

[2]  Calculated in accordance with the definition of "Uncertificated REMIC 2 Pass-Through Rate" herein.

[3]  REMIC 2 Regular Interest Swap IO will not have a principal amount but will accrue interest on its Uncertificated Notional Amount, as defined herein.

[4]  REMIC 2 Regular Interest FMR IO will not have a principal amount but will at all times have a notional amount equal to the aggregate principal amounts of all of the REMIC 1 Regular Interests.

<u>REMIC 3</u>

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the REMIC 2 Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets shall be designated as "REMIC 3." The Class R-3 Interest represents the sole class of "residual interests" in REMIC 3 for purposes of the REMIC Provisions.

The following table sets forth (or describes) the Class designation, Pass-Through Rate and Original Class Certificate Principal Balance for each Class of Certificates that represents one or more of the "regular interests" in REMIC 3 and each class of uncertificated "regular interests" in REMIC 3:

| Class Designation | Original Class Certificate Principal Balance | Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| I-A | $ 491,550,000.00 | Variable[2] | May 25, 2047 |
| II-A1 | $ 357,425,000.00 | Variable[2] | May 25, 2047 |
| II-A2 | $ 125,322,000.00 | Variable[2] | May 25, 2047 |
| II-A3 | $ 199,414,000.00 | Variable[2] | May 25, 2047 |
| II-A4 | $ 117,955,000.00 | Variable[2] | May 25, 2047 |
| M-1 | $ 50,997,000.00 | Variable[2] | May 25, 2047 |
| M-2 | $ 44,623,000.00 | Variable[2] | May 25, 2047 |
| M-3 | $ 27,092,000.00 | Variable[2] | May 25, 2047 |
| M-4 | $ 23,905,000.00 | Variable[2] | May 25, 2047 |
| M-5 | $ 23,108,000.00 | Variable[2] | May 25, 2047 |
| M-6 | $ 21,514,000.00 | Variable[2] | May 25, 2047 |
| M-7 | $ 20,718,000.00 | Variable[2] | May 25, 2047 |
| M-8 | $ 12,749,000.00 | Variable[2] | May 25, 2047 |
| M-9 | $ 17,531,000.00 | Variable[2] | May 25, 2047 |
| Swap IO | N/A | Variable[5] | May 25, 2047 |
| FM Reserve IO | N/A | Variable[5] | May 25, 2047 |
| Class C Interest[3] | $ 59,762,058.04 | Variable[2] | May 25, 2047 |
| Class P Interest | $ 100.00 | N/A[4] | May 25, 2047 |

---

[1] Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each Class of Certificates or uncertificated interests that represents one or more of the "regular interests" in REMIC 3.

[2] Calculated in accordance with the definition of "Pass-Through Rate" herein.

[3] The Class C Interest will accrue interest at its variable Pass-Through Rate on its Notional Amount outstanding from time to time, which shall equal the aggregate of the Uncertificated Principal Balances of the REMIC 2 Regular Interests. The Class C Interest will not accrue interest on its Uncertificated Principal Balance.

[4] The Class P Interest will not accrue interest.

[5] The interests designated "Swap IO" and "FM Reserve IO" will not have principal amounts or interest rates but will be entitled to 100% of the interest paid on REMIC 2 Regular Interests Swap IO and FMR IO, respectively. These interests will not be certificated.

## REMIC CX

 As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the Class C Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC CX."  The Class R-CX Interest shall represent the sole class of "residual interests" in REMIC CX for purposes of the REMIC Provisions (as defined herein) under federal income tax law.  The following table irrevocably sets forth the designation, the Pass-Through Rate, initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC CX Regular Interests.

| Designation | Uncertificated REMIC CX Pass-Through Rate | Initial Uncertificated Principal Balance | Assumed Final Maturity Date[1] |
|:---:|:---:|:---:|:---:|
| Class C | Variable[2] | $59,762,058.04 | May 25, 2047 |

[1] Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC CX Regular Interest.

[2] The Class C Certificates will not accrue interest on their Certificate Principal Balance.  Instead, the monthly interest due on the Class C Certificates will be 100% of the interest paid on the Class C Interest.

<u>REMIC PX</u>

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the Class P Interest as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC PX." The Class R-PX Interest shall represent the sole class of "residual interests" in REMIC PX for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, the Pass-Through Rate, initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC PX Regular Interests.

| Designation | Uncertificated REMIC PX Pass-Through Rate | Initial Uncertificated Principal Balance | Assumed Final Maturity Date[1] |
|---|---|---|---|
| Class P | N/A[2] | $100.00 | May 25, 2047 |

[1] Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC PX Regular Interest.

[2] The Class P Certificates will not accrue interest.

<u>REMIC SwapX</u>

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the REMIC Swap IO as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC SwapX." The Class R-SwapX Interest shall represent the sole class of "residual interests" in REMIC SwapX for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, the Pass-Through Rate, initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC SwapX Regular Interests.

| Designation | Uncertificated REMIC SwapX Pass-Through Rate | Initial Uncertificated Principal Balance | Assumed Final Maturity Date[1] |
|---|---|---|---|
| Class Swap IO | N/A[2] | N/A[2] | May 25, 2047 |

[1]  Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC SwapX Regular Interest.

[2]  The Class Swap IO Interest will not have an Uncertificated REMIC SwapX Pass-Through Rate or an Uncertificated Principal Balance, but will be entitled to 100% of the interest paid on REMIC 2 Regular Interest Swap IO Interest.

ARTICLE I

DEFINITIONS

Section 1.01    <u>Defined Terms</u>.

Whenever used in this Agreement or in the Preliminary Statement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.  Unless otherwise specified, all calculations in respect of interest on the Class A Certificates, the Mezzanine Certificates and the payments to the Final Maturity Reserve Trust shall be made on the basis of the actual number of days elapsed on the basis of a 360-day year and all other calculations of interest described herein shall be made on the basis of a 360-day year consisting of twelve 30-day months.  The Class P Certificates and the Residual Certificates are not entitled to distributions in respect of interest and, accordingly, will not accrue interest.

"<u>1933 Act</u>":  The Securities Act of 1933, as amended.

"<u>1934 Act</u>":  The Exchange Act of 1934, as amended.

"<u>Account</u>":  Either of the Collection Account and Distribution Account.

"<u>Accrual Period</u>":   With respect to the Class C Certificates, the REMIC 1 Regular Interests and the Class C Interest, and each Distribution Date, the calendar month prior to the month of such Distribution Date. With respect to the Class A Certificates and the Mezzanine Certificates, and each Distribution Date, the period commencing on the immediately preceding Distribution Date (or in the case of the first such Accrual Period, commencing on the Closing Date) and ending on the day immediately preceding such Distribution Date.

"<u>Additional Termination Event</u>":  As defined in the Swap Agreement.

"<u>Adjustable Rate Mortgage Loan</u>":  A Mortgage Loan which provides for an adjustable Mortgage Rate payable with respect thereto.

"<u>Adjusted Net Maximum Mortgage Rate</u>":  With respect to any Mortgage Loan (or the related REO Property), as of any Distribution Date, a per annum rate of interest equal to the Maximum Mortgage Rate for such Mortgage Loan (if such Mortgage Loan is an Adjustable Rate Mortgage Loan) or the Mortgage Rate for such Mortgage Loan (if such Mortgage Loan is a Fixed Rate Mortgage Loan), in either case as of the first day of the month preceding the month in which such Distribution Date occurs, minus the sum of (i) the Servicing Fee Rate, (ii) the PMI Insurer Fee Rate, if applicable, and (iii) the Trustee Fee Rate.

"<u>Adjusted Net Mortgage Rate</u>":  With respect to any Mortgage Loan (or the related REO Property), as of any Distribution Date, a per annum rate of interest equal to the Mortgage Rate for such Mortgage Loan as of the first day of the month preceding the month in which such Distribution Date occurs, minus the sum of (i) the Servicing Fee Rate, (ii) the PMI Insurer Fee Rate, if applicable, and (iii) the Trustee Fee Rate.

"<u>Adjustment Date</u>":  With respect to each Adjustable Rate Mortgage Loan, each date, on which the Mortgage Rate of such Mortgage Loan changes pursuant to the related Mortgage Note.

The first Adjustment Date following the Cut-off Date as to each Adjustable Rate Mortgage Loan is set forth in the Mortgage Loan Schedule.

"Advance":  As to any Mortgage Loan or REO Property, any advance made by the Servicer in respect of any Distribution Date pursuant to Section 4.04.

"Advancing Person":  As defined in Section 3.27 hereof.

"Adverse REMIC Event":  As defined in Section 10.01(f) hereof.

"Affiliate":  With respect to any Person, any other Person controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise and "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Aggregate Final Maturity Reserve Amount":  With respect any Distribution Date, the sum of the Group I Final Maturity Reserve Amount and the Group II Final Maturity Reserve Amount.

"Agreement":  This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

"Allocated Realized Loss Amount":  With respect to any Distribution Date and any Class of the Mezzanine Certificates, an amount equal to (a) the sum of (i) any Realized Losses allocated to such Class of Certificates on such Distribution Date and (ii) any Allocated Realized Loss Amount for such Class of Certificates remaining unpaid from the previous Distribution Date less (b) any Allocated Realized Loss Amounts that have been reinstated with respect to such Class of Certificates on prior Distribution Dates due to Subsequent Recoveries.

"Annual Statement of Compliance":  As defined in Section 3.20(a) hereof.

"Appraised Value":  With respect to any Mortgaged Property, the value thereof as determined by an appraisal made for the originator of the related Mortgage Loan at the time of origination of such Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae.

"Assessment of Compliance":  As defined in Section 3.21(a) hereof.

"Assignment":  An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form (excepting therefrom, if applicable, the mortgage recordation information which has not been required pursuant to Section 2.01 hereof or returned by the applicable recorder's office), which is sufficient under the laws of the jurisdiction in which the related Mortgaged Property is located to reflect of record the sale of the Mortgage.

"Attestation Report":  As defined in Section 3.21(b) hereof.

"Available Funds":  With respect to any Distribution Date, an amount equal to the excess of (i) the sum of (a) the aggregate of the Monthly Payments on the Mortgage Loans due on the related Due Date and received on or prior to the related Determination Date, (b) Liquidation

Proceeds, Insurance Proceeds, Principal Prepayments, Gross Subsequent Recoveries and other unscheduled recoveries of principal and interest in respect of the Mortgage Loans during the related Prepayment Period (other than any prepayment charges collected by the Servicer in connection with the full or partial prepayment of any of the Mortgage Loans, any Servicer Prepayment Charge Payment Amount in connection with the Mortgage Loans and any Prepayment Interest Excess), (c) the aggregate of any amounts received in respect of an REO Property acquired in respect of a Mortgage Loan withdrawn from any REO Account and deposited in the Collection Account for such Distribution Date, (d) the aggregate of any amounts deposited in the Collection Account by the Servicer in respect of related Prepayment Interest Shortfalls on the Mortgage Loans for such Distribution Date, (e) the aggregate of any Advances made by the Servicer or the Trustee for such Distribution Date with respect to the Mortgage Loans, (f) the aggregate of any related advances made by or on behalf of the Trustee for such Distribution Date with respect to the Mortgage Loans pursuant to Section 7.02(b) and (g) the aggregate of any amounts constituting proceeds of repurchases or substitutions of the Mortgage Loans occurring during the related Prepayment Period over (ii) the sum, without duplication, of (a) amounts reimbursable or payable to the Depositor, the Servicer, the Trustee, the Delaware Trustee, the Seller, the NIMS Insurer or any Sub-Servicer pursuant to Section 3.11 or Section 3.12 and any amounts otherwise payable to such parties in respect of Extraordinary Trust Fund Expenses, (b) amounts deposited in the Collection Account or the Distribution Account pursuant to clauses (i)(a) through (g) above, as the case may be, in error, (c) Stayed Funds, (d) any Trustee Fee pursuant to Section 8.05 and any indemnification payments or expense reimbursements made by the Trust pursuant to Section 8.05, (e) the PMI Insurer Fee payable from the Collection Account and (f) amounts reimbursable to the Trustee for an advance made pursuant to Section 7.02(b) which advance the Trustee has determined to be nonrecoverable from the Stayed Funds in respect of which it was made.

"Balloon Mortgage Loan": A Mortgage Loan that provides for a Balloon Payment.

"Balloon Payment": With respect to any Balloon Mortgage Loan, the payment of the unamortized principal balance of a Mortgage Loan in a single payment at the maturity of such Mortgage Loan.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978 (Title 11 of the United States Code), as amended.

"Bankruptcy Loss": With respect to any Mortgage Loan, a Realized Loss resulting from a Deficient Valuation or Debt Service Reduction.

"Book-Entry Certificates": Any of the Certificates that shall be registered in the name of the Depository or its nominee, the ownership of which is reflected on the books of the Depository or on the books of a Person maintaining an account with the Depository (directly, as a "Depository Participant," or indirectly, as an indirect participant in accordance with the rules of the Depository and as described in Section 5.02 hereof). On the Closing Date, the Class A Certificates and the Mezzanine Certificates shall be Book-Entry Certificates.

"Book-Entry Custodian": The custodian appointed pursuant to Section 5.01(b).

"Business Day": Any day other than a Saturday, a Sunday or a day on which banking or savings institutions in the State of California, the State of Delaware, the State of New York, the

State of Washington, or in the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Calculation Period":  As such term is defined in the Swap Agreement.

"Certificate":  Any Regular Certificate or Residual Certificate.

"Certificate Margin":  With respect to the Class I-A Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.260% per annum and (B) after the Optional Termination Date, 0.520% per annum.  With respect to the Class II-A1 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.110% per annum and (B) after the Optional Termination Date, 0.220% per annum.  With respect to the Class II-A2 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.190% per annum and (B) after the Optional Termination Date, 0.380% per annum.  With respect to the Class II-A3 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.250% per annum and (B) after the Optional Termination Date, 0.500% per annum.  With respect to the Class II-A4 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.360% per annum and (B) after the Optional Termination Date, 0.720% per annum.  With respect to the Class M-1 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.470% per annum and (B) after the Optional Termination Date, 0.705% per annum.  With respect to the Class M-2 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.550% per annum and (B) after the Optional Termination Date, 0.825% per annum.  With respect to the Class M-3 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.750% per annum and (B) after the Optional Termination Date, 1.125% per annum.  With respect to the Class M-4 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 1.350% per annum and (B) after the Optional Termination Date, 2.025% per annum.  With respect to the Class M-5 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 1.700% per annum and (B) after the Optional Termination Date, 2.550% per annum.  With respect to the Class M-6 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 2.250% per annum and (B) after the Optional Termination Date, 3.375% per annum.  With respect to the Class M-7 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 2.250% per annum and (B) after the Optional Termination Date, 3.375% per annum.  With respect to the Class M-8 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 2.250% per annum and (B) after the Optional Termination Date, 3.375% per annum.  With respect to the Class M-9 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 2.250% per annum and (B) after the Optional Termination Date, 3.375% per annum.

"Certificate of Trust":  The certificate of trust filed with respect to the Trust with the Secretary of State in accordance with Section 3810(a) of the Statutory Trust Statute.

"Certificate Owner":  With respect to each Book-Entry Certificate, any beneficial owner thereof.

"Certificate Principal Balance":  With respect to any Class A Certificates, Mezzanine Certificates or Class P Certificates immediately prior to any Distribution Date, an amount equal to the Initial Certificate Principal Balance thereof reduced by the sum of all amounts actually distributed in respect of principal of such Class and, in the case of a Mezzanine Certificate,

Realized Losses allocated thereto on all prior Distribution Dates and, in the case of a Mezzanine Certificate, increased by the Allocated Realized Loss Amounts reinstated thereto on all prior Distribution Dates due to Subsequent Recoveries.  With respect to any Class C Certificates as of any date of determination, an amount equal to the Uncertificated Principal Balance of the Class C Interest.  The Residual Certificates will not have a Certificate Principal Balance.

"Certificate Register":  The register established and maintained pursuant to Section 5.02 hereof.

"Certificateholder" or "Holder":  The Person in whose name a Certificate is registered in the Certificate Register, except that a Disqualified Organization or a Non-United States Person shall not be a Holder of a Residual Certificate for any purposes hereof and, solely for the purposes of giving any consent, direction or taking any other action pursuant to this Agreement, any Certificate registered in the name of the Depositor or the Servicer or any Affiliate thereof shall be deemed not to be outstanding and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent, direction or other action has been obtained, except as otherwise provided in Section 11.01.  The Trustee and the NIMS Insurer may conclusively rely upon a certificate of the Depositor or the Servicer in determining whether a Certificate is held by an Affiliate thereof.  All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee and the NIMS Insurer shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

"Certification":  As defined in Section 4.08(b) hereof.

"Class":  Collectively, Certificates which have the same priority of payment and bear the same class designation and the form of which is identical except for variation in the Percentage Interest evidenced thereby.

"Class I-A Certificate":  Any one of the Class I-A Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing (i) a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class II-A1 Certificate":  Any one of the Class II-A1 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class II-A2 Certificate":  Any one of the Class II-A2 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class II-A3 Certificate":  Any one of the Class II-A3 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class II-A4 Certificate":  Any one of the Class II-A4 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A Certificates":  The Group I Senior Certificates and the Group II Senior Certificates.

"Class A Principal Distribution Amount":  With respect to any Distribution Date, the sum of the Group I Senior Principal Distribution Amount and the Group II Senior Principal Distribution Amount.

"Class C Certificate":  Any one of the Class C Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a (ii) regular interest in REMIC CX, (ii) the obligation to pay Net WAC Rate Carryover Amounts and (iii) the obligation to pay any Class IO Distribution Amount.

"Class C Interest"  An uncertificated interest in the Trust Fund held by the Trustee on behalf of the Holders of the Class C Certificates and the Class R-CX Interest, evidencing a Regular Interest in REMIC 3 for purposes of the REMIC Provisions.

"Class C NIM Payment Amount":  For any Distribution Date (I) on or before the date the NIM Notes are issued, zero, (II) from the first Distribution Date after the date on which the NIM Notes are issued until the principal balance of the NIM Notes has been reduced to zero, the amount necessary to pay in full the NIM Notes as provided in the Indenture and to pay in full any amounts owed to the NIMS Insurer as provided in the Indenture less the amounts payable to the Class C Certificates from the Reserve Fund on such Distribution Date and (III) thereafter, zero.

"Class C Shortfall":  As defined in Section 10.01(l) hereof.

"Class FMR IO Interest"  An uncertificated interest in the Trust Fund, evidencing a Regular Interest in REMIC 3 for purposes of the REMIC Provisions.

"Class IO Distribution Amount":  As defined in Section 4.09 hereof.  For purposes of clarity, the Class IO Distribution Amount for any Distribution Date shall equal the amount payable to the Supplemental Interest Trust on such Distribution Date in excess of the amount payable on the Class Swap-IO Interest on such Distribution Date, all as further provided in Section 4.09 hereof.  The Class IO Distribution Amount will reduce amounts actually paid to the Class A, Class M and Class C Certificates.

"Class M-1 Certificate":  Any one of the Class M-1 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-1 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-1 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date) and (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 68.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-2 Certificate":  Any one of the Class  M-2 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-2 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date) and (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 74.10% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-3 Certificate":  Any one of the Class M-3 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and

evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-3 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-3 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date) and (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 77.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-4 Certificate":  Any one of the Class M-4 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-4 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date) and (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 80.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the

related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-5 Certificate":  Any one of the Class M-5 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-5 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date) and (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 83.40% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-6 Certificate":  Any one of the Class M-6 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-6 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate

Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date) and (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 86.10% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-7 Certificate":  Any one of the Class M-7 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-7 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date) and (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 88.70% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-8 Certificate":  Any one of the Class  M-8 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-8 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-8 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date) and (ix) the aggregate Certificate Principal Balance of the Class M-8 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 90.30% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-9 Certificate":  Any one of the Class  M-9 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 3, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-9 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-9 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment

of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date), (ix) the aggregate Certificate Principal Balance of the Class M-8 Certificates (after taking into account the payment of the Class M-8 Principal Distribution Amount on such Distribution Date) and (x) the aggregate Certificate Principal Balance of the Class M-9 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 92.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class P Certificate":  Any one of the Class P Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC PX.

"Class P Interest":  An uncertificated interest in the Trust Fund held by the Trustee on behalf of the Holders of the Class P Certificates, evidencing a Regular Interest in REMIC 3 for purposes of the REMIC Provisions.

"Class R Certificate":  Any one of the Class R Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, evidencing the ownership of the Class R-1 Interest, the Class R-2 Interest and the Class R-3 Interest.

"Class R-1 Interest":  The Residual Interest in REMIC 1.

"Class R-2 Interest":  The Residual Interest in REMIC 2.

"Class R-3 Interest":  The Residual Interest in REMIC 3.

"Class R-CX Certificate":  Any one of the Class R-CX Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, evidencing the ownership of the Class R-CX Interest and the Class R-SwapX Interest.

"Class R-CX Interest":  The Residual Interest in REMIC CX.

"Class R-PX Certificate":  Any one of the Class R-PX Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A, executed, authenticated and delivered by the Trustee, evidencing the ownership of the Class R-PX Interest.

"Class R-PX Interest":  The Residual Interest in REMIC PX.

"Class R-SwapX Interest":  The Residual Interest in REMIC SwapX.

"Class Swap IO Interest":  An uncertificated interest in the Trust Fund, evidencing a Regular Interest in REMIC 3 for purposes of the REMIC Provisions.

"Class Swap IO Upper-Tier Interest":  An uncertificated interest in the Trust Fund, evidencing a Regular Interest in REMIC SwapX for purposes of the REMIC Provisions.

"Close of Business":  As used herein, with respect to any Business Day, 5:00 p.m. (New York time).

"Closing Date":  April 10, 2007.

"Closing Date Mortgage Loans":  The Group I Closing Date Mortgage Loans and the Group II Closing Date Mortgage Loans.

"Code":  The Internal Revenue Code of 1986, as amended.

"Collection Account":  The account or accounts created and maintained by the Servicer pursuant to Section 3.10(a), which shall be entitled "Citibank, N.A., as Trustee, in trust for registered Holders of WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust" and which must be an Eligible Account.

"Commission":  The Securities and Exchange Commission.

"Compensating Interest":  As defined in Section 3.24.

"Corporate Trust Office":  The principal corporate trust office of the Trustee at which at any particular time its corporate trust business in connection with this Agreement shall be administered, which office at the date of the execution of this instrument is located at 388 Greenwich Street, 14th Floor, New York, NY 10013, Attention: Agency and Trust (WaMu Series 2007-HE2), or at such other address as the Trustee may designate from time to time by notice to the Certificateholders, the Swap Counterparty, the Depositor and the Servicer.

"Corresponding Certificates":  As shown on the following chart:

| REMIC 2 Regular Interest | Corresponding Certificate |
| --- | --- |
| IA | Class I-A Certificates |
| IIA1 | Class II-A1 Certificates |
| IIA2 | Class II-A2 Certificates |
| IIA3 | Class II-A3 Certificates |
| IIA4 | Class II-A4 Certificates |
| M1 | Class M-1 Certificates |
| M2 | Class M-2 Certificates |
| M3 | Class M-3 Certificates |
| M4 | Class M-4 Certificates |
| M5 | Class M-5 Certificates |
| M6 | Class M-6 Certificates |
| M7 | Class M-7 Certificates |
| M8 | Class M-8 Certificates |
| M9 | Class M-9 Certificates |
| Class C Interest | Class C Certificates |
| P and the Class P Interest | Class P Certificates |

"Counterparty Payment":  With respect to any Distribution Date is an amount equal to the product of (i) USD-LIBOR-BBA for such Distribution Date, (ii) the Swap Notional Amount for such Distribution Date and (iii) a fraction, the numerator of which is 30 and the denominator of which is 360.

"Credit Enhancement Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is (x) the sum of the aggregate Certificate Principal Balance of the Mezzanine Certificates and the Uncertificated Principal Balance of the Class C Interest, calculated prior to distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in respect of the Certificates then entitled to distributions of principal on such Distribution Date, and the denominator of which is (y) the aggregate Stated Principal Balance of the Mortgage Loans, calculated prior to taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period.

"Credit Support Annex Account":  As defined in Section 4.09(d) hereof.

"Cumulative Loss Trigger Event":  A Cumulative Loss Trigger Event has occurred with respect to any Distribution Date in or after May 2009, if the percentage obtained by dividing (x) the aggregate amount of Realized Losses incurred (less any Subsequent Recoveries) with respect to the Mortgage Loans from the Cut-off Date through the last day of the related Due Period by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, exceeds the applicable percentage set forth below for such Distribution Date:

| Distribution Date Occurring in | Cumulative Loss Percentage |
|---|---|
| May 2009 through April 2010 | 1.50% for the first month, plus an additional $1/12^{th}$ of 1.85% for each month thereafter. |
| May 2010 through April 2011 | 3.35% for the first month, plus an additional $1/12^{th}$ of 1.90% for each month thereafter. |
| May 2011 through April 2012 | 5.25% for the first month, plus an additional $1/12^{th}$ of 1.50% for each month thereafter. |
| May 2012 through April 2013 | 6.75% for the first month, plus an additional $1/12^{th}$ of 0.85% for each month thereafter. |
| May 2013 through April 2014 | 7.60% for the first month, plus an additional $1/12^{th}$ of 0.05% for each month thereafter. |
| May 2014 and thereafter | 7.65% for each month. |

"Custodial Agreement":  With respect to the initial Custodian, the Custodial Agreement, dated as of April 1, 2007, by and between the Trustee and Deutsche Bank National Trust Company, as custodian, and with respect to any other custodian, any agreement that may be entered into by the Trustee and any Custodian or any agreement assigned to the Trustee providing for holding and safekeeping of Mortgage Files on behalf of the Trust.

"Custodian":  Deutsche Bank National Trust Company, or any other custodian appointed as provided in Section 8.11 hereof pursuant to a Custodial Agreement.

"Cut-off Date":  With respect to each Closing Date Mortgage Loan, April 1, 2007; and with respect to each Substitute Mortgage Loan, its date of substitution, as applicable.

"Cut-off Date Aggregate Principal Balance":  The aggregate of the Cut-off Date Principal Balances of the Mortgage Loans.

"Cut-off Date Principal Balance":  With respect to any Mortgage Loan, the unpaid principal balance thereof as of the Cut-off Date (with respect to a Closing Date Mortgage Loan); or as of the applicable date of substitution (with respect to a Substitute Mortgage Loan), after giving effect to scheduled payments due on or before the Cut-off Date, whether or not received.

"DBRS":  DBRS, Inc., or its successors in interest.

"Debt Service Reduction":  With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a

proceeding under the Bankruptcy Code, except such a reduction resulting from a Deficient Valuation.

"<u>Deficient Valuation</u>":  With respect to any Mortgage Loan, a valuation of the related Mortgaged Property by a court of competent jurisdiction in an amount less than the then outstanding principal balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"<u>Definitive Certificates</u>":  As defined in Section 5.01(b) hereof.

"<u>Delaware Trustee</u>":  Christiana Bank & Trust Company, or its successor-in-interest as provided in Section 8.08, or any successor trustee appointed as herein provided.

"<u>Delinquency Percentage</u>":  With respect to any Distribution Date, the percentage obtained by dividing (x) the aggregate Stated Principal Balance of (i) Mortgage Loans Delinquent 60 days or more, (ii) REO Properties related to the Mortgage Loans and (iii) Mortgage Loans in foreclosure and in bankruptcy (excluding any such Mortgage Loans which are less than 60 days Delinquent under the bankruptcy plan) by (y) the aggregate Stated Principal Balance of the Mortgage Loans, in each case, calculated prior to taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period.

"<u>Delinquency Trigger Event</u>":  A Delinquency Trigger Event has occurred with respect to a Distribution Date if the Delinquency Percentage exceeds 42.00% of the Credit Enhancement Percentage.

"<u>Delinquent</u>":  With respect to any Mortgage Loan and related Monthly Payment, the Monthly Payment due on a Due Date which is not made by the Close of Business on the next scheduled Due Date for such Mortgage Loan.  For example, a Mortgage Loan is 60 or more days Delinquent if the Monthly Payment due on a Due Date is not made by the Close of Business on the second scheduled Due Date after such Due Date.

"<u>Depositor</u>":  WaMu Asset Acceptance Corp., a Delaware corporation, or any successor in interest.

"<u>Depository</u>":  The initial Depository shall be The Depository Trust Company, whose nominee is Cede & Co., or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended.  The Depository shall initially be the registered Holder of the Book-Entry Certificates.  The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York.

"<u>Depository Participant</u>":  A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"<u>Determination Date</u>":  With respect to any Distribution Date, the 15th day of the calendar month in which such Distribution Date occurs or, if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day.

"Directly Operate":  With respect to any REO Property, the furnishing or rendering of services to the tenants thereof, the management or operation of such REO Property, the holding of such REO Property primarily for sale to customers, the performance of any construction work thereon or any use of such REO Property in a trade or business conducted by the REMIC other than through an Independent Contractor; provided, however, that the Trustee (or the Servicer on behalf of the Trustee) shall not be considered to Directly Operate an REO Property solely because the Trustee (or the Servicer on behalf of the Trustee) establishes rental terms, chooses tenants, enters into or renews leases, deals with taxes and insurance, or makes decisions as to repairs or capital expenditures with respect to such REO Property.

"Disqualified Organization":  Any:  (A) "disqualified organization" under Section 860E of the Code, which as of the Closing Date is any of  (i) the United States, any state or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (ii) any organization (other than a cooperative described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code unless such organization is subject to the tax imposed by Section 511 of the Code, or (iii) any organization described in Section 1381(a)(2)(C) of the Code; (B) "electing large partnership" within the meaning of Section 775 of the Code; or (C) other Person so designated by the Trustee based upon an Opinion of Counsel provided by nationally recognized counsel to the Trustee that the holding of an ownership interest in a Residual Certificate by such Person may cause the Trust or any Person having an ownership interest in any Class of Certificates (other than such Person) to incur liability for any federal tax imposed under the Code that would not otherwise be imposed but for the transfer of an ownership interest in a Residual Certificate to such Person.  A corporation will not be treated as an instrumentality of the United States or of any state or political subdivision thereof if all of its activities are subject to income tax and a majority of its board of directors is not selected by a governmental unit.  The terms "United States," "state" and "international organization" shall have the meanings set forth in Section 7701 of the Code.

"Distribution Account":  The trust account or accounts created and maintained by the Trustee pursuant to Section 3.10(b) which shall be entitled "Distribution Account, Citibank, N.A., as Trustee, in trust for the registered Certificateholders of WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust" and which must be an Eligible Account.

"Distribution Date":  The 25th day of any calendar month, or if such 25th day is not a Business Day, the Business Day immediately following such 25th day, commencing in May 2007.

"Due Date":  With respect to each Distribution Date, the first day of the calendar month in which such Distribution Date occurs, which is the day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Due Period":  With respect to any Distribution Date, the period commencing on the second day of the month preceding the month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

"Early Termination Date":  As defined in the Swap Agreement.

"Eligible Account":  Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of

which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the short-term unsecured debt obligations of such holding company) are rated no lower than P-1 by Moody's, F-1 by Fitch and A-1 by S&P (or comparable ratings if Moody's, Fitch and S&P are not the Rating Agencies) at the time any amounts are held on deposit therein; provided that so long as Washington Mutual Bank is the Servicer, any account maintained with Washington Mutual Bank shall be an Eligible Account if the long-term unsecured debt obligations of Washington Mutual Bank are rated no lower than "A2" by Moody's, or "A" by Fitch and "A-" by S&P and the short-term unsecured debt obligations of Washington Mutual Bank are rated no lower than A-2 by S&P, provided that if the long-term unsecured debt obligations of Washington Mutual Bank are downgraded by S&P to a rating lower than "A-" or the short-term unsecured debt obligations of Washington Mutual Bank are downgraded by S&P to a rating lower than A-2, Washington Mutual Bank shall transfer the deposits in any account maintained by Washington Mutual Bank (unless any such account is otherwise qualified as an Eligible Account pursuant to (ii), (iii) or (iv) of the definition of Eligible Account) to an Eligible Account within ten (10) Business Days of notification of such downgrade, (ii) an account or accounts the deposits in which are fully insured by the FDIC (to the limits established by such corporation), the uninsured deposits in which account are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to the Trustee and to each Rating Agency, the Certificateholders will have a claim with respect to the funds in such account or a perfected first priority security interest against such collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, (iii) a trust account or accounts maintained with the trust department of a federal or state chartered depository institution, national banking association or trust company acting in its fiduciary capacity or (iv) an account otherwise acceptable to the NIMS Insurer and each Rating Agency without reduction or withdrawal of their then current ratings of the Certificates as evidenced by a letter from each Rating Agency to the Trustee. Eligible Accounts may bear interest.

"ERISA": The Employee Retirement Income Security Act of 1974, as amended.

"Escrow Payments": As defined in Section 3.09 hereof.

"Excess Overcollateralized Amount": With respect to any Distribution Date, the excess, if any, of (i) the Overcollateralized Amount for such Distribution Date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on such Distribution Date) over (ii) the Overcollateralization Target Amount for such Distribution Date.

"Extra Principal Distribution Amount": With respect to any Distribution Date, the lesser of (x) the Net Monthly Excess Cashflow for such Distribution Date and (y) the Overcollateralization Deficiency Amount for such Distribution Date.

"Extraordinary Trust Fund Expense": Any amounts reimbursable to the Trustee or the Delaware Trustee, or any director, officer, employee or agent of the Trustee or the Delaware Trustee, as applicable, from the Trust pursuant to Section 8.05, any amounts payable from the Distribution Account in respect of taxes pursuant to Section 10.01(g)(iii), any amounts payable from the Distribution Account in respect of any REMIC pursuant to Section 10.01(c), any amounts payable from the Trust as a trustee fee for any successor trustee and any amounts payable by the Trustee for the recording of the assignments of mortgage pursuant to Section 2.01.

"Fannie Mae":  Federal National Mortgage Association, or any successor thereto.

"FDIC":  Federal Deposit Insurance Corporation, or any successor thereto.

"Final Maturity Reserve Account":  As defined in Section 4.10(a) hereof.

"Final Maturity Reserve Funding Date":  The earlier of (a) the Distribution Date in April 2037 and (b) the Distribution Date on which the amount on deposit in the Final Maturity Reserve Account (after giving effect to all distributions on such Distribution Date other than distributions from the Final Maturity Reserve Account) is equal to the Stated Principal Balance of the Mortgage Loans having 40-year original terms to maturity (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and, if such Distribution Date is on or after the Distribution Date in May 2027, less the Overcollateralized Amount with respect to such Distribution Date.

"Final Maturity Reserve Rate":  An annual rate of 0.80%.

"Final Maturity Reserve Shortfall":  With respect to any Distribution Date, the excess of (a) the Stated Principal Balance of the Mortgage Loans having 40-year original terms to maturity (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) over (b) amounts on deposit in the Final Maturity Reserve Account (after giving effect to all distributions on such Distribution Date other than distributions from the Final Maturity Reserve Account).

"Final Maturity Reserve Trust":  As defined in Section 4.10(a) hereof.

"Final Maturity Reserve Trust Trustee":  Citibank, N.A., not in its individual capacity but solely in its capacity as a trustee of the Final Maturity Reserve Trust, and any successor thereto.

"Final Recovery Determination":  With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by the Seller, the Depositor or the Servicer pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01), a determination made by the Servicer that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which the Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered.  The Servicer shall maintain records, prepared by a Servicing Representative, of each Final Recovery Determination made thereby.

"Fitch":  Fitch, Inc., or its successor in interest.

"Fixed Rate Mortgage Loan":  A Mortgage Loan which provides for a fixed Mortgage Rate payable with respect thereto.

"Formula Rate":  For any Distribution Date and the Class A Certificates and the Mezzanine Certificates, the lesser of (x) LIBOR plus the related Certificate Margin and (y) the related Maximum Cap Rate.

"Freddie Mac":  The Federal Home Loan Mortgage Corporation, or any successor thereto.

"Gross Margin":  With respect to each Adjustable Rate Mortgage Loan, the fixed percentage set forth in the related Mortgage Note that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note used to determine the Mortgage Rate for such Mortgage Loan.

"Gross Subsequent Recoveries":  Any unexpected recoveries related to a Liquidated Mortgage Loan received by the Servicer which were allocated as a Realized Loss in reducing a Certificate Principal Balance of a Class of the Mezzanine Certificates on a Distribution Date prior to the Prepayment Period in which such funds were received.  Gross Subsequent Recoveries may include but are not limited to unanticipated insurance settlements, tax refunds or mortgage bankruptcy distributions.

"Group I Closing Date Mortgage Loans":  Any of the Group I Mortgage Loans included in the Trust Fund on the Closing Date.  The aggregate Cut-off Date Principal Balance of the Group I Closing Date Mortgage Loans is equal to $606,476,772.

"Group I Final Maturity Reserve Amount":  With respect to any Distribution Date (a) on and after the Distribution Date in May 2017 up to and including the earlier of (i) the Distribution Date in April 2027 and (ii) the Final Maturity Reserve Funding Date, if the Stated Principal Balance of the Mortgage Loans having 40-year original terms to maturity is greater than the Stated Principal Balance for such Distribution Date set forth in Schedule III attached hereto, the lesser of (A) the product of (i) the Final Maturity Reserve Rate, (ii) the aggregate Stated Principal Balance of the Group I Mortgage Loans having 40-year original terms to maturity on the first day of the related Due Period (not including for this purpose the Group I Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date) and (iii) a fraction, the numerator of which is the actual number of days in the related Accrual Period and the denominator of which is 360 and (B) the Final Maturity Reserve Shortfall for such Distribution Date multiplied by a fraction, (1) the numerator of which is the aggregate Stated Principal Balance of the Group I Mortgage Loans on the first day of the related Due Period (not including for this purpose the Group I Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date), and (2) the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans on the first day of the related Due Period (not including for this purpose the Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date), and (b) on any other Distribution Date, zero.

"Group I Interest Remittance Amount":  With respect to any Distribution Date, that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Group I Mortgage Loans or to Compensating Interest paid by the Servicer with respect to the Group I Mortgage Loans.

"Group I Mortgage Loans":  Those Mortgage Loans identified as Group I Mortgage Loans on the Mortgage Loan Schedule.

"Group I Net Swap Payment":  With respect to any Distribution Date, the Net Swap Payment for such Distribution Date multiplied by the Group I Swap Percentage for such Distribution Date.

"Group I Principal Allocation Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is (x) the Group I Principal Remittance Amount for such Distribution Date, and the denominator of which is (y) the Principal Remittance Amount for such Distribution Date.

"Group I Principal Distribution Amount":  With respect to any Distribution Date, the sum of (i) (x) the Group I Principal Remittance Amount minus (y) the amount of any Overcollateralization Release Amount for such Distribution Date multiplied by the Group I Principal Allocation Percentage, and (ii) the Extra Principal Distribution Amount multiplied by the Group I Principal Allocation Percentage for such Distribution Date.

"Group I Principal Remittance Amount":  With respect to any Distribution Date, the sum of (i) all scheduled payments of principal collected or advanced on the Group I Mortgage Loans by the Servicer that were due during the related Due Period, (ii) all partial and full principal prepayments of the Group I Mortgage Loans applied by the Servicer during the related Prepayment Period, (iii) the principal portion of all Net Liquidation Proceeds, Insurance Proceeds and Gross Subsequent Recoveries received during the related Prepayment Period with respect to the Group I Mortgage Loans, (iv) that portion of the Purchase Price, representing principal of any repurchased Group I Mortgage Loan, deposited in the Collection Account during the related Prepayment Period, (v) the principal portion of any Substitution Price deposited in the Collection Account during the related Prepayment Period with respect to the Group I Mortgage Loans and (vi) on the Distribution Date on which the Trust is to be terminated in accordance with this Agreement, that portion of the Termination Price representing principal with respect to the Group I Mortgage Loans.

"Group I Senior Certificates":  The Class I-A Certificates.

"Group I Senior Principal Distribution Amount":  With respect to any Distribution Date, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Group I Senior Certificates immediately prior to such Distribution Date and (II) the excess of (x) the aggregate Certificate Principal Balance of the Group I Senior Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 62.10% and (ii) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus 0.50% of the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the Cut-off Date.

"Group I Swap Payment":  With respect to any Distribution Date, the Swap Payment for such Distribution Date multiplied by the Group I Swap Percentage for such Distribution Date.

"Group I Swap Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Group I Mortgage Loans and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans, in each case, as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).  For the avoidance of doubt, the sum of the Group I Swap Percentage and the Group II Swap Percentage shall equal 100%.

"Group I Swap Termination Payment":  The Swap Termination Payment payable by the Supplemental Interest Trust Trustee multiplied by the Group I Swap Percentage for such Distribution Date.

"Group II Closing Date Mortgage Loans":  Any of the Group II Mortgage Loans included in the Trust Fund on the Closing Date.  The aggregate Cut-off Date Principal Balance of the Group II Closing Date Mortgage Loans is equal to $987,188,515.

"Group II Final Maturity Reserve Amount":  With respect to any Distribution Date (a) on and after the Distribution Date in May 2017 up to and including the earlier of (i) the Distribution Date in April 2027 and (ii) the Final Maturity Reserve Funding Date, if the Stated Principal Balance of the Mortgage Loans having 40-year original terms to maturity is greater than the Stated Principal Balance for such Distribution Date set forth in Schedule III attached hereto, the lesser of (A) the product of (i) the Final Maturity Reserve Rate, (ii) the aggregate Stated Principal Balance of the Group II Mortgage Loans having 40-year original terms to maturity on the first day of the related Due Period (not including for this purpose the Group II Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date) and (iii) a fraction, the numerator of which is the actual number of days in the related Accrual Period and the denominator of which is 360 and (B) the Final Maturity Reserve Shortfall for such Distribution Date multiplied by a fraction, (1) the numerator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans on the first day of the related Due Period (not including for this purpose the Group II Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date), and (2) the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans on the first day of the related Due Period (not including for this purpose the Mortgage Loans for which prepayments in full have been received and distributed in the month prior to that Distribution Date), and (b) on any other Distribution Date, zero.

"Group II Interest Remittance Amount":  With respect to any Distribution Date, that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Group II Mortgage Loans or to Compensating Interest paid by the Servicer with respect to the Group II Mortgage Loans.

"Group II Mortgage Loans":  Those Mortgage Loans identified as Group II Mortgage Loans on the Mortgage Loan Schedule.

"Group II Net Swap Payment":  With respect to any Distribution Date, the Net Swap Payment for such Distribution Date multiplied by the Group II Swap Percentage for such Distribution Date.

"Group II Principal Allocation Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is (x) the Group II Principal Remittance Amount for such Distribution Date, and the denominator of which is (y) the Principal Remittance Amount for such Distribution Date.

"Group II Principal Distribution Amount":  With respect to any Distribution Date, the sum of (i) (x) the Group II Principal Remittance Amount minus (y) the amount of any Overcollateralization Release Amount for such Distribution Date multiplied by the Group II Principal Allocation Percentage, and (ii) the Extra Principal Distribution Amount multiplied by the Group II Principal Allocation Percentage for such Distribution Date.

"Group II Principal Remittance Amount":  With respect to any Distribution Date, the sum of (i) all scheduled payments of principal collected or advanced on the Group II Mortgage Loans by the Servicer that were due during the related Due Period, (ii) all partial and full principal prepayments of the Group II Mortgage Loans applied by the Servicer during the related Prepayment Period, (iii) the principal portion of all Net Liquidation Proceeds, Insurance Proceeds and Gross Subsequent Recoveries received during the related Prepayment Period with respect to the Group II Mortgage Loans, (iv) that portion of the Purchase Price, representing principal of any repurchased Group II Mortgage Loan, deposited to the Collection Account during the related Prepayment Period, (v) the principal portion of any Substitution Price deposited in the Collection Account during the related Prepayment Period with respect to the Group II Mortgage Loans and (vi) on the Distribution Date on which the Trust is to be terminated in accordance with this Agreement, that portion of the Termination Price representing principal with respect to the Group II Mortgage Loans.

"Group II Senior Certificates":  The Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates.

"Group II Senior Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Group II Senior Certificates immediately prior to such Distribution Date and (II) the excess of (x) the aggregate Certificate Principal Balance of the Group II Senior Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 62.10% and (ii) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus 0.50% of the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the Cut-off Date.

"Group II Swap Payment":  With respect to any Distribution Date, the Swap Payment for such Distribution Date multiplied by the Group II Swap Percentage for such Distribution Date.

"Group II Swap Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans and the denominator of which is the aggregate Stated Principal

Balance of the Mortgage Loans, in each case,  as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).  For the avoidance of doubt, the sum of the Group I Swap Percentage and the Group II Swap Percentage shall equal 100%.

"Group II Swap Termination Payment":  The Swap Termination Payment payable by the Supplemental Interest Trust Trustee multiplied by the Group II Swap Percentage for such Distribution Date.

"Indenture":  The indenture or a document of similar import, if any, entered into following the Closing Date, by the NIMS Issuer relating to the NIM Notes to be issued thereunder.

"Independent":  When used with respect to any specified Person, any such Person who (a) is in fact independent of the Depositor, the Servicer and their respective Affiliates, (b) does not have any direct financial interest in or any material indirect financial interest in the Depositor or the Servicer or any Affiliate thereof, and (c) is not connected with the Depositor or the Servicer or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, trust administrator, partner, director or Person performing similar functions; provided, however, that a Person shall not fail to be Independent of the Depositor or the Servicer or any Affiliate thereof merely because such Person is the beneficial owner of 1% or less of any class of securities issued by the Depositor or the Servicer or any Affiliate thereof, as the case may be.

"Independent Contractor":  Either (i) any Person (other than the Servicer) that would be an "independent contractor" with respect to any of the REMICs created hereunder within the meaning of Section 856(d)(3) of the Code if such REMIC were a real estate investment trust (except that the ownership tests set forth in that Section shall be considered to be met by any Person that owns, directly or indirectly, 35% or more of any Class of Certificates), so long as each such REMIC does not receive or derive any income from such Person and provided that the relationship between such Person and such REMIC is at arm's length, all within the meaning of Treasury Regulation Section 1.856-4(b)(5), or (ii) any other Person (including the Servicer) if the Trustee has received an Opinion of Counsel to the effect that the taking of any action in respect of any REO Property by such Person, subject to any conditions therein specified, that is otherwise herein contemplated to be taken by an Independent Contractor will not cause such REO Property to cease to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code (determined without regard to the exception applicable for purposes of Section 860D(a) of the Code), or cause any income realized in respect of such REO Property to fail to qualify as Rents from Real Property.

"Index":  With respect to each Adjustable Rate Mortgage Loan and with respect to each related Adjustment Date, the index as specified in the related Mortgage Note.

"Initial Certificate Principal Balance":  With respect to any Regular Certificate, the amount designated "Initial Certificate Principal Balance" on the face thereof.

"Initial Notional Amount":  With respect to any Class C Certificate, the amount designated "Initial Notional Amount" on the face thereof.

"Insurance Proceeds":  Proceeds of any title policy, hazard policy or other insurance policy covering a Mortgage Loan or the related Mortgaged Property (including any related PMI Policy), to the extent such proceeds are not (i) to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Servicer would follow in servicing mortgage loans held for its own account, subject to the terms and conditions of the related Mortgage Note and Mortgage or (ii) Gross Subsequent Recoveries with respect to such Mortgage Loan.

"Insured NIM Notes":  Net interest margin securities, if any, issued by the NIMS Issuer, which are backed, in whole or in part, by the cashflow on certain or all of the Class C Certificates and the Class P Certificates and insured by the NIMS Insurer.

"Interest Coverage Account":  The account established and maintained pursuant to Section 4.12, as described therein.

"Interest Coverage Amount":  The amount to be paid by the Depositor to the Trustee for deposit in the Interest Coverage Account on the Closing Date pursuant to Section 4.12, which amount is $955,000.

"Interest Determination Date":  With respect to the Class A Certificates and the Mezzanine Certificates and each Accrual Period, the second LIBOR Business Day preceding the commencement of such Accrual Period.

"Interest Remittance Amount":  The Group I Interest Remittance Amount and the Group II Interest Remittance Amount.

"Late Collections":  With respect to any Mortgage Loan, all amounts received subsequent to the Determination Date immediately following any related Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds, Gross Subsequent Recoveries or otherwise, which represent late payments or collections of principal and/or interest due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) but delinquent on a contractual basis for such Due Period and not previously recovered.

"LIBOR":  With respect to each Accrual Period, the rate determined by the Trustee on the related Interest Determination Date on the basis of the "Interest Settlement Rate" for United States dollar deposits of one-month maturity set forth by the British Bankers' Association (the "BBA"), as such rate appears on the Reuters Monitor Money Rates Service page "LIBOR01, as of 11:00 a.m. (London time) on such Interest Determination Date.  With respect to any Interest Determination Date, if the BBA's Interest Settlement Rate does not appear on Reuters Monitor Money Rates Service page "LIBOR01 as of 11:00 a.m. (London time) on such date, or if such page is not available on such date the Trustee will obtain such rate from Bloomberg L.P. page "BBAM."  Alternatively, the Trustee may request the principal London office of each of the Reference Banks to provide a quotation of its rate.  On such Interest Determination Date, LIBOR for the related Accrual Period will be established by the Trustee as follows:

> (i)    If on such Interest Determination Date two or more Reference Banks provide such offered quotations, LIBOR for the related Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiples of 0.03125%); and

(ii)     If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, LIBOR for the related Accrual Period shall be the higher of (i) LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate.

The Trustee will select a particular index as the alternative index only if it receives an Opinion of Counsel that the selection of such index will not cause any REMIC to lose its classification as a REMIC for federal income tax purposes.

"LIBOR Business Day":  Any day on which banks in The City of London, England and New York City are open for conducting transactions in foreign currency and exchange.

"Liquidated Mortgage Loan":  As to any Distribution Date, any Mortgage Loan in respect of which the Servicer has determined, in accordance with the servicing procedures specified herein, as of the end of the related Prepayment Period, that all Liquidation Proceeds which it expects to recover with respect to the liquidation of the Mortgage Loan or disposition of the related REO Property have been recovered.

"Liquidation Event":  With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made as to such Mortgage Loan or (iii) such Mortgage Loan is removed from the Trust Fund by reason of its being purchased, sold or replaced pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01.  With respect to any REO Property, either of the following events:  (i) a Final Recovery Determination is made as to such REO Property or (ii) such REO Property is removed from the Trust Fund by reason of its being sold or purchased pursuant to Section 3.16(c), Section 3.23 or Section 9.01.

"Liquidation Proceeds":  The amount (other than amounts received in respect of the rental of any REO Property prior to REO Disposition) received by the Servicer in connection with (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or condemnation, (ii) the liquidation of a defaulted Mortgage Loan by means of a trustee's sale, foreclosure sale or otherwise or (iii) the repurchase, substitution or sale of a Mortgage Loan or an REO Property pursuant to or as contemplated by Section 2.03, Section 3.16(c), Section 3.23 or Section 9.01.

"Loan Group":  Either Loan Group I or Loan Group II.

"Loan Group I":  All of the Group I Mortgage Loans collectively.

"Loan Group II":  All of the Group II Mortgage Loans collectively.

"Loan-to-Value Ratio":  As of any date and as to any Mortgage Loan, the fraction, expressed as a percentage, the numerator of which is the (x) Principal Balance of the Mortgage Loan (if such Mortgage Loan is secured by a first lien on the related Mortgaged Property) or the sum of the Principal Balance of the Mortgage Loan and any other mortgage loan secured by a senior lien on the related Mortgaged Property (if such Mortgage Loan is secured by a junior lien on the related Mortgaged Property) and the denominator of which is (y) the Value of the related Mortgaged Property.

"Lost Note Affidavit":  With respect to any Mortgage Loan as to which the original Mortgage Note has been permanently lost or destroyed and has not been replaced, an affidavit from the Seller certifying that the original Mortgage Note has been lost or destroyed (together with a copy of the related Mortgage Note and indemnifying the Trust against any loss, cost or liability resulting from the failure to deliver the original Mortgage Note) in the form of Exhibit H hereto.

"Marker Rate":  With respect to the Class C Interest and any Distribution Date, a per annum rate equal to two (2) multiplied by the weighted average of the Pass-Through Rates for REMIC 2 Regular Interests A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ, with (A) the rates on each such REMIC 2 Regular Interest (other than the REMIC 2 Regular Interest ZZ) subject to a floor and a cap equal to the lesser of (i) LIBOR plus the Certificate Margin for the Corresponding Certificate for such REMIC 2 Regular Interest, and (ii) the Net WAC Rate for the Corresponding Certificates as computed for federal income tax purposes, (B) the rate on REMIC 2 Regular Interest ZZ subject to a cap of zero for purposes of this calculation, and (C) the rates on all of the REMIC 2 Regular Interests multiplied by a fraction the numerator of which is the actual number of days elapsed in the Accrual Period for each such REMIC 2 Regular Interest and the denominator of which is 30.

"Maximum Cap Rate":

For any Distribution Date and the Group I Senior Certificates, a per annum rate equal to (a) the product of (i) the weighted average of the Adjusted Net Maximum Mortgage Rates of the Group I Mortgage Loans, weighted on the basis of the Stated Principal Balances thereof as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) and (ii) the sum of (I) a fraction (1) the numerator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the Due Date in the month preceding the month of such Distribution Date, and (2) the denominator of which is aggregate Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates immediately prior to such Distribution Date, and (II) a fraction (1) the numerator of which is (A) any Net Counterparty Payment for such Distribution Date less (B) the Aggregate Final Maturity Reserve Amount for such Distribution Date less (C) any unpaid Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement) payable by the Supplemental Interest Trust Trustee, including any amount remaining unpaid from prior Distribution Dates, less (D) the Net Swap Payment, if any, for such Distribution Date, in each case multiplied by 12, and (2) the denominator of which is the aggregate Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates immediately prior to such Distribution Date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.

For any Distribution Date and the Group II Senior Certificates, a per annum rate equal to (a) the product of (i) the weighted average of the Adjusted Net Maximum Mortgage Rates of the Group II Mortgage Loans, weighted on the basis of the Stated Principal Balances thereof as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) and (ii) the sum of (I) a fraction (1) the numerator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the Due Date in the month preceding the month of such Distribution Date, and (2) the denominator of which is aggregate Certificate Principal Balance of the Class A Certificates and the Mezzanine

Certificates immediately prior to such Distribution Date, and (II) a fraction (1) the numerator of which is (A) any Net Counterparty Payment for such Distribution Date less (B) the Aggregate Final Maturity Reserve Amount for such Distribution Date less (C) any unpaid Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement) payable by the Supplemental Interest Trust Trustee, including any amount remaining unpaid from prior Distribution Dates, less (D) the Net Swap Payment, if any, for such Distribution Date, in each case multiplied by 12, and (2) the denominator of which is the aggregate Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates immediately prior to such Distribution Date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.

For any Distribution Date and the Mezzanine Certificates, a per annum rate equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate principal balance of each Loan Group as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) the sum of the current Certificate Principal Balances of the related classes of the Class A Certificates) of (1) the Maximum Cap Rate with respect to the Group I Senior Certificates and (2) the Maximum Cap Rate with respect to the Group II Senior Certificates.

"Maximum ZZ Uncertificated Accrued Interest Deferral Amount": With respect to any Distribution Date, the excess of (i) Uncertificated Accrued Interest calculated with the Uncertificated Pass-Through Rate for REMIC 2 Regular Interest ZZ and an Uncertificated Principal Balance equal to the excess of (x) the Uncertificated Principal Balance of REMIC 2 Regular Interest ZZ over (y) the REMIC 2 Overcollateralized Amount, in each case for such Distribution Date, over (ii) Uncertificated Accrued Interest on REMIC 2 Regular Interests A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8 and M9, with the rate on each such REMIC 2 Regular Interest subject to a floor and a cap equal to the lesser of (i) LIBOR plus the Certificate Margin for the Corresponding Certificate for such REMIC 2 Regular Interest, and (ii) the Net WAC Rate for the Corresponding Certificates as computed for federal income tax purposes; provided, however, that for this purpose, calculations of the Uncertificated REMIC 2 Pass-Through Rate and the related caps with respect to all of the REMIC 2 Regular Interests shall be multiplied by a fraction, the numerator of which is the actual number of days in the Accrual Period and the denominator of which is 30.

"Maximum Mortgage Rate":  With respect to each Mortgage Loan, the percentage set forth in the related Mortgage Note as the maximum Mortgage Rate thereunder.

"MERS":  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"MERS® System":  The system of recording transfers of Mortgages electronically maintained by MERS.

"Mezzanine Certificates":  The Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates and the Class M-9 Certificates.

"MIN":  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

"Minimum Mortgage Rate":  With respect to each Mortgage Loan, the percentage set forth in the related Mortgage Note as the minimum Mortgage Rate thereunder.

"MOM Loan":  With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

"Monthly Interest Distributable Amount":  With respect to any Distribution Date and the Class A Certificates and the Mezzanine Certificates, the amount of interest accrued during the related Accrual Period at the related Pass-Through Rate on the Certificate Principal Balance of such Class immediately prior to such Distribution Date.  With respect to the Class C Interest and any Distribution Date, the amount of interest accrued during the related Accrual Period at the related Pass-Through Rate on the Notional Amount of such Class immediately prior to such Distribution Date.  With respect to the Class C Certificates and any Distribution Date, the Monthly Interest Distributable Amount shall equal the Monthly Interest Distributable Amount for the Class C Interest.

In all cases, the Monthly Interest Distributable Amount for any Class of Certificates and the Class C Interest shall be reduced by any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls allocated to such Class under Section 1.03.

"Monthly Payment":  With respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note, determined:  (a) after giving effect to (i) any Deficient Valuation and/or Debt Service Reduction with respect to such Mortgage Loan and (ii) any reduction in the amount of interest collectible from the related Mortgagor pursuant to the Relief Act; (b) without giving effect to any extension granted or agreed to by the Servicer pursuant to Sections 3.01 and 3.07; and (c) on the assumption that all other amounts, if any, due under such Mortgage Loan are paid when due.

"Moody's":  Moody's Investors Service, Inc. or its successor in interest.

"Mortgage":  The mortgage, deed of trust or other instrument creating a first lien or second lien on, or first priority security interest in or second priority security interest in, a Mortgaged Property securing a Mortgage Note.

"Mortgage File":  The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

"Mortgage Loan":  Each mortgage loan transferred and assigned to the Trust and delivered to the Trustee or another Custodian pursuant to Section 2.01 or Section 2.03(d) as from time to time held as a part of the Trust Fund, the Mortgage Loans so held being identified in the Mortgage Loan Schedule.

"Mortgage Loan Purchase Agreement":  The agreement between the Servicer, in its capacity as Seller, and the Depositor, regarding the transfer of the Mortgage Loans by the Seller to or at the direction of the Depositor, substantially in the form attached hereto as Exhibit C.

"Mortgage Loan Schedule":  As of any date, the list of Mortgage Loans included in REMIC 1 on such date, attached hereto as Exhibit D.  The Mortgage Loan Schedule shall be prepared by the Seller and shall set forth the following information as of the Cut-off Date with respect to each Mortgage Loan, as applicable:

(i)    the Mortgagor's name and the originator's Mortgage Loan identifying number;

(ii)    the street address of the Mortgaged Property including the state and zip code;

(iii)    a code indicating whether the Mortgaged Property is owner-occupied;

(iv)    the type of Residential Dwelling constituting the Mortgaged Property;

(v)    the original months to maturity;

(vi)    the Loan-to-Value Ratio and the combined Loan-to-Value Ratio at origination;

(vii)    the Mortgage Rate in effect immediately following the Cut-off Date;

(viii)    the date on which the first Monthly Payment was due on the Mortgage Loan;

(ix)    the stated maturity date;

(x)    the amount of the Monthly Payment due on the first Due Date after the Cut-off Date;

(xi)    the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance;

(xii)    the original principal amount of the Mortgage Loan;

(xiii)    the Stated Principal Balance of the Mortgage Loan as of the Close of Business on the Cut-off Date;

(xiv)    whether such Mortgage Loan is a Fixed Rate Mortgage Loan or an Adjustable Rate Mortgage Loan, and with respect to each Adjustable Rate Mortgage Loan:  (a) the Gross Margin, (b) the Maximum Mortgage Rate, (c) the Minimum Mortgage Rate, (d) the Periodic Rate Cap for the first Adjustment Date and each subsequent Adjustment Date and (e) the next Adjustment Date immediately following the Cut-off Date;

(xv)     a code indicating the purpose of the Mortgage Loan (i.e., purchase financing, rate/term refinancing, cash-out refinancing);

(xvi)    the Mortgage Rate at origination;

(xvii)   a code indicating the documentation program;

(xviii)  the Seller's risk grade and the FICO score;

(xix)    the Origination Value of the Mortgaged Property;

(xx)     the sale price of the Mortgaged Property, if applicable;

(xxi)    whether such Mortgage Loan is secured by a first lien or a second lien on the related Mortgaged Property;

(xxii)   the date of origination;

(xxiii)  the stated remaining months to maturity as of the Cut-off Date;

(xxiv)   the current principal and interest payment of the Mortgage Loan as of the Cut-off Date;

(xxv)    the interest "paid to date" of the Mortgage Loan as of the Cut-off Date;

(xxvi)   a code indicating whether the Mortgage Loan is a Group I Mortgage Loan or a Group II Mortgage Loan;

(xxvii)  a code indicating the Index that is associated with such Mortgage Loan (if such Mortgage Loan is an Adjustable Rate Mortgage Loan);

(xxviii) the rate adjustment frequency (if such Mortgage Loan is an Adjustable Rate Mortgage Loan);

(xxix)   the number of years the prepayment penalty is in effect;

(xxx)    a code indicating that such Mortgage Loan is covered under the PMI Policy, if applicable; and

(xxxi)   with respect to each MOM Loan, the related MIN.

The Mortgage Loan Schedule shall set forth the following information, with respect to the Mortgage Loans in the aggregate as of the Cut-off Date: (1) the number of Mortgage Loans; (2) the Cut-off Date Principal Balance of the Mortgage Loans; (3) the weighted average Mortgage Rate of the Mortgage Loans and (4) the weighted average maturity of the Mortgage Loans. The Mortgage Loan Schedule shall be amended from time to time by the Servicer in accordance with the provisions of this Agreement. With respect to any Substitute Mortgage Loan, Cut-off Date shall refer to the related Cut-off Date for such Mortgage Loan, determined in accordance with the definition of Cut-off Date herein. The Mortgage Loan Schedule shall

clearly identify the Mortgage Loans that are included in Group I Mortgage Loans and those that are included in Group II Mortgage Loans.

"Mortgage Note":  The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan.

"Mortgage Pool":  The pool of Mortgage Loans, identified on Exhibit D from time to time, and any REO Properties acquired in respect thereof.

"Mortgage Rate":  With respect to each Fixed Rate Mortgage Loan, the annual rate set forth in the related Mortgage Note, as amended, modified or supplemented from time to time. With respect to each Adjustable Rate Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note, which rate (A) as of any date of determination until the first Adjustment Date following the Cut-off Date shall be the rate set forth in the Mortgage Loan Schedule as the Mortgage Rate in effect immediately following the Cut-off Date and (B) as of any date of determination thereafter shall be the rate as adjusted on the most recent Adjustment Date, to equal the sum, rounded to the next highest or nearest 0.125% (as provided in the Mortgage Note), of the Index, determined as set forth in the related Mortgage Note, plus the related Gross Margin subject to the limitations set forth in the related Mortgage Note.  With respect to each Mortgage Loan that becomes an REO Property, as of any date of determination, the annual rate determined in accordance with the immediately preceding sentence as of the date such Mortgage Loan became an REO Property.

"Mortgaged Property":  The underlying property securing a Mortgage Loan, including any REO Property, consisting of a fee simple or leasehold estate in a parcel of real property improved by a Residential Dwelling.

"Mortgagor":  The obligor on a Mortgage Note.

"Net Counterparty Payment":  With respect to any Distribution Date, the amount, if any, by which the Counterparty Payment for such Distribution Date exceeds the Swap Payment for such Distribution Date.

"Net Liquidation Proceeds":  With respect to any Liquidated Mortgage Loan or any other disposition of related Mortgaged Property (including REO Property), the related Liquidation Proceeds net of Advances, Servicing Advances, Servicing Fees and any other servicing fees received and retained in connection with the liquidation of such Mortgage Loan or Mortgaged Property in accordance with the terms of this Agreement.

"Net Monthly Excess Cashflow":  With respect to each Distribution Date, the sum of (a) any Overcollateralization Release Amount for such Distribution Date, (b) any Remaining Principal Distribution Amount and (c) the positive excess of (x) Available Funds for such Distribution Date over (y) the sum for such Distribution Date of (A) the Monthly Interest Distributable Amounts for the Class A Certificates and the Mezzanine Certificates, (B) the Unpaid Interest Shortfall Amounts for the Class A Certificates, (C) the Net Swap Payment, (D) the Aggregate Final Maturity Reserve Amount, (E) any unpaid Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement) payable by the Supplemental Interest Trust Trustee, including any amount remaining unpaid from prior Distribution Dates, and (F) the Principal Remittance Amount.

"Net Mortgage Rate":  With respect to any Mortgage Loan (or the related REO Property), as of any date of determination, a per annum rate of interest equal to the then applicable Mortgage Rate for such Mortgage Loan minus the Servicing Fee Rate.

"Net Prepayment Interest Shortfall":  With respect to any Distribution Date, the excess, if any, of any Prepayment Interest Shortfalls for such date over the related Compensating Interest.

"Net Swap Payment":  With respect to any Distribution Date, the amount, if any, by which the Swap Payment exceeds the Counterparty Payment on such Distribution Date.  For avoidance of doubt, the Net Swap Payment with respect to any Distribution Date shall equal to the sum of the Group I Net Swap Payment and the Group II Net Swap Payment for such Distribution Date.

"Net WAC Rate":

For any Distribution Date (other than the first Distribution Date) and the Group I Senior Certificates is a per annum rate equal to (a) the excess, if any, of (i) the weighted average of the Adjusted Net Mortgage Rates of the Group I Mortgage Loans, weighted on the basis of the Stated Principal Balances thereof as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) over (ii) the percentage equivalent of a fraction, (1) the numerator of which is the sum of (A) the Group I Final Maturity Reserve Amount for such Distribution Date, (B) any unpaid Group I Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, and (C) the Group I Net Swap Payment, if any, for such Distribution Date, in each case multiplied by 12, and (2) the denominator of which is the aggregate Stated Principal Balance of the Group I Mortgage Loans as of the Due Date in the month preceding the month of such Distribution Date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.  For federal income tax purposes, the Net WAC Rate for the Group I Senior Certificates shall be expressed as a rate equal to the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest 1GRP multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.

For any Distribution Date (other than the first Distribution Date) and the Group II Senior Certificates is a per annum rate equal to (a) the excess, if any, of (i) the weighted average of the Adjusted Net Mortgage Rates of the Group II Mortgage Loans, weighted on the basis of the Stated Principal Balances thereof as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) over (ii) the percentage equivalent of a fraction, (1) the numerator of which is the sum of (A) the Group II Final Maturity Reserve Amount for such Distribution Date, (B) any unpaid Group II Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, and (C) the Group II Net Swap Payment, if any, for such Distribution Date, in each case multiplied by 12, and (2) the denominator of which is the aggregate Stated Principal Balance of the Group II Mortgage Loans as of the Due Date in the month preceding the month of such Distribution Date multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.  For federal income tax purposes, the Net WAC Rate for the Group II Senior Certificates shall be expressed as a rate

equal to the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest 2GRP multiplied by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.

For any Distribution Date and the Mezzanine Certificates, the Subordinated Net WAC Rate.

The Net WAC Rate determined for federal income tax purposes may differ from the Net WAC Rate.  In particular, the Net WAC Rate for federal income tax purposes will not be reduced by the amount of any Swap Termination Payment.  The treatment of differences between the Net WAC Rate and the Rate determined for federal income tax purposes is provided in Section 10.01(l).

"Net WAC Rate Carryover Amount":  With respect to the Class A Certificates and the Mezzanine Certificates and any Distribution Date for which the Pass-Through Rate for such Class of Certificates for such Distribution Date is the related Net WAC Rate, the sum of (i) the positive excess of (A) the amount of interest that would have been distributable to such Class of Certificates on such Distribution Date if the Pass-Through Rate for such Class of Certificates for such Distribution Date were calculated at the related Formula Rate over (B) the amount of interest distributable on such Class of Certificates at the related Net WAC Rate for such Distribution Date and (ii) the related Net WAC Rate Carryover Amount for the previous Distribution Date not previously distributed together with interest thereon at a rate equal to the related Formula Rate for such Class of Certificates for the most recently ended Accrual Period.

"New Lease":  Any lease of REO Property entered into on behalf of the Trust, including any lease renewed or extended on behalf of the Trust if the Trust has the right to renegotiate the terms of such lease.

"NIM Notes":  The Insured NIM Notes and the Other NIM Notes.

"NIMS Insurer":  A Person, or any of its successors that shall be the insurer under an insurance policy insuring certain payments on Insured NIM Notes, if any, provided, however, upon the occurrence of certain events (as set forth in the Indenture and/or any other agreement among such Person, the NIMS Issuer, the Servicer, the Trustee and/or other Persons), the NIMS Insurer shall be the Person designated in the Indenture or such other agreement.  If none of the net interest margin securities have been issued by the NIMS Issuer, that are insured by an insurance policy, there shall be no NIMS Insurer under this Agreement, all references to the NIMS Insurer or Insured NIM Notes in this agreement are for administrative convenience only, shall be completely disregarded and no Person shall have any rights of the NIMS Insurer under this Agreement.

"NIMS Insurer Default":  The existence and continuation of any default by the NIMS Insurer (including a failure by the NIMS Insurer to make a payment) under an insurance policy or policies issued in connection with the Indenture.

"NIMS Issuer":  One or more Affiliates of the Depositor and/or one or more entities sponsored by an Affiliate of the Depositor.

"Nonrecoverable Advance":  Any Advance or Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith

business judgment of the Servicer, will not or, in the case of a proposed Advance or Servicing Advance, would not be ultimately recoverable from related late payments, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein.

"Notional Amount":  With respect to the Class C Interest, immediately prior to any Distribution Date, an amount equal to the aggregate of the Uncertificated Principal Balances of the REMIC 2 Regular Interests.

"Officer's Certificate":  A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a vice president (however denominated), the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of the Servicer, the Seller or the Depositor, as applicable.

"Opinion of Counsel":  A written opinion of counsel, who may, without limitation, be a salaried counsel for the Depositor or the Servicer, reasonably acceptable to the Trustee or Delaware Trustee, if such opinion is required to be delivered to the Trustee or Delaware Trustee, except that any opinion of counsel relating to (a) the qualification of any Trust REMIC as a REMIC or (b) compliance with the REMIC Provisions must be an opinion of Independent counsel.

"Optional Termination Date":  The first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans and each REO Property remaining in the Trust Fund is equal to or less than 10% of the Cut-off Date Principal Balance of the Closing Date Mortgage Loans.

"Original Class Certificate Principal Balance":  With respect to the Class A Certificates, the Mezzanine Certificates and the Class P Certificates, the corresponding Certificate Principal Balance on the Closing Date.

"Original Class Notional Amount":  With respect to the Class C Interest, $59,762,058.04.

"Original Trust Agreement":  The Trust Agreement, dated as of April 1, 2007, between the Depositor and the Delaware Trustee, providing for the creation of the Trust.

"Origination Value":  With respect to any Mortgaged Property, the lesser of (i) the Appraised Value thereof and (ii) the value thereof as determined and assigned at origination by a review appraisal conducted by the Seller.

"Other NIM Notes":  Net Interest Margin Securities, if any, issued by the NIMS Issuer, which are backed, in whole or in part, by the cashflow on certain Class C Certificates and the Class P Certificates and not insured by any NIMS Insurer.

"Overcollateralization Deficiency Amount":  With respect to any Distribution Date, the amount, if any, by which the Overcollateralization Target Amount exceeds the Overcollateralized Amount on such Distribution Date (assuming that 100% of the aggregate Principal Remittance Amount is applied as a principal payment on such Distribution Date).

"Overcollateralization Floor":  0.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

"<u>Overcollateralization Release Amount</u>":  With respect to any Distribution Date, the lesser of (x) the Principal Remittance Amount for such Distribution Date and (y) the Excess Overcollateralized Amount for such Distribution Date.

"<u>Overcollateralization Target Amount</u>":  With respect to any Distribution Date (i) prior to the Stepdown Date, 3.75% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) the lesser of (I) 3.75% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date and (II) 7.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (y) 0.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, and (iii) on or after the Stepdown Date if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Distribution Date. Notwithstanding the foregoing, on and after any Distribution Date following the reduction of the aggregate Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates to zero, the Overcollateralization Target Amount will be zero.

"<u>Overcollateralized Amount</u>":  With respect to any Distribution Date, the amount, if any, by which (i) the aggregate Stated Principal Balance of the Mortgage Loans on the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) exceeds (ii) the sum of the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Uncertificated Principal Balance of the Class P Interest as of such Distribution Date (after giving effect to distributions to be made on such Distribution Date, other than distributions of the Extra Principal Distribution Amount, if any).

"<u>Ownership Interest</u>":  As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"<u>Pass-Through Rate</u>":

With respect to the Class A Certificates and the Mezzanine Certificates for any Distribution Date (other than the first Distribution Date), the lesser of (x) the related Formula Rate for such Distribution Date and (y) the related Net WAC Rate for such Distribution Date.

With respect to the Class A Certificates and the Mezzanine Certificates and the first Distribution Date, the related Formula Rate for such Distribution Date.

For federal income tax purposes, the Pass-Through Rate for any Certificate (other than the Class C Certificates, Class P Certificates and Class R Certificates) will never exceed the Net WAC Rate for such Certificate, as such Net WAC Rate is determined for federal income tax purposes.  Amounts (other than principal) paid on the Certificates (other than the Class C Certificates, Class P Certificates and Class R Certificates) in excess of the Net WAC Rate as determined for federal income tax purposes shall be treated as paid outside of any REMIC.

With respect to the Class C Interest and any Distribution Date, a per annum rate equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (A) through (Q) below, and the denominator of which is the aggregate of the Uncertificated Principal Balances of REMIC 2 Regular Interests AA, A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ.  For purposes of calculating the Pass-Through Rate for the Class C Interest, the numerator is equal to the sum of the following components:

(A)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest AA minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest AA;

(B)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest A-IA minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest A-IA;

(C)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest A-IIA1 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest A-IIA1;

(D)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest A-IIA2 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest A-IIA2;

(E)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest A-IIA3 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest A-IIA3;

(F)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest A-IIA4 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest A-IIA4;

(G)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M1 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M1;

(H)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M2 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M2;

(I)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M3 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M3;

(J)     the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M4 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M4;

(K)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M5 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M5;

(L)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M6 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M6;

(M)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M7 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M7;

(N)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M8 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M8;

(O)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest M9 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest M9;

(P)    the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest ZZ minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 2 Regular Interest ZZ; and

(Q)    100% of the interest distributed to REMIC 2 Regular Interest P.

The Class C Certificates will not have a Pass-Through Rate, but will be entitled to 100% of the distributions on the Class C Interest.

With respect to the Class Swap IO Interest, the Class Swap IO Interest shall not have a Pass-Through Rate, but will be entitled to 100% of the interest paid by REMIC 2 Regular Interest Swap IO. The Class Swap IO Upper-Tier Interest will not have a Pass-Through Rate but will be entitled to 100% of the interest paid on the Class Swap IO Interest.

With respect to the Class FMR IO Interest and any Distribution Date, a per annum rate equal to the Final Maturity Rate. However, for federal income tax purposes and under the REMIC Provisions, the Class FMR IO Interest will not have a Pass-Through Rate, but will be entitled to 100% of the interest paid by REMIC 2 Regular Interest FMR IO.

"Percentage Interest": With respect to any Certificate (other than a Residual Certificate), a fraction, expressed as a percentage, the numerator of which is the Initial Certificate Principal Balance or Initial Notional Amount represented by such Certificate and the denominator of which is the Original Class Certificate Principal Balance or Original Class Notional Amount of the related Class. With respect to a Residual Certificate, the portion of the Class evidenced thereby, expressed as a percentage, as stated on the face of such Certificate; provided, however, with respect to each Class referred to in this paragraph, that the sum of all such percentages for each such Class totals 100%.

"Periodic Rate Cap": With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, the fixed percentage set forth in the related Mortgage Note, which is

the maximum amount by which the Mortgage Rate for such Mortgage Loan may increase or decrease (without regard to the Maximum Mortgage Rate or the Minimum Mortgage Rate) on such Adjustment Date from the Mortgage Rate in effect immediately prior to such Adjustment Date.

"Permitted Investments": Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued or managed by the Depositor, the Servicer, the NIMS Insurer, the Trustee, the Delaware Trustee or any of their respective Affiliates or for which an Affiliate of the NIMS Insurer, the Trustee or the Delaware Trustee serves as an advisor:

(i)    direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Trustee or its agents acting in their commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company (or, if the only Rating Agency is S&P, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) or its ultimate parent has a short-term uninsured debt rating in the highest available rating category of Fitch, Moody's and S&P and provided that each such investment has an original maturity of no more than 365 days; and provided further that, if the only Rating Agency is S&P and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of S&P if S&P is the Rating Agency; and (B) any other demand or time deposit or deposit which is fully insured by the FDIC;

(iii)    repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated F-1+ or higher by Fitch, rated A-1+ by S&P and rated A2 or higher by Moody's;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any State thereof and that are rated by each Rating Agency in its highest long-term unsecured rating category at the time of such investment or contractual commitment providing for such investment;

(v)     commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency in its highest short-term unsecured debt rating available at the time of such investment;

(vi)     units of taxable money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940), which funds have the highest rating available for such securities from the Rating Agencies or which have been designated in writing by the Rating Agencies as Permitted Investments; and

(vii)     if previously confirmed in writing to the Trustee, any other demand, money market or time deposit, or any other obligation, security or investment, as may be acceptable to the Rating Agencies in writing as a permitted investment of funds backing securities having ratings equivalent to its highest initial rating of the Class A Certificates;

provided, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

Any of the foregoing investments that are issued by or acquired from or through the Trustee or any of its Affiliates or for which the Trustee or any of its Affiliates is an obligor or act as depository institution or counterparty or otherwise provides services, shall not be disqualified as a Permitted Investment (so long as it satisfies the applicable requirements of the preceding definition).

"Permitted Transferee":   Any transferee of a Residual Certificate other than a Disqualified Organization or a non-U.S. Person.

"Person":   Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan":   Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code.

"PMI Insurer":   Radian Guaranty Inc.

"PMI Insurer Fee":   The amount payable to the PMI Insurer on each Distribution Date, which amount with respect to each PMI Mortgage Loan shall equal one twelfth of the product of (i) the PMI Insurer Fee Rate, multiplied by (ii) the Principal Balance of the related PMI Mortgage Loans or any related REO Property as of the first day of the month for which the PMI

Insurer Fee is calculated plus any applicable premium taxes on the PMI Mortgage Loans located in the States of West Virginia and Kentucky and Florida's Hurricane Assessment fee.

"PMI Insurer Fee Rate":  With respect to each PMI Mortgage Loan, the per annum rate payable to the PMI Insurer under the related policy.

"PMI Mortgage Loans":  The Mortgage Loans insured by the PMI Insurer set forth on the list of Mortgage Loans attached hereto as Schedule IV.

"PMI Policy":  Policy number 07-993035 issued by the PMI Insurer in favor of the PMI Mortgage Loans.

"Preference Claim":  As defined in Section 4.02 hereof.

"Prepayment Assumption":  The pricing prepayment assumption as described in the Prospectus Supplement.

"Prepayment Charge":  With respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a full (but not partial) prepayment of such Mortgage Loan in accordance with the terms thereof (other than any Servicer Prepayment Charge Payment Amount).

"Prepayment Charge Schedule":  As of the Cut-off Date, a list attached hereto as Schedule I (including the Prepayment Charge Summary attached thereto), setting forth the following information with respect to each Prepayment Charge:

> (i)     the Mortgage Loan identifying number;
>
> (ii)    a code indicating the type of Prepayment Charge;
>
> (iii)   the state of origination of the related Mortgage Loan;
>
> (iv)    the date on which the first monthly payment was due on the related Mortgage Loan;
>
> (v)     the term of the related Prepayment Charge; and
>
> (vi)    the principal balance of the related Mortgage Loan as of the Cut-off Date.

The Prepayment Charge Schedule shall be amended from time to time by the Servicer in accordance with the provisions of this Agreement and a copy of each related amendment shall be furnished by the Servicer to the NIMS Insurer and the Trustee.

"Prepayment Interest Excess":  With respect to any Distribution Date, for each Mortgage Loan for which a Principal Prepayment in full is applied on or after the first calendar day of the month of such Distribution Date and before the 15th calendar day of such month, the amount of interest collected on such Principal Prepayment in full at the applicable Net Mortgage Rate from the first day of the month in which such Distribution Date occurs through the day on which such Principal Prepayment is applied.

"<u>Prepayment Interest Shortfall</u>":  With respect to any Distribution Date, for each Mortgage Loan that was during the related Prepayment Period the subject of a Principal Prepayment in full or in part that was applied by the Servicer to reduce the outstanding principal balance of such loan on a date preceding the Due Date in the month in which such Distribution Date occurs, an amount equal to interest at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the lesser of (i) the number of days commencing on the date on which the prepayment is applied and ending on the last day of the month in which such Principal Prepayment is applied and (ii) 30 days.  The obligations of the Servicer in respect of any Prepayment Interest Shortfall are set forth in Section 3.24.  For avoidance of doubt, no Prepayment Interest Shortfalls shall exist with respect to Principal Prepayments in full which are applied during the period from the first through the 14th day of the month of the related Distribution Date.

"<u>Prepayment Period</u>":  With respect to any Distribution Date, (i) the period from the 15th day of the month immediately preceding the month in which such Distribution Date occurs (or in the case of the first Distribution Date, the Cut-off Date) through the 14th day of the month in which such Distribution Date occurs, inclusive, for purposes of Principal Prepayments in full; and (ii) the calendar month immediately preceding the calendar month in which such Distribution Date occurs, for any other purpose. Except for purposes of calculating Prepayment Interest Excess, Principal Prepayments made during the calendar month immediately preceding the Cut-off Date and received by the Servicer shall be deemed to be received after the Cut-off Date and during the Prepayment Period related to the first Distribution Date.

"<u>Prime Rate</u>":  The prime rate of United States money center commercial banks as published in The Wall Street Journal.

"<u>Principal Balance</u>":  As to any Mortgage Loan other than a Liquidated Mortgage Loan, and any day, the related Cut-off Date Principal Balance, minus all collections credited against the Cut-off Date Principal Balance of any such Mortgage Loan.  For purposes of this definition, a Liquidated Mortgage Loan shall be deemed to have a Principal Balance equal to the Principal Balance of the related Mortgage Loan as of the final recovery of related Liquidation Proceeds and a Principal Balance of zero thereafter.  As to any REO Property and any day, the Principal Balance of the related Mortgage Loan shall equal the Principal Balance of the related Mortgage Loan immediately prior to such Mortgage Loan becoming REO Property minus any REO Principal Amortization received with respect thereto on or prior to such day.

"<u>Principal Distribution Amount</u>":  With respect to any Distribution Date, the sum of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount.

"<u>Principal Prepayment</u>":  Any payment of principal made by the Mortgagor on a Mortgage Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"<u>Principal Remittance Amount</u>":  With respect to any Distribution Date, the sum of the Group I Principal Remittance Amount and the Group II Principal Remittance Amount.

"<u>Prospectus Supplement</u>":  That certain Prospectus Supplement dated April 5, 2007, relating to the public offering of the Class A Certificates and the Mezzanine Certificates.

"Purchase Price":  With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01, and as confirmed by an Officer's Certificate from the Servicer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 9.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the Mortgagor or by an advance by the Servicer through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the Mortgagor or by an advance by the Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and Advances that as of the date of purchase had been distributed in respect of REO Imputed Interest pursuant to Section 4.01, (iii) any unreimbursed Servicing Advances, Advances and Nonrecoverable Advances and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property, (iv) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan or REO Property pursuant to Section 3.11 (a)(ix) and Section 3.16(b), (v) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, enforcement expenses reasonably incurred or to be incurred by the NIMS Insurer, the Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation and (vi) in the case of a Mortgage Loan required to be repurchased pursuant to Section 2.03 because such Mortgage Loan is in breach of the representation in Section 6(xlvi) or in Section 6(lxi) of the Mortgage Loan Purchase Agreement, any additional costs or damages in excess of the amounts to be paid pursuant to clauses (i) through (v) above (including attorney's fees) incurred by the Trust as a result of the Trust's status as an assignee or purchaser of such Mortgage Loans.

"Rating Agency or Rating Agencies":  Moody's, Fitch and S&P or their successors.  If such agencies or their successors are no longer in existence, "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable Persons, designated by the Depositor, notice of which designation shall be given to the Trustee and the Servicer.

"Reacquired Mortgage Loan":  A Mortgage Loan replaced or to be replaced by one or more Substitute Mortgage Loans.

"Realized Loss":  With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan.

"Record Date":  With respect to (i) the Class C Certificates, the Class P Certificates, the Residual Certificates and any Definitive Certificates, the Close of Business on the last Business Day of the calendar month preceding the month in which the related Distribution Date occurs and (ii) with respect to the Class A Certificates and the Mezzanine Certificates, the Close of Business on the Business Day immediately preceding the related Distribution Date; provided, however, that following the date on which Definitive Certificates for a Class A Certificate or a Mezzanine Certificate are available pursuant to Section 5.02, the Record Date for such

Certificates shall be the last Business Day of the calendar month preceding the month in which the related Distribution Date occurs.

"Recording Documents":  As defined in Section 2.01 hereof.

"Reference Banks":  Those banks (i) with an established place of business in London, England, (ii) not controlling, under the control of or under common control with the Depositor, the Seller or the Servicer or any affiliate thereof and (iii) which have been designated as such by the Trustee with the consent of the NIMS Insurer; provided, however, that if fewer than two of such banks provide a LIBOR rate, then any leading bank selected by the Trustee with the consent of the NIMS Insurer which is engaged in transactions in United States dollar deposits in the international Eurocurrency market.

"Refinanced Mortgage Loan":  A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

"Regular Certificates":  The Class A Certificates, the Mezzanine Certificates, the Class C Certificates and the Class P Certificates.

"Regulation AB":  Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as has been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Relief Act":  The Servicemembers' Civil Relief Act of 2003 or similar state or local law.

"Relief Act Interest Shortfall":  With respect to any Distribution Date, for any Mortgage Loan with respect to which there has been a reduction in the amount of interest collectible thereon for the most recently ended Due Period as a result of the application of the Relief Act, the amount by which (i) interest collectible on such Mortgage Loan during such Due Period is less than (ii) one month's interest on the Principal Balance of such Mortgage Loan at the Mortgage Rate for such Mortgage Loan before giving effect to the application of the Relief Act.

"Remaining Principal Distribution Amount":  With respect to any Distribution Date, an amount equal to the Principal Distribution Amount remaining after the distributions set forth in Section 4.01(c)(i) through (iii).

"REMIC":  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC 1":  The primary segregated pool of assets subject hereto and to be administered hereunder, with respect to which a REMIC election is to be made consisting of:  (i) such Mortgage Loans as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof, (ii) any REO Property, together with all collections thereon and proceeds thereof, (iii) the Trust's rights with respect to the Mortgage Loans under all insurance policies, including the PMI Policy, required to be maintained pursuant to this Agreement and any proceeds thereof, (iv) the Depositor's rights with respect to the Mortgage Loans under the Mortgage Loan Purchase

Agreement (including any security interest created thereby), and (v) the Collection Account, the Distribution Account (subject to the last sentence of this definition) and any REO Account and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, a REMIC election will not be made with respect to the Reserve Fund, the Supplemental Interest Trust, the Final Maturity Reserve Trust, the Interest Coverage Account and the Servicer Prepayment Charge Payment Amounts.

"<u>REMIC 1 Group I Regular Interests</u>":  REMIC 1 Regular Interest I and REMIC 1 Regular Interest I-1-A through REMIC 1 Regular Interest I-59-B as designated in the Preliminary Statement hereto.

"<u>REMIC 1 Group II Regular Interests</u>":  REMIC 1 Regular Interest II-1-A through REMIC 1 Regular Interest II-59-B as designated in the Preliminary Statement hereto.

"<u>REMIC 1 Regular Interest</u>":  Any of the 238 separate non-certificated beneficial ownership interests in REMIC 1 issued hereunder and designated as a "regular interest" in REMIC 1. Each REMIC 1 Regular Interest shall accrue interest at the related Uncertificated REMIC 1 Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto.

"<u>REMIC 2</u>":  The segregated pool of assets consisting of all of the REMIC 1 Regular Interests conveyed to the Trust for the benefit of REMIC 3, as holder of the REMIC 2 Regular Interests and the Class R Certificateholders, as holders of the Class R-2 Interest, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"<u>REMIC 2 Interest Loss Allocation Amount</u>":  With respect to any Distribution Date, an amount equal to (a) the product of (i) 50% of the aggregate Principal Balance of the Mortgage Loans and related REO Properties then outstanding and (ii) the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest AA minus the Marker Rate, divided by (b) 12.

"<u>REMIC 2 Overcollateralization Target Amount</u>":  0.50% of the Overcollateralization Target Amount.

"<u>REMIC 2 Overcollateralized Amount</u>": With respect to any date of determination, (i) 0.50% of the aggregate Uncertificated Principal Balances of the REMIC 2 Regular Interests AA, A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ minus (ii) the aggregate of the Uncertificated Principal Balances of REMIC 2 Regular Interests A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8 and M9, in each case as of such date of determination.

"<u>REMIC 2 Principal Loss Allocation Amount</u>":  With respect to any Distribution Date, an amount equal to the product of (i) 0.50% of the aggregate Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) 1 minus a fraction, the numerator of which is 2 times the aggregate of the Uncertificated Principal Balances of REMIC 2 Regular Interest A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8 and M9 and the denominator of which is the aggregate of the Uncertificated Principal Balances of REMIC 2

Regular Interests A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ.

"REMIC 2 Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC 2 issued hereunder and designated as a "regular interest" in REMIC 2. Each REMIC 2 Regular Interest shall accrue interest at the related Uncertificated REMIC 2 Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal (other than REMIC 2 Regular Interests Swap IO and FMR IO), subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto. The following is a list of each of the REMIC 2 Regular Interests: REMIC 2 Regular Interest AA, REMIC 2 Regular Interest A-IA, REMIC 2 Regular Interest A-IIA1, REMIC 2 Regular Interest A-IIA2, REMIC 2 Regular Interest A-IIA3, REMIC 2 Regular Interest A-IIA4, REMIC 2 Regular Interest M1, REMIC 2 Regular Interest M2, REMIC 2 Regular Interest M3, REMIC 2 Regular Interest M4, REMIC 2 Regular Interest M5, REMIC 2 Regular Interest M6, REMIC 2 Regular Interest M7, REMIC 2 Regular Interest M8, REMIC 2 Regular Interest M9, REMIC 2 Regular Interest ZZ, REMIC 2 Regular Interest XX, REMIC 2 Regular Interest 1SUB, REMIC 2 Regular Interest 1GRP and REMIC 2 Regular Interest 2SUB, REMIC 2 Regular Interest 2GRP, REMIC 2 Regular Interest Swap IO and REMIC 2 Regular Interest FMR IO.

"REMIC 3":  The segregated pool of assets consisting of all of the REMIC 2 Regular Interests conveyed to the Trust, for the benefit of the Holders of the Regular Certificates (other than the Class P Certificates and the Class Swap IO Upper-Tier Interest), REMIC CX, as the holder of the Class C Interest, REMIC PX, as the holder of the Class P Interest, REMIC SwapX as holder of the Class Swap IO Interest, and the Class R Certificateholders, as holders of the Class R-3 Interest, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC 3 Regular Interests":  The Class C Interest, the Class P Interest, the Class Swap IO Interest, and the Class FM Reserve IO Interest.

"REMIC CX":  The segregated pool of assets consisting of the Class C Interest, conveyed to the Trust, for the benefit of the Holders of the Class C Certificates and the Class R-CX Certificates, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC FM Rate":  For (i) the Distribution Date in May 2007 through the Distribution Date in April 2017, the excess of (a) the Uncertificated REMIC 2 Pass-Through Rate on REMIC 1 Regular Interest IX over (b) the Uncertificated REMIC 2 Pass-Through Rate on REMIC 1 Regular Interest IX, (ii) the Distribution Date beginning with the Distribution Date in May 2017 through the Distribution Date in April 2037, a rate equal to the Final Maturity Reserve Rate and (iii) thereafter, 0.00%.

"REMIC Provisions":  Provisions of the federal income tax law relating to real estate mortgage investment conduits which appear at Section 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and regulations and rulings promulgated thereunder, as the foregoing may be in effect from time to time.

"REMIC PX":  The segregated pool of assets consisting of the Class P Interest, conveyed to the Trust, for the benefit of the Holders of the Class P Certificates and the Class R-PX Certificates, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC Regular Interests":  The REMIC 1 Regular Interests, the REMIC 2 Regular Interests and the REMIC 3 Regular Interests.

"REMIC SwapX":  The segregated pool of assets consisting of the Class Swap IO Interest, conveyed to the Trust, for the benefit of the Holders of the Class Swap IO Upper-Tier Interest and the Class R-SwapX Certificates, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"Remittance":  As defined in Section 7.02(b) hereof.

"Remittance Report":  A report prepared by the Servicer and delivered to the NIMS Insurer and the Trustee pursuant to Section 4.04.

"Rents from Real Property":  With respect to any REO Property, gross income of the character described in Section 856(d) of the Code.

"REO Account":  The account or accounts maintained by the Servicer in respect of an REO Property pursuant to Section 3.23.

"REO Disposition":  The sale or other disposition of an REO Property on behalf of the Trust.

"REO Imputed Interest":  As to any REO Property, for any calendar month during which such REO Property was at any time part of the Trust Fund, one month's interest at the applicable Net Mortgage Rate on the Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan if appropriate) as of the Close of Business on the Distribution Date in such calendar month.

"REO Principal Amortization":  With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Mortgage Loans and REO Properties pursuant to Section 9.01 that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable pursuant to Section 3.23 in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the Servicer pursuant to Section 3.23 for unpaid Servicing Fees in respect of the related Mortgage Loan and unreimbursed Servicing Advances and Advances in respect of such REO Property or the related Mortgage Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"REO Property":  A Mortgaged Property acquired by the Servicer on behalf of the Trust through foreclosure or deed-in-lieu of foreclosure, as described in Section 3.23.

"Replacement Payment":  As defined in Section 3.30(b) hereof.

"<u>Request for Release</u>":  A release signed by a Servicing Representative, in the form of Exhibit E-1 or E-2 attached hereto.

"<u>Reserve Fund</u>":  The reserve fund established pursuant to Section 3.26.

"<u>Reserve Interest Rate</u>":  With respect to any Interest Determination Date, the rate per annum that the Trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.03125%) of the one-month United States dollar lending rates which banks in New York City selected by the Trustee with the consent of the NIMS Insurer are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Trustee can determine no such arithmetic mean, in the case of any Interest Determination Date after the initial Interest Determination Date, the lowest one-month United States dollar lending rate which such New York banks selected by the Trustee with the consent of the NIMS Insurer are quoting on such Interest Determination Date to leading European banks.

"<u>Residential Dwelling</u>":  Any one of the following:  (i) a detached one-family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a Fannie Mae eligible condominium project or a Freddie Mac eligible condominium project, (iv) a manufactured home, or (v) a detached one-family dwelling in a planned unit development, none of which is a co-operative or mobile home.

"<u>Residual Certificates</u>":  The Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates.

"<u>Residual Interest</u>":  The sole class of "residual interests" in a REMIC within the meaning of Section 860G(a)(2) of the Code.

"<u>Residual NIM Holder</u>":  As defined in Section 3.16(c) hereof.

"<u>Responsible Officer</u>":  When used with respect to the Trustee, the Delaware Trustee, the Final Maturity Reserve Trust Trustee or the Supplemental Interest Trust Trustee, any managing director, director, associate, principal, vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee, the Delaware Trustee, the Final Maturity Reserve Trust Trustee or the Supplemental Interest Trust Trustee, as applicable, customarily performing functions similar to those performed by any of the above designated officers and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"<u>S&P</u>":  Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

"<u>Secretary of State</u>":  The Secretary of State of the State of Delaware.

"<u>Seller</u>":  Washington Mutual Bank, a federal savings association, or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

"<u>Servicer</u>":  Washington Mutual Bank, a federal savings association, or any successor servicer appointed as herein provided, in its capacity as Servicer hereunder.

"Servicer Event of Default":  One or more of the events described in Section 7.01.

"Servicer Prepayment Charge Payment Amount":  The amounts (i) payable by the Servicer in respect of any Prepayment Charges waived other than in accordance with the standard set forth in Section 2.04(a)(viii) or (ii) collected from the Servicer in its capacity as Seller in respect of a remedy for the breach of the representation and warranty made by the Servicer in its capacity as Seller set forth in Section 2.04(a)(vii).

"Servicer Remittance Date":  With respect to any Distribution Date, 3:00 p.m. New York time on the Business Day preceding the Distribution Date.

"Servicing Account":  The account or accounts created and maintained pursuant to Section 3.09.

"Servicing Advances":  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Servicer in the performance of its servicing obligations in connection with a default, delinquencies or other unanticipated event or where reimbursement is otherwise permitted in accordance with any of the terms of this Agreement, including, but not limited to, the cost of (i) the preservation, restoration, inspection and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, and including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered in the MERS® System, (iii) the management and liquidation of the REO Property and (iv) compliance with the obligations under Sections 3.01, 3.09, 3.14, 3.16, and 3.23.

"Servicing Fee":  With respect to each Mortgage Loan and for any calendar month, an amount equal to one month's interest (or in the event of any payment of interest which accompanies a Principal Prepayment in full made by the Mortgagor during such calendar month, interest for the number of days covered by such payment of interest) at the Servicing Fee Rate on the same principal amount on which interest on such Mortgage Loan accrues for such calendar month.  A portion of such Servicing Fee may be retained by any Sub-Servicer as its servicing compensation.

"Servicing Fee Rate":  0.50% per annum.

"Servicing Representative":  Any officer or employee of the Servicer involved in, or responsible for, the administration and servicing of Mortgage Loans, whose name and specimen signature appear on a list of servicing representatives furnished by the Servicer to the Trustee and the Depositor on the Closing Date, as such list may from time to time be amended.

"Startup Day":  As defined in Section 10.01(b) hereof.

"Stated Principal Balance":  With respect to any Mortgage Loan:  (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, the related Cut-off Date Principal Balance, as shown in the Mortgage Loan Schedule, minus the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-off Date, to the extent received from the Mortgagor or advanced by the Servicer and distributed pursuant to Section 4.01 on or before such date of determination, (ii) all Principal Prepayments received after the Cut-off Date, to the extent distributed pursuant to Section 4.01 on or before such date of

determination, (iii) all Liquidation Proceeds and Insurance Proceeds to the extent distributed pursuant to Section 4.01 on or before such date of determination, and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation made during or prior to the Due Period for the most recent Distribution Date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero.  With respect to any REO Property:  (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Mortgage Loan as of the date on which such REO Property was acquired on behalf of the Trust, minus the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 4.01 on or before such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

"Statutory Trust Statute":  Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. §3801 et seq., as the same may be amended from time to time.

"Stayed Funds":  If the Servicer is the subject of a proceeding under the federal Bankruptcy Code and the making of a Remittance (as defined in Section 7.02(b)) is prohibited by Section 362 of the federal Bankruptcy Code, funds that are in the custody of the Servicer, a trustee in bankruptcy or a federal bankruptcy court and should have been the subject of such Remittance absent such prohibition.

"Stepdown Date":  The earlier of (a) the later of (i) the Distribution Date in May, 2010 and (ii) the first Distribution Date on which the Credit Enhancement Percentage (calculated for this purpose only after taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period but prior to distribution of the Principal Distribution Amount in respect of the Certificates then entitled to distributions of principal on such Distribution Date) is greater than or equal to 37.90% and (b) the Distribution Date following the Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero.

"Subordinated Net WAC Rate":  For any Distribution Date with respect to the Mezzanine Certificates, a per annum rate (subject to adjustment based on the actual number of days elapsed in the related Interest Accrual Period) equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate Stated Principal Balance of each Loan Group as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) the current aggregate Certificate Principal Balance of the related Class A Certificates) of the Net WAC Pass-Through Rate for the Group I Certificates and the Net WAC Pass-Through Rate for the Group II Certificates.  For federal income tax purposes, for any Distribution Date with respect to the regular interests in REMIC 3 the ownership of which is represented by the Mezzanine Certificates, the Subordinated Net WAC Rate shall be expressed as the weighted average (adjusted for the actual number of days elapsed in the related Interest Accrual Period) of the Uncertificated REMIC 2 Pass-Through Rates on (a) REMIC 2 Regular Interest 1SUB, subject to a cap and a floor equal to the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest 1GRP and (b) REMIC 2 Regular Interest

2SUB, subject to a cap and a floor equal to the Uncertificated REMIC 2 Pass-Through Rate for REMIC 2 Regular Interest 2GRP, weighted on the basis of the Uncertificated Principal Balance of each such REMIC 2 Regular Interest.

"<u>Sub-Servicer</u>":  Any Person with which the Servicer has entered into a Sub-Servicing Agreement and which meets the qualifications of a Sub-Servicer pursuant to Section 3.02.

"<u>Sub-Servicing Account</u>":  An account or accounts established by a Sub-Servicer which meets the requirements set forth in Section 3.08 and is otherwise acceptable to the applicable Servicer.

"<u>Sub-Servicing Agreement</u>":  The written contract between the Servicer and a Sub-Servicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02.

"<u>Subsequent Recoveries</u>":  The Gross Subsequent Recoveries net of amounts payable or reimbursable to the Servicer for related (i) Advances, (ii) Servicing Advances and (iii) Servicing Fees.

"<u>Substitute Mortgage Loan</u>":  A mortgage loan substituted for a Reacquired Mortgage Loan pursuant to the terms of this Agreement or the Mortgage Loan Purchase Agreement which must, on the date of such substitution, (i) have an outstanding principal balance (or in the case of a substitution of more than one mortgage loan for a Reacquired Mortgage Loan, an aggregate principal balance), after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of, and not more than 5.00% less than, the outstanding principal balance of the Reacquired Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Reacquired Mortgage Loan, (iii) if the Substitute Mortgage Loan is an Adjustable Rate Mortgage Loan, have a Maximum Mortgage Rate not greater than the Maximum Mortgage Rate on the Reacquired Mortgage Loan and have a Minimum Mortgage Rate not less than the Minimum Mortgage Rate of the Reacquired Mortgage Loan, (iv) if the Substitute Mortgage Loan is an Adjustable Rate Mortgage Loan, have a Gross Margin equal to or greater than the Gross Margin of the Reacquired Mortgage Loan, (v) if the Substitute Mortgage Loan is an Adjustable Rate Mortgage Loan, have a next Adjustment Date not more than two months later than the next Adjustment Date on the Reacquired Mortgage Loan, (vi) have a remaining term to maturity not greater than one year later and not more than two years less than the remaining term to maturity of the Reacquired Mortgage Loan, provided, that the cumulative effect of all substitutions shall not cause the weighted average life (at the pricing speed) of any class of Certificates to increase by more than the lesser of (x) five years or (y) 50% of its original weighted average life (at the pricing speed), (vii) have the same Due Date of the Reacquired Mortgage Loan, (viii) be current (with no contractual delinquencies outstanding) as of the date of substitution, (ix) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Reacquired Mortgage Loan as of such date, provided that the weighted average current Loan-to-Value Ratio of the Substitute Mortgage Loans shall be equal to or less than the weighted average current Loan-to-Value Ratio of the Reacquired Mortgage Loans and provided further that, provided, that no Substitute Mortgage Loan shall have a current Loan-to-Value Ratio greater than 100%, (x) have a risk grading determined by the Seller at least equal to the risk grading assigned on the Reacquired Mortgage Loan, (xi) have been underwritten or

reunderwritten by the Seller in accordance with the same or, as determined by the Seller, more favorable, underwriting guidelines as the Reacquired Mortgage Loan, (xii) with respect to Substitute Mortgage Loans substituted for Reacquired Mortgage Loans that are Group I Mortgage Loans, have had an original Principal Balance that conformed to Fannie Mae and Freddie Mac loan limits as of the date of its origination, (xiii) be secured by the same property type as the Reacquired Mortgage Loan, (xiv) have a lien priority equal to or superior to that of the Reacquired Mortgage Loan, (xv) be covered by the PMI Policy if the Reacquired Mortgage Loan was covered by the PMI Policy, and (xvi) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement applicable to the Reacquired Mortgage Loan.  In the event that one or more mortgage loans are substituted for one or more Reacquired Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate principal balances (applied separately for the Group I Mortgage Loans and Group II Mortgage Loans), the Mortgage Rates described in clauses (ii) through (v) hereof shall be satisfied for each such mortgage loan, the risk gradings described in clause (x) hereof shall be satisfied as to each such mortgage loan, the terms described in clause (vi) hereof shall be determined on the basis of weighted average remaining term to maturity (provided that no such mortgage loan may have a remaining term to maturity longer than the Reacquired Mortgage Loan), the Loan-to-Value Ratios described in clause (ix) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (xvi) hereof must be satisfied as to each Substitute Mortgage Loan or in the aggregate, as the case may be.

"Substitution Price":  As defined in Section 2.03(d) hereof.

"Supplemental Final Maturity Reserve Amount":  With respect to any Distribution Date (a) prior to the Distribution Date in April 2027, zero, (b) on and after the Distribution Date in April 2027 up to and including the Final Maturity Reserve Funding Date, the lesser of (i) the amount of the Net Monthly Excess Cashflow for such Distribution Date remaining after the distribution pursuant to Section 4.01(d)(i)(Z) and (ii) the excess of (A) the Stated Principal Balance of the Mortgage Loans having 40-year original terms to maturity (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) over (B) the sum of (1) amounts on deposit in the Final Maturity Reserve Account (after giving effect to all distributions on such Distribution Date other than distributions from the Final Maturity Reserve Account) and (2) the Overcollateralized Amount with respect to such Distribution Date and (c) after the Final Maturity Reserve Funding Date, zero.

"Supplemental Interest Account":  As defined in Section 4.09(a) hereof.

"Supplemental Interest Trust":  As defined in Section 4.09(a) hereof.

"Supplemental Interest Trust Trustee":  Citibank, N.A., not in its individual capacity but solely in its capacity as a trustee of the Supplemental Interest Trust, and any successor thereto.

"Swap Agreement":  The interest rate swap agreement, dated as of April 10, 2007, between the Supplemental Interest Trust Trustee and the Swap Counterparty, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit B.

"Swap Counterparty":  ABN AMRO Bank N.V., or any successor in interest thereto in accordance with the Swap Agreement.

"Swap Credit Support Annex":  The credit support annex related to the Swap Agreement.

"Swap Default":  The effective designation of an Early Termination Date in respect of the Swap Agreement following the occurrence of a Swap Event of Default, a Termination Event with respect to the Swap Agreement or an Additional Termination Event with respect to the Swap Agreement.

"Swap Event of Default":  An "Event of Default" as such term is defined in the Swap Agreement.

"Swap LIBOR":  A per annum rate equal to the floating rate payable by the Swap Counterparty under the Swap Agreement.

"Swap Notional Amount":  With respect to any Distribution Date is the amount set forth on Schedule II attached hereto with respect to such Distribution Date.

"Swap Payment":  With respect to each Distribution Date, an amount equal to the product of (a) 4.760%, (b) the Swap Notional Amount and (c) a fraction, the numerator of which is 30 and the denominator of which 360.

"Swap Rate":  With respect to any Distribution Date, the rate payable by the Trust as specified in the Swap Agreement.

"Swap Termination Payment":  Upon the designation of an "Early Termination Date" as defined in the Swap Agreement, the payment to be made by the Supplemental Interest Trust Trustee to the Swap Counterparty, or by the Swap Counterparty to the Supplemental Interest Trust Trustee, as applicable, pursuant to the terms of the Swap Agreement.

"Tax Returns":  The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit (REMIC) Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holder of the REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed by the Trustee on behalf of each REMIC, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"Telerate Page 3750":  The display designated as page "3750" on the Dow Jones Telerate Capital Markets Report (or such other page as may replace page 3750 on that report for the purpose of displaying London interbank offered rates of major banks).

"Termination Event":  As defined in the Swap Agreement.

"Termination Price":  As defined in Section 9.01(a) hereof.

"Terminator":  As defined in Section 9.01.

"Transfer":  Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"Transferee":  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"Transferor":  Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

"Trigger Event": A Trigger Event has occurred with respect to a Distribution Date if either a Cumulative Loss Trigger Event or a Delinquency Trigger Event has occurred with respect to such Distribution Date.

"Trust":  WaMu Asset Backed Certificates WaMu Series 2007-HE2 Trust, a Delaware statutory trust, created pursuant to the Original Trust Agreement.

"Trust Fund":  All of the assets of the Trust, which is divided into separate pools of assets consisting of REMIC 1, REMIC 2, REMIC 3, REMIC CX, REMIC PX, REMIC SwapX, the Reserve Fund, the Supplemental Interest Trust, the Final Maturity Reserve Trust, the Interest Coverage Account and any Servicer Prepayment Charge Payment Amounts and the Trust's rights under the Swap Agreement.

"Trust REMIC":  Any of REMIC 1, REMIC 2, REMIC 3, REMIC CX, REMIC PX and/or REMIC SwapX.

"Trustee":  Citibank, N.A., a national banking association, or its successor in interest, or any successor trustee appointed as herein provided.

"Trustee Fee":  With respect to each Distribution Date, one-twelfth of the Trustee Fee Rate multiplied by the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (prior to giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

"Trustee Fee Rate":  0.00% per annum.

"Uncertificated Accrued Interest":  With respect to each REMIC Regular Interest on each Distribution Date, an amount equal to one month's interest at the related Uncertificated Pass-Through Rate on the Uncertificated Principal Balance or Uncertificated Notional Amount of such REMIC Regular Interest.  In each case, Uncertificated Accrued Interest will be reduced by any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls allocated to such REMIC Regular Interests pursuant to Section 1.03.

"Uncertificated Pass-Through Rate":  The Uncertificated REMIC 1 Pass-Through Rate, the Uncertificated REMIC 2 Pass-Through Rate and the Uncertificated REMIC 3 Pass-Through Rate.

"Uncertificated Notional Amount": With respect to REMIC 2 Regular Interest Swap IO and each Distribution Date listed below, the aggregate Uncertificated Principal Balance of the REMIC 1 Regular Interests ending with the designation "A" listed below:

| Distribution Date | REMIC I Regular Interests |
|---|---|
| 1 and 2 | I-1-A through I-59-A and II-1-A through II-59-A |
| 3 | I-2-A through I-59-A and II-2-A through II-59-A |
| 4 | I-3-A through I-59-A and II-3-A through II-59-A |
| 5 | I-4-A through I-59-A and II-4-A through II-59-A |
| 6 | I-5-A through I-59-A and II-5-A through II-59-A |
| 7 | I-6-A through I-59-A and II-6-A through II-59-A |
| 8 | I-7-A through I-59-A and  II-7-A through II-59-A |
| 9 | I-8-A through I-59-A and  II-8-A through II-59-A |
| 10 | I-9-A through I-59-A and  II-9-A through II-59-A |
| 11 | I-10-A through I-59-A and  II-10-A through II-59-A |
| 12 | I-11-A through I-59-A and  II-11-A through II-59-A |
| 13 | I-12-A through I-59-A and  II-12-A through II-59-A |
| 14 | I-13-A through I-59-A and  II-13-A through II-59-A |
| 15 | I-14-A through I-59-A and  II-14-A through II-59-A |
| 16 | I-15-A through I-59-A and  II-15-A through II-59-A |
| 17 | I-16-A through I-59-A and  II-16-A through II-59-A |
| 18 | I-17-A through I-59-A and  II-17-A through II-59-A |
| 19 | I-18-A through I-59-A and  II-18-A through II-59-A |
| 20 | I-19-A through I-59-A and II-19-A through II-59-A |
| 21 | I-20-A through I-59-A and II-20-A through II-59-A |
| 22 | I-21-A through I-59-A and II-21-A through II-59-A |
| 23 | I-22-A through I-59-A and II-22-A through II-59-A |
| 24 | I-23-A through I-59-A and II-23-A through II-59-A |
| 25 | I-24-A through I-59-A and II-24-A through II-59-A |
| 26 | I-25-A through I-59-A and II-25-A through II-59-A |
| 27 | I-26-A through I-59-A and II-26-A through II-59-A |
| 28 | I-27-A through I-59-A and II-27-A through II-59-A |
| 29 | I-28-A through I-59-A and II-28-A through II-59-A |
| 30 | I-29-A through I-59-A and II-29-A through II-59-A |
| 31 | I-30-A through I-59-A and II-30-A through II-59-A |
| 32 | I-31-A through I-59-A and II-31-A through II-59-A |
| 33 | I-32-A through I-59-A and II-32-A through II-59-A |
| 34 | I-33-A through I-59-A and II-33-A through II-59-A |
| 35 | I-34-A through I-59-A and II-34-A through II-59-A |
| 36 | I-35-A through I-59-A and II-35-A through II-59-A |
| 37 | I-36-A through I-59-A and II-36-A through II-59-A |
| 38 | I-37-A through I-59-A and II-37-A through II-59-A |
| 39 | I-38-A through I-59-A and II-38-A through II-59-A |
| 40 | I-39-A through I-59-A and II-39-A through II-59-A |
| 41 | I-40-A through I-59-A and II-40-A through II-59-A |
| 42 | I-41-A through I-59-A and II-41-A through II-59-A |
| 43 | I-42-A through I-59-A and II-42-A through II-59-A |
| 44 | I-43-A through I-59-A and II-43-A through II-59-A |
| 45 | I-44-A through I-59-A and II-44-A through II-59-A |
| 46 | I-45-A through I-59-A and II-45-A through II-59-A |
| 47 | I-46-A through I-59-A and II-46-A through II-59-A |
| 48 | I-47-A through I-59-A and II-47-A through II-59-A |
| 49 | I-48-A through I-59-A and II-48-A through II-59-A |
| 50 | I-49-A through I-59-A and II-49-A through II-59-A |
| 51 | I-50-A through I-59-A and II-50-A through II-59-A |
| 52 | I-51-A through I-59-A and II-51-A through II-59-A |
| 53 | I-52-A through I-59-A and II-52-A through II-59-A |
| 54 | I-53-A through I-59-A and II-53-A through II-59-A |
| 55 | I-54-A through I-59-A and II-54-A through II-59-A |
| 56 | I-55-A through I-59-A and II-59-A through II-59-A |
| 57 | I-56-A through I-59-A and II-56-A through II-59-A |

| Distribution Date | REMIC I Regular Interests |
|---|---|
| 58 | I-57-A through I-59-A and II-57-A through II-59-A |
| 59 | I-58-A through I-59-A and II-58-A through II-59-A |
| 60 | I-59-A and II-59-A |
| thereafter | $0.00 |

"Uncertificated Principal Balance":  With respect to each REMIC Regular Interest, the principal amount of such REMIC Regular Interest outstanding as of any date of determination. As of the Closing Date, the Uncertificated Principal Balance of each REMIC Regular Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial Uncertificated Principal Balance.   On each Distribution Date, the Uncertificated Principal Balance of each REMIC Regular Interest shall be reduced by all distributions of principal made on such REMIC Regular Interest on such Distribution Date pursuant to Section 4.05 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses and increased by Subsequent Recoveries as provided in Section 4.06, and the Uncertificated Principal Balance of REMIC 2 Regular Interest ZZ shall be increased by interest deferrals as provided in Section 4.05.  The Uncertificated Principal Balance of each REMIC Regular Interest that has an Uncertificated Principal Balance shall never be less than zero.  Notwithstanding the foregoing, the Uncertificated Principal Balance of (i) the Class C Interest shall always be equal to (i) the excess, if any, of (A) the then aggregate Uncertificated Principal Balances of the REMIC 2 Regular Interests over (B) the sum of the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates and the Class P Interest minus (ii) the amount, if any, paid to the Class A Certificates on the first Distribution Date as Extra Principal Distribution Amount.

"Uncertificated REMIC 1 Pass-Through Rate": With respect to REMIC 1 Regular Interest IX and REMIC 1 Regular Interest P, a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Group I Mortgage Loans.  With respect to each REMIC 1 Group I Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Group I Mortgage Loans multiplied by 2, subject to a maximum rate of two times the Swap Rate. With respect to each REMIC 1 Group I Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Adjusted Net Mortgage Rates of the Group I Mortgage Loans over (ii) two times the Swap Rate and (y) 0.00%.  With respect to REMIC 1 Regular Interest IIX, a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Group II Mortgage Loans.  With respect to each REMIC 1 Group II Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Group II Mortgage Loans multiplied by 2, subject to a maximum rate of two times the Swap Rate.  With respect to each REMIC 1 Group II Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Adjusted Net Mortgage Rates of the Group II Mortgage Loans over (ii) two times the Swap Rate and (y) 0.00%.

"Uncertificated REMIC 2 Pass-Through Rate":  With respect to REMIC 2 Regular Interests AA, A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9, ZZ, 1SUB, 2SUB and XX, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC 1 Regular Interests IX and IIX, the Uncertificated REMIC 1 Pass-Through Rate for each such REMIC 1 Regular Interest for each such Distribution

Date minus the REMIC FM Rate, (x) with respect to each REMIC 1 Regular Interest ending with the designation "B", the weighted average of the Uncertificated REMIC 1 Pass-Through Rates for such REMIC 1 Regular Interests minus the REMIC FM Rate, (y) with respect to REMIC 1 Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for each such REMIC I Regular Interest listed below, weighted on the basis of the Uncertificated Principal Balance of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| 1 | I-1-A through I-59-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-59-A | Uncertificated REMIC 1 Pass-Through Rate |
| 2 | I-1-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 3 | I-2-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-2-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A | Uncertificated REMIC 1 Pass-Through Rate |
| 4 | I-3-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-3-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A and I-2-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A and II-2-A | Uncertificated REMIC 1 Pass-Through Rate |
| 5 | I-4-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-4-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-3-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-3-A | Uncertificated REMIC 1 Pass-Through Rate |
| 6 | I-5-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-5-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-4-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-4-A | Uncertificated REMIC 1 Pass-Through Rate |
| 7 | I-6-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-6-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-5-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-5-A | Uncertificated REMIC 1 Pass-Through Rate |
| 8 | I-7-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-7-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-6-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-6-A | Uncertificated REMIC 1 Pass-Through Rate |
| 9 | I-8-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-8-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-7-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-7-A | Uncertificated REMIC 1 Pass-Through Rate |
| 10 | I-9-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-9-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-8-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-8-A | Uncertificated REMIC 1 Pass-Through Rate |
| 11 | I-10-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-10-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-9-A | Uncertificated REMIC 1 Pass-Through Rate |

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-9-A | Uncertificated REMIC 1 Pass-Through Rate |
| 12 | I-11-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-11-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-10-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-10-A | Uncertificated REMIC 1 Pass-Through Rate |
| 13 | I-12-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-12-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-11-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-11-A | Uncertificated REMIC 1 Pass-Through Rate |
| 14 | I-13-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-13-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-12-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-12-A | Uncertificated REMIC 1 Pass-Through Rate |
| 15 | I-14-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-14-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-13-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-13-A | Uncertificated REMIC 1 Pass-Through Rate |
| 16 | I-15-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-15-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-14-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-14-A | Uncertificated REMIC 1 Pass-Through Rate |
| 17 | I-16-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-16-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-15-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-15-A | Uncertificated REMIC 1 Pass-Through Rate |
| 18 | I-17-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-17-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-16-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-16-A | Uncertificated REMIC 1 Pass-Through Rate |
| 19 | I-18-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-18-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-17-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-17-A | Uncertificated REMIC 1 Pass-Through Rate |
| 20 | I-19-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-19-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-18-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-18-A | Uncertificated REMIC 1 Pass-Through Rate |
| 21 | I-20-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-20-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-19-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-19-A | Uncertificated REMIC 1 Pass-Through Rate |
| 22 | I-21-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-21-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-20-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-20-A | Uncertificated REMIC 1 Pass-Through Rate |
| 23 | I-22-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-22-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | I-1-A through I-21-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-21-A | Uncertificated REMIC 1 Pass-Through Rate |
| 24 | I-23-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-23-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-22-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-22-A | Uncertificated REMIC 1 Pass-Through Rate |
| 25 | I-24-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-24-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-23-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-23-A | Uncertificated REMIC 1 Pass-Through Rate |
| 26 | I-25-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-25-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-24-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-24-A | Uncertificated REMIC 1 Pass-Through Rate |
| 27 | I-26-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-26-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-25-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-25-A | Uncertificated REMIC 1 Pass-Through Rate |
| 28 | I-27-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-27-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-26-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-26-A | Uncertificated REMIC 1 Pass-Through Rate |
| 29 | I-28-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-28-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-27-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-27-A | Uncertificated REMIC 1 Pass-Through Rate |
| 30 | I-29-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-29-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-28-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-28-A | Uncertificated REMIC 1 Pass-Through Rate |
| 31 | I-30-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-30-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-29-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-29-A | Uncertificated REMIC 1 Pass-Through Rate |
| 32 | I-31-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-31-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-30-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-30-A | Uncertificated REMIC 1 Pass-Through Rate |
| 33 | I-32-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-32-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-31-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-31-A | Uncertificated REMIC 1 Pass-Through Rate |
| 34 | I-33-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-33-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-32-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-32-A | Uncertificated REMIC 1 Pass-Through Rate |
| 35 | I-34-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-34-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a |

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | | maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-33-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-33-A | Uncertificated REMIC 1 Pass-Through Rate |
| 36 | I-35-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-35-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-34-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-34-A | Uncertificated REMIC 1 Pass-Through Rate |
| 37 | I-36-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-36-A and  II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-35-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-35-A | Uncertificated REMIC 1 Pass-Through Rate |
| 38 | I-37-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-37-A and  II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-36-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-36-A | Uncertificated REMIC 1 Pass-Through Rate |
| 39 | I-38-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-38-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-37-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-37-A | Uncertificated REMIC 1 Pass-Through Rate |
| 40 | I-39-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-39-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-38-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-38-A | Uncertificated REMIC 1 Pass-Through Rate |
| 41 | I-40-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-40-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-39-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-39-A | Uncertificated REMIC 1 Pass-Through Rate |
| 42 | I-41-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-41-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-40-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-40-A | Uncertificated REMIC 1 Pass-Through Rate |
| 43 | I-42-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-42-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-41-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-41-A | Uncertificated REMIC 1 Pass-Through Rate |
| 44 | I-43-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-43-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-42-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-42-A | Uncertificated REMIC 1 Pass-Through Rate |
| 45 | I-44-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-44-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-43-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-43-A | Uncertificated REMIC 1 Pass-Through Rate |
| 46 | I-45-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-45-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-44-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-44-A | Uncertificated REMIC 1 Pass-Through Rate |
| 47 | I-46-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | II-46-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 48 | I-1-A through I-45-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-45-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-47-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-47-A and  II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 49 | I-1-A through I-46-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-46-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-48-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-48-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 50 | I-1-A through I-47-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-47-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-49-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-49-A and  II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 51 | I-1-A through I-48-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-48-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-50-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-50-A and  II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 52 | I-1-A through I-49-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-49-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-51-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-15-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 53 | I-1-A through I-50-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-50-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-52-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-52-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 54 | I-1-A through I-51-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-51-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-53-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-53-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 55 | I-1-A through I-52-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-52-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-54-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-54-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 56 | I-1-A through I-53-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-53-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-55-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-55-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 57 | I-1-A through I-54-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-54-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-56-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-56-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 58 | I-1-A through I-55-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-55-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-57-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-57-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 59 | I-1-A through I-56-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-56-A | Uncertificated REMIC 1 Pass-Through Rate |
| | I-58-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a |

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | | maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-58-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-57-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-57-A | Uncertificated REMIC 1 Pass-Through Rate |
| 60 | I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-58-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-58-A | Uncertificated REMIC 1 Pass-Through Rate |
| thereafter | I-1-A through I-59-A | Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-59-A | Uncertificated REMIC 1 Pass-Through Rate |

With respect to REMIC 2 Regular Interest 1GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC 1 Regular Interest IX, the Uncertificated REMIC 1 Pass-Through Rate for such REMIC 1 Regular Interest for each Distribution Date minus the REMIC FM Rate, (x) with respect to REMIC 1 Group I Regular Interests ending with the designation "B", the weighted average of the Uncertificated REMIC 1 Pass-Through Rates for such REMIC 1 Regular Interests minus the REMIC FM Rate and (y) with respect to REMIC 1 Group I Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC I Regular Interests listed below, weighted on the basis of the Uncertificated Principal Balance of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| 1 | I-1-A through I-59-A | Uncertificated REMIC 1 Pass-Through Rate |
| 2 | I-1-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 3 | I-2-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A | Uncertificated REMIC 1 Pass-Through Rate |
| 4 | I-3-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A and I-2-A | Uncertificated REMIC 1 Pass-Through Rate |
| 5 | I-4-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-3-A | Uncertificated REMIC 1 Pass-Through Rate |
| 6 | I-5-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-4-A | Uncertificated REMIC 1 Pass-Through Rate |
| 7 | I-6-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-5-A | Uncertificated REMIC 1 Pass-Through Rate |
| 8 | I-7-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-6-A | Uncertificated REMIC 1 Pass-Through Rate |
| 9 | I-8-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-7-A | Uncertificated REMIC 1 Pass-Through Rate |
| 10 | I-9-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-8-A | Uncertificated REMIC 1 Pass-Through Rate |
| 11 | I-10-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-9-A | Uncertificated REMIC 1 Pass-Through Rate |
| 12 | I-11-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-10-A | Uncertificated REMIC 1 Pass-Through Rate |
| 13 | I-12-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a |

73

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | | maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-11-A | Uncertificated REMIC 1 Pass-Through Rate |
| 14 | I-13-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-12-A | Uncertificated REMIC 1 Pass-Through Rate |
| 15 | I-14-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-13-A | Uncertificated REMIC 1 Pass-Through Rate |
| 16 | I-15-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-14-A | Uncertificated REMIC 1 Pass-Through Rate |
| 17 | I-16-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-15-A | Uncertificated REMIC 1 Pass-Through Rate |
| 18 | I-17-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-16-A | Uncertificated REMIC 1 Pass-Through Rate |
| 19 | I-18-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-17-A | Uncertificated REMIC 1 Pass-Through Rate |
| 20 | I-19-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-18-A | Uncertificated REMIC 1 Pass-Through Rate |
| 21 | I-20-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-19-A | Uncertificated REMIC 1 Pass-Through Rate |
| 22 | I-21-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-20-A | Uncertificated REMIC 1 Pass-Through Rate |
| 23 | I-22-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-21-A | Uncertificated REMIC 1 Pass-Through Rate |
| 24 | I-23-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-22-A | Uncertificated REMIC 1 Pass-Through Rate |
| 25 | I-24-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-23-A | Uncertificated REMIC 1 Pass-Through Rate |
| 26 | I-25-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-24-A | Uncertificated REMIC 1 Pass-Through Rate |
| 27 | I-26-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-25-A | Uncertificated REMIC 1 Pass-Through Rate |
| 28 | I-27-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-26-A | Uncertificated REMIC 1 Pass-Through Rate |
| 29 | I-28-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-27-A | Uncertificated REMIC 1 Pass-Through Rate |
| 30 | I-29-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-28-A | Uncertificated REMIC 1 Pass-Through Rate |
| 31 | I-30-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-29-A | Uncertificated REMIC 1 Pass-Through Rate |
| 32 | I-31-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-30-A | Uncertificated REMIC 1 Pass-Through Rate |
| 33 | I-32-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-31-A | Uncertificated REMIC 1 Pass-Through Rate |
| 34 | I-33-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-32-A | Uncertificated REMIC 1 Pass-Through Rate |
| 35 | I-34-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-33-A | Uncertificated REMIC 1 Pass-Through Rate |
| 36 | I-35-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-34-A | Uncertificated REMIC 1 Pass-Through Rate |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| 37 | I-36-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-35-A | Uncertificated REMIC 1 Pass-Through Rate |
| 38 | I-37-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-36-A | Uncertificated REMIC 1 Pass-Through Rate |
| 39 | I-38-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-37-A | Uncertificated REMIC 1 Pass-Through Rate |
| 40 | I-39-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-38-A | Uncertificated REMIC 1 Pass-Through Rate |
| 41 | I-40-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-39-A | Uncertificated REMIC 1 Pass-Through Rate |
| 42 | I-41-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-40-A | Uncertificated REMIC 1 Pass-Through Rate |
| 43 | I-42-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-41-A | Uncertificated REMIC 1 Pass-Through Rate |
| 44 | I-43-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-42-A | Uncertificated REMIC 1 Pass-Through Rate |
| 45 | I-44-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-43-A | Uncertificated REMIC 1 Pass-Through Rate |
| 46 | I-45-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-44-A | Uncertificated REMIC 1 Pass-Through Rate |
| 47 | I-46-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-45-A | Uncertificated REMIC 1 Pass-Through Rate |
| 48 | I-47-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-46-A | Uncertificated REMIC 1 Pass-Through Rate |
| 49 | I-48-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-47-A | Uncertificated REMIC 1 Pass-Through Rate |
| 50 | I-49-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-48-A | Uncertificated REMIC 1 Pass-Through Rate |
| 51 | I-50-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-49-A | Uncertificated REMIC 1 Pass-Through Rate |
| 52 | I-51-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-50-A | Uncertificated REMIC 1 Pass-Through Rate |
| 53 | I-52-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-51-A | Uncertificated REMIC 1 Pass-Through Rate |
| 54 | I-53-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-52-A | Uncertificated REMIC 1 Pass-Through Rate |
| 55 | I-54-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-53-A | Uncertificated REMIC 1 Pass-Through Rate |
| 56 | I-55-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-54-A | Uncertificated REMIC 1 Pass-Through Rate |
| 57 | I-56-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-55-A | Uncertificated REMIC 1 Pass-Through Rate |
| 58 | I-57-A through I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-56-A | Uncertificated REMIC 1 Pass-Through Rate |
| 59 | I-58-A and I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | I-1-A through I-57-A | Uncertificated REMIC 1 Pass-Through Rate |
| 60 | I-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
|  | I-1-A through I-58-A | Uncertificated REMIC 1 Pass-Through Rate |
| thereafter | I-1-A through I-59-A | Uncertificated REMIC 1 Pass-Through Rate |

With respect to REMIC 2 Regular Interest 2GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC 1 Regular Interest IIX, the Uncertificated REMIC 1 Pass-Through Rate for such REMIC 1 Regular Interest for each Distribution Date minus the REMIC FM Rate, (x) with respect to REMIC 1 Group II Regular Interests ending with the designation "B", the weighted average of the Uncertificated REMIC 1 Pass-Through Rates for such REMIC 1 Regular Interests minus the REMIC FM Rate and (y) with respect to REMIC 1 Group II Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC I Regular Interests listed below, weighted on the basis of the Uncertificated Principal Balance of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| 1 | II-1-A through II-59-A | Uncertificated REMIC 1 Pass-Through Rate |
| 2 | II-1-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| 3 | II-2-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A | Uncertificated REMIC 1 Pass-Through Rate |
| 4 | II-3-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A and II-2-A | Uncertificated REMIC 1 Pass-Through Rate |
| 5 | II-4-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-3-A | Uncertificated REMIC 1 Pass-Through Rate |
| 6 | II-5-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-4-A | Uncertificated REMIC 1 Pass-Through Rate |
| 7 | II-6-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-5-A | Uncertificated REMIC 1 Pass-Through Rate |
| 8 | II-7-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-6-A | Uncertificated REMIC 1 Pass-Through Rate |
| 9 | II-8-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-7-A | Uncertificated REMIC 1 Pass-Through Rate |
| 10 | II-9-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-8-A | Uncertificated REMIC 1 Pass-Through Rate |
| 11 | II-10-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-9-A | Uncertificated REMIC 1 Pass-Through Rate |
| 12 | II-11-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-10-A | Uncertificated REMIC 1 Pass-Through Rate |
| 13 | II-12-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-11-A | Uncertificated REMIC 1 Pass-Through Rate |
| 14 | II-13-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-12-A | Uncertificated REMIC 1 Pass-Through Rate |
| 15 | II-14-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-13-A | Uncertificated REMIC 1 Pass-Through Rate |
| 16 | II-15-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-14-A | Uncertificated REMIC 1 Pass-Through Rate |

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| 17 | II-16-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-15-A | Uncertificated REMIC 1 Pass-Through Rate |
| 18 | II-17-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-16-A | Uncertificated REMIC 1 Pass-Through Rate |
| 19 | II-18-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-17-A | Uncertificated REMIC 1 Pass-Through Rate |
| 20 | II-19-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-18-A | Uncertificated REMIC 1 Pass-Through Rate |
| 21 | II-20-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-19-A | Uncertificated REMIC 1 Pass-Through Rate |
| 22 | II-21-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-20-A | Uncertificated REMIC 1 Pass-Through Rate |
| 23 | II-22-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-21-A | Uncertificated REMIC 1 Pass-Through Rate |
| 24 | II-23-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-22-A | Uncertificated REMIC 1 Pass-Through Rate |
| 25 | II-24-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-23-A | Uncertificated REMIC 1 Pass-Through Rate |
| 26 | II-25-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-24-A | Uncertificated REMIC 1 Pass-Through Rate |
| 27 | II-26-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-25-A | Uncertificated REMIC 1 Pass-Through Rate |
| 28 | II-27-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-26-A | Uncertificated REMIC 1 Pass-Through Rate |
| 29 | II-28-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-27-A | Uncertificated REMIC 1 Pass-Through Rate |
| 30 | II-29-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-28-A | Uncertificated REMIC 1 Pass-Through Rate |
| 31 | II-30-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-29-A | Uncertificated REMIC 1 Pass-Through Rate |
| 32 | II-31-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-30-A | Uncertificated REMIC 1 Pass-Through Rate |
| 33 | II-32-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-31-A | Uncertificated REMIC 1 Pass-Through Rate |
| 34 | II-33-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-32-A | Uncertificated REMIC 1 Pass-Through Rate |
| 35 | II-34-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-33-A | Uncertificated REMIC 1 Pass-Through Rate |
| 36 | II-35-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-34-A | Uncertificated REMIC 1 Pass-Through Rate |
| 37 | II-36-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-35-A | Uncertificated REMIC 1 Pass-Through Rate |
| 38 | II-37-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-36-A | Uncertificated REMIC 1 Pass-Through Rate |
| 39 | II-38-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
|  | II-1-A through II-37-A | Uncertificated REMIC 1 Pass-Through Rate |
| 40 | II-39-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005  04/24/2007 08:46 PM

| Distribution Date | REMIC 1 Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-38-A | Uncertificated REMIC 1 Pass-Through Rate |
| 41 | II-40-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-39-A | Uncertificated REMIC 1 Pass-Through Rate |
| 42 | II-41-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-40-A | Uncertificated REMIC 1 Pass-Through Rate |
| 43 | II-42-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-41-A | Uncertificated REMIC 1 Pass-Through Rate |
| 44 | II-43-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-42-A | Uncertificated REMIC 1 Pass-Through Rate |
| 45 | II-44-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-43-A | Uncertificated REMIC 1 Pass-Through Rate |
| 46 | II-45-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-44-A | Uncertificated REMIC 1 Pass-Through Rate |
| 47 | II-46-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-45-A | Uncertificated REMIC 1 Pass-Through Rate |
| 48 | II-47-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-46-A | Uncertificated REMIC 1 Pass-Through Rate |
| 49 | II-48-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-47-A | Uncertificated REMIC 1 Pass-Through Rate |
| 50 | II-49-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-48-A | Uncertificated REMIC 1 Pass-Through Rate |
| 51 | II-50-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-49-A | Uncertificated REMIC 1 Pass-Through Rate |
| 52 | II-51-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-50-A | Uncertificated REMIC 1 Pass-Through Rate |
| 53 | II-52-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-51-A | Uncertificated REMIC 1 Pass-Through Rate |
| 54 | II-53-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-52-A | Uncertificated REMIC 1 Pass-Through Rate |
| 55 | II-54-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-53-A | Uncertificated REMIC 1 Pass-Through Rate |
| 56 | II-55-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-54-A | Uncertificated REMIC 1 Pass-Through Rate |
| 57 | II-56-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-55-A | Uncertificated REMIC 1 Pass-Through Rate |
| 58 | II-57-A through II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-56-A | Uncertificated REMIC 1 Pass-Through Rate |
| 59 | II-58-A and II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-57-A | Uncertificated REMIC 1 Pass-Through Rate |
| 60 | II-59-A | 2 multiplied by Swap LIBOR minus the REMIC FM Rate, subject to a maximum rate of Uncertificated REMIC 1 Pass-Through Rate |
| | II-1-A through II-58-A | Uncertificated REMIC 1 Pass-Through Rate |
| thereafter | II-1-A through II-59-A | Uncertificated REMIC 1 Pass-Through Rate |

With respect to REMIC 2 Regular Interest Swap-IO, and (i) the second Distribution Date through the 60th Distribution Date, the excess of (x) the weighted average of the Uncertificated REMIC 1 Pass-Through Rates for REMIC 1 Regular Interests including the designation "A", over (y) 2 multiplied by Swap LIBOR and (ii) thereafter, 0.00%.

With respect to any Distribution Date and REMIC 2 Regular Interest FMR IO, the REMIC FM Rate.  For federal income tax purposes, REMIC 2 Regular Interest FMR IO will be entitled to a percentage of the interest payable on each REMIC 1 Regular Interest, with the percentage equal to (i) on each Distribution Date starting with the Distribution Date in May 2007 through the Distribution Date in May 2017, the excess of the REMIC 1 Uncertificated Pass-Through Rate of such Regular Interest over the REMIC 1 Uncertificated Pass-Through Rate of such Regular Interest, (ii) on each Distribution Date starting with the Distribution Date in May 2017 through the Distribution Date in April 2027, the excess of the REMIC 1 Uncertificated Pass-Through Rate of such Regular Interest over the difference between the REMIC 1 Uncertificated Pass-Through Rate of such Regular Interest and the Final Maturity Reserve Rate, and (iii) 0.00% thereafter.

"Undercollateralized Amount":  With respect to any Distribution Date, the amount, if any, by which (i) the sum of the aggregate Certificate Principal Balances of the Class A Certificates and the Mezzanine Certificates and the Uncertificated Principal Balance of the Class P Interest as of such Distribution Date (after giving effect to distributions to be made on such Distribution Date) exceeds (ii) the aggregate Stated Principal Balance of the Mortgage Loans on the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

"Uninsured Cause":  Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained pursuant to Section 3.14.

"United States Person" or "U.S. Person":  (i) A citizen or resident of the United States; (ii) a corporation, partnership or other entity classified as a corporation or partnership for United States federal income tax purposes created or organized in, or under the laws of, the United States or any political subdivision thereof (except, in the case of a partnership or entity treated as a partnership, to the extent provided in regulations) provided that, solely for purposes of the restrictions on the transfer of the Residual Certificates, no partnership or other entity treated as a partnership shall be treated as a United States Person unless all persons that own an interest in such partnership or other entity, either directly or through any entity that is not a corporation for United States federal income tax purposes, are required by the applicable operative agreement to be United States Persons; (iii) an estate the income of which is subject to United States federal income taxation regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States Persons have the authority to control all substantial decisions of the trust or if the trust was in existence on August 20, 1996, was treated as a United States Person on August 19, 1996, and made a valid election to continue to be treated as a United States Person.  The term "United States" shall have the meaning set forth in Section 7701 of the Code or successor provisions.

"Unpaid Interest Shortfall Amount":  With respect to the Class A Certificates and the Mezzanine Certificates and (i) the first Distribution Date, zero, and (ii) any Distribution Date after the first Distribution Date, the amount, if any, by which (a) the sum of (1) the Monthly Interest Distributable Amount for such Class of Certificates for the immediately preceding Distribution Date and (2) the outstanding Unpaid Interest Shortfall Amount, if any, for such Class of Certificates for such preceding Distribution Date exceeds (b) the aggregate amount distributed on such Class of Certificates in respect of interest pursuant to clause (a) of this

definition on such preceding Distribution Date, plus interest on the amount of interest due but not paid on such Class of Certificates on such preceding Distribution Date, to the extent permitted by law, at the Pass-Through Rate for such Class of Certificates for the related Accrual Period.

"USD-LIBOR-BBA":  As defined in the Swap Agreement in the Annex to the 2000 ISDA Definitions.

"Value":  With respect to any Mortgaged Property, the lesser of (i) the Origination Value thereof and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is the Origination Value thereof.

"Voting Rights":  The portion of the voting rights of all of the Certificates which is allocated to any Certificate.  At all times the Class A Certificates, the Mezzanine Certificates and the Class C Certificates shall have 98% of the Voting Rights (allocated among the Holders of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates in proportion to the then outstanding Certificate Principal Balances of their respective Certificates), the Class P Certificates shall have 1% of the Voting Rights and the Class R Certificates shall have 1% of the Voting Rights.  The Voting Rights allocated to any Class of Certificates (other than the Class P Certificates and the Class R Certificates) shall be allocated among all Holders of each such Class in proportion to the outstanding Certificate Principal Balance of such Certificates and the Voting Rights allocated to the Class P Certificates and the Class R Certificates shall be allocated among all Holders of each such Class in proportion to such Holders' respective Percentage Interest; provided, however, that when none of the Regular Certificates are outstanding, 100% of the Voting Rights shall be allocated among Holders of the Class R Certificates in accordance with such Holders' respective Percentage Interests in the Certificates of such Class.  The Class R-CX Certificates and the Class R-PX Certificates shall not have Voting Rights.

"Washington Mutual Custodian":  None of the Mortgage Loans are held by the Washington Mutual Custodian as custodian.  References to the Washington Mutual Custodian are left in this Agreement for administrative convenience and shall be completely disregarded.  There is no Washington Mutual Custodian under this Agreement and no Person shall have any rights of the Washington Mutual Custodian under this Agreement.

Section 1.02    Accounting.

Unless otherwise specified herein, for the purpose of any definition or calculation, whenever amounts are required to be netted, subtracted or added or any distributions are taken into account, such definition or calculation and any related definitions or calculations shall be determined without duplication of such functions.

Section 1.03    Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of the Monthly Interest Distributable Amount for the Class A Certificates, the Mezzanine Certificates and the Class C Interest for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first to the Class C Interest to the extent of one month's interest at the then applicable Pass-Through Rate on the Notional Amount of such Regular Interest, and then among the Class A Certificates and the Mezzanine Certificates on a pro rata basis based on, and to the extent of,

interest for the related Accrual Period at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance of each such Certificate.

For purposes of calculating the amount of the Monthly Interest Distributable Amount for the Class C Certificates for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and any Relief Act Interest Shortfalls allocated to the Class C Interest pursuant to the paragraph above shall be allocated among the Class C Certificates on a pro rata basis based on one month's interest.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC 2 Regular Interests for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated:

(a)     50% of any Net Prepayment Interest and Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated to AA and ZZ up to an aggregate amount equal to the REMIC 2 Interest Loss Allocation Amount, 98% and 2%, respectively, and thereafter among AA, A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ, pro rata based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Uncertificated Principal Balance of each such REMIC 2 Regular Interest; and

(b)     50% of any Net Prepayment Interest and Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated to REMIC 2 Regular Interest 1GRP, 2GRP, 1SUB, 2SUB, and XX, pro rata based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Uncertificated Principal Balance of each such REMIC 3 Regular Interest.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC 1 Regular Interests for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls incurred in respect of the Group I Mortgage Loans for any Distribution Date shall be allocated to REMIC 1 Regular Interests IX and the aggregate amount of any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls incurred in respect of the Group II Mortgage Loans for any Distribution Date shall be allocated to REMIC 1 Regular Interest IIX.

Section 1.04     Rights of the NIMS Insurer.

(a)     Each of the rights of the NIMS Insurer set forth in this Agreement shall exist so long as the Insured NIM Notes remain outstanding; provided, however, the NIMS Insurer shall not have any rights hereunder (except as provided in Section 9.01) so long as any NIMS Insurer Default is continuing.

(b)     Notwithstanding anything to the contrary anywhere in this Agreement, all rights and benefits of the NIMS Insurer hereunder shall permanently terminate upon such time as the Insured NIM Notes shall no longer be outstanding.

# ARTICLE II

## CONVEYANCE OF MORTGAGE LOANS;
## ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01      <u>Conveyance of Mortgage Loans</u>.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust, without recourse, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement (other than the Depositor's rights under Section 17 thereof) and all other assets included or to be included in REMIC 1.  Such assignment includes all scheduled payments on the Mortgage Loans due after the Cut-off Date and all unscheduled collections in respect of the Mortgage Loans received after the Cut-off Date (other than the portion of such collections due on or prior to the Cut-off Date).  The REMIC 1 Regular Interests, REMIC 1 Regular Interest IX and the Class R-1 Interest shall collectively be a separate series of beneficial interests in the assets of the Trust consisting of the Trust Fund assets included in the definition of REMIC 1 pursuant to Section 3806(b)(2) of the Statutory Trust Statute.  The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement and the PMI Policy.

The Trustee, not in its individual capacity but solely in its separate capacity as Supplemental Interest Trust Trustee, is hereby directed to exercise the rights, perform the obligations, and make any representations to be exercised, performed, or made by the Supplemental Interest Trust Trustee, as described herein.  The Supplemental Interest Trust Trustee is hereby directed to execute and deliver the Swap Agreement on behalf of Party B (as defined therein) and to exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity.

The Seller, the Servicer, the Depositor and the Certificateholders (by acceptance of their Certificates) acknowledge and agree that:

(i)      the Supplemental Interest Trust Trustee shall execute and deliver the Swap Agreement on behalf of Party B (as defined therein), and

(ii)      the Supplemental Interest Trust Trustee shall exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity.

Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Trustee shall apply to the Trustee's  execution (as Supplemental Interest Trust Trustee) of the Swap Agreement, and the performance of its duties and satisfaction of its obligations thereunder.

If the assignment and transfer of the Mortgage Loans and the other property specified in Section 2.01 from the Depositor to the Trust pursuant to this Agreement is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Depositor intends that the

rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (i) the Depositor shall be deemed to have granted and does hereby grant to the Trust as of the Closing Date a perfected, first priority security interest in the entire right, title and interest of the Depositor in and to the Mortgage Loans and all other property conveyed to the Trust pursuant to this Section 2.01 and all proceeds thereof and (ii) this Agreement shall constitute a security agreement under applicable law.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Custodian acting on behalf of the Trustee (in which capacity it will, unless otherwise specified, be acting under this Article II) the following documents or instruments with respect to each Mortgage Loan so transferred and assigned (with respect to each Mortgage Loan, a "Mortgage File"):

(a)     the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of Citibank, N.A., as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee or (in the case of not more than 1.00% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date) a copy of such original Mortgage Note with an accompanying Lost Note Affidavit executed by the Seller;

(b)     the original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM loan, with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(c)     unless the Mortgage Loan is registered on the MERS® System, an original Assignment in blank;

(d)     the original recorded Assignment or Assignments showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee or in blank (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN) as contemplated by the immediately preceding clause (c);

(e)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(f)     as an original, photocopy or in electronic form, the lender's title insurance policy, together with all endorsements or riders issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first or second lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

Except with respect to any Mortgage Loan for which MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record, the Servicer, in its capacity as Seller, shall promptly, following the later of the Closing Date and the date of receipt by the Servicer of the recording information for a Mortgage submit or cause to be submitted for recording, at no expense to the Trust, the Trustee, the Delaware Trustee or the Depositor, in the appropriate public office for real property records, each Assignment referred to

in Sections 2.01(c) and (d) above and shall execute each original Assignment referred to in clause (c) above in the following form: "Citibank, N.A., as Trustee under applicable agreement, without recourse." In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Servicer, in its capacity as Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded. Notwithstanding the foregoing, the Assignments shall not be required to be completed and submitted for recording with respect to any Mortgage Loan if each Rating Agency does not require recordation in order for such Rating Agency to assign the initial ratings to the Class A Certificates, the Mezzanine Certificates and the Other NIM Notes and the initial shadow rating to the Insured NIM Notes, without giving effect to any insurance policy issued by the NIMS Insurer; provided, however, each such Assignment shall be submitted for recording by the Servicer, in its capacity as Seller, in the manner described above, at no expense to the Trust, the Trustee or the Delaware Trustee upon the earliest to occur of: (i) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (ii) the occurrence of a Servicer Event of Default, (iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (iv) the occurrence of a servicing transfer as described in Section 7.02 hereof and (v) if the Seller is not the Servicer and with respect to any one Assignment, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Servicer is unable to pay the cost of recording the Assignment, such expense shall be paid by the Trustee and shall be reimbursable to the Trustee as an Extraordinary Trust Fund Expense.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Depositor further agrees that it shall cause, within 30 Business Days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trust in accordance with this Agreement by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trust and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it shall not, and shall not permit the Servicer to, and the Servicer agrees that it shall not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

If any of the documents referred to in Sections 2.01(b), (c), (d) or (e) above (collectively, the "Recording Documents") has as of the Closing Date been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Servicer, in its capacity as the Seller, to deliver such Recording Documents shall be deemed to be satisfied upon (1) delivery to the Trustee (or the Custodian on behalf of the Trustee) of a copy of each such Recording Document certified by the Seller in the case of (x) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the Seller, delivery to the Trustee (or the Custodian on behalf of the Trustee) promptly upon receipt thereof, and in any event no later than one year after the Closing Date, of either the original or a copy of such Recording Document certified by the applicable public recording office to be a true and complete copy of the original. In instances where, due to a delay on the part of the recording office where any such Recording Documents have been delivered for recordation, the Recording Documents cannot be delivered to the Trustee (or the Custodian on behalf of the Trustee) within one year

after the Closing Date, the Servicer, in its capacity as the Seller, shall deliver to the Trustee (or the Custodian on behalf of the Trustee) within such time period an Officer's Certificate stating the date by which the Servicer, in its capacity as the Seller, expects to receive such Recording Documents from the applicable recording office.  In the event that Recording Documents have still not been received by the Servicer, in its capacity as the Seller, and delivered to the Trustee (or the Custodian on behalf of the Trustee) by the date specified in its previous Officer's Certificate delivered to the Trustee (or the Custodian on behalf of the Trustee), as the case may be, the Servicer, in its capacity as the Seller, shall deliver to the Trustee (or the Custodian on behalf of the Trustee) by such date an additional Officer's Certificate stating a revised date by which the Servicer, in its capacity as the Seller, expects to receive the applicable Recording Documents.  This procedure shall be repeated until the Recording Documents have been received by the Servicer, in its capacity as the Seller, and delivered to the Trustee (or the Custodian on behalf of the Trustee).  If the original lender's title insurance policy was not delivered pursuant to Section 2.01(f) above, the Servicer, in its capacity as the Seller, shall deliver or cause to be delivered to the Trustee (or the Custodian on behalf of the Trustee) promptly after receipt thereof, and in any event within 120 days after the Closing Date, the original lender's title insurance policy.  The Servicer, in its capacity as the Seller, shall deliver or cause to be delivered to the Trustee (or the Custodian on behalf of the Trustee) promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee (or the Custodian on behalf of the Trustee) are and shall be held by or on behalf of the Seller, the Depositor or the Servicer, as the case may be, in trust for the benefit of the Trust.  In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee (or the Custodian on behalf of the Trustee).  Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Servicer.

Notwithstanding any term hereof to the contrary, it is hereby expressly acknowledged and agreed that so long as there is a Custodian action on behalf of the Trustee, all Mortgage Files (including all documents comprising Mortgage Files) and all Recording Documents shall be delivered exclusively to the Custodian (unless otherwise expressly directed by the Trustee).

The Mortgage Loans permitted by the terms of this Agreement to be included in the Trust are limited to (i) the Mortgage Loans (which the Depositor acquired pursuant to the Mortgage Loan Purchase Agreement, which contains, among other representations and warranties, a representation and warranty of the Seller that no Mortgage Loan is a "high-cost" or "predatory" loan under any state or local law or regulation applicable to the originator), and (ii) Substitute Mortgage Loans (which, by definition as set forth herein and referred to in the Mortgage Loan Purchase Agreement, are required to conform to, among other representations and warranties, the representation and warranty of the Seller that no Substitute Mortgage Loan is a "high cost" or "predatory" loan under any state or local law or regulation applicable to the originator).  It is agreed and understood by the parties hereto that it is not intended that any mortgage loan be included in the Trust that is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, a "High Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, a "High Cost Home Loan" as

defined in the Kentucky high-cost loan statute effective June 24, 2003 (Ky. Rev. Stat. Section 360.100), or a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective January 1, 2005 (Ind. Code Ann. §§ 24-9-1 through 24-9-9) or a "High Cost Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Gen. Laws Ch. 183C. §§1 et seq.).

The Depositor shall file such financing statements, and the Depositor, the Servicer and the Trustee acting on behalf of the Trust at the direction of the Depositor shall, to the extent consistent with this Agreement, take such other actions as may be necessary to ensure that, if this Agreement were found to create a security interest in the Mortgage Pool Assets, such security interest would be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. In connection herewith, the Trust shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as in force in the relevant jurisdiction.

Section 2.02     <u>Acceptance of REMIC 1 by the Trustee</u>.

Subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, the Trustee or a Custodian on behalf of the Trustee, as applicable, acknowledges receipt of the documents referred to in Section 2.01 above and all other assets included in the definition of "REMIC 1" under clauses (i), (iii), (iv) and (vi) (to the extent of amounts deposited into the Distribution Account) and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and all such assets and such other assets included in the definition of "REMIC 1" in trust for the exclusive use and benefit of all present and future holders of REMIC 1 Regular Interests and the Class R-1 Interest.

The Trustee or the Custodian, as applicable, agrees, for the benefit of the holders of REMIC 1 Regular Interests and the Class R-1 Interest, to review each Mortgage File on or before the Closing Date, with respect to each Mortgage Loan and to certify to the Trustee, the NIMS Insurer, the Depositor and the Servicer in substantially the form attached hereto as Exhibit F-1 that, as to each Closing Date Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents constituting part of such Mortgage File (other than such documents described in Section 2.01(e)) required to be delivered to it pursuant to this Agreement are in its possession, (ii) such documents have been reviewed by the Trustee, the Custodian or the Washington Mutual Custodian, as applicable and are not mutilated, torn or defaced unless initialed by the related borrower and relate to such Mortgage Loan and (iii) based on the Trustee's examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (i), (ii), (ix), (xii), (xiv) (to the extent of the Periodic Rate Cap for the first Adjustment Date and subsequent Adjustment Dates) and (xvi) of the definition of "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage File.  It is herein acknowledged that, in conducting such review, neither the Trustee nor any Custodian is under any duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine whether they are genuine, complete, enforceable, or appropriate for the represented purpose (including with respect to Section 2.01(f), whether such title insurance policy (a) contains all necessary endorsements, (b) insures the priority of the Mortgage as a first or second lien or (c) whether the interest vested in the Mortgagor is a fee interest) or whether they have actually been

recorded or that they are other than what they purport to be on their face or (ii) to determine whether any Mortgage File should include any of the documents specified in clause (e) of Section 2.01; and the Trustee or the Custodian, as applicable, shall be entitled to assume that all signatures and endorsements appearing on any such document are genuine and duly authorized.

Prior to the first anniversary date of this Agreement, the Trustee shall deliver (or, with respect to the Mortgage Loans held by another Custodian, such Custodian shall deliver) to the Depositor, the Servicer and the NIMS Insurer a final certification in the form annexed hereto as Exhibit F-2 evidencing the completeness of the Mortgage Files, with any applicable exceptions noted thereon.

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee holding such Mortgage Files or any Custodian holding such Mortgage Files finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the Trustee shall so notify or such other Custodian shall notify the Depositor, the Seller, the NIMS Insurer and the Servicer.  In addition, upon the discovery by the Depositor, the Servicer or the Trustee of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

Section 2.03     <u>Cure, Repurchase or Substitution of Mortgage Loans by the Seller; Remedies for Breaches by Depositor or Servicer; Remedies for Breaches Relating to Prepayment Charges</u>.

(a)     Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, the Mortgage File or of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders (it being understood that (i) in the case of any such representation or warranty made to the knowledge or the best of knowledge of the Seller, as to which the Seller has no knowledge, without regard to the Seller's lack of knowledge with respect to the substance of such representation or warranty being inaccurate at the time it was made or (ii) with respect to the representation and warranty set forth in the last sentence of Section 6(xxxix), Section 6(xlvi), the first sentence of Section 6(xlvii), Section 6(lxi) and Section 6(lxiv) of the Mortgage Loan Purchase Agreement, a breach of any such representation or warranty shall in and of itself be deemed to materially and adversely affect the interest of the Certificateholders in the related Mortgage Loan), the Trustee or the Custodian (pursuant to the Custodial Agreement) shall promptly notify the Trustee (in the case of the Custodian), the Depositor, the Seller, the NIMS Insurer and the Servicer of such defect, missing document or breach and request that the Seller deliver such missing document or cure such defect or breach within 90 days from the date the Seller was notified of such missing document, defect or breach (except as described in Section 2.03(e)), and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Servicer (or, in accordance with Section 3.02(b), the Trustee) shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC 1 at the Purchase Price within 90 days after the date on which the Seller was notified (subject to Section 2.03(e))

of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement. The Purchase Price for the repurchased Mortgage Loan shall be deposited in the Collection Account, and the Trustee or a Custodian, as applicable, upon receipt of written certification from the Servicer of such deposit, shall release to the Seller or the Depositor, as applicable, the related Mortgage File, and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Seller or the Depositor, as applicable, shall furnish to it and as shall be necessary to vest in the Seller or the Depositor, as applicable, any Mortgage Loan released pursuant hereto. In furtherance of the foregoing, if the Seller or the Depositor, as applicable, is not a member of MERS and repurchases a Mortgage Loan which is registered on the MERS® System, the Servicer, in its capacity as Seller or the Depositor, as applicable, at its own expense and without any right of reimbursement, shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller or the Depositor, as applicable, and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations. Neither the Trustee nor any Custodian shall have any further responsibility with regard to such Mortgage File. In lieu of repurchasing any such Mortgage Loan as provided above, if so provided in the Mortgage Loan Purchase Agreement, the Seller or the Depositor, as applicable, may cause such Mortgage Loan to be removed from REMIC 1 (in which case it shall become a Reacquired Mortgage Loan) and substitute one or more Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(d). It is understood and agreed that the obligation of the Seller to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such omission, defect or breach available to the Certificateholders, the Trust, the Trustee on behalf of the Certificateholders, the Delaware Trustee and the NIMS Insurer.

(b)     Within 90 days of the earlier of discovery by the Depositor or receipt of notice by the Depositor of the breach of any representation or warranty of the Depositor set forth in Section 2.05 (other than subsection (ii) thereof) with respect to any Mortgage Loan, which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Depositor shall cure such breach in all material respects. Within 90 days of the earlier of discovery by the Depositor or receipt of notice by the Depositor of the breach the representation made by the Depositor set forth in Section 2.05(ii), the Depositor shall repurchase, or cause the repurchase at the Purchase Price set forth in Section 2.03(a) above or substitute, or cause the substitution of such Mortgage Loan with a Substitute Mortgage Loan in the manner and subject to the limitations set forth in Section 2.03(d), unless it has cured such breach in all material respects. It is understood and agreed that the obligation of the Depositor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Certificateholders, the Trust, the Trustee on behalf of the Certificateholders, the Delaware Trustee and the NIMS Insurer.

(c)     As promptly as practicable (and no later than 90 days) after the earlier of discovery by the Servicer or receipt of notice by the Servicer of the breach of any representation, warranty or covenant of the Servicer set forth in Section 2.04 which materially and adversely affects the value of any Mortgage Loan or the interests of the Certificateholders in any Mortgage Loan, the Servicer shall cure such breach in all material respects.

Promptly upon the earlier of discovery by the Servicer or receipt of notice by the Servicer of the breach of any representation, warranty or covenant of the Servicer set forth in Section 2.04(a)(vii) or (viii) which materially and adversely affects the interests of the Holders of the Class P Certificates to any Prepayment Charge, the Servicer shall cure such breach in all material respects.  If the representation made by the Servicer in its capacity as Seller in Section 2.04(a)(vii) is breached, the Servicer in its capacity as Seller shall pay into the Collection Account the amount of the scheduled Prepayment Charge, less any amount previously collected and deposited by, or paid by, the Servicer into the Collection Account; and if the covenant made by the Servicer in Section 2.04(a)(viii) is breached, the Servicer shall pay into the Collection Account the amount of the waived Prepayment Charge.  Payments by the Servicer into the Collection Account pursuant to this paragraph shall be made on the later of (i) the Servicer Remittance Date next following the earlier of discovery by the Servicer or receipt of notice by the Servicer of the breach of the related representation, warranty or covenant of the Servicer set forth in Section 2.04(a)(vii) or (viii) which materially and adversely affects the interests of the Holders of the Class P Certificates to any Prepayment Charge and (ii) the Servicer Remittance Date next following the Prepayment Period in which such breach occurred.

(d)    Any substitution of Substitute Mortgage Loans for Reacquired Mortgage Loans made pursuant to Section 2.03(a) or Section 2.03(b) shall be effected prior to the date which is two years after the Startup Date for REMIC 1.

As to any Reacquired Mortgage Loan for which the Seller or the Depositor substitutes a Substitute Mortgage Loan or Loans, such substitution shall be effected by the Seller or the Depositor, as applicable, by delivering to the Trustee (or, with respect to the Mortgage Loans held by another Custodian, to such Custodian) on behalf of the Trustee, for such Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2.01, together with an Officer's Certificate providing that each such Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Price (as described below), if any, in connection with such substitution.  The Trustee shall acknowledge or with respect to the Mortgage Loans held by another Custodian such other Custodian shall acknowledge receipt for such Substitute Mortgage Loan or Loans and, within ten Business Days thereafter, review such documents as specified in Section 2.02 and deliver to the Depositor, the Servicer and the NIMS Insurer, with respect to such Substitute Mortgage Loan or Loans, a certification substantially in the form attached hereto as Exhibit F-1, with any applicable exceptions noted thereon.  Within one year of the date of substitution, the Trustee shall deliver or with respect to the Mortgage Loans held by another Custodian, such other Custodian shall deliver to the Depositor, the Seller, the NIMS Insurer and the Servicer a certification substantially in the form of Exhibit F-2 hereto with respect to such Substitute Mortgage Loan or Loans, with any applicable exceptions noted thereon.  Monthly Payments due with respect to Substitute Mortgage Loans in the month of substitution are not part of REMIC 1 and will be retained by the substituting party.  For the month of substitution, distributions to Certificateholders will reflect the Monthly Payment due on such Reacquired Mortgage Loan on or before the Due Date in the month of substitution, and the substituting party shall thereafter be entitled to retain all amounts subsequently received in respect of such Reacquired Mortgage Loan.  The Trustee shall give or cause to be given written notice to the NIMS Insurer and the Certificateholders that such substitution has taken place, and the Servicer shall amend or cause to be amended the Mortgage Loan Schedule and, if applicable, the Prepayment Charge Schedule to reflect the removal of such Reacquired Mortgage Loan from the terms of this Agreement and the

substitution of the Substitute Mortgage Loan or Loans and shall deliver a copy of such amended Mortgage Loan Schedule and, if applicable, the Prepayment Charge Schedule to the NIMS Insurer and the Trustee.  Upon such substitution, such Substitute Mortgage Loan or Loans shall constitute part of the Mortgage Pool and shall be subject in all respects to the terms of this Agreement and the Mortgage Loan Purchase Agreement, including all applicable representations and warranties thereof included in the Mortgage Loan Purchase Agreement as of the date of substitution.

For any month in which the Seller or the Depositor substitutes one or more Substitute Mortgage Loans for one or more Reacquired Mortgage Loans, the Servicer will determine the amount (the "Substitution Price"), if any, by which the aggregate Purchase Price of all such Reacquired Mortgage Loans in Loan Group I or Loan Group II, respectively, exceeds the aggregate of the Stated Principal Balance of the Substitute Mortgage Loans that will become part of Loan Group I or Loan Group II, respectively, as of the date of substitution, together with one month's interest on such Stated Principal Balance at the applicable Net Mortgage Rate, plus all outstanding Advances and Servicing Advances with respect to such Reacquired Mortgage Loan. On the date of such substitution, the Seller or the Depositor, as applicable, will deliver or cause to be delivered to the Servicer for deposit in the Collection Account an amount equal to the Substitution Price, if any (which for federal income tax purposes will be treated as payment for the repurchase of that portion of the Reacquired Mortgage Loans), and the Trustee, upon receipt of the related Substitute Mortgage Loan or Loans (or acknowledgement of such receipt by another Custodian) and certification by the Servicer of such deposit, shall release or, if such Mortgage File is held by another Custodian, such Custodian shall release to the Seller or the Depositor, as applicable, the related Mortgage File or Files and the Trustee shall execute and deliver or, if such Mortgage File is held by another Custodian, such Custodian shall execute and deliver such instruments of transfer or assignment, without recourse, as the Seller or the Depositor shall deliver to it or such Custodian, as applicable, and as shall be necessary to vest therein any Reacquired Mortgage Loan released pursuant hereto.

In addition, the Servicer in its capacity as Seller or the Depositor, as applicable, shall obtain at its own expense and deliver to the NIMS Insurer and the Trustee an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on REMIC 1, created hereunder, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on contributions after the startup day under Section 860G(d)(1) of the Code, or (b) any Trust REMIC hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(e)     Upon discovery by the Depositor, the Seller, the Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two Business Days give written notice thereof to the other parties.  In connection therewith, the Servicer in its capacity as Seller shall repurchase or, subject to the limitations set forth in Section 2.03(d), substitute one or more Substitute Mortgage Loans for the affected Mortgage Loan within 90 days of the earlier of discovery or receipt of such notice with respect to such affected Mortgage Loan. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(a) and Section 2.03(d).  The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty.

Section 2.04    <u>Representations, Warranties and Covenants of the Servicer</u>.

(a)    The Servicer hereby represents, warrants and covenants to the Trustee, for the benefit of the Trustee and the Certificateholders, and to the Depositor, that as of the Closing Date or as of such date specifically provided herein:

(i)    The Servicer is a federal savings association, duly organized, validly existing and in good standing under the laws of the United States of America, and has all licenses necessary to carry on its business as now being conducted;

(ii)    The Servicer has the full power and authority to service each Mortgage Loan, to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary action on the part of the Servicer the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery thereof by the Depositor and the Trustee, constitutes a legal, valid and binding obligation of the Servicer, enforceable against the Servicer in accordance with its terms, except to the extent that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to the equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)    The execution and delivery of this Agreement by the Servicer, the servicing of the Mortgage Loans by the Servicer hereunder, the consummation by the Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Servicer and will not (A) result in a breach of any term or provision of the charter or by-laws of the Servicer or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Servicer of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Servicer; and the Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Servicer to perform its obligations under this Agreement or (y) the business, operations, financial condition, properties or assets of the Servicer taken as a whole;

(iv)    The Servicer is an approved seller/servicer for Fannie Mae or Freddie Mac in good standing and is a HUD approved mortgagee pursuant to Section 203 and Section 211 of the National Housing Act;

(v)    No litigation is pending against the Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Servicer to service the Mortgage Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)     No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of, or compliance by the Servicer with, this Agreement or the consummation by the Servicer of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(vii)     The information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms under applicable law upon the Mortgagor's voluntary principal prepayment (except to the extent that:  (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally; or (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment); provided that the representation, warranty and covenant contained in this clause (vii) is made by the Servicer only in its capacity as Seller;

(viii)     The Servicer will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and related Mortgage Loan and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default).   Notwithstanding the foregoing, the Servicer may waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the Mortgagor's default in making the Mortgage Loan payments;

(ix)     With respect to each Mortgage Loan, the Servicer will furnish, or cause to be furnished, information regarding the borrower credit file related to such Mortgage Loan to credit reporting agencies in compliance with the provisions of the Fair Credit Reporting Act and the applicable implementing regulations.   The Servicer will transmit full-file credit reporting data for each Mortgage Loan pursuant to Fannie Mae Guide Announcement 95-19 and that for each Mortgage Loan, the Servicer agrees it shall report one of the following statuses each month as follows:   new origination, current, delinquent (30-, 60-, 90-days, etc.), foreclosed, or charged-off; and

(x)     The Servicer (or a Sub-Servicer servicing the Mortgage Loans on its behalf) is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS.

(b)     It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee or a Custodian, as the case may be, and shall inure to the benefit of the Trust, the Trustee, the Depositor and the Certificateholders.   Upon discovery by any of the Depositor, the Servicer or the Trustee of a breach of any of the foregoing representations, warranties and covenants which materially and adversely affects the value of any Mortgage Loan, Prepayment

Charge or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice (but in no event later than two Business Days following such discovery) to the other of such parties.  The obligation of the Servicer set forth in Section 2.03(c) to cure breaches (or, in the case of (a)(vii) or (a)(viii) above, to pay a Servicer Prepayment Charge Payment Amount) shall constitute the sole remedy against the Servicer available to the Certificateholders, the Depositor, the NIMS Insurer, the Trust, the Delaware Trustee or the Trustee on behalf of the Certificateholders respecting a breach of the representations, warranties and covenants contained in this Section 2.04.  The preceding sentence shall not, however, limit any remedies available to the Certificateholders, the Depositor, the NIMS Insurer, the Trust, the Delaware Trustee or the Trustee on behalf of the Certificateholders, (i) pursuant to the Mortgage Loan Purchase Agreement signed by the Servicer in its capacity as Seller, respecting a breach of the representations, warranties and covenants of the Servicer in its capacity as Seller contained in the Mortgage Loan Purchase Agreement or (ii) pursuant to Section 7.01 hereof.

Section 2.05    <u>Representations and Warranties of the Depositor</u>.

The Depositor hereby represents, warrants and covenants to the Trustee, for the benefit of the Trustee and the Certificateholders, and to the Servicer, that as of the Closing Date or as of such date specifically provided herein:

(i)    Each of this Agreement and the Mortgage Loan Purchase Agreement constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity);

(ii)    Immediately prior to the sale and assignment by the Depositor to the Trust of each Mortgage Loan, the Depositor had good and marketable title to each Mortgage Loan subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

(iii)    As of the Closing Date, the Depositor has transferred all of its right, title and interest in the Mortgage Loans to the Trust;

(iv)    The Depositor is solvent and will not be made insolvent by the transfer of the Mortgage Loans.  The Depositor has not transferred the Mortgage Loans to the Trust with any intent to hinder, delay or defraud any of its creditors;

(v)    The Depositor has been duly incorporated and is validly existing as a corporation in good standing under the laws of Delaware, with full corporate power and authority to own its assets and conduct its business as presently being conducted;

(vi)    The Depositor is not in violation of its articles of incorporation or by-laws or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any contract, indenture, mortgage,

loan agreement, note, lease or other instrument to which the Depositor is a party or by which it or its properties may be bound, which default might result in any material adverse changes in the financial condition, earnings, affairs or business of the Depositor or which might materially and adversely affect the properties or assets, taken as a whole, of the Depositor;

(vii)    The execution, delivery and performance of this Agreement and the Mortgage Loan Purchase Agreement by the Depositor, and the consummation of the transactions contemplated hereby and thereby, do not and will not result in a material breach or violation of any of the terms or provisions of, or, to the knowledge of the Depositor, constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Depositor is a party or by which the Depositor is bound or to which any of the property or assets of the Depositor is subject, nor will such actions result in any violation of the provisions of the articles of incorporation or by-laws of the Depositor or, to the best of the Depositor's knowledge without independent investigation, any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Depositor or any of its properties or assets (except for such conflicts, breaches, violations and defaults as would not have a material adverse effect on the ability of the Depositor to perform its obligations under this Agreement or the Mortgage Loan Purchase Agreement);

(viii)    To the best of the Depositor's knowledge without any independent investigation, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body of the United States or any other jurisdiction is required for the issuance of the Certificates, or the consummation by the Depositor of the other transactions contemplated by this Agreement or the Mortgage Loan Purchase Agreement, except such consents, approvals, authorizations, registrations or qualifications as (a) may be required under State securities or blue sky laws, (b) have been previously obtained or (c) the failure of which to obtain would not have a material adverse effect on the performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement or the Mortgage Loan Purchase Agreement;

(ix)    There are no actions, proceedings or investigations pending before or, to the Depositor's knowledge, threatened by any court, administrative agency or other tribunal to which the Depositor is a party or of which any of its properties is the subject:  (a) which if determined adversely to the Depositor would have a material adverse effect on the business, results of operations or financial condition of the Depositor; (b) asserting the invalidity of this Agreement, the Mortgage Loan Purchase Agreement or the Certificates; (c) seeking to prevent the issuance of the Certificates or the consummation by the Depositor of any of the transactions contemplated by this Agreement or the Mortgage Loan Purchase Agreement, as the case may be; or (d) which might materially and adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement or the Mortgage Loan Purchase Agreement; and

(x)    The Depositor has the full power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by

this Agreement and has duly authorized by all necessary action on the part of the Depositor the execution, delivery and performance of this Agreement and this Agreement, assuming the due authorization, execution and delivery thereof by the parties thereto other than the Depositor, constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, except to the extent that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to the equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 2.06     <u>Issuance of Certificates</u>.

Concurrently with the transfers described in Section 2.08, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed, authenticated and delivered to or upon the written order of the Depositor, the Certificates in authorized denominations.

Section 2.07     <u>Reserved</u>.

Section 2.08     <u>Conveyance of REMIC Regular Interests and Acceptance of REMICs by the Trustee; Issuance of Certificates</u>.

(a)     The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust without recourse all the right, title and interest of the Depositor in and to the REMIC 1 Regular Interests for the benefit of REMIC 3, as the holder of the REMIC 2 Regular Interest, and the holder of the Class R-2 Interest. The Trustee acknowledges on behalf of the Trust receipt of the REMIC 1 Regular Interests (which are uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of REMIC 3, as the holder of the REMIC 2 Regular Interests, and the holder of the Class R-2 Interest. The interests evidenced by the Class R-2 Interest and the REMIC 2 Regular Interests constitute the entire beneficial ownership interest in REMIC 2. Pursuant to Section 3818 of the Statutory Trust Statute, the REMIC 1 Regular Interests shall not be cancelled and shall be held as treasury interests owned by the Trust. The REMIC 2 Regular Interests and the Class R-2 Interest shall together be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC 1 Regular Interests pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

(b)     In exchange for the REMIC 1 Regular Interests and, concurrently with the assignment to the Trust thereof, the Trustee on behalf of the Trust has delivered to or upon the order of the Depositor, the REMIC 2 Regular Interests (which are uncertificated) evidencing (together with the Class R-2 Interest) the entire beneficial ownership interest in REMIC 2.

(c)     The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust without recourse all the right, title and interest of the Depositor in and to the REMIC 2 Regular Interests for the benefit of the holders of the Certificates (other than the Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates), REMIC CX,

as holder of the Class C Interest, REMIC PX, as holder of the Class P Interest, REMIC SwapX, as holder of the Class Swap IO Interest, and the Class R-3 Interest.  The Trustee acknowledges on behalf of the Trust receipt of the REMIC 2 Regular Interests (which are uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Certificates (other than the Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates), REMIC CX, as holder of the Class C Interest, REMIC PX, as holder of the Class P Interest, REMIC SwapX, as holder of the Class Swap IO Interest, and the Class R-3 Interest.  The interests evidenced by the Class R-3 Interest, the Regular Certificates (other than the Class C Certificates and the Class P Certificates), and the REMIC 3 Regular Interests, constitute the entire beneficial ownership interest in REMIC 3.  Pursuant to Section 3818 of the Statutory Trust Statute, the REMIC 2 Regular Interests shall not be cancelled and shall be held as treasury interests owned by the Trust.  The REMIC 3 Regular Interests, the Certificates (other than the Class C Certificates, the Class P Certificates, the Class R Certificates, the Class R-CX Certificates and the Class R-PX Certificates), and the Class R-3 Interest shall together be a separate series of beneficial interests in the assets of the Trust consisting of the REMIC 2 Regular Interests pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

(d)     In exchange for the REMIC 2 Regular Interests and, concurrently with the assignment to the Trust thereof, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee on behalf of the Trust has executed, authenticated and delivered to or upon the order of the Depositor, the Regular Certificates (other than the Class C Certificates and the Class P Certificates) in authorized denominations evidencing (together with the Class R-3 Interest and the REMIC 3 Regular Interests) the entire beneficial ownership interest in REMIC 3.  The Trustee acknowledges on behalf of the Trust that it holds the Class FMR IO Interest for the benefit of the holders of the Class C Certificates.

(e)     The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust without recourse all the right, title and interest of the Depositor in and to the Class C Interest for the benefit of the holders of the Class C Certificates and the Class R-CX Certificates.  The Trustee acknowledges on behalf of the Trust receipt of the Class C Interest and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Class C Certificates and the Class R-CX Certificates.  The interests evidenced by the Class C Certificates, in respect of the regular interest in REMIC CX, and the Class R-CX Certificates constitute the entire beneficial ownership interest in REMIC CX.  Pursuant to Section 3818 of the Statutory Trust Statute, the Class C Interest shall not be cancelled and shall be held as treasury interests owned by the Trust. The Class C Certificates, in respect of the regular interest in REMIC CX, and the Class R-CX Certificates shall together be a separate series of beneficial interests in the assets of the Trust consisting of the Class C Interest pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

(f)     In exchange for the Class C Interest and, concurrently with the assignment to the Trust thereof, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee on behalf of the Trust has executed, authenticated and delivered to or upon the order of the Depositor, the Class C Certificates in authorized denominations evidencing (together with the Class R-CX Interest) the entire beneficial ownership interest in REMIC CX.

(g)     The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust without recourse all the right,

title and interest of the Depositor in and to the Class P Interest for the benefit of the holders of the Class P Certificates and the Class R-PX Certificates. The Trustee acknowledges on behalf of the Trust receipt of the Class P Interest and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Class P Certificates and the Class R-PX Certificates. The interests evidenced by the Class P Certificates and the Class R-PX Certificates constitute the entire beneficial ownership interest in REMIC PX. Pursuant to Section 3818 of the Statutory Trust Statute, the Class P Interest shall not be cancelled and shall be held as treasury interests owned by the Trust. The Class P Certificates and the Class R-PX Certificates shall together be a separate series of beneficial interests in the assets of the Trust consisting of the Class P Interest pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

(h)    In exchange for the Class P Interest and, concurrently with the assignment to the Trust thereof, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee on behalf of the Trust has executed, authenticated and delivered to or upon the order of the Depositor, the Class P Certificates in authorized denominations evidencing (together with the Class R-PX Interest) the entire beneficial ownership interest in REMIC PX.

(i)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trust without recourse all the right, title and interest of the Depositor in and to the Class Swap IO Interest for the benefit of the holders of the Class C Certificates and the Class R-SwapX Interest. The Trustee acknowledges on behalf of the Trust receipt of the Class Swap IO Interest and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Class C Certificates and the Class R-CX Certificates. The interests evidenced by the Class C Certificates, in respect of the regular interest in REMIC SwapX, and the Class R-CX Certificates constitute the entire beneficial ownership interest in REMIC SwapX. Pursuant to Section 3818 of the Statutory Trust Statute, the Class Swap IO Interest shall not be cancelled and shall be held as treasury interests owned by the Trust. The Class C Certificates, in respect of the regular interest in REMIC SwapX, and the Class R-SwapX Interest shall together be a separate series of beneficial interests in the assets of the Trust consisting of the Class Swap IO Interest pursuant to Section 3806(b)(2) of the Statutory Trust Statute.

(j)    In exchange for the Class Swap IO Interest and, concurrently with the assignment to the Trust thereof, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee on behalf of the Trust has executed, authenticated and delivered to or upon the order of the Depositor, the Class C Certificates in authorized denominations evidencing (together with the Class R-SwapX Interest) the entire beneficial ownership interest in REMIC SwapX.

(k)    Concurrently with the assignments and deliveries to the Trust and the acceptances by the Trustee on behalf of the Trust, pursuant to Section 2.01, Section 2.02 and this Section 2.08, the Trustee on behalf of the Trust, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed, authenticated and delivered to or upon the order of the Depositor (i) the Class R Certificates in authorized denominations evidencing the Class R-1 Interest, the Class R-2 Interest and the Class R-3 Interest, (ii) the Class R-CX Certificates evidencing the Class R-CX Interest and the R-SwapX Interest and (iii) the Class R-PX Certificates evidencing the Class R-PX Interest.

Section 2.09    Creation of the Trust.

The Trust was created pursuant to the Original Trust Agreement and is hereby continued. As set forth in the Original Trust Agreement, the Trust shall be known as "WaMu Asset Backed Certificates WaMu Series 2007-HE2 Trust." The purpose of the Trust is, and the Trust shall have the power and authority, to engage in the following activities, all as provided by and subject to the terms of this Agreement:

(i)    to acquire, hold, lease, manage, administer, control, invest, reinvest, operate and/or transfer all or part of the Trust Fund;

(ii)    to issue regular and residual interests in the Trust REMICs and the Certificates;

(iii)    to make distributions on regular and residual interests in the Trust REMICs and the Certificates; and

(iv)    to engage in such other activities, including entering into agreements, as are described in or required by the terms of this Agreement or as are necessary, suitable or convenient to accomplish the foregoing or incidental thereto.

Citibank, N.A. is hereby appointed as the trustee of the Trust, to have all the rights, duties and obligations of the Trustee with respect to the Trust expressly set forth hereunder, and Citibank, N.A. hereby accepts such appointment and the trust created hereby. Christiana Bank & Trust Company is hereby appointed as the Delaware Trustee of the Trust, to have all the rights, duties and obligations of the Delaware Trustee with respect to the Trust hereunder and Christiana Bank & Trust Company hereby accepts such appointment and the trust created hereby. It is the intention of the Depositor, the Servicer, the Trustee and the Delaware Trustee that the Trust constitute a statutory trust under the Statutory Trust Statute, that this Agreement constitute the governing instrument of the Trust, and that this Agreement amend and restate the Original Trust Agreement. The parties hereto acknowledge and agree that, prior to the execution and delivery hereof, the Delaware Trustee has filed the Certificate of Trust.

The assets of the Trust shall remain in the custody of the Trustee or the Custodian, on behalf of the Trust, and shall be owned by the Trust. Moneys to the credit of the Trust shall be held by the Trustee and invested as provided herein. All assets received and held by the Trust will not be subject to any right, charge, security interest, lien or claim of any kind in favor of either of the institution acting as Trustee or the institution acting as Delaware Trustee in its own right, or any Person claiming through either. Neither the Trustee nor the Delaware Trustee shall have the power or authority to transfer, assign, hypothecate, pledge or otherwise dispose of any of the assets of the Trust to any Person, except as permitted herein. No creditor of a beneficiary of the Trust, of the Trustee, of the Delaware Trustee, of the Servicer or of the Depositor shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the Trust, except in accordance with the terms of this Agreement.

Section 2.10    Restrictions on Activities of the Trust.

Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Trust, so long as any Certificates are outstanding, the Trust shall not,

and none of the Trustee, the Delaware Trustee, the Depositor or the Servicer shall knowingly cause the Trust to, do any of the following:

(i)      engage in any business or activity other than those set forth in Section 2.09;

(ii)     incur or assume any indebtedness except for such indebtedness that may be incurred by the Trust in connection with the execution or performance of this Agreement or any other agreement contemplated hereby;

(iii)    guarantee or otherwise assume liability for the debts of any other party;

(iv)     do any act in contravention of this Agreement or any other agreement contemplated hereby to which the Trust is a party;

(v)      do any act which would make it impossible to carry on the ordinary business of the Trust;

(vi)     confess a judgment against the Trust;

(vii)    possess or assign the assets of the Trust for other than a Trust purpose;

(viii)   cause the Trust to lend any funds to any entity, except as contemplated by this Agreement; or

(ix)     change the purposes and powers of the Trust from those set forth in this Agreement.

Section 2.11    <u>Separateness Requirements</u>.

Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Trust, so long as any Certificates are outstanding, the Trust shall perform the following:

(i)      except as expressly permitted by this Agreement or the Custodial Agreement, maintain its books, records, bank accounts and files separate from those of any other Person;

(ii)     except as expressly permitted by this Agreement, maintain its assets in its own separate name and in such a manner that it is not costly or difficult to segregate, identify, or ascertain such assets;

(iii)    consider the interests of the Trust's creditors in connection with its actions;

(iv)     hold itself out to creditors and the public as a legal entity separate and distinct from any other Person and correct any known misunderstanding regarding its separate identity and refrain from engaging in any activity that compromises the separate legal identity of the Trust;

Pooling and Servicing Agreement
[TPW: NYLEGAL:658370.7] 20984-00005   04/24/2007 08:46 PM

(v)     prepare and maintain separate records, accounts and financial statements in accordance with generally accepted accounting principles, consistently applied, and susceptible to audit.  To the extent it is included in consolidated financial statements or consolidated tax returns, such financial statements and tax returns will reflect the separateness of the respective entities and indicate that the assets of the Trust will not be available to satisfy the debts of any other Person;

(vi)     allocate and charge fairly and reasonably any overhead shared with any other Person;

(vii)     transact all business with affiliates on an arm's-length basis and pursuant to written, enforceable agreements;

(viii)     conduct business solely in the name of the Trust.  In that regard all written and oral communications of the Trust, including, without limitation, letters, invoices, purchase orders and contracts, shall be made solely in the name of the Trust;

(ix)     maintain a separate office through which its business shall be conducted, provided that such office may be an office of the Trustee, which office shall not be shared with the Depositor or any affiliates of the Depositor;

(x)     in the event that services have been or are in the future performed or paid by any Person on behalf of the Trust (other than the Trustee, the Delaware Trustee, the Servicer or the tax matters person as permitted herein), reimburse such Person, as applicable, for the commercially reasonable value of such services or expenses provided or incurred by such Person.  Accordingly, (i) the Trust shall reimburse such Person, as applicable, for the commercially reasonable value of such services or expenses provided or incurred by such Person; (ii) to the extent invoices for such services are not allocated and separately billed to the Trust, the amount thereof that was or is to be allocated and separately billed to the Trust was or will be reasonably related to the services provided to the Trust; and (iii) any other allocation of direct, indirect or overhead expenses for items shared between the Trust and any other Person, was or will be, to the extent practicable, allocated on the basis of actual use or value of services rendered or otherwise on a basis reasonably related to actual use or the value of services rendered;

(xi)     except as expressly permitted by this Agreement, not commingle its assets or funds with those of any other Person;

(xii)     except as expressly permitted by this Agreement, not assume, guarantee, or pay the debts or obligations of any other Person;

(xiii)     except as expressly permitted by this Agreement, not pledge its assets for the benefit of any other Person;

(xiv)     not hold out its credit or assets as being available to satisfy the obligations of others;

(xv)     pay its liabilities only out of its funds;

(xvi)     pay the salaries of its own employees, if any; and

(xvii)  cause the agents and other representatives of the Trust, if any, to act at all times with respect to the Trust consistently and in furtherance of the foregoing.

None of the Trustee, the Delaware Trustee, the Depositor or the Servicer shall take any action that is inconsistent with the purposes of the Trust or Section 2.10 or Section 2.11.  Neither the Depositor nor the Servicer shall direct the Trustee or the Delaware Trustee to take any action that is inconsistent with the purposes of the Trust or Section 2.10 or Section 2.11.

## ARTICLE III

## ADMINISTRATION AND SERVICING
## OF THE MORTGAGE LOANS

Section 3.01    <u>Servicer to Act as Servicer</u>.

The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interests of and for the benefit of the Certificateholders (as determined by the Servicer in its reasonable judgment) in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans in the local areas where the related Mortgaged Property is located but without regard to:

(i)     any relationship that the Servicer, any Sub-Servicer or any Affiliate of the Servicer or any Sub-Servicer may have with the related Mortgagor;

(ii)    the ownership or non-ownership of any Certificate by the Servicer or any Affiliate of the Servicer;

(iii)   the Servicer's obligation to make Advances or Servicing Advances; or

(iv)    the Servicer's or any Sub-Servicer's right to receive compensation for its services hereunder or with respect to any particular transaction.

To the extent consistent with the foregoing, the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes.  Subject only to the above-described servicing standards and the terms of this Agreement and of the respective Mortgage Loans, the Servicer shall have full power and authority, acting alone or through Sub-Servicers as provided in Section 3.02, to do or cause to be done any and all things in connection with such servicing and administration in accordance with policies and procedures generally accepted in the mortgage banking industry.  Without limiting the generality of the foregoing, the Servicer in its own name or in the name of a Sub-Servicer is hereby authorized and empowered by the Trust when the Servicer believes it appropriate in its best judgment in accordance with the servicing standards set forth above, to execute and deliver, on behalf of the Certificateholders, the Trust and the Trustee, and upon notice to the Trustee, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Mortgage Loans and the Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the

ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the Trust and the Certificateholders.  The Servicer shall service and administer the Mortgage Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby.  The Servicer shall also comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any standard hazard insurance policy.  Subject to Section 3.17, the Trustee on behalf of the Trust shall execute, at the written direction of the Servicer, and furnish to the Servicer and any Sub-Servicer such documents as are necessary or appropriate to enable the Servicer or any Sub-Servicer to carry out their servicing and administrative duties hereunder, and the Trustee on behalf of the Trust hereby grants to the Servicer and each Sub-Servicer a power of attorney to carry out such duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trust and the Certificateholders.  The Trustee on behalf of the Trust, at the direction of the Servicer, shall execute a separate power of attorney in favor of (and furnish such power of attorney to) the Servicer and/or each Sub-Servicer for the purposes described herein to the extent necessary or desirable to enable the Servicer to perform its duties hereunder.  The Trustee shall not be liable for the actions of the Servicer or any Sub-Servicers under such powers of attorney.

The Servicer further is authorized and empowered by the Trustee, on behalf of the Trust, in its own name or in the name of a Sub-Servicer, when the Servicer believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trust, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trust and its successors and assigns. Any reasonable expenses incurred in connection with the actions described in the preceding sentence or as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, shall be reimbursable to the Servicer by withdrawal from the Collection Account pursuant to Section 3.11.

Subject to Section 3.09 hereof, in accordance with the standards of the preceding paragraph, the Servicer shall advance or cause to be advanced funds as necessary for the purpose of effecting the timely payment of taxes and assessments on the Mortgaged Properties, which advances shall be Servicing Advances reimbursable in the first instance from collections on the related Mortgage Loans from the Mortgagors pursuant to Section 3.09, and further as provided in Section 3.11.  Any cost incurred by the Servicer or by Sub-Servicers in effecting the timely payment of taxes and assessments on a Mortgaged Property shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.

Notwithstanding anything in this Agreement to the contrary, the Servicer may not make any future advances with respect to a Mortgage Loan (except as provided in Section 4.04) and the Servicer shall not (i) permit any modification with respect to any Mortgage Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such Mortgage Loan (unless, as provided in Section 3.07, the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Servicer, reasonably foreseeable) or (ii) permit any modification, waiver or amendment of any term of any Mortgage Loan that would both (A) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the

Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any Trust REMIC to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or contributions after the startup day under the REMIC Provisions.

The Servicer may delegate its responsibilities under this Agreement; provided, however, that no such delegation shall release the Servicer from the responsibilities or liabilities arising under this Agreement.

With respect to each Mortgage Loan, the Servicer will furnish, or cause to be furnished, information regarding the borrower credit file related to such Mortgage Loan to credit reporting agencies in compliance with the provisions of the Fair Credit Reporting Act and the applicable implementing regulations.

Section 3.02    <u>Sub-Servicing Agreements Between the Servicer and Sub-Servicers</u>.

(a)    The Servicer may enter into Sub-Servicing Agreements provided (i) that such agreements would not result in a withdrawal or a downgrading by any Rating Agency of the ratings on any Class of Certificates, any of the Other NIM Notes or any of the Insured NIM Notes (without giving effect to any insurance policy issued by the NIMS Insurer), as evidenced by a letter to that effect delivered by each Rating Agency to the Depositor and the NIMS Insurer and (ii) that, except in the case of any Sub-Servicing Agreements the Servicer may enter into with Washington Mutual, Inc. or any Affiliate thereof, the NIMS Insurer shall have consented to such Sub-Servicing Agreements (which consent shall not be unreasonably withheld) with Sub-Servicers, for the servicing and administration of the Mortgage Loans. The Trustee on behalf of the Trust is hereby authorized to acknowledge, at the request of the Servicer, any Sub-Servicing Agreement that meets the requirements applicable to Sub-Servicing Agreements set forth in this Agreement and that is otherwise permitted under this Agreement.

Each Sub-Servicer shall be (i) authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable such Sub-Servicer to perform its obligations hereunder and under the related Sub-Servicing Agreement, (ii) an institution approved as a mortgagee by the Department of Housing and Urban Development pursuant to Section 203 of the National Housing Act of 1934, as amended, or an institution the deposit accounts in which are insured by the FDIC and (iii) a Fannie Mae approved mortgage servicer. Each Sub-Servicing Agreement must impose on the related Sub-Servicer requirements conforming to the provisions set forth in Section 3.08. The Servicer will examine each Sub-Servicing Agreement and will be familiar with the terms thereof. The terms of any Sub-Servicing Agreement will not be inconsistent with any of the provisions of this Agreement. The Servicer and the Sub-Servicers may enter into and make amendments to the Sub-Servicing Agreements or enter into different forms of Sub-Servicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of this Agreement, and that no such amendment or different form shall be made or entered into which could be reasonably expected to be materially adverse to the interests of the Certificateholders, without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any variation without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights from the provisions set forth in Section 3.08 relating to credits and charges to the Sub-Servicing Accounts or the timing and amount of remittances by the Sub-Servicers to the Servicer are conclusively deemed to be

inconsistent with this Agreement and therefore prohibited. The Servicer shall deliver to the NIMS Insurer and the Trustee copies of all Sub-Servicing Agreements, and any amendments or modifications thereof, promptly upon the Servicer's execution and delivery of such instruments.

(b)    As part of its servicing activities hereunder, the Servicer (except as otherwise provided in the last sentence of this paragraph), for the benefit of the Trust and the Certificateholders, shall enforce the obligations of each Sub-Servicer under the related Sub-Servicing Agreement and, subject to the last sentence of this paragraph, of the Seller under the Mortgage Loan Purchase Agreement including, without limitation, any obligation to make advances in respect of delinquent payments as required by a Sub-Servicing Agreement, or to purchase or otherwise remedy as contemplated herein a Mortgage Loan on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant, as described in Section 2.03(a).    Such enforcement, including, without limitation, the legal prosecution of claims, termination of Sub-Servicing Agreements, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans. The Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement, to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loans or (ii) from a specific recovery of costs, expenses or attorneys' fees against the party against whom such enforcement is directed.    Enforcement of the Mortgage Loan Purchase Agreement against the Seller shall be effected by the Servicer to the extent it is not the Seller, and otherwise by the Trustee, in accordance with the foregoing provisions of this paragraph.

Section 3.03    Successor Sub-Servicers.

The Servicer, with the written consent of the NIMS Insurer, shall be entitled to terminate any Sub-Servicing Agreement and the rights and obligations of any Sub-Servicer pursuant to any Sub-Servicing Agreement in accordance with the terms and conditions of such Sub-Servicing Agreement.  In the event of termination of any Sub-Servicer, all servicing obligations of such Sub-Servicer shall be assumed simultaneously by the Servicer without any act or deed on the part of such Sub-Servicer or the Servicer, and the Servicer either shall service directly the related Mortgage Loans or shall enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Section 3.02.

Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated by the Trustee without fee, in accordance with the terms of this Agreement, and the Trustee shall so terminate such Sub-Servicing Agreement at the direction of the NIMS Insurer in the event that the Servicer (or the Trustee, if then acting as Servicer) shall, for any reason, no longer be the Servicer (including termination due to a Servicer Event of Default).

Section 3.04    Liability of the Servicer.

Notwithstanding any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Servicer and a Sub-Servicer or reference to actions taken through a Sub-Servicer or otherwise, the Servicer shall remain obligated and primarily liable to the Trust and the Certificateholders for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such

obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from a Sub-Servicer and to the same extent and under the same terms and conditions as if the Servicer alone were servicing and administering the Mortgage Loans.  The Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification and no such indemnification shall be an expense of the Trust.

Section 3.05     No Contractual Relationship Between Sub-Servicers and the NIMS Insurer, the Trustee or Certificateholders.

Any Sub-Servicing Agreement that may be entered into and any transactions or services relating to the Mortgage Loans involving a Sub-Servicer in its capacity as such shall be deemed to be between the related Sub-Servicer and the Servicer alone, and the Trustee, the NIMS Insurer and the Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to such Sub-Servicer except as set forth in Section 3.06.  The Servicer shall be solely liable for all fees owed by it to any Sub-Servicer, irrespective of whether the Servicer's compensation pursuant to this Agreement is sufficient to pay such fees and such fees shall not be an expense of the Trust.

Section 3.06     Assumption or Termination of Sub-Servicing Agreements by Trustee.

In the event the Servicer shall for any reason no longer be the servicer (including by reason of the occurrence of a Servicer Event of Default), the Trustee or its designee shall thereupon assume all of the rights and obligations of the Servicer under each Sub-Servicing Agreement that the Servicer may have entered into, unless the Trustee, its designee or the successor servicer for the Trustee appointed pursuant to Section 7.02, elects to terminate any Sub-Servicing Agreement in accordance with its terms as provided in Section 3.03.  Upon such assumption, the Trustee, its designee or the successor servicer for the Trustee appointed pursuant to Section 7.02 shall be deemed, subject to Section 3.03, to have assumed all of the Servicer's interest therein and to have replaced the Servicer as a party to each Sub-Servicing Agreement to the same extent as if each Sub-Servicing Agreement had been assigned to the assuming party, except that (i) the Servicer shall not thereby be relieved of any liability or obligations under any Sub-Servicing Agreement that arose before it ceased to be the Servicer and (ii) none of the Trustee, its designee or any successor Servicer shall be deemed to have assumed any liability or obligation of the Servicer that arose before it ceased to be the Servicer.

The Servicer at its own expense and without reimbursement shall, upon request of the Trustee, deliver to the assuming party all documents and records relating to each Sub-Servicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by or on behalf of it, and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

Section 3.07     Collection of Certain Mortgage Loan Payments.

The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any applicable insurance policies, follow such collection procedures as it would follow with respect to mortgage loans comparable

to the Mortgage Loans and held for its own account.  Consistent with the foregoing, the Servicer may in its discretion (i) waive any late payment charge or, if applicable, any penalty interest, or (ii) extend the due dates for the Monthly Payments due on a Mortgage Note for a period of not greater than 180 days; provided that any extension pursuant to this clause (ii) shall not affect the amortization schedule of any Mortgage Loan for purposes of any computation hereunder, except as provided below.  In the event of any such arrangement pursuant to clause (ii) above, the Servicer shall make timely advances on such Mortgage Loan during such extension pursuant to Section 4.04 and in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements, subject to Section 4.04(d) pursuant to which the Servicer shall not be required to make any such advances that are Nonrecoverable Advances.  Notwithstanding the foregoing, in the event that any Mortgage Loan is in default or, in the judgment of the Servicer, such default is reasonably foreseeable, the Servicer, consistent with the standards set forth in Section 3.01, may also waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan, accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan (such payment, a "Short Pay-off") or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor; provided, that in the judgment of the Servicer, any such modification, waiver or amendment could reasonably be expected to result in collections and other recoveries in respect of such Mortgage Loans in excess of Net Liquidation Proceeds that would be recovered upon the foreclosure of, or other realization upon, such Mortgage Loan and provided further, that the NIMS Insurer's prior written consent shall be required for any modification, waiver or amendment if the aggregate number of outstanding Mortgage Loans which have been modified, waived or amended exceeds 5% of the number of Closing Date Mortgage Loans as of the Cut-off Date.

Section 3.08      Sub-Servicing Accounts.

In those cases where a Sub-Servicer is servicing a Mortgage Loan pursuant to a Sub-Servicing Agreement, such Sub-Servicer shall be required to establish and maintain one or more segregated accounts (collectively, the "Sub-Servicing Account").  The Sub-Servicing Account shall be an Eligible Account and shall be entitled "Citibank, N.A., as Trustee, in trust for registered Holders of WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust.  Such Sub-Servicer shall be required to deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after such Sub-Servicer's receipt thereof, all proceeds of Mortgage Loans received by such Sub-Servicer less its servicing compensation to the extent permitted by the related Sub-Servicing Agreement, and shall thereafter deposit such amounts in the Sub-Servicing Account, in no event more than two Business Days after the deposit of such funds into the clearing account.  Such Sub-Servicer shall thereafter be required to deposit all such proceeds in the Collection Account or remit such proceeds to the Servicer for deposit in the Collection Account not later than the Determination Date following the deposit of such amounts in the Sub-Servicing Account.  For purposes of this Agreement, the Servicer shall be deemed to have received payments on the Mortgage Loans when such Sub-Servicer receives such payments.

Section 3.09    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

The Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated accounts (the "Servicing Accounts").  Servicing Accounts shall be Eligible Accounts.  The Servicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, all collections from the Mortgagors (or related advances from Sub-Servicers) for the payment of taxes, assessments, hazard insurance premiums and comparable items for the account of the Mortgagors ("Escrow Payments") collected on account of the Mortgage Loans and shall thereafter deposit such Escrow Payments in the Servicing Accounts, in no event more than two Business Days after the deposit of such funds in the clearing account, for the purpose of effecting the payment of any such items as required under the terms of this Agreement.  Withdrawals of amounts from a Servicing Account may be made only to (i) effect payment of taxes, assessments, hazard insurance premiums, and comparable items; (ii) reimburse the Servicer (or a Sub-Servicer to the extent provided in the related Sub-Servicing Agreement) out of related collections for any advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.14 (with respect to hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) pay interest, if required and as described below, to Mortgagors on balances in the Servicing Account; (v) clear and terminate the Servicing Account upon the termination of the Servicer's obligations and responsibilities in respect of the Mortgage Loans under this Agreement in accordance with Article IX or (vi) recover amounts deposited in error.  As part of its servicing duties, the Servicer or Sub-Servicers shall pay to the Mortgagors interest on funds in Servicing Accounts, to the extent required by law and, to the extent that interest earned on funds in the Servicing Accounts is insufficient, to pay such interest from its or their own funds, without any reimbursement therefor.  To the extent that a Mortgage does not provide for Escrow Payments, the Servicer shall determine whether any such payments are made by the Mortgagor in a manner and at a time that avoids the loss of the Mortgaged Property due to a tax sale or the foreclosure of a tax lien.  The Servicer assumes full responsibility for the payment of all such bills within such time and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments; provided, however, that such advances shall constitute Servicing Advances.

Section 3.10    Collection Account and Distribution Account.

(a)    On behalf of the Trust, the Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trust and the Certificateholders.  On behalf of the Trust, the Servicer shall deposit or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, and shall thereafter deposit in the Collection Account, in no event more than two Business Days after the deposit of such funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it subsequent to the Cut-off Date (other than in respect of principal or interest on the related Mortgage Loans due on

or before the Cut-off Date or payments (other than Principal Prepayments) received by it on or prior to the Cut-off Date but allocable to a Due Period subsequent thereto):

> (i)     all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

> (ii)     all payments on account of interest (net of the related Servicing Fee and the related Prepayment Interest Excess) on each Mortgage Loan;

> (iii)     all Insurance Proceeds and Liquidation Proceeds (other than proceeds collected in respect of any particular REO Property and amounts paid by the Servicer in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 9.01) and all Gross Subsequent Recoveries;

> (iv)     any amounts required to be deposited pursuant to Section 3.12 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;

> (v)     any amounts required to be deposited by the Servicer pursuant to the second paragraph of Section 3.14(a) in respect of any blanket policy deductibles;

> (vi)     all proceeds of any Mortgage Loan repurchased or purchased in accordance with Section 2.03, Section 3.16(c) or Section 9.01 and all Servicer Prepayment Charge Payment Amounts required to be deposited in the Collection Account pursuant to Section 2.03;

> (vii)     all amounts representing the Substitution Price;

> (viii)     without duplication, all payments of claims received by the Servicer under the PMI Policy, if any; and

> (ix)     all Prepayment Charges collected by the Servicer.

For purposes of the immediately preceding sentence, the Cut-off Date with respect to any Substitute Mortgage Loan shall be deemed to be the date of substitution.

The aggregate amount deposited in the Collection Account on any date pursuant to this Section 3.10(a) may be net of any amounts permitted to be withdrawn by the Servicer from the Collection Account on such date pursuant to Section 3.11(a).

The foregoing requirements for deposit in the Collection Accounts shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, any Prepayment Interest Excess and payments in the nature of late payment charges, NSF fees, reconveyance fees, prepayment charges paid by Mortgagors upon voluntary partial prepayment of certain mortgage loans, assumption fees and other similar fees and charges (other than Prepayment Charges) need not be deposited by the Servicer in the Collection Account and shall, upon collection, belong to the Servicer as additional compensation for its servicing activities.  In the event the Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account, any provision herein to the contrary notwithstanding.

(b)     On behalf of the Trust, the Trustee shall establish and maintain one or more segregated accounts (such account or accounts, the "Distribution Account"), held in trust for the benefit of the Trust and the Certificateholders.  On behalf of the Trust, the Servicer shall deliver to the Trustee in immediately available funds for deposit on the same day in the Distribution Account on or before 3:00 p.m. New York time (i) on the Servicer Remittance Date, that portion of the Available Funds (calculated without regard to the references in the definition thereof to amounts that may be withdrawn from the Distribution Account) for the related Distribution Date then on deposit in the Collection Account, the amount of all Prepayment Charges on the Prepayment Charge Schedule collected by the Servicer in connection with any of the Mortgage Loans and any Servicer Prepayment Charge Payment Amounts then on deposit in the Collection Account and the amount of any funds reimbursable to an Advancing Person pursuant to Section 3.27 and (ii) on each Business Day as of the commencement of which the balance on deposit in the Collection Account exceeds $75,000 following any withdrawals pursuant to the next succeeding sentence, the amount of such excess, but only if the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account."  If the balance on deposit in the Collection Account exceeds $75,000 as of the commencement of business on any Business Day and the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account," the Servicer shall, on or before 3:00 p.m. New York time on such Business Day, withdraw from the Collection Account any and all amounts payable or reimbursable to the Depositor, the Servicer, the Trustee, the Seller or any Sub-Servicer pursuant to Section 3.11 and shall pay such amounts to the Persons entitled thereto.  In order to comply with its duties under the U.S.A. Patriot Act, the Trustee shall obtain and verify certain information and documentation from the parties hereto, including, but not limited to, each party's name, address, and other identifying information.

(c)     Funds in the Collection Account and the Distribution Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.12.  The Servicer shall give notice to the Trustee, the NIMS Insurer, the Depositor and the Rating Agencies of the location of the Collection Account maintained by it when established and prior to any change thereof.  The Trustee shall give notice to the Servicer, the NIMS Insurer, the Depositor and the Rating Agencies of the location of the Distribution Account when established and prior to any change thereof.

(d)     Funds held in the Collection Account at any time may be delivered by the Servicer to the Trustee for deposit in an account (which may be the Distribution Account and must satisfy the standards for the Distribution Account as set forth in the definition thereof) and for all purposes of this Agreement shall be deemed to be a part of the Collection Account; provided, however, that the Trustee shall have the sole authority to withdraw any funds held pursuant to this subsection (d).  In the event the Servicer shall deliver to the Trustee for deposit in the Distribution Account any amount not required to be deposited therein, it may at any time request that the Trustee withdraw, and the Trustee shall withdraw, such amount from the Distribution Account and remit to the Servicer any such amount, any provision herein to the contrary notwithstanding.  In addition, the Servicer shall deliver to the Trustee from time to time for deposit, and the Trustee shall so deposit, in the Distribution Account:

(i)     any Advances, as required pursuant to Section 4.04, unless delivered directly to the Trustee by an Advancing Person;

(ii)    any amounts required to be deposited pursuant to Section 3.23(d) or (f) in connection with any REO Property;

(iii)    any amounts to be paid by the Servicer in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 9.01;

(iv)    any amounts required to be deposited pursuant to Section 3.24 in connection with any Prepayment Interest Shortfalls; and

(v)    any Stayed Funds, as soon as permitted by the federal bankruptcy court having jurisdiction in such matters.

(e)    Promptly upon receipt of any Stayed Funds, whether from the Servicer, a trustee in bankruptcy, federal bankruptcy court or other source, the Trustee shall deposit such funds in the Distribution Account, subject to withdrawal thereof pursuant to Section 7.02(b) or as otherwise permitted hereunder.

Section 3.11    Withdrawals from the Collection Account and Distribution Account.

(a)    The Servicer shall, from time to time, make withdrawals from the Collection Account, for any of the following purposes or as described in Section 4.04, without priority:

(i)    to remit to the Trustee for deposit in the Distribution Account the amounts required to be so remitted pursuant to Section 3.10(b) or permitted to be so remitted pursuant to the first sentence of Section 3.10(d);

(ii)    subject to Section 3.16(d), to reimburse the Servicer for Advances, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Monthly Payments on the related Mortgage Loans in accordance with the provisions of Section 4.04;

(iii)    subject to Section 3.16(d), to pay the Servicer or any Sub-Servicer (a) any unpaid Servicing Fees or (b) any unreimbursed Servicing Advances with respect to each Mortgage Loan, but only to the extent of any Late Collections, Liquidation Proceeds, Insurance Proceeds, Gross Subsequent Recoveries or other amounts as may be collected by the Servicer from a Mortgagor, or otherwise received with respect to such Mortgage Loan;

(iv)    to pay to the Servicer as servicing compensation (in addition to the Servicing Fee) on the Servicer Remittance Date any interest or investment income earned on funds deposited in the Collection Account;

(v)    to pay to the Servicer, the Depositor, or the Seller, as the case may be, with respect to each Mortgage Loan that has previously been purchased or replaced pursuant to Section 2.03 or Section 3.16(c) all amounts received thereon subsequent to the date of purchase or substitution, as the case may be;

(vi)    to reimburse the Servicer for any Advance or Servicing Advance previously made which the Servicer has determined to be a Nonrecoverable Advance in accordance with the provisions of Section 4.04;

(vii)    to reimburse the Servicer or the Depositor for expenses incurred by or reimbursable to the Servicer or the Depositor, as the case may be, pursuant to Section 6.03;

(viii)    to reimburse the NIMS Insurer, the Servicer or the Trustee, as the case may be, for enforcement expenses reasonably incurred in respect of the breach or defect giving rise to the purchase obligation under Section 2.03 of this Agreement that were included in the Purchase Price of the Mortgage Loan, including any expenses arising out of the enforcement of the purchase obligation; provided, however, that the reimbursement to the NIMS Insurer pursuant to this clause shall be limited to an annual amount of $25,000;

(ix)    to pay, or to reimburse the Servicer for advances in respect of, expenses incurred in connection with any Mortgage Loan pursuant to Section 3.16(b);

(x)    to pay the PMI Insurer the PMI Insurer Fee; and

(xi)    to clear and terminate the Collection Account pursuant to Section 9.01.

The Servicer shall keep and maintain separate accounting, on an individual Mortgage Loan basis, for the purpose of justifying any withdrawal from the Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (ii), (iii), (v), (vi), (viii) and (ix) above. The Servicer shall provide written notification to the Trustee and the NIMS Insurer, on or prior to the next succeeding Servicer Remittance Date, upon making any withdrawals from the Collection Account pursuant to subclause (vii) above.

(b)    The Trustee shall, from time to time, make withdrawals from the Distribution Account, for any of the following purposes, without required priority:

(i)    to make distributions to Certificateholders and for deposit into the Reserve Fund, the Supplemental Interest Trust and the Final Maturity Reserve Trust in accordance with Section 4.01;

(ii)    to pay to itself amounts to which it is entitled pursuant to Section 8.05 or to pay any other Extraordinary Trust Fund Expenses;

(iii)    to pay to itself any interest income earned on funds deposited in the Distribution Account pursuant to Section 3.12(c);

(iv)    to reimburse itself pursuant to Section 7.02 or pursuant to Section 7.01 to the extent such amounts in Section 7.01 were not reimbursed by the Servicer;

(v)    to pay any amounts in respect of taxes pursuant to Section 10.01(g);

(vi)     to remit to the Servicer any amount deposited in the Distribution Account by the Servicer but not required to be deposited therein in accordance with Section 3.10(d);

(vii)     to pay to an Advancing Person reimbursements for Advances and/or Servicing Advances pursuant to Section 3.27;

(viii)     to clear and terminate the Distribution Account pursuant to Section 9.01; and

(ix)     to pay itself the Trustee Fees.

Section 3.12     Investment of Funds in the Interest Coverage Account, the Collection Account and the Distribution Account.

(a)     The Servicer may direct any depository institution maintaining the Collection Account and any REO Account (for purposes of this Section 3.12, an "Investment Account"), and the Trustee, in its individual capacity, may direct any depository institution maintaining the Distribution Account (for purposes of this Section 3.12, the Distribution Account is also an "Investment Account"), to invest the funds in such Investment Account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Trustee is the obligor thereon and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Trustee is the obligor thereon.  All such Permitted Investments shall be held to maturity, unless payable on demand.  Any investment of funds in an Investment Account shall be made in the name of the Trustee (in its capacity as such), or in the name of a nominee of the Trustee.  The Trustee shall be entitled to sole possession (except with respect to investment direction of funds held in the Interest Coverage Account, the Collection Account and any REO Account and any income and gain realized thereon) over each such investment, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Trustee or its agent, together with any document of transfer necessary to transfer title to such investment to the Trustee or its nominee.  In the event amounts on deposit in a Distribution Account are at any time invested in a Permitted Investment payable on demand, the Trustee shall:

(x)     consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)     demand payment of all amounts due thereunder promptly upon actual notice by a Responsible Officer of the Trustee that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)     All income and gain realized from the investment of funds deposited in the Interest Coverage Account, the Collection Account and any REO Account held by or on behalf of the Servicer shall be for the benefit of the Servicer in its individual capacity and shall be subject to its withdrawal in accordance with Section 3.11 or Section 3.23, as applicable.  The

Servicer shall deposit in the Interest Coverage Account, the Collection Account or any REO Account, as applicable, from its own funds, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(c)     All income and gain realized from the investment of funds deposited in the Distribution Account held by or on behalf of the Trustee shall be for the benefit of the Trustee and shall be subject to its withdrawal at any time.  The Trustee shall deposit in the Distribution Account, from its own funds, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such account immediately upon realization of such loss.

(d)     Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may, and subject to Section 8.01 and Section 8.02(a)(iii), upon the request of the Holders of Certificates representing more than 50% of the Voting Rights allocated to any Class of Certificates shall, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

Section 3.13     <u>Reserved</u>.

Section 3.14     <u>Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage</u>.

(a)     The Servicer shall cause to be maintained for each Mortgage Loan fire insurance with extended coverage on the related Mortgaged Property in an amount which is at least equal to the least of (i) the then current principal balance of such Mortgage Loan, (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis and (iii) the maximum insurable value of the improvements which are a part of such Mortgaged Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy.  The Servicer shall also cause to be maintained fire insurance with extended coverage on each REO Property in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Mortgage Loan at the time it became an REO Property, plus accrued interest at the Mortgage Rate and related Servicing Advances.  The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.  Any amounts to be collected by the Servicer under any such policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage or amounts to be released to the Mortgagor in accordance with the procedures that the Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the related Mortgage and Mortgage Note) shall be deposited in the Collection Account, subject to withdrawal pursuant to Section 3.11, if received in respect of a Mortgage Loan, or in the REO Account, subject to withdrawal pursuant to Section 3.23, if received in respect of an REO Property.  Any cost incurred by the Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.  It is understood and agreed

that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.  If the Mortgaged Property or REO Property is at any time in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards and flood insurance has been made available, the Servicer will cause to be maintained a flood insurance policy in respect thereof.  Such flood insurance shall be in an amount equal to the lesser of (i) the unpaid principal balance of the related Mortgage Loan and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of A:X or better in Best's Key Rating Guide (or such other rating that is comparable to such rating) insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section 3.14, it being understood and agreed that such policy may contain a deductible clause, in which case the Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with the first two sentences of this Section 3.14, and there shall have been one or more losses which would have been covered by such policy, deposit to the Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause.  In connection with its activities as administrator and servicer of the Mortgage Loans, the Servicer agrees to prepare and present, on behalf of itself and the Trust, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b)    The Servicer shall obtain (to the extent commercially available) and maintain fidelity bond and errors and omissions coverage acceptable to Fannie Mae or Freddie Mac with respect to its obligations under this Agreement, unless the Servicer or any of its Affiliates has obtained a waiver of such Fannie Mae or Freddie Mac requirements from either Fannie Mae or Freddie Mac.  The Servicer shall provide the Trustee and the NIMS Insurer (upon such party's reasonable request) with copies of any such insurance policies and fidelity bond.  The Servicer shall be deemed to have complied with this provision if an Affiliate of the Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Servicer.

Section 3.15    Enforcement of Due-On-Sale Clauses; Assumption Agreements.

The Servicer shall, to the extent it has knowledge of any conveyance or prospective conveyance of any Mortgaged Property by any Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however, that the Servicer shall not be required to take such action if in its sole business judgment the Servicer believes that the collections and other recoveries in respect of such Mortgage Loans could reasonably be expected to be maximized if the Mortgage Loan were not accelerated, and the Servicer shall not exercise any such rights if prohibited by law from doing so.  If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, or if any of the other conditions set forth in the proviso to the preceding sentence apply, the Servicer will enter into an assumption and modification agreement from or with the person to whom such

property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. The Servicer may also enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided that no such substitution shall be effective unless such person satisfies the underwriting criteria of the Servicer and has a credit risk rating at least equal to that of the original Mortgagor. In connection with any assumption, modification or substitution, the Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other mortgage loans owned solely by it. The Servicer shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable under the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy, or a new policy meeting the requirements of this Section is obtained. Any fee collected by the Servicer in respect of any assumption, modification or substitution of liability agreement will be retained by the Servicer as additional servicing compensation. In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Monthly Payment) may be amended or modified, except as otherwise required pursuant to the terms thereof. The Servicer shall notify the Trustee and the NIMS Insurer that any such substitution, modification or assumption agreement has been completed by forwarding to the Trustee (with a copy to the NIMS Insurer) the executed original of such substitution, modification or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or by the terms of the Mortgage Note or any assumption which the Servicer may be restricted by law from preventing, for any reason whatever. For purposes of this Section 3.15, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

Section 3.16    Realization Upon Defaulted Mortgage Loans.

(a)    The Servicer shall use reasonable efforts consistent with the servicing standard set forth in Section 3.01 to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. The Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that such costs and expenses will constitute and be recoverable as Servicing Advances by the Servicer as contemplated in Section 3.11 and Section 3.23. The foregoing is subject to the provision that, in any case in which Mortgaged Property shall have suffered damage from an Uninsured Cause, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its sole and absolute discretion that such restoration will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself for such expenses.

(b)     Notwithstanding the foregoing provisions of this Section 3.16 or any other provision of this Agreement, with respect to any Mortgage Loan as to which the Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property, the Servicer shall not, on behalf of the Trust, either (i) obtain title to such Mortgaged Property as a result of or in lieu of foreclosure or otherwise or (ii) otherwise acquire possession of, or take any other action with respect to, such Mortgaged Property, if, as a result of any such action, the Trustee, the Trust, the Trust Fund or the Certificateholders would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the Servicer has also previously determined, based on its reasonable judgment and a report prepared by an Independent Person who regularly conducts environmental audits using customary industry standards, that:

(1)     such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Trust Fund to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

(2)     there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are present for which such action could be required, that it would be in the best economic interest of the Trust Fund to take such actions with respect to the affected Mortgaged Property.

Notwithstanding the foregoing, with respect to the Mortgage Loans, if such environmental audit reveals, or if the Servicer has knowledge or notice, that the Mortgaged Property securing the Mortgage Loan contains such wastes or substances or is within one mile of the site of such wastes or substances, the Servicer shall not foreclose or accept a deed in lieu of foreclosure without the prior written consent of the NIMS Insurer.

The cost of the environmental audit report contemplated by this Section 3.16 shall be advanced by the Servicer, subject to the Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.  It is understood by the parties hereto that any such advance will constitute a Servicing Advance.

If the Servicer determines, as described above, that it is in the best economic interest of the Trust Fund to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes or petroleum-based materials affecting any such Mortgaged Property, then the Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund.  The cost of any such compliance, containment, cleanup or remediation shall be advanced by the Servicer, subject to the Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders

to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans. It is understood by the parties hereto that any such advance will constitute a Servicing Advance.

(c)     The Holder of the Class C Certificates (except if such Holder is the Seller or any of its Affiliates) may at its option purchase from REMIC 1 any Mortgage Loan or related REO Property that is 90 days or more delinquent or that has been otherwise in default for 90 days or more, which such Holder determines in good faith will otherwise become subject to foreclosure proceedings (evidence of such determination to be delivered in writing to the Trustee prior to purchase), at a price equal to the Purchase Price; provided, however, that the Holder of the Class C Certificates shall purchase any such Mortgage Loans or related REO Properties on the basis of delinquency or default, purchasing first the Mortgage Loans or related REO Properties that became delinquent or otherwise in default on an earlier date. For the avoidance of doubt, the Holder of the Class C Certificates in exercising its right to purchase Mortgage Loans pursuant to this Section 3.16(c) shall not be subject to any requirement of this Article III (other than the requirements of this Section 3.16(c)). In the event the Holder of the Class C Certificates does not exercise its option to purchase from REMIC 1 any such Mortgage Loan or related REO Property, the NIMS Insurer shall be entitled to purchase such Mortgage Loan or related REO Property; provided, however, that the NIM Insurer shall purchase any such Mortgage Loans or related REO Properties on the basis of delinquency or default, purchasing first the Mortgage Loans or related REO Properties that became delinquent or otherwise in default on an earlier date. The Purchase Price for any Mortgage Loan or related REO Property purchased hereunder shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Servicer of such deposit, shall release or cause to be released to the Holder of the Class C Certificates or the NIMS Insurer, as applicable, the related Mortgage File and the Trustee, on behalf of the Trust, shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Holder of the Class C Certificates or the NIMS Insurer, as applicable, shall furnish and as shall be necessary to vest in the Holder of the Class C Certificates or the NIMS Insurer, as applicable, title to any Mortgage Loan or related REO Property released pursuant hereto. For so long as the indenture trustee under the Indenture is the Holder of the Class C Certificate, the holder (the "Residual NIM Holder") of the subordinate note, the owner trust certificate or another instrument representing the right to receive the proceeds of the trust estate securing payments on the NIM Notes after all of the NIM Notes have been paid off shall be deemed to be the "Holder of the Class C Certificates" for purposes of this Section 3.16(c). The Trustee shall request from the Residual NIM Holder a certificate substantially in the form of Exhibit G attached hereto. The Trustee may conclusively rely upon and shall be fully protected in acting or refraining from acting based on such certificate.

(d)     Proceeds received (other than any prepayment charges or premiums received) in connection with any Final Recovery Determination, as well as any recovery resulting from a partial collection of Insurance Proceeds, Liquidation Proceeds or Gross Subsequent Recoveries, in respect of any Mortgage Loan, will be applied in the following order of priority: _first_, to reimburse the Servicer or any Sub-Servicer for any related unreimbursed Servicing Advances and Advances, pursuant to Section 3.11(a)(ii) or (a)(iii); _second_, to accrued and unpaid interest on the Mortgage Loan, to the date of the Final Recovery Determination, or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery Determination; and _third_, as a recovery of principal of the Mortgage Loan. If the amount of the recovery so allocated to interest is less than the full amount

of accrued and unpaid interest due on such Mortgage Loan, the amount of such recovery will be allocated by the Servicer as follows:  first, to unpaid Servicing Fees; and second, to the balance of the interest then due and owing.  The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Servicer or any Sub-Servicer pursuant to Section 3.11(a)(iii).

(e)     The Servicer may (but is not obligated to) enter into a special servicing agreement with an unaffiliated holder of a 100% Percentage Interest of the most junior Class of the Mezzanine Certificates, subject to each Rating Agency's acknowledgment that the ratings of the Class A Certificates, the Mezzanine Certificates and the Other NIM Notes and the initial shadow rating to the Insured NIM Notes, without giving effect to any insurance policy issued by the NIMS Insurer, in each case, in effect immediately prior to the entering into such agreement would not be qualified, downgraded or withdrawn and none of the Class A Certificates, the Mezzanine Certificates or the NIM Notes would be placed on credit review status (except for possible upgrading) as a result of such agreement.  Any such agreement may contain provisions whereby such Holder may (i) instruct the Servicer to commence or delay foreclosure proceedings with respect to delinquent Mortgage Loans and will contain provisions for the deposit of cash with the Servicer by the Holder that would be available for distribution to Certificateholders if Liquidation Proceeds are less than they otherwise may have been had the Servicer acted in accordance with its normal procedures, (ii) purchase delinquent Mortgage Loans from the Trust immediately prior to the commencement of foreclosure proceedings at a price equal to the Purchase Price, and/or (iii) assume all of the servicing rights and obligations with respect to delinquent Mortgage Loans so long as such Holder (A) meets the requirements for a Sub-Servicer set forth in Section 3.02(a), (B) will service such Mortgage Loans in accordance with this Agreement and (C) the Servicer has the right to transfer such servicing rights without the payment of any compensation to a Sub-Servicer.

Section 3.17     Trustee to Cooperate; Release of Mortgage Files.

(a)     Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full shall be escrowed in a manner customary for such purposes, the Servicer will promptly notify the Trustee and the applicable Custodian holding the related Mortgage File by a certification in the form of Exhibit E-2 (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.10 have been or will be so deposited) of a Servicing Representative and shall request delivery to it of the related Mortgage File.  Upon receipt of such certification and request, the Trustee or such Custodian, as applicable, shall promptly release the related Mortgage File to the Servicer and the Servicer is authorized to cause the removal from the registration on the MERS® System of any such Mortgage Loan, if applicable.  No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account or the Distribution Account.

(b)     From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan, including, for this purpose, collection under any insurance policy relating to the Mortgage Loans, the Trustee or the applicable Custodian shall, upon request of the Servicer and delivery to the Trustee or the applicable Custodian of a Request for Release in the form of Exhibit E-l, release the related Mortgage File to the Servicer, and the Trustee or the applicable Custodian, on behalf of the Trustee, shall, at the direction of the Servicer, execute such documents (each as prepared and provided to the Trustee by the Servicer) as shall be necessary

to the prosecution of any such proceedings and the Servicer shall retain such Mortgage File in trust for the benefit of the Certificateholders.  Such Request for Release shall obligate the Servicer to return each and every document previously requested from the Mortgage File to the Trustee or the applicable Custodian when the need therefor by the Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Collection Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Servicer has delivered to the Trustee or the applicable Custodian a certificate of a Servicing Representative certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery.  Upon receipt of a certificate of a Servicing Representative stating that such Mortgage Loan was liquidated and that all amounts received or to be received in connection with such liquidation that are required to be deposited into the Collection Account have been so deposited, or that such Mortgage Loan has become an REO Property, a copy of the Request for Release shall be released by the Trustee or the applicable Custodian to the Servicer or its designee.

(c)    At the direction of the Servicer and upon written certification of a Servicing Representative, each of the Trustee or the applicable Custodian, on behalf of the Trust, shall execute and deliver to the Servicer any court pleadings, requests for trustee's sale or other documents (each as prepared and provided to the Trustee by the Servicer) reasonably necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity, or shall execute and deliver to the Servicer a power of attorney sufficient to authorize the Servicer or a Sub-Servicer to execute such documents on its behalf, provided that each of the Trustee or the applicable Custodian, on behalf of the Trust, shall be obligated to execute the documents identified above if necessary to enable the Servicer or a Sub-Servicer to perform their respective duties hereunder or under the Sub-Servicing Agreement.  The Trustee shall have no liability for the Servicer's use or misuse of any such power of attorney.  Each such certification shall include a request that such pleadings or documents be executed by the Trustee or the applicable Custodian and a statement as to the reason such documents or pleadings are required.

(d)    If any Mortgage Loan is repurchased, substituted or purchased in accordance with Section 2.03, Section 3.16(c) or Section 9.01, the Trustee, on behalf of the Trust, shall execute and deliver the Mortgage Loan Assignment Agreement in the form of Exhibit E-3 with respect to such Mortgage Loan, transferring such Mortgage Loan to the Person entitled thereto pursuant to such Section 2.03, Section 3.16(c) or Section 9.01, as applicable.

Section 3.18    Servicing Compensation.

As compensation for the activities of the Servicer hereunder, the Servicer shall be entitled to the Servicing Fee with respect to each Mortgage Loan payable solely from payments of interest in respect of such Mortgage Loan, subject to Section 3.24.  In addition, the Servicer shall be entitled to recover unpaid Servicing Fees out of Late Collections, Insurance Proceeds, Liquidation Proceeds or Gross Subsequent Recoveries to the extent permitted by Section 3.11(a)(iii) and out of amounts derived from the operation and sale of an REO Property

to the extent permitted by Section 3.23. The right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Servicer's responsibilities and obligations under this Agreement; provided, however, that the Servicer may pay from the Servicing Fee any amounts due to a Sub-Servicer pursuant to a Sub-Servicing Agreement entered into under Section 3.02.

Additional servicing compensation in the form of Prepayment Interest Excess, prepayment premiums or charges in connection with voluntary Principal Prepayments in part, assumption or modification fees, late payment charges, NSF fees, reconveyance fees and other similar fees and charges (other than Prepayment Charges) shall be retained by the Servicer only to the extent such fees or charges are received by the Servicer. The Servicer shall also be entitled pursuant to Section 3.11(a)(iv) to withdraw from the Collection Account, and pursuant to Section 3.23(b) to withdraw from any REO Account, as additional servicing compensation, interest or other income earned on deposits therein, subject to Section 3.12. The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including premiums for the insurance required by Section 3.14, to the extent such premiums are not paid by the related Mortgagors or by a Sub-Servicer, it being understood however, that payment of such premiums by the Servicer shall constitute Servicing Advances and servicing compensation of each Sub-Servicer, and to the extent provided herein and in Section 8.05, the fees, expenses and indemnities of the Trustee) and shall not be entitled to reimbursement therefor except as specifically provided herein.

Section 3.19    Reports to the Trustee; Collection Account Statements.

Not later than fifteen days after each Distribution Date, the Servicer shall forward to the Trustee, the NIMS Insurer and the Depositor a statement prepared by the Servicer setting forth the status of the Collection Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the aggregate amount of deposits into and withdrawals from the Collection Account of each category of deposit specified in Section 3.10(a) and each category of withdrawal specified in Section 3.11. Such statement may be in the form of the then current Fannie Mae Monthly Accounting Report for its Guaranteed Mortgage Pass-Through Program with appropriate additions and changes, and shall also include information as to the aggregate of the outstanding principal balances of all of the Mortgage Loans as of the last day of the calendar month immediately preceding such Distribution Date. Copies of such statement shall be provided by the Trustee to any Certificateholder and to any Person identified to the Trustee as a prospective transferee of a Certificate, upon request at the expense of the requesting party, provided such statement is delivered by the Servicer to the Trustee.

Section 3.20    Annual Statement as to Compliance.

The Servicer shall deliver to the Trustee, the Depositor, the NIMS Insurer and each Rating Agency, not later than March 15 of each calendar year beginning in the year following the year of execution of this Agreement through and including the calendar year in which a Form 15 Suspension Notice is filed with respect to the Trust and April 30 of each calendar year thereafter, an Officer's Certificate (an "Annual Statement of Compliance") stating that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement or other applicable servicing agreement, if any, has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on

such review, the Servicer has fulfilled all of its obligations under this Agreement or other applicable servicing agreement, if any, in all material respects throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.  The Servicer shall deliver a similar Annual Statement of Compliance by any Sub-Servicer to which the Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans, to the Trustee and the Depositor as described above as and when required with respect to the Servicer.  Copies of any such statement shall be provided by the Trustee to any Certificateholder and to any Person identified to the Trustee as a prospective transferee of a Certificate, upon the request and at the expense of the requesting party, provided that such statement is delivered by the Servicer to the Trustee.

Section 3.21     <u>Assessments of Compliance and Attestation Reports</u>.

(a)     Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, the Servicer shall deliver to the Depositor on or before March 15 of each calendar year beginning in the year following the year of execution of this Agreement prior to and including the calendar year in which Form 15 Suspension Notice is filed with respect to the Trust and April 30 of each calendar year thereafter, a report regarding the Servicer's assessment of compliance (an "Assessment of Compliance") with the servicing criteria during the preceding calendar year.  The Assessment of Compliance must be reasonably satisfactory to the Depositor, and as set forth in Regulation AB, the Assessment of Compliance must contain the following:

(i)     A statement by the Servicer of its responsibility for assessing compliance with the servicing criteria applicable to the Servicer;

(ii)     A statement by the Servicer that it used the servicing criteria applicable to it, including at the minimum those that are specified on Exhibit N hereto, and which will also be attached to the Assessment of Compliance, to assess compliance with the servicing criteria applicable to the Servicer;

(iii)     An assessment by the Servicer of the Servicer's compliance with the applicable servicing criteria for the period consisting of the preceding calendar year, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Servicer, that are backed by the same asset type as the Mortgage Loans;

(iv)     A statement that a registered public accounting firm has issued an attestation report on the Servicer's Assessment of Compliance for the period consisting of the preceding calendar year; and

(v)     A statement as to which of the Servicing Criteria, if any, are not applicable to the Servicer, which statement shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Servicer, that are backed by the same asset type as the Mortgage Loans.

(b)     On or before March 15 of each calendar year beginning in the year following the year of execution of this Agreement prior to and including the calendar year in which Form 15 Suspension Notice is filed with respect to the Trust and April 30 of each calendar

year thereafter, the Servicer shall furnish to the Depositor a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the Servicer, as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

(c)     The Servicer shall cause any Sub-Servicer to which the Servicer delegated any of its responsibilities with respect to the Mortgage Loans, and each subcontractor determined by the Servicer to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB to which the Servicer delegated any of its responsibilities with respect to the Mortgage Loans, to deliver to the Trustee and the Depositor an Assessment of Compliance and Attestation Report as and when provided above.

(d)     Such Assessment of Compliance, as to any Sub-Servicer, shall at a minimum address each of the servicing criteria applicable to it, including at the minimum those that are specified on Exhibit N hereto which are indicated as applicable to any "primary servicer." Notwithstanding the foregoing, as to any subcontractor, an Assessment of Compliance is not required to be delivered unless it is required as part of a Form 10-K with respect to the Trust.

(e)     The Trustee and the Custodian shall also provide to the Depositor an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the servicing criteria applicable to it, including at the minimum (i) in the case of the Trustee those that are specified on Exhibit N hereto which are indicated as applicable to the "trustee" or (ii) in the case of the Custodian, as provided in the Custodial Agreement.

Section 3.22     <u>Access to Certain Documentation</u>.

The Servicer shall provide to the Office of Thrift Supervision, the FDIC and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificateholder access to the documentation regarding the Mortgage Loans serviced by the Servicer under this Agreement, as may be required by applicable laws and regulations. Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Servicer designated by it. In addition, access to the documentation regarding the Mortgage Loans serviced by the Servicer under this Agreement sufficient to permit the Certificateholder to comply with applicable regulations of the Office of Thrift Supervision, the FDIC or any other federal or state banking or insurance regulatory authority with respect to investment in the Certificates will be provided to any Certificateholder that is a savings and loan association, bank or insurance company, upon reasonable request during normal business hours at the offices of the Servicer designated by it at the expense of the Person requesting such access.

Section 3.23     <u>Title, Management and Disposition of REO Property</u>.

(a)     The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, on behalf of the Trust. The Servicer, on behalf of REMIC 1 (and on behalf of the Trust), shall sell any REO Property as soon as practicable and, in any event, shall either sell any REO Property before the close of the third taxable year after the year

REMIC 1 acquires ownership of such REO Property for purposes of Section 860G(a)(8) of the Code or request from the Internal Revenue Service, no later than 60 days before the day on which the three-year grace period would otherwise expire, an extension of the three-year grace period, unless the Servicer shall have delivered to the Trustee, the NIMS Insurer and the Depositor an Opinion of Counsel, addressed to the Trustee, the NIMS Insurer and the Depositor, to the effect that the holding by REMIC 1 of such REO Property subsequent to three years after its acquisition will not result in the imposition on any Trust REMIC of taxes on "prohibited transactions" thereof, as defined in Section 860F of the Code, or cause any Trust REMIC to fail to qualify as a REMIC under Federal law at any time that any Certificates are outstanding.  If an extension of the three-year period is granted, the Servicer shall sell the related REO Property no later than 60 days prior to the expiration of such extension period.  The Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by any Trust REMIC of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC Provisions.

(b)     The Servicer shall segregate and hold all funds collected and received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall establish and maintain, or cause to be established and maintained, with respect to REO Properties an account held in trust for the Trust (the "REO Account"), which shall be an Eligible Account.  The Servicer may allow the Collection Account to serve as the REO Account, subject to separate ledgers for each REO Property.  The Servicer may retain or withdraw any interest income paid on funds deposited in the REO Account.

(c)     The Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property as are consistent with the manner in which the Servicer manages and operates similar property owned by the Servicer or any of its Affiliates, all on such terms and for such period as the Servicer deems to be in the best interests of Certificateholders.  In connection therewith, the Servicer shall deposit, or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof and shall thereafter deposit in the REO Account, in no event more than two Business Days after the deposit of such funds into the clearing account, all revenues received by it with respect to an REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Property including, without limitation:

(i)     all insurance premiums due and payable in respect of such REO Property;

(ii)     all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon; and

(iii)     all costs and expenses necessary to maintain such REO Property.

To the extent that amounts on deposit in the REO Account with respect to an REO Property are insufficient for the purposes set forth in clauses (i) through (iii) above with respect to such REO Property, the Servicer shall advance from its own funds as Servicing Advances such amount as is necessary for such purposes if, but only if, the Servicer would make such advances if the Servicer owned the REO Property and if such Servicing Advance would not constitute a Nonrecoverable Advance.

Notwithstanding the foregoing, neither the Servicer nor the Trustee shall:

(i)     authorize the Trust to enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

(ii)    authorize any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

(iii)   authorize any construction on any REO Property, other than construction permitted under Section 856(e)(4)(B) of the Code; or

(iv)    authorize any Person to Directly Operate any REO Property on any date more than 90 days after its date of acquisition by the Trust;

unless, in any such case, the Servicer has obtained an Opinion of Counsel (the cost of which shall constitute a Servicing Advance), a copy of which shall be provided to the NIMS Insurer and the Trustee, to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by REMIC 1, in which case the Servicer may take such actions as are specified in such Opinion of Counsel.

The Servicer may contract with any Independent Contractor for the operation and management of any REO Property, provided that:

(i)     the terms and conditions of any such contract shall not be inconsistent herewith;

(ii)    any such contract shall require, or shall be administered to require, that the Independent Contractor pay all costs and expenses incurred in connection with the operation and management of such REO Property, including those listed above, and remit all related revenues (net of such costs and expenses) to the Servicer as soon as practicable, but in no event later than thirty days following the receipt thereof by such Independent Contractor;

(iii)   none of the provisions of this Section 3.23(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Servicer of any of its duties and obligations to the Trustee on behalf of the Certificateholders with respect to the operation and management of any such REO Property; and

(iv)    the Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, irrespective of whether the Servicer's compensation pursuant to Section 3.18 is sufficient to pay such fees; provided, however, that to the extent that any payments made by such Independent Contractor would constitute Servicing Advances if made by the Servicer, such amounts shall be reimbursable as Servicing Advances made by the Servicer.

(d)    In addition to the withdrawals permitted under Section 3.23(c), the Servicer may from time to time make withdrawals from the REO Account for any REO Property: (i) to pay itself or any Sub-Servicer unpaid Servicing Fees in respect of the related Mortgage Loan; and (ii) to reimburse itself or any Sub-Servicer for unreimbursed Servicing Advances and Advances made in respect of such REO Property or the related Mortgage Loan. On the Servicer Remittance Date, the Servicer shall withdraw from each REO Account maintained by it and deposit into the Distribution Account in accordance with Section 3.10(d)(ii), for distribution on the related Distribution Date in accordance with Section 4.01, the income from the related REO Property received during the prior calendar month, net of any withdrawals made pursuant to Section 3.23(c) or this Section 3.23(d).

(e)    Subject to the time constraints set forth in Section 3.23(a), each REO Disposition shall be carried out by the Servicer at such price and upon such terms and conditions as the Servicer shall deem necessary or advisable, as shall be normal and usual in its general servicing activities for similar properties.

(f)    The proceeds from the REO Disposition, net of any amount required by law to be remitted to the Mortgagor under the related Mortgage Loan and net of any payment or reimbursement to the Servicer or any Sub-Servicer as provided above, shall be deposited in the Distribution Account in accordance with Section 3.10(d)(ii) on the Servicer Remittance Date in the month following the receipt thereof for distribution on the related Distribution Date in accordance with Section 4.01. Any REO Disposition shall be for cash only (unless changes in the REMIC Provisions made subsequent to the Startup Day allow a sale for other consideration).

(g)    The Servicer shall file information returns with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Section 3.24    Obligations of the Servicer in Respect of Prepayment Interest Shortfalls.

The Servicer shall deliver to the Trustee for deposit into the Distribution Account on or before 3:00 p.m. New York time on the Servicer Remittance Date from its own funds an amount

("Compensating Interest") equal to the lesser of (i) the aggregate of the Prepayment Interest Shortfalls for the related Distribution Date resulting solely from Principal Prepayments during the related Prepayment Period and (ii) the amount of its aggregate Servicing Fee for the most recently ended calendar month.

Section 3.25     <u>Obligations of the Servicer in Respect of Mortgage Rates and Monthly Payments</u>.

In the event that a shortfall in any collection on or liability with respect to any Mortgage Loan results from or is attributable to adjustments to Mortgage Rates, Monthly Payments or Stated Principal Balances that were made by the Servicer in a manner not consistent with the terms of the related Mortgage Note and this Agreement, the Servicer, upon discovery or receipt of notice thereof, immediately shall deliver to the Trustee for deposit in the Distribution Account from its own funds the amount of any such shortfall and shall indemnify and hold harmless the Trust, the Trustee, the Depositor and any successor servicer in respect of any such liability. Such indemnities shall survive the termination or discharge of this Agreement. Notwithstanding the foregoing, this Section 3.25 shall not limit the ability of the Servicer to seek recovery of any such amounts from the related Mortgagor under the terms of the related Mortgage Note, as permitted by law and shall not be an expense of the Trust.

Section 3.26     <u>Reserve Fund</u>.

No later than the Closing Date, the Trustee, on behalf of the Certificateholders, shall establish and maintain with itself a separate, segregated non-interest bearing trust account titled, "Reserve Fund, Citibank, N.A., as Trustee, in trust for registered Holders of WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust." The Trustee shall account for the right to receive payments from the Reserve Fund as property that the Trustee holds separate and apart from the REMIC Regular Interests. On the first Distribution Date, amounts in the Reserve Fund will include any amounts withdrawn from the Interest Coverage Account and deposited in the Reserve Fund pursuant to Section 4.12(c).

(a)     The following amounts shall be deposited into the Reserve Fund:

(i)     On the Closing Date, the Depositor shall deposit, or cause to be deposited, into the Reserve Fund $1,000;

(ii)     On each Distribution Date as to which there is a Net WAC Rate Carryover Amount payable to any of the Class A Certificates or the Mezzanine Certificates, the Trustee has been directed by the Holders of the Class C Certificates to, and therefore shall, deposit into the Reserve Fund the amounts described in Section 4.01(d)(i)(U); and

(iii)     On each Distribution Date as to which there are no Net WAC Rate Carryover Amounts, the Trustee shall deposit into the Reserve Fund on behalf of the Holders of the Class C Certificates, from amounts otherwise distributable to such Class C Certificates, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000.

(b)     The Reserve Fund shall be treated as an "outside reserve fund" under applicable Treasury regulations and shall not be part of any REMIC created hereunder. For

federal and state income tax purposes, the Holders of the Class C Certificates shall be deemed to be the owners of the Reserve Fund and all amounts deposited into the Reserve Fund (other than the initial deposit therein of $1,000) shall be treated as amounts distributed by REMIC 3 to REMIC CX in respect of the Class C Interest, and then distributed by REMIC CX to the Holders of the Class C Certificates. For federal and state income tax purposes, payments in respect of the Class A Certificates and the Mezzanine Certificates of Net WAC Rate Carryover Amounts will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1).

(c)     By accepting a Class C Certificate, each Holder of a Class C Certificate shall be deemed to have directed the Trustee to, and the Trustee shall pursuant to such direction, deposit into the Reserve Fund the amounts described in Section 3.26(a)(ii) and (a)(iii) above on each Distribution Date. By accepting a Class C Certificate, each Holder of a Class C Certificate further agrees that such direction is given for good and valuable consideration, the receipt and sufficiency of which is acknowledged by such acceptance.

(d)     At the direction of the Holders of a majority in Percentage Interest in the Class C Certificates, the Trustee shall direct any depository institution maintaining the Reserve Fund to invest the funds in such account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Trustee or an Affiliate manages or advises such investment, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Trustee or an Affiliate manages or advises such investment. If no investment direction of the Holders of a majority in Percentage Interest in the Class C Certificates with respect to the Reserve Fund is received by the Trustee, the Trustee shall invest the funds in the Reserve Fund in Permitted Investments managed by the Trustee or an Affiliate of the kind described in clause (vi) of the definition of Permitted Investments. Notwithstanding the foregoing, any funds in the Reserve Fund shall be invested in Permitted Investments upon and pursuant to written investment directions from the Servicer. All income and gain earned upon such investment shall be deposited into the Reserve Fund. The Trustee shall have no liability for any loss on any investment made pursuant to the terms of this Section 3.26(d).

(e)     For federal tax return and information reporting, the right of the Certificateholders to receive payment on account of the Class A Certificates and the Mezzanine Certificates from the Reserve Fund in respect of any Net WAC Rate Carryover Amount shall be assigned a value of zero.

Section 3.27     <u>Advance Facility</u>.

(a)     The Trustee, on behalf of the Trust, at the direction of the Servicer and with the consent of the NIMS Insurer, is hereby authorized to enter into a facility with any Person which provides that such Person (an "Advancing Person") may make all or a portion of the Advances and/or Servicing Advances to the Trust under this Agreement, although no such facility shall reduce or otherwise affect the Servicer's obligation to fund such Advances and/or Servicing Advances. To the extent that an Advancing Person makes all or a portion of any Advance or any Servicing Advance and provides the Trustee with notice acknowledged by the Servicer that such Advancing Person is entitled to reimbursement, such Advancing Person shall

be entitled to receive reimbursement pursuant to this Agreement for such amount to the extent provided in Section 3.27(b). Such notice from the Advancing Person shall specify the amount of the reimbursement and shall specify which Section of this Agreement permits the applicable Advance or Servicing Advance to be reimbursed. The Trustee shall be entitled to rely without independent investigation on the Advancing Person's statement with respect to the amount of any reimbursement pursuant to this Section 3.27 and with respect to the Advancing Person's statement with respect to the Section of this Agreement that permits the applicable Advance or Servicing Advance to be reimbursed. An Advancing Person whose obligations are limited to the making of Advances and/or Servicing Advances shall not be required to meet the qualifications of a Servicer or a Sub-Servicer pursuant to Article VI hereof and will not be deemed to be a Sub-Servicer under this Agreement. If the terms of a facility proposed to be entered into with an Advancing Person by the Trust would not materially and adversely affect the interests of any Certificateholder, then the NIMS Insurer shall not withhold its consent to the Trust's entering into such facility.

(b)     If an advancing facility is entered into, then the Servicer shall not be permitted to reimburse itself under any Section specified or for any amount specified by the Advancing Person in the notice described under Section 3.27(a) above and acknowledged by the Servicer prior to the remittance to the Trust, but instead the Servicer shall include such amounts in the applicable remittance to the Trustee made pursuant to Section 3.10(a). The Trustee is hereby authorized to pay to the Advancing Person reimbursements for Advances and Servicing Advances from the Distribution Account to the same extent the Servicer would have been permitted to reimburse itself for such Advances and/or Servicing Advances in accordance with the specified Sections had the Servicer itself made such Advance or Servicing Advance. The Trustee is hereby authorized to pay directly to the Advancing Person such portion of the Servicing Fee as the parties to any advancing facility may agree.

(c)     All Advances and Servicing Advances made pursuant to the terms of this Agreement shall be deemed made and shall be reimbursed on a "first in-first out" (FIFO) basis.

Section 3.28     PMI Policy; Claims Under the PMI Policy.

Notwithstanding anything to the contrary elsewhere in this Article III, the Servicer shall not agree to any modification or assumption of a PMI Mortgage Loan or take any other action with respect to a PMI Mortgage Loan that could result in denial of coverage under the PMI Policy. The Servicer shall notify the PMI Insurer that the Trustee, as trustee on behalf of the Trust, is the insured, as that term is defined in the PMI Policy, of each PMI Mortgage Loan. The Servicer shall, on behalf of the Trust, prepare and file on a timely basis with the PMI Insurer, with a copy to the Trustee, all claims which may be made under the PMI Policy with respect to the PMI Mortgage Loans. The Servicer shall take all actions required under the PMI Policy as a condition to the payment of any such claim. Any amount received from the PMI Insurer with respect to any such PMI Mortgage Loan shall be deposited by the Servicer, no later than two Business Days following receipt thereof, into the Collection Account. On each Servicer Remittance Date, the Servicer shall pay to the PMI Insurer the PMI Insurer Fee for such Distribution Date from the amounts on deposit in the Collection Account prior to transferring any amounts in the Collection Account to the Trustee for deposit into the Distribution Account.

Section 3.29    Swap Agreement.

The Depositor hereby directs the Supplemental Interest Trust Trustee to execute and deliver on behalf of the Supplemental Interest Trust the Swap Agreement and authorizes and directs the Supplemental Interest Trust Trustee to perform its obligations thereunder on behalf of the Supplemental Interest Trust in accordance with the terms of the Swap Agreement. The Depositor hereby authorizes and directs the Supplemental Interest Trust Trustee to ratify on behalf of the Supplemental Interest Trust, as the Supplemental Interest Trust's own actions, the terms agreed to by the Depositor (or any of its Affiliates) in relation to the Swap Agreement, as reflected in the Swap Agreement, and the Supplemental Interest Trust Trustee hereby so ratifies the Swap Agreement. The Supplemental Interest Trust Trustee shall amend of the Swap Agreement in accordance with its terms and as requested by a party to the Swap Agreement to cure any ambiguity in or correct or supplement any provision of the Swap Agreement, provided, however, that where compliance with the Rating Agency Condition (as defined in the Swap Agreement) is required under the Swap Agreement, the Supplemental Interest Trust Trustee shall have received a prior written confirmation from each applicable Rating Agency that such amendment would not cause such Rating Agency to downgrade or withdraw the then current ratings of any outstanding Class A Certificates or Mezzanine Certificates.  On the Closing Date, the Supplemental Interest Trust Trustee shall enter into the Swap Agreement, solely on behalf of the Supplemental Interest Trust, with the Swap Counterparty.  The Swap Agreement shall be part of the Trust Fund but not part of any REMIC. The Swap Counterparty is the calculation agent under the Swap Agreement and shall calculate all amounts pursuant to the Swap Agreement and notify the Supplemental Interest Trust Trustee of all such amounts.  The Supplemental Interest Trust Trustee shall not be obligated to enter into any amendment to the Swap Agreement that would in its reasonable judgment adversely affect or alter its duties, obligations, liabilities or protections thereunder.

Section 3.30    Replacement Swap Agreement.

(a)    The Supplemental Interest Trust Trustee shall, solely on behalf of the Supplemental Interest Trust, at the direction of the NIMS Insurer or, with the consent of the NIMS Insurer, at the direction of the Depositor, in the event the Swap Agreement is terminated as a result of the designation by either party thereto of an Early Termination Date, enter into a replacement swap agreement with a replacement counterparty designated by the Depositor or the NIMS Insurer, as applicable.  Such replacement swap agreement shall be upon such terms and conditions as shall be determined by the NIMS Insurer or, with the consent of the NIMS Insurer, at the direction of the Depositor, provided, however, that such terms shall not impose on the Supplemental Interest Trust Trustee any duties, burdens obligations or liabilities in its individual capacity not otherwise acceptable to it, provided that such consent shall not be unreasonably withheld.

(b)    Notwithstanding anything to the contrary herein, any Swap Termination Payment received by the Supplemental Interest Trust Trustee shall be deposited in the Supplemental Interest Account and shall be used to make any upfront payment required under a replacement swap agreement and any upfront payment (the "Replacement Payment") received by the Supplemental Interest Trust Trustee from the counterparty to a replacement swap agreement shall be used to pay any Swap Termination Payment owed to the Swap Counterparty that is being replaced.  The Swap Counterparty that is being replaced shall have first priority as to such Replacement Payments versus all other creditors of the Supplemental Interest Trust

Trustee, and the Supplemental Interest Trust Trustee shall pay from the Replacement Payments received the lesser of (x) the Replacement Payments so received and (y) any Swap Termination Payment owed to the Swap Counterparty (to the extent not already paid by the Supplemental Interest Trust Trustee) that is being replaced immediately upon receipt.

(c)    Notwithstanding anything contained herein, in the event that a replacement swap agreement cannot be obtained within 30 days after receipt by the Supplemental Interest Trust Trustee of the Swap Termination Payment paid by the terminated Swap Counterparty, the Supplemental Interest Trust Trustee will deposit the Swap Termination Payment into a separate, non-interest bearing reserve account and shall, on each Distribution Date, withdraw from the amount then remaining on deposit in such reserve account (the "Swap Termination Reserve Account"), an amount equal to the Net Counterparty Payment, if any, that would have been paid to the Supplemental Interest Trust Trustee by the original Swap Counterparty (computed in accordance with the terms of the original Swap Agreement) and distribute such amount in accordance with Section 4.01(d)(iv)(B) of this Agreement. The Supplemental Interest Trust Trustee shall not be required to establish the Swap Termination Reserve Account until the date of such deposit of the Swap Termination Payment.

(d)    If a downgrade event (described in Part 5(b) of Schedule to the Swap Agreement) occurs, the Supplemental Interest Trust Trustee shall, promptly after a Responsible Officer of the Supplemental Interest Trust Trustee has received actual knowledge or written notice of the reduction or withdrawal of the rating (it being understood that the Supplemental Interest Trust Trustee has no duty to monitor the ratings of the Swap Counterparty), request the Swap Counterparty to take actions required to be taken by the Swap Counterparty by Part 5(b) of Schedule to the Swap Agreement.

Section 3.31    <u>Swap Counterparty Default</u>

In the event that the Swap Counterparty fails to perform any of its obligations under the Swap Agreement (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that any Event of Default, Termination Event, or Additional Termination Event (each as defined in the Swap Agreement) occurs with respect to the Swap Agreement, the Supplemental Interest Trust Trustee shall, promptly following actual notice of such failure, breach or event, notify the Depositor and send any notices and make any demands, on behalf of the Supplemental Interest Trust, required to enforce the rights of the Supplemental Interest Trust under the Swap Agreement (subject to Section 8.02(a)(iii))..

In the event that the Swap Counterparty's obligations are guaranteed by a third party under a guaranty relating to the Swap Agreement (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Swap Counterparty fails to make any payment by the close of business on the day it is required to make payment under the terms of the Swap Agreement, the Supplemental Interest Trust Trustee shall, promptly following actual notice of the Swap Counterparty's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty; provided, that the Supplemental Interest Trust Trustee shall in no event be liable for any failure or delay in the performance by the Swap Counterparty or any Guarantor of its obligations hereunder or pursuant to the Swap Agreement and the Guaranty, nor for any special, indirect or consequential loss or

damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

## ARTICLE IV

## FLOW OF FUNDS

Section 4.01     Distributions.

(a)     On each Distribution Date, the Trustee shall withdraw from the Distribution Account that portion of the Available Funds for such Distribution Date consisting of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date, and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Group I Interest Remittance Amount or the Group II Interest Remittance Amount remaining for such Distribution Date:

(i)     The Group I Interest Remittance Amount shall be distributed as follows:

(A)     *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable for the related Distribution Date;

(B)     *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable for the related Distribution Date to the extent not paid pursuant to Section 4.01(a)(ii)(A);

(C)     *third*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, for such Distribution Date;

(D)     *fourth*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, for such Distribution Date, to the extent not paid pursuant to Section 4.01(a)(ii)(C);

(E)     *fifth*, to the Class I-A Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Class; and

(F)     *sixth*, concurrently, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Classes, in each case, to the extent not paid pursuant to

Section 4.01(a)(ii)(E), allocated among the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, *pro rata*, based on their respective entitlements.

(ii)    The Group II Interest Remittance Amount shall be distributed as follows:

(A)    *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable for the related Distribution Date;

(B)    *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable for the related Distribution Date to the extent not paid pursuant to Section 4.01(a)(i)(A);

(C)    *third*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, for such Distribution Date;

(D)    *fourth*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, to the extent not paid pursuant to Section 4.01(a)(i)(C);

(E)    *fifth*, concurrently, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Classes, in each case allocated among the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, *pro rata*, based on their respective entitlements; and

(F)    *sixth*, to the Class I-A Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Class, to the extent not paid pursuant to Section 4.01(a)(i)(E).

(iii)    The sum of any Group I Interest Remittance Amount and Group II Interest Remittance Amount remaining undistributed following the distributions pursuant to Sections 4.01(a)(i) and (ii) shall be distributed as follows:

*first*, to the Class M-1 Certificates, the related Monthly Interest Distributable Amount;

*second*, to the Class M-2 Certificates, the related Monthly Interest Distributable Amount;

*third*, to the Class M-3 Certificates, the related Monthly Interest Distributable Amount;

*fourth*, to the Class M-4 Certificates, the related Monthly Interest Distributable Amount;

*fifth*, to the Class M-5 Certificates, the related Monthly Interest Distributable Amount;

*sixth*, to the Class M-6 Certificates, the related Monthly Interest Distributable Amount;

*seventh*, to the Class M-7 Certificates, the related Monthly Interest Distributable Amount;

*eighth*, to the Class M-8 Certificates, the related Monthly Interest Distributable Amount; and

*ninth*, to the Class M-9 Certificates, the related Monthly Interest Distributable Amount.

(iv)     Any Group I Interest Remittance Amount or any Group II Interest Remittance Amount remaining undistributed following distributions pursuant to Section 4.01(a)(iii) shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(b)     On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Class A Certificates and the Mezzanine Certificates shall be entitled to receive distributions in respect of principal to the extent of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in the following amounts and order of priority:

(i)     the Group I Principal Distribution Amount will be distributed as follows:

(A)     *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(B)     *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment not caused by a

Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such Distribution Date;

>    (C)    *third*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

>    (D)    *fourth*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such Distribution Date;

>    (E)    *fifth*, to the Class I-A Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

>    (F)    *sixth*, to the Group II Senior Certificates (allocated among the Group II Senior Certificates in the priority described in Section 4.01(b)(v)), until the Certificate Principal Balances thereof have been reduced to zero.

>    (ii)    the Group II Principal Distribution Amount will be distributed as follows:

>    (A)    *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

>    (B)    *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement), including any amount remaining unpaid from prior Distribution Dates, as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such Distribution Date;

>    (C)    *third*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to

the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(D)     *fourth*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such Distribution Date;

(E)     *fifth*, to the Group II Senior Certificates (allocated among the Group II Senior Certificates in the priority described in Section 4.01(b)(v)) until the Certificate Principal Balances thereof have been reduced to zero; and

(F)     *sixth*, to the Class I-A Certificates, until the Certificate Principal Balance thereof has been reduced to zero.

(iii)     the sum of any Group I Principal Distribution Amount and Group II Principal Distribution Amount remaining undistributed following the distributions pursuant to Sections 4.01(b)(i) and (ii) shall be distributed in the following order of priority:

*first*, to the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*second*, to the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*third*, to the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*fourth*, to the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*fifth*, to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*sixth*, to the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*seventh*, to the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*eighth*, to the Class M-8 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

*ninth*, to the Class M-9 Certificates, until the Certificate Principal Balance thereof has been reduced to zero.

(iv)     Any principal remaining undistributed pursuant to Sections 4.01(b)(i), (ii) and (iii) above shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(v)     With respect to the Group II Senior Certificates, all principal distributions will be allocated sequentially, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, in each case, until their Certificate Principal Balances have been reduced to zero, with the exception that beginning on the first Distribution Date on or after which the Certificate Principal Balances of the Mezzanine Certificates have been reduced to zero and the Net Monthly Excess Cashflow and Overcollateralized Amount for such Distribution Date are insufficient to cover Realized Losses on the Group II Mortgage Loans, principal distributions among the Group II Senior Certificates will be allocated, pro rata, based on their Certificate Principal Balances, in each case, until their Certificate Principal Balances have been reduced to zero.

(c)     On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the Class A Certificates and the Mezzanine Certificates shall be entitled to receive distributions in respect of principal to the extent of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount in the following amounts and order of priority:

(i)     the Group I Principal Distribution Amount will be distributed as follows:

(A)     *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount not paid on prior Distribution Dates) (unless the Swap Counterparty is the Defaulting Party or the sole Affected Party (each, as defined in the Swap Agreement)), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(B)     *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior Distribution Dates) (unless the Swap Counterparty is the Defaulting Party or the sole Affected Party (each, as defined in the Swap Agreement)), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such Distribution Date;

(C)     *third*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the

distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(D)    *fourth*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group II Principal Distribution Amount for such Distribution Date;

(E)    *fifth*, to the Class I-A Certificates, the Group I Senior Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero; and

(F)    *sixth*, to the Group II Senior Certificates, the Group II Senior Principal Distribution Amount, to the extent not paid pursuant to Section 4.01(c)(ii)(E) (allocated among the Group II Senior Certificates in the priority described in Section 4.01(c)(v)), until the Certificate Principal Balances thereof have been reduced to zero.

(ii)    the Group II Principal Distribution Amount will be distributed as follows:

(A)    *first*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group II Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group II Swap Termination Payment (including any amount not paid on prior Distribution Dates) (unless the Swap Counterparty is the Defaulting Party or the sole Affected Party (each, as defined in the Swap Agreement)), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(B)    *second*, to the Supplemental Interest Trust Trustee for payment to the Swap Counterparty, the Group I Net Swap Payment, provided a Swap Default with respect to the Swap Counterparty has not occurred and is not continuing, and any unpaid Group I Swap Termination Payment (including any amount not paid on prior Distribution Dates) (unless the Swap Counterparty is the Defaulting Party or the sole Affected Party (each, as defined in the Swap Agreement)), as applicable, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such Distribution Date;

(C)    *third*, to the Final Maturity Reserve Trust, the Group II Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date;

(D)    *fourth*, to the Final Maturity Reserve Trust, the Group I Final Maturity Reserve Amount, if any, remaining unpaid after giving effect to

the distribution of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group I Principal Distribution Amount for such Distribution Date;

(E)     *fifth*, to the Group II Senior Certificates, the Group II Senior Principal Distribution Amount (allocated among the Group II Senior Certificates in the priority described in Section 4.01(c)(v)), until the Certificate Principal Balances thereof have been reduced to zero; and

(F)     *sixth*, to the Class I-A Certificates, the Group I Senior Principal Distribution Amount, to the extent not paid pursuant to Section 4.01(c)(i)(E), until the Certificate Principal Balance thereof has been reduced to zero.

(iii)     the sum of any Group I Principal Distribution Amount and Group II Principal Distribution Amount remaining undistributed following the distribution pursuant to Sections 4.01(c)(i) and (ii) shall be distributed in the following order of priority:

*first*, to the Class M-1 Certificates, the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*second*, to the Class M-2 Certificates, the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*third*, to the Class M-3 Certificates, the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*fourth*, to the Class M-4 Certificates, the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*fifth*, to the Class M-5 Certificates, the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*sixth*, to the Class M-6 Certificates, the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*seventh*, to the Class M-7 Certificates, the Class M-7 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*eighth*, to the Class M-8 Certificates, the Class M-8 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero; and

*ninth*, to the Class M-9 Certificates, the Class M-9 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero.

(iv)     Any principal remaining undistributed following distributions pursuant to Sections 4.01(c)(i), (ii) and (iii) shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(v)     With respect to the Group II Senior Certificates, all principal distributions will be allocated sequentially, to the Class II-A1 Certificates, the Class II-A2 Certificates, the Class II-A3 Certificates and the Class II-A4 Certificates, in each case, until their Certificate Principal Balances have been reduced to zero, with the exception that beginning on the first Distribution Date on or after which the Certificate Principal Balances of the Mezzanine Certificates have been reduced to zero and the Net Monthly Excess Cashflow and Overcollateralized Amount for such Distribution Date are insufficient to cover realized losses on the Group II Mortgage Loans, principal distributions among the Group II Senior Certificates will be allocated, pro rata, based on their Certificate Principal Balances, in each case, until their Certificate Principal Balances have been reduced to zero.

(d)     (i) On each Distribution Date, the Trustee shall distribute any Net Monthly Excess Cashflow in the following order of priority, in each case to the extent of the Net Monthly Excess Cashflow remaining undistributed:

(A)     to the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount equal to the sum of any Extra Principal Distribution Amount and the Remaining Principal Distribution Amount for such Distribution Date, payable to such Class or Classes of Certificates as part of the Group I Principal Distribution Amount or the Group II Principal Distribution Amount, as applicable, pursuant to Section 4.01(b) or Section 4.01(c) above, as applicable;

(B)     concurrently, to the Class A Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Classes for such Distribution Date to the extent remaining unpaid after distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount on such Distribution Date, allocated among such classes, pro rata, based on their respective entitlements;

(C)     to the Class M-1 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(D)    to the Class M-1 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(E)    to the Class M-2 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(F)    to the Class M-2 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(G)    to the Class M-3 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(H)    to the Class M-3 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(I)    to the Class M-4 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(J)    to the Class M-4 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(K)    to the Class M-5 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(L)    to the Class M-5 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(M)    to the Class M-6 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(N)    to the Class M-6 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(O)    to the Class M-7 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(P)     to the Class M-7 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(Q)     to the Class M-8 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(R)     to the Class M-8 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(S)     to the Class M-9 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(T)     to the Class M-9 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(U)     to the Reserve Fund, the amount equal to the difference between any Net WAC Rate Carryover Amounts with respect to the Class A Certificates and the Mezzanine Certificates for such Distribution Date and any amounts deposited in the Reserve Fund pursuant to this Section 4.01(d)(i)(U) that were not distributed on prior Distribution Dates (or, if no Net WAC Rate Carryover Amounts are payable to such Classes of Certificates on such Distribution Date, to the Reserve Fund, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000);

(V)     to the Supplemental Interest Trust Trustee, for payment to the Swap Counterparty, any unpaid Swap Termination Payment caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement payable by the Supplemental Interest Trust Trustee including any amount remaining unpaid from prior Distribution Dates;

(W)     to the Final Maturity Reserve Trust, the Supplemental Final Maturity Reserve Amount for such Distribution Date;

(X)     if such Distribution Date follows the Prepayment Period during which occurs the latest date on which a Prepayment Charge may be required to be paid in respect of any Mortgage Loans, to REMIC PX, as holder of the Class P Interest, in reduction of the Uncertificated Principal Balance thereof, until the Uncertificated Principal Balance thereof is reduced to zero;

(Y)     to REMIC CX, as holder of the Class C Interest, the sum of (A) the Monthly Interest Distributable Amount for the Class C Interest, plus (B) until the Uncertificated Principal Balance of the Class C Interest is reduced to zero, any Overcollateralization Release Amount for such Distribution Date, plus (C) until the Uncertificated Principal Balance of the Class C Interest is reduced to

zero, on any Distribution Date on which the Certificate Principal Balances of the Class A Certificates and the Mezzanine Certificates has been reduced to zero, any remaining amounts for such Distribution Date (in both cases, net of such portion of amounts payable pursuant to this Section 4.01(d)(i)(Y) that were paid pursuant to Section 4.01(d)(i)(U) above); and

(Z)     any remaining amounts to the Class R Certificates (in respect of the appropriate Class R-3 Interest).

(ii)     On each Distribution Date, after making the distributions of the Available Funds as provided in this Section 4.01 (except pursuant to Section 4.01(d)(iii)), the Trustee shall withdraw from the Reserve Fund the amounts on deposit therein and shall distribute such amounts in the following order of priority:  first, concurrently, to the Class A Certificates, up to the amount of the related Net WAC Rate Carryover Amount, allocated among the Class A Certificates, pro rata, based on their respective Net WAC Rate Carryover Amounts; then, to the Mezzanine Certificates, up to the amount of the related Net WAC Rate Carryover Amount, in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates, in each case to the extent of such amounts remaining in the Reserve Fund.

On the Distribution Date on which the Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates has been reduced to zero, after making all other distributions on such Distribution Date (including to the Class A Certificates and the Mezzanine Certificates out of the Reserve Fund), the Trustee shall distribute all remaining amounts in the Reserve Fund to the Class C Certificates.

(iii)     On the earlier of the Distribution Date in April 2037 and the termination of the Trust after giving effect to all other distributions pursuant to this Section 4.01, the Trustee shall withdraw from the Final Maturity Reserve Account funds on deposit therein and shall distribute such amounts in the following order of priority:

(A)     concurrently, to the Class A Certificates, in reduction of their respective Certificate Principal Balances, pro rata, based on their Certificate Principal Balances, until the Certificate Principal Balances thereof have been reduced to zero;

(B)     to the Mezzanine Certificates, in reduction of their respective Certificate Principal Balances, in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates, in each case until the Certificate Principal Balances thereof have been reduced to zero;

(C)     concurrently, to the Class A Certificates, up to the amount of the related Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Classes remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, in each case allocated among the Class A Certificates, pro rata, based on their Monthly Interest Distributable Amounts and any Unpaid Interest Shortfall Amounts;

(D)     to the Mezzanine Certificates, up to the amount of the related Monthly Interest Distributable Amount for such Classes remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, allocated among the Mezzanine Certificates in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates;

(E)     to the Mezzanine Certificates, up to the amount of any related Unpaid Interest Shortfall Amount for such Classes remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, allocated among the Mezzanine Certificates in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates;

(F)     concurrently, to the Class A Certificates, up to the amount of the related Net WAC Rate Carryover Amount remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, allocated among the Class A Certificates, pro rata, based on their unpaid Net WAC Rate Carryover Amounts;

(G)     to the Mezzanine Certificates, up to the amount of the related Net WAC Rate Carryover Amount remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates;

(H)     to the Mezzanine Certificates, up to the amount of the related Allocated Realized Loss Amount remaining unpaid after giving effect to all other distributions pursuant to this Section 4.01, in the following order of priority:  first to the Class M-1 Certificates, second to the Class M-2 Certificates, third to the Class M-3 Certificates, fourth to the Class M-4 Certificates, fifth to the Class M-5 Certificates, sixth to the Class M-6 Certificates, seventh to the

Class M-7 Certificates, eighth to the Class M-8 Certificates and ninth to the Class M-9 Certificates;

(I)    to the Supplemental Interest Trust Trustee, for payment to the Swap Counterparty, any unpaid Swap Termination Payment caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement) payable by the Supplemental Interest Trust Trustee, including any amount remaining unpaid from prior Distribution Dates to the extent not paid with Net Monthly Excess Cashflow on such Distribution Date; and

(J)    to the Class C Certificates, any remaining amount.

Amounts held by the Final Maturity Reserve Trust shall be deemed to be distributed first from amounts received from the Supplemental Interest Trust, if any, and then from all other amounts.  Except as provided in the preceding sentence, all amounts distributable to the Class I-A Certificates on account of the Mortgage Loans, shall be distributable first on account of the Group I Mortgage Loans.  On the Distribution Date on which the funds are distributed from the Final Maturity Reserve Trust pursuant to this Section 4.01(d)(iii), after making all distributions pursuant to this Section 4.01(d)(iii) (other than pursuant to Section 4.01(d)(iii)(J)), the Trustee shall distribute to itself all amounts remaining in the Final Maturity Reserve Trust that were deposited in the Final Maturity Reserve Account from the Supplemental Interest Trust and shall distribute all other amounts remaining in the Final Maturity Reserve Trust pursuant to Section 4.01(d)(iii)(J).

(iv)    On each Distribution Date, the Supplemental Interest Trust Trustee shall withdraw from the Supplemental Interest Account the amounts equal to the Net Swap Payment and the Swap Termination Payment payable by the Supplemental Interest Trust Trustee, on behalf of the Supplemental Interest Trust, that are required to be deposited in the Supplemental Interest Account pursuant to this Section 4.01 with respect to such Distribution Date and shall distribute such amounts to the Swap Counterparty on such Distribution Date.  On each Distribution Date, the Supplemental Interest Trust Trustee shall withdraw from the Supplemental Interest Account the Net Counterparty Payment and the Swap Termination Payment payable by the Swap Counterparty and received by the Supplemental Interest Trust Trustee from the Swap Counterparty and deposited in the Supplemental Interest Account and the initial deposit of $1,000 and shall distribute such amounts as follows (provided the Swap Termination Payment shall be distributed as provided in Section 3.30(c)):

(A)    *first*, for payment to the Swap Counterparty, any unpaid Swap Termination Payment not caused by a Derivative Provider Trigger Event (as defined in the Swap Agreement) payable by the Supplemental Interest Trust Trustee, on behalf of the Supplemental Interest Trust, including any amount remaining unpaid from prior Distribution Dates; and

(B)    *second*,

(1)    if the NIM Notes are outstanding, for payment in the amounts and in accordance with priorities (A) through (Y) of Section 4.01(d)(i) to the extent not paid with Net

Monthly Excess Cashflow on such Distribution Date; provided the amount distributable to the Class C Certificates pursuant to Section 4.01(d)(i)(Y) shall be equal to the lesser of (I) the amount remaining after distribution of the amount in the Supplemental Interest Account pursuant to Sections 4.01(d)(i)(A) through (X) on such Distribution Date and (II) the Class C NIM Payment Amount for such Distribution Date; or

(2)     if the NIM Notes are not outstanding, for payment in the amounts and in accordance with priorities (A) through (W) of Section 4.01(d)(i) to the extent not paid with Net Monthly Excess Cashflow on such Distribution Date.

provided, however, that the amount that shall be distributed pursuant to Section 4.01(d)(iv)(B) priority (1) cannot exceed the aggregate Realized Losses reduced by the aggregate of amounts previously distributed pursuant to this Section 4.01(d)(iv)(B) priority (1).

Any amounts in the Supplemental Interest Account received from the Swap Counterparty and not distributed on a Distribution Date after payments pursuant to Section 4.01(d)(iv)(B)(2) will remain in the Supplemental Interest Account and be distributed pursuant to Section 4.01(d)(iv)(B)(2) on the next Distribution Date. On the Distribution Date on which the Certificate Principal Balance of the Class A Certificates and the Mezzanine Certificates has been reduced to zero, after making all other distributions on such Distribution Date (including to the Class A Certificates and the Mezzanine Certificates out of the Supplemental Interest Account), the Supplemental Interest Trust Trustee shall distribute all remaining amounts in the Supplemental Interest Account to itself.

(v)     On each Distribution Date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period shall be withdrawn from the Distribution Account and distributed by the Trustee to the Class P Interest, and shall not be available for distribution to any other Class of Certificates. On each Distribution Date, all amounts representing any Servicer Prepayment Charge Payment Amounts paid by or collected by the Servicer during the related Prepayment Period shall be withdrawn from the Distribution Account and distributed by the Trustee to the Class P Interest, and shall not be available for distribution to any other Class of Certificates. The payment of the foregoing amounts in respect of such Regular Interests shall not reduce the Uncertificated Principal Balance thereof.

(e)     [Reserved].

(f)     All distributions made with respect to each Class of Certificates on each Distribution Date shall be allocated pro rata among the outstanding Certificates in such Class based on their respective Percentage Interests. Payments in respect of each Class of Certificates on each Distribution Date will be made to the Holders of the respective Class of record on the related Record Date (except as otherwise provided in this Section 4.01 or Section 9.01 respecting the final distribution on such Class), based on the aggregate Percentage Interest represented by their respective Certificates, and shall be made by wire transfer of immediately available funds to

the account of any such Holder at a bank or other entity having appropriate facilities therefor, if such Holder shall have so notified the Trustee in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date and is the registered owner of Certificates having an initial aggregate Certificate Principal Balance or Notional Amount that is in excess of the lesser of (i) $5,000,000 or (ii) two-thirds of the Original Class Certificate Principal Balance or Original Class Notional Amount of such Class of Certificates, or otherwise by check mailed by first class mail to the address of such Holder appearing in the Certificate Register. The final distribution on each Certificate shall be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office of the Trustee or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, which shall credit the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. All such credits and disbursements with respect to a Book-Entry Certificate are to be made by the Depository and the Depository Participants in accordance with the provisions of the Certificates. None of the Trustee, the Delaware Trustee, the Depositor, the Servicer or the Seller shall have any responsibility therefor except as otherwise provided by applicable law.

(g)     The rights of the Certificateholders to receive distributions in respect of the Certificates, and all interests of the Certificateholders in such distributions, shall be as set forth in this Agreement. None of the Holders of any Class of Certificates, the Trustee, the Delaware Trustee or the Servicer shall in any way be responsible or liable to the Holders of any other Class of Certificates in respect of amounts properly previously distributed on the Certificates.

(h)     Except as otherwise provided in Section 9.01, whenever the Trustee expects that the final distribution with respect to any Class of Certificates shall be made on the next Distribution Date, the Trustee shall, no later than three (3) days before the related Distribution Date, mail to the NIMS Insurer and each Holder on such date of such Class of Certificates a notice to the effect that:

(i)     the Trustee expects that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee therein specified, and

(ii)     no interest shall accrue on such Certificates from and after the end of the related Accrual Period.

Any funds not distributed to any Holder or Holders of Certificates of such Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Trustee and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 4.01(h) shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the

remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Trustee shall, directly or through an agent, mail a final notice to the remaining non-tendering Certificateholders concerning surrender of their Certificates but shall continue to hold any remaining funds for the benefit of non-tendering Certificateholders. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in such trust fund. If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Trustee shall pay to WaMu Capital Corp., Lehman Brothers Inc. and Banc of America Securites LLC, equally, all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Trustee as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 4.01(h).

(i)    Notwithstanding anything to the contrary herein, (i) in no event shall the Certificate Principal Balance of a Mezzanine Certificate be reduced more than once in respect of any particular amount both (a) allocated to such Certificate in respect of Realized Losses pursuant to Section 4.06 and (b) distributed to such Certificate in reduction of the Certificate Principal Balance thereof pursuant to this Section 4.01, and (ii) in no event shall the Uncertificated Principal Balance of a REMIC Regular Interest be reduced more than once in respect of any particular amount both (a) allocated to such REMIC Regular Interest in respect of Realized Losses pursuant to Section 4.06 and (b) distributed on such REMIC Regular Interest in reduction of the Uncertificated Principal Balance thereof pursuant to Section 4.05.

(j)    Any amounts distributed to REMIC CX on any Distribution Date in respect of the Class C Interest under Section 4.01(d)(i) shall, on such Distribution Date, be distributed by REMIC CX to the Holders of the Class C Certificates. Any amounts remaining in REMIC CX shall be distributed to the Holders of the Class R-CX Certificates in respect of the Class R-CX Interest. Any amounts distributed to REMIC PX on any Distribution Date in respect of the Class P Interest shall, on such Distribution Date, be distributed by REMIC PX to the Holders of the Class P Certificates. Any amounts remaining in REMIC PX shall be distributed to the Holders of the Class R-PX Certificates in respect of the Class R-PX Interest. Any amounts distributed to REMIC SwapX on any Distribution Date in respect of the Class Swap IO Interest under Section 4.01(d)(i) shall, on such Distribution Date, be distributed by REMIC CX to the Holders of the Class C Certificates. Any amounts remaining in REMIC CX shall be distributed to the Holders of the Class R-CX Certificates in respect of the Class R-CX Interest. For the avoidance of doubt, the provisions of Sections 4.01(f), 4.01(g) and 4.01(h) shall apply to the Class C Certificates and the Class P Certificates.

(k)    For purposes of distributions pursuant to Section 4.01(d)(iv)(B) and for purposes of determining the Class C NIM Payment Amount, the Trustee shall use, and shall be entitled to rely on, the information provided to the Trustee by or on behalf of (i) the Holders of all of the Class C Certificates as to whether and when the NIM Notes have been issued and outstanding and (ii) the indenture trustee under the Indenture with respect to the amount necessary to pay in full the NIM Notes as provided in the Indenture and to pay in full any amounts owed to the NIMS Insurer as provided in the Indenture. Based upon and subject to its receipt of the necessary information it receives from the indenture trustee under the Indenture, the Trustee shall determine the Class C NIM Payment Amount for any Distribution Date using

the most current information with respect to such amounts available to the Trustee on such Distribution Date.

Section 4.02    Preference Claims.

The Trustee shall promptly notify the NIMS Insurer of any proceeding or the institution of any action, of which a Responsible Officer of the Trustee has actual knowledge, seeking the avoidance as a preferential transfer under applicable bankruptcy, insolvency, receivership or similar law (a "Preference Claim") of any distribution made with respect to the Class C Certificates or the Class P Certificates. Each Holder of the Class C Certificates or the Class P Certificates, by its purchase of such Certificates, the Servicer, the Trustee and the Delaware Trustee hereby agree that the NIMS Insurer may at any time during the continuation of any proceeding relating to a Preference Claim direct all matters relating to such Preference Claim, including, without limitation, (i) the direction of any appeal of any order relating to such Preference Claim and (ii) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition and without limitation of the foregoing, the NIMS Insurer shall be subrogated to the rights of the Servicer, the Trustee, the Delaware Trustee and each Holder of the Class C Certificates and the Class P Certificates in the conduct of any such Preference Claim, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Preference Claim; provided, however, that the NIMS Insurer will not have any rights with respect to any Preference Claim set forth in this paragraph unless the Trustee, as indenture trustee or indenture administrator with respect to the Insured NIM Notes or the holder of any Insured NIM Notes has been required to relinquish a distribution made on the Class C Certificates, the Class P Certificates or the Insured NIM Notes, as applicable, and the NIMS Insurer made a payment in respect of such relinquished amount.

Section 4.03    Statements.

(a)    On each Distribution Date, the Trustee shall prepare and make available to each Holder of the Regular Certificates, the Servicer, the NIMS Insurer, the Swap Counterparty, the indenture trustee under the Indenture and the Rating Agencies a statement by electronic medium (as set forth in the penultimate paragraph of this Section 4.03(a)), based on information provided to the Trustee by the Servicer or the Swap Counterparty, as to the distributions made on such Distribution Date:

(i)    the record dates, the accrual period, the determination date and the distribution date;

(ii)    the amount of the distribution made on such Distribution Date to the Holders of each Class of Regular Certificates, separately identified, allocable to principal and the amount of the distribution made to the Holders of the Class P Certificates allocable to Prepayment Charges;

(iii)    the amount of the distribution made on such Distribution Date to the Holders of each Class of Regular Certificates (other than the Class P Certificates), allocable to interest and the Pass-Through Rates, separately identified;

(iv)    the Overcollateralized Amount, the Overcollateralization Release Amount, the Overcollateralization Deficiency Amount and the Overcollateralization

Target Amount as of such Distribution Date and the Excess Overcollateralized Amount for the Mortgage Pool for such Distribution Date;

(v)     by Loan Group and in the aggregate amount of servicing compensation received by the Servicer with respect to the related Due Period and such other customary information as the Trustee deems necessary or desirable, or which a Certificateholder reasonably requests, to enable Certificateholders to prepare their tax returns;

(vi)     the Group I Interest Remittance Amount and the Group II Interest Remittance Amount and the Group I Principal Remittance Amount and the Group II Principal Remittance Amount for such Distribution Date;

(vii)     the aggregate amount of Advances and Servicing Advances for the related Due Period, the amount of unrecovered Advances and Servicing Advances (after giving effect to Advances and Servicing Advances made on the Distribution Date) outstanding and the amount of Nonrecoverable Advances and Servicing Advances for such Distribution Date;

(viii)     the number and aggregate Stated Principal Balance of the Group I Mortgage Loans, the Group II Mortgage Loans and all Mortgage Loans at the Close of Business at the end of the related Due Period and at the beginning of the related Due Period;

(ix)     the number, aggregate principal balance, weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans as of the related Determination Date;

(x)     by Loan Group and in the aggregate, the number and aggregate unpaid principal balance of Mortgage Loans (a) delinquent 30-59 days, (b) delinquent 60-89 days, (c) delinquent 90-119 days and (d) 120 or more days in each case, as of the last day of the preceding calendar month provided, however that any aggregate unpaid principal balance of Mortgage Loans shall be reported as of the last day of the related Due Period, (d) as to which foreclosure proceedings have been commenced and (e) with respect to which the related Mortgagor has filed for protection under applicable bankruptcy laws, with respect to whom bankruptcy proceedings are pending or with respect to whom bankruptcy protection is in force;

(xi)     with respect to any Mortgage Loan that became an REO Property during the preceding Prepayment Period, the unpaid principal balance and the Principal Balance of such Mortgage Loan as of the date it became an REO Property;

(xii)     the total number and cumulative principal balance of all REO Properties as of the Close of Business of the last day of the preceding Prepayment Period;

(xiii)     by Loan Group and in the aggregate, the aggregate amount of Principal Prepayments made during the related Prepayment Period;

(xiv)   by Loan Group and in the aggregate, the aggregate amount of principal and interest Realized Losses incurred during the related Prepayment Period and the cumulative amount of principal and interest Realized Losses;

(xv)   the aggregate amount of Extraordinary Trust Fund Expenses withdrawn from the Collection Account or the Distribution Account for such Distribution Date;

(xvi)   the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates, before and after giving effect to the distributions made on such Distribution Date, and the Notional Amount of the Class C Certificates, after giving effect to the distributions made on such Distribution Date;

(xvii)   the Monthly Interest Distributable Amount in respect of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates for such Distribution Date and the Unpaid Interest Shortfall Amount, if any, with respect to the Class A Certificates and the Mezzanine Certificates for such Distribution Date;

(xviii) by Loan Group and in the aggregate, the aggregate amount of any Net Prepayment Interest Shortfalls for such Distribution Date, to the extent not covered by payments by the Servicer pursuant to Section 3.24, and the aggregate amount of any Relief Act Interest Shortfalls for such Distribution Date;

(xix)   the Credit Enhancement Percentage for such Distribution Date;

(xx)   the related Net WAC Rate Carryover Amount for the Class A Certificates and the Mezzanine Certificates, if any, for such Distribution Date and the amount remaining unpaid after reimbursements therefor on such Distribution Date;

(xxi)   the Trustee Fee, the Servicer Fee and the PMI Insurer Fee for such Distribution Date;

(xxii)   whether a Stepdown Date or a Trigger Event has occurred;

(xxiii)   the Available Funds;

(xxiv) the respective Pass-Through Rates applicable to the Class A Certificates, the Mezzanine Certificates and the Class C Certificates for such Distribution Date and the Pass-Through Rate applicable to the Class A Certificates and the Mezzanine Certificates for the immediately succeeding Distribution Date;

(xxv)   by Loan Group and in the aggregate, the Principal Balance of Mortgage Loans repurchased by the Seller or the Depositor, as applicable;

(xxvi)   any other information that is required by the Code and regulations thereunder to be made available to Certificateholders;

(xxvii)   the amount on deposit in the Reserve Fund;

(xxviii) [reserved];

(xxviii) (A) the dollar amount of claims made under the PMI Policy that were denied during the related Prepayment Period (and the number of Mortgage Loans to which such denials related) and (B) the aggregate dollar amount of claims made under the PMI Policy that were denied since the Cut-off Date (and the number of Mortgage Loans to which such denials related);

(xxix) the amount of Subsequent Recoveries and Gross Subsequent Recoveries for the related Prepayment Period and the cumulative amount of Subsequent Recoveries and Gross Subsequent Recoveries in the aggregate and for each of Loan Group I and Loan Group II;

(xxx) the Group I Swap Payment, the Group II Swap Payment, the Swap Payment, the Counterparty Payment, the Group I Net Swap Payment, the Group II Net Swap Payment, the Net Swap Payment and the Net Counterparty Payment for such Distribution Date; the Group I Swap Termination Payment paid on such Distribution Date, the Group II Swap Termination Payment paid on such Distribution Date, the Swap Termination Payment and the Swap Termination Payment remaining unpaid from prior Distribution Dates, and in each case whether payable by the Supplemental Interest Trust Trustee or by the Swap Counterparty; and any Counterparty Payments unpaid from prior Distribution Dates;

(xxxi) the Group I Final Maturity Reserve Amount, the Group II Final Maturity Reserve Amount, the Supplemental Final Maturity Reserve Amount, the Aggregate Final Maturity Reserve Amount and the aggregate amount on deposit in the Final Maturity Reserve Account for such Distribution Date; and

(xxxii) the amount on deposit in the Interest Coverage Account.

The Trustee shall make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to Certificateholders, the Servicer, the NIMS Insurer, the Swap Counterparty and the Rating Agencies via the Trustee's internet website. The Trustee's internet website shall initially be located at http://www.sf.citidirect.com. Questions concerning payments can be addressed to the Trustee's customer service desk at 1-800-422-2066. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

In the case of information furnished pursuant to subclauses (i) through (iii) above, the amounts shall be expressed in a separate section of the report as a dollar amount for each Class for each $1,000 original dollar amount as of the Closing Date.

(b)     Within a reasonable period of time after the end of each calendar year, the Trustee shall make available on the Trustee's website to each Person who at any time during such calendar year was a Certificateholder of a Regular Certificate such information concerning distributions made on the Certificates made during such calendar year as is reasonably necessary to provide to enable such Person to prepare their tax returns. Such obligation of the Trustee shall

be deemed to have been satisfied to the extent that substantially comparable information shall be prepared and furnished by the Trustee to Certificateholders pursuant to any requirements of the Code as are in force from time to time.

(c)    On each Distribution Date, the Trustee shall make available on the Trustee's website to the Holders of the Residual Certificates and the NIMS Insurer a copy of the reports made available to the Regular Certificateholders in respect of such Distribution Date with such other information as the Trustee deems necessary or appropriate.

(d)    The Trustee shall furnish to the Holders of the Residual Certificates the applicable Form 1066 and each applicable Form 1066Q as required by the Code. Additionally, the Trustee shall make available on its website to each Person who at any time during the calendar year was a Holder of a Residual Certificate certain statements setting forth information set forth in clauses (i) through (xxxii) of Section 4.03(a) above. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee to such Holders pursuant to the rules and regulations of the Code as are in force from time to time.

(e)    On each Distribution Date the Trustee shall provide Bloomberg Financial Markets, L.P. ("Bloomberg") CUSIP level factors for each Class of Certificates as of such Distribution Date, using a format and media mutually acceptable to the Trustee and Bloomberg.

Section 4.04    Remittance Reports; Advances.

(a)    On or before the 18th day of each calendar month commencing in May 2007, or if such 18th day is not a Business Day, the Business Day immediately following such 18th day, but in no event later than such date which would allow the Trustee to submit a claim to the NIMS Insurer under the Indenture, the Servicer shall deliver to the NIMS Insurer and the Trustee by telecopy or electronic mail (or by such other means as the Servicer, the NIMS Insurer and the Trustee, as the case may be, may agree from time to time) a Remittance Report with respect to the related Distribution Date. Not later than each Servicer Remittance Date (or, in the case of certain information, as agreed between the Trustee and the Servicer, not later than four Business Days after the end of each Due Period), the Servicer shall deliver or cause to be delivered to the Trustee in addition to the information provided on the Remittance Report, such other information reasonably available to it with respect to the Mortgage Loans as the Trustee may reasonably require to perform the calculations necessary to make the distributions contemplated by Section 4.01 and to prepare the statements to Certificateholders contemplated by Section 4.03. The Trustee shall not be responsible to recompute, recalculate or verify any information provided to it by the Servicer.

(b)    The amount of Advances to be made by the Servicer for any Distribution Date shall equal, subject to Section 4.04(d), the sum of (i) the aggregate amount of Monthly Payments (with each interest portion thereof net of the related Servicing Fee), due on the related Due Date in respect of the Mortgage Loans (other than with respect to any Balloon Loan with a delinquent Balloon Payment as described in clause (iii) below), which Monthly Payments were delinquent as of the close of business on the related Determination Date, plus (ii) with respect to each REO Property (other than with respect to any REO Property relating to a Balloon Loan with a delinquent Balloon Payment as described in clause (iv) below), which REO Property was acquired during or prior to the related Prepayment Period and as to which such REO Property an

REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the Monthly Payments (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date in respect of the related Mortgage Loans, over the net income from such REO Property transferred to the Distribution Account pursuant to Section 3.23 for distribution on such Distribution Date, plus (iii) with respect to each Balloon Loan with a delinquent Balloon Payment, an amount equal to the assumed monthly principal and interest payment (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date based on the original principal amortization schedule for such Balloon Loan assuming such Mortgage Loan was not a Balloon Loan, plus (iv) with respect to each REO Property relating to a Balloon Loan with a delinquent Balloon Payment, which REO Property was acquired during or prior to the related Prepayment Period and as to which REO Property an REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the assumed monthly principal and interest payment (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date based on the original principal amortization schedule for the related Balloon Loan assuming such Mortgage Loan was not a Balloon Loan, over the net income from such REO Property transferred to the Distribution Account pursuant to Section 3.23 for distribution on such Distribution Date.

On or before 3:00 p.m. New York time on the Servicer Remittance Date, the Servicer shall remit in immediately available funds to the Trustee for deposit in the Distribution Account an amount equal to the aggregate amount of Advances, if any, to be made in respect of the Mortgage Loans and REO Properties for the related Distribution Date either (i) from its own funds or (ii) from the Collection Account, to the extent of funds held therein for future distribution (in which case, it will cause to be made an appropriate entry in the records of Collection Account that amounts held for future distribution have been, as permitted by this Section 4.04, used by the Servicer in discharge of any such Advance) or (iii) in the form of any combination of (i) and (ii) aggregating the total amount of Advances to be made by the Servicer with respect to the Mortgage Loans and REO Properties.  Any amounts held for future distribution and so used shall be appropriately reflected in the Servicer's records and replaced by the Servicer by deposit in the Collection Account on or before any future Servicer Remittance Date to the extent that the Available Funds for the related Distribution Date (determined without regard to Advances to be made on the Servicer Remittance Date) shall be less than the total amount that would be distributed to the Classes of Certificateholders pursuant to Section 4.01 on such Distribution Date if such amounts held for future distributions had not been so used to make Advances.  The Trustee will provide notice to the NIMS Insurer and the Servicer by telecopy by the close of business on any Servicer Remittance Date in the event that the amount remitted by the Servicer to the Trustee on such date is less than the Advances required to be made by the Servicer for the related Distribution Date.

(c)    The obligation of the Servicer to make such Advances is mandatory, notwithstanding any other provision of this Agreement but subject to Section 4.04(d) below, and, with respect to any Mortgage Loan, shall continue until the payment of the Mortgage Loan in full or the recovery of all Liquidation Proceeds thereon.

(d)    Notwithstanding anything herein to the contrary, no Advance or Servicing Advance shall be required to be made hereunder by the Servicer if such Advance or Servicing Advance would, if made, constitute a Nonrecoverable Advance.  The determination by the Servicer that it has made a Nonrecoverable Advance or that any proposed Advance or Servicing

Advance, if made, would constitute a Nonrecoverable Advance, shall be evidenced by an Officer's Certificate of the Servicer delivered to the NIMS Insurer, the Depositor and the Trustee.

Section 4.05    <u>Distributions on the REMIC Regular Interests</u>.

(a)    On each Distribution Date, the Trustee shall cause the sum of the Group I Interest Remittance Amount and the Group I Principal Remittance Amount, in the following order of priority, to be distributed by REMIC 1 to REMIC 2 on account of the REMIC 1 Group I Regular Interests and distributed to the Holders of the Class R Certificates (in respect of the Class R-1 Interest), as the case may be:

(1)    to Holders of REMIC 1 Regular Interest IX, and each of REMIC 1 Regular Interest I-1-A through I-59-B, *pro rata*, in an amount equal to (A) Uncertificated Interest for such REMIC 1 Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates.

(2)    to the extent of amounts remaining after the distributions made pursuant to clause (1) above, payments of principal shall be allocated to REMIC I Regular Interest IX, then to REMIC I Regular Interests I-1-A through I-59-B starting with the lowest numerical denomination until the Uncertificated Principal Balance of each such REMIC I Regular Interest is reduced to zero, provided that, for REMIC I Regular Interests with the same numerical denomination, such payments of principal shall be allocated pro rata between such REMIC I Regular Interests; and

(3)    to the Holders of REMIC 1 Regular Interest P, (A) all amounts representing Prepayment Charges in respect of the Group I Mortgage Loans received during the related Prepayment Period and (B) on the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter until $100 has been distributed pursuant to this clause.

(b)    On each Distribution Date, the Trustee shall cause the sum of the Group II Interest Remittance Amount and the Group II Principal Remittance Amount, in the following order of priority, to be distributed by REMIC 1 to REMIC 2 on account of the REMIC 1 Group II Regular Interests and distributed to the holders of the Class R Certificates (in respect of the Class R-1 Interest), as the case may be:

(1)    to Holders of REMIC 1 Regular Interest IIX and each of REMIC 1 Regular Interest II-1-A through II-59-B, *pro rata*, in an amount equal to (A) Uncertificated Interest for such REMIC 1 Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates.

(2)    to the extent of amounts remaining after the distributions made pursuant to clause (1) above, payments of principal shall be allocated to REMIC I Regular Interest IIX, then to REMIC I Regular Interests II-1-A through II-59-B starting with the lowest numerical denomination until the Uncertificated Principal Balance of each such REMIC I Regular Interest is reduced to zero, provided that, for REMIC I

Regular Interests with the same numerical denomination, such payments of principal shall be allocated pro rata between such REMIC I Regular Interests.

(3)     to the Holders of REMIC 1 Regular Interest P, (A) all amounts representing Prepayment Charges in respect of the Group II Mortgage Loans received during the related Prepayment Period and (B) on the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter until $100 has been distributed pursuant to this clause.

(c)     On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC 2 to REMIC 3 on account of the REMIC 2 Regular Interests and distributed to the Holders of the Class R Certificates (in respect of the Class R-2 Interest), as the case may be:

(i)     first, to the Holders of REMIC 2 Regular Interest Swap-IO, in an amount equal to (A) Uncertificated Accrued Interest for such REMIC 2 Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; second, to the Holders of REMIC 2 Regular Interest FMR-IO, in an amount equal to (A) Uncertificated Accrued Interest for such REMIC 2 Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; and third to the Holders of REMIC 2 Regular Interests AA, A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8, M9 and ZZ, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates.  Amounts payable as Uncertificated Accrued Interest in respect of REMIC 2 Regular Interest ZZ shall be reduced and deferred when the REMIC 2 Overcollateralized Amount is less than the REMIC 2 Overcollateralization Target Amount, by the lesser of (x) the amount of such difference and (y) the Maximum ZZ Uncertificated Interest Deferral Amount and such amount shall be payable to the Holders of REMIC 2 Regular Interests A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8 and M9 in the same proportion as the Extra Principal Distribution Amount is allocated to the Corresponding Certificates and the Uncertificated Principal Balance of the REMIC 2 Regular Interest ZZ shall be increased by such amount;

(ii)     to the Holders of REMIC 2 Regular Interests 1SUB, 1GRP, 2SUB, 2GRP and XX, *pro rata*, in an amount equal to (A) the Uncertificated Accrued Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(iii)     to the Holders of REMIC 2 Regular Interests, in an amount equal to 50% of the remainder of the Available Funds such Distribution Date after the distributions made pursuant to clauses (i) and (ii) above, allocated as follows:

(1)     98.00% of such remainder to the Holders of REMIC 2 Regular Interest AA until the Uncertificated Balance of such REMIC 2 Regular Interest is reduced to zero, provided, however, that REMIC 2 Regular Interest AA shall not be reduced until the Distribution Date

immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter, at which point such amount shall be distributed to REMIC 2 Regular Interest AA, until $100 has been distributed pursuant to this clause;

(2)     2.00% of such remainder, first, to the Holders of REMIC 2 Regular Interest A-IA, A-IIA1, A-IIA2, A-IIA3, A-IIA4, M1, M2, M3, M4, M5, M6, M7, M8 and M9, 1.00% and in the same proportion as principal payments are allocated to the Corresponding Certificates, until the Uncertificated Balances of such REMIC 2 Regular Interests are reduced to zero and second, to the Holders of REMIC 2 Regular Interest ZZ, until the Uncertificated Balance of such REMIC 2 Regular Interest is reduced to zero; and

(3)     any remaining amount to the Holders of the Class R Certificates (in respect of the Class R-2 Interest);

(iv)     to the Holders of REMIC 2 Regular Interests, in an amount equal to 50% of the remainder of the Available Funds such Distribution Date after the distributions made pursuant to clauses (i) and (ii) above, allocated as follows:

(1)     to the Holders of REMIC 2 Regular Interests 1SUB, 1GRP, 2SUB, 2GRP in such a manner as to keep the Uncertificated Principal Balance of each REMIC 2 Regular Interest with the designation "GRP" equal to 0.01% of the aggregate Stated Principal Balance of the Mortgage Loans in the related Loan Group (determined as of the current Distribution Date), and the Uncertificated Principal Balance of each REMIC 2 Regular Interest with the designation "SUB" equal to 0.01% of the excess of (x) the aggregate Stated Principal Balance of the Mortgage Loans in the related Loan Group over (y) the current Certificate Principal Balance of the Class A Certificates in the related Loan Group (except that if any such excess is a larger number than in the preceding distribution period, the least amount of principal shall be distributed to such REMIC 2 Regular Interests such that the REMIC 2 Subordinated Ratio is maintained); and then to the Holder of REMIC 2 Regular Interest XX, in each case until the Uncertificated Principal Balance of the REMIC 2 Regular Interest has been reduced to zero; and

(2)     any remaining amount to the Holder of the Class R Certificates (in respect of the Class R-2 Interest); and

(v)    to the Holder of the REMIC 2 Regular Interest AA, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period, provided that the payment of such amounts shall not reduce the Uncertificated Principal Balance of such REMIC 2 Regular Interest.

Section 4.06    <u>Allocation of Realized Losses</u>.

(a)    Prior to each Determination Date, the Servicer shall determine as to each Mortgage Loan and REO Property:  (i) the total amount of Realized Losses, if any, incurred in connection with any Final Recovery Determinations made during the related Prepayment Period; (ii) whether and the extent to which such Realized Losses constituted Bankruptcy Losses; and (iii) the respective portions of such Realized Losses allocable to interest and allocable to principal.   Prior to each Determination Date, the Servicer shall also determine as to each Mortgage Loan:  (i) the total amount of Realized Losses, if any, incurred in connection with any Deficient Valuations made during the related Prepayment Period; and (ii) the total amount of Realized Losses, if any, incurred in connection with Debt Service Reductions in respect of Monthly Payments due during the related Due Period.  The information described in the two preceding sentences that is to be supplied by the Servicer shall be evidenced by an Officer's Certificate delivered to the NIMS Insurer and the Trustee by the Servicer prior to the Determination Date immediately following the end of (i) in the case of Bankruptcy Losses allocable to interest, the Due Period during which any such Realized Loss was incurred, and (ii) in the case of all other Realized Losses, the Prepayment Period during which any such Realized Loss was incurred.

(b)    If on any Distribution Date after giving effect to all Realized Losses incurred with respect to the Mortgage Loans during or prior to the related Due Period and distributions of principal with respect to the Class A Certificates and the Mezzanine Certificates on such Distribution Date, the Uncertificated Principal Balance of the Class C Interest is equal to zero, Realized Losses equal to the Undercollateralized Amount shall be allocated by the Trustee on such Distribution Date as follows:

(i)    to the Class M-9 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(ii)    to the Class M-8 Certificates, until the Certificate Principal Balance thereof has been reduced to zero,

(iii)    to the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(iv)    to the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(v)    to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(vi)    to the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(vii)    to the Class M-3 Certificates until the Certificate Principal Balance thereof has been reduced to zero;

(viii)    to the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

(ix)    to the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero.

All Realized Losses to be allocated to the Certificate Principal Balances of the Mezzanine Certificates on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided in Section 4.01. All references above to the Certificate Principal Balance of the Mezzanine Certificates shall be to the Certificate Principal Balance of the Mezzanine Certificates immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses or increase thereof by any Subsequent Recoveries, in each case to be allocated to such Mezzanine Certificates on such Distribution Date.

Any allocation of Realized Losses to a Mezzanine Certificate on any Distribution Date shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated. No allocations of any Realized Losses shall be made to the Class A Certificates or the Class P Certificates. Any Realized Losses that reduce the distributions in respect of and/or the Uncertificated Principal Balance of the Class C Interest, shall be allocated by the Trustee to reduce the distributions in respect of and/or the Certificate Principal Balance of the Class C Certificates.

(c)    (i)  Realized Losses on the Group I Mortgage Loans shall be allocated by the Trustee on each Distribution Date to REMIC 1 Regular Interest IX. If the Uncertificated Principal Balance of REMIC 1 Regular Interest IX has been reduced to zero, Realized Losses on the Group I Mortgage Loans shall be allocated to the remaining REMIC 1 Group I Regular Interests in ascending numerical order, in each case until the Uncertificated Principal Balance of such REMIC 1 Regular Interest has been reduced to zero. Realized Losses on the Group II Mortgage Loans shall be allocated by the Trustee on each Distribution Date to REMIC 1 Regular Interest IIX. If the Uncertificated Principal Balance of REMIC 1 Regular Interest IIX has been reduced to zero, Realized Losses on the Group II Mortgage Loans shall be allocated to the remaining REMIC 1 Group II Regular Interests in ascending numerical order, in each case until the Uncertificated Principal Balance of such REMIC 1 Regular Interest has been reduced to zero.

(ii)    50% of all Realized Losses on the Mortgage Loans shall be allocated by the Trustee on each Distribution Date to the following REMIC 2 Regular Interests in the specified percentages, as follows:

first, to Uncertificated Accrued Interest payable to the REMIC 2 Regular Interest AA and ZZ up to an aggregate amount equal to the REMIC 2 Interest Loss Allocation Amount, 98% and 2%, respectively;

second, to the Uncertificated Principal Balances of the REMIC 2 Regular Interest AA and ZZ up to an aggregate amount equal to the REMIC 2 Principal Loss Allocation Amount, 98% and 2%, respectively;

third, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M9 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M9 has been reduced to zero;

fourth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M8 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M8 has been reduced to zero;

fifth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M7 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M7 has been reduced to zero;

sixth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M6 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M6 has been reduced to zero;

seventh, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M5 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M5 has been reduced to zero;

eighth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M4 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M4 has been reduced to zero;

ninth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M3 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M3 has been reduced to zero;

tenth, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M2 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M2 has been reduced to zero; and

eleventh, to the Uncertificated Principal Balances of REMIC 2 Regular Interest AA, M1 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 2 Regular Interest M1 has been reduced to zero.

(iii)    50% of all Realized Losses on the Mortgage Loans shall be allocated by the Trustee on each Distribution Date to REMIC 2 Regular Interest 1GRP, 1SUB, 2GRP, REMIC 2 Regular Interest 2SUB, and REMIC 2 Regular Interest XX, as follows:

after all distributions have been made on such Distribution Date, Realized Losses shall be applied in such a manner as to keep the Uncertificated Principal Balance of each REMIC 2 Regular Interest ending with the designation "GRP" equal to 0.01% of the aggregate Stated Principal Balance of the Mortgage

Loans in the related Loan Group (determined as of the current Distribution Date), and the Uncertificated Principal Balance of each REMIC 2 Regular Interest ending with the designation "SUB" equal to 0.01% of the excess of (x) the aggregate Stated Principal Balance of the Mortgage Loans in the related Loan Group as of the current Distribution Date over (y) the Certificate Principal Balance of the Senior Certificates related to such Loan Group immediately prior to such Distribution Date (except that if such excess is larger than it was for the preceding Distribution Date, the least amount of Realized Loss shall be allocated such that the REMIC 2 Subordinated Ratio is maintained); and then to REMIC 2 Regular Interest XX.

(d)     If on any Distribution Date Allocated Realized Loss Amounts are to be reinstated due to Subsequent Recoveries, the Allocated Realized Loss Amounts shall be reinstated by the Trustee on such Distribution Date to increase the Certificate Principal Balances of the Mezzanine Certificates in the following order of priority, in each case until the related Allocated Realized Loss Amount has been reduced to zero:

(i)      to the Class M-1 Certificates;

(ii)     to the Class M-2 Certificates;

(iii)    to the Class M-3 Certificates;

(iv)    to the Class M-4 Certificates;

(v)     to the Class M-5 Certificates;

(vi)    to the Class M-6 Certificates;

(vii)   to the Class M-7 Certificates;

(viii)  to the Class M-8 Certificates; and

(ix)    to the Class M-9 Certificates.

All Subsequent Recoveries to be allocated to the Certificate Principal Balances of the Mezzanine Certificates on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided in Section 4.01. All references above to the Certificate Principal Balance of the Mezzanine Certificates shall be to the Certificate Principal Balance of the Mezzanine Certificates immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses or increase thereof by any Subsequent Recoveries, in each case to be allocated to the Mezzanine Certificates on such Distribution Date.

Any Allocated Realized Loss Amounts to be reinstated to a Certificate on any Distribution Date due to Subsequent Recoveries shall be made by increasing the Certificate Principal Balance thereof by the amount so reinstated. No allocations of any Subsequent Recoveries shall be made to the Class A Certificates or the Class P Certificates.

(e)     (i) If on any Distribution Date Subsequent Recoveries occurred in the related Prepayment Period relating to the Group I Mortgage Loans, the amount of such

Subsequent Recoveries shall be allocated first to the REMIC 1 Group I Regular Interests with the designations "A" and "B" in the reverse order in which Realized Losses were allocated under Section 4.06(c)(i), and then to REMIC 1 Regular Interest IX.  If on any Distribution Date Subsequent Recoveries occurred in the related Prepayment Period relating to the Group II Mortgage Loans, the amount of such Subsequent Recoveries shall be allocated first to the REMIC 1 Group II Regular Interests with the designations "A" and "B" in the reverse order in which Realized Losses were allocated under Section 4.06(c)(i), and then to REMIC 1 Regular Interest IIX.

(ii)    If on any Distribution Date Subsequent Recoveries occurred in the related Prepayment Period, the amount of such Subsequent Recoveries shall be allocated among the REMIC 2 Regular Interests as follows:

(A)    50% of the Subsequent Recoveries from all Loan Groups shall be allocated among the REMIC 3 Regular Interests in the same proportions and amounts, but in the reverse order, as Realized Losses were allocated under Section 4.06(c)(ii).

(B)    50% of the Subsequent Recoveries from all Loan Groups shall be allocated in the same proportions, but in reverse order, as the Realized Losses were allocated under Section 4.06(c)(iii).

Section 4.07    Compliance with Withholding Requirements.

Notwithstanding any other provision of this Agreement, the Trustee shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Trustee reasonably believes are applicable under the Code.  The consent of Certificateholders shall not be required for such withholding.  In the event the Trustee does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Trustee shall indicate the amount withheld to such Certificateholders.

Section 4.08    Commission Reporting.

(a)    The Trustee and the Servicer shall reasonably cooperate with the Depositor in connection with the Trust's satisfying the reporting requirements under the 1934 Act.

(i)    Within 15 days after each Distribution Date, the Depositor shall, in accordance with industry standards and applicable regulations, file with the Commission via the Electronic Data Gathering Analysis and Retrieval System ("EDGAR"), a Distribution Report on Form 10-D, signed by the Depositor, with a copy of the monthly statement to be furnished by the Trustee to the Certificateholders for such Distribution Date and detailing all data elements specified in Item 1121(a) of Regulation AB as part of the monthly statement or otherwise as part of the Form 10-D; provided that the Depositor shall have received no later than 12:00 p.m. P.S.T. 2 Business Days prior to the date such Distribution Report on Form 10-D is required to be filed, all information required to be provided to the Depositor as described in clause (a)(iv) below.

(ii)     The Depositor will prepare and file Current Reports on Form 8-K in respect of the Trust, as and when required.

(iii)     Prior to January 30 of the first year in which the Depositor is able to do so under applicable law, the Depositor shall, in accordance with industry standards and applicable regulations, file a Form 15 Suspension Notice with respect to the Trust, if applicable. Prior to (x) March 15 of the year following the year of the execution of this Agreement and (y) unless and until a Form 15 Suspension Notice shall have been filed, prior to March 15 of each year thereafter, the Servicer shall provide the Depositor with an Annual Statement of Compliance, together with a copy of the Assessment of Compliance and Attestation Report to be delivered by the Servicer pursuant to Sections 3.20 and 3.21 (including with respect to any Sub-Servicer or subcontractor, if required to be filed). Prior to (x) March 31, of the year following the year of the execution of this Agreement and (y) unless and until a Form 15 Suspension Notice shall have been filed, March 31 of each year thereafter, the Depositor shall, subject to subsection (d) below, file a Form 10-K, in substance as required by applicable law or applicable Securities and Exchange Commission staff's interpretations and conforming to industry standards, with respect to the Trust.  Such Form 10-K shall include the Assessment of Compliance, Attestation Report, Annual Statements of Compliance and other documentation provided by the Servicer pursuant to Sections 3.20 and 3.21 (including with respect to any Sub-Servicer or subcontractor, if required to be filed) and with respect to the Trustee, and the Form 10-K (the "Certification") signed by the senior officer of the Depositor in charge of securitization; provided that the Depositor shall have received no later than March 15 of each calendar year prior to the filing deadline for the Form 10-K all information, data and exhibits required to be provided or filed with such Form 10-K and required to be provided to the Depositor as described in clause (a)(iv) below.  If they are not so timely delivered, the Depositor shall file an amended Form 10-K including such documents as exhibits reasonably promptly after they are delivered to the Depositor.

(iv)     As to each item of information required to be included in any Form 10-D, Form 8-K or Form 10-K, the Depositor's obligation to include the information in the applicable report is subject to receipt from the entity that is indicated in Exhibit O as the responsible party for providing that information, if other than the Trustee or the Depositor, as applicable, as and when required as described above.  Each of the Trustee, the Servicer and the Depositor, as applicable, hereby agree to notify and provide to the Trustee and the Depositor all information that is required to be included in any Form 10-D, Form 8-K or Form 10-K, with respect to which that entity is indicated in Exhibit O as the responsible party for providing that information.  The Servicer shall be responsible for determining the pool concentration applicable to any Sub-Servicer or originator at any time, for purposes of disclosure as required by Items 1117 and 1119 of Regulation AB.

(b)     The Depositor shall prepare and the appropriate person shall execute, in accordance with the Exchange Act or any other applicable law, any certification required under the Exchange Act or any other applicable law to accompany the Form 10-K or any other periodic report.  The Trustee shall sign a back-up certification (in the form attached hereto as Exhibit P) for the benefit of the Depositor and its officers, directors and Affiliates.  The Trustee shall indemnify and hold harmless the Depositor, the Servicer and each Person, if any, who "controls" the Depositor or the Servicer within the meaning of the Securities Act of 1933, as amended, and their respective officers and directors from and against any losses, damages, penalties, fines,

forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) a breach of the Trustee's obligations under Section 3.21(e) to provide the Assessment of Compliance until a Form 15 is filed, Section 4.03(a) to make available statements as specified in Section 4.03(a) to the extent the required information has been provided to the Trustee by the Servicer or the Swap Counterparty, Section 4.08(a)(iv) to provide information to be included in any Form 10-D, Form 8-K or Form 10-K or this Section 4.08(b) to provide backup certification or (ii) any material misstatement or omission in (A) the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Trustee in the form of Exhibit P or in the Assessment of Compliance provided pursuant to Section 3.21 until a Form 15 is filed or (B) the information provided by the Trustee pursuant to Section 4.08(a)(iv) for inclusion in any Form 10-D, Form 8-K or Form 10-K or in the statement provided by the Trustee pursuant to Section 4.03(a) unless such misstatement or omission is based on the information provided to the Trustee by the Servicer or the Swap Counterparty.  The Servicer shall indemnify and hold harmless the Depositor, the Trustee and each Person, if any, who "controls" the Depositor or the Trustee within the meaning of the Securities Act of 1933, as amended, and their respective officers and directors from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) a breach of the Servicer's obligations under Section 3.20, Section 3.21 or Section 4.08 or (ii) any material misstatement or omission in the Certification made in reliance on any material misstatement or omission contained in any certification provided by the Servicer under this Section 4.08 or in the Officer's Certificate provided pursuant to Section 3.20 or the Assessment of Compliance provided pursuant to Section 3.21.  If the indemnification provided for herein is unavailable or insufficient to hold harmless the indemnified party, then (i) the Trustee agrees that in connection with (a) a breach of the Trustee's obligations under Section 3.21(e) to provide the Assessment of Compliance until a Form 15 is filed, Section 4.03(a) to make available statements as specified in Section 4.03(a) to the extent the required information has been provided to the Trustee by the Servicer or the Swap Counterparty, Section 4.08(a)(iv) to provide information to be included in any Form 10-D, Form 8-K or Form 10-K or this Section 4.08(b) to provide backup certification or (b) any material misstatement or omission in (A) the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Trustee in the form of Exhibit P or in the Assessment of Compliance provided pursuant to Section 3.21 until a Form 15 is filed, or (B) the information provided by the Trustee pursuant to Section 4.08(a)(iv) for inclusion in any Form 10-D, Form 8-K or Form 10-K or in the statement provided by the Trustee pursuant to Section 4.03(a) unless such misstatement or omission is based on the information provided to the Trustee by the Servicer or the Swap Counterparty that it shall contribute to the amount paid or payable by the Depositor and/or the Servicer as a result of the losses, claims, damages or liabilities of the Depositor and/or the Servicer in such proportion as is appropriate to reflect the relative fault of the Depositor or the Servicer, as the case may be, on the one hand and the Trustee on the other and (ii) the Servicer agrees that it shall contribute to the amount paid or payable by the Depositor and/or the Trustee as a result of the losses, claims, damages or liabilities of the Depositor and/or the Trustee in such proportion as is appropriate to reflect the relative fault of the Depositor or the Trustee, as the case may be, on the one hand and the Servicer on the other in connection with (a) a breach of the Servicer's obligations under this Section 4.08(b) or (b) any material misstatement or omission in the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Servicer under this Section 4.08 or in the Officer's Certificate provided pursuant to Section 3.20 or the Assessment of Compliance provided pursuant to Section 3.21.

Section 4.09     <u>Supplemental Interest Trust</u>.

(a)     On the Closing Date, there is hereby established a separate common law trust under the laws of the State of Delaware for the benefit of the Holders of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates (the "Supplemental Interest Trust"), into which the Depositor shall deposit: (i) the Swap Agreement and (ii) $1,000.  The Supplemental Interest Trust shall be maintained by the Supplemental Interest Trust Trustee, who initially, shall be the Trustee. On the Closing Date, the Supplemental Interest Trust Trustee shall establish and maintain in its name, a separate non-interest bearing account (the "Supplemental Interest Account"), to be held in the Supplemental Interest Trust into which the Depositor shall initially deposit $1,000.  The Supplemental Interest Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee or of the Supplemental Interest Trust Trustee held pursuant to this Agreement.

(b)     The Supplemental Interest Trust Trustee shall deposit, to the extent of available funds, into the Supplemental Interest Account any amounts required to be paid to the Supplemental Interest Trust Trustee pursuant to Section 4.01 and shall distribute from the Supplemental Interest Account any such amounts to the Swap Counterparty as required by Section 4.01(d)(iv).  For federal income tax purposes, such amounts paid to the Supplemental Interest Trust on each Distribution Date shall first be deemed paid to the Supplemental Interest Trust in respect of Class Swap IO Upper-Tier Interest to the extent of the amount distributable on such Class Swap IO Upper-Tier Interest on such Distribution Date, and any remaining amount shall be deemed paid to the Supplemental Interest Trust in respect of  a Class IO Distribution Amount.  The Supplemental Interest Trust Trustee shall deposit into the Supplemental Interest Account any amounts received from the Swap Counterparty and shall distribute from the Supplemental Interest Account any such amounts to the Swap Counterparty and to the Holders of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates as required pursuant to Section 4.01(d)(iv).

(c)     Funds in the Supplemental Interest Account shall be invested in Permitted Investments.  The Holders of the majority of the Percentage Interest of the Class C Certificates shall direct the Supplemental Interest Trust Trustee, in writing, as to investment of amounts on deposit therein. All income and gain earned upon such investment shall be deposited into the Supplemental Interest Account.

(d)     In addition, on or after the Closing Date, the Supplemental Interest Trust Trustee shall establish and maintain in its name, a separate non-interest bearing account (the "Credit Support Annex Account"), to be held in the Supplemental Interest Trust.  The Credit Support Annex Account shall be an Eligible Account and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee or of the Supplemental Interest Trust Trustee held pursuant to this Agreement.

The Supplemental Interest Trust Trustee shall deposit into the Credit Support Annex Account any amounts received from the Swap Counterparty under the Swap Credit Support Annex.  Except for investment earnings, the Swap Counterparty shall not have any legal, equitable or beneficial interest in the Credit Support Annex Account other than in accordance with this Agreement, the Swap Agreement and applicable law.  The Supplemental Interest Trust

Trustee shall maintain and apply all collateral and earnings thereon on deposit in the Credit Support Annex Account in accordance with Swap Credit Support Annex.

Cash collateral posted by the Swap Counterparty in accordance with the Swap Credit Support Annex shall be invested at the direction of the Swap Counterparty in Permitted Investments in accordance with the requirements of the Swap Credit Support Annex.   All amounts earned on amounts on deposit in the Credit Support Annex Account (whether cash collateral or securities) shall be for the account of and taxable to the Swap Counterparty.  Neither the Supplemental Interest Trust Trustee or the Trustee shall be liable for the selection of investments or for the losses incurred thereon. The Supplemental Interest Trustee shall be entitled to rely upon notices and information that it receives from the calculation agent and Swap Counterparty pursuant to the terms of the Swap Agreement, acting in good faith.

Upon the occurrence of an Event of Default, a Termination Event, or an Additional Termination Event (each as defined in the Swap Agreement) or upon the occurrence or designation of an Early Termination Date (as defined in the Swap Agreement) as a result of any such Event of Default, Termination Event, or Additional Termination Event, and, in either such case, unless the Swap Counterparty has paid in full all of its Obligations (as defined in the Swap Credit Support Annex) that are then due, then any collateral posted by the Swap Counterparty in accordance with the Swap Credit Support Annex shall be applied to the payment of any Obligations due to Party B (as defined in the Swap Agreement) in accordance with the Swap Credit Support Annex.  To the extent the Supplemental Interest Trust Trustee is required to return any of the Posted Collateral to the Swap Counterparty under the terms of the Swap Credit Support Annex, the Supplemental Interest Trust Trustee shall return such collateral in accordance with the terms of the Swap Credit Support Annex.

It is the intention of the parties that, for federal and state income and state and local franchise tax purposes, the Holders of the Class C Certificates be considered the owners of the Supplemental Interest  Trust (exclusive of the Credit Support Annex Account) and that the Supplemental Interest Trust (exclusive of the Credit Support Annex Account) be disregarded as an entity separate from the Holder of the Class C Certificates unless and until the date when either (a) there is more than one Holder of the Class C Certificates or (b) any Class of Certificates in addition to the Class C Certificates is recharacterized as an equity interest in the Supplemental Interest Trust (exclusive of the Credit Support Annex Account) for federal income tax purposes, in which case it is the intention of the parties that, for federal and state income and state and local franchise tax purposes, the Supplemental Interest Trust (exclusive of the Credit Support Annex Account) be treated as a partnership.  Neither the Supplemental Interest Trust Trustee nor the Trustee shall be responsible for any entity-level tax reporting, of tax return preparation or filing, for the Supplemental Interest Trust.  If the Supplemental Interest Trust becomes characterized as a partnership for federal income tax purposes, the Servicer or its Affiliate shall (i) obtain, or cause to be obtained, a taxpayer identification number for the Supplemental Interest Trust, (ii) prepare and file, or cause to be prepared and filed, any necessary federal, state or local tax returns for the Supplemental Interest Trust, and (iii) prepare and deliver, or cause to be prepared and delivered, to the Swap Counterparty an IRS Form W-9 and to update such form upon expiration, as required under then applicable U.S. Treasury regulations, and promptly upon learning that such IRS Form W-9 (or any successor form thereto) has become obsolete or incorrect.  Each Holder of a Class C Certificate and each transferee thereof, by accepting the Class C Certificate, hereby to (x) designates and authorizes the Servicer or its Affiliate to act as its agent and as agent for the Supplemental Interest Trust in obtaining a

taxpayer identification number for the Supplemental Interest Trust, preparing and filing tax returns, and issuing the IRS Form W-9, and (y) agrees to cooperate with the Servicer and to provide any information the Servicer reasonably requires to perform the foregoing functions.

(e)    Any obligation of the Supplemental Interest Trust Trustee under the Swap Agreement shall be deemed to be an obligation of the Supplemental Interest Trust.

Section 4.10    Final Maturity Reserve Trust.

(a)    On the Closing Date, there is hereby established a separate common law trust under the laws of the State Delaware for the benefit of the Holders of the Class A Certificates, the Mezzanine Certificates and the Class C Certificates (the "Final Maturity Reserve Trust") into which the Depositor shall deposit $1,000. The Final Maturity Reserve Trust shall be maintained by the Final Maturity Reserve Trust Trustee, who, initially, shall be the Trustee. On the Closing Date, the Final Maturity Reserve Trust Trustee shall establish and maintain in its name, a separate non-interest bearing account (the "Final Maturity Reserve Account"), into which the Depositor shall initially deposit $1,000. The Final Maturity Reserve Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee or of the Final Maturity Reserve Trust Trustee held pursuant to this Agreement.

(b)    The Final Maturity Reserve Trust Trustee shall deposit into the Final Maturity Reserve Account any Group I Final Maturity Reserve Amount, Group II Final Maturity Reserve Amount and Supplemental Final Maturity Reserve Amount pursuant to Section 4.01. The Final Maturity Reserve Trust Trustee shall distribute the funds in the Final Maturity Reserve Account pursuant to Section 4.01(d)(iii).

(c)    Funds in the Final Maturity Reserve Trust shall be held by the Trustee in the Final Maturity Reserve Account uninvested. The Class C Certificates shall evidence ownership of the Final Maturity Reserve Trust for federal income tax purposes.

(d)    For federal income tax purposes, any Certificateholder that receives a principal payment from the Final Maturity Reserve Trust shall be treated as selling a portion of its Certificate to the Holder of the Class C Certificates and as having received the amount of the principal payment from the Holder of the Class C Certificates as the proceeds of the sale. The portion of the Certificate that is treated as having been sold shall equal the amount of the corresponding reduction in the Certificate Principal Balance of such Certificate. Principal payments received from the Final Maturity Reserve Trust shall not be treated as distributions from any REMIC created hereby. All principal distributions from the Final Maturity Reserve Trust shall be accounted for hereunder in accordance with this Section 4.10(d).

Section 4.11    Intention of the Parties and Interpretation.

Each of the parties acknowledges and agrees that the purpose of Sections 3.20, 3.21 and 4.08 of this Agreement is to facilitate compliance by the Depositor with the provisions of Regulation AB, as such may be amended from time to time and subject to clarification and interpretive advice as may be issued by the staff of the Commission from time to time. Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish that purpose, (b) the parties' obligations hereunder

will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB, (c) the parties shall comply with requests made by the Depositor for delivery of additional or different information as the Depositor may determine in good faith is necessary to comply with the provisions of Regulation AB, and (d) no amendment of this Agreement shall be required to effect any such changes in the parties' obligations as are necessary to accommodate evolving interpretations of the provisions of Regulation AB.

Section 4.12        Interest Coverage Account.

(a)        No later than the Closing Date, the Trustee shall establish and maintain a segregated non-interest bearing trust account that is an Eligible Account, which shall be titled "Interest Coverage Account, Citibank, N.A., as trustee for the registered Holders of WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust" (the "Interest Coverage Account"). The Trustee shall, promptly upon receipt, deposit in the Interest Coverage Account and retain therein the Interest Coverage Amount remitted on the Closing Date to the Trustee by the Depositor.  Funds deposited in the Interest Coverage Account shall be held in trust by the Trustee for the Certificateholders for the uses and purposes set forth herein.

(b)        For federal income tax purposes, the Servicer shall be the owner of the Interest Coverage Account and shall report all items of income, deduction, gain or loss arising therefrom.  At no time will the Interest Coverage Account be an asset of any REMIC created hereunder. Amounts held in the Interest Coverage Account shall be invested in Permitted Investments upon and pursuant to written investment directions from the Servicer. The Trustee shall have no liability for losses on any such investment and in the absence of such written directions from the Servicer, the Trustee shall be under no duty to invest (or otherwise pay interest on) such funds. All income and gain realized from investment of funds deposited in the Interest Coverage Account shall be for the sole and exclusive benefit of the Servicer and shall be remitted by the Trustee to the Servicer no later than the first Business Day following receipt of such income and gain by the Trustee.  The Servicer shall deposit in the Interest Coverage Account the amount of any net loss incurred in respect of any such Permitted Investment immediately upon realization of such loss.

(c)        On the first Distribution Date, the Trustee shall withdraw from the Interest Coverage Account and deposit in the Reserve Fund an amount equal to the difference between (x) the aggregate amount of interest accrued during the related Accrual Period at the related Formula Rate on the Certificate Principal Balance of each Class of the Class A Certificates and the Mezzanine Certificates immediately prior to such Distribution Date, minus the aggregate amount of any Relief Act Interest Shortfalls or Net Prepayment Interest Shortfalls for such Distribution Date over (y) the sum of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount for such Distribution Date.  On the second Distribution Date, the Trustee shall withdraw any remaining amounts from the Interest Coverage Account and distribute them to the Servicer.

ARTICLE V

THE CERTIFICATES

Section 5.01     The Certificates.

(a)     The Certificates in the aggregate will represent the entire beneficial ownership interest in the Mortgage Loans and all other assets included in the Trust Fund.

The Certificates will be substantially in the forms annexed hereto as Exhibits A-1 through A-6.  The Certificates of each Class will be issuable in registered form only, in denominations of authorized Percentage Interests as described in the definition thereof.  Each Certificate will share ratably in all rights of the related Class.

Upon original issue, the Certificates shall be executed by the Trustee and authenticated and delivered by the Trustee, to or upon the order of the Depositor.  The Certificates shall be executed and attested by manual or facsimile signature on behalf of the Trustee by an authorized signatory.  Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such Certificates.  No Certificate shall be entitled to any benefit under this Agreement or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided herein executed by the Trustee by manual signature, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder.  All Certificates shall be dated the date of their authentication.

(b)     The Book Entry Certificates shall initially be issued as one or more Certificates held by the Book-Entry Custodian or, if appointed to hold such Certificates as provided below, the Depository and registered in the name of the Depository or its nominee and, except as provided below, registration of the Book-Entry Certificates may not be transferred by the Trustee except to another Depository that agrees to hold the Book-Entry Certificates for the respective Certificate Owners with Ownership Interests therein.  The Certificate Owners shall hold their respective Ownership Interests in and to the Book-Entry Certificates through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to definitive, fully registered Certificates ("Definitive Certificates") in respect of such Ownership Interests.  All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner.  Each Depository Participant shall only transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.  The Trustee is hereby initially appointed as the Book-Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such.  The Book-Entry Custodian may, and if it is no longer qualified to act as such, the Book-Entry Custodian shall, appoint, by a written instrument delivered to the Depositor, the Servicer and if the Trustee is not the Book-Entry Custodian, the Trustee and any other transfer agent (including the Depository or any successor Depository) to act as Book-Entry Custodian under such conditions as the

predecessor Book-Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book-Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any such appointment of other than the Depository. If the Trustee resigns or is removed in accordance with the terms hereof, successor Trustee or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book-Entry Custodian. The Depositor shall have the right to inspect, and to obtain copies of, any Certificates held as Book-Entry Certificates by the Book-Entry Custodian.

The Trustee, the Delaware Trustee, the Servicer, the NIMS Insurer and the Depositor may for all purposes (including the making of payments due on the Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the Book-Entry Certificates for the purposes of the exercise by Certificateholders of the rights of Certificateholders hereunder. The rights of Certificate Owners with respect to the Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners. The Depositor is hereby authorized to execute and deliver on behalf of the Trust the Letter of Representations to be submitted on behalf of the Trust to the Depository and to perform the obligations of the Issuer (as defined in the Letter of Representations) thereunder. The Trustee is hereby authorized to execute and deliver as agent of the Trust the Letter of Representations to be submitted on behalf of the Trust to the Depository and to perform the obligations of the Agent (as defined in the Letter of Representations) thereunder. Multiple requests and directions from, and votes of, the Depository as Holder of the Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

If (i)(A) the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (B) the Depositor is unable to locate a qualified successor, (ii) the Depositor notifies the Trustee and the Depository of its intent to terminate the book-entry system through the Depository and, upon receipt of notice of such intent from the Depository, the Depository Participants with a position in the Book Entry Certificates agree to initiate such termination, or (iii) after the occurrence of a Servicer Event of Default, Certificate Owners representing in the aggregate not less than 51% of the Ownership Interests of the Book-Entry Certificates advise the Trustee through the Depository, in writing, that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Book-Entry Custodian or the Depository, as applicable, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates. Such Definitive Certificates will be issued in minimum denominations of $25,000, except that any beneficial ownership that was represented by a Book-Entry Certificate in an amount less than $25,000 immediately prior to the issuance of a Definitive Certificate shall be issued in a minimum denomination equal to the amount represented by such Book-Entry Certificate. None of the Depositor, the Servicer, the Trustee or the Delaware Trustee shall be liable for any delay in the delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates all references herein to obligations imposed upon or to be performed by

the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates, and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

Section 5.02    Registration of Transfer and Exchange of Certificates.

(a)    The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee in accordance with the provisions of Section 8.12 a Certificate Register for the Certificates in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided.

(b)    No transfer, sale, pledge or other disposition of any Class C Certificate, Class P Certificate or Residual Certificate shall be made unless such disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with the 1933 Act and laws.  In the event of any such transfer of any Class C Certificate, Class P Certificate or Residual Certificate (other than in connection with (i) the initial transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Depositor to the Seller, (ii) the transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Seller to an Affiliate of the Seller or to a trust, the depositor of which is an Affiliate of the Seller, (iii) the transfer of any Class C Certificate, Class P Certificate or Residual Certificates by an Affiliate of the Seller to one or more entities sponsored by such Affiliate or to a trust, the depositor of which is one or more entities sponsored by such Affiliate or (iv) a subsequent transfer of any Class C Certificates, Class P Certificates or Residual Certificates to the Seller or its designee by such entity or trust described in clauses (ii) or (iii) above to which the Certificates were previously transferred in reliance on clauses (ii) or (iii) above) (i) unless such transfer is made in reliance upon Rule 144A (as evidenced by the investment letter delivered to the Trustee, in substantially the form attached hereto as Exhibit J) under the 1933 Act, the Trustee and the Depositor shall require a written Opinion of Counsel (which may be in-house counsel) acceptable to and in form and substance reasonably satisfactory to the Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from the 1933 Act or is being made pursuant to the 1933 Act, which Opinion of Counsel shall not be an expense of the Trustee, the Delaware Trustee, the Trust Fund or the Depositor or (ii) the Trustee shall require the transferor to execute a transferor certificate (in substantially the form attached hereto as Exhibit L) and the transferee to execute an investment letter (in substantially the form attached hereto as Exhibit J) acceptable to and in form and substance reasonably satisfactory to the Depositor and the Trustee certifying to the Depositor and the Trustee the facts surrounding such transfer, which investment letter shall not be an expense of the Trustee or the Depositor.  The Holder of a Class C Certificate, Class P Certificate or Residual Certificate desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the Delaware Trustee, the Depositor and the Trust Fund against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

(c)    For so long as the Supplemental Interest Trust or the Final Maturity Reserve Trust is in existence, no transfer of a Class A Certificate or Mezzanine Certificate shall be made unless the Trustee shall have received a representation letter from the transferee of such Certificate, substantially in the form set forth in Exhibit I, to the effect that either (i) it is neither a Plan nor a Person acting on behalf of any such Plan or using the assets of any such Plan to

effect such transfer or (ii) it is an accredited investor within the meaning of Prohibited Transaction Exemption 2007-05, as amended from time to time (the "Exemption") and the acquisition and holding of such Certificate and the separate right to receive payments from the Supplemental Interest Trust Trustee and the Final Maturity Reserve Trust Trustee are eligible for the exemptive relief available under Prohibited Transaction Class Exemption ("PTCE") 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers").  If the Class A Certificate, or the Mezzanine Certificate is a Book-Entry Certificate, the transferee will be deemed to have made a representation as provided in clause (i) or (ii) of this paragraph, as applicable.

Subsequent to the termination of the Supplemental Interest Trust and the Final Maturity Reserve Trust, no transfer of a Mezzanine Certificate shall be made unless the Trustee shall have received a representation letter from the transferee of such Certificate, substantially in the form set forth in Exhibit I, to the effect that either (i) it is neither a Plan nor a Person acting on behalf of any such Plan or using the assets of any such Plan to effect such transfer or (ii) it has acquired and is holding such Certificate in reliance on the Exemption, and that it understands that there are certain conditions to the availability of the Exemption, including that the certificate must be rated, at the time of purchase, not lower than "BBB-"(or its equivalent) by S&P, Fitch, DBRS Moody's, and the Certificate is so rated or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.  If the Mezzanine Certificate is a Book-Entry Certificate, the transferee will be deemed to have made a representation as provided in clause (i), (ii) or (iii) of this paragraph, as applicable.

No transfer of a Class C Certificate, Class P Certificate or Residual Certificate or any interest therein shall be made to any Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring such Certificates with "Plan Assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless, in the case of the Class C Certificates or the Class P Certificates, the Depositor, the Trustee and the Servicer are provided with an Opinion of Counsel which establishes to the satisfaction of the Depositor, the Trustee and the Servicer that the purchase of such Certificates is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Servicer, the Trustee, the Delaware Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Servicer, the Trustee. the Delaware Trustee or the Trust Fund.  Neither an Opinion of Counsel nor any certification will be required in connection with the (i) initial transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Depositor to the Seller, (ii) the transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Seller to an Affiliate of the Seller or to a trust, the depositor of which is an Affiliate of the Seller, (iii) the transfer of any Class C Certificates, Class P Certificates or Residual Certificates by an Affiliate of the Seller to one or more entities sponsored by such Affiliate or to a trust the depositor of which is one or more entities sponsored by such Affiliate or (iv) a subsequent transfer of any Class C Certificates, Class P Certificates or Residual Certificates to the Seller or its designee by such entity or trust described in clauses (ii)

or (iii) above to which the Certificates were previously transferred in reliance on clauses (ii) or (iii) above (in which case, the Depositor, the Seller, any such Affiliate and such entities sponsored by such Affiliate shall have deemed to have represented that the applicable transferee is not a Plan or a Person investing Plan Assets) and the Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee, shall be a written representation) from the Depositor of the status of each transferee, the Seller or such an Affiliate. Each transferee of a Class C Certificate, Class P Certificate or Residual Certificate shall sign a letter substantially in the form of Exhibit I to demonstrate its compliance with this Section 5.02(c) (other than in connection with the (i) initial transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Depositor to the Seller, (ii) the transfer of any Class C Certificate, Class P Certificate or Residual Certificates by the Seller to an Affiliate of the Seller or to a trust, the depositor of which is an Affiliate of the Seller, (iii) the transfer of any Class C Certificates, Class P Certificates or Residual Certificates by an Affiliate of the Seller to one or more entities sponsored by such Affiliate or to a trust the depositor of which is one or more entities sponsored by such Affiliate or (iv) a subsequent transfer of any Class C Certificates, Class P Certificates or Residual Certificates to the Seller or its designee by such entity or trust described in clauses (ii) or (iii) above to which the Certificates were previously transferred in reliance on clauses (ii) or (iii) above).

For so long as the Swap Agreement is in effect, except as provided in the next sentence, no transfer of any Class C Certificate shall be effective unless and until the proposed transferee of such Class C Certificate provides to each of (a) the Trustee, (b) the Supplemental Interest Trust Trustee and (c) the Swap Counterparty, the appropriate tax certification form (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable or any successor form thereto), and such proposed transferee agrees to update such forms (i) upon expiration of any such form, (ii) as required under then applicable U.S. Treasury regulations, and (iii) promptly upon learning that any IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable or any successor form thereto, has become obsolete or incorrect. The foregoing sentence shall not apply to any transfer of a Class C Certificate if, immediately after such transfer, there would be more than one Holder of the Class C Certificates. If the Holder of any Class C Certificates or any proposed transferee of a Class C Certificate requests, the Supplemental Interest Trust Trustee shall provide such Holder with the then current contact information for the Swap Counterparty. Except for transfers described in the second sentence of this paragraph, any purported sales or transfers of any Class C Certificate to a transferee that does not comply with the requirements of this paragraph shall be deemed null and void under this Agreement, and the Trustee shall continue to treat the purported transferor as the owner of the relevant Class C Certificates for all purposes of this Agreement. Upon receipt of any tax certification form pursuant to this paragraph, the Supplemental Interest Trust Trustee shall forward a copy of such form to the Swap Counterparty.

The Supplemental Interest Trust Trustee and the Trustee, respectively, shall not be liable for the completeness, accuracy, content or truthfulness of any such tax certification provided to it. The Supplemental Interest Trust Trustee and the Trustee shall only be required to forward any tax certification received by it to the Swap Counterparty at the last known address provided to it, and shall not be liable for the receipt of such tax certification by the Swap Counterparty, nor any failure of the Swap Counterparty to process such certification or to take any action as required under the respective Swap Agreement, or under applicable law. The Supplemental Interest Trustee and the Trustee shall have no duty to take action to correct any misstatement or omission in any tax certification provided to it and forwarded to the Swap Counterparty.

If any Certificate or any interest therein is acquired or held in violation of the provisions of the preceding paragraphs, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Certificate retroactive to the date of transfer to the purported beneficial owner.  Any purported beneficial owner whose acquisition or holding of any such Certificate or interest therein was effected in violation of the provisions of the preceding paragraph shall indemnify and hold harmless the Depositor, the Servicer, the Trustee, the Delaware Trustee and the Trust Fund from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

(d)     Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably appointed the Depositor or its designee as its attorney-in-fact to negotiate the terms of any mandatory sale under clause (v) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(ii)     No Person shall acquire an Ownership Interest in a Residual Certificate unless such Ownership Interest is a pro rata undivided interest.

(iii)     Except in connection with any transfer to an Affiliate of the Depositor, in connection with any proposed transfer of any Ownership Interest in a Residual Certificate, the Trustee shall as a condition to registration of the transfer, require delivery to it, in form and substance satisfactory to it, of each of the following:

(A)     an affidavit in the form of Exhibit K hereto from the proposed transferee to the effect that such transferee is a Permitted Transferee and that it is not acquiring its Ownership Interest in the Residual Certificate that is the subject of the proposed transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee; and

(B)     a covenant of the proposed transferee to the effect that the proposed transferee agrees to be bound by and to abide by the transfer restrictions applicable to the Residual Certificates.

(iv)     Any attempted or purported transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section shall be absolutely null and void and shall vest no rights in the purported transferee.  If any purported transferee shall, in violation of the provisions of this Section, become a Holder of a Residual Certificate, then the prior Holder of such Residual Certificate that is a Permitted Transferee shall, upon discovery that the registration of transfer of such Residual Certificate was not in fact permitted by this Section, be restored to all rights as Holder thereof retroactive to the date of registration of transfer of such Residual Certificate.  The Trustee shall not be under any liability to any Person for any registration of transfer of a Residual Certificate that is in fact not permitted by this Section or for making any

distributions due on such Residual Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Trustee received the documents specified in clause (iii). The Trustee shall be entitled to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time such distributions were made all distributions made on such Residual Certificate. Any such distributions so recovered by the Trustee shall be distributed and delivered by the Trustee to the prior Holder of such Residual Certificate that is a Permitted Transferee.

(v)     If any Person other than a Permitted Transferee acquires any Ownership Interest in a Residual Certificate in violation of the restrictions in this Section, then the Trustee shall have the right but not the obligation, without notice to the Holder of such Residual Certificate or any other Person having an Ownership Interest therein, to notify the Depositor to arrange for the sale of such Residual Certificate. The proceeds of such sale, net of commissions (which may include commissions payable to the Depositor or its affiliates in connection with such sale), expenses and taxes due, if any, will be remitted by the Trustee to the previous Holder of such Residual Certificate that is a Permitted Transferee, except that in the event that the Trustee determines that the Holder of such Residual Certificate may be liable for any amount due under this Section or any other provisions of this Agreement, the Trustee may withhold a corresponding amount from such remittance as security for such claim. The terms and conditions of any sale under this clause (v) shall be determined in the sole discretion of the Trustee and it shall not be liable to any Person having an Ownership Interest in a Residual Certificate as a result of its exercise of such discretion.

(vi)    If any Person other than a Permitted Transferee acquires any Ownership Interest in a Residual Certificate in violation of the restrictions in this Section, then the Trustee will provide to the Internal Revenue Service, and to the persons designated in Section 860E(e)(3) of the Code, information needed to compute the tax imposed under Section 860E(e)(1) of the Code on such transfer.

The foregoing provisions of this Section shall cease to apply to transfers occurring on or after the date on which there shall have been delivered to the Trustee, in form and substance satisfactory to the Trustee, (i) written notification from each Rating Agency that the removal of the restrictions on Transfer set forth in this Section will not cause such Rating Agency to downgrade its rating of any of the Other NIM Notes, the Insured NIM Notes (without giving effect to any insurance policy issued by the NIMS Insurer) or the Certificates and (ii) an Opinion of Counsel to the effect that such removal will not cause any REMIC created hereunder to fail to qualify as a REMIC.

(e)     Subject to the preceding subsections, upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee designated from time to time for such purpose pursuant to Section 8.12, the Trustee shall execute and authenticate and deliver, in the name of the designated Transferee or Transferees, one or more new Certificates of the same Class of a like aggregate Percentage Interest.

(f)     At the option of the Holder thereof, any Certificate may be exchanged for other Certificates of the same Class with authorized denominations and a like aggregate Percentage Interest, upon surrender of such Certificate to be exchanged at any office or agency

of the Trustee maintained for such purpose pursuant to Section 8.12. Whenever any Certificates are so surrendered for exchange the Trustee shall execute, authenticate and deliver the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing.

(g)    No service charge shall be made for any registration of transfer or exchange of Certificates of any Class, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

All Certificates surrendered for registration of transfer or exchange shall be canceled by the Trustee and disposed of pursuant to its standard procedures.

Notwithstanding any term herein contained to the contrary, the Trustee shall not be under any obligation to determine or monitor whether any transfer or exchange of any Certificate complies with the Securities Act, or any other state securities laws that may be applicable, or ERISA, the Investment Company Act or the Code; provided, however, that if a certificate, opinion or other requirement is specifically set forth in this Section 5.02, the Trustee shall be under a duty to receive and examine such certificate or opinion to determine whether conforms on its face with the requirement specifically set forth in this Section 5.02.

Section 5.03    <u>Mutilated, Destroyed, Lost or Stolen Certificates</u>.

If (i) any mutilated Certificate is surrendered to the Trustee or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and (ii) there is delivered to the Trustee, the Depositor and (in the case of a Class C Certificate or Class P Certificate) the NIMS Insurer such security or indemnity as may be required by them to save each of them, and the Trust Fund, harmless, then, in the absence of notice to the Trustee that such Certificate has been acquired by a protected purchaser, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor and Percentage Interest. Upon the issuance of any new Certificate under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith. Any duplicate Certificate issued pursuant to this Section, shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.04    <u>Persons Deemed Owners</u>.

The Servicer, the Depositor, the Trustee, the Delaware Trustee, the NIMS Insurer and any agent of the Servicer, the Depositor, the Trustee, the Delaware Trustee, or the NIMS Insurer may treat the Person, including a Depository, in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 4.01 and for all other purposes whatsoever, and none of the Servicer, the Depositor, the Trustee, the

Delaware Trustee, the NIMS Insurer nor any agent of any of them shall be affected by notice to the contrary.

ARTICLE VI

THE SERVICER AND THE DEPOSITOR

Section 6.01    <u>Liability of the Servicer and the Depositor</u>.

The Depositor and the Servicer each shall be liable in accordance herewith only to the extent of the obligations specifically imposed by this Agreement and undertaken hereunder by the Depositor and the Servicer herein.

Section 6.02    <u>Merger or Consolidation of the Depositor or the Servicer</u>.

Subject to the following paragraph, the Depositor will keep in full effect its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation. Subject to the following paragraph, the Servicer will keep in full effect its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation and its qualification as an approved conventional seller/servicer for Fannie Mae or Freddie Mac in good standing.  The Depositor and the Servicer each will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

The Depositor or the Servicer may be merged or consolidated with or into any Person, or transfer all or substantially all of its assets to any Person, in which case any Person resulting from any merger or consolidation to which the Depositor or the Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Servicer, shall be the successor of the Depositor or the Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person to the Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; and provided further that the Rating Agencies' ratings of the Other NIM Notes, the Class A Certificates and the Mezzanine Certificates and the shadow rating of the Insured NIM Notes (without giving effect to any insurance policy issued by the NIMS Insurer) in effect immediately prior to such merger or consolidation will not be qualified, reduced or withdrawn as a result thereof (as evidenced by a letter to such effect from the Rating Agencies to the Trustee).

Section 6.03    <u>Limitation on Liability of the Depositor, the Servicer and Others</u>.

None of the Depositor, the Servicer or any of the directors, officers, employees or agents of the Depositor or the Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Servicer or any such person against any breach of warranties, representations or covenants made herein, or against any specific liability imposed on the Servicer or the Depositor, as applicable, pursuant hereto, or against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

The Depositor, the Servicer and any director, officer, employee or agent of the Depositor or the Servicer may rely in good faith on any document of any kind which, prima facie, is properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Servicer and any director, officer, employee or agent of the Depositor or the Servicer shall be indemnified and held harmless by the Trust against any loss, liability or expense incurred in connection with any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. Neither the Depositor nor the Servicer shall be under any obligation to appear in, prosecute or defend any legal action unless such action is related to its respective duties under this Agreement and, in its opinion, does not involve it in any expense or liability; provided, however, that each of the Depositor and the Servicer may in its discretion undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, unless the Depositor or the Servicer acts without the consent of Holders of Certificates entitled to at least 51% of the Voting Rights (which consent shall not be necessary in the case of litigation or other legal action by either to enforce their respective rights or defend themselves hereunder), the legal expenses and costs of such action and any liability resulting therefrom (except any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder) shall be expenses, costs and liabilities of the Trust, and the Depositor and the Servicer shall be entitled to be reimbursed therefor from the Collection Account as and to the extent provided in Section 3.11, any such right of reimbursement being prior to the rights of the Certificateholders to receive any amount in the Collection Account.

The Servicer (except the Trustee to the extent it has succeeded the Servicer as required hereunder) indemnifies and holds the Trustee, the Delaware Trustee, the Depositor and the Trust Fund harmless against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Trustee, the Delaware Trustee, the Depositor or the Trust Fund may sustain in any way related to the failure of the Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement. The Servicer shall immediately notify the Trustee, the Delaware Trustee, the NIMS Insurer and the Depositor if a claim is made that may result in such claims, losses, penalties, fines, forfeitures, legal fees or related costs, judgments, or any other costs, fees and expenses, and the Servicer shall assume (with the consent of the Trustee) the defense of any such claim and pay all expenses in connection therewith, including reasonable counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against the Servicer, the Trustee, the Delaware Trustee, the Depositor and/or the Trust Fund in respect of such claim. The provisions of this paragraph shall survive the termination of this Agreement and the payment of the outstanding Certificates.

Section 6.04    Limitation on Resignation of Servicer.

The Servicer shall not resign from the obligations and duties hereby imposed on it except (i) upon determination that its duties hereunder are no longer permissible under applicable law or (ii) with the written consent of the Trustee and the NIMS Insurer and written confirmation from each Rating Agency (which confirmation shall be furnished to the Depositor and the Trustee) that such resignation will not cause such Rating Agency to reduce the then current rating of any of the Other NIM Notes, the Class A Certificates or the Mezzanine Certificates or the shadow

rating of the Insured NIM Notes (without giving effect to any insurance policy issued by the NIMS Insurer).   Any such determination pursuant to clause (i) of the preceding sentence permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect obtained at the expense of the Servicer and delivered to the Trustee.   No resignation of the Servicer shall become effective until the Trustee or a successor servicer reasonably acceptable to the NIMS Insurer shall have assumed the Servicer's responsibilities, duties, liabilities (other than those liabilities arising prior to the appointment of such successor) and obligations under this Agreement.

Except as expressly provided herein, the Servicer shall not assign or transfer any of its rights, benefits or privileges hereunder to any other Person, nor delegate to or subcontract with, nor authorize or appoint any other Person to perform any of the duties, covenants or obligations to be performed by the Servicer hereunder.   The foregoing prohibition on assignment shall not prohibit the Servicer from designating a Sub-Servicer as payee of any indemnification amount payable to the Servicer hereunder; provided, however, that as provided in Section 3.06 hereof, no Sub-Servicer shall be a third-party beneficiary hereunder and the parties hereto shall not be required to recognize any Sub-Servicer as an indemnitee under this Agreement.   If, pursuant to any provision hereof, the duties of the Servicer are transferred to a successor servicer, the entire amount of the Servicing Fee and other compensation payable to the Servicer pursuant hereto shall thereafter be payable to such successor servicer.

Section 6.05     <u>Rights of the Depositor, the NIMS Insurer and the Trustee in Respect of the Servicer</u>.

The Servicer shall afford (and any Sub-Servicing Agreement shall provide that each Sub-Servicer shall afford) the Depositor, the NIMS Insurer and the Trustee, upon reasonable notice, during normal business hours, access to all records maintained by the Servicer (and any such Sub-Servicer) in respect of the Servicer's rights and obligations hereunder and access to officers of the Servicer (and those of any such Sub-Servicer) responsible for such obligations. Upon request, the Servicer shall furnish to the Depositor, the NIMS Insurer and the Trustee its (and any such Sub-Servicer's) most recent financial statements and such other information relating to the Servicer's capacity to perform its obligations under this Agreement that it possesses.   To the extent such information is not otherwise available to the public, the Depositor, the NIMS Insurer and the Trustee shall not disseminate any information obtained pursuant to the preceding two sentences without the Servicer's (or any such Sub-Servicer's) written consent, except as required pursuant to this Agreement or to the extent that it is necessary to do so (i) in working with legal counsel, auditors, taxing authorities or other governmental agencies, rating agencies or reinsurers or (ii) pursuant to any law, rule, regulation, order, judgment, writ, injunction or decree of any court or governmental authority having jurisdiction over the Depositor, the NIMS Insurer, the Trustee or the Trust Fund, and in either case, the Depositor or the Trustee, as the case may be, shall use, and the NIMS Insurer shall be deemed to have agreed with the parties hereto to use, its best efforts to assure the confidentiality of any such disseminated non-public information.   The Depositor may, but is not obligated to, enforce the obligations of the Servicer under this Agreement and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Servicer under this Agreement or exercise the rights of the Servicer under this Agreement; provided that the Servicer shall not be relieved of any of its obligations under this Agreement by virtue of such performance by the Depositor or its designee.   The Depositor shall not have any responsibility or liability for any

action or failure to act by the Servicer and is not obligated to supervise the performance of the Servicer under this Agreement or otherwise.

ARTICLE VII

DEFAULT

Section 7.01    <u>Servicer Events of Default</u>.

"Servicer Event of Default," wherever used herein, means any one of the following events:

(i)    any failure by the Servicer to remit to the Trustee for distribution to the Certificateholders any payment (other than an Advance required to be made from its own funds on any Servicer Remittance Date pursuant to Section 4.04) required to be made under the terms of the Certificates and this Agreement which continues unremedied for a period of one Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Depositor, the Trustee (in which case notice shall be provided by telecopy), or to the Servicer, the Depositor and the Trustee by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; or

(ii)    any failure on the part of the Servicer duly to observe or perform in any material respect any of the covenants or agreements on the part of the Servicer contained in this Agreement which continues unremedied for a period of 45 days (30 days in the case of any failure to maintain a Sub-Servicing Agreement with an eligible Sub-Servicer to the extent required in accordance with Section 3.02(c)) after the earlier of (i) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Depositor or the Trustee, or to the Servicer, the Depositor and the Trustee by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights and (ii) actual knowledge of such failure by a Servicing Representative of the Servicer; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and if such proceeding is being contested by the Servicer in good faith, such decree or order shall have remained in force undischarged or unstayed for a period of 60 days or results in the entry of an order for relief or any such adjudication or appointment; or

(iv)    the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

(v)    the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable

insolvency or reorganization statute, make an assignment for the benefit of its creditors; or

(vi)    [reserved]; or

(vii)    any failure of the Servicer to make, or cause an Advancing Person to make, any Advance on any Servicer Remittance Date required to be made from its own funds pursuant to Section 4.04 which continues unremedied until 3:00 p.m. New York time on the Business Day immediately following the Servicer Remittance Date.

If a Servicer Event of Default described in clauses (i) through (vi) of this Section shall occur, then, and in each and every such case, so long as such Servicer Event of Default shall not have been remedied, the Depositor or the Trustee may, and at the written direction of the NIMS Insurer or the Holders of Certificates entitled to at least 51% of Voting Rights, the Trustee shall, by notice in writing to the NIMS Insurer and the Servicer (and to the Depositor if given by the Trustee or to the Trustee if given by the Depositor), terminate all of the rights and obligations of the Servicer in its capacity as Servicer under this Agreement, to the extent permitted by law, and in and to the Mortgage Loans and the proceeds thereof. If a Servicer Event of Default described in clause (vii) hereof shall occur, the Trustee shall, by notice in writing to the Servicer (delivered immediately by facsimile and effective on the date of acknowledgement of receipt in the case of a Servicer Event of Default described in clause (vii)), the NIMS Insurer and the Depositor, terminate all of the rights and obligations of the Servicer in its capacity as Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof. On or after the receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder of any Certificate) or the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee pursuant to and under this Section and, without limitation, the Trustee is hereby authorized and empowered, as attorney-in-fact or otherwise, to execute and deliver on behalf of and at the expense of the Servicer, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Servicer agrees, at its sole cost and expense, promptly (and in any event no later than ten Business Days subsequent to such notice) to provide the Trustee with all documents and records requested by it to enable it to assume the Servicer's functions under this Agreement, and to cooperate with the Trustee in effecting the termination of the Servicer's responsibilities and rights under this Agreement, including, without limitation, the transfer within one Business Day to the Trustee for administration by it of all cash amounts which at the time shall be or should have been credited by the Servicer to the Collection Account held by or on behalf of the Servicer, or any REO Account or Servicing Account held by or on behalf of the Servicer or thereafter be received with respect to the Mortgage Loans or any REO Property (provided, however, that the Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the date of such termination, whether in respect of Advances or otherwise, and shall continue to be entitled to the benefits of Section 6.03, notwithstanding any such termination, with respect to events occurring prior to such termination). For purposes of this Section 7.01, the Trustee shall not be deemed to have knowledge of a Servicer Event of Default unless a Responsible Officer of Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Servicer Event of Default is received by the Trustee and such notice references the Certificates, any of the Trust REMICs or this Agreement.

The Trustee shall be entitled to be reimbursed by the Servicer (or by the Trust if the Servicer is unable to fulfill its obligations hereunder) for all costs associated with the transfer of servicing from the predecessor servicer, including without limitation, any costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Trustee to correct any errors or insufficiencies in the servicing data or otherwise to enable the Trustee to service the Mortgage Loans properly and effectively.

Section 7.02     Trustee to Act; Appointment of Successor.

(a)     On and after the time the Servicer receives a notice of termination, the Trustee shall be the successor in all respects to the Servicer in its capacity as Servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto and arising thereafter, which shall be assumed by the Trustee (except for any representations or warranties of the Servicer under this Agreement, the responsibilities, duties and liabilities contained in Section 2.03(c) and its obligation to deposit amounts in respect of losses pursuant to Section 3.12) by the terms and provisions hereof including, without limitation, the Servicer's obligations to make Advances pursuant to Section 4.04; provided, however, that if the Trustee is prohibited by law or regulation from obligating itself to make advances regarding delinquent Mortgage Loans, then the Trustee shall not be obligated to make Advances pursuant to Section 4.04; and provided further, that any failure to perform such duties or responsibilities caused by the Servicer's failure to provide information required by Section 7.01 shall not be considered a default by the Trustee as successor to the Servicer hereunder; provided, however, it is understood and acknowledged by the parties that there will be a period of transition (not to exceed 90 days) before the servicing transfer is fully effected.  As compensation therefor, the Trustee shall be entitled to the Servicing Fee, and all other compensation to which the Servicer is entitled under the terms thereof, and all funds relating to the Mortgage Loans to which the Servicer would have been entitled if it had continued to act hereunder (other than amounts which were due or would become due to the Servicer prior to its termination or resignation).  Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for any Servicing Fee or for any differential in the amount of the Servicing Fee paid hereunder and the amount necessary to induce any successor Servicer to act as successor Servicer under this Agreement and the transactions set forth or provided for herein.   After the Servicer receives a notice of termination, notwithstanding the above and subject to the next paragraph, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act or if it is prohibited by law from making advances regarding delinquent Mortgage Loans, or if the NIMS Insurer or the Holders of Certificates entitled to at least 51% of the Voting Rights so request in writing to the Trustee, promptly appoint, or petition a court of competent jurisdiction to appoint, an established mortgage loan servicing institution acceptable to each Rating Agency, having a net worth of not less than $15,000,000 and reasonably acceptable to the NIMS Insurer, as the successor to the Servicer under this Agreement in the assumption of all or any part of the responsibilities, duties or liabilities of the Servicer under this Agreement.

No appointment of a successor to the Servicer under this Agreement shall be effective until the assumption by the successor of all of the Servicer's responsibilities, duties and liabilities hereunder.  In connection with such appointment and assumption described herein, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such

compensation shall be in excess of that permitted the Servicer as such hereunder. The Depositor, the Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Pending appointment of a successor to the Servicer under this Agreement, the Trustee shall act in such capacity as hereinabove provided.

In connection with the termination or resignation of the Servicer hereunder, either (i) the successor Servicer, including the Trustee if the Trustee is acting as successor Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Servicer shall cooperate with the successor Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Servicer shall cooperate with the successor Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Servicer. The predecessor Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The predecessor Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this Section 7.02(a).

Upon removal or resignation of the Servicer, the Trustee, with the cooperation of the Depositor, (x) shall solicit bids for a successor Servicer as described below and (y) pending the appointment of a successor Servicer as a result of soliciting such bids, shall serve as Servicer of the Mortgage Loans serviced by such predecessor Servicer. The Trustee shall solicit, by public announcement, bids from housing and home finance institutions, banks and mortgage servicing institutions meeting the qualifications set forth in the first paragraph of this Section 7.02 (including the Trustee or any affiliate thereof). Such public announcement shall specify that the successor Servicer shall be entitled to the servicing compensation agreed upon between the Trustee, the successor Servicer and the Depositor; provided, however, that no such fee shall exceed the Servicing Fee. Within thirty days after any such public announcement, the Trustee with the cooperation of the Depositor, shall negotiate in good faith and effect the sale, transfer and assignment of the servicing rights and responsibilities hereunder to the qualified party submitting the highest satisfactory bid as to the price they will pay to obtain such servicing. The Trustee, upon receipt of the purchase price shall pay such purchase price to the Servicer being so removed, after deducting from any sum received by the Trustee from the successor to the Servicer in respect of such sale, transfer and assignment all costs and expenses of any public announcement and of any sale, transfer and assignment of the servicing rights and responsibilities reasonably incurred hereunder. After such deductions, the remainder of such sum shall be paid by the Trustee to the Servicer at the time of such sale.

(b)    If the Servicer fails to remit to the Trustee for distribution to the Certificateholders any payment required to be made under the terms of this Agreement (for purposes of this Section 7.02(b), a "Remittance") because the Servicer is the subject of a proceeding under the Bankruptcy Code and the making of such Remittance is prohibited by Section 362 of the Bankruptcy Code, the Trustee shall upon written notice of such prohibition, regardless of whether it has received a notice of termination under Section 7.01, shall be treated as though it had succeeded to the Servicer and shall advance the amount of such Remittance by

depositing such amount in the Distribution Account on the related Distribution Date.  The Trustee shall be obligated to make such advance only if (i) such advance, in the good faith judgment of the Trustee can reasonably be expected to be ultimately recoverable from Stayed Funds and (ii) the Trustee is not prohibited by law from making such advance or obligating itself to do so.  Upon remittance of the Stayed Funds to the Trustee or the deposit thereof in the Distribution Account by the Servicer, a trustee in bankruptcy or a federal bankruptcy court, the Trustee may recover the amount so advanced, without interest, by withdrawing such amount from the Distribution Account; however, nothing in this Agreement shall be deemed to affect the Trustee's rights to recover from the Servicer's own funds interest on the amount of any such advance.  If the Trustee at any time makes an advance under this subsection which it later determines in its good faith judgment will not be ultimately recoverable from the Stayed Funds with respect to which such advance was made, the Trustee shall be entitled to reimburse itself for such advance, without interest, by withdrawing from the Distribution Account, out of amounts on deposit therein, an amount equal to the portion of such advance attributable to the Stayed Funds.

Section 7.03    <u>Notification to Certificateholders</u>.

(a)    Upon any termination of the Servicer pursuant to Section 7.01 above or any appointment of a successor to the Servicer pursuant to Section 7.02 above, the Trustee shall give prompt written notice thereof to Certificateholders at their respective addresses appearing in the Certificate Register and to the NIMS Insurer.

(b)    Not later than the later of 60 days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Servicer Event of Default or five days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Holders of Certificates and to the NIMS Insurer and the Swap Counterparty notice of each such occurrence, unless such default or Servicer Event of Default shall have been cured or waived.

Section 7.04    <u>Waiver of Servicer Events of Default</u>.

The Holders representing at least 66% of the Voting Rights evidenced by all Classes of Certificates affected by any default or Servicer Event of Default hereunder may, with the consent of the NIMS Insurer, waive such default or Servicer Event of Default; <u>provided</u>, <u>however</u>, that a default or Servicer Event of Default under clause (i) or (vii) of Section 7.01 may be waived only by all of the Holders of the Regular Certificates and the NIMS Insurer (as evidenced by the written consent of the NIMS Insurer).  Upon any such waiver of a default or Servicer Event of Default, such default or Servicer Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder.  No such waiver shall extend to any subsequent or other default or Servicer Event of Default or impair any right consequent thereon except to the extent expressly so waived.

ARTICLE VIII

THE TRUSTEE

Section 8.01    Duties of Trustees.

The Trustee, prior to the occurrence of a Servicer Event of Default known to the Trustee and after the curing of all Servicer Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement.  During a Servicer Event of Default known to the Trustee, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.  Any permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement.  If any such instrument is found not to conform to the requirements of this Agreement in a material manner, the Trustee shall take such action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Certificateholders.

No provision of this Agreement shall be construed to relieve the Trustee or Delaware Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)    Prior to the occurrence of a Servicer Event of Default known to the Trustee, and after the curing of all such Servicer Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, neither the Trustee nor the Delaware Trustee shall be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee or the Delaware Trustee and, in the absence of bad faith on the part of the Trustee or the Delaware Trustee, such trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to such trustee that conform to the requirements of this Agreement;

(ii)    Neither the Trustee nor the Delaware Trustee shall be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of such trustee unless it shall be proved that such trustee was negligent in ascertaining the pertinent facts; and

(iii)    Neither the Trustee nor the Delaware Trustee shall be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights relating to the time, method and place of

conducting any proceeding for any remedy available to such trustee, or exercising any trust or power conferred upon such trustee, under this Agreement.

Section 8.02    Certain Matters Affecting the Trustees.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may request and rely conclusively upon and shall be fully protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties and the manner of obtaining consents and evidencing the authorization of the execution thereof shall be subject to such reasonable regulations as such trustee may prescribe;

(ii)    Each of the Trustee and the Delaware Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    Neither the Trustee nor the Delaware Trustee shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the NIMS Insurer or the Certificateholders, pursuant to the provisions of this Agreement, unless the NIMS Insurer or such Certificateholders shall have offered to such trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of a Servicer Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of a Servicer Event of Default hereunder and after the curing of all Servicer Events of Default which may have occurred, neither the Trustee nor the Delaware Trustee shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee or the Delaware Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of such trustee not reasonably assured to such trustee by the NIMS Insurer or such Certificateholders, such trustee may require reasonable indemnity against such expense,

or liability from the NIMS Insurer or such Certificateholders as a condition to taking any such action;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, custodians, nominees or attorneys, and neither shall be responsible for any willful misconduct or negligence of such agents, custodians, nominees or attorneys (as long as such agents, custodians, nominees or attorneys are appointed with due and proper care);

(vii)    The Trustee shall not be personally liable for any loss resulting from the investment of funds held in the Collection Account or the Supplemental Interest Account at the direction of the Servicer pursuant to Section 3.12 or the Holders of the majority of the Percentage Interest in the Class C Certificates, pursuant to Section 4.09, as applicable;

(viii)    Except as otherwise expressly provided herein, none of the provisions of this Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers (not including expenses, disbursements and advances incurred or made by such trustee including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of such trustee's performance in accordance with the provisions of this Agreement) if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(ix)    The Supplemental Interest Trust Trustee and the Final Maturity Reserve Trustee shall have only such duties as are expressly set forth herein (and in the case of the Supplemental Interest Trust Trustee acting solely on behalf of the Supplemental Interest Trust, the Swap Agreement) and no implied duties or obligations shall be read into this Agreement on the part of the Supplemental Interest Trust Trustee or the Final Maturity Reserve Trustee.  The Supplemental Interest Trust Trustee shall only be obligated to make payments to the Trust to the extent that the Supplemental Interest Trust Trustee receives the related funds from the Swap Counterparty, and shall only be obligated to make payments to the Swap Counterparty under the Swap Agreement to the extent that the Supplemental Interest Trust Trustee receives the related funds from the Trust;

(x)    Except as expressly provided in this Agreement, in no event shall the Trustee be under any duty or obligation to monitor, determine, investigate or compel compliance by the Trust with the requirements of the Statutory Trust Statute;

(xi)    The Trustee shall not be charged with knowledge or notice of any matter unless it is actually known to a Responsible Officer of the Trustee or written notice is received by the Trustee at the Corporate Trust Office; and

(xii)    In no event shall the Trustee be liable for the actions or omissions of the Servicer (excepting the Trustee's own actions as successor servicer).

(b)    All rights of action under this Agreement or under any of the Certificates, enforceable by the Trustee may be enforced by it without the possession of any of the

Certificates, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Certificates, subject to the provisions of this Agreement.

(c)     Each of the Supplemental Interest Trust Trustee and the Final Maturity Reserve Trust Trustee shall be entitled to the same rights, protections, immunities and indemnities afforded to the Trustee hereunder.

Section 8.03     Trustees Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature of the Trustee and the Delaware Trustee, the execution and authentication of the Trustee on the Certificates, the acknowledgments of the Trustee contained in Article II and the representations and warranties of the Trustee in Section 8.13) shall be taken as the statements of the Depositor, and neither the Trustee nor the Delaware Trustee shall assume any responsibility for their correctness.   Neither the Trustee nor the Delaware Trustee makes any representations or warranties as to the validity or sufficiency of this Agreement (other than as specifically set forth in Section 8.13) or of the Certificates (other than execution and authentication of the Trustee on the Certificates) or of any Mortgage Loan or related document.   Neither the Trustee nor the Delaware Trustee shall be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of the Certificates, or for the use or application of any funds paid to the Depositor or the Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Collection Account by the Servicer, other than any funds held by or on behalf of the Trustee in accordance with Section 3.10.

Section 8.04     Trustees May Own Certificates.

Each of the Trustee and the Delaware Trustee in its individual capacity or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not trustee and may transact banking and/or trust business with the Seller, the Depositor, the Servicer or their Affiliates.

Section 8.05     Trustees' Fees and Expenses.

(a)     On the Closing Date, the Depositor shall pay to the Trustee as specified in a separate agreement between the Depositor and the Trustee.   The Trustee shall withdraw from the Distribution Account on each Distribution Date and pay to itself the Trustee Fee for such Distribution Date and any interest earnings (net of losses) on amounts on deposit in the Distribution Account.   The right to receive the Trustee Fee may not be transferred in whole or in part except in connection with the transfer of all of the Trustee's responsibilities and obligations under this Agreement.   Subject to separate written agreements with the Delaware Trustee, the Servicer covenants and agrees to, and the Servicer shall, pay the Delaware Trustee from time to time, and the Delaware Trustee shall be entitled to payment for all services rendered by it in the exercise and performance of any of the powers and duties hereunder of the Delaware Trustee.

Each of the Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Trust and held harmless against any loss, liability or expense (not including expenses, disbursements and advances incurred or made by such trustee, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of such trustee's performance in accordance with the provisions of this Agreement)

incurred by such trustee arising out of or in connection with the acceptance or administration of its duties (including, without limitation, its obligation to enter into the Swap Agreement in its capacity as the Supplemental Interest Trust Trustee) and duties under this Agreement, other than any loss, liability or expense (i) in any way relating to the failure of the Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement, (ii) that constitutes a specific liability of the Trustee pursuant to Sections 4.08 or 10.01(c) or (iii) any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, including as a result of a breach of the Trustee's obligations under Article X hereof.  Any amounts payable to the Trustee or any director, officer, employee or agent of the Trustee in respect of the indemnification provided by this paragraph (a), or pursuant to any other right of reimbursement from the Trust that the Trustee or any director, officer, employee or agent of the Trustee may have hereunder in its capacity as such, may be withdrawn by the Trustee from the Distribution Account at any time. Such indemnity shall survive the termination of this Agreement and the resignation of the Trustee.

As a limitation on the foregoing with respect to certain expenses of the Trustee and the Delaware Trustee, the Trustee and the Delaware Trustee shall receive from the Trust Fund amounts with respect to indemnification for reasonable counsel fees and expenses (collectively, "Legal Fees") in connection with any third-party litigation or other claims alleging violations of laws or regulations relating to consumer lending and/or servicing of the Trust Fund (collectively, "Third Party Claims") in an amount not greater than $50,000 per month (with amounts in excess of $50,000 for any month carried-forward to subsequent months, in each case the Trustee shall have first priority to indemnification over the Delaware Trustee from such monthly and annual amounts).  Neither the Trustee nor the Delaware Trustee shall have any obligation to incur additional expenses for which reimbursement is limited pursuant to this paragraph in excess of the aggregate limit set forth above unless it has received reasonable security or indemnity for such additional expenses. The Certificateholders shall hold each of the Trustee and the Delaware Trustee harmless for any consequences to such Certificateholders resulting from any failure of such trustee to incur any such additional expenses in excess of the aforementioned aggregate limit.

(b)    Without limiting the Servicer's indemnification obligations under Section 6.03, the Servicer agrees to indemnify each of the Trustee and the Delaware Trustee from, and hold it harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) resulting from a breach of the Servicer's obligations and duties under this Agreement.  Such indemnity shall survive the termination or discharge of this Agreement and the resignation or removal of the Trustee or the Delaware Trustee.  Any payment under this Section 8.05(b) made by the Servicer to the Trustee or the Delaware Trustee shall be from the Servicer's own funds, without reimbursement from the Trust Fund therefor.

Section 8.06    Eligibility Requirements for Trustees.

The Trustee hereunder shall at all times be a corporation or an association (other than the Depositor, the Seller, the Servicer or any Affiliate of the foregoing) organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority.  If such corporation or association publishes reports of conditions at least annually, pursuant to law or to the

requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. The Delaware Trustee hereunder shall at all times have its principal place of business in the State of Delaware and shall satisfy the applicable requirements under the laws of the State of Delaware authorizing it to act as the Delaware Trustee of the Trust. In case at any time the Trustee or the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section, such trustee shall resign immediately in the manner and with the effect specified in Section 8.07.

Section 8.07     <u>Resignation or Removal of Trustees</u>.

Each of the Trustee and the Delaware Trustee may at any time resign and be discharged from the trust hereby created by giving written notice thereof to the NIMS Insurer, the Depositor, the Servicer, the Swap Counterparty and the Certificateholders. Upon receiving such notice of resignation, the Servicer shall promptly appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the resigning trustee and to the successor trustee acceptable to the NIMS Insurer and to the Holders of Certificates entitled to more than 50% of the Voting Rights. A copy of such instrument shall be delivered to the Certificateholders and the Servicer by the Depositor. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

If at any time the Trustee or the Delaware Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 and shall fail to resign after written request therefor by the Servicer (with the consent of the NIMS Insurer) or the NIMS Insurer, or if at any time the Trustee or the Delaware Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of such trustee or of its property shall be appointed, or any public officer shall take charge or control of such trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Servicer (with the consent of the NIMS Insurer) or the NIMS Insurer, may remove such trustee and the Servicer (with the consent of the NIMS Insurer) may appoint a successor trustee, by written instrument, in triplicate, which instrument shall be delivered to the trustee so removed, the trustee continuing and to the successor trustee. A copy of such instrument shall be delivered to the Certificateholders and the Servicer by the Depositor.

The Holders of Certificates entitled to more than 50% of the Voting Rights, with the consent of the NIMS Insurer, may at any time remove the Trustee or the Delaware Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by the NIMS Insurer or such Holders, as applicable, or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor and the Servicer, one complete set to the trustee so removed and one complete set to the successor so appointed. A copy of such instrument shall be delivered to the NIMS Insurer, the Certificateholders, the trustee continuing and the Servicer by the Depositor.

Any resignation or removal of the Trustee or the Delaware Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section shall not become effective until acceptance of appointment by the successor trustee as provided in Section 8.08.

Section 8.08      Successor Trustees.

Any successor trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor, and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as Trustee or Delaware Trustee herein.  The predecessor trustee shall deliver to the successor trustee all Mortgage Files and related documents and statements, as well as all moneys, held by it hereunder (other than any Mortgage Files at the time held by a Custodian, which Custodian shall become the agent of any successor trustee (but not a successor of the Delaware Trustee) hereunder), and the Depositor and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06 and the appointment of such successor trustee shall not result in a downgrading of the ratings of any of the Other NIM Notes or of any Class of Certificates or of the shadow ratings of the Insured NIM Notes (without giving effect to any insurance policy issued by the NIMS Insurer) by any Rating Agency, as evidenced by a letter from each Rating Agency.

Upon acceptance of appointment by a successor trustee as provided in this Section, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates at their addresses as shown in the Certificate Register and the Swap Counterparty.  If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

It is acknowledged and agreed that the Person serving as Trustee hereunder shall also serve as Supplemental Interest Trust Trustee and as Final Maturity Reserve Trust Trustee.  If the Trustee resigns or is removed as Trustee hereunder, the Trustee shall also cease to be the Supplemental Interest Trust Trustee and as Final Maturity Reserve Trust Trustee hereunder.  Any person appointed as successor trustee hereunder shall also be required to serve as successor supplemental interest trust trustee and final maturity reserve trust trustee.

Section 8.09      Merger or Consolidation of Trustees.

Any corporation or association into which the Trustee or the Delaware Trustee may be merged or converted or with which it may be consolidated or any corporation or association resulting from any merger, conversion or consolidation to which the Trustee or the Delaware Trustee shall be a party, or any corporation or association succeeding to the business of such Trustee or Delaware Trustee, as the case may be, shall be the successor of such trustee hereunder, provided such corporation or association shall be eligible under the provisions of Section 8.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.10    Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of REMIC 1, or property securing the same may at the time be located, the Servicer and the Trustee or the Delaware Trustee, acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by such trustee and the NIMS Insurer, to act as co-trustee or co-trustees, jointly with such trustee, or separate trustee or separate trustees, of all or any part of REMIC 1, and to vest in such Person or Persons, in such capacity, such title to REMIC 1, or any part thereof and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Servicer and the Trustee or the Delaware Trustee, as applicable, may consider necessary or desirable.  If the Servicer shall not have joined in such appointment or the NIMS Insurer shall not have approved such appointment within 15 days after the receipt by it of a request so to do, or in case a Servicer Event of Default shall have occurred and be continuing, the Trustee or the Delaware Trustee, as applicable, alone shall have the power to make such appointment.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08 hereof.  If such appointment is at the request of the Servicer, then any expense of the Trustee or the Delaware Trustee, as applicable, shall be deemed a Servicing Advance for all purpose of this Agreement, otherwise it will be an expense of the Trustee or the Delaware Trustee, as applicable, and will be payable out of such trustee's funds.

In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee or the Delaware Trustee, as applicable, shall be conferred or imposed upon and exercised or performed by the Trustee or the Delaware Trustee, as applicable, and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee or the Delaware Trustee, as applicable, (whether as trustee hereunder or as successor to the Servicer hereunder), such trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to REMIC 1, or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee or the Delaware Trustee, as applicable.

Any notice, request or other writing given to the Trustee or the Delaware Trustee, as applicable, shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII.  Each separate trustee and co-trustee, upon its acceptance of the trust conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or the Delaware Trustee, as applicable, or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee or the Delaware Trustee, as applicable.  Every such instrument shall be filed with the Trustee or the Delaware Trustee, as applicable.

Any separate trustee or co-trustee may, at any time, constitute the Trustee or the Delaware Trustee, as applicable, its agent or attorney-in-fact, with full power and authority, to

the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee or the Delaware Trustee, as applicable, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11    Appointment of Custodians.

Deutsche Bank National Trust Company is hereby appointed as initial Custodian hereunder pursuant to the terms of the Custodial Agreement. The Trustee shall be authorized and is hereby directed to execute and deliver the Custodial Agreement with such initial Custodian. It is hereby expressly acknowledged and agreed that the Trustee is not responsible for the selection or appointment of such initial Custodian, and the Trustee shall have no liability for the actions or omissions of the initial Custodian. The Trustee may, with the consent of the Depositor and the Servicer, appoint one or more additional or alternative Custodians to hold all or a portion of the Mortgage Files as agent for the Trustee, by entering into a Custodial Agreement.  The appointment of any Custodian may at any time be terminated and a substitute Custodian appointed therefor upon the reasonable request of the Servicer to the Trustee and the consent of the NIMS Insurer, the consent to which shall not be unreasonably withheld.  The Trustee shall pay any and all fees and expenses of any Custodian (other than the Washington Mutual Custodian) in accordance with each Custodial Agreement.  Subject to Article VIII hereof, the Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Certificateholders having an interest in any Mortgage File held by such Custodian.  Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Mortgage File. Each Custodial Agreement may be amended only as provided in Section 11.01.  In no event shall the appointment of any Custodian pursuant to a Custodial Agreement diminish the obligations of the Trustee hereunder.  Except in the case of the initial Custodian, the Trustee shall at all times remain responsible under the terms of this Agreement notwithstanding the fact that certain duties have been assigned to the Custodian (other than the Washington Mutual Custodian), but only to the extent the Trustee is responsible for its own acts hereunder.  Any documents delivered by the Depositor or the Servicer to a Custodian other than the Trustee, if any, shall be deemed to have been delivered to the Trustee for all purposes hereunder; and any documents held by such a Custodian, if any, shall be deemed to be held by the Trustee for all purposes hereunder.  In order to comply with its duties under the U.S. Patriot Act, the Custodian shall obtain and verify certain information and documentation from the other parties to this Agreement, including, but not limited to, such parties' name, address, and other identifying information.

Section 8.12    Appointment of Office or Agency.

The Trustee will appoint an office or agency where the Certificates may be surrendered for registration of transfer or exchange, and presented for final distribution, and where notices and demands to or upon the Trustee in respect of the Certificates and this Agreement may be served.  As of the Closing Date, the Trustee designates its offices located at the office of Trustee's agent, located at Citibank, N.A. Corporate Agency and Trust, 111 Wall Street, 15th Floor, New York, NY 10005, Attn: Transfer Desk (WaMu 2007-HE2).

Section 8.13    Representations and Warranties of the Trustee.

The Trustee hereby represents and warrants to the Servicer and the Depositor, as of the Closing Date, that:

(i)    it is a national banking association duly organized, validly existing and in good standing under the laws of the United States.

(ii)    the execution and delivery of this Agreement, and the performance and compliance with the terms of this Agreement, will not violate its charter or bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material agreement or other instrument to which it is a party or which is applicable to it or any of its assets.

(iii)    it has the full power and authority to enter into and consummate all transactions contemplated by this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement.

(iv)    this Agreement, assuming due authorization, execution and delivery by the Servicer and the Depositor, constitutes its valid, legal and binding obligation, enforceable against it in accordance with the terms hereof, subject to (A) applicable bankruptcy, insolvency, receivership, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

Section 8.14    Duties of Delaware Trustee.

(a)    The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Statutory Trust Statute that the Trust have at least one trustee with a principal place of business in Delaware.  It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee.

(b)    The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware, (ii) the execution of any certificates with respect to the Trust required to be filed with the Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Statutory Trust Statute and (iii) such other duties as are set forth in this Article VIII.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Holders of the REMIC 1 Regular Interests, REMIC 2 Regular Interests, REMIC 3 Regular Interests or the Certificates, it is hereby understood and agreed by the parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement.

Section 8.15    Amendment to Certificate of Trust.

If at any time required by Section 3810 of the Statutory Trust Statute, the Delaware Trustee, and upon written instructions from the Delaware Trustee, the Trustee and any other

trustee of the Trust shall cause an amendment to the Certificate of Trust to be filed with the Secretary of State in accordance with the provisions of such Section 3810.

Section 8.16     Trustees Act on Behalf of Trust.

Except to the extent otherwise expressly provided herein, in the performance of its obligations under this Agreement, each of the Trustee and the Delaware Trustee shall at all times be acting on behalf of the Trust or the Certificateholders, as applicable.

ARTICLE IX

TERMINATION

Section 9.01     Termination Upon Purchase or Liquidation of All Mortgage Loans.

(a)     Subject to Section 9.02, the Trust and the respective obligations and responsibilities under this Agreement of the Depositor, the Servicer, the Trustee and the Delaware Trustee (other than the obligations of the Servicer to the Trustee pursuant to Section 8.05 and of the Servicer to provide for and the Trustee to make payments in respect of the REMIC 1 Regular Interests, REMIC 2 Regular Interests, REMIC 3 Regular Interests and the Classes of Certificates as hereinafter set forth) shall terminate in accordance with Section 3808 of the Delaware Trust Statute upon the payment to the Certificateholders and the deposit of all amounts held by or on behalf of the Trustee or the Trust and required hereunder to be so paid or deposited on the Distribution Date coinciding with or following the earlier to occur of (i) the purchase by the Terminator (as defined below) of all Mortgage Loans and each REO Property remaining in REMIC 1 and (ii) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or REO Property remaining in REMIC 1; provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof.  The purchase by the Terminator of all Mortgage Loans and each REO Property remaining in REMIC 1 shall be at a price (the "Termination Price") equal to (a) if the Terminator is the Servicer purchasing the Mortgage Loans and the REO Properties on its own behalf, 100% of the aggregate Stated Principal Balance of all the Mortgage Loans included in REMIC 1 and accrued interest on the Stated Principal Balance of each such Mortgage Loan at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the related Mortgagor or by an advance by the Servicer to but not including the first day of the month in which such purchase is to be effected, plus the appraised value of each REO Property, if any, included in REMIC 1, such appraisal to be conducted by an appraiser selected by the Terminator in its reasonable discretion and (b) if the Terminator is the Servicer purchasing the Mortgage Loans and the REO Properties at the request of and on behalf of an unaffiliated third party or is the NIMS Insurer, the greater of (A) the aggregate Purchase Price of all the Mortgage Loans included in REMIC 1, plus the appraised value of each REO Property, if any, included in REMIC 1, such appraisal to be conducted by an appraiser selected by the Terminator in its reasonable discretion, and (B) the aggregate fair market value of all of the assets of REMIC 1 (as determined by the Terminator, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to the third paragraph of this Section 9.01), and any additional amounts necessary to pay all interest accrued on, as well as amounts necessary to pay in full the principal balance of,

the NIM Notes and any amounts necessary to reimburse the NIMS Insurer for all amounts paid under the NIMs insurance policy and any other amounts reimbursable or otherwise payable to the NIMS Insurer, in each case, with interest thereon at the applicable rate set forth in the Indenture and to the extent not previously reimbursed or paid and any amounts payable by the Supplemental Interest Trust Trustee to the Swap Counterparty pursuant to the Swap Agreement, including any Swap Termination Payment payable by the Supplemental Interest Trust Trustee including any interest on such Swap Termination Payment at the applicable rate set forth in the Swap Agreement from the Early Termination Date until such Swap Termination Payment is paid.

(b)     The Servicer shall have the right and, if the Servicer does not exercise such right, the NIMS Insurer, shall have the right (the party exercising such right, the "Terminator") to purchase all of the Mortgage Loans and each REO Property remaining in REMIC 1 pursuant to clause (i) of the preceding paragraph no later than the Determination Date in the month immediately preceding the Distribution Date on which the Certificates will be retired; provided, however, that the Terminator may elect to purchase all of the Mortgage Loans and each REO Property remaining in REMIC 1 pursuant to clause (i) of the preceding paragraph only if the aggregate Stated Principal Balance of the Mortgage Loans and each REO Property remaining in the Trust Fund at the time of such election is equal to or less than 10% of the Cut-off Date Principal Balance of the Closing Date Mortgage Loans.  Additionally, if the Terminator is the Servicer purchasing the Mortgage Loans and the REO Properties on its own behalf, the Terminator may elect to  purchase all of the Mortgage Loans and each REO Property in REMIC 1 pursuant to clause (i) of the preceding paragraph only if the Termination Price (A) is equal to or less than the aggregate fair market value of all of the assets of REMIC 1 (as determined by the Terminator, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to Section 9.01(c)), less unreimbursed Advances and Servicing Advances (other than Advances and Servicing Advances made with respect to Mortgage Loans as to which the Servicer expects that that foreclosure is not imminent), (B) will result in distributions on the Certificates sufficient (together with all amounts received under the Indenture other than on account of the Certificates) to pay all interest accrued on, as well as amounts necessary to pay in full the principal balance of, the NIM Notes and any amounts necessary to reimburse the NIMS Insurer for all amounts paid under the NIMs insurance policy and any other amounts reimbursable or otherwise payable to the NIMS Insurer, in each case, with interest thereon at the applicable rate set forth in the Indenture and to the extent not previously reimbursed or paid (unless the NIMS Insurer consents to a lesser Termination Price) and (C) will result in distributions to the Swap Counterparty sufficient to pay in full all amounts payable by the Supplemental Interest Trust Trustee to the Swap Counterparty pursuant to the Swap Agreement, including any Swap Termination Payment payable by the Supplemental Interest Trust Trustee including any interest on such Swap Termination Payment at the applicable rate set forth in the Swap Agreement from the Early Termination Date until such Swap Termination Payment is paid.  The Terminator shall give notice to the Supplemental Interest Trust Trustee and the Swap Counterparty of its election to purchase all Mortgage Loans and REO Properties remaining to REMIC 1 no later than four Business Days prior to the related Determination Date in the month immediately preceding the Distribution Date on which the Certificates will be retired; provided that the Terminator, or the Supplemental Interest Trust Trustee on its behalf, may request a non-binding estimate of the Swap Termination Payment due upon the exercise of the right of repurchase pursuant to this Section 9.01 prior to such Determination Date.

(c)    Notice of the liquidation of the REMIC 1 Regular Interests shall be given promptly by the Trustee by letter to Certificateholders mailed during the month of such final distribution on or before the Determination Date in such month, in each case specifying (i) the Distribution Date upon which the Trust Fund will terminate and final payment in respect of the REMIC 1 Regular Interests and the related Certificates will be made upon presentation and surrender of the related Certificates at the office of the Trustee therein designated, (ii) that no interest shall accrue in respect of the REMIC 1 Regular Interests or the related Certificates from and after the Accrual Period relating to the final Distribution Date therefor and (iii) that the Record Date otherwise applicable to such Distribution Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the office of the Trustee designated in such notice for purposes of such surrender.  The Trustee shall remit to the Servicer from such funds deposited in the Distribution Account (i) any amounts which the Servicer would be permitted to withdraw and retain from the Collection Account pursuant to Section 3.11 and (ii) any other amounts otherwise payable by the Trustee to the Servicer from amounts on deposit in the Distribution Account pursuant to the terms of this Agreement, in each case prior to making any final distributions pursuant to Section 9.01(d) below.  Upon certification to the Trustee by a Servicing Representative of the making of such final deposit, the Trustee shall promptly release or cause to be released to the Terminator the Mortgage Files for the remaining Mortgage Loans, and the Trustee shall execute all assignments, endorsements and other instruments necessary to effectuate such transfer.

(d)    Upon presentation of the Certificates by the Certificateholders on the final Distribution Date, the Trustee shall distribute, in addition with all other amounts distributable in accordance with Section 4.01 on such Distribution Date, to each Certificateholder so presenting and surrendering its Certificates the amount otherwise distributable on such Distribution Date in accordance with Section 4.01 in respect of the Certificates so presented and surrendered.  Any funds not distributed to any Holder or Holders of Certificates being retired on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Trustee and credited to the account of the appropriate non-tendering Holder or Holders.  If any Certificates as to which notice has been given pursuant to this Section 9.01 shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto.  Subject to the applicable law, if within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Trustee shall, directly or through an agent, mail a final notice to remaining related non-tendering Certificateholders concerning surrender of their Certificates.  The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in the trust funds.  If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Trustee shall pay to WaMu Capital Corp., Lehman Brothers Inc. and Banc of America Securities LLC, equally, all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease.  No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Trustee as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01.

Upon the completion of winding up of the Trust, including the payment or the making reasonable provision for payment of all obligations of the Trust in accordance with Section 3808(e) of the Statutory Trust Statute, the Delaware Trustee shall prepare, the Trustee, the

Delaware Trustee and any other trustee hereunder shall sign, and the Delaware Trustee (upon the Trustee's consent acting at direction of the Servicer) shall file, a certificate of cancellation with the Secretary of State in accordance with Section 3810 of the Statutory Trust Statute, at which time the Trust and this Agreement shall terminate. The Servicer shall act as the liquidator of the Trust and shall be responsible for taking all actions in connection with winding up the Trust, in accordance with the requirements of this Agreement (including this Section 9.01 and Section 9.02) and applicable law.

Section 9.02    Additional Termination Requirements.

(a)    In the event that the Terminator purchases all the Mortgage Loans and each REO Property or the final payment on or other liquidation of the last Mortgage Loan or REO Property remaining in REMIC 1 pursuant to Section 9.01, the Trust Fund shall be terminated in accordance with the following additional requirements:

(i)    The Trustee shall specify the first day in the 90-day liquidation period in a statement attached to each Trust REMIC's final Tax Return pursuant to Treasury regulation Section 1.860F-1 and shall satisfy all requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder with respect to each Trust REMIC, as evidenced by an Opinion of Counsel delivered to the Trustee and the Depositor obtained at the expense of the Terminator;

(ii)    During such 90-day liquidation period, and at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell all of the assets of REMIC 1 to the Terminator for cash; and

(iii)    At the time of the making of the final payment on the Certificates, the Trustee shall distribute or credit, or cause to be distributed or credited, to the Holders of the Residual Certificates all cash on hand in the Trust Fund (other than cash retained to meet claims), and the Trust Fund shall terminate at that time.

(b)    At the expense of the Terminator, the Trustee shall prepare or cause to be prepared the documentation required in connection with the adoption of a plan of liquidation of each Trust REMIC pursuant to the Section 9.02(a).

(c)    By their acceptance of Certificates, the Holders thereof hereby agree to authorize the Trustee to specify the 90-day liquidation period for each Trust REMIC, which authorization shall be binding upon all successor Certificateholders.

Section 9.03    Termination of the Supplemental Interest Trust and the Final Maturity Reserve Trust.

(a)    The obligations of the Depositor, the Trustee and the Supplemental Interest Trust Trustee created hereby with respect to the Supplemental Interest Trust shall terminate upon the earlier of:

(i)    the termination of the Swap Agreement pursuant to the terms of the Swap Agreement; and

(ii)    the termination of this Agreement pursuant to Section 9.01.

(b)     The obligations of the Depositor, the Trustee and the Final Maturity Reserve Trust Trustee created hereby with respect to the Final Maturity Reserve Trust shall terminate upon the earlier of:

(i)     the Distribution Date in April 2037; and

(ii)     the termination of this Agreement pursuant to Section 9.01.

ARTICLE X

REMIC PROVISIONS

Section 10.01     <u>REMIC Administration</u>.

(a)     The Trustee shall elect to treat each Trust REMIC as a REMIC under the Code and, if necessary, under applicable state law.  Each such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued, copies of which forms and returns shall promptly be furnished by the Trustee to the NIMS Insurer.  For the purposes of the REMIC election in respect of REMIC 1, the REMIC 1 Regular Interests shall be designated as the Regular Interests in REMIC 1 and the Class R-1 Interest shall be designated as the Residual Interest in REMIC 1.  For the purposes of the REMIC election in respect of REMIC 2, the REMIC 2 Regular Interests shall be designated as the Regular Interests in REMIC 2 and the Class R-2 Interest shall be designated as the Residual Interest in REMIC 2.  The REMIC 3 Regular Interests shall be designated as the Regular Interests in REMIC 3 and the Class R-3 Interest shall be designated as the Residual Interest in REMIC 3.  For the purposes of the REMIC election in respect of REMIC CX, the Class C Certificates shall be designated as the Regular Interests in REMIC CX and the Class R-CX Interest shall be designated as the Residual Interest in REMIC CX.  For the purposes of the REMIC election in respect of REMIC PX, the Class P Certificates shall be designated as the Regular Interests in REMIC PX and the Class R-PX Interest shall be designated as the Residual Interest in REMIC PX.  For the purposes of the REMIC election in respect of REMIC SwapX, the Class Swap IO Upper-Tier Interest shall be designated as the Regular Interests in REMIC SwapX and the Class R-SwapX Interest shall be designated as the Residual Interest in REMIC SwapX.  The Trustee shall not permit the creation of any "interests" in REMIC 1, REMIC 2, REMIC 3, REMIC CX, REMIC SwapX or REMIC PX (within the meaning of Section 860G of the Code) other than the REMIC 1 Regular Interests, the REMIC 2 Regular Interests, the REMIC 3 Regular Interests and the interests represented by the Certificates.

(b)     The Closing Date is hereby designated as the "Startup Day" of each Trust REMIC within the meaning of Section 860G(a)(9) of the Code.

(c)     The Trustee shall pay, out of funds on deposit in the Distribution Account, any and all expenses relating to any tax audit of the Trust Fund (including, but not limited to, any professional fees or any administrative or judicial proceedings with respect to any Trust REMIC that involve the Internal Revenue Service or state tax authorities) unless such expenses, professional fees or any administrative or judicial proceedings are incurred by reason of the Trustee's willful misfeasance, bad faith or negligence.  The Trustee, as agent for each Trust REMIC's tax matters person, shall (i) act on behalf of the Trust Fund in relation to any tax

matter or controversy involving any Trust REMIC and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto and will be entitled to reimbursement from the Trust Fund for any expenses incurred by the Trustee in connection therewith unless such administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority is incurred by reason of the Trustee's willful misfeasance, bad faith or negligence.  The holder of the largest Percentage Interest of the Class R Certificates shall be designated, in the manner provided under Treasury regulations Section 1.860F-4(d) and Treasury regulations Section 301.6231(a)(7)-1, as the tax matters person of each Trust REMIC created hereunder other than REMIC CX, REMIC SwapX and REMIC PX.  The holder of the largest Percentage Interest of the Class R-CX Certificates shall be designated, in the manner provided under Treasury regulations Section 1.860F-4(d) and Treasury regulations Section 301.6231(a)(7)-1, as the tax matters person of REMIC CX and REMIC SwapX.  The holder of the largest Percentage Interest of the Class R-PX Certificates shall be designated, in the manner provided under Treasury regulations Section 1.860F-4(d) and Treasury regulations Section 301.6231(a)(7)-1, as the tax matters person of REMIC PX.  By its acceptance thereof, each such holder hereby agrees to irrevocably appoint the Trustee or an Affiliate as its agent to perform all of the duties of the tax matters person of each respective REMIC.

(d)     The Trustee shall prepare, sign and file in a timely manner, all of the Tax Returns in respect of each REMIC created hereunder, copies of which Tax Returns shall be promptly furnished to the NIMS Insurer.  The expenses of preparing and filing such returns shall be borne by the Trustee without any right of reimbursement therefor.  The Servicer shall provide on a timely basis to the Trustee or its designee such information with respect to the assets of the Trust Fund as is in its possession and reasonably required by the Trustee to enable it to perform its respective obligations under this Article.

(e)     The Trustee shall perform on behalf of each Trust REMIC all reporting and other tax compliance duties that are the responsibility of such REMIC under the Code, the REMIC Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.  Among its other duties, as required by the Code, the REMIC Provisions or such other compliance guidance, the Trustee shall provide (i) to any Transferor of a Residual Certificate (or other person designated in Section 860E(e)(3) of the Code) and to the Internal Revenue Service such information as is necessary for the computation of any tax relating to the transfer of a Residual Certificate to any Person who is not a Permitted Transferee, (ii) to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount and market discount or premium (using the Prepayment Assumption as required) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each Trust REMIC.  The Servicer shall provide on a timely basis to the Trustee such information with respect to the assets of the Trust Fund, including, without limitation, the Mortgage Loans, as is in its possession and reasonably required by the Trustee to enable it to perform its obligations under this subsection.  In addition, the Depositor shall provide or cause to be provided to the Trustee, within ten (10) days after the Closing Date, all information or data that the Trustee reasonably determines to be relevant for tax purposes as to the valuations and issue prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flow of the Certificates.  The Depositor shall also provide such information or data to the NIMS Insurer.

(f)    The Trustee shall take such action and shall cause each Trust REMIC created hereunder to take such action as shall be necessary to create or maintain the status thereof as a REMIC under the REMIC Provisions (and the Servicer shall assist the Trustee, to the extent reasonably requested by the Trustee to do specific actions in order to assist in the maintenance of such status).  The Trustee shall not take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any Trust REMIC as a REMIC or (ii) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions set forth in Section 860F(a) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, an "Adverse REMIC Event") unless the Trustee and the NIMS Insurer have received an Opinion of Counsel, addressed to the Trustee and the NIMS Insurer (at the expense of the party seeking to take such action but in no event at the expense of the Trustee) to the effect that the contemplated action will not, with respect to any Trust REMIC, endanger such status or result in the imposition of such a tax, nor shall the Servicer take or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action; provided that the Servicer may conclusively rely on such Opinion of Counsel and shall incur no liability for its action or failure to act in accordance with such Opinion of Counsel.  The Trustee shall deliver to the NIMS Insurer a copy of any such advice or opinion.  In addition, prior to taking any action with respect to any Trust REMIC or the assets thereof, or causing any Trust REMIC to take any action, which is not contemplated under the terms of this Agreement, the Servicer will consult with the Trustee or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to a Trust REMIC, and the Servicer shall not take any such action or cause any Trust REMIC to take any such action as to which the Trustee has advised it in writing that an Adverse REMIC Event could occur; provided that the Servicer may conclusively rely on such writing and shall incur no liability for its action or failure to act in accordance with such writing.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Agreement, but in no event shall such cost be an expense of the Trustee.  At all times as may be required by the Code, the Trustee will ensure that substantially all of the assets of REMIC 1 will consist of "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g)    If any tax is imposed on prohibited transactions of any Trust REMIC created hereunder pursuant to Section 860F(a) of the Code, on the net income from foreclosure property of  any such REMIC pursuant to Section 860G(c) of the Code, or on any contributions to any such REMIC after the Startup Day therefor pursuant to Section 860G(d) of the Code, or if any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Trustee pursuant to Section 10.03 hereof, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article X, (ii) to the Servicer pursuant to Section 10.03 hereof, if such tax arises out of or results from a breach by the Servicer of any of its obligations under Article III or this Article X, or (iii) otherwise against amounts on deposit in the Distribution Account and shall be paid by withdrawal therefrom.

(h)    On or before April 15 of each calendar year (or the applicable deadline thereafter if extensions for filing are properly filed) commencing after the date of this Agreement, the Trustee shall deliver to the Servicer, the NIMS Insurer and each Rating Agency a

Certificate from a Responsible Officer of the Trustee stating the Trustee's compliance with this Article X.

(i)    The Trustee shall, for federal income tax purposes, maintain books and records with respect to each Trust REMIC on a calendar year and on an accrual basis.

(j)    Following the Startup Day, the Trustee shall not accept any contributions of assets to any Trust REMIC other than in connection with any Substitute Mortgage Loan delivered in accordance with Section 2.03 unless it shall have received an Opinion of Counsel to the effect that the inclusion of such assets in the Trust Fund will not cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject any Trust REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(k)    Neither the Trustee nor the Servicer shall enter into any arrangement by which any Trust REMIC will receive a fee or other compensation for services or permit any Trust REMIC to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(l)    The Trustee shall treat each of the Reserve Fund, the Supplemental Interest Trust (other than the Credit Support Annex Account) and the Final Maturity Reserve Trust as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the Holders of the Class C Certificates and that is not an asset of any REMIC. The Trustee shall treat the Credit Support Annex Account as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the Swap Counterparty andthat is not an asset of any REMIC. The Trustee shall treat the beneficial owners of the Certificates (other than the Class P Certificates, the Class C Certificates and the Residual Certificates) as having entered into a notional principal contract with respect to the beneficial owners of the Class C Certificates. Pursuant to each such notional principal contract, all beneficial owners of the Certificates (other than the Class P Certificates, the Class C Certificates and the Residual Certificates) shall be treated as having agreed to pay, on each Distribution Date, to the beneficial owners of the Class C Certificates an aggregate amount equal to the excess, if any, of (i) the amount payable on such Distribution Date on the interest in REMIC 3 corresponding to such Class of Certificates over (ii) the amount payable on such Class of Certificates on such Distribution Date (such excess, a "Class C Shortfall"). A Class C Shortfall payable from interest collections shall be allocated pro rata among such Certificates based on the amount of interest otherwise payable to such Certificates, and a Class C Shortfall payable from principal collections shall be allocated to the most subordinate Class of Certificates with an outstanding Certificate Principal Balance to the extent of such balance. In addition, pursuant to such notional principal contract, the beneficial owner of the Class C Certificates shall be treated as having agreed to pay (i) Net WAC Rate Carryover Amounts and (ii) on any Distribution Date on or after May 2017 through the Distribution Date in April 2027 if amounts are not paid in to the Final Maturity Reserve Trust because the Final Maturity Reserve Funding Date has occurred or the amount on Schedule III exceeds the Stated Principal Balance of the 40-year Mortgage Loans, any amounts that would have been paid to the Final Maturity Reserve Trust if the Final Maturity Reserve Funding Date had not occurred or the Stated Principal Balance of the 40-year Mortgage Loans exceeded the amount on Schedule III, to the extent such amounts are used to make payments on such Certificates to the Holders of the Certificates (other than the Class P Certificates, the Class

C Certificates and the Residual Certificates) pursuant to the terms of this Agreement. Any payments on the Certificates in light of the foregoing shall not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1). However, any payment from the Certificates of a Class C Shortfall shall be treated for tax purposes as having been received by the beneficial owners of such Certificates in respect of their interests in the REMIC 3 and as having been paid by such beneficial owners to the Supplemental Interest Trust Trustee pursuant to the notional principal contract. Thus, each Certificate (other than the Class P Certificates, the Class C Certificates and the Residual Certificates) shall be treated as representing ownership of not only regular interests in REMIC 3, but also ownership of an interest in (and obligations with respect to) a notional principal contract. For purposes of determining the issue price of the regular interests in REMIC 3, the Trustee shall assume that the notional principal contract has a value of $10,000 as of the Closing Date in favor of the Certificates (other than the Class C Certificates, the Class P Certificates and the Residual Certificates) and shall allocate such value proportionately to each such Class of Certificates based on such Class's initial Certificate Principal Balance.

Section 10.02    Prohibited Transactions and Activities.

None of the Depositor, the Servicer, the Trustee or the Delaware Trustee shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of REMIC 1, (iii) the termination of REMIC 1 pursuant to Article IX of this Agreement, (iv) a substitution pursuant to Article II of this Agreement or (v) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement), nor acquire any assets for any Trust REMIC (other than REO Property acquired in respect of a defaulted Mortgage Loan), nor sell or dispose of any investments in the Collection Account or the Distribution Account for gain, nor accept any contributions to any Trust REMIC after the Closing Date (other than a Substitute Mortgage Loan delivered in accordance with Section 2.03), unless it and the NIMS Insurer have received an Opinion of Counsel, addressed to the Trustee and the NIMS Insurer (at the expense of the party seeking to cause such sale, disposition, substitution, acquisition or contribution but in no event at the expense of the Trustee or the Delaware Trustee) that such sale, disposition, substitution, acquisition or contribution will not (a) affect adversely the status of any Trust REMIC as a REMIC or (b) cause any Trust REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

Section 10.03    Trustee, Servicer and Depositor Indemnification.

(a)    The Trustee agrees to indemnify the Trust Fund, the Delaware Trustee, the Depositor and the Servicer for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Delaware Trustee, the Depositor or the Servicer as a result of a breach of the Trustee's covenants set forth in this Article X or any state, local or franchise taxes imposed upon the Trust as a result of the location of the Trustee.

(b)    The Servicer agrees to indemnify the Trust Fund, the Delaware Trustee, the Depositor and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Delaware Trustee, the Depositor or the Trustee as a result of a breach of the Servicer's covenants set forth in Article III

or this Article X or any state, local or franchise taxes imposed upon the Trust as a result of the location of the Servicer or any Sub-Servicer.

(c)     The Depositor agrees to indemnify the Trust Fund, the Delaware Trustee, the Servicer and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Delaware Trustee, the Servicer or the Trustee as a result of a breach of the Depositor's covenants set forth in this Article X.

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.01     <u>Amendment</u>.

This Agreement or any Custodial Agreement may be amended from time to time by the Depositor, the Servicer, the Trustee, the Delaware Trustee and, if applicable, the Custodian, with the consent of the NIMS Insurer, and if necessary, with the prior written consent of the Swap Counterparty (as described below), and without the consent of any of the Certificateholders, (i) to cure any ambiguity or defect, (ii) to correct, modify or supplement any provisions herein (including to give effect to the expectations of Certificateholders), or in any Custodial Agreement, (iii) to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of the Trust Fund as a REMIC at all times that any Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund, provided that the Trustee, the NIMS Insurer, the Depositor and the Servicer have received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect the status of the Trust Fund as a REMIC or adversely affect in any material respect the interest of any Certificateholder or (iv) to make any other provisions with respect to matters or questions arising under this Agreement or in any Custodial Agreement which shall not be inconsistent with the provisions of this Agreement or such Custodial Agreement, provided that, in each case, such action shall not, as evidenced by an Opinion of Counsel delivered to the parties hereto and the NIMS Insurer, adversely affect in any material respect the interests of any Certificateholder, provided, further, that (A) such action will not affect in any material respect the permitted activities of the Trust and (B) such action will not increase in any material respect the degree of discretion which the Servicer is allowed to exercise in servicing the Mortgage Loans and, provided, further, that any such amendment which modifies the rights or obligations of the Delaware Trustee hereunder shall require the consent of the Delaware Trustee.  No amendment shall be deemed to adversely affect in any material respect the interests of any Certificateholder who shall have consented thereto, and no Opinion of Counsel shall be required to address the effect of any such amendment on any such consenting Certificateholder.

This Agreement or any Custodial Agreement may also be amended from time to time by the Depositor, the Servicer, the Trustee, the Delaware Trustee and, if applicable, the Custodian, with the consent of the NIMS Insurer, and if necessary, with the prior written consent of the Swap Counterparty (as described below), and with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or any Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates; provided,

however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments received on Mortgage Loans which are required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner, other than as described in (i), without the consent of the Holders of Certificates of such Class evidencing at least 66% of the Voting Rights allocated to such Class, or (iii) modify the consents required by the immediately preceding clauses (i) and (ii) without the consent of the Holders of all Certificates then outstanding and, provided, further, that any such amendment which modifies the rights or obligations of the Delaware Trustee hereunder shall require the consent of the Delaware Trustee.  Notwithstanding any other provision of this Agreement, for purposes of the giving or withholding of consents pursuant to this Section 11.01, Certificates registered in the name of the Depositor or the Servicer or any Affiliate thereof shall be entitled to Voting Rights with respect to matters affecting such Certificates.

In addition to the provisions of this Section 11.01 and as long as the Swap Counterparty remains the Swap Counterparty under the Swap Agreement or is owed any amounts under this Agreement, the prior written consent of the Swap Counterparty shall be necessary for the adoption of any proposed amendment of this Agreement that, in the Swap Counterparty's reasonable determination, materially affects the Swap Counterparty's rights or interests under this Agreement, including, but not limited to, the right to receive any Net Swap Payment or Swap Termination Payment due and owing to it under this Agreement; provided that any such consent of the Swap Counterparty shall not be unreasonably withheld.

Notwithstanding any contrary provision of this Agreement, the Trustee and the NIMS Insurer shall be entitled to receive an Opinion of Counsel to the effect that such amendment will not result in the imposition of any tax on any Trust REMIC pursuant to the REMIC Provisions or cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding and that such amendment is authorized by the terms of this Section 11.01.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Certificateholder and the NIMS Insurer.

It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

The cost of any Opinion of Counsel to be delivered pursuant to this Section 11.01 shall be borne by the Person seeking the related amendment, but in no event shall such Opinion of Counsel be an expense of the Trustee, the Delaware Trustee or the Trust Fund.

Each of the Trustee and the Delaware Trustee may, but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities under this Agreement or otherwise.

Section 11.02     <u>Recordation of Agreement; Counterparts.</u>

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable

jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the expense of the Trust, but only upon direction of Certificateholders accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

Section 11.03    Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not (i) operate to terminate this Agreement or the Trust, (ii) entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, or (iii) otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

Except as expressly provided for herein, no Certificateholder shall have any right to vote or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for 15 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding.  It is understood and intended, and expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder, which priority or preference is not otherwise provided for herein, or to enforce any right under this Agreement, except in the manner herein provided and for the equal, ratable and common benefit of all Certificateholders.  For the protection and enforcement of the provisions of this Section 11.03 each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04    Governing Law; Jurisdiction.

This Agreement shall be construed in accordance with the laws of the State of Delaware and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.05    Notices.

All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, by facsimile or by express delivery service, to (a) in the case of the Servicer, Washington Mutual Bank, 1301 Second Avenue, Seattle, Washington 98101, Attention:  General Counsel (telecopy number:  (206) 554-2717), with a copy to Washington Mutual Bank, 11200 W. Parkland Ave., Milwaukee, WI 53224, Attention: Investor Reporting, or such other address or telecopy number as may hereafter be furnished to the other parties hereto in writing by the Servicer, (b) in the case of the Trustee, Citibank, N.A., 388 Greenwich Street, 14th Floor, New York, NY 10013, Attention: Agency and Trust (WaMu Series 2007-HE2) or such other address or telecopy number as may hereafter be furnished to the other parties hereto in writing by the Trustee, (c) in the case of the Delaware Trustee, Christiana Bank & Trust Company, 300 Delaware Avenue, Suite 714, Wilmington, DE 19801, or such other address as may be furnished to the other parties hereto in writing by the Delaware Trustee, (d) in the case of the Depositor, WaMu Asset Acceptance Corp., 1400 South Douglass Road, Suite 100, Anaheim, California 92806, Attention: General Counsel (telecopy number:  (206) 554-2717), or such other address or telecopy number as may be furnished to the other parties hereto in writing by the Depositor, (e) in the case of the Swap Counterparty, as provided in the Swap Agreement, and (f) in the case of the NIMS Insurer, the NIMS Insurer's address or telecopy number as set forth in the Indenture, or such other addresses or telecopy number as may be furnished to the other parties hereto in writing by the NIMS Insurer.  Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such Holder as shown in the Certificate Register.  Notice of any Servicer default shall be given by telecopy and by certified mail.  Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have duly been given when mailed, whether or not the Certificateholder receives such notice.  A copy of any notice required to be telecopied hereunder shall also be mailed to the appropriate party in the manner set forth above.

Section 11.06    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 11.07    Notice to the Rating Agencies, the Swap Counterparty and the NIMS Insurer.

The Trustee shall use its best efforts promptly to provide notice to the Rating Agencies, the Swap Counterparty and the NIMS Insurer with respect to each of the following of which it has actual knowledge:

1.    Any amendment to this Agreement;

2.      The occurrence of any Servicer Event of Default that has not been cured or waived;

3.      The resignation or termination of the Servicer, the Trustee or the Delaware Trustee;

4.      The repurchase or substitution of Mortgage Loans pursuant to or as contemplated by Section 2.03;

5.      The final payment to the Holders of any Class of Certificates;

6.      Any change in the location of the Collection Account or the Distribution Account;

7.      The Trustee were it to succeed as Servicer, is unable to make advances regarding delinquent Mortgage Loans; and

8.      The filing of any claim under the Servicer's blanket bond and errors and omissions insurance policy required by Section 3.14 or the cancellation or material modification of coverage under any such instrument.

In addition, the Trustee shall promptly make available to each Rating Agency and the Swap Counterparty copies of each Statement to Certificateholders described in Section 4.03 hereof and the Servicer shall promptly furnish to each Rating Agency copies of the following:

1.      each annual statement as to compliance described in Section 3.20 hereof;

2.      each annual independent public accountants' servicing report described in Section 3.21 hereof.

Any such notice pursuant to this Section 11.07 shall be in writing and shall be deemed to have been duly given if personally delivered or mailed by first class mail, postage prepaid, or by express delivery service to (i) Moody's Investors Service, Inc., 99 Church Street, New York, New York 10048, Attention:  MBS Monitoring/WaMu Series 2007-HE2 Trust, (ii) Standard & Poor's Rating Services, Inc., 55 Water Street, New York, New York 10041, (iii) Fitch, Inc., One State Street Plaza, New York, NY 10004, Attention: RMBS Performance Analytics (iv) ABN AMRO Bank N.V., 55 East 52nd Street, New York, NY 10055, Attention: Associate General Counsel and (v) the NIMS Insurer at the address provided in Section 11.05.

In addition, each party hereto agrees that it will furnish or make available to the NIMS Insurer a copy of any opinions, notices, reports, schedules, certificates, statements, rating confirmation letters or other information that are furnished hereunder to the Trustee or the Certificateholders.

Section 11.08    Article and Section References.

All Article and Section references used in this Agreement, unless otherwise provided, are to articles and sections in this Agreement.

Section 11.09     Third-Party Beneficiaries.

(a)     The NIMS Insurer shall be deemed a third-party beneficiary of this Agreement, and shall be entitled to enforce such rights, in each case, as if it were a party hereto. Notwithstanding anything to the contrary anywhere in this Agreement, all rights of the NIMS Insurer hereunder (i) shall be suspended whenever rights of the NIMS Insurer under the Indenture (other than the right to consent to amendments to the Indenture) are suspended and (ii) except in the case of any right to indemnification hereunder shall permanently terminate upon the later to occur of (A) the payment in full of the Insured NIM Notes as provided in the Indenture and (B) the payment in full to the NIMS Insurer of any amounts owed to the NIMS Insurer as provided in the Indenture.

(b)     The Swap Counterparty shall be deemed a third-party beneficiary of this Agreement, and shall be entitled to enforce such rights, in each case, as if it were a party hereto. Notwithstanding anything to the contrary anywhere in this Agreement, all rights of the Swap Counterparty hereunder shall permanently terminate upon the later to occur of (i) the expiration of the Swap Agreement, and (ii) the payment in full to the Swap Counterparty, of any amounts owed to it under the Swap Agreement.

Section 11.10     Grant of Security Interest.

It is the express intent of the parties hereto that the conveyance of the Mortgage Loans and the other property specified in Section 2.01 by the Depositor to the Trust be, and be construed as, a sale and not a pledge to secure a debt or other obligation of the Depositor. However, in the event that, notwithstanding the aforementioned intent of the parties, the Mortgage Loans or other property conveyed to the Trust pursuant to Section 2.01 are held to be property of the Depositor, then, (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Mortgage Loans and all other property conveyed to the Trust pursuant to Section 2.01 by the Depositor to the Trust to secure a debt or other obligation of the Depositor and (b)(1) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code as in effect from time to time in the State of Delaware; (2) the conveyance provided for in Section 2.01 hereof shall be deemed to be a grant by the Depositor to the Trust of a security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans and all other property conveyed to the Trust pursuant to Section 2.01 in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts, other than investment earnings, from time to time held or invested in the Collection Account and the Distribution Account, whether in the form of cash, instruments, securities or other property; (3) the obligations secured by such security agreement shall be deemed to be all of the Depositor's obligations under this Agreement, including the obligation to provide to the Certificateholders and the Swap Counterparty the benefits of this Agreement relating to the Mortgage Loans and the Trust Fund; and (4) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trust for the purpose of perfecting such security interest under applicable law.  Accordingly, the Depositor hereby grants to the Trust a security interest in the Mortgage Loans and all other property described in clause (2) of the preceding sentence, for the purpose of securing to the Trust the performance by the Depositor of

the obligations described in clause (3) of the preceding sentence.  Notwithstanding the foregoing, the parties hereto intend the conveyance pursuant to Section 2.01 to be a true, absolute and unconditional sale of the Mortgage Loans and assets constituting the Trust Fund by the Depositor to the Trust.

IN WITNESS WHEREOF, the Depositor, the Servicer, the Trustee and the Delaware Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

WAMU ASSET ACCEPTANCE CORP.,
as Depositor


By: _____
Name:    Trisha Lowe
Title:    Vice President


WASHINGTON MUTUAL BANK,
as Servicer


By: _____
Name:    Barbara Loper
Title:    Vice President


CITIBANK, N.A.,
as Trustee


By: _____
Name:
Title:


CHRISTIANA BANK & TRUST COMPANY,
as Delaware Trustee


By: _____
Name:
Title:

STATE OF WASHINGTON         )

                                   ) ss.:

COUNTY OF KING                 )

        On April ___, 2007 before me, _____, personally appeared TRISHA LOWE, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

                                                                (Seal)

STATE OF WASHINGTON       )
                                 ) ss.:
COUNTY OF KING              )

       On April ___, 2007 before me, _____, personally appeared BARBARA LOPER, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.


Signature _____


                                                   (Seal)

STATE OF NEW YORK            )
                            ) ss.:
COUNTY OF NEW YORK          )

     On April ___, 2007 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.


Signature _____


                                                         (Seal)

STATE OF DELAWARE )
) ss.:
COUNTY OF NEW CASTLE )

On this ___ day of April 2007 before me, a Notary Public in and for said State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacit(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature_____

(Seal)

Exhibit G

LONG BEACH SECURITIES CORP.,
Depositor


LONG BEACH MORTGAGE COMPANY,
Seller and Master Servicer


and


DEUTSCHE BANK NATIONAL TRUST COMPANY,
Trustee

POOLING AND SERVICING AGREEMENT
Dated as of May 1, 2006

_____


Long Beach Mortgage Loan Trust 2006-A

Asset-Backed Certificates, Series 2006-A

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS................................................................................................ 4
    Section 1.01    Defined Terms.................................................................................. 4
    Section 1.02    Accounting. ....................................................................................47
    Section 1.03    Allocation of Certain Interest Shortfalls. ......................................47

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
                 CERTIFICATES..............................................................................47
    Section 2.01    Conveyance of Mortgage Loans. ...................................................47
    Section 2.02    Acceptance of REMIC 1 by the Trustee.........................................51
    Section 2.03    Cure, Repurchase or Substitution of Mortgage Loans by the Seller; Remedies
                for Breaches by Depositor or Master Servicer; Remedies for Breaches Relating
                to Prepayment Charges...................................................................52
    Section 2.04    Representations, Warranties and Covenants of the Master Servicer...........................55
    Section 2.05    Representations and Warranties of the Depositor......................................58
    Section 2.06    Issuance of Certificates...................................................................60
    Section 2.07    Reserved...........................................................................................60
    Section 2.08    Conveyance of REMIC Regular Interests and Acceptance of REMICs by the
                Trustee; Issuance of Certificates...................................................60

ARTICLE III ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS ....................61
    Section 3.01    Master Servicer to Act as Master Servicer.................................................61
    Section 3.02    Sub-Servicing Agreements Between the Master Servicer and Sub-Servicers. ............63
    Section 3.03    Successor Sub-Servicers...................................................................64
    Section 3.04    Liability of the Master Servicer.........................................................64
    Section 3.05    No Contractual Relationship Between Sub-Servicers and the Trustee or
                Certificateholders...........................................................................65
    Section 3.06    Assumption or Termination of Sub-Servicing Agreements by Trustee. .....................65
    Section 3.07    Collection of Certain Mortgage Loan Payments. ....................................66
    Section 3.08    Sub-Servicing Accounts. ..................................................................66
    Section 3.09    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.................67
    Section 3.10    Collection Account and Distribution Account. ........................................67
    Section 3.11    Withdrawals from the Collection Account and Distribution Account. .......................70
    Section 3.12    Investment of Funds in the Interest Coverage Account, the Collection Account
                and the Distribution Account............................................................72
    Section 3.13    Reserved...........................................................................................73
    Section 3.14    Maintenance of Hazard Insurance and Errors and Omissions and Fidelity
                Coverage. ........................................................................................73
    Section 3.15    Enforcement of Due-On-Sale Clauses; Assumption Agreements. ...........................75
    Section 3.16    Realization Upon Defaulted Mortgage Loans.........................................76
    Section 3.17    Trustee to Cooperate; Release of Mortgage Files.....................................79
    Section 3.18    Servicing Compensation. .................................................................80

i

Section 3.19    Reports to the Trustee; Collection Account Statements.............................81
Section 3.20    Annual Statement as to Compliance. ................................................81
Section 3.21    Assessments of Compliance and Attestation Reports. ..............................82
Section 3.22    Access to Certain Documentation...................................................83
Section 3.23    Title, Management and Disposition of REO Property. ..............................83
Section 3.24    Obligations of the Master Servicer in Respect of Prepayment Interest
                Shortfalls. ......................................................................87
Section 3.25    [Reserved]........................................................................87
Section 3.26    Reserve Fund. ....................................................................87
Section 3.27    Advance Facility. ................................................................88
Section 3.28    PMI Policy; Claims Under the PMI Policy...........................................89
Section 3.29    Cap Agreement.....................................................................89

ARTICLE IV FLOW OF FUNDS.........................................................................90
Section 4.01    Distributions. ...................................................................90
Section 4.02    [Reserved]........................................................................99
Section 4.03    Statements........................................................................99
Section 4.04    Remittance Reports; Advances.....................................................103
Section 4.05    Distributions on the REMIC Regular Interests.....................................104
Section 4.06    Allocation of Realized Losses....................................................106
Section 4.07    Compliance with Withholding Requirements. .......................................108
Section 4.08    Commission Reporting. ...........................................................108
Section 4.09    Cap Account......................................................................111
Section 4.10    Intention of the Parties and Interpretation......................................111

ARTICLE V THE CERTIFICATES......................................................................112
Section 5.01    The Certificates.................................................................112
Section 5.02    Registration of Transfer and Exchange of Certificates............................114
Section 5.03    Mutilated, Destroyed, Lost or Stolen Certificates................................118
Section 5.04    Persons Deemed Owners. ..........................................................118

ARTICLE VI THE MASTER SERVICER AND THE DEPOSITOR ...............................................119
Section 6.01    Liability of the Master Servicer and the Depositor. .............................119
Section 6.02    Merger or Consolidation of the Depositor or the Master Servicer..................119
Section 6.03    Limitation on Liability of the Depositor, the Master Servicer and Others. ........119
Section 6.04    Limitation on Resignation of Master Servicer. ...................................120
Section 6.05    Rights of the Depositor and the Trustee in Respect of the Master Servicer. .......121

ARTICLE VII DEFAULT ............................................................................122
Section 7.01    Master Servicer Events of Default. ..............................................122
Section 7.02    Trustee to Act; Appointment of Successor. .......................................124
Section 7.03    Notification to Certificateholders...............................................126
Section 7.04    Waiver of Master Servicer Events of Default. ....................................126

ii

ARTICLE VIII THE TRUSTEE............................................................................................127
   Section 8.01   Duties of Trustee.............................................................................127
   Section 8.02   Certain Matters Affecting the Trustee..........................................128
   Section 8.03   Trustee Not Liable for Certificates or Mortgage Loans. ..............129
   Section 8.04   Trustee May Own Certificates......................................................130
   Section 8.05   Trustee's Fees and Expenses........................................................130
   Section 8.06   Eligibility Requirements for Trustee.............................................131
   Section 8.07   Resignation or Removal of Trustee...............................................131
   Section 8.08   Successor Trustee.........................................................................132
   Section 8.09   Merger or Consolidation of Trustee.............................................133
   Section 8.10   Appointment of Co-Trustee or Separate Trustee. .........................133
   Section 8.11   Appointment of Custodians...........................................................134
   Section 8.12   Appointment of Office or Agency. ................................................134
   Section 8.13   Representations and Warranties of the Trustee. ..........................135

ARTICLE IX TERMINATION...........................................................................................135
   Section 9.01   Termination Upon Purchase or Liquidation of All Mortgage Loans. .......................135
   Section 9.02   Additional Termination Requirements. .........................................137

ARTICLE X REMIC PROVISIONS....................................................................................138
   Section 10.01   REMIC Administration. ...............................................................138
   Section 10.02   Prohibited Transactions and Activities.........................................141
   Section 10.03   Trustee, Master Servicer and Depositor Indemnification. ...........142

ARTICLE XI MISCELLANEOUS PROVISIONS................................................................142
   Section 11.01   Amendment. .................................................................................142
   Section 11.02   Recordation of Agreement; Counterparts......................................144
   Section 11.03   Limitation on Rights of Certificateholders. ..................................144
   Section 11.04   Governing Law; Jurisdiction. .......................................................145
   Section 11.05   Notices..........................................................................................145
   Section 11.06   Severability of Provisions. ...........................................................145
   Section 11.07   Notice to the Rating Agencies.......................................................145
   Section 11.08   Article and Section References......................................................146
   Section 11.09   [Reserved].....................................................................................146
   Section 11.10   Grant of Security Interest..............................................................146

SE 2154917 v8
(26425.0085)

## **Exhibits**

Exhibit A-1       Form of Class A-1 Certificates
Exhibit A-2       Form of Class A-2 Certificates
Exhibit A-3       Form of Class A-3 Certificates
Exhibit A-4       Form of Class M-1 Certificates
Exhibit A-5       Form of Class M-2 Certificates
Exhibit A-6       Form of Class M-3 Certificates
Exhibit A-7       Form of Class M-4 Certificates
Exhibit A-8       Form of Class M-5 Certificates
Exhibit A-9       Form of Class M-6 Certificates
Exhibit A-10      Form of Class M-7 Certificates
Exhibit A-11      Form of Class B-1 Certificates
Exhibit A-12      Form of Class B-2 Certificates
Exhibit A-13      Form of Class C Certificates
Exhibit A-14      Form of Class P Certificates
Exhibit A-15      Form of Class R Certificates
Exhibit B         Form of Cap Agreement
Exhibit C         Form of Mortgage Loan Purchase Agreement
Exhibit D         Mortgage Loan Schedule
Exhibit E-1       Request for Release (for Trustee/Custodian)
Exhibit E-2       Request for Release (Certificate – Mortgage Loan Paid in Full)
Exhibit E-3       Form of Mortgage Loan Assignment Agreement
Exhibit F-1       Form of Trustee's Initial Certification
Exhibit F-2       Form of Trustee's Final Certification
Exhibit G         [Reserved]
Exhibit H         Form of Lost Note Affidavit
Exhibit I         Form of ERISA Representation
Exhibit J-1A      Form of Class B Certificate Transferor Certificate
Exhibit J-1B      Form of Class B Certificate Transferee Certificate
Exhibit J-2       Form of Investment Letter
Exhibit K         Form of Class R Certificate Transfer Affidavit
Exhibit L         Form of Transferor Certificate
Exhibit M         [Reserved]
Exhibit N         Criteria to be Addressed in Assessment of Compliance
Exhibit O         Form 10-D, Form 8-K and Form 10-K Reporting Responsibility
Exhibit P         Form of Trustee Certificate

SE 2154917 v8
(26425.0085)

## **Schedules**

Schedule I          Prepayment Charge Schedule
Schedule II         [Reserved]
Schedule III        [Reserved]
Schedule IV         PMI Mortgage Loan Schedule (Not applicable)

SE 2154917 v8
(26425.0085)

This POOLING AND SERVICING AGREEMENT is dated as of May 1, 2006 (the "Agreement"), among LONG BEACH SECURITIES CORP., as depositor (the "Depositor"), LONG BEACH MORTGAGE COMPANY, as seller (the "Seller") and master servicer (the "Master Servicer") and DEUTSCHE BANK NATIONAL TRUST COMPANY, as trustee (the "Trustee").

PRELIMINARY STATEMENT:

The Depositor intends to sell pass-through certificates (collectively, the "Certificates"), to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest in the Trust Fund created hereunder. The Certificates will consist of fifteen classes of certificates, designated as (i) the Class A-1 Certificates, (ii) the Class A-2 Certificates, (iii) the Class A-3 Certificates, (iv) the Class M-1 Certificates, (v) the Class M-2 Certificates, (vi) the Class M-3 Certificates, (vii) the Class M-4 Certificates, (viii) the Class M-5 Certificates, (ix) the Class M-6 Certificates, (x) the Class M-7 Certificates, (xi) the Class B-1 Certificates, (xii) the Class B-2 Certificates, (xiii) the Class C Certificates, (xiv) the Class P Certificates and (xv) the Class R Certificates.

1

## REMIC 1

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (exclusive of the Reserve Fund, the Cap Account, the Cap Agreement and the Master Servicer Prepayment Charge Payment Amounts) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC 1." The Class R-1 Interest shall represent the sole class of "residual interests" in REMIC 1 for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, the Uncertificated REMIC 1 Pass-Through Rate, the initial Uncertificated Principal Balance, and solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC 1 Regular Interests. None of the REMIC 1 Regular Interests will be certificated.

| Designation | Initial Uncertificated Principal Balance | Uncertificated REMIC 1 Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| AA | $[_____.__] | Variable[2] | May, 2036 |
| A1 | [_____.__] | Variable[2] | May, 2036 |
| A2 | [_____.__] | Variable[2] | May, 2036 |
| A3 | [_____.__] | Variable[2] | May, 2036 |
| M1 | [_____.__] | Variable[2] | May, 2036 |
| M2 | [_____.__] | Variable[2] | May, 2036 |
| M3 | [_____.__] | Variable[2] | May, 2036 |
| M4 | [_____.__] | Variable[2] | May, 2036 |
| M5 | [_____.__] | Variable[2] | May, 2036 |
| M6 | [_____.__] | Variable[2] | May, 2036 |
| M7 | [_____.__] | Variable[2] | May, 2036 |
| B-1 | [_____.__] | Variable[2] | May, 2036 |
| B-2 | [_____.__] | Variable[2] | May, 2036 |
| ZZ | [_____.__] | Variable[2] | May, 2036 |
| P | $100.00 | Variable[2] | May, 2036 |

[1]    Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC 1 Regular Interest.

[2]    Calculated in accordance with the definition of "Uncertificated REMIC 1 Pass-Through Rate" herein.

2

## REMIC 2

As provided herein, the Trustee shall make an election to treat the segregated pool of assets consisting of the REMIC 1 Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets shall be designated as "REMIC 2." The Class R-2 Interest represents the sole class of "residual interests" in REMIC 2 for purposes of the REMIC Provisions.

The following table sets forth (or describes) the Class designation, Pass-Through Rate and Original Class Certificate Principal Balance for each Class of Certificates that represents one or more of the "regular interests" in REMIC 2 and each class of uncertificated "regular interests" in REMIC 2:

| Class Designation | Original Class Certificate Principal Balance | Pass-Through Rate | Assumed Final Maturity Date[1] |
|---|---|---|---|
| A-1 | $260,802,000.00 | Variable[2] | May, 2036 |
| A-2 | 75,000,000.00 | Variable[2] | May, 2036 |
| A-3 | 20,000,000.00 | Variable[2] | May, 2036 |
| M-1 | 58,058,000.00 | Variable[2] | May, 2036 |
| M-2 | 14,115,000.00 | Variable[2] | May, 2036 |
| M-3 | 25,833,000.00 | Variable[2] | May, 2036 |
| M-4 | 10,653,000.00 | Variable[2] | May, 2036 |
| M-5 | 12,517,000.00 | Variable[2] | May, 2036 |
| M-6 | 9,054,000.00 | Variable[2] | May, 2036 |
| M-7 | 9,854,000.00 | Variable[2] | May, 2036 |
| B-1 | 15,180,000.00 | Variable[2] | May, 2036 |
| B-2 | 9,055,000.00 | Variable[2] | May, 2036 |
| C[3] | [_____.__] | Variable[2] | May, 2036 |
| P | 100.00 | N/A[4] | May, 2036 |

[1]    Solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date in the month following the month of the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each Class of Certificates.

[2]    Calculated in accordance with the definition of "Pass-Through Rate" herein.

[3]    The Class C Certificates will accrue interest at their variable Pass-Through Rate on their Notional Amount outstanding from time to time, which shall equal the aggregate of the Uncertificated Principal Balances of the REMIC 1 Regular Interests. The Class C Certificates will not accrue interest on their Uncertificated Principal Balance.

[4]    The Class P Certificates will not accrue interest.

3

ARTICLE I

DEFINITIONS

Section 1.01    <u>Defined Terms</u>.

  Whenever used in this Agreement or in the Preliminary Statement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.  Unless otherwise specified, all calculations in respect of interest on the LIBOR Certificates shall be made on the basis of the actual number of days elapsed on the basis of a 360-day year and all other calculations of interest described herein shall be made on the basis of a 360-day year consisting of twelve 30-day months.  The Class P Certificates and the Class R Certificates are not entitled to distributions in respect of interest and, accordingly, will not accrue interest.

  "<u>1933 Act</u>":  The Securities Act of 1933, as amended.

  "<u>1934 Act</u>":  The Exchange Act of 1934, as amended.

  "<u>Account</u>":  Either of the Collection Account and Distribution Account.

  "<u>Accrual Period</u>":  With respect to the Class C Certificates, the Class B Certificates and the REMIC 1 Regular Interests, and each Distribution Date, the calendar month prior to the month of such Distribution Date. With respect to the Class A Certificates and the Mezzanine Certificates, and each Distribution Date, the period commencing on the immediately preceding Distribution Date (or in the case of the first such Accrual Period, commencing on the Closing Date) and ending on the day immediately preceding such Distribution Date.

  "<u>Adjusted Net Mortgage Rate</u>":  With respect to any Mortgage Loan (or the related REO Property), as of any Distribution Date, a per annum rate of interest equal to the Mortgage Rate for such Mortgage Loan as of the first day of the month preceding the month in which such Distribution Date occurs, minus the sum of (i) the Servicing Fee Rate, (ii) the PMI Insurer Fee Rate, if applicable, and (iii) the Trustee Fee Rate.

  "<u>Advance</u>":  As to any Mortgage Loan or REO Property, any advance made by the Master Servicer in respect of any Distribution Date pursuant to Section 4.04.

  "<u>Advancing Person</u>":  As defined in Section 3.27 hereof.

  "<u>Adverse REMIC Event</u>":  As defined in Section 10.01(f) hereof.

  "<u>Affiliate</u>":  With respect to any Person, any other Person controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise and "controlling" and "controlled" shall have meanings correlative to the foregoing.

  "<u>Agreement</u>":  This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

SE 2154917 v8
(26425.0085)

"Allocated Realized Loss Amount":  With respect to any Distribution Date and any Class of the Mezzanine Certificates and the Class B Certificates, an amount equal to (a) the sum of (i) any Realized Losses allocated to such Class of Certificates on such Distribution Date and (ii) any Allocated Realized Loss Amount for such Class of Certificates remaining unpaid from the previous Distribution Date less (b) any Allocated Realized Loss Amounts that have been reinstated with respect to such Class of Certificates on prior Distribution Dates due to Subsequent Recoveries.

"Annual Statement of Compliance":  As defined in Section 3.20(a) hereof.

"Appraised Value":  With respect to any Mortgaged Property, the value thereof as determined by an appraisal made for the originator of the related Mortgage Loan at the time of origination of such Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae.

"Assessment of Compliance":  As defined in Section 3.21(a) hereof.

"Assignment":  An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form (excepting therefrom, if applicable, the mortgage recordation information which has not been required pursuant to Section 2.01 hereof or returned by the applicable recorder's office), which is sufficient under the laws of the jurisdiction in which the related Mortgaged Property is located to reflect of record the sale of the Mortgage.

"Attestation Report":  As defined in Section 3.21(b) hereof.

"Available Funds":  With respect to any Distribution Date, an amount equal to the excess of (i) the sum of (a) the aggregate of the Monthly Payments on the Mortgage Loans due on the related Due Date and received on or prior to the related Determination Date, (b) Liquidation Proceeds, Insurance Proceeds, Principal Prepayments, Gross Subsequent Recoveries and other unscheduled recoveries of principal and interest in respect of the Mortgage Loans during the related Prepayment Period (other than any Prepayment Charges collected by the Master Servicer in connection with the full or partial prepayment of any of the Mortgage Loans, any Master Servicer Prepayment Charge Payment Amount in connection with the Mortgage Loans and any Prepayment Interest Excess), (c) the aggregate of any amounts received in respect of an REO Property acquired in respect of a Mortgage Loan withdrawn from any REO Account and deposited in the Collection Account for such Distribution Date, (d) the aggregate of any amounts deposited in the Collection Account by the Master Servicer in respect of related Prepayment Interest Shortfalls on the Mortgage Loans for such Distribution Date, (e) the aggregate of any Advances made by the Master Servicer or the Trustee for such Distribution Date with respect to the Mortgage Loans, (f) the aggregate of any related advances made by or on behalf of the Trustee for such Distribution Date with respect to the Mortgage Loans pursuant to Section 7.02(b) and (g) the aggregate of any amounts constituting proceeds of repurchases or substitutions of the Mortgage Loans occurring during the related Prepayment Period over (ii) the sum, without duplication, of (a) amounts reimbursable or payable to the Depositor, the Master Servicer, the Trustee, the Seller or any Sub-Servicer pursuant to Section 3.11 or Section 3.12 in respect of the Mortgage Loans or otherwise payable in respect of Extraordinary Trust Fund Expenses, (b) amounts deposited in the Collection Account or the Distribution Account pursuant to clauses (i)(a) through (g) above, as the case may be, in error, (c) Stayed Funds, (d) any Trustee

5

Fee pursuant to Section 8.05 and any indemnification payments or expense reimbursements made by the Trust Fund pursuant to Section 8.05, (e) the PMI Insurer Fee payable from the Distribution Account and (f) amounts reimbursable to the Trustee for an advance made pursuant to Section 7.02(b) which advance the Trustee has determined to be nonrecoverable from the Stayed Funds in respect of which it was made.

"Bankruptcy Code":  The Bankruptcy Reform Act of 1978 (Title 11 of the United States Code), as amended.

"Bankruptcy Loss":  With respect to any Mortgage Loan, a Realized Loss resulting from a Deficient Valuation or Debt Service Reduction.

"Book-Entry Certificates":  Any of the Certificates that shall be registered in the name of the Depository or its nominee, the ownership of which is reflected on the books of the Depository or on the books of a Person maintaining an account with the Depository (directly, as a "Depository Participant", or indirectly, as an indirect participant in accordance with the rules of the Depository and as described in Section 5.02 hereof).  On the Closing Date, the Class A Certificates, the Mezzanine Certificates and the Class B Certificates shall be Book-Entry Certificates.

"Book-Entry Custodian":  The custodian appointed pursuant to Section 5.01(b).

"Business Day":  Any day other than a Saturday, a Sunday or a day on which banking or savings institutions in the State of California, the State of Delaware, the State of New York, the State of Washington, or in the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Cap Account":  As defined in Section 4.09(a) hereof.

"Cap Agreement":  The interest rate cap agreement consisting of the confirmation incorporating by reference the ISDA Master Agreement, dated May 10, 2006 between the Trust, Washington Mutual Bank, and the Cap Provider, attached as Exhibit B hereto, as such agreement may be amended and supplemented in accordance with its terms and any replacement interest rate cap agreement acceptable to the Trustee.

"Cap Provider":  Bear Stearns Financial Products Inc. or any successor thereto in accordance with the Cap Agreement.

"Certificate":  Any Regular Certificate or Class R Certificate.

"Certificate Margin":  With respect to the Class A-1 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.090% per annum and (B) after the Optional Termination Date, 0.180% per annum.  With respect to the Class A-3 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.200% per annum and (B) after the Optional Termination Date, 0.400% per annum.  With respect to the Class M-1 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.370% per annum and (B) after the Optional Termination Date, 0.555% per annum.  With respect to the Class M-2 Certificates on each Distribution Date (A) on or prior to the Optional Termination

Date, 0.390% per annum and (B) after the Optional Termination Date, 0.585% per annum. With respect to the Class M-3 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.500% per annum and (B) after the Optional Termination Date, 0.750% per annum. With respect to the Class M-4 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 0.590% per annum and (B) after the Optional Termination Date, 0.885% per annum. With respect to the Class M-5 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 1.150% per annum and (B) after the Optional Termination Date, 1.725% per annum. With respect to the Class M-6 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 1.200% per annum and (B) after the Optional Termination Date, 1.800% per annum. With respect to the Class M-7 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 2.400% per annum and (B) after the Optional Termination Date, 3.600% per annum.

"Certificate Owner": With respect to each Book-Entry Certificate, any beneficial owner thereof.

"Certificate Principal Balance": With respect to any Class A Certificates, Mezzanine Certificates, Class B Certificates or Class P Certificates immediately prior to any Distribution Date, an amount equal to the Initial Certificate Principal Balance thereof reduced by the sum of all amounts actually distributed in respect of principal of such Class and, in the case of a Mezzanine Certificate or Class B Certificate, Realized Losses allocated thereto on all prior Distribution Dates and, in the case of a Mezzanine Certificate or Class B Certificate, increased by the Allocated Realized Loss Amounts reinstated thereto on all prior Distribution Dates due to Subsequent Recoveries. With respect to any Class C Certificates as of any date of determination, an amount equal to the excess, if any, of (A) the then aggregate Uncertificated Principal Balances of the REMIC 1 Regular Interests over (B) the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates. The Class R Certificates will not have a Certificate Principal Balance.

"Certificate Register": The register established and maintained pursuant to Section 5.02 hereof.

"Certificateholder" or "Holder": The Person in whose name a Certificate is registered in the Certificate Register, except that a Disqualified Organization or a Non-United States Person shall not be a Holder of a Class R Certificate for any purposes hereof and, solely for the purposes of giving any consent, direction or taking any other action pursuant to this Agreement, any Certificate registered in the name of the Depositor or the Master Servicer or any Affiliate thereof shall be deemed not to be outstanding and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent, direction or other action has been obtained, except as otherwise provided in Section 11.01. The Trustee may conclusively rely upon a certificate of the Depositor or the Master Servicer in determining whether a Certificate is held by an Affiliate thereof. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

7

"<u>Certification</u>":  As defined in Section 4.08(b) hereof.

"<u>Class</u>":  Collectively, Certificates which have the same priority of payment and bear the same class designation and the form of which is identical except for variation in the Percentage Interest evidenced thereby.

"<u>Class A Certificates</u>":  The Class A-1 Certificates, the Class A-2 Certificates and the Class A-3 Certificates.

"<u>Class A-1 Certificate</u>":  Any one of the Class A-1 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-1 executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"<u>Class A-2 Certificate</u>":  Any one of the Class A-2 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-2 executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"<u>Class A-3 Certificate</u>":  Any one of the Class A-3 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-3 executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"<u>Class A Principal Distribution Amount</u>":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date and (II) the excess of (x) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 24.50% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"<u>Class B Certificates</u>":  The Class B-1 Certificates and the Class B-2 Certificates.

"<u>Class B-1 Certificate</u>":  Any one of the Class B-1 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-11, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"<u>Class B-1 Principal Distribution Amount</u>":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class B-1 Certificates immediately

8

prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date) and (ix) the aggregate Certificate Principal Balance of the Class B-1 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 82.80% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class B-2 Certificate":  Any one of the Class B-2 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-12, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class B-2 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class B-2 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate

9

Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date), (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates (after taking into account the payment of the Class M-7 Principal Distribution Amount on such Distribution Date), (ix) the aggregate Certificate Principal Balance of the Class B-1 Certificates (after taking into account the payment of the Class B-1 Principal Distribution Amount on such Distribution Date) and (x) the aggregate Certificate Principal Balance of the Class B-2 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 86.20% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class C Certificate":  Any one of the Class C Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-13, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class C Shortfall":  As defined in Section 10.01(l) hereof.

"Class M-1 Certificate":  Any one of the Class M-1 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-4, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-1 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-1 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date) and (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 46.30% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-2 Certificate":  Any one of the Class  M-2 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-5, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-2 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date) and (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 51.60% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-3 Certificate":  Any one of the Class M-3 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-6, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-3 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-3 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date) and (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 61.30% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-4 Certificate":  Any one of the Class M-4 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-7, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-4 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), and (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 65.30% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-5 Certificate":  Any one of the Class M-5 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-8, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-5 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date) and (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 70.00% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due

12

during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-6 Certificate":  Any one of the Class M-6 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-9, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-6 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date) and (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 73.40% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class M-7 Certificate":  Any one of the Class M-7 Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-10, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class M-7 Principal Distribution Amount":  With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the amount equal to the lesser of (I) the aggregate Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the payment of the Class A Principal Distribution Amount on such Distribution Date), (ii) the aggregate Certificate Principal Balance of the Class M-1 Certificates (after taking into account the payment of the Class M-1 Principal Distribution Amount on such Distribution Date), (iii) the aggregate Certificate Principal Balance of the Class M-2 Certificates (after taking into account the payment

13

of the Class M-2 Principal Distribution Amount on such Distribution Date), (iv) the aggregate Certificate Principal Balance of the Class M-3 Certificates (after taking into account the payment of the Class M-3 Principal Distribution Amount on such Distribution Date), (v) the aggregate Certificate Principal Balance of the Class M-4 Certificates (after taking into account the payment of the Class M-4 Principal Distribution Amount on such Distribution Date), (vi) the aggregate Certificate Principal Balance of the Class M-5 Certificates (after taking into account the payment of the Class M-5 Principal Distribution Amount on such Distribution Date), (vii) the aggregate Certificate Principal Balance of the Class M-6 Certificates (after taking into account the payment of the Class M-6 Principal Distribution Amount on such Distribution Date) and (viii) the aggregate Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) 77.10% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the Overcollateralization Floor.

"Class P Certificate":  Any one of the Class P Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-14, executed, authenticated and delivered by the Trustee, representing the right to distributions as set forth herein and therein and evidencing a regular interest in REMIC 2.

"Class R Certificate":  Any one of the Class R Certificates as designated on the face thereof substantially in the form annexed hereto as Exhibit A-15, executed, authenticated and delivered by the Trustee, evidencing the ownership of the Class R-1 Interest and the Class R-2 Interest.

"Class R-1 Interest":  The Residual Interest in REMIC 1.

"Class R-2 Interest":  The Residual Interest in REMIC 2.

"Close of Business":  As used herein, with respect to any Business Day, 5:00 p.m. (New York time).

"Closing Date":  May 10, 2006.

"Closing Date Mortgage Loans":  Any of the Mortgage Loans included in the Trust Fund on the Closing Date.  The aggregate Cut-off Date Principal Balance of the Closing Date Mortgage Loans is equal to $[_____].

"Code":  The Internal Revenue Code of 1986, as amended.

"Collection Account":  The account or accounts created and maintained by the Master Servicer pursuant to Section 3.10(a), which shall be entitled "Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of Long Beach Mortgage Loan Trust 2006-A, Asset-Backed Certificates, Series 2006-A" and which must be an Eligible Account.

14

"Commission":  The Securities and Exchange Commission.

"Compensating Interest":  As defined in Section 3.24.

"Corporate Trust Office":  The principal corporate trust office of the Trustee at which at any particular time its corporate trust business in connection with this Agreement shall be administered, which office at the date of the execution of this instrument is located at 1761 East St. Andrew Place, Santa Ana, California 92705, or at such other address as the Trustee may designate from time to time by notice to the Certificateholders, the Depositor and the Master Servicer.

"Corresponding Certificates":  As shown on the following chart:

| REMIC 1 Regular Interest | Corresponding Certificate |
|---|---|
| A1 | Class A-1 Certificates |
| A2 | Class A-2 Certificates |
| A3 | Class A-3 Certificates |
| M1 | Class M-1 Certificates |
| M2 | Class M-2 Certificates |
| M3 | Class M-3 Certificates |
| M4 | Class M-4 Certificates |
| M5 | Class M-5 Certificates |
| M6 | Class M-6 Certificates |
| M7 | Class M-7 Certificates |
| B1 | Class B-1 Certificates |
| B2 | Class B-2 Certificates |
| P | Class P Certificates |

"Credit Enhancement Percentage":  With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is (x) the sum of the aggregate Certificate Principal Balance of the Mezzanine Certificates, the Class B Certificates and the Class C Certificates, calculated prior to distribution of the Principal Distribution Amount in respect of the Certificates then entitled to distributions of principal on such Distribution Date, and the denominator of which is (y) the aggregate Stated Principal Balance of the Mortgage Loans,

15

calculated prior to taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period.

"Cumulative Loss Trigger Event":  A Cumulative Loss Trigger Event has occurred with respect to any Distribution Date in or after June 2008, if the percentage obtained by dividing (x) the aggregate amount of Realized Losses incurred (less any Subsequent Recoveries) with respect to the Mortgage Loans from the Cut-off Date through the last day of the related Due Period by (y) the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, exceeds the applicable percentage set forth below for such Distribution Date:

| Distribution Date Occurring in | Cumulative Loss Percentage |
| --- | --- |
| June 2008 through May 2009 | 2.75% for the first month, plus an additional 1/12th of 3.40% for each month thereafter. |
| June 2009 through May 2010 | 6.15% for the first month, plus an additional 1/12th of 3.40% for each month thereafter. |
| June 2010 through May 2011 | 9.55% for the first month, plus an additional 1/12th of 2.70% for each month thereafter. |
| June 2011 through May 2012 | 12.25% for the first month, plus an additional 1/12th of 1.00% for each month thereafter. |
| June 2012 and thereafter | 13.25% for each month. |

"Custodial Agreement":  Any agreement that may be entered into by the Trustee and any Custodian or any agreement assigned to the Trustee providing for holding and safekeeping of Mortgage Files on behalf of the Trust.

"Custodian":  A custodian appointed as provided in Section 8.11 hereof pursuant to a Custodial Agreement.

"Cut-off Date":  With respect to each Closing Date Mortgage Loan, May 1, 2006; and with respect to each Qualified Substitute Mortgage Loan, its date of substitution, as applicable.

"Cut-off Date Aggregate Principal Balance":  The aggregate of the Cut-off Date Principal Balances of the Mortgage Loans.

"Cut-off Date Principal Balance":  With respect to any Mortgage Loan, the unpaid principal balance thereof as of the Cut-off Date (with respect to a Closing Date Mortgage Loan); or as of the applicable date of substitution (with respect to a Qualified Substitute Mortgage Loan), after giving effect to scheduled payments due on or before the Cut-off Date, whether or not received.

"Debt Service Reduction":  With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction resulting from a Deficient Valuation.

16

"Deficient Valuation":  With respect to any Mortgage Loan, a valuation of the related Mortgaged Property by a court of competent jurisdiction in an amount less than the then outstanding principal balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"Definitive Certificates":  As defined in Section 5.01(b) hereof.

"Deleted Mortgage Loan":  A Mortgage Loan replaced or to be replaced by one or more Qualified Substitute Mortgage Loans.

"Delinquency Percentage":  With respect to any Distribution Date, the percentage obtained by dividing (x) the aggregate Stated Principal Balance of (i) Mortgage Loans Delinquent 60 days or more, (ii) REO Properties related to the Mortgage Loans and (iii) Mortgage Loans in foreclosure and in bankruptcy (excluding any such Mortgage Loans which are less than 60 days Delinquent under the bankruptcy plan) by (y) the aggregate Stated Principal Balance of the Mortgage Loans, in each case, calculated prior to taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period.

"Delinquency Trigger Event":  A Delinquency Trigger Event has occurred with respect to a Distribution Date if the Delinquency Percentage exceeds 12.07% of the Credit Enhancement Percentage.

"Delinquent":  With respect to any Mortgage Loan and related Monthly Payment, the Monthly Payment due on a Due Date which is not made by the Close of Business on the next scheduled Due Date for such Mortgage Loan.  For example, a Mortgage Loan is 60 or more days Delinquent if the Monthly Payment due on a Due Date is not made by the Close of Business on the second scheduled Due Date after such Due Date.

"Depositor":  Long Beach Securities Corp., a Delaware corporation, or any successor in interest.

"Depository":  The initial Depository shall be The Depository Trust Company, whose nominee is Cede & Co., or any other organization registered as a "clearing agency" pursuant to Section 17A of the Securities Exchange Act of 1934, as amended.  The Depository shall initially be the registered Holder of the Book-Entry Certificates.  The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York.

"Depository Participant":  A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"Determination Date":  With respect to any Distribution Date, the 15th day of the calendar month in which such Distribution Date occurs or, if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day.

SE 2154917 v8
(26425.0085)

"Directly Operate":  With respect to any REO Property, the furnishing or rendering of services to the tenants thereof, the management or operation of such REO Property, the holding of such REO Property primarily for sale to customers, the performance of any construction work thereon or any use of such REO Property in a trade or business conducted by the REMIC other than through an Independent Contractor; provided, however, that the Trustee (or the Master Servicer on behalf of the Trustee) shall not be considered to Directly Operate an REO Property solely because the Trustee (or the Master Servicer on behalf of the Trustee) establishes rental terms, chooses tenants, enters into or renews leases, deals with taxes and insurance, or makes decisions as to repairs or capital expenditures with respect to such REO Property.

"Disqualified Organization":  Any:  (A) "disqualified organization" under Section 860E of the Code, which as of the Closing Date is any of  (i) the United States, any state or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (ii) any organization (other than a cooperative described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code unless such organization is subject to the tax imposed by Section 511 of the Code, or (iii) any organization described in Section 1381(a)(2)(C) of the Code; (B) "electing large partnership" within the meaning of Section 775 of the Code; or (C) other Person so designated by the Trustee based upon an Opinion of Counsel provided by nationally recognized counsel to the Trustee that the holding of an ownership interest in a Class R Certificate by such Person may cause the Trust Fund or any Person having an ownership interest in any Class of Certificates (other than such Person) to incur liability for any federal tax imposed under the Code that would not otherwise be imposed but for the transfer of an ownership interest in a Class R Certificate to such Person.  A corporation will not be treated as an instrumentality of the United States or of any state or political subdivision thereof if all of its activities are subject to income tax and a majority of its board of directors is not selected by a governmental unit.  The terms "United States," "state" and "international organization" shall have the meanings set forth in Section 7701 of the Code.

"Distribution Account":  The trust account or accounts created and maintained by the Trustee pursuant to Section 3.10(b) which shall be entitled "Distribution Account, Deutsche Bank National Trust Company, as Trustee, in trust for the registered Certificateholders of Long Beach Mortgage Loan Trust 2006-A, Asset-Backed Certificates, Series 2006-A" and which must be an Eligible Account.

"Distribution Date":  The 25th day of any calendar month, or if such 25th day is not a Business Day, the Business Day immediately following such 25th day, commencing in June 2006.

"Due Date":  With respect to each Distribution Date, the first day of the calendar month in which such Distribution Date occurs, which is the day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Due Period":  With respect to any Distribution Date, the period commencing on the second day of the month preceding the month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

"Eligible Account":  Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of

SE 2154917 v8
(26425.0085)

which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the short-term unsecured debt obligations of such holding company) are rated no lower than P-1 by Moody's, F-1 by Fitch and A-1 by S&P (or comparable ratings if Moody's, Fitch and S&P are not the Rating Agencies) at the time any amounts are held on deposit therein; provided that so long as Washington Mutual Bank is the Sub-Servicer, any account maintained with Washington Mutual Bank shall be an Eligible Account if the long-term unsecured debt obligations of Washington Mutual Bank are rated no lower than "A2" by Moody's, or "A" by Fitch and "A-" by S&P and the short-term unsecured debt obligations of Washington Mutual Bank are rated no lower than A-2 by S&P, provided that if the long-term unsecured debt obligations of Washington Mutual Bank are downgraded by S&P to a rating lower than "A-" or the short-term unsecured debt obligations of Washington Mutual Bank are downgraded by S&P to a rating lower than A-2, Washington Mutual Bank shall transfer the deposits in any account maintained by Washington Mutual Bank (unless any such account is otherwise qualified as an Eligible Account pursuant to (ii), (iii) or (iv) of the definition of Eligible Account) to an Eligible Account within ten (10) Business Days of notification of such downgrade, (ii) an account or accounts the deposits in which are fully insured by the FDIC (to the limits established by such corporation), the uninsured deposits in which account are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to the Trustee and to each Rating Agency, the Certificateholders will have a claim with respect to the funds in such account or a perfected first priority security interest against such collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, (iii) a trust account or accounts maintained with the trust department of a federal or state chartered depository institution, national banking association or trust company acting in its fiduciary capacity or (iv) an account otherwise acceptable to each Rating Agency without reduction or withdrawal of their then current ratings of the Certificates as evidenced by a letter from each Rating Agency to the Trustee.  Eligible Accounts may bear interest.

"ERISA":  The Employee Retirement Income Security Act of 1974, as amended.

"Escrow Payments":  As defined in Section 3.09 hereof.

"Excess Overcollateralized Amount":  With respect to any Distribution Date, the excess, if any, of (i) the Overcollateralized Amount for such Distribution Date (assuming that 100% of the Principal Remittance Amount and certain amounts received on account of the Cap Agreement applied as a principal payment on such Distribution Date) over (ii) the Overcollateralization Target Amount for such Distribution Date.

"Extra Principal Distribution Amount":  With respect to any Distribution Date, the lesser of (x) the Net Monthly Excess Cashflow for such Distribution Date and (y) the Overcollateralization Deficiency Amount for such Distribution Date.

"Extraordinary Trust Fund Expense":  Any amounts reimbursable to the Trustee, or any director, officer, employee or agent of the Trustee, from the Trust Fund pursuant to Section 8.05, any amounts payable from the Distribution Account in respect of taxes pursuant to Section 10.01(g)(iii), any amounts payable from the Distribution Account in respect of any REMIC pursuant to Section 10.01(c), any amounts payable from the Trust Fund as a trustee fee

19

for any successor trustee and any amounts payable by the Trustee for the recording of the assignments of mortgage pursuant to Section 2.01.

"Fannie Mae":  Federal National Mortgage Association, or any successor thereto.

"FDIC":  Federal Deposit Insurance Corporation, or any successor thereto.

"Final Recovery Determination":  With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by the Seller or the Master Servicer pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01), a determination made by the Master Servicer that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which the Master Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered.  The Master Servicer shall maintain records, prepared by a Servicing Representative, of each Final Recovery Determination made thereby.

"First Mortgage Loan":  A Mortgage Loan that is secured by a first lien on the Mortgaged Property securing the related Mortgage Note.

"Fitch":  Fitch Ratings, Inc., or its successor in interest.

"Fixed Rate Certificates":  The Class A-2 Certificates and the Class B Certificates.

"Formula Rate":  For any Distribution Date and the LIBOR Certificates, LIBOR plus the related Certificate Margin.  With respect to the Class A-2 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 5.548% per annum and (B) after the Optional Termination Date, 6.048% per annum.  With respect to the Class B-1 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 7.000% per annum and (B) after the Optional Termination Date, 7.500% per annum.  With respect to the Class B-2 Certificates on each Distribution Date (A) on or prior to the Optional Termination Date, 7.000% per annum and (B) after the Optional Termination Date, 7.500% per annum.

"Freddie Mac":  The Federal Home Loan Mortgage Corporation, or any successor thereto.

"Gross Subsequent Recoveries":  Any unexpected recoveries related to a Liquidated Mortgage Loan received by the Master Servicer which were allocated as a Realized Loss in reducing a Certificate Principal Balance of a Class of the Mezzanine Certificates or the Class B Certificates on a Distribution Date prior to the Prepayment Period in which such funds were received.  Gross Subsequent Recoveries may include but are not limited to unanticipated insurance settlements, tax refunds or mortgage bankruptcy distributions.

"Independent":  When used with respect to any specified Person, any such Person who (a) is in fact independent of the Depositor, the Master Servicer and their respective Affiliates, (b) does not have any direct financial interest in or any material indirect financial interest in the Depositor or the Master Servicer or any Affiliate thereof, and (c) is not connected with the Depositor or the Master Servicer or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, trust administrator, partner, director or Person performing similar functions;

20

provided, however, that a Person shall not fail to be Independent of the Depositor or the Master Servicer or any Affiliate thereof merely because such Person is the beneficial owner of 1% or less of any class of securities issued by the Depositor or the Master Servicer or any Affiliate thereof, as the case may be.

"Independent Contractor":  Either (i) any Person (other than the Master Servicer) that would be an "independent contractor" with respect to any of the REMICs created hereunder within the meaning of Section 856(d)(3) of the Code if such REMIC were a real estate investment trust (except that the ownership tests set forth in that Section shall be considered to be met by any Person that owns, directly or indirectly, 35% or more of any Class of Certificates), so long as each such REMIC does not receive or derive any income from such Person and provided that the relationship between such Person and such REMIC is at arm's length, all within the meaning of Treasury Regulation Section 1.856-4(b)(5), or (ii) any other Person (including the Master Servicer) if the Trustee has received an Opinion of Counsel to the effect that the taking of any action in respect of any REO Property by such Person, subject to any conditions therein specified, that is otherwise herein contemplated to be taken by an Independent Contractor will not cause such REO Property to cease to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code (determined without regard to the exception applicable for purposes of Section 860D(a) of the Code), or cause any income realized in respect of such REO Property to fail to qualify as Rents from Real Property.

"Initial Certificate Principal Balance":  With respect to any Regular Certificate, the amount designated "Initial Certificate Principal Balance" on the face thereof.

"Initial Notional Amount":  With respect to any Class C Certificate, the amount designated "Initial Notional Amount" on the face thereof.

"Insurance Proceeds":  Proceeds of any title policy, hazard policy or other insurance policy covering a Mortgage Loan or the related Mortgaged Property (including any related PMI Policy), to the extent such proceeds are not (i) to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing similar mortgage loans held for its own account giving due consideration to the related First Mortgage Loan, subject to the terms and conditions of the related Mortgage Note and Mortgage, (ii) Gross Subsequent Recoveries with respect to such Mortgage Loan or (iii) required to be paid to any holder of the related First Mortgage Loan.

"Interest Determination Date":  With respect to the LIBOR Certificates and each Accrual Period, the second LIBOR Business Day preceding the commencement of such Accrual Period.

"Interest Remittance Amount":  With respect to any Distribution Date, that portion of the Available Funds for such Distribution Date attributable to interest received or advanced with respect to the Mortgage Loans or to Compensating Interest paid by the Master Servicer with respect to the Mortgage Loans.

"Late Collections":  With respect to any Mortgage Loan, all amounts received subsequent to the Determination Date immediately following any related Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds, Gross Subsequent Recoveries or otherwise, which represent late payments or collections of principal

21

and/or interest due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) but delinquent on a contractual basis for such Due Period and not previously recovered.

"LIBOR":  With respect to each Accrual Period, the rate determined by the Trustee on the related Interest Determination Date on the basis of the "Interest Settlement Rate" for United States dollar deposits of one-month maturity set forth by the British Bankers' Association (the "BBA"), as such rate appears on the Telerate Page 3750, as of 11:00 a.m. (London time) on such Interest Determination Date.  With respect to any Interest Determination Date, if the BBA's Interest Settlement Rate does not appear on Telerate Page 3750 as of 11:00 a.m. (London time) on such date, or if Telerate Page 3750 is not available on such date the Trustee will obtain such rate from Reuters Monitor Money Rates Service page "LIBOR01" or Bloomberg L.P. page "BBAM."  Alternatively, the Trustee may request the principal London office of each of the Reference Banks to provide a quotation of its rate.  On such Interest Determination Date, LIBOR for the related Accrual Period will be established by the Trustee as follows:

> (i)    If on such Interest Determination Date two or more Reference Banks provide such offered quotations, LIBOR for the related Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiples of 0.03125%); and

> (ii)    If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, LIBOR for the related Accrual Period shall be the higher of (i) LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate.

The Trustee will select a particular index as the alternative index only if it receives an Opinion of Counsel that the selection of such index will not cause any REMIC to lose its classification as a REMIC for federal income tax purposes.

"LIBOR Business Day":  Any day on which banks in The City of London, England and New York City are open for conducting transactions in foreign currency and exchange.

"LIBOR Certificates":  The Class A-1 Certificates, the Class A-3 Certificates and the Mezzanine Certificates.

"Liquidated Mortgage Loan":  As to any Distribution Date, (i) any Mortgage Loan in respect of which the Master Servicer has determined, in accordance with the servicing procedures specified herein, as of the end of the related Prepayment Period, that all Liquidation Proceeds which it expects to recover with respect to the liquidation of the Mortgage Loan or disposition of the related REO Property have been recovered and (ii) any Mortgage Loan or REO Property that has been charged off as contemplated in Section 3.16(a)(ii).

"Liquidation Event":  With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made as to such Mortgage Loan, (iii) such Mortgage Loan is charged off as contemplated in Section 3.16(a)(ii) or (iv) such Mortgage Loan is removed from the Trust Fund by reason of its being purchased, sold or replaced pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01.

SE 2154917 v8
(26425.0085)

With respect to any REO Property, either of the following events: (i) a Final Recovery Determination is made as to such REO Property, (ii) such REO Property is charged off as contemplated in Section 3.16(a)(ii) or (iii) such REO Property is removed from the Trust Fund by reason of its being sold or purchased pursuant to Section 3.16(c), Section 3.23 or Section 9.01.

"Liquidation Proceeds": The amount (other than amounts received in respect of the rental of any REO Property prior to REO Disposition) received by the Master Servicer in connection with (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or condemnation, (ii) the liquidation of a defaulted Mortgage Loan by means of a trustee's sale, foreclosure sale or otherwise or (iii) the repurchase, substitution or sale of a Mortgage Loan or an REO Property pursuant to or as contemplated by Section 2.03, Section 3.16(c), Section 3.23 or Section 9.01, in each case, which is remaining after, or not otherwise required to be applied to, the satisfaction of any related First Mortgage Loan.

"Loan-to-Value Ratio": As of any date and as to any Mortgage Loan, the fraction, expressed as a percentage, the numerator of which is the (x) the sum of the Principal Balance of the Mortgage Loan and any other mortgage loan secured by a senior lien on the related Mortgaged Property and the denominator of which is (y) the Value of the related Mortgaged Property.

"Lost Note Affidavit": With respect to any Mortgage Loan as to which the original Mortgage Note has been permanently lost or destroyed and has not been replaced, an affidavit from the Seller certifying that the original Mortgage Note has been lost or destroyed (together with a copy of the related Mortgage Note and indemnifying the Trust against any loss, cost or liability resulting from the failure to deliver the original Mortgage Note) in the form of Exhibit H hereto.

"Marker Rate": With respect to the Class C Certificates and any Distribution Date, a per annum rate equal to two (2) multiplied by the weighted average of the Pass-Through Rates for REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2 and ZZ, with:

(A) the rates on each such REMIC 1 Regular Interest (other than REMIC 1 Regular Interests A2, B1, B2 and ZZ) subject to a floor and a cap equal to the lesser of (i) LIBOR plus the Certificate Margin for the Corresponding Certificate for such REMIC 1 Regular Interest and (ii) the Net WAC Rate for the Corresponding Certificates;

(B) the rates on REMIC 1 Regular Interests A2, B1, and B2 subject to a floor and a cap equal to the lesser of (i) the Formula Rate for the Corresponding Certificate for such REMIC 1 Regular Interest and (ii) the Net WAC Rate for the Corresponding Certificates;

(C) the rate on REMIC 1 Regular Interest ZZ subject to a cap of zero for purposes of this calculation; and

(D) the rates on all of the REMIC 1 Regular Interests (other than REMIC 1 Regular Interests A2, B1 and B2) multiplied by a fraction the numerator of which is the actual number of days elapsed in the Accrual Period for each such REMIC 1 Regular Interest and the denominator of which is 30.

23

"Master Servicer":  Long Beach Mortgage Company, a Delaware corporation, or any successor servicer appointed as herein provided, in its capacity as Master Servicer hereunder.

"Master Servicer Event of Default":  One or more of the events described in Section 7.01.

"Master Servicer Prepayment Charge Payment Amount":  The amounts (i) payable by the Master Servicer in respect of any Prepayment Charges waived other than in accordance with the standard set forth in Section 2.04(a)(viii) or (ii) collected from the Master Servicer in its capacity as Seller in respect of a remedy for the breach of the representation and warranty made by the Master Servicer in its capacity as Seller set forth in Section 2.04(a)(vii).

"Master Servicer Remittance Date":  With respect to any Distribution Date, 3:00 p.m. New York time on the Business Day preceding the Distribution Date.

"Maximum ZZ Uncertificated Accrued Interest Deferral Amount": With respect to any Distribution Date, the excess of (i) Uncertificated Accrued Interest calculated with the Uncertificated Pass-Through Rate for REMIC 1 Regular Interest ZZ and an Uncertificated Principal Balance equal to the excess of (x) the Uncertificated Principal Balance of REMIC 1 Regular Interest ZZ over (y) the REMIC 1 Overcollateralized Amount, in each case for such Distribution Date, over (ii) Uncertificated Accrued Interest on REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1 and B2, calculated with:

> (A)    the rates on each such REMIC 1 Regular Interest (other than REMIC 1 Regular Interests A2, B1, B2 and ZZ) subject to a floor and a cap equal to the lesser of (i) LIBOR plus the Certificate Margin for the Corresponding Certificate for such REMIC 1 Regular Interest and (ii) the Net WAC Rate for the Corresponding Certificates;

> (B)    the rates on REMIC 1 Regular Interests A2, B1, and B2 subject to a floor and a cap equal to the lesser of (i) the Formula Rate for the Corresponding Certificate for such REMIC 1 Regular Interest and (ii) the Net WAC Rate for the Corresponding Certificates; and

> (C)    the rates on all of the REMIC 1 Regular Interests (other than REMIC 1 Regular Interests A2, B1 and B2) multiplied by a fraction the numerator of which is the actual number of days elapsed in the Accrual Period for each such REMIC 1 Regular Interest and the denominator of which is 30.

"MERS":  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"MERS® System":  The system of recording transfers of Mortgages electronically maintained by MERS.

"Mezzanine Certificates":  The Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates and the Class M-7 Certificates.

"MIN":  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

24

"MOM Loan":  With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

"Monthly Interest Distributable Amount":  With respect to any Distribution Date and the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, the amount of interest accrued during the related Accrual Period at the related Pass-Through Rate on the Certificate Principal Balance of such Class immediately prior to such Distribution Date.  With respect to the Class C Certificates and any Distribution Date, the amount of interest accrued during the related Accrual Period at the related Pass-Through Rate on the Notional Amount of such Class immediately prior to such Distribution Date.

In all cases, the Monthly Interest Distributable Amount for any Class of Certificates shall be reduced by any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls allocated to such Class under Section 1.03.

"Monthly Payment":  With respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note, determined:  (a) after giving effect to (i) any Deficient Valuation and/or Debt Service Reduction with respect to such Mortgage Loan and (ii) any reduction in the amount of interest collectible from the related Mortgagor pursuant to the Relief Act; (b) without giving effect to any extension granted or agreed to by the Master Servicer pursuant to Sections 3.01 and 3.07; and (c) on the assumption that all other amounts, if any, due under such Mortgage Loan are paid when due.

"Moody's":  Moody's Investors Service, Inc. or its successor in interest.

"Mortgage":  The mortgage, deed of trust or other instrument creating a second lien on or second priority security interest in, a Mortgaged Property securing a Mortgage Note.

"Mortgage File":  The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

"Mortgage Loan":  Each mortgage loan transferred and assigned to the Trustee and delivered to the Trustee or another Custodian pursuant to Section 2.01 or Section 2.03(d) as from time to time held as a part of the Trust Fund, the Mortgage Loans so held being identified in the Mortgage Loan Schedule.

"Mortgage Loan Purchase Agreement":  The agreement between the Master Servicer, in its capacity as Seller, and the Depositor, regarding the transfer of the Mortgage Loans by the Seller to or at the direction of the Depositor, substantially in the form attached hereto as Exhibit C.

"Mortgage Loan Schedule":  As of any date, the list of Mortgage Loans included in REMIC 1 on such date, attached hereto as Exhibit D.  The Mortgage Loan Schedule shall be prepared by the Seller and shall set forth the following information as of the Cut-off Date with respect to each Mortgage Loan, as applicable:

25

(i)      the Mortgagor's name and the originator's Mortgage Loan identifying number;

(ii)      the street address of the Mortgaged Property including the state and zip code;

(iii)      a code indicating whether the Mortgaged Property is owner-occupied;

(iv)      the type of Residential Dwelling constituting the Mortgaged Property;

(v)      the original months to maturity;

(vi)      the Loan-to-Value Ratio at origination;

(vii)      the Mortgage Rate in effect immediately following the Cut-off Date;

(viii)      the date on which the first Monthly Payment was due on the Mortgage Loan;

(ix)      the stated maturity date;

(x)      the amount of the Monthly Payment due on the first Due Date after the Cut-off Date;

(xi)      the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance;

(xii)      the original principal amount of the Mortgage Loan;

(xiii)      the Stated Principal Balance of the Mortgage Loan as of the Close of Business on the Cut-off Date;

(xiv)      [Reserved]

(xv)      a code indicating the purpose of the Mortgage Loan (i.e., purchase financing, rate/term refinancing, cash-out refinancing);

(xvi)      the Mortgage Rate at origination;

(xvii)      a code indicating the documentation program;

(xviii)      the Seller's risk grade and the FICO score;

(xix)      the Origination Value of the Mortgaged Property;

(xx)      the sale price of the Mortgaged Property, if applicable;

26

(xxi)     whether such Mortgage Loan is secured by a first lien or a second lien on the related Mortgaged Property;

(xxii)     the date of origination;

(xxiii)     the stated remaining months to maturity as of the Cut-off Date;

(xxiv)     the current principal and interest payment of the Mortgage Loan as of the Cut-off Date;

(xxv)     the interest "paid to date" of the Mortgage Loan as of the Cut-off Date;

(xxvi)     [Reserved]

(xxvii)     [Reserved]

(xxviii)     [Reserved]

(xxix)     the number of years the prepayment penalty is in effect;

(xxx)     a code indicating that such Mortgage Loan is covered under the PMI Policy, if applicable; and

(xxxi)     with respect to each MOM Loan, the related MIN.

The Mortgage Loan Schedule shall set forth the following information, with respect to the Mortgage Loans in the aggregate as of the Cut-off Date:  (1) the number of Mortgage Loans; (2) the Cut-off Date Principal Balance of the Mortgage Loans; (3) the weighted average Mortgage Rate of the Mortgage Loans and (4) the weighted average maturity of the Mortgage Loans.  The Mortgage Loan Schedule shall be amended from time to time by the Master Servicer in accordance with the provisions of this Agreement.  With respect to any Qualified Substitute Mortgage Loan, Cut-off Date shall refer to the related Cut-off Date for such Mortgage Loan, determined in accordance with the definition of Cut-off Date herein.

"Mortgage Note":  The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan.

"Mortgage Pool":  The pool of Mortgage Loans, identified on Exhibit D from time to time, and any REO Properties acquired in respect thereof.

"Mortgage Rate":  The annual rate set forth in the related Mortgage Note, as amended, modified or supplemented from time to time.

"Mortgaged Property":  The underlying property securing a Mortgage Loan, including any REO Property, consisting of a fee simple or leasehold estate in a parcel of real property improved by a Residential Dwelling.

"Mortgagor":  The obligor on a Mortgage Note.

27

"Net Liquidation Proceeds":  With respect to any Liquidated Mortgage Loan or any other disposition of related Mortgaged Property (including REO Property), the related Liquidation Proceeds net of Advances, Servicing Advances, Servicing Fees and any other servicing fees and expenses incurred by or on behalf of the Master Servicer (including, without limitation, amounts advanced to cure defaults on any related First Mortgage Loan and amounts advanced to keep current or pay off any related First Mortgage Loan) received and retained in connection with the liquidation of such Mortgage Loan or Mortgaged Property in accordance with the terms of this Agreement.

"Net Monthly Excess Cashflow":  With respect to each Distribution Date, the sum of (a) any Overcollateralization Release Amount for such Distribution Date, (b) any Remaining Principal Distribution Amount and (c) the positive excess of (x) Available Funds for such Distribution Date over (y) the sum for such Distribution Date of (A) the Monthly Interest Distributable Amounts for the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, (B) the Unpaid Interest Shortfall Amounts for the Class A Certificates, and (C) the Principal Remittance Amount.

"Net Mortgage Rate":  With respect to any Mortgage Loan (or the related REO Property), as of any date of determination, a per annum rate of interest equal to the then applicable Mortgage Rate for such Mortgage Loan minus the Servicing Fee Rate.

"Net Prepayment Interest Shortfall":  With respect to any Distribution Date, the excess, if any, of any Prepayment Interest Shortfalls for such date over the related Compensating Interest.

"Net WAC Rate":  For any Distribution Date (other than the first Distribution Date), a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Mortgage Loans, weighted on the basis of the Stated Principal Balances thereof as of the Due Date in the month preceding the month of such Distribution Date (adjusted for principal payments distributed on a prior Distribution Date) and, in the case of the LIBOR Certificates, multiplied by (b) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days elapsed in the related Accrual Period.

"Net WAC Rate Carryover Amount":  With respect to the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and any Distribution Date for which the Pass-Through Rate for such Class of Certificates for such Distribution Date is the Net WAC Rate, the sum of (i) the positive excess of (A) the amount of interest that would have been distributable to such Class of Certificates on such Distribution Date if the Pass-Through Rate for such Class of Certificates for such Distribution Date were calculated at the related Formula Rate over (B) the amount of interest distributable on such Class of Certificates at the Net WAC Rate for such Distribution Date and (ii) the related Net WAC Rate Carryover Amount for the previous Distribution Date not previously distributed together with interest thereon at a rate equal to the related Formula Rate for such Class of Certificates for the most recently ended Accrual Period.

"New Lease":  Any lease of REO Property entered into on behalf of the Trust, including any lease renewed or extended on behalf of the Trust if the Trust has the right to renegotiate the terms of such lease.

"Nonrecoverable Advance": Any Advance or Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the Master Servicer, will not or, in the case of a proposed Advance or Servicing Advance, would not be ultimately recoverable from related late payments, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein. Any Advances or Servicing Advances relating to Mortgage Loans or REO Properties charged off pursuant to Section 3.16(a)(ii) shall be deemed to be Nonrecoverable Advances.

"Notional Amount": With respect to the Class C Certificates, immediately prior to any Distribution Date, an amount equal to the aggregate of the Uncertificated Principal Balances of the REMIC 1 Regular Interests.

"Officers' Certificate": A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President or a vice president (however denominated), and by the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of the Master Servicer, the Seller or the Depositor, as applicable.

"Opinion of Counsel": A written opinion of counsel, who may, without limitation, be a salaried counsel for the Depositor or the Master Servicer, reasonably acceptable to the Trustee, if such opinion is delivered to the Trustee, except that any opinion of counsel relating to (a) the qualification of any Trust REMIC as a REMIC or (b) compliance with the REMIC Provisions must be an opinion of Independent counsel.

"Optional Termination Date": The first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans and each REO Property remaining in the Trust Fund is equal to or less than 10% of the Cut-off Date Principal Balance of the Closing Date Mortgage Loans.

"Original Class Certificate Principal Balance": With respect to the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates, the corresponding Certificate Principal Balance on the Closing Date.

"Original Class Notional Amount": With respect to the Class C Certificates, $[_____].

"Origination Value": With respect to any Mortgaged Property, the lesser of (i) the Appraised Value thereof and (ii) the value thereof as determined and assigned at origination by a review appraisal conducted by the Seller.

"Overcollateralization Deficiency Amount": With respect to any Distribution Date, the amount, if any, by which the Overcollateralization Target Amount exceeds the Overcollateralized Amount on such Distribution Date (assuming that 100% of the aggregate Principal Remittance Amount and certain amounts received on account of the Cap Agreement are applied as a principal payment on such Distribution Date).

"Overcollateralization Floor": 0.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

"<u>Overcollateralization Release Amount</u>":  With respect to any Distribution Date, the lesser of (x) the Principal Remittance Amount for such Distribution Date and (y) the Excess Overcollateralized Amount.

"<u>Overcollateralization Target Amount</u>":  With respect to any Distribution Date (i) prior to the Stepdown Date, 6.90% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) the lesser of (I) 6.90% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date and (II) 13.80% of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (y) 0.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date, and (iii) on or after the Stepdown Date if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Distribution Date.  Notwithstanding the foregoing, on and after any Distribution Date following the reduction of the aggregate Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates to zero, the Overcollateralization Target Amount will be zero.

"<u>Overcollateralized Amount</u>":  With respect to any Distribution Date, the amount, if any, by which (i) the aggregate Stated Principal Balance of the Mortgage Loans on the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) exceeds (ii) the sum of the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates as of such Distribution Date (after giving effect to distributions to be made on such Distribution Date, other than distributions of the Extra Principal Distribution Amount, if any).

"<u>Ownership Interest</u>":  As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"<u>Pass-Through Rate</u>":

With respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates for any Distribution Date (other than the first Distribution Date), the lesser of (x) the related Formula Rate for such Distribution Date and (y) the Net WAC Rate for such Distribution Date.

With respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates and the first Distribution Date, the related Formula Rate for such Distribution Date.

With respect to the Class C Certificates and any Distribution Date, a per annum rate equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (A) through (N) below, and the denominator of which is the aggregate of the Uncertificated Principal Balances of REMIC 1 Regular Interests AA, A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2 and ZZ.  For purposes of calculating the

30

Pass-Through Rate for the Class C Certificates, the numerator is equal to the sum of the following components:

(A)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest AA minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest AA;

(B)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest A1 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest A1;

(C)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest A2 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest A2;

(D)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest A3 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest A3;

(E)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M1 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M1;

(F)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M2 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M2;

(G)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M3 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M3;

(H)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M4 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M4;

(I)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M5 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M5;

(J)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M6 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M6;

(K)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest M7 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest M7;

SE 2154917 v8
(26425.0085)

(L)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest B1 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest B1;

(M)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest B2 minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest B2; and

(N)    the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest ZZ minus the Marker Rate, applied to an amount equal to the Uncertificated Principal Balance of REMIC 1 Regular Interest ZZ.

"Percentage Interest":  With respect to any Certificate (other than a Class R Certificate), a fraction, expressed as a percentage, the numerator of which is the Initial Certificate Principal Balance or Initial Notional Amount represented by such Certificate and the denominator of which is the Original Class Certificate Principal Balance or Original Class Notional Amount of the related Class.  With respect to a Class R Certificate, the portion of the Class evidenced thereby, expressed as a percentage, as stated on the face of such Certificate; provided, however, with respect to each Class referred to in this paragraph, that the sum of all such percentages for each such Class totals 100%.

"Permitted Investments":  Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued or managed by the Depositor, the Master Servicer, the Trustee or any of their respective Affiliates or for which an Affiliate of the Trustee serves as an advisor:

(i)    direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Trustee or its agents acting in their commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company (or, if the only Rating Agency is S&P, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) or its ultimate parent has a short-term uninsured debt rating in the highest available rating category of Fitch, Moody's and S&P and provided that each such investment has an original maturity of no more than 365 days; and provided further that, if the only Rating Agency is S&P and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign

32

depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of S&P if S&P is the Rating Agency; and (B) any other demand or time deposit or deposit which is fully insured by the FDIC;

(iii)    repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated F-1+ or higher by Fitch, rated A-1+ by S&P and rated A2 or higher by Moody's;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any State thereof and that are rated by each Rating Agency in its highest long-term unsecured rating category at the time of such investment or contractual commitment providing for such investment;

(v)    commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency in its highest short-term unsecured debt rating available at the time of such investment;

(vi)    units of taxable money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940), which funds have the highest rating available for such securities from the Rating Agencies or which have been designated in writing by the Rating Agencies as Permitted Investments; and

(vii)    if previously confirmed in writing to the Trustee, any other demand, money market or time deposit, or any other obligation, security or investment, as may be acceptable to the Rating Agencies in writing as a permitted investment of funds backing securities having ratings equivalent to its highest initial rating of the Class A Certificates;

provided, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

The Trustee or its Affiliates are permitted to receive additional compensation (such compensation shall not be an expense of the Trust or constitute an Extraordinary Trust Fund Expense) that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments.

SE 2154917 v8
(26425.0085)

"Permitted Transferee":  Any transferee of a Class R Certificate other than a Disqualified Organization or a non-U.S. Person.

"Person":  Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan":  Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code.

"PMI Insurer":  None of the Mortgage Loans are insured by a primary mortgage insurance policy.  References to the PMI Insurer, PMI Insurer Fee, PMI Insurer Fee Rate, PMI Mortgage Loans and PMI Policy are left in this Agreement for administrative convenience and shall be completely disregarded.  There are no PMI Mortgage Loans or any PMI Insurer under this Agreement and no Person shall have any rights of the PMI Insurer under this Agreement.

"PMI Insurer Fee":  The amount payable to the PMI Insurer on each Distribution Date, which amount shall equal one twelfth of the product of (i) the PMI Insurer Fee Rate, multiplied by (ii) the aggregate Stated Principal Balance of the PMI Mortgage Loans and any related REO Properties as of the first day of the related Due Period plus any applicable premium taxes on the PMI Mortgage Loans located in the States of West Virginia and Kentucky.

"PMI Insurer Fee Rate":  0.00% per annum.

"PMI Mortgage Loans":  The Mortgage Loans insured by the PMI Insurer set forth on the list of Mortgage Loans attached hereto as Schedule IV.  There are no PMI Mortgage Loans under this Agreement.

"PMI Policy":  Not applicable.

"Prepayment Assumption":  The pricing prepayment assumption as described in the Prospectus Supplement.

"Prepayment Charge":  With respect to any Mortgage Loan, the charges or premiums, if any, due in connection with a full (but not partial) prepayment of such Mortgage Loan in accordance with the terms thereof (other than any Master Servicer Prepayment Charge Payment Amount).

"Prepayment Charge Schedule":  As of the Cut-off Date, a list attached hereto as Schedule I (including the Prepayment Charge Summary attached thereto), setting forth the following information with respect to each Prepayment Charge:

> (i)  the Mortgage Loan identifying number;

> (ii)  a code indicating the type of Prepayment Charge;

> (iii)  the state of origination of the related Mortgage Loan;

34

(iv)    the date on which the first monthly payment was due on the related Mortgage Loan;

(v)    the term of the related Prepayment Charge; and

(vi)    the principal balance of the related Mortgage Loan as of the Cut-off Date.

The Prepayment Charge Schedule shall be amended from time to time by the Master Servicer in accordance with the provisions of this Agreement and a copy of each related amendment shall be furnished by the Master Servicer to the Trustee.

"Prepayment Interest Excess": With respect to any Distribution Date, for each Mortgage Loan for which a Principal Prepayment in full is applied on or after the first calendar day of the month of such Distribution Date and before the 15th calendar day of such month, the amount of interest collected on such Principal Prepayment in full at the applicable Net Mortgage Rate from the first day of the month in which such Distribution Date occurs through the day on which such Principal Prepayment is applied.

"Prepayment Interest Shortfall":  With respect to any Distribution Date, for each Mortgage Loan that was during the related Prepayment Period the subject of a Principal Prepayment in full or in part that was applied by the Master Servicer to reduce the outstanding principal balance of such loan on a date preceding the Due Date in the month in which such Distribution Date occurs, an amount equal to interest at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the lesser of (i) the number of days commencing on the date on which the prepayment is applied and ending on the last day of the month in which such Principal Prepayment is applied and (ii) 30 days.  The obligations of the Master Servicer in respect of any Prepayment Interest Shortfall are set forth in Section 3.24.  For avoidance of doubt, no Prepayment Interest Shortfalls shall exist with respect to Principal Prepayments in full which are applied during the period from the first through the 14th day of the month of the related Distribution Date.

"Prepayment Period":  With respect to any Distribution Date, (i) the period from the 15th day of the month immediately preceding the month in which such Distribution Date occurs (or in the case of the first Distribution Date, the Cut-off Date) through the 14th day of the month in which such Distribution Date occurs, inclusive, for purposes of Principal Prepayments in full; and (ii) the calendar month immediately preceding the calendar month in which such Distribution Date occurs, for any other purpose.  Except for purposes of calculating Prepayment Interest Excess, Principal Prepayments made during the calendar month immediately preceding the Cut-off Date and received by the Master Servicer shall be deemed to be received after the Cut-off Date and during the Prepayment Period related to the first Distribution Date.

"Prime Rate":  The prime rate of United States money center commercial banks as published in *The Wall Street Journal*.

"Principal Balance":  As to any Mortgage Loan other than a Liquidated Mortgage Loan, and any day, the related Cut-off Date Principal Balance, *minus* all collections credited against the Cut-off Date Principal Balance of any such Mortgage Loan.  For purposes of this definition, a

Liquidated Mortgage Loan shall be deemed to have a Principal Balance equal to the Principal Balance of the related Mortgage Loan as of the final recovery of related Liquidation Proceeds and a Principal Balance of zero thereafter.  As to any REO Property and any day, the Principal Balance of the related Mortgage Loan shall equal the Principal Balance of the related Mortgage Loan immediately prior to such Mortgage Loan becoming REO Property minus any REO Principal Amortization received with respect thereto on or prior to such day.

"Principal Distribution Amount":  With respect to any Distribution Date, the sum of (i) (x) the Principal Remittance Amount minus (y) the amount of any Overcollateralization Release Amount for such Distribution Date, and (ii) the Extra Principal Distribution Amount for such Distribution Date.

"Principal Prepayment":  Any payment of principal made by the Mortgagor on a Mortgage Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"Principal Remittance Amount":  With respect to any Distribution Date, the sum of (i) all scheduled payments of principal collected or advanced on the Mortgage Loans by the Master Servicer that were due during the related Due Period, (ii) all partial and full principal prepayments of the Mortgage Loans applied by the Master Servicer during the related Prepayment Period, (iii) the principal portion of all Net Liquidation Proceeds, Insurance Proceeds and Gross Subsequent Recoveries received during the related Prepayment Period, (iv) that portion of the Purchase Price, representing principal of any repurchased Mortgage Loan, deposited to the Collection Account during the related Prepayment Period, (v) the principal portion of any Substitution Adjustments deposited in the Collection Account during the related Prepayment Period and (vi) on the Distribution Date on which the Trust is to be terminated in accordance with this Agreement, that portion of the Termination Price representing principal with respect to the Mortgage Loans.

"Prospectus Supplement":  That certain Prospectus Supplement dated May 2, 2006 relating to the public offering of the Class A Certificates and the Mezzanine Certificates.

"Purchase Price":  With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01, and as confirmed by an Officers' Certificate from the Master Servicer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 9.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the Mortgagor or by an advance by the Master Servicer through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the Mortgagor or by an advance by the Master Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental

36

income, Insurance Proceeds, Liquidation Proceeds and Advances that as of the date of purchase had been distributed in respect of REO Imputed Interest pursuant to Section 4.01, (iii) any unreimbursed Servicing Advances, Advances and Nonrecoverable Advances and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property, (iv) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan or REO Property pursuant to Section 3.11 (a)(ix) and Section 3.16(b), (v) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, enforcement expenses reasonably incurred or to be incurred by the Master Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation and (vi) in the case of a Mortgage Loan required to be repurchased pursuant to Section 2.03 because such Mortgage Loan is in breach of the representation in Section 6(xlvi) or in Section 6(lvi) of the Mortgage Loan Purchase Agreement, any additional costs or damages in excess of the amounts to be paid pursuant to clauses (i) through (v) above (including attorney's fees) incurred by the Trust as a result of the Trust's status as an assignee or purchaser of such Mortgage Loans.

"Qualified Substitute Mortgage Loan": A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement or the Mortgage Loan Purchase Agreement which must, on the date of such substitution, (i) have an outstanding principal balance (or in the case of a substitution of more than one mortgage loan for a Deleted Mortgage Loan, an aggregate principal balance), after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of, and not more than 5.00% less than, the outstanding principal balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Deleted Mortgage Loan, (iii) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (iv) be current (with no contractual delinquencies outstanding) as of the date of substitution, (v) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (vi) have a risk grading determined by the Seller at least equal to the risk grading assigned on the Deleted Mortgage Loan, (vii) have been underwritten or reunderwritten by the Seller in accordance with the same or, as determined by the Seller, more favorable, underwriting guidelines as the Deleted Mortgage Loan, (viii) be secured by the same property type as the Deleted Mortgage Loan, (ix) have a lien priority equal to or superior to that of the Deleted Mortgage Loan, (x) be covered by the PMI Policy if the Deleted Mortgage Loan was covered by the PMI Policy, and (xi) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement applicable to the Deleted Mortgage Loan. In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of the aggregate principal balances, the Mortgage Rates described in clause (ii) hereof shall be satisfied for each such mortgage loan, the risk gradings described in clause (vi) hereof shall be satisfied as to each such mortgage loan, the terms described in clause (iii) hereof shall be determined on the basis of weighted average remaining term to maturity (provided that no such mortgage loan may have a remaining term to maturity longer than the Deleted Mortgage Loan), the Loan-to-Value Ratios described in clause (v) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (xi) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be.

SE 2154917 v8
(26425.0085)

"Rating Agency or Rating Agencies": Moody's and S&P or their successors. If such agencies or their successors are no longer in existence, "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable Persons, designated by the Depositor, notice of which designation shall be given to the Trustee and the Master Servicer.

"Realized Loss": With respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan. Any Mortgage Loan or REO Property that is charged off pursuant to Section 3.16(a)(ii) will give rise to a Realized Loss at the time it is charged off, as described in Section 3.16 hereof.

"Record Date": With respect to (i) the Fixed-Rate Certificates, the Class C Certificates, the Class P Certificates, the Class R Certificates and any Definitive Certificates, the Close of Business on the last Business Day of the calendar month preceding the month in which the related Distribution Date occurs and (ii) with respect to the LIBOR Certificates, the Close of Business on the Business Day immediately preceding the related Distribution Date; provided, however, that following the date on which Definitive Certificates for a LIBOR Certificate are available pursuant to Section 5.02, the Record Date for such Certificates shall be the last Business Day of the calendar month preceding the month in which the related Distribution Date occurs.

"Recording Documents": As defined in Section 2.01 hereof.

"Reference Banks": Those banks (i) with an established place of business in London, England, (ii) not controlling, under the control of or under common control with the Depositor, the Seller or the Master Servicer or any affiliate thereof and (iii) which have been designated as such by the Trustee; provided, however, that if fewer than two of such banks provide a LIBOR rate, then any leading banks selected by the Trustee which are engaged in transactions in United States dollar deposits in the international Eurocurrency market.

"Refinanced Mortgage Loan": A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

"Regular Certificates": The Class A Certificates, the Mezzanine Certificates, the Class B Certificates, the Class C Certificates and the Class P Certificates.

"Regulation AB": Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Relief Act": The Servicemembers' Civil Relief Act of 2003 or similar state or local law.

"Relief Act Interest Shortfall": With respect to any Distribution Date, for any Mortgage Loan with respect to which there has been a reduction in the amount of interest collectible thereon for the most recently ended Due Period as a result of the application of the Relief Act,

38

the amount by which (i) interest collectible on such Mortgage Loan during such Due Period is less than (ii) one month's interest on the Principal Balance of such Mortgage Loan at the Mortgage Rate for such Mortgage Loan before giving effect to the application of the Relief Act.

"Remaining Principal Distribution Amount": With respect to any Distribution Date, an amount equal to the Principal Distribution Amount remaining after the distributions set forth in Section 4.01(c)(i).

"REMIC": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC 1": The segregated pool of assets subject hereto, constituting a primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made consisting of: (i) such Mortgage Loans as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof, (ii) any REO Property, together with all collections thereon and proceeds thereof, (iii) the Trustee's rights with respect to the Mortgage Loans under all insurance policies, including the PMI Policy, required to be maintained pursuant to this Agreement and any proceeds thereof, (iv) the Depositor's rights with respect to the Mortgage Loans under the Mortgage Loan Purchase Agreement (including any security interest created thereby), and (v) the Collection Account, the Distribution Account (subject to the last sentence of this definition) and any REO Account and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, a REMIC election will not be made with respect to the Reserve Fund, the Cap Account, the Cap Agreement and the Master Servicer Prepayment Charge Payment Amounts.

"REMIC 1 Interest Loss Allocation Amount": With respect to any Distribution Date, an amount equal to (a) the product of (i) the aggregate Principal Balance of the Mortgage Loans and related REO Properties then outstanding and (ii) the Uncertificated REMIC 1 Pass-Through Rate for REMIC 1 Regular Interest AA minus the Marker Rate, divided by (b) 12.

"REMIC 1 Overcollateralization Target Amount": 1% of the Overcollateralization Target Amount.

"REMIC 1 Overcollateralized Amount": With respect to any date of determination, (i) 1% of the aggregate Uncertificated Principal Balances of the REMIC 1 Regular Interests AA, A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2 and ZZ minus (ii) the aggregate of the Uncertificated Principal Balances of REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, and B2, in each case as of such date of determination.

"REMIC 1 Principal Loss Allocation Amount": With respect to any Distribution Date, an amount equal to the product of (i) the aggregate Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) 1 minus a fraction, the numerator of which is 2 times the aggregate of the Uncertificated Principal Balances of REMIC 1 Regular Interest A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1 and B2 and the denominator of which is the aggregate of the Uncertificated Principal Balances of REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2 and ZZ.

"REMIC 1 Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC 1 issued hereunder and designated as a "regular interest" in REMIC 1. Each REMIC 1 Regular Interest shall accrue interest at the related Uncertificated REMIC 1 Pass-Through Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Principal Balance as set forth in the Preliminary Statement hereto. The following is a list of each of the REMIC 1 Regular Interests: REMIC 1 Regular Interest AA, REMIC 1 Regular Interest A1, REMIC 1 Regular Interest A2, REMIC 1 Regular Interest A3, REMIC 1 Regular Interest M1, REMIC 1 Regular Interest M2, REMIC 1 Regular Interest M3, REMIC 1 Regular Interest M4, REMIC 1 Regular Interest M5, REMIC 1 Regular Interest M6, REMIC 1 Regular Interest M7, REMIC 1 Regular Interest B1, REMIC 1 Regular Interest B2, REMIC 1 Regular Interest ZZ and REMIC 1 Regular Interest XX.

"REMIC 2": The segregated pool of assets consisting of all of the REMIC 1 Regular Interests conveyed in trust to the Trustee, for the benefit of the Holders of the Regular Certificates and the Class R Certificateholders, as holders of the Class R-2 Interest, pursuant to Article II hereunder, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC Provisions": Provisions of the federal income tax law relating to real estate mortgage investment conduits which appear at Section 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and regulations and rulings promulgated thereunder, as the foregoing may be in effect from time to time.

"REMIC Regular Interests": The REMIC 1 Regular Interests and the REMIC 2 Regular Interests.

"Remittance": As defined in Section 7.02(b) hereof.

"Remittance Report": A report prepared by the Master Servicer and delivered to the Trustee pursuant to Section 4.04.

"Rents from Real Property": With respect to any REO Property, gross income of the character described in Section 856(d) of the Code.

"REO Account": The account or accounts maintained by the Master Servicer in respect of an REO Property pursuant to Section 3.23.

"REO Disposition": The sale or other disposition of an REO Property on behalf of the Trust Fund.

"REO Imputed Interest": As to any REO Property, for any calendar month during which such REO Property was at any time part of the Trust Fund, one month's interest at the applicable Net Mortgage Rate on the Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan if appropriate) as of the Close of Business on the Distribution Date in such calendar month.

SE 2154917 v8
(26425.0085)

"REO Principal Amortization":  With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Mortgage Loans and REO Properties pursuant to Section 9.01 that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable pursuant to Section 3.23 in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the Master Servicer pursuant to Section 3.23 for unpaid Servicing Fees in respect of the related Mortgage Loan and unreimbursed Servicing Advances and Advances in respect of such REO Property or the related Mortgage Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"REO Property":  A Mortgaged Property acquired by the Master Servicer on behalf of the Trust Fund through foreclosure or deed-in-lieu of foreclosure, as described in Section 3.23.

"Request for Release":  A release signed by a Servicing Representative, in the form of Exhibit E-1 or E-2 attached hereto.

"Reserve Fund":  The reserve fund established pursuant to Section 3.26.

"Reserve Interest Rate":  With respect to any Interest Determination Date, the rate per annum that the Trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.03125%) of the one-month United States dollar lending rates which banks in New York City selected by the Trustee are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Trustee can determine no such arithmetic mean, in the case of any Interest Determination Date after the initial Interest Determination Date, the lowest one-month United States dollar lending rate which such New York banks selected by the Trustee are quoting on such Interest Determination Date to leading European banks.

"Residential Dwelling":  Any one of the following:  (i) a detached one-family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a Fannie Mae eligible condominium project or a Freddie Mac eligible condominium project, (iv) a manufactured home, or (v) a detached one-family dwelling in a planned unit development, none of which is a co-operative or mobile home.

"Residual Interest":  The sole class of "residual interests" in a REMIC within the meaning of Section 860G(a)(2) of the Code.

"Responsible Officer":  When used with respect to the Trustee, any managing director, director, associate, principal, vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

41

"<u>S&P</u>":  Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

"<u>Seller</u>":  Long Beach Mortgage Company, a Delaware corporation, or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

"<u>Servicing Account</u>":  The account or accounts created and maintained pursuant to Section 3.09.

"<u>Servicing Advances</u>":  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Master Servicer in the performance of its servicing obligations in connection with a default, delinquencies or other unanticipated event or where reimbursement is otherwise permitted in accordance with any of the terms of this Agreement, including, but not limited to, the cost of (i) the preservation, restoration, inspection and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, and including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered in the MERS® System, (iii) the management and liquidation of the REO Property and (iv) compliance with the obligations under Sections 3.01, 3.09, 3.14, 3.16, and 3.23.

"<u>Servicing Fee</u>":  With respect to each Mortgage Loan and for any calendar month, an amount equal to one month's interest (or in the event of any payment of interest which accompanies a Principal Prepayment in full made by the Mortgagor during such calendar month, interest for the number of days covered by such payment of interest) at the Servicing Fee Rate on the same principal amount on which interest on such Mortgage Loan accrues for such calendar month.  A portion of such Servicing Fee may be retained by any Sub-Servicer as its servicing compensation.

"<u>Servicing Fee Rate</u>":  0.50% per annum.

"<u>Servicing Representative</u>":  Any officer or employee of the Master Servicer involved in, or responsible for, the administration and servicing of Mortgage Loans, whose name and specimen signature appear on a list of servicing representatives furnished by the Master Servicer to the Trustee and the Depositor on the Closing Date, as such list may from time to time be amended.

"<u>Startup Day</u>":  As defined in Section 10.01(b) hereof.

"<u>Stated Principal Balance</u>":  With respect to any Mortgage Loan:  (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, the related Cut-off Date Principal Balance, as shown in the Mortgage Loan Schedule, minus the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-off Date, to the extent received from the Mortgagor or advanced by the Master Servicer and distributed pursuant to Section 4.01 on or before such date of determination, (ii) all Principal Prepayments received after the Cut-off Date, to the extent distributed pursuant to Section 4.01 on or before such date of determination, (iii) all Liquidation Proceeds and Insurance Proceeds to the extent distributed pursuant to Section 4.01 on or before such date of determination, and (iv) any

42

Realized Loss incurred with respect thereto as a result of a Deficient Valuation made during or prior to the Due Period for the most recent Distribution Date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero.  With respect to any REO Property:  (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Mortgage Loan as of the date on which such REO Property was acquired on behalf of the Trust Fund, minus the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 4.01 on or before such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

"Stayed Funds":  If the Master Servicer is the subject of a proceeding under the federal Bankruptcy Code and the making of a Remittance (as defined in Section 7.02(b)) is prohibited by Section 362 of the federal Bankruptcy Code, funds that are in the custody of the Master Servicer, a trustee in bankruptcy or a federal bankruptcy court and should have been the subject of such Remittance absent such prohibition.

"Stepdown Date":  The earlier of (a) the later of (i) the Distribution Date in June 2009 and (ii) the first Distribution Date on which the Credit Enhancement Percentage (calculated for this purpose only after taking into account payments of principal on the Mortgage Loans due on the related Due Date or received during the related Prepayment Period but prior to distribution of the Principal Distribution Amount in respect of the Certificates then entitled to distributions of principal on such Distribution Date) is greater than or equal to 75.50 % and (b) the date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero.

"Sub-Servicer":   Any Person with which the Master Servicer has entered into a Sub-Servicing Agreement and which meets the qualifications of a Sub-Servicer pursuant to Section 3.02.

"Sub-Servicing Account":  An account or accounts established by a Sub-Servicer which meets the requirements set forth in Section 3.08 and is otherwise acceptable to the applicable Master Servicer.

"Sub-Servicing Agreement":  The written contract between the Master Servicer and a Sub-Servicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02.

"Subsequent Recoveries":  The Gross Subsequent Recoveries net of amounts payable or reimbursable to the Master Servicer for related (i) costs and expenses incurred with respect to the Mortgage Loan after it has been charged off, (ii) Advances, (iii) Servicing Advances and (iv) Servicing Fees.

"Substitution Adjustments":  As defined in Section 2.03(d) hereof.

43

"<u>Tax Returns</u>":  The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit (REMIC) Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holder of the REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed by the Trustee on behalf of each REMIC, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"<u>Telerate Page 3750</u>":  The display designated as page "3750" on the Dow Jones Telerate Capital Markets Report (or such other page as may replace page 3750 on that report for the purpose of displaying London interbank offered rates of major banks).

"<u>Termination Price</u>":  As defined in Section 9.01(a) hereof.

"<u>Terminator</u>":  As defined in Section 9.01.

"<u>Transfer</u>":  Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"<u>Transferee</u>":  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"<u>Transferor</u>":  Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

"<u>Trigger Event</u>":  A Trigger Event has occurred with respect to a Distribution Date if either a Cumulative Loss Trigger Event or a Delinquency Trigger Event has occurred with respect to such Distribution Date.

"<u>Trust</u>":  Long Beach Mortgage Loan Trust 2006-A, the trust created hereunder.

"<u>Trust Fund</u>":  All of the assets of the Trust, which is the trust created hereunder consisting of REMIC 1, REMIC 2, the Reserve Fund, the Cap Account, the Cap Agreement and any Master Servicer Prepayment Charge Payment Amounts.

"<u>Trust REMIC</u>":  Any of REMIC 1 and/or REMIC 2.

"<u>Trustee</u>":  Deutsche Bank National Trust Company, a national banking association, or its successor in interest, or any successor trustee appointed as herein provided.

"<u>Trustee Fee</u>":  With respect to each Distribution Date, one-twelfth of the Trustee Fee Rate multiplied by the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (prior to giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

"<u>Trustee Fee Rate</u>":  0.004% per annum.

SE 2154917 v8
(26425.0085)

"<u>Uncertificated Accrued Interest</u>":  With respect to each REMIC Regular Interest on each Distribution Date, an amount equal to one month's interest at the related Uncertificated Pass-Through Rate on the Uncertificated Principal Balance or Uncertificated Notional Amount of such REMIC Regular Interest.  In each case, Uncertificated Accrued Interest will be reduced by any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls allocated to such REMIC Regular Interests pursuant to Section 1.03.

"<u>Uncertificated Pass-Through Rate</u>":  The Uncertificated REMIC 1 Pass-Through Rate and the Uncertificated REMIC 2 Pass-Through Rate.

"<u>Uncertificated Principal Balance</u>":  With respect to each REMIC Regular Interest, the principal amount of such REMIC Regular Interest outstanding as of any date of determination.  As of the Closing Date, the Uncertificated Principal Balance of each REMIC Regular Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial Uncertificated Principal Balance.  On each Distribution Date, the Uncertificated Principal Balance of each REMIC Regular Interest shall be reduced by all distributions of principal made on such REMIC Regular Interest on such Distribution Date pursuant to Section 4.05 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses and increased by Subsequent Recoveries as provided in Section 4.06, and the Uncertificated Principal Balance of REMIC 1 Regular Interest ZZ shall be increased by interest deferrals as provided in Section 4.05.  The Uncertificated Principal Balance of each REMIC Regular Interest that has an Uncertificated Principal Balance shall never be less than zero.  Notwithstanding the foregoing, the Certificate Principal Balance of (i) the Class C Certificates shall always be equal to (i) the excess, if any, of (A) the then aggregate Uncertificated Principal Balances of the REMIC 2 Regular Interests over (B) the sum of the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates minus (ii) the amount, if any, paid to the Class A Certificates on the first Distribution Date as Extra Principal Distribution Amount.

"<u>Uncertificated REMIC 1 Pass-Through Rate</u>": With respect to each REMIC 1 Regular Interest, a per annum rate equal to the weighted average of the Adjusted Net Mortgage Rates of the Mortgage Loans.

"<u>Undercollateralized Amount</u>":  With respect to any Distribution Date, the amount, if any, by which (i) the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class P Certificates as of such Distribution Date (after giving effect to distributions to be made on such Distribution Date) exceeds (ii) the aggregate Stated Principal Balance of the Mortgage Loans on the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

"<u>Uninsured Cause</u>":  Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained pursuant to Section 3.14.

"<u>United States Person</u>" or "<u>U.S. Person</u>":  (i) A citizen or resident of the United States; (ii) a corporation, partnership or other entity classified as a corporation or partnership for United

45

States federal income tax purposes created or organized in, or under the laws of, the United States or any political subdivision thereof (except, in the case of a partnership or entity treated as a partnership, to the extent provided in regulations) provided that, solely for purposes of the restrictions on the transfer of the Class R Certificates, no partnership or other entity treated as a partnership shall be treated as a United States Person unless all persons that own an interest in such partnership or other entity, either directly or through any entity that is not a corporation for United States federal income tax purposes, are required by the applicable operative agreement to be United States Persons; (iii) an estate the income of which is subject to United States federal income taxation regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States Persons have the authority to control all substantial decisions of the trust or if the trust was in existence on August 20, 1996, was treated as a United States Person on August 19, 1996, and made a valid election to continue to be treated as a United States Person.  The term "United States" shall have the meaning set forth in Section 7701 of the Code or successor provisions.

"Unpaid Interest Shortfall Amount":  With respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates and (i) the first Distribution Date, zero, and (ii) any Distribution Date after the first Distribution Date, the amount, if any, by which (a) the sum of (1) the Monthly Interest Distributable Amount for such Class of Certificates for the immediately preceding Distribution Date and (2) the outstanding Unpaid Interest Shortfall Amount, if any, for such Class of Certificates for such preceding Distribution Date exceeds (b) the aggregate amount distributed on such Class of Certificates in respect of interest pursuant to clause (a) of this definition on such preceding Distribution Date, plus interest on the amount of interest due but not paid on such Class of Certificates on such preceding Distribution Date, to the extent permitted by law, at the Pass-Through Rate for such Class of Certificates for the related Accrual Period.

"Value":  With respect to any Mortgaged Property, the lesser of (i) the Origination Value thereof and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is the Origination Value thereof.

"Voting Rights":  The portion of the voting rights of all of the Certificates which is allocated to any Certificate.  At all times the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates shall have 98% of the Voting Rights (allocated among the Holders of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates in proportion to the then outstanding Certificate Principal Balances of their respective Certificates), the Class P Certificates shall have 1% of the Voting Rights and the Class R Certificates shall have 1% of the Voting Rights.  The Voting Rights allocated to any Class of Certificates (other than the Class P Certificates and the Class R Certificates) shall be allocated among all Holders of each such Class in proportion to the outstanding Certificate Principal Balance of such Certificates and the Voting Rights allocated to the Class P Certificates and the Class R Certificates shall be allocated among all Holders of each such Class in proportion to such Holders' respective Percentage Interest; provided, however, that when none of the Regular Certificates are outstanding, 100% of the Voting Rights shall be allocated among Holders of the Class R Certificates in accordance with such Holders' respective Percentage Interests in the Certificates of such Class.

"Washington Mutual Custodian":   None of the Mortgage Loans are held by the Washington Mutual Custodian as custodian.   References to the Washington Mutual Custodian are left in this Agreement for administrative convenience and shall be completely disregarded. There is no Washington Mutual Custodian under this Agreement and no Person shall have any rights of the Washington Mutual Custodian under this Agreement.

Section 1.02    Accounting.

Unless otherwise specified herein, for the purpose of any definition or calculation, whenever amounts are required to be netted, subtracted or added or any distributions are taken into account, such definition or calculation and any related definitions or calculations shall be determined without duplication of such functions.

Section 1.03    Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of the Monthly Interest Distributable Amount for the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first to the Class C Certificates to the extent of one month's interest at the then applicable Pass-Through Rate on the Notional Amount of such Regular Interest, and then among the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, in each case, on a *pro rata* basis based on, and to the extent of, interest for the related Accrual Period at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance or Notional Amount of each such Certificate.

For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC 1 Regular Interests  for any Distribution Date, the aggregate amount of any Net Prepayment Interest Shortfalls and Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated to AA and ZZ up to an aggregate amount equal to the REMIC 1 Interest Loss Allocation Amount, 98% and 2%, respectively, and thereafter among AA, A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2 and ZZ, *pro rata* based on, and to the extent of, one month's interest at the then applicable respective Uncertificated REMIC 1 Pass-Through Rate on the respective Uncertificated Principal Balance of each such REMIC 1 Regular Interest.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01    Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement (other than the Depositor's rights under Section 17 thereof) and all other assets included or to be

47

included in REMIC 1.  Such assignment includes all scheduled payments on the Mortgage Loans due after the Cut-off Date and all unscheduled collections in respect of the Mortgage Loans received after the Cut-off Date (other than the portion of such collections due on or prior to the Cut-off Date).  The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement and the PMI Policy.  In addition, on or prior to the Closing Date, the Trustee shall execute the Cap Agreement and the Depositor hereby directs the Trustee to do so.

If the assignment and transfer of the Mortgage Loans and the other property specified in Section 2.01 from the Depositor to the Trustee pursuant to this Agreement is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Depositor intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (i) the Depositor shall be deemed to have granted and does hereby grant to the Trustee as of the Closing Date a perfected, first priority security interest in the entire right, title and interest of the Depositor in and to the Mortgage Loans and all other property conveyed to the Trust Fund pursuant to this Section 2.01 and all proceeds thereof and (ii) this Agreement shall constitute a security agreement under applicable law.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee as custodian (in which capacity it will, unless otherwise specified, be acting under this Article II) the following documents or instruments with respect to each Mortgage Loan so transferred and assigned (with respect to each Mortgage Loan, a "Mortgage File"):

(a)  the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee or (in the case of not more than 1.00% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date) a copy of such original Mortgage Note with an accompanying Lost Note Affidavit executed by the Seller;

(b)  the original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM loan, with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(c)  unless the Mortgage Loan is registered on the MERS® System, an original Assignment in blank;

(d)  the original recorded Assignment or Assignments showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee or in blank (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN) as contemplated by the immediately preceding clause (c);

(e)  the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

48

(f)    as an original, photocopy or in electronic form, the lender's title insurance policy, together with all endorsements or riders issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a second lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

Except with respect to any Mortgage Loan for which MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record, the Master Servicer, in its capacity as Seller, shall promptly (and in no event later than thirty (30) Business Days, subject to extension upon a mutual agreement between the Master Servicer and the Trustee), following the later of the Closing Date and the date of receipt by the Master Servicer of the recording information for a Mortgage submit or cause to be submitted for recording, at no expense to the Trust Fund, the Trustee or the Depositor, in the appropriate public office for real property records, each Assignment referred to in Sections 2.01(c) and (d) above and shall execute each original Assignment referred to in clause (c) above in the following form: "Deutsche Bank National Trust Company, as Trustee under applicable agreement, without recourse." In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Master Servicer, in its capacity as Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded. Notwithstanding the foregoing, the Assignments shall not be required to be completed and submitted for recording with respect to any Mortgage Loan if each Rating Agency does not require recordation in order for such Rating Agency to assign the initial ratings to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates; provided, however, each such Assignment shall be submitted for recording by the Master Servicer, in its capacity as Seller, in the manner described above, at no expense to the Trust Fund or the Trustee, upon the earliest to occur of:  (i) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (ii) the occurrence of a Master Servicer Event of Default, (iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (iv) the occurrence of a servicing transfer as described in Section 7.02 hereof and (v) if the Seller is not the Master Servicer and with respect to any one Assignment, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Master Servicer is unable to pay the cost of recording the Assignments, such expense shall be paid by the Trustee and shall be reimbursable to the Trustee as an Extraordinary Trust Fund Expense.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Depositor further agrees that it shall cause, within 30 Business Days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it shall not, and shall not permit the Master Servicer to, and the Master Servicer agrees that it shall not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

49

If any of the documents referred to in Sections 2.01(b), (c), (d) or (e) above (collectively, the "Recording Documents") has as of the Closing Date been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Master Servicer, in its capacity as the Seller, to deliver such Recording Documents shall be deemed to be satisfied upon (1) delivery to the Trustee or the applicable Custodian of a copy of each such Recording Document certified by the Seller in the case of (x) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the Seller, delivery to the Trustee or the applicable Custodian promptly upon receipt thereof, and in any event no later than one year after the Closing Date, of either the original or a copy of such Recording Document certified by the applicable public recording office to be a true and complete copy of the original. In instances where, due to a delay on the part of the recording office where any such Recording Documents have been delivered for recordation, the Recording Documents cannot be delivered to the Trustee or the applicable Custodian within one year after the Closing Date, the Master Servicer, in its capacity as the Seller, shall deliver to the Trustee or the applicable Custodian within such time period an Officer's Certificate stating the date by which the Master Servicer, in its capacity as the Seller, expects to receive such Recording Documents from the applicable recording office. In the event that Recording Documents have still not been received by the Master Servicer, in its capacity as the Seller, and delivered to the Trustee or the applicable Custodian by the date specified in its previous Officer's Certificate delivered to the Trustee or the applicable Custodian, as the case may be, the Master Servicer, in its capacity as the Seller, shall deliver to the Trustee or the applicable Custodian by such date an additional Officer's Certificate stating a revised date by which the Master Servicer, in its capacity as the Seller, expects to receive the applicable Recording Documents. This procedure shall be repeated until the Recording Documents have been received by the Master Servicer, in its capacity as the Seller, and delivered to the Trustee or the applicable Custodian. If the original lender's title insurance policy was not delivered pursuant to Section 2.01(f) above, the Master Servicer, in its capacity as the Seller, shall deliver or cause to be delivered to the Trustee or the applicable Custodian promptly after receipt thereof, and in any event within 120 days after the Closing Date, the original lender's title insurance policy. The Master Servicer, in its capacity as the Seller, shall deliver or cause to be delivered to the Trustee or the applicable Custodian promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee or the applicable Custodian are and shall be held by or on behalf of the Seller, the Depositor or the Master Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee or the applicable Custodian. Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Master Servicer.

The Mortgage Loans permitted by the terms of this Agreement to be included in the Trust are limited to (i) the Mortgage Loans (which the Depositor acquired pursuant to the Mortgage Loan Purchase Agreement, which contains, among other representations and warranties, a

50

representation and warranty of the Seller that no Mortgage Loan is a "high-cost" or "predatory" loan under any state or local law or regulation applicable to the originator), and (ii) Qualified Substitute Mortgage Loans (which, by definition as set forth herein and referred to in the Mortgage Loan Purchase Agreement, are required to conform to, among other representations and warranties, the representation and warranty of the Seller that no Qualified Substitute Mortgage Loan is a "high cost" or "predatory" loan under any state or local law or regulation applicable to the originator). It is agreed and understood by the parties hereto that it is not intended that any mortgage loan be included in the Trust that is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, a "High Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, a "High Cost Home Loan" as defined in the Kentucky high-cost loan statute effective June 24, 2003 (Ky. Rev. Stat. Section 360.100), or a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective January 1, 2005 (Ind. Code Ann. §§ 24-9-1 through 24-9-9) or a "High Cost Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Gen. Laws Ch. 183C. §§1 et seq.).

Section 2.02    Acceptance of REMIC 1 by the Trustee.

Subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, the Trustee or a Custodian on behalf of the Trustee, as applicable, acknowledges receipt of the documents referred to in Section 2.01 above and all other assets included in the definition of "REMIC 1" under clauses (i), (iii), (iv) and (vi) (to the extent of amounts deposited into the Distribution Account) and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and all such assets and such other assets included in the definition of "REMIC 1" in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee or the Custodian, as applicable, agrees, for the benefit of the Certificateholders, to review each Mortgage File on or before the Closing Date, with respect to each Mortgage Loan and to certify to the Trustee, the Depositor and the Master Servicer in substantially the form attached hereto as Exhibit F-1 that, as to each Closing Date Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents constituting part of such Mortgage File (other than such documents described in Section 2.01(e)) required to be delivered to it pursuant to this Agreement are in its possession, (ii) such documents have been reviewed by the Trustee or the Washington Mutual Custodian, as applicable and are not mutilated, torn or defaced unless initialed by the related borrower and relate to such Mortgage Loan and (iii) based on the Trustee's examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (i), (ii), (ix), (xii) and (xvi) of the definition of "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage File. It is herein acknowledged that, in conducting such review, neither the Trustee nor any Custodian is under any duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine whether they are genuine, enforceable, or appropriate for the represented purpose (including with respect to Section 2.01(f), whether such title insurance policy (a) contains all necessary endorsements, (b) insures the priority of the Mortgage as a second lien or (c) whether the interest vested in the Mortgagor is a fee interest) or whether they have actually been recorded or that they are other than what they purport to be on their face or

SE 2154917 v8
(26425.0085)

(ii) to determine whether any Mortgage File should include any of the documents specified in clause (e) of Section 2.01.

Prior to the first anniversary date of this Agreement, the Trustee shall deliver (or, with respect to the Mortgage Loans held by another Custodian, such Custodian shall deliver) to the Depositor and the Master Servicer a final certification in the form annexed hereto as Exhibit F-2 evidencing the completeness of the Mortgage Files, with any applicable exceptions noted thereon.

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee holding such Mortgage Files or any Custodian holding such Mortgage Files finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the Trustee shall so notify or such other Custodian shall notify the Depositor, the Seller and the Master Servicer.  In addition, upon the discovery by the Depositor, the Master Servicer or the Trustee of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

Section 2.03   <u>Cure, Repurchase or Substitution of Mortgage Loans by the Seller; Remedies for Breaches by Depositor or Master Servicer; Remedies for Breaches Relating to Prepayment Charges</u>.

(a)      Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, the Mortgage File or of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders (it being understood that (i) in the case of any such representation or warranty made to the knowledge or the best of knowledge of the Seller, as to which the Seller has no knowledge, without regard to the Seller's lack of knowledge with respect to the substance of such representation or warranty being inaccurate at the time it was made or (ii) with respect to the representation and warranty set forth in the last sentence of Section 6(xxxix), Section 6(xlvi), the first sentence of Section 6(xlvii) and Section 6(lv) of the Mortgage Loan Purchase Agreement, a breach of any such representation or warranty shall in and of itself be deemed to materially and adversely affect the interest of the Certificateholders in the related Mortgage Loan), the Trustee shall promptly notify the Depositor, the Seller and the Master Servicer of such defect, missing document or breach and request that the Seller deliver such missing document or cure such defect or breach within 90 days from the date the Seller was notified of such missing document, defect or breach (except as described in Section 2.03(e)), and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Master Servicer (or, in accordance with Section 3.02(b), the Trustee) shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC 1 at the Purchase Price within 90 days after the date on which the Seller was notified (subject to Section 2.03(e)) of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.  The Purchase Price for the repurchased Mortgage Loan

SE 2154917 v8
(26425.0085)

shall be deposited in the Collection Account, and the Trustee or a Custodian, as applicable, upon receipt of written certification from the Master Servicer of such deposit, shall release to the Seller the related Mortgage File, and the Trustee or a Custodian on behalf of the Trustee, as applicable, shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Seller shall furnish to it or such Custodian, as applicable, and as shall be necessary to vest in the Seller any Mortgage Loan released pursuant hereto.  In furtherance of the foregoing, if the Seller is not a member of MERS and repurchases a Mortgage Loan which is registered on the MERS® System, the Master Servicer, in its capacity as Seller, at its own expense and without any right of reimbursement, shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations.  Neither the Trustee nor any Custodian shall have any further responsibility with regard to such Mortgage File.  In lieu of repurchasing any such Mortgage Loan as provided above, if so provided in the Mortgage Loan Purchase Agreement, the Seller may cause such Mortgage Loan to be removed from REMIC 1 (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(d).  It is understood and agreed that the obligation of the Seller to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such omission, defect or breach available to the Certificateholders, the Trustee on behalf of the Certificateholders.

(b)    Within 90 days of the earlier of discovery by the Depositor or receipt of notice by the Depositor of the breach of any representation or warranty of the Depositor set forth in Section 2.05 with respect to any Mortgage Loan, which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Depositor shall cure such breach in all material respects.

(c)    As promptly as practicable (and no later than 90 days) after the earlier of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of any representation, warranty or covenant of the Master Servicer set forth in Section 2.04 which materially and adversely affects the value of any Mortgage Loan or the interests of the Certificateholders in any Mortgage Loan, the Master Servicer shall cure such breach in all material respects.

Promptly upon the earlier of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of any representation, warranty or covenant of the Master Servicer set forth in Section 2.04(a)(vii) or (viii) which materially and adversely affects the interests of the Holders of the Class P Certificates to any Prepayment Charge, the Master Servicer shall cure such breach in all material respects.  If the representation made by the Master Servicer in its capacity as Seller in Section 2.04(a)(vii) is breached, the Master Servicer in its capacity as Seller shall pay into the Collection Account the amount of the scheduled Prepayment Charge, less any amount previously collected and deposited by, or paid by, the Master Servicer into the Collection Account; and if the covenant made by the Master Servicer in Section 2.04(a)(viii) is breached, the Master Servicer shall pay into the Collection Account the amount of the waived Prepayment Charge.  Payments by the Master Servicer into the Collection Account pursuant to this paragraph shall be made on the later of (i) the Master Servicer Remittance Date next following the earlier

53

of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of the related representation, warranty or covenant of the Master Servicer set forth in Section 2.04(a)(vii) or (viii) which materially and adversely affects the interests of the Holders of the Class P Certificates to any Prepayment Charge and (ii) the Master Servicer Remittance Date next following the Prepayment Period in which such breach occurred. For the avoidance of doubt, a waiver of a Prepayment Charge by the Sub-Servicer that would constitute a breach of the Master Servicer's covenant in Section 2.04(a)(viii) if such Prepayment Charge were waived by the Master Servicer shall be a breach by the Master Servicer of its covenant in Section 2.04(a)(viii).

(d)       Any substitution of Qualified Substitute Mortgage Loans for Deleted Mortgage Loans made pursuant to Section 2.03(a) shall be effected prior to the date which is two years after the Startup Date for REMIC 1.

As to any Deleted Mortgage Loan for which the Seller substitutes a Qualified Substitute Mortgage Loan or Loans, such substitution shall be effected by the Seller delivering to the Trustee (or, with respect to the Mortgage Loans held by another Custodian, to such Custodian) on behalf of the Trustee, for such Qualified Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2.01, together with an Officers' Certificate providing that each such Qualified Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Adjustments (as described below), if any, in connection with such substitution. The Trustee shall acknowledge or with respect to the Mortgage Loans held by another Custodian such other Custodian shall acknowledge receipt for such Qualified Substitute Mortgage Loan or Loans and, within ten Business Days thereafter, review such documents as specified in Section 2.02 and deliver to the Depositor and the Master Servicer, with respect to such Qualified Substitute Mortgage Loan or Loans, a certification substantially in the form attached hereto as Exhibit F-1, with any applicable exceptions noted thereon. Within one year of the date of substitution, the Trustee shall deliver or with respect to the Mortgage Loans held by another Custodian, such other Custodian shall deliver to the Depositor, the Seller and the Master Servicer a certification substantially in the form of Exhibit F-2 hereto with respect to such Qualified Substitute Mortgage Loan or Loans, with any applicable exceptions noted thereon. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution are not part of REMIC 1 and will be retained by the Seller. For the month of substitution, distributions to Certificateholders will reflect the Monthly Payment due on such Deleted Mortgage Loan on or before the Due Date in the month of substitution, and the Seller shall thereafter be entitled to retain all amounts subsequently received in respect of such Deleted Mortgage Loan. The Trustee shall give or cause to be given written notice to the Certificateholders that such substitution has taken place, and the Master Servicer shall amend or cause to be amended the Mortgage Loan Schedule and, if applicable, the Prepayment Charge Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan or Loans and shall deliver a copy of such amended Mortgage Loan Schedule and, if applicable, the Prepayment Charge Schedule to the Trustee. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall constitute part of the Mortgage Pool and shall be subject in all respects to the terms of this Agreement and the Mortgage Loan Purchase Agreement, including all applicable representations and warranties thereof included in the Mortgage Loan Purchase Agreement as of the date of substitution.

54

For any month in which the Seller substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will determine the amounts (the "Substitution Adjustments"), if any, by which the aggregate Purchase Price of all such Deleted Mortgage Loans exceeds the aggregate of the Stated Principal Balance of the Qualified Substitute Mortgage Loans, as of the date of substitution, together with one month's interest on such Stated Principal Balance at the applicable Net Mortgage Rate, plus all outstanding Advances and Servicing Advances with respect to such Deleted Mortgage Loan. On the date of such substitution, the Seller will deliver or cause to be delivered to the Master Servicer for deposit in the Collection Account an amount equal to the sum of Substitution Adjustments, if any (which for federal income tax purposes will be treated as payment for the repurchase of that portion of the Deleted Mortgage Loans), and the Trustee, upon receipt of the related Qualified Substitute Mortgage Loan or Loans (or acknowledgement of such receipt by another Custodian) and certification by the Master Servicer of such deposit, shall release or, if such Mortgage File is held by another Custodian, such Custodian shall release to the Seller the related Mortgage File or Files and the Trustee shall execute and deliver or, if such Mortgage File is held by another Custodian, such Custodian shall execute and deliver such instruments of transfer or assignment, without recourse, as the Seller shall deliver to it or such Custodian, as applicable, and as shall be necessary to vest therein any Deleted Mortgage Loan released pursuant hereto.

In addition, the Master Servicer in its capacity as Seller shall obtain at its own expense and deliver to the Trustee an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on REMIC 1, created hereunder, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on contributions after the startup day under Section 860G(d)(1) of the Code, or (b) any Trust REMIC hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(e)     Upon discovery by the Depositor, the Seller, the Master Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two Business Days give written notice thereof to the other parties. In connection therewith, the Master Servicer in its capacity as Seller shall repurchase or, subject to the limitations set forth in Section 2.03(d), substitute one or more Qualified Substitute Mortgage Loans for the affected Mortgage Loan within 90 days of the earlier of discovery or receipt of such notice with respect to such affected Mortgage Loan. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(a) and Section 2.03(d). The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty.

Section 2.04     <u>Representations, Warranties and Covenants of the Master Servicer</u>.

(a)     The Master Servicer hereby represents, warrants and covenants to the Trustee, for the benefit of the Trustee and the Certificateholders, and to the Depositor, that as of the Closing Date or as of such date specifically provided herein:

(i)     The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, is

duly authorized and qualified to transact any and all business contemplated by this Agreement and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in the states where the Mortgaged Properties are located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Master Servicer or to ensure the enforceability or validity of each Mortgage Loan and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each Mortgage Loan and to service the Mortgage Loans in accordance with the terms of this Agreement;

(ii)    The Master Servicer has the full power and authority to service each Mortgage Loan, to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary action on the part of the Master Servicer the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery thereof by the Depositor and the Trustee, constitutes a legal, valid and binding obligation of the Master Servicer, enforceable against the Master Servicer in accordance with its terms, except to the extent that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to the equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(iii)    The execution and delivery of this Agreement by the Master Servicer, the servicing of the Mortgage Loans by the Master Servicer hereunder, the consummation by the Master Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Master Servicer and will not (A) result in a breach of any term or provision of the charter or by-laws of the Master Servicer or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Master Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Master Servicer of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Master Servicer; and the Master Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Master Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Master Servicer to perform its obligations under this Agreement or (y) the business, operations, financial condition, properties or assets of the Master Servicer taken as a whole;

(iv)    The Master Servicer is an approved seller/servicer for Fannie Mae or Freddie Mac in good standing and is a HUD approved mortgagee pursuant to Section 203 and Section 211 of the National Housing Act;

SE 2154917 v8
(26425.0085)

(v)    No litigation is pending against the Master Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Master Servicer to service the Mortgage Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Master Servicer of, or compliance by the Master Servicer with, this Agreement or the consummation by the Master Servicer of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(vii)    The information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms under applicable law upon the Mortgagor's voluntary principal prepayment (except to the extent that:  (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally; or (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment); provided that the representation, warranty and covenant contained in this clause (vii) is made by the Master Servicer only in its capacity as Seller;

(viii)    The Master Servicer will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver is related to a default or a reasonably foreseeable default and would maximize recovery of total proceeds taking into account the value of such Prepayment Charge and related Mortgage Loan and doing so is standard and customary in servicing mortgage loans similar to the Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default).  Notwithstanding the foregoing, the Master Servicer may waive any Prepayment Charge or part of a Prepayment Charge in any instance when the mortgage debt is accelerated as a result of the Mortgagor's default in making the Mortgage Loan payments and the Master Servicer may waive any prepayment charges or previous due in connection with a partial prepayment;

(ix)    With respect to each Mortgage Loan, the Master Servicer will furnish, or cause to be furnished, information regarding the borrower credit file related to such Mortgage Loan to credit reporting agencies in compliance with the provisions of the Fair Credit Reporting Act and the applicable implementing regulations.  The Master Servicer will transmit full-file credit reporting data for each Mortgage Loan pursuant to Fannie Mae Guide Announcement 95-19 and that for each Mortgage Loan, the Master Servicer agrees it shall report one of the following statuses each month as follows:  new origination, current, delinquent (30-, 60-, 90-days, etc.), foreclosed, or charged-off; and

(x)     The Master Servicer (or a Sub-Servicer servicing the Mortgage Loans on its behalf) is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS.

(b)     It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee or a Custodian, as the case may be, and shall inure to the benefit of the Trustee, the Depositor and the Certificateholders.  Upon discovery by any of the Depositor, the Master Servicer or the Trustee of a breach of any of the foregoing representations, warranties and covenants which materially and adversely affects the value of any Mortgage Loan, Prepayment Charge or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice (but in no event later than two Business Days following such discovery) to the other of such parties.  The obligation of the Master Servicer set forth in Section 2.03(c) to cure breaches (or, in the case of (a)(vii) or (a)(viii) above, to pay a Master Servicer Prepayment Charge Payment Amount) shall constitute the sole remedy against the Master Servicer available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders respecting a breach of the representations, warranties and covenants contained in this Section 2.04.  The preceding sentence shall not, however, limit any remedies available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders, (i) pursuant to the Mortgage Loan Purchase Agreement signed by the Master Servicer in its capacity as Seller, respecting a breach of the representations, warranties and covenants of the Master Servicer in its capacity as Seller contained in the Mortgage Loan Purchase Agreement or (ii) pursuant to Section 7.01 hereof.

Section 2.05    <u>Representations and Warranties of the Depositor</u>.

The Depositor hereby represents, warrants and covenants to the Trustee, for the benefit of the Trustee and the Certificateholders, and to the Master Servicer, that as of the Closing Date or as of such date specifically provided herein:

(i)     Each of this Agreement and the Mortgage Loan Purchase Agreement constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity);

(ii)     Immediately prior to the sale and assignment by the Depositor to the Trustee on behalf of the Trust of each Mortgage Loan, the Depositor had good and marketable title to each Mortgage Loan subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

58

(iii)    As of the Closing Date, the Depositor has transferred all of its right, title and interest in the Mortgage Loans to the Trustee on behalf of the Trust;

(iv)    The Depositor is solvent and will not be made insolvent by the transfer of the Mortgage Loans.  The Depositor has not transferred the Mortgage Loans to the Trustee with any intent to hinder, delay or defraud any of its creditors;

(v)    The Depositor has been duly incorporated and is validly existing as a corporation in good standing under the laws of Delaware, with full corporate power and authority to own its assets and conduct its business as presently being conducted;

(vi)    The Depositor is not in violation of its articles of incorporation or by-laws or in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, loan agreement, note, lease or other instrument to which the Depositor is a party or by which it or its properties may be bound, which default might result in any material adverse changes in the financial condition, earnings, affairs or business of the Depositor or which might materially and adversely affect the properties or assets, taken as a whole, of the Depositor;

(vii)    The execution, delivery and performance of this Agreement and the Mortgage Loan Purchase Agreement by the Depositor, and the consummation of the transactions contemplated hereby and thereby, do not and will not result in a material breach or violation of any of the terms or provisions of, or, to the knowledge of the Depositor, constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Depositor is a party or by which the Depositor is bound or to which any of the property or assets of the Depositor is subject, nor will such actions result in any violation of the provisions of the articles of incorporation or by-laws of the Depositor or, to the best of the Depositor's knowledge without independent investigation, any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Depositor or any of its properties or assets (except for such conflicts, breaches, violations and defaults as would not have a material adverse effect on the ability of the Depositor to perform its obligations under this Agreement or the Mortgage Loan Purchase Agreement);

(viii)    To the best of the Depositor's knowledge without any independent investigation, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body of the United States or any other jurisdiction is required for the issuance of the Certificates, or the consummation by the Depositor of the other transactions contemplated by this Agreement or the Mortgage Loan Purchase Agreement, except such consents, approvals, authorizations, registrations or qualifications as (a) may be required under State securities or blue sky laws, (b) have been previously obtained or (c) the failure of which to obtain would not have a material adverse effect on the

59

performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement or the Mortgage Loan Purchase Agreement;

(ix)    There are no actions, proceedings or investigations pending before or, to the Depositor's knowledge, threatened by any court, administrative agency or other tribunal to which the Depositor is a party or of which any of its properties is the subject:  (a) which if determined adversely to the Depositor would have a material adverse effect on the business, results of operations or financial condition of the Depositor; (b) asserting the invalidity of this Agreement, the Mortgage Loan Purchase Agreement or the Certificates; (c) seeking to prevent the issuance of the Certificates or the consummation by the Depositor of any of the transactions contemplated by this Agreement or the Mortgage Loan Purchase Agreement, as the case may be; or (d) which might materially and adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of, this Agreement or the Mortgage Loan Purchase Agreement; and

(x)    The Depositor has the full power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary action on the part of the Depositor the execution, delivery and performance of this Agreement and this Agreement, assuming the due authorization, execution and delivery thereof by the parties thereto other than the Depositor, constitutes a legal, valid and binding obligation of the Depositor, enforceable against the Depositor in accordance with its terms, except to the extent that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to the equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 2.06    Issuance of Certificates.

The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery to it or a Custodian of the Mortgage Files, subject to the provisions of Sections 2.01 and 2.02, together with the assignment to it of all other assets included in the Trust Fund, receipt of which is hereby acknowledged.  Concurrently with such assignment and delivery and in exchange therefor, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed, authenticated and delivered to or upon the written order of the Depositor, the Certificates in authorized denominations.  The interests evidenced by the Certificates constitute the entire beneficial ownership interest in the Trust Fund.

Section 2.07    Reserved.

Section 2.08    Conveyance of REMIC Regular Interests and Acceptance of REMICs by the Trustee; Issuance of Certificates.

(a)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all

60

the right, title and interest of the Depositor in and to the REMIC 1 Regular Interests for the benefit of the holders of the Certificates, and the holder of the Class R-2 Interest. The Trustee acknowledges receipt of the REMIC 1 Regular Interests (which are uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Certificates, and the holder of the Class R-2 Interest. The interests evidenced by the Class R-2 Interest and the Regular Certificates constitute the entire beneficial ownership interest in REMIC 2.

(b)    Concurrently with the assignment and delivery to the Trustee and the acceptance by the Trustee, pursuant to Section 2.01, Section 2.02 and this Section 2.08, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed, authenticated and delivered to or upon the order of the Depositor the Class R Certificates in authorized denominations evidencing the Class R-1 Interest and the Class R-2 Interest.

## ARTICLE III

## ADMINISTRATION AND SERVICING
## OF THE MORTGAGE LOANS

Section 3.01    <u>Master Servicer to Act as Master Servicer</u>.

The Master Servicer shall service and administer the Mortgage Loans on behalf of the Trustee in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans in the local areas where the related Mortgaged Property is located and giving due consideration to the related First Mortgage Loan. Subject only to the above-described servicing standards and the terms of this Agreement and of the respective Mortgage Loans, the Master Servicer shall have full power and authority, acting alone or through Sub-Servicers as provided in Section 3.02, to do or cause to be done any and all things in connection with such servicing and administration in accordance with policies and procedures generally accepted in the mortgage banking industry. Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Sub-Servicer is hereby authorized and empowered by the Trustee when the Master Servicer believes it appropriate in its best judgment in accordance with the servicing standards set forth above, to execute and deliver, on behalf of the Certificateholders and the Trustee, and upon notice to the Trustee, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Mortgage Loans and the Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the Trustee and the Certificateholders. The Master Servicer shall service and administer the Mortgage Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby. The Master Servicer shall also comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any applicable standard hazard insurance policy. Subject to Section 3.17, the Trustee, shall execute, at the written direction of the Master Servicer, and furnish to the Master Servicer and

61

any Sub-Servicer such documents as are necessary or appropriate to enable the Master Servicer or any Sub-Servicer to carry out their servicing and administrative duties hereunder, and the Trustee hereby grants to the Master Servicer and each Sub-Servicer a power of attorney to carry out such duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trustee and the Certificateholders.  The Trustee, at the direction of the Master Servicer, shall execute a separate power of attorney in favor of (and furnish such power of attorney to) the Master Servicer and/or each Sub-Servicer for the purposes described herein to the extent necessary or desirable to enable the Master Servicer to perform its duties hereunder.  The Trustee shall not be liable for the actions of the Master Servicer or any Sub-Servicers under such powers of attorney.

The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Sub-Servicer, when the Master Servicer or the Sub-Servicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any reasonable expenses incurred in connection with the actions described in the preceding sentence or as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, shall be reimbursable to the Master Servicer by withdrawal from the Collection Account pursuant to Section 3.11.

Subject to Section 3.09 hereof, in accordance with the standards of the preceding paragraph, the Master Servicer on escrowed accounts, if any, shall advance or cause to be advanced funds as necessary for the purpose of effecting the timely payment of taxes and assessments on the Mortgaged Properties, which advances shall be Servicing Advances reimbursable in the first instance from collections on the related Mortgage Loans from the Mortgagors pursuant to Section 3.09, and further as provided in Section 3.11.  Any cost incurred by the Master Servicer or by Sub-Servicers in effecting the timely payment of taxes and assessments on a Mortgaged Property shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.

Notwithstanding anything in this Agreement to the contrary, the Master Servicer may not make any future advances with respect to a Mortgage Loan (except as provided in Section 4.04) and the Master Servicer shall not (i) permit any modification with respect to any Mortgage Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such Mortgage Loan (unless, as provided in Section 3.07, the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Master Servicer, reasonably foreseeable) or (ii) permit any modification, waiver or amendment of any term of any Mortgage Loan that would both (A) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any Trust REMIC to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or contributions after the startup day under the REMIC Provisions.

The Master Servicer may delegate its responsibilities under this Agreement; provided, however, that no such delegation shall release the Master Servicer from the responsibilities or liabilities arising under this Agreement.

If the Mortgage relating to a Mortgage Loan had a First Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may consent to the refinancing of the First Mortgage Loan, provided, that such refinancing conforms to the Master Servicer's standard subordination underwriting guidelines which shall at all times conform with the servicing standard set forth in this Section 3.01 of this Agreement.

With respect to each Mortgage Loan, the Master Servicer will furnish, or cause to be furnished, information regarding the borrower credit file related to such Mortgage Loan to credit reporting agencies in compliance with the provisions of the Fair Credit Reporting Act and the applicable implementing regulations.

Section 3.02    <u>Sub-Servicing Agreements Between the Master Servicer and Sub-Servicers</u>.

(a)    The Master Servicer may enter into Sub-Servicing Agreements provided (i) that such agreements would not result in a withdrawal or a downgrading by any Rating Agency of the ratings on any Class of Certificates as evidenced by a letter to that effect delivered by each Rating Agency to the Depositor and (ii) that, except in the case of any Sub-Servicing Agreements the Master Servicer may enter into with Washington Mutual, Inc. or any Affiliate thereof for the servicing and administration of the Mortgage Loans. That certain Subservicing Agreement by and between the Master Servicer and Washington Mutual Bank dated April 9, 2001 is hereby acknowledged as being permitted under this Agreement and meeting the requirements applicable to Sub-Servicing Agreements set forth in this Agreement. The Trustee is hereby authorized to acknowledge, at the request of the Master Servicer, any Sub-Servicing Agreement that meets the requirements applicable to Sub-Servicing Agreements set forth in this Agreement and that is otherwise permitted under this Agreement.

Each Sub-Servicer shall be (i) authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Sub-Servicer to perform its obligations hereunder and under the Sub-Servicing Agreement, (ii) an institution approved as a mortgagee by the Department of Housing and Urban Development pursuant to Section 203 of the National Housing Act of 1934, as amended, or an institution the deposit accounts in which are insured by the FDIC and (iii) a Fannie Mae approved mortgage servicer. Each Sub-Servicing Agreement must impose on the Sub-Servicer requirements conforming to the provisions set forth in Section 3.08. The Master Servicer will examine each Sub-Servicing Agreement and will be familiar with the terms thereof. The terms of any Sub-Servicing Agreement will not be inconsistent with any of the provisions of this Agreement. The Master Servicer and the Sub-Servicers may enter into and make amendments to the Sub-Servicing Agreements or enter into different forms of Sub-Servicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of this Agreement, and that no such amendment or different form shall be made or entered into which could be reasonably expected to be materially adverse to the interests of the Certificateholders, without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any variation without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights from the provisions set forth in

63

Section 3.08 relating to credits and charges to the Sub-Servicing Accounts or the timing and amount of remittances by the Sub-Servicers to the Master Servicer are conclusively deemed to be inconsistent with this Agreement and therefore prohibited.  The Master Servicer shall deliver to the Trustee copies of all Sub-Servicing Agreements, and any amendments or modifications thereof, promptly upon the Master Servicer's execution and delivery of such instruments.

(b)    As part of its servicing activities hereunder, the Master Servicer (except as otherwise provided in the last sentence of this paragraph), for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of each Sub-Servicer under the related Sub-Servicing Agreement and, subject to the last sentence of this paragraph, of the Seller under the Mortgage Loan Purchase Agreement including, without limitation, any obligation to make advances in respect of delinquent payments as required by a Sub-Servicing Agreement, or to purchase or otherwise remedy as contemplated herein a Mortgage Loan on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant, as described in Section 2.03(a).    Such enforcement, including, without limitation, the legal prosecution of claims, termination of Sub-Servicing Agreements, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans.  The Master Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement, to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loans or (ii) from a specific recovery of costs, expenses or attorneys' fees against the party against whom such enforcement is directed.  Enforcement of the Mortgage Loan Purchase Agreement against the Seller shall be effected by the Master Servicer to the extent it is not the Seller, and otherwise by the Trustee, in accordance with the foregoing provisions of this paragraph.

Section 3.03    Successor Sub-Servicers.

The Master Servicer shall be entitled to terminate any Sub-Servicing Agreement and the rights and obligations of any Sub-Servicer pursuant to any Sub-Servicing Agreement in accordance with the terms and conditions of such Sub-Servicing Agreement.  In the event of termination of any Sub-Servicer, all servicing obligations of such Sub-Servicer shall be assumed simultaneously by the Master Servicer without any act or deed on the part of such Sub-Servicer or the Master Servicer, and the Master Servicer either shall service directly the related Mortgage Loans or shall enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Section 3.02.

Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated by the Trustee without fee, in accordance with the terms of this Agreement, and the Trustee shall so terminate such Sub-Servicing Agreement in the event that the Master Servicer (or the Trustee, if then acting as Master Servicer) shall, for any reason, no longer be the Master Servicer (including termination due to a Master Servicer Event of Default).

Section 3.04    Liability of the Master Servicer.

Notwithstanding any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer and a Sub-Servicer or

reference to actions taken through a Sub-Servicer or otherwise, the Master Servicer shall remain obligated and primarily liable to the Trustee and the Certificateholders for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from the Sub-Servicer and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Mortgage Loans. The Master Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Master Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification and no such indemnification shall be an expense of the Trust.

Section 3.05   <u>No Contractual Relationship Between Sub-Servicers and the Trustee or Certificateholders</u>.

Any Sub-Servicing Agreement that may be entered into and any transactions or services relating to the Mortgage Loans involving a Sub-Servicer in its capacity as such shall be deemed to be between the Sub-Servicer and the Master Servicer alone, and the Trustee and the Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Sub-Servicer except as set forth in Section 3.06. The Master Servicer shall be solely liable for all fees owed by it to any Sub-Servicer, irrespective of whether the Master Servicer's compensation pursuant to this Agreement is sufficient to pay such fees and such fees shall not be an expense of the Trust.

Section 3.06   <u>Assumption or Termination of Sub-Servicing Agreements by Trustee</u>.

In the event the Master Servicer shall for any reason no longer be the master servicer (including by reason of the occurrence of a Master Servicer Event of Default), the Trustee or its designee shall thereupon assume all of the rights and obligations of the Master Servicer under each Sub-Servicing Agreement that the Master Servicer may have entered into, unless the Trustee elects to terminate any Sub-Servicing Agreement in accordance with its terms as provided in Section 3.03. Upon such assumption, the Trustee, its designee or the successor servicer for the Trustee appointed pursuant to Section 7.02 shall be deemed, subject to Section 3.03, to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to each Sub-Servicing Agreement to the same extent as if each Sub-Servicing Agreement had been assigned to the assuming party, except that (i) the Master Servicer shall not thereby be relieved of any liability or obligations under any Sub-Servicing Agreement that arose before it ceased to be the Master Servicer and (ii) none of the Trustee, its designee or any successor Master Servicer shall be deemed to have assumed any liability or obligation of the Master Servicer that arose before it ceased to be the Master Servicer.

The Master Servicer at its own expense and without reimbursement shall, upon request of the Trustee, deliver to the assuming party all documents and records relating to each Sub-Servicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by or on behalf of it, and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

65

Section 3.07     Collection of Certain Mortgage Loan Payments.

The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any applicable insurance policies, follow such collection procedures as it would follow with respect to mortgage loans comparable to the Mortgage Loans and held for its own account giving due consideration to the related First Mortgage Loan.   Consistent with the foregoing, the Master Servicer may in its discretion (i) waive any late payment charge or, if applicable, any penalty interest, or (ii) extend the due dates for the Monthly Payments due on a Mortgage Note for a period of not greater than 180 days; provided that any extension pursuant to this clause (ii) shall not affect the amortization schedule of any Mortgage Loan for purposes of any computation hereunder, except as provided below.   In the event of any such arrangement pursuant to clause (ii) above, the Master Servicer shall make timely advances on such Mortgage Loan during such extension pursuant to Section 4.04 and in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements, subject to Section 4.04(d) pursuant to which the Master Servicer shall not be required to make any such advances that are Nonrecoverable Advances.   Notwithstanding the foregoing, in the event that any Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable, the Master Servicer, consistent with the standards set forth in Section 3.01, may also waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan, accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan (such payment, a "Short Pay-off") or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor; provided, that in the judgment of the Master Servicer, any such modification, waiver or amendment could reasonably be expected to result in collections and other recoveries in respect of such Mortgage Loans in excess of Net Liquidation Proceeds that would be recovered upon the foreclosure of, or other realization upon, such Mortgage Loan.

Section 3.08     Sub-Servicing Accounts.

In those cases where a Sub-Servicer is servicing a Mortgage Loan pursuant to a Sub-Servicing Agreement, the Sub-Servicer shall be required to establish and maintain one or more segregated accounts (collectively, the "Sub-Servicing Account").   The Sub-Servicing Account shall be an Eligible Account and shall be entitled "Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of Long Beach Mortgage Loan Trust 2006-A, Asset-Backed Certificates, Series 2006-A.   The Sub-Servicer shall be required to deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Sub-Servicer's receipt thereof, all proceeds of Mortgage Loans received by the Sub-Servicer less its servicing compensation to the extent permitted by the Sub-Servicing Agreement, and shall thereafter deposit such amounts in the Sub-Servicing Account, in no event more than two Business Days after the deposit of such funds into the clearing account.   The Sub-Servicer shall thereafter be required to deposit all such proceeds in the Collection Account or remit such proceeds to the Master Servicer for deposit in the Collection Account not later than the Determination Date following the deposit of such amounts in the Sub-Servicing Account.

66

For purposes of this Agreement, the Master Servicer shall be deemed to have received payments on the Mortgage Loans when the Sub-Servicer receives such payments.

Section 3.09    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

If required by the related Mortgage Loan, the Master Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated accounts (the "Servicing Accounts"). Servicing Accounts shall be Eligible Accounts. The Master Servicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, all collections from the Mortgagors (or related advances from Sub-Servicers) for the payment of taxes, assessments, hazard insurance premiums and comparable items for the account of the Mortgagors ("Escrow Payments") collected on account of the Mortgage Loans and shall thereafter deposit such Escrow Payments in the Servicing Accounts, in no event more than two Business Days after the deposit of such funds in the clearing account, for the purpose of effecting the payment of any such items as required under the terms of this Agreement. Withdrawals of amounts from a Servicing Account may be made only to (i) effect payment of taxes, assessments, hazard insurance premiums, and comparable items; (ii) reimburse the Master Servicer (or a Sub-Servicer to the extent provided in the related Sub-Servicing Agreement) out of related collections for any advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.14 (with respect to hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) pay interest, if required and as described below, to Mortgagors on balances in the Servicing Account; (v) clear and terminate the Servicing Account upon the termination of the Master Servicer's obligations and responsibilities in respect of the Mortgage Loans under this Agreement in accordance with Article IX or (vi) recover amounts deposited in error. As part of its servicing duties, the Master Servicer or Sub-Servicers shall pay to the Mortgagors interest on funds in Servicing Accounts, to the extent required by law and, to the extent that interest earned on funds in the Servicing Accounts is insufficient, to pay such interest from its or their own funds, without any reimbursement therefor.

Section 3.10    Collection Account and Distribution Account.

(a)    On behalf of the Trust Fund, the Master Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trustee and the Certificateholders. On behalf of the Trust Fund, the Master Servicer shall deposit or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, and shall thereafter deposit in the Collection Account, in no event more than two Business Days after the deposit of such funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it subsequent to the Cut-off Date (other than in respect of principal or interest on the related Mortgage Loans due on or before the Cut-off Date or payments (other than Principal Prepayments) received by it on or prior to the Cut-off Date but allocable to a Due Period subsequent thereto):

67

(i)      all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(ii)     all payments on account of interest (net of the related Servicing Fee and the related Prepayment Interest Excess) on each Mortgage Loan;

(iii)    all Insurance Proceeds and Liquidation Proceeds (other than proceeds collected in respect of any particular REO Property and amounts paid by the Master Servicer in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 9.01) and all Gross Subsequent Recoveries;

(iv)     any amounts required to be deposited pursuant to Section 3.12 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;

(v)      any amounts required to be deposited by the Master Servicer pursuant to the second paragraph of Section 3.14(b) in respect of any blanket policy deductibles;

(vi)     all proceeds of any Mortgage Loan repurchased or purchased in accordance with Section 2.03, Section 3.16(c) or Section 9.01 and all Master Servicer Prepayment Charge Payment Amounts required to be deposited in the Collection Account pursuant to Section 2.03;

(vii)    all Substitution Adjustments;

(viii)   all Prepayment Charges collected by the Master Servicer; and

(ix)     without duplication, all payments of claims received by the Master Servicer under the PMI Policy, if any.

For purposes of the immediately preceding sentence, the Cut-off Date with respect to any Qualified Substitute Mortgage Loan shall be deemed to be the date of substitution.

The foregoing requirements for deposit in the Collection Accounts shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, any Prepayment Interest Excess and payments in the nature of late payment charges, NSF fees, reconveyance fees, assumption fees and other similar fees and charges (other than Prepayment Charges) need not be deposited by the Master Servicer in the Collection Account and shall, upon collection, belong to the Master Servicer as additional compensation for its servicing activities. In the event the Master Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account, any provision herein to the contrary notwithstanding.

(b)      On behalf of the Trust Fund, the Trustee shall establish and maintain one or more segregated accounts (such account or accounts, the "Distribution Account"), held in trust for the benefit of the Trustee and the Certificateholders. On behalf of the Trust Fund, the Master Servicer shall deliver to the Trustee in immediately available funds for deposit on the same day

SE 2154917 v8
(26425.0085)

in the Distribution Account on or before 3:00 p.m. New York time (i) on the Master Servicer Remittance Date, that portion of the Available Funds (calculated without regard to the references in the definition thereof to amounts that may be withdrawn from the Distribution Account) for the related Distribution Date then on deposit in the Collection Account, the amount of all Prepayment Charges on the Prepayment Charge Schedule collected by the Master Servicer in connection with any of the Mortgage Loans and any Master Servicer Prepayment Charge Payment Amounts then on deposit in the Collection Account and the amount of any funds reimbursable to an Advancing Person pursuant to Section 3.27 and (ii) on each Business Day as of the commencement of which the balance on deposit in the Collection Account exceeds $75,000 following any withdrawals pursuant to the next succeeding sentence, the amount of such excess, but only if the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account."  If the balance on deposit in the Collection Account exceeds $75,000 as of the commencement of business on any Business Day and the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account," the Master Servicer shall, on or before 3:00 p.m. New York time on such Business Day, withdraw from the Collection Account any and all amounts payable or reimbursable to the Depositor, the Master Servicer, the Trustee, the Seller or any Sub-Servicer pursuant to Section 3.11 and shall pay such amounts to the Persons entitled thereto.  In order to comply with its duties under the U.S.A. Patriot Act, the Trustee shall obtain and verify certain information and documentation from the parties hereto, including, but not limited to, each party's name, address, and other identifying information.

(c)     Funds in the Collection Account and the Distribution Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.12. The Master Servicer shall give notice to the Trustee, the Depositor and the Rating Agencies of the location of the Collection Account maintained by it when established and prior to any change thereof.  The Trustee shall give notice to the Master Servicer, the Depositor and the Rating Agencies of the location of the Distribution Account when established and prior to any change thereof.

(d)     Funds held in the Collection Account at any time may be delivered by the Master Servicer to the Trustee for deposit in an account (which may be the Distribution Account and must satisfy the standards for the Distribution Account as set forth in the definition thereof) and for all purposes of this Agreement shall be deemed to be a part of the Collection Account; provided, however, that the Trustee shall have the sole authority to withdraw any funds held pursuant to this subsection (d).  In the event the Master Servicer shall deliver to the Trustee for deposit in the Distribution Account any amount not required to be deposited therein, it may at any time request that the Trustee withdraw, and the Trustee shall withdraw, such amount from the Distribution Account and remit to the Master Servicer any such amount, any provision herein to the contrary notwithstanding.  In addition, the Master Servicer shall deliver to the Trustee from time to time for deposit, and the Trustee shall so deposit, in the Distribution Account:

(i)     any Advances, as required pursuant to Section 4.04, unless delivered directly to the Trustee by an Advancing Person;

(ii)    any amounts required to be deposited pursuant to Section 3.23(d) or (f) in connection with any REO Property;

69

(iii)     any amounts to be paid by the Master Servicer in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 9.01;

(iv)     any amounts required to be deposited pursuant to Section 3.24 in connection with any Prepayment Interest Shortfalls; and

(v)     any Stayed Funds, as soon as permitted by the federal bankruptcy court having jurisdiction in such matters.

(e)     Promptly upon receipt of any Stayed Funds, whether from the Master Servicer, a trustee in bankruptcy, federal bankruptcy court or other source, the Trustee shall deposit such funds in the Distribution Account, subject to withdrawal thereof pursuant to Section 7.02(b) or as otherwise permitted hereunder.

Section 3.11    <u>Withdrawals from the Collection Account and Distribution Account</u>.

(a)     The Master Servicer shall, from time to time, make withdrawals from the Collection Account, for any of the following purposes or as described in Section 4.04, without priority:

(i)     to remit to the Trustee for deposit in the Distribution Account the amounts required to be so remitted pursuant to Section 3.10(b) or permitted to be so remitted pursuant to the first sentence of Section 3.10(d);

(ii)     subject to Section 3.16(d), to reimburse the Master Servicer for Advances, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Monthly Payments on the related Mortgage Loans in accordance with the provisions of Section 4.04;

(iii)     subject to Section 3.16(d), to pay the Master Servicer or any Sub-Servicer (a) any unpaid Servicing Fees or (b) any unreimbursed Servicing Advances with respect to each Mortgage Loan, but only to the extent of any Late Collections, Liquidation Proceeds, Insurance Proceeds, Gross Subsequent Recoveries or other amounts as may be collected by the Master Servicer from a Mortgagor, or otherwise received with respect to such Mortgage Loan;

(iv)     to pay to the Master Servicer as servicing compensation (in addition to the Servicing Fee) on the Master Servicer Remittance Date any interest or investment income earned on funds deposited in the Collection Account;

(v)     to pay to the Master Servicer or the Seller, as the case may be, with respect to each Mortgage Loan that has previously been purchased or replaced pursuant to Section 2.03 or Section 3.16(c) all amounts received thereon subsequent to the date of purchase or substitution, as the case may be;

70

(vi)    to reimburse the Master Servicer for any Advance or Servicing Advance previously made which the Master Servicer has determined to be a Nonrecoverable Advance in accordance with the provisions of Section 4.04;

(vii)    to reimburse the Master Servicer or the Depositor for expenses incurred by or reimbursable to the Master Servicer or the Depositor, as the case may be, pursuant to Section 6.03;

(viii)    to reimburse the Master Servicer or the Trustee, as the case may be, for enforcement expenses reasonably incurred in respect of the breach or defect giving rise to the purchase obligation under Section 2.03 of this Agreement that were included in the Purchase Price of the Mortgage Loan, including any expenses arising out of the enforcement of the purchase obligation;

(ix)    to pay, or to reimburse the Master Servicer for advances in respect of, expenses incurred in connection with any Mortgage Loan pursuant to Section 3.16(b);

(x)    to pay, or to reimburse the Master Servicer for costs and expenses incurred with respect to any Mortgage Loan or REO Property after it has been charged off as contemplated in Section 3.16(a)(ii), but only to the extent of Gross Subsequent Recoveries received with respect to such Mortgage Loan or REO Property; and

(xi)    to clear and terminate the Collection Account pursuant to Section 9.01.

The Master Servicer shall keep and maintain separate accounting, on an individual Mortgage Loan basis, for the purpose of justifying any withdrawal from the Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (ii), (iii), (v), (vi), (viii) and (ix) above. The Master Servicer shall provide written notification to the Trustee, on or prior to the next succeeding Master Servicer Remittance Date, upon making any withdrawals from the Collection Account pursuant to subclause (vii) above.

(b)    The Trustee shall, from time to time, make withdrawals from the Distribution Account, for any of the following purposes, without priority:

(i)    to make distributions to Certificateholders and for deposit into the Reserve Fund in accordance with Section 4.01;

(ii)    to pay to itself amounts to which it is entitled pursuant to Section 8.05 or to pay any other Extraordinary Trust Fund Expenses;

(iii)    to pay to itself any interest income earned on funds deposited in the Distribution Account pursuant to Section 3.12(c);

        (iv)     to reimburse itself pursuant to Section 7.02 or pursuant to Section 7.01 to the extent such amounts in Section 7.01 were not reimbursed by the Master Servicer;

        (v)     to pay any amounts in respect of taxes pursuant to Section 10.01(g);

        (vi)     to remit to the Master Servicer any amount deposited in the Distribution Account by the Master Servicer but not required to be deposited therein in accordance with Section 3.10(d);

        (vii)     to pay to an Advancing Person reimbursements for Advances and/or Servicing Advances pursuant to Section 3.27;

        (viii)     to clear and terminate the Distribution Account pursuant to Section 9.01;

        (ix)     to pay the PMI Insurer the PMI Insurer Fee based on information received from the Master Servicer; and

        (x)     to pay itself the Trustee Fees.

Section 3.12   <u>Investment of Funds in the Interest Coverage Account, the Collection Account and the Distribution Account</u>.

        (a)     The Master Servicer may direct any depository institution maintaining the Collection Account and any REO Account (for purposes of this Section 3.12, an "Investment Account"), and the Trustee, in its individual capacity, may direct any depository institution maintaining the Distribution Account (for purposes of this Section 3.12, the Distribution Account is also an "Investment Account"), to invest the funds in such Investment Account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Trustee is the obligor thereon and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Trustee is the obligor thereon.  All such Permitted Investments shall be held to maturity, unless payable on demand.  Any investment of funds in an Investment Account shall be made in the name of the Trustee (in its capacity as such), or in the name of a nominee of the Trustee.  The Trustee shall be entitled to sole possession (except with respect to investment direction of funds held in the Collection Account and any REO Account and any income and gain realized thereon) over each such investment, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Trustee or its agent, together with any document of transfer necessary to transfer title to such investment to the Trustee or its nominee.  In the event amounts on deposit in an Investment Account are at any time invested in a Permitted Investment payable on demand, the Trustee shall:

        (x)     consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may

SE 2154917 v8
(26425.0085)

otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)    demand payment of all amounts due thereunder promptly upon actual notice by a Responsible Officer of the Trustee that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)    All income and gain realized from the investment of funds deposited in the Collection Account and any REO Account held by or on behalf of the Master Servicer shall be for the benefit of the Master Servicer and shall be subject to its withdrawal in accordance with Section 3.11 or Section 3.23, as applicable. The Master Servicer shall deposit in the Collection Account or any REO Account, as applicable, from its own funds, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(c)    All income and gain realized from the investment of funds deposited in the Distribution Account held by or on behalf of the Trustee shall be for the benefit of the Trustee and shall be subject to its withdrawal at any time. The Trustee shall deposit in the Distribution Account, from its own funds, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(d)    Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may, and subject to Section 8.01 and Section 8.02(a)(v), upon the request of the Holders of Certificates representing more than 50% of the Voting Rights allocated to any Class of Certificates shall, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

Section 3.13    Reserved.

Section 3.14    Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage.

(a)    With respect to each Mortgage Loan, the Master Servicer shall maintain accurate records reflecting the fire and casualty insurance coverage maintained by the related Mortgagors with respect to the Mortgaged Properties in accordance with its normal servicing practices. The Master Servicer shall, if it has received notice of a default or deficiency in respect of the payment of any ground rents, taxes, assessments, water rates or casualty insurance premiums or other charges that are or may become a lien upon the related Mortgaged Property, notify the related Mortgagor and the holder of the related First Mortgage Loan.

(b)    To the extent permitted under the related Mortgage Loan, and to the extent the Master Servicer receives notice that a fire insurance policy has been cancelled, the Master Servicer shall, to the extent consistent with its normal servicing practices, cause to be maintained

73

for each Mortgage Loan fire insurance on the related Mortgaged Property in an amount which is at least equal to the least of (i) the then current principal balance of such Mortgage Loan, (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis and (iii) the maximum insurable value of the improvements which are a part of such Mortgaged Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy.  The Master Servicer shall also cause to be maintained fire insurance with extended coverage on each REO Property in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Mortgage Loan at the time it became an REO Property, plus accrued interest at the Mortgage Rate and related Servicing Advances.  The Master Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.  Any amounts to be collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage, amounts to be released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the related Mortgage and Mortgage Note and amounts required to be paid to the holder of the related First Mortgage Loan) shall be deposited in the Collection Account, subject to withdrawal pursuant to Section 3.11, if received in respect of a Mortgage Loan, or in the REO Account, subject to withdrawal pursuant to Section 3.23, if received in respect of an REO Property.  Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.  It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.  If the Mortgaged Property or REO Property is at the time of origination of the related Mortgage Loan in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards and flood insurance has been made available, the Master Servicer will cause to be maintained, to the extent required by the related Mortgage Loan, a flood insurance policy in respect thereof.  Such flood insurance shall be in an amount equal to the least of (i) the unpaid principal balance of the related Mortgage Loan, (ii) the full insurable value of the related Mortgaged Property and (iii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Master Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of A:X or better in Best's Key Rating Guide (or such other rating that is comparable to such rating) insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section 3.14, it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with the first two sentences of this Section 3.14, and there shall have been one or more losses which would have been covered by such policy, deposit to the Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause.  In connection with its activities as administrator and servicer of the Mortgage

Loans, the Master Servicer agrees to prepare and present, on behalf of itself, the Trustee and the Certificateholders, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(c)    The Master Servicer shall keep in force during the term of this Agreement a policy or policies of insurance covering errors and omissions for failure in the performance of the Master Servicer's obligations under this Agreement, which policy or policies shall be in such form and amount that would meet the requirements of Fannie Mae or Freddie Mac if it were the purchaser of the Mortgage Loans, unless the Master Servicer or any of its Affiliates has obtained a waiver of such Fannie Mae or Freddie Mac requirements from either Fannie Mae or Freddie Mac. The Master Servicer shall also maintain a fidelity bond in the form and amount that would meet the requirements of Fannie Mae or Freddie Mac, unless the Master Servicer or any of its Affiliates has obtained a waiver of such Fannie Mae or Freddie Mac requirements from either Fannie Mae or Freddie Mac. The Master Servicer shall provide the Trustee (upon reasonable request) with copies of any such insurance policies and fidelity bond. The Master Servicer shall be deemed to have complied with this provision if an Affiliate of the Master Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Master Servicer. Any such errors and omissions policy and fidelity bond shall by its terms not be cancelable without thirty days' prior written notice to the Trustee. The Master Servicer shall also cause each Sub-Servicer to maintain a comparable policy of insurance covering errors and omissions and a fidelity bond meeting such requirements.

Section 3.15    <u>Enforcement of Due-On-Sale Clauses; Assumption Agreements</u>.

The Master Servicer shall, to the extent it has knowledge of any conveyance or prospective conveyance of any Mortgaged Property by any Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however, that the Master Servicer shall not be required to take such action if in its sole business judgment the Master Servicer believes that the collections and other recoveries in respect of such Mortgage Loans could reasonably be expected to be maximized if the Mortgage Loan were not accelerated, and the Master Servicer shall not exercise any such rights if prohibited by law from doing so. If the Master Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, or if any of the other conditions set forth in the proviso to the preceding sentence apply, the Master Servicer will enter into an assumption and modification agreement from or with the person to whom such property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. The Master Servicer may also enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided that no such substitution shall be effective unless such person satisfies the underwriting criteria of the Master Servicer and has a credit risk rating at least equal to that of the original Mortgagor. In connection with any assumption, modification or substitution, the Master Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other mortgage loans owned

SE 2154917 v8
(26425.0085)

solely by it.  The Master Servicer shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable under the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy, or a new policy meeting the requirements of this Section is obtained.  Any fee collected by the Master Servicer in respect of any assumption, modification or substitution of liability agreement will be retained by the Master Servicer as additional servicing compensation. In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Monthly Payment) may be amended or modified, except as otherwise required pursuant to the terms thereof.  The Master Servicer shall notify the Trustee that any such substitution, modification or assumption agreement has been completed by forwarding to the Trustee the executed original of such substitution, modification or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Master Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or by the terms of the Mortgage Note or any assumption which the Master Servicer may be restricted by law from preventing, for any reason whatever.  For purposes of this Section 3.15, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

Section 3.16    <u>Realization Upon Defaulted Mortgage Loans</u>.

(a)    (i)    The Master Servicer shall use reasonable efforts consistent with the servicing standard set forth in Section 3.01, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07.  The Master Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that such costs and expenses will constitute and be recoverable as Servicing Advances by the Master Servicer as contemplated in Section 3.11 and Section 3.23.  The foregoing is subject to the provision that, in any case in which Mortgaged Property shall have suffered damage from an Uninsured Cause, the Master Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its sole and absolute discretion that such restoration will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself for such expenses.

(ii)    No later than the day on which a Mortgage Loan becomes 180 days Delinquent, the Master Servicer shall determine whether a significant net recovery is possible through foreclosure proceedings or other liquidation of the related Mortgaged Property.  If the Master Servicer determines that no such recovery is possible, it shall charge off such Mortgage Loan no later than the date it becomes 180 days Delinquent, and it may charge off such Mortgage Loan prior to that date.  Once a Mortgage Loan has been charged off, the Master Servicer shall discontinue making Advances, the Master Servicer shall not be entitled to

76

any additional Servicing Fee for such Mortgage Loan, and the Mortgage Loan shall be treated as a Liquidated Mortgage Loan giving rise to a Realized Loss.

(iii)    Once a Mortgage Loan is charged off pursuant to Section 3.16(a)(ii), the Master Servicer shall not be obligated to service such Mortgage Loan. The Master Servicer may cease any collection efforts with respect to such Mortgage Loan, and statements of account may no longer be sent to such Mortgagor. The Master Servicer shall write off each charged off Mortgage Loan as bad debt.

(b)    Notwithstanding the foregoing provisions of this Section 3.16 or any other provision of this Agreement, with respect to any Mortgage Loan as to which the Master Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property, the Master Servicer shall not, on behalf of the Trustee, either (i) obtain title to such Mortgaged Property as a result of or in lieu of foreclosure or otherwise or (ii) otherwise acquire possession of, or take any other action with respect to, such Mortgaged Property, if, as a result of any such action, the Trustee, the Trust Fund or the Certificateholders would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the Master Servicer has also previously determined, based on its reasonable judgment and a report prepared by an Independent Person who regularly conducts environmental audits using customary industry standards, that:

(1)    such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Trust Fund to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

(2)    there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are present for which such action could be required, that it would be in the best economic interest of the Trust Fund to take such actions with respect to the affected Mortgaged Property.

The cost of the environmental audit report contemplated by this Section 3.16 shall be advanced by the Master Servicer, subject to the Master Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans. It is understood by the parties hereto that any such advance will constitute a Servicing Advance.

If the Master Servicer determines, as described above, that it is in the best economic interest of the Trust Fund to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect

77

to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes or petroleum-based materials affecting any such Mortgaged Property, then the Master Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund.  The cost of any such compliance, containment, cleanup or remediation shall be advanced by the Master Servicer, subject to the Master Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.  It is understood by the parties hereto that any such advance will constitute a Servicing Advance.

(c)     The Holder of the Class C Certificates (except if such Holder is the Seller or any of its Affiliates) may at its option purchase from REMIC 1 any Mortgage Loan or related REO Property that is 90 days or more delinquent or that has been otherwise in default for 90 days or more, which such Holder determines in good faith will otherwise become subject to foreclosure proceedings (evidence of such determination to be delivered in writing to the Trustee prior to purchase), at a price equal to the Purchase Price; provided, however, that the Holder of the Class C Certificates shall purchase any such Mortgage Loans or related REO Properties on the basis of delinquency or default, purchasing first the Mortgage Loans or related REO Properties that became delinquent or otherwise in default on an earlier date.  For the avoidance of doubt, the Holder of the Class C Certificates in exercising its right to purchase Mortgage Loans pursuant to this Section 3.16(c) shall not be subject to any requirement of this Article III (other than the requirements of this Section 3.16(c)).  The Purchase Price for any Mortgage Loan or related REO Property purchased hereunder shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall release or cause to be released to the Holder of the Class C Certificates the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Holder of the Class C Certificates shall furnish and as shall be necessary to vest in the Holder of the Class C Certificates title to any Mortgage Loan or related REO Property released pursuant hereto.

(d)     Proceeds received (other than any Prepayment Charges received) in connection with any Final Recovery Determination, as well as any recovery resulting from a partial collection of Insurance Proceeds, Liquidation Proceeds or Gross Subsequent Recoveries, in respect of any Mortgage Loan, will be applied in the following order of priority:  _first_, to reimburse the Master Servicer or any Sub-Servicer for (A) any related unreimbursed Servicing Advances and Advances, pursuant to Section 3.11(a)(ii) or (a)(iii); and (B) any related costs and expenses incurred with respect to a charged off Mortgage Loan pursuant to Section 3.11(a)(x) from Gross Subsequent Recoveries;  _second_, to accrued and unpaid interest on the Mortgage Loan, to the date of the Final Recovery Determination, or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery Determination; and  _third_, as a recovery of principal of the Mortgage Loan.  If the amount of the recovery so allocated to interest is less than the full amount of accrued and unpaid interest due on such Mortgage Loan, the amount of such recovery will be allocated by the Master Servicer as follows:  _first_, to unpaid Servicing Fees; and  _second_, to the balance of the interest then due and owing.  The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Master Servicer or any Sub-Servicer pursuant to Section 3.11(a)(iii).

78

(e)    The Master Servicer may (but is not obligated to) enter into a special servicing agreement with an unaffiliated holder of a 100% Percentage Interest of the Class B Certificates, or if the Class B Certificates are no longer outstanding, the most junior Class of the Mezzanine Certificates, subject to each Rating Agency's acknowledgment that the ratings of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, in each case, in effect immediately prior to the entering into such agreement would not be qualified, downgraded or withdrawn and none of the Class A Certificates, the Mezzanine Certificates or the Class B Certificates would be placed on credit review status (except for possible upgrading) as a result of such agreement.    Any such agreement may contain provisions whereby such Holder may (i) instruct the Master Servicer to commence or delay foreclosure proceedings with respect to delinquent Mortgage Loans and will contain provisions for the deposit of cash with the Master Servicer by the Holder that would be available for distribution to Certificateholders if Liquidation Proceeds are less than they otherwise may have been had the Master Servicer acted in accordance with its normal procedures, (ii) purchase delinquent Mortgage Loans from the Trust Fund immediately prior to the commencement of foreclosure proceedings at a price equal to the Purchase Price, and/or (iii) assume all of the servicing rights and obligations with respect to delinquent Mortgage Loans so long as such Holder (A) meets the requirements for a Sub-Servicer set forth in Section 3.02(a), (B) will service such Mortgage Loans in accordance with this Agreement and (C) the Master Servicer has the right to transfer such servicing rights without the payment of any compensation to a subservicer.

Section 3.17    Trustee to Cooperate; Release of Mortgage Files.

(a)    Upon the payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full shall be escrowed in a manner customary for such purposes, the Master Servicer will promptly notify the Trustee and the applicable Custodian holding the related Mortgage File by a certification in the form of Exhibit E-2 (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.10 have been or will be so deposited) of a Servicing Representative and shall request delivery to it of the related Mortgage File.    Upon receipt of such certification and request, the Trustee or such Custodian, as applicable, shall promptly release the related Mortgage File to the Master Servicer and the Master Servicer is authorized to cause the removal from the registration on the MERS® System of any such Mortgage Loan, if applicable.    No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account or the Distribution Account.

(b)    From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan, including, for this purpose, collection under any insurance policy relating to the Mortgage Loans, the Trustee or the applicable Custodian shall, upon request of the Master Servicer and delivery to the Trustee or the applicable Custodian of a Request for Release in the form of Exhibit E-1, release the related Mortgage File to the Master Servicer, and the Trustee or the applicable Custodian, on behalf of the Trustee, shall, at the direction of the Master Servicer, execute such documents as shall be necessary to the prosecution of any such proceedings and the Master Servicer shall retain such Mortgage File in trust for the benefit of the Certificateholders. Such Request for Release shall obligate the Master Servicer to return each and every document previously requested from the Mortgage File to the Trustee or the applicable Custodian when the need therefor by the Master Servicer no longer exists, unless the Mortgage Loan has been

liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Collection Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered to the Trustee or the applicable Custodian a certificate of a Servicing Representative certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery.  Upon receipt of a certificate of a Servicing Representative stating that such Mortgage Loan was liquidated and that all amounts received or to be received in connection with such liquidation that are required to be deposited into the Collection Account have been so deposited, or that such Mortgage Loan has become an REO Property, a copy of the Request for Release shall be released by the Trustee or the applicable Custodian to the Master Servicer or its designee.

(c)    At the direction of the Master Servicer and upon written certification of a Servicing Representative, each of the Trustee or the applicable Custodian shall execute and deliver to the Master Servicer any court pleadings, requests for trustee's sale or other documents reasonably necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity, or shall execute and deliver to the Master Servicer a power of attorney sufficient to authorize the Master Servicer or the Sub-Servicer to execute such documents on its behalf, provided that each of the Trustee or the applicable Custodian shall be obligated to execute the documents identified above if necessary to enable the Master Servicer or the Sub-Servicer to perform their respective duties hereunder or under the Sub-Servicing Agreement.  Each such certification shall include a request that such pleadings or documents be executed by the Trustee or the applicable Custodian and a statement as to the reason such documents or pleadings are required.

(d)    If any Mortgage Loan is repurchased, substituted or purchased in accordance with Section 2.03, Section 3.16(c) or Section 9.01, the Trustee shall execute and deliver the Mortgage Loan Assignment Agreement in the form of Exhibit E-3 with respect to such Mortgage Loan, transferring such Mortgage Loan to the Person entitled thereto pursuant to such Section 2.03, Section 3.16(c) or Section 9.01, as applicable.

Section 3.18    Servicing Compensation.

As compensation for the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to the Servicing Fee with respect to each Mortgage Loan payable solely from payments of interest in respect of such Mortgage Loan, subject to Section 3.24.  In addition, the Master Servicer shall be entitled to recover unpaid Servicing Fees out of Late Collections, Insurance Proceeds, Liquidation Proceeds or Gross Subsequent Recoveries to the extent permitted by Section 3.11(a)(iii) and out of amounts derived from the operation and sale of an REO Property to the extent permitted by Section 3.23.  The Master Servicer shall also be entitled to recover from the related Gross Subsequent Recoveries to the extent permitted by Section 3.11(a)(x) costs and expenses incurred after a Mortgage Loan has been charged off.  The right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Master Servicer's responsibilities and obligations under this Agreement;

80

provided, however, that the Master Servicer may pay from the Servicing Fee any amounts due to a Sub-Servicer pursuant to a Sub-Servicing Agreement entered into under Section 3.02.

Additional servicing compensation in the form of Prepayment Interest Excess, assumption or modification fees, late payment charges, NSF fees, reconveyance fees and other similar fees and charges (other than Prepayment Charges) shall be retained by the Master Servicer only to the extent such fees or charges are received by the Master Servicer. The Master Servicer shall also be entitled pursuant to Section 3.11(a)(iv) to withdraw from the Collection Account, and pursuant to Section 3.23(b) to withdraw from any REO Account, as additional servicing compensation, interest or other income earned on deposits therein, subject to Section 3.12. The Master Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including premiums for the insurance required by Section 3.14, to the extent such premiums are not paid by the related Mortgagors or by a Sub-Servicer, it being understood however, that payment of such premiums by the Master Servicer shall constitute Servicing Advances and servicing compensation of each Sub-Servicer, and to the extent provided herein and in Section 8.05, the fees and expenses of the Trustee) and shall not be entitled to reimbursement therefor except as specifically provided herein.

Section 3.19    Reports to the Trustee; Collection Account Statements.

Not later than fifteen days after each Distribution Date, the Master Servicer shall forward to the Trustee and the Depositor a statement prepared by the Master Servicer setting forth the status of the Collection Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the aggregate amount of deposits into and withdrawals from the Collection Account of each category of deposit specified in Section 3.10(a) and each category of withdrawal specified in Section 3.11. Such statement may be in the form of the then current Fannie Mae Monthly Accounting Report for its Guaranteed Mortgage Pass-Through Program with appropriate additions and changes, and shall also include information as to the aggregate of the outstanding principal balances of all of the Mortgage Loans as of the last day of the calendar month immediately preceding such Distribution Date. Copies of such statement shall be provided by the Trustee to any Certificateholder and to any Person identified to the Trustee as a prospective transferee of a Certificate, upon request at the expense of the requesting party, provided such statement is delivered by the Master Servicer to the Trustee.

Section 3.20    Annual Statement as to Compliance.

The Master Servicer shall deliver to the Trustee, the Depositor and each Rating Agency, not later than March 15 of each calendar year beginning in the year following the year of execution of this Agreement through and including the calendar year in which a Form 15 Suspension Notice is filed with respect to the Trust Fund and April 30 of each calendar year thereafter, an Officers' Certificate (an "Annual Statement of Compliance") stating that (i) a review of the activities of the Master Servicer during the preceding calendar year and of performance under this Agreement or other applicable servicing agreement, if any, has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on such review, the Master Servicer has fulfilled all of its obligations under this Agreement or other applicable servicing agreement, if any, in all material respects throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such

81

failure known to such officer and the nature and status thereof.  The Master Servicer shall deliver a similar Annual Statement of Compliance by the Sub-Servicer, and any other subservicer to which the Master Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans, to the Trustee and the Depositor as described above as and when required with respect to the Master Servicer.  Copies of any such statement shall be provided by the Trustee to any Certificateholder and to any Person identified to the Trustee as a prospective transferee of a Certificate, upon the request and at the expense of the requesting party, provided that such statement is delivered by the Master Servicer to the Trustee.

Section 3.21    <u>Assessments of Compliance and Attestation Reports.</u>

   (a) Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, the Master Servicer shall deliver to the Depositor on or before March 15 of each calendar year beginning in the year following the year of execution of this Agreement prior to and including the calendar year in which Form 15 Suspension Notice is filed with respect to the Trust Fund and April 30 of each calendar year thereafter, a report regarding the Master Servicer's assessment of compliance (an "Assessment of Compliance") with the servicing criteria during the preceding calendar year.  The Assessment of Compliance must be reasonably satisfactory to the Depositor, and as set forth in Regulation AB, the Assessment of Compliance must contain the following:

     (i) A statement by the Master Servicer of its responsibility for assessing compliance with the servicing criteria applicable to the Master Servicer;

     (ii) A statement by the Master Servicer that it used the servicing criteria applicable to it, including at the minimum those that are specified on Exhibit N hereto, and which will also be attached to the Assessment of Compliance, to assess compliance with the servicing criteria applicable to the Master Servicer;

     (iii) An assessment by the Master Servicer of the Master Servicer's compliance with the applicable servicing criteria for the period consisting of the preceding calendar year, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Master Servicer, that are backed by the same asset type as the Mortgage Loans;

     (iv) A statement that a registered public accounting firm has issued an attestation report on the Master Servicer's Assessment of Compliance for the period consisting of the preceding calendar year; and

     (v) A statement as to which of the Servicing Criteria, if any, are not applicable to the Master Servicer, which statement shall be based on the activities it performs with respect to asset-backed securities transactions taken as a whole involving the Master Servicer, that are backed by the same asset type as the Mortgage Loans.

   (b) On or before March 15 of each calendar year beginning in the year following the year of execution of this Agreement prior to and including the calendar year in which Form 15 Suspension Notice is filed with respect to the Trust Fund and April 30 of each

calendar year thereafter, the Master Servicer shall furnish to the Depositor a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the Master Servicer, as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

(c)    The Master Servicer shall cause the Sub-Servicer and any other subservicer to which the Master Servicer delegated any of its responsibilities with respect to the Mortgage Loans, and each subcontractor determined by the Master Servicer to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB to which the Master Servicer delegated any of its responsibilities with respect to the Mortgage Loans, to deliver to the Trustee and the Depositor an Assessment of Compliance and Attestation Report as and when provided above.

(d)    Such Assessment of Compliance, as to the Sub-Servicer and any other subservicer, shall at a minimum address each of the servicing criteria applicable to it, including at the minimum those that are specified on Exhibit N hereto which are indicated as applicable to any "primary servicer." Notwithstanding the foregoing, as to any subcontractor, an Assessment of Compliance is not required to be delivered unless it is required as part of a Form 10-K with respect to the Trust Fund.

(e)    The Trustee shall also provide to the Depositor an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the servicing criteria applicable to it, including at the minimum those that are specified on Exhibit N hereto which are indicated as applicable to the "trustee."

Section 3.22    Access to Certain Documentation.

The Master Servicer shall provide to the Office of Thrift Supervision, the FDIC and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificateholder access to the documentation regarding the Mortgage Loans serviced by the Master Servicer under this Agreement, as may be required by applicable laws and regulations. Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Master Servicer designated by it. In addition, access to the documentation regarding the Mortgage Loans serviced by the Master Servicer under this Agreement sufficient to permit the Certificateholder to comply with applicable regulations of the Office of Thrift Supervision, the FDIC or any other federal or state banking or insurance regulatory authority with respect to investment in the Certificates will be provided to any Certificateholder that is a savings and loan association, bank or insurance company, upon reasonable request during normal business hours at the offices of the Master Servicer designated by it at the expense of the Person requesting such access.

Section 3.23    Title, Management and Disposition of REO Property.

(a)    The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, in trust for the benefit of the Certificateholders. The Master Servicer, on behalf of REMIC 1 (and on behalf of the Trustee for the benefit of the Certificateholders), shall sell any REO Property as soon as practicable and, in any event, shall

83

either sell any REO Property before the close of the third taxable year after the year REMIC 1 acquires ownership of such REO Property for purposes of Section 860G(a)(8) of the Code or request from the Internal Revenue Service, no later than 60 days before the day on which the three-year grace period would otherwise expire, an extension of the three-year grace period, unless the Master Servicer shall have delivered to the Trustee and the Depositor an Opinion of Counsel, addressed to the Trustee and the Depositor, to the effect that the holding by REMIC 1 of such REO Property subsequent to three years after its acquisition will not result in the imposition on any Trust REMIC of taxes on "prohibited transactions" thereof, as defined in Section 860F of the Code, or cause any Trust REMIC to fail to qualify as a REMIC under Federal law at any time that any Certificates are outstanding.  If an extension of the three-year period is granted, the Master Servicer shall sell the related REO Property no later than 60 days prior to the expiration of such extension period.  The Master Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by any Trust REMIC of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC Provisions.

(b)    The Master Servicer shall segregate and hold all funds collected and received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall establish and maintain, or cause to be established and maintained, with respect to REO Properties an account held in trust for the Trustee for the benefit of the Certificateholders (the "REO Account"), which shall be an Eligible Account. The Master Servicer may allow the Collection Account to serve as the REO Account, subject to separate ledgers for each REO Property.  The Master Servicer may retain or withdraw any interest income paid on funds deposited in the REO Account.

(c)    The Master Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property as are consistent with the manner in which the Master Servicer manages and operates similar property owned by the Master Servicer or any of its Affiliates, all on such terms and for such period as the Master Servicer deems to be in the best interests of Certificateholders to the extent consistent with the interests of the holder of the related First Mortgage Loan.  In connection therewith, the Master Servicer shall deposit, or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof and shall thereafter deposit in the REO Account, in no event more than two Business Days after the deposit of such funds into the clearing account, all revenues received by it with respect to an REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Property including, without limitation:

(i)    all insurance premiums due and payable in respect of such REO Property;

SE 2154917 v8
(26425.0085)

(ii)     all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon; and

(iii)     all costs and expenses necessary to maintain such REO Property.

To the extent that amounts on deposit in the REO Account with respect to an REO Property are insufficient for the purposes set forth in clauses (i) through (iii) above with respect to such REO Property, the Master Servicer shall advance from its own funds as Servicing Advances such amount as is necessary for such purposes if, but only if, the Master Servicer would make such advances if the Master Servicer owned the REO Property and if such Servicing Advance would not constitute a Nonrecoverable Advance.

Notwithstanding the foregoing, neither the Master Servicer nor the Trustee shall:

(i)     authorize the Trust Fund to enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

(ii)     authorize any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

(iii)     authorize any construction on any REO Property, other than construction permitted under Section 856(e)(4)(B) of the Code; or

(iv)     authorize any Person to Directly Operate any REO Property on any date more than 90 days after its date of acquisition by the Trust Fund;

unless, in any such case, the Master Servicer has obtained an Opinion of Counsel (the cost of which shall constitute a Servicing Advance), a copy of which shall be provided to the Trustee, to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by REMIC 1, in which case the Master Servicer may take such actions as are specified in such Opinion of Counsel.

The Master Servicer may contract with any Independent Contractor for the operation and management of any REO Property, provided that:

(i)     the terms and conditions of any such contract shall not be inconsistent herewith;

(ii)     any such contract shall require, or shall be administered to require, that the Independent Contractor pay all costs and expenses incurred in connection with the operation and management of such REO Property, including those listed above, and remit all related revenues (net of such costs and expenses) to the Master Servicer as soon as practicable, but in no event later than thirty days following the receipt thereof by such Independent Contractor;

SE 2154917 v8
(26425.0085)

(iii)    none of the provisions of this Section 3.23(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Master Servicer of any of its duties and obligations to the Trustee on behalf of the Certificateholders with respect to the operation and management of any such REO Property; and

(iv)    the Master Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Master Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Master Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification.  The Master Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, irrespective of whether the Master Servicer's compensation pursuant to Section 3.18 is sufficient to pay such fees; provided, however, that to the extent that any payments made by such Independent Contractor would constitute Servicing Advances if made by the Master Servicer, such amounts shall be reimbursable as Servicing Advances made by the Master Servicer.

(d)    In addition to the withdrawals permitted under Section 3.23(c), the Master Servicer may from time to time make withdrawals from the REO Account for any REO Property:  (i) to pay to the holder of the related First Mortgage Loan the amounts to which such holder is entitled by the terms of such First Mortgage Loan; (ii) to pay itself or any Sub-Servicer unpaid Servicing Fees in respect of the related Mortgage Loan; and (iii) to reimburse itself or any Sub-Servicer for unreimbursed Servicing Advances and Advances made in respect of such REO Property or the related Mortgage Loan.  On the Master Servicer Remittance Date, the Master Servicer shall withdraw from each REO Account maintained by it and deposit into the Distribution Account in accordance with Section 3.10(d)(ii), for distribution on the related Distribution Date in accordance with Section 4.01, the income from the related REO Property received during the prior calendar month, net of any withdrawals made pursuant to Section 3.23(c) or this Section 3.23(d).

(e)    Subject to the time constraints set forth in Section 3.23(a), each REO Disposition shall be carried out by the Master Servicer at such price and upon such terms and conditions as the Master Servicer shall deem necessary or advisable, as shall be normal and usual in its general servicing activities for similar properties.

(f)    The proceeds from the REO Disposition, net of any amount required by law to be remitted to the Mortgagor under the related Mortgage Loan, net of any amounts required to be remitted to the holder of the related First Mortgage Loan and net of any payment or reimbursement to the Master Servicer or any Sub-Servicer as provided above, shall be deposited in the Distribution Account in accordance with Section 3.10(d)(ii) on the Master Servicer Remittance Date in the month following the receipt thereof for distribution on the related Distribution Date in accordance with Section 4.01.  Any REO Disposition shall be for cash only (unless changes in the REMIC Provisions made subsequent to the Startup Day allow a sale for other consideration).

SE 2154917 v8
(26425.0085)

(g)    The Master Servicer shall file information returns with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively.    Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Section 3.24    Obligations of the Master Servicer in Respect of Prepayment Interest Shortfalls.

The Master Servicer shall deliver to the Trustee for deposit into the Distribution Account on or before 3:00 p.m. New York time on the Master Servicer Remittance Date from its own funds an amount ("Compensating Interest") equal to the lesser of (i) the aggregate of the Prepayment Interest Shortfalls for the related Distribution Date resulting solely from Principal Prepayments during the related Prepayment Period and (ii) the amount of its aggregate Servicing Fee for the most recently ended calendar month.

Section 3.25    [Reserved].

Section 3.26    Reserve Fund.

No later than the Closing Date, the Trustee, on behalf of the Certificateholders, shall establish and maintain with itself a separate, segregated non-interest bearing trust account titled, "Reserve Fund, Deutsche Bank National Trust Company, as Trustee, in trust for registered Holders of Long Beach Mortgage Loan Trust 2006-A, Asset-Backed Certificates, Series 2006-A."  The Trustee shall account for the right to receive payments from the Reserve Fund as property that the Trustee holds separate and apart from the REMIC Regular Interests.

(a)    The following amounts shall be deposited into the Reserve Fund:

(i)    On the Closing Date, the Depositor shall deposit, or cause to be deposited, into the Reserve Fund $1,000;

(ii)    On each Distribution Date as to which there is a Net WAC Rate Carryover Amount payable to any of the Class A Certificates, the Mezzanine Certificates or the Class B Certificates, the Trustee has been directed by the Holders of the Class C Certificates to, and therefore shall, deposit into the Reserve Fund the amounts described in Section 4.01(d)(i)(u); and

(iii)    On each Distribution Date as to which there are no Net WAC Rate Carryover Amounts, the Trustee shall deposit into the Reserve Fund on behalf of the Holders of the Class C Certificates, from amounts otherwise distributable to such Class C Certificates, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000.

(b)    The Reserve Fund shall be treated as an "outside reserve fund" under applicable Treasury regulations and shall not be part of any REMIC created hereunder.  For federal and state income tax purposes, the Holders of the Class C Certificates shall be deemed to be the owners of the Reserve Fund and all amounts deposited into the Reserve Fund (other than

87

the initial deposit therein of $1,000) shall be treated as amounts distributed by REMIC 2 to the Holders of the Class C Certificates. For federal and state income tax purposes, payments in respect of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates of Net WAC Rate Carryover Amounts will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1).

(c) By accepting a Class C Certificate, each Holder of a Class C Certificate shall be deemed to have directed the Trustee to, and the Trustee shall pursuant to such direction, deposit into the Reserve Fund the amounts described in Section 3.26(a)(ii) and (a)(iii) above on each Distribution Date. By accepting a Class C Certificate, each Holder of a Class C Certificate further agrees that such direction is given for good and valuable consideration, the receipt and sufficiency of which is acknowledged by such acceptance.

(d) At the direction of the Holders of a majority in Percentage Interest in the Class C Certificates, the Trustee shall direct any depository institution maintaining the Reserve Fund to invest the funds in such account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Trustee or an Affiliate manages or advises such investment, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Trustee or an Affiliate manages or advises such investment. If no investment direction of the Holders of a majority in Percentage Interest in the Class C Certificates with respect to the Reserve Fund is received by the Trustee, the Trustee shall invest the funds in the Reserve Fund in Permitted Investments managed by the Trustee or an Affiliate of the kind described in clause (vi) of the definition of Permitted Investments. Notwithstanding the foregoing, any funds in the Reserve Fund shall be invested in Deutsche Bank Cash Management Fund 541 for so long as such investment complies with clause (vi) of the definition of Permitted Investments. All income and gain earned upon such investment shall be deposited into the Reserve Fund.

(e) For federal tax return and information reporting, the right of the Certificateholders to receive payment on account of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates from the Reserve Fund in respect of any Net WAC Rate Carryover Amount shall be assigned a value of zero.

Section 3.27    Advance Facility.

(a) The Trustee, on behalf of the Trust Fund, at the direction of the Master Servicer, is hereby authorized to enter into a facility with any Person which provides that such Person (an "Advancing Person") may make all or a portion of the Advances and/or Servicing Advances to the Trust Fund under this Agreement, although no such facility shall reduce or otherwise affect the Master Servicer's obligation to fund such Advances and/or Servicing Advances. To the extent that an Advancing Person makes all or a portion of any Advance or any Servicing Advance and provides the Trustee with notice acknowledged by the Master Servicer that such Advancing Person is entitled to reimbursement, such Advancing Person shall be entitled to receive reimbursement pursuant to this Agreement for such amount to the extent provided in Section 3.27(b). Such notice from the Advancing Person shall specify the amount of the reimbursement and shall specify which Section of this Agreement permits the applicable

88

Advance or Servicing Advance to be reimbursed. The Trustee shall be entitled to rely without independent investigation on the Advancing Person's statement with respect to the amount of any reimbursement pursuant to this Section 3.27 and with respect to the Advancing Person's statement with respect to the Section of this Agreement that permits the applicable Advance or Servicing Advance to be reimbursed. An Advancing Person whose obligations are limited to the making of Advances and/or Servicing Advances shall not be required to meet the qualifications of a Master Servicer or a Sub-Servicer pursuant to Article VI hereof and will not be deemed to be a Sub-Servicer under this Agreement.

(b)     If an advancing facility is entered into, then the Master Servicer shall not be permitted to reimburse itself under any Section specified or for any amount specified by the Advancing Person in the notice described under Section 3.27(a) above and acknowledged by the Master Servicer prior to the remittance to the Trust Fund, but instead the Master Servicer shall include such amounts in the applicable remittance to the Trustee made pursuant to Section 3.10(a). The Trustee is hereby authorized to pay to the Advancing Person reimbursements for Advances and Servicing Advances from the Distribution Account to the same extent the Master Servicer would have been permitted to reimburse itself for such Advances and/or Servicing Advances in accordance with the specified Sections had the Master Servicer itself made such Advance or Servicing Advance. The Trustee is hereby authorized to pay directly to the Advancing Person such portion of the Servicing Fee as the parties to any advancing facility may agree.

(c)     All Advances and Servicing Advances made pursuant to the terms of this Agreement shall be deemed made and shall be reimbursed on a "first in-first out" (FIFO) basis.

Section 3.28    PMI Policy; Claims Under the PMI Policy

Notwithstanding anything to the contrary elsewhere in this Article III, the Master Servicer shall not agree to any modification or assumption of a PMI Mortgage Loan or take any other action with respect to a PMI Mortgage Loan that could result in denial of coverage under the PMI Policy. The Master Servicer shall notify the PMI Insurer that the Trustee, as trustee on behalf of the Certificateholders, is the insured, as that term is defined in the PMI Policy, of each PMI Mortgage Loan. The Master Servicer shall, on behalf of the Trustee, prepare and file on a timely basis with the PMI Insurer, with a copy to the Trustee, all claims which may be made under the PMI Policy with respect to the PMI Mortgage Loans. The Master Servicer shall take all actions required under the PMI Policy as a condition to the payment of any such claim. Any amount received from the PMI Insurer with respect to any such PMI Mortgage Loan shall be deposited by the Master Servicer, no later than two Business Days following receipt thereof, into the Collection Account. On each Distribution Date, the Trustee shall pay to the PMI Insurer the PMI Insurer Fee for such Distribution Date from the amounts on deposit in the Distribution Account prior to making any distributions to the Certificateholders.

Section 3.29    Cap Agreement.

(a)     The Depositor hereby directs the Trustee to execute and deliver on behalf of the Trust the Cap Agreement and authorizes the Trustee to perform its obligations thereunder and under the Cap Agreement on behalf of the Trust in accordance with the terms of the Cap Assignment.

(b)     If the rating of the Cap Provider's obligations is withdrawn or reduced (in the manner set forth in Section 14 of the Cap Agreement) below one of the Approved Rating Thresholds (as defined in Section 14 of the Cap Agreement), the Trustee shall, promptly after a Responsible Officer of the Trustee has received actual knowledge or written notice of the reduction or withdrawal of the rating (it being understood that the Trustee has no duty to monitor the ratings of the Cap Provider), request the Cap Provider to take actions required to be taken by the Cap Provider by Section 14 of the Cap Agreement.

(c)     In the event that the Cap Agreement is canceled or otherwise terminated for any reason (other than the exhaustion of the interest rate projection provided thereby or replacement of the Cap Agreement by the Cap Provider in accordance with Section 3.29(b)), the Depositor shall, to the extent a replacement contract is available, direct the Trustee to obtain from a counterparty designated by the Depositor a replacement contract comparable to the Cap Agreement (which both such counterparty and such replacement contract shall be acceptable to the Trustee and the Holders of the Certificates entitled to at least 50% of the Voting Rights) providing interest rate protection which is equal to the then existing protection provided by the Cap Agreement, provided, however, that if the cost of any such replacement contract providing the same interest rate protection would be greater than the amount of any early termination payment received by the Trustee under the Cap Agreement the amount of interest rate protection provided by such replacement contract may be reduced to a level such that the cost of such replacement contract shall not exceed the amount of such early termination payment.

## ARTICLE IV

## FLOW OF FUNDS

Section 4.01    <u>Distributions</u>.

(a)     On each Distribution Date, the Trustee shall withdraw from the Distribution Account that portion of the Available Funds for such Distribution Date consisting of the Interest Remittance Amount for such Distribution Date, and make the following disbursements and transfers in the order of priority described below, to the extent of the Interest Remittance Amount remaining for such Distribution Date:

(i)     *first*, concurrently, to the Class A-1 Certificates, the Class A-2 Certificates and the Class A-3 Certificates, the Monthly Interest Distributable Amount and any Unpaid Interest Shortfall Amount for such Classes, in each case allocated among the Class A-1 Certificates, the Class A-2 Certificates and the Class A-3 Certificates, *pro rata*, based on their respective entitlements;

*second*, to the Class M-1 Certificates, the related Monthly Interest Distributable Amount;

*third*, to the Class M-2 Certificates, the related Monthly Interest Distributable Amount;

*fourth*, to the Class M-3 Certificates, the related Monthly Interest Distributable Amount;

90

*fifth*, to the Class M-4 Certificates, the related Monthly Interest Distributable Amount;

*sixth*, to the Class M-5 Certificates, the related Monthly Interest Distributable Amount;

*seventh*, to the Class M-6 Certificates, the related Monthly Interest Distributable Amount;

*eighth*, to the Class M-7 Certificates, the related Monthly Interest Distributable Amount;

*ninth*, to the Class B-1 Certificates, the related Monthly Interest Distributable Amount; and

*tenth*, to the Class B-2 Certificates, the related Monthly Interest Distributable Amount.

(ii)     Any Interest Remittance Amount remaining undistributed following distributions pursuant to Section 4.01(a)(i) shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(b)     On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Class A Certificates, the Mezzanine Certificates and the Class B Certificates shall be entitled to receive distributions in respect of principal to the extent of the Principal Distribution Amount in the following amounts and order of priority:

(i)     *first*, to the Class A Certificates (allocated among the Class A Certificates in the priority described in Section 4.01(b)(iii)) until the Certificate Principal Balances thereof have been reduced to zero; and

*second*, to the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*third*, to the Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*fourth*, to the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*fifth*, to the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*sixth*, to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*seventh*, to the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*eighth*, to the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

*ninth*, to the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

*tenth*, to the Class B-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero.

(ii)     Any principal remaining undistributed pursuant to Section 4.01(b)(i) above shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(iii)     With respect to the Class A Certificates, all principal distributions will be allocated sequentially, to the Class A-1 Certificates, the Class A-2 Certificates and the Class A-3 Certificates, in each case, until their Certificate Principal Balances have been reduced to zero, with the exception that beginning on the first Distribution Date on or after which the Certificate Principal Balances of the Mezzanine Certificates and the Class B Certificates have been reduced to zero and the Net Monthly Excess Cashflow and Overcollateralized Amount for such Distribution Date are insufficient to cover Realized Losses on the Mortgage Loans, principal distributions among the Class A Certificates will be allocated, *pro rata*, based on their Certificate Principal Balances, in each case, until their Certificate Principal Balances have been reduced to zero.

(c)     On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the Class A Certificates, the Mezzanine Certificates and the Class B Certificates shall be entitled to receive distributions in respect of principal to the extent of the Principal Distribution Amount in the following amounts and order of priority:

(i)     *first*, to the Class A Certificates, the Class A Principal Distribution Amount (allocated among the Class A Certificates in the priority described in Section 4.01(c)(iii)), until the Certificate Principal Balances thereof have been reduced to zero;

*second*, to the Class M-1 Certificates, the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*third*, to the Class M-2 Certificates, the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*fourth*, to the Class M-3 Certificates, the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

92

*fifth*, to the Class M-4 Certificates, the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*sixth*, to the Class M-5 Certificates, the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*seventh*, to the Class M-6 Certificates, the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*eighth*, to the Class M-7 Certificates, the Class M-7 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

*ninth*, to the Class B-1 Certificates, the Class B-1 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero; and

*tenth*, to the Class B-2 Certificates, the Class B-2 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero.

(ii)     Any principal remaining undistributed following distributions pursuant to Section 4.01(c)(i) shall be used in determining the amount of Net Monthly Excess Cashflow, if any, for such Distribution Date.

(iii)     With respect to the Class A Certificates, all principal distributions will be allocated sequentially, to the Class A-1 Certificates, the Class A-2 Certificates and the Class A-3 Certificates, in each case, until their Certificate Principal Balances have been reduced to zero, with the exception that beginning on the first Distribution Date on or after which the Certificate Principal Balances of the Mezzanine Certificates and the Class B Certificates have been reduced to zero and the Net Monthly Excess Cashflow and Overcollateralized Amount for such Distribution Date are insufficient to cover realized losses on the Mortgage Loans, principal distributions among the Class A Certificates will be allocated, pro rata, based on their Certificate Principal Balances, in each case, until their Certificate Principal Balances have been reduced to zero.

(d)     (i)     On each Distribution Date, the Trustee shall distribute any Net Monthly Excess Cashflow in the following order of priority, in each case to the extent of the Net Monthly Excess Cashflow remaining undistributed:

(a)     to the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount equal to the sum of any Extra Principal Distribution Amount and the Remaining Principal Distribution Amount for such Distribution Date, payable to such Class or

93

Classes of Certificates as part of the Principal Distribution Amount, pursuant to Section 4.01(b) or Section 4.01(c) above, as applicable;

(b)    *concurrently*, to the Class A Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Classes for such Distribution Date to the extent remaining unpaid after distribution of the Interest Remittance Amount on such Distribution Date, allocated among such classes, *pro rata*, based on their respective entitlements;

(c)    to the Class M-1 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(d)    to the Class M-1 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(e)    to the Class M-2 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(f)    to the Class M-2 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(g)    to the Class M-3 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(h)    to the Class M-3 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(i)    to the Class M-4 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(j)    to the Class M-4 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(k)    to the Class M-5 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(l)    to the Class M-5 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

SE 2154917 v8
(26425.0085)

(m)     to the Class M-6 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(n)     to the Class M-6 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(o)     to the Class M-7 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(p)     to the Class M-7 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(q)     to the Class B-1 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(r)     to the Class B-1 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(s)     to the Class B-2 Certificates, in an amount equal to the Unpaid Interest Shortfall Amount, if any, for such Class for such Distribution Date;

(t)     to the Class B-2 Certificates, in an amount equal to the Allocated Realized Loss Amount, if any, for such Class for such Distribution Date;

(u)     to the Reserve Fund, the amount equal to the difference between any Net WAC Rate Carryover Amounts with respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates for such Distribution Date and any amounts deposited in the Reserve Fund pursuant to this Section 4.01(d)(i)(u) that were not distributed on prior Distribution Dates (or, if no Net WAC Rate Carryover Amounts are payable to such Classes of Certificates on such Distribution Date, to the Reserve Fund, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000);

(v)     if such Distribution Date follows the Prepayment Period during which occurs the latest date on which a Prepayment Charge may be required to be paid in respect of any Mortgage Loans, to the Class P Certificates, in reduction of the Certificate Principal Balance thereof, until the Certificate Principal Balance thereof is reduced to zero;

SE 2154917 v8
(26425.0085)

(w)    to the Class C Certificates, the sum of (A) the Monthly Interest Distributable Amount for the Class C Certificates, plus (B) until the Certificate Principal Balance of the Class C Certificates is reduced to zero, any Overcollateralization Release Amount for such Distribution Date, plus (C) until the Certificate Principal Balance of the Class C Certificates is reduced to zero, on any Distribution Date on which the Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates has been reduced to zero, any remaining amounts for such Distribution Date (in both cases, net of such portion of amounts payable pursuant to this Section 4.01(d)(i)(w) that were paid pursuant to Section 4.01(d)(i)(u) above); and

(x)    any remaining amounts to the Class R Certificates (in respect of the appropriate Class R-2 Interest).

(ii)    On each Distribution Date, after making the distributions of the Available Funds as provided in this Section 4.01 and the distributions from the Cap Account pursuant to Section 4.01(d)(iii)(b), the Trustee shall withdraw from the Reserve Fund the amounts on deposit therein and shall distribute such amounts in the following order of priority:  first, concurrently, to the Class A Certificates, up to the amount of the related Net WAC Rate Carryover Amount, allocated among the Class A Certificates, *pro rata*, based on their respective Net WAC Rate Carryover Amounts; then, to the Mezzanine Certificates and the Class B Certificates, up to the amount of the related Net WAC Rate Carryover Amount, in the following order of priority: *first* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class B-1 Certificates and *ninth* to the Class B-2 Certificates, in each case to the extent of such amounts remaining in the Reserve Fund.

On the Distribution Date on which the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates has been reduced to zero, after making all other distributions on such Distribution Date (including to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates out of the Reserve Fund), the Trustee shall distribute all remaining amounts in the Reserve Fund to the Class C Certificates.

(iv)    On or before each Distribution Date, the Trustee shall deposit into the Cap Account the amounts received from the Cap Provider with respect to such Distribution Date. On each Distribution Date, the Trustee shall withdraw from the Cap Account the amounts on deposit therein (including the amounts received pursuant to the Cap Agreement on such Distribution Date) and distribute them as follows:

(a)    *first*, to the LIBOR Certificates, to pay Monthly Interest Distributable Amounts and, if applicable, any Unpaid Interest Shortfall

Amounts in accordance with priorities of Section 4.01(a)(i), to the extent unpaid from the Available Funds;

(b) *second*, to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, to pay principal as provided in Section 4.01(d)(i)(a), but only to the extent necessary to maintain or restore the Overcollateralized Amount by covering Realized Losses that would have been allocated on the related Distribution Date (prior to distribution of Net Monthly Excess Cashflow on such Distribution Date); and

(c) *third*, to the LIBOR Certificates, to pay any Unpaid Interest Shortfall Amounts and Net WAC Rate Carryover Amounts, in the same priority as described in Section 4.01(d)(i).

Any amounts in the Cap Account not distributed on a Distribution Date after payments pursuant to Section 4.01(d)(iii)(c) will remain in the Cap Account and be distributed pursuant to Section 4.01(d)(iii) on the next Distribution Date. On the Distribution Date on which the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates has been reduced to zero, after making all other distributions on such Distribution Date (including the Class A Certificates, the Mezzanine Certificates and the Class B Certificates out of the Cap Account), the Trustee shall distribute all remaining amounts in the Cap Account to itself.

(iv) On each Distribution Date, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period shall be withdrawn from the Distribution Account and distributed by the Trustee to the Class P Certificates, and shall not be available for distribution to any other Class of Certificates. On each Distribution Date, all amounts representing any Master Servicer Prepayment Charge Payment Amounts paid by or collected by the Master Servicer during the related Prepayment Period shall be withdrawn from the Distribution Account and distributed by the Trustee to the Class P Certificates, and shall not be available for distribution to any other Class of Certificates. The payment of the foregoing amounts in respect of the Class P Certificates shall not reduce the Certificate Principal Balance thereof.

(e) [Reserved]

(f) All distributions made with respect to each Class of Certificates on each Distribution Date shall be allocated *pro rata* among the outstanding Certificates in such Class based on their respective Percentage Interests. Payments in respect of each Class of Certificates on each Distribution Date will be made to the Holders of the respective Class of record on the related Record Date (except as otherwise provided in this Section 4.01 or Section 9.01 respecting the final distribution on such Class), based on the aggregate Percentage Interest represented by their respective Certificates, and shall be made by wire transfer of immediately available funds to the account of any such Holder at a bank or other entity having appropriate facilities therefor, if such Holder shall have so notified the Trustee in writing at least five Business Days prior to the

SE 2154917 v8
(26425.0085)

Record Date immediately prior to such Distribution Date and is the registered owner of Certificates having an initial aggregate Certificate Principal Balance or Notional Amount that is in excess of the lesser of (i) $5,000,000 or (ii) two-thirds of the Original Class Certificate Principal Balance or Original Class Notional Amount of such Class of Certificates, or otherwise by check mailed by first class mail to the address of such Holder appearing in the Certificate Register. The final distribution on each Certificate shall be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office of the Trustee or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, which shall credit the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. All such credits and disbursements with respect to a Book-Entry Certificate are to be made by the Depository and the Depository Participants in accordance with the provisions of the Certificates. None of the Trustee, the Depositor, the Master Servicer or the Seller shall have any responsibility therefor except as otherwise provided by applicable law.

(g)     The rights of the Certificateholders to receive distributions in respect of the Certificates, and all interests of the Certificateholders in such distributions, shall be as set forth in this Agreement. None of the Holders of any Class of Certificates, the Trustee or the Master Servicer shall in any way be responsible or liable to the Holders of any other Class of Certificates in respect of amounts properly previously distributed on the Certificates.

(h)     Except as otherwise provided in Section 9.01, whenever the Trustee expects that the final distribution with respect to any Class of Certificates shall be made on the next Distribution Date, the Trustee shall, no later than three (3) days before the related Distribution Date, mail to each Holder on such date of such Class of Certificates a notice to the effect that:

(i)     the Trustee expects that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee therein specified, and

(ii)     no interest shall accrue on such Certificates from and after the end of the related Accrual Period.

Any funds not distributed to any Holder or Holders of Certificates of such Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Trustee and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 4.01(h) shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second

98

notice all such Certificates shall not have been surrendered for cancellation, the Trustee shall, directly or through an agent, mail a final notice to the remaining non-tendering Certificateholders concerning surrender of their Certificates but shall continue to hold any remaining funds for the benefit of non-tendering Certificateholders.  The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in such trust fund.  If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Trustee shall pay to WaMu Capital Corp. and Goldman, Sachs & Co., equally, all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease.  No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Trustee as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 4.01(h).

(i)      Notwithstanding anything to the contrary herein, (i) in no event shall the Certificate Principal Balance of a Mezzanine Certificate or a Class B Certificate be reduced more than once in respect of any particular amount both (a) allocated to such Certificate in respect of Realized Losses pursuant to Section 4.06 and (b) distributed to such Certificate in reduction of the Certificate Principal Balance thereof pursuant to this Section 4.01, and (ii) in no event shall the Uncertificated Principal Balance of a REMIC Regular Interest be reduced more than once in respect of any particular amount both (a) allocated to such REMIC Regular Interest in respect of Realized Losses pursuant to Section 4.06 and (b) distributed on such REMIC Regular Interest in reduction of the Uncertificated Principal Balance thereof pursuant to Section 4.05.

Section 4.02     [Reserved].

Section 4.03     Statements.

(a)      On each Distribution Date, the Trustee shall prepare and make available to each Holder of the Regular Certificates, the Master Servicer and the Rating Agencies a statement by electronic medium (as set forth in the penultimate paragraph of this Section 4.03(a)), based on information provided to the Trustee by the Master Servicer as to the distributions made on such Distribution Date:

(i)      the record dates, the accrual period, the determination date and the distribution date;

(ii)      the amount of the distribution made on such Distribution Date to the Holders of each Class of Regular Certificates, separately identified, allocable to principal and the amount of the distribution made to the Holders of the Class P Certificates allocable to Prepayment Charges and Master Servicer Prepayment Charge Payment Amounts;

(iii)      the amount of the distribution made on such Distribution Date to the Holders of each Class of Regular Certificates (other than the Class P Certificates), allocable to interest and the Pass-Through Rates, separately identified;

(iv)      the Overcollateralized Amount, the Overcollateralization Release Amount, the Overcollateralization Deficiency Amount and the

99

Overcollateralization Target Amount as of such Distribution Date and the Excess Overcollateralized Amount for the Mortgage Pool for such Distribution Date;

(v)  the aggregate amount of servicing compensation received by the Master Servicer with respect to the related Due Period and such other customary information as the Trustee deems necessary or desirable, or which a Certificateholder reasonably requests, to enable Certificateholders to prepare their tax returns;

(vi)  the Interest Remittance Amount and the Principal Remittance Amount for such Distribution Date;

(vii)  the aggregate amount of Advances and Servicing Advances for the related Due Period, the amount of unrecovered Advances and Servicing Advances (after giving effect to Advances and Servicing Advances made on the Distribution Date) outstanding and the amount of Nonrecoverable Advances and Servicing Advances for such Distribution Date;

(viii)  the number and aggregate Stated Principal Balance of the Mortgage Loans at the Close of Business at the end of the related Due Period and at the beginning of the related Due Period;

(ix)  the number, aggregate principal balance, weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans as of the related Determination Date;

(x)  the number and aggregate unpaid principal balance of Mortgage Loans (a) delinquent 30-59 days, (b) delinquent 60-89 days, (c) delinquent 90-119 days and (d) 120 or more days in each case, as of the last day of the preceding calendar month provided, however that any aggregate unpaid principal balance of Mortgage Loans shall be reported as of the last day of the related Due Period, (d) as to which foreclosure proceedings have been commenced and (e) with respect to which the related Mortgagor has filed for protection under applicable bankruptcy laws, with respect to whom bankruptcy proceedings are pending or with respect to whom bankruptcy protection is in force;

(xi)  with respect to any Mortgage Loan that became an REO Property during the preceding Prepayment Period, the unpaid principal balance and the Principal Balance of such Mortgage Loan as of the date it became an REO Property;

(xii)  the total number and cumulative principal balance of all REO Properties as of the Close of Business of the last day of the preceding Prepayment Period;

(xiii)  the aggregate amount of Principal Prepayments made during the related Prepayment Period;

SE 2154917 v8
(26425.0085)

(xiv)    the aggregate amount of principal and interest Realized Losses incurred during the related Prepayment Period and the cumulative amount of principal and interest Realized Losses;

(xv)    the aggregate amount of Extraordinary Trust Fund expenses withdrawn from the Collection Account or the Distribution Account for such Distribution Date;

(xvi)    the Certificate Principal Balance of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates, before and after giving effect to the distributions made on such Distribution Date, and the Notional Amount of the Class C Certificates, after giving effect to the distributions made on such Distribution Date;

(xvii)    the Monthly Interest Distributable Amount in respect of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates for such Distribution Date and the Unpaid Interest Shortfall Amount, if any, with respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates for such Distribution Date;

(xviii)    the aggregate amount of any Net Prepayment Interest Shortfalls for such Distribution Date, to the extent not covered by payments by the Master Servicer pursuant to Section 3.24, and the aggregate amount of any Relief Act Interest Shortfalls for such Distribution Date;

(xix)    the Credit Enhancement Percentage for such Distribution Date;

(xx)    the related Net WAC Rate Carryover Amount for the Class A Certificates, the Mezzanine Certificates and the Class B Certificates, if any, for such Distribution Date and the amount remaining unpaid after reimbursements therefor on such Distribution Date;

(xxi)    the Trustee Fee, the Master Servicer Fee and the PMI Insurer Fee on such Distribution Date;

(xxii)    whether a Stepdown Date or a Trigger Event has occurred;

(xxiii)    the Available Funds;

(xxiv)    the respective Pass-Through Rates applicable to the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates for such Distribution Date and the Pass-Through Rate applicable to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates for the immediately succeeding Distribution Date;

(xxv)    the Principal Balance of Mortgage Loans repurchased by the Seller;

101

(xxvi)   any other information that is required by the Code and regulations thereunder to be made available to Certificateholders;

(xxvii)   the amount on deposit in the Reserve Fund;

(xxviii)  (A) the dollar amount of payments received related to claims under the PMI Policy during the related Prepayment Period (and the number of Mortgage Loans to which such payments related), (B) the aggregate dollar amount of payments received related to claims under the PMI Policy since the Cut-off Date (and the number of Mortgage Loans to which such payments related); and (C) the amount of coverage remaining under the PMI Policy;

(xxix)   (A) the dollar amount of claims made under the PMI Policy that were denied during the related Prepayment Period (and the number of Mortgage Loans to which such denials related) and (B) the aggregate dollar amount of claims made under the PMI Policy that were denied since the Cut-off Date (and the number of Mortgage Loans to which such denials related);

(xxx)   the amount of Subsequent Recoveries and Gross Subsequent Recoveries for the related Prepayment Period and the cumulative amount of Subsequent Recoveries and Gross Subsequent Recoveries in the aggregate; and

(xxxi)   for such Distribution Date, the amount of any payment made by the Cap Provider under the Cap Agreements.

The Trustee shall make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to Certificateholders, the Master Servicer and the Rating Agencies via the Trustee's internet website.  The Trustee's internet website shall initially be located at https://www.tss.db.com/invr.  Assistance in using the website can be obtained by calling the Trustee's customer service desk at 1-800-735-7777.  Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such.  The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

In the case of information furnished pursuant to subclauses (i) through (iii) above, the amounts shall be expressed in a separate section of the report as a dollar amount for each Class for each $1,000 original dollar amount as of the Closing Date.

(b)   Within a reasonable period of time after the end of each calendar year, the Trustee shall, upon written request, furnish to each Person who at any time during the calendar year was a Certificateholder of a Regular Certificate, if requested in writing by such Person, such information as is reasonably necessary to provide to such Person a statement containing the information set forth in subclauses (i) through (ii) above, aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder.  Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable

SE 2154917 v8
(26425.0085)

information shall be prepared and furnished by the Trustee to Certificateholders pursuant to any requirements of the Code as are in force from time to time.

(c)     On each Distribution Date, the Trustee shall forward to the Holders of the Class R Certificates a copy of the reports forwarded to the Regular Certificateholders in respect of such Distribution Date with such other information as the Trustee deems necessary or appropriate.

(d)     Within a reasonable period of time after the end of each calendar year, the Trustee shall deliver to each Person who at any time during the calendar year was a Holder of a Class R Certificate, if requested in writing by such Person, such information as is reasonably necessary to provide to such Person a statement containing the information provided pursuant to the previous paragraph aggregated for such calendar year or applicable portion thereof during which such Person was a Holder of a Class R Certificate. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be prepared and furnished to Certificateholders by the Trustee pursuant to any requirements of the Code as from time to time in force.

(e)     On each Distribution Date the Trustee shall provide Bloomberg Financial Markets, L.P. ("Bloomberg") CUSIP level factors for each Class of Certificates as of such Distribution Date, using a format and media mutually acceptable to the Trustee and Bloomberg.

Section 4.04     Remittance Reports; Advances.

(a)     On or before the 18th day of each calendar month commencing in June 2006, or if such 18th day is not a Business Day, the Business Day immediately following such 18th day, the Master Servicer shall deliver to the Trustee by telecopy or electronic mail (or by such other means as the Master Servicer and the Trustee may agree from time to time) a Remittance Report with respect to the related Distribution Date. Not later than each Master Servicer Remittance Date (or, in the case of certain information, as agreed between the Trustee and the Master Servicer, not later than four Business Days after the end of each Due Period), the Master Servicer shall deliver or cause to be delivered to the Trustee in addition to the information provided on the Remittance Report, such other information reasonably available to it with respect to the Mortgage Loans as the Trustee may reasonably require to perform the calculations necessary to make the distributions contemplated by Section 4.01 and to prepare the statements to Certificateholders contemplated by Section 4.03. The Trustee shall not be responsible to recompute, recalculate or verify any information provided to it by the Master Servicer.

(b)     The amount of Advances to be made by the Master Servicer for any Distribution Date shall equal, subject to Section 4.04(d), the sum of (i) the aggregate amount of Monthly Payments (with each interest portion thereof net of the related Servicing Fee), due on the related Due Date in respect of the Mortgage Loans, which Monthly Payments were delinquent as of the close of business on the related Determination Date, plus (ii) with respect to each REO Property, which REO Property was acquired during or prior to the related Prepayment Period and as to which such REO Property an REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the Monthly Payments (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related

103

Due Date in respect of the related Mortgage Loans, over the net income from such REO Property transferred to the Distribution Account pursuant to Section 3.23 for distribution on such Distribution Date.

On or before 3:00 p.m. New York time on the Master Servicer Remittance Date, the Master Servicer shall remit in immediately available funds to the Trustee for deposit in the Distribution Account an amount equal to the aggregate amount of Advances, if any, to be made in respect of the Mortgage Loans and REO Properties for the related Distribution Date either (i) from its own funds or (ii) from the Collection Account, to the extent of funds held therein for future distribution (in which case, it will cause to be made an appropriate entry in the records of Collection Account that amounts held for future distribution have been, as permitted by this Section 4.04, used by the Master Servicer in discharge of any such Advance) or (iii) in the form of any combination of (i) and (ii) aggregating the total amount of Advances to be made by the Master Servicer with respect to the Mortgage Loans and REO Properties.  Any amounts held for future distribution and so used shall be appropriately reflected in the Master Servicer's records and replaced by the Master Servicer by deposit in the Collection Account on or before any future Master Servicer Remittance Date to the extent that the Available Funds for the related Distribution Date (determined without regard to Advances to be made on the Master Servicer Remittance Date) shall be less than the total amount that would be distributed to the Classes of Certificateholders pursuant to Section 4.01 on such Distribution Date if such amounts held for future distributions had not been so used to make Advances.  The Trustee will provide notice to the Master Servicer by telecopy by the close of business on any Master Servicer Remittance Date in the event that the amount remitted by the Master Servicer to the Trustee on such date is less than the Advances required to be made by the Master Servicer for the related Distribution Date.

(c)      The obligation of the Master Servicer to make such Advances is mandatory, notwithstanding any other provision of this Agreement but subject to Section 4.04(d) below, and, with respect to any Mortgage Loan, shall continue until the earliest of the Mortgage Loan is paid in full, charged-off, or until the recovery of all Liquidation Proceeds thereon.

(d)      Notwithstanding anything herein to the contrary, no Advance or Servicing Advance shall be required to be made hereunder by the Master Servicer if such Advance or Servicing Advance would, if made, constitute a Nonrecoverable Advance.  The determination by the Master Servicer that it has made a Nonrecoverable Advance or that any proposed Advance or Servicing Advance, if made, would constitute a Nonrecoverable Advance, shall be evidenced by an Officers' Certificate of the Master Servicer delivered to the Depositor and the Trustee.

Section 4.05    Distributions on the REMIC Regular Interests.

(a)      On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC 1 to REMIC 2 on account of the REMIC 2 Regular Interests and distributed to the Holders of the Class R Certificates (in respect of the Class R-2 Interest), as the case may be:

(i)      to the Holders of REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, B2, and ZZ, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates.  Amounts payable as Uncertificated Accrued

Interest in respect of REMIC 1 Regular Interest ZZ shall be reduced and deferred when the REMIC 1 Overcollateralized Amount is less than the REMIC 1 Overcollateralization Target Amount, by the lesser of (x) the amount of such difference and (y) the Maximum ZZ Uncertificated Interest Deferral Amount and such amount shall be payable to the Holders of REMIC 1 Regular Interests A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1, and B2 in the same proportion as the Extra Principal Distribution Amount is allocated to the Corresponding Certificates and the Uncertificated Principal Balance of the REMIC 1 Regular Interest ZZ shall be increased by such amount;

(ii)     to the Holders of REMIC 1 Regular Interests, in an amount equal to the remainder of the Available Funds for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(1)     98.00% of such remainder to the Holders of REMIC 1 Regular Interest AA until the Uncertificated Balance of such REMIC 1 Regular Interest is reduced to zero, provided, however, that REMIC 1 Regular Interest AA shall not be reduced until the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter, at which point such amount shall be distributed to REMIC 1 Regular Interest AA, until $100 has been distributed pursuant to this clause;

(2)     2.00% of such remainder, first, to the Holders of REMIC 1 Regular Interest A1, A2, A3, M1, M2, M3, M4, M5, M6, M7, B1 and B2, 1.00% and in the same proportion as principal payments are allocated to the Corresponding Certificates, until the Uncertificated Balances of such REMIC 1 Regular Interests are reduced to zero and second, to the Holders of REMIC 1 Regular Interest ZZ, until the Uncertificated Balance of such REMIC 1 Regular Interest is reduced to zero; and

(3)     any remaining amount to the Holders of the Class R Certificates (in respect of the Class R-1 Interest);

(4)     any remaining amount to the Holders of the Class R Certificates (in respect of the Class R-2 Interest); and

(v)     to the Holders of the REMIC 1 Regular Interest P, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period, provided that the payment of such amounts shall not reduce the Uncertificated Principal Balance of such REMIC 1 Regular Interest.

(b)     The intent of the principal distribution provisions of this Section, and of the Realized Loss allocation provisions of Section 4.06, is to maintain an Uncertificated Principal Balance for each REMIC 1 Regular Interest (other than REMIC 1 Regular Interests AA, ZZ, and P) that equals 1% of the Certificate Principal Balance of the Corresponding Certificate, and to maintain the combined Uncertificated Principal Balances of REMIC 1 Regular Interests AA and P at 98% of the aggregate Stated Principal Balances of the Mortgage Loans. To the extent that the provisions of this Section 4.05 or Section 4.06 do not produce such Uncertificated Principal Balances for the REMIC 1 Regular Interests, the Trustee is authorized to reallocate principal payments and Realized Losses in such a manner so as to result in such Uncertificated Principal Balances.

Section 4.06     Allocation of Realized Losses.

(a)     Prior to each Determination Date, the Master Servicer shall determine as to each Mortgage Loan and REO Property:  (i) the total amount of Realized Losses, if any, incurred in connection with any Final Recovery Determinations made during the related Prepayment Period; (ii) whether and the extent to which such Realized Losses constituted Bankruptcy Losses; and (iii) the respective portions of such Realized Losses allocable to interest and allocable to principal.  Prior to each Determination Date, the Master Servicer shall also determine as to each Mortgage Loan:  (i) the total amount of Realized Losses, if any, incurred in connection with any Deficient Valuations made during the related Prepayment Period; and (ii) the total amount of Realized Losses, if any, incurred in connection with Debt Service Reductions in respect of Monthly Payments due during the related Due Period.  The information described in the two preceding sentences that is to be supplied by the Master Servicer shall be evidenced by an Officers' Certificate delivered to the Trustee by the Master Servicer prior to the Determination Date immediately following the end of (i) in the case of Bankruptcy Losses allocable to interest, the Due Period during which any such Realized Loss was incurred, and (ii) in the case of all other Realized Losses, the Prepayment Period during which any such Realized Loss was incurred.

(b)     If on any Distribution Date after giving effect to all Realized Losses incurred with respect to the Mortgage Loans during or prior to the related Due Period and distributions of principal with respect to the Class A Certificates, the Mezzanine Certificates and the Class B Certificates on such Distribution Date, the Certificate Principal Balance of the Class C Certificates is equal to zero, Realized Losses equal to the Undercollateralized Amount shall be allocated by the Trustee on such Distribution Date as follows:  first, to the Class B-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, second, to the Class B-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, third, to the Class M-7 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, fourth, to the Class M-6 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, fifth, to the Class M-5 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, sixth, to the Class M-4 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, seventh, to the Class M-3 Certificates, until the Certificate Principal Balance thereof has been reduced to zero, eighth, to the Class M-2 Certificates until the Certificate Principal Balance thereof has been reduced to zero, and ninth, to the Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero.  All Realized Losses to be allocated to the Certificate Principal Balances of the Mezzanine Certificates and the Class B Certificates on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided in Section 4.01.  All references above to the Certificate Principal Balance of the Mezzanine Certificates and the Class B Certificates shall be to the Certificate Principal Balance of the Mezzanine Certificates and the Class B Certificates immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses or increase thereof by any Subsequent Recoveries, in each case to be allocated to such Mezzanine Certificates and the Class B Certificates on such Distribution Date.

Any allocation of Realized Losses to a Mezzanine Certificate or Class B Certificate on any Distribution Date shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated.  No allocations of any Realized Losses shall be made to the Class A Certificates or the Class P Certificates.

106

(c)    all Realized Losses on the Mortgage Loans shall be allocated by the Trustee on each Distribution Date to the following REMIC 1 Regular Interests in the specified percentages, as follows:

first, to Uncertificated Accrued Interest payable to the REMIC 1 Regular Interest AA and ZZ up to an aggregate amount equal to the REMIC 1 Interest Loss Allocation Amount, 98% and 2%, respectively;

second, to the Uncertificated Principal Balances of the REMIC 1 Regular Interest AA and ZZ up to an aggregate amount equal to the REMIC 1 Principal Loss Allocation Amount, 98% and 2%, respectively;

third, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, B2 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest B2 has been reduced to zero;

fourth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, B1 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest B1 has been reduced to zero;

fifth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M7 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M7 has been reduced to zero;

sixth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M6 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M6 has been reduced to zero;

seventh, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M5 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M5 has been reduced to zero;

eighth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M4 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M4 has been reduced to zero;

ninth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M3 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M3 has been reduced to zero;

tenth, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M2 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M2 has been reduced to zero; and

eleventh, to the Uncertificated Principal Balances of REMIC 1 Regular Interest AA, M1 and ZZ, 98%, 1% and 1%, respectively, until the Uncertificated Principal Balance of REMIC 1 Regular Interest M1 has been reduced to zero.

(b)    If on any Distribution Date Allocated Realized Loss Amounts are to be reinstated due to Subsequent Recoveries, the Allocated Realized Loss Amounts shall be reinstated by the Trustee on such Distribution Date to increase the Certificate Principal Balances of the Mezzanine Certificates and the Class B Certificates in the following order of priority, in each case until the related Allocated Realized Loss Amount has been reduced to zero: *first,* to the Class M-1 Certificates, *second* to the Class M-2 Certificates, *third* to the Class M-3 Certificates, *fourth* to the Class M-4 Certificates, *fifth* to the Class M-5 Certificates, *sixth* to the Class M-6 Certificates, *seventh* to the Class M-7 Certificates, *eighth* to the Class B-1 Certificates and *ninth* to the Class B-2 Certificates.   All Subsequent Recoveries to be allocated to the Certificate Principal Balances of the Mezzanine Certificates or the Class B Certificates on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided in Section 4.01.   All references above to the Certificate Principal Balance of the Mezzanine Certificates and the Class B Certificates shall be to the Certificate Principal Balance of the Mezzanine Certificates and the Class B Certificates immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses or increase thereof by any Subsequent Recoveries, in each case to be allocated to the Mezzanine Certificates and the Class B Certificates on such Distribution Date.

Any Allocated Realized Loss Amounts to be reinstated to a Certificate on any Distribution Date due to Subsequent Recoveries shall be made by increasing the Certificate Principal Balance thereof by the amount so reinstated.   No allocations of any Subsequent Recoveries shall be made to the Class A Certificates or the Class P Certificates.

(c)    If on any Distribution Date Subsequent Recoveries occurred in the related Prepayment Period, the amount of such Subsequent Recoveries shall be allocated among the REMIC 1 Regular Interests in the same proportions and amounts, but in the reverse order, as Realized Losses were allocated under Section 4.06(a)(i).

Section 4.07    Compliance with Withholding Requirements.

Notwithstanding any other provision of this Agreement, the Trustee shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Trustee reasonably believes are applicable under the Code.   The consent of Certificateholders shall not be required for such withholding.   In the event the Trustee does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Trustee shall indicate the amount withheld to such Certificateholders.

Section 4.08    Commission Reporting.

(a)    The Trustee and the Master Servicer shall reasonably cooperate with the Depositor in connection with the Trust's satisfying the reporting requirements under the 1934 Act.

(i)    Within 15 days after each Distribution Date, the Depositor shall, in accordance with industry standards and applicable regulations, file with the Commission via the Electronic Data Gathering Analysis and Retrieval System ("EDGAR"), a Distribution Report on Form 10-D, signed by the Depositor, with a copy of the monthly statement to be furnished by the

Trustee to the Certificateholders for such Distribution Date and detailing all data elements specified in Item 1121(a) of Regulation AB as part of the monthly statement or otherwise as part of the Form 10-D; provided that the Depositor shall have received no later than 12:00 p.m. P.S.T. 2 Business Days prior to the date such Distribution Report on Form 10-D is required to be filed, all information required to be provided to the Depositor as described in clause (a)(iv) below.

(ii)      The Depositor will prepare and file Current Reports on Form 8-K in respect of the Trust, as and when required.

(iii)     Prior to January 30 of the first year in which the Depositor is able to do so under applicable law, the Depositor shall, in accordance with industry standards and applicable regulations, file a Form 15 Suspension Notice with respect to the Trust Fund, if applicable. Prior to (x) March 15 of the year following the year of the execution of this Agreement and (y) unless and until a Form 15 Suspension Notice shall have been filed, prior to March 15 of each year thereafter, the Master Servicer shall provide the Depositor with an Annual Statement of Compliance, together with a copy of the Assessment of Compliance and Attestation Report to be delivered by the Master Servicer pursuant to Sections 3.20 and 3.21 (including with respect to the Sub-Servicer and any other subservicer or subcontractor, if required to be filed). Prior to (x) March 31, of the year following the year of the execution of this Agreement and (y) unless and until a Form 15 Suspension Notice shall have been filed, March 31 of each year thereafter, the Depositor shall, subject to subsection (d) below, file a Form 10-K, in substance as required by applicable law or applicable Securities and Exchange Commission staff's interpretations and conforming to industry standards, with respect to the Trust Fund. Such Form 10-K shall include the Assessment of Compliance, Attestation Report, Annual Statements of Compliance and other documentation provided by the Master Servicer pursuant to Sections 3.20 and 3.21 (including with respect to the Sub-Servicer and any other subservicer or subcontractor, if required to be filed) and with respect to the Trustee, and the Form 10-K (the "Certification") signed by the senior officer of the Depositor in charge of securitization; provided that the Depositor shall have received no later than March 15 of each calendar year prior to the filing deadline for the Form 10-K all information, data and exhibits required to be provided or filed with such Form 10-K and required to be provided to the Depositor as described in clause (a)(iv) below.  If they are not so timely delivered, the Depositor shall file an amended Form 10-K including such documents as exhibits reasonably promptly after they are delivered to the Depositor.

(iv)     As to each item of information required to be included in any Form 10-D, Form 8-K or Form 10-K, the Depositor's obligation to include the information in the applicable report is subject to receipt from the entity that is indicated in Exhibit O as the responsible party for providing that information, if other than the Trustee or the Depositor, as applicable, as and when required as described above.  Each of the Trustee, the Master Servicer and the Depositor, as applicable, hereby agree to notify and provide to the Trustee and the Depositor all information that is required to be included in any Form 10-D, Form 8-K or Form 10-K, with respect to which that entity is indicated in Exhibit O as the responsible party for providing that information.  The Master Servicer shall be responsible for determining the pool concentration applicable to any subservicer or originator at any time, for purposes of disclosure as required by Items 1117 and 1119 of Regulation AB.

SE 2154917 v8
(26425.0085)

(b)    The Depositor shall prepare and the appropriate person shall execute, in accordance with the Exchange Act or any other applicable law, any certification required under the Exchange Act or any other applicable law to accompany the Form 10-K or any other periodic report.  The Trustee shall sign a back-up certification (in the form attached hereto as Exhibit P) for the benefit of the Depositor and its officers, directors and Affiliates.  The Trustee shall indemnify and hold harmless the Depositor, the Master Servicer and each Person, if any, who "controls" the Depositor or the Master Servicer within the meaning of the Securities Act of 1933, as amended, and their respective officers and directors from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) a breach of the Trustee's obligations under Section 3.21(e) to provide the Assessment of Compliance until a Form 15 is filed, Section 4.03(a) to make available statements as specified in Section 4.03(a) to the extent the required information has been provided to the Trustee by the Master Servicer, Section 4.08(a)(iv) to provide information to be included in any Form 10-D, Form 8-K or Form 10-K or this Section 4.08(b) to provide backup certification or (ii) any material misstatement or omission in (A) the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Trustee in the form of Exhibit P or in the Assessment of Compliance provided pursuant to Section 3.21 until a Form 15 is filed or (B) the information provided by the Trustee pursuant to Section 4.08(a)(iv) for inclusion in any Form 10-D, Form 8-K or Form 10-K or in the statement provided by the Trustee pursuant to Section 4.03(a) unless such misstatement or omission is based on the information provided to the Trustee by the Master Servicer.  The Master Servicer shall indemnify and hold harmless the Depositor, the Trustee and each Person, if any, who "controls" the Depositor or the Trustee within the meaning of the Securities Act of 1933, as amended, and their respective officers and directors from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) a breach of the Master Servicer's obligations under Section 3.20, Section 3.21 or Section 4.08 or (ii) any material misstatement or omission in the Certification made in reliance on any material misstatement or omission contained in any certification provided by the Master Servicer under this Section 4.08 or in the Officer's Certificate provided pursuant to Section 3.20 or the Assessment of Compliance provided pursuant to Section 3.21.  If the indemnification provided for herein is unavailable or insufficient to hold harmless the indemnified party, then (i) the Trustee agrees that in connection with (a) a breach of the Trustee's obligations under Section 3.21(e) to provide the Assessment of Compliance until a Form 15 is filed, Section 4.03(a) to make available statements as specified in Section 4.03(a) to the extent the required information has been provided to the Trustee by the Master Servicer, Section 4.08(a)(iv) to provide information to be included in any Form 10-D, Form 8-K or Form 10-K or this Section 4.08(b) to provide backup certification or (b) any material misstatement or omission in (A) the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Trustee in the form of Exhibit P or in the Assessment of Compliance provided pursuant to Section 3.21 until a Form 15 is filed, or (B) the information provided by the Trustee pursuant to Section 4.08(a)(iv) for inclusion in any Form 10-D, Form 8-K or Form 10-K or in the statement provided by the Trustee pursuant to Section 4.03(a) unless such misstatement or omission is based on the information provided to the Trustee by the Master Servicer that it shall contribute to the amount paid or payable by the Depositor and/or the Master Servicer as a result of the losses, claims, damages or liabilities of the Depositor and/or the Master Servicer in such proportion as is appropriate to reflect the relative fault of the Depositor or the Master Servicer, as the case may be, on the one hand and the Trustee on the other and (ii) the Master Servicer agrees

SE 2154917 v8
(26425.0085)

that it shall contribute to the amount paid or payable by the Depositor and/or the Trustee as a result of the losses, claims, damages or liabilities of the Depositor and/or the Trustee in such proportion as is appropriate to reflect the relative fault of the Depositor or the Trustee, as the case may be, on the one hand and the Master Servicer on the other in connection with (a) a breach of the Master Servicer's obligations under this Section 4.08(b) or (b) any material misstatement or omission in the Certification made in reliance on any material misstatement or omission contained in the certification provided by the Master Servicer under this Section 4.08 or in the Officer's Certificate provided pursuant to Section 3.20 or the Assessment of Compliance provided pursuant to Section 3.21.

Section 4.09    <u>Cap Account</u>.

(a)    On the Closing Date, the Trustee shall establish and maintain in its name, a separate non-interest bearing account for the benefit of the Holders of the Class A Certificates, the Mezzanine Certificates, the Class B Certificates and the Class C Certificates (the "Cap Account"), into which the Depositor shall initially deposit $1,000.  The Cap Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee held pursuant to this Agreement.

(b)    The Trustee shall deposit into the Cap Account any amounts received pursuant to the Cap Agreement and shall distribute from the Cap Account any such amounts as required by Section 4.01(d)(iii).

(c)    Funds in the Cap Account shall be invested in Eligible Investments.  The Class C Certificates shall evidence ownership of the Cap Agreement and the Cap Account for federal income tax purposes and the Holders of the majority of the Percentage Interest thereof shall direct the Trustee, in writing, as to investment of amounts on deposit therein.  In the absence of written instructions from the Holders of the Class C Certificates as to investment of funds on deposit in the Cap Account, such funds shall be invested in Deutsche Bank Cash Management Fund 541 for so long as such investment complies with clause (vi) of the definition of Permitted Investments.  All income and gain earned upon such investment shall be deposited into the Cap Account.

Section 4.10    <u>Intention of the Parties and Interpretation.</u>

Each of the parties acknowledges and agrees that the purpose of Sections 3.20, 3.21 and 4.08 of this Agreement is to facilitate compliance by the Depositor with the provisions of Regulation AB, as such may be amended from time to time and subject to clarification and interpretive advice as may be issued by the staff of the Commission from time to time. Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish that purpose, (b) the parties' obligations hereunder will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB, (c) the parties shall comply with requests made by the Depositor for delivery of additional or different information as the Depositor may determine in good faith is necessary to comply with the provisions of Regulation AB, and (d) no amendment of this Agreement shall be

111

required to effect any such changes in the parties' obligations as are necessary to accommodate evolving interpretations of the provisions of Regulation AB.

## ARTICLE V

## THE CERTIFICATES

Section 5.01    The Certificates.

(a)    The Certificates in the aggregate will represent the entire beneficial ownership interest in the Mortgage Loans and all other assets included in REMIC 1.

The Certificates will be substantially in the forms annexed hereto as Exhibits A-1 through A-15.  The Certificates of each Class will be issuable in registered form only, in denominations of authorized Percentage Interests as described in the definition thereof.  Each Certificate will share ratably in all rights of the related Class.

Upon original issue, the Certificates shall be executed by the Trustee and authenticated and delivered by the Trustee, to or upon the order of the Depositor.  The Certificates shall be executed and attested by manual or facsimile signature on behalf of the Trustee by an authorized signatory.  Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such Certificates.  No Certificate shall be entitled to any benefit under this Agreement or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided herein executed by the Trustee by manual signature, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder.  All Certificates shall be dated the date of their authentication.

(b)    The Book Entry Certificates shall initially be issued as one or more Certificates held by the Book-Entry Custodian or, if appointed to hold such Certificates as provided below, the Depository and registered in the name of the Depository or its nominee and, except as provided below, registration of the Book-Entry Certificates may not be transferred by the Trustee except to another Depository that agrees to hold the Book-Entry Certificates for the respective Certificate Owners with Ownership Interests therein.  The Certificate Owners shall hold their respective Ownership Interests in and to the Book-Entry Certificates through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to definitive, fully registered Certificates ("Definitive Certificates") in respect of such Ownership Interests.  All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner.  Each Depository Participant shall only transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.  The Trustee is hereby initially appointed as the Book-Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such.  The Book-Entry

112

Custodian may, and if it is no longer qualified to act as such, the Book-Entry Custodian shall, appoint, by a written instrument delivered to the Depositor, the Master Servicer and if the Trustee is not the Book-Entry Custodian, the Trustee and any other transfer agent (including the Depository or any successor Depository) to act as Book-Entry Custodian under such conditions as the predecessor Book-Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book-Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any such appointment of other than the Depository.  If the Trustee resigns or is removed in accordance with the terms hereof, successor Trustee or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book-Entry Custodian.  The Depositor shall have the right to inspect, and to obtain copies of, any Certificates held as Book-Entry Certificates by the Book-Entry Custodian.

The Trustee, the Master Servicer and the Depositor may for all purposes (including the making of payments due on the Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the Book-Entry Certificates for the purposes of the exercise by Certificateholders of the rights of Certificateholders hereunder.  The rights of Certificate Owners with respect to the Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners.  The Depositor is hereby authorized to execute and deliver on behalf of the Trust the Letter of Representations to be submitted on behalf of the Trust to the Depository and to perform the obligations of the Issuer (as defined in the Letter of Representations) thereunder.  The Trustee is hereby authorized to execute and deliver as agent of the Trust the Letter of Representations to be submitted on behalf of the Trust to the Depository and to perform the obligations of the Agent (as defined in the Letter of Representations) thereunder.  Multiple requests and directions from, and votes of, the Depository as Holder of the Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners.  The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

If (i)(A) the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (B) the Depositor is unable to locate a qualified successor, (ii) the Depositor notifies the Trustee and the Depository of its intent to terminate the book-entry system through the Depository and, upon receipt of notice of such intent from the Depository, the Depository Participants with a position in the Book Entry Certificates agree to initiate such termination, or (iii) after the occurrence of a Master Servicer Event of Default, Certificate Owners representing in the aggregate not less than 51% of the Ownership Interests of the Book-Entry Certificates advise the Trustee through the Depository, in writing, that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same.  Upon surrender to the Trustee of the Book-Entry Certificates by the Book-Entry Custodian or the Depository, as applicable, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates.  Such Definitive Certificates will be issued in minimum denominations of $25,000, except that any beneficial ownership that was represented by a Book-Entry Certificate in an amount less than $25,000 immediately prior to the issuance of

113

a Definitive Certificate shall be issued in a minimum denomination equal to the amount represented by such Book-Entry Certificate. None of the Depositor, the Master Servicer or the Trustee shall be liable for any delay in the delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates, and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

Section 5.02    Registration of Transfer and Exchange of Certificates.

(a)    The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee in accordance with the provisions of Section 8.12 a Certificate Register for the Certificates in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided.

(b)    No transfer, sale, pledge or other disposition of any Class B Certificate, Class C Certificate, Class P Certificate or Class R Certificate shall be made unless such disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with the 1933 Act and laws. In the event of any such transfer of any Class B Certificate to be made without registration under the Securities Act (other than in connection with the initial sale of the Class B Certificates to the initial purchasers or the initial issuance thereof), then the Trustee shall refuse to register such transfer unless it receives (and upon receipt, may conclusively rely upon) a certificate from the Class B Certificateholder desiring to effect such transfer substantially in the form attached as Exhibit J-1A hereto and a certificate from such Class B Certificateholder's prospective transferee substantially in the form attached as Exhibit J-1B hereto (which in the case of the Book-Entry Certificates, the Class B Certificateholder's prospective transferee will be deemed to have represented such certification). In the event of any such transfer of any Class C Certificate, Class P Certificate or Class R Certificate (other than in connection with (i) the initial transfer of any Class C Certificate, Class P Certificate or Class R Certificates by the Depositor to the Seller or (ii) the transfer of any Class C Certificate, Class P Certificate or Class R Certificates by the Seller to an Affiliate of the Seller (i) unless such transfer is made in reliance upon Rule 144A (as evidenced by the investment letter delivered to the Trustee, in substantially the form attached hereto as Exhibit J-2) under the 1933 Act, the Trustee and the Depositor shall require a written Opinion of Counsel (which may be in-house counsel) acceptable to and in form and substance reasonably satisfactory to the Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from the 1933 Act or is being made pursuant to the 1933 Act, which Opinion of Counsel shall not be an expense of the Trustee, the Trust Fund or the Depositor or (ii) the Trustee shall require the transferor to execute a transferor certificate (in substantially the form attached hereto as Exhibit L) and the transferee to execute an investment letter (in substantially the form attached hereto as Exhibit J-2) acceptable to and in form and substance reasonably satisfactory to the Depositor and the Trustee certifying to the Depositor and the Trustee the facts surrounding such transfer, which investment letter shall not be an expense of the Trustee or the Depositor. The Holder of a Class B Certificate, Class C Certificate, Class P Certificate or Class R Certificate desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the

114

Depositor and the Trust Fund against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

          (c)      Each Transferee of a Class A Certificate or Mezzanine Certificate will be deemed to have represented by virtue of its purchase or holding of such Certificate (or interest therein) that either (a) such Transferee is not a Plan or purchasing such Certificate with Plan Assets as defined below, (b) it has acquired and is holding such Certificate in reliance on Prohibited Transaction Exemption ("PTE") 90-59 at 55 F.R. 36724 (1990), as such PTE is further amended by PTE 2000-58, 65 F. R. 67765 (November 13, 2000) and PTE 2002-41, 67 F.R. 163 (August 22, 2002) (the "Exemption"), and that it understands that there are certain conditions to the availability of the Exemption and that the Cap Agreement is an "eligible yield supplement agreement" within the meaning of PTE 2000-58 and that such Certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by S&P, Fitch or Moody's, or (c) the following conditions are satisfied: (i) such Transferee is an insurance company, (ii) the source of funds used to purchase or hold such Certificate (or interest therein) is an "insurance company general account" (as defined in U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, and (iii) the conditions set forth in Sections I and III of PTCE 95-60 have been satisfied. Each transferee of a Class B Certificate shall be deemed to have represented by its purchase or holding of such Certificate (or interest therein) that the conditions in clause (a) or clause (c)(i), (ii) and (iii) have been satisfied.

          No transfer of a Class C Certificate, Class P Certificate or Class R Certificate or any interest therein shall be made to any Plan subject to ERISA or Section 4975 of the Code, any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring such Certificates with "Plan Assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless, in the case of the Class C Certificates or the Class P Certificates, the Depositor, the Trustee and the Master Servicer are provided with an Opinion of Counsel which establishes to the satisfaction of the Depositor, the Trustee and the Master Servicer that the purchase of such Certificates is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Master Servicer, the Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Master Servicer, the Trustee or the Trust Fund. Neither an Opinion of Counsel nor any certification will be required in connection with the (i) initial transfer of any Class C Certificate, Class P Certificate or Class R Certificate by the Depositor to the Seller or (ii) the transfer of any Class C Certificate, Class P Certificate or Class R Certificate by the Seller to an Affiliate of the Seller (in which case, the Depositor, the Seller and such Affiliate and such entities sponsored by such Affiliate shall have deemed to have represented that the applicable transferee is not a Plan or a Person investing Plan Assets) and the Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee, shall be a written representation) from the Depositor of the status of each transferee, the Seller or such an Affiliate. Each transferee of a Class C Certificate, Class P Certificate or Class R Certificate shall sign a letter substantially in the form of Exhibit I to demonstrate its compliance with this Section 5.02(c) (other than in connection with the (i) initial transfer of any Class C Certificate, Class P Certificate or Class R Certificate by the Depositor to the Seller or (ii) the transfer of any Class C Certificate, Class P Certificate or Class R Certificate by the Seller to an Affiliate of the Seller.

If any Certificate or any interest therein is acquired or held in violation of the provisions of the preceding paragraphs, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Certificate retroactive to the date of transfer to the purported beneficial owner.  Any purported beneficial owner whose acquisition or holding of any such Certificate or interest therein was effected in violation of the provisions of the preceding paragraph shall indemnify and hold harmless the Depositor, the Master Servicer, the Trustee and the Trust Fund from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

(d)    Each Person who has or who acquires any Ownership Interest in a Class R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably appointed the Depositor or its designee as its attorney-in-fact to negotiate the terms of any mandatory sale under clause (v) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale, and the rights of each Person acquiring any Ownership Interest in a Class R Certificate are expressly subject to the following provisions:

(i)    Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(ii)    No Person shall acquire an Ownership Interest in a Class R Certificate unless such Ownership Interest is a *pro rata* undivided interest.

(iii)    Except in connection with a transfer to an Affiliate of the Depositor, in connection with any proposed transfer of any Ownership Interest in a Class R Certificate, the Trustee shall as a condition to registration of the transfer, require delivery to it, in form and substance satisfactory to it, of each of the following:

A.    an affidavit in the form of Exhibit K hereto from the proposed transferee to the effect that such transferee is a Permitted Transferee and that it is not acquiring its Ownership Interest in the Class R Certificate that is the subject of the proposed transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee; and

B.    a covenant of the proposed transferee to the effect that the proposed transferee agrees to be bound by and to abide by the transfer restrictions applicable to the Class R Certificates.

(iv)    Any attempted or purported transfer of any Ownership Interest in a Class R Certificate in violation of the provisions of this Section shall be absolutely null and void and shall vest no rights in the purported transferee.  If any purported transferee shall, in violation of the provisions of this Section, become a Holder of a Class R Certificate, then the prior Holder of such Class R Certificate that is a Permitted Transferee shall, upon discovery that the registration of transfer of such Class R Certificate was not in fact permitted by this Section, be restored to all rights as Holder thereof retroactive to the date of

116

registration of transfer of such Class R Certificate. The Trustee shall not be under any liability to any Person for any registration of transfer of a Class R Certificate that is in fact not permitted by this Section or for making any distributions due on such Class R Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Trustee received the documents specified in clause (iii). The Trustee shall be entitled to recover from any Holder of a Class R Certificate that was in fact not a Permitted Transferee at the time such distributions were made all distributions made on such Class R Certificate. Any such distributions so recovered by the Trustee shall be distributed and delivered by the Trustee to the prior Holder of such Class R Certificate that is a Permitted Transferee.

(v)     If any Person other than a Permitted Transferee acquires any Ownership Interest in a Class R Certificate in violation of the restrictions in this Section, then the Trustee shall have the right but not the obligation, without notice to the Holder of such Class R Certificate or any other Person having an Ownership Interest therein, to notify the Depositor to arrange for the sale of such Class R Certificate. The proceeds of such sale, net of commissions (which may include commissions payable to the Depositor or its affiliates in connection with such sale), expenses and taxes due, if any, will be remitted by the Trustee to the previous Holder of such Class R Certificate that is a Permitted Transferee, except that in the event that the Trustee determines that the Holder of such Class R Certificate may be liable for any amount due under this Section or any other provisions of this Agreement, the Trustee may withhold a corresponding amount from such remittance as security for such claim. The terms and conditions of any sale under this clause (v) shall be determined in the sole discretion of the Trustee and it shall not be liable to any Person having an Ownership Interest in a Class R Certificate as a result of its exercise of such discretion.

(vi)     If any Person other than a Permitted Transferee acquires any Ownership Interest in a Class R Certificate in violation of the restrictions in this Section, then the Trustee will provide to the Internal Revenue Service, and to the persons designated in Section 860E(e)(3) of the Code, information needed to compute the tax imposed under Section 860E(e)(1) of the Code on such transfer.

The foregoing provisions of this Section shall cease to apply to transfers occurring on or after the date on which there shall have been delivered to the Trustee, in form and substance satisfactory to the Trustee, (i) written notification from each Rating Agency that the removal of the restrictions on Transfer set forth in this Section will not cause such Rating Agency to downgrade its rating of any of the Certificates and (ii) an Opinion of Counsel to the effect that such removal will not cause any REMIC created hereunder to fail to qualify as a REMIC.

(e)     Subject to the preceding subsections, upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee designated from time to time for such purpose pursuant to Section 8.12, the Trustee shall execute and authenticate and deliver, in the name of the designated Transferee or Transferees, one or more new Certificates of the same Class of a like aggregate Percentage Interest.

117

(f)　　　At the option of the Holder thereof, any Certificate may be exchanged for other Certificates of the same Class with authorized denominations and a like aggregate Percentage Interest, upon surrender of such Certificate to be exchanged at any office or agency of the Trustee maintained for such purpose pursuant to Section 8.12. Whenever any Certificates are so surrendered for exchange the Trustee shall execute, authenticate and deliver the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing.

(g)　　　No service charge shall be made for any registration of transfer or exchange of Certificates of any Class, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

All Certificates surrendered for registration of transfer or exchange shall be canceled by the Trustee and disposed of pursuant to its standard procedures.

Section 5.03　　<u>Mutilated, Destroyed, Lost or Stolen Certificates</u>.

If (i) any mutilated Certificate is surrendered to the Trustee or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and (ii) there is delivered to the Trustee and the Depositor such security or indemnity as may be required by them to save each of them, and the Trust Fund, harmless, then, in the absence of notice to the Trustee that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor and Percentage Interest. Upon the issuance of any new Certificate under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith. Any duplicate Certificate issued pursuant to this Section, shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.04　　<u>Persons Deemed Owners</u>.

The Master Servicer, the Depositor, the Trustee and any agent of the Master Servicer, the Depositor or the Trustee may treat the Person, including a Depository, in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 4.01 and for all other purposes whatsoever, and none of the Master Servicer, the Depositor, the Trustee nor any agent of any of them shall be affected by notice to the contrary.

SE 2154917 v8
(26425.0085)

ARTICLE VI

THE MASTER SERVICER AND THE DEPOSITOR

Section 6.01    Liability of the Master Servicer and the Depositor.

The Depositor and the Master Servicer each shall be liable in accordance herewith only to the extent of the obligations specifically imposed by this Agreement and undertaken hereunder by the Depositor and the Master Servicer herein.

Section 6.02    Merger or Consolidation of the Depositor or the Master Servicer.

Subject to the following paragraph, the Depositor will keep in full effect its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation. Subject to the following paragraph, the Master Servicer will keep in full effect its existence, rights and franchises as a corporation under the laws of the jurisdiction of its incorporation and its qualification as an approved conventional seller/servicer for Fannie Mae or Freddie Mac in good standing.   The Depositor and the Master Servicer each will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

The Depositor or the Master Servicer may be merged or consolidated with or into any Person, or transfer all or substantially all of its assets to any Person, in which case any Person resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person to the Master Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; and provided further that the Rating Agencies' ratings of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates in effect immediately prior to such merger or consolidation will not be qualified, reduced or withdrawn as a result thereof (as evidenced by a letter to such effect from the Rating Agencies to the Trustee).

Section 6.03    Limitation on Liability of the Depositor, the Master Servicer and Others.

None of the Depositor, the Master Servicer or any of the directors, officers, employees or agents of the Depositor or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Master Servicer or any such person against any breach of warranties, representations or covenants made herein, or against any specific liability imposed on the Master Servicer or the Depositor, as applicable, pursuant hereto, or against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.  The Depositor, the Master Servicer and any director, officer, employee or

119

agent of the Depositor or the Master Servicer may rely in good faith on any document of any kind which, *prima facie*, is properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor or the Master Servicer shall be indemnified and held harmless by the Trust Fund against any loss, liability or expense incurred in connection with any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. Neither the Depositor nor the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal action unless such action is related to its respective duties under this Agreement and, in its opinion, does not involve it in any expense or liability; provided, however, that each of the Depositor and the Master Servicer may in its discretion undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, unless the Depositor or the Master Servicer acts without the consent of Holders of Certificates entitled to at least 51% of the Voting Rights (which consent shall not be necessary in the case of litigation or other legal action by either to enforce their respective rights or defend themselves hereunder), the legal expenses and costs of such action and any liability resulting therefrom (except any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder) shall be expenses, costs and liabilities of the Trust Fund, and the Depositor and the Master Servicer shall be entitled to be reimbursed therefor from the Collection Account as and to the extent provided in Section 3.11, any such right of reimbursement being prior to the rights of the Certificateholders to receive any amount in the Collection Account.

The Master Servicer (except the Trustee to the extent it has succeeded the Master Servicer as required hereunder) indemnifies and holds the Trustee, the Depositor and the Trust Fund harmless against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Trustee, the Depositor or the Trust Fund may sustain in any way related to the failure of the Master Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement. The Master Servicer shall immediately notify the Trustee and the Depositor if a claim is made that may result in such claims, losses, penalties, fines, forfeitures, legal fees or related costs, judgments, or any other costs, fees and expenses, and the Master Servicer shall assume (with the consent of the Trustee) the defense of any such claim and pay all expenses in connection therewith, including reasonable counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against the Master Servicer, the Trustee, the Depositor and/or the Trust Fund in respect of such claim. The provisions of this paragraph shall survive the termination of this Agreement and the payment of the outstanding Certificates.

Section 6.04    Limitation on Resignation of Master Servicer.

The Master Servicer shall not resign from the obligations and duties hereby imposed on it except (i) upon determination that its duties hereunder are no longer permissible under applicable law or (ii) with the written consent of the Trustee and written confirmation from each Rating Agency (which confirmation shall be furnished to the Depositor and the Trustee) that such resignation will not cause such Rating Agency to reduce the then current rating of any of the Class A Certificates, the Mezzanine Certificates or the Class B Certificates. Any such

determination pursuant to clause (i) of the preceding sentence permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel to such effect obtained at the expense of the Master Servicer and delivered to the Trustee. No resignation of the Master Servicer shall become effective until the Trustee or a successor servicer shall have assumed the Master Servicer's responsibilities, duties, liabilities (other than those liabilities arising prior to the appointment of such successor) and obligations under this Agreement.

Except as expressly provided herein, the Master Servicer shall not assign or transfer any of its rights, benefits or privileges hereunder to any other Person, nor delegate to or subcontract with, nor authorize or appoint any other Person to perform any of the duties, covenants or obligations to be performed by the Master Servicer hereunder. The foregoing prohibition on assignment shall not prohibit the Master Servicer from designating a Sub-Servicer as payee of any indemnification amount payable to the Master Servicer hereunder; provided, however, that as provided in Section 3.06 hereof, no Sub-Servicer shall be a third-party beneficiary hereunder and the parties hereto shall not be required to recognize any Sub-Servicer as an indemnitee under this Agreement. If, pursuant to any provision hereof, the duties of the Master Servicer are transferred to a successor master servicer, the entire amount of the Servicing Fee and other compensation payable to the Master Servicer pursuant hereto shall thereafter be payable to such successor master servicer.

Section 6.05    <u>Rights of the Depositor and the Trustee in Respect of the Master Servicer</u>.

The Master Servicer shall afford (and any Sub-Servicing Agreement shall provide that each Sub-Servicer shall afford) the Depositor and the Trustee, upon reasonable notice, during normal business hours, access to all records maintained by the Master Servicer (and any such Sub-Servicer) in respect of the Master Servicer's rights and obligations hereunder and access to officers of the Master Servicer (and those of any such Sub-Servicer) responsible for such obligations. Upon request, the Master Servicer shall furnish to the Depositor and the Trustee its (and any such Sub-Servicer's) most recent financial statements and such other information relating to the Master Servicer's capacity to perform its obligations under this Agreement that it possesses. To the extent such information is not otherwise available to the public, the Depositor and the Trustee shall not disseminate any information obtained pursuant to the preceding two sentences without the Master Servicer's (or any such Sub-Servicer's) written consent, except as required pursuant to this Agreement or to the extent that it is necessary to do so (i) in working with legal counsel, auditors, taxing authorities or other governmental agencies, rating agencies or reinsurers or (ii) pursuant to any law, rule, regulation, order, judgment, writ, injunction or decree of any court or governmental authority having jurisdiction over the Depositor, the Trustee or the Trust Fund, and in either case, the Depositor or the Trustee, as the case may be, shall use its best efforts to assure the confidentiality of any such disseminated non-public information. The Depositor may, but is not obligated to, enforce the obligations of the Master Servicer under this Agreement and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Master Servicer under this Agreement or exercise the rights of the Master Servicer under this Agreement; provided that the Master Servicer shall not be relieved of any of its obligations under this Agreement by virtue of such performance by the Depositor or its designee. The Depositor shall not have any responsibility or liability for any action or failure to act by the Master Servicer and is not obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

SE 2154917 v8
(26425.0085)

# ARTICLE VII

## DEFAULT

Section 7.01   <u>Master Servicer Events of Default</u>.

"Master Servicer Event of Default," wherever used herein, means any one of the following events:

(i)      any failure by the Master Servicer to remit to the Trustee for distribution to the Certificateholders any payment (other than an Advance required to be made from its own funds on any Master Servicer Remittance Date pursuant to Section 4.04) required to be made under the terms of the Certificates and this Agreement which continues unremedied for a period of one Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Depositor, the Trustee (in which case notice shall be provided by telecopy), or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates entitled to at least 25% of the Voting Rights; or

(ii)     any failure on the part of the Master Servicer duly to observe or perform in any material respect any of the covenants or agreements on the part of the Master Servicer contained in this Agreement which continues unremedied for a period of 45 days (30 days in the case of any failure to maintain a Sub-Servicing Agreement with an eligible Sub-Servicer to the extent required in accordance with Section 3.02(c)) after the earlier of (i) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Depositor or the Trustee, or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates entitled to at least 25% of the Voting Rights and (ii) actual knowledge of such failure by a Servicing Representative of the Master Servicer; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceeding, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and if such proceeding is being contested by the Master Servicer in good faith, such decree or order shall have remained in force undischarged or unstayed for a period of 60 days or results in the entry of an order for relief or any such adjudication or appointment; or

(iv)    the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

122

(v)     the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors; or

(vi)     [reserved]; or

(vii)     any failure of the Master Servicer to make, or cause an Advancing Person to make, any Advance on any Master Servicer Remittance Date required to be made from its own funds pursuant to Section 4.04 which continues unremedied until 3:00 p.m. New York time on the Business Day immediately following the Master Servicer Remittance Date; or

(viii)     the Master Servicer ceases to be an approved seller or servicer of Fannie Mae.

If a Master Servicer Event of Default described in clauses (i) through (vi) of this Section shall occur, then, and in each and every such case, so long as such Master Servicer Event of Default shall not have been remedied, the Depositor or the Trustee may, and at the written direction of the Holders of Certificates entitled to at least 51% of Voting Rights, the Trustee shall, by notice in writing to the Master Servicer (and to the Depositor if given by the Trustee or to the Trustee if given by the Depositor), terminate all of the rights and obligations of the Master Servicer in its capacity as Master Servicer under this Agreement, to the extent permitted by law, and in and to the Mortgage Loans and the proceeds thereof.  If a Master Servicer Event of Default described in clauses (vii) or (viii) hereof shall occur, the Trustee shall, by notice in writing to the Master Servicer (delivered immediately by facsimile and effective on the date of acknowledgement of receipt in the case of a Master Servicer Event of Default described in clause (vii)) and the Depositor, terminate all of the rights and obligations of the Master Servicer in its capacity as Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof.  On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder of any Certificate) or the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee pursuant to and under this Section and, without limitation, the Trustee is hereby authorized and empowered, as attorney-in-fact or otherwise, to execute and deliver on behalf of and at the expense of the Master Servicer, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise.  The Master Servicer agrees, at its sole cost and expense, promptly (and in any event no later than ten Business Days subsequent to such notice) to provide the Trustee with all documents and records requested by it to enable it to assume the Master Servicer's functions under this Agreement, and to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights under this Agreement, including, without limitation, the transfer within one Business Day to the Trustee for administration by it of all cash amounts which at the time shall be or should have been credited by the Master Servicer to the Collection Account held by or on behalf of the Master Servicer, or any REO Account or Servicing Account held by or on behalf of the Master Servicer or thereafter be received with respect to the Mortgage Loans or any REO Property (provided, however, that the Master Servicer shall continue to be entitled to receive all amounts

123

accrued or owing to it under this Agreement on or prior to the date of such termination, whether in respect of Advances or otherwise, and shall continue to be entitled to the benefits of Section 6.03, notwithstanding any such termination, with respect to events occurring prior to such termination).  For purposes of this Section 7.01, the Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default unless a Responsible Officer of Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Master Servicer Event of Default is received by the Trustee and such notice references the Certificates, any of the Trust REMICs or this Agreement.

The Trustee shall be entitled to be reimbursed by the Master Servicer (or by the Trust Fund if the Master Servicer is unable to fulfill its obligations hereunder) for all costs associated with the transfer of servicing from the predecessor master servicer, including without limitation, any costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Trustee to correct any errors or insufficiencies in the servicing data or otherwise to enable the Trustee to service the Mortgage Loans properly and effectively.

Section 7.02    Trustee to Act; Appointment of Successor.

(a)    On and after the time the Master Servicer receives a notice of termination, the Trustee shall be the successor in all respects to the Master Servicer in its capacity as Master Servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto and arising thereafter, which shall be assumed by the Trustee (except for any representations or warranties of the Master Servicer under this Agreement, the responsibilities, duties and liabilities contained in Section 2.03(c) and its obligation to deposit amounts in respect of losses pursuant to Section 3.12) by the terms and provisions hereof including, without limitation, the Master Servicer's obligations to make Advances pursuant to Section 4.04; provided, however, that if the Trustee is prohibited by law or regulation from obligating itself to make advances regarding delinquent Mortgage Loans, then the Trustee shall not be obligated to make Advances pursuant to Section 4.04; and provided further, that any failure to perform such duties or responsibilities caused by the Master Servicer's failure to provide information required by Section 7.01 shall not be considered a default by the Trustee as successor to the Master Servicer hereunder; provided, however, it is understood and acknowledged by the parties that there will be a period of transition (not to exceed 90 days) before the servicing transfer is fully effected.  As compensation therefor, the Trustee shall be entitled to the Servicing Fee and all funds relating to the Mortgage Loans to which the Master Servicer would have been entitled if it had continued to act hereunder (other than amounts which were due or would become due to the Master Servicer prior to its termination or resignation).  Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for any Servicing Fee or for any differential in the amount of the Servicing Fee paid hereunder and the amount necessary to induce any successor Master Servicer to act as successor Master Servicer under this Agreement and the transactions set forth or provided for herein.  After the Master Servicer receives a notice of termination, notwithstanding the above and subject to the next paragraph, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act or if it is prohibited by law from making advances regarding delinquent Mortgage Loans, or if the Holders of Certificates entitled to at least 51% of the Voting Rights so request in writing to the Trustee, promptly appoint, or petition a court of

competent jurisdiction to appoint, an established mortgage loan servicing institution acceptable to each Rating Agency, having a net worth of not less than $15,000,000, as the successor to the Master Servicer under this Agreement in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer under this Agreement.

No appointment of a successor to the Master Servicer under this Agreement shall be effective until the assumption by the successor of all of the Master Servicer's responsibilities, duties and liabilities hereunder. In connection with such appointment and assumption described herein, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of that permitted the Master Servicer as such hereunder. The Depositor, the Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Pending appointment of a successor to the Master Servicer under this Agreement, the Trustee shall act in such capacity as hereinabove provided.

In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Master Servicer. The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this Section 7.02(a).

Upon removal or resignation of the Master Servicer, the Trustee, with the cooperation of the Depositor, (x) shall solicit bids for a successor Master Servicer as described below and (y) pending the appointment of a successor Master Servicer as a result of soliciting such bids, shall serve as Master Servicer of the Mortgage Loans serviced by such predecessor Master Servicer. The Trustee shall solicit, by public announcement, bids from housing and home finance institutions, banks and mortgage servicing institutions meeting the qualifications set forth in the first paragraph of this Section 7.02 (including the Trustee or any affiliate thereof). Such public announcement shall specify that the successor Master Servicer shall be entitled to the servicing compensation agreed upon between the Trustee, the successor Master Servicer and the Depositor; provided, however, that no such fee shall exceed the Servicing Fee. Within thirty days after any such public announcement, the Trustee with the cooperation of the Depositor, shall negotiate in good faith and effect the sale, transfer and assignment of the servicing rights and responsibilities hereunder to the qualified party submitting the highest satisfactory bid as to the price they will pay to obtain such servicing. The Trustee, upon receipt of the purchase price

SE 2154917 v8
(26425.0085)

shall pay such purchase price to the Master Servicer being so removed, after deducting from any sum received by the Trustee from the successor to the Master Servicer in respect of such sale, transfer and assignment all costs and expenses of any public announcement and of any sale, transfer and assignment of the servicing rights and responsibilities reasonably incurred hereunder.  After such deductions, the remainder of such sum shall be paid by the Trustee to the Master Servicer at the time of such sale.

(b)    If the Master Servicer fails to remit to the Trustee for distribution to the Certificateholders any payment required to be made under the terms of this Agreement (for purposes of this Section 7.02(b), a "Remittance") because the Master Servicer is the subject of a proceeding under the Bankruptcy Code and the making of such Remittance is prohibited by Section 362 of the Bankruptcy Code, the Trustee shall upon written notice of such prohibition, regardless of whether it has received a notice of termination under Section 7.01, shall be treated as though it had succeeded to the Master Servicer and shall advance the amount of such Remittance by depositing such amount in the Distribution Account on the related Distribution Date.  The Trustee shall be obligated to make such advance only if (i) such advance, in the good faith judgment of the Trustee can reasonably be expected to be ultimately recoverable from Stayed Funds and (ii) the Trustee is not prohibited by law from making such advance or obligating itself to do so.  Upon remittance of the Stayed Funds to the Trustee or the deposit thereof in the Distribution Account by the Master Servicer, a trustee in bankruptcy or a federal bankruptcy court, the Trustee may recover the amount so advanced, without interest, by withdrawing such amount from the Distribution Account; however, nothing in this Agreement shall be deemed to affect the Trustee's rights to recover from the Master Servicer's own funds interest on the amount of any such advance.  If the Trustee at any time makes an advance under this subsection which it later determines in its good faith judgment will not be ultimately recoverable from the Stayed Funds with respect to which such advance was made, the Trustee shall be entitled to reimburse itself for such advance, without interest, by withdrawing from the Distribution Account, out of amounts on deposit therein, an amount equal to the portion of such advance attributable to the Stayed Funds.

Section 7.03    Notification to Certificateholders.

(a)    Upon any termination of the Master Servicer pursuant to Section 7.01 above or any appointment of a successor to the Master Servicer pursuant to Section 7.02 above, the Trustee shall give prompt written notice thereof to Certificateholders at their respective addresses appearing in the Certificate Register.

(b)    Not later than the later of 60 days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Master Servicer Event of Default or five days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Holders of Certificates notice of each such occurrence, unless such default or Master Servicer Event of Default shall have been cured or waived.

Section 7.04    Waiver of Master Servicer Events of Default.

The Holders representing at least 66% of the Voting Rights evidenced by all Classes of Certificates affected by any default or Master Servicer Event of Default hereunder may waive

such default or Master Servicer Event of Default; provided, however, that a default or Master Servicer Event of Default under clause (i) or (vii) of Section 7.01 may be waived only by all of the Holders of the Regular Certificates. Upon any such waiver of a default or Master Servicer Event of Default, such default or Master Servicer Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default or Master Servicer Event of Default or impair any right consequent thereon except to the extent expressly so waived.

ARTICLE VIII

THE TRUSTEE

Section 8.01    Duties of Trustee.

The Trustee, prior to the occurrence of a Master Servicer Event of Default and after the curing of all Master Servicer Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. During a Master Servicer Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Any permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. If any such instrument is found not to conform to the requirements of this Agreement in a material manner, the Trustee shall take such action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Certificateholders.

No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own misconduct; provided, however, that:

(i)    Prior to the occurrence of a Master Servicer Event of Default, and after the curing of all such Master Servicer Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee that conform to the requirements of this Agreement;

(ii)    The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the

127

Trustee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Holders of Certificates entitled to at least 25% of the Voting Rights relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement.

Section 8.02    <u>Certain Matters Affecting the Trustee.</u>

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may request and rely conclusively upon and shall be fully protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties and the manner of obtaining consents and evidencing the authorization of the execution thereof shall be subject to such reasonable regulations as the Trustee may prescribe;

(ii)    The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of a Master Servicer Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of a Master Servicer Event of Default hereunder and after the curing of all Master Servicer Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the

128

facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee not reasonably assured to the Trustee by such Certificateholders, the Trustee may require reasonable indemnity against such expense, or liability from such Certificateholders as a condition to taking any such action;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents custodians, nominees or attorneys and shall not be responsible for any willful misconduct or negligence of such agents, custodians, nominees or attorneys (as long as such agents, custodians, nominees or attorneys are appointed with due and proper care);

(vii)    The Trustee shall not be personally liable for any loss resulting from the investment of funds held in the Collection Account at the direction of the Master Servicer pursuant to Section 3.12 or the Holders of the majority of the Percentage Interest in the Class C Certificates, pursuant to Section 4.09, as applicable; and

(viii)    Except as otherwise expressly provided herein, none of the provisions of this Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers (not including expenses, disbursements and advances incurred or made by the Trustee including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Trustee's performance in accordance with the provisions of this Agreement) if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(b)    All rights of action under this Agreement or under any of the Certificates, enforceable by the Trustee may be enforced by it without the possession of any of the Certificates, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Certificates, subject to the provisions of this Agreement.

Section 8.03    Trustee Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature of the Trustee, the execution and authentication of the Trustee on the Certificates, the acknowledgments of the Trustee contained in Article II and the representations and warranties of the Trustee in Section 8.13) shall be taken as the statements of the Depositor, and the Trustee shall not assume any responsibility for their correctness. The Trustee makes no representations

129

or warranties as to the validity or sufficiency of this Agreement (other than as specifically set forth in Section 8.13) or of the Certificates (other than execution and authentication of the Trustee on the Certificates) or of any Mortgage Loan or related document. The Trustee shall not be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of the Certificates, or for the use or application of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Collection Account by the Master Servicer, other than any funds held by or on behalf of the Trustee in accordance with Section 3.10.

Section 8.04    Trustee May Own Certificates.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee and may transact banking and/or trust business with the Seller, the Depositor, the Master Servicer or their Affiliates.

Section 8.05    Trustee's Fees and Expenses.

(a)    On the Closing Date, the Depositor shall pay to the Trustee as specified in a separate agreement between the Depositor and the Trustee. The Trustee shall withdraw from the Distribution Account on each Distribution Date and pay to itself the Trustee Fee for such Distribution Date and one day's interest earnings (net of losses) on amounts on deposit in the Distribution Account. The right to receive the Trustee Fee may not be transferred in whole or in part except in connection with the transfer of all of the Trustee's responsibilities and obligations under this Agreement.

The Trustee, and any director, officer, employee or agent of the Trustee shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense (not including expenses, disbursements and advances incurred or made by the Trustee, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Trustee's performance in accordance with the provisions of this Agreement) incurred by the Trustee arising out of or in connection with the acceptance or administration of its obligations (including, without limitation, its obligation to enter into the Cap Assignment) and duties under this Agreement, other than any loss, liability or expense (i) in any way relating to the failure of the Master Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement, (ii) that constitutes a specific liability of the Trustee pursuant to Section 4.08 or 10.01(c) or (iii) any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, including as a result of a breach of the Trustee's obligations under Article X hereof. Any amounts payable to the Trustee or any director, officer, employee or agent of the Trustee in respect of the indemnification provided by this paragraph (a), or pursuant to any other right of reimbursement from the Trust Fund that the Trustee or any director, officer, employee or agent of the Trustee may have hereunder in its capacity as such, may be withdrawn by the Trustee from the Distribution Account at any time. Such indemnity shall survive the termination of this Agreement and the resignation of the Trustee.

As a limitation on the foregoing with respect to certain expenses of the Trustee, the Trustee shall receive from the Trust Fund amounts with respect to indemnification for counsel fees and expenses (collectively, "Legal Fees") in connection with any third-party litigation or other claims alleging violations of laws or regulations relating to consumer lending and/or servicing of the Trust Fund (collectively, "Third Party Claims") in an amount not greater than $25,000 per month, and $600,000 in the aggregate (with amounts in excess of $25,000 for any month carried-forward to subsequent months, until the $600,000 aggregate maximum is reached). The Trustee shall have no obligation to incur additional expenses for which reimbursement is limited pursuant to this paragraph in excess of the aggregate limit set forth above unless it has received reasonable security or indemnity for such additional expenses. The Certificateholders shall hold the Trustee harmless for any consequences to such Certificateholders resulting from any failure of the Trustee to incur any such additional expenses in excess of the aforementioned aggregate limit.

(b)      Without limiting the Master Servicer's indemnification obligations under Section 6.03, the Master Servicer agrees to indemnify the Trustee from, and hold it harmless against, any loss, liability or expense resulting from a breach of the Master Servicer's obligations and duties under this Agreement. Such indemnity shall survive the termination or discharge of this Agreement and the resignation or removal of the Trustee. Any payment under this Section 8.05(b) made by the Master Servicer to the Trustee shall be from the Master Servicer's own funds, without reimbursement from the Trust Fund therefor.

Section 8.06    Eligibility Requirements for Trustee.

The Trustee hereunder shall at all times be a corporation or an association (other than the Depositor, the Seller, the Master Servicer or any Affiliate of the foregoing) organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority. If such corporation or association publishes reports of conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 8.07.

Section 8.07    Resignation or Removal of Trustee.

The Trustee may at any time resign and be discharged from the trust hereby created by giving written notice thereof to the Depositor, the Master Servicer and the Certificateholders. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor Trustee by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor Trustee acceptable to the Holders of Certificates entitled to at least 51% of the Voting Rights. A copy of such instrument shall be delivered to the Certificateholders and the Master Servicer by the Depositor. If no successor Trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the

131

resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 and shall fail to resign after written request therefor by the Depositor, or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Depositor may remove the Trustee and the Depositor may appoint a successor Trustee, acceptable to the Holders of Certificates entitled to at least 51% of the Voting Rights, by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor Trustee. A copy of such instrument shall be delivered to the Certificateholders and the Master Servicer by the Depositor.

The Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor Trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Trustee so removed and one complete set to the successor so appointed. A copy of such instrument shall be delivered to the Certificateholders and the Master Servicer by the Depositor.

Any resignation or removal of the Trustee and appointment of a successor Trustee pursuant to any of the provisions of this Section shall not become effective until acceptance of appointment by the successor Trustee as provided in Section 8.08.

Section 8.08    Successor Trustee.

Any successor Trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor, and to its predecessor Trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as Trustee herein. The predecessor Trustee shall deliver to the successor Trustee all Mortgage Files and related documents and statements, as well as all moneys, held by it hereunder (other than any Mortgage Files at the time held by a Custodian, which Custodian shall become the agent of any successor Trustee hereunder), and the Depositor and the predecessor Trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor Trustee all such rights, powers, duties and obligations.

No successor Trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor Trustee shall be eligible under the provisions of Section 8.06 and the appointment of such successor Trustee shall not result in a downgrading of the ratings of any Class of Certificates by any Rating Agency, as evidenced by a letter from each Rating Agency.

Upon acceptance of appointment by a successor Trustee as provided in this Section, the Depositor shall mail notice of the succession of such Trustee hereunder to all Holders of

Certificates at their addresses as shown in the Certificate Register.  If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be mailed at the expense of the Depositor.

Section 8.09    Merger or Consolidation of Trustee.

Any corporation or association into which the Trustee may be merged or converted or with which it may be consolidated or any corporation or association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or association succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation or association shall be eligible under the provisions of Section 8.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.10    Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of REMIC 1, or property securing the same may at the time be located, the Master Servicer and the Trustee, acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of REMIC 1, and to vest in such Person or Persons, in such capacity, such title to REMIC 1, or any part thereof and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable.  If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request so to do, or in case a Master Servicer Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08 hereof.  If such appointment is at the request of the Master Servicer then any expense of the Trustee shall be deemed a Servicing Advance for all purpose of this Agreement, otherwise it will be an expense of the Trustee and will be payable out of the Trustee's funds.

In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to REMIC 1, or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this

133

Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trust conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11    Appointment of Custodians.

The Trustee may, with the consent of the Depositor and the Master Servicer, appoint one or more Custodians to hold all or a portion of the Mortgage Files as agent for the Trustee, by entering into a Custodial Agreement. The Trustee shall initially serve as the Custodian and this Agreement shall serve as the Custodial Agreement. The appointment of any Custodian may at any time be terminated and a substitute Custodian appointed therefor upon the reasonable request of the Master Servicer to the Trustee, the consent to which shall not be unreasonably withheld. The Trustee shall pay any and all fees and expenses of any Custodian (other than the Washington Mutual Custodian) in accordance with each Custodial Agreement. Subject to Article VIII hereof, the Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Certificateholders having an interest in any Mortgage File held by such Custodian. Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Mortgage File. Each Custodial Agreement may be amended only as provided in Section 11.01. In no event shall the appointment of any Custodian pursuant to a Custodial Agreement diminish the obligations of the Trustee hereunder. The Trustee shall at all times remain responsible under the terms of this Agreement notwithstanding the fact that certain duties have been assigned to the Custodian (other than the Washington Mutual Custodian), but only to the extent the Trustee is responsible for its own acts hereunder. Any documents delivered by the Depositor or the Master Servicer to a Custodian other than the Trustee, if any, shall be deemed to have been delivered to the Trustee for all purposes hereunder; and any documents held by such a Custodian, if any, shall be deemed to be held by the Trustee for all purposes hereunder. In order to comply with its duties under the U.S. Patriot Act, the Custodian shall obtain and verify certain information and documentation from the other parties to this Agreement, including, but not limited to, such parties' name, address, and other identifying information.

Section 8.12    Appointment of Office or Agency.

The Trustee will appoint an office or agency in the City of New York where the Certificates may be surrendered for registration of transfer or exchange, and presented for final distribution, and where notices and demands to or upon the Trustee in respect of the Certificates

and this Agreement may be served.  As of the Closing Date, the Trustee designates its offices located at the office of Trustee's agent, located at DB Services Tennessee, 648 Grassmere Park Road, Nashville, TN 37211-3658, Attn: Transfer Unit for such purpose.

Section 8.13    <u>Representations and Warranties of the Trustee</u>.

The Trustee hereby represents and warrants to the Master Servicer and the Depositor, as of the Closing Date, that:

(i)    it is a national banking association duly organized, validly existing and in good standing under the laws of the United States.

(ii)    the execution and delivery of this Agreement, and the performance and compliance with the terms of this Agreement, will not violate its charter or bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material agreement or other instrument to which it is a party or which is applicable to it or any of its assets.

(iii)    it has the full power and authority to enter into and consummate all transactions contemplated by this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement.

(iv)    this Agreement, assuming due authorization, execution and delivery by the Master Servicer and the Depositor, constitutes its valid, legal and binding obligation, enforceable against it in accordance with the terms hereof, subject to (A) applicable bankruptcy, insolvency, receivership, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

ARTICLE IX

TERMINATION

Section 9.01    <u>Termination Upon Purchase or Liquidation of All Mortgage Loans</u>.

(a)    Subject to Section 9.02, the respective obligations and responsibilities under this Agreement of the Depositor, the Master Servicer and the Trustee (other than the obligations of the Master Servicer to the Trustee pursuant to Section 8.05 and of the Master Servicer to provide for and the Trustee to make payments in respect of the REMIC 1 Regular Interests, REMIC 2 Regular Interests and the Classes of Certificates as hereinafter set forth) shall terminate upon the payment to the Certificateholders and the deposit of all amounts held by or on behalf of the Trustee and required hereunder to be so paid or deposited on the Distribution Date coinciding with or following the earlier to occur of (i) the purchase by the Terminator (as defined below) of all Mortgage Loans and each REO Property remaining in REMIC 1 and (ii) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or REO Property remaining in REMIC 1; provided, however, that in no event shall the trust created

135

hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof.  The purchase by the Terminator of all Mortgage Loans and each REO Property remaining in REMIC 1 shall be at a price (the "Termination Price") equal to (a) if the Terminator is the Master Servicer purchasing the Mortgage Loans and the REO Properties on its own behalf, 100% of the aggregate Stated Principal Balance of all the Mortgage Loans included in REMIC 1 and accrued interest on the Stated Principal Balance of each such Mortgage Loan at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last paid by the related Mortgagor or by an advance by the Master Servicer to but not including the first day of the month in which such purchase is to be effected, plus the appraised value of each REO Property, if any, included in REMIC 1, such appraisal to be conducted by an appraiser selected by the Terminator in its reasonable discretion and (b) if the Terminator is the Master Servicer purchasing the Mortgage Loans and the REO Properties at the request of and on behalf of an unaffiliated third party, the greater of (A) the aggregate Purchase Price of all the Mortgage Loans included in REMIC 1, plus the appraised value of each REO Property, if any, included in REMIC 1, such appraisal to be conducted by an appraiser selected by the Terminator in its reasonable discretion, and (B) the aggregate fair market value of all of the assets of REMIC 1 (as determined by the Terminator, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to the third paragraph of this Section 9.01).

(b)    The Master Servicer shall have the right (when exercising such right, the "Terminator") to purchase all of the Mortgage Loans and each REO Property remaining in REMIC 1 pursuant to clause (i) of the preceding paragraph no later than the Determination Date in the month immediately preceding the Distribution Date on which the Certificates will be retired; provided, however, that the Terminator may elect to purchase all of the Mortgage Loans and each REO Property remaining in REMIC 1 pursuant to clause (i) of the preceding paragraph only if the aggregate Stated Principal Balance of the Mortgage Loans and each REO Property remaining in the Trust Fund at the time of such election is equal to or less than 10% of the Cut-off Date Principal Balance of the Closing Date Mortgage Loans.  Additionally, if the Terminator is the Master Servicer purchasing the Mortgage Loans and the REO Properties on its own behalf, the Terminator may elect to purchase all of the Mortgage Loans and each REO Property in REMIC 1 pursuant to clause (i) of the preceding paragraph only if the Termination Price is equal to or less than the aggregate fair market value of all of the assets of REMIC 1 (as determined by the Terminator, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to Section 9.01(c)), less unreimbursed Advances and Servicing Advances (other than Advances and Servicing Advances made with respect to Mortgage Loans as to which the Master Servicer expects that foreclosure is not imminent).

(c)    Notice of the liquidation of the REMIC 1 Regular Interests shall be given promptly by the Trustee by letter to Certificateholders mailed (a) in the event such notice is given in connection with the purchase of the Mortgage Loans and each REO Property by the Terminator, not earlier than the 15th day and not later than the 25th day of the month next preceding the month of the final distribution on the Certificates or (b) otherwise during the month of such final distribution on or before the Determination Date in such month, in each case specifying (i) the Distribution Date upon which the Trust Fund will terminate and final payment in respect of the REMIC 1 Regular Interests and the related Certificates will be made upon

136

presentation and surrender of the related Certificates at the office of the Trustee therein designated, (ii) the amount of any such final payment, (iii) that no interest shall accrue in respect of the REMIC 1 Regular Interests or the related Certificates from and after the Accrual Period relating to the final Distribution Date therefor and (iv) that the Record Date otherwise applicable to such Distribution Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the office of the Trustee designated in such notice for purposes of such surrender. The Trustee shall remit to the Master Servicer from such funds deposited in the Distribution Account (i) any amounts which the Master Servicer would be permitted to withdraw and retain from the Collection Account pursuant to Section 3.11 and (ii) any other amounts otherwise payable by the Trustee to the Master Servicer from amounts on deposit in the Distribution Account pursuant to the terms of this Agreement, in each case prior to making any final distributions pursuant to Section 9.01(d) below. Upon certification to the Trustee by a Servicing Representative of the making of such final deposit, the Trustee shall promptly release or cause to be released to the Terminator the Mortgage Files for the remaining Mortgage Loans, and the Trustee shall execute all assignments, endorsements and other instruments necessary to effectuate such transfer.

(d)     Upon presentation of the Certificates by the Certificateholders on the final Distribution Date, the Trustee shall distribute to each Certificateholder so presenting and surrendering its Certificates the amount otherwise distributable on such Distribution Date in accordance with Section 4.01 in respect of the Certificates so presented and surrendered. Any funds not distributed to any Holder or Holders of Certificates being retired on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Trustee and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 9.01 shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Trustee shall, directly or through an agent, mail a final notice to remaining related non-tendering Certificateholders concerning surrender of their Certificates. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in the trust funds. If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Trustee shall pay to WaMu Capital Corp. and Goldman, Sachs & Co., equally, all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Trustee as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01.

Immediately following the deposit of funds in trust hereunder in respect of the Certificates, the Trust Fund shall terminate.

Section 9.02    Additional Termination Requirements.

(a)     In the event that the Terminator purchases all the Mortgage Loans and each REO Property or the final payment on or other liquidation of the last Mortgage Loan or

137

REO Property remaining in REMIC 1 pursuant to Section 9.01, the Trust Fund shall be terminated in accordance with the following additional requirements:

> (i)     The Trustee shall specify the first day in the 90-day liquidation period in a statement attached to each Trust REMIC's final Tax Return pursuant to Treasury regulation Section 1.860F-1 and shall satisfy all requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder with respect to each Trust REMIC, as evidenced by an Opinion of Counsel delivered to the Trustee and the Depositor obtained at the expense of the Terminator;

> (ii)    During such 90-day liquidation period, and at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell all of the assets of REMIC 1 to the Terminator for cash; and

> (iii)   At the time of the making of the final payment on the Certificates, the Trustee shall distribute or credit, or cause to be distributed or credited, to the Holders of the Class R Certificates all cash on hand in the Trust Fund (other than cash retained to meet claims), and the Trust Fund shall terminate at that time.

(b)     At the expense of the Terminator, the Trustee shall prepare or cause to be prepared the documentation required in connection with the adoption of a plan of liquidation of each Trust REMIC pursuant to the Section 9.02(a).

(c)     By their acceptance of Certificates, the Holders thereof hereby agree to authorize the Trustee to specify the 90-day liquidation period for each Trust REMIC, which authorization shall be binding upon all successor Certificateholders.

## ARTICLE X

## REMIC PROVISIONS

Section 10.01  REMIC Administration.

(a)     The Trustee shall elect to treat each Trust REMIC as a REMIC under the Code and, if necessary, under applicable state law. Each such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. For the purposes of the REMIC election in respect of REMIC 1, the REMIC 1 Regular Interests shall be designated as the Regular Interests in REMIC 1 and the Class R-1 Interest shall be designated as the Residual Interest in REMIC 1. For the purposes of the REMIC election in respect of REMIC 2, the REMIC 2 Regular Interests shall be designated as the Regular Interests in REMIC 2 and the Class R-2 Interest shall be designated as the Residual Interest in REMIC 2. The Trustee shall not permit the creation of any "interests" in REMIC 1 and REMIC 2 (within the meaning of Section 860G of the Code) other than the REMIC 1 Regular Interests and the interests represented by the Certificates.

138

(b)     The Closing Date is hereby designated as the "Startup Day" of each Trust REMIC within the meaning of Section 860G(a)(9) of the Code.

(c)     The Trustee shall pay, out of funds on deposit in the Distribution Account, any and all expenses relating to any tax audit of the Trust Fund (including, but not limited to, any professional fees or any administrative or judicial proceedings with respect to any Trust REMIC that involve the Internal Revenue Service or state tax authorities) unless such expenses, professional fees or any administrative or judicial proceedings are incurred by reason of the Trustee's willful misfeasance, bad faith or negligence.  The Trustee, as agent for each Trust REMIC's tax matters person, shall (i) act on behalf of the Trust Fund in relation to any tax matter or controversy involving any Trust REMIC and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto and will be entitled to reimbursement from the Trust Fund for any expenses incurred by the Trustee in connection therewith unless such administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority is incurred by reason of the Trustee's willful misfeasance, bad faith or negligence.  The holder of the largest Percentage Interest of the Class R Certificates shall be designated, in the manner provided under Treasury regulations Section 1.860F-4(d) and Treasury regulations Section 301.6231(a)(7)-1, as the tax matters person of each Trust REMIC created hereunder.  By its acceptance thereof, each such holder hereby agrees to irrevocably appoint the Trustee or an Affiliate as its agent to perform all of the duties of the tax matters person of each respective REMIC.

(d)     The Trustee shall prepare, sign and file in a timely manner, all of the Tax Returns in respect of each REMIC created hereunder.  The expenses of preparing and filing such returns shall be borne by the Trustee without any right of reimbursement therefor.  The Master Servicer shall provide on a timely basis to the Trustee or its designee such information with respect to the assets of the Trust Fund as is in its possession and reasonably required by the Trustee to enable it to perform its respective obligations under this Article.

(e)     The Trustee shall perform on behalf of each Trust REMIC all reporting and other tax compliance duties that are the responsibility of such REMIC under the Code, the REMIC Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.  Among its other duties, as required by the Code, the REMIC Provisions or such other compliance guidance, the Trustee shall provide (i) to any Transferor of a Class R Certificate (or other person designated in Section 860E(e)(3) of the Code) and to the Internal Revenue Service such information as is necessary for the computation of any tax relating to the transfer of a Class R Certificate to any Person who is not a Permitted Transferee, (ii) to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount and market discount or premium (using the Prepayment Assumption as required) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each Trust REMIC.  The Master Servicer shall provide on a timely basis to the Trustee such information with respect to the assets of the Trust Fund, including, without limitation, the Mortgage Loans, as is in its possession and reasonably required by the Trustee to enable it to perform its obligations under this subsection.  In addition, the Depositor shall provide or cause to be provided to the Trustee, within ten (10) days after the Closing Date, all information or data that the Trustee reasonably determines to be relevant for tax purposes as to

139

the valuations and issue prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flow of the Certificates.

(f)     The Trustee shall take such action and shall cause each Trust REMIC created hereunder to take such action as shall be necessary to create or maintain the status thereof as a REMIC under the REMIC Provisions (and the Master Servicer shall assist the Trustee, to the extent reasonably requested by the Trustee to do specific actions in order to assist in the maintenance of such status).  The Trustee shall not take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any Trust REMIC as a REMIC or (ii) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions set forth in Section 860F(a) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, an "Adverse REMIC Event") unless the Trustee shall have received an Opinion of Counsel, addressed to the Trustee (at the expense of the party seeking to take such action but in no event at the expense of the Trustee) to the effect that the contemplated action will not, with respect to any Trust REMIC, endanger such status or result in the imposition of such a tax, nor shall the Master Servicer take or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action; provided that the Master Servicer may conclusively rely on such Opinion of Counsel and shall incur no liability for its action or failure to act in accordance with such Opinion of Counsel.  In addition, prior to taking any action with respect to any Trust REMIC or the assets thereof, or causing any Trust REMIC to take any action, which is not contemplated under the terms of this Agreement, the Master Servicer will consult with the Trustee or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to a Trust REMIC, and the Master Servicer shall not take any such action or cause any Trust REMIC to take any such action as to which the Trustee has advised it in writing that an Adverse REMIC Event could occur; provided that the Master Servicer may conclusively rely on such writing and shall incur no liability for its action or failure to act in accordance with such writing.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Agreement, but in no event shall such cost be an expense of the Trustee.  At all times as may be required by the Code, the Trustee will ensure that substantially all of the assets of REMIC 1 will consist of "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g)     If any tax is imposed on prohibited transactions of any Trust REMIC created hereunder pursuant to Section 860F(a) of the Code, on the net income from foreclosure property of  any such REMIC pursuant to Section 860G(c) of the Code, or on any contributions to any such REMIC after the Startup Day therefor pursuant to Section 860G(d) of the Code, or if any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Trustee pursuant to Section 10.03 hereof, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article X, (ii) to the Master Servicer pursuant to Section 10.03 hereof, if such tax arises out of or results from a breach by the Master Servicer of any of its obligations under Article III or this Article X, or (iii) otherwise against amounts on deposit in the Distribution Account and shall be paid by withdrawal therefrom.

(h)     On or before April 15 of each calendar year commencing after the date of this Agreement, the Trustee shall deliver to the Master Servicer and each Rating Agency a Certificate from a Responsible Officer of the Trustee stating the Trustee's compliance with this Article X.

(i)     The Trustee shall, for federal income tax purposes, maintain books and records with respect to each Trust REMIC on a calendar year and on an accrual basis.

(j)     Following the Startup Day, the Trustee shall not accept any contributions of assets to any Trust REMIC other than in connection with any Qualified Substitute Mortgage Loan delivered in accordance with Section 2.03 unless it shall have received an Opinion of Counsel to the effect that the inclusion of such assets in the Trust Fund will not cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject any Trust REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(k)     Neither the Trustee nor the Master Servicer shall enter into any arrangement by which any Trust REMIC will receive a fee or other compensation for services or permit any Trust REMIC to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(l)     [The Trustee shall treat each of the Reserve Fund and the Cap Account as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h) that is owned by the Holders of the Class C Certificates and that is not an asset of any REMIC. For federal and state income tax purposes, payments in respect of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates of Net WAC Rate Carryover Amounts will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1). For federal tax return and information reporting, the right of the Certificateholders to receive payment on account of the Class A Certificates, the Mezzanine Certificates and the Class B Certificates from the Cap Account shall be assigned a value of [$10,000].]

Section 10.02  Prohibited Transactions and Activities.

None of the Depositor, the Master Servicer or the Trustee shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of REMIC 1, (iii) the termination of REMIC 1 pursuant to Article IX of this Agreement, (iv) a substitution pursuant to Article II of this Agreement or (v) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement), nor acquire any assets for any Trust REMIC (other than REO Property acquired in respect of a defaulted Mortgage Loan), nor sell or dispose of any investments in the Collection Account or the Distribution Account for gain, nor accept any contributions to any Trust REMIC after the Closing Date (other than a Qualified Substitute Mortgage Loan delivered in accordance with Section 2.03), unless it shall have received an Opinion of Counsel, addressed to the Trustee at the expense of the party seeking to cause such sale, disposition, substitution, acquisition or contribution but in no event at the expense of the Trustee) that such sale, disposition,

141

substitution, acquisition or contribution will not (a) affect adversely the status of any Trust REMIC as a REMIC or (b) cause any Trust REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

Section 10.03  <u>Trustee, Master Servicer and Depositor Indemnification</u>.

        (a)     The Trustee agrees to indemnify the Trust Fund, the Depositor and the Master Servicer for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor or the Master Servicer as a result of a breach of the Trustee's covenants set forth in this Article X or any state, local or franchise taxes imposed upon the Trust as a result of the location of the Trustee.

        (b)     The Master Servicer agrees to indemnify the Trust Fund, the Depositor and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Depositor or the Trustee as a result of a breach of the Master Servicer's covenants set forth in Article III or this Article X or any state, local or franchise taxes imposed upon the Trust as a result of the location of the Master Servicer or any subservicer.

        (c)     The Depositor agrees to indemnify the Trust Fund, the Master Servicer and the Trustee for any taxes and costs including, without limitation, any reasonable attorneys' fees imposed on or incurred by the Trust Fund, the Master Servicer or the Trustee as a result of a breach of the Depositor's covenants set forth in this Article X.

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.01  <u>Amendment</u>.

        This Agreement or any Custodial Agreement may be amended from time to time by the Depositor, the Master Servicer, the Trustee and, if applicable, the Custodian and without the consent of any of the Certificateholders, (i) to cure any ambiguity or defect, (ii) to correct, modify or supplement any provisions herein (including to give effect to the expectations of Certificateholders), or in any Custodial Agreement, (iii) to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of the Trust Fund as a REMIC at all times that any Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund, provided that the Trustee, the Depositor and the Master Servicer have received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect the status of the Trust Fund as a REMIC or adversely affect in any material respect the interest of any Certificateholder or (iv) to make any other provisions with respect to matters or questions arising under this Agreement or in any Custodial Agreement which shall not be inconsistent with the provisions of this Agreement or such Custodial Agreement, provided that, in each case, such action shall not, as evidenced by an Opinion of Counsel delivered to the parties hereto, adversely affect in any material respect the interests of any Certificateholder and, provided, further, that (A) such action will not affect in

142

any material respect the permitted activities of the Trust and (B) such action will not increase in any material respect the degree of discretion which the Master Servicer is allowed to exercise in servicing the Mortgage Loans. No amendment shall be deemed to adversely affect in any material respect the interests of any Certificateholder who shall have consented thereto, and no Opinion of Counsel shall be required to address the effect of any such amendment on any such consenting Certificateholder.

This Agreement or any Custodial Agreement may also be amended from time to time by the Depositor, the Master Servicer, the Trustee and, if applicable, the Custodian, with the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or any Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments received on Mortgage Loans which are required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner, other than as described in (i), without the consent of the Holders of Certificates of such Class evidencing at least 66% of the Voting Rights allocated to such Class, or (iii) modify the consents required by the immediately preceding clauses (i) and (ii) without the consent of the Holders of all Certificates then outstanding. Notwithstanding any other provision of this Agreement, for purposes of the giving or withholding of consents pursuant to this Section 11.01, Certificates registered in the name of the Depositor or the Master Servicer or any Affiliate thereof shall be entitled to Voting Rights with respect to matters affecting such Certificates.

Notwithstanding any contrary provision of this Agreement, the Trustee shall be entitled to receive an Opinion of Counsel to the effect that such amendment will not result in the imposition of any tax on any Trust REMIC pursuant to the REMIC Provisions or cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Certificateholder.

It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

The cost of any Opinion of Counsel to be delivered pursuant to this Section 11.01 shall be borne by the Person seeking the related amendment, but in no event shall such Opinion of Counsel be an expense of the Trustee or the Trust Fund.

The Trustee may, but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities under this Agreement or otherwise.

Section 11.02  <u>Recordation of Agreement; Counterparts</u>.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer at the expense of the Trust, but only upon direction of Certificateholders accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

Section 11.03  <u>Limitation on Rights of Certificateholders</u>.

The death or incapacity of any Certificateholder shall not (i) operate to terminate this Agreement or the Trust, (ii) entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, or (iii) otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

Except as expressly provided for herein, no Certificateholder shall have any right to vote or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for 15 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding.  It is understood and intended, and expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder, which priority or preference is not otherwise provided for herein, or to enforce any right under this Agreement, except in the manner herein provided and for the equal, ratable and common benefit of all Certificateholders.  For the protection and enforcement of the provisions of this

144

Section 11.03 each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04   Governing Law; Jurisdiction.

This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.05   Notices.

All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, by facsimile or by express delivery service, to (a) in the case of the Master Servicer, Long Beach Mortgage Company, 1400 South Douglass Road, Suite 100, Anaheim, California 92806, Attention:  General Counsel (telecopy number:  (206) 554-2717), or such other address or telecopy number as may hereafter be furnished to the other parties hereto in writing by the Master Servicer, (b) in the case of the Trustee, Deutsche Bank National Trust Company, 1761 St. Andrew Place, Santa Ana, California 92705-4934, Attention:  Trust Administration Services LB060A (telecopy number (714) 247-6478) or such other address or telecopy number as may hereafter be furnished to the other parties hereto in writing by the Trustee and (c) in the case of the Depositor, Long Beach Securities Corp., 1400 South Douglass Road, Suite 100, Anaheim, California 92806, Attention: General Counsel (telecopy number:  (206) 554-2717), or such other address or telecopy number as may be furnished to the other parties hereto in writing by the Depositor.  Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such Holder as shown in the Certificate Register.  Notice of any Master Servicer default shall be given by telecopy and by certified mail. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have duly been given when mailed, whether or not the Certificateholder receives such notice.  A copy of any notice required to be telecopied hereunder shall also be mailed to the appropriate party in the manner set forth above.

Section 11.06   Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

Section 11.07   Notice to the Rating Agencies.

The Trustee shall use its best efforts promptly to provide notice to the Rating Agencies with respect to each of the following of which it has actual knowledge:

1.      Any amendment to this Agreement;

2.      The occurrence of any Master Servicer Event of Default that has not been cured or waived;

3.      The resignation or termination of the Master Servicer or the Trustee;

4.      The repurchase or substitution of Mortgage Loans pursuant to or as contemplated by Section 2.03;

5.      The final payment to the Holders of any Class of Certificates;

6.      Any change in the location of the Collection Account or the Distribution Account;

7.      The Trustee were it to succeed as Master Servicer, is unable to make advances regarding delinquent Mortgage Loans; and

8.      The filing of any claim under the Master Servicer's blanket bond and errors and omissions insurance policy required by Section 3.14 or the cancellation or material modification of coverage under any such instrument.

In addition, the Trustee shall promptly make available to each Rating Agency copies of each Statement to Certificateholders described in Section 4.03 hereof and the Master Servicer shall promptly furnish to each Rating Agency copies of the following:

1.      each annual statement as to compliance described in Section 3.20 hereof;

2.      each annual independent public accountants' servicing report described in Section 3.21 hereof.

Any such notice pursuant to this Section 11.07 shall be in writing and shall be deemed to have been duly given if personally delivered or mailed by first class mail, postage prepaid, or by express delivery service to (i) Moody's Investors Service, Inc., 99 Church Street, New York, NY 10048, Attention: MBS Monitoring/Long Beach Mortgage Loan Trust 2006-A and (ii) Standard & Poor's Rating Services, Inc., 55 Water Street, New York, New York 10041.

Section 11.08   Article and Section References.

All Article and Section references used in this Agreement, unless otherwise provided, are to articles and sections in this Agreement.

Section 11.09   [Reserved].

Section 11.10   Grant of Security Interest.

It is the express intent of the parties hereto that the conveyance of the Mortgage Loans and the other property specified in Section 2.01 by the Depositor to the Trustee be, and be construed as, a sale and not a pledge to secure a debt or other obligation of the Depositor. However, in the event that, notwithstanding the aforementioned intent of the parties, the Mortgage Loans or other property conveyed to the Trustee pursuant to Section 2.01 are held to be property of the Depositor, then, (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Mortgage Loans and all other property conveyed to the Trustee pursuant to Section 2.01 by the Depositor to the Trustee to secure a debt or other obligation of the Depositor and (b)(1) this Agreement shall also be deemed to be a security agreement within

146

the meaning of Articles 8 and 9 of the Uniform Commercial Code as in effect from time to time in the State of New York; (2) the conveyance provided for in Section 2.01 hereof shall be deemed to be a grant by the Depositor to the Trustee of a security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans and all amounts payable to the holders of the Mortgage Loans and all other property conveyed to the Trustee pursuant to Section 2.01 in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts, other than investment earnings, from time to time held or invested in the Collection Account and the Distribution Account, whether in the form of cash, instruments, securities or other property; (3) the obligations secured by such security agreement shall be deemed to be all of the Depositor's obligations under this Agreement, including the obligation to provide to the Certificateholders the benefits of this Agreement relating to the Mortgage Loans and the Trust Fund; and (4) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee for the purpose of perfecting such security interest under applicable law.  Accordingly, the Depositor hereby grants to the Trustee a security interest in the Mortgage Loans and all other property described in clause (2) of the preceding sentence, for the purpose of securing to the Trustee the performance by the Depositor of the obligations described in clause (3) of the preceding sentence.  Notwithstanding the foregoing, the parties hereto intend the conveyance pursuant to Section 2.01 to be a true, absolute and unconditional sale of the Mortgage Loans and assets constituting the Trust Fund by the Depositor to the Trustee.

SE 2154917 v8
(26425.0085)

IN WITNESS WHEREOF, the Depositor, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

LONG BEACH SECURITIES CORP.,
  as Depositor


By: _____
Name:
Title:

LONG BEACH MORTGAGE COMPANY,
  as Master Servicer


By: _____
Name:    James Mark
Title:    Authorized Officer

DEUTSCHE BANK NATIONAL TRUST COMPANY,
  as Trustee


By: _____
Name:    Ronaldo Reyes
Title:    Vice President


By:_____
Name:    Hang Luu
Title:    Authorized Signer

SE 2154917

STATE OF WASHINGTON     )
                                  ) ss.:
COUNTY OF KING            )

On May ___, 2006 before me, _____, personally appeared JAMES MARK, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.


Signature _____


                                                       (Seal)

STATE OF WASHINGTON　　　　　)
　　　　　　　　　　　　　　　　) ss.:
COUNTY OF KING　　　　　　　　)

On May ___, 2006 before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

SE 2154917

STATE OF CALIFORNIA       )
                               ) ss.:

COUNTY OF ORANGE       )

        On May ___, 2006 before me, _____, personally appeared RONALDO REYES, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

                                               (Seal)

STATE OF CALIFORNIA       )  
                                     ) ss.:  
COUNTY OF ORANGE         )

       On May ___, 2006 before me, _____, personally appeared HANG LUU, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

                                                               (Seal)

**EXHIBIT B**

**Prospectus Supplement and Accompanying Prospectus**