UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

GOOD HILL PARTNERS L.P. ON BEHALF
OF GOOD HILL MASTER FUND, L.P.,

                Plaintiff,

           -against-

WM ASSET HOLDINGS CORP. CI 2007-
WM2, WM ASSET HOLDINGS CO 2007-
WM2 LLC, WM ASSET HOLDINGS CORP.,
WAMU ASSET ACCEPTANCE CORP.,
WAMU CAPITAL CORP., WASHINGTON
MUTUAL BANK, and WASHINGTON
MUTUAL, INC.,

                Defendants.

---------------------------------------------------------------x

ELECTRONICALLY FILED

Case No. 08 Civ. 3730 (JSR)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Victor J. Rocco (VR-4191)
Heller Ehrman LLP
7 Times Square
New York, NY 10036
Phone: (212) 832-8300
Fax: (212) 763-7600

*Attorneys for Defendants WM Asset Holdings*
*Corp. CI 2007-WM2, WM Asset Holdings CI*
*2007-WM2 LLC, WM Asset Holdings Corp.,*
*WaMu Asset Acceptance Corp., WaMu Capital*
*Corp., Washington Mutual Bank, and*
*Washington Mutual, Inc.*

## Table of Contents

**Page**

**Preliminary Statement** ...............................................................................................1

**Background** ..................................................................................................................4

    A.    The Subordinated Status of the NIM Bonds ..............................................4

    B.    The Role of the Servicer and the Determination of a "Realized Loss" .................6

    C.    The NIM Bond Offering ..............................................................................8

    D.    The Alleged Fraud .......................................................................................9

**Argument** ...................................................................................................................10

I.    Good Hill Has Failed to State a Fraud Claim Under Section 10(b) or the
Common Law of Connecticut ...............................................................................10

    A.    Good Hill Has Not Pleaded a Material Omission or Misstatement.....................11

        1.    Good Hill Does Not Allege Facts Sufficient to Suggest that
the Servicer Had a Charge-Off Policy ...............................................11

        2.    Projections or Forecasts of Potential Future Losses Do Not
Rise to the Level of Actionable Misstatements ..................................16

        3.    Alleged E-mail and Telephone Communications from WCC Employees
Are Not Actionable Misstatements......................................................18

    B.    Good Hill Has Failed to Allege Scienter Adequately...........................................20

II.    Good Hill Has Failed to State a Claim for Control Person Liability Under
Section 20(a) of the Securities Exchange Act ................................................24

**Conclusion** .................................................................................................................25

## Table of Authorities

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87, 98, 99, 105 (2d Cir. 2007) ...............................................11, 21, 22

*Barrios v. Paco Pharm. Servs., Inc.*,
  816 F. Supp. 243, 252 (S.D.N.Y. 1993) ...........................................................20

*Bay Harbour Mgmt. LLC v. Carothers*,
  No. 07 Civ. 1124, 2008 WL 2566557 (2d Cir. June 24, 2008) .......................24

*Boguslavsky v. Kaplan*,
  159 F.3d 715, 720 (2d Cir. 1998) .....................................................................25

*Citino v. Redevelopment Agency*,
  721 A.2d 1197, 1207 (Conn. App. Ct. 1998) ...................................................18

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2008).................................................25

*Fant v. Perelman*,
  Nos. 97 Civ. 8435, 97 Civ. 8436, 1999 U.S. Dist. LEXIS 5694, at *30-31
  (S.D.N.Y. Apr. 9, 1999) ...................................................................................24

*Feinman v. Schulman Berlin & Davis*,
  677 F. Supp. 168, 170 (S.D.N.Y. 1988) ...........................................................20

*IM Partners v. Debit Direct, Ltd.*,
  394 F. Supp. 2d 503, 518 (D. Conn. 2005) .................................................18, 24

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) ......................................................18

*In re Hyperion Sec. Litig.*,
  No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995) .............20

*In re Int'l Bus. Mach. Corp. Sec. Litig.*,
  163 F.3d 102, 107 (2d Cir. 1998) ................................................................17, 19

*In re Monster Worldwide Sec. Litig.*,
  No. 07 Civ. 2237, 2008 WL 623339, at *1 (S.D.N.Y. Mar. 4, 2008) ........20, 21

*In re Pfizer, Inc. Sec. Litig.*,
  538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008) ......................................................11

*In re Razorfish, Inc. Sec. Litig.*,
  No. 00 Civ. 9474 (JSR), 2001 WL 1111502, at *2 n.1, *3 (S.D.N.Y.
  Sept. 21, 2001).............................................................................................11, 16

*In re Salomon Analyst Level 3 Litig.*,
  373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) .................................................17

*Iqbal v. Hasty*,
    490 F.3d 143, 157-58 (2d Cir. 2007)..................................................................15

*Luce v. Edelstein*,
    802 F.2d 49, 56 (2d Cir. 1986) .......................................................................18

*Matyas v. Minck*,
    655 A.2d 1155, 1161 (Conn. App. Ct. 1995) ................................................18

*Miller v. Appleby*,
    438 A.2d 811, 813 (Conn. 1981) ...............................................................18, 24

*Novak v. Kasaks*,
    216 F.3d 300, 307, 308 (2d Cir. 2000) ......................................................21, 24

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450, 1472 (2d Cir. 1996) ..............................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    No. 06 Civ. 2902, 2008 U.S. App. LEXIS 13449, at \*12, \*16 (2d Cir.
    June 26, 2008) ..................................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499, 2507, 2510 (2007) ...............................................................21

*United States v. Finnerty*,
    No. 07 Cr. 1104, 2008 WL 2778830 (2d Cir. July 18, 2008).........................16

*Vertex, Inc. v. City of Waterbury*,
    898 A.2d 178, 190 (Conn. 2006) ....................................................................18

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d at 505, 519 (S.D.N.Y. 2007) ...............................................24

**Statutes and Rules**

Connecticut Uniform Securities Act
    Conn. Gen. Stat. § 36b-4 .................................................................................18

Federal Rules of Civil Procedure
    Rule 9(b).................................................................................................1, 10, 11

    Rule 12(b)(6) .............................................................................................1, 11

Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(b)(2))...............1, 10, 11, 20

Securities Exchange Act of 1934
    Section 10(b) ..........................................................................................*passim*

    Section 20(a)...............................................................................................10, 25

Defendants WM Asset Holdings Corp. CI 2007-WM2 ("WM Cayman"), WM Asset

Holdings CI 2007-WM2 LLC ("WM U.S."), WM Asset Holdings Corp. ("WM Asset

Holdings"), WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance"), WaMu Capital Corp.

