UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

GOOD HILL PARTNERS L.P. ON BEHALF OF     :
GOOD HILL MASTER FUND, L.P.,               :

                                  Plaintiff,     :    Case No. 08 Civ. 3730 (JSR)

                                         :

            - against -               :    **ELECTRONICALLY FILED**

                                         :

WM ASSET HOLDINGS CORP. CI 2007-WM2,   :
WM ASSET HOLDINGS CO 2007-WM2 LLC,    :
WM ASSET HOLDINGS CORP., WAMU ASSET   :
ACCEPTANCE CORP., WAMU CAPITAL CORP.,  :
WASHINGTON MUTUAL BANK, and              :
WASHINGTON MUTUAL, INC.                :

                           Defendants.     :

------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**COHEN & GRESSER LLP**

Mark S. Cohen
mcohen@cohengresser.com
Marc E. Isserles
misserles@cohengresser.com
Nathaniel P. T. Read
nread@cohengresser.com

100 Park Avenue, 23rd Floor
New York, NY 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS....................................................................................3

ARGUMENT....................................................................................................6

I.    Good Hill Has Sufficiently Pled A Claim For Relief Under Section 10(b)
      of the Exchange Act and Rule 10b-5....................................................................6

      A.    Defendants' Failure to Disclose The Bank's "Charge-Off" Policy
            Constitutes An Actionable Omission. ..........................................................7

            1.    Good Hill Challenges The Nondisclosure of The Charge-Off
                  Policy That Defendants Actually Applied In This Case.................9

            2.    Defendants Cannot Escape Liability For a Fraudulent
                  Omission By Pointing To The Absence of A Charge-Off
                  Policy In the PSA. .......................................................................11

      B.    Good Hill Also Adequately Pled Actionable Affirmative
            Misrepresentations.....................................................................................14

      C.    Good Hill Adequately Alleged Facts Supporting A Strong
            Inference of Scienter...................................................................................17

II.   Defendants Offer No Independent Basis For Dismissing Good Hill's
      Remaining Claims. .............................................................................................23

CONCLUSION .................................................................................................24

## TABLE OF AUTHORITIES

Page

**Cases**

*Associated Press v. U.S. Dep't of Defense,*
410 F. Supp. 2d 147, 153 (S.D.N.Y. 2006) ....................................................7

*Caiola v. Citibank, N.A.,*
295 F.3d 312, 331 (2d Cir. 2002)) ...............................................................8

*Chill v. Gen. Elec. Co.,*
101 F.3d 263, 269 (2d Cir. 1996) ...............................................................20

*Connecticut Nat'l Bank v. Giacomi,*
699 A.2d 101 (1997 ....................................................................................23

*Fant v. Perelman,*
No. 97 Civ. 8435 (LAP), 1999 WL 199078, at *9
(S.D.N.Y. Apr. 9, 1999) ....................................................................... 19-20

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154, 161 (2d Cir. 2000) ...............................................................18

*Halperin v. eBanker USA.com, Inc.,*
295 F.3d 352, 357 (2d Cir. 2002) .................................................................8

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
159 F.3d 723, 728-29 (2d Cir. 1998) .............................................................8

*IM Partners v. Debit Direct Ltd.,*
394 F. Supp. 2d 503, 518 (D. Conn. 2005) ..................................................23

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.,*
381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) .................................................15

*In re Doral Fin. Corp. Sec. Litig.,*
___ F. Supp. 2d ___, No. 05 MD 1706 (JSR),
2008 WL 2636864, at *1 (S.D.N.Y. July 7, 2008)........................................22

*In re I.B.M. Corp. Sec. Litig.,*
163 F.3d 102, 106, 107 (2d Cir. 1998) ....................................................6, 14

*In re Initial Public Offering Sec. Litig.,*
241 F. Supp. 2d 281, 360 (S.D.N.Y. 2003) .................................................20

*In re Initial Public Offering Sec. Litig.*,
   358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) ...................................................20

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ...........................................20, 22

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63, 77 (2d Cir. 2001) ............................................................. 21-22

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259, 268-69 (2d Cir. 1993) ..............................................................8

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220, 231 (S.D.N.Y. 2006) ........................................................22

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props.*,
   939 F. Supp. 294, 297-98 (S.D.N.Y. 1996) ..................................................8

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ............................................. 7-8

*Lehn v. Dailey*,
   825 A.2d 140 (Conn. App. Ct. 2003) .........................................................23

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161, 172 (2d Cir. 2005) ................................................................6

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ......................................................................20

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92, 96-97 (2d Cir. 2004) .............................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   ___ F.3d ___, 2008 WL 2521676, at *4 (2d Cir. June 26, 2008)..................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   ___ U.S. ___, 127 S.Ct. 2499 (2007) .........................................................22

*Xerion Partners I LLC v. Resurgence Asset Mgmt.*,
   *LLC*, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007) ................................... 19-20

**Statutes**

15 U.S.C. § 78u-4(b)(2) ...................................................................................18

Securities Exchange Act of 1934, Section 10(b) ......................................*passim*

Plaintiff Good Hill Partners L.P., on behalf of Good Hill Master Fund, L.P. ("Good Hill") respectfully submits this memorandum of law in opposition to the motion to dismiss the Amended Complaint, filed on August 11, 2008, by Defendants WM Asset Holdings Corp. CI 2007-WM2 ("WM Asset Caymans"), WM Asset Holdings CI 2007-WM2 LLC ("WM Asset LLC"), WM Asset Holdings Corp. ("WM Asset Holdings"), WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance"), WaMu Capital Corp. ("WaMu Capital"), Washington Mutual Bank (the "Bank"), and Washington Mutual, Inc. ("WaMu") (collectively, the "Defendants").

## PRELIMINARY STATEMENT

This is a fraud action arising out of a straightforward but glaring omission at the heart of an asset-backed bond offering. In marketing and selling "net interest margin" ("NIM") bonds to Good Hill (the "2007 WM2-Offering"), Defendants made detailed written disclosures describing the nature of the NIM bonds and the attendant risks of loss. Notably absent from those disclosures, however, was a statement that the Bank – which acted as the servicer of the mortgages that formed part of the collateral for the NIM bonds – could (and would) impose a "charge-off" policy. A charge-off policy generally requires the Bank to write off junior-liens loans as bad debt after they have been delinquent for 180 days. Imposition of a charge-off policy would substantially increase the "Realized Losses" incurred on the collateral, thereby significantly decreasing the value of the NIM bonds.

