UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
GOOD HILL PARTNERS L.P. ON BEHALF  :
OF GOOD HILL MASTER FUND, L.P.,     :     ELECTRONICALLY FILED
                                    :
         Plaintiff,                 :     Case No. 08 Civ. 3730 (JSR)
                                    :
     -against-                      :
                                    :
WM ASSET HOLDINGS CORP. CI 2007-    :
WM2, WM ASSET HOLDINGS CO 2007-     :
WM2 LLC, WM ASSET HOLDINGS CORP.,   :
WAMU ASSET ACCEPTANCE CORP.,        :
WAMU CAPITAL CORP., WASHINGTON      :
MUTUAL BANK, and WASHINGTON         :
MUTUAL, INC.,                       :
                                    :
         Defendants.                :
---------------------------------------------------------------x


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

                                        Victor J. Rocco (VR-4191)
                                        Heller Ehrman LLP
                                        7 Times Square
                                        New York, NY 10036
                                        Phone: (212) 832-8300
                                        Fax: (212) 763-7600

                                        *Attorneys for Defendants WM Asset Holdings*
                                        *Corp. CI 2007-WM2, WM Asset Holdings CI*
                                        *2007-WM2 LLC, WM Asset Holdings Corp.,*
                                        *WaMu Asset Acceptance Corp., WaMu Capital*
                                        *Corp., Washington Mutual Bank, and*
                                        *Washington Mutual, Inc.*

**Table of Contents**

<u>**Page**</u>

I. Good Hill Does Not Allege a General or Specific Charge-Off Policy ................................1

II. The Term Sheet and E-mail Contain Non-Actionable Opinions .........................................5

III. Telephone Communications from a WCC Employee Are Not
 Actionable Misstatements ..................................................................................................6

IV. Good Hill Has Failed Adequately to Allege Scienter .........................................................8

## Table of Authorities

**Page(s)**

**Cases**

*Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*
   No. 06 Civ. 5383 (JGK), 2007 WL 2077153, at *4 (S.D.N.Y. July 20, 2007)................... 5

*Hart v. Internet Wire, Inc.*
   145 F. Supp. 2d 360, 367 (S.D.N.Y. 2001)........................................................................ 8

*In re AstraZeneca Sec. Litig.*
   559 F. Supp. 2d 453, 469-71 (S.D.N.Y. 2008) .................................................................. 9

*In re Int'l Bus. Mach. Sec. Litig.*
   163 F.3d 102, 107 (2d Cir. 1998)....................................................................................... 8

*Iqbal v. Hasty*
   490 F.3d 143, 157-58 (2d Cir. 2007) ................................................................................. 4

*Rombach v. Chang*
   355 F.3d 164, 170 (2d Cir. 2004)....................................................................................... 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
   127 S.Ct. 2499, 2509 (2007)............................................................................................ 10

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*
   474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007)........................................................................ 9

**Statutes**

Private Securities Litigation Reform Act of 1995 ("PSLRA").................................................. 1, 3

**Rules**

Fed. Rules Civ. Proc.
   12(b)(6) ............................................................................................................................. 1

Fed. Rules Civ. Proc.
   9(b) ................................................................................................................................ 1, 3

Defendants respectfully submit this reply memorandum of law in further support of their Motion to Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## I.     GOOD HILL DOES NOT ALLEGE A GENERAL OR SPECIFIC CHARGE-OFF POLICY

Defendants' motion to dismiss the Amended Complaint is straightforward: the disclosure documents for the NIM Bond Offering are not misleading. They plainly and accurately disclose the Servicer's broad discretion to recognize a "Realized Loss" on a junior-lien mortgage loan in the Trust at any time – and certainly within 180 days of default. Good Hill spends its entire Opposition to the motion to dismiss deconstructing and refuting arguments that are not the basis for the motion and, in the process, flip-flops, both with respect to the allegations in its Amended Complaint and even the arguments that it now advances in opposition. The Amended Complaint is fatally defective, however, because there is not a single factual allegation to support Good Hill's rank speculation that the Bank had a charge-off policy that it failed to disclose at the time Good Hill purchased its NIM bonds.

