UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
GOOD HILL PARTNERS L.P. on behalf of :
GOOD HILL MASTER FUND, L.P.,          :
                                      :
                  Plaintiff,          :
                                      :        08 Civ. 3730 (JSR)
             -v-                      :
                                      :
WM ASSET HOLDINGS CORP. CI 2007-WM2,  :        MEMORANDUM ORDER
WM ASSET HOLDINGS CO 2007-WM2 LLC,    :
WM ASSET HOLDINGS CORP., WAMU ASSET   :
ACCEPTANCE CORP., WAMU CAPITAL        :
CORP., WASHINGTON MUTUAL BANK, and    :
WASHINGTON MUTUAL, INC.,              :
                                      :
                  Defendants.         :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        This is yet another case arising from the widespread charge-

offs of nonperforming subprime mortgages and the concomitant effect

on the value of mortgage-backed securities.  Plaintiff Good Hill

Partners ("Good Hill") is the investment manager for Good Hill Master

Fund.  Defendants WM Asset Holdings Corp. CI 2007-WM2 and WM Asset

Holdings CI 2007-WM2 LLC were the issuer and co-issuer, respectively,

of the "net interest margin" ("NIM") bonds involved in this case;

defendant WM Asset Holdings Corp. was the seller and sponsor of the

bonds; defendant WaMu Capital Corp. was the initial purchaser and

underwriter of the bonds; and defendant WaMu Asset Acceptance Corp.

was "the depositor of the certificates issued[,] which in the

aggregate constituted the entire ownership interest in the pool of

mortgage loans that served as the collateral for the NIM bonds in the

2007-WM2 Offering."  Amended Complaint ("Am. Compl.") ¶ 22.  The

foregoing defendants are collectively referred to as the "Issuing

Defendants." Co-defendant Washington Mutual Bank (the "Bank") is the servicer of the collateral underlying the NIM bonds and is a wholly-owned subsidiary of co-defendant Washington Mutual, Inc. ("WaMu"), the parent company of all the defendants.

In April, 2007, Good Hill purchased $18.45 million of WaMu NIM bonds, see Am. Compl. ¶ 10, in the WaMu CI NIM Notes Series 2007-WM2 offering ("2007-WM2 offering," referenced in Am. Compl. ¶ 10), constituting a purchase at 98% of the bonds' face value. Id. Good Hill ultimately lost $7 million on the investment, prompting the instant action. Id. ¶ 133. Specifically, Good Hill's Amended Complaint alleges eight causes of action: (1) federal securities fraud, under section 10(b) of the Securities and Exchange Act (15 U.S.C. § 78j(b)) and Rule 10(b)(5) promulgated thereunder, against the Issuing Defendants and the Bank; (2) control person liability for the securities fraud, against WaMu and the Bank; (3) fraud under Connecticut common law, against the Issuing Defendants and the Bank; (4) aiding and abetting Connecticut common law fraud, against WaMu and the Bank; (5) violation of the Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-4, against the Issuing Defendants and the Bank; (6) negligent misrepresentation under Connecticut common law, against the Issuing Defendants and Bank; (7) innocent misrepresentation under Connecticut common law, against the Issuing Defendants and the Bank; and (8) unjust enrichment under Connecticut common law, against all defendants.

Defendants now move to dismiss all claims.  For the following reasons, the Court dismisses the federal claims with prejudice, and declines to exercise supplemental jurisdiction over the state law claims, which are therefore dismissed without prejudice.

By way of background, WaMu securitizes subprime mortgage loans through asset-backed bond offerings, one kind of which are the NIM bonds at the center of this case.  In simplified terms, the income that NIM bonds generate arises from the differential (the "net interest margin") between the interest paid on the underlying mortgage loans and the interest paid on the bonds backed by the mortgage loans.  Id. ¶ 51.  The 2007-WM2 offering was part of an offering of asset-backed bonds collateralized by a $1.5 billion pool of subprime mortgages held by the WaMu Series 2007-HE2 Trust (the "Trust").  The Trust held related senior-lien and junior-lien mortgage loans (primary and secondary liens on the same underlying property), though the vast bulk of the Trust was comprised of senior-lien loans.  Id. ¶ 63.  Since junior-lien loans are subordinated claims, senior-lien obligations ordinarily must be paid before any proceeds can be applied to related junior-lien loans. This creates a basic risk associated with holding junior-lien securities: that insufficient funds may be available to pay the junior lien-holders after the satisfaction of the related senior lien.  See id. ¶ 65.