("WCC"), Washington Mutual Bank (the "Bank"), and Washington Mutual, Inc. ("WaMu," and

collectively, the "Defendants") respectfully submit this memorandum of law in support of their

Motion to Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure

12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## Preliminary Statement

This is an action brought by Good Hill Partners L.P. ("Good Hill") to recover damages

principally for an alleged violation of Section 10(b) of the Securities Exchange Act of 1934 and

Rule 10b-5 thereunder arising out of the purchase of high risk Net Interest Margin ("NIM")

bonds in connection with a NIM bond offering in April 2007 ("2007-WM2 Offering").  The

Defendants moved to dismiss the original complaint, and Good Hill filed an Amended

Complaint seeking largely the same relief and now alleging claims under Connecticut law.

Good Hill's second bite at the apple is no better than its first.  The Amended Complaint

does not allege an actionable misstatement or omission; does not include a single allegation that

would give rise to a plausible inference that the Defendants, or any one of them, acted with the

requisite fraudulent intent; and, inexplicably, does not attach the various deal documents to

which it refers, and which, once again, refute Good Hill's claims of fraud.  What the Amended

Complaint does do is abandon Good Hill's initial fraud theory in favor of a completely new one.

The original theory was based on a pure fiction, the idea that Defendants falsely represented in

their disclosure documents that the trust that holds the subprime mortgage loans (the "Trust"),

which generates the income that is used to pay down the NIM bonds that Good Hill purchased,

would not incur a "Realized Loss" until a foreclosure sale or other liquidation proceeding – some

1

12 to 14 months after the loan went into default.  And that fiction, in turn, rested on a conjured-up definition of the term "Realized Loss," not the definition of that term that appears in the Pooling and Servicing Agreement (the "PSA") underlying the transaction at issue and which defines the obligations of the mortgage servicer (the "Servicer") with respect to the mortgage loans in the Trust.

Unable to find its fraud in the representations in the various deal documents, Good Hill now charges a material omission under Rule 10b-5(b).  Good Hill alleges that the Defendants had a duty to disclose that the Servicer would apply what it describes as a "charge-off" policy to junior-lien mortgage loans in the Trust, which, or so Good Hill says, would typically require the Servicer to declare a "Realized Loss" and remove the delinquent loan from the mortgage pool no later than 180 days after a junior-lien mortgage loan becomes delinquent.  But try as it might to conjure up a secret WaMu "charge-off" policy for junior-lien mortgage loans, the documents on which Good Hill relies, once again, do not support its claim, and it alleges no other fact in its latest pleading to suggest such a policy existed at the time it purchased its bonds.  In short, despite its accusatory tone and bluster, Good Hill's Amended Complaint ultimately alleges no deceptive conduct on the part of Defendants.

Good Hill bases its claims entirely on disclosures made in connection with a completely different, and unrelated, transaction, the Long Beach Mortgage Loan Trust 2006-A offering (the "Long Beach Offering"), which took place a year before the offering at issue in this case, and involved a different mix of subprime mortgages as collateral.  These obvious and quite material differences between the two deals notwithstanding, the disclosure documents for the Long Beach Offering make clear that the "charge-off policy" upon which Good Hill now chooses to base its claims is not a "policy" at all.  In fact, the deal documents from the Long Beach Offering show

2

what Good Hill describes in the Amended Complaint as a "charge-off policy" is merely a

covenanted obligation regarding servicing procedures that is unique to the Pooling and Servicing

Agreement for that offering.  Good Hill does not allege any facts in the Amended Complaint that

would suggest that the disclosures in the Long Beach Offering are in any way relevant to the

disclosures made in the deal documents for the 2007-WM2 Offering.

     Good Hill again attempts to bolster its fraud claims with many of the same "supporting

allegations" that it asserted in the original complaint, again to no avail.  It alleges that

unidentified graphs and models in the Term Sheet and e-mail communications with WCC

employees – all of which it says show that the Trust would incur minimal losses in the first 13

months following the NIM bond offering – reinforced its belief that losses would not be realized

on junior loans prior to foreclosure.  Good Hill now supplements that allegation with a reference

in the Amended Complaint to a series of telephone calls – which may have taken place after it

purchased the bonds – with a WCC employee who purportedly told it that the Bank would

recognize related senior and junior loans as a single loan for purposes of declaring a Realized

Loss.  These telephone conversations are not representations that reasonably could be relied

upon by any investor, as such unilateral statements could not trump the disclosed contractual

obligations of a party to an agreement.  And whether taken separately or together, these

conversations and visual depictions are nothing more than expressions of opinion or expectations

regarding the future, which cannot form the basis of an actionable misrepresentation.

     Even assuming Good Hill could allege facts sufficient to plead an omission or

misstatement of material fact – and it has not – it still has not alleged a single fact that would

give rise to an inference that any of the Defendants (or any individual associated with any of the

Defendants) acted with the kind of fraudulent intent that is necessary to state a claim for relief

under either the federal securities laws or the common law.  The Amended Complaint is devoid

of any non-conclusory allegations of fact to suggest that, at the time of the NIM bond offering,

any of the Defendants knew or should have known that the Bank intended to adjust its practice to

recognize Realized Losses with regard to defaulted junior-lien loans at 180 days or that there

was a meaningful possibility that the Bank intended to adjust its practice.

For each of these and the other reasons discussed below, the Amended Complaint does

not state a claim under federal or state securities laws or under the common law of Connecticut,

and should be dismissed with prejudice.

**Background**

Good Hill is the purported investment manager of a fund that purchased $18.45 million

of NIM bonds from defendant WCC on April 19, 2007.  (*See* Amended Complaint, dated July

18, 2008, ("A.C.") ¶¶ 10, 100 (attached as Ex. A to Declaration of Victor J. Rocco, dated August

11, 2008 ("Rocco Decl.").)  The bonds that Good Hill purchased were issued by defendants WM

Cayman and WM U.S. as part of a private placement offering that was sponsored by defendant

WM Asset Holdings (the "NIM bond offering" or the "2007-WM2 Offering").  (*See id.* ¶¶ 26,

28.)