Good Hill – a sophisticated investor familiar with these types of bond offerings – reasonably expected to find an express and prominent disclosure about the existence of a charge-off policy in the offering documents for the 2007-WM2 Offering if, as Good Hill learned only after it had purchased the bonds at issue, the Bank intended to impose such a policy. Yet in every place at which a reasonable investor would expect to find a disclosure of a charge-off policy, the offering documents are completely silent. Moreover, Defendants made additional

affirmative representations that, like Defendants' omissions, communicated to Good Hill that the Bank would not impose a 180-day charge-off policy on junior-lien mortgage loans. Good Hill purchased the bonds in reliance on these omissions and misrepresentations, and then lost at least $7 million when the Bank – just three months into the term of the bonds – announced for the first time that it would impose a 180-day charge-off policy.

In moving to dismiss the Amended Complaint, Defendants do not contest that, if a charge-off policy existed, they would have a duty to disclose it because the imposition of such a policy would have been material to investors. Instead, Defendants spend the lion's share of their brief trying to convince this Court that Good Hill has not adequately alleged the existence of a company-wide WaMu charge-off policy purportedly applicable to *every* WaMu bond offering involving junior-lien mortgages. But Good Hill simply did not allege a company-wide charge-off policy in the Amended Complaint. To the contrary, Good Hill alleged that the Bank – as servicer of the junior-liens held by the Trust in *this* bond transaction – *actually* imposed a 180-day charge-off policy three months after they sold the bonds to Good Hill, and that this specific policy was not disclosed in the 2007-WM2 Offering documents.

Defendants also argue that they could not have disclosed a charge-off policy to investors because the terms of the Pooling and Service Agreement ("PSA") defining the Bank's role as servicer expressly do not *obligate* it to impose a charge-off policy. This argument, too, is wildly off the mark. Defendants appear to be asking this Court to dismiss a nondisclosure securities fraud claim on the nonsensical ground that one of the 2007-WM2 Offering documents is itself *silent* about the existence of a charge-off policy – the very disclosure at issue. Indeed, Defendants nowhere even attempt to explain why the PSA – which was executed and distributed to investors as part of the 2007-WM2 Offering, and expressly referenced throughout the

2

disclosure documents – fails to disclose in any provision the charge-off policy that the Bank ultimately imposed.  Defendants also seek to demonstrate that the alleged affirmative misrepresentations are not actionable, but their arguments here too fail to join issue with, let alone conclusively refute, the actual allegations of the Amended Complaint.

Finally, Defendants argue that Good Hill has failed adequately to plead that Defendants acted with scienter.  But the Amended Complaint contains detailed allegations of fact creating a strong inference that the Defendants either consciously knew about the Bank's intent to impose a charge-off policy at the time of the offering or were reckless in failing to identify and disclose the possibility that the Bank would impose such a policy.  Once again, Defendants ignore these allegations and attack phantom allegations that cannot be found in the Amended Complaint.  And in a telling silence, Defendants fail to offer this Court a single, non-culpable explanation for their failure to disclose the charge-off policy to Good Hill.

For all of these reasons, Good Hill respectfully submits that this Court should deny Defendants' motion to dismiss the Amended Complaint.

## STATEMENT OF FACTS

Good Hill purchased over $18 million of NIM bonds in an April 2007 offering issued by WM Asset Caymans and WM Asset LLC, sponsored by WM Asset Holdings, and marketed by WaMu Capital (the "2007-WM2 Offering").  *See* Am. Compl. ¶¶ 3, 5, 10, 26-29.  The 2007-WM2 Offering was described in a Private Placement Memorandum dated April 26, 2007 (the "PPM"), which attached the Prospectus Supplement, Prospectus, Term Sheet, and the PSA, and referred investors to those documents for disclosures regarding the various aspects of the investment.  *See id.* ¶¶ 58-60.  The NIM bonds were collateralized by an income stream generated by payments made on junior- and senior-lien subprime mortgage loans issued by the Bank.  *See id.* ¶¶ 9, 50-53.  The Bank serviced these loans, which it had previously gathered into

3

a $1.5 billion pool. *See id.* ¶¶ 7, 21, 32, 48-49, 64. Each of the junior-lien mortgages included in the pool was related to a senior-lien mortgage also in the pool: the borrower and collateral on the loans were the same. *See id.* ¶¶ 63, 91-92. Prior to Good Hill's purchase, WaMu Asset Acceptance Corp. and the Bank issued the Prospectus through which they sold bonds also backed by the mortgage loans in the trust. *See id.* ¶¶ 30, 32, 42, 48, 56.

Holders of NIM bonds generally receive the income stream generated by the difference between the interest paid by debtors on the mortgage loans in the collateral pool and the interest paid on the bonds issued prior to Good Hill's purchase. *See id.* ¶¶ 9, 51-53, 65, 128-129. When the trust incurs "Realized Losses," however, the cash generated by this net interest margin can be used to pay other bondholders. *See id.* ¶¶ 9, 65, 128.

One way a collateral trust can incur Realized Losses is through the application of a charge-off policy. A charge-off policy generally requires a junior-lien loan to be "charged off" or removed from the underlying collateral trust no later than 180 days after the borrower defaults on the loan. *See id.* 12, 68, 77. In other junior-lien-backed WaMu bond offerings, WaMu Capital and other WaMu affiliates specifically disclosed in no fewer than five places in the prospectus supplement and PSA for those offerings that the Bank, acting as servicer, would apply a charge-off policy. *See id.* ¶¶ 68-77. These disclosures either specifically refer to the "charge-off policy" using those exact words or discuss the policy's operation. *See id.*

The offering documents for the 2007-WM2 Offering, including the Prospectus Supplement and PSA, detail the Bank's servicing policies and practices regarding the mortgage loans in the collateral pool. *See id.* ¶¶ 80-86. But those documents do not disclose that the Bank would impose a charge-off policy on junior-lien mortgage loans, representing that no such policy would be imposed. *See id.* Other than this significant omission, the relevant risk disclosures in

the 2007-WM2 Offering are virtually identical to the disclosures made in contemporaneous junior-lien-backed transactions offered by WaMu Capital and other WaMu affiliates acting as issuers. *See id.* ¶¶ 68-77, 80-86.