Good Hill claims that when it purchased its NIM bonds, the Bank concealed from it a six-month "charge-off policy" with respect to defaulted junior mortgage loans which dramatically affected the value of the bonds and ultimately resulted in a substantial loss to Good Hill. (Am. Compl. ¶¶ 12, 104.) But Good Hill does not plead a single non-conclusory allegation to suggest that a "charge-off policy" existed for any WaMu bond offering, let alone the offering in which Good Hill participated, or that the deal documents were misleading or incomplete. Good Hill's Opposition utterly fails to refute that obvious fact.

The Amended Complaint repeatedly asserts, in the most conclusory terms, that this "charge-off policy" was the subject of "numerous . . . express disclosures in . . . WaMu offerings backed by junior-lien mortgages" in 2006 and 2007. (*Id.* ¶ 79; *see also e.g.*, *id.* ¶¶ 12; 67, 68, 79,

1

80-84, 86, 111.) Good Hill, however, can identify a single bond offering in the Amended Complaint that even mentions the term "charge-off policy" in the disclosure documents, the Long Beach Mortgage Loan Trust 2006-A offering (the "Long Beach Offering") (*id.* ¶¶ 69 – 76), and the disclosure documents for that unrelated and completely different transaction tell a very different story. The PSA for the Long Beach Offering ("Long Beach PSA") makes irrefutably clear that what Good Hill describes in its Opposition as a "firmly established" charge-off policy – and even a paradigm for disclosing that policy – (Opp. at 10) is nothing more than a contractual servicing obligation that is part of the Long Beach PSA. That obligation specifically requires the servicer to make a "charge-off" determination on a defaulted mortgage loan no later than 180 days after delinquency; and, in the event the Servicer concludes that it will be unable to realize a "significant net recovery" on those loans through a foreclosure sale or other liquidation event, to declare a "Realized Loss" at the same time. (Long Beach PSA § 3.16(a)(ii), attached at Ex. G of Decl. of Victor J. Rocco, dated August 11, 2008 ("Rocco Decl.").) Thus, far from providing an "example of the kind of disclosures that a reasonable investor would expect to see if the Bank as servicer were planning to impose a charge-off policy to junior-lien mortgages in the [2007-WM2 Offering]," (Opp. at 10), the disclosures in the Long Beach Offering, which the Amended Complaint also proffers as evidence of a "policy," are merely a description of the Servicer's contractual obligations as they are defined in the PSA for that particular deal. (*See* Am. Compl. ¶¶ 73-75.)

The PSA for 2007-WM2 Offering, which is the subject of Good Hill's claims, has servicing provisions of its own with different rights and obligations. (*See* Rocco Decl. Ex. F.) Under its terms, the Bank may realize losses and charge off loans whenever appropriate, and certainly may do so within six months of default, as apparently happened here. (The Amended

Complaint is actually silent as to the particulars of how losses in the portfolio underlying the NIM Bonds were realized on junior lien loans and how the loans were written off.)  The Bank has broad discretion to declare a Realized Loss on a defaulted loan as soon as it concludes that it will be unable to recover any proceeds from a foreclosure sale or liquidation event, subject to the servicing standards it follows with respect to its own portfolio and industry practice.  (PSA § 3.01; *id.* at 37, 54.)

Good Hill recognizes these obvious shortfalls in its pleading and, in its submission in Opposition, eschews the Long Beach Offering as evidence of its claim.  (*See* Opp. at 10-11.)  Instead, it now clings to ambiguous statements allegedly made by a Bank employee three months after Good Hill purchased its NIM bonds as evidence of a Bank charge-off policy.  (*Id.*)  Good Hill argues that Henry Engelken, then an employee of the Bank, informed it in July 2007 that the Bank "would begin to impose a charge-off policy on junior lien mortgage loans held by the Trust . . ." (Am. Compl. ¶¶ 112-13.)  In Good Hill's view, this alleged conversation confirms that the Bank actually had a "charge-off" policy and that it had it in place three months earlier in April 2007, when it purchased its bonds.  But this spare allegation is not probative of either fact, nor does it come close to providing the information necessary to satisfy the particularity standards of Rule 9(b) or the PSLRA.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