The instant dispute centers on whether a "charge-off" - that is, the removal of an underlying, nonperforming mortgage from the Trust, generating a loss - is applied across-the-board to both senior

and junior liens or only to the latter.  According to the Amended
Complaint, Good Hill reasonably believed at the time of purchase that
the defendants' policy was to apply charge-offs to both senior-lien
and junior-lien loans equally, that is, to the entire pool across-
the-board.  See id. ¶¶ 92, 94.  Fewer than three months after Good
Hill purchased its bonds, however, WaMu and the Bank began applying
charge-offs to junior-lien loans first.  Id. ¶ 17.  Good Hill
incurred significant losses as a result of this policy.

        The fundamental premise of all of Good Hill's claims is that
the defendants, in connection with Good Hill's purchase of the bonds,
intentionally or negligently failed to disclose the Bank's intention
to apply the charge-offs to junior-lien mortgages before senior-lien
mortgages, and instead led plaintiff to believe that any charge-off
would be applied across-the-board.  Id. ¶ 115.  Good Hill does not
allege that the documents associated with plaintiffs' purchase of the
2007-WM2 offering expressly stated that the charge-offs would be
across-the-board - and the inherent subordination of junior-lien
mortgages to senior lien mortgages would suggest otherwise - but they
argue that an across-the-board charge-off policy was implied by the
confluence of three factors.  First, another, contemporaneous,
similar WaMu bond offering expressly disclosed a charge-off policy
for junior-lien mortgages and therefore the fact that the 2007-WM2
offering did not indicate such a charge-off policy meant that no such
policy would be applied, see Am. Compl. ¶ 76.  Second, charts and
graphs included with the 2007-WM2 offering materials indicated that a
junior-lien-first charge-off policy would not be applied, see id. ¶¶

4

88, 90.  Third, certain verbal and e-mail communications about the 2007-WM2 offering between plaintiff and representatives of WaMu Capital confirmed Good Hill's assumption that related junior-lien and senior-lien loans would be treated identically, <u>see</u> <u>id.</u> ¶¶ 91, 93, 96.

Turning to the federal securities fraud claim, a plaintiff, in order to state a claim under 10(b) of the Securities Exchange Act and Rule 10(b)(5) promulgated thereunder, "must plead that in connection with the purchase or sale of securities, that the defendant, acting with scienter, made a false material representation or omitted to disclose material information [required to be disclosed] and that plaintiff's reliance on defendant's action caused [plaintiff] injury." <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citations omitted).

None of the three factors relied on by plaintiff is sufficient to meet this standard.  As to the first factor, the Amended Complaint alleges that defendants' Long Beach Mortgage Loan Trust 2006-A bond offering, which the Amended Complaint characterizes as a "contemporaneous, highly similar transaction," <u>id.</u> ¶ 76, stated in its offering prospectus, (referenced in <u>id.</u> ¶ 69), its prospectus supplement (<u>id.</u>), and its Pooling and Servicing Agreement ("Long Beach PSA," referenced at <u>id.</u> ¶ 84), that mortgage charge-offs would be applied to junior-lien mortgages.  <u>Id.</u> ¶¶ 70-75.  The Amended Complaint further alleges that in this context a knowledgeable investor, seeing that the comparable 2007-WM2 documents were silent as to a charge-off policy, would infer that any mortgage would be

applied across-the-board to both junior-lien and senior-lien
mortgages.  Id. ¶¶ 80, 82, 84, 85, 111.