**A.    The Subordinated Status of the NIM Bonds**

The NIM bonds at issue in this lawsuit were associated with a series of asset-backed

certificates (the "Senior bonds") that were sold to investors through a public offering in early

April 2007.  (*See id.* ¶ 56.)  Purchasers of the Senior bonds are entitled to receive a monthly cash

distribution of interest and/or principal from a trust formed by the Bank specifically for the

purpose of holding pools of subprime mortgage loans.  (Prospectus Supplement, dated April 5,

2007 ("Pro. Supp."), at S-1, S-3-4 (attached as Ex. E to Rocco Decl.).)  The vast majority of the

loans in the Trust are senior-lien (or first lien) subprime mortgage loans, while the remaining

4

loans held by the Trust are junior-lien (or second lien) subprime mortgage loans.[1]  (*See id.* at S-54-55; *see also* A.C. ¶ 63.)  The payments received by the Trust from the underlying mortgages also serve as the source of income to pay down the NIM bonds.  (A.C. ¶ 54; *see also* Private Placement Memorandum, dated April 26, 2007 ("PPM"), at 17 (attached as Ex. C to Rocco Decl.).)  According to the PPM, the NIM bonds are entitled to receive the excess cash flow, if any, generated each month by the pooled subprime mortgage loans that is not otherwise used, among other things, to reimburse the Servicer for its advances, fees or expenses, pay interest and principal due to Senior bond holders and satisfy the excess collateral reserve for Senior bonds.[2]  (PPM at 17.)

The declaration of a "Realized Loss," as defined in the PSA, is critical to the performance of the NIM bonds that Good Hill purchased.  Because they are subordinated, the NIM bonds are "extremely sensitive to losses" on the subprime mortgage loans held by the Trust – a risk that is prominently disclosed in the disclosure materials which Good Hill received before it purchased the NIM bonds.  (*See* PPM at 17; *see also* A.C. ¶ 54.)  "[W]hen the Trust suffers [a] Realized Loss[], the residual income is no longer used to pay the principal and interest due on the NIM bonds, but is instead used to make up the shortfall on the payments due to the holders of the [Senior bonds]."  (A.C. ¶ 65; *see also* PPM at 17.)

---

[1] Defendants also issue bonds that are collateralized by pools that hold all senior-lien mortgage loans and all junior-lien mortgage loans.  (A.C. ¶ 46.)

[2] The NIM bonds represent a right to the proceeds received by two certificates (the Class C and P certificates) that were issued by the Trust in connection with the securitization of the mortgage pool. (PPM at 3-5.)  Only one of those certificates, the Class C certificate, is at issue in this lawsuit. (*See id.* 3-4 (describing cash flow that Class C Certificate is entitled to receive from the Trust).)

**B.    The Role of the Servicer and the Determination of a "Realized Loss"**

The decision to declare a "Realized Loss" on a defaulted mortgage loan held by the Trust is defined and governed by the terms of the PSA that defendant WaMu Asset Acceptance, as depositor of the loans, entered with the defendant Bank, as the Servicer of the pooled mortgage loans.  (*See* A.C. ¶ 48; *see also* PSA, dated April 1, 2007, §§ 3.01 – 3.31 (attached as Ex. F to Rocco Decl.).)  Good Hill's initial theory of the fraud – a theory which it has since abandoned – was that Defendants violated the PSA by declaring "Realized Losses" on junior-lien mortgage loans in the Trust before a foreclosure sale or other liquidation proceeding.

But that theory was untenable.  The PSA, which is attached to the PPM that Good Hill received prior to its purchase of the bonds, makes clear that the Servicer has broad discretion to recognize a "Realized Loss."  The PSA defines "Realized Loss" as:

> [w]ith respect to any Liquidated Mortgage Loan, the amount of loss realized equal to the portion of the Principal Balance remaining unpaid after application of all Net Liquidation Proceeds and Insurance Proceeds in respect of such Mortgage Loan.

(PSA at 54.)  The term "Liquidated Mortgage Loan," in turn, is key to the definition of "Realized Loss," and is defined in the PSA as:

> any Mortgage Loan in respect of which the Servicer has determined, in accordance with the servicing procedures specified herein . . . that all Liquidation Proceeds which it expects to recover with respect to the liquidation of the Mortgage Loan or disposition of the related REO Property have been recovered.

(*Id.* at 37.)  The use of the phrase "expects to recover" in the definition of "Liquidated Mortgage Loan" makes clear that the Servicer may declare a "Realized Loss" even if it has not liquidated the defaulted mortgage loan in the ordinary sense of the word.[3]  In fact, the only limitations on

---

[3] The definition of "Realized Loss" in the PSA is consistent with section 4.04(d) of the PSA, which prohibits the Servicer from advancing to the Trust principal or interest due on a delinquent mortgage loan that it concludes is a "Nonrecoverable Advance."  (*Id.* § 4.04(d).)  A

*(Footnote continued)*

the Servicer's discretion to declare a "Realized Loss" are that it must act (1) in the interest of all bondholders, collectively, in the Trust, and (2) "in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers . . . ." (*Id.* § 3.01.)

The Servicer's rights and/or obligation under a PSA to declare a "Realized Loss" on a delinquent mortgage loan vary from one transaction to another. The PSA for the Long Beach Offering, to which the Amended Complaint refers, includes a provision that *requires* the Servicer to make a determination whether to declare a "Realized Loss" on certain mortgage loans in the mortgage pool no later than 180 days after delinquency; and, in the event the Servicer concludes that it will be unable to obtain a "significant net recovery" on those loans through a foreclosure sale or liquidation proceeding, to declare a "Realized Loss" at the same time. (*See* Long Beach Offering PSA, dated May 1, 2006, ("Long Beach PSA") § 3.16(a)(ii) (attached as Ex. G to Rocco Decl.).) Thus, in contrast to the broad discretion granted to the Servicer to declare a "Realized Loss" in the PSA for the 2007-WM2 Offering, the PSA for the Long Beach Offering contractually obligates the Servicer to make a "Realized Loss" determination no later than 180 days after a junior-lien mortgage loan first becomes delinquent, regardless of how the Servicer administers its own mortgage loan portfolio or the practice of other local mortgage lenders and servicers. (*Id.*) Of course, there is no similar "charge-off" requirement in the transaction at issue in this case, nor could there be given the constraints imposed on the Servicer by the PSA.