The disclosures in the 2007-WM2 Offering documents that the Bank would not impose a charge-off policy were confirmed by the expected loss curves and repayment windows included in the Term Sheet circulated to investors as part of that Offering. *See id.* ¶¶ 60, 88-90. If WaMu Capital had disclosed in the Term Sheet that the Bank was going to impose a charge-off policy, the loss curves and repayment windows would have appeared markedly different and incorporated significant loss amounts in the first year following the 2007-WM2 Offering. *See id.* In addition, in the days before Good Hill purchased the NIM bonds, WaMu Capital sent e-mails to Good Hill confirming loss scenarios that were wholly inconsistent with the application of a charge-off policy. *See id.* ¶¶ 95-96. During that same time, Kevin Richmond, the lead subprime-mortgage-backed bond trader at WaMu Capital, stated that the Bank would treat the related senior-lien and junior lien mortgage loans as one loan when determining losses on the collateral pool. *See id.* ¶¶ 93-94. These statements confirmed the disclosures in the 2007-WM2 Offering documents that the Bank would not impose a charge-off policy. *See id.*

Good Hill purchased over $18 million in NIM bonds in reliance on these various misrepresentations and omissions, which made clear that the Bank would not impose a charge-off policy. *See id.* ¶¶ 5, 98-100. Yet just three months after Good Hill bought the NIM bonds, the Bank told Good Hill that it would apply a charge-off policy to the junior-lien loans in the collateral backing those bonds. *See id.* ¶ 112. As a result, Good Hill suffered at least $7 million in losses. *See id.* ¶ 23, 133.

When the Bank informed Good Hill that it would impose the charge-off policy, the Bank's representatives wrongly stated that the 2007-WM2 Offering documents had disclosed its right to impose such a policy. *See id.* ¶¶ 112-113. All of the Defendants knew or should have known of the Bank's intent to impose the charge-off policy. *See id.* ¶¶ 102-115. WaMu Capital and the other defendants were directed and controlled by the Bank and WaMu, with whom they worked closely to complete the 2007-WM2 Offering. *See id.* ¶¶ 104, 116-126. WaMu Capital and WaMu Asset also had experience on similar transactions in which the Bank had a practice of making specific disclosures about a charge-off policy when it intended to apply one. *See id.* ¶ 103. WM Asset Caymans and WM Asset LLC also had a duty to identify and disclose to investors all material risks associated with the bond offering. *See id.* ¶ 104. The failure of any Defendant to identify and disclose the risk that the Bank would in fact apply a charge-off policy was highly unusual and marked an extreme departure from the standards of ordinary care governing the marketing and sale of asset-backed bonds. *See id.* ¶¶ 105-115.

## ARGUMENT

### I.    Good Hill Has Sufficiently Pled A Claim For Relief Under Section 10(b) of the Exchange Act and Rule 10b-5.

To state a claim for relief under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re I.B.M. Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)). In moving to dismiss Good Hill's 10b-5 claim (Count I), Defendants essentially confine themselves to the first two elements: arguing that Good Hill has failed to allege actionable omissions or misstatements, *see* Memorandum of Law In Support of

Defendants' Motion to Dismiss The Amended Complaint ("Mem.") at 10-20, and that Good Hill

has failed adequately to allege scienter, *see* Mem. at 20-24.[1]  As discussed below, neither of

these arguments has any merit.

### A.    Defendants' Failure To Disclose The Bank's "Charge-Off" Policy Constitutes An Actionable Omission.

The Amended Complaint alleges that Defendants failed to disclose the critical fact that

the Bank could or would, as servicer of the underling loans that formed part of the collateral for

the NIM bonds, apply a 180-day charge-off policy to junior lien mortgages.  In other words,

Good Hill primarily seeks relief on the basis of a material omission at the heart of the 2007-

WM2 Offering – an omission that rendered the offering documents critically incomplete and

highly misleading insofar as they implied that the Bank would not impose such a charge-off

policy.

In moving to dismiss the Amended Complaint, Defendants do not, because they cannot,

argue that they lacked a duty to disclose a charge-off policy in the 2007-WM2 Offering

documents given that disclosure of such a policy plainly would have been necessary for the

disclosures in those documents to be complete and accurate.  *See Lapin v. Goldman Sachs*

---

[1] As explained below, *see infra* at 16-16, although Defendants include a brief argument that Good Hill could not justifiably rely on some of the alleged misrepresentations that Defendants made over e-mail and by telephone, Mem. at 18-19, that argument is based on invented allegations that cannot be found anywhere in the Amended Complaint.  Moreover, in a brief footnote passage, Mem. at 10 n.4, Defendants advance an additional reliance argument, stating that Good Hill "alleges no facts that reasonably could justify its belief that it was entitled to an uninterrupted cash flow in return on its investment," especially in light of the purportedly broad discretion given to the Bank as servicer to declare Realized Losses. *See id.*  That argument fails because (i) Defendants presented it only in a footnote in their brief, *see Associated Press v. U.S. Dep't of Defense*, 410 F. Supp. 2d 147, 153 (S.D.N.Y. 2006), and (ii) Good Hill plainly did not allege any such entitlement to an "uninterrupted cash flow in return on its investment."  Rather, Good Hill simply alleged that it was entitled to believe, based on Defendants' omissions and misrepresentations, that the Bank would not declare Realized Losses *on the basis* of a 180-day charge-off policy – an allegation that is perfectly consistent with the recognition of *some* Realized Losses within the first year of the term of the bonds. *See* Am. Compl. ¶¶ 80, 95-98.

*Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("the lack of an independent duty to

speak in the first instance becomes irrelevant once a party chooses to discuss material issues,

because upon choosing to speak one 'has a duty to be both accurate and complete.'") (quoting

*Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002)).