The Amended Complaint is "completely silent" as to what Engelken actually meant by his reference to a "charge-off policy."  Even if Good Hill's cryptic characterization of the conversation is accurate, there is nothing to suggest that Engelken was referring to a "policy" of the Bank (general or specific to the 2007-WM2 Offering) or even to the kind of covenanted obligation which is found in the Long Beach PSA.  Nor does the Amended Complaint suggest that Engelken was informing Good Hill that the Bank intended to do anything that was in any

3

way inconsistent with, or beyond, what it is permitted to do by the PSA for 2007-WM2. (The Amended Complaint, in fact, does not allege that the Bank did anything contrary to the terms of the PSA.) Simply put, the remark is too ambiguous to support a plausible inference that Engeklen was acknowledging a secret policy that existed when Good Hill purchased its NIM bonds three months earlier, in April 2007. *See Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (plaintiff must "amplify a claim with some factual allegations . . . to render the claim plausible").

In fact, if anything, the stronger inference is that when Engelken referred to a 180 day charge-off policy, he was only saying that, consistent with its rights under the PSA, the Bank henceforth would be exercising its discretion to declare a Realized Loss on a junior-lien mortgage loan as soon as it concludes that it will be unable to recover any proceeds from a foreclosure sale or liquidation proceeding – in this case, no later than 180 days after that loan first becomes delinquent. Indeed, Good Hill concedes that when Engelken made the statement he also said that the Bank's right to recognize losses within the first six months was expressly disclosed in the underlying deal documents. (Am. Compl. ¶ 113.) And there can be no reasonable dispute that the PSA grants the Bank with the broad discretion to declare a "Realized Loss" on a defaulted junior lien mortgage loan within 180 days of delinquency.[1]

---

[1] Although Good Hill concedes this fact (*see* Opp. at 16) it also argues in a footnote that "[b]ecause the 2007-WM2 PSA makes no reference to a Realized Loss arising from a charge-off decision, it appears to prohibit the Bank from declaring a Realized Loss in advance of a formal liquidation proceeding." (*Id.* at 12 n. 2.) Good Hill is wrong. The only limitation in the PSA as to when the Bank can declare a "Realized Loss" is that it must act in the same manner towards similarly situated loans in its own portfolio, and give due consideration to industry practices. (PSA § 3.01.) The Long Beach PSA, on the other hand, vests the servicer with those same broad rights, but requires the servicer to make a "Realized Loss" determination no later than 180 days after the junior-lien mortgage loan was first delinquent – regardless of how it how it services its own loan portfolio or the industry practice.

4

Thus, Good Hill's sweeping allegations regarding a "charge-off policy" are either too conclusory to be considered probative of, or just irrelevant to, its claim. Good Hill has attempted to extrapolate the existence of its "charge off policy," first in its Amended Complaint from the Long Beach Offering, now in its Opposition from an ambiguous conversation that took place three months after its NIM bonds purchase. Neither supports its baseless claim, and, in the end, the Bank's "charge-off policy," however Good Hill tries to spin it, proves to be nothing more than a hollow contrivance.[2]  *See, e.g.*, *Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, No. 06 Civ. 5383 (JGK), 2007 WL 2077153, at *4 (S.D.N.Y. July 20, 2007) ("Where a complaint does not allege any basis for a duty to disclose, a claim based upon nondisclosure of material information cannot be sustained.").

At bottom, the Amended Complaint offers no factual allegations that would support a claim of deceptive conduct by any of the Defendants and, if Good Hill was misled, it is the result of its own misunderstanding of the terms of its investment and the nature of the documents that underlie that transaction.

## II. THE TERM SHEET AND E-MAIL CONTAIN NON-ACTIONABLE OPINIONS

Nor can Good Hill plead a fraud based on alleged misstatements in the Term Sheet and e-mail communications with certain WCC employees. The projections in the Term Sheet and e-mail communications are nothing more than WCC's opinion, based upon a series of modeling

---

[2] Good Hill even makes up a definition for its made up policy. Without citing any support for its definition, it declares that: "A charge-off policy generally requires the Bank to write off junior-liens loans as bad debt after they have been delinquent for 180 days." (Opp. at 1.) The PSA in the Long Beach Offering provides that the Bank *may* charge-off a defaulted loan within 180 days of default, but, once again, that is only a provision in one contract, not, as Good Hill would have it, the definition of a policy.

5

assumptions, on how the NIM bonds might perform in the future, and cannot, therefore, form the basis of an actionable misstatement. (Defs Br. at 17.)