    As a general matter, however, it is doubtful that one may
infer from the absence of any reference in the instant offering to a
junior-lien charge-off policy disclosed in another offering that the
instant offering was based on an across-the-board charge-off policy.
And, in any case, no such inference is reasonable here, for the
obvious reason that the Long Beach offering's underlying mortgages
were entirely junior-lien, see Long Beach Mortgage Loan Trust 2006-A
Prospectus Supplement("Long Beach PS," referenced in Am. Compl. ¶ 69,
at S-49), whereas the 2007-WM2 offering was a mix of senior and
junior-lien mortgages, see Am. Compl. ¶ 63.

    Putting still another spin on the Long Beach comparison,
plaintiff argues that the very fact that a charge-off policy was
disclosed in the Long Beach offering shows that any failure to
disclose the write-off policy applicable to the 2007-WM2 offering was
a material omission.  But this assumes, inter alia, that the
defendants had already formulated a junior-lien-first charge-off
policy at the time of the 2007-WM2 offering, a fact unsupported by
any non-conclusory assertions in the Amended Complaint.  Nor does any
of this remotely rise to a level sufficient to support plaintiff's
claim that the alleged non-disclosure was intentional and fraudulent.

    As to the second factor, the Amended Complaint notes that
certain graphs and tables included in the 2007-WM2 offering's Term
Sheet ("2007-WM2 Term Sheet"), see Am. Compl. ¶ 58, set forth "loss
scenarios" that do not reflect the charge-off policy ultimately

applied to the 2007-WM2 bonds.  Id. ¶ 90.  Graphs and tables of this

nature do not, however, generally serve as a basis for actionable

misstatements because they are opinions and not objective facts.  In

re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251-52

(S.D.N.Y. 2005).  Moreover, any reliance on the graphs and tables in

the 2007-WM2 Term Sheet was expressly disclaimed by means of

cautionary language including "preliminary," "expected to change,"

and "based upon numerous assumptions."  2007-WM2 Term Sheet at 2.

Finally, as to the third factor, the Amended Complaint

alleges that when Robert Clark, a Director at WaMu Capital, e-mailed

a report to Good Hill indicating that the Trust held related junior-

lien and senior-lien loans, Am. Compl. ¶ 91, (which was factually

true), Good Hill interpreted this as a basis for believing that "the

Bank would not charge-off a defaulted junior lien ... in advance of

... the senior lien."  Id. ¶ 92.  This was, however, clearly not the

statement that Mr. Clark made.  Slightly more relevantly, the Amended

Complaint alleges that Kevin Richmond of WaMu Capital, in oral

conversations with plaintiff between April 18 and April 26, 2007,

confirmed that "the Bank would treat related senior-lien and junior-

lien mortgage loans as one loan for purposes of Realized Losses,"

(i.e. for charge-off purposes).  Id. ¶ 93.  However, "a reasonable

investor would have familiarized [itself] with the potential for loss

disclosed in the prospectuses, rather than relying on the oral

assurances of brokers."  In re Hyperion Sec. Litig., No. 93 Civ.

7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995).  This also

applies to the alleged misrepresentations made by Timothy O'Brien of

WaMu Capital that "poorly-performing prior bond offerings had not incurred Realized Losses," which, in any event, was a reference to past performances of different securities.  Am. Compl. ¶ 96.

From the following, it is patent that the Amended Complaint fails to allege a material misrepresentation, let alone facts from which one could infer that any misrepresentation was made with the scienter required to support a claim of federal securities fraud.  See, e.g., Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000).  It follows that plaintiff's federal securities fraud claim must be dismissed.  In the absence of such primary violation, the "control person" subordinate claim must also be dismissed.  See, e.g., SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

Since both federal claims are dismissed, and since this case is still in its infancy, it would be improvident for this Court to exercise supplemental jurisdiction over the remaining, state-law claims.  See Valencia v. Sung M. Lee, 316 F.3d 299, 305 (2d Cir. 2003).  Accordingly, the Clerk of the Court is directed to enter final judgment dismissing the federal claims with prejudice, dismissing the state-law claims without prejudice, and, as a consequence, dismissing the Amended Complaint in its entirety.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        October 31, 2008