---

"Nonrecoverable Advance" is defined in the PSA, in relevant part, as any advance "proposed to be made in respect of a Mortgage Loan . . . that, in the good faith business judgment of the Servicer" will not be "ultimately recoverable" from "Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan . . . ." (*Id.* at 45-46.)

C.    **The NIM Bond Offering**

The bonds that Good Hill acquired from WCC were one of three series of NIM bonds

offered to investors by WM Cayman and WM U.S.  (*See* PPM at i; A.C. ¶ 61.)  Two of the series

of bonds were insured; the series bought by Good Hill was not.  (PPM at i.)  Good Hill allegedly

purchased the NIM bonds for 98% of their face value, or $18,081,000.  (A.C. ¶ 100.)  Good Hill

offers no explanation for its investment strategy.

In connection with the NIM bond offering, Good Hill received the following documents:

(1) a Term Sheet dated April 18, 2007 prepared by WCC (the "Term Sheet") (attached as Ex. B

to Rocco Decl.); (2) the April 26, 2007 PPM prepared by WM Cayman and WM U.S.; and (3)

the additional disclosures that were attached and referenced in the PPM, including the

Prospectus, dated March 22, 2007 (attached as Ex. D to Rocco Decl.), and Prospectus

Supplement for the Senior bond offering, and the PSA (together with the PPM, the "deal

documents").  (A.C. ¶ 58.)  Good Hill allegedly also received an April 18, 2007 e-mail from two

WCC employees, and spoke by telephone about the NIM bonds with a WCC employee during

the period of April 18 through April 26, 2007.  (*Id.* ¶¶ 93, 94, 96.)

The deal documents make clear that the NIM bonds are "complex securities" which are

"not suitable investments for all investors."  (Pro. Supp. at S-10.)  Indeed, the Prospectus

Supplement identifies over 20 separate risk factors that investors should consider before

purchasing the Senior bonds, which, although paid before the NIM bondholders, also depend

upon the same income stream as the NIM bonds for payment.  All bondholders, senior and NIM

alike, assume the risk that "Recent Developments in the Residential Mortgage Market May

Adversely Affect the Return on [Their] Certificates."  (*Id.*)  The Prospectus Supplement further

states that the:

8

continued decline or an extended flattening of [housing prices] may result in additional increases in delinquencies and losses on residential mortgage loans generally, [and] particularly . . . with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values.

(*Id.* at S-10-11.)

### D.    The Alleged Fraud

The Amended Complaint seeks to recover damages for alleged omissions in connection with the NIM bond offering.  The crux of Good Hill's latest iteration of the alleged fraud is that Defendants knew, but did not disclose in the documents associated with the NIM bond offering, that the Servicer would apply a "charge-off policy" on junior-lien mortgage loans in the Trust. (A.C. ¶¶ 1, 14.)  According to Good Hill, a "charge-off policy" requires the Servicer to declare a Realized Loss on a delinquent loan as soon as it concludes that it would be unable to obtain a significant net recovery from either a foreclosure sale or liquidation proceeding, but no later than 180 days after the loan first becomes delinquent.  (*Id.*)

Good Hill broadly alleges that over the past two years, WCC and other WaMu affiliates have specifically disclosed in the deal documents for other bond offerings backed by junior-lien mortgage loans that the Servicer would apply a "charge-off policy" to delinquent loans in the Trust.  (*Id.* ¶ 68.)  It further alleges that the very absence of such a disclosure in the deal documents for the 2007-WM2 Offering actually led it to believe that "the Bank would *not* apply a charge-off policy to junior-lien mortgages, and that the Trust would not incur realized losses on the basis of such a policy."  (*Id.* ¶ 80 (emphasis in original).)  In other words, Good Hill claims that, although it purchased high-risk bonds, it was ensured an uninterrupted cash flow for the first 14 months after its investment, which effectively would have guaranteed its investment.

(*Id.* ¶ 78.)[4]

Good Hill alleges that its belief that the Trust would not incur a "Realized Loss" for the first 12 to 14 months was reinforced by a March 28, 2007 collateral report it received from one WCC employee, which made it clear that "for each junior-lien mortgage loan held by the Trust, the related senior-lien mortgage loan was also held by the Trust." (*Id.* ¶ 91.)  Good Hill further claims that another WCC employee told one of its representatives during a telephone call that "the Bank would treat the 'related' senior-lien and junior-lien mortgage loans as one loan for purposes of Realized Losses." (*Id.* ¶ 93 (internal quotation marks added).)  Good Hill further attempts to bolster its claim by citing unidentified graphs and models in the Term Sheet, and certain e-mails with WCC employees, which purportedly showed that the Trust would incur minimal Realized Losses in the first 13 months following the offering.  (*Id.* ¶¶ 90, 96-97.)

Based on the above allegations, Good Hill has asserted claims under Section 10(b), Section 20(a), and Rule 10b-5 of the Securities Exchange Act of 1934, and both the state securities laws and common law of Connecticut.  For the reasons set forth below, Good Hill has failed to allege the essential elements necessary to plead a claim for relief for any of its claims, let alone to plead them with the particularity required under Rule 9(b) or the PSLRA.  The Amended Complaint should be dismissed with prejudice.

<u>**Argument**</u>

**I.    Good Hill Has Failed to State a Fraud Claim Under
      Section 10(b) or the Common Law of Connecticut**

---

[4] Good Hill alleges no facts that reasonably could justify its belief that it was entitled to an uninterrupted cash flow in return on its investment, especially in light of the broad discretion invested in the Servicer, who, subject to certain standards, can remove a non-performing loan from the mortgage pool once it determines that it will be unable to recover any proceeds from a foreclosure sale or other liquidation proceeding and therefore ties the income stream directly to the vagaries of the housing and mortgage markets.

To plead a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, Good Hill must allege that each defendant (i) made a misstatement or omission of material fact, (ii) with scienter, (iii) in connection with the purchase or sale of securities, (iv) upon which it relied, and (v) that plaintiff's reliance was the proximate cause of its injury. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), Good Hill must "provide the grounds upon which [its] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Id.* at 98 (internal quotation and citation omitted). The heightened pleading standards of Rule 9(b) and the PSLRA further require that Good Hill plead each of the above elements with particularity. *See In re Razorfish, Inc. Sec. Litig.*, No. 00 Civ. 9474 (JSR), 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001).