Nor do Defendants argue – because they could not seriously do so – that the existence of

a charge-off policy for junior-lien mortgages would not have been "material" to a reasonable

investor. *See Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002) ("The

touchstone of the inquiry is not whether isolated statements within a document were true, but

whether defendants' representations or omissions, considered together and in context, would

affect the total mix of information and thereby mislead a reasonable investor regarding the nature

of the securities offered."). As the Amended Complaint plainly alleges, imposition of such a

policy substantially increases the likelihood that Realized Losses will be incurred within the first

year of the bond offering, which in turn would substantially affect the value of the collateral

supporting the NIM bonds and the NIM bonds themselves. *See* Am. Compl. ¶¶ 3, 18-19, 78.

Because Good Hill adequately alleged that Defendants had a duty to disclose the charge-

off policy, and that the disclosure of such a policy would have been material to a reasonable

investor, there can be no serious question here that Good Hill has adequately pled an actionable

omission sufficient to give rise to potential 10b-5 liability. *See, e.g., In re Time Warner Inc. Sec.

Litig.,* 9 F.3d 259, 268-69 (2d Cir. 1993); *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props.,*

939 F. Supp. 294, 297-98 (S.D.N.Y. 1996); *see also Hunt v. Alliance N. Am. Gov't Income Trust,

Inc.*, 159 F.3d 723, 728-29 (2d Cir. 1998) (reversing dismissal where prospectuses stated that

fund would use hedging techniques that fund managers allegedly knew were unavailable because

too costly). Defendants nonetheless contend that their failure to disclose the charge-off policy is

8

still somehow not actionable (1) because Good Hill purportedly failed to allege sufficient facts

demonstrating the existence of a WaMu-wide company charge-off policy applicable to *every*

WaMu bond offering involving junior-liens, and (2) because the PSA from the 2007-WM2

Offering does not obligate the Bank to impose any such charge-off policy.  As explained below,

these arguments fail and do not support dismissal of the Amended Complaint.

> *1.    Good Hill Challenges The Nondisclosure of The*
> *Charge-Off Policy That Defendants Actually*
> *Applied In This Case.*

Defendants first adopt the curious tack of arguing that they had no obligation to disclose

the alleged charge-off policy because no such policy even exists.  *See* Mem. at 12 (arguing that

Good Hill did not allege that a "'charge off' policy existed at the time of the NIM bond offering

with respect to the kind of mixed loan portfolio of senior-lien and junior-lien mortgage loans that

secure the bonds that it purchased" or that "this *so-called policy existed at all*, with respect to any

kind of loan pool, mixed or stand alone senior- or junior-lien.") (emphasis added); *see id.* at 13

(arguing that the alleged charge-off policy "is not a WaMu 'policy' at all").

Thus, Defendants appear to base their motion on Good Hill's purported failure to allege

facts establishing a WaMu-wide company charge-off policy applicable to *every* WaMu bond

offering involving junior-liens.  The short response to this argument is that it is a flat misreading

of the Amended Complaint.  In alleging that Defendants committed securities fraud, Good Hill

did not – and need not – allege that WaMu has a company-wide policy under which the Bank,

when acting as servicer on junior-lien mortgages, will always and uniformly apply a charge-off

policy in every offering.  To the contrary, Good Hill simply alleged that the Bank *actually*

imposed such a policy to the junior-liens at issue in *this bond offering*, and yet the Defendants

failed to disclose that policy in the Prospectus Supplement, PSA and other 2007-WM2 Offering

documents.  *See* Am. Compl. ¶¶ 17, 112.

Defendants attempt to support their position by arguing that the Amended Complaint included the disclosures in the 2006 Long Beach Offering in an attempt to show some form of WaMu company-wide charge-off policy. *See* Mem. at 15. But that attempt is misguided. Good Hill referred to the disclosures in the Long Beach Offering to provide an *example* of the kind of disclosures that a reasonable investor would expect to see *if* the Bank as servicer were planning to impose a charge-off policy to junior-lien mortgages in the particular transaction at issue. *See* Am. Compl. ¶ 76 ("These representative documents [from the Long Beach Offering] – created as part of a contemporaneous, highly similar transaction involving the Bank, WaMu Capital, and other WaMu affiliates acting as issuers – demonstrate that, *if the Bank as servicer intends to apply a charge-off policy to junior-lien mortgages*, a reasonable investor would expect to see that intent repeatedly and openly disclosed in the prospectus supplement and other offering documents.") (emphasis added). There is not a single allegation in the Amended Complaint that even plausibly supports Defendants' fabricated notion that Good Hill is seeking to litigate the existence and lawfulness of a purported charge-off policy that WaMu uniformly applies to every WaMu asset-backed bond offering involving junior-lien mortgage loans.

Indeed, the very idea that Good Hill would look to the Long Beach Offering's disclosures to establish the *existence* of a charge-off policy applicable to the 2007-WM2 Offering makes no sense. After all, the existence of that charge-off policy was firmly established, as the Amended Complaint expressly alleges, when the Bank informed Good Hill in July 2007 that it would in fact impose a 180-day charge-off policy, and when the Bank in fact imposed that policy. *See* Am. Compl. ¶¶ 17-18, 112, 128-129.

The charge-off policy that the Bank actually applied to the junior-lien mortgages at issue in this case – a policy under which the Bank would, as a general rule, automatically charge-off

10

delinquent junior-liens after 180 days – is the *only* charge-off policy that Good Hill has challenged or intends to challenge in this case. And, as to that policy, Defendants' brief is completely silent. Of course, to the extent Defendants intend to deny the existence of *that* policy – to argue that the Bank did not actually impose a 180-day charge-off "policy" to the junior-lien mortgages in the Trust for the 2007-WM2 Offering – that argument would simply contradict the express allegations of the Amended Complaint, *see* Am. Compl. ¶ 17-18, 112, 128-129, and would present, at best, a fact question plainly inappropriate for resolution on a motion to dismiss.

>    2.    *Defendants Cannot Escape Liability For a*
>          *Fraudulent Omission By Pointing To The*
>          *Absence of A Charge-Off Policy In the PSA.*

Defendants also argue that the disclosure of a charge-off policy in the "deal documents" for the WM2-2007 Offering was unnecessary because the PSA does not contractually *obligate* the Bank as servicer to impose any such policy. *See* Mem. at 12-16. Indeed, because the PSA for the 2007-WM2 Offering is silent about a charge-off policy, and purportedly gives the Bank as servicer "broad discretion" to declare Realized Losses, Defendants claim that they *could not* have disclosed the existence of a charge-off policy without somehow misrepresenting the terms of the PSA. *See* Mem. at 15-16.