Good Hill argues that the graphs and table in the Term Sheet and the e-mail communications were not expressions of opinion, but amounted to "implied false representations" of present fact that the Bank would not impose a "charge-off" policy to the junior-liens when it actually intended to apply such a policy. (Opp. at 15.) Since the Amended Complaint fails to allege facts sufficient to suggest that the Bank had a "charge-off policy" with respect to junior lien loans, this argument suffers from the same fatal defect as Good Hill's omission based claims. Good Hill has failed to establish the existence of a "charge off policy," so there can be no "implied false representation" about whether such policy would be applied to junior lien loans. The graphs, tables and email communications are non-actionable predictions and expressions of opinion.[3]

## III. TELEPHONE COMMUNICATIONS FROM A WCC EMPLOYEE ARE NOT ACTIONABLE MISSTATEMENTS

Good Hill also fails to plead a claim on the basis of alleged representations made by WCC employee Kevin Richmond during a series of telephone calls between April 18, 2007 through April 26, 2007 in which he basically represented that the Bank would treat senior and junior related loans as one for Realized Loss purposes. None of these alleged statements are actionable misrepresentations. It is simply unreasonable for any investor – much less a sophisticated investor like Good Hill – to rely on statements that are so obviously contrary to the

---

[3] Good Hill does not dispute, thus implicitly concedes, that the titles of the graphs on which it allegedly relied *expressly state* that those graphs only show projections for "First Lien" fixed-and adjustable-rate mortgages, not the second-lien mortgages upon which Good Hill bases its claims.

disclosed contractual servicing obligations of the Bank. This is especially so where the representations are made by a non-employee with respect to a matter that Good Hill now claims was critical to its investment decision. (Opp. at 1, 4.) These remarks were either mere expressions of opinion or predictions, and they could not reasonably be relied upon by Good Hill when making its investment decision.

Good Hill concedes that it understood that the Bank had the discretion under the 2007-WM2 PSA to declare a "Realized Loss" on a junior-lien mortgage loan within 180 days of default. (*Id.* at 16.) It now offers that it was misled, however, because, although the Bank could realize losses within the first 180 days of default, Mr. Richmond's remark further implied "that the Bank would not impose a policy under which it regularly and automatically would charge-off junior-lien mortgage loans after they had been delinquent for 180 days." (*Id.*) Even if Good Hill's proffered explanation of a conversation is plausible – and it is not – it suffers from three further fatal defects.

*First*, and foremost, this claim, like Good Hill's other omission and misstatement based claims assumes the existence of a "charge-off policy" which Good Hill has not adequately plead. *Second*, even assuming a "charge-off policy" existed at the time of the NIM Bond offering, Good Hill does not explain how a statement that the Bank would treat "related" senior-lien and junior-lien loans as one-loan for "Realized Loss" purposes could possibly be interpreted to mean that the Bank would not realize losses on and write off delinquent junior lien loans within six months of default whenever the PSA authorized or required it to do so. An investor could only reasonably believe that the Bank would have to fulfill its servicing obligations. *Third*, Good Hill does not allege any facts that would explain why it was reasonable to interpret Mr. Richmond's statements about how the Bank would recognize "Realized Losses" on the mortgage loans as

7

anything other than his prediction about the future as opposed to a deliberate misrepresentation of an existing fact. *See In re Int'l Bus. Mach. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998). There are no allegations in the Amended Complaint that would suggest that Mr. Richmond, who is not even an alleged employee or agent of the Bank, knew at the time of his purported statements that the Bank intended to impose a "policy" or do anything that was contrary to the PSA, and chose deliberately to mislead Good Hill.