Although the Court accepts as true all well-pleaded allegations in the Amended Complaint and draws all reasonable inferences in favor of Good Hill, no credit is given to conclusory statements that are unsupported by factual allegations. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. Further, in ruling on the motion, the Court may consider the full text of "documents incorporated into the complaint by reference," like the Term Sheet and deal documents. *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008) (internal quotations and citations omitted). These documents show that there was no deception in the 2007-WM2 Offering.

### A.     Good Hill Has Not Pleaded a Material Omission or Misstatement

1.     Good Hill Does Not Allege Facts Sufficient to
Suggest that the Servicer Had a Charge-Off Policy

Good Hill has abandoned its original fraud claim that the deal documents for the 2007-WM2 Offering falsely represented that the Servicer would not declare a "Realized Loss" on a

junior-lien mortgage loan until a foreclosure sale or other liquidation proceeding occurred 12 to 14 months after the loan went into default.  But Good Hill had no choice.  That claim was based on Good Hill's own, contrived definition of "Realized Loss," not the definition that appears in the PSA.  The PSA makes clear that the Servicer has broad discretion in servicing the loans, including the right to declare a "Realized Loss" on a junior-lien mortgage loan at any time provided that certain conditions are satisfied.  (*Id.* at 37.)

Good Hill no longer disputes this incontrovertible fact.  Instead, in an effort to cobble together some kind of colorable fraud claim, the Amended Complaint now alleges that Defendants did not disclose enough information in connection with the 2007-WM2 Offering about how the Servicer would apply its broad discretion with respect to recognizing Realized Losses.  It alleges that Defendants had a duty to disclose that the Servicer would impose a "charge-off" policy to junior-lien mortgage loans in the Trust, which – or so Good Hill says – would typically require the Servicer to declare a "Realized Loss" no later than 180 days after those loans went into default.  (A.C. ¶¶ 12, 104.)  Good Hill goes even further and claims that by failing to disclose this so-called policy, Defendants implicitly represented that "Realized Losses" would only be recognized after a foreclosure sale or liquidation proceeding, some 12 to 14 months after default.  (*Id.* ¶¶ 106-07.)  But try as it might to retool its baseless fraud theory, Good Hill once again fails to come anywhere close to pleading a claim for relief.

For starters, Good Hill does not plead a single fact in the Amended Complaint that would suggest that a "charge-off" policy existed at the time of the NIM bond offering with respect to the kind of mixed loan portfolio of senior-lien and junior-lien mortgage loans that secure the bonds that it purchased.  More basically, it does not allege anything that would suggest this so-called policy existed at all, with respect to any kind of loan pool, mixed or stand alone senior- or

12

junior-lien.  The fraud alleged in the Amended Complaint is based entirely on representations

made in documents relating to a completely different, and unrelated, offering:  the Long Beach

Offering, which Good Hill conveniently and, incorrectly, describes as a "contemporaneous" and

"highly similar transaction."  (*Id.* ¶ 76.)

      The deal documents for the Long Beach Offering are clear that the "charge-off" policy

upon which Good Hill now bases its claims is not a WaMu "policy" at all.  Those documents

show that the Amended Complaint's alleged "charge-off" policy is merely a covenanted

obligation that is unique to the PSA for that offering.  Section 3.16(a)(ii) of the Long Beach PSA

specifically requires the mortgage servicer to "charge-off" a defaulted mortgage loan as soon as

it concludes that it will be unable to realize a "significant net recovery" through a foreclosure

sale or other liquidation event, *but no later than 180 days after the loan first becomes delinquent.*

(Long Beach PSA § 3.16(a)(ii).)  That provision reads as follows:

> No later than the day on which a Mortgage Loan becomes 180 days Delinquent,
> the Master Servicer shall determine whether a significant net recovery is possible
> through foreclosure proceedings or other liquidation of the related Mortgaged
> Property.  If the Master Servicer determines that no such recovery is possible it
> shall charge off such Mortgage Loan no later than the date it becomes 180 days
> Delinquent, and it may charge off such Mortgage Loan prior to that date.  Once a
> Mortgage Loan has been charged off . . .  the Mortgage Loan shall be treated as a
> Liquidated Mortgage Loan giving rise to a Realized Loss.

(*Id.*)  Thus, what Good Hill describes in its Amended Complaint as "more detailed disclosures"

(A.C. ¶ 73) in the deal documents for the Long Beach Offering are in reality not any more

detailed than the disclosures that appear in the 2007-WM2 Offering.

      Just like the later 2007-WM2 Offering, the disclosures in the Long Beach Offering are

nothing more than a description of the Servicer's contractual obligations as they are defined in

the PSA in that particular deal.  Indeed, Good Hill admits in the Amended Complaint that "a

section describing the charge-off policy applicable to the junior-lien mortgage loans" in the

supplemental prospectus for the Long Beach Offering contains "substantially the same text" found in the Long Beach PSA. (*Id.* ¶¶ 73-74.) The same is true for the other two "charge-off" disclosures which appear in the Long Beach supplemental prospectus, both of which do nothing more than summarize the Servicer's contractual obligations under Section 3.16(a)(ii) of the Long Beach PSA. (*Id.*)

The PSA for the 2007-WM2 Offering has servicing terms of its own that are similarly binding obligations of the Servicer, all of which properly were disclosed to Good Hill. And, as even Good Hill recognizes, in contrast to the Long Beach Offering, the PSA for the 2007-WM2 Offering does not include any contractual obligation that even remotely resembles the "charge-off" provision in the Long Beach PSA. (*Id.* ¶ 84.)[5] The deal documents for the 2007-WM2 Offering accurately disclosed the Servicer's obligations under the PSA in that Offering, which invest broad discretion in the Servicer to declare a "Realized Loss" on a junior-lien mortgage loan as soon as the Servicer concludes that it will be unable to recover any proceeds on the loan from a foreclosure sale or other liquidation event, subject to the servicing standards it follows with respect to its own portfolio and industry standards. (PSA §§3.01, 3.16(a).)