As an initial matter, by taking the position that the PSA itself precludes imposition of a charge-off policy, Defendants have effectively *admitted* that they had no legal authority to impose the 180-day charge-off policy that the Bank actually imposed in this case. Although Good Hill need not establish that imposition of a 180-day charge-off policy actually violated the terms of the PSA – it need only allege Defendants' failure to adequately disclose the material fact that such a policy could or would be imposed – Defendants' concession is fatal to their argument that Good Hill has somehow failed to plead an actionable omission or misrepresentation. On Defendants' own account, the Prospectus Supplement, PSA, and other

11

documents describing the 2007-WM2 Offering flatly prohibit the very charge-off policy that the Bank ultimately imposed.[2]

Moreover, Defendants' effort to insulate their fraudulent omission on the ground that the 2007-WM2 PSA did not require imposition of a charge-off policy is a complete non-starter. In so arguing, Defendants misleadingly suggest that the PSA agreement is some sort of freestanding contract between unrelated parties and its content necessarily dictated the kinds of disclosures that Defendants would be required to make in the Prospectus Supplement and other disclosure documents. But, as Defendants well know, the PSA is an agreement between two of the Defendants in this case (the Bank as servicer and WaMu Asset Acceptance as depositor) that was executed as an integral part of this particular bond offering, and that Defendants expressly made an integral part of the 2007-WM2 Offering documents.

---

[2] In fact, contrary to Defendants' assertion, the PSA appears to prohibit the Bank even from exercising discretion to charge-off junior lien mortgages as bad debt in particular instances. Defendants' base their argument that the PSA gave the Bank "broad discretion" to declare a Realized Loss on the PSA's use of the phrase "expects to recover" in its definition of the term "Liquidated Mortgage Loan," which term is itself the subject of the PSA's definition of "Realized Loss." *See* Mem. at 6 ("The use of the phrase 'expects to recover' in the definition of 'Liquidated Mortgage Loan' makes clear that the Servicer may declare a 'Realized Loss' even if it has not liquidated the defaulted mortgage loan in the ordinary sense of the word."). Defendants' argument overlooks the critical fact that the Long Beach Offering's PSA includes the same phrase "expects to recover" in its definition of Liquidated Mortgage Loan, *see* August 11, 2008 Declaration of Victor Rocco ("Rocco Dec."), Ex. G, at 22, and yet the definition of "Realized Loss" in that PSA *expressly* refers to a Realized Loss arising from a bad-debt charge-off. *See id.* at 38; *see also* Am. Compl ¶¶ 84-86. Of course, if Defendants were correct that the phrase "expects to recover" itself were sufficient to give the Bank as servicer the authority to charge-off junior lien mortgages even in advance of a liquidation proceeding, there would have been no need for the Long Beach Offering to refer to the charge-off policy in its definition of "Realized Loss." Thus, the Long Beach Offering's definitions make clear that a Realized Loss arising from a Liquidated Mortgage Loan is a Realized Loss that is qualitatively different in kind from the kind of Realized Loss arising from a pre-liquidation charge-off decision. Because the 2007-WM2 PSA makes no reference to a Realized Loss arising from a charge-off decision, it appears to prohibit the Bank from declaring a Realized Loss in advance of a formal liquidation proceeding.

12

The PSA was executed on April 1, 2007 – just four days before the Prospectus Supplement was issued – and was attached as an exhibit to the PPM, dated April 26, 2007. *See* Am. Compl. ¶ 60.   Moreover, the PPM, Prospectus, and Prospectus Supplement refer repeatedly to the terms of the PSA, and the PPM expressly directs investors to review the terms of the PSA in evaluating the bond offering. *See* Cover Page to PPM (Rocco Dec., Ex. C).  In short, the PSA is as much a part of the 2007-WM2 "deal documents" as any other document that was part of the WM2-Offering, and the content of that agreement is thus critical in determining whether Defendants made adequate disclosures of material information to investors.[3]

Accordingly, whether Defendants could or should have disclosed the existence of a charge-off policy in the PPM, Prospectus, or Prospectus Supplement given the *existing* terms of the 2007-WM2 PSA is simply beside the point.  The relevant point is that, if the Defendants intended to impose a charge-off policy to junior-lien mortgages in this transaction (a policy that they in fact imposed just three months into the term of the bonds), Defendants should have offered investors the kind of disclosures made in the Long Beach Offering – a PSA that includes an express charge-off policy provision, and express disclosures about that provision in the Prospectus Supplement and related offering documents that summarize and describe the obligations and policies of the Bank as servicer.  Defendants' argument ultimately begs the

---

[3]  Defendants assert in their brief that "Pooling and Service Agreements are contracts, not disclosure documents," and that 10b-5 liability somehow cannot be based on the terms of the 2007-WM2 PSA. Mem. at 14 n.5; *see id.* (claiming that the terms of Pooling and Service Agreements "are not facts, but covenants, which cannot be either true or false.").  Defendants offer no legal authority in support of this novel distinction between "facts" and "covenants," and, as far as Good Hill is aware, no such authority exists.  In any case, even assuming that the distinction between "facts" and "covenants" had any force as a general matter (and it does not), that distinction would make no sense in the circumstances of this case because Defendants incorporated the contractual covenants in the 2007-WM2 PSA into the Prospectus Supplement and other 2007-WM2 Offering documents by expressly referring to and directing investors to review those covenants.  Accordingly, Defendants used the PSA itself to communicate to investors the critical facts relating to how the Bank would service the loans held by the Trust.

critical question of why the Bank, WaMu Asset Acceptance, and ultimately WaMu itself,[4] did

not execute a PSA agreement that, like the PSA from the Long Beach Offering, expressly

disclosed a charge-off policy. Indeed, by defending against an alleged fraudulent nondisclosure

on the basis of what itself is a glaring nondisclosure in the terms and conditions of the 2007-

WM2 PSA, Defendants' argument misses the point of Good Hill's entire case.

### B.    Good Hill Also Adequately Pled Actionable Affirmative Misrepresentations.

Good Hill also pled additional affirmative misrepresentations, including (i) graphs and

tables in the Term Sheet that falsely implied that no charge-off policy would be imposed, *see*

Am. Compl. ¶¶ 88-90, and (ii) emails and oral statements from two WaMu Capital employees

that also falsely implied that no charge-off policy would be imposed, *see id.* ¶ 93-97.