### IV.    GOOD HILL HAS FAILED ADEQUATELY TO ALLEGE SCIENTER

Despite spending nearly one-third of its opposition addressing Defendants' scienter arguments, Good Hill has not identified a single non-conclusory allegation in the Amended Complaint that would suggest – much less give rise to the strong inference necessary to plead scienter under Section 10(b) – that the Bank intended at the time of the NIM bond offering to impose a so-called "charge-off policy" to junior-lien mortgage loans in the Trust.[4]

Good Hill instead argues that an alleged statement made by Henry Engelken in July 2007 – apparently during the same conversation in which he purportedly told Good Hill that the Bank would impose a "180 day charge-off policy" on junior-lien loans – is sufficient to raise a strong inference that Defendants knew or should have known that the Bank intended to impose the policy at the time of the NIM bond offering. (Opp. at 19-20 n.7.) It alleges that Engelken told Good Hill that the disclosures in the deal documents "state that the Bank has the right to impose

---

[4] Good Hill concedes in its Opposition, as it must, that the Amended Complaint does not include any allegations that would show that the Defendants [have / had] both motive and opportunity to commit the fraud. (See Opp. at 18.) Absent motive and opportunity, "the strength of the circumstantial allegations [regarding fraudulent intent] must be correspondingly greater," and Good Hill must "allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 367 (S.D.N.Y. 2001) (citations omitted). As discussed above, and in our opening submission, Good Hill does not even come close to meeting this stringent standard.

8

a charge-off policy" (Am. Compl. ¶ 112), and that this purported statement places its claims outside of this Circuit's well established rule against pleading fraud by hindsight, *see*, *e.g.*, *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007), because it "implied that the Bank had conscious awareness of its intent to impose a charge-off policy at the time of the offering." (Opp. at 20 n.7.)  As we demonstrate above, Engelken's cryptic statement most likely referred to the Bank's servicing rights under the 2007-WM2 Offering and is not probative either of the existence of a "charge-off policy" or of the Bank's intention to impose such a policy when Good Hill bought its bonds. (*See infra* at 3.)  The fact that the Bank had the right under the disclosed terms of the NIM bond offering certainly doesn't imply the further fact that the Bank intended to exercise that right and deliberately failed to disclose its intentions to Good Hill when Good Hill bought the bonds.[5]

Good Hill's other scienter arguments are similarly unavailing.  Good Hill's claims that the Defendants' fraudulent intent can be inferred from their recklessness in failing to disclose the "charge-off policy" is untenable since, as an initial matter, it has failed even to allege that such a policy even existed.  Its further claim that the disclosures in the Long Beach Offering are illustrative of the Bank's uniform practice of disclosing charge-off policies (*see* Opp. at 10, 13) is similarly unavailing since, as we have demonstrated, those disclosures were nothing more than disclosures of the servicing terms of that particular offering.  (*See infra* at 1-2.)

Finally, Good Hill makes much of its assertion that the Defendants did not attempt in

---

[5] As Good Hill has failed to adequately allege that the Bank intended at the time of the 2007-WM2 Offering to impose a "charge-off policy," all of Good Hill's other scienter arguments that are based on the existence of a "charge-off policy" are fatally flawed. (*see* Opp. at 19.)  In any event, the Amended Complaint is devoid of any facts that any Defendant engaged in conduct that was unreasonable or represented an extreme departure from standards of ordinary care.  *See, e.g., In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469-71 (S.D.N.Y. 2008).

their moving brief to propose "a single non-culpable competing inference that could explain the alleged omissions and misrepresentations." (*Id.* at 22.) But the competing (and much stronger) inference that can be drawn from Good Hill's allegations is obvious: At the time of the Offering, the Bank had no intention of imposing any sort of charge-off policy that would result in the Bank regularly and automatically charging-off defaulted junior lien loans within the first six months of default. As a result, no other Defendant knew, or was reckless in not knowing, about the Bank's non-existent intention to impose such a policy. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007). All of Good Hill's non-conclusory allegations of fact are consistent with the much more plausible inference that, well after the Offering, in late June 2007, the Bank determined that, in response to developments in the housing and mortgage markets, it would be appropriate to adjust its servicing practice to declare Realized Losses on defaulted junior-lien loans after 180 days of default.

## **Conclusion**

For all of the reasons set forth herein and in the Defendants' opening memorandum, the motion should be granted in all respects and the Amended Complaint should be dismissed with prejudice, and judgment should be entered in favor of the Defendants.

Dated: New York, New York  
September 3, 2008

Respectfully submitted,

\_\_\_\_\_/s/ Victor J. Rocco_____  
HELLER EHRMAN LLP  
Victor J. Rocco (VR-4191)  
Jeremy N. Kudon (JK-8131)  
7 Times Square  
New York, NY 10036  
Phone: (212) 832-8300  
Fax: (212) 763-7600

Attorneys for Defendants