In the end, Good Hill offers no *bona fide* reason why the servicing provisions of the Long Beach Offering are relevant to the Servicer's obligations or responsibilities in the 2007-WM2 Offering. Nor does Good Hill explain how the Defendants properly could disclose any servicing

---

[5] Good Hill alleges that the absence of a similar provision in the PSA for the 2007-WM2 Offering "is a nondisclosure and implied false representation attributable both to the Issuing Defendants and to the Bank itself." (*Id.* ¶ 86.) This allegation, of course, is nonsense. Pooling and Servicing Agreements are contracts, not disclosure documents, which, among other things, define the mortgage servicer's rights and obligations with respect to the administration and servicing of the underlying mortgage loans in the trust. (Pro. Supp. at S-39 ("Pursuant to the pooling agreement, the servicer will be required to service the mortgage loans in . . . accordance with the terms of the pooling agreement and related mortgage loans . . . .").) The terms of those agreements are not facts, but covenants, which cannot be either true or false.

obligation other than obligations that are set forth in the PSA supporting the WM2-2007

Offering.  Indeed, a disclosure in the 2007-WM2 Offering which suggests the Servicer must

recognize a "Realized Loss" at a definite point in time, as required in the Long Beach PSA,

would conflict with the Servicer's obligation under the 2007-WM2 Offering PSA to declare such

losses whenever it deems appropriate "in the same manner in which it services and administers

similar mortgage loans for its own portfolio, giving due consideration to customary and usual

standards of practice of mortgage lenders and loan servicers . . . ." (*Id.* § 3.01.)  In other words,

because the "customary and usual standards of practice of mortgage lenders could change at any

time," Defendants could not have made any specific representations in the deal documents

regarding precisely when the Servicer would recognize a "Realized Loss" on a defaulted

mortgage loan without misstating the terms of its servicing obligation and running the

concomitant risk that this statement would ultimately prove to be inaccurate.

Certainly, Good Hill's claim that a single transaction which took place at another time,

involving a different kind of mortgage pool with quite different servicing obligations is evidence

of a broader WaMu policy that should have been disclosed in the deal documents at issue in this

case is untenable.  Simply put, Good Hill has not alleged a single fact in the Amended Complaint

to support its conclusory assertion that Defendants had a "consistent practice of making

numerous and express disclosures in the offering documents of the servicer's intent and authority

to apply a charge-off policy" (A.C. ¶ 79 (emphasis omitted); *see also id.* ¶¶ 12-14; 66-68, 76-77,

79, 81-82), or that the so-called "charge-off" policy was the was the subject of "numerous

express disclosures in . . . WaMu offerings backed by junior-lien mortgages" (*id.* ¶ 80).  *See*

*Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (explaining that in the wake of *Twombly*, a

plaintiff must "amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim *plausible*") (emphasis in original); *see also In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *2 n.1 (noting that "[p]urely conclusory allegations in the Complaint are, of course, irrelevant" to evaluation of Rule 12(b)(6) motion).

Finally, despite Good Hill's claims to the contrary, it would not have been reasonable for Good Hill – or any other investor – to expect Defendants to disclose a "charge-off" policy with respect to the 2007-WM2 Offering. *See United States v. Finnerty*, No. 07 Cr. 1104, 2008 WL 2778830 (2d Cir. July 18, 2008) (considering the expectations of the investing public when evaluating whether defendant's conduct had been deceptive in a securities fraud prosecution). A mandatory "charge-off" procedure was *not* a term of the PSA in the 2007-WM2 Offering and although disclosure of such a mandatory procedure in deal documents might be expected where the PSA requires a "charge–off" (as in the Long Beach Offering), such a disclosure would not be required, or even appropriate, with respect to the 2007-WM2 Offering since the PSA in that offering had no similar term.

At bottom, there was no deception. If Good Hill was misled, it was the result not of any misstatement in the deal documents or other material omission, but of its own misunderstanding of the underlying transaction and the Servicer's contractual obligations as defined by the PSA.

2.    Projections or Forecasts of Potential Future Losses
Do Not Rise to the Level of Actionable Misstatements

Good Hill also claims that certain graphs and a table in the Term Sheet are actionable misstatements. According to Good Hill, because these graphs and table allegedly project that the Trust would incur minimal, if any, "Realized Losses" during the first 13 months following Good Hill's purchase of the NIM bonds, and that the NIM bonds would be fully repaid within 14 months, they "amounted to" false representations that the Servicer would not impose the so-called charge-off policy whereby the Servicer would be required to charge off (and recognize

16

"Realized Losses" on) defaulted junior-lien loans at 180 days.  (A.C. ¶¶ 88-90.)  These projections, however, say nothing in derogation of the Servicer's broad discretion to recognize "Realized Losses," and certainly do not support the conclusion that the Servicer may not recognize a Realized Loss on a junior-lien mortgage loan prior to foreclosure after 180 days of borrower default.[6]  (*See* Term Sheet at 29-30, 32.)  There is nothing in the Term Sheet to suggest that the Servicer would not recognize a "Realized Loss" with regard to junior-lien mortgage loans until at least a year after the NIM bond offering.

The projections in the Term Sheet are nothing more than WCC's opinion, based upon a series of modeling assumptions, on how the NIM bonds might perform in the future.  (*See* A.C. ¶¶ 15, 90); *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (concluding that valuation models could not form basis of  actionable misstatement or omission because they were opinions rather than fact).  As such, those projections cannot be actionable misstatements unless "they are worded as guarantees or are supported by specific statements of fact," or unless there are sufficient allegations in the Amended Complaint to show that WCC did not "genuinely or reasonably believe them."  *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

None of these circumstances obtain here.  Disclaimers in the Term Sheet make clear that the representations in the graphs and table set forth in the Term Sheet are not guarantees.  The Term Sheet even states that the information is "preliminary," "expected to change," incomplete, unverified, "will be superseded in its entirety," and may be "based upon numerous assumptions"

---

[6] In fact, by their very titles, the graphs in the Term Sheet which show loss curves refer exclusively to first-lien mortgages.  (*See* Term Sheet at 29-30.)  It is therefore difficult to understand how Good Hill can claim that these graphs of estimated losses made any representations at all regarding the treatment of *second-lien loans* on which it would have relied.

that may or may not be reasonable, and which, if changed, could "dramatically affect" information in the Term Sheet.  (Term Sheet at 2); *see also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).  Nor has Good Hill identified any specific statements of fact in the Term Sheet that support the projections in the graphs or table, let alone a statement of fact that was false or misleading to investors.  *See, e.g., In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (granting motion to dismiss on Section 10(b) claims, in part, because defendants' "predictions of continued prosperity" were not alleged to have been in the form of a guarantee or "bolstered . . . with specific statements that were false or misleading").[7]  Finally, there is no factual allegation that WCC did not believe that the disclosure of the Bank's servicing obligations was in any way inaccurate or untrue.