Defendants argue that the graphs and tables in the WaMu Capital Term Sheet do not

contain actionable misrepresentations because those tables and graphs were merely "projections .

. . based upon a series of modeling assumptions, on how the NIM bonds might perform in the

future." Mem. at 17. According to Defendants, projections in valuation models are non-

actionable "opinion" statements, unless those projections are "worded as guarantees or are

supported by specific statements of fact" – conditions that Defendants argue are not met here

given the disclaimers in the Term Sheet. *Id.* (citing *In re I.B.M. Corp. Sec. Litig.*, 163 F.3d at

107).

---

[4] Although Defendants treat the PSA as a document somehow set in stone that necessarily constrained the types of disclosures that they were required to make, they do not contest (nor could they) the allegations in the Amended Complaint that "WaMu and the Bank not only had the power to direct and control the disclosures made in the 2007-WM2 Offering, but were specifically involved in, and exerted practical and effective control over, the disclosures made in that Offering." Am. Compl. ¶ 125. In order words, although Defendants ultimately seek shelter behind the existing terms of the PSA, they do not – and indeed cannot – contest that they had full authority to execute a PSA that would have fully and fairly disclosed the charge-off policy that the Bank ultimately imposed.

The difficulty with Defendants' argument is that Good Hill clearly did not allege that the "projections" in the Term Sheet's tables and graphs ultimately failed to materialize or that the bonds later failed to perform as indicated on the graphs and tables. Rather, Good Hill alleged that, at the time Defendants distributed those graphs and tables, the projections that they contained were utterly inconsistent with application of a charge-off policy. *See* Am. Compl. ¶¶ 89-90. In other words, Good Hill alleged that, if the junior-lien mortgages were subject to a charge-off policy, the tables and charts – *at the time they were issued* – necessarily would have contained different information (including much higher contemplated Realized Losses) to reflect the anticipated application of that policy. *Id.* As such, the tables and graphs amounted to an implied false representation that the Bank would not impose a charge-off policy to the junior-liens held by the Trust. It is this implied false statement of *present* fact – not any forward-looking projection of future performance – that Good Hill challenged in the Amended Complaint. As such, Defendants' discussion of the rule barring liability for future projections absent specific guarantees is simply irrelevant on the facts alleged in the Amended Complaint. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("bespeaks caution" doctrine only protects forward-looking statements, not misrepresentations of "present or historical" fact); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004) (safe-harbor provision in PLSRA for forward-looking statements inapplicable to misrepresentation encompassing representation of present fact).

Defendants also argue that Good Hill's claims based on Defendants' oral misrepresentations and email communications should be dismissed because those alleged misrepresentations somehow "contradict" the express language of the 2007-WM2 PSA, and, according to Defendants, it is unreasonable as a matter of law for a plaintiff to rely on such

15

misrepresentations. Mem. at 19-20.[5]  Specifically, Defendants argue that Good Hill could not

have "justifiably relied on these statements to conclude that the Bank would *never* recognize a

Realized Loss with respect to a defaulted junior-lien mortgage loan at 180 days, so that it was

guaranteed an uninterrupted stream of income for 12 to 14 months." Mem. at 19 (emphasis

added).

Once again, Defendants rest their argument on allegations that Good Hill simply did not

make. Good Hill did not allege that it understood from these individuals that the Bank would

"never" declare a Realized Loss at 180 days, nor did it allege some sort of entitlement to an

"uninterrupted stream of income for 12 to 14 months." Mem. at 19.  To the contrary, Good Hill

alleged that these individuals impliedly represented that the Bank would not impose a *policy*

under which it regularly and automatically would charge-off junior-lien mortgage loans after

they had been delinquent for 180 days. *See* Am. Compl. ¶¶ 94, 97.  Moreover, far from

contradicting the express terms of the PSA, those representations are entirely consistent with the

PSA, which Defendants themselves properly read to *preclude* imposition of a 180-day charge-off

policy. *See supra* at 11-12. The only contradiction at issue here is the contradiction between the

PSA (and the other Offering documents) and the charge-off policy that the Bank imposed three

months into the term of the bonds.   Given the Bank's ultimate imposition of that policy, the

---

[5] Defendants also suggest that these misrepresentations are not actionable because neither of the
individuals responsible for making them (Messrs. Richmond and O'Brien) were employees or
agents of the Bank, which "serviced the mortgage pool." Mem. at 19.  This argument is a
complete red herring.  Defendants do not and could not assert that these individuals lacked
authority to act for WaMu Capital in connection with the 2007-WM2 Offering, nor do they or
could they dispute that WaMu Capital is liable for false representations made in connection with
selling and marketing these bonds to Good Hill.  The fact that the *subject matter* of these
representations concerned the Bank's servicing policies simply has no bearing on whether
WaMu Capital's representations – made by WaMu Capital in connection with the marketing and
sale of these securities – are actionable.

statements of WaMu Capital employees that no such policy would be imposed were false and
misleading and thus actionable.

### C.    Good Hill Adequately Alleged Facts Supporting A Strong Inference of Scienter.

Defendants also move to dismiss Good Hill's 10b-5 claim on the ground that Good Hill

has failed adequately to plead that the Defendants acted with the requisite scienter in failing to

disclose that the Bank could or would impose a 180-day charge-off policy for junior-lien loans

held by the Trust and in making additional affirmative misrepresentations about the imposition

of that policy.[6]