　　　　3.　　　　Alleged E-mail and Telephone Communications from
　　　　　　　　　　WCC Employees Are Not Actionable Misstatements

Good Hill also claims that, in a series of telephone calls during the period of April 18 through April 26, WCC employee Kevin Richmond confirmed Good Hill's understanding that the "Trust would most likely incur Realized Losses on the junior-lien mortgage loans at the same time as it incurred Realized Losses on the related senior-lien loan" (which Good Hill claims would typically not occur until at least a year after the NIM bond offering), and expressly stated that the Bank would treat "related" senior-lien and junior-lien loans as one loan for Realized

---

[7] The failure to plead a misstatement or omission means Good Hill's claims for fraud, aiding and abetting, negligent misrepresentation, innocent misrepresentation, and unjust enrichment under the common law of Connecticut, as well as the Connecticut Uniform Securities Act, Conn. Gen. Stat. §36b-4, also fail for want of the proper pleading of this element.  *See Miller v. Appleby*, 438 A.2d 811, 813 (Conn. 1981) (fraud); *Citino v. Redevelopment Agency*, 721 A.2d 1197, 1207 (Conn. App. Ct. 1998) (negligent misrepresentation); *Matyas v. Minck*, 655 A.2d 1155,1161 (Conn. App. Ct. 1995) (innocent misrepresentation); *Vertex, Inc. v. City of Waterbury*, 898 A.2d 178, 190 (Conn. 2006) (unjust enrichment); *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 518 (D. Conn. 2005) (Connecticut Uniform Securities Act).

Loss purposes. (A.C. ¶¶ 92-93, 99.) Good Hill also alleges that e-mails from Mr. Richmond and fellow WCC employee Timothy O'Brien represented to Good Hill that "the Trust would not suffer the Realized Losses that Good Hill had calculated" as part of a yield analysis that it had performed. (*Id.* ¶ 96.) Good Hill broadly asserts that these statements "amounted to" additional false representations that no charge-off policy would be imposed. (*Id.* ¶¶ 94, 97.)

Good Hill claims to have relied on the representations allegedly made by Mr. Richmond because he "was listed as a contact for further information" and because "Good Hill knew based on conversations with Mr. Richmond that he was familiar with the representations and disclosures made by WaMu and its affiliates . . . ." (*Id.* ¶ 93.) But neither Mr. Richmond nor Mr. O'Brien are alleged to have been employed by, or to have been agents of, the Bank, which serviced the mortgage pool, and certainly neither of them had the authority unilaterally to alter or supersede the Servicer's contractual obligations as defined by the PSA. In these circumstances, "it would be unreasonable" for Good Hill "to have interpreted the statements at issue as anything other than an individual's prediction about the future." *Int'l Bus. Mach. Sec. Litig.*, 163 F. 3d at 107.

Nor could Good Hill have justifiably relied on these statements to conclude that the Bank would never recognize a Realized Loss with respect to a defaulted junior-lien mortgage loan at 180 days, so that it was guaranteed an uninterrupted stream of income for 12 to 14 months. As discussed above, any representation that the Bank would follow a particular practice in servicing the loans and recognizing "Realized Losses" would directly contradict the Servicer's disclosed contractual obligation under the PSA to service the loans and declare losses "in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan

servicers . . . ." (PSA § 3.01.)  To the extent that the alleged representations by Mr. O'Brien or

Mr. Richmond conflicted with the language of the PSA, their statements must be evaluated

against the entirety of any underlying written agreement.  *See Barrios v. Paco Pharm. Servs.,*

*Inc.*, 816 F. Supp. 243, 252 (S.D.N.Y. 1993) ("When an offering document exactly states the

cautionary 'fact' that the plaintiff claims has been covered up or misrepresented, no §10(b) claim

will lie."); *Feinman v. Schulman Berlin & Davis*, 677 F. Supp. 168, 170 (S.D.N.Y. 1988)

("Reliance on statements which are directly contradicted by the clear language of the offering

memorandum through which plaintiffs purchased their securities cannot be a basis for a federal

securities fraud claim.").  Similarly, it is insufficient for the purposes of stating a claim under

Section 10(b) to allege that an investor was mislead by an inference drawn from statements

where "those inferences are contradicted by specific disclosures in the prospectuses."  *In re*

*Hyperion Sec. Litig.*, No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995).

Indeed, the *Hyperion* court went so far as to say that, despite any such representations, a

"reasonable investor would have familiarized himself with the potential for loss disclosed in the

prospectuses, rather than relying on the oral assurances of brokers."  *Id.*  A "sophisticated

investor" such as Good Hill should be held to the same standard of reasonableness.  (A.C. ¶

107.)

   **B.    Good Hill Has Failed to Allege Scienter Adequately**

   Finally, and equally importantly, the Amended Complaint fails to allege scienter under

Section 10(b) or any of the ancillary claims that it asserts.

   Pursuant to the PSLRA, a plaintiff must state with particularity "facts giving rise to a

strong inference that the defendant acted with the required state of mind."  *In re Monster*

*Worldwide Sec. Litig.*, No. 07 Civ. 2237, 2008 WL 623339, at *1 (S.D.N.Y. Mar. 4, 2008)

(quoting 15 U.S.C. § 78u-4(b)(2)).  "So far as Section 10(b) . . . [is] concerned, the required state

20

of mind is 'scienter,' defined in this context as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007)).  A "plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99.  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 127 S. Ct. at 2510).  "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, No. 06 Civ. 2902, 2008 U.S. App. LEXIS 13449, at *12 (2d Cir. June 26, 2008).  To rely on the "motive and opportunity" theory of scienter, a plaintiff may not "proceed based on motives possessed by virtually all corporate insiders." *Id.* at *16 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Rather, a plaintiff must allege facts sufficient to show "that defendants benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.

Good Hill does not even come close to meeting this strict standard of pleading state of mind.  First, Good Hill makes no allegations that any Defendant (or any individual officer or employee of any Defendant) had the motive to commit the purported fraud, let alone that any Defendant or individual received a "concrete and personal" benefit as a result of the purported fraud.  To the extent that Good Hill purports to rely on this theory of scienter, the Amended Complaint is insufficient.