---

[6] Defendants suggest that the Amended Complaint also is insufficient because it does not allege
the scienter of any particular individuals who ultimately were responsible for the alleged
nondisclosure of the charge-off policy. *See* Mem. at 21 ("Good Hill does not make a single non-
conclusory allegation of fact that would suggest that any Defendant (let alone any individual
officer or employee of any Defendant) knew or should have known at the time of the 2007-WM2
Offering that the Bank intended to impose" a charge-off policy). In support of this argument,
Defendants quote from the Second Circuit's recent decision in *Teamsters Local 445 Freight Div.
Pension Fund v. Dynex Capital, Inc.*, in which the court stated that "[w]hen the defendant is a
corporate entity, this means that the pleaded facts must create a strong inference that someone
whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters
Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, ___ F.3d ___, 2008 WL 2521676,
at *4 (2d Cir. June 26, 2008). What the Defendants fail to explain, however, is that the Second
Circuit in *Teamsters Local 445* expressly rejected any rule that would require a plaintiff to plead
scienter with respect to a particular officer or director in order to plead scienter with respect to
the corporation. *See id.* ("In most cases, the most straightforward way to raise such an inference
[of scienter] for a corporate defendant will be to plead it for an individual defendant. But it is
possible to raise the required inference with regard to a corporate defendant without doing so for
an individual defendant."); *id.* (giving as an example a false "dramatic announcement" by a
corporation, which would provide a strong inference of corporate scienter "since so dramatic an
announcement would have been approved by corporate officials sufficiently knowledgeable
about the company to know that the announcement was false.") (citations and internal quotations
omitted). Under *Teamsters Local 445*, Good Hill properly may focus on the actions of the
corporation in order to plead corporate scienter – without identifying any particular officers or
individuals – because the 2007-WM2 Offering documents must have been prepared and
approved by "corporate officials sufficiently knowledgeable about the company" who knew
about the undisclosed charge-off policy, or were reckless in failing to know about it, and thus
should have disclosed that policy. *Id.*

Under the PSLRA, a plaintiff seeking money damages also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Defendants concede, as they must, that a plaintiff may satisfy this scienter requirement in one of two ways – either by (1) showing that the defendant had both motive and opportunity to commit the fraud, or by (2) alleging facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Although Defendants fault the Amended Complaint for failing to satisfy both of these requirements, a fair reading of its allegations makes clear that Good Hill sought to demonstrate only the latter form of scienter – namely, scienter based on conscious misbehavior or reckless conduct.

In arguing that Good Hill has failed adequately to allege Defendants' scienter, Defendants assert that "Good Hill does not make any of the sorts of allegations that one might expect in a securities or other kind of fraud case." Mem. at 22; *see id.* (arguing that "Good Hill does not allege that any representative of the Bank informed any employee of the Issuing Defendants that the Bank intended to ignore its contractual obligations under the PSA and impose a mandatory charge-off policy on junior-lien loans" and that Good Hill does not "allege the existence of any internal memorandum or report in which the Bank stated its intention or plan to impose a charge-off policy"). But Defendants do not – and cannot – identify any legal principle requiring Good Hill to make those "sorts of allegations" in order to adequately allege that Defendants acted with scienter.

Indeed, by focusing exclusively on what the Amended Complaint does not allege, Defendants wholly ignore the allegations that it *does* make. Here, Good Hill has amply pled facts suggesting a strong inference of scienter:

18

- "Given the close working relationship between the Bank and the Issuing Defendants [including WaMu Capital] in the marketing and sale of these bonds, the Issuing Defendants had every available opportunity to ascertain from the Bank whether, in fact, the Bank would apply a charge-off policy to the junior-liens at issue. Moreover, the Issuing Defendants had a duty as issuers to investigate and to disclose all of the material risks regarding the 2007-WM2 Offering – including the material risk that the Bank would apply a charge-off policy and that the Trust, as a result, would likely experience significant Realized Losses in the first six months." Am. Compl. ¶ 104.

- "The failure of WaMu Capital and the other Issuing Defendants to evaluate the risk that the Bank as servicer would apply a charge-off policy, and their failure to disclose that meaningful risk to investors, was highly unusual and represented a departure from the standards of ordinary care governing the issuance of asset-backed bonds." *Id.* ¶ 105.

- The WaMu Capital employees who made false representations to Good Hill were, at a minimum, reckless in failing to appreciate the risk that, contrary to their representations, the Bank in fact would impose a charge-off policy. *Id.* ¶ 108.

- The Bank indisputably knew about its own servicing policies and practices, and thus was better situated than any other entity to identify, evaluate, and disclose to investors the risk that it might actually impose a charge-off policy to the junior-liens held by the Trust – just as it had done in prior similar bond deals involving junior-lien mortgages. *See id.* ¶ 110-111, 115. In light of that past experience, and the Bank's imposition of a charge-off policy just three months after the 2007-WM2 Offering, the Bank's failure to identify and to disclose the risk that it would impose a charge-off policy constituted conscious misbehavior or, at a minimum, "highly unreasonable" conduct representing an "extreme departure from the ordinary standard of care that the Bank typically exhibited." *Id.* ¶ 114.

- "[W]hen the Bank informed Good Hill that it would begin to impose a charge-off policy on junior-lien mortgages held by the Trust in July 2007, the Bank told Good Hill that the disclosures in the Prospectus Supplement, 2007-WM2 PSAA, and related documents state that the Bank had the right to impose a charge-off policy." *Id.* ¶ 112. The Bank's statement gives rise to a strong inference that the Bank consciously knew at the time of the 2007-WM2 offering that it intended to impose a charge-off policy. *See id.* ¶ 113.[7]

---

[7] Defendants dismiss that allegation as an impermissible allegation of "fraud by hindsight." Mem. at 24 (citing *Fant v. Perelman*, No. 97 Civ. 8435 (LAP), 1999 WL 199078, at *9 (S.D.N.Y. Apr. 9, 1999), and *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F.

Defendants do not even address – let alone conclusively refute – these critical scienter allegations, which are sufficient to create a "strong" inference of conscious misbehavior or reckless conduct. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (plaintiff may plead a strong inference of scienter by alleging conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."); *id.* ("egregious refusal to see the obvious, or to investigate the doubtful," can raise inference of recklessness") (citations and internal quotations omitted); *see also Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) (allegations that "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud" are sufficient to plead recklessness); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) (denying motion to dismiss where plaintiff alleged inference of scienter based on defendants' failure to exercise a duty to monitor information).[8]

---

Supp. 2d 505, 519 (S.D.N.Y. 2007)).  But in so arguing, Defendants once again misstate the relevant allegations.  Contrary to Defendants' assertion, Good Hill did not allege scienter based on the mere fact that "three months after the NIM bond offering the Bank informed Good Hill that it would begin recognizing losses on defaulted junior-liens at 180 days." Mem. at 24. Instead, Good Hill based this allegation on the content of the statement that the Bank made when it informed Good Hill of the previously undisclosed policy – a statement that implied that the Bank had conscious awareness of its intent to impose a charge-off policy at the time of the offering.  *See* Am. Compl. ¶ 112-113.  Thus, unlike the plaintiffs in the cases that Defendants cite, Good Hill plainly did not allege "fraud by hindsight"; it alleged a statement by a Defendant about the Defendant's state of mind at the time of the fraud.