Second, Good Hill has failed to allege any facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. In fact, Good Hill does not make a single non-conclusory allegation of fact that would suggest that any Defendant (let alone any individual officer or employee of any Defendant) knew or should have known at the time of the 2007-WM2 Offering that the Bank intended to impose (or that there was a "meaningful possibility" that the Bank would impose) any sort of "charge-off policy," or even that Defendants knew or should have known at the time of the offering that the Bank would later decide, in accordance with the terms of the PSA, to recognize Realized Losses on certain junior-lien loans after 180 days of default.

Indeed, Good Hill does not make any of the sorts of allegations that one might expect in a securities or other kind of fraud case. For example, Good Hill does not allege that any representative of the Bank informed any employee of the Issuing Defendants that the Bank intended to ignore its contractual obligations under the PSA and impose a mandatory charge-off policy on junior-lien loans. Nor does Good Hill allege the existence of any internal memorandum or report in which the Bank stated its intention or plan to impose a charge-off policy either with respect to the bond deal at issue in the instant case or, equally importantly, to other junior-lien mortgage loans in the Bank's portfolio. Also, there is no allegation of fact in the Amended Complaint that would support the claim that any of the Defendants intended to mislead Good Hill in any way. Likewise, Good Hill does not allege that the Bank was aware, at the time of the NIM bond offering, that other mortgage lenders and servicers in the geographic areas where the junior-lien mortgage loans in the Trust were located were imposing an automatic and mandatory 180-day charge-off policy on junior-lien mortgage loans. And although Good Hill references oral statements allegedly made by Kevin Richmond of WCC that "amounted to

an additional, false representation that the Bank" would not impose the purported charge-off policy (A.C. ¶¶ 93-94), Good Hill never makes any particularized allegation of fact that Mr. Richmond himself knew at the time of the alleged oral statements that the Bank had any intention of imposing any sort of charge-off policy.  Similarly, while Good Hill identifies alleged e-mails sent to Good Hill by Mr. Richmond and Timothy O'Brien of WCC which purportedly "amounted to additional false representations by WaMu Capital that the Bank would not apply a charge-off policy" (*id.* ¶¶ 96-97), Good Hill again fails to allege that either Mr. Richmond or Mr. O'Brien (or any other individual) had knowledge at the time of the e-mails that the Bank intended to impose a charge-off policy.

Instead, the best Good Hill can do is to simply ask the Court to infer Defendants' knowledge or intent to impose such a policy because, in other, "similar" bond deals, the Bank allegedly had an express policy of charging off defaulted junior-lien loans at 180 days.  But, as discussed at length above, Good Hill has only identified one purportedly "similar" bond deal, and that deal is, in fact, easily distinguishable in several key respects from the bond deal at issue in the instant case.  Good Hill does not even attempt to explain how the existence of or disclosures made in this other, unrelated bond deal would have had any bearing on any Defendant's knowledge or intentions regarding servicing decisions to be made with respect to the bond deal at issue in the instant action.  Thus, Good Hill's allegations regarding the existence of or disclosures made in an unrelated, dissimilar bond deal do not give rise to any inference – let alone a strong inference – that any particular Defendant acted with the requisite state of mind when making any purported omission or misrepresentation alleged in the Amended Complaint.

Further, Good Hill's allegations that three months after the NIM bond offering the Bank informed Good Hill that it would begin recognizing losses on defaulted junior-lien loans at 180

23

days do not establish scienter at the time of the offering.  Such allegations of "fraud by hindsight" are not sufficient to plead scienter.  *Fant v. Perelman*, Nos. 97 Civ. 8435, 97 Civ. 8436, 1999 U.S. Dist. LEXIS 5694, at *30-31 (S.D.N.Y. Apr. 9, 1999) ("[P]laintiffs have merely alleged their conclusion that defendants necessarily must have known and thus concealed in October the details of the proposal announced November 12.  No facts supporting this conclusion are pleaded . . . .  [T]his method of attempting to plead fraud by hindsight is insufficient."); *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007) (plaintiff's assertion that defendant's post-offering resignation showed knowledge of wrongdoing at time of offering "falls far short of 'deliberate illegal behavior,' or 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'") (quoting *Novak*, 216 F.3d at 308), *aff'd, Bay Harbour Mgmt. LLC v. Carothers*, No. 07 Civ. 1124, 2008 WL 2566557 (2d Cir. June 24, 2008).

Accordingly, even after amending its complaint, Good Hill has failed to plead scienter for any of the causes of action requiring a culpable mental state.[8]

## II.    Good Hill Has Failed to State a Claim for Control Person Liability Under Section 20(a) of the Securities Exchange Act

Nor can Good Hill state a claim for control liability under Section 20(a) of the Securities Exchange Act of 1934.  The Second Circuit has explained that "[i]n order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person

---

[8] Accordingly, Good Hill's failure to plead adequately the requisite state of mind on the part of the Defendants invalidates their claim for fraud under Connecticut common law as well their claim under the Connecticut Uniform Securities Act because a culpable state of mind is an essential element of these causes of action.  *See Miller*, 438 A.2d 811, 813 (fraud); *IM Partners*, 394 F. Supp. 2d 503, 518 (Connecticut Uniform Securities Act).

24

was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v.*

*Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

1472 (2d Cir. 1996)).  Because Good Hill does not state a claim pursuant to Section 10(b)

against any of the defendants, it cannot sufficiently plead the "primary violation" element of its

control liability claim against WaMu and the Bank.  *See Edison Fund v. Cogent Inv. Strategies*

*Fund, Ltd.*, 551 F Supp. 2d 210, 230-31 (S.D.N.Y. 2008) (dismissing Section 20(a) claim due to

lack of primary violation of federal securities laws).

## <u>Conclusion</u>

For all of the reasons set forth herein, the motion should be granted in all respects and the

Amended Complaint should be dismissed with prejudice, and judgment should be entered in

favor of the Defendants.

Dated: New York, New York                      Respectfully submitted,
       August 11, 2008

_____/s/ Victor J. Rocco_____
HELLER EHRMAN LLP
Victor J. Rocco (VR-4191)
(victor.rocco@hellerehrman.com)
Jeremy N. Kudon (JK-8131)
(jeremy.kudon@hellerehrman.com)
7 Times Square
New York, NY 10036
Phone: (212) 832-8300
Fax: (212) 763-7600

Attorneys for Defendants WM Asset Holdings
Corp. CI 2007-WM2, WM Asset Holdings CI
2007-WM2 LLC, WM Asset Holdings Corp.,
WaMu Asset Acceptance Corp., WaMu Capital
Corp., Washington Mutual Bank, and
Washington Mutual, Inc.