[8] *See also In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 360 (S.D.N.Y. 2003) (failure to disclose "obviously" fraudulent and material conduct in the face of a duty to disclose gives rise to a strong inference of scienter); *In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (management's alleged omissions and misrepresentations concerning issues relating to "day-to-day operations" of company were actionable since management must have known about those issues).

Instead, Defendants appear to rest their scienter argument on the patently false assertion that Good Hill's scienter allegations are based *entirely* on the disclosures that can be found in prior similar WaMu bond offerings involving the Bank as servicer. *See* Mem. at 23 ("[T]he best Good Hill can do is simply ask the Court to infer Defendants' knowledge or intent to impose such a policy because, in other 'similar' bond deals, the Bank allegedly had an express policy of charging off defaulted junior-lien loans at 180 days . . . .").

But as the allegations quoted above conclusively demonstrate, the Amended Complaint is not so limited and alleges conduct that amounts to conscious misbehavior or recklessness even without reference to the disclosures in prior bond deals. Moreover, contrary to Defendants' assertions, Good Hill *did* explain how the disclosures in prior bond deals, such as the Long Beach Offering, are relevant to the issue of Defendants' scienter in this transaction. Good Hill alleged that those disclosures illustrate how WaMu entities in general, and WaMu Capital and the Bank in particular, have treated disclosures in similar bond deals in which the Bank as servicer could and would impose a charge-off policy to junior liens: namely, these entities prominently and expressly disclose that charge-off policy in the offering documents. In light of the express disclosures in deals such as the Long Beach Offering, Good Hill alleged that it was unreasonable and an extreme departure from the ordinary standards of care applicable to a bond offering for Defendants to remain utterly silent about the meaningful possibility that the Bank would in fact impose a charge-off policy. *See* Am. Compl. ¶¶ 103, 111, 114. And the law of this Circuit is clear that "defendants' asserted actions contrary to expressed policy *and prior practice* can form the basis for proof of recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (emphasis added); *id.* (reversing grant of motion to dismiss on scienter grounds in

part based on allegation of conduct contrary to prior practice); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (denying motion to dismiss on same ground).

Finally, in evaluating the adequacy of Good Hill's scienter allegations, it is quite revealing that Defendants fail in their brief to offer a *single* non-culpable competing inference that could explain the alleged omissions and misrepresentations. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127 S.Ct. 2499 (2007), the U.S. Supreme Court made clear that an inference of scienter will count as a "strong" inference only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504. As the Court explained, "[t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*; *see In re Doral Fin. Corp. Sec. Litig.*, ___ F. Supp. 2d ___, No. 05 MD 1706 (JSR), 2008 WL 2636864, at *1 (S.D.N.Y. July 7, 2008) (same).

Tellingly, while Defendants unconvincingly attack the inference of fraudulent intent that Good Hill draws from the alleged facts, they do not even *attempt* to offer a non-culpable inference for their omissions and misrepresentations. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d at 250 (concluding that plaintiffs adequately alleged scienter in part because defendants failed to point to any competing non-culpable inferences from alleged facts). Because Defendants have not articulated a non-culpable reason to explain their glaring omissions and misrepresentations, the *only* plausible inference from the alleged facts before this Court is the

inference of fraudulent intent articulated at length in the Amended Complaint. *See* Am. Compl.

¶¶ 108, 115.

For all of these reasons, Good Hill submits that it has adequately alleged a strong

inference of scienter sufficient to withstand a motion to dismiss.

## II.    Defendants Offer No Independent Basis For Dismissing Good Hill's Remaining Claims.

In moving to dismiss the remaining claims of the Amended Complaint, Defendants offer

cursory legal arguments that are entirely duplicative of their arguments to dismiss Good Hill's

10b-5 claim.  Thus, if this Court concludes – as it should – that Good Hill has adequately plead a

claim for relief under 10b-5, it also should conclude that Good Hill has adequately pled a claim

for relief on its remaining claims under Section 20(a) of the Exchange Act (Count II), fraud

(Count III), aiding and abetting fraud (Count IV), violation of the Connecticut Uniform

Securities Act § 36b-4 ("CUSA") (Count V),[9] negligent misrepresentation (Count VI), innocent

misrepresentation (Count VII), and unjust enrichment (Count Eight).

---

[9] Defendants cite *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 518 (D. Conn. 2005), for the proposition that an allegation of a "culpable state of mind" is an essential element of a §36b-4 cause of action under CUSA. *See* Mem. at 24 n.8. But *IM Partners* simply held that, because a CUSA cause of action "sounds in fraud," a plaintiff must comply with Rule 9(b)'s particularity requirement for the elements of the cause of action. *See IM Partners*, 394 F. Supp. 2d at 518. The court did not hold that a "culpable state of mind" is an element of the cause of action, and indeed cited and quoted from a case that expressly holds the opposite. *See id.* (citing and quoting *Lehn v. Dailey*, 825 A.2d 140 (Conn. App. Ct. 2003), for the elements of a §36b-4 CUSA cause of action); *Lehn*, 825 A.2d at 146 (interpreting *Connecticut Nat'l Bank v. Giacomi*, 699 A.2d 101 (Conn. 1997), to hold that a violation of § 36b-4 "does not require an intent to defraud, but may be predicated on a negligent omission of a material fact").

## CONCLUSION

For the foregoing reasons, Good Hill respectfully requests that this Court deny

Defendants' motion to dismiss the Amended Complaint.

Dated: August 25, 2008
New York, New York

### COHEN & GRESSER LLP


By: _____s/_____
Mark S. Cohen
mcohen@cohengresser.com
Marc E. Isserles
misserles@cohengresser.com
Nathaniel P. T. Read
nread@cohengresser.com

100 Park Avenue, 23rd Floor
New York, NY 10017
Phone: (212) 957-7600
Fax:    (212) 957-4514

*Attorneys for Plaintiff Good Hill Partners L.P.